**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., | Case No. 15-10047 (__) |
| Alleged Debtor. | |

**STATEMENT OF PETITIONING CREDITORS IN SUPPORT OF**
**INVOLUNTARY CHAPTER 11 PETITION AGAINST CAESARS**
**ENTERTAINMENT OPERATING COMPANY, INC.**

YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Robert F. Poppiti, Jr. (No. 5052)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 571-6600
Facsimile:      (302) 571-1253

JONES DAY
Bruce Bennett
James O. Johnston
Sidney P. Levinson
Joshua M. Mester
Monika S. Wiener
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:     (213) 489-3939
Facsimile:      (213) 243-2539

*Attorneys for Appaloosa Investment Limited Partnership I, OCM Opportunities Fund VI, L.P. and Special Value Expansion Fund, LLC*

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ........................................................................ 1

II.     JURISDICTION AND VENUE .................................................................... 5

III.    BACKGROUND .......................................................................................... 5

        A.   The Debtor.................................................................................... 5

        B.   The Second Lien Notes .............................................................. 6

        C.   The Debtor's Insolvency ............................................................ 7

        D.   Prepetition Self-Dealing Transactions And Resulting Litigation.............................. 7

        E.   The Debtor's Negotiations With First Lien Creditors............................... 9

        F.   The Debtor's Defaults ................................................................ 10

        G.   The Debtor's Agreement With First Lien Bondholders ........................................ 11

IV.     ARGUMENT............................................................................................... 13

        A.   The Petitioning Creditors Are Eligible Under Section 303(b) To File The
             Involuntary Petition.................................................................... 14

        B.   The Petitioning Creditors Are Authorized To File The Involuntary Petition
             Under The Terms Of The Second Lien Notes, The Indentures And The Trust
             Indenture Act........................................................................... 15

        C.   The Debtor Is Not Generally Paying Its Debts As They Come Due........................ 20

V.      CONCLUSION............................................................................................. 26

# TABLE OF AUTHORITIES

Page

C<small>ASES</small>

*Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg. (In re Bd. of Dirs. of Telecom*
*Arg.),*
Case No. 06 Civ. 2352 (NRB), 2006 U.S. Dist. LEXIS 85274
(S.D.N.Y. Nov. 17, 2006) ...................................................................................20

*B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A.*
*(In re B.D. Int'l Disc. Corp.),*
701 F.2d 1071 (2d Cir. 1983).............................................................................21

*CC Britain Equities, L.L.C. v. Allen-Main Assocs. Ltd. P'ship.*
*(In re Allen-Main Assocs. Ltd. P'ship.),*
223 B.R. 59 (B.A.P. 2d Cir. 1998)......................................................................15

*Crown Heights Jewish Cmty. Council, Inc. v. Fischer (In re Fischer),*
202 B.R. 341 (E.D.N.Y. 1996) ...........................................................................22

*Cruden v. Bank of N.Y.,*
957 F.2d 961 (2d Cir. 1992)................................................................................18

*Danner v. Caesars Entm't Corp.,*
Case No. 14-CV-7973-SAS (S.D.N.Y. Oct. 2, 2014)............................................8

*Drachman v. Harvey,*
453 F.2d 722 (2d Cir. 1971 ...............................................................................20

*Envirodyne Indus., Inc. v. Conn. Mut. Life Co. (In re Envirodyne Indus., Inc.),*
174 B.R. 986 (Bankr. N.D. Ill. 1994) .............................................................4, 19

*FMB Bancshares, Inc. v. Trapeza CDO XII, Ltd. (In re FMB Bancshares, Inc.),*
517 B.R. 361 (Bankr. M.D. Ga. 2014)............................................................4, 19

*GMAM Inv. Funds Trust I v. Globo Comunicacoes E Participacoes S.A. (In re*
*Globo Comunicacoes E Participacoes S.A..),*
317 B.R. 235 (S.D.N.Y. 2004).......................................................................4, 19

*Great Plains Trust Co. v. Union Pac. R.R. Co.,*
492 F.3d 986 (8th Cir. 2007) .............................................................................18

*Hilton Worldwide, Inc. Global Benefits Admin. Comm. v. Caesars Entm't Corp.*,
   No. 1:14-cv-01766-TSE-IDD (E.D. Va. Dec. 24, 2014) ...........................................8

*In re Bd. of Dirs. of Multicanal S.A.*,
   307 B.R. 384 (Bankr. S.D.N.Y. 2004) ...................................................................20

*In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*,
   779 F.2d 471 (9th Cir. 1985) ...............................................................................24

*In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*,
   177 B.R. 684 (Bankr. D. Colo. 1995) ..............................................................20, 22

*In re CLE Corp.*,
   59 B.R. 579 (Bankr. N.D. Ga. 1986) ............................................................3, 20, 25

*In re Fallon Luminous Prods. Corp.*,
   Case No. 09-35581, 2010 Bankr. LEXIS 248
   (Bankr. E.D. Tenn. Jan. 20, 2010) .......................................................................25

*In re Green*,
   Case No. 06-11761-FM, 2007 Bankr. LEXIS 1296
   (Bankr. W.D. Tex. Apr. 9, 2007) ..........................................................................15

*In re Paper I Partners, L.P.*,
   283 B.R. 661 (Bankr. S.D.N.Y. 2002) ...................................................................22

*In re Pioneer Fin. Corp.*,
   246 B.R. 626 (Bankr. D. Nev. 2000) ..............................................................20, 22

*In re Reed*,
   11 B.R. 755 (Bankr. S.D. W. Va. 1981) .........................................................5, 23, 25

*In re Southland Corp.*,
   124 B.R. 211 (Bankr. N.D. Tex. 1991) ..................................................................22

*Meehancombs Global Credit Opportunities Master Fund, LP v.*
   *Caesars Entm't Corp.*,
   No. 14-cv-7091 (S.D.N.Y. Sept. 3, 2014) ...............................................................8

*Newby v. Enron Corp.* (*In re Enron Corp. Secs., Derivative & ERISA Litig.*),
   Case No. MDL-1446, 2008 U.S. Dist. LEXIS 21560
   (S.D. Tex. Mar. 19, 2008) ....................................................................................18

*UMB Bank v. Caesars Entm't Corp.*,
C.A. No. 10393-VCG (Del. Ch. Nov. 25, 2014) ........................................................8

*United States. Fid. & Guar. Co. v. Annuziata*,
67 N.Y.2d 229 (1986) ...............................................................................................17

*Wilmington Sav. Fund Soc'y, FSB v. Caesars Entm't Corp.*,
C.A. No. 10004-8 ........................................................................................................8

**STATUTES**

11 U.S.C. § 101(5) ..........................................................................................................20

11 U.S.C. § 303 ........................................................................................................ *passim*

15 U.S.C. § 77 .......................................................................................................... *passim*

28 U.S.C. § 157 .................................................................................................................5

28 U.S.C. § 1334 ...............................................................................................................5

28 U.S.C. § 1408 ...............................................................................................................5

28 U.S.C. § 1409 ...............................................................................................................5


**OTHER AUTHORITIES**

*Collier on Bankruptcy* ¶ 303.31
(Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014) ...................................21

Fed. R. Bankr. P. 1003 ....................................................................................................14

Fed. R. Bankr. P. 1013 ......................................................................................................1

Pursuant to Section 303 of the United States Bankruptcy Code (the "Bankruptcy Code"), Appaloosa Investment Limited Partnership I, OCM Opportunities Fund VI, L.P. and Special Value Expansion Fund, LLC  (collectively, the "Petitioning Creditors") have filed an involuntary petition under chapter 11 of the Bankruptcy Code (the "Involuntary Petition") against Caesars Entertainment Operating Company, Inc. (the "Debtor") because the Debtor "elected not to pay" approximately $225 million in interest to holders of the Debtor's second-priority senior secured notes due 2018 (the "Second Lien Notes") having an aggregate principal amount of $4.5 billion, and is thus generally not paying its debts as they become due.  The Petitioning Creditors therefore respectfully request that this court enter an order for relief against the Debtor pursuant to Section 303(h)(1) of the Bankruptcy Code and Rule 1013 of the Federal Rules of Bankruptcy Procedure.  Copies of the documents referenced herein are attached to the Declaration of Joshua M. Mester ("Mester Decl.") filed concurrently herewith.

## I.

## PRELIMINARY STATEMENT

On December 15, 2014, the Debtor defaulted on payments of more than $225 million in interest owed to hundreds of noteholders, who together hold Second Lien Notes having an aggregate original principal amount in excess of $4.5 billion.  On the same day, the Debtor announced in a filing with the SEC that it had "elected not to pay" that interest, even though it had "approximately $1.5 billion of cash and cash equivalents," and that it was taking advantage of a "grace period" applicable to such payments.[1]  There is no "grace period," however, applicable to payments on the Second Lien Notes, the existence of a "Default" under the indentures, or the right of holders of the Second Lien Notes to enforce the Debtor's obligations

---

[1]    Mester Decl., Ex. 1, at 2.

- 1 -

to pay the past due interest payments.  Moreover, additional remedies become available after the

Defaults (which have already occurred) become Events of Default on January 15, 2015.

On December 19, 2014, the Debtor announced an agreement with certain of its first lien

noteholders, which provides that the Debtor and certain of its subsidiaries will file chapter 11

bankruptcy cases on or after January 15, 2015, but no later than January 20, 2015.[2]  That

agreement is memorialized in an "Amended And Restated Restructuring Support And

Forbearance Agreement" (the "Lock Up Agreement"), dated as of December 31, 2014, between

the Debtor and Caesars Parent on the one hand and certain first lien noteholders on the other.[3]

Under the chapter 11 plan that would be proposed by the Debtor under the Lock Up Agreement,

holders of Second Lien Notes would never receive payment of the delinquent interest payments

that were due on December 15, 2014, nor would they ever receive any payment on account of

most of the outstanding principal amount of the Second Lien Notes.  Instead, the plan would treat

holders of Second Lien Notes as fully unsecured, and provide them with equity that even the

Debtor values at a small fraction of the outstanding principal.[4]

In any event, it appears that the Debtor and its controlling shareholders have

contemplated, and prepared for, a chapter 11 bankruptcy filing for nearly a year (and perhaps

even longer).  During that period, insiders have plundered the Debtor, helping themselves to

cash and other assets worth many billions of dollars, to the detriment of creditors.  As a result of

these transactions, creditors have commenced four lawsuits against the Debtor, including one in

the Delaware Court of Chancery filed by UMB Bank, acting as indenture trustee for a series of

first lien notes, seeking appointment of a receiver.  The Court of Chancery recently granted

---

[2]   Mester Decl., Ex. 2, at 3.

[3]   Mester Decl., Ex. 3, at Ex. 10.1.

[4]   *Id.*

UMB Bank's motion for expedited treatment of its request for the appointment of a receiver under Delaware law.  In granting that relief, the court found that UMB Bank had carried its burden to show that there is both a colorable claim and a sufficient threat of irreparable harm to justify the considerable expense of an expedited proceeding.[5]

The Petitioning Creditors have filed this Involuntary Petition to prevent any further transactions that diminish the Debtor's estate, and to obtain the aid of this Court in assuring that all parties will be dealt with fairly in any restructuring.[6]  As required by Section 303(b)(1), each of the Petitioning Creditors is the holder of a claim against the Debtor, for principal and interest, that is neither contingent as to liability nor the subject of a bona fide dispute as to liability or amount.[7]  Such claims are, in the aggregate, at least $15,325 more than the value of any lien on property of the debtor securing them.  This is evident from the terms of the chapter 11 plan that has been agreed to by the Debtor and certain of the first lien noteholders, which would treat the claims of holders of Second Lien Notes as completely unsecured.[8]

As beneficial holders of the Second Lien Notes, each of the Petitioning Creditors has an absolute right under the Indentures (as defined below), the Second Lien Notes themselves, and

---

[5]   Mester Decl., Ex. 4, at 54:8-12.

[6]   *See, e.g.*, *In re CLE Corp.*, 59 B.R. 579, 584 (Bankr. N.D. Ga. 1986) ("[P]etitioners had a number of legitimate reasons for initiating this case:  to invoke the protection and supervision of the Court to protect themselves and other creditors; to investigate, account for, and protect the Debtor's assets; and to effect an orderly and effective reorganization of the Debtor under this Court's supervision.").

[7]   As set forth in the Involuntary Petition and attachments thereto, each of the Petitioning Creditors holds claims that are more than sufficient to satisfy the requirements imposed by Section 303(b)(1).  Certain of the Petitioning Creditors also hold additional claims against the Debtor that, although neither contingent nor subject to bona fide dispute, are not relied upon for purposes of filing the Involuntary Petition and are not necessary to support their entitlement to the relief requested therein.

[8]   In any event, if there is any controversy about whether the Petitioning Creditors hold unsecured claims that exceed the jurisdictional amount, the Petitioning Creditors agree to waive the benefit of any lien securing claims having an aggregate amount equal to $15,325.

Section 316(b) of the Trust Indenture Act[9] to enforce its right to receive payment of interest

when due.  Under the plain language of the Indentures (as defined below) and the Second Lien

Notes, interest payments became due on December 15, 2014.  As several courts have expressly

held, filing an involuntary petition is among the remedies available to noteholders following

payment defaults such as those that have occurred here, even if the indenture contains a "no-

action clause" that conditions the exercise of remedies in different circumstances.[10]

　　　Finally, the Debtor is generally not paying its debts as they become due.  The Debtor has

now been in payment default, for about four weeks, on interest payments owed to hundreds of

holders of Second Lien Notes that, in the aggregate, total about $225 million.  Both the number

and the amount of overdue claims against the Debtor – which incurs relatively few monthly

operating expenses on a non-consolidated basis aside from debt service – are very substantial.

There is no reasonable basis for the Debtor's failure to make the interest payments on the Second

Lien Notes when due on December 15; as admitted by the Debtor, such nonpayment is not

attributable to administrative error, nor to any temporary liquidity shortfall.  Rather, the

nonpayment was willful and deliberate – or in the words of the Debtor, "elected" – as part of an

agreement with first lien lenders that would permanently deprive holders of Second Lien Notes

not only of payment of the overdue interest but also most of their principal.  If that were not

enough, there is overwhelming evidence, in the form of billions of dollars in self-dealing

transactions, that the Debtor is "conducting [its] financial affairs in a manner not consistent with

---

[9]    15 U.S.C. §§ 77aaa-77bbbb.

[10]   *See Envirodyne Indus., Inc. v. Conn. Mut. Life Co. (In re Envirodyne Indus., Inc.)*, 174 B.R.
      986, 997 (Bankr. N.D. Ill. 1994); *FMB Bancshares, Inc. v. Trapeza CDO XII, Ltd. (In re
      FMB Bancshares, Inc.)*, 517 B.R. 361, 368 (Bankr. M.D. Ga. 2014); *GMAM Inv. Funds Trust
      I v. Globo Comunicacoes E Participacoes S.A. (In re Globo Comunicacoes E Participacoes
      S.A..)*, 317 B.R. 235, 248 (S.D.N.Y. 2004).

one operating in good faith and in the regular course of business." [11]

Accordingly, the Petitioning Creditors are entitled to entry of an order for relief against the Debtor in this bankruptcy case.

## II.

## JURISDICTION AND VENUE

This Court has jurisdiction over this case under 28 U.S.C. §§ 157 and 1334.  Venue in this Court is proper under 28 U.S.C. §§ 1408 and 1409 because the Debtor is a Delaware corporation.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## III.

## BACKGROUND

This section focuses upon the facts that are relevant to the request of the Petitioning Creditors for entry of an order for relief.

### A.      The Debtor.

The Debtor operates hotel and casino properties that are part of the "Caesars" resort and gaming empire.  As a result of multiple transactions conducted over the past several years, the Debtor is highly leveraged and has more than $18.4 billion in outstanding indebtedness versus less than $1 billion in annual EBITDA, or cash flow.[12]  Much of this debt was created in connection with a $30 billion leveraged buyout of its corporate parent, Caesars Entertainment Corporation ("Caesars Parent") by affiliates of Apollo Global Management, LLC and TPG Capital, LP in January 2008.[13]

---

[11]   *In re Reed*, 11 B.R. 755, 760 (Bankr. S.D. W. Va. 1981).

[12]   Mester Decl., Ex. 19, Ex. 99.1, at 13 (reporting adjusted EBITDA of $993 million for CEOC for the twelve months ended September 30, 2014).

[13]   Mester Decl., Ex. 5, at 8.

B.      The Second Lien Notes.

Under an indenture dated December 24, 2008 (the "2008 Indenture"), the Debtor issued

$847.6 million in original principal amount of 10% second-priority senior secured notes due

2018, and $214.8 million in original principal amount of 10% second-priority senior secured

notes due 2015.[14]  As of December 15, 2014, the principal balance owing on Notes issued under

the 2008 Indenture was $825 million.[15]

Thereafter, under an indenture dated April 15, 2009 (the "2009 Indenture," and together

with the 2008 Indenture, the "Indentures"), the Debtor issued an additional $3.7 billion in

original principal amount of 10% second-priority senior secured notes due 2018.[16]  As of

December 15, 2014, the principal balance owing on Notes issued under the 2009 Indenture

remained about $3.7 billion.[17]

The Second Lien Notes issued under both Indentures are secured by second-priority liens

on substantially all assets of the Debtor and its subsidiaries, and are unconditionally guaranteed

by Caesars Parent (the "Parent Guarantee").  However, the Debtor now takes the position that:

(i) the Notes are entirely unsecured,[18] and (ii) the Parent Guarantee was released earlier this year

as a result of certain insider transactions that have been legally challenged by multiple creditors,

including the indenture trustee of the Notes issued under the 2009 Indenture.[19]

---

[14]   Mester Decl., Ex. 6.

[15]   Mester Decl., Ex. 1, at 2.

[16]   Mester Decl., Ex. 7.

[17]   Mester Decl., Ex. 1, at 2.

[18]   Mester Decl., Ex. 3, at Ex. 10.1, Ex. B at 3.

[19]   Caesars Parent claims that the Parent Guarantee was released pursuant to Section 12.02(c) of
the 2009 Indenture as a result of certain insider transactions.  Mester Decl., Ex. 8 at 2.  The
Petitioning Creditors dispute this.

- 6 -

### C.     The Debtor's Insolvency.

The Debtor's most recent 10-Q filing with the SEC paints a grim picture of the Debtor's finances.  By its own admission, the Debtor has "experienced substantial net losses and operating losses in recent years," which has resulted in a stockholder deficit (negative equity) shown on the Debtor's balance sheet of about $7.5 billion as of September 30, 2014.[20]  The Debtor also reported negative operating cash flows of $548 million for the nine months ended September 30, 2014.[21]  The Debtor projects that its losses will only continue to mount, as it will experience net operating losses and negative operating cash flows for the "foreseeable future."[22]

The Debtor has further admitted that it "do[es] not currently expect that [its] cash flows from operations will be sufficient to repay [its] indebtedness," and therefore anticipates that it will "need to pursue additional debt or equity offerings or seek a refinancing, amendment, private restructuring or a reorganization under Chapter 11 of the Bankruptcy Code."[23]  The Debtor therefore "estimate[s], that absent a refinancing, amendment, private restructuring or a reorganization under Chapter 11 of the Bankruptcy Code," there is "substantial doubt" as to its ability to continue as a going concern beyond the fourth quarter of 2015.[24]

### D.     Prepetition Self-Dealing Transactions And Resulting Litigation.

The Debtor's precipitous financial deterioration is attributable, in significant part, to a series of transactions between it and persons who are insiders and/or affiliates, in which the Debtor has been stripped of  assets worth billions of dollars.  The Debtor received inadequate

---

[20]    Mester Decl., Ex. 5, at 9.

[21]    *Id.*

[22]    *Id.*

[23]    *Id.* at 10.

[24]    *Id.*

consideration – and in some important instances no consideration – for the transfers of these assets. These transactions are described in greater detail in several lawsuits that have been filed against the Debtor, Caesars Parent, and certain of their affiliates and insiders, including an action filed on August 4, 2014 in the Delaware Court of Chancery by Wilmington Savings Fund Society, FSB, as successor trustee under the 2009 Indenture, challenging these transactions as avoidable fraudulent transfers, breaches of fiduciary duty, and waste.[25] Other lawsuits have since been filed, two by holders of "Legacy Notes" challenging a transaction announced in August, 2014, in which Caesars Parent's guarantee of such notes was purportedly eliminated,[26] and another by UMB Bank, as indenture trustee for the Debtor's 8.5% Senior Secured Notes due 2020, alleging fraudulent transfers and breaches of fiduciary duty and seeking appointment of a receiver.[27]

The Debtor and Caesars Parent were also recently named in a lawsuit filed by Hilton Worldwide, Inc. and certain other parties in the United States District Court for the Eastern District of Virginia to enforce retirement plan funding and contribution obligations that they assumed in connection with a 1998 transaction.[28] The complaint alleges, among other things, that the Debtor and Caesars Parent have failed to make required plan contributions totaling more than $17.7 million to date, and that they are jointly and severally liable for such contributions.

---

[25]   *Wilmington Sav. Fund Soc'y, FSB v. Caesars Entm't Corp.*, C.A. No. 10004-8 (the "WSFS Action").

[26]   *Meehancombs Global Credit Opportunities Master Fund, LP v. Caesars Entm't Corp.*, No. 14-cv-7091 (S.D.N.Y. Sept. 3, 2014); *Danner v. Caesars Entm't Corp.*, Case No. 14-CV-7973-SAS (S.D.N.Y. Oct. 2, 2014).

[27]   *UMB Bank v. Caesars Entm't Corp.*, C.A. No. 10393-VCG (Del. Ch. Nov. 25, 2014) (the "UMB Action").

[28]   *Hilton Worldwide, Inc. Global Benefits Admin. Comm. v. Caesars Entm't Corp.*, No. 1:14-cv-01766-TSE-IDD (E.D. Va. Dec. 24, 2014).

### E.    The Debtor's Negotiations With First Lien Creditors.

On December 11, 2014, certain first lien noteholders of the Debtor publicly released hundreds of pages of materials relating to their negotiations with the Debtor and Caesars Parent regarding the terms of a proposed restructuring of the Debtor.[29]  Among those materials were several versions of the Lock Up Agreement, along with term sheets setting forth in detail the material terms of a proposed restructuring of the Debtor.

Every version of the Lock Up Agreement exchanged among the parties, whether authored by the Debtor or by first lien noteholders, required, as a condition to the continuing effectiveness of the Lock Up Agreement, the filing of a chapter 11 bankruptcy case on or about January 15, 2015 – the same day that the holders of Second Lien Notes would be entitled to accelerate payment of principal under the 2009 Indenture based upon the non-payment of interest.[30]  In addition, none of the draft agreements or term sheets contemplated the payment of interest due to the holders of Second Lien Notes on December 15, 2014.  In fact, one version of the Lock Up Agreement disclosed by the first lien noteholders, dated November 14, 2014, expressly ***prohibited*** the Debtor from making the interest payment to holders of Second Lien Notes under the 2008 Indenture due on December 15, 2014, unless Caesars Parent were to deposit an equal amount of cash into the Debtor's deposit accounts, with the failure to make such deposit providing cause to terminate the Lock Up Agreement.[31]

---

[29]    Mester Decl., Ex. 9.

[30]    Mester Decl., Ex. 10, at § 8(i) (providing for termination of Lock Up Agreement if the Debtor fails to commence its bankruptcy case on or before January 15, 2015 without the written consent of first lien lenders);  Mester Decl., Ex. 11, at § 8(b) & Ex. C, ¶1 (providing for termination of Lock Up Agreement if the Debtor fails to commence bankruptcy case on January 15, 2015 or within 5 Business Days thereafter).

[31]    Mester Decl., Ex. 11, at  13.

Under the chapter 11 plan described in the materials disclosed by the first lien lenders,

holders of Second Lien Notes were never going to receive payment of the overdue interest.

Instead, under the term sheets proposed both by the Debtor and by the first lien noteholders, the

holders of Second Lien Notes were to be offered a minority equity interest in an entity,

"PropCo," that would own a portion – but not all – of CEOC's remaining assets that have not yet

been transferred to affiliates for the benefit of controlling shareholders and management.[32]   The

materials also reveal that a financial advisor retained by the Debtor had valued the equity to be

distributed to all holders of Second Lien Notes at $612 million, or about 12% of the current

outstanding principal amount of the Second Lien Notes – and about 11% of the combined

outstanding principal and overdue interest.[33]  If holders of Second Lien Notes voted against the

plan as a class, their recovery would be even less.

On December 12, 2014, the Debtor announced that its discussions with the first lien

creditors had resulted in an oral agreement in principle with the first lien bank lenders which was

contingent on, among other things, the Debtor reaching an economic deal with the first lien

noteholders that the first lien bank lenders found acceptable.[34]

### F.      The Debtor's Defaults.

Consistent with the term sheets disclosed by the first lien noteholders, on December 15,

2014 the Debtor defaulted on semi-annual interest payments aggregating $225 million on Second

Lien Notes having an aggregate principal amount of $4.5 billion.  Specifically, the Debtor

---

[32]   Mester Decl., Ex. 12, at  2-3 (proposing equity interest equal in amount to value of unencumbered assets); Mester Decl., Ex. 13, at 3 (proposing equity interest equal to 28.4% of PropCo entity); Mester Decl., Ex. 14, at 3 (providing for possibility of separate classification of holders of Second Lien Notes).

[33]   Mester Decl., Ex. 15, at 3.

[34]   Mester Decl., Ex. 16, at 2.

defaulted on (i) $41 million in interest payments that were due on Second Lien Notes issued

under the 2008 Indenture; and (ii) $184 million in interest payments that were due on Second

Lien Notes issued under the 2009 Indenture.[35]

The Debtor issued a statement that it had "elected not to pay" the December 15 interest

payments on the Notes "[i]n light of the ongoing discussions with the First Lien Bondholders

with respect to a Restructuring."[36]  The Debtor further claimed that each of the Indentures

"provides for a 30-day grace period for an interest payment before an event of default may be

deemed to have occurred under such indenture."[37]

### G.      The Debtor's Agreement With First Lien Bondholders.

On December 19, 2014, the Debtor announced that it had reached an agreement with the

first lien noteholders with whom it had been negotiating on the terms of a restructuring to be

effectuated by the commencement of chapter 11 bankruptcy cases (the "Chapter 11 Cases") by

the Debtor and certain of its affiliates between January 15, 2015 and January 20, 2015.[38]  That

agreement, as subsequently amended, was memorialized in the Lock Up Agreement, which was

attached to an 8-K filing made by the Debtor on December 31, 2014.  The Lock Up Agreement

requires first lien noteholders who execute the agreement to, among other things, (i) vote in favor

of the Debtor's proposed chapter 11 plan, as described in an attached term sheet; (ii) not take any

actions inconsistent with the Lock Up Agreement or the proposed plan; and (iii) direct UMB to

agree to a consensual stay of the UMB Action, to the extent such action is not otherwise subject

---

[35]   Mester Decl., Ex. 1, at 2.

[36]   *Id*.

[37]   *Id.*

[38]   Mester Decl., Ex. 2, at 3.

to the automatic stay.[39]  The continued effectiveness of the Lock Up Agreement is contingent upon the Debtor reaching certain "Milestones" in the Chapter 11 Cases, including: (i) commencement of the Chapter 11 Cases on or after January 15, 2015, but no later than January 20, 2015; (ii) bankruptcy court approval of a disclosure statement for the Debtor's proposed chapter 11 plan within 150 days after the petition date; and (iii) confirmation of the plan within 120 days after the disclosure statement is approved.[40]

The plan to be proposed by the Debtor in the Chapter 11 Cases is described in a term sheet attached as an exhibit to the Lock Up Agreement. Consistent with the earlier draft term sheets disclosed by the first lien noteholders, under the plan described in the term sheet, holders of Second Lien Notes would:  (i) never receive payment of the overdue interest on their notes; (ii) be classified together with holders of the Debtor's "Legacy" Notes and treated as completely unsecured; (iii) receive, on account of the $4.5 billion of principal that is owed on the Second Lien Notes, their pro rata share of a minority equity interest in PropCo.[41]  The term sheet also provides for a full release of all prepetition claims of the Debtor's estate against Caesars Parent and its insiders and affiliates, which would include all of the derivative claims asserted in the WSFS Action, the UMB Action and the actions filed by holders of the Legacy Notes.  Consistent with the Lock Up Agreement, the Debtor notified the Delaware court on January 7, 2015 of its intention to "voluntarily commence a reorganization under Chapter 11 of the U.S. Bankruptcy Code on or around January 15, 2015, which will automatically stay this action as to [the Debtor]."[42]  The Debtor further advised the Delaware court of the provisions requiring first lien

---

[39]  *Id.* at Ex. 10.1, p. 11.

[40]  *Id.* at Ex. 10.1, p. 38.

[41]  Mester Decl., Ex. 3, at Ex. 10.1, Ex. B at 3.

[42]  *Id.* at 11.  Mester Decl., Ex. 17, at 1.

noteholders who are parties to the Lock Up Agreement to direct UMB to agree to a consensual stay.[43]

On January 5, 2015, in an effort to induce and coerce first lien noteholders and lenders to support the Lock Up Agreement and proposed plan, the Debtor and Caesars Parent announced that the term sheet for the plan would be amended to provide that such creditors will, if they consent to the Lock Up Agreement prior to January 12, 2015, receive additional payments from Caesars Parent in an aggregate amount of up to $206 million.[44] Such payments would purportedly be made by Caesars Parent in exchange for the consenting noteholders' agreement to forbear from exercising any default-related rights and remedies that they might have, notwithstanding (i) that the Debtor has not defaulted on any payments due to the first lien noteholders; (ii) that the Debtor denies the existence of any other defaults under its first lien notes; and (iii) that the Debtor has announced its intention to file for bankruptcy on or about January 15, 2015.

## IV.

## ARGUMENT

For the reasons set forth below, the Debtor's defaults on the December 15 interest payments due to holders of the Second Lien Notes, together with the circumstances under which such defaults occurred, entitle the Petitioning Creditors to an order for relief against the Debtor under Section 303 of the Bankruptcy Code.

---

[43] *Id.*

[44] Mester Decl., Ex. 18, at 2.  The potential fees total 3.25% of the claims of first lien noteholders, which have principal outstanding of $6.345 billion.

**A.    The Petitioning Creditors Are Eligible Under Section 303(b) To File The Involuntary Petition.**

Section 303(b) provides that "[a]n involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title . . .by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $15,325 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims."[45]

The Petitioning Creditors are holders of claims against the Debtor that are not contingent as to liability or amount, nor the subject of a bona fide dispute as to liability or amount.  Those claims include, without limitation:  (i) payments of accrued interest that are overdue and payable to them under the terms of the Second Lien Notes and the Indentures; and (ii) the principal amounts owing on the Second Lien Notes.

As set forth in the Involuntary Petition and supporting affidavits submitted pursuant to Rule 1003(a) of the Federal Rules of Bankruptcy Procedure, the Petitioning Creditors hold claims against the Debtor based upon their holdings of Second Lien Notes, and such claims aggregate at least $15,325 more than the value of any lien on property of the debtor securing such claims.  To the extent that claims of the Petitioning Creditors are found not to be at least $15,325 more than the value of the liens securing such claims, each of the Petitioning Creditors agrees to waive the benefit of any lien securing claims having an amount equal to an aggregate

---

[45]   11 U.S.C. § 303(b)(1).

- 14 -

of $15,325.[46]   Based on the terms of the Lock Up Agreement and proposed plan, which treat the

Second Lien Notes as completely unsecured, it appears unlikely that any waiver of security by

the Petitioning Creditors will be necessary.

> **B.    The Petitioning Creditors Are Authorized To File The Involuntary Petition Under The Terms Of The Second Lien Notes, The Indentures And The Trust Indenture Act.**

Section 6.07 of the Indentures governs, and expressly preserves, the right of holders of

Notes, such as the Petitioning Creditors, to enforce their right to receive payment of principal

and interest under the Second Lien Notes.  Pursuant to Section 6.07:

> Notwithstanding any other provision of this Indenture, ***the right of any holder to receive payment of*** principal of and ***interest on the Notes*** held by such holder, ***on or after the respective due dates expressed or provided for in the Notes***, ***or to bring suit for the enforcement of any such payment on or after such respective dates***, shall not be impaired or affected without the consent of such holder.[47]

The "***respective due dates*** expressed or provided for in the Notes" can be found in

Section 1 of the Second Lien Notes, which provides that "[t]he Issuer shall pay interest

semiannually on June 15 ***and December 15*** of each year."[48]   Section 4.01 of the Indentures

confirms that "[t]he Issuer shall promptly pay the principal of and interest on the Notes ***on the***

---

[46]   *See, e.g.*, *In re Green*, Case No. 06-11761-FM, 2007 Bankr. LEXIS 1296, at *16 (Bankr. W.D. Tex. Apr. 9, 2007) ("A secured creditor may waive security for all or a portion of its claim, to meet the aggregate unsecured debt requirement of § 303(b)."); *CC Britain Equities, L.L.C. v. Allen-Main Assocs. Ltd. P'ship. (In re Allen-Main Assocs. Ltd. P'ship.)*, 223 B.R. 59, 61 (B.A.P. 2d Cir. 1998) ("Under the appropriate circumstances, it is also possible for a fully secured creditor to waive all or part of its claim to become an eligible unsecured creditor.").

[47]   Mester Decl., Exs. 6 and 7, at § 6.07 (emphasis added).

[48]   Mester Decl., Ex. 6 at B-1-5, Ex. 7 at B-5 (emphasis added).

*dates and in the manner provided in the Notes* and in this Indenture," and further describes the

manner in which interest "shall be considered paid *on the date due*."[49]

The Indentures do not provide for any "30-day grace period" to pay interest when due, as

the Debtor incorrectly claimed when it failed to make the interest payments on December 15,

2014.[50]  In fact, the provision in the Indentures upon which the Debtor apparently relied in

making that statement, Section 6.01(a), confirms not only that the interest payments were due on

December 15, but also that Debtor "defaulted" when it failed to make those payments.  Unlike

Sections 4.01 and 6.07 of the Indentures and Section 1 of the Second Lien Notes, which govern

when payment of interest is due and the right of the noteholders to bring suit for the enforcement

of payment on or after the due dates, Section 6.01(a) governs when the indenture trustee and

noteholders can *accelerate* the due date of payment of *principal* – which is not required in order

to bring suit on unpaid *interest*.  Under Section 6.01(a), the right to accelerate the due date of

principal occurs if:  "(a) there is a *default in any payment of interest* (including any additional

interest) on any Note *when the same becomes due and payable*, and *such default* continues for a

period of 30 days."[51]  If anything, that language confirms not only that the failure to pay interest

on the date due is a "default," but is in fact a "Default" as that term is defined in the 2008

Indenture and in the 2009 Indenture.[52]

Accordingly, the 30-day period referenced in Section 6.01(a) of the Indentures is not a

"grace period" that extends the due date for payment of interest.  Indeed, the phrase "grace

---

[49]   *Id.* at § 4.01 (emphasis added).

[50]   Mester Decl., Ex. 1, at 2.

[51]   *Id.* at § 6.01(a) (emphasis added).

[52]   "Default" is defined as "any event which is, or after notice or passage of time or both would
        be, an Event of Default."  *Id.* at § 1.01.  Under that definition, the failure to pay interest on
        the date due is a "Default."

period" is not even used in the 2009 Indenture with respect to payment obligations thereunder.[53]

The 30-day period provides the Debtor with an opportunity to cure the Default before the holders of Second Lien Notes or indenture trustee can accelerate the due date for payment of ***principal***.[54] It does not, however, postpone the date on which the noteholders can otherwise enforce their rights for payment of ***interest***.  This is confirmed by Section 6.07, which expressly allows the noteholders to enforce payment of "***interest*** on the Notes held by such holder, ***on or after the respective due dates*** expressed or provided for in the Notes, or to bring suit for the enforcement of any such payment ***on or after such respective dates***."[55]

The "no-action clause" contained in Section 6.06 of the Indenture does not prevent the noteholders from filing and prosecuting the Involuntary Petition.  Section 6.06 provides:

> (a) ***Except to enforce the right to receive payment of principal, premium (if any) or interest when due***, no holder may pursue any remedy with respect to this Indenture or the Notes unless:
>
> > (i) such holder has previously given the Trustee notice that an Event of Default is continuing,
> >
> > (ii) holders of at least 30% in principal amount of the outstanding Notes have requested the Trustee to pursue the remedy,

---

[53] The term "grace period" is used elsewhere in the Indentures in reference to:  (i) obligations of the Debtor to pay indebtedness under agreements other than the Indentures; and (ii) the guarantee of Debtor's performance of non-payment obligations under the Indenture.  *Id.* at §§ 6.01(d), 12.01(a).  The inclusion of that phrase in other contexts, but not with respect to the failure to make payment when due, is presumed to be intentional under New York law (which governs the 2009 Indenture).  *E.g.*, *United States. Fid. & Guar. Co. v. Annuziata*, 67 N.Y.2d 229, 233 (1986) (contractual provision's omission of any reference to a term that was used in another context within the same instrument "must be assumed to have been intentional under accepted canons of contract construction").

[54] Mester Decl., Exs. 6 and 7, at §6.02.

[55] *Id.* at § 6.07.

(iii) such holders have offered the Trustee reasonable security or indemnity satisfactory to the Trustee against any loss, liability or expense,

(iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity, and

(v) the holders of a majority in principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.[56]

As the preamble to Section 6.06 makes clear, any restrictions that might otherwise exist under the No-Action Clause do not apply to pursuit of remedies in an effort to enforce the right to receive payment of principal or interest when due.[57]

---

[56]  Mester Decl., Exs. 6 and 7, at §6.06 (emphasis added).  This provision (the "No-Action Clause") is also set forth in paragraph 15 of the Notes.  Mester Decl., Ex. 6 at B-1-10, Ex. 7 at B-10.

[57]  These provisions are consistent with § 316(b) of the Trust Indenture Act, which prohibits modification by majority bondholder vote of an individual bondholder's right to receive payments of principal or interest on the due dates for such payments.  15 U.S.C. § 77ppp(b) ("Notwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder.").  Courts have consistently held based on § 316(b) that no-action clauses contained in an indenture that is qualified under the Act do not bar suits by individual noteholders to collect principal or interest when due.  *E.g.*, *Newby v. Enron Corp.* (*In re Enron Corp. Secs., Derivative & ERISA Litig.*), Case No. MDL-1446, 2008 U.S. Dist. LEXIS 21560, at *47 (S.D. Tex. Mar. 19, 2008) ("A significant exception to a no-action clause is the bondholder's/noteholder's individual right to sue for payment of principal and interest on or after the due dates set out in his bond/note."); *Great Plains Trust Co. v. Union Pac. R.R. Co*., 492 F.3d 986, 991 (8th Cir. 2007) ("We find persuasive the conclusion reached by other courts that a no-action clause may not override a debenture holder's absolute right guaranteed by Section 316 to seek payment of overdue interest."); *Cruden v. Bank of N.Y.*, 957 F.2d 961, 968 (2d Cir. 1992) ("[D]ebenture holders could not bring suit 'upon or with respect to' the Indenture until either (a) there was an 'event of default' . . .*and* the debenture holders [complied with the requirements of the no-action clause], *or* (b) the issuer defaulted on payment of principal or interest.") (italics in original).

Several courts have expressly held that the "principal and interest" exception allows the filing of an involuntary petition by noteholders.[58] In this regard, courts have determined that an involuntary petition constitutes an action to enforce the payment of past due interest, and have rejected the argument that any distinction should be made between individual bondholder actions seeking a money judgment for overdue interest, and collective remedies such as an involuntary bankruptcy filing. This determination is based in part on the fact that Section 316(b) of the Trust Indenture Act "does not contain any limitations as to what remedies a bondholder may pursue when seeking payment of delinquent principal and interest."[59] Section 303 of the Bankruptcy Code likewise contemplates that a small minority of creditors may place even the largest of corporations into involuntary bankruptcy where, as here, the statutory requirements are otherwise satisfied. Thus, to the extent that the Debtor would seek to limit noteholders' ability to file an involuntary petition as a means to enforce their rights to the payment of principal and interest when due, it cannot rely on the No-Action Clause to do so, and must instead "take its argument to Congress."[60]

Finally, the law is clear that beneficial holders of the Second Lien Notes, such as the Petitioning Creditors, have the right to enforce payment of interest – and with it, the right to bring this involuntary petition. Federal courts have held based on § 316(b) of the Trust Indenture

---

[58] *See Envirodyne Indus.*, 174 B.R. at 997 (noteholders' filing of an involuntary bankruptcy petition against the issuer was an action seeking the payment of past due interest and therefore not subject to the indenture's no-action clause); *FMB Bancshares*, 517 B.R. at 368 (same); *see also Globo Comunicacoes*, 317 B.R. at 248 (reversing bankruptcy court's determination that no-action clause prohibited noteholders from filing involuntary petition against foreign issuer as a matter of law on grounds that clause "[did] not on its face purport to prohibit [noteholders] from filing an involuntary bankruptcy petition without the consent of the trustee of the notes.").

[59] *Id.* at 996.

[60] *Id.*

Act that beneficial holders of bonds have standing to sue the issuer for payment of principal and interest in their own right.[61]  The basis for this conclusion is that the provisions of the Trust Indenture Act are controlling to the extent that they conflict with particular provisions contained in a qualified indenture,[62] and Section 316(b) of the Act does not distinguish between beneficial and registered holders in protecting the right of "holders" to bring suit to enforce payment of principal and interest.  In this regard, the Trust Indenture Act is consistent with bankruptcy law, which recognizes that each beneficial holder of debt securities is the holder of a claim under Section 101(5) of the Bankruptcy Code.[63]

In sum, the Petitioning Creditors are authorized to file the Involuntary Petition under the terms of the Indentures, the Second Lien Notes, and applicable law including the Trust Indenture Act.

### C.    The Debtor Is Not Generally Paying Its Debts As They Come Due.

Section 303(h) provides that "[i]f the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition

---

[61]   *In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384, 387 n.2 (Bankr. S.D.N.Y. 2004) (noting that Section 316(b) refers to "'holders' without qualification," and that "the Federal courts have permitted beneficial holders to sue to vindicate [Trust Indenture Act] rights"); *accord Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg. (In re Bd. of Dirs. of Telecom Arg.)*, Case No. 06 Civ. 2352 (NRB), 2006 U.S. Dist. LEXIS 85274 (S.D.N.Y. Nov. 17, 2006); *see also Drachman v. Harvey*, 453 F.2d 722, 727 (2d Cir. 1971) (federal law confers standing on beneficial shareholders to sue under the Securities Exchange Act of 1934).

[62]   15 U.S.C. § 77rrr.

[63]   *E.g.*, *In re Pioneer Fin. Corp.*, 246 B.R. 626, 633 (Bankr. D. Nev. 2000) ("Plainly, it is the beneficial holder, not a holder of record, who has the 'claim' and the 'right to payment.'"); *In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 691-92 (Bankr. D. Colo. 1995).

was filed."[64] If the petition is controverted by the debtor, Section 303(h) requires the court to

order relief against the debtor under the chapter under which the petition was filed, only if –

> (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount; or

> (2) within 120 days before the date of the filing of the petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.[65]

As previously explained, on December 15, 2014, the Debtor failed to pay interest in the

aggregate amount of $225 million then due to hundreds of holders of Second Lien Notes.  The

Debtor's obligations to pay such interest are not the subject of any bona fide dispute as to

liability or amount.

The "generally not paying standard" is not synonymous with the Bankruptcy Code's

definition of insolvency contained in Section 101(32); it is "not a balance-sheet insolvency test

based on a comparison of assets and liabilities."[66]  The standard also differs from the "equity

insolvency" test, inasmuch as it considers whether the debtor is *actually* paying its debt when

due, not whether it *can* pay its debts when due.[67]

Courts consider the following four factors in making this determination:  (i) the number

of claims that the debtor has not paid, (ii) the amounts of these unpaid claims, (iii) the materiality

---

[64]  11 U.S.C. § 303(h).

[65]  *Id.*

[66]  *Collier on Bankruptcy* ¶ 303.31 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014).

[67]  *Id.*; *see also B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071, 1076 (2d Cir. 1983) (noting Congressional compromise in which the phrase "is generally not paying" was substituted for "is generally unable to pay").

of the non-payments, and (iv) the debtor's overall financial condition and affairs.[68]  "No one factor is necessarily determinative of whether in fact the debtor is generally not paying debts as they become due," and thus "[a]n examination of the debtor's entire financial situation and debt structure may be necessary to make this determination."[69]  As explained below, each of these four factors supports a finding that the Debtor is not generally paying its debts as they come due.

*Number of Unpaid Claims.*  Here, the number of claims that are not being paid is ***at least*** equal to the number of beneficial holders of the Second Lien Notes.  While the exact number of entities that hold Second Lien Notes issued under the Indentures cannot be discerned from publicly available information, that number is likely substantial – totaling hundreds of holders – based upon the size of the issuances under the Indentures (over $4.5 billion in the aggregate).  Each beneficial holder of the Second Lien Notes holds a separate claim against the Debtor that was not paid when due, and, under the plan to be proposed by the Debtor under the Lock Up Agreement, would never be paid.[70]

---

[68]   *In re Paper I Partners, L.P.*, 283 B.R. 661, 677 (Bankr. S.D.N.Y. 2002); *Crown Heights Jewish Cmty. Council, Inc. v. Fischer (In re Fischer)*, 202 B.R. 341, 350 (E.D.N.Y. 1996) (citing cases).

[69]   *CLE Corp.*, 59 B.R. at 586.

[70]   As noted above, each beneficial holder is treated as the holder of a claim under the Bankruptcy Code.  *E.g.*, *Pioneer Fin.*, 246 B.R. at 633.  Consistent with that premise, the claim of each beneficial holder who votes on a plan of reorganization is tabulated separately in order to determine whether a class of creditors has the requisite one-half of the number of votes required to accept the plan.  *E.g.*, *In re Southland Corp.*, 124 B.R. 211, 219 & Appx. A (Bankr. N.D. Tex. 1991) (counting both number and amount of claims for each class of notes); *Colo. Springs*, 177 B.R. at 688 n.1, 692 n.3 (calculating both amount and number of votes of noteholders).   In *Colorado Springs*, the court concluded that the solicitation of votes from record owners rather than beneficial holders was inadequate.  In reaching that conclusion, the court commented that even though the total dollar amount of bonds for which no vote was cast was small (just 3%), "each beneficial bondholder has a separate and independent right to due process which is unrelated to the dollar amount of their investment."  *Id.* at 692.  Specifically, the court observed that only 28 votes were cast by the record owners, and that based on the size of ownership lots, "the number of non-voting beneficial

*Amount of Unpaid Claims.*  The Debtor has admitted, in an 8-K report filed on December 15, 2014, that it failed to pay $225 million in interest payments to holders of the Second Lien Notes as such payments came due on December 15, 2014.[71]  There may be additional debts that the Debtor is not paying (such as the retirement plan contributions described in the complaint that was recently filed by Hilton against the Debtor and Caesars Parent), which would be the subject of discovery if the Debtor contests the Involuntary Petition.  But even assuming that the December 15 interest payments on the Second Lien Notes were the *only* debts that were not being paid by the Debtor when due as of the petition date, such non-payments clearly represent a substantial percentage of the Debtor's total monthly operating expenses, a standard used by some courts to evaluate the amount of non-payment of debts.[72]  Based on the Debtor's publicly filed financial statements, it appears that the Debtor had a total of $542 million in interest payments falling due during the month of December (including the interest payment not made to holders of Second Lien Notes), and that the Debtor otherwise incurs an average of approximately $15 million in operating expenses each month, for an estimated total of $557 million in expenses for the month of December.[73]  The missed interest payments of $225 million equal approximately 40% of that amount.

---

(continued…)

holders could range from 5 to 67," meaning that "between 15 percent and 70 percent of the beneficial holders have failed to cast a vote on the Amended Plan."  *Id.* at 692 n.3.  These cases and others reflect the universally understood proposition that each separate beneficial holder of notes is regarded as holding a separate claim in bankruptcy.

[71]   Mester Decl., Ex. 1, at 2.

[72]    *Reed*, 11 B.R. at 760.

[73]   This estimate is based on the Debtor's reported operating expenses, on a non-consolidated basis, averaged over the three-month reporting period of the Debtor's 10-Q filing for the third quarter of 2014, excluding the following expense categories:  (i) depreciation and amortization; (ii) write-downs, reserves, project opening costs, net of recoveries;

*Materiality of Nonpayment.* The third factor, materiality of non-payment, considers the duration of the nonpayments and whether there is a reasonable basis for nonpayment.[74]  Here, the Debtor's defaults have continued for about four weeks.  Courts have held much shorter periods to be sufficient.  For example, the Ninth Circuit has held, as a matter of summary adjudication, a period of just eight days was sufficient to satisfy the "generally not paying" standard.[75]

Moreover, there is no reasonable basis for the Debtor's defaults on the payments of interest to holders of Second Lien Notes.  By the Debtor's own admission, it has the cash on hand needed to pay the overdue interest, and last month, in fact paid not only more than $300 million in interest due to first lien lenders, but also repaid $17 million in principal under pay-in-kind notes not due until 2018 that were held, in significant part, by Caesars Growth, an affiliate of the Debtor.  In the meantime, Caesars Parent – a guarantor of the Second Lien Notes and other first lien and unsecured debt issued by the Debtor – announced on January 5, 2015 that it would pay fees to first lien noteholders of as much as $206 million, purportedly in exchange for the noteholders' agreement to "forbear" from exercising default-related rights and remedies.  Yet, the Debtor has willfully "elected" not to make the payments of interest to holders of Second Lien Notes.  The stated reason for the Debtor's defaults was that it was engaged in negotiations with first lien lenders.  Those negotiations have resulted in an agreement that, if effectuated, will

---

(continued…)

(iii) impairment of intangible and tangible assets; (iv) loss on interests in non-consolidated affiliates; (v) loss on interests in subsidiaries; and (vi) amortization of intangible assets. Mester Decl., Ex. 5, at 50.

[74]  *Reed*, 11 B.R. at 760.

[75]  *In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, 779 F.2d 471, 475 (9th Cir. 1985) (where debtor had represented to the public that monies invested would be promptly returned on demand, failure to pay multiple depositors' demands totaling $830,000 over eight-day period supported summary judgment adjudication that debtor was generally not paying debts).

not provide for payments of interest to holders of Second Lien Notes, and in fact contemplates only a small distribution on account of outstanding principal. Where, as here, the Debtor is selectively paying certain debts but not others, the Debtor simply cannot show a reasonable basis for nonpayment and meet this third factor.[76]

*Nature and Conduct of Debtor's Business.* The fourth factor of the "generally not paying" test requires an examination of the debtor's "overall contemporaneous handling of its affairs" in order to determine whether the debtor is "conducting [its] financial affairs in a manner not consistent with one operating in good faith and in the regular course of business."[77] For example, courts have considered in applying this factor whether the debtor "is winding up his business or personal affairs, selling assets in a liquidating fashion, paying only nondischargeable or co-obligor debts, kiting checks, or otherwise is conducting his financial affairs in a manner not consistent with one operating in good faith and in the regular course of business."[78]

As detailed in the four prepetition complaints filed by creditors against the Debtor and its affiliates, that is exactly the kind of conduct in which the Debtor has engaged during the months leading up to its willful default on the December 15 payments to holders of Second Lien Notes. Specifically, the Debtor has: (a) liquidated several of its most valuable assets by selling them to insiders for inadequate consideration (or in some cases, no consideration at all), without the

---

[76]  *CLE Corp.*, 59 B.R. at 588 (debtor was generally not paying debts as they came due where it selectively avoided paying debts that would cause it to run out of money in 45 to 60 days while continuing to pay other debts, and the sole reason for nonpayment was debtor's "acknowledged inability to meet these obligations as they become due."); *In re Fallon Luminous Prods. Corp.*, Case No. 09-35581, 2010 Bankr. LEXIS 248, at *14-16 (Bankr. E.D. Tenn. Jan. 20, 2010) (debtor was not generally paying debts where it was using loan proceeds to pay operating expenses and payables to trade creditors, while simultaneously failing to make periodic accrued interest payments to its secured lenders).

[77]  *Reed*, 11 B.R. at 760.

[78]  *Id.*

benefit of any marketing process, at a time when the Debtor had no independent directors; (b) made hundreds of millions of dollars of payments to or for the benefit insiders, while refusing to make the December 15 interest payments on the Second Lien Notes; and (c) taken various other actions for the benefit of insiders that have resulted in substantial harm to the Debtor and holders of Second Lien Notes such as the Petitioning Creditors.

On December 17, 2014, in one of the pending lawsuits against the Debtor, the Delaware Chancery Court granted, over the Debtor's vigorous objection, a motion to expedite trial on UMB Bank's claim seeking the appointment of a receiver under Delaware law.  In so ruling, the Court necessarily found that UMB had asserted a "colorable claim" and had established "a threat of irreparable harm that justifies the considerable expense of an expedited proceeding."[79] Although a receiver has not been appointed yet, the fact that the Delaware court granted the motion to expedite, and made the explicit or implicit findings that it did, provides further support for the position of the Petitioning Creditors that the "nature and conduct of the Debtor's business" compel a determination by this Court that the Debtor is generally not paying its debts as they become due, and that an order for relief against the Debtor is warranted.

**V.**

**CONCLUSION**

Based on the above, and such other evidence as may be adduced at trial, the Petitioning Creditors respectfully request that the Court enter an order for relief against the Debtor pursuant to Section 303 of the Bankruptcy Code, and grant such other relief as may be appropriate under the circumstances.

---

[79]   Mester Decl., Ex. 4, at 54:8-12, 55:17-20.

Dated:      January 12, 2015           Respectfully submitted,
              Wilmington, Delaware

*/s/ Robert F. Poppiti, Jr.*

Robert S. Brady  (No. 2847)
Edmon L. Morton  (No. 3856)
Robert F. Poppiti, Jr. (No. 5052)
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware  19801
Telephone:   (302) 571-6600
Facsimile:   (302) 571-1253

-and-

Bruce Bennett
James O. Johnston
Sidney P. Levinson
Joshua M. Mester
Monika S. Wiener
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:   (213) 489-3939
Facsimile:   (213) 243-2539

Attorneys for Appaloosa Investment Limited
Partnership I, OCM Opportunities Fund VI,
L.P. and Special Value Expansion Fund, LLC