**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., | Case No. 15-10047 (__) |
| Alleged Debtor. | |

**DECLARATION OF JOSHUA M. MESTER IN SUPPORT OF**
**STATEMENT OF PETITIONING CREDITORS IN SUPPORT OF**
**INVOLUNTARY CHAPTER 11 PETITION AGAINST**
**CAESARS ENTERTAINMENT OPERATING COMPANY, INC.**

I, Joshua M. Mester, declare as follows:

1.      I am a partner at the law firm of Jones Day in Los Angeles, California which represents the Petitioning Creditors[1] in the above captioned case.  I submit this declaration in support of the Petitioning Creditors' Statement in Support of Involuntary Chapter 11 Petition Against Caesars Entertainment Operating Company, Inc.

2.      Attached hereto are true and correct copies of the following documents:

A.      <u>Exhibit 1</u>:  Caesars Entertainment Operating Company, Inc. Form 8-K, filed on December 15, 2014.

B.      <u>Exhibit 2</u>:  Caesars Entertainment Operating Company, Inc. Form 8-K, filed on December 19, 2014.

C.      <u>Exhibit 3</u>:  Caesars Entertainment Operating Company, Inc. Form 8-K, filed on December 31, 2014.

D.      <u>Exhibit 4</u>:  Excerpts of Transcript of Hearing held on December 17, 2014 in the Court of Chancery of the State of Delaware Civil Action No. 10393- VCG, *UMB Bank v. Caesars Entertainment Corp., et al.*

---

[1] "Petitioning Creditors" are Appaloosa Investment Limited Partnership I, OCM Opportunities Fund VI, L.P. and Special Value Expansion Fund, LLC.

E.    Exhibit 5:  Excerpts of Caesars Entertainment Operating Company, Inc. Form 10-Q for the Quarterly Period Ended September 30, 2014, filed on November 14, 2014.

F.    Exhibit 6:  Indenture dated as of December 24, 2008 for 10.00% Second-Priority Senior Secured Notes due 2018 and 10.00% Second-Priority Senior Secured Notes due 2015.

G.    Exhibit 7:  Indenture dated as of April 15, 2009 for 10.00% Second-Priority Senior Secured Notes due 2018.

H.    Exhibit 8:  Caesars Entertainment Corporation Form 8-K, filed on August 22, 2014.

I.    Exhibit 9:  Press Release, dated December 11, 2014, titled "First Lien Bondholder, Through its Counsel Kramer Levin, Discloses Information Provided by Caesars During Settlement Negotiations."

J.    Exhibit 10:  October 28, 2014 Paul, Weiss, Rifkind, Wharton & Garrison LLP Draft Restructuring Support and Forbearance Agreement.

K.    Exhibit 11:  November 14, 2014 Kramer Levin Naftalis & Frankel LLP Comments to Draft Restructuring Support and Forbearance Agreement.

L.    Exhibit 12:  October 30, 2014 Draft Summary Term Sheet for Proposed Restructuring.

M.    Exhibit 13:  November 8, 2014 Kramer Levin Naftalis & Frankel LLP Comments to Draft Summary Term Sheet for Proposed Restructuring.

N.    Exhibit 14:  November 24, 2014 Paul, Weiss, Rifkind, Wharton & Garrison LLP Comments to Draft Summary Term Sheet for Proposed Restructuring.

O.    Exhibit 15:  Blackstone's Project Julii Revised Proposal to First Lien Noteholders, dated October 24, 2014.

P.    Exhibit 16:  Caesars Entertainment Operating Company, Inc. Form 8-K, filed on December 12, 2014.

Q.    Exhibit 17:  Letter dated January 7, 2014 to The Honorable Sam Glasscock, III, Delaware Court of Chancery, from Kenneth J. Nachbar of Morris, Nichols, Arsht & Tunnell LLP regarding *UMB Bank v. Caesars Entertainment Corporation, et al.*, C.A. No. 10393-VCG.

R.      <u>Exhibit 18</u>:  Caesars Entertainment Corporation Form 8-K, filed on January 5, 2014.

S.      <u>Exhibit 19</u>:  Caesars Entertainment Corporation Form 8-K, filed on November 10, 2014.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 11, 2015, at Los Angeles, California.

By: _____
Joshua M. Mester

**<u>EXHIBIT 1</u>**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 8-K

---

### CURRENT REPORT
### Pursuant to Section 13 or 15(d)
### of the Securities Exchange Act of 1934

### Date of Report (Date of earliest event reported) December 15, 2014

---

# Caesars Entertainment Operating Company, Inc.
#### (Exact name of registrant as specified in its charter)

---

| Delaware | 001-10413 | 75-1941623 |
|:---:|:---:|:---:|
| **(State** | **(Commission** | **(IRS Employer** |
| **of Incorporation)** | **File Number)** | **Identification Number)** |

**One Caesars Palace Drive**
**Las Vegas, Nevada 89109**
(Address of principal executive offices) (Zip Code)

**(702) 407-6000**
(Registrant's telephone number, including area code)

**N/A**
(Former Name or Former Address, if Changed Since Last Report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 7.01 Regulation FD Disclosure.**

As disclosed in the Current Report on Form 8-K filed on December 12, 2014, Caesars Entertainment Corporation ("CEC") and Caesars Entertainment Operating Company, Inc., a majority owned subsidiary of CEC ("CEOC"), are continuing confidential discussions with certain beneficial holders of CEOC's 11.25% senior secured notes due 2017, CEOC's 8.5% senior secured notes due 2020 and CEOC's 9% senior secured notes due 2020 (the "First Lien Bondholders") regarding the material economic terms for a restructuring of CEOC's debt (a "Restructuring").

In light of the ongoing discussions with the First Lien Bondholders with respect to a Restructuring, at this time CEOC has elected not to pay the following interest payments due December 15, 2014: (i) a $41.3 million interest payment that was due on CEOC's 10% second-priority senior secured notes due 2015 (the "2015 Second Lien Notes") and 10% second-priority senior secured notes due 2018 (the "2018 Second Lien Notes(1)") issued under the indenture dated December 24, 2008 (the "December 2008 Indenture") and (ii) a $184.0 million interest payment that was due on CEOC's 10% second-priority senior secured notes due 2018 (the "2018 Second Lien Notes(2)" and, together with the 2015 Second Lien Notes and the 2018 Second Lien Notes(1), the "Second Lien Notes") issued under the indenture dated April 15, 2009 (the "April 2009 Indenture"). The December 2008 Indenture and the April 2009 Indenture each provides for a 30-day grace period for an interest payment before an event of default may be deemed to have occurred under such indenture. There is approximately $825 million of Second Lien Notes outstanding under the December 2008 Indenture and $3.7 billion of Second Lien Notes outstanding under the April 2009 Indenture. As of September 30, 2014, CEOC had approximately $1.5 billion of cash and cash equivalents.

No assurances can be made that (a) a Restructuring will be implemented or (b) an agreement will be reached between CEC, CEOC and CEOC's creditors on the terms of a Restructuring.

The information set forth in this Item 7.01 of this Current Report on Form 8-K is being furnished pursuant to Item 7.01 of Form 8-K and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference into any of CEOC's filings under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made before or after the date hereof and regardless of any general incorporation language in such filings, except to the extent expressly set forth by specific reference in such a filing. The filing of this Item 7.01 of this Current Report on Form 8-K shall not be deemed an admission as to the materiality of any information herein that is required to be disclosed solely by reason of Regulation FD.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

CAESARS ENTERTAINMENT OPERATING
COMPANY, INC.

Date: December 15, 2014

By: /s/ Scott E. Wiegand
    Name: Scott E. Wiegand
    Title: Senior Vice President, Deputy General Counsel and
    Corporate Secretary

**<u>EXHIBIT 2</u>**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 8-K

---

### CURRENT REPORT
### Pursuant to Section 13 or 15(d)
### of the Securities Exchange Act of 1934

### Date of Report (Date of earliest event reported) December 19, 2014

---

# Caesars Entertainment Operating Company, Inc.
#### (Exact name of registrant as specified in its charter)

---

| **Delaware** | **001-10413** | **75-1941623** |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

**One Caesars Palace Drive**
**Las Vegas, Nevada 89109**
(Address of principal executive offices) (Zip Code)

**(702) 407-6000**
(Registrant's telephone number, including area code)

**N/A**
(Former Name or Former Address, if Changed Since Last Report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 Entry into Material Definitive Agreement.**

*Restructuring Support Agreement*

On December 19, 2014, Caesars Entertainment Corporation (" CEC "), Caesars Entertainment Operating Company, Inc., a majority owned subsidiary of CEC (" CEOC "), and holders (the " Consenting Creditors ") of over 38% of claims in respect of CEOC's 11.25% senior secured notes due 2017, CEOC's 8.5% senior secured notes due 2020 and CEOC's 9% senior secured notes due 2020 (collectively, the " First Lien Notes " and the claims with respect thereto, the " First Lien Bond Claims ") entered into an agreement (the " RSA ") to restructure CEOC's indebtedness (the " Restructuring ") pursuant to the terms of the term sheet (summarized below) incorporated into the RSA (the " Term Sheet "). The RSA will become effective upon the signing of the RSA by creditors holding at least 60% of the First Lien Bond Claims by 5:00 p.m., New York City time, on January 5, 2015, which condition may be waived in accordance with the RSA.

The Consenting Creditors have agreed to (a) support the Restructuring and vote all their First Lien Bond Claims and all their claims in respect of indebtedness outstanding under CEOC's senior secured credit facilities (" First Lien Bank Claims ") in favor of a joint pre-negotiated chapter 11 plan of reorganization of CEOC (the " Plan "), when properly solicited to do so, (b) not take any actions materially inconsistent with the Restructuring, (c) not transfer their First Lien Bond Claims and First Lien Bank Claims unless the transferee agrees to be bound by the terms of the RSA and (d) forbear from exercising certain default-related rights and remedies under the indentures governing the First Lien Notes (the " First Lien Indentures "). Pursuant to the RSA, any litigation between CEOC, CEC, their respective directors, and any Consenting Creditor would, subject to the terms and conditions set forth therein, be adjourned, stayed and/or dismissed without prejudice after a chapter 11 filing in accordance with the RSA. If the RSA is amended in a manner that would adversely affect the First Lien Bank Claims, the Consenting Creditors will no longer be obligated to vote their respective First Lien Bank Claims in favor of the Plan, but will still be required to vote their respective First Lien Bond Claims in favor of the Plan.

CEOC and CEC have also agreed to support the Restructuring and, subject to CEOC's fiduciary duties, not encourage any other restructuring of CEOC's indebtedness. CEOC has also agreed to enter into amended account control agreements in respect of certain account control agreements with Credit Suisse AG, Cayman Islands Branch, as collateral agent, as previously disclosed by CEOC in its Current Report on Form 8-K filed with the Securities and Exchange Commission on October 16, 2014. Under the RSA, CEOC, CEC and the Consenting Creditors are obligated to negotiate in good faith to reach an agreement with respect to the remaining terms of the operating leases, the debt facilities and the backstop agreement for the preferred equity on or prior to noon on December 24, 2014. The RSA may be terminated by any party if such terms are not mutually agreed by noon on December 24, 2014.

The RSA may be terminated by CEOC (and CEC, only with respect to (e) below) if, among other things, (a) a Consenting Creditor breaches its obligations under the RSA, subject to the terms and conditions set forth therein, (b) any statute, regulation, ruling or order enjoins or restricts the consummation of the Restructuring, (c) required in the exercise of its fiduciary duties as set forth in the RSA, (d) a party to the RSA files a motion in CEOC's voluntary chapter 11 cases that CEOC will commence to effectuate the Restructuring (the " Chapter 11 Cases ") substantially inconsistent with the terms of the RSA, (e) at least 66 2/3% of the beneficial holders of the First Lien Notes with power to vote in favor of the Plan have not signed the RSA by the Petition Date (as defined below), (f) any document needed to effectuate the Restructuring has terms not substantially consistent with the RSA and otherwise reasonably acceptable to CEOC, or (g) the Restructuring has not been consummated within 120 days after the entry of a confirmation order that has become a final order (the " Outside Date ").

The Consenting Creditors holding greater than two-thirds of the aggregate amount of all First Lien Bond Claims held by the Consenting Creditors (the " Requisite Consenting Creditors ") (and CEC, except for (a), with respect to itself, (i) and (k) below) may terminate the RSA if (a) CEOC or CEC breaches its respective obligations under the RSA, subject to the terms and conditions set forth therein, (b) any statute, regulation, ruling or order enjoins or restricts the consummation of the Restructuring, (c) a trustee or examiner with expanded powers is appointed in CEOC's Chapter 11 Cases, (d) CEOC's Chapter 11 Cases are dismissed or converted under chapter 7 of the Bankruptcy Code, (e) any definitive document necessary to effectuate the Restructuring is not substantially consistent with the RSA, (f) CEOC files a motion substantially inconsistent with the terms of the RSA, (g) CEOC executes a letter of intent or similar documents stating its intention to pursue an alternative proposal, (h) the automatic stay is lifted with regard to CEOC's assets having a fair market value in excess of $5 million (other than pursuant to relief sought by CEOC), (i) CEOC fails to meet or comply with the Milestones (as further described below), (j) the Restructuring is not consummated by the Outside Date, or (k) CEOC or CEC challenges the validity or priority of a material portion of the collateral securing the First Lien Notes.

The milestones that CEOC must meet or comply with under the RSA are as follows (collectively, " Milestones "): (a) commencement of CEOC's Chapter 11 Cases (the " Petition Date ") on or after January 15, 2015, but no later than January 20, 2015; (b) entry of an order for interim use of cash collateral within five business days after the Petition Date; (c) filing of a motion to assume the RSA (" RSA Assumption Motion ") within 20 days after the Petition Date; (d) filing of the Plan and disclosure statement (the " Disclosure Statement ") within 45 days after the Petition Date; (e) entry of a final order for use of cash collateral within 75 days after the Petition Date; (f) entry of an order approving the RSA within 90 days of filing the RSA Assumption Motion; (g) entry of orders approving the Disclosure Statement and solicitation procedures within 150 days after the Petition Date; (h) entry of an order confirming the Plan within 120 days after the Bankruptcy Court's approval of the Disclosure Statement; (i) the date upon which all conditions precedent to the Plan have been satisfied or waived and the Plan has become effective (the " Effective Date ") occurring by the Outside Date; provided that such Outside Date may be extended under certain circumstances if all regulatory approvals for certain assets have not been received and consummating the Restructuring without such assets would have a materially adverse effect on CEOC.

The RSA may be amended by CEOC, CEC and the Requisite Consenting Creditors, provided that (a) any amendment to the treatment of claims (other than the First Lien Bond Claims) will not require consent from any Consenting Creditors, so long as such amendment would not have an adverse impact on the interests of the holders of the First Lien Bond Claims, (b) an amendment to the definition of Consenting Creditors or Requisite Consenting Creditors or the provisions regarding the transfer of claims requires the consent of CEOC, CEC and each Consenting Creditor, (c) any amendment that would materially and adversely affect any Consenting Creditor, in its capacity as such, disproportionally to other First Lien Bond Claim holders requires the consent of such Consenting Creditor, and (d) the conditions to effectiveness of the RSA may only be waived by CEOC and CEC.

### Term Sheet to the RSA

The following is a summary of the materials terms of the Term Sheet:

*Corporate Structure and Governance*

- CEOC shall be restructured as a separate operating company (" OpCo "), and property company (" PropCo "), with a real estate investment trust (the " REIT ") directly or indirectly owning and controlling PropCo.

- OpCo shall have three board members, with CEC appointing either two or three of such members depending on whether it owns 90% or more of the equity. If CEC appoints all three members, then one member shall be an independent member.

- OpCo shall have a non-voting board observer, reasonably acceptable to OpCo, designated by the Requisite Consenting Creditors.

- The REIT shall have seven board members, with the holders of First Lien Notes (" First Lien Noteholders ") appointing either six or seven of the members depending on whether the First Lien Noteholders own 90% or more of the equity.

- PropCo shall own all of CEOC's real property and a separate subsidiary of PropCo shall own all of the assets of Caesars Palace Las Vegas (" CPLV ").


*PropCo and OpCo Lease*

- OpCo will enter into two leases for all of PropCo properties: one for CPLV and one for the non-CPLV properties. The leases will be structured as triple net leases with an adjustment for capital expenditure as described below. The initial term of each lease will be for 15 years with four five-year renewals.

- Rent will be (a) $475 million for the non-CPLV properties, reset after three years and five years at a 70% base rent and 30% variable component (with readjustment by 19.5% of the change in revenue of the properties) as well as after ten years at an 80% base rent and 20% variable component (with readjustment by 13.0% of the change in revenue of the properties), and (b) $160 million for the CPLV properties, reset after five years and ten years at an 80% base rent and 20% variable component (with readjustment by 13.0% of the change in revenue of CPLV). OpCo will be responsible for capital expenditures with PropCo reimbursing OpCo for the lesser of $78 million or 37.5% of the annual capital expenditures, with such amount decreasing by 50 cents for each dollar of OpCo free cash generated above a $10 million baseline. Such reduction would be calculated on an annual basis.

- CEC will provide a guarantee of payments and performance of OpCo's monetary obligations under the leases. CEC's guarantee obligation can only be terminated if PropCo terminates the manager without cause.


*New Capital Structure*

- New First Lien OpCo Debt : OpCo will issue up to $1,188 million in principal amount of first lien debt with a six year term and interest at LIBOR plus 4.00% with a 1% LIBOR floor.

- New Second Lien OpCo Debt : OpCo will issue up to $547 million in principal amount of second lien debt with a seven year term and interest at 8.5%.

- New First Lien PropCo Debt : PropCo will issue $2,392 million in principal amount of first lien debt with a five year term and interest at LIBOR plus 3.5% with a 1% LIBOR floor.

- New Second Lien PropCo Debt : PropCo will issue $1,425 million in principal amount of second lien debt with a six year term and interest at 8.0%.

- <u>CPLV Debt</u> : CPLV will issue $2,600 million in debt. No less than $2,000 million of such debt will be sold to third party investors for cash proceeds (" <u>CPLV Market Debt</u> "). Any remaining debt up to $600 million will constitute "CPLV Mezzanine Debt". The weighted average yield on the CPLV Market Debt and CPLV Mezzanine Debt will be capped such that the annual debt service shall not exceed $130 million, with the cap increased by $2 million for every $100 million of Equitized CPLV Mezzanine Debt (as defined below).

- <u>PropCo Preferred Equity</u> : PropCo may issue up to $300 million of preferred equity (the " <u>PropCo Preferred Equity</u> "), the proceeds of which will be used to first reduce the amount of CPLV Debt issued to First Lien Noteholders, if any, second, if required, to reduce the amount of CPLV Market Debt required to meet certain conditions, and third to reduce the amount of New Second Lien PropCo Debt. The PropCo Preferred Equity will be entitled to paid-in-kind dividends at a rate equal to the dividend yield to holders of ProCo's common stock, provided the rate shall not be less than 5% per annum. The PropCo Preferred Equity shall be fully backstopped and any First Lien Noteholder who signs the RSA on or prior to December 24, 2014 may join the backstop, which shall receive a commitment fee and the right to purchase 50% of the PropCo Preferred Equity. All First Lien Noteholders, regardless of participation in the backstop, shall have the right to purchase PropCo Preferred Equity.


*Recoveries*

- Each lender under CEOC's senior secured credit facilities (each, a " <u>First Lien Bank Lender</u> ") will receive its pro rata share of (a) $705 million in cash, (b) $883 million in New First Lien OpCo Debt, (c) $406 million of New Second Lien OpCo Debt, (d) $1,961 million in New First Lien PropCo Debt, and (e) up to $1,450 million in additional cash or CPLV Mezzanine Debt.

- Each First Lien Noteholder will receive its pro rata share of (a) $413 million in cash, (b) $306 million in New First Lien OpCo Debt, (c) $141 million of New Second Lien OpCo Debt, (d) $431 million in New First Lien PropCo Debt, (e) $1,425 million in New Second Lien PropCo Debt, (f) up to $1,150 million in additional cash or CPLV Mezzanine Debt, (g) 69.9% directly or indirectly of PropCo equity (or cash as described below under Put Options and Equity Rights) and (h) 100% of the OpCo equity (or cash as described below under Put Options and Equity Rights).

- If they vote as a class to accept the Plan, each Non-First Lien Noteholder (as defined in the Term Sheet) will receive its pro rata share of 30.1% of the equity, directly or indirectly, in PropCo, and have the option to be a participant in the Equity Rights (as described below). If the Non-First Lien Noteholders do not vote as a class to accept the Plan, each Non-First Lien Noteholder will receive its pro rata share of 17.5% of the equity, directly or indirectly, in PropCo, and the remaining 12.6% of PropCo equity shall be allocated to the equity holders of PropCo, excluding the Non-First Lien Noteholders, based on their pro rata ownership in PropCo.


*Put Options and Equity Rights*

- Each First Lien Noteholder may elect to put up to (a) all of the OpCo equity for $700 million and/or (b) 14.8% of the PropCo equity they are to receive under the Plan to CEC for $269 million. The First Lien Noteholders may also elect to purchase all or some of the PropCo equity being put.

- If the Non-First Lien Noteholders vote as a class to accept the Plan, they may elect to purchase up to all of the PropCo equity (excluding 5% of PropCo equity retained by OpCo) from the First Lien Noteholders (" <u>Equity Rights</u> "). For every $1 of PropCo equity purchased, the Non-First Lien Noteholders must purchase $0.25 of CPLV Mezzanine Debt, which will then be converted into PropCo equity (" <u>Equitized CPLV Mezzanine Debt</u> ").

*CEC's Contribution to the Restructuring*

- In order to effectuate the Restructuring, CEC has agreed to take the following actions:

  - Contribute $406 million to CEOC;

  - Contribute an additional $75 million to CEOC if there is insufficient liquidity at closing;

  - Purchase up to all of OpCo equity for $700 million and 14.8% of PropCo equity for $269 million;

  - Give PropCo a right of first refusal on all new domestic non-Las Vegas opportunities, with CEC or OpCo leasing such properties; and

  - Guarantee OpCo's monetary obligations to PropCo under the leases.

*Additional Terms*

- <u>Cash Collateral</u> : The First Lien Noteholders will support entry of a cash collateral order. Such order shall include a budget, milestones and payment of adequate protection in the form of interest at a rate equal to 1.5%.

- <u>PropCo Call Rights</u> : Subject to the terms of the debt documents for Caesars Entertainment Resort Properties, LLC and its subsidiaries, PropCo shall have a right for up to 180 days after consummation of the Restructuring to enter into an agreement to buy Harrah's Atlantic City and Harrah's Laughlin for a cash purchase price equal to ten times the agreed annual rent for such properties.

There are no assurances that the RSA will become effective or that the Restructuring will be completed on the terms contemplated or at all.

The foregoing description of the RSA and the term sheet to the RSA does not purport to be complete and is qualified in its entirety by reference to the RSA, which CEOC will file by amendment to this Current Report on Form 8-K.

**Item 7.01 Regulation FD Disclosure.**

On December 19, 2014, CEC announced the entry of CEC and CEOC into the RSA. A copy of the press release is attached hereto as Exhibit 99.1, and is incorporated into this report by reference.

The information set forth in this Item 7.01 of this Current Report on Form 8-K is being furnished pursuant to Item 7.01 of Form 8-K and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference into any of CEOC's filings under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made before or after the date hereof and regardless of any general incorporation language in such filings, except to the extent expressly set forth by specific reference in such a filing. The filing of this Item 7.01 of this Current Report on Form 8-K shall not be deemed an admission as to the materiality of any information herein that is required to be disclosed solely by reason of Regulation FD.

**Forward-Looking Statements**

This filing contains or may contain "forward-looking statements" intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995. You can identify these statements by the fact that they do not relate strictly to historical or current facts. These statements contain words such as "may," "will," "might," "expect," "intend," "could," "would" or "estimate," or the negative of these words or other words or expressions of similar meaning may identify forward-looking statements and are found at various places throughout this Form 8-K. These forward-looking statements, including, without limitation, those relating to the Restructuring, wherever they occur in this filing, are based on CEOC management's current expectations about future events and are necessarily estimates reflecting the best judgment of management and involve a number of risks and uncertainties that could cause actual results to differ materially from those suggested by the forward-looking statements.

Investors are cautioned that forward-looking statements are not guarantees of future performance or results and involve risks and uncertainties that cannot be predicted or quantified, and, consequently, actual results may differ materially from those expressed or implied by such forward-looking statements. Such risks and uncertainties include, but are not limited to, the following factors, as well as other factors described from time to time in CEOC's reports filed with the SEC (including the sections entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" contained therein):

• the ability to retain key employees during the Restructuring;

• the effects of CEOC's bankruptcy filing on CEOC and its subsidiaries and affiliates, including CEC, and the interests of various creditors, equity holders and other constituents;

• the event that the RSA may not be consummated in accordance with its terms, or persons not party to the RSA may successfully challenge the implementation thereof;

• the effect of bankruptcy court rulings in the Chapter 11 Cases and the outcome of such cases in general;

• the length of time CEOC will operate in the Chapter 11 Cases or CEOC's ability to comply with the milestones provided by the RSA;

• risks associated with third party motions in the Chapter 11 Cases, which may hinder or delay CEOC's ability to consummate the Restructuring as contemplated by the RSA;

• the potential adverse effects of Chapter 11 proceedings on CEOC's liquidity or results of operations;

• the impact of CEOC's substantial indebtedness and the restrictions in CEOC's debt agreements that might limit CEOC's ability to negotiate and complete the Restructuring;

• litigation outcomes and judicial and governmental body actions, including gaming legislative action, referenda, regulatory disciplinary actions, and fines and taxation, including but not limited to, the assertion and outcome of litigation or other claims that may be brought against CEC and CEOC by certain creditors, some of whom have notified CEC and CEOC of their objection to various transactions undertaken by CEC and CEOC in 2013 and 2014;

- CEOC's significant liquidity requirements and substantial levels of indebtedness;

- increased costs of financing, a reduction in the availability of financing and fluctuations in interest rates in connection with the Restructuring;

- economic, business, competitive, and/or regulatory factors affecting the businesses of CEOC and its subsidiaries and affiliates, including CEC, generally;

- the effects of local and national economic, credit and capital market conditions on the economy in general, and on the gaming industry in particular;

- changes in laws, including increased tax rates, smoking bans, regulations or accounting standards, third-party relations and approvals, and decisions, disciplines, and fines of courts, regulators, and governmental bodies;

- the effects of competition, including locations of competitors, competition for new licenses and operating and market competition;

- abnormal gaming holds ("gaming hold" is the amount of money that is retained by the casino from wagers by customers);

- construction factors, including delays, increased costs of labor and materials, availability of labor and materials, zoning issues, environmental restrictions, soil and water conditions, weather and other hazards, site access matters, and building permit issues;

- access to insurance on reasonable terms for CEC and CEOC's assets; and

- the impact, if any, of unfunded pension benefits under multi-employer pension plans.

You are cautioned to not place undue reliance on these forward-looking statements, which speak only as of the date of this filing. CEOC undertakes no obligation to publicly update or release any revisions to these forward-looking statements to reflect events or circumstances after the date of this filing or to reflect the occurrence of unanticipated events, except as required by law.

**Item 9.01 Financial Statements and Exhibits.**

(d)    Exhibits. The following exhibit is being furnished herewith:

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Text of press release, dated December 19, 2014. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

CAESARS ENTERTAINMENT OPERATING COMPANY, INC.

Date: December 19, 2014

By: / s / SCOTT E. WIEGAND

Name:  Scott E. Wiegand
Title:   Senior Vice President, Deputy General Counsel and
          Corporate Secretary

**EXHIBIT INDEX**

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Text of press release, dated December 19, 2014. |



**Stephen Cohen – Media**
**Caesars Entertainment Corporation**
**(347) 489-6602**

**Jennifer Chen – Investors**
**Caesars Entertainment Corporation**
**(702) 407-6407**

**Caesars Entertainment Operating Co. Reaches Agreement with**
**First Lien Noteholder Steering Committee on Debt Restructuring**

*Business Operations to Continue as Usual with No Interruption in Service*

*No Impact to Related Entities, including Caesars Entertainment,*
*Caesars Acquisition Co. and Caesars Entertainment Resort Properties*

LAS VEGAS, Dec. 19, 2014 — Caesars Entertainment Operating Company, Inc. ("CEOC"), a subsidiary of Caesars Entertainment Corporation ("Caesars Entertainment") (Nasdaq: CZR), and Caesars Entertainment have reached an agreement with CEOC's first lien noteholder steering committee regarding terms of a financial restructuring plan. The proposed plan will significantly reduce long-term debt and annual interest payments, and result in a stronger balance sheet for CEOC.

The restructuring support agreement has been signed by all members of the first lien noteholder steering committee.

"The planned restructuring of CEOC will allow us to establish a strong and sustainable capital structure for CEOC and maximize value for our stakeholders," said Gary Loveman, Chairman of CEOC. "I want to thank this creditor group for its support of the restructuring. We believe the financial restructuring plan we are announcing today is in the best interests of all of CEOC's stakeholders. We look forward to continuing to welcome guests across our network throughout this process. Business operations at all properties and the Total Rewards program will continue as usual throughout the balance sheet restructuring process."

To implement the balance sheet deleveraging, CEOC expects to voluntarily commence a reorganization under Chapter 11 of the U.S. Bankruptcy Code in mid-January 2015. CEOC and its properties will continue to operate in the ordinary course throughout the restructuring process. Caesars Entertainment, Caesars Entertainment Resort Properties and Caesars Growth Partners, which are separate entities with independent debt capital structures, will not be part of the court-supervised process.

Under the terms of the proposed financial restructuring, CEOC will convert its corporate structure by separating virtually all of its US-based gaming operating assets and real property assets into two companies, including an operating entity ("OpCo") and a newly formed, publicly traded real estate investment trust ("REIT") that will directly or indirectly own a newly formed property company ("PropCo").

The proposed transactions would reduce CEOC's debt by approximately $10 billion, providing for the exchange of approximately $18.4 billion of outstanding debt for $8.6 billion of new debt. Annual interest expense would be reduced by approximately 75%, from approximately $1.7 billion to approximately $450 million. PropCo would lease its real property assets to OpCo in exchange for annual lease payments of $635 million, with the lease payments guaranteed by CEC.

"The highly efficient REIT structure would enable CEOC to maximize its value and provide the most financial recovery to each of CEOC's creditor groups," Loveman said. "The formation of a publicly traded REIT would also allow CEOC to significantly reduce its leverage by creating two better capitalized companies with vastly improved cash flow generation. The transaction provides for the continued integration of CEOC's existing properties with Caesars Entertainment's multi-channel distribution network and industry-leading Total Rewards loyalty program. Combined, these actions will result in a stronger, more competitive and sustainable CEOC and will better position Caesars Entertainment for future growth, investment and success."

<div align="center">Terms & Capital Structure</div>

The proposed restructuring plan has the support of all members of the first lien bondholder steering committee. CEOC is continuing to work to obtain additional support from its other creditors.

The specifics of the plan are consistent with the plan disclosed via 8-K on December 12, 2014, however, to further reduce the leverage of CEOC beyond the previously published plan, first lien note holders will have the right to backstop the issuance of $300 million convertible preferred equity securities to be issued by PropCo. First lien holders who agree to backstop the purchase will be paid a commitment fee. The preferred shares will be convertible into PropCo common stock at plan value. First lien holders who sign the restructuring support by December 24, 2014 can join the backstop.

Under the plan, Caesars Entertainment will contribute up to $1.45 billion in cash to CEOC in support of the restructuring: $700 million to offer to purchase up to 100% of the equity in OpCo from creditors, $269 million to offer to purchase up to 15% of the equity in PropCo, $406 million to fund liquidity and cash recoveries to creditors and a guarantee of up to an additional $75 million of cash, which can be drawn by CEOC under certain circumstances. In addition, Caesars Entertainment has agreed to guarantee OpCo's monetary obligations under the lease to help facilitate the creation of the valuable REIT structure.

The restructuring is conditioned upon the release of all pending and potential litigation claims against Caesars Entertainment, Caesars Acquisition and related parties. The proposed restructuring plan is subject to approval by the bankruptcy court and the receipt of required gaming regulatory approvals. There are no assurances that the restructuring support agreement will become effective or that the proposed restructuring plan will be completed on the terms contemplated or at all.

Further details on the transaction will be included in Form 8-K filed with the SEC later today.

**About Caesars Entertainment Operating Company Inc.**

Caesars Entertainment Operating Company, Inc. ("CEOC"), a majority owned subsidiary of Caesars Entertainment Corporation, provides casino entertainment services and owns, operates or manages 44 gaming and resort properties in 13 states of the United States and in five countries primarily under the Caesars, Harrah's and Horseshoe brand names. CEOC is focused on building customer loyalty through providing its guests with a combination of great service, excellent products, unsurpassed distribution, operational excellence and technology leadership as well as all the advantages of the Total Rewards program. CEOC also is committed to environmental sustainability and energy conservation, and recognizes the importance of being a responsible steward of the environment.

**About Caesars Entertainment**

Caesars Entertainment Corporation (CEC) is the world's most diversified casino-entertainment provider and the most geographically diverse U.S. casino-entertainment company. CEC is mainly comprised of the following three entities: the majority owned operating subsidiary Caesars Entertainment Operating Company, wholly owned Caesars Entertainment Resort Properties and Caesars Growth Properties, in which we hold a variable economic interest. Since its beginning in Reno, Nevada, 75 years ago, CEC has grown through development of new resorts, expansions and acquisitions and its portfolio of subsidiaries now operate 50 casinos in 13 U.S. states and five countries. The Company's resorts operate primarily under the Caesars ®, Harrah's ® and Horseshoe ® brand names. CEC's portfolio also includes the London Clubs International family of casinos. CEC is focused on building loyalty and value with its guests through a unique combination of great service, excellent products, unsurpassed distribution, operational excellence and technology leadership. The Company is committed to environmental sustainability and energy conservation and recognizes the importance of being a responsible steward of the environment. For more information, please visit www.caesars.com.

**Forward Looking Information**

This release includes "forward-looking statements" intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995. You can identify these statements by the fact that they do not relate strictly to historical or current facts. These statements contain words such as "may," "will," "expect," "believe," "would," "estimate," "continue," or "future," or the negative or other variations thereof or comparable terminology. In particular, they include statements relating to, among other things, the proposed restructuring of CEOC and future outcomes. These forward-looking statements are based on current expectations and projections about future events.

Investors are cautioned that forward-looking statements are not guarantees of future performance or results and involve risks and uncertainties that cannot be predicted or quantified, and, consequently, actual results may differ materially from those expressed or implied by such forward-looking statements. Such risks and uncertainties include, but are not limited to, the following factors, and other

factors described from time to time in the Company's reports filed with the Securities and Exchange Commission (including the sections entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" contained therein):

- the ability to retain key employees during CEOC's restructuring;

- the effects of CEOC's bankruptcy filing on Caesars Entertainment and its subsidiaries and affiliates, and the interests of various creditors, equity holders and other constituents;

- the event that the restructuring of CEOC may not be consummated in accordance with its terms, or persons not party to the agreement described in this release may successfully challenge the implementation thereof;

- the effects of the bankruptcy court rulings in the Chapter 11 case and the outcome of such cases in general;

- the length of time CEOC will operate in the Chapter 11 cases or CEOC's ability to comply with the milestones provided by the restructuring support agreement;

- risks associated with third party motions in the Chapter 11 cases, which may hinder or delay CEOC's ability to consummate its restructuring plan as contemplated by the restructuring support agreement;

- the potential adverse effects of Chapter 11 proceedings on Caesars Entertainment's liquidity or results of operations;

- the impact of CEOC's substantial indebtedness and the restrictions in CEOC's debt agreements that might limit CEOC's ability to negotiate and complete its restructuring;

- litigation outcomes and judicial and governmental body actions, including gaming legislative action, referenda, regulatory disciplinary actions, and fines and taxation, including but not limited to, the assertion and outcome of litigation or other claims that may be brought against Caesars Entertainment and CEOC by certain creditors, some of whom have notified Caesars Entertainment and CEOC of their objection to various transactions undertaken by Caesars Entertainment and CEOC in 2013 and 2014;

- CEOC's significant liquidity requirements and substantial levels of indebtedness;

- increased costs of financing, a reduction in the availability of financing and fluctuations in interest rates in connection with CEOC's restructuring;

- economic, business, competitive, and/or regulatory factors affecting the businesses of Caesars Entertainment and its subsidiaries generally;

- the effects of local and national economic, credit and capital market conditions on the economy in general, and on the gaming industry in particular;

- changes in laws, including increased tax rates, smoking bans, regulations or accounting standards, third-party relations and approvals, and decisions, disciplines, and fines of courts, regulators, and governmental bodies;

- the effects of competition, including locations of competitors, competition for new licenses and operating and market competition;

- abnormal gaming holds ("gaming hold" is the amount of money that is retained by the casino from wagers by customers);

- construction factors, including delays, increased costs of labor and materials, availability of labor and materials, zoning issues, environmental restrictions, soil and water conditions, weather and other hazards, site access matters, and building permit issues;

- access to insurance on reasonable terms for Caesars Entertainment and CEOC's assets; and

- the impact, if any, of unfunded pension benefits under multi-employer pension plans.

Any forward-looking statements are made pursuant to the Private Securities Litigation Reform Act of 1995 and, as such, speak only as of the date made. Caesars disclaims any obligation to update the forward-looking statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date stated or, if no date is stated, as of the date of this filing.

# # #

**EXHIBIT 3**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 8-K

---

## CURRENT REPORT
### Pursuant to Section 13 or 15(d)
### of the Securities Exchange Act of 1934

**December 31, 2014**
**Date of Report (Date of earliest event reported)**

---

# Caesars Entertainment
# Operating Company, Inc.
### (Exact name of registrant as specified in its charter)

---

| **Delaware** | **001-10413** | **75-1941623** |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

**One Caesars Palace Drive**
**Las Vegas, Nevada 89109**
(Address of principal executive offices) (Zip Code)

**(702) 407-6000**
(Registrant's telephone number, including area code)

**N/A**
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐      Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐      Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐      Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐      Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01  Entry into Material Definitive Agreement.**

On December 31, 2014, Caesars Entertainment Corporation (" CEC "), Caesars Entertainment Operating Company, Inc., a majority owned subsidiary of CEC (" CEOC "), and certain holders of claims in respect of CEOC's 11.25% senior secured notes due 2017, CEOC's 8.5% senior secured notes due 2020 and CEOC's 9% senior secured notes due 2020 (collectively, the " First Lien Notes " and, the claims with respect thereto, the " First Lien Bond Claims ") agreed to amend and restate (the " Amendment ") the Restructuring Support and Forbearance Agreement, dated as of December 19, 2014 (the " RSA "), among CEC, CEOC and the Consenting Creditors (as defined in the RSA). Pursuant to the Amendment, the RSA has been amended to provide that (A) CEC, CEOC and their respective affiliates will not offer any additional consideration to any holders of First Lien Notes or any holders of indebtedness incurred by CEOC under its credit agreement (the " First Lien Bank Debt ") without making any such additional consideration available to Consenting Creditors that are holders of First Lien Bond Claims or holders of claims with respect to First Lien Bank Debt (" First Lien Bank Claims "), respectively, on a pro rata basis and (B) any Consenting Creditor that is a holder of First Lien Bond Claims or a holder of First Lien Bank Claims will have a right to terminate the RSA with respect to itself if such holder is not accorded additional consideration received by other holders of First Lien Notes or other holders of First Lien Bank Debt, respectively, in connection with the restructuring of CEOC.

The foregoing description of the Amendment does not purport to be complete and is qualified in its entirety by reference to the Amendment, which is filed as Exhibit 10.1 hereto and incorporated herein by reference.

**Item 9.01  Financial Statements and Exhibits.**

(d)    Exhibits. The following exhibit is being filed herewith:

| Exhibit No. | Description |
| --- | --- |
| 10.1 | Amended and Restated Restructuring Support and Forbearance Agreement, dated as of December 31, 2014, among Caesars Entertainment Operating Company, Inc., on behalf of itself and the subsidiary loan parties party thereto, Caesars Entertainment Corporation, LeverageSource III (H Holdings), L.P., LeverageSource V, L.P. and each of the holders of First Lien Bond Claims party thereto. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

CAESARS ENTERTAINMENT OPERATING COMPANY, INC.

Date: December 31, 2014

By: _____/ s / Scott E. Wiegand_____

Name: Scott E. Wiegand

Title: Senior Vice President, Deputy General Counsel and Corporate Secretary

## EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| 10.1 | Amended and Restated Restructuring Support and Forbearance Agreement, dated as of December 31, 2014, among Caesars Entertainment Operating Company, Inc., on behalf of itself and the subsidiary loan parties party thereto, Caesars Entertainment Corporation, LeverageSource III (H Holdings), L.P., LeverageSource V, L.P. and each of the holders of First Lien Bond Claims party thereto. |

**THIS AGREEMENT IS NOT, AND SHALL NOT BE DEEMED, A SOLICITATION FOR CONSENTS TO ANY PLAN PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR A SOLICITATION TO TENDER OR EXCHANGE OF ANY OF THE NOTES OR BONDS ISSUED PURSUANT TO THE FIRST LIEN INDENTURES. EACH CONSENTING CREDITOR'S VOTE ON THE PLAN SHALL NOT BE SOLICITED UNTIL THE CONSENTING CREDITORS HAVE RECEIVED THE DISCLOSURE STATEMENT AND RELATED BALLOT(S), AS APPROVED BY THE BANKRUPTCY COURT**

## AMENDED & RESTATED RESTRUCTURING SUPPORT AND FORBEARANCE AGREEMENT

This Amended & Restated Restructuring Support and Forbearance Agreement dated as of December 31, 2014 amends, restates and replaces the Restructuring Support and Forbearance Agreement dated as of December 19, 2014 (as amended, supplemented, or otherwise modified from time to time, this "Agreement"), among: (i) Caesars Entertainment Operating Company, Inc. ("CEOC"), on behalf of itself and each of the Subsidiary Loan Parties (as defined in the Credit Agreement (as defined below)) identified on Exhibit A hereto (collectively, the "Company"), (ii) Caesars Entertainment Corporation ("CEC," and together with the Company, the "Caesars Parties"), (iii) LeverageSource III (H Holdings), L.P. ("LS3"), (iv) LeverageSource V, L.P. ("LS5"), and (v) each of the undersigned noteholders, each of which is the holder of, or the investment advisor or the investment manager to a holder or holders of First Lien Bond Claims (as defined below) (and in such capacity having the power to bind such holder with respect to any First Lien Bond Claims identified on its signature page hereto) (including any permitted assignees under this Agreement, collectively, the "Consenting Creditors," and together with the Caesars Parties, LS3, and LS5, each referred to as a "Party" and collectively referred to as the "Parties"). All capitalized terms not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet (as defined below).

## RECITALS:

**WHEREAS**, before the date hereof, the Parties and their representatives have engaged in arm's-length, good-faith negotiations regarding a potential restructuring of the Company's indebtedness and other obligations pursuant to the terms and conditions of this Agreement and the terms and conditions set forth on the term sheet annexed hereto as Exhibit B (the "Restructuring") (which term sheet, including any schedules, annexes, and exhibits attached thereto, is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (as such term sheet may be modified in accordance with Section 14 hereof, the "Restructuring Term Sheet"));

**WHEREAS**, if effected, the Restructuring will resolve all claims between the Consenting Creditors (including EMC (as defined below)) and the Caesars Parties, including any litigation-related claims against the Company and CEC and those at issue in the Caesars-Commenced Litigation (as defined below);

**WHEREAS**, the Company will be implementing the Restructuring through a prenegotiated joint chapter 11 plan of reorganization;

1

**WHEREAS** , the Parties have agreed that the Company may use Cash Collateral (as defined below) during the Chapter 11 Cases (as defined below) on the terms and subject to the conditions set forth in the Restructuring Term Sheet and as otherwise satisfactory to the Parties; and

**WHEREAS** , the Parties have agreed to take certain actions in support of the Restructuring on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which each of the Parties hereby acknowledges, each Party, intending to be legally bound hereby, agrees as follows:

1. **Definitions; Rules of Construction** .

(a) Definitions . The following terms shall have the following definitions:

" Additional Bank Consideration " means any consideration provided by the Caesars Parties or their Affiliates in connection with the Restructuring or entry into this Agreement to any holder of First Lien Bank Debt, in its capacity as such, that exceeds or is superior to that contemplated under the Restructuring, including, without limitation, additional consideration, the granting of any guaranty, and/or the allocation of any rights or opportunities (whether investment, commercial, management, advisory or otherwise) related to the Company or the Restructuring.

" Additional Bond Consideration " means any consideration provided by the Caesars Parties or their Affiliates in connection with the Restructuring or entry into this Agreement to any holder of First Lien Bond Debt, in its capacity as such, that exceeds or is superior to that contemplated under the Restructuring, including, without limitation, additional consideration, the granting of any guaranty, and/or allocation of any rights or opportunities (whether investment, commercial, management, advisory or otherwise) related to the Company or the Restructuring.

" Affiliate " means, with respect to any Person, any other Person (whether now or hereinafter in existence) which directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

" Agreement " has the meaning set forth in the preamble hereof.

" Alternative Proposal " means any plan of reorganization or liquidation, proposal, offer, transaction, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of material assets or equity interests or restructuring (other than the Restructuring) involving the Company and its controlled subsidiaries.

2

" Bankruptcy Code " means title 11 of the United States Code, 11 U.S.C. §§101 *et seq* .

" Bankruptcy Court " means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced, as determined by the Company in consultation with CEC and previously disclosed to the Consenting Creditors.

" Business Day " means any day other than Saturday, Sunday, and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

" Caesars-Commenced Litigation " means the case captioned *Caesars Entertainment Operating Company, Inc. and Caesars Entertainment Corporation v. Appaloosa Investment Limited Partnership I, et. al.* , Index No. 652392/2014 (N.Y. Sup. Ct., N.Y. Cty.).

" Caesars Cases " means the cases captioned (a)  *Wilmington Savings Fund Society, FSB, solely in its capacity as successor Indenture Trustee for the 10% Second-Priority Senior Secured Notes due 2018, on behalf of itself and derivatively on behalf of Caesars Entertainment Operating Company, Inc. v. Caesars Entertainment Corporation, et. al.* , Case No. 10004-VCG (Del. Ch.), (b)  *MeehanCombs Global Credit Opportunities Master Fund, LP, et. al. v. Caesars Entertainment Corporation and Caesars Entertainment Operating Company, Inc.* , No. 14-cv-7097 (S.D.N.Y.), and (c)  *Frederick Barton Danner v. Caesars Entertainment Corporation and Caesars Entertainment Operating Company, Inc.* , No. 14-cv-7973 (S.D.N.Y.), and (d) all claims in, and causes of action relating to, the Caesars Cases otherwise described in clauses (a)–(c) above.

" Caesars Parties " has the meaning set forth in the preamble hereof.

" Cash Collateral " means the Company's cash to the extent that such cash is "Collateral" and subject to a perfected "Lien," both as defined under the Credit Agreement and/or First Lien Indentures, as the case may be, and in each case that has not been avoided.

" Cash Collateral Stipulation " means a stipulation governing the use of Cash Collateral that shall be consistent with the Restructuring Term Sheet and otherwise reasonably acceptable in form and substance to the Company, CEC, and the Requisite Consenting Creditors.

" CEC " has the meaning set forth in the preamble hereof.

" CEC Transactions " means the transactions consummated pursuant to, in contemplation of, or in connection with (a) the Amended and Restated Credit Agreement, dated as of November 14, 2012, among CEOC, as borrower, and CEC, as lenders, and (b) the Global Intercompany Note, dated as of January 28, 2008, among CEC and certain Affiliates.

" CEOC " has the meaning set forth in the preamble hereof.

3

" <u>CES</u> " means Caesars Enterprise Services, LLC and its subsidiaries (whether now or hereinafter in existence).

" <u>Chapter 11 Cases</u> " means the voluntary chapter 11 cases that the Company will commence to effectuate the Restructuring.

" <u>Claim</u> " means any claim identified on a Party's signature block hereto on account of indebtedness issued by CEOC pursuant to the Credit Agreement, the First Lien Indentures, or the Non-First Lien Indentures, or any other claim (as that term is defined by section 101(5) of the Bankruptcy Code), in each case, other than any claim for which the holder (x) does not have the right to control voting or (y) is not permitted by a preexisting contractual obligation or operation of law to vote in favor of the Restructuring. For the avoidance of doubt (i) "Claim" shall not include any claims in respect of derivatives related to or referencing indebtedness, (ii) without limiting <u>Section 12</u> hereof, if the holder of a claim ceases to have the right to control voting with respect to such claim, such claim shall no longer be deemed a "Claim" for purposes of this Agreement, unless and until such holder subsequently acquires the right to control voting with respect to such claim, and (iii) the definition set forth herein shall not limit nor be deemed to limit the scope of any release provided under the Restructuring Term Sheet.

" <u>Claim Holder</u> " refers to (i) each Consenting Creditor, (ii) LS3, (iii) LS5, and (iv) each Caesars Party, to the extent such Caesars Party, as of the date of execution of this Agreement, either (a) is a beneficial owner of Claims or (b) has investment or voting discretion with respect to Claims and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement.

" <u>Collateral Agent</u> " has the meaning ascribed to it in the Credit Agreement and First Lien Indentures.

" <u>Company</u> " has the meaning set forth in the preamble hereof.

" <u>Company Termination Event</u> " has the meaning set forth in <u>Section 10</u> hereof.

" <u>Confidential Claims Information</u> " has the meaning set forth in <u>Section 5(a)(iii)</u> hereof.

" <u>Confirmation Order</u> " has the meaning set forth on <u>Exhibit D</u> hereto.

" <u>Consenting Creditors</u> " has the meaning set forth in the preamble hereof.

" <u>Credit Agreement</u> " means the Third Amended and Restated Credit Agreement, dated as of July 25, 2014, among CEC, CEOC, as borrower, the lenders party thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent.

" <u>Creditor Termination Event</u> " has the meaning set forth in <u>Section 8</u> hereof.

" <u>Creditor Termination Right</u> " has the meaning set forth in <u>Section 8</u> hereof.

4

"   Definitive Documentation   " means the RSA Assumption Motion, Plan, Disclosure Statement, Cash Collateral Stipulation, any court filings in the Chapter 11 Cases that could be reasonably expected to affect the interests of holders of First Lien Bond Claims (but not, for the avoidance of doubt, any professional retention motions or applications), in their capacities as such, and any other documents or exhibits related to or contemplated in the foregoing.

"   Deposit Accounts   " means (i) account number                          held at U.S. Bank National Association and (ii) account number                held at Wells Fargo Bank, National Association, or such other account(s) as may be designated in the event that applicable control agreements are breached or if a notice of exclusive control is delivered with respect to such account(s).

"   Disclosure Statement   " means the Company's disclosure statement, including any exhibits, appendices, related documents, ballots, and procedures related to the solicitation of votes to accept or reject the Plan, in each case, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, in respect of the Plan and that is prepared and distributed in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Rule 3018 of the Federal Rules of Bankruptcy Procedure, and other applicable law, each of which shall be substantially consistent with this Agreement and shall otherwise be reasonably acceptable to the Requisite Consenting Creditors and the Company.

"   Effective Date   " means the date upon which all conditions precedent to the effectiveness of the Plan have been satisfied or are expressly waived in accordance with the terms thereof, as the case may be, and on which the Restructuring and the other transactions to occur on the Effective Date pursuant to the Plan become effective or are consummated.

"   EMC   " means certain entities or accounts managed or controlled by Elliott Management Corporation who are named as defendants in the Caesars-Commenced Litigation.

"   Event of Default   " has the meaning ascribed to it in the First Lien Indentures.

"   Executory Contracts and Unexpired Leases   " means any contracts or unexpired leases to which the Company is a party that are subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"   Fiduciary Out   " has the meaning set forth in Section 10(c) hereof.

"   First Lien Bank Claim   " means a Claim in respect of First Lien Bank Debt.

"   First Lien Bank Debt   " means indebtedness incurred by the Company pursuant to the Credit Agreement.

"   First Lien Bank Documents   " means the "Loan Documents" as defined in the Credit Agreement.

"   First Lien Bond Claim   " means a Claim in respect of First Lien Bond Debt.

5

" First Lien Bond Debt " means indebtedness incurred by the Company pursuant to the First Lien Indentures.

" First Lien Fees and Expenses " means (i) all reasonable and documented out-of-pocket expenses (other than professional fees) incurred by any Initial Consenting Creditor in connection with the negotiation and implementation of the Restructuring plus (ii) First Lien Professional Fees.

" First Lien Indentures " means (i) the Indenture dated as of June 10, 2009, as it may have been amended and supplemented from time to time, governing CEOC's 11.25% Senior Secured Notes due 2017, (ii) the Indenture dated as of February 14, 2012, as it may have been amended and supplemented from time to time, governing CEOC's 8.5% Senior Secured Notes due 2020, (iii) the Indenture dated as of August 22, 2012, as it may have been amended and supplemented from time to time, governing CEOC's 9% Senior Secured Notes due 2020 and (iv) the Indenture dated as of February 15, 2013, as it may have been amended and supplemented from time to time, governing CEOC's 9% Senior Secured Notes due 2020.

" First Lien Professional Fees " means all reasonable and documented fees and expenses of the First Lien Professionals incurred in their representation of holders of First Lien Bond Debt in connection with the Company, from the date of the First Lien Professionals' respective retentions by such holders of First Lien Bond Debt through and including the later of either (i) the termination of this Agreement pursuant to Sections 8 , 9 , or 10 of this Agreement or (ii) the Effective Date; provided that documentation of such First Lien Professional Fees shall be summary in nature and shall not include billing detail that may be subject to the attorney-client privilege or other similar protective doctrines.

" First Lien Professionals " means Kramer Levin Naftalis & Frankel LLP, Miller Buckfire & Co., Breazeale, Sachse & Wilson, L.L.P., Ballard Spahr LLP, one (1) special REIT counsel, and one (1) local counsel engaged by the Consenting Creditors in connection with the Chapter 11 Cases, and such other legal, consulting, financial, and/or other professional advisors as may be retained or may have been retained from time to time by any of the Initial Consenting Creditors with the prior written consent of the Company, which consent shall not be unreasonably withheld.

" Forbearance Defaults " means defaults or Events of Default alleged in or in connection with (a) the May 2014 Transactions, (b) the Services Transactions, (c) the CEC Transactions, (d) the Incurrence Transactions, (e) the Restricted Transactions, (f) the Caesars Cases, (g) the Caesars-Commenced Litigation, and (h) any actions taken pursuant to and in compliance with the terms of this Agreement.

" Forbearance Termination Event " has the meaning set forth in Section 3(a) hereto.

" Incurrence Transactions " means the transactions consummated pursuant to, in contemplation of, or in connection with the Incremental Facility Amendment and Term B-7 Agreement, dated as of June 11, 2014, among CEC, Caesars Operating Escrow LLC, the Incremental Lenders party thereto, Bank of America, N.A., Credit Suisse AG, Cayman Islands Branch, and upon the assumption of the Term B-7 Loans, CEOC.

6

"  Initial Consenting Creditor " means the Consenting Creditors who are the following signatories hereto: (i) Brigade Capital Management, LP; (ii) DDJ Capital Management, LLC; (iii) Elliott International, L.P.; (iv) Elliott Associates, L.P.; (v) The Liverpool Limited Partnership; (vi) J.P. Morgan Investment Management Inc.; (vii) JPMorgan Chase Bank, N.A.; and (viii) Pacific Investment Management Company LLC.

"  LS3 " has the meaning set forth in the preamble hereof.

"  LS5 " has the meaning set forth in the preamble hereof.

"  May 2014 Transactions " means the transactions consummated pursuant to, in contemplation of, or in connection with the Transaction Agreement dated as of March 1, 2014, as amended, by and among CEC, CEOC, Caesars License Company, LLC, Harrah's New Orleans Management Company, Corner Investment Company, LLC, 3535 LV Corp., Parball Corporation, JCC Holding Company II, LLC, Caesars Acquisition Company, and Caesars Growth Partners, LLC.

"  Milestones " means those milestones set forth on Exhibit D hereto.

"  MLSA " means that certain Management and Lease Support Agreement, as described in the Restructuring Term Sheet.

"  Non-First Lien Indentures " means the indentures governing CEOC's (a) 10.00% second-priority senior secured notes due 2015, (b) 10.00% second-priority senior secured notes due 2018, (c) 12.75% second-priority senior secured notes due 2018, (d) 10.75% senior notes due 2016, (e) 10.75%/11.5% senior toggle notes due 2018, (f) 6.5% senior notes due 2016, and (g) 5.75% senior notes due 2017.

"  Note Purchase and Support Agreement " means that certain agreement entered into by CEC, CEOC, and certain holders of the 6.50% Senior Notes due 2016 and 5.7% Notes due 2017, dated August 12, 2014.

"  Outside Date " has the meaning set forth on Exhibit D hereto.

"  Parties " has the meaning set forth in the preamble hereof.

"  Person " means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any legal entity or association.

"  Petition Date " means the date on which the Company commences the Chapter 11 Cases.

"  Plan " means the joint prenegotiated chapter 11 plan of reorganization of the Company through which the Restructuring will be effected (as amended, supplemented, or otherwise modified from time to time), and which Plan must be materially consistent with this Agreement and the Restructuring Term Sheet and shall otherwise be reasonably acceptable to the Requisite Consenting Creditors and the Company.

7

" <u>Qualified Marketmaker</u> " means an entity that holds itself out to the public or applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against the Company, in its capacity as a dealer or market maker in claims against the Company.

" <u>Requisite Consenting Creditors</u> " means, as of any time of determination, the Consenting Creditors holding greater than two-thirds of the aggregate amount of all First Lien Bond Claims held at such time by all of the Consenting Creditors; <u>provided</u> that any First Lien Bond Claims held by any of the Caesars Parties and/or their respective Affiliates shall not be included in the foregoing calculation.

" <u>Restricted Transactions</u> " means the transactions consummated pursuant to, in contemplation of, or in connection with the Note Purchase and Support Agreement.

" <u>Restructuring</u> " has the meaning set forth in the recitals hereof.

" <u>Restructuring Support Party</u> " means each of (i) the Caesars Parties (other than the Company), (ii) the Consenting Creditors, (iii) LS3, and (iv) LS5, together with the respective Affiliates, subsidiaries, managed funds, representatives, officers, directors, agents, and employees of each of the foregoing, in each case to the extent controlled by such Restructuring Support Party.

" <u>Restructuring Support Period</u> " means the date commencing on the date this Agreement becomes effective in accordance with <u>Section 15</u> hereof and ending on the earlier of (i) the date on which this Agreement is terminated with respect to all Parties, and (ii) the Effective Date.

" <u>Restructuring Term Sheet</u> " has the meaning set forth in the recitals hereof.

" <u>RSA Assumption Motion</u> " has the meaning set forth on <u>Exhibit D</u> hereto.

" <u>Securities Act</u> " has the meaning set forth in <u>Section 7(c)</u> hereof.

" <u>Services Transactions</u> " means the transactions consummated pursuant to, in contemplation of, or in connection with the Omnibus License and Enterprise Services Agreement, dated May 20, 2014, by and among CES, CEOC, CERP, Caesars Growth Properties Holdings, LLC, Caesars License Company, LLC, and Caesars World, Inc.

" <u>Termination Events</u> " has the meaning set forth in <u>Section 10</u> hereto.

" <u>Transfer</u> " has the meaning set forth in <u>Section 12</u> hereto.

" <u>Transferee</u> " has the meaning set forth on <u>Exhibit E</u> hereto.

8

"<u>Trustee</u>" has the meaning ascribed to it in the First Lien Indentures.

"<u>Trustee Litigation</u>" means the case captioned *UMB Bank v. Caesars Entertainment Corporation,* et al., C.A. No. 10393-VCG (Del. Ch.).

(b) <u>Rules of Construction</u>. Other than as contained within <u>Section 28</u>, each reference in this Agreement to "this Agreement", "hereunder", "hereof", "herein", or words of like import shall mean and be a reference to this Agreement, the Restructuring Term Sheet, and the Cash Collateral Stipulation taken as a whole.

**2. <u>Commitment of Restructuring Support Parties</u>.**

(a) <u>Affirmative Covenants</u>. Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, each Restructuring Support Party shall:

(i) negotiate in good faith the Definitive Documentation, in form and substance consistent in all material respects with this Agreement (including the Restructuring Term Sheet and all exhibits thereto, which, for the avoidance of doubt, shall be binding on all the Parties upon the effectiveness of this Agreement), and as otherwise reasonably acceptable to the Requisite Consenting Creditors, the Company, and CEC (in respect of CEC, to the extent such Definitive Documents could be reasonably expected to affect the interests of CEC);

(ii) consent to those actions contemplated by this Agreement or otherwise required to be taken to effectuate the Restructuring, including entering into all documents and agreements necessary to consummate the Restructuring, in each case, to which such Restructuring Support Party is to be a party;

(iii) support the Restructuring and vote in favor of the Plan, when properly solicited to do so under the Bankruptcy Code, all Claims now or hereafter beneficially owned by such Restructuring Support Party or for which it now or hereafter serves as the nominee, investment manager, or advisor for beneficial holders of Claims (and not withdraw or revoke its tender, consent, or vote with respect to the Plan); <u>provided that</u> the foregoing may be waived by the Company in its sole discretion; <u>provided</u>, <u>further</u>, that (x) such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by any of the Consenting Creditors at any time following the termination of this Agreement with respect to such Consenting Creditor, but only to the extent this Agreement has terminated on account of a breach by a Party other than such Consenting Creditor, it being understood and agreed that no Restructuring Support Party shall enter into any arrangement whereby it transfers voting rights for the purpose of avoiding any obligations under this Agreement, and (y) if this Agreement (including the Restructuring Term Sheet) is amended in a manner that would adversely affect a Consenting Creditor's First Lien Bank Claim(s), such Consenting Creditor (1) shall no longer be obligated to vote hereunder in respect of any First Lien Bank Claim(s) and (2), to the extent such Consenting Creditor has voted any First Lien Bank Claim(s) hereunder, shall be permitted to revoke its vote in respect of such First Lien Bank Claim(s) (and upon such revocation, such vote shall be deemed void *ab initio*).

(iv) upon its execution of this Agreement, exercise its Put Option with respect to OpCo New Common Stock as provided by the Restructuring Term Sheet, which election shall be binding on such Restructuring Support Party and any Transferee thereof; and

(v) support the mutual release and exculpation provisions to be provided in the Plan.

(b) <u>Negative Covenants</u> . Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, each Restructuring Support Party shall not:

(i) seek, solicit, support, vote its Claims for, or consent to, an Alternative Proposal; or

(ii) take any action materially inconsistent with the transactions expressly contemplated by this Agreement, or that would materially delay or obstruct the consummation of the Restructuring, including, without limitation, commencing, or joining with any Person in commencing, any litigation or involuntary case for relief under the Bankruptcy Code against the Company or CEC.

Subject in all respects as may otherwise be provided for under the applicable documents governing the intercreditor relationships among the parties thereto, nothing in this Agreement shall prohibit any Restructuring Support Party from (x) appearing as a party-in-interest in any matter arising in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement or the Restructuring, and do not hinder, delay, or prevent consummation of the Restructuring, (y) taking or directing any action relating to maintenance, protection, or preservation of any collateral, to the extent such actions are not inconsistent with this Agreement, and (z) enforcing any right, remedy, condition, consent, or approval requirement under this Agreement or any Definitive Documentation entered into in connection with the Restructuring; <u>provided that</u> , in each case, any such action is not materially inconsistent with such Restructuring Support Party's obligations hereunder.

**3. <u>Consenting Creditors' Forbearance</u> .**

(a) Until the earlier to occur of (i) the termination of this Agreement and (ii) the occurrence of any Event of Default (other than any Forbearance Default) that continues for five (5) consecutive Business Days after notice thereof from the Trustee to the Company (each of clause (i) and clause (ii), a " <u>Forbearance Termination Event</u> "), each Consenting Creditor agrees to forbear from exercising its default-related rights and remedies (as well as any setoff rights and remedies) under the First Lien Indentures or applicable law, against the Company and CEC and, with respect to each, their property and interests in property.

(b) Upon the occurrence of a Forbearance Termination Event, the agreement of the Consenting Creditors hereunder to forbear from exercising rights and remedies in respect of the Forbearance Defaults, shall immediately terminate without requirement of any demand, presentment, protest, or notice of any kind, all of which the Company hereby waives (to the extent permitted by applicable law).

10

(c) The Company agrees that, upon the occurrence of, and at any time after the occurrence of, a Forbearance Termination Event, the Consenting Creditors or the Collateral Agent or the Trustee, as applicable, may proceed, subject to the terms of the First Lien Bank Documents, the First Lien Indentures, and applicable law, to exercise any or all rights and remedies under the First Lien Bank Documents, the First Lien Indentures, applicable law, and/or in equity, including, without limitation, the rights and remedies on account of the Forbearance Defaults, all of which rights and remedies are fully reserved.

(d) The Caesars Parties agree that, prior to the termination of this Agreement with respect to any particular Consenting Creditor, the Caesars Parties shall not commence any litigation or interpose any claim arising from or in any way related to the First Lien Bond Debt against any such Consenting Creditor. The Consenting Creditors agree that, prior to the termination of this Agreement with respect to any particular Caesars Party, the Consenting Creditors shall not commence any litigation or interpose or join in any claim arising from or in any way relating to the First Lien Bond Debt against any such Caesars Party, including, without limitation, in connection with any of the Caesars Cases or the Trustee Litigation.

(e) For the avoidance of doubt, and notwithstanding anything herein, the forbearance set forth in this Section 3 shall not constitute a waiver with respect to any defaults or any events of defaults under the First Lien Indentures and shall not bar any Consenting Creditor from filing a proof of claim or taking action to establish the amount of such Claim.

(f) Anything in this Agreement or otherwise notwithstanding, (i) the Trustee Litigation may proceed unaffected by this Agreement, including, without limitation, all Parties to this Agreement may take any and all actions, make any and all omissions, give any and all directions and/or instructions, file any and all papers and documents, provide any and all evidence, raise and/or prosecute any and all claims and defenses, and otherwise act (or omit to act) in connection with or in reference to the Trustee Litigation as they may elect in their sole and absolute discretion, and all Parties to this Agreement hereby reserve all of their respective rights, powers, and remedies in connection with or in reference to the Trustee Litigation; and (ii) each of the Parties to this Agreement hereby agrees not to allege, assert directly or indirectly, plead, raise by claim or defense, challenge, or otherwise contend that the rights, powers, or remedies of any Party or trustee in connection with or in reference to the Trustee Action are in any manner restricted, limited, or otherwise prejudiced due to the existence of this Agreement or anything contained in this Agreement, and nothing contained in this Agreement shall be admissible for any such purpose. Notwithstanding the foregoing, the Consenting Creditors agree that if and only if the Petition Date occurs, then upon the occurrence of such Petition Date, they (x) shall not seek to modify or otherwise oppose the imposition of the automatic stay under Section 362 of the Bankruptcy Code until the earlier of (i) the termination of this Agreement and (ii) the Effective Date and (y) to the extent a Consenting Creditor has directed the Trustee in connection with the Trustee Litigation, such Consenting Creditor shall direct the Trustee to agree to a consensual stay of the Trustee Litigation commencing upon the Petition Date and expiring upon the termination of this Agreement.

11

**4. <u>Withdrawal of Litigation and Tolling</u>** .

(a) Subject to <u>Section 4(e)</u> hereof, prior to the Petition Date, (i) the Company and CEC will dismiss without prejudice, or otherwise stay, the claims asserted against EMC in the Caesars-Commenced Litigation (and, for the avoidance of doubt, shall not attempt to or otherwise cause the retraction revocation or termination of the dismissal during the term of this Agreement) ( <u>provided</u> , <u>however</u> , that the Company and CEC may pursue all claims in the Caesars-Commenced Litigation against any entity that is not an affiliate of EMC, directly or indirectly controlled or managed by Elliott Management Corporation or its Affiliates, or a Consenting Creditor), and (ii) within two (2) business days of such dismissal, EMC will withdraw, without prejudice, its pending motion to dismiss (and, for the avoidance of doubt, shall not attempt to or otherwise cause the retraction revocation or termination of the withdrawal during the term of this Agreement). No Caesars Party shall, during the term of this Agreement, prosecute or pursue against EMC any of the claims asserted against EMC in the Caesars-Commenced Litigation or any similar or related claims.

(b) Subject to <u>Section 4(e)</u> hereof, upon the termination of this Agreement with respect to the Company, CEC, and EMC, the agreements between the Company, CEC, and EMC in respect of the Caesars-Commenced Litigation as set forth above shall immediately terminate.

(c) [Reserved.]

(d) The Caesars Parties acknowledge and agree that the time from the date hereof through and including the date that is five (5) Business Days after the date that this Agreement has been terminated with respect to all Parties shall not be counted for purposes of determining whether any litigation commenced or claim interposed by any of the Consenting Creditors, the Trustee, or the Collateral Agent against any Caesars Party, which litigation or claim relates in any way to the Company or its Affiliates (including, but not limited to, any claims relating to any transaction by or among, or approved by, the Caesars Parties), was commenced or interposed within the applicable statute of limitations or in compliance with any other rule or doctrine of timeliness. If any Caesars Party commences any litigation or asserts any claim against any particular Consenting Creditor, which litigation or claim relates to or arises from the First Lien Indentures or any matters at issue in the Caesars-Commenced Litigation (including but not limited to the assertion of claims by the Company or CEC against EMC in the Caesars-Commenced Litigation), the time between the date hereof through and including the date that is five (5) Business Days after the date that this Agreement has been terminated with respect to such Consenting Creditor shall not be counted for purposes of determining whether any such litigation was commenced or claim interposed within the applicable statute of limitations or in compliance with any similar rule or doctrine of timeliness.

(e) Notwithstanding anything in this <u>Section 4</u> to the contrary, in the event that EMC does not become Party to this Agreement as a Consenting Creditor by the date that is two (2) Business Days after the date hereof, <u>Section 4(a)</u> and <u>4(b)</u> shall be of no effect and <u>Section 4(c)</u> shall be deemed amended such that it shall not apply with respect to claims held by Caesars against EMC.

12

**5. Covenants of Caesars Parties** .

(a) Affirmative Covenants of the Caesars Parties . Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, each of the Caesars Parties shall:

(i) (A) support and complete the Restructuring and all transactions contemplated under the Restructuring Term Sheet and this Agreement, in accordance with the Milestones, (B) negotiate in good faith the Definitive Documentation necessary to effectuate the Restructuring, on the terms and subject to the conditions set forth in this Agreement, (C) use its commercially reasonable efforts to obtain any and all required governmental, regulatory, licensing, or other approvals (including, without limitation, any necessary third-party consents) necessary to the implementation or consummation of the Restructuring; (D) use its commercially reasonable efforts to lift or otherwise reverse the effect of any injunction or other order or ruling of a court or regulatory body that would impede the consummation of a material aspect of the Restructuring, and (E) operate the Company in the ordinary course consistent with industry practice and the operations contemplated pursuant to the Company's business plan, taking into account the Restructuring and the commencement of the Chapter 11 Cases;

(ii) promptly notify or update the Consenting Creditors upon becoming aware of any of the following occurrences: (A) an additional person becomes a Consenting Creditor after the date of this Agreement; (B) a Termination Event has occurred; (C) any person has challenged the validity or priority of, or has sought to avoid, any lien securing the First Lien Bond Debt pursuant to a pleading filed with the Bankruptcy Court or another forum of competent jurisdiction; (D) material developments, negotiations, or proposals relating to the Caesars-Commenced Litigation, the Caesars Cases, the Forbearance Defaults, and any other case or controversy that may be commenced against such Caesars Party in a court of competent jurisdiction or brought before a state or federal regulatory, licensing, or similar board, authority, or tribunal that would reasonably be expected to materially impede or prevent consummation of the Restructuring; and

(iii) unless the Caesars Party obtains the prior written consent of a Consenting Creditor: (x) use the information regarding any Claims owned at any time by such Consenting Creditor (the " Confidential Claims Information ") solely in connection with this Agreement (including any disputes relating thereto); and (y) except as required by law, rule, or regulation or by order of a court or as requested or required by the Securities and Exchange Commission or by any other federal or state regulatory, judicial, governmental, or supervisory authority or body, keep the Confidential Claims Information strictly confidential and not disclose the Confidential Claims Information to any other Person; provided , however , that the Caesars Parties may combine the Confidential Claims Information provided to the Caesars Parties by a Consenting Creditor with the corresponding data provided to the Company by the Consenting Creditors and freely disclose such combined data on an aggregate basis. In the event that any of the Caesars Parties is required (by law, rule, regulation, deposition, interrogatories, requests for information or documents in legal or administrative proceedings, subpoena, civil investigative demand or other similar process, or by any governmental, judicial, regulatory, or supervisory body) to disclose the Confidential Claims Information or the contents thereof, the Caesars Parties shall, to the extent legally permissible, provide affected Consenting Creditors with prompt notice

13

of any such request or requirement so that such Consenting Creditors may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this section. If, in the absence of a protective order or other remedy or the receipt of a waiver from a Consenting Creditor, a Caesars Party believes that it is nonetheless, following consultation with counsel, required to disclose the Confidential Claims Information, such Caesars Party may disclose only that portion of the Confidential Claims Information that it believes, following consultation with counsel, it is required to disclose, provided that it exercises reasonable efforts to preserve the confidentiality of the Confidential Claims Information, including, without limitation, by marking the Confidential Claims Information "Confidential – Attorneys' Eyes Only" and by reasonably cooperating with the affected Consenting Creditor to obtain an appropriate protective order or other reliable assurance that confidential and attorneys' eyes only treatment will be accorded the Confidential Claims Information. In no event shall this Agreement be construed to impose on a Consenting Creditor an obligation to disclose the price for which it acquired or disposed of any Claim. The Caesars Parties' obligations under this <u>Section 5(a)(iii)</u> shall survive termination of this Agreement.

(b) <u>Negative Covenants of the Caesars Parties</u>. Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, each of the Caesars Parties (except with the prior written consent of the Requisite Consenting Creditors) shall not, directly or indirectly:

(i) take any action to solicit, initiate, encourage, or assist the submission of an Alternative Proposal; <u>provided that</u> this <u>Section 5(b)(i)</u> shall not apply to the Company after the Petition Date. If any Caesars Party receives a proposal or expression of interest in undertaking an Alternative Proposal, so long as the Consenting Creditors have agreed to comply with any applicable confidentiality restrictions related thereto (it being understood that CEC will not require any confidentiality restrictions that are in addition to the confidentiality restrictions set forth in any non-disclosure agreement between (1) any Consenting Creditor and the Company, or (2) the First Lien Professionals and the Company, that is in effect on the date hereof), the Caesars Party shall promptly notify the First Lien Professionals of the receipt of such proposal or expression of interest, with such notice to include the identity of the Person or group of Persons involved as well as the terms of such Alternative Proposal; it being acknowledged and agreed that, without limiting the restrictions imposed on the Company pursuant to this <u>Section 5(b)(i)</u>, the Company may pursue such Alternative Proposal (including by facilitating diligence in connection with such Alternative Proposal) in accordance with the Company's fiduciary duties as set forth by <u>Section 20</u> hereof;

(ii) (A) publicly announce its intention not to pursue the Restructuring; (B) suspend or revoke the Restructuring; or (C) execute any agreements, instruments, or other documents (including any modifications or amendments to any material Definitive Documentation necessary to effectuate the Restructuring) that, in whole or in part, are not substantially consistent with this Agreement, or are not otherwise reasonably acceptable to the Requisite Consenting Creditors and the Company; or

(iii) take any action or omit to take any action, or incur, enter into, or suffer any transaction, arrangement, condition, matter, or circumstance, that (in any such case) materially impairs, or would reasonably be expected to materially impair, the ability of CEC to perform its obligations under the MLSA relative to its ability to perform its obligations under the MLSA as of the date of this Agreement (after giving effect to the consummation of the Restructuring as if the Restructuring had been consummated on the date of this Agreement).

14

In the event the Company receives and determines to pursue an Alternative Proposal in an exercise of its fiduciary duties as set forth by Section 20 hereof, the Company shall promptly notify the Consenting Creditors of the existence and material terms of such Alternative Proposal; provided that the Company may withhold the material terms of such Alternative Proposal from any Consenting Creditor(s) who do not agree to applicable reasonable and customary confidentiality restrictions with respect thereto and/or who are in breach of this Agreement. After receipt of the material terms of such Alternative Proposal, the Requisite Consenting Creditors shall have three (3) Business Days after notice by the Company to propose changes to the terms of this Agreement, including the Restructuring Term Sheet and any exhibits thereto. The Company shall keep the Consenting Creditors informed of any amendments, modifications or developments with respect to such Alternative Proposal and any material information related to such Alternative Proposal, and, to the extent an Alternative Proposal is amended in any material respect, the Requisite Consenting Creditors shall have three (3) Business Days from any such amendment to propose changes to the terms of this Agreement.

For the avoidance of doubt, the covenants set forth in this Section 5 are in addition to, and not in lieu of, any covenants, obligations, or agreements of CEC contained in the Guaranty and Pledge Agreement, all of which covenants, obligations and agreements of CEC contained in the Guaranty and Pledge Agreement are hereby ratified and confirmed in all respects and shall survive and continue in full force and effect.

        (c) Additional Covenants in Respect of CES . The Company and CEC shall use commercially reasonable efforts to cause, subject to the terms and conditions hereof and for the duration of the Restructuring Support Period, CES (except with the prior written consent of the Requisite Consenting Creditors) (i) to operate its business in the ordinary course, and (ii) to preserve and maintain intact all material assets, properties, and other interests (including, without limitation, intellectual property interests and intangible assets, such as reward programs and customer lists) that are currently owned, licensed, used, or enjoyed by the Company.

        (d) Additional Affirmative Covenants of the Company . Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, the Company shall:

            (i) to the extent permitted by the Bankruptcy Court and applicable law, cause the signature pages attached to this Agreement to be redacted to the extent this Agreement is filed on the docket maintained in the Chapter 11 Cases, posted on the Company's website, or otherwise made publicly available;

            (ii) to the extent not otherwise paid in connection with the Chapter 11 Cases (including pursuant to any debtor-in-possession financing or the Cash Collateral Stipulation), promptly pay in cash (A) upon the execution of this Agreement by the Company, all accrued First Lien Fees and Expenses for which invoices or receipts are furnished by the First Lien Professionals and/or Consenting Creditors, (B) following the execution of this Agreement by the Company and prior to the Petition Date, all First Lien Fees and Expenses for which

invoices or receipts are furnished by the First Lien Professionals and/or Consenting Creditors, and (C) after the Petition Date, subject to the Bankruptcy Court's approval of the Company's use of Cash Collateral, all unpaid First Lien Fees and Expenses incurred after the date of this Agreement from time to time, in any event within ten (10) Business Days of delivery to the Company of any applicable invoice or receipt, which shall be in compliance with any order of the Bankruptcy Court and payment of which shall be authorized pursuant to the Cash Collateral Stipulation. For the avoidance of doubt, invoices on account of First Lien Professional Fees shall contain summary detail of services performed to enable the Company to determine the reasonableness of such First Lien Professional Fees. The Company's obligations to pay the First Lien Professional Fees shall not be affected or reduced by the payment of any First Lien Professional Fees by any holder of First Lien Bond Debt, irrespective of whether such holder remains a holder of First Lien Bond Debt as of the date of this Agreement or is a Consenting Creditor; and

(iii) within five (5) Business Days after satisfaction of the conditions to effectiveness of this Agreement set forth in Section 15 hereof, the Company shall enter into amended account control agreements with respect to the Deposit Accounts preventing the withdrawal of funds outside of the ordinary course of business from such Deposit Accounts, and the Company agrees that during such five (5) Business Day period, it shall not remove any funds from the Deposit Accounts outside of the ordinary course of business; provided that such account control agreements shall automatically revert back to the form of account control agreements in existence immediately prior to the execution of this Agreement upon the termination of this Agreement on account of the breach of this Agreement by one or more Consenting Creditors holding in the aggregate more than 5.0% of the First Lien Bond Claims held by all Consenting Creditors at the time of such breach (other than a breach by any Caesars Party or any of their Affiliates); provided further that such control agreements shall still automatically revert on account of a breach of this Agreement by one or more Consenting Creditors holding in the aggregate less than 5.0% of First Lien Bond Claims held by all non-breaching Consenting Creditors at the time of such breach (other than a breach by any Caesars Party or any of its Affiliates) if aggregate First Lien Bond Claims held by Consenting Creditors with power to vote in favor of the Plan is less than 2/3 plus one dollar of all First Lien Bond Debt (measured by notional value) or such breach otherwise would have a material adverse effect on the Restructuring.

(e) Additional Negative Covenants of the Company. Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, the Company (except with the prior written consent of the Requisite Consenting Creditors) shall not, directly or indirectly:

(i) take any action in connection with the Restructuring that violates this Agreement;

(ii) (A) redeem, purchase or acquire, or offer to acquire any shares of, or any options, warrants, conversion privileges, or rights of any kind to acquire any shares of, any of its capital stock or other equity interests, or (B) issue, sell, pledge, dispose of, or grant or incur any encumbrance on, any shares of, or any options, warrants, conversion privileges, or rights of any kind to acquire any shares of, any of its capital stock or other equity interests (other than issuances of equity interests upon the exercise, exchange, or conversion of options, warrants, or other conversion privileges that are outstanding as of the date hereof and only in accordance with the terms of such options, warrants, or other conversion privileges as in effect on the date hereof);

16

(iii) to the extent it would materially impair the rights of the Consenting Creditors and the Company's ability to consummate the Restructuring, and other than as required by the Plan, amend or propose to amend its respective certificate or articles of incorporation, bylaws, or comparable organizational documents;

(iv) to the extent it would materially impair the rights of the Consenting Creditors, (A) split, combine or reclassify any outstanding shares of its capital stock or other equity interests, or (B) declare, set aside or pay any dividend or other distribution payable in cash, stock, property, a combination thereof, or otherwise with respect to any of its capital stock or other equity interests or any capital stock or other equity interests of any other Person;

(v) pay or make any payment, transfer, or other distribution (whether in cash, securities, or other property) of or in respect of principal of or interest on any funded indebtedness of the Company that either (A) is expressly subordinate in right of payment to the First Lien Bond Debt or (B) secured by an interest in collateral, which interest is subordinate in priority to that securing any of the First Lien Bond Debt, or any payment or other distribution (whether in cash, securities, or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation, or termination in respect of any such funded indebtedness that is not contemplated by the Restructuring Term Sheet; or

(vi) enter into any proposed settlement (other than as contemplated by this Agreement and the Restructuring or as previously disclosed to the First Lien Professionals prior to the date hereof) of any claim, litigation, dispute, controversy, cause of action, proceeding, appeal, determination, investigation, matter, or otherwise that will materially impair the Company's ability to consummate the Restructuring.

(f) The Company acknowledges that it has reviewed this Agreement and has decided to enter into this Agreement on the terms and conditions set forth herein and in the Restructuring Term Sheet in the exercise of its fiduciary duties.

**6. Mutual Representations, Warranties and Covenants** .

(a) Each of the Parties, severally and not jointly, represents and warrants to each other Party that the following statements are true, correct, and complete as of the date hereof (or the date that a Transferee becomes a Party):

(i) it is validly existing and in good standing under the laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

17

(ii) except as expressly provided in this Agreement or in the Bankruptcy Code (if applicable) or as may be required for disclosure by the Securities and Exchange Commission, no material consent or approval of, or any registration or filing with, any other Person is required for it to carry out the Restructuring contemplated by, and perform its obligations under, this Agreement;

(iii) except as expressly provided in this Agreement or the Bankruptcy Code (if applicable), it has all requisite organizational power and authority to enter into this Agreement and to carry out the Restructuring contemplated by, and perform its obligations under, this Agreement;

(iv) the execution and delivery by it of this Agreement, and the performance of its obligations hereunder, have been duly authorized by all necessary organizational action on its part;

(v) it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement; and

(vi) the execution, delivery, and performance by such Party of this Agreement does not and will not (1) violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, (2) conflict with, result in a breach of, or constitute (with or without notice or lapse of time or both) a default under any material debt for borrowed money to which it or any of its subsidiaries is a party, or (3) violate any order, writ, injunction, decree, statute, rule, or regulation; provided that , (x) the foregoing shall not apply with respect to the Company on account of any defaults arising from the commencement of the Chapter 11 Cases or the pendency of the Restructuring and (y) for the avoidance of doubt, but without limiting the Company's obligations pursuant to Section 5(b)(i) hereof, nothing in this Section 6(a)(vi) shall, or shall be deemed to, waive, limit, or otherwise impair the Company's ability to exercise its fiduciary duties as set forth by Section 20 hereof, but subject, in all events, to Section 20 (b) hereof prior to the Petition Date.

(b) The Caesars Parties represent and warrant to the Restructuring Support Parties that there are no pending agreements (oral or written), understandings, negotiations, or discussions with respect to any Alternative Proposal.

(c) Each Caesars Party, severally and not jointly, on behalf of itself and its Affiliates, represents, warrants and covenants that it has not offered, and will not offer any Additional Bank Consideration or Additional Bond Consideration to any holder of First Lien Bank Debt or First Lien Bond Debt, respectively, without making such Additional Bank Consideration or Additional Bond Consideration available to Consenting Creditors on a *pro rata* basis in the manner contemplated in Section 34 in this Agreement.

18

**7. Ownership of Claims** . Each Claim Holder, severally and not jointly, represents and warrants as follows:

(a) as of the date of this Agreement, it (i) is either (A) the sole beneficial owner of the principal amount of Claims set forth below its signature hereto, or (B) has sole investment or voting discretion with respect to the principal amount of Claims set forth below its signature hereto and has the power and authority to bind the beneficial owner(s) of Claims to the terms of this Agreement, (ii) has full power and authority to act on behalf of, vote, and consent to matters concerning such Claims and dispose of, exchange, assign, and transfer such Claims, and (iii) holds no Claims (other than potential causes of action or litigation claims, contingent, unmatured or unliquidated claims, or claims for interest or fees arising under or in connection with any indenture, credit agreement, or other credit document) that are not identified below its signature hereto; in each case except as this provision may be specifically waived, in writing by the Company;

(b) other than pursuant to this Agreement, such Claims that are subject to Section 7(a) hereof are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrance of any kind, that would adversely affect in any way such Consenting Creditor's performance of its obligations contained in this Agreement at the time such obligations are required to be performed; and

(c) (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act of 1933, as amended (the " Securities Act "), (C) a non-U.S. person under Regulation S under the Securities Act, or (D) the foreign equivalent of (A) or (B) above, and (ii) any securities of any Caesars Party acquired by the applicable Claim Holder in connection with the Restructuring will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**8. Termination by Consenting Creditors** . (i) The Requisite Consenting Creditors may terminate this Agreement and (ii) CEC, other than with respect to Sections 8(i) and 8(k) , may terminate this Agreement (each, a " Creditor Termination Right "), in each case, upon delivery of written notice to the Company in accordance with Section 26 hereof at any time after the occurrence of, and during the continuation of, any of the following events (each, a " Creditor Termination Event "):

(a) the breach by any of the Caesars Parties, LS3, or LS5 of any of their obligations, representations, warranties, or covenants set forth in this Agreement in any material respect, which breach remains uncured for a period of five (5) consecutive Business Days after the receipt by such breaching Party and the Company of written notice of such breach from the Requisite Consenting Creditors or CEC, as the case may be; provided that for the avoidance of doubt, CEC may not exercise a Creditor Termination Right arising from its own breach, or that of LS3 or LS5, of any obligation, representation, warranty, or covenant set forth in this Agreement;

19

(b) the issuance, promulgation, or enactment by any governmental entity, including any regulatory or licensing authority or court of competent jurisdiction, of any statute, regulation, ruling or order declaring this Agreement or any material portion hereof to be unenforceable or enjoining or otherwise restricting the consummation of a material portion of the Restructuring (including with respect to the regulatory approvals or tax treatment contemplated by the Restructuring), which action remains uncured for a period of five (5) consecutive Business Days after the receipt by the Company and the Consenting Creditors of written notice of such event;

(c) a trustee under section 1104 of the Bankruptcy code or an examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall have been appointed in the Chapter 11 Cases;

(d) the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code or the Chapter 11 Cases shall have been dismissed, in each case, by order of the Bankruptcy Court, which order has not otherwise been stayed;

(e) if any of the Definitive Documentation necessary to effectuate the Restructuring (including any amendment or modification thereof) filed with the Bankruptcy Court or otherwise finalized, or has become effective, shall contain terms and conditions that are not materially consistent with this Agreement or shall otherwise not be on terms reasonably acceptable to the Requisite Consenting Creditors, the Company, and CEC, and such material inconsistency remains uncured for a period of five (5) consecutive Business Days after the receipt by the Company and the Consenting Creditors of written notice of such material inconsistency;

(f) a Caesars Party, LS3, LS5, or any of their respective Affiliates files any motion or pleading with the Bankruptcy Court that is not substantially consistent with this Agreement and such motion or pleading has not been withdrawn within two (2) Business Days of each of the Company's and the applicable filing Party's receiving written notice from the Requisite Consenting Creditors that such motion or pleading is materially inconsistent with this Agreement, unless such motion or pleading does not seek, and could not result in, relief that would have any adverse impact on the interest of holders of First Lien Bond Claims in connection with the Restructuring; provided that CEC may only terminate this Agreement pursuant to this Section 8(f) if CEC is materially and adversely affected by such motion or pleading;

(g) the Company executes a letter of intent (or similar document) stating its intention to pursue an Alternative Proposal;

(h) other than pursuant to any relief sought by the Company that is not materially inconsistent with its obligations hereunder, the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Company having an aggregate fair market value in excess of $5,000,000 without the written consent of the Requisite Consenting Creditors;

(i) the Company fails to satisfy or comply with any Milestone;

20

(j) the occurrence of the Outside Date if all of the material transactions contemplated hereby have not been consummated; or

(k) any Caesars Party commences an action to challenge the validity or priority of, or to avoid, the liens on any asset or assets comprising any material portion of the collateral securing the First Lien Bond Debt.

**9. Mutual Termination** . This Agreement may be terminated by mutual agreement among (a) the Caesars Parties, and (b) the Requisite Consenting Creditors.

**10. Company Termination Events** . This Agreement may be terminated by delivery to the other Parties of a written notice, delivered in accordance with Section 26 of this Agreement, by (i) the Company upon the occurrence of any of the following events (each a " Company Termination Event ," and together with the Creditor Termination Events, the " Termination Events ") and (ii) CEC upon the occurrence of a Company Termination Event listed in Section 10(e) :

(a) the breach by any Restructuring Support Party of any of the obligations, representations, warranties, or covenants of such Restructuring Support Party set forth in this Agreement in any respect that materially and adversely affects the Company's interests in connection with the Restructuring, which breach remains uncured for a period of five (5) consecutive Business Days after the receipt by such breaching Restructuring Support Party from the Company of written notice of such breach; provided that , with respect to a breach by one or more Consenting Creditors, the foregoing shall apply only if (x) such breaching Consenting Creditor(s) hold(s) in excess of 5.0% of First Lien Bond Claims held by all Consenting Creditors, (y) non-breaching Consenting Creditors with power to vote in favor of the Plan do not then hold at least 2/3 plus one dollar of First Lien Bond Debt (measured by notional value), or (z) such breach would otherwise have a material adverse effect on the Restructuring;

(b) the issuance, promulgation, or enactment by any governmental entity, including any regulatory or licensing authority or court of competent jurisdiction, of any statute, regulation, ruling or order declaring this Agreement or any material portion hereof to be unenforceable or enjoining or otherwise restricting the consummation of a material portion of the Restructuring (including with respect to the regulatory approvals or tax treatment contemplated by the Restructuring), which action remains uncured for a period of five (5) consecutive Business Days after the receipt by the Company and the Consenting Creditors of written notice of such event; provided that the Caesars Parties have otherwise complied with their obligations under Section 5(a)(i)(D) of this Agreement;

(c) the exercise by the Company of its fiduciary duties as set forth by Section 20 hereof (the " Fiduciary Out "), but without limiting the Company's obligations pursuant to Section 5(b)(i) hereof;

(d) any Party other than the Company and its Affiliates files any motion or pleading with the Bankruptcy Court that is not substantially consistent with this Agreement and such motion or pleading has not been withdrawn or corrected within seven (7) Business Days of such Party receiving written notice from the Company that such motion or pleading is materially inconsistent with this Agreement, or CEC and/or any of its Affiliates (other than the Company) obtains relief with respect to any motion or pleading with the Bankruptcy Court that is not substantially consistent with this Agreement;

21

(e) if at least 2/3 of First Lien Bond Debt (measured by notional value) plus one dollar is not beneficially owned or controlled, with power to vote in favor of the Plan, by Consenting Creditors as of the Petition Date;

(f) if any of the Definitive Documentation (including any amendment or modification thereof) is filed with the Bankruptcy Court or otherwise finalized, or has become effective, shall contain terms and conditions that are not substantially consistent with this Agreement or shall otherwise not be on terms reasonably acceptable to the Company, and such material inconsistency remains uncured for a period of five (5) consecutive Business Days after the receipt by the Restructuring Support Parties of written notice of such material inconsistency; or

(g) the Effective Date has not occurred by the Outside Date.

## 11. <u>Termination</u> .

(a) No Party may exercise any of its respective termination rights as set forth in <u>Section 8</u> or <u>Section 10</u> hereof, as applicable, if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), with such failure to perform or comply causing, or resulting in, the occurrence of the Termination Event specified herein.

(b) Upon the termination of this Agreement pursuant to <u>Section 8</u> , <u>Section 9</u> , or <u>Section 10</u> hereof, all Parties shall be released from their commitments, undertakings, and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any Party. Upon the termination of this Agreement pursuant to <u>Section 34</u> hereof, the terminating Consenting Creditor shall be released from its commitments, undertakings, and agreements under or relating to this Agreement, and there shall be no liability or obligation on the part of such Consenting Creditor. Notwithstanding anything herein to the contrary, the termination of this Agreement by a Consenting Creditor under <u>Section 34</u> hereof shall not be deemed a termination of this Agreement for purposes of the Backstop Commitment Agreement.

(c) Notwithstanding <u>Section 11(b)</u> hereof, in no event shall any termination of this Agreement relieve a Party from (i) liability for its breach or non-performance of its obligations hereunder prior to the termination date, including but not limited to CEC's and the Company's obligations to pay the First Lien Professional Fees, and (ii) obligations under this Agreement which by their terms expressly survive a termination date; <u>provided</u> , <u>however</u> , that, notwithstanding anything to the contrary contained herein, any Termination Event (including any automatic termination) may be waived in accordance with the procedures established by <u>Section 14</u> hereof, in which case such Termination Event so waived shall be deemed not to have occurred, this Agreement consequently shall be deemed to continue in full force and effect, and the rights and obligations of the Parties shall be restored, subject to any modification set forth in

22

such waiver. Upon a Termination Event that releases a Consenting Creditor from its commitments, undertakings, and agreements under or related to this Agreement (as set forth in <u>Section 11(b)</u>), unless otherwise agreed to in writing by such Consenting Creditor, any and all votes, approvals, or consents delivered by such Consenting Creditor and, as applicable, its Affiliates, subsidiaries, managed funds, representatives, agents, and employees in connection with the Restructuring prior to such termination date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Company.

**12. <u>Transfer of Claims</u>** . The Restructuring Support Parties agree, with the exception of the permitted transfers and purchases enumerated in (a) and (b) below, that no Restructuring Support Party will, directly or indirectly, sell, contract to sell, give, assign, hypothecate, pledge, encumber, grant a security interest in, offer, sell any option or contract to purchase, or otherwise transfer or dispose of, any economic, voting or other rights in or to, by operation of law or otherwise (collectively, "<u>Transfer</u>"), all or any portion of its First Lien Bond Claims or First Lien Bank Claims now or hereafter owned, and no such Transfer will be effective, unless the transferee executes and provides to the Company and counsel to the Consenting Creditors a transfer agreement in the form attached hereto as <u>Exhibit E</u> within two (2) Business Days of the execution of an agreement (or trade confirmation) in respect of such Transfer. For the avoidance of doubt, the Caesars Parties agree that any such transfer agreement shall be included in the definition of "<u>Confidential Claims Information</u>" in <u>Section 5(a)(iii)</u> hereof. In addition to the foregoing Transfer, the following Transfers shall be permitted:

(a) any Transfer by one Consenting Creditor to an Affiliate of such Consenting Creditor or one or more of its affiliated funds or an affiliated entity or entities with a common investment advisor or investment manager (in each case, other than portfolio companies); <u>provided that</u> , for the avoidance of doubt, any transferee under this <u>Section 12(a)</u> shall be deemed a Consenting Creditor for purposes of this Agreement, effective as of the date of the Transfer, and any transferor under this <u>Section 12(a)</u> shall remain liable in all respects for any breach of this Agreement by such transferee; and

(b) any Transfer by one Consenting Creditor to another Consenting Creditor.

Any Transfer of any Restructuring Support Party's First Lien Bond Claims or First Lien Bank Claims that does not comply with the foregoing shall be deemed void *ab initio* ; <u>provided</u> , <u>however</u> , for the avoidance of doubt, that upon any purchase, acquisition, or assumption by any Restructuring Support Party of any Claims (including but not limited to First Lien Bond Claims and First Lien Bank Claims), such Claims shall automatically be deemed to be subject to all the terms of this Agreement. The restrictions in this Agreement are in addition to any Transfer restrictions in the Credit Agreement, the First Lien Indentures, and Non-First Lien Indentures, and in the event of a conflict the Transfer restrictions contained in this Agreement shall control; <u>provided</u> , <u>however</u> , that nothing herein shall restrict, waive, or suspend any consent right the Company may have with respect to any Transfer.

23

Notwithstanding the foregoing, a Qualified Marketmaker that acquires any First Lien Bond Claim or First Lien Bank Claim subject to this Agreement with the purpose and intent of acting as a Qualified Marketmaker for such First Lien Bond Claim or First Lien Bank Claim shall not be required to execute a Transfer Agreement or otherwise agree to be bound by the terms and conditions set forth herein if, and only if, such Qualified Marketmaker sells or assigns such First Lien Bond Claim or First Lien Bank Claim within ten (10) Business Days of its acquisition and the purchaser or assignee of such First Lien Bond Claim or First Lien Bank Claim is a Consenting Creditor or an entity that executes and provides a Transfer Agreement in accordance with the terms set forth herein.

Notwithstanding anything herein to the contrary: (a) to the extent that a Restructuring Support Party effects the Transfer of all of its Claims in accordance with this Agreement, such Restructuring Support Party shall cease to be a Party to this Agreement in all respects and shall have no further obligations hereunder; provided , however , that if such Restructuring Support Party acquires a Claim at any point thereafter, it shall be deemed to be a Party to this Agreement on the same terms as if it had not effected a Transfer of all of its Claims; and (b) subject to Section 2(a) (iii) hereof, to the extent that a Restructuring Support Party effects the Transfer of a Claim that it holds as a participant (and not grantor) pursuant to a participation agreement with voting provisions substantially similar to those set forth in the form of participation agreement produced by the Loan Syndications & Trading Association, the transferee thereof shall not be required to execute a Transfer Agreement.

   **13. Cooperation** . Before the filing of and during the Chapter 11 Cases, (i) the Company shall use commercially reasonable efforts to provide to counsel for the Consenting Creditors (a) drafts of all material motions, applications (other than applications seeking to retain professional advisors), and other documents the Company intends to file with the Bankruptcy Court, no less than three (3) Business Days before the date when the Company intends to file any such document unless such advance notice is impossible or impracticable under the circumstances, in which case the Company shall notify telephonically or by electronic mail counsel to the Consenting Creditors to advise it of the documents to be filed and the facts that make the provision of advance copies no less than three (3) Business Days before submission impossible or impracticable, and shall provide such copies as soon as reasonably possible thereafter, and (b) copies of all material documents actually filed by the Company with the Bankruptcy Court promptly but not later than one (1) day after such filing.

   **14. Amendments** . No amendment, modification, waiver, or other supplement of the terms of this Agreement (including the Restructuring Term Sheet) shall be valid unless such amendment, modification, waiver, or other supplement is in writing and has been signed by the Caesars Parties, the Requisite Consenting Creditors, LS3, and LS5; provided , however , that:

        (a) no such consents shall be required from any Consenting Creditor with respect to any modification or amendment or any other agreement, document or other instrument implementing the Restructuring, regarding the treatment of Claims other than with respect to First Lien Bond Claims, so long as it would not, reasonably construed, have an adverse impact on the interests of holders of First Lien Bond Claims (including with respect to the form or value of recoveries to be provided on account of such Claims pursuant to the Restructuring), in their capacities as such, in connection with the Restructuring;

24

(b) any amendment to this Agreement to (i) the defined terms "Consenting Creditors" or "Requisite Consenting Creditors" or (ii) Section 12 hereof shall require the written consent of the Company, CEC and each Consenting Creditor;

(c) any amendment that would materially and adversely affect any Consenting Creditor that is a holder of First Lien Bond Claims, solely in its capacity as such, in a manner that is disproportionate to any other holder of First Lien Bond Claims, solely in its capacity as such, shall require the prior written consent of the adversely affected Consenting Creditor;

(d) for the avoidance of doubt, any waiver of the conditions to the effectiveness of this Agreement set forth by Section 15 hereof may be waived only upon the express written consent of each of the Caesars Parties;

(e) the Company may waive application of the representations and warranties set forth by Section 7(a)(ii) and Section 7(a)(iii) hereof in all or in part with respect to any Consenting Creditor in its sole discretion, but in consultation with CEC; and

(f) any amendment to this Agreement to the defined term "Initial Consenting Creditor" shall require the written consent of the Company, CEC, and each Initial Consenting Creditor.

**15.  Conditions to Effectiveness** .  For the avoidance of doubt, this Agreement (and the obligations of all Parties hereunder) shall not become effective or enforceable against or by any of the Parties until the first date that this Agreement shall have been executed by (i) the Caesars Parties, (ii) LS3, (iii) LS5, and (iv) Consenting Creditors beneficially owning or controlling with the power to vote in favor of the Plan at least 60.0% of the outstanding amount of the Company's obligations under the First Lien Indentures as of such date; provided , further , that such Consenting Creditors shall have also exercised their Put Options with respect to OpCo New Common Stock as provided by the Restructuring Term Sheet; provided further still that if the conditions to effectiveness set forth by this Section 15 are not satisfied or waived by the Company as provided herein on or before January 9, 2015, this Agreement shall be null and void *ab initio* and of no force or effect.

**16.  Entire Agreement** .  This Agreement, including the Restructuring Term Sheet and the Cash Collateral Stipulation, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement; provided , however , that any confidentiality agreement executed by any Restructuring Support Party shall survive this Agreement and shall continue to be in full force and effect in accordance with its terms.

**17.  Survival of Agreement** .  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible restructuring of the Company and in contemplation of possible filings by the Company under Chapter 11 of the Bankruptcy Code, and (a) the exercise of the rights granted in this Agreement (including giving of notice of termination) shall not be a violation of the automatic stay provisions of section 362 of the Bankruptcy Code and (b) the Company hereby waives its right to assert a contrary position in the Chapter 11 Cases, if any, with respect to the foregoing.

**18.** <u>**No Waiver of Participation and Preservation of Rights**</u> . If the transactions contemplated herein are not consummated, or following the occurrence of the termination of this Agreement with respect to all Parties, if applicable, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses.

**19.** <u>**Counterparts**</u> . This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

**20.** <u>**Company Fiduciary Duties**</u> .

(a) Subject to <u>Section 5(b)(i)</u> and <u>Section 20(b)</u> hereof, nothing in this Agreement shall otherwise require the Company or any directors, officers, or members of the Company, each in its capacity as a director, officer, or member of the Company, to take any action, or to refrain from taking any action, to the extent inconsistent with its or their fiduciary obligations under applicable law (as reasonably determined by them in good faith after consultation with legal counsel).

(b) Notwithstanding anything to the contrary in this Agreement, prior to the Petition Date, and without limiting the Company's obligations pursuant to <u>Section 5(b)(i)</u> hereof, the Company may only act in a manner inconsistent with the other terms of this Agreement to the extent required to pursue an Alternative Proposal that it reasonably determines in its good faith business judgment constitutes a binding proposal that is reasonably likely to be more favorable to the Company, its creditors (including holders of First Lien Bond Claims) and other parties to whom the Company owes fiduciary duties, than the Restructuring.

(c) All Consenting Creditors reserve all rights they may have, including the right (if any) to challenge any exercise by the Company of its fiduciary duties.

**21.** <u>**Headings**</u> . The headings of the Sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

**22.** <u>**Relationship Among Parties**</u> . Notwithstanding anything herein to the contrary, the duties and obligations of the Restructuring Support Parties under this Agreement shall be several, not joint. No Restructuring Support Party shall, as a result of its entering into and performing its obligations under this Agreement, be deemed to be part of a "group" (as that term is used in section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder) with any of the other Restructuring Support Parties. It is understood and agreed that no Consenting Creditor has any duty of trust or confidence in any kind or form with any other Consenting Creditor, and, except as expressly provided in this Agreement, there are no commitments among or between them. In this regard, it is understood

26

and agreed that any Consenting Creditor may trade in the Claims or other debt or equity securities of the Company without the consent of the Company or any other Consenting Creditor, subject to applicable securities laws, the terms of this Agreement, and the terms of the First Lien Bank Documents and the First Lien Indentures; provided , however , that no Consenting Creditor shall have any responsibility for any such trading to any other entity by virtue of this Agreement. No prior history, pattern, or practice of sharing confidences among or between the Consenting Creditors shall in any way affect or negate this understanding and agreement.

23. **Specific Performance; Remedies Cumulative** . It is understood and agreed by the Parties that, without limiting any other remedies available at law or equity, money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder, without the necessity of proving the inadequacy of money damages as a remedy. Each of the Parties hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance, or other equitable remedies.

24. **No Commitment** . No Restructuring Support Party shall be obligated to fund or otherwise be committed to provide funding in connection with the Restructuring, except pursuant to a separate commitment letter or definitive documentation relating specifically to such funding, if any, that has been (i) executed by such Restructuring Support Party and (ii) approved by the Bankruptcy Court, as necessary, along with the satisfaction of any conditions precedent to such funding requirements.

25. **Governing Law and Dispute Resolution** . This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. Each of the Parties hereby agrees that the United States District Court for the Southern District of New York shall have jurisdiction to enforce this Agreement; provided that if and when the Chapter 11 Cases are filed, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

26. **Notices** . All notices, requests, documents delivered, and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by facsimile transmission, mailed (first class postage prepaid) or by electronic mail (" e-mail ") to the Parties at the following addresses, facsimile numbers, or e-mail addresses:

If to the Company:

Caesars Entertainment Operating Company, Inc.
One Caesars Palace Drive
Las Vegas, NV 89109
Attn: General Counsel

With a copy to (which shall not constitute notice):

27

Kirkland & Ellis LLP
601 Lexington Ave
New York, NY 10022
Attn:    Paul M. Basta, P.C.
         Nicole L. Greenblatt
Facsimile: (212) 446 4900
E-mail Address:    paul.basta@kirkland.com
                   ngreenblatt@kirkland.com


-and-


Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attn:    David R. Seligman, P.C.
         Ryan Preston Dahl
E-mail Address:    dseligman@kirkland.com
                   rdahl@kirkland.com
Facsimile: (312) 862-2200


If to CEC:


Caesars Entertainment Corp.
One Caesars Palace Drive
Las Vegas, NV 89109
Attn: General Counsel


With a copy to (which shall not constitute notice):


Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:    Jeffrey D. Saferstein
         Samuel E. Lovett
Telephone: (212) 373-3000
Facsimile (212) 373-2053
E-mail Address:    jsaferstein@paulweiss.com
                   slovett@paulweiss.com


If to a Consenting Creditor, to the address set forth beneath such lender's signature block,

28

with a copy to (which shall not constitute notice):

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attn:    Kenneth H. Eckstein
         Daniel M. Eggermann
Telephone: (212) 715-9100
Facsimile: (212) 715-8229
E-mail Address:    keckstein@kramerlevin.com
                   deggermann@kramerlevin.com

   27. **Third-Party Beneficiaries** . Unless expressly stated herein, the terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

   28. **Conflicts Between the Restructuring Term Sheet and this Agreement** . In the event of any conflict among the terms and provisions in the Restructuring Term Sheet and this Agreement, the terms and provisions of the Restructuring Term Sheet shall control. Nothing contained in this Section 28 shall affect, in any way, the requirements set forth herein for the amendment of this Agreement and the Restructuring Term Sheet as set forth in Section 14 herein.

   29. **Settlement Discussions** . This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

   30. **Good-Faith Cooperation; Further Assurances** . The Parties shall cooperate with each other in good faith in respect of matters concerning the implementation and consummation of the Restructuring.

   31. **Access** . The Company will promptly provide the First Lien Professionals reasonable access, upon reasonable notice, during normal business hours to relevant properties, books, contracts (including any Executory Contracts and Unexpired Leases), commitments, records, management and executive personnel, and advisors of the Company (other than with respect to materials subject to attorney-client privilege or where granting such access is prohibited by law); provided , however , that the Company's obligations hereunder shall be conditioned upon such Party being party to an appropriate confidentiality agreement or undertaking; provided , further , however , that any existing confidentiality agreements entered into between the Company and a Party shall be deemed to be appropriate.

<center>29</center>

**32. <u>Qualification on Consenting Creditor Representations</u>** . The Parties acknowledge that all representations, warranties, covenants, and other agreements made by any Consenting Creditor that is a separately managed account of an investment manager are being made only with respect to the Claims managed by such investment manager (in the amount identified on the signature pages hereto), and shall not apply to (or be deemed to be made in relation to) any Claims that may be beneficially owned by such Consenting Creditor that are not held through accounts managed by such investment manager.

**33. <u>Publicity</u>** . The Company shall use its commercially reasonable efforts to submit drafts to the First Lien Professionals of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least three (3) Business Days prior to making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith.

**34. <u>Additional Consideration.</u>** To the extent that a holder of First Lien Bank Debt, in its capacity as such, receives Additional Bank Consideration in connection with the Restructuring, such Additional Bank Consideration shall be made available to all Consenting Creditors that are holders of First Lien Bank Claims, in their capacities as such, on the same terms and on a *pro rata* basis in accordance with their respective First Lien Bank Claims holdings. Any Consenting Creditor that is a holder of First Lien Bank Claims who is not accorded such Additional Bank Consideration shall have the right to terminate this Agreement upon three (3) Business Days' written notice to the Parties in accordance with <u>Section 26</u> hereof; provided that such termination shall only be with respect to the terminating Consenting Creditor, and not with respect to any non-terminating Parties.

To the extent that a holder of First Lien Bond Debt, in its capacity as such, receives Additional Bond Consideration in connection with the Restructuring, such Additional Bond Consideration shall be made available to all Consenting Creditors that are holders of First Lien Bond Claims, in their capacities as such, on the same terms and on a *pro rata* basis in accordance with their respective First Lien Bond Claims holdings. Any Consenting Creditor that is a holder of First Lien Bond Claims who is not accorded such Additional Bond Consideration shall have the right to terminate this Agreement upon three (3) Business Days' written notice to the Parties in accordance with <u>Section 26</u> hereof; provided that such termination shall only be with respect to the terminating Consenting Creditor, and not with respect to any non-terminating Parties.

**[Signature Pages Follow]**

30

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**CAESARS ENTERTAINMENT OPERATING COMPANY, INC.,** on behalf of itself and each of the Subsidiary Loan Parties

By:    /s/Mary E. Higgins
      Name: Mary E. Higgins
      Title:   Chief Financial Officer

**CAESARS ENTERTAINMENT CORPORATION**

By:    /s/ Eric Hession
Name: Eric Hession
Title:   SVP, Finance & Treasurer

31

**Exhibit A**

**Subsidiary Loan Parties**

| Subsidiary Pledgor | State of Formation |
|---|---|
| California Clearing Corporation | California |
| Harrah South Shore Corporation | California |
| AJP Holdings, LLC | Delaware |
| AJP Parent, LLC | Delaware |
| Bally's Midwest Casino, Inc. | Delaware |
| Biloxi Hammond, LLC | Delaware |
| Biloxi Village Walk Development, LLC | Delaware |
| Caesars Palace Corporation | Delaware |
| Caesars Trex, Inc. | Delaware |
| Chester Facility Holding Company, LLC | Delaware |
| CZL Development Company, LLC | Delaware |
| Harrah's Chester Downs Investment Company, LLC | Delaware |
| Harrah's International Holding Company, Inc. | Delaware |
| Harrah's Iowa Arena Management, LLC | Delaware |
| Harrah's MH Project, LLC | Delaware |
| Harrah's Operating Company Memphis, LLC | Delaware |
| Harrah's Shreveport/Bossier City Holding Company, LLC | Delaware |
| Harrah's Shreveport/Bossier City Investment Company, LLC | Delaware |
| Harrah's West Warwick Gaming Company, LLC | Delaware |
| Horseshoe Gaming Holding, LLC | Delaware |
| Koval Holdings Company, LLC | Delaware |
| Reno Crossroads LLC | Delaware |
| Showboat Atlantic City Mezz 1, LLC | Delaware |
| Showboat Atlantic City Mezz 2, LLC | Delaware |
| Showboat Atlantic City Mezz 3, LLC | Delaware |
| Showboat Atlantic City Mezz 4, LLC | Delaware |
| Showboat Atlantic City Mezz 5, LLC | Delaware |
| Showboat Atlantic City Mezz 6, LLC | Delaware |
| Showboat Atlantic City Mezz 7, LLC | Delaware |
| Showboat Atlantic City Mezz 8, LLC | Delaware |
| Showboat Atlantic City Mezz 9, LLC | Delaware |
| Showboat Atlantic City Propco, LLC | Delaware |
| Tahoe Garage Propco, LLC | Delaware |

| **Subsidiary Pledgor** | **State of Formation** |
|---|---|
| Tunica Roadhouse Corporation | Delaware |
| Village Walk Construction, LLC | Delaware |
| Winnick Holdings, LLC | Delaware |
| Winnick Parent, LLC | Delaware |
| Caesars World, Inc. | Florida |
| Southern Illinois Riverboat/Casino Cruises, Inc. | Illinois |
| Caesars Riverboat Casino, LLC | Indiana |
| Casino Computer Programming, Inc. | Indiana |
| Horseshoe Hammond, LLC | Indiana |
| Roman Entertainment Corporation of Indiana | Indiana |
| Roman Holding Corporation of Indiana | Indiana |
| Players Bluegrass Downs, Inc. | Kentucky |
| Harrah's Bossier City Investment Company, L.L.C. | Louisiana |
| Horseshoe Entertainment | Louisiana |
| Horseshoe Shreveport, L.L.C. | Louisiana |
| Players Riverboat II, LLC | Louisiana |
| BL Development Corp. | Minnesota |
| GCA Acquisition Subsidiary, Inc. | Minnesota |
| Grand Casinos of Biloxi, LLC | Minnesota |
| Grand Casinos, Inc. | Minnesota |
| Grand Media Buying, Inc. | Minnesota |
| East Beach Development Corporation | Mississippi |
| Grand Casinos of Mississippi, LLC-Gulfport | Mississippi |
| Robinson Property Group Corp. | Mississippi |
| Harrah's North Kansas City LLC | Missouri |
| 190 Flamingo, LLC | Nevada |
| 3535 LV Corp. | Nevada |
| B I Gaming Corporation | Nevada |
| Benco, Inc. | Nevada |
| Caesars Entertainment Canada Holding, Inc. | Nevada |
| Caesars Entertainment Finance Corp. | Nevada |
| Caesars Entertainment Golf, Inc. | Nevada |
| Caesars Entertainment Retail, Inc. | Nevada |
| Caesars India Sponsor Company, LLC | Nevada |
| Caesars License Company, LLC (f/k/a Harrah's License Company, LLC) | Nevada |

33

| Subsidiary Pledgor | State of Formation |
|---|---|
| Caesars Marketing Services Corporation | |
| (f/k/a Harrah's Marketing Services Corporation) | Nevada |
| Caesars Palace Realty Corp. | Nevada |
| Caesars Palace Sports Promotions, Inc. | Nevada |
| Caesars United Kingdom, Inc. | Nevada |
| Caesars World Merchandising, Inc. | Nevada |
| Consolidated Supplies, Services and Systems | Nevada |
| DCH Exchange, LLC | Nevada |
| DCH Lender, LLC | Nevada |
| Desert Palace, Inc. | Nevada |
| Durante Holdings, LLC | Nevada |
| FHR Corporation | Nevada |
| Flamingo-Laughlin, Inc. | Nevada |
| Harrah's Arizona Corporation | Nevada |
| Harrah's Bossier City Management Company, LLC, a Nevada Limited Liability Company | Nevada |
| Harrah's Chester Downs Management Company, LLC | Nevada |
| Harrah's Illinois Corporation | Nevada |
| Harrah's Interactive Investment Company | Nevada |
| Harrah's Investments, Inc. | Nevada |
| Harrah's Management Company | Nevada |
| Harrah's Maryland Heights Operating Company | Nevada |
| Harrah's New Orleans Management Company | Nevada |
| Harrah's Pittsburgh Management Company | Nevada |
| Harrah's Reno Holding Company, Inc. | Nevada |
| Harrah's Shreveport Investment Company, LLC | Nevada |
| Harrah's Shreveport Management Company, LLC | Nevada |
| Harrah's Southwest Michigan Casino Corporation | Nevada |
| Harrah's Travel, Inc. | Nevada |
| Harveys BR Management Company, Inc. | Nevada |
| Harveys C.C. Management Company, Inc. | Nevada |
| Harveys Iowa Management Company, Inc. | Nevada |
| Harveys Tahoe Management Company, Inc. | Nevada |
| H-BAY, LLC | Nevada |
| HBR Realty Company, Inc. | Nevada |
| HCAL, LLC | Nevada |
| HCR Services Company, Inc. | Nevada |

| Subsidiary Pledgor | State of Formation |
| --- | --- |
| HEI Holding Company One, Inc. | Nevada |
| HEI Holding Company Two, Inc. | Nevada |
| HHLV Management Company, LLC | Nevada |
| Hole in the Wall, LLC | Nevada |
| Horseshoe GP, LLC | Nevada |
| HTM Holding, Inc. | Nevada |
| Koval Investment Company, LLC | Nevada |
| Las Vegas Golf Management, LLC | Nevada |
| Las Vegas Resort Development, Inc. | Nevada |
| LVH Corporation | Nevada |
| Nevada Marketing, LLC | Nevada |
| New Gaming Capital Partnership, a Nevada Limited Partnership | Nevada |
| Parball Corporation | Nevada |
| PHW Manager, LLC | Nevada |
| Players Development, Inc. | Nevada |
| Players Holding, LLC | Nevada |
| Players International, LLC | Nevada |
| Players LC, LLC | Nevada |
| Players Maryland Heights Nevada, LLC | Nevada |
| Players Resources, Inc. | Nevada |
| Players Riverboat Management, LLC | Nevada |
| Players Riverboat, LLC | Nevada |
| Reno Projects, Inc. | Nevada |
| Rio Development Company, Inc. | Nevada |
| Showboat Holding, Inc. | Nevada |
| TRB Flamingo, LLC | Nevada |
| Trigger Real Estate Corporation | Nevada |
| Bally's Park Place, Inc. | New Jersey |
| Boardwalk Regency Corporation | New Jersey |
| Caesars New Jersey, Inc. | New Jersey |
| Caesars World Marketing Corporation | New Jersey |
| GNOC, Corp. | New Jersey |
| Martial Development Corp. | New Jersey |
| Ocean Showboat, Inc. | New Jersey |
| Players Services, Inc. | New Jersey |
| Showboat Atlantic City Operating Company, LLC | New Jersey |
| Harrah's NC Casino Company, LLC | North Carolina |

35

**Exhibit B**

**Restructuring Term Sheet**

36

**This document and any related communications shall not be
used for any purpose in any litigation or proceeding.**

**This Term Sheet is highly confidential and this Term Sheet, its contents and its existence may not
be distributed, disclosed or discussed to or with any party other than in accordance with the
express terms of confidentiality agreements/arrangements
among the respective parties and the Company.**

**S**UMMARY **T**ERM **S**HEET FOR **P**ROPOSED **R**ESTRUCTURING [1] [2]

**C**AESARS ENTERTAINMENT OPERATING COMPANY **,** INC **.**
*and certain of its direct or indirect subsidiaries*
(" **_CEOC_** " and together with certain of its direct or indirect subsidiaries, the " **_Company_** ")

---

[1]    Nothing herein shall be deemed to be the solicitation of an acceptance or rejection of a plan of reorganization; any such solicitation shall
be in compliance with the relevant provisions of securities laws, the Bankruptcy Code and other applicable statutes and rules.

[2]    This Term Sheet is an exhibit to, and part of, the Restructuring Support and Forbearance Agreement (the " **_RSA_** "), which contains
additional descriptive language and legal terms in respect of the Company's restructuring.

1

I.    **Summary of Proposed Treatment** [3]

Holders of the obligations (the " *First Lien Bank Obligations* ") under the First Lien Bank Documents [4] ($5,359 million plus interest thereon accrued through the Petition Date) and swaps entered into pursuant to First Lien Bank Documents ($42 million) (collectively, the " *First Lien Bank Lenders* ")

Each First Lien Bank Lender shall receive its pro rata share of (a) $705 million in cash, (b) $883 million in New First Lien OpCo Debt, (c) $406 million of New Second Lien OpCo Debt, (d) $1,961 million in New First Lien PropCo Debt, and (e) $1,450 million in additional cash if the full amount of the CPLV Market Debt is financed for cash and, if not fully financed, Mezzanine CPLV Debt for the portion not so financed subject to the limitations set forth herein [5] . Each First Lien Bank Lender waives any entitlement to post-petition interest to the extent First Lien Noteholders do not receive post-petition interest.

Secured claims of Holders of the obligations (the " *First Lien Note Obligations* ") under the First Lien Indentures ($6,345 million plus interest thereon accrued through the Petition Date) (the " *First Lien Noteholders* ")

Each First Lien Noteholder shall receive in respect of its secured claim, its pro rata share of (a) $413 million in cash, (b) $306 million in New First Lien OpCo Debt, (c) $141 million of New Second Lien OpCo Debt, (d) $431 million in New First Lien PropCo Debt, (e) $1,425 million in New Second Lien PropCo Debt, (f) $1,150 million in additional cash if the CPLV Market Debt is financed for cash and, if not fully financed, Mezzanine CPLV Debt for the portion not so financed subject to the limitations set forth herein, (g) 69.9% directly or indirectly of PropCo [6] on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt and Preferred PropCo Equity, if any), (or cash to the extent of any Equity Rights exercised and/ or such Holder exercises its Put Option, as further described below) and (h) 100% of the OpCo New Common Stock (or, at its option, cash in the event such Holder exercises its Put Option, as further described below).

As more fully described under Put Options, Equity Rights and Purchase Option (and subject to the limitations set forth therein), each First Lien Noteholder (a) will have the opportunity to be a Put Participant and sell the

---

[3]    Administrative, priority and critical trade claims shall be paid in full in cash as soon as practicable following consummation of the Restructuring or as otherwise provided for in definitive documentation. The plan may provide for separate classification for general unsecured claims on terms and with treatment that is reasonably acceptable to the Requisite Consenting Creditors (as defined in the RSA).

[4]    Capitalized terms not defined herein have the meanings set forth in the RSA.

[5]    The First Lien Bank Lenders may choose to have up to $100 million of Mezzanine CPLV Debt they are to receive converted to a corresponding amount of New First Lien OpCo Debt, New Second Lien OpCo Debt, New First Lien PropCo Debt, New Second Lien PropCo Debt or equity in PropCo

[6]    Pending regulatory and REIT requirements, the First Lien Noteholders will receive their interest in PropCo indirectly through REIT New Common Stock (as opposed to directly through PropCo New LP Interests as Caesars Entertainment Company or its designee (" *CEC* ") and CEOC will).

2

right to receive under the Plan some or all of its equity to the Backstop Parties for cash, (b) will have the opportunity to purchase PropCo Preferred Equity and/or (c) may receive cash from the Non-First Lien Noteholders for the right to receive some or all of their equity in connection with the exercise of the Equity Rights.

If the First Lien Noteholders fully exercise the Put Options, the First Lien Noteholders, on an aggregate basis, will receive an additional $969 million in cash and a corresponding decrease in their equity recoveries, as more fully described in Section II below under "Put Options Price."

Deficiency Claims of First Lien Noteholders and all claims of non-critical trade creditors and Holders of the obligations (collectively the " *Non-First Lien Obligations* ") under (a) the Second Lien Indentures ($5,238 million plus interest thereon accrued through the Petition Date) (the " *Second Lien Noteholders* "), (b) the guaranteed unsecured indentures ($479 million plus interest thereon accrued through the Petition Date) (the " *Unsecured Guaranteed Noteholders* ") , and (c) the unsecured note indentures ($530 million plus interest thereon accrued through the Petition Date) (the " *Unsecured Noteholders* ," collectively with the Second Lien Noteholders and Unsecured Guaranteed Noteholders, the " *Non-First Lien Noteholders* ")

If the Non-First Lien Noteholders, and with respect to their deficiency claims, the First Lien Noteholders, vote as a class to accept the Plan, then the First Lien Noteholders will waive or assign at CEOC's direction distributions in respect of their deficiency claims and distributions under the turnover provisions in all intercreditor agreements, and each Non-First Lien Noteholder shall receive its pro rata share of an amount of 30.1% of the equity, directly or indirectly, in PropCo on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt and Preferred PropCo Equity, if any), which shall be deemed to include consideration for the value of any unencumbered assets. And, as more fully described under the Equity Right, if the Non-First Lien Noteholders vote as a class to accept the Plan, each Non-First Lien Noteholder shall also have the option to be a Rights Participant.

If the Non-First Lien Noteholders, and with respect to their deficiency claims, the First Lien Noteholders, do not vote as a class to accept the Plan, then each Non-First Lien Noteholder shall receive its pro rata share of 17.5% of the equity, directly or indirectly, in PropCo on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt and Preferred PropCo Equity, if any), which shall be deemed to include consideration for the value of any unencumbered assets. The First Lien Noteholders will waive or assign at CEOC's direction distributions in respect of their deficiency claims and distributions under the turnover provisions in all intercreditor agreements on account of the 17.5% of equity to the Non-First Lien Noteholders. If the Non-First Lien Noteholders, and with respect to their deficiency claims, the First Lien Noteholders, do not vote as a class to accept the Plan, then the remaining 12.6% of PropCo equity shall be allocated to the equity holders of PropCo, excluding the Non-First Lien Noteholders, based on their pro rata ownership in PropCo (after giving effect to the exercise of the Put Options).

The Plan may provide for the separate classification of Non-First Lien Noteholders in separate classes or subclasses in a manner not inconsistent with this Term Sheet.

3

**II.**    **Put Options, Equity Rights and Purchase Option** [7]

| | |
|---|---|
| Put Options | Each First Lien Noteholder shall have the option to put some or all of its right under the Plan to receive (i) the OpCo New Common Stock it would otherwise receive pursuant to the Plan (the "***OpCo New Common Stock Put Options***"); and/ or (ii) the direct or indirect interests in PropCo it would otherwise receive pursuant to the Plan (provided that no more than 14.8% (excluding dilution from Equitized CPLV Mezzanine Debt and Preferred PropCo Equity, if any) of such interests are put in the aggregate) (the "***REIT New Common Stock Put Options***" and, together with OpCo New Common Stock Put Options, the "***Put Options***"), and to instead receive cash as described below under "Put Options Price," in which case CEC and any other Backstop Parties will purchase such equity interests as further described below, subject in the case of PropCo equity interests to the exercise of the Equity Rights described below, provided however that, in the event the UPREIT Structure is used (as defined herein), the First Lien Noteholders shall be required to put at least 5% of their PropCo equity to CEC (after taking into account any conversion of CPLV Mezzanine Debt acquired pursuant to the Equity Rights). The Put Options must be selected in connection with plan solicitation provided that with respect to First Lien Noteholders that are parties to the RSA, elections to exercise the OpCo New Common Stock Put Options must be made at the time of execution of the RSA. |

Each First Lien Noteholder that exercises any of its Put Options in whole or in part shall be referred to herein as a "***Put Participant***."

| | |
|---|---|
| Put Options Allocation Between the Backstop Parties | As detailed in <u>Annex I</u>, CEC shall purchase the right to receive all the OpCo New Common Stock subject to the OpCo New Common Stock Put Options and REIT New Common Stock (or PropCo New LP Interests if applicable) subject to the REIT New Common Stock Put Options exercised by the Put Participants. [8] |

The First Lien Noteholders may elect to become backstop parties (together with CEC, the "***Backstop Parties***") (which election shall be made in connection with plan solicitation) and purchase a portion of the REIT New Common Stock (or PropCo New LP Interests if applicable) subject to the REIT New Common Put Options. First Lien Noteholders who wish to become Backstop Parties must make any required investor representations required for federal and state securities law purposes.

---

[7]    For tax efficiency or other purposes, the cash consideration to be paid to First Lien Noteholders through the exercise of either the Put Options or the Equity Rights may flow through the Company to the First Lien Noteholders as part of their recovery under the Plan as direct payments of cash, rather than be paid in respect of the receipt of stock or CPLV Mezzanine Debt or be paid directly by the Backstop Parties and/or the Right Participants. The Company and CEC shall consult with the First Lien Professionals in respect of the preceding and, if the decision could reasonably be expected to adversely affect the recovery of the First Lien Noteholders (in form, value, or otherwise as determined by the Requisite Consenting Creditors), it shall be subject to the reasonable consent of the Requisite Consenting Creditors.

[8]    For regulatory purposes, it is assumed that the First Lien Noteholders executing the RSA will elect to put at least 50.1% of the OpCo New Common Stock to CEC.

4

The Backstop Parties shall receive no fee for purchasing or agreeing to purchase the equity subject to the Put Participants' Put Options.

| | |
|---|---|
| Put Options Price | The Put Options shall be at a price per share implying a total value of $700 million for 100% of the OpCo New Common Stock and $269 million for 14.8% of PropCo (directly or indirectly) on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt and Preferred PropCo Equity, if any). |
| Equity Rights | If the Non-First Lien Noteholders vote as a class to accept the Plan, the " ***Equity Rights*** " as detailed below shall occur and each Non-First Lien Noteholder shall have the non-transferable right to be a " ***Right Participant*** ." If the Non-First Lien Noteholders do not vote as a class to accept the Plan, there shall be no Equity Rights. |

Each Right Participant may elect to purchase (with the purchase immediately occurring after the closing of the Put Option) the right to receive up to all of the direct or indirect interest in PropCo to be received by the First Lien Noteholders and the Backstop Parties (but for the avoidance of doubt, not including the 5% of PropCo equity retained by OpCo) (the " ***Equity Rights*** "), subject to being cut back on a pro rata basis based on the amount of Equity Rights exercised. Any Non-First Lien Noteholder exercising an Equity Right must (a) make any required investor representations required for federal and state securities law purposes and (b) execute the RSA. Each Non-First Lien Noteholder shall have 60 days following of the filing of the Company's chapter 11 cases to execute the RSA and elect whether to exercise its Equity Rights, which Exercise Rights shall be subject to the Non-First Lien Noteholders accepting the Plan as a class.

For every $1 of direct or indirect interest in PropCo purchased pursuant to the Equity Rights, the Right Participant shall also purchase $0.25 of CPLV Mezzanine Debt to be received by the First Lien Noteholders with such CPLV Mezzanine Debt then being converted into direct or indirect interest in PropCo at the same price per share as the Put Option (the " Equitized CPLV Mezzanine Debt ").

The Right Participants must make their purchases <u>first</u> from the First Lien Noteholders who elect to sell to the Right Participants (pro rata among such First Lien Noteholders) with such election to be made in connection with plan solicitation, <u>second</u> from CEC, <u>third</u> from the First Lien Noteholders who do not elect to sell to the Right Participants (pro rata among such First Lien Noteholders), <u>fourth</u> from the non-CEC Backstop Parties (pro rata among the non-CEC Backstop Parties).

For the avoidance of doubt, the First Lien Noteholders and the Backstop Parties, as applicable, must sell their respective right to receive equity, pursuant to the terms of the Equity Rights, to the Right Participants. The Right Participants shall receive no fee for acting as Right Participants.

5

The procedures implementing the Equity Rights and exercise thereof shall be subject to the reasonable consent of the Requisite Consenting Creditors.

| | |
|---|---|
| Equity Rights Price | The Equity Rights shall be at the same price per share as the Put Option. |
| Purchase Option | Each First Lien Noteholder shall have the non-transferable option to purchase their pro rata share (based on their holdings of the First Lien Note Obligations) of 50% of the Preferred PropCo Equity, with such purchases proportionally diluting the Preferred PropCo Equity purchased by the Preferred Backstop Investors (as defined in the Backstop Commitment Agreement to be attached hereto). |
| Purchase Option Price | The Purchase Option shall be at a price per share implying a total value of $250 million for 100% of the Preferred PropCo Equity. |
| Regulatory Requirements | All parties shall abide by, and use their commercially reasonable efforts to obtain, any regulatory and licensing requirements or approvals to consummate the Restructuring as promptly as practicable including, but not limited to requirements or approvals that may arise as a result of such party's equity holdings in the REIT, PropCo or OpCo, as the case may be. Such parties receiving equity shall use commercially reasonable efforts to cooperate with, and timely obtain and submit, all applicable licensing materials and information to, applicable gaming authorities throughout any regulatory or licensing process, including without limitation with respect to any applicable license, permit, or finding of suitability, and shall cause any individual subject to regulatory, licensing, or suitability approval to similarly cooperate and provide all such relevant materials and information. To facilitate regulatory approvals and prompt consummation of the Restructuring, any party signing the RSA must irrevocably elect upon execution of the RSA the amount of Put Options with respect to OpCo New Common Stock. |

The Company and its affiliates will assist with required regulatory approvals and structuring issues, including common stock voting structures to ensure compliance with regulatory requirements.

To the extent any required regulatory approvals are not obtained by the Closing of the Restructuring, the parties agree to work together to facilitate consummation of the Restructuring as promptly as practicable. Actions to be taken may include entering into transactions to permit the Closing to occur while such regulatory approvals are pending (alternate temporary structures), temporary escrowing of equity and/or selling down equity below regulatory threshold levels. Any actions proposed to be taken in connection with obtaining regulatory approvals that adversely affect any First Lien Noteholder, in an economic or other material respect, must be reasonably acceptable to the Requisite Consenting Creditors, and will be binding on all First Lien Noteholders.

| | |
|---|---|
| REIT Requirements | To the extent any party would otherwise receive more than 9.8% of the outstanding REIT New Common Stock, such party shall instead receive |

6

direct PropCo New LP Interests equal to the value of such REIT New Common Stock above 9.8%. All PropCo Preferred Equity will be issued directly by PropCo, unless counsel to the Company concludes, after consultation with the First Lien Professionals, that issuance of such PropCo Preferred Equity by the REIT (as opposed to PropCo) would not adversely affect its ability to deliver the REIT opinion referenced below in IX under the heading "Tax Opinions/Private Letter Rulings."

| | |
|---|---|
| Closing | The Put Options and Equity Rights will close immediately following distribution of the equity securities under the Plan (it being understood that the exercise date for the Put Options and Equity Rights will be set forth in the solicitation materials and shall occur on a date determined by the Company prior to the projected effective date of the Plan). [9] |
| Put Options Conditions Precedent | The exercise of the Put Options and Equity Rights will be subject to customary conditions precedent including: |

- the Bankruptcy Court shall have entered orders (a) approving the disclosure statement in respect of the Plan and (b) confirming the Plan;

- the effective date of the Plan shall have occurred;

- all regulatory approvals, or waiting periods, shall have been received or expired; and

- other customary conditions precedent in form and substance reasonably satisfactory to the Company, the Backstop Parties, and the Requisite Consenting Creditors.

## III.    The REIT and Equity Securities

| | |
|---|---|
| REIT | The Company shall restructure itself upon consummation of the Restructuring as a separate operating company (" **OpCo** "), and property company (" **PropCo** "). Pursuant to the Restructuring a real estate investment trust (the " **REIT** ") will be formed to own and control the general partner of PropCo (" **PropCo GP** ") and to hold PropCo New LP Interests. |

---

[9]    For tax efficiency or other purposes, the cash consideration to be paid to First Lien Noteholders through the exercise of either the Put Options or the Equity Rights may flow through the Company to the First Lien Noteholders as part of their recovery under the Plan as direct payments of cash, rather than be paid in respect of the receipt of stock or CPLV Mezzanine Debt or be paid directly by the Backstop Parties and/or the Right Participants. The Company and CEC shall consult with the First Lien Professionals in respect of the preceding and, if the decision could reasonably be expected to adversely affect the recovery of the First Lien Noteholders (in form, value, or otherwise as determined by the Requisite Consenting Creditors), it shall be subject to the reasonable consent of the Requisite Consenting Creditors.

7

The separation of the Company into OpCo, PropCo and the REIT (the "**Separation Structure**") will be accomplished through either (a) the tax free contribution of PropCo assets to the REIT in a tax-free reorganization qualifying under Section 368(a)(1)(G) of the Internal Revenue Code (the "**Code**") (such structure, the "Spin"), provided however, that in lieu of the Spin, the separation will be accomplished by (b) a tax-free contribution of PropCo assets to the PropCo partnership in a transaction qualifying under section 721 of the Code (the "**UPREIT Structure**") if (i) the Company is unable to receive a favorable private letter ruling from the IRS (the "Spin Ruling") or a "should" level opinion of counsel (the "**Spin Opinion**"), concluding, in either case, based on facts, customary representations (and certain customary assumptions, in the case of a Spin Opinion) set forth or described in the Spin Ruling or Spin Opinion, that the Spin qualifies under Section 368(a)(1)(G) of the Code, (ii) at the election of the Requisite Consenting Creditors if the Estimated REIT E&P (as defined below) exceeds $1.3 billion or (iii) at the election of the Company and CEC, with the consent of the Requisite Consenting Creditors, such consent not to be unreasonably withheld. In either event, (x) the distribution of the new equity and debt will be made in a manner that will not generate taxable income to the Company other than cancellation of indebtedness income, and (y) the Company and CEC shall regularly consult and coordinate with the First Lien Professionals on the Separation Structure and all decisions that may materially affect the tax consequences thereof to the First Lien Noteholders.

No later than 50 days prior to the deadline for voting on the Plan, the Company will deliver to the Consenting Creditors its reasonable estimate of the earnings and profits of the REIT (i) as of, and assuming an effective date of the Plan on, December 31, 2015, (ii) calculated using the implied equity values in this term sheet and valuing all new debt at par, and (iii) computed as if all of the PropCo New LP Interests other than the PropCo Preferred Equity are held through the REIT (the "**Estimated REIT E&P**"), together with supporting work papers. The Consenting Creditors shall have 20 days to review the Company's calculation of the Estimated REIT E&P and provide any proposed revisions to the Company, and the Company and the Consenting Creditors agree to negotiate in good faith such proposed revisions and to attempt to resolve any differences between the parties within 10 days of the receipt of such proposed revisions. In the event the parties reach agreement as to the amount of the Estimated REIT E&P such Estimated REIT E&P shall be final and binding as among the Company and the Consenting Creditors for purposes of the preceding paragraph. In the event the parties do not reach agreement on the amount of the Estimated REIT E&P, then the determination of the Estimated REIT E&P shall be made by an independent accounting firm mutually acceptable to the Company and the Consenting Creditors.

| | |
|---|---|
| Equity Securities | The common equity securities to be issued will consist of new shares of common stock (a) of the REIT (such stock, the "**REIT New Common Stock**") and (b) of OpCo (such stock, the "**OpCo New Common Stock**"). Such securities will be freely transferable to the extent provided under Section 1145 of the Bankruptcy Code. |

The Boards of Directors of CEOC, OpCo and the REIT shall each use its reasonable best efforts to have the OpCo New Common Stock, if more than 30% of the OpCo New Common Stock is owned by the First Lien Noteholders and Non-First Lien Noteholders (the " ***Non-CEC Holders*** "), and the REIT New Common Stock, respectively, (a) registered under US securities laws and (b) listed on a nationally recognized exchange, as soon as practicable subject to meeting applicable listing requirements following the effective date of the Plan. A registration statement covering the REIT Common Stock (and if applicable, a registration statement covering the OpCo New Common Stock) shall be filed as soon as practicable following the effective date of the Plan and in any event within 75 days thereafter. The Board of Directors of CEOC shall consult with First Lien Professionals on the form and substance of the registration statement(s). The parties shall enter into a customary registration rights agreement providing for among other things a re-sale registration statement for any First Lien Noteholder that cannot freely transfer its equity pursuant to Section 1145 of the Bankruptcy Code and keeping any registration statements that do not automatically incorporate SEC filings by reference up to date.

In order to meet the requirement that a REIT have at least 100 shareholders, the REIT will have the right to issue, for cash, up to $125,000 of non-voting preferred stock (125 shares, $1,000 liquidation preference and approximately 12% dividend).

| | |
|---|---|
| Contribution by CEOC of Properties to PropCo | If the UPREIT Structure is used, at least 5% of the PropCo New LP Interests purchased by CEC under the Put Options (on a fully diluted basis) shall be deemed as CEOC's on account of its contribution of real estate into PropCo. In such case, CEOC shall have the option to participate in future issuances, or purchase additional equity from PropCo at FMV if participation is not feasible, to maintain its percentage ownership interest in PropCo at 5% if it would otherwise decrease below that threshold. |
| Services JV | Each of the Company and CEC (including through Caesars Entertainment Resort Properties LLC and Caesars Growth Properties Holdings, LLC) shall agree to take those steps that may be necessary or advisable with respect to Caesars Enterprise Services, LLC and its subsidiaries (collectively " ***CES*** ") to ensure that the chapter 11 cases or a restructuring consummated thereby shall not impair, modify, or affect in any adverse way under the applicable agreements (i) the Company's rights with respect to governance or administration of CES (including by amending Sections 5.5(b) with respect to any payment defaults arising from commencement of the chapter 11 cases, 5.6 and 7.12 of that certain Amended Limited Liability Company Agreement of Caesars Enterprise Services, LLC dated as of May 20, 2014 (as the same may have been amended from time to time), (ii) the Company's rights with respect to that certain Omnibus License and Enterprise Services Agreement dated as of May 20, 2014 (as the same may have been amended from time to time) (including by amending Section 16.4 thereof), (iii) the Company's rights with respect to any or all intellectual property or other business arrangements by and among the Company and CES, whether pursuant to section 365(c) of the Bankruptcy Code, any change of control provisions set forth in those agreements, or |

9

other terms of such agreements and (iv) PropCo's and OpCo's right to use and access intellectual property and other rights in the same manner that such rights are currently used and accessed across the enterprise to the extent currently provided under the Omnibus License and Enterprise Services Agreement.

In addition, such agreements shall be modified as necessary or appropriate to reflect the OpCo/PropCo structure including (i) to provide that Total Rewards and other enterprise-wide and property specific resources are allocated, and services provided, in a way that does not discriminate against PropCo, (ii) for so long as CEC or its affiliates manages the properties, CES shall ensure that, in the event CEC or its subsidiaries cease to provide the resources and services provided under such agreements to PropCo, CES shall provide such resources and services directly to PropCo on equivalent terms to or via an alternative arrangement reasonably acceptable to PropCo; provided that if CEC or its affiliates are terminated as manager under the applicable agreements other than by or with the consent of PropCo, CES shall provide such resources and services pursuant to a management agreement on substantially the same terms and conditions, notwithstanding such termination, if so elected by PropCo. In the event PropCo terminates or consents to the termination of the management relationship with CEC or its affiliates, for so long as the transition period under the applicable management agreement(s) continues, PropCo shall continue to have access to such resources and services on no less favorable terms. The modified documents shall be in form and substance reasonably satisfactory to the Requisite Consenting Creditors.

Furthermore, CES shall at the request of the REIT Board of Directors have meetings or conference calls once a quarter with a designee of the REIT Board of Directors to discuss, and consult on, the strategic and financial business plans, budgeting, including proposed capital expenditures and other topics as reasonably requested by the REIT Board of Directors. The REIT shall also have audit and information rights.

## IV.    CEC

| | |
|---|---|
| Cash Contribution | $131 million to be used by the Company for general corporate purposes and $275 million (the "**Additional CEC Contribution**") to fund sources and uses (and capital structure described herein) at Exit. |
| CEC Standby Commitment | $75 million, which shall only be funded if there are insufficient sources and uses (after giving effect to any Available Cash) to fund the capital structure described herein at Exit. |
| CEC Put Options Purchases | CEC or an affiliated entity shall, pursuant to the Put Options, purchase up to (a) $269 million of PropCo New LP Interests or REIT New Common Stock at a price implying a total value of $269 million for 14.8% of the PropCo on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt and Preferred PropCo Equity, if any) and (b) $700 million of OpCo New Common Stock at a price per share implying a total value of $700 million for 100% of the OpCo New Common Stock. |

10

| | |
|---|---|
| Domestic Acquisitions and New Building Opportunities | CEC and its non-debtor subsidiaries shall give PropCo a right of first refusal to own the real estate, and have CEC or OpCo lease, all non-Las Vegas domestic (U.S.) real estate acquisitions and new building opportunities with CEC retaining management rights with respect to such opportunities. |
| | PropCo shall give CEC a right of first refusal to operate and manage all non-Las Vegas properties that PropCo acquires. |
| | The material terms of these rights of first refusal to be mutually agreed among the Company, CEC and the Initial Consenting Creditors. |
| CEC Lease Guaranty | CEC, OpCo and PropCo will enter into a Management and Lease Support Agreement (the "**MLSA**") pursuant to which (i) CEC, or a wholly-owned subsidiary, will manage the properties on behalf of OpCo and (ii) CEC will provide a guaranty in respect of the OpCo's operating lease obligations, in each case while such lease (including any extensions, renewals or replacements) remains in effect. Certain of the material terms of the MLSA are set forth on <u>Annex II</u>. The remaining terms of the MLSA to be mutually agreed among the Company, CEC and the Initial Consenting Creditors on or prior to noon on December 24, 2014, with such terms being annexed hereto. |
| | Certain of the material terms of the operating leases are set forth on <u>Annex II</u>. The remaining terms of the operating leases to be mutually agreed among the Company, CEC and the Initial Consenting Creditors on or prior to noon on December 24, 2014, with such terms being annexed hereto. |
| Releases | The Plan shall provide (subject to completion of the investigation by CEOC's governance committee) that CEC's participation in the Plan through its entry into the RSA and performance of the terms thereunder in facilitating the transactions contemplated by the Restructuring shall be a full and complete settlement under Bankruptcy Rule 9019 of any claims or causes of action, known or unknown, that the Company, its estates and third parties have or could have against CEC, CAC and their respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees, managers, attorneys, professionals, advisors and representatives (each of the foregoing in their capacity as such) relating to the Company, other than (a) claims under the RSA and (b) claims arising from past, existing, and future commercial relationships between any subsidiary of CEC (other than CEOC and its subsidiaries) and CEOC or any of its subsidiaries. |
| | As part of the settlement embodied in the Plan and the RSA (subject to completion of the investigation by CEOC's governance committee), effective on the date the Restructuring is consummated, as consideration for the Cash Contribution, the CEC Put Options Purchases, the Domestic Acquisitions and New Building Opportunities, entry into the MLSA and other valuable consideration, the Company, its estate and all of the |

11

Company's creditors shall be deemed to have released CEC, CAC and their respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees, managers, attorneys, professionals, advisors and representatives (each of the foregoing in their capacities as such, the " *CEC Released Parties* ") from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, at law, in equity or otherwise, relating to or based upon any act or omission relating to the Company which occurred prior to the effectiveness of the Restructuring (other than (a) claims under the RSA and (b) claims arising from past, existing, and future commercial relationships between any subsidiary of CEC (other than CEOC and its subsidiaries) and CEOC or any of its subsidiaries), including a release and waiver of any obligations arising under the Guaranty and Pledge Agreement of CEC dated as of July 25, 2014. The Plan shall also include standard injunction and exculpation provisions in respect of the CEC Released Parties.

As part of the settlement embodied in the Plan and the RSA, effective on the date the Restructuring is consummated, as consideration for their entry into the RSA and other valuable consideration, the Company and the CEC Released Parties shall be deemed to have released the Consenting Creditors and their respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees, managers, attorneys, professionals, advisors and representatives (each of the foregoing in their capacity as such) from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, at law, in equity or otherwise, relating to or based upon any act or omission relating to the Company which occurred prior to the effectiveness of the Restructuring.

**V.    Caesars Palace Las Vegas ("CPLV")**

| | |
|---|---|
| Transfer to Unrestricted Subsidiary | CPLV shall be transferred to a newly formed wholly owned unrestricted subsidiary of PropCo (" *CPLV Sub* ") and its property shall be leased to OpCo. |
| | Certain of the material terms of the operating lease are set forth on <u>Annex II</u> . The remaining terms of the operating lease to be mutually agreed among the Company, CEC and the Initial Consenting Creditors on or prior to noon on December 24, 2014, with such terms being annexed hereto. |
| Issuance of CPLV Market Debt | CPLV Sub shall use its commercially reasonable efforts to finance $2,600 million of CPLV Debt with third party investors for cash proceeds (the " *CPLV Market Debt* ") on or before consummation of the Restructuring (with 100% of the net proceeds being used to increase the cash payments to the First Lien Bank Lenders and the First Lien Noteholders). At least $2,000 million of CPLV Market Debt must be issued. |
| | If $2,000 million or more but less than $2,600 million of CPLV Market Debt is issued, the remainder will be issued to the First Lien Bank Lenders |

12

and the First Lien Noteholders in the form of CPLV Mezzanine Debt. The principal amount of CPLV Market Debt and CPLV Mezzanine Debt shall collectively total $2,600 million.

Notwithstanding the above, to the extent PropCo Preferred Equity is issued, the proceeds thereof shall first reduce the principal amount of CPLV Mezzanine Debt (if any) to be issued to the First Lien Noteholders, second to reduce the principal amount of CPLV Market Debt, and third to reduce the principal amount of New Second Lien PropCo Debt.

The weighted average yield on the CPLV Market Debt and CPLV Mezzanine Debt will be capped such that the annual debt service shall not exceed $130 million, with the cap increased by $2 million for every $100 million of Equitized CPLV Mezzanine Debt.

| | |
|---|---|
| CPLV Mezzanine Debt | If CPLV Market Debt is issued in an amount greater than $2,000 million, but less than $2,600 million (less the proceeds from the PropCo Preferred Equity applied to reduce the amount of CPLV Mezzanine Debt (if any) to be issued to the First Lien Noteholders and CPLV Market Debt), then CPLV Holding shall issue secured non-guaranteed debt (the " **CPLV Mezzanine Debt** ") in an amount equal to the difference to the First Lien Bank Lenders and the First Lien Noteholders. Such CPLV Mezzanine Debt shall have a 6 year term and shall bear interest at 8% (if $600 million of CPLV Mezzanine Debt is issued) increasing by 0.25% for every $25 million reduction in the principal amount of CPLV Mezzanine Debt issued below $600 million (up to a maximum of 13%). Additional terms of the CPLV Market Debt and CPLV Mezzanine Date to be mutually agreed among the Company, CEC and the Initial Consenting Creditors on or prior to noon on December 24, 2014, with such terms being annexed hereto. |

" **CPLV Holding** " will be a newly formed holding company that owns 100% of CPLV Sub.

| | |
|---|---|
| Receipt of CPLV Mezzanine Debt | If CPLV Mezzanine Debt is issued, then it shall be distributed as follows: |

- The first $300 million of CPLV Mezzanine Debt shall be distributed 1/3 to the First Lien Bank Lenders and 2/3 to the First Lien Noteholders; and

- Any CPLV Mezzanine Debt over $300 million shall be distributed 1/2 to the First Lien Bank Lenders and 1/2 to the First Lien Noteholders.

The $2,600 million aggregate total amount of cash proceeds from the CPLV Market Debt and the principal amount of CPLV Mezzanine Debt (and the proceeds from the PropCo Preferred Equity applied to reduce the amount of CPLV Mezzanine Debt and CPLV Market Debt) will be allocated as follows:

- $1,450 for First Lien Bank Holders and

- $1,150 for First Lien Bondholders,

with the amount of CPLV Mezzanine Debt to be issued to each in accordance with the above.

13

**VI.    New Capital Structure [10]**

| | |
|---|---|
| New First Lien OpCo Debt | Up to $1,188 million in principal amount of first lien debt. 6 year term. Non-call year 1, thereafter callable at 103/102/101/par for the next three years respectively. Interest at LIBOR plus 4.00%, with a 1% LIBOR floor. Additional terms to be mutually agreed among the Company, CEC and the Initial Consenting Creditors on or prior to noon on December 24, 2014, with such terms being annexed hereto. |
| | $883 million distributed to First Lien Bank Lenders and $306 million distributed to First Lien Noteholders, subject to adjustment as set forth herein. |
| | OpCo will use its commercially reasonable efforts to syndicate the New First Lien OpCo Debt to the market and, to the extent so syndicated, the cash proceeds will be used to increase the cash payments to the First Lien Bank Lenders and First Lien Noteholders, ratably based on the amount of New First Lien OpCo Debt otherwise to be issued to them. The New First Lien OpCo Debt will be marketed at an interest rate less than or equal to the rates contemplated above. |
| | The First Lien OpCo Debt distributable to First Lien Bank Lenders and First Lien Noteholders must be in the form of bank debt and bond debt, respectively. |
| New Second Lien OpCo Debt | Up to $547 million in principal amount of second lien debt. 7 year term. Non-call year 1, thereafter callable at 103/102/101/par for the next three years respectively. Interest at 8.5%. Additional terms to be mutually agreed among the Company, CEC and the Initial Consenting Creditors on or prior to noon on December 24, 2014, with such terms being annexed hereto. |
| | $406 million distributed to First Lien Bank Lenders and $141 million distributed to First Lien Noteholders. |
| New First Lien PropCo Debt | $2,392 million in principal amount of first lien debt. 5 year term. Non-call year 1, thereafter callable at 103/102/101/par for the next three years respectively. Interest at LIBOR plus 3.5% with a 1% LIBOR floor. Additional terms to be mutually agreed among the Company, CEC and the Initial Consenting Creditors on or prior to noon on December 24, 2014, with such terms being annexed hereto. |

---

[10]    All amounts subject to the ability of the First Lien Bank Lenders to convert $100 million of CPLV Mezzanine Debt to New First Lien OpCo Debt, New Second Lien OpCo Debt, New First Lien PropCo Debt, New Second Lien PropCo Debt or equity in PropCo.

$1,961 million distributed to the First Lien Bank Lenders and $431 million distributed to First Lien Noteholders, subject to adjustment as set forth herein.

The First Lien PropCo Debt distributable to First Lien Bank Lenders and First Lien Noteholders must be in the form of bank debt and bond debt, respectively.

New Second Lien PropCo Debt

$1,425 million in principal amount of second lien debt. 6 year term. Customary NC3, with step-downs thereafter. Interest 8.0%. Additional terms to be mutually agreed among the Company, CEC and the Initial Consenting Creditors on or prior to noon on December 24, 2014, with such terms being annexed hereto.

Distributed to First Lien Noteholders, subject to adjustment as set forth herein.

Notwithstanding the above, to the extent PropCo Preferred Equity is issued, the proceeds thereof, after first reducing the principal amount of CPLV Mezzanine Debt (if any) to be issued to the First Lien Noteholders and then reducing the principal amount of CPLV Market Debt, shall be used to reduce the principal amount of New Second Lien PropCo Debt.

PropCo Preferred Equity

$300 million in principal amount of PropCo Preferred Equity. PIK interest 5%. Additional terms annexed hereto as Annex III.

Subject to the Purchase Option, all of the PropCo Preferred Equity shall be purchased by the Preferred Backstop Investors as set forth in the Backstop Commitment Agreement which shall be substantially in form and substance as that annexed hereto as Annex IV, subject to company's ongoing review and approval (other than with respect to the economic terms of such agreement), such approval not to be unreasonably withheld and such approval shall be provided on or prior to noon on December 24, 2014. 50% of the PropCo Preferred Equity purchased by the Preferred Backstop Investors will be made available to First Lien Noteholders pursuant to the Purchase Option. Any PropCo Preferred Equity purchased pursuant to the Purchase Option shall dilute the Backstop Investors' purchases pro rata.

Proceeds of the issue of the PropCo Preferred Equity shall be used first to reduce the principal amount of CPLV Mezzanine Debt (if any) to be issued to the First Lien Noteholders, second to reduce the principal amount of CPLV Market Debt, and third to reduce the principal amount of New Second Lien PropCo Debt.

15

**VII.    Charter Documents and By-Laws of the Equity Issuers**

| | |
|---|---|
| Corporate Governance | CEOC, a Delaware corporation will become OpCo and will have charter documents and by-laws that are acceptable to CEC and the Requisite Consenting Creditors. |

PropCo will be a limited partnership organized under the laws of Delaware and will have a limited partnership agreement that is customary for an UPREIT structure and reasonably acceptable to CEOC, CEC and the Requisite Consenting Creditors.

PropCo GP will be a limited liability company organized under the laws of Delaware and will have an operating agreement that is reasonably acceptable to CEOC, CEC and the Requisite Consenting Creditors.

The REIT will be a corporation organized under the laws of Maryland and will have charter documents and by-laws that are reasonably acceptable to CEOC, CEC and the Requisite Consenting Creditors.

OpCo Board of Directors

If CEC owns 90% or more of the OpCo New Common Stock, then the board of directors of OpCo shall consist of 3 voting members to be designated by CEC, each to be identified in a plan supplement and one of which shall be independent and reasonably acceptable to the Requisite Consenting Creditors. The independent director shall be a member of all committees of the board.

If CEC owns less than 90% of the OpCo New Common Stock, then the board of directors of OpCo shall consist of 3 voting members, 2 designated by CEC and 1 designed by the Requisite Consenting Creditors (which shall be a member of all committees of the board), each to be identified in a plan supplement.

Regardless of CEC's percentage ownership, there shall be one non-voting observer, reasonably acceptable to OpCo, to be designated by the Requisite Consenting Creditors and identified in a plan supplement. The observer shall be given notice of and an opportunity to attend the portion of all meetings concerning business and strategy sessions matters and other matters that would have an adverse material economic impact on PropCo (and receive all materials given to board members in connection with such matters), subject to appropriate limitations in respect of privilege issues.

REIT Board of Directors

If CEC owns less than 10% of PropCo (directly or indirectly), then the board of directors of the REIT shall consist of 7 voting members to be designated by the Requisite Consenting Creditors, each to be identified in a Plan Supplement.

If CEC owns 10% or more of PropCo (directly or indirectly), then the board of directors of the REIT shall consist of 7 voting members, 6 to be designated by the Requisite Consenting Creditors and 1 designated by CEC, each to be identified in a Plan Supplement.

At least 3 voting members must be licensed by the required regulatory authorities by closing. If there are not at closing at least 3 voting members licensed, then to assist with closing up to 2 of the independent members of CEOC shall be designated to the REIT board so that there will be 3 voting

16

|  | members at closing, with such members being removed as the non-voting members are licensed. Until such time as the CEOC independents and members designated by CEC are a minority of the board, the REIT shall be prohibited from taking major transactions without shareholder approval. To the extent any of members are not so licensed by closing, they shall be non-voting members until so licensed. |
|---|---|
| PropCo | PropCo will be controlled by its PropCo GP, whose sole shareholder will be the REIT. |

## VIII.  <u>Implementation</u>

|  |  |
|---|---|
| In-Court Restructuring: Use of Cash Collateral | In the chapter 11 cases filed by the Company to effectuate the Restructuring, the First Lien Noteholders will support entry of a cash collateral order that will allow the Company to use cash collateral for working capital and general corporate purposes and to pay costs associated with the Company's Restructuring. The cash collateral arrangements shall allow such use of cash, subject to (i) the milestones set forth in the RSA (plus forty-five (45) days following the breach of any milestone) and (ii) a budget acceptable to the Requisite Consenting Creditors and the Company, including capital expenditures in an amount to be agreed for the earlier of 18 months and an event of default under such cash collateral order on the terms set forth in the Cash Collateral Stipulation. [11] |

As more fully set forth in the Cash Collateral Stipulation, in exchange for the Company's use of cash collateral, the First Lien Noteholders and the First Lien Bank Lenders and/or their respective legal and financial advisors shall receive, among other things, the following:

- adequate protection liens

- liens on proceeds of avoidance actions

- payment of First Lien Professional Fees to the extent not otherwise paid in accordance with the RSA

---

[11]   Events of Default to include, among other things, (a) entry of an order modifying the automatic stay with respect to material assets, (b) the Company seeks to create any additional post-petition liens, (c) the Company commences, joins or assists in a proceeding against the First Lien Noteholders or First Lien Bank Lenders, (d) any modification to the Cash Collateral Order without the bank agent's or the Requisite Consenting Creditors' consent, (e) entry of a final order terminating or requiring repayment of the Adequate Protection Payments, (f) dismissal or conversion of the Company's chapter 11 cases, (g) failure to make an Adequate Protection Payment (5 business day grace period), and (h) failure to perform any other material term of the Cash Collateral Order (5 business day cure period).

17

- Adequate Protection Payments at a rate equal to 1.5% [12]

- Adequate Protection Payment of remaining Available Cash at Exit, as contemplated below

- receipt of quarterly budgets, a monthly variance report, an annual business plan and projections, and such other reports and information to the extent required by the Cash Collateral Stipulation.

The cash collateral Stipulation will contain a "pipeline plus" carveout for all fees and expenses of estate professionals (i.e., the "pipeline" benefiting from the carve shall not be subject to a budget or a cap) plus post-notice fee and expense reserves in an amount to be reasonably agreed between CEOC and the First Lien Professionals.

| | |
|---|---|
| Available Cash | The Available Cash shall be applied at closing <u>first</u> to fund, together with the Additional CEC Contribution the sources and uses (and capital structure described herein) at Exit and <u>second</u> , to the extent of any remaining Available Cash, to fund adequate protection payments, as applicable. |
| | "Available Cash" means (i) the pro forma amount of CEOC balance sheet cash available after giving effect to the Exit, the consummation of the Plan, all debt reductions and repayments, the payment of all fees, expenses and related uses of cash on the Exit Date in accordance with the plan over (ii) $400 million of minimum required CEOC liquidity, which shall be reduced by $0.50 for every dollar raised in revolving credit, provided that such reduction shall in no instance be greater than $100 million (the minimum cash requirement amount includes the $100 million of CEC's cash contribution, and does not include (a) cash held by Chester Downs and Marina, LLC and Chester Downs Finance Corp., (b) cash held by the international entities owned by CEOC (e.g. the London Clubs), and (c) customer cash held in custody by CEOC (i.e. "front money")). |

## IX.    Other

| | |
|---|---|
| PropCo Call Rights | Subject to the terms of the CERP debt documents and in no event in a manner that is dilutive of covenant compliance (provided that CEC and CERP shall use commercially reasonable efforts to obtain waivers or amendments to permit the transaction if necessary), PropCo shall have the right, for up to 180 days following the date the Restructuring is consummated, to enter into a binding agreement to purchase the real property (and lease it back to CERP) and all improvements associated with |

---

[12]    Such payments shall be in settlement of any claims for adequate protection that the First Lien Bank Lenders and First Lien Noteholders may assert throughout the chapter 11 cases.

18

Harrah's Atlantic City and Harrah's Laughlin for a cash purchase price equal to ten times the agreed annual rent for such properties, and on other customary terms and conditions, with the closing of such purchase(s) to occur following regulatory approvals, provided that such 180 day period shall be extended for up to 12 months if the call rights are not exercisable during the initial 180 day period due to CERP covenant issues.

The parties shall discuss in good faith whether additional properties should be subject to the PropCo call rights and other terms applicable to the call rights.

| | |
|---|---|
| Definitive Agreements | Subject to the terms of the RSA, as soon as reasonably practicable, the parties will execute Definitive Documentation implementing the Restructuring in form and substance consistent in all material respects with this Term Sheet and reasonably acceptable to the Requisite Consenting Creditors, the Company and CEC. |
| Non Transfer | As set forth in the RSA and subject to its terms and certain exceptions contained therein, each Restructuring Support Party will agree, on behalf of itself and its affiliates, not to transfer any First Lien Bank Obligations or First Lien Note Obligations held by such party and its affiliates from the date of execution of the RSA through the consummation of the Restructuring (including without limitation closing all Put Options and Equity Rights) unless the transferee(s) agree(s) to be bound by all of the terms and conditions of the RSA and this Term Sheet. |
| Intercreditor Agreements | Plan distributions shall be made in compliance with and shall, except as explicitly provided for herein, enforce all applicable intercreditor and subordination agreements. |
| Tax Opinions/Private Letter Rulings | As a condition to effectiveness of the Plan, Counsel to the Company shall deliver an opinion on which the First Lien Noteholders may rely, or the REIT shall receive a private letter ruling from the IRS, concluding, based on facts, customary representations and assumptions set forth or described in such opinion and/or private letter ruling, that the REIT's method of operation since its formation and its proposed method of operation up to and including the end of the date of the opinion or ruling has enabled and will enable the REIT to meet the requirements for qualification and taxation as a real estate investment trust under the Code. |

Counsel to the Company shall deliver to the Company an opinion, or the Company shall receive a private letter ruling from the IRS, concluding, based on facts, customary representations and assumptions set forth or described in such opinion and/or private letter ruling, that the transfer of assets to PropCo and to the REIT, and the transfer of consideration to creditors of the Company should not result in a material amount of U.S. federal income tax to the Company, determined as if the Company and its subsidiaries were a stand-alone consolidated group. The Company shall make any such opinion and/or private letter ruling available to the First Lien Professionals.

19

# Annex I
## Backstop Parties

| Party | PropCo New LP Interests / REIT New Common Stock | OpCo New Common Stock | Total Amount |
|---|---|---|---|
| CEC | $ 269 million[13] | $700 million | $969 million[14] |

---

[13]  Subject to dilution if other First Lien Noteholders elect to become Backstop Parties.

[14]  Subject to dilution if other First Lien Noteholders elect to become Backstop Parties.

**Annex II**
**Lease & MLSA Term Sheet Summary**

<center>L ease T erm S heet</center>

Note: It is currently anticipated that the real estate assets of the subsidiaries of a newly-formed Delaware limited partnership ("Propco") will be leased to subsidiaries of "Opco" (defined below) pursuant to two separate leases. One lease (the "Lease") [1] will include all "Facilities" (defined below) other than Caesars Palace Las Vegas ("CPLV"). The other lease (the "CPLV Lease") will only include CPLV. To the extent that a term below does not differentiate between the Lease and the CPLV Lease, such term shall be included in both leases.

| | |
|---|---|
| Landlord | With respect to the Lease, all of the subsidiaries of Propco that own the fee or ground leasehold (as applicable) interests in the real property comprising the "Non-CPLV Facilities" (as defined below). |
| | With respect to the CPLV Lease, a subsidiary of Propco that owns the fee interest in the real property comprising the CPLV Facility. |
| Tenant | With respect to the Lease, the subsidiaries of Caesars Entertainment Operating Company ("CEOC" or "Opco") necessary for the operation of all of the Non-CPLV Facilities, including all license holders with respect thereto, as reasonably demonstrated to Propco. |
| | With respect to the CPLV Lease, subsidiaries of CEOC necessary for the operation of the CPLV Facility, including all license holders with respect thereto, as reasonably demonstrated to Propco. |
| Guaranty / MLSA | Caesars Entertainment Corporation ("CEC"), a wholly-owned subsidiary of CEC ("Manager"), Opco and Propco will enter into a Management and Lease Support Agreement with respect to each of the Lease and the CPLV Lease (each, an "MLSA"), pursuant to which (i) Manager will manage the Facilities (as defined below) on behalf of Opco and (ii) CEC will provide a full guarantee of all payments and performance of Opco's monetary obligations under each of the CPLV Lease and the Lease. [2] The terms of the MLSA are more particularly set forth in that certain Summary of Terms with respect to the MLSA. |
| Leased Property | With respect to the Lease, all of the real property interest in the facilities (the "Non-CPLV Facilities") described on Exhibit A attached hereto, including all buildings and structures located thereon, and all rights appurtenant thereto. The Non-CPLV Facilities also may include any material non-U.S. real estate assets (if any) directly or indirectly wholly-owned by Opco, subject to compliance with all legal, regulatory, tax/REIT |

---

[1]    Lease may be structured as two individual cross-defaulted leases, to accommodate the JV interest for the Joliet asset.

[2]    NTD: Management Agreement and Guaranty will be integrated as one document, subject to terms of MLSA Term Sheet.

<center>1</center>

and contractual restrictions and requirements applicable to such assets; provided, however, that no such non-U.S. real estate asset shall be included in the Non-CPLV Facilities if, despite the reasonable best efforts of Opco and/or CEOC, it would be unduly onerous or costly, in consideration of the value of such real estate asset, to include such real estate asset in the Non-CPLV Facilities. If any such non-U.S. assets are included in the Non-CPLV Facilities as described above, the parties will reasonably agree on an ownership and operational structure with respect to such non-U.S. assets, which structure may include separate leases.

With respect to the CPLV Lease, all of the real property interest in CPLV (the "CPLV Facility", together with the Non-CPLV Facilities, the "Facilities"), as described on Exhibit B attached hereto, including all buildings and structures located thereon, and all rights appurtenant thereto.

|        |        |
|--------|--------|
| **Term** | 15 year initial term (the "Initial Term"). |

Four 5-year renewal terms (each, a "Renewal Term") to be exercised at Tenant's option by notifying Landlord (i) no earlier than 18 months prior to the then-current expiration and (ii) no later than 12 months prior to the then-current expiration.

The Term with respect to any Leased Property shall not exceed 80% of the useful life of such Leased Property. Any Leased Property not meeting such requirement shall be subject to a shorter Term than the other Leased Property that satisfies such requirements. [3]

The "Rent Reduction Adjustment" with respect to a Facility shall mean (i) with respect to the Base Rent, a proportionate reduction of the Base Rent based on the EBITDAR of such Facility versus the EBITDAR of all the Facilities and (ii) with respect to Percentage Rent, a reduction of the then current dollar amount based on excluding the Net Revenue of the applicable Facility from the Percentage Rent formula on a pro forma basis.

**Rent**    "Rent" means the sum of Base Rent and Percentage Rent. Rent shall be paid monthly in advance.

Rent under the Lease and the CPLV Lease shall be as follows for the Initial Term and each Renewal Term: [4]

**Lease** :

(a) For the first 3 Lease years, Base Rent of $475,000,000 per Lease year.

(b) For the 4th Lease year through the 10th Lease year, (i) Base Rent equal to $332,500,000, subject to the annual Escalator (as hereinafter defined)

---

[3] The parties understand that none of the Facilities will run afoul of the 80% test during the Initial Term, and that the provision will apply (if at all) only in respect of Renewal Terms.

[4] For tax purposes, portions of each Non-CPLV Facility (e.g., barges and boats) may be subject to a specific Rent allocation to be set forth in the definitive documents.

commencing in the 7th Lease year as described below, plus (ii) Percentage Rent equal to the Non-CPLV Initial Percentage Rent (as hereinafter defined), as adjusted at the commencement of the 6th Lease year as described below.

(c) From and after the commencement of the 11th Lease year, (i) Base Rent equal to 80% of the Rent for the 10th Lease year, subject to the annual Escalator as described below, plus (ii) Percentage Rent equal to Non-CPLV Secondary Percentage Rent (as hereinafter defined).

For the 4 th and 5 th Lease year, Percentage Rent, in each such Lease year, shall be equal to a fixed annual amount equal to $142,500,000, adjusted as follows: (i) in the event that the Net Revenue with respect to the Non-CPLV Facilities for the 3rd Lease year has increased versus the Net Revenue for the 12 month period immediately preceding the 1st Lease year (such increase, the " Year 4 Non-CPLV Increase "), such $142,500,000 shall increase by the product of (a) the Non-CPLV Factor (as defined below) and (b) the Year 4 Non-CPLV Increase; and (ii) in the event that the Net Revenue with respect to the Non-CPLV Facilities for the 3rd Lease year has decreased versus the Net Revenue for the 12 month period immediately preceding the 1st Lease year (such decrease, the " Year 4 Non-CPLV Decrease "), such $142,500,000 shall decrease by the product of (a) the Non-CPLV Factor and (b) the Year 4 Non-CPLV Decrease (such resulting amount being referred to herein as the " Non-CPLV Initial Percentage Rent ").

For the 6th Lease year through the 10th Lease year, Percentage Rent, in each such Lease year, shall be equal to a fixed annual amount equal to the Non-CPLV Initial Percentage Rent, adjusted as follows: (i) in the event that the Net Revenue with respect to the Non-CPLV Facilities for the 5th Lease year has increased versus the Net Revenue for the 3rd Lease year (such increase, the " Year 6 Non-CPLV Increase "), Percentage Rent shall increase by the product of (a) the Non-CPLV Factor and (b) the Year 6 Non-CPLV Increase; and (ii) in the event that the Net Revenue with respect to the Non-CPLV Facilities for the 5th Lease year has decreased versus the Net Revenue for the 3rd Lease year (such decrease, the " Year 6 Non-CPLV Decrease "), Percentage Rent shall decrease by the product of (a) the Non-CPLV Factor and (b) the Year 6 Non-CPLV Decrease.

For the 11th Lease year through the 15th Lease year, Percentage Rent shall be equal to a fixed annual amount equal to 20% of the Rent for the 10th Lease year, adjusted as follows: (i) in the event that the Net Revenue with respect to the Non-CPLV Facilities for the 10th Lease year has increased versus the Net Revenue for the 5th Lease year (such increase, the " Year 11 Non-CPLV Increase "), Percentage Rent shall increase by the product of (a) the Non-CPLV Factor and (b) the Year 11 Non-CPLV Increase; and (ii) in the event that the Net Revenue with respect to the Non-CPLV Facilities for the 10th Lease year has decreased versus the Net Revenue for the 5th Lease year (such decrease, the " Year 11 Non-CPLV Decrease "), Percentage Rent shall decrease by the product of (a) the Non-CPLV Factor and (b) the Year 11 Non-CPLV Decrease (such resulting amount being referred to herein as "Non-CPLV Secondary Percentage Rent").

3

At the commencement of each Renewal Term, (i) the Base Rent under the Lease for the first year of such Renewal Term shall be adjusted to fair market value rent (provided that (A) in no event will the Base Rent be decreased and (B) no such adjustment shall cause Base Rent to be increased by more than 10% of the prior year's Base Rent), subject thereafter to the annual Escalator, and (ii) the Percentage Rent for such Renewal Term will be equal to the Percentage Rent in effect for the Lease year immediately preceding the first year of such Renewal Term, adjusted as follows: (1) in the event that the Net Revenue with respect to the Non-CPLV Facilities for the Lease year immediately preceding the applicable Renewal Term has increased versus the Net Revenue for (x) in respect of the first Renewal Term, the 10th Lease year and (y) for each subsequent Renewal Term, the Lease year prior to the first Lease year of the immediately preceding Renewal Term (such increase, the "Renewal Term Non-CPLV Increase"), Percentage Rent shall increase by the product of (a) the Non-CPLV Factor and (b) the Renewal Term Non-CPLV Increase; and (ii) in the event that the Net Revenue with respect to the Non-CPLV Facilities for the Lease year immediately preceding the applicable Renewal Term has decreased versus the Net Revenue for (x) in respect of the first Renewal Term, the 10th Lease year and (y) in respect of each subsequent Renewal Term, the Lease year prior to the first Lease year of the immediately preceding Renewal Term (such decrease, the "Renewal Term Non-CPLV Decrease"), Percentage Rent shall decrease by the product of (a) the Non-CPLV Factor and (b) the Renewal Term Non-CPLV Decrease. The Lease shall contain a customary mechanism by which Landlord and Tenant shall determine the fair market value adjustment to Base Rent at least 12 months prior to the commencement of the applicable Renewal Term. The fair market valuation shall be as of the date of commencement of the applicable Renewal Term.

The " Non-CPLV Factor " shall be equal to: (i) for the 4th Lease year through the 10th Lease year, 19.5%; and (ii) from and after the 11th Lease year, 13%.

From and after the commencement of the 7th Lease year, Base Rent for the Lease will be subject to an annual escalator (the "Escalator") equal to the higher of 2% and the Consumer Price Index ("CPI") increase with respect to such year, above the previous lease year's Base Rent.

**CPLV Lease :**

(a) For the first 5 Lease years, Base Rent of $160,000,000 per Lease year, subject to the annual Escalator.

(b) From and after the commencement of the 6th Lease year, (i) Base Rent equal to 80% of the Rent for the 5th Lease year, subject to the annual Escalator, plus (ii) Percentage Rent equal to the CPLV Initial Percentage Rent (as hereinafter defined), as adjusted in the 11th Lease year as described below.

4

For the 6th Lease year through the 10th Lease year, Percentage Rent shall be equal to a fixed annual amount equal to 20% of the Rent for the 5th Lease year, adjusted as follows: (i) in the event that the Net Revenue with respect to the CPLV Facility for the 5th Lease year has increased versus the Net Revenue for the 12 month period immediately preceding the 1st Lease year (such increase, the "Year 6 CPLV Increase"), Percentage Rent shall increase by the product of (a) 13% (the "CPLV Factor") and (b) the Year 6 CPLV Increase; and (ii) in the event that the Net Revenue with respect to the CPLV Facility for the 5th Lease year has decreased versus the Net Revenue for the 12 month period immediately preceding the 1st Lease year (such decrease, the "Year 6 CPLV Decrease"), Percentage Rent shall decrease by the product of (a) the CPLV Factor and (b) the Year 6 CPLV Decrease (such resulting amount being referred to herein as "CPLV Initial Percentage Rent").

From and after the commencement of the 11th Lease year, Percentage Rent shall be equal to a fixed annual amount equal to the CPLV Initial Percentage Rent, adjusted as follows: (i) in the event that the Net Revenue with respect to the CPLV Facility for the 10th Lease year has increased versus the Net Revenue for the 5th Lease year (such increase, the "Year 11 CPLV Increase"), Percentage Rent shall increase by the product of (a) the CPLV Factor and (b) the Year 11 CPLV Increase and (ii) in the event that the Net Revenue with respect to the CPLV Facility for the 10th Lease year has decreased versus the Net Revenue for the 5th Lease year (such decrease, the "Year 11 CPLV Decrease"), Percentage Rent shall decrease by the product of (a) the CPLV Factor and (b) the Year 11 CPLV Decrease.

At the commencement of each Renewal Term, (i) the Base Rent under the CPLV Lease for the first year of such Renewal Term shall be adjusted to fair market value rent (provided that (A) in no event will the Base Rent be decreased and (B) no such adjustment shall cause Base Rent to be increased by more than 10% of the prior year's Base Rent), subject thereafter to the annual Escalator, and (ii) the Percentage Rent for such Renewal Term will be equal to the Percentage Rent in effect for the Lease year immediately preceding the first year of such Renewal Term, adjusted as follows: (1) in the event that the Net Revenue with respect to the CPLV Facility for the Lease year immediately preceding the applicable Renewal Term has increased versus the Net Revenue for (x) in respect of the first Renewal Term, the 10th Lease year and (y) for each subsequent Renewal Term, the Lease year prior to the first Lease year of the immediately preceding Renewal Term (such increase, the "Renewal Term CPLV Increase"), Percentage Rent shall increase by the product of (a) the CPLV Factor and (b) the Renewal Term CPLV Increase; and (ii) in the event that the Net Revenue with respect to the CPLV Facility for the Lease year immediately preceding the applicable Renewal Term has decreased versus the Net Revenue for (x) in respect of the first Renewal Term, the 10th Lease year and (y) in respect of each subsequent Renewal Term, the Lease

5

year prior to the first Lease year of the immediately preceding Renewal Term (such decrease, the "Renewal Term CPLV Decrease"), Percentage Rent shall decrease by the product of (a) the CPLV Factor and (b) the Renewal Term CPLV Decrease. The CPLV Lease shall contain a customary mechanism by which Landlord and Tenant shall determine the fair market value adjustment to Base Rent at least 12 months prior to the commencement of the applicable Renewal Term. The fair market valuation shall be as of the date of commencement of the applicable Renewal Term.

"Net Revenue" shall be defined in the definitive documents.

| | |
|---|---|
| Rent Allocation | Rent will be allocated under section 467 of the Code and regulations thereunder on a declining basis within the 115/85 safe harbor, adjusted as necessary such that the REIT's pro rata share of Landlord's anticipated free cash flow from operations, after payment by Landlord (and its subsidiaries) of all required debt service and operating expenses, is no less than 100% of the REIT's anticipated taxable income (assuming annual Cap Ex Reimbursements of $78.0 million). |
| Triple Net Lease | Subject to the provision below regarding Landlord's reimbursement to Tenant of capital expenditures (the "Capex Reimbursement"), the Leases will be absolute, traditional triple net leases. Tenant shall pay all Rent absolutely net to Landlord, without abatement, and unaffected by any circumstance (except as expressly provided below in the cases of casualty and condemnation and the Capex Reimbursement). Subject to the Capex Reimbursement, Tenant will assume complete responsibility for the condition, operation, repair, alteration and improvement of the Facilities, for compliance with all legal requirements (whether now or hereafter in effect) including, without limitation, all environmental requirements (whether arising before or after the effective date of the Lease), and for payment of all costs and liabilities of any nature associated with the Facilities, including, without limitation, all impositions, taxes, insurance and utilities, and all costs and expenses relating to the use, operation, maintenance, repair, alteration and management thereof. Opco and Tenant will, jointly and severally, provide a customary environmental indemnity to Landlord. |
| Expenses, Maintenance, Repairs and Maintenance Capital Expenditures, Minor Alterations | Tenant shall be responsible for the maintenance and repair of the Leased Properties (including capital expenditures with respect thereto); provided, however, that, under the Leases, Landlord shall reimburse to Tenant an annual amount in respect of capital expenditures incurred by Tenant with respect to the Leased Properties under the Lease and CPLV Lease in the amount equal to the lesser of (1) $78.0 million per Lease year in the aggregate (decreasing proportionately upon any Facility ceasing to be Leased Properties pursuant to the terms of the Lease or CPLV Lease in proportion with the Rent Reduction Adjustment), and (2) 37.5% of all capital expenditures incurred by Opco in such year (such lesser amount, the "CapEx Reimbursement Amount"). The CapEx Reimbursement Amount shall be applied 75% to the Lease and 25% to the CPLV Lease, |

6

subject to adjustment as agreed upon by Propco to the extent required by (or to improve the terms of) any CPLV financing. Such CapEx Reimbursement Amount shall be decreased each Lease year, for such Lease year only, by an amount equal to 50% of excess cash flow (to be defined in a manner consistent with Tenant's financing documentation) in excess of $10 million generated by Tenant from the Facilities during the prior year. Such decrease will be structured in a manner to comply with REIT requirements.

Within 30 days after the end of each month, Tenant shall provide to Landlord a report setting forth all revenues and capital expenditures for the preceding month for the Non-CPLV Facilities (in the aggregate), on the one hand, and the CPLV Facility, on the other hand, and include Tenant's request identifying the portion of the CapEx Reimbursement Amount it is requesting to be paid. Within 15 days after Landlord's receipt of such report, Landlord shall pay Tenant an amount equal to the lesser of (i) an estimated one-twelfth portion of the applicable CapEx Reimbursement Amount payable (as reasonably estimated in accordance with the applicable budget preparation process) in respect of each Lease year, or (ii) the actual amount of capital expenditures incurred by Tenant during such month, multiplied by a fraction, the numerator of which is the estimated CapEx Reimbursement Amount for that year, and the denominator of which is the Minimum CapEx Amount. Payment of the CapEx Reimbursement Amount shall be reconciled on a quarterly and year-end cumulative basis such that, (i) within the later of (x) 15 days after Tenant's delivery of the required quarterly reporting or (y) 45 days after the end of each quarter and (ii) within 30 days after the delivery of audited year-end financial statements (as applicable), quarterly and at year end Landlord will have paid to Tenant an amount equal to the ratio of the CapEx Reimbursement Amount to the Minimum CapEx Amount (in each case, as the same may be adjusted as provided herein), multiplied by the actual amount of capital expenditures paid by Tenant for such period, provided, in no event will Landlord pay to Tenant more than its applicable CapEx Reimbursement Amount for such year. In the event that Landlord does not reimburse Tenant for such costs within the time periods set forth above and after Tenant's 15-day (or 30-day, as applicable) written request therefor, Tenant shall have the right to deduct such sums from subsequent installments of Rent payable under the Lease or CPLV Lease, as applicable. In the event that Tenant fails to pay Rent as and when due under the Lease or CPLV Lease beyond all applicable notice and cure periods, Landlord shall have the right to deduct such unpaid Rent amounts from subsequent installments of the CapEx Reimbursement Amount payable under the Lease or CPLV Lease, as applicable.

Tenant must expend sums for capital expenditures relating to the Facilities in an annual amount at least equal to $175,000,000 (such amount being a gross amount toward which the CapEx Reimbursement Amount may be applied), which amount shall be increased or decreased with the inclusion or removal of Leased Properties from the Leases, in proportion with the EBITDAR of any new or sold Leased Property versus the EBITDAR of all the Leased Properties (such amount, as adjusted, the "Minimum CapEx

7

Amount"). If Tenant does not spend the full amount of the Minimum CapEx Amount as required under the Leases, Landlord shall have the right to seek the remedy of specific performance to require Tenant to spend any such unspent amount.

Propco shall have the right to designate an observer on the Opco Board in accordance with the Summary Term Sheet for Proposed Restructuring, which observer shall have the opportunity to participate in all discussions and meetings of the Board and applicable committee regarding capital expenditures, budgeting, planning and construction of capital improvements for the (existing and new) Facilities and to receive all materials given to committee members in connection with such matters.

Tenant shall be permitted to make any alterations and improvements (including Material Alterations (defined below)) to the Facilities in its reasonable discretion; provided, however, that (i) all alterations must be of equal or better quality than the applicable existing Facility, as applicable, (ii) any such alterations do not have an adverse effect on the structural integrity of any portion of the Leased Properties, and (iii) any such alterations would not otherwise result in a diminution of value to any Leased Properties. If any alteration does not meet the standards of (i), (ii) and (iii) above, then such alteration shall be subject to Landlord's approval. "Material Alteration" shall mean Tenant elects to (i) materially alter a Facility, (ii) expand a Facility, or (iii) develop the undeveloped land leased pursuant to the Lease, and, in each case, the cost of such activity exceeds $50,000,000. The Minimum CapEx Amount shall not include the cost of Material Alterations.

**Material Alterations; Growth Capex; Development of Undeveloped Land**

In the event Tenant is going to perform any Material Alteration, Tenant shall notify Landlord of such Material Alteration. Within 30 days of receipt of a notification of a Material Alteration, Landlord shall notify Tenant as to whether it will fund all or a portion of such proposed Material Alteration and, if so, the terms and conditions upon which it would do so. Tenant shall have 10 days to accept or reject Landlord's funding proposal. If Landlord declines to fund a proposed Material Alteration, Tenant shall be permitted to secure outside financing or utilize then existing available financing for a 9-month period, after which 9-month period, if Tenant has not secured outside or then-existing available financing, Tenant shall again be required to first seek funding from Landlord.

If Landlord agrees to fund the Material Alteration and Tenant rejects the terms thereof, Tenant shall be permitted to either use then existing available financing or seek outside financing for a 9-month period for such Material Alteration, in each case on terms that are economically more advantageous to Tenant than offered under Landlord's funding proposal, and if Tenant elects to utilize economically more advantageous financing it shall provide Landlord with reasonable evidence of the terms of such financing. Prior to any advance of funds (if applicable), Tenant and Landlord shall enter into the agreements necessary to effectuate the applicable terms of Landlord financing (including, without limitation, an amendment to the Lease if financing is structured as a Rent increase).

8

If Tenant constructs a Material Alteration with its then existing available financing or outside financing, (i) during the Term, such Material Alteration shall be deemed part of the Leased Property solely for the purpose of calculating Percentage Rent and shall for all other purposes be Tenant's property and (ii) following expiration or termination of the Term, such Material Alteration shall be Tenant's property but Landlord shall have the option to purchase such property for fair market value. If Landlord does not elect to purchase such Material Alteration, Tenant shall, at its option, either remove the Material Alteration from the Leased Property and restore the Leased Property to the condition existing prior to such Material Alteration being constructed, at its sole cost and expense and prior to expiration or earlier termination of the Term, or leave the Material Alteration at the Leased Property at the expiration or earlier termination of the Term, at no cost to Landlord. If Landlord elects to purchase the Material Alteration, any amount due to Tenant for the purchase shall be credited against any amounts owed by Tenant to Landlord under the applicable Lease (including damages, if any, in connection with the termination of such Lease). If Landlord agrees to fund a proposed Material Alteration and Tenant accepts the terms thereof, such Material Alteration shall be deemed part of the Leased Property for all purposes.

| | |
|---|---|
| Right of First Refusal | **Tenant's Right of First Refusal** : |

Prior to consummating a transaction whereby Landlord or any of its affiliates (provided, however, that this provision will not apply if the MLSA has been terminated by Landlord or CEC (or an affiliate thereof) is otherwise no longer responsible for management of the Facilities with own, operate or develop a domestic (U.S.) gaming facility outside of Las Vegas, Nevada (either existing prior to such date or to be developed) that is not then subject to a pre-existing lease or management agreement in favor a third-party operator that was not entered into in contemplation of such acquisition or development, Landlord shall notify Tenant and CEC of the subject opportunity. CEC (or its designee) shall have the right to lease (and Manager manage) such facility, and if such right is exercised Landlord and CEC (or its designee) will structure such transaction in a manner that allows the subject property to be owned by Landlord and leased to CEC (or its designee). In such event, CEC (or its designee) shall enter into a lease with respect to the additional property whereby (i) rent thereunder shall be established based on formulas consistent with the EBITDAR coverage ratio with respect to the Lease then in effect (the "Allocated Rent Amount") and (ii) such other terms that CEC (or its designee) and Landlord agree upon shall be incorporated. In the event that the foregoing right is not exercised by CEC (or its designee), Landlord (or an affiliate thereof) shall have the right to consummate the subject transaction without Tenant's and/or CEC's involvement, provided the same is on terms no more favorable to the counterparty than those presented to Tenant for consummating such transaction.

9

The mechanics and timing of applicable notices in respect of, and the exercise of, Tenant's ROFR will be more particularly set forth in the Lease.

<u>Landlord's Right of First Refusal</u> :

Prior to consummating a transaction whereby Tenant or any of its affiliates (including CEC or any of its affiliates) (provided, however, that this provision will not apply if the MLSA has been terminated by Propco or, with Propco's consent, CEC (or an affiliate thereof) is otherwise no longer managing the Facilities) will own, operate or develop a domestic (U.S.) gaming facility outside of Las Vegas, Nevada (either existing prior to such date or to be developed) that is not subject to a lease or management agreement in favor a third-party operator that was not entered into in contemplation of such acquisition or development, Tenant shall notify Landlord of the subject opportunity. Landlord shall have the right to own such facility and lease it to Tenant, and if Landlord exercises such right then Tenant and Landlord will structure such transaction in a manner that allows the subject property to be owned by Landlord and leased to Tenant (and be managed by Manager). In such event, Tenant and Landlord shall amend the Lease by (i) adding the additional property as Leased Property, (ii) increasing Rent by the Allocated Rent Amount with respect to such property and (iii) incorporating such other terms that Tenant and Landlord have agreed to. In the event that Landlord declines its right to own the facility, Tenant (or an affiliate thereof) shall have the right to consummate the subject transaction without Landlord's involvement, provided the same is on terms no more favorable to the counterparty than those presented to Landlord for consummating such transaction. Further, in the event Landlord declines its right to own such facility, the Lease shall provide for similar terms as those provided in the Penn Gaming lease with respect to any such facilities which are located outside of Las Vegas, Nevada and within the restricted area (as defined in the Penn Gaming lease but reduced to 30 miles) of any existing Non-CPLV Facilities.

The mechanics and timing of applicable notices in respect of, and the exercise of, Landlord's ROFR will be more particularly set forth in the Lease.

| | |
|---|---|
| Permitted Use | Tenant shall use the Leased Property for hotel, gaming, entertainment, conference, retail and other uses consistent with its current use, or with prevailing industry use. |
| Landlord Sale of Properties | Landlord may sell, without Tenant consent in each instance, any or all of the Facilities, upon the following terms: (i) the purchaser shall enter into a severance lease with Tenant for the sold Facility(ies) on substantially the same terms as contained in the applicable Lease, with an appropriate rent |

adjustment; (ii) the applicable Lease shall be modified as necessary to reflect the removal of the applicable Facility(ies), including, without limitation, an adjustment to the Rent thereunder so as to preserve the same economics following the entry into such severance lease; and (iii) CEC and Manager shall enter into a new MLSA with respect to the severance lease on terms substantially similar to CEC's obligations with respect to the MLSA with respect to the Leases. The Leases shall not be cross-defaulted with any such severance lease.

Each Lease shall survive any such assignment or transfer by Landlord and the successor Landlord shall become a party thereto.

If the partnership (as opposed to the spin-off) structure is used, Landlord's right to sell the Facilities as described above shall be subject to compliance with a customary Tax Protection Agreement protecting CEOC from adverse tax consequences resulting from asset sales or repayment of debt below certain thresholds.

Assignment by Tenant

Tenant will not have the right to directly assign portions of the Lease, however, the following assignments will be permitted, as well as others of a similar nature:

1) An assignment to a permitted lender (described in further detail below) for collateral purposes, any assignment to such permitted lender or any other purchaser upon a foreclosure or transaction in lieu of foreclosure, and any assignment to any subsequent purchaser thereafter each shall be permitted; provided, however, that in all such transfers, the foreclosing lender or any purchaser or successor purchaser must keep the MLSA in place unless Landlord has consented (in its sole discretion) to the termination of the MLSA, as more particularly provided in the MLSA term sheet, and if Landlord has so consented to an MLSA termination, the foreclosing lender or any purchaser or successor purchaser shall engage an "acceptable operator" (satisfying parameters to be set forth in the Leases with respect to, among other things, gaming and other appropriate operational experience and qualification) to operate the Facilities.

2) An assignment to an affiliate of Tenant, to CEC or an affiliate of CEC.

3) Any sublease of any portion of the premises, pursuant to a bona-fide third party transaction, so long as Tenant is not released from its obligations under the Lease, and (x) provided all covenants with respect to CEC management continue to be satisfied, and (y) subject to restrictions against transactions designed to avoid payment of Percentage Rent or otherwise to negate requirements or provisions in the CPLV Lease or the Lease; provided, however, the following shall be permitted: (A) any subleases existing as of the effective date of the Lease or CPLV Lease, as applicable, consistent with currently existing arrangements and (B) any affiliate subleases necessary or appropriate for the operation of the Facilities in connection with licensing requirements (e.g., gaming, liquor, etc.).

11

Additionally, the following transfers of direct and indirect interests in Tenant will be permitted:

1) Transfers of stock in Tenant or its parent(s) on a nationally-recognized exchange; provided, however, in order to be a permitted transfer, in the event of a change of control of CEC, the quality of management must be generally consistent or superior to that which existed immediately prior to the transfer.

2) Reconfiguration of the Board of Directors of Tenant's parent(s) that does not result from a change of control.

3) Transfers of interests in Tenant that do not cause a change in control of Tenant.

In all events, except as expressly provided in the MLSA term sheet, neither Tenant nor the Guarantor under the Guaranty will be released in connection with any such transfer, assignment, sublet or other disposition, whether permitted or restricted.

Notwithstanding anything to the contrary, there shall be no restrictions on direct or indirect transfers in CEC; provided, however, in order to be a permitted transfer, in the event of a change of control of CEC, the quality of management must be generally consistent or superior to that which existed immediately prior to the transfer.

For purposes hereof, the term "change of control" shall be defined in a manner consistent with Opco debt financing documents.

| | |
|---|---|
| Landlord Financing | Landlord may finance or refinance its interest in any of the Non-CPLV Facilities and CPLV Facility, as applicable ("Landlord Financing"), in its discretion. Tenant will reasonably cooperate in all Landlord Financings. Tenant will operate (or cause to be operated) the Facilities in compliance with the customary terms of the Landlord Financing documents (including all covenants pertaining to the maintenance of the Facilities, as applicable, funding and maintaining lender required reserves, complying with all cash management requirements of the lender, procuring insurance and providing reporting), pertaining to the Facilities, as applicable, as existing as of the effective date of the Leases and any new or additional terms of any new or modified Landlord Financing made following the effective date of the Leases, in each case provided that such terms are customary and do not (x) materially increase Tenant's obligations under the Leases, or (y) materially diminish Tenant's rights under the Leases (it being acknowledged that Tenant's obligation to fund and maintain customary and reasonable reserves as required by Landlord's lender does not materially increase Tenant's obligations or materially diminish Tenant's rights under the Leases). The Leases shall be subordinate to all Landlord Financing, provided Landlord shall obtain non-disturbance agreements from its lenders in a form to be reasonably agreed to by the parties. |

12

| | |
|---|---|
| Tenant Financing | Tenant shall be permitted to obtain the financing contemplated by the Restructuring Support Agreement, and any refinancing/replacements thereof, subject to parameters on any financing/refinancing (such as lender qualifications for entitlement to leasehold mortgagee protections) to be set forth in the Leases. The lender (with appropriate qualifications) under such Tenant financing (i) shall be given notice of a default under the Lease, (ii) shall be afforded a right to cure any applicable Tenant default, (iii) shall, upon an early termination or rejection of the Lease, be given the opportunity to enter into a replacement lease (on terms consistent with the Lease) and (iv) shall be afforded other customary leasehold mortgagee protections. |
| | Such mortgagee protections shall provide that the leases shall survive any debt default by Tenant under such financing and any foreclosure by such lender on Tenant's leasehold interest (provided all curable defaults have been, or upon foreclosure will be, cured), and neither Landlord nor Tenant nor its lenders or assignees shall have termination rights under the Leases in respect thereof (absent an Event of Default under the applicable Lease). |
| | Upon foreclosure, the foreclosing lender must keep the MLSA in place unless Landlord has consented (in its sole discretion) to the termination of the MLSA, as more particularly provided in the MLSA term sheet, and if Landlord has so consented to an MLSA termination, the foreclosing lender shall engage an "acceptable operator" (satisfying parameters to be set forth in the Leases with respect to, among other things, gaming and other appropriate operational experience and qualification) to operate the Facilities. |
| Financial Statements of Tenant | Tenant shall provide to Landlord quarterly and audited annual financial statements (prepared in accordance with applicable securities law requirements, including as to format and timing, and shall consent to the inclusion of such financial statements in all public or private disclosure and offering documents of Propco and the REIT required by applicable law). In addition, the Tenant under the CPLV Lease shall provide to Landlord such additional customary and reasonable financial information related to CPLV as may be required for the Landlord Financing pertaining to CPLV. |
| | In addition, Tenant shall provide revenue and capital expenditure reports to Landlord to the extent set forth in the section above titled "Expenses, Maintenance, Repairs and Maintenance Capital Expenditures, Minor Alterations". |
| Casualty | In the event of any casualty with respect to a Facility, Tenant is obligated to rebuild/restore, and has no right to terminate the Lease, except that, (i) for the CPLV Lease, during the final two years of the Term, in connection with a casualty which costs in excess of 25% of total property fair market value as determined by mutually acceptable architect or contractor, either Landlord or Tenant may terminate the Lease, (ii) for the Lease, during final two years of the Term, in connection with a casualty for any individual Facility which costs in excess of 25% of total fair market value |

13

for such individual Facility as determined by mutually acceptable architect or contractor, either Landlord or Tenant may terminate the Lease as to such individual Facility (in which event the Rent obligations under the Lease in respect of the remaining Facilities shall be proportionately adjusted, based on a mechanic to be set forth in the Leases), and (iii) Tenant shall not have an obligation to rebuild/restore solely to the extent the casualty was uninsured under the insurance policies Tenant is required to keep in place under the Lease or CPLV lease, as applicable.

| | |
|---|---|
| Condemnation | If substantially all of the CPLV Facility is taken, then the CPLV Lease will terminate. If substantially all of any individual Non-CPLV Facility under the Lease is taken, then the Lease will terminate as to such individual Non-CPLV Facility, and the Rent shall be reduced by the Rent Reduction Amount with respect to the applicable Non-CPLV Facility. In any such case (when the Lease or CPLV Lease (as applicable) is terminated in whole or in part), the applicable award will be distributed, first to Landlord in payment of the fair market value of Landlord's interest in the applicable Facilities, then to Tenant in payment of the fair market value of the Tenant's property which was so taken, and the balance of the award if any, to Landlord. In the case of a partial condemnation, the applicable Lease will continue unabated except that Base Rent shall be adjusted in proportion to the portion of the Facility which was taken (based on a mechanic to be set forth in the Leases). |
| Events of Default | Standard events of default including failure to pay monetary sums and failure to comply with the covenants set forth in the Lease. With respect to monetary defaults, Tenant shall be entitled to notice and a 10 day cure period. With respect to non-monetary defaults, Tenant shall be entitled to notice and, so long as Tenant (i) commences to cure within 30 days after receipt of notice and (ii) continues to diligently cure the applicable default, the applicable non-monetary default shall not become an Event of Default. Landlord will refrain from exercising remedies under the Lease in respect of an Event of Default for the duration of the cure periods furnished to CEC as specifically provided in the MLSA term sheet. |
| | A default under the Lease shall not be a default under the CPLV Lease. With respect to the Lease, (a) during the term of the initial Landlord financing with respect to the Non-CPLV Facilities, a default under the CPLV Lease shall be a default under the Lease, and (b) from and after the replacement of the initial Landlord financing with respect to the Non-CPLV Facilities with replacement financing, a default under the CPLV Lease shall not be a default under the Lease. |
| | Any default by Tenant with respect to a Tenant Financing or Landlord with respect to a Landlord Financing shall not be considered a default under the leases. |
| Remedies upon Event of Default | If Landlord elects to terminate the Lease or CPLV Lease upon an Event of Default by Tenant during the Term (including any Renewal Terms for which Tenant has exercised its renewal option), then Landlord shall be |

14

entitled to seek damages with respect to an acceleration of future rents in accordance with applicable law, but in no event shall such damages exceed the difference between (i) the net present value of the Rent for the applicable Leased Properties for the balance of the Initial Term and/or such Renewal Term if exercised (as applicable), minus (ii) the net present value of the fair market rental for the applicable Leased Properties for the balance of the Initial Term and/or such Renewal Term if exercised (as applicable).

| | |
|---|---|
| Alternative Dispute Resolution | The parties will reasonably consider an alternative dispute resolution process as part of the negotiation of the definitive documentation. |

**Effect of Lease Termination:**

If the Lease or CPLV Lease is terminated for any reason, at Landlord's option (1) Tenant will cooperate (and shall cause Manager to cooperate) to transfer to a designated successor at fair market value all tangible personal property located at each Facility (as applicable) and used exclusively at such Facility (as applicable); and/or (2) Tenant shall stay in possession and continue to operate the business in the same manner as prior practice (for a period not to exceed 2-years) while the identity of a successor tenant is determined. Any amount due to Tenant hereunder for the purchase of the personal property shall be credited by Landlord against any amounts owed by Tenant to Landlord under the applicable Lease (including damages, if any, in connection with the termination of such Lease).

The foregoing is subject to the express terms of the MLSA in the event of a Non-Consented Lease Termination (as defined in the MLSA term sheet) of the Lease or CPLV Lease.

**REIT Provisions**

Each lease shall contain certain provisions required to satisfy REIT-related requirements applicable to Landlord, including:

- Tenant shall not sublet, assign or enter into any management arrangements pursuant to which subtenant rent would be based on net income or profits of the subtenant.

- Landlord shall have the right to assign the leases to another person (e.g., a taxable REIT subsidiary) in order to maintain landlord's REIT status.

- Tenant shall be obligated to provide information to Landlord necessary to verify REIT compliance.

**Regulatory**

Landlord and Tenant shall comply with all applicable regulatory requirements. The Non-CPLV Facilities intended to be demised under the Lease shall be severable into separate leases with respect to any Facility in the event necessary to comply with any applicable licensing or regulatory requirements, pursuant to a mechanism to be set forth in the Lease as agreed between Landlord and Tenant. The resulting severed leases shall be cross-defaulted. If a Facility is so severed, Rent under the initial Lease shall be reduced by the Rent Reduction Adjustment with respect to such Facility, and the Rent under a lease for any such severed Facility shall be equal to such deducted amount.

15

Governing Law                          New York, except that the provisions relating to the creation of the leasehold estate and
                                       remedies concerning recovery of possession of the leased property shall be governed by
                                       the law of the state where the Facility is located.

16

**EXHIBIT A**

<u>Non-CPLV Facilities</u>

| | | |
|---|---|---|
| **1. Horseshoe Council Bluffs** | Council Bluffs | IA |
| **2. Harrah's Council Bluffs** | Council Bluffs | IA |
| **3. Harrah's Metropolis** | Metropolis | IL |
| **4. Horseshoe Southern Indiana - Vessel** | New Albany and Elizabeth | IN |
| **5. Horseshoe Hammond** | Hammond | IN |
| **6. Horseshoe Bossier City** | Bossier City | LA |
| **7. Harrah's Bossier City (Louisiana Downs)** | Bossier City | LA |
| **8. Harrah's North Kansas City** | North Kansas City and Randolph | MO |

17

| | | |
|---|---|---|
| **9. Grand Biloxi Casino Hotel (f/k/a Harrah's Gulf Coast) and Biloxi Land Assemblage** | Biloxi | MS |
| **10. Horseshoe Tunica** | Robinsonville | MS |
| **11. Tunica Roadhouse** | Robinsonville | MS |
| **12. Caesars Atlantic City** | Atlantic City and Pleasantville | NJ |
| **13. Bally's Atlantic City and Schiff Parcel** | Atlantic City | NJ |
| **14. Harrah's Lake Tahoe** | Stateline | NV |
| **15. Harvey's Lake Tahoe** | Stateline | NV |
| **16. Harrah's Reno** | Reno | NV |
| **17. Harrah's Joliet (subject to the rights of Des Plaines Development Corporation/ John Q. Hammons)** | Joliet | IL |

18

**Golf Courses**

| | | |
|---|---|---|
| **18. Rio Secco Golf Course** | Henderson | NV |
| **19. Cascata Golf Course** | Boulder City | NV |
| **20. Grand Bear Golf Course** | Saucier | MS |

**Racetracks**

| | | |
|---|---|---|
| **21. Bluegrass Downs** | Paducah | KY |

**Miscellaneous**

| | | |
|---|---|---|
| **22. Las Vegas Land Assemblage** | Las Vegas | NV |
| **23. Harrah's Airplane Hangar** | Las Vegas | NV |

19

**EXHIBIT B**

CPLV Facilities

**1. Caesars Palace**                    Las Vegas                    NV

20

# SUMMARY OF TERMS

### Management and Lease Support Agreement ("MLSA") [1]

### between CEC, Manager, Landlord and Tenant
### in connection with the Leases
### (all as hereinafter defined)

**CEC:**  Caesars Entertainment Corporation, a Delaware corporation

**Manager:**  A wholly-owned subsidiary of CEC, as manager of the Facilities under the MLSA [2]

**Landlord:**  [Propco] collectively together with its subsidiaries that own the Facilities (as defined in the Leases), as landlord under the Leases, as more particularly described in the "Lease Term Sheet"

**Tenant:**  [Opco/CEOC] collectively together with certain of its subsidiaries, as tenant under the Leases, as more particularly described in the "Lease Term Sheet"

**Leases:**  (1) A certain lease of various facilities (other than Caesars Palace Las Vegas) between Landlord and Tenant and (2) a certain lease of Caesars Palace Las Vegas between Landlord and Tenant, as more particularly described in the "Lease Term Sheet"

---

[1]  MLSA to consist of the two separate agreements on same terms to correspond to the two separate leases. Agreements to have same terms other than as specified herein. In connection with the incorporation of the CEC guaranty into the MLSA rather than its being a stand-alone instrument, the definitive deal documentation will provide that a termination of the MLSA by Tenant or Manager (including in the case of a rejection in bankruptcy) will not, subject to the 3 rd and 4 th Bullet Points of "CEC Guaranty" and subject to footnote 5 below, result in termination of CEC's guaranty obligations under the MLSA.

[2]  Notwithstanding anything set forth in this MLSA Term Sheet or in the RSA Term Sheet, the Lease Term Sheet or the Debt Term Sheets, it is understood and agreed that all assets (other than the real property transferred to Propco upon the formation of the REIT structure) required to operate the properties consistent with current practice (the "Facility Management Assets"), shall be transferred to an entity (the "Facility Management Assets Owner") so as to be made continuously available to Manager through a mutually agreeable bankruptcy remote structure that shall remove the risk of lack of access in all events (it being understood that the structures to be considered include the Facility Management Assets Owner being owned by Manager and/or Landlord).

1

**Term:**

The MLSA commences on the date the Leases commence. The MLSA automatically terminates, but may be replaced in accordance with the provisions described below, with respect to any Facility if such Facility is no longer demised under a Lease. The Term of the MLSA expires with respect to each Lease upon the earlier to occur of (1) the date that none of the Facilities are demised under such Lease, (2) Tenant and Landlord terminate the MLSA with respect to such Lease, (3) termination in connection with a Tenant Foreclosure (pursuant to option 1 in the following section) and (4) the termination of such Lease (pursuant to the third Bullet Point in "CEC Guaranty" below).

Notwithstanding any such termination of the MLSA, in the event of a Non-Consented Lease Termination (as defined below), the following shall occur (unless expressly elected not to occur by Landlord in accordance with the 4th Bullet Point of "CEC Guaranty"): (i) the Lease and the MLSA shall be replaced on the same terms as previously existed and (ii) the management rights and obligations of Manager shall continue thereunder subject to and on the terms contemplated below in the fourth Bullet Point of "CEC Guaranty" and the guaranty obligations of CEC shall continue thereunder subject to and on the terms contemplated below in the fourth Bullet Point of "CEC Guaranty." [3]

**Tenant Foreclosure:**

If Tenant's lender (or any lender, if more than one) has a valid lien on the leasehold estate under the Leases or on the direct or indirect equity in the Tenant, whether by mortgage, equity pledge or otherwise, and duly forecloses on such lien following an Event of Default under Tenant's financing (and/or in connection with any pursuit of remedies in a bankruptcy proceeding), such lender (the "**OpCo Lenders**") shall, in connection with and as a condition to effectuating such Tenant Foreclosure (and/or pursuit of remedies in any proceeding),

---

[3]    Notwithstanding anything contained in the section titled "Term" or otherwise in this MLSA Term Sheet, unless the Landlord shall have terminated the Lease or the MLSA expressly in writing (or expressly consented in writing to such termination), the CEC guaranty obligations shall, subject to the 3rd and 4th Bullet Points of "CEC Guaranty" and subject to footnote 5 below, continue in effect. Each of the Lease and the MLSA shall contain a provision stating that each document is being entered into as part of an overall integrated transaction and that the parties would not be entering into one document without the other. Further, the parties will acknowledge that in a chapter 11 case, they would not reject one agreement without rejecting the other as if they were one agreement and not separable.

irrevocably elect one of the following: (1) with the consent of Landlord (in its sole and absolute discretion) and Manager, to terminate the MLSA and, in connection with such termination, directly operate the Facilities pursuant to the terms of the Leases, or obtain a replacement operator to operate the Facilities or (2) to retain Manager as operator of the Facilities pursuant to the terms of the MLSA and keep the MLSA in full force and effect in accordance with its terms. The Opco Lenders will enter into an agreement (the "*Consent Agreement*") with Landlord, CEC and Manager to effect the consent rights hereunder (with it being understood that any rejection of a Lease in bankruptcy will be treated as a Non-Consented Lease Termination unless in connection therewith (x) Landlord terminates the Manager under the MLSA or (y) Landlord consents to the termination of the MLSA (in its sole and absolute discretion)).

In the event of a Non-Consented Lease Termination, the following shall occur (unless expressly elected not to occur by Landlord in accordance with the 4 th Bullet Point of "CEC Guaranty"): (i) the Lease and the MLSA shall be replaced on the same terms as previously existed and (ii) the management rights and obligations of Manager shall continue thereunder subject to and on the terms contemplated below in the fourth Bullet Point of "CEC Guaranty" and the guaranty obligations of CEC shall continue thereunder subject to and on the terms contemplated below in the fourth Bullet Point of "CEC Guaranty".

**REIT Management:**

The terms of the MLSA shall be reasonably acceptable to the parties thereto and shall include, inter alia, the following terms:

- Operations management provisions pursuant to which Manager will manage the Facilities in its business judgment on reasonable and customary terms to be more fully set forth in the MLSA and, in any event, on terms no less favorable to Tenant than current practice.

- All direct expenses for operating the Facilities will be reimbursed by Tenant (including, without limitation, fees and expenses allocated to Manager and/or Tenant for the Facilities under arrangements with Caesars Enterprise Services, LLC (" **CES** ")). Manager will enter into separate shared services arrangements with CES (and, if necessary, any other applicable affiliates) for access to all of its services (including without limitation use of the Total Rewards ® program) for the benefit of the Facilities so that the Facilities can be run consistent with past practice and in the future consistent with all other CEC (or CEC affiliates') directly or indirectly owned or managed facilities, without discrimination against the Facilities. [4]

---

[4] In connection with the implementation of definitive transaction documentation, Landlord must understand and approve any fee and expense structure to the extent it impacts Landlord or any of the Facilities.

- All expenses associated with owning and maintaining the Facility Management Assets will be reimbursed by Tenant.

- Manager may delegate duties under the MLSA to one or more affiliates on customary terms so long as neither Landlord nor Tenant is prejudiced thereby.

**CEC Guaranty:**  Pursuant to the MLSA, CEC will guaranty the payment and performance of all monetary obligations of Tenant under the Leases, subject to the following terms:

- CEC will have no liability with respect to the Leases unless an "Event of Default" is continuing under the Leases.

- If an "Event of Default" under either of the Leases occurs, CEC shall have no liability with respect to the Leases, unless CEC was given notice of the applicable default of Tenant under the Lease or CPLV Lease, as applicable, and (A) with respect to a monetary default. CEC failed to cure such default on or prior to five (5) business days after Tenant's deadline under the applicable Lease (or, if later, after CEC's receipt of such notice from Landlord) and (B) with respect to a non-monetary default, CEC failed to cure such default on or prior to Tenant's deadline to cure such default under the applicable Lease (or, if later, after CEC's receipt of such notice from Landlord).

- CEC's and Manager's obligations with respect to each MLSA (including, without limitation, CEC's guaranty obligations with respect to the Lease and the CPLV Lease, as applicable) shall terminate in the event the Lease or CPLV Lease (as applicable) is terminated by Landlord expressly in writing (or with Landlord's express written consent), except to the extent of any accrued and unpaid guaranty obligations through the date of such termination (which shall be immediately due and payable upon demand) and such damages to which Landlord is entitled due to such termination pursuant to the Lease or CPLV Lease, as applicable. In addition, CEC's obligations with respect to each MLSA

4

(including, without limitation, CEC's guaranty obligations with respect to the Lease and the CPLV Lease, as applicable) shall terminate in the event that Manager is terminated by Landlord expressly in writing (or by Tenant's lender with Landlord's express written consent, in its sole and absolute discretion) as manager of the Facilities or the CPLV Facility (as applicable) [5]; provided, however, (i) CEC's guaranty obligation shall continue to the extent of any accrued and unpaid guaranty obligations through the date of such termination (which shall be immediately due and payable upon demand) and such damages to which Landlord is entitled due to such termination pursuant to the Lease or the CPLV Lease, as applicable, and (ii) CEC's guaranty obligations shall continue to cover any post-termination management transition period during which Manager continues to act as manager. Except as provided in this Bullet Point, CEC's guaranty obligations under the MLSA shall not terminate for any reason.

- In the event a Lease is terminated without the express written consent of Landlord including, without limitation,

---

[5] Each Lease shall provide that Manager may only be terminated as manager of the Facilities or the CPLV Facility by Landlord (or by Tenant's lender with Landlord's express written consent in its sole and absolute discretion) and, in the event of any such termination or otherwise (including in the case of a rejection in bankruptcy), Landlord shall have the sole right to elect to appoint a replacement Manager (and if so elected by Landlord, Tenant (and its successor and assigns, including under the Consent Agreement) shall be deemed to have accepted such appointment and no other right or approval shall be necessary for such appointment to be effective. If Landlord does not elect to appoint Manager (or another CEC affiliate, to be made available by CEC, under the same terms as the MLSA as provided herein) as replacement Manager (unless prevented from making such election by order of a court or other governmental entity, automatic stay or other legal prohibition), Landlord shall be deemed to have terminated Manager with its express written consent. If Landlord is prevented from making such election by order of a court or other governmental entity, automatic stay or other legal prohibition, then Landlord and Tenant (and its successor and assigns, including under the Consent Agreement) shall be deemed to have consented to Manager's continued management of the Facilities notwithstanding the termination of the MLSA until Landlord is no longer prevented from making such election. Each Lease shall further provide that if Manager is terminated as manager of the Facilities or the CPLV Facility other than by Landlord (or by Tenant's lender with Landlord's express written consent in its sole and absolute discretion), then such Lease shall automatically terminate (and such termination shall constitute a Non-Consented Lease Termination).

5

by a rejection in bankruptcy (a "**Non-Consented Lease Termination**"), then the following shall occur (unless Landlord expressly elects in writing that the following shall not occur and expressly consents in writing to the Lease termination) without expense or loss of economic benefit to Landlord: (i) Tenant (or its successors and assigns, including under the Consent Agreement) shall transfer all of its assets (including, without limitation, rights under licenses and with respect to intellectual property) to a replacement entity directly or indirectly owned by CEC or Tenant (or its successors and assigns, including under the Consent Agreement) that will assume the rights and obligations of Tenant under the Lease (the "**Replacement Tenant**"), (ii) a new lease (the "**Replacement Lease**") on terms identical to the Lease so terminated shall be entered into by Landlord with the Replacement Tenant and (iii) to the extent not transferred pursuant to clause (i) above or otherwise provided by Manager, CEC and CES shall replicate all prior arrangements with respect to management, sub-management, licensing, intellectual property and otherwise as necessary to provide for the continued management and operation of the Facilities as existed prior to such termination, and, upon such occurrence (x) CEC, Manager, Replacement Tenant and Landlord shall enter into a new management and lease support agreement on terms identical to the MLSA (and CEC, Manager and its applicable affiliates shall enter into any necessary associated sub-management, licensing and other applicable arrangements) and (y) the management rights and obligations of Manager and guaranty obligations of CEC shall continue with respect to such Replacement Lease as set forth in the MLSA. The Consent Agreement will provide that Tenant and the OpCo Lenders will act in support of this right. If (1) Landlord has not elected in writing that the foregoing shall not occur and (2) clauses (i), (ii) and (iii) do not occur other than as a direct and proximate result of Landlord's acts or failure to act in accordance with this Bullet Point, then CEC's guaranty shall not terminate. If Landlord elects in writing that the foregoing shall not occur and/or clauses (i), (ii) or (iii) do not occur as a direct and proximate result of Landlord's acts or failure to act in accordance with this Bullet Point, then Landlord shall have been deemed to expressly consent to the termination of the Lease in writing (and CEC's guaranty

6

shall terminate). Landlord shall have the right of specific performance to compel CEC and/or its affiliates to comply with the foregoing. In addition, CEC, Manager and Landlord shall have the right of specific performance to compel Tenant (or its successors and assigns, including under the Consent Agreement (which shall contain such remedy)) to comply with the foregoing. If Tenant (or its successors and assigns, including under the Consent Agreement) do not cooperate with the foregoing, CEC and Manager shall have the right to replicate the structure, including determining the ownership and identity of the Replacement Tenant, without regard to the interests of Tenant or its successors (including the OpCo Lenders).

**CEC Covenants:**

The MLSA shall contain customary terms and waivers of all suretyship and other defenses by CEC and will include a covenant by CEC requiring that (a) the sale of assets by CEC be for fair market value consideration, on arm's-length terms and, in the event of sales to affiliates, be subject to (i) confirmation of fair market value by the approval of an independent group of CEC's board of directors and by a fairness opinion from an investment bank reasonably acceptable to Landlord (with an approved list of investment banks to be agreed in the MLSA) and (ii) a right of first refusal in favor of Landlord or its designee and (b) non-cash dividends by CEC be permitted only to the extent such dividends would not reasonably be expected to result in CEC's inability to perform its guaranty obligations under the MLSA.

**Integrated Agreement:**

For the avoidance of doubt, each of the provisions constituting the MLSA, including the management obligations of Manager and the guaranty obligations of CEC, are and are intended to be part of a single integrated agreement and shall not be deemed to be separate or severable agreements.

7

**Annex III**
**Terms of the Preferred PropCo Equity**

**Terms of Series A Convertible Preferred Stock**

*Description:* Series A Convertible Preferred Stock (the " <u>Series A Preferred Stock</u> ").

*Issuer:* CEOC PropCo, a newly created holding company (" <u>PropCo</u> ").

*Purchase Price:* $250 million.

*Use of Proceeds:* The proceeds from the Series A Preferred Stock will (i) first be used to reduce the Caesars Palace Las Vegas ("CPLV") secured non-guaranteed financing (the " <u>CPLV Financing</u> ") in respect of the portion received by the first lien bondholders, if any, (ii) second, be used to reduce the CPLV financing placed with third party investors, if required, and (iii) third, if the CPLV Financing is sold to the market in full, the proceeds will be used to reduce the second lien debt of PropCo, as outlined in the Plan.

*Issue Amount:* $300 million aggregate initial liquidation preference.

*Initial Liquidation Preference* : $[        ] per share of Series A Preferred Stock.

*Rank:* The Series A Preferred Stock shall rank (i) senior to PropCo's common stock and any other class of preferred stock of PropCo (including with respect to dividend rights and rights upon liquidation), unless otherwise approved in accordance with the voting rights section below and (ii) subordinate to any existing or future indebtedness of PropCo.

*Dividends:* PIK dividend payable quarterly at the rate equal to the Yield (as defined below) as of any record date set for the payment of dividends to the holders of the common stock, provided that the dividend rate for the Series A Preferred Stock shall not be less than 5% per annum. Dividends are payable quarterly or, if more frequent than quarterly, when common stock dividends are paid, and are cumulative and compound based on the original purchase price and previously accumulated dividends.

All accrued and accumulated dividends are prior in preference to any dividend on the common stock and any securities junior to the Series A Preferred Stock, and shall be fully declared and paid before any dividends are declared and paid, or any other distributions or redemptions are made, on the common stock or on any securities junior to the Series A Preferred Stock (other than dividends payable in shares of common stock or repurchases pursuant to binding contractual commitments of common stock held by employees, directors or consultants upon termination of their employment or services).

" <u>Yield</u> " means the quotient resulting from (i) the aggregate amount of dividends declared payable to the holders of the common stock as of the record date for the common stock, if such date is concurrent with the record date for the Series A Preferred Stock, or the most recent record date if any, following the most recent record date for the Series A Preferred Stock if such record date is not concurrent, divided by (ii) the value of the common stock established and disclosed in connection with the Plan of Reorganization.

1

*Liquidation Preference:* Upon the commencement of any liquidation, dissolution or winding up of the affairs of PropCo or bankruptcy reorganization or any other similar event or proceeding, whether voluntary or involuntary, with respect to PropCo (each a " Liquidation Event ") or Deemed Liquidation Event (as defined below), each share of Series A Preferred Stock shall be entitled to receive in preference to any distribution to the holders of any common stock or securities junior to the Series A Preferred Stock the sum of (x) the Initial Liquidation Preference per share of Series A Preferred Stock (as adjusted for stock splits, recapitalizations and similar events) plus (y) accrued and unpaid dividends (collectively the " Liquidation Preference "), provided, however, in lieu of receiving the Liquidation Preference, the holders of Series A Preferred Stock may elect to convert their shares of Series A Preferred Stock into common stock immediately prior to (and subject to the consummation of) such Liquidation Event or Deemed Liquidation Event and share in the proceeds and other consideration of the Liquidation Event or Deemed Liquidation Event as common stockholders.

If upon any Liquidation Event or Deemed Liquidation Event, the remaining assets of PropCo are insufficient to pay the Liquidation Preference to which holders of the Series A Preferred Stock are entitled, the holders of the Series A Preferred Stock shall share ratably in any distribution of the remaining assets and funds of PropCo in proportion to the respective Liquidation Preference which would otherwise be payable in respect of the Series A Preferred Stock in the aggregate upon such Liquidation Event or Deemed Liquidation Event if all amounts payable on or with respect to such shares were paid in full, and PropCo shall not make any payments to the holders of common stock or any securities junior to the Series A Preferred Stock.

A " Deemed Liquidation Event " means any of the following (i) the lease of all or substantially all of the assets of PropCo to a party other than OpCo or the sale of all or substantially all of PropCo's assets (in each case whether in one transaction or a series of transactions); (ii) upon an acquisition of PropCo by another person or entity by means of any transaction or series of transactions (including any reorganization, merger, consolidation or share transfer) where the shareholders of the common stock and Series A Preferred Stock of PropCo immediately preceding such transaction own, following such transaction, less than 50% of the voting securities of PropCo; (iii) if any person (including any syndicate or group deemed to be a "person" under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended and the rules of the SEC thereunder) is or becomes the "beneficial owner" (as determined in accordance with Rule 13d-3 of the Securities Exchange Act of 1934, as amended, except that a person will be deemed to own any securities that such person has a right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of 50% or more of the total voting power of all classes of voting stock; (iv) on the first day on which a majority of the members of the board of directors of PropCo does not consist of Continuing Directors (as defined below); and (v) on approval of a plan of liquidation or dissolution.

" Continuing Directors " means (i) individuals who on the date of the original issuance of the Series A Preferred Stock constituted the Board of Directors or (ii) any new directors whose election or nomination was approved by at least a majority of the directors then

2

still in office who were either directors on the date of the original issuance of the Series A Preferred Stock or whose election or nomination was previously so approved by the shareholders of common stock and Series A Preferred Stock.

*Optional Conversion:* At any time and from time to time following the issuance date of the Series A Preferred Stock, the holders of Series A Preferred Stock shall have the right to convert all or any portion of the Series A Preferred Stock at such holder's option to a number of shares of common stock equal to (A) the sum of (x) the Initial Liquidation Preference per share of Series A Preferred Stock (as adjusted for stock splits, recapitalizations and similar events) plus (y) any accrued and unpaid dividends (including any amounts paid in shares of common stock), divided by (B) the Conversion Price (as defined below). The Series A Preferred Stock will initially be convertible into [14.2]% of the common stock of PropCo on a fully-diluted basis.

*Conversion Price:* The Conversion Price shall initially be the price per share of the equity of PropCo as determined in the Plan, subject to adjustment as described below under "Anti-Dilution Protection."

*Optional Redemption at the Option of Holder:* Commencing on the date that is ten (10) years following the closing date, Holders of the Series A Preferred Stock shall have the right to require PropCo to redeem all or a portion of the Series A Preferred Stock at a per share price equal to the Liquidation Preference. Holders of the Series A Preferred Stock shall also have the ability to require PropCo to redeem all or a portion of the Series A Preferred Stock at any time at a per share price equal to the Liquidation Preference upon (a) the occurrence of a " Breach " (as defined below) or (b) the effective date of a confirmed plan in a chapter 11 bankruptcy case for PropCo or any similar bankruptcy or insolvency proceeding. PropCo shall not have any right to require mandatory redemption.

Any:

1. Failure to pay dividends when due;

2. Failure to make any redemption payment or liquidation payment when due;

3. Breaches of any other covenants set forth herein; or

4. Assignment for the benefit of creditors or bankruptcy

shall constitute a " Breach ," and the holders of the Series A Preferred Stock shall be entitled to a dividend rate increase by an increment of 2% per annum for all periods of time during which a Breach is continuing.

In the event that at any time and from time to time, a Breach pursuant to clauses 1, 2 or 3 above is not cured within three months of its occurrence, then the majority of the holders of the Series A Preferred Stock shall have the right to designate a party (which party may be a holder of the Series A Preferred Stock) to observe all matters submitted to or considered by the board of directors of PropCo until such time as the event is cured.

3

*Voting and consent rights:* The holders of the Series A Preferred Stock shall be entitled to vote on an as-converted basis with the holders of PropCo's common stock on all matters submitted to a vote of the holders of common stock.

To the extent that the shares of common stock and/or Series A Preferred Stock held by any holder of Series A Preferred Stock and/or common stock would, on the record date for a vote on matters submitted to the common stock, enable such holder to vote an interest equal to 5% or more of the common stock, such holder shall be entitled to vote an interest equal to 4.99% of the common stock. Any interests held by such party in excess of 4.99% shall be deemed cast in favor of the vote of the majority. The foregoing shall not apply to any holder who, on the record date for a vote on matters submitted to the common stock, holds less than 5% of the vote in respect of such matter, and shall only apply to matters submitted to the vote of the common stock, and not matters that the Series A Preferred Stock may vote on as a separate class.

In addition, the following matters require the consent of the majority of the holders of the Series A Preferred Stock, voting as a separate class, and excluding such shares owned by PropCo, OpCo or any subsidiary or other entity controlled by or controlling any such party:

1.  changes to PropCo's certificate of incorporation or bylaws adversely affecting preferences, rights, privileges or powers of any holder of the Series A Preferred Stock;

2.  alterations of the rights, preferences or privileges of the Series A Preferred Stock;

3.  increasing the number of authorized shares of Series A Preferred Stock; or

4.  creating any new class or series of stock, or any other equity securities, or any other securities convertible into equity securities of PropCo, in each such case having a preference over, or being on a parity with, the Series A Preferred Stock with respect to dividends, liquidation, voting or redemption.

*Anti-Dilution Protection:* The Series A Preferred Stock will have customary anti-dilution provisions, including in connection with (a) a subdivision or combination of outstanding common stock, reclassification, recapitalization, stock split, dividend or other distribution payable in any form, (b) any Deemed Liquidation Event under clauses (i) through (iv) of such definition, and (c) any consideration in respect of a tender offer or exchange offer for common stock of PropCo or securities junior to the Series A Preferred Stock made by PropCo or any of its subsidiaries. The Series A Preferred Stock shall be adjusted on a weighted average basis for issuances of common stock (or common stock equivalents, equity securities, or securities/debt convertible into equity securities).

In the event that a shareholder rights plan is in effect, the Series A Preferred Stock will receive upon conversion of such shares, in addition to the common stock of PropCo, rights under the shareholder rights agreement.

4

*Registration rights:* The holders of Series A Preferred Stock will have customary registration rights.

[ *Ownership* : Not more than 50% in value of PropCo's capital stock may be owned, directly or indirectly, by five or fewer individuals.]

*Documentation* : The Series A Preferred Stock will be issued pursuant to a certificate of designations governing the rights and preferences of the Series A Preferred Stock (the " Certificate of Designations ").

*Governing Law:* Delaware.

5

**Annex IV**
**Backstop Commitment Agreement**

### BACKSTOP COMMITMENT AGREEMENT

BACKSTOP COMMITMENT AGREEMENT (this " Agreement "), dated as of [ _____ ], is by and among Caesars Entertainment Operating Company, Inc., a Delaware corporation (" CEOC "), and the investors identified on Schedule I hereto to the extent such parties are not Terminating Preferred Backstop Investors (each, a " Preferred Backstop Investor " and, collectively, the " Preferred Backstop Investors ").

### RECITALS

WHEREAS, on [ _____ ] (the " Petition Date "), CEOC and certain debtor affiliates (collectively, the " Debtor ") anticipate commencing jointly administered proceedings (the " Chapter 11 Proceedings ") for relief under chapter 11 of title 11 of the United States Code (as amended, the " Bankruptcy Code ") in the Bankruptcy Court (as defined in the Restructuring Support Agreement) (and such case, the " Bankruptcy Case ");

WHEREAS, in connection with the Chapter 11 Proceedings, the Debtor has engaged in good faith negotiations with certain parties in interest regarding the terms of the Bankruptcy Plan of Reorganization of the Debtor (the " Plan "), which Plan shall be consistent in all material respects with the Restructuring Term Sheet setting forth the principal terms to be included in the Plan and attached as Exhibit A to the Restructuring Support Agreement;

WHEREAS, pursuant to the Plan, CEOC has agreed to cause the formation of Propco (the "Company"), and the Company has agreed to, in each case on the terms and conditions set forth therein, commence a rights offering (the " Rights Offering ") whereby holders [1] (each a " Holder " and collectively, the " Holders ") of the Senior Secured Notes (as defined below) shall be granted non-transferable rights (" Rights ") to purchase up to [ _____ ] shares of Preferred Stock (as defined below) issued by the Company in the aggregate at a purchase price of $[ _____ ] per share (" Per Share Purchase Price ") payable in cash for aggregate proceeds to the Company of $250.0 million pursuant to the Offering Conditions;

WHEREAS, in order to facilitate the Rights Offering, pursuant to this Agreement, and subject to the terms, conditions and limitations set forth herein and in consideration of the payment of the Commitment Payment (as defined below), the Company is willing to sell, and the Preferred Backstop Investors are willing to purchase, on the Effective Date, the total number of Preferred Stock not purchased by Holders in the Rights Offering (the " Unsubscribed Shares ").

---

[1] NTD. To extent Preferred Stock is not 1145 eligible, holders who purchase in the Rights Offering will be required to rep to being one of a QIB, IAI, or a non-U.S. person under Regulation S as the Rights Offering will be a private placement. Subscription forms should include such an investor qualification. Rights to be distributed pro rata among eligible holders.

1

**NOW, THEREFORE,** in consideration of the premises and of the mutual agreements contained herein, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

Section 1. **<u>DEFINITIONS</u>** .

(a) As used in this Agreement, the following terms shall have the following meanings:

" <u>8.5% Notes</u> " means the 8- $^1/_2$ % Senior Secured Notes due 2020 in the aggregate principal amount of $1,250,000,000 issued pursuant to that certain Indenture dated as of February 14, 2012 (as modified, supplemented and/or amended and in effect on the date hereof) among Caesars Operating Escrow LLC, Caesars Escrow Corporation, Caesars Entertainment Corporation, and U.S. Bank National Association, as trustee.

" <u>11.25% Notes</u> " means the 11- $^1/_4$ % Senior Secured Notes due 2017 in the aggregate principal amount of $2,095,000,000 issued pursuant to that certain Indenture dated as of June 10, 2009 (as modified, supplemented and/or amended and in effect on the date hereof, among Harrah's Operating Escrow LLC, Harrah's Escrow Corporation, Harrah's Entertainment, Inc. n/k/a Caesars Entertainment Corporation, and U.S. Bank National Association, as trustee.

" <u>Addendum</u> " has the meaning assigned to it in <u>Section 10.9</u> .

" <u>Additional 9% Notes</u> " means the 9% Senior Secured Notes due 2020 in the aggregate principal amount of $1,500,000,000 issued pursuant to that certain Indenture dated as of February 15, 2013 (as modified, supplemented and/or amended and in effect on the date hereof) among Caesars Operating Escrow LLC, Caesars Escrow Corporation, Caesars Entertainment Corporation, and U.S. Bank National Association, as trustee.

" <u>Affiliate</u> " means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

" <u>Agreement</u> " has the meaning assigned to it in the preamble hereto.

" <u>Approval Motion</u> " has the meaning assigned to it in <u>Section 5.1</u> .

" <u>Approval Order</u> " has the meaning assigned to it in <u>Section 5.1</u> .

" <u>Assumption Agreement</u> " has the meaning assigned to it in <u>Section 10.9</u> .

" <u>Backstop Commitment</u> " means the commitment of each Preferred Backstop Investor to acquire the number of Preferred Stock equal to the product of (i) each such Preferred Backstop Investor's Backstop Percentage and (ii) the Unsubscribed Shares.

2

" <u>Backstop Percentage</u> " means the percentage set forth opposite the name of such Preferred Backstop Investor under the heading "Backstop Percentage" on Schedule I hereto (as such <u>Schedule I</u> may be updated pursuant to <u>Section 10.9</u> hereof and/or to reflect the increase or deduction of Backstop Commitments or Default Shares acquired or disposed of pursuant to the last paragraph of Section 8(a) and Section 8 (b)(i) and/or to reflect the removal of a potential Preferred Backstop Investor pursuant to the definition of Preferred Backstop Investor).

" <u>Backstop Purchase Price</u> " means, with respect to any Preferred Backstop Investor, such Preferred Backstop Investor's Backstop Percentage of the product of the (i) Per Share Purchase Price and (ii) the Unsubscribed Shares.

" <u>Backstop Shares</u> " has the meaning assigned to it in <u>Section 2.2(a)</u> .

" <u>Bankruptcy Case</u> " has the meaning assigned to it in the recitals hereto.

" <u>Bankruptcy Code</u> " means title 11 of the United States Code, as amended from time to time.

" <u>Bankruptcy Court</u> " has the meaning assigned to it in the recitals hereto.

" <u>Business Day</u> " means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the City of New York.

" <u>Closing</u> " has the meaning assigned to it in <u>Section 2.2(b)</u> .

" <u>Commitment Payment</u> " means for each Preferred Backstop Investor a fee equal to the Commitment Percentage of the product of (i) such Preferred Backstop Investor's Backstop Percentage and (ii) $300 million.

" <u>Commitment Percentage</u> " means 5%, provided such percentage shall increase by an additional 4% for each 240 day period after the Petition Date until the Subscription Commencement Date begins.

" <u>Company</u> " has the meaning assigned to it in the preamble hereto.

" <u>Confirmation Hearing</u> " shall mean the hearing held by the Bankruptcy Court to consider the confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

" <u>Confirmation Order</u> " means the Order of the Bankruptcy Court confirming the Plan.

" <u>Contracts</u> " means any contract, arrangement, note, bond, commitment, purchase order, sales order, franchise, guarantee, indemnity, indenture, instrument, lease, license or other agreement, understanding, instrument or obligation, whether written or oral, all amendments, supplements and modifications of or for any of the foregoing and all rights and interests arising thereunder or in connection therewith.

" control " (including the terms " controlled by " and " under common control with "), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs, policies or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by Contract, credit arrangement or otherwise.

" Debtor " has the meaning assigned to it in the recitals hereto.

" Defaulting Preferred Backstop Investor " has the meaning assigned to it in Section 8(b)(i) .

" Default Purchase Right " has the meaning assigned to it in Section 8(b)(i) .

" Default Shares " has the meaning assigned to it in Section 8(b)(i) .

" Effective Date " has the meaning assigned to it in the Plan.

" Encumbrance " means any security interest, pledge, mortgage, lien, claim, option, charge or encumbrance.

" Exchange Act " means the Securities Exchange Act of 1934, as amended from time to time, and the rules and regulations promulgated thereunder, or any successor statute.

" Exculpated Claims " has the meaning assigned to it in Section 9(b) .

" Exculpated Parties " has the meaning assigned to it in Section 9(b) .

" Governmental Authority " means any federal, national, supranational, foreign, state, provincial, local, county, municipal or other government, any governmental, regulatory or administrative authority, agency, department, bureau, board, commission or official or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority, or any court, tribunal, judicial or arbitral body, or any Self-Regulatory Organization.

" Holder " has the meaning assigned to it in the recitals hereto.

" Indemnitees " has the meaning assigned to it in Section 9(a) .

" Initial 9% Notes " means the 9% Senior Secured Notes due 2020 in the initial aggregate principal amount of $1,500,000,000 issued pursuant to that certain Indenture dated as of August 22, 2012 (as modified, supplemented and/or amended and in effect on the date hereof) among Caesars Operating Escrow LLC, Caesars Escrow Corporation, Caesars Entertainment Corporation, and U.S. Bank National Association, as trustee.

" KKWC " has the meaning assigned to it in Section 10.9 .

4

" <u>Law</u> " means any federal, national, supranational, foreign, state, provincial, local, county, municipal or similar statute, law, common law, writ, injunction, decree, guideline, policy, ordinance, regulation, rule, code, Order, constitution, treaty, requirement, judgment or judicial or administrative doctrines enacted, promulgated, issued, enforced or entered by any Governmental Authority.

" <u>Losses</u> " has the meaning assigned to it in <u>Section 9(a)</u> hereof.

" <u>Milestone</u> " has the meaning assigned to it in <u>Section 5.6</u> .

" <u>Milestone Dates</u> " has the meaning assigned to it in <u>Section 5.6</u> .

" <u>Material Adverse Effect</u> " means any event, circumstance, development, change or effect that, individually or in the aggregate with all other events, circumstances, developments, changes or effects, (a) has had or would reasonably be expected to have or result in a material adverse effect or change in the results of operations, properties, assets, liabilities or condition (financial or otherwise) of the applicable Company Party taken as a whole or (b) has or would reasonably be expected to prevent, materially delay or materially impair the ability of the applicable Company Party to consummate the Rights Offering or the applicable Company Party to consummate any of the transactions contemplated hereby.

" <u>Non-Defaulting Preferred Backstop Investors</u> " has the meaning assigned to it in <u>Section 8(b)(i)</u> .

" <u>Non-Terminating Preferred Backstop Investors</u> " means any Preferred Backstop Investor that is not a Terminating Preferred Backstop Investor.

" <u>Order</u> " means any order, writ, judgment, injunction, decree, rule, ruling, directive, stipulation, determination or award made, issued or entered by or with any Governmental Authority, whether preliminary, interlocutory or final.

" <u>Offering Conditions</u> " means those terms and conditions set forth on Exhibit C.

" <u>Payment Date</u> " has the meaning assigned to it in <u>Section 2.3(a)</u> .

" <u>Per Share Purchase Price</u> " has the meaning assigned to it in the recitals hereto.

" <u>Person</u> " means any individual, partnership, firm, corporation, limited liability company, association, joint venture, trust, Governmental Authority, first nation, aboriginal or native group or band, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Exchange Act.

" <u>Plan</u> " has the meaning assigned to it in the recitals hereto.

" <u>Plan Solicitation Order</u> " means an Order entered by the Bankruptcy Court, in form and substance materially consistent with this Agreement and the Restructuring Support Agreement

5

and otherwise reasonably satisfactory to the Preferred Backstop Investors and CEOC, which shall, among other things, approve the disclosure statement relating to the Plan, including the Rights Offering Documents, and set procedures for the solicitation of votes to accept or reject the Plan.

" Preferred Backstop Investor Default " has the meaning assigned to it in Section 8(b)(i) .

" Preferred Backstop Investor Material Adverse Effect " means any event, circumstance, development, change or effect that, individually or in the aggregate with all other events, circumstances, developments, changes or effects, has or would reasonably be expected to prevent, materially delay or materially impair the ability of the applicable Preferred Backstop Investor to consummate the transactions contemplated hereby.

" Preferred Backstop Investors " means (i) the parties listed on Schedule I hereto who have executed the Restructuring Support Agreement on or prior to December 29, 2014 or their managed funds and accounts [2] and (ii) the parties who have executed the Restructuring Support Agreement on or prior to December 29, 2014, or their managed funds and accounts, who have submitted written notice indicating that they elect to be Preferred Backstop Investors before January 5, 2015, to CEOC with a simultaneous copy to the Preferred Backstop Investors who are currently listed on Schedule I hereto (such parties electing pursuant to clause (ii), the " New Preferred Backstop Investors "). In the case of New Preferred Backstop Investors, the Schedule I of the Backstop Agreement shall be updated to reflect such parties on January 5, 2015. Notwithstanding the foregoing, Schedule I shall be updated pursuant to Section 10.9 hereof, and shall exclude any Terminating Preferred Backstop Investor. For the avoidance of doubt, to the extent that a party no longer has a Backstop Percentage, such party shall no longer be a "Preferred Backstop Investor."

" Preferred Stock " means the Series A Convertible Preferred Stock of the Company, par value $[_____] per share, on terms and conditions set forth on the term sheet attached as Exhibit D hereto, as may be supplemented as appropriate, and subject to definitive documentation acceptable to the Required Preferred Backstop Investors, as determined by such Required Preferred Backstop Investors in their reasonable discretion, to be agreed to on or before the Petition Date; provided, however, that any terms affecting the economics of the Preferred Stock, directly or indirectly, as determined by the Required Preferred Backstop Investors, shall be subject to the Required Preferred Backstop Investors' sole discretion.

" Required Preferred Backstop Investors " means, as of any date of determination, the Non-Defaulting Preferred Backstop Investors and Non-Terminating Preferred Backstop Investors holding more than 66-2/3% of the total Backstop Commitment, calculated without regard to the Backstop Commitments held by Defaulting Preferred Backstop Investors and Terminating Preferred Backstop Investors.

---

[2]    NTD: parties have the ability to elect on December 29, 2014 to be Preferred Backstop Parties, but are not required to do so.

6

" <u>Restructuring Support Agreement</u> " means that certain Restructuring Plan Support Agreement, made and entered into as of December 19, 2014, by and among the Debtor, Caesars Entertainment Corporation, LeverageSource III (H Holdings), L.P., LeverageSource V, L.P., and the Consenting Creditors (as defined therein).

" <u>Rights</u> " has the meaning assigned to it in the recitals hereto.

" <u>Rights Offering</u> " has the meaning assigned to it in the recitals hereto.

" [ <u>Rights Offering Documents</u> ] " has the meaning assigned to it in the Plan and shall be approved by the Bankruptcy Court pursuant to the Plan Solicitation Order in form and substance materially consistent with this Agreement and the Restructuring Support Agreement and otherwise reasonably satisfactory to the Preferred Backstop Investors and CEOC.

" <u>Senior Secured Notes</u> " means the (i) 11.25% Notes, (ii) 8.5% Notes, (iii) Initial 9% Notes and (iv) Additional 9% Notes.

" <u>Securities Act</u> " means the Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated thereunder, or any successor statute.

" <u>Self-Regulatory Organization</u> " means any securities exchange, futures exchange, contract market, any other exchange or corporation or similar self-regulatory body or organization applicable to a party to this Agreement.

" <u>Subscription Commencement Date</u> " means the date the Plan Solicitation Package is mailed or distribution is otherwise commenced in accordance with the Plan Solicitation Order.

" <u>Subscription Expiration Date</u> " means _____ [Insert date that is ten days prior to the Voting Deadline and not less than 20 days after the Subscription Commencement Date] or such later date as the Required Preferred Backstop Investors shall agree.

" <u>Subsidiaries</u> " of any Person means any corporation, partnership, joint venture, limited liability company, trust, estate or other Person of which (or in which), directly or indirectly, more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), (b) the interest in the capital or profits of such partnership, joint venture or limited liability company or other Person or (c) the beneficial interest in such trust or estate is at the time owned by such first Person, or by such first Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries.

" <u>Terminating Preferred Backstop Investors</u> " has the meaning assigned in <u>Section 8(a)</u> .

" <u>Unsubscribed Shares</u> " has the meaning assigned to it in the recitals hereto.

7

" Voting Deadline " means the date set by the Bankruptcy Court as the deadline for voting to accept or reject the Plan.

Section 2. **RIGHTS OFFERING; BACKSTOP; COMMITMENT PAYMENT** .

2.1 Rights Offering .

(a) The Company shall make the Rights Offering pursuant to the Plan, which shall be subject to the Offering Conditions and such other terms and conditions set forth in the Rights Offering Documents.

(b) Ten Business Days prior to the date of the Confirmation Hearing, the Company shall notify the Preferred Backstop Investors of the Rights Offering and the Preferred Backstop Investors shall have the right, but not obligation, upon written notice to the Company to elect to purchase up to 50% of the Preferred Stock issued in the Rights Offering (in addition to each of their rights as a Holder pursuant to the Rights Offering Documents) on the same terms and conditions as the other Holders under the Rights Offering Documents; provided, however, that the Preferred Backstop Investors shall not be required to post funds until the Effective Date. Each Preferred Backstop Investor shall have the right to purchase its pro rata share of such amount, based on its Backstop Percentage and to the extent any Preferred Backstop Investor elects to not purchase its pro rata share, such share(s) shall be made available to the Preferred Backstop Investors that are purchasing their pro rata share.

(c) The Company hereby agrees and undertakes to give, or to cause to be given, to the Preferred Backstop Investors as soon as reasonably practicable, but in no event later than two (2) Business Days, after the entry of the Confirmation Order, by overnight mail, e-mail or by electronic facsimile transmission, (i) written notification setting forth (A) the total number of shares of Preferred Stock purchased by Holders (inclusive of any shares of Preferred Stock purchased pursuant to Section 2.1(b)) in the Rights Offering pursuant to the exercise of Rights and the aggregate cash proceeds received by the Company therefor, (B) the number of Unsubscribed Shares, (C) the Backstop Purchase Price for each Preferred Backstop Investor and (D) the targeted Effective Date and (ii) a subscription form to be completed by each Preferred Backstop Investor to facilitate such Preferred Backstop Investor's subscription for the Preferred Stock purchased pursuant to this Agreement. In addition, on the first Business Day of each calendar week during the period beginning on the Subscription Commencement Date and ending on the Subscription Expiration Date, the Company shall give, or cause to be given, to the Preferred Backstop Investors by overnight mail, e-mail or by electronic facsimile transmission a written notification setting forth the then most current information as to the total amount of Preferred Stock then subscribed for in the Rights Offering, the number of then unsubscribed Preferred Stock, the Backstop Purchase Price for each Preferred Backstop Investor (as if the Rights Offering were to be concluded with the then current amount of subscribed for Preferred Stock) and the targeted Effective Date.

8

2.2 <u>Backstop</u> .

(a) On the terms and subject to the conditions contained herein, and in reliance on the representations and warranties set forth in this Agreement, each of the Preferred Backstop Investors hereby agrees, severally and not jointly, to purchase on the Effective Date, and the Company hereby agrees to sell and issue to each such Preferred Backstop Investor, at the Backstop Purchase Price therefor, its Backstop Percentage of the Unsubscribed Shares, subject to the Offering Conditions. The Preferred Stock which each of the Preferred Backstop Investors purchases pursuant to this Agreement are referred to herein as such Preferred Backstop Investor's " <u>Backstop Shares</u> ." For the avoidance of doubt, any shares of Preferred Stock acquired in the Rights Offering pursuant to Section 2.1(b) shall not be deemed Backstop Shares.

(b) The closing of the purchase and sale of the Backstop Shares hereunder (the " <u>Closing</u> ") will occur on the Effective Date contemporaneously with substantial consummation of the Plan. At the Closing, payment for the Backstop Shares that each Preferred Backstop Investor has agreed to purchase shall be effected by each such Preferred Backstop Investor delivering to the Company in immediately available funds its respective Backstop Purchase Price (ii) against delivery by the Company of the Backstop Shares to which such Preferred Backstop Investor is entitled to and delivery to each Preferred Backstop Investor such certificates, documents or instruments required to be delivered by it to such Preferred Backstop Investor pursuant to this Agreement. The agreements, instruments, certificates and other documents to be delivered on the Effective Date by or on behalf of the Company shall be delivered to each applicable Preferred Backstop Investor in accordance with <u>Section 10.3</u> hereof.

2.3 <u>Commitment Payment</u> .

(a) The Commitment Payment shall be earned upon the entry of the Approval Order and shall be payable, with respect to a Preferred Backstop Investor, upon the earlier of (x) the Effective Date of the Plan and (y) two Business Days after the termination of this Agreement by or with respect to such Preferred Backstop Investor, provided that the Commitment Payment, with respect to a Preferred Backstop Investor, shall not be required to be paid to a particular Preferred Backstop Investor to the extent that such termination of this Agreement with respect to such Preferred Backstop Investor has occurred due to a breach of this Agreement by such Preferred Backstop Investor, to the extent such breach has been determined as solely caused by the Preferred Backstop Investor by a final, non-appealable order entered by a court of competent jurisdiction (such date, the " <u>Payment Date</u> ").

(b) On the Payment Date, CEOC shall pay to each Preferred Backstop Investor, by wire transfer in immediately available funds to an account specified by such Preferred Backstop Investor to CEOC not less than one (1) day prior to the Payment Date, such Preferred Backstop Investor's pro rata portion of the Commitment Payment based on such Preferred Backstop Investor's Backstop Percentage (which percentage, for the avoidance of doubt, shall be adjusted pursuant to the definition of Backstop Percentage).

9

(c) The provisions for the payment of the Commitment Payment and the other provisions provided herein, are an integral part of the transactions contemplated by this Agreement and without these provisions the Preferred Backstop Investors would not have entered into this Agreement, and the Commitment Payment shall, pursuant to the Approval Order, constitute allowed administrative expenses of the Debtors' estate under sections 503(b) and 507 of the Bankruptcy Code.

Section 3. **REPRESENTATIONS AND WARRANTIES OF THE COMPANY and CEOC** . Each of the Company and CEOC (the "Company Parties") hereby represents and warrants, severally and not jointly, to each of the Preferred Backstop Investors as of the date hereof and as of the Effective Date (except for representations and warranties that are made as of a specific date, which are made only as of such date), on behalf of itself and not any other party, as follows:

3.1 <u>Organization and Qualification; Subsidiaries</u> . Each Company Party and its Subsidiaries has been duly organized and is validly existing and is in good standing under the laws of their respective jurisdictions of organization, with the requisite power and authority to own its properties and conduct its business as currently conducted.

3.2 <u>Authorization; Enforcement; Validity</u> . Subject only to Bankruptcy Court approval, each Company Party has all necessary corporate power and authority to enter into this Agreement and to carry out its obligations hereunder (including, without limitation (a) the issuance of the Backstop Shares and (b) the payment of the Commitment Payment) in accordance with the terms hereof. The execution and delivery by each Company Party of this Agreement, the performance by each of the Company and CEOC of its obligations hereunder (including, without limitation, (x) the issuance of the Backstop Shares and (y) the payment of the Commitment Payment), have been duly authorized by all requisite action on the part of such Company Party, and no other action on the part of the Company Party is necessary to authorize the execution and delivery by the Company Party of this Agreement or the consummation of the transactions contemplated by this Agreement. This Agreement has been duly executed and delivered by the Company Party, and assuming due authorization, execution and delivery by the other parties hereto and subject to Bankruptcy Court approval, this Agreement constitutes the legal, valid and binding obligation of the Company Party, enforceable against the Company Party in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

3.3 <u>No Conflicts</u> . Assuming that all consents, approvals, authorizations and other actions described in <u>Section 3.4</u> have been obtained, and except as may result from any facts or circumstances relating solely to any of the Preferred Backstop Investors, the execution, delivery and performance by the Company Party of this Agreement and the consummation of the transactions contemplated hereby (including, without limitation, (x) the issuance of the Backstop

10

Shares and (y) the payment of the Commitment Payment) do not and will not: (a) violate, conflict with or result in the breach of the certificate of incorporation, articles of incorporation, bylaws, certificate of formation, operating agreement, limited liability company agreement or similar formation or organizational documents of the Company Party or any of its Subsidiaries; (b) conflict with or violate any Law or Order applicable to the Company or any of its respective assets or properties; (c) violate, conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which the Company Party or its Subsidiaries is a party or to which any of their respective assets or properties are subject, or result in the creation of any Encumbrance on any of their respective assets or properties, except, in the case of clauses (b) and (c), for any such conflict, violation, breach or default that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.4 <u>Consents and Approvals</u> . The execution, delivery and performance by the Company Party of this Agreement do not require any consent, approval, authorization or other Order of, action by, filing with or notification to, any Governmental Authority or any other Person under any of the terms, conditions or provisions of any Law or Order applicable to the Company Party or any of its Subsidiaries or by which any of their respective assets or properties may be bound, any Contract to which the Company Party or any of its Subsidiaries is a party or by which the Company Party or any of its Subsidiaries may be bound, except the entry of the Approval Order and the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the fourteen (14) day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable.

Section 4. **<u>REPRESENTATIONS AND WARRANTIES OF THE BACKSTOP INVESTORS</u>** . Each Preferred Backstop Investor represents and warrants, severally and not jointly, to the Company Parties as of the date hereof and as of the Effective Date (except for representations and warranties that are made as of a specific date, which are made only as of such date), as follows:

4.1 <u>Authorization; Enforcement; Validity</u> . Such Preferred Backstop Investor has all necessary corporate, limited liability company or equivalent power and authority to enter into this Agreement and to carry out, or cause to be carried out, its obligations hereunder in accordance with the terms hereof. The execution and delivery by such Preferred Backstop Investor of this Agreement and the performance by such Preferred Backstop Investor of its obligations hereunder have been duly authorized by all requisite action on the part of such Preferred Backstop Investor, and no other action on the part of such Preferred Backstop Investor is necessary to authorize the execution and delivery by such Preferred Backstop Investor of this Agreement or the consummation of the transactions contemplated by this Agreement. This Agreement has been duly executed and delivered by such Preferred Backstop Investor, and assuming due authorization, execution and delivery by the other parties hereto, this Agreement

11

constitutes the legal, valid and binding obligation of such Preferred Backstop Investor, enforceable against such Preferred Backstop Investor in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

4.2 <u>No Conflicts</u> . The execution, delivery, and performance by such Preferred Backstop Investor of this Agreement do not and will not (a) violate any provision of the organizational documents of such Preferred Backstop Investor; (b) conflict with or violate any Law or Order applicable to such Preferred Backstop Investor or any of its respective assets or properties; (c) violate, conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which such Preferred Backstop Investor is a party or to which any of its assets or properties are subject, or result in the creation of any Encumbrance on any of its assets or properties, except, in the case of clauses (b) and (c), for any such conflict, violation, breach or default that would not reasonably be expected to have, individually or in the aggregate, a Preferred Backstop Investor Material Adverse Effect on such Preferred Backstop Investor.

4.3 <u>Consents and Approvals</u> . No consent, approval, order, authorization, registration or qualification of or with any court or Governmental Authority or body having jurisdiction over such Preferred Backstop Investor is required in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for any consent, approval, order or authorization required under the Bankruptcy Code.

4.4 <u>Investor Representation</u> . (i) It is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) an institutional accredited investor as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act, (C) a non-U.S. person under Regulation S under the Securities Act, or (D) the foreign equivalent of (A) or (B) above, and (ii) any securities of the Company acquired by the applicable Preferred Backstop Investor in connection with this Agreement will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

Section 5. **ADDITIONAL COVENANTS** .

5.1 <u>Approval Motion and Approval Order</u> . CEOC agrees to file a motion and supporting papers (the " <u>Approval Motion</u> ") (including an order in form and substance materially consistent with this Agreement and otherwise reasonably satisfactory to CEOC and the Required Preferred Backstop Investors) seeking an order of the Bankruptcy Court (the " <u>Approval Order</u> ") approving this Agreement.

5.2 <u>Commercially Reasonable Efforts</u> . CEOC agrees to use its commercially reasonable efforts to timely satisfy (if applicable) each of the conditions under Sections 6 and 7 of this Agreement.

5.3 <u>Further Assurances</u> . Each party hereto, without expanding such party's obligations under the Restructuring Support Agreement other than as specifically contemplated hereby, shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as any other party hereto may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby, in each case at the cost of CEOC.

5.4 <u>Use of Proceeds</u> . The Company shall use the net proceeds from the sale of Preferred Stock issued pursuant to the Rights Offering solely as provided in the Plan.

5.5 <u>Milestones</u> . CEOC shall use its reasonable best efforts to cause the following actions (each, individually a " <u>Milestone</u> " and collectively, the " <u>Milestones</u> ") to occur on or before the dates specified below (such corresponding date, the " <u>Milestone Date</u> ");

(a) The motion for the Approval Order shall have been filed no later than 45 days from the Petition Date and the Approval Order shall have been entered by the Bankruptcy Court by no later than 150 days from the date of the filing of such motion;

(b) the Plan Solicitation Order shall have been entered by the Bankruptcy Court by no later than 150 days from the Petition Date;

(c) the Confirmation Order shall have been entered by the Bankruptcy Court by no later than 120 days from the date of entry of the Plan Solicitation Order;

(d) the Company shall file a registration statement under the Securities Exchange Act of 1933, as amended, (the "Registration Statement") registering the Preferred Stock as soon as practicable following the effective date of the Plan and in any event within 75 days thereafter, and shall cause the Registration Statement to be effective as soon as practicable thereafter;

(e) the Subscription Expiration Date shall have occurred by no later than [240 days after the Petition Date]; and

(f) the Effective Date shall have occurred by no later than [180 days from the date the Confirmation Order becomes a final order].

Section 6. **CONDITIONS TO THE BACKSTOP INVESTORS' OBLIGATIONS** . The obligations of each of the Preferred Backstop Investors to purchase the Backstop Shares pursuant to this Agreement on the Effective Date shall be subject to the satisfaction at or prior to the Effective Date of each of the following conditions, any one or more of which may be waived in writing by the Required Preferred Backstop Investors:

6.1 <u>Representations and Warranties</u> . (a) All of the representations and warranties made by the Company Parties in this Agreement shall be true and correct in all material respects

13

as of the Effective Date as though made at and as of the Effective Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date); (b) the Company Parties shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by the Company Parties on or prior to the Effective Date or such earlier date as may be applicable; and (c) with respect to clauses (a) and (b), at the Closing there shall be delivered to the Preferred Backstop Investors a certificate signed by a duly authorized representative of the Company to the foregoing effect.

6.2 <u>Approval Order</u> . The Approval Order shall have been entered by the Bankruptcy Court.

6.3 <u>Confirmation Order</u> . The Confirmation Order shall have been entered by the Bankruptcy Court, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacatur, in whole or in part, of the Confirmation Order.

6.4 <u>Plan and Rights Offering Documents</u> . (i) Each of the Plan (and the exhibits thereto) and the Confirmation Order, with respect to provisions that could affect the economic interests of the Preferred Backstop Investors or that could be adverse to any of the Preferred Backstop Investors, shall not be inconsistent with this Agreement and the Restructuring Support Agreement, and shall be in form and substance reasonably acceptable to the Required Preferred Backstop Investors, and (ii) the Rights Offering Documents, which shall include the Offering Conditions, shall be in form and substance materially consistent with this Agreement and the Restructuring Support Agreement and otherwise reasonably acceptable to the Required Preferred Backstop Investors and CEOC.

6.5 <u>Conditions to Confirmation</u> . Each of the conditions precedent to the effectiveness of the Plan and the occurrence of the Effective Date shall have been satisfied or waived in accordance with the Plan.

6.6 <u>Rights Offering</u> . The Subscription Expiration Date shall have occurred.

6.7 <u>Payment of Amounts</u> . The Company shall have paid each Preferred Backstop Investor such Preferred Backstop Investor's pro rata portion of the Commitment Payment in accordance with the terms of this Agreement.

Section 7. **CONDITIONS TO THE COMPANY'S OBLIGATIONS** . The obligations of the Company to issue and sell the Backstop Shares to each of the Preferred Backstop Investors pursuant to this Agreement shall be subject to the satisfaction at or prior to the Effective Date of each of the following conditions, any one or more of which may be waived in writing by CEOC or the Company:

7.1 <u>Representations and Warranties</u> . (a) All of the representations and warranties made by each Preferred Backstop Investor in this Agreement shall be true and correct in all

14

material respects as of the date hereof and as of the Effective Date as though made at and as of the Effective Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date), except to the extent that the breach of any such representation or warranty would not reasonably be expected to have a Preferred Backstop Investor Material Adverse Effect on such Preferred Backstop Investor and (b) each Preferred Backstop Investor shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by such Preferred Backstop Investor on or prior to the Effective Date.

7.2 <u>Approval Order</u> . The Approval Order shall have been entered by the Bankruptcy Court.

7.3 <u>Confirmation Order</u> . The Confirmation Order shall have been entered by the Bankruptcy Court, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacatur, in whole or in part, of the Confirmation Order.

7.4 <u>Conditions to Confirmation</u> . Each of the conditions precedent to the effectiveness of the Plan and the occurrence of the Effective Date shall have been satisfied in accordance with the Plan.

7.5 <u>Rights Offering</u> . The Subscription Expiration Date shall have occurred

7.6 <u>Backstop Subscription Forms</u> . CEOC and the Company shall have received a duly executed subscription form from each Preferred Backstop Investor in accordance with Section 2.1(b).

Section 8. **<u>TERMINATION</u>** .

(a) <u>Termination by the Preferred Backstop Investors</u> . This Agreement may be terminated at any time by any Preferred Backstop Investor with respect to itself (and not with respect to any other Preferred Backstop Investor):

(i) upon the failure of any of the conditions set forth in <u>Section 6</u> hereof to be satisfied, which failure cannot be cured or is not cured within [10] days of written notice to the Company and CEOC by such Preferred Backstop Investor;

(ii) if any of the Company Parties alters, amends or modifies any term of this Agreement without the consent of the Required Preferred Backstop Investor, or if any alteration, amendment or modification is adverse to any Preferred Backstop Investor, without the consent of each Preferred Backstop Investor;

(iii) if any of the Company Parties breaches any representation or warranty or breaches any covenant applicable to it in any material respect under this Agreement and if such breach is curable, it is not cured within [10] days of written notice to the applicable Company Party by such Preferred Backstop Investor;

15

(iv) if any of the Milestones shall not have occurred on or prior to the applicable Milestone Date; or

(v) upon the occurrence of any matters set forth in any of [clauses (a) through (k) of Section 8] of the Restructuring Support Agreement and/or a Company Termination Event (as defined in the Restructuring Support Agreement) and/or a termination of the Restructuring Support Agreement;

provided that, in the event any Preferred Backstop Investor elects to terminate this Agreement (each, a " Terminating Preferred Backstop Investor "), the Backstop Commitments allocated to such Terminating Preferred Backstop Investor shall be allocated to all Non-Defaulting Preferred Backstop Investors who elect to acquire such Backstop Commitments on a pro rata basis (based on the Backstop Percentages of such electing Non-Defaulting Preferred Backstop Investors), and provided further that in the event no Non-Defaulting Preferred Backstop Investor elects to acquire the Backstop Commitments of the Terminating Preferred Backstop Investors, this Agreement shall terminate.

(b) Termination by the Company.

(i) (A) upon termination of the Restructuring Support Agreement, the Company may terminate this Agreement by written notice to the Preferred Backstop Investors or (B) if any Preferred Backstop Investor breaches this Agreement in a manner that causes a Preferred Backstop Investor Material Adverse Effect with respect to such Preferred Backstop Investor, and if such breach is curable, is not cured within five (5) Business Days after receipt of written notice from the Company to such Preferred Backstop Investor (each, a " Preferred Backstop Investor Default " and any such defaulting Preferred Backstop Investor, a " Defaulting Preferred Backstop Investor "), then following the expiration of the five (5) Business Day notice period, the Company shall follow the procedures set forth in clause (ii) below and each of the other Preferred Backstop Investors (the " Non-Defaulting Preferred Backstop Investors ") shall have the right (the " Default Purchase Right ") but not the obligation, to purchase on the Effective Date all or a portion of the Backstop Shares that were to be purchased by the Defaulting Preferred Backstop Investor (the " Default Shares ") at a price per share equal to the Per Share Purchase Price. To the extent that the Non-Defaulting Preferred Backstop Investors (in the aggregate) desire to purchase more than the total number of Default Shares, such Default Shares shall be allocated between the Non-Defaulting Preferred Backstop Investors pro rata, based on their respective Backstop Percentages.

(ii) As soon as practicable after a Preferred Backstop Investor Default, but in no event later than three (3) Business Days following the Company or CEOC becoming aware of such Preferred Backstop Investor Default, the Company or CEOC shall send a written notice (in accordance with the notice provisions set forth in Section 10.3 ) to each Non-Defaulting Preferred Backstop Investor, specifying the number of Default Shares. The

16

Non-Defaulting Preferred Backstop Investors shall have five (5) Business Days from receipt of such notice to elect to exercise the Default Purchase Right by notifying the Company and CEOC in writing of its or their election to purchase all or a portion of the Default Shares then available as a result of the Preferred Backstop Investor Default or find a third-party reasonably satisfactory to the Non-Defaulting Preferred Backstop Investors to replace the commitment of the Defaulting Preferred Backstop Investor. If at the conclusion of such five (5) Business Day period, the Non-Defaulting Preferred Backstop Investors have not elected to exercise the Default Purchase Right in its entirety or have not found a third-party to replace the commitment of the Defaulting Backstop Purchaser, then the Company or CEOC may terminate this Agreement.

(iii) Notwithstanding anything to the contrary in this Section 8(b), in addition to any liability to the Company or CEOC, the parties agree that any Defaulting Preferred Backstop Investor will be liable to the Non-Defaulting Preferred Backstop Investors for the consequences to the Non-Defaulting Preferred Backstop Investors of its breach and that the Non-Defaulting Backstop Purchasers can enforce rights of damages and/or specific performance pursuant to <u>Section 10.18</u> immediately upon the expiration of the original five (5) Business Day notice period set forth <u>Section 8(b)(i)</u> .

(c) <u>Mutual Termination</u> . This Agreement may be terminated by the mutual written consent of CEOC and the Preferred Backstop Investors representing more than 75% of the aggregate Backstop Percentage.

(d) <u>Effect of Termination</u> . If this Agreement is terminated pursuant to this <u>Section 8</u> , subject to the last paragraph of Section 8(a), the obligations of such parties contained in <u>Sections 2.3</u> , <u>9</u> , <u>10.2</u> through <u>10.19</u> and this <u>Section 8</u> shall survive any such termination.

Section 9. **PROTECTION OF COMMITMENT PAYMENT** .

Both of the Company and CEOC shall jointly and severally indemnify, save and hold harmless each Preferred Backstop Investor, and each of their respective directors, officers, stockholders, employees, partners, members, managers, representatives, attorneys, other professional advisors and agents and all of their respective heirs, successors, legal administrators, permitted assigns and designees, and each Person who (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) controls any of the Preferred Backstop Investors and the officers, directors, agents and employees of any such controlling Person (collectively, the " <u>Covered Persons</u> ") from and against all losses, claims, damages, liabilities, costs (including, without limitation, the costs of investigation and reasonable attorneys' fees) and expenses, as incurred by any or all of the Covered Persons in connection with any direct claim or claim against them by a third party for avoidance of or otherwise in connection with or arising from the payment of the Commitment Payment; provided that neither the Company nor CEOC shall have any obligation to indemnify or save and hold harmless any Covered Person (i) for any claim or expense that is judicially determined (the determination having become final and no longer subject to appeal) to have arisen solely and directly from such Covered Persons' gross negligence, willful misconduct, or breach of this Agreement that has caused a Preferred

17

Backstop Investor Material Adverse Effect and that would result in the loss of such Preferred Backstop Investor's entitlement under the terms of this Agreement to payment of the Commitment Payment or (ii) for any claim or expense that is settled prior to a judicial determination as to the exclusion set forth in clause (i) above, but determined by the Bankruptcy Court, after notice and a hearing, to be a claim or expense for which such Covered Person should not receive indemnity under the terms of this Section 9; provided that, without otherwise limiting CEOC's or the Company's obligation under this Section 9, CEOC and the Company shall have no obligation to indemnify any Covered Person pending such judicial determination where CEOC or the Company has in good faith and in a reasonable manner, asserted an uncured breach of this Agreement that has caused a Preferred Backstop Investor Material Adverse Effect that would result in the loss of such Preferred Backstop Investor's entitlement under the terms of this Agreement to payment of the Commitment Payment. This provision will be in addition to the rights of each and all of the Covered Persons to bring an action against the Company for breach of any term of this Agreement. The Company acknowledges and agrees that each and all of the Covered Persons shall be treated as third-party beneficiaries with rights to bring an action against the Company under this Section 9.

Section 10. **MISCELLANEOUS** .

10.1 <u>Payments</u> . All payments made by or on behalf of CEOC and/or the Company or any of their affiliates to a Preferred Backstop Investor or its assigns, successors or designees pursuant to this Agreement shall be without withholding, set-off, counterclaim or deduction of any kind.

10.2 <u>Survival</u> . The representations and warranties made in this Agreement will survive the execution and delivery of this Agreement and the Closing for the length of the applicable statute of limitations with respect thereto.

10.3 <u>No Waiver of Rights</u> . All waivers hereunder must be made in writing, and the failure of any party at any time to require another party's performance of any obligation under this Agreement shall not affect the right subsequently to require performance of that obligation. Any waiver of any breach of any provision of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision or a waiver or modification of any other provision.

10.4 <u>Notices</u> . All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested) to the respective parties hereto at the following addresses (or at such other address for any party as shall be specified by such party in a notice given in accordance with this <u>Section 10.3</u> )

(a)    If to the Company, to:

[PROPCO]
[ ___ ]
[ ___ ]
Attention: [ ___ ]
Facsimile: [ ___ ]

with a copy (which shall not constitute notice to the Company) to

[ ___ ]
[ ___ ]
[ ___ ]
Facsimile: [ ___ ]
Attention: [ ___ ]

(b)    If to CEOC, to:

Caesars Entertainment Operating Company, Inc.
One Caesars Palace Drive
Las Vegas, NV 89109
Attn: General Counsel

With a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Ave
New York, NY 10022
Attn:  Paul M. Basta, P.C.
        Nicole L. Greenblatt
Facsimile: (212) 446 4900
E-mail Address:  paul.basta@kirkland.com
                ngreenblatt@kirkland.com

-and-

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654

Attn:  David R. Seligman, P.C.
        Ryan Preston Dahl
E-mail Address:  dseligman@kirkland.com
                rdahl@kirkland.com
Facsimile: (312) 862-2200

19

(c)     If to a Preferred Backstop Investor, to the mailing address or facsimile number set forth on <u>Schedule I</u> hereto.

with a copy (which shall not constitute notice to such Preferred Backstop Investor) to:

Kleinberg, Kaplan, Wolff & Cohen, P.C.
551 Fifth Avenue, 18th Floor
New York, NY 10176
Telephone: (212) 986-6000 Facsimile: (212) 986-8866
Attention: Mary Kuan, Esq.

Any of the foregoing addresses or facsimile numbers may be changed by giving notice of such change in the foregoing manner, except that notices for changes of address or facsimile number shall be effective only upon receipt.

10.5 <u>Headings</u> . The section and subsection headings in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

10.6 <u>Construction</u> . The parties hereto and their respective legal counsel participated in the preparation of this Agreement, and therefore, this Agreement shall be construed neither against nor in favor of any of the parties hereto, but rather in accordance with the fair meaning thereof.

10.7 <u>Severability</u> . If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

10.8 <u>Entire Agreement</u> . This Agreement (including the Schedules and Exhibits hereto) and the agreements and documents referenced herein constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede all prior agreements and undertakings, both written and oral, among the parties hereto with respect to the subject matter hereof.

10.9 <u>Successors and Assigns</u> . This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Except as set forth below, neither this Agreement nor any of the rights, interests or obligations under this

20

Agreement will be assigned by any party (whether by operation of law or otherwise) without the prior written consent of the other parties. Notwithstanding the foregoing, (i) a Preferred Backstop Investor may enter into arrangements with other parties regarding its rights and/or obligations under this Agreement, provided that it shall remain liable for its obligations with respect to the Backstop Commitment, and (ii) the rights, obligations and interests hereunder may be assigned, delegated or transferred, in whole or in part, by any Preferred Backstop Investors (A) either alone or in connection with a corresponding Transfer (as such term is defined in the Restructuring Support Agreement) of Claims (as such term is defined in the Restructuring Support Agreement) to a transferee with the consent of CEOC, such consent not to be unreasonably withheld, delayed or denied and (B) to affiliates and to other Preferred Backstop Investors; provided , however , that such transferee, as a condition precedent to such Transfer, becomes a party to this Agreement and assumes the obligations of the transferring Preferred Backstop Investor under this Agreement by executing an addendum substantially in the form set forth in Exhibit A (the " Addendum ") and an assumption in substantially the form set forth in Exhibit B hereto (the " Assumption Agreement ") and deliver the same to Kleinberg, Kaplan, Wolff & Cohen, P.C. (" KKWC ") and a copy to CEOC. Any Transfer that is made in violation of the immediately preceding sentence shall be null and void ab initio, and CEOC and each Preferred Backstop Investor, as applicable, shall have the right to enforce the voiding of such transfer. Following any assignment of a Preferred Backstop Investor's rights and obligations in this Agreement described in Section 10.9(ii) above, Schedule I hereto shall be updated by KKWC (in consultation with the assigning Preferred Backstop Investor and the Transferee) and delivered to CEOC solely to reflect the name and address of the applicable transferee and the Backstop Percentage that shall apply to such transferee, and any changes to the Backstop Percentage applicable to the assigning Preferred Backstop Investor. Any update to Schedule I hereto described in the immediately preceding sentence shall not be deemed an amendment or modification of this Agreement. In performing this Agreement, CEOC may rely solely on the most current Schedule I delivered by KKWC.

10.10 No Third Party Beneficiaries . This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns and, except as expressly set forth in Section 9 , nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever.

10.11 Amendment . This Agreement may not be altered, amended, or modified except by a written instrument executed by or on behalf of CEOC and the Required Preferred Backstop Investors, provided that if any alteration, amendment or modification could be adverse to any of the Preferred Backstop Investors, such Preferred Backstop Investors' written consent shall be required. This Agreement shall become binding only after the same is signed and delivered by or on behalf of each of the parties hereto.

10.12 Governing Law . This Agreement shall be interpreted, construed and enforced in accordance with the laws of the State of New York, without regard to the conflicts of law principles thereof.

10.13 <u>Consent to Jurisdiction</u> . Each of the parties hereto (a) irrevocably and unconditionally agrees that any actions, suits or proceedings, at Law or equity, arising out of or relating to this Agreement or any agreements or transactions contemplated hereby shall be heard and determined in the Bankruptcy Court; (b) irrevocably submits to the jurisdiction of such court in any such action, suit or proceeding; (c) consents that any such action, suit or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court; and (d) agrees that service of process in any such action, suit or proceeding may be effected by providing a copy thereof by any of the methods of delivery permitted by <u>Section 10.3</u> to such party at its address as provided in <u>Section 10.3</u> (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Law).

10.14 <u>Waiver of Jury Trial</u> . EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS. EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.13.

10.15 <u>Currency</u> . Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars and all payments hereunder shall be made in United States dollars.

10.16 <u>Approvals</u> . Notwithstanding anything to the contrary herein, unless notified in writing to the contrary, for purposes of seeking approvals of the Preferred Backstop Investors hereunder, such as in accordance with <u>Section 6.4</u> , the Company Parties may rely on the written approval (including email) of KKWC.

10.17 <u>Counterparts</u> . This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

10.18 <u>Specific Performance</u> . Each party hereto acknowledges that, in view of the uniqueness of the securities referenced herein and the transactions contemplated by this Agreement, the other parties hereto would not have an adequate remedy at law for money damages in the event that this Agreement has not been performed in accordance with its terms, and therefore agrees that such other parties shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which it may be entitled, at law or in equity, without otherwise limiting the parties' remedies hereunder.

22

10.19 <u>Rules of Construction</u> . Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Section, subsection, clause, schedule, annex and exhibit references are to this Agreement unless otherwise specified. Any reference to this Agreement shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, and supplements thereto and thereof, as applicable. Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.

10.20 <u>Covenants and Representations</u> . Notwithstanding anything to the contrary in this Agreement or otherwise, (i) CEOC, on behalf of itself and the Debtors, shall cause the Company to perform each obligations, covenant, undertaking and agreement in this Agreement, and to cause the Company's representations and warranties in this Agreement to be true, complete and correct as of the times given and shall be liable for all obligations not satisfied or performed by the Company, (ii) all obligations, covenants, undertakings and agreements of the Preferred Backstop Investors to the Company shall apply only after the Company has been properly incorporated and formed in accordance with the Plan and (iii) the Company shall be deemed to give the representations and warranties with respect to itself and contained in Section 3 only on the Effective Date and on the date that it has been properly incorporated and formed in accordance with the Plan.

*[No further text appears; signature pages follow]*

23

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

CAESARS ENTERTAINMENT OPERATING COMPANY, INC.

By: _____
Name:
Title:

[BACKSTOP INVESTOR]

By: _____
Name:
Title:

24

Schedule I

## SCHEDULE OF BACKSTOP INVESTORS

| Name and Address of Preferred Backstop Investors and Wire Instructions | Backstop Percentage [3] |
|---|---|
| Certain funds or entities or accounts managed by Brigade Capital Management | % |
| Certain funds or accounts managed by DDJ Capital Management, LLC | |
| Certain funds or entities or accounts managed by Elliott Management Corporation | |
| PIMCO and/or certain funds or entities or accounts managed by PIMCO | |
| Certain funds or entities or accounts managed by JPMorgan Asset Management | |
| **Total:** | 100% |

[Need email/contact info for notices, subscription status reports etc.]

---

3    NTD: The initial percentage for each Preferred Backstop Investor will be equal to the product of (i) the quotient resulting from (x) the amount designated by such Preferred Backstop Investor, provided such amount shall not exceed the principal amount of the first lien bonds held by such Preferred Backstop Investor divided by (y) the aggregate amount designated by all Preferred Backstop Investors pursuant to clause (x) and (ii) 100.

25

**Exhibit A**

**ADDENDUM**

Reference is made to that certain Backstop Commitment Agreement (as amended, modified or supplemented from time to time, the "Agreement") by and among Caesars Entertainment Operating Company, Inc., a Delaware corporation ("CEOC"), and each of the Preferred Backstop Investors party thereto from time to time. Each capitalized term used but not defined herein shall have the meaning given to it in the Agreement.

Upon execution and delivery of this Addendum by the undersigned, as provided in Section 10.9 of the Agreement, the undersigned hereby becomes a Preferred Backstop Investor, as applicable thereunder and bound thereby effective as of the date of the Agreement.

By executing and delivering this Addendum, the undersigned represents and warrants, for itself and for the benefit of each party to the Agreement, that:

    (a)    as of the date of this Addendum, the undersigned has executed and delivered an Assumption and Joinder Agreement therefor (a copy of which is attached to this Addendum);

    (b)    as of the date of this Addendum, with respect to each transferee that (i) is an individual, such Transferee has all requisite authority to enter into this Addendum and to carry out the transactions contemplated by, and perform its respective obligation under, the Agreement and (ii) is not an individual, such transferee is duly organized, validly existing, and in good standing under the laws of the state of its organization, and has all requisite corporate, partnership, or limited liability company power and authority to enter into this Addendum and to carry out the transactions contemplated by, and perform its respective obligations under, the Agreement;

    (c)    assuming the due execution and delivery of the Agreement by the Company the Addendum and the Agreement are legally valid and binding obligations of it, enforceable against it in accordance with its terms, except as may be limited by bankruptcy, insolvency or similar laws, or by equitable principles relating to or limiting creditors' rights generally; and

    (d)    as of the date of this Addendum, it is not aware of any event that, due to any fiduciary or other duty to any other person, would prevent it from taking any action required of it under the Agreement and this Addendum.

By executing and delivering this Addendum to CEOC, the undersigned agrees to be bound by all the terms of the Agreement.

26

The undersigned acknowledges and agrees that once delivered to CEOC, it may not revoke, withdraw, amend, change or modify this Addendum unless the Agreement has been terminated.

THIS ADDENDUM SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

This Addendum may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

[Signature on Following Page]

27

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be duly executed and delivered by their proper and duly authorized officers as of this [___] day of [_____].

TRANSFEREE WHO BECOMES A BACKSTOP INVESTOR

[NAME]

_____
as a Preferred Backstop Investor
Name:

28

Exhibit B

**ASSUMPTION AND JOINDER AGREEMENT**

Reference is made to (i) that certain Backstop Commitment Agreement (as amended, modified or supplemented from time to time, the " Agreement "), dated as of [ **___**], 2014, by and among Caesars Entertainment Operating Company, Inc., a Delaware corporation (" CEOC ") and each of the Preferred Backstop Investors party thereto from time to time, and (ii) that certain Addendum, dated as of [ **___**], [ **___**] (the " Transferor Addendum ") submitted by **_____**, as transferor (the " Transferor "). Each capitalized term used but not defined herein shall have the meaning given to it in the Agreement.

As a condition precedent to becoming a Preferred Backstop Investor, the undersigned (the " Transferee ") hereby agrees to become bound by all the terms, conditions and obligations set forth in the Agreement and the Transferor Addendum copies of which are attached hereto as Annex I. This Assumption and Joinder Agreement shall take effect and shall become an integral part of the Agreement and the Transferor Addendum immediately upon its execution, and the Transferee shall be deemed to be bound by all of the terms, conditions and obligations of the Agreement and the Transferor Addendum as of the date thereof. The Transferee shall hereafter be deemed to be a "Preferred Backstop Investor" and a "party" for all purposes under the Agreement.

[Signatures on Following Page]

29

IN WITNESS WHEREOF, this Assumption and Joinder Agreement has been duly executed by each of the undersigned as of the date specified below.

Date: [_____]

_____          _____
Name of Transferor                                    Name of Transferee

_____          _____
Authorized Signatory of Transferor                      Authorized Signatory of Transferee

_____          _____
(Type or Print Name and Title of Authorized Signatory)    (Type or Print Name and Title of Authorized Signatory)

                                                   Address of Transferee:

                                                   _____

                                                   _____

                                                   _____
                                                   Attn:

                                                   _____
                                                   Tel:

                                                   _____
                                                   Fax:

                                                   _____
                                                   E-mail:

                                                   _____

30

**Exhibit C**

**OFFERING CONDITIONS**

1.   Holders shall receive an Election Form and ballot in the Solicitation Package, which shall be approved by the Bankruptcy Court.

2.   The Election Form must be submitted by the Subscription Expiration Date.

3.   Returned Election Form for Holders other than the Preferred Backstop Investors must provide evidence of financial wherewithal to purchase the shares of Preferred Stock pursuant to the Rights Offering. CEOC shall determine in its discretion whether such Holders are satisfactory to CEOC (such approved Holders, the " Satisfactory Holders ").

4.   CEOC shall notify the Preferred Backstop Investors of the Satisfactory Holders and the Preferred Stock such Satisfactory Holders have elected to purchase pursuant to the Rights Offering no later than three days before the deadline set by the Bankruptcy Court for the filing of objections to confirmation of the Plan (the " Objection Deadline ").

5.   On or before the Objection Deadline, all Holders designated as Satisfactory Holders (which, for the avoidance of doubt, shall exclude the Preferred Backstop Investors) shall post cash in the amount of the maximum aggregate Per Share Purchase Price for all Preferred Stock such Holder elected to purchase ( the "Purchase Amount Obligation ") with a third party escrow agent designated by CEOC and reasonably satisfactory to the Required Preferred Backstop Investors.

6.   To the extent that the cash timely posted by the Satisfactory Holders is less than the Purchase Amount Obligation, the Preferred Backstop Investors shall have the right, but not the obligation, to satisfy their respective Backstop Commitments with respect to any shortfall in the Purchase Amount Obligation, provided that any Backstop Commitment declined by any Preferred Backstop Investor shall be allocated pro rata (based on the Backstop Commitment of the Preferred Backstop Investors electing to participate) to the Preferred Backstop Investors electing to participate.

31

**Debt Term Sheet Annex**

New First Lien OpCo Debt
$[          ] Term Facility
Summary of Principal Terms [1]

| | |
|---|---|
| Borrower : | [Caesars Entertainment Operating Company, Inc.] [2] (the " ***Borrower*** "). |

**Agent/Collateral Agent :**

[          ] will act as sole administrative agent for the Senior Facilities (in such capacity and together with its permitted successors and assigns, the " ***Agent*** "), and will perform the duties customarily associated with such role.

[          ] will act as collateral agent for the Senior Facilities (in such capacity, the " ***Collateral Agent*** ") and will perform the duties customarily associated with such role.

The Agent and Collateral Agent shall each be acceptable to the First Lien Bank Lenders and the First Lien Noteholders.

**Facilities :**

(A)    a senior secured term loan facility in an aggregate principal amount set forth in the Restructuring Term Sheet (the " ***First Lien Term Facility*** " and loans thereunder, the " ***Term Loans*** "), which will be issued to each First Lien Bank Lender, in accordance with the Restructuring Term Sheet (in such capacity, collectively the " ***Lenders*** ").

(B)    at the Borrower's option, a senior secured revolving credit facility in an aggregate principal amount not to exceed $200 million (the " ***Revolving Facility*** " and, together with the First Lien Term Facility, the " ***Senior Facilities*** "), to be provided by the First Lien Bank Lenders or such other financial institutions to become Lenders under the Senior Facilities, a portion of which will be available through a subfacility in the form of letters of credit.

In accordance with the Restructuring Term Sheet, the Borrower shall use its commercially reasonable efforts to syndicate the First Lien Term Facility to the market at or below the interest rates set forth herein and, to the extent so syndicated, the cash proceeds will be used to increase the cash payments to the First Lien Bank Lenders pursuant to the terms of the Restructuring Term Sheet.

---

1    All capitalized terms used but not defined herein shall have the meaning assigned thereto in the Restructuring Term Sheet to which this Term Sheet is attached (the " ***Restructuring Term Sheet*** ").

2    [NTD: Assumes CEOC is the operating company in the new REIT structure.

1

Definitive Documentation :

The definitive documentation for the Senior Facilities (the " ***Senior Facilities Documentation*** ") shall, except as otherwise set forth herein, be based on financing and security documentation typical and customary for exit financings, taking into consideration (i) the First Lien Credit Agreement, dated as of October 11, 2013, among Caesars Entertainment Resort Properties, LLC, Caesars Entertainment Resort Properties Finance, Inc., Harrah's Las Vegas, LLC, Harrah's Atlantic City Holding, Inc., Rio Properties, LLC, Flamingo Las Vegas Holding, LLC, Harrah's Laughlin, LLC and Paris Las Vegas Holding, LLC, as borrowers, the lenders party thereto and Citicorp North America, Inc., as administrative agent (the " ***CERP Credit Agreement*** ") and (ii) the operating lease structure of the Borrower and its subsidiaries, and otherwise be reasonably satisfactory to the Borrower and the Requisite Consenting Creditors (the " ***Documentation Precedent*** "); provided that, in the case of provisions setting forth the debt and lien capacity, such Senior Facilities Documentation shall be based on and consistent with the CERP Credit Agreement, as modified to reflect the terms set forth herein.

Incremental Facilities :

The Borrower will be permitted after the Closing Date to add additional revolving or term loan credit facilities (the " ***Incremental Facilities*** ") in an aggregate principal amount not to exceed the greater of (x) $150 million and (y) an aggregate principal amount of indebtedness that would not cause (1) in the case of debt incurred under the Incremental Facilities that is secured by pari passu liens on the Collateral, the pro forma First Lien Net Leverage Ratio (to be defined as the ratio of total funded debt outstanding that consists of the Term Loans and other funded debt that is secured by first-priority liens on the Collateral that are pari passu with the Term Loans (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) to adjusted EBITDA) (" ***First Lien Net Leverage Ratio*** ") to exceed a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma First Lien Net Leverage Ratio in effect on the Closing Date [3] and (2) in the case of debt incurred under the Incremental Facilities that is secured by junior liens on the Collateral, the pro forma Total Secured Net Leverage Ratio (to be defined as the ratio of total funded

---

[3]     For the avoidance of doubt, (i) the calculation of the ratios in the OpCo debt documents shall exclude Chester Downs (from both debt and EBITDA) and (ii) any Revolving Facility loans outstanding at the time of incurrence of any debt shall be included in the calculation of any Leverage Ratio at the time of such incurrence.

2

outstanding that is secured by liens on the Collateral (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) to adjusted EBITDA) (" ***Total Secured Net Leverage Ratio*** ") to exceed a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma Total Secured Net Leverage Ratio in effect on the Closing Date; *provided* , that:

(i)    the loans under such additional credit facilities shall be secured senior obligations and shall rank pari passu or junior in right of security with, and shall have the same guarantees as, the Senior Facilities; *provided* , that, if such additional credit facilities rank junior in right of security to the Senior Facilities, (x) such additional credit facilities will be established as a separate facility from the Senior Facilities and pursuant to separate documentation, (y) such Incremental Facilities shall be subject to the Intercreditor Agreements (as defined below) or other intercreditor agreements that are not materially less favorable to the Lenders and the First Lien Noteholders than the Intercreditor Agreements and (z) for the avoidance of doubt, will not be subject to clause (iv) below;

(ii)    the loans under the additional term loan facilities will mature no earlier than, and will have a weighted average life to maturity no shorter than, that of the First Lien Term Facility and all other terms of any such additional term loan facility (other than pricing, amortization or maturity) shall be substantially identical to the First Lien Term Facility or otherwise reasonably acceptable to the Agent;

(iii)    all fees and expenses owing in respect of such increase to the Agent, Collateral Agent and the Lenders shall have been paid; and

(iv)    each incremental term facility shall be subject to a "most favored nation" pricing provision that ensures that the initial "yield" on the incremental facility does not exceed the "yield" at such time on the First Lien Term Facility by more than 50 basis points (with "yield" being determined by the Agent taking into account the applicable margin, upfront fees, any original issue discount and any LIBOR or ABR floors, but excluding any structuring, commitment and arranger or similar fees).

3

| | |
|---|---|
| <u>Purpose</u> : | On the Closing Date, the Term Loan will be issued to each First Lien Bank Lender in accordance with the Restructuring Term Sheet. |
| <u>Availability</u> : | The full amount of the First Lien Term Facility will be issued on the Closing Date. Amounts under the First Lien Term Facility that are repaid or prepaid may not be reborrowed. |
| <u>Interest Rates</u> : | LIBOR + 4.0% per annum, with a 1.0% LIBOR floor. |
| <u>Default Rate</u> : | With respect to overdue principal (whether at stated maturity, upon acceleration or otherwise), the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount (including overdue interest), the interest rate applicable to ABR loans plus 2.00% per annum and in each case, shall be payable on demand. |
| <u>Final Maturity and Amortization</u> : | The First Lien Term Facility will mature on the date that is six (6) years after the Closing Date, and, commencing with the second full fiscal quarter ended after the Closing Date, will amortize in equal quarterly installments in an aggregate annual amount equal to 1% of the original principal amount of the First Lien Term Facility with the balance payable on the maturity date of the First Lien Term Facility. |
| <u>Guarantees</u> : | All obligations of the Borrower under the Senior Facilities and, at the option of the Borrower, under any interest rate protection or other hedging arrangements entered into with the Agent, an entity that is a Lender or agent at the time of such transaction (or on the Closing Date, if applicable), or any affiliate of any of the foregoing (" ***Hedging Arrangements*** "), or any cash management arrangements with any such person (" ***Cash Management Arrangements*** "), will be unconditionally guaranteed (the " ***Guarantees*** ") by each existing and subsequently acquired or organized wholly owned domestic subsidiary of the Borrower (the " ***Subsidiary Guarantors*** "), subject to exceptions consistent with the Documentation Precedent and others, if any, to be agreed upon. The Guarantees will be guarantees of payment and performance and not of collection. |
| <u>Security</u> : | Subject to exceptions described below and other exceptions to be agreed upon, the Senior Facilities, the Guarantees, any Hedging Arrangements and any Cash Management Arrangements will be secured on a first-priority basis by |

4

substantially all the owned material assets of the Borrower and each Subsidiary Guarantor, in each case whether owned on the Closing Date or thereafter acquired (collectively, the " *Collateral* "), including but not limited to: (a) a perfected first-priority pledge of all the equity interests directly held by the Borrower or any Subsidiary Guarantor (which pledge, in the case of any foreign subsidiary, shall be limited to 100% of the non-voting equity interests (if any) and 65% of the voting equity interests of such foreign subsidiary), (b) a lien on cash, deposit accounts and securities accounts, and (c) perfected first-priority security interests in, and mortgages on, substantially all owned tangible and intangible assets of the Borrower and each Subsidiary Guarantor (including, but not limited to, accounts receivable, inventory, equipment, general intangibles, investment property, intellectual property and real property) except for (v) real property with a fair market value less than $15.0 million and leaseholds, (w) vehicles, (x) those assets as to which the Borrower, Agent and Collateral Agent shall reasonably determine that the costs or other consequences of obtaining such a security interest are excessive in relation to the value of the security to be afforded thereby, (y) assets to which the granting or perfecting such security interest would violate any applicable law (including gaming laws and regulations) or contract (and with regard to which contract the counterparty thereto requires such prohibition as a condition to entering into such contract, such contract has been entered into in the ordinary course of business, such restriction is consistent with industry custom and consent has been requested and not received), and (z) other exceptions consistent with the Documentation Precedent. There shall be neither lockbox arrangements nor any control agreements relating to the Borrower's and its subsidiaries' bank accounts or securities accounts.

All the above-described pledges, security interests and mortgages shall be created on terms, and pursuant to documentation consistent with the Documentation Precedent.

The Senior Facilities Documentation will provide that none of the Collateral Agent, Lenders or Administrative Agent will be permitted to terminate Caesars Entertainment Corporation or any of its subsidiaries or affiliates as manager of any of the PropCo facilities without the prior written consent of PropCo.

The relative rights and priorities in the Collateral for each of the Credit Agreement and the First Lien Notes will be set forth in a customary intercreditor agreement between the

5

administrative agent for the Credit Agreement, on the one hand, and the trustee for the First Lien Notes, on the other hand, except that such intercreditor agreement shall provide that the indebtedness outstanding under the Credit Agreement and the First Lien Notes vote together as one class and are pari passu in all respects, including in respect of directing the collateral agent thereunder (the " *First Lien Intercreditor Agreement* ").

The relative rights and priorities in the Collateral for each of the Credit Agreement, the First Lien Notes and the Second Lien Notes will be set forth in a customary intercreditor agreement, consistent with the Documentation Precedent, as between the collateral agent for the Credit Agreement and the First Lien Notes, on the one hand, and the collateral agent for the Second Lien Notes, on the other hand (the " *First Lien/Second Lien Intercreditor Agreement* " and, together with the First Lien Intercreditor Agreement, the " *Intercreditor Agreements* ").

Mandatory Prepayments :

Unless (in the case of clause (a)) the net cash proceeds are reinvested (or committed to be reinvested) in the business within 12 months after (and, if so committed to be reinvested, are actually reinvested within three months after the end of such initial 12-month period), a non-ordinary course asset sale or other non-ordinary disposition of property (other than sale of receivables in connection with a permitted receivable financing) of the Borrower or any of the subsidiaries (including insurance and condemnation proceeds), (a) the Lenders' pro rata share (to be defined as the ratio of funded debt outstanding that consists of the Term Loans to the sum of the total funded debt outstanding that consists of the Term Loans and the First Lien Notes) of 100% of the net cash proceeds in excess of an amount to be agreed upon from such non-ordinary course asset sales or other non-ordinary dispositions of property, and (b) the Lenders' pro rata share (to be defined as the ratio of funded debt outstanding that consists of the Term Loans to the sum of the total funded debt outstanding that consists of the Term Loans and the First Lien Notes) of 100% of the net cash proceeds of issuances, offerings or placements of debt obligations of the Borrower and its subsidiaries (other than debt permitted to be incurred under the Senior Facilities Documentation unless otherwise provided as a condition to the incurrence thereof), shall be applied to prepay the Term Loans under the First Lien Term Facility, in each case subject to customary and other exceptions to be agreed upon, including those consistent with the Documentation Precedent.

6

In addition, beginning with the first full fiscal year of the Borrower after the Closing Date, 50% of Excess Cash Flow (to be defined in a manner consistent with the Documentation Precedent and to take into account application of Excess Cash Flow under the Lease and otherwise in a manner satisfactory to the Requisite Consenting Creditors and subject to a minimum threshold to be agreed) of the Borrower and its restricted subsidiaries (stepping down to 25% if the First Lien Net Leverage Ratio is less than or equal to 2.75 to 1.00 and stepping down to 0% if the First Lien Net Leverage Ratio is less than or equal to 2.25 to 1.00) shall be used to prepay the Term Loans under the First Lien Term Facility and the First Lien Notes, on a ratable basis; *provided* that any voluntary prepayment of Term Loans made during any fiscal year (including Loans under the Revolving Facility to the extent commitments thereunder are permanently reduced by the amount of such prepayments at the time of such prepayment) and voluntary repayment of the First Lien Notes shall be credited against excess cash flow prepayment obligations for such fiscal year (or, at the Borrower's option, any future year) on a Dollar-for-Dollar basis.

All mandatory prepayments shall be made pro rata among the Lenders.

Notwithstanding the foregoing, each Lender under the First Lien Term Facility shall have the right to reject its pro rata share of any mandatory prepayments described above, in which case the amounts so rejected may be retained by the Borrower on terms consistent with the Documentation Precedent.

The above-described mandatory prepayments shall be applied to the First Lien Term Facility in direct order of maturity.

Prepayments from subsidiaries' Excess Cash Flow and asset sale proceeds will be limited under the Senior Facilities Documentation to the extent (x) the repatriation of funds to fund such prepayments is prohibited, restricted or delayed by applicable local laws, (y) applied to repay indebtedness of a foreign subsidiary of the Borrower or (z) the repatriation of funds to fund such prepayments would result in material adverse tax consequences.

7

| | |
|---|---|
| <u>Voluntary Prepayments and Reductions in Commitments</u> : | Voluntary reductions of the unutilized portion of the commitments under the Senior Facilities and prepayments of borrowings thereunder will be permitted at any time in minimum principal amounts to be agreed upon, without premium or penalty, subject to the following paragraph and subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period. All voluntary prepayments of the First Lien Term Facility will be applied pro rata to the Term Loan (and pro rata among the Lenders) and to the remaining amortization payments under the First Lien Term Facility in such order as the Borrower may direct. |

Voluntary Prepayments of the Term Loans made prior to the four year anniversary of the Closing Date will be subject to a prepayment premium, as follows:

- First year following Closing Date: customary "make-whole" premium (T+50)

- Second year following Closing Date: 3%

- Third year following Closing Date: 2%

- Fourth year following Closing Date: 1%

- Fourth year anniversary and thereafter: par

| | |
|---|---|
| <u>Representations and Warranties</u> : | The following representations and warranties, among others, if any, to be negotiated in the Senior Facilities Documentation, will apply (to be applicable to the Borrower and its restricted subsidiaries, subject to customary and other exceptions and qualifications to be agreed upon, consistent with the Documentation Precedent): organization, existence, and power; qualification; authorization and enforceability; no conflict; governmental consents; subsidiaries; accuracy of financial statements and other information in all material respects; projections; no material adverse change since the Closing Date; absence of litigation; compliance with laws (including PATRIOT Act, OFAC, FCPA, ERISA, margin regulations, environmental laws and laws with respect to sanctioned persons); payment of taxes; ownership of properties; governmental regulation; inapplicability of the Investment Company Act; Closing Date solvency on a consolidated basis; labor matters; validity, priority and perfection of security interests in the Collateral; intellectual property; treatment as designated senior debt under subordinated debt documents (if any); use of proceeds; and insurance. |

8

| | |
|---|---|
| <u>Affirmative Covenants</u> : | The following affirmative covenants, among others, if any, to be negotiated in the Senior Facilities Documentation, will apply (to be applicable to the Borrower and its restricted subsidiaries), subject to customary (consistent with the Documentation Precedent) and other baskets, exceptions and qualifications to be agreed upon: maintenance of corporate existence and rights; performance and payment of obligations; delivery of annual and quarterly consolidated financial statements (accompanied by customary management discussion and analysis and (annually) by an audit opinion from nationally recognized auditors that is not subject to any qualification as to scope of such audit or going concern) (with extended time periods to be agreed for delivery of the first annual and certain quarterly financial statements to be delivered after the Closing Date) and an annual budget; delivery of notices of default and material adverse litigation, ERISA events and material adverse change; maintenance of properties in good working order; maintenance of books and records; maintenance of customary insurance; commercially reasonable efforts to maintain ratings (but not a specific rating); compliance with laws; inspection of books and properties; environmental; additional guarantors and additional collateral (subject to limitations set forth under the captions " ***Guarantees*** " and " ***Security*** "); further assurances in respect of collateral matters; use of proceeds; and payment of taxes. |

The Senior Facilities Documentation will provide that any management or similar fees paid to Caesars Entertainment Corporation or any of its subsidiaries or affiliates will be made on an arm's-length basis and on "market" terms (including caps on amounts and consent rights relating to modifications of applicable agreements relating thereto).

| | |
|---|---|
| <u>Negative Covenants</u> : | The following negative covenants, among others, if any, to be negotiated in the Senior Facilities Documentation, will apply (to be applicable to the Borrower and its restricted subsidiaries), subject to customary exceptions and qualifications (consistent with the Documentation Precedent) and others to be agreed upon: |

1.   Limitation on dispositions of assets.

2.   Limitation on mergers and acquisitions.

3.   Limitation on dividends and stock repurchases and optional redemptions (and optional prepayments) of subordinated debt, it being understood that such limitations will be more restrictive until the Total Net Leverage Ratio is less than 3.00 to 1.00.

9

4.  Limitation on indebtedness (including guarantees and other contingent obligations) and preferred stock, it being understood that additional unsecured indebtedness may be incurred in an aggregate principal amount that would not cause the pro forma Total Net Leverage Ratio (to be defined as the ratio of total funded debt outstanding (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) to adjusted EBITDA) ("*Total Net Leverage Ratio*") to exceed a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma Total Net Leverage Ratio in effect on the Closing Date.

5.  Limitation on loans and investments.

6.  Limitation on liens and further negative pledges.

7.  Limitation on transactions with affiliates.

8.  Limitation on sale/leaseback transactions.

9.  Limitation on changes in the business of the Borrower and its subsidiaries.

10. Limitation on restrictions on ability of subsidiaries to pay dividends or make distributions.

11. Limitation on changes to fiscal year.

12. Limitation on modifications to subordinated debt documents.

13. Limitation on material modifications to the MLSA, lease and other arrangements entered into in connection with the lease structure.

EBITDA shall be defined in a manner consistent with the Documentation Precedent.

All ratios and calculations shall be measured on a Pro Forma Basis (to be defined in a manner consistent with the Documentation Precedent, and including the annualized effect of addbacks in the definition of EBITDA).

10

With respect to basket amounts, covenant thresholds and similar levels in the Senior Facilities Documentation provisions with respect to debt and lien capacity that are tied to dollar amounts, such amounts, thresholds and levels will be based on the corresponding dollar amounts that are set forth in the CERP Credit Agreement, in each case as adjusted pursuant to the agreement of the parties, including to reflect the pro forma capital structure of the Borrower and the relative size and EBITDA of the Borrower (such amounts as adjusted, the " ***Basket Adjustments*** ").

<u>Financial Covenant</u> :  First Lien Term Facility: None.

<u>Events of Default</u> :  The following (subject to customary and other thresholds and grace periods to be agreed upon, consistent with the Documentation Precedent, and applicable to the Borrower and its restricted subsidiaries), among others, if any, to be negotiated in the Senior Facilities Documentation: nonpayment of principal, interest or other amounts; violation of covenants; incorrectness of representations and warranties in any material respect; cross event of default and cross acceleration to material indebtedness; bankruptcy and similar events; material judgments; ERISA events; invalidity of the Guarantees or any security document, in each case, representing a material portion of the Guarantees or the Collateral; and Change of Control (to be defined in a manner consistent with the Documentation Precedent).

<u>Unrestricted Subsidiaries</u> :  The Senior Facilities Documentation will contain provisions pursuant to which, subject to limitations consistent with the Documentation Precedent, the Borrower will be permitted to designate any existing or subsequently acquired or organized subsidiary as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a restricted subsidiary. Unrestricted subsidiaries will not be subject to the affirmative or negative covenant or event of default provisions of the Senior Facilities Documentation, and the results of operations and indebtedness of unrestricted subsidiaries will not be taken into account for purposes of calculating the financial ratios contained in the Senior Facilities Documentation on terms consistent with the Documentation Precedent.

<u>Voting</u> :  Usual for facilities and transactions of this type and consistent with the Documentation Precedent; provided that the Borrower and its affiliates, including the Sponsors, shall not have voting rights with respect to loans and commitments held by them.

11

Cost and Yield Protection :

Usual for facilities and transactions of this type, consistent with the Documentation Precedent.

Assignments and Participations :

The Lenders will be permitted to assign loans and commitments under the Senior Facilities with the consent of the Borrower (not to be unreasonably withheld or delayed, but which consent under the First Lien Term Facility shall be deemed granted if the Borrower fails to respond to a request for consent by a Lender within ten business days of such request being made); *provided* , that such consent of the Borrower shall not be required (i) if such assignment is made, in the case of the First Lien Term Facility, to another Lender under the First Lien Term Facility or an affiliate or approved fund of a Lender under the First Lien Term Facility or (ii) after the occurrence and during the continuance of an event of default relating to payment default or bankruptcy. All assignments will also require the consent of the Agent (subject to exceptions consistent with the Documentation Precedent) not to be unreasonably withheld or delayed. Each assignment, in the case of the First Lien Term Facility, will be in an amount of an integral multiple of $1,000,000. The Agent will receive a processing and recordation fee of $3,500, payable by the assignor and/or the assignee, with each assignment. Assignments will be by novation and will not be required to be pro rata between the Senior Facilities.

The Lenders will be permitted to sell participations in loans subject to the restrictions set forth herein and consistent with the Documentation Precedent. Voting rights of participants shall (i) be limited to matters in respect of (a) increases in commitments of such participant, (b) reductions of principal, interest or fees payable to such participant, (c) extensions of final maturity or scheduled amortization of the loans or commitments in which such participant participates and (d) releases of all or substantially all of the value of the Guarantees, or all or substantially all of the Collateral and (ii) for clarification purposes, not include the right to vote on waivers of defaults or events of default.

Notwithstanding the foregoing, assignments (and, to the extent such list is made available to all Lenders, participations) shall not be permitted to ineligible institutions identified to the Agent on or prior to the Closing Date and,

12

with the consent of the Agent, thereafter; provided that the Agent shall not be held liable or responsible for any monitoring or enforcing of the foregoing.

Assignments shall not be deemed non-pro rata payments. Non-pro rata prepayments will be permitted to the extent required to permit "extension" transactions and "replacement" facility transactions (with existing and/or new Lenders), subject to customary restrictions consistent with the Documentation Precedent.

Assignments to the Sponsors and their respective affiliates (other than the Borrower and its subsidiaries) (each, an " **Affiliated Lender** ") shall be permitted subject to customary restrictions consistent with the Documentation Precedent.

| | |
|---|---|
| <u>Non-Pro Rata Repurchases</u> : | The Borrower and its subsidiaries may purchase from any Lender (other than the Borrower or any of its affiliates, including the Sponsors), at individually negotiated prices, outstanding principal amounts or commitments under the First Lien Term Facility in a non-pro rata manner; *provided* that (i) the purchaser shall make a representation to the seller at the time of assignment that it does not possess material non-public information with respect to the Borrower and its subsidiaries that has not been disclosed to the seller or Lenders generally (other than the Lenders that have elected not to receive material non-public information), (ii) any commitments or loans so repurchased shall be immediately cancelled and (iii) no default or event of default exists or would result therefrom. |
| <u>Expenses and Indemnification</u> : | Consistent with the Documentation Precedent. |
| <u>Regulatory Matters</u> : | Customary for facilities of this type and consistent with the Documentation Precedent. |
| <u>Governing Law and Forum</u> : | New York. |
| <u>Counsel to Agent/Collateral Agent</u> : | [            ]. |

13

New First Lien OpCo Debt
$[          ] First Lien Notes
Summary of Principal Terms [1]

| | |
|---|---|
| Issuer : | [Caesars Entertainment Operating Company, Inc.] [2] , in its capacity as the issuer of the First Lien Notes (the " ***Issuer*** "). |
| Issue : | The First Lien Notes in an amount set forth in the Restructuring Term Sheet will be issued under and have the benefit of an indenture and security documentation typical and customary in the case of first lien senior secured notes issued pursuant to an exit financing, taking into consideration (i) the indenture for the first-priority senior secured notes issued on October 11, 2013 by Caesars Entertainment Resort Properties, LLC, Caesars Entertainment Resort Properties Finance, Inc., Harrah's Atlantic City Holding, Inc., Harrah's Las Vegas, LLC, Harrah's Laughlin, LLC, Flamingo Las Vegas Holding, LLC, Paris Las Vegas Holding, LLC, Rio Properties, LLC (the " ***CERP First Lien Indenture*** ") and (ii) the operating lease structure of the Issuer and its subsidiaries, and otherwise be reasonably satisfactory to the Issuer and the Requisite Consenting Creditors (the " ***Documentation Precedent*** "); provided that, in the case of provisions setting forth the debt and lien capacity, the indenture shall be based on and consistent with the CERP First Lien Indenture, as modified to reflect the terms set forth herein. |
| | In accordance with the Restructuring Term Sheet, the Issuer shall use its commercially reasonable efforts to syndicate the First Lien Notes to the market at or below the interest rates set forth herein and, to the extent so syndicated, the cash proceeds will be used to increase the cash payments to the First Lien Noteholders pursuant to the terms of the Restructuring Term Sheet. |
| Purpose : | On the Closing Date, the First Lien Notes will be issued to each First Lien Noteholder in accordance with the Restructuring Term Sheet. |
| Maturity : | The First Lien Notes will mature on the date that is six (6) years after the Closing Date. |
| Interest Rate : | LIBOR + 4.0% per annum, with a 1.0% LIBOR floor. |

---

1    All capitalized terms used but not defined herein shall have the meanings assigned thereto in the Restructuring Term Sheet to which this Term Sheet is attached (the " ***Restructuring Term Sheet*** "), or in the New First Lien OpCo Debt Term Sheet attached thereto.

2    NTD: Assumes CEOC is the operating company in the new REIT structure.

1

Default Rate :

With respect to overdue principal (whether at stated maturity, upon acceleration or otherwise), the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount (including overdue interest), the interest rate applicable to ABR loans plus 2.00% per annum and in each case, shall be payable on demand.

Ranking :

The First Lien Notes will constitute senior first-priority secured indebtedness of the Issuer, and will rank pari passu in all respects, including in right of payment with all obligations under the Senior Facilities (the " *Credit Agreement* ") and all other first lien senior indebtedness of the Issuer.

Guarantees :

The First Lien Notes and all obligations under the indenture related thereto will be unconditionally guaranteed by each existing and subsequently acquired or organized wholly owned domestic subsidiary of the Issuer (the " *Note Guarantors* "), subject to exceptions consistent with the Documentation Precedent and others, if any, to be agreed upon, on a senior first-priority secured basis (the " *Note Guarantees* "). The Note Guarantees will rank pari passu in all respects, including in right of payment, with all obligations under the Credit Agreement and all other senior indebtedness of the Note Guarantors. The Note Guarantees will be guarantees of payment and performance and not of collection.

Security :

Subject to the limitations set forth below and limitations consistent with the Documentation Precedent, the First Lien Notes and the Note Guarantees will be secured by a first-priority security interest in substantially all the owned material assets of the Issuer and each Note Guarantor, in each case whether owned on the Closing Date or thereafter acquired (collectively, the " *Collateral* "), including but not limited to: (a) a perfected first-priority pledge of all the equity interests directly held by the Issuer or any Note Guarantor (which pledge, in the case of any foreign subsidiary, shall be limited to 100% of the non-voting equity interests (if any) and 65% of the voting equity interests of such foreign subsidiary) (b) a lien on cash, deposit accounts and securities accounts, and (c) perfected first-priority security interests in, and mortgages on, substantially all owned tangible and intangible assets of the Issuer and each Note Guarantor (including, but not limited to, accounts receivable, inventory, equipment, general intangibles, investment property, intellectual property and real property) except for (v) real property with a fair market value less than $15.0 million and leaseholds, (w) vehicles, (x) those assets as to which the Issuer and Collateral Agent shall reasonably determine that the costs or other

2

consequences of obtaining such a security interest are excessive in relation to the value of the security to be afforded thereby, (y) assets to which the granting or perfecting such security interest would violate any applicable law (including gaming laws and regulations) or contract (and with regard to which contract the counterparty thereto requires such prohibition as a condition to entering into such contract, such contract has been entered into in the ordinary course of business, such restriction is consistent with industry custom and consent has been requested and not received), and (z) other exceptions consistent with the Documentation Precedent; and provided that the pledge of equity interests and other securities will be subject to customary Rule 3-16 cut-back provisions. There shall be neither lockbox arrangements nor any control agreements relating to the Issuer's and its subsidiaries' bank accounts or securities accounts.

All of the above-described pledges, security interests and mortgages shall be created on terms, and pursuant to documentation, consistent with the Documentation Precedent.

The indenture for the First Lien Notes will provide that none of the Collateral Agent, First Lien Noteholders or Trustee will be permitted to terminate Caesars Entertainment Corporation or any of its subsidiaries or affiliates as manager of any of the PropCo facilities without the prior written consent of PropCo.

The relative rights and priorities in the Collateral for each of the Credit Agreement and the First Lien Notes will be set forth in the First Lien Intercreditor Agreement, as between the administrative agent for the Credit Agreement, on the one hand, and the trustee for the First Lien Notes, on the other hand, which intercreditor agreement shall provide that the indebtedness outstanding under the Credit Agreement and the First Lien Notes vote together as one class and are pari passu in all respects, including in respect of directing the collateral agent thereunder.

The relative rights and priorities in the Collateral for each of the Credit Agreement, the First Lien Notes and the Second Lien Notes will be set forth in the First Lien/Second Lien Intercreditor Agreement, as between the collateral agent for the Credit Agreement and the First Lien Notes, on the one hand, and the collateral agent for the Second Lien Notes, on the other hand.

| | |
|---|---|
| <u>Mandatory Redemption</u> : | None. |

3

<u>Optional Redemption</u> :

Prior to the first anniversary of the Closing Date, the Issuer may redeem the Notes at a make-whole price based on U.S. Treasury notes with a maturity closest to the first anniversary of the Closing Date plus 50 basis points.

Prior to the first anniversary of the Closing Date, the Issuer may redeem up to 35% of the Notes in an amount equal to the amount of proceeds from an equity offering at a price equal to par plus the coupon on such Notes.

After the first anniversary of the Closing Date, the Notes will be callable at par plus accrued interest plus a premium equal to 3.00%, which premium shall decline to 2.00% on the second anniversary of the Closing Date, to 1.00% on the first anniversary of the Closing Date and to zero on the fourth anniversary of the Closing Date.

All redemptions shall be made on a pro rata basis among the First Lien Notes.

<u>Offer to Repurchase with Proceeds of Debt Issuance</u> :

The Issuer will be required to make an offer to repurchase the First Lien Notes at par in an amount equal to the First Lien Noteholders' pro rata share (to be defined as the ratio of funded debt outstanding that consists of the First Loan Notes to the sum of the total funded debt outstanding that consists of the First Lien Notes and the First Lien Term Facility) of 100% of the net cash proceeds of issuances, offerings or placements of debt obligations of the Issuer and its subsidiaries (other than debt permitted to be incurred under the indenture governing the First Lien Notes unless otherwise provided as a condition to the incurrence thereof).

<u>Offer to Purchase from Asset Sale Proceeds</u> :

The Issuer will be required to make an offer to repurchase the First Lien Notes at par in an amount equal to the First Lien Noteholders' pro rata share (to be defined as the ratio of funded debt outstanding that consists of the First Loan Notes to the sum of the total funded debt outstanding that consists of the First Lien Notes and the First Lien Term Facility) of 100% of the net cash proceeds from any non-ordinary course asset sales or dispositions by the Issuer or any Note Guarantor in accordance with the Documentation Precedent to the extent any such proceeds are not otherwise applied in a manner consistent with the Documentation Precedent.

<u>Offer to Repurchase Upon a Change of Control</u> :

The Issuer will be required to make an offer to repurchase the First Lien Notes following the occurrence of a " ***change of control*** " (to be defined in a manner consistent with the Documentation Precedent) at a price in cash equal to 101.0% of the outstanding principal amount thereof, plus accrued and unpaid interest to the date of repurchase.

4

| | |
|---|---|
| Offer to Repurchase from Excess Cash Flow : | Beginning with the first full fiscal year of the Issuer after the Closing Date, the Issuer will be required to make an offer to repurchase the First Lien Notes at par in an amount equal to the First Lien Noteholders' pro rata share (to be defined as the ratio of funded debt outstanding that consists of the First Loan Notes to the sum of the total funded debt that consists of the First Lien Notes and First Lien Term Facility) of 50% of Excess Cash Flow (to be defined in a manner consistent with the definition in the Credit Agreement and subject to the same minimum threshold therein) of the Issuer and its restricted subsidiaries (stepping down to 25% if the First Lien Net Leverage Ratio is less than or equal to 2.75 to 1.00 and stepping down to 0% if the First Lien Net Leverage Ratio is less than or equal to 2.25 to 1.00); *provided* that any voluntary prepayment of Term Loans made during any fiscal year (including Loans under the Revolving Facility to the extent commitments thereunder are permanently reduced by the amount of such prepayments at the time of such prepayment) and voluntary repayment of the First Lien Notes shall be credited against excess cash flow prepayment obligations for such fiscal year (or, at the Borrower's option, any future year) on a Dollar-for-Dollar basis.

Prepayments from subsidiaries' Excess Cash Flow and asset sale proceeds will be limited under the First Lien Notes Documentation to the extent (x) the repatriation of funds to fund such prepayments is prohibited, restricted or delayed by applicable local laws, (y) applied to repay indebtedness of a foreign subsidiary of the Borrower or (z) the repatriation of funds to fund such prepayments would result in material adverse tax consequences. |
| Defeasance and Discharge Provisions : | Customary for high yield debt securities consistent with the Documentation Precedent. |
| Modification : | Customary for high yield debt securities consistent with the Documentation Precedent. Notes held by the Issuer and its affiliates, including the Sponsors, shall not have voting rights. |
| Registration Rights : | Customary registration rights. |
| Covenants : | Substantially the same as those in the Documentation Precedent (including in respect of baskets and carveouts to such covenants; *provided* that such baskets and carveouts shall conform to the corresponding amounts in the Credit Agreement). For the avoidance of doubt, there shall be no financial maintenance covenants. |

5

1. The provisions limiting indebtedness shall, in addition to carve-outs consistent with the Documentation Precedent, provide that the amount of indebtedness incurred under the "bank basket" will not exceed an amount equal to the sum of (i) the aggregate principal amount of the Credit Agreement (including the accordion provisions thereunder), plus (ii) such additional amount of indebtedness that may be incurred that would not cause the ratio of funded debt (including the debt referred to in clause (i) of this sentence) outstanding that is (A) secured by a first priority lien on the Collateral (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) to adjusted EBITDA (the " ***Net First Lien Leverage Ratio*** ") to exceed a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma First Lien Net Leverage Ratio in effect on the Closing Date, (B) secured by junior liens on the Collateral (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) to adjusted EBITDA (the " ***Net Total Secured Leverage Ratio*** ") to exceed a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma Net Total Secured Leverage Ratio in effect on the Closing Date and (C) unsecured (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) to adjusted EBITDA (the " ***Net Total Leverage Ratio*** ") to exceed a ratio to be set on the Closing Date that is equal to 0.25x greater than the pro forma Net Total Leverage Ratio in effect on the Closing Date; [3]

2. The provisions limiting liens shall provide for customary permitted liens consistent with the Documentation Precedent and include (i) the ability to incur first-priority liens on indebtedness to the extent that the pro forma Net First Lien Leverage Ratio is not greater than a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma First Lien Net Leverage Ratio in effect on the Closing Date; (ii) the ability to incur liens junior to the liens securing the First Lien Notes, provided that the indebtedness secured by such junior liens is permitted under the indenture, and (iii) the ability to incur liens on assets of non-Note Guarantor subsidiaries so long as such liens secure obligations of non-Note Guarantor subsidiaries that are otherwise permitted.

---

[3]    For the avoidance of doubt, (i) the calculation of the ratios in the OpCo debt document shall exclude Chester Downs (from both debt and EBITDA) and (ii) any Revolving Facility loans outstanding at the time of incurrence of any debt shall be included in the calculation of any Leverage Ratio at the time of such incurrence.

6

3. With respect to basket amounts, covenant thresholds and similar levels in the indenture governing the First Lien Notes provisions with respect to debt and lien capacity that are tied to dollar amounts, such amounts, thresholds and levels will be based on the corresponding dollar amounts that are set forth in the CERP First Lien Indenture, in each case as adjusted pursuant to the agreement of the parties, including to reflect the pro forma capital structure of the Issuer and the relative size and EBITDA of the Issuer (such amounts as adjusted, the "*Basket Adjustments*").

4. The provisions limiting dividends and stock repurchases and optional redemptions (and optional prepayments) of subordinated debt will be more restrictive until the Net Total Leverage Ratio is less than 3.00 to 1.00.

5. The indenture for the First Lien Notes will provide that any management or similar fees paid to Caesars Entertainment Corporation or any of its subsidiaries or affiliates will be made on an arm's-length basis and on "market" terms (including caps on amounts and consent rights relating to modifications of applicable agreements relating thereto).

| | |
|---|---|
| <u>Events of Default</u> : | Customary for high yield debt securities and consistent with the Documentation Precedent. |
| <u>Governing Law</u> : | New York. |
| <u>Regulatory Matters</u> : | Consistent with the Documentation Precedent. |
| <u>Counsel to the Notes Lead Arranger</u> : | [            ]. |

7

New Second Lien OpCo Debt
$[          ] Second Lien Notes
Summary of Principal Terms [1]

| | |
|---|---|
| Issuer : | [Caesars Entertainment Operating Company, Inc.] [2], in its capacity as the issuer of the Second Lien Notes (the " **Issuer** "). |
| Issue : | The Second Lien Notes in an a amount set forth in the Restructuring Term Sheet will be issued under and have the benefit of an indenture and security documentation typical and customary in the case of second lien senior secured notes issued pursuant to an exit financing, taking into consideration (i) the indenture for the second-priority senior secured notes issued on October 11, 2013 by Caesars Entertainment Resort Properties, LLC, Caesars Entertainment Resort Properties Finance, Inc., Harrah's Atlantic City Holding, Inc., Harrah's Las Vegas, LLC, Harrah's Laughlin, LLC, Flamingo Las Vegas Holding, LLC, Paris Las Vegas Holding, LLC, Rio Properties, LLC (the " **CERP Second Lien Indenture** ") and (ii) the operating lease structure of the Issuer and its subsidiaries, and otherwise be reasonably satisfactory to the Issuer and the Requisite Consenting Creditors (the " **Documentation Precedent** "); provided that, in the case of provisions setting forth the debt and lien capacity, the indenture shall be based on and consistent with the CERP Second Lien Indenture, as modified to reflect the terms set forth herein. |
| Purpose : | On the Closing Date, the Second Lien Notes will be issued to each First Lien Bank Lender and First Lien Noteholder in accordance with the Restructuring Term Sheet. |
| Maturity : | The Second Lien Notes will mature on the date that is seven (7) years after the Closing Date. |
| Interest Rate : | A fixed rate equal to 8.5%. |
| Ranking : | The Second Lien Notes will constitute senior second-priority secured indebtedness of the Issuer, and will rank pari passu in right of payment with all obligations under the Senior Facilities (the " **Credit Agreement** ") and all other senior indebtedness (including the First Lien Notes) of the Issuer. |

---

1    All capitalized terms used but not defined herein shall have the meanings assigned thereto in the Restructuring Term Sheet to which this Term Sheet is attached (the " **Restructuring Term Sheet** "), or in the New First Lien OpCo Debt Term Sheet attached thereto.

2    NTD: Assumes CEOC is the operating company in the new REIT structure.

1

Guarantees :

The Second Lien Notes and all obligations under the indenture related thereto will be unconditionally guaranteed by each existing and subsequently acquired or organized wholly owned domestic subsidiary of the Issuer that guarantees the Credit Agreement or the First Lien Notes (the " *Note Guarantors* "), subject to exceptions consistent with the Documentation Precedent and others, if any, to be agreed upon, on a senior second-priority secured basis (the " *Note Guarantees* "). The Note Guarantees will rank pari passu in right of payment with all obligations under the Credit Agreement and all other senior indebtedness of the Note Guarantors. The Note Guarantees will be automatically released upon release of the corresponding guarantees of the Credit Agreement and the First Lien Notes; provided that such released guarantees shall be reinstated if such released guarantors thereof are required to subsequently guarantee the Credit Agreement or the First Lien Notes. The Note Guarantees will be guarantees of payment and performance and not of collection.

Security :

Subject to the limitations set forth below and limitations consistent with the Documentation Precedent, the Second Lien Notes and the Note Guarantees will be secured by a second-priority security interest in those assets of the Issuer and the Note Guarantors that secure the First Lien Notes (the " *Collateral* "), *provided* that (i) assets securing the Second Lien Notes shall not include property excluded from the Collateral securing the First Lien Notes and (ii) the pledge of equity interests and other securities will be subject to customary Rule 3-16 cut-back provisions.

The relative rights and priorities in the Collateral for each of the Credit Agreement, the First Lien Notes and the Second Lien Notes will be set forth in the First Lien/Second Lien Intercreditor Agreement as between the collateral agent for the Credit Agreement and the First Lien Notes, on the one hand, and the collateral agent for the Second Lien Notes, on the other hand.

The indenture for the Second Lien Notes will provide that none of the Collateral Agent, note holders or Trustee will be permitted to terminate Caesars Entertainment Corporation or any of its subsidiaries or affiliates as manager of any of the PropCo facilities without the prior written consent of PropCo.

2

| | |
|---|---|
| <u>Mandatory Redemption</u> : | None. |
| <u>Optional Redemption</u> : | Prior to the first anniversary of the Closing Date, the Issuer may redeem the Notes at a make-whole price based on U.S. Treasury notes with a maturity closest to the first anniversary of the Closing Date plus 50 basis points. |
| | Prior to the first anniversary of the Closing Date, the Issuer may redeem up to 35% of the Notes in an amount equal to the amount of proceeds from an equity offering at a price equal to par plus the coupon on such Notes. |
| | After the first anniversary of the Closing Date, the Notes will be callable at par plus accrued interest plus a premium equal to 3.00%, which premium shall decline to 2.00% on the second anniversary of the Closing Date, to 1.00% on the first anniversary of the Closing Date and to zero on the fourth anniversary of the Closing Date. |
| | All redemptions shall be made on a pro rata basis among the Notes. |
| <u>Offer to Purchase from Asset Sale Proceeds</u> : | The Issuer will be required to make an offer to repurchase the Second Lien Notes at par with the net cash proceeds from any non-ordinary course asset sales or dispositions by the Issuer or any Note Guarantor in accordance with the Documentation Precedent to the extent any such proceeds are not otherwise applied in a manner consistent with the Documentation Precedent. |
| <u>Offer to Repurchase Upon a Change of Control</u> : | The Issuer will be required to make an offer to repurchase the Second Lien Notes following the occurrence of a " ***change of control*** " (to be defined in a manner consistent with the Documentation Precedent) at a price in cash equal to 101.0% of the outstanding principal amount thereof, plus accrued and unpaid interest to the date of repurchase. |
| <u>Defeasance and Discharge Provisions</u> : | Customary for high yield debt securities consistent with the Documentation Precedent. |
| <u>Modification</u> : | Customary for high yield debt securities consistent with the Documentation Precedent. Notes held by the Issuer and its affiliates, including the Sponsors, shall not have voting rights. |
| <u>Registration Rights</u> : | Customary registration rights. |
| <u>Covenants</u> : | Substantially the same as those in the Documentation Precedent (including in respect of baskets and carveouts to such |

3

covenants); *provided* , that such covenants shall in no event be more restrictive than the corresponding covenant in the First Lien Notes. For the avoidance of doubt, there shall be no financial maintenance covenants.

1. The provisions limiting indebtedness shall, in addition to carve-outs consistent with the Documentation Precedent, provide that the amount of indebtedness incurred under the "bank basket" will not exceed an amount equal to the sum of (i) the aggregate principal amount of the Credit Agreement (including the accordion provisions thereunder), plus (ii) such additional amount of indebtedness that may be incurred that would not cause the ratio of funded debt outstanding that is (A) secured by a first priority lien on the Collateral (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) to adjusted EBITDA (the " ***Net First Lien Leverage Ratio*** ") to exceed a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma First Lien Net Leverage Ratio in effect on the Closing Date, (B) secured by junior liens on the Collateral (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) (the " ***Net Total Secured Leverage Ratio*** ") to exceed a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma Net Total Secured Leverage Ratio in effect on the Closing Date and (C) unsecured (net of unrestricted cash and cash equivalents not to exceed in the aggregate $100 million) to adjusted EBITDA (the " ***Net Total Leverage Ratio*** ") to exceed a ratio to be set on the Closing Date that is equal to 0.25x greater than the pro forma Net Total Leverage Ratio in effect on the Closing Date. [3]

2. The provisions limiting liens shall provide for customary permitted liens consistent with the Documentation Precedent and include (i) the ability to incur (x) first-priority liens on indebtedness to the extent that the pro forma Net First Lien Leverage Ratio is not greater than a ratio to be set on the Closing Date that is equal to a ratio that is 0.25x greater than the pro forma Net First Lien Leverage Ratio in effect on the Closing Date and (y) pari passu liens on indebtedness so long as such liens are subject to the First Lien/Second Intercreditor Agreement or another intercreditor agreement that is not materially less favorable to the holders than the First

---

[3]   For the avoidance of doubt, (i) the calculation of the ratios in the OpCo debt document shall exclude Chester Downs (from both debt and EBITDA) and (ii) any Revolving Facility loans outstanding at the time of incurrence of any debt shall be included in the calculation of any Leverage Ratio at the time of such incurrence.

4

Lien/Second Lien Intercreditor Agreement and such indebtedness is permitted under the indenture; (ii) the ability to incur liens junior to the liens securing the Second Lien Notes, provided that the indebtedness secured by such junior liens is permitted under the indenture and (iii) the ability to incur liens on assets of non-Note Guarantor subsidiaries so long as such liens secure obligations of non-Note Guarantor subsidiaries that are otherwise permitted.

3. With respect to basket amounts, covenant thresholds and similar levels in the indenture governing the Second Lien Notes provisions with respect to debt and lien capacity that are tied to dollar amounts, such amounts, thresholds and levels will be based on the corresponding dollar amounts that are set forth in the CERP Second Lien Indenture, in each case as adjusted pursuant to the agreement of the parties, including to reflect the pro forma capital structure of the Issuer and the relative size and EBITDA of the Issuer (such amounts as adjusted, the "***Basket Adjustments***")

4. The provisions limiting dividends and stock repurchases and optional redemptions (and optional prepayments) of subordinated debt will be more restrictive until the Net Total Leverage Ratio is less than 3.00 to 1.00.

5. The indenture for the Second Lien Notes will provide that any management or similar fees paid to Caesars Entertainment Corporation or any of its subsidiaries or affiliates will be made on an arm's-length basis and on "market" terms (including caps on amounts and consent rights relating to modifications of applicable agreements relating thereto).

| | |
|---|---|
| <u>Events of Default</u> : | Customary for high yield debt securities and consistent with the Documentation Precedent. |
| <u>Governing Law</u> : | New York. |
| <u>Regulatory Matters</u> : | Consistent with the Documentation Precedent. |
| <u>Counsel to the Notes Lead Arranger</u> : | [          ]. |

5

<u>New First Lien PropCo Debt</u>
<u>$[          ] Term Facility</u>
<u>Summary of Principal Terms</u> [1]

<u>Borrower</u> :

[REIT PropCo] (the " ***Borrower*** ").

<u>Agent/Collateral Agent</u> :

[          ] will act as sole administrative agent for the Senior Facilities (in such capacity and together with its permitted successors and assigns, the " ***Agent*** "), and will perform the duties customarily associated with such role.

[          ] will act as collateral agent for the Senior Facilities (in such capacity, the " ***Collateral Agent*** ") and will perform the duties customarily associated with such role.

The Agent and Collateral Agent shall each be acceptable to the First Lien Bank Lenders and First Lien Noteholders.

<u>Facilities</u> :

(A)  a senior secured term loan facility in an aggregate principal amount set forth in the Restructuring Term Sheet (the " ***First Lien Term Facility*** " and loans thereunder, the " ***Term Loans*** "), which will be issued to each First Lien Bank Lender in accordance with the Restructuring Term Sheet (in such capacity, the " ***Lenders*** ").

(B)  at the Borrower's option, a senior secured revolving credit facility in an aggregate principal amount not to exceed an amount to be agreed (and acceptable to the Requisite Consenting Creditors) (the " ***Revolving Facility*** " and, together with the First Lien Term Facility, the " ***Senior Facilities*** "), to be provided by the First Lien Bank Lenders or such other financial institutions to become Lenders under the Senior Facilities, a portion of which will be available through a subfacility in the form of letters of credit.

<u>Definitive Documentation</u> :

The definitive documentation for the Senior Facilities (the " ***Senior Facilities Documentation*** ") shall, except as otherwise set forth herein, be based on financing and security documentation typical and customary for exit financings, taking into consideration (i) the First Lien Credit Agreement, dated as of October 11, 2013, among Caesars Entertainment Resort Properties, LLC, Caesars Entertainment Resort

---

1    All capitalized terms used but not defined herein shall have the meaning assigned thereto in the Restructuring Term Sheet to which this Term Sheet is attached (the " ***Restructuring Term Sheet*** ").

1

Properties Finance, Inc., Harrah's Las Vegas, LLC, Harrah's Atlantic City Holding, Inc., Rio Properties, LLC, Flamingo Las Vegas Holding, LLC, Harrah's Laughlin, LLC and Paris Las Vegas Holding, LLC, as borrowers, the lenders party thereto and Citicorp North America, Inc., as administrative agent, and (ii) the operating lease structure and the REIT structure of the Borrower and its subsidiaries, and otherwise be reasonably satisfactory to the Borrower and the Requisite Consenting Creditors (the "***Documentation Precedent***").

Incremental Facilities :

The Borrower will be permitted after the Closing Date to add additional revolving or term loan credit facilities (the "***Incremental Facilities***") on terms consistent with Documentation Precedent.

Purpose :

On the Closing Date, the Term Loan will be issued to each First Lien Bank Lender in accordance with the Restructuring Term Sheet.

Availability :

The full amount of the First Lien Term Facility will be issued on the Closing Date. Amounts under the First Lien Term Facility that are repaid or prepaid may not be reborrowed.

Interest Rates :

LIBOR + 3.5% per annum, with a 1.0% LIBOR floor.

Default Rate :

With respect to principal (whether at stated maturity, upon acceleration or otherwise), the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount (including overdue interest), the interest rate applicable to ABR loans plus 2.00% per annum and in each case, shall be payable on demand.

Final Maturity and Amortization :

The First Lien Term Facility will mature on the date that is five (5) years after the Closing Date, and, commencing with the second full fiscal quarter ended after the Closing Date, will amortize in equal quarterly installments in an aggregate annual amount equal to 1% of the original principal amount of the First Lien Term Facility with the balance payable on the maturity date of the First Lien Term Facility.

Guarantees :

All obligations of the Borrower under the Senior Facilities and, at the option of the Borrower, under any interest rate protection or other hedging arrangements entered into with the Agent, an entity that is a Lender or agent at the time of such transaction (or on the Closing Date, if applicable), or any affiliate of any of the foregoing (" ***Hedging Arrangements*** "), or any cash management arrangements with any such person

2

("**Cash Management Arrangements**"), will be unconditionally guaranteed (the "**Guarantees**") by each existing and subsequently acquired or organized wholly owned domestic subsidiary of the Borrower (the "**Subsidiary Guarantors**"), subject to exceptions consistent with the Documentation Precedent and others, if any, to be agreed upon. The Guarantees will be guarantees of payment and performance and not of collection.

Security :    Subject to exceptions described below and other exceptions to be agreed upon, the Senior Facilities, the Guarantees, any Hedging Arrangements and any Cash Management Arrangements will be secured on a first-priority basis by substantially all the owned material assets of the Borrower and each Subsidiary Guarantor, in each case whether owned on the Closing Date or thereafter acquired (collectively, the "**Collateral**"), including but not limited to: (a) a perfected first-priority pledge of all the equity interests directly held by the Borrower or any Subsidiary Guarantor (which pledge, in the case of any foreign subsidiary, shall be limited to 100% of the non-voting equity interests (if any) and 65% of the voting equity interests of such foreign subsidiary), (b) a perfected first priority lien on cash, deposit accounts and securities accounts, and (c) perfected first-priority security interests in, and mortgages on, substantially all owned tangible and intangible assets of the Borrower and each Subsidiary Guarantor (including, but not limited to, accounts receivable, inventory, equipment, general intangibles, investment property, intellectual property and real property (including assignment of rents)) except for (v) real property with a fair market value less than $15.0 million and leaseholds, (w) vehicles, (x) those assets as to which the Borrower, Agent and Collateral Agent shall reasonably determine that the costs or other consequences of obtaining such a security interest are excessive in relation to the value of the security to be afforded thereby, (y) assets to which the granting or perfecting such security interest would violate any applicable law (including gaming laws and regulations) or contract (and with regard to which contract such counterparty thereto requires such prohibition as a condition to entering into such contract, such contract has been entered into in the ordinary course of business, such restriction is consistent with industry custom and consent has been requested and not received) and (z) other exceptions consistent with the Documentation Precedent. For the avoidance of doubt, lockbox arrangements and control agreements relating to the Borrower's and its subsidiaries' bank accounts and securities accounts will be

3

required to be delivered at closing. The operating lease with [Caesars Entertainment Operating Company, Inc.] shall be subject to a customary subordination and non-disturbance agreement as provided in the Lease Term Sheet attached to the Restructuring Support Agreement.

All the above-described pledges, security interests and mortgages shall be created on terms, and pursuant to documentation consistent with the Documentation Precedent.

The relative rights and priorities in the Collateral for each of the Credit Agreement and the First Lien Notes will be set forth in a customary intercreditor agreement between the administrative agent for the Credit Agreement, on the one hand, and the trustee for the First Lien Notes, on the other hand, except that such intercreditor agreement shall provide that the indebtedness outstanding under the Credit Agreement and the First Lien Notes vote together as one class and are pari passu in all respects, including in respect of directing the collateral agent thereunder (the "***First Lien Intercreditor Agreement***").

The relative rights and priorities in the Collateral for each of the Credit Agreement, the First Lien Notes and the Second Lien Notes will be set forth in a customary intercreditor agreement between the collateral agent for the Credit Agreement and the First Lien Notes, on the one hand, and the collateral agent for the Second Lien Notes, on the other hand (the "***First Lien/Second Lien Intercreditor Agreement***").

| | |
|---|---|
| <u>Mandatory Prepayments</u>: | Customary asset sale mandatory prepayments and Excess Cash Flow mandatory prepayments (commencing with the first full fiscal year of the Borrower after the Closing Date, and subject to a minimum threshold to be agreed), on terms and definitions consistent with Documentation Precedent, with Excess Cash Flow to be calculated for these purposes after any Mandatory REIT Distributions. Excess Cash Flow payments will be made ratably between the Term Loans and the First Lien Notes (and ratably among the Lenders and holders of the First Lien Notes). |
| <u>Voluntary Prepayments and Reductions in Commitments</u>: | Voluntary reductions of the unutilized portion of the commitments under the Senior Facilities and prepayments of borrowings thereunder will be permitted at any time, in minimum principal amounts to be agreed upon, without premium or penalty, subject to the following paragraph and subject to reimbursement of the Lenders' redeployment costs |

<div align="center">4</div>

in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period. All voluntary prepayments of the First Lien Term Facility will be applied pro rata to the Term Loan (and pro rata among the Lenders) and to the remaining amortization payments under the First Lien Term Facility in such order as the Borrower may direct.

Voluntary Prepayments of the Term Loans made prior to the four year anniversary of the Closing Date will be subject to a prepayment premium, as follows:

- First year following Closing Date: customary "make-whole" premium (T+50)

- Second year following Closing Date: 3%

- Third year following Closing Date: 2%

- Fourth year following Closing Date: 1%

- Fourth year anniversary and thereafter: par

Representations and Warranties :

The following representations and warranties, among others, if any, to be negotiated in the Senior Facilities Documentation, will apply (to be applicable to the Borrower and its restricted subsidiaries, subject to customary and other exceptions and qualifications to be agreed upon, consistent with the Documentation Precedent): organization, existence, and power; qualification; authorization and enforceability; no conflict; governmental consents; subsidiaries; accuracy of financial statements and other information in all material respects; projections; no material adverse change since the Closing Date; absence of litigation; compliance with laws (including PATRIOT Act, OFAC, FCPA, ERISA, margin regulations, environmental laws and laws with respect to sanctioned persons); payment of taxes; ownership of properties; governmental regulation; inapplicability of the Investment Company Act; Closing Date solvency on a consolidated basis; labor matters; validity, priority and perfection of security interests in the Collateral; intellectual property; treatment as designated senior debt under subordinated debt documents (if any); use of proceeds; and insurance.

Affirmative Covenants :

The following affirmative covenants, among others, if any, to be negotiated in the Senior Facilities Documentation, will apply (to be applicable to the Borrower and its restricted subsidiaries), subject to customary (consistent with the Documentation Precedent) and other baskets, exceptions and qualifications to be agreed upon: maintenance of corporate

5

existence and rights; performance and payment of obligations; delivery of annual and quarterly consolidated financial statements (accompanied by customary management discussion and analysis and (annually) by an audit opinion from nationally recognized auditors that is not subject to any qualification as to scope of such audit or going concern) (other than solely with respect to, or resulting solely from an upcoming maturity date under any series of indebtedness occurring within one year from the time such opinion is delivered) (with extended time periods to be agreed for delivery of the first annual and certain quarterly financial statements to be delivered after the Closing Date) and an annual budget (it being understood that the public REIT reporting that includes the Borrower shall satisfy the Borrower's reporting obligations so long as it includes a consolidating income statement and balance sheet for the Borrower); delivery of notices of default and material adverse litigation, ERISA events and material adverse change; maintenance of properties in good working order; maintenance of books and records; maintenance of customary insurance; commercially reasonable efforts to maintain ratings (but not a specific rating); compliance with laws; inspection of books and properties; environmental; additional guarantors and additional collateral (subject to limitations set forth under the captions " *Guarantees* " and " *Security* "); further assurances in respect of collateral matters; use of proceeds; and payment of taxes.

<u>Negative Covenants</u> :

The following negative covenants, among others, if any, to be negotiated in the Senior Facilities Documentation, will apply (to be applicable to the Borrower and its restricted subsidiaries), subject to customary exceptions and qualifications (consistent with the Documentation Precedent) and others to be agreed upon:

1. Limitation on dispositions of assets.

2. Limitation on mergers and acquisitions.

3. Limitations on dividends and stock repurchases and optional redemptions (and optional prepayments) of subordinated debt; provided, that, any distributions required to be made to distribute 100% of REIT taxable income or satisfy any REIT-related requirements shall be permitted (such distributions, the " *Mandatory REIT Distributions* ").

6

4.   Limitation on indebtedness (including guarantees and other contingent obligations) and preferred stock.

5.   Limitation on loans and investments.

6.   Limitation on liens and further negative pledges.

7.   Limitation on transactions with affiliates.

8.   Limitation on sale/leaseback transactions.

9.   Limitation on changes in the business of the Borrower and its subsidiaries.

10.  Limitation on restrictions on ability of subsidiaries to pay dividends or make distributions.

11.  Limitation on changes to fiscal year.

12.  Limitation on modifications to subordinated debt documents.

13.  Limitation on material modifications to the MLSA, lease and other arrangements entered into in connection with the lease structure.

EBITDA shall be defined in a manner consistent with the Documentation Precedent.

All ratios and calculations shall be measured on a Pro Forma Basis (to be defined in a manner consistent with the Documentation Precedent, and including the annualized effect of addbacks in the definition of EBITDA).

The Senior Facilities Documentation will provide that any management or similar fees paid to Caesars Entertainment Corporation or any of its subsidiaries or affiliates will be made on an arm's-length basis and on "market" terms (including caps on amounts and consent rights relating to modifications of applicable agreements relating thereto).

Financial Covenant :    First Lien Term Facility: None.

Events of Default :    The following (subject to customary and other thresholds and grace periods to be agreed upon, consistent with the Documentation Precedent, and applicable to the Borrower and its restricted subsidiaries), among others, if any, to be negotiated in the Senior Facilities Documentation:

7

nonpayment of principal, interest or other amounts; violation of covenants; incorrectness of representations and warranties in any material respect; cross event of default and cross acceleration to material indebtedness; bankruptcy and similar events; material judgments; ERISA events; invalidity of the Guarantees or any security document, in each case, representing a material portion of the Guarantees or the Collateral; and Change of Control (to be defined in a manner consistent with the Documentation Precedent).

Unrestricted Subsidiaries :

The Senior Facilities Documentation will contain provisions pursuant to which, subject to limitations consistent with the Documentation Precedent, the Borrower will be permitted to designate any existing or subsequently acquired or organized subsidiary as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a restricted subsidiary. Unrestricted subsidiaries will not be subject to the affirmative or negative covenant or event of default provisions of the Senior Facilities Documentation, and the results of operations and indebtedness of unrestricted subsidiaries will not be taken into account for purposes of calculating the financial ratios contained in the Senior Facilities Documentation on terms consistent with the Documentation Precedent. In addition, [CPLV Sub] shall constitute an unrestricted subsidiary of the Borrower on the Closing Date.

Voting :

Usual for facilities and transactions of this type and consistent with the Documentation Precedent; provided that the Borrower and its affiliates, including the Sponsors, shall not have voting rights with respect to loans and commitments held by them.

Cost and Yield Protection :

Usual for facilities and transactions of this type, consistent with the Documentation Precedent.

Assignments and Participations :

Customary assignment provisions consistent with the Documentation Precedent.

Non-Pro Rata Repurchases :

The Borrower and its subsidiaries may purchase from any Lender (other than the Borrower or any of its affiliates, including the Sponsors), at individually negotiated prices, outstanding principal amounts or commitments under the First Lien Term Facility in a non-pro rata manner; *provided* that (i) the purchaser shall make a representation to the seller at the time of assignment that it does not possess material non-public information with respect to the Borrower and its

8

subsidiaries that has not been disclosed to the seller or Lenders generally (other than the Lenders that have elected not to receive material non-public information), (ii) any commitments or loans so repurchased shall be immediately cancelled and (iii) no default or event of default exists or would result therefrom.

<u>Expenses and Indemnification</u> :     Consistent with the Documentation Precedent.

<u>Regulatory Matters</u> :     Customary for facilities of this type and consistent with the Documentation Precedent.

<u>Governing Law and Forum</u> :     New York.

<u>Counsel to Agent/Collateral Agent</u> :     [          ].

9

<u>New First Lien PropCo Debt</u>
<u>$[        ] First Lien Notes</u>
<u>Summary of Principal Terms</u> [1]

| | |
|---|---|
| <u>Issuer</u> : | [REIT PropCo], in its capacity as the issuer of the First Lien Notes (the " ***Issuer*** ""). |
| <u>Issue</u> : | The First Lien Notes in an amount set forth in the Restructuring Term Sheet will be issued under and have the benefit of an indenture and security documentation typical and customary in the case of first lien senior secured notes issued pursuant to an exit financing, taking into consideration (i) the indenture for the first-priority senior secured notes issued on October 11, 2013 by Caesars Entertainment Resort Properties, LLC, Caesars Entertainment Resort Properties Finance, Inc., Harrah's Atlantic City Holding, Inc., Harrah's Las Vegas, LLC, Harrah's Laughlin, LLC, Flamingo Las Vegas Holding, LLC, Paris Las Vegas Holding, LLC, Rio Properties, LLC and (ii) the operating lease structure and the REIT structure of the Issuer and its subsidiaries, and otherwise be reasonably satisfactory to the Issuer and the Requisite Consenting Creditors (the " ***Documentation Precedent*** ""). |
| <u>Purpose</u> : | On the Closing Date, the First Lien Notes will be issued to each First Lien Noteholder in accordance with the Restructuring Term Sheet. |
| <u>Maturity</u> : | The First Lien Notes will mature on the date that is five (5) years after the Closing Date. |
| <u>Interest Rate</u> : | LIBOR + 3.5% per annum, with a 1.0% LIBOR floor. |
| <u>Default Rate</u> : | With respect to principal (whether at stated maturity, upon acceleration or otherwise), the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount (including overdue interest), the interest rate applicable to ABR loans plus 2.00% per annum and in each case, shall be payable on demand. |
| <u>Ranking</u> : | The First Lien Notes will constitute senior first-priority secured indebtedness of the Issuer, and will rank pari passu in all respects, including in right of payment, with all obligations under the Senior Facilities (the " ***Credit Agreement*** "") and all other first lien senior indebtedness of the Issuer. |

---

[1]    All capitalized terms used but not defined herein shall have the meanings assigned thereto in the Restructuring Term Sheet to which this Term Sheet is attached (the " ***Restructuring Term Sheet*** ""), or in the New First Lien PropCo Debt Term Sheet attached thereto.

1

Guarantees :

The First Lien Notes and all obligations under the indenture related thereto will be unconditionally guaranteed by each existing and subsequently acquired or organized wholly owned domestic subsidiary of the Issuer (the " ***Note Guarantors*** "), subject to exceptions consistent with the Documentation Precedent and others, if any, to be agreed upon, on a senior first-priority secured basis (the " ***Note Guarantees*** "). The Note Guarantees will rank pari passu in all respects, including in right of payment, with all obligations under the Credit Agreement and all other senior indebtedness of the Note Guarantors. The Note Guarantees will be guarantees of payment and performance and not of collection.

Security :

Subject to the limitations set forth below and limitations consistent with the Documentation Precedent, the First Lien Notes and the Note Guarantees will be secured by a first-priority security interest in substantially all the owned material assets of the Issuer and each Note Guarantor, in each case whether owned on the Closing Date or thereafter acquired (collectively, the " ***Collateral*** "), including but not limited to: (a) a perfected first-priority pledge of all the equity interests directly held by the Issuer or any Note Guarantor (which pledge, in the case of any foreign subsidiary, shall be limited to 100% of the non-voting equity interests (if any) and 65% of the voting equity interests of such foreign subsidiary) (b) a perfected first priority lien on cash, deposit accounts and securities accounts, and (c) perfected first-priority security interests in, and mortgages on, substantially all owned tangible and intangible assets of the Issuer and each Note Guarantor (including, but not limited to, accounts receivable, inventory, equipment, general intangibles, investment property, intellectual property and real property (including an assignment of rents)) except for (v) real property with a fair market value less than $15.0 million and leaseholds, (w) vehicles, (x) those assets as to which the Issuer and Collateral Agent shall reasonably determine that the costs or other consequences of obtaining such a security interest are excessive in relation to the value of the security to be afforded thereby, (y) assets to which the granting or perfecting such security interest would violate any applicable law (including gaming laws and regulations) or contract (and with regard to which contract the counterparty thereto requires such prohibition as a condition to entering into such contract, such contract has been entered into in the ordinary course of business, such restriction is consistent with industry custom and consent has been requested and not received), and (z) other exceptions

2

consistent with the Documentation Precedent; and provided that the pledge of equity interests and other securities will be subject to customary Rule 3-16 cut-back provisions. For avoidance of doubt, lockbox arrangements and control agreements relating to the Issuer's and its subsidiaries' bank accounts and securities accounts will be required to be delivered at closing. The operating lease with [Caesars Entertainment Operating Company, Inc.] shall be subject to a customary subordination and non-disturbance agreement as provided in the Lease Term Sheet attached to the Restructuring Support Agreement.

All the above-described pledges, security interests and mortgages shall be created on terms, and pursuant to documentation, consistent with the Documentation Precedent.

The relative rights and priorities in the Collateral for each of the Credit Agreement and the First Lien Notes will be set forth in the First Lien Intercreditor Agreement, as between the administrative agent for the Credit Agreement, on the one hand, and the trustee for the First Lien Notes, on the other hand, which intercreditor agreement shall provide that the indebtedness outstanding under the Credit Agreement and the First Lien Notes vote together as one class and are pari passu in all respects, including in respect of directing the collateral agent thereunder.

The relative rights and priorities in the Collateral for each of the Credit Agreement, the First Lien Notes and the Second Lien Notes will be set forth in the First Lien/Second Lien Intercreditor Agreement, as between the collateral agent for the Credit Agreement and the First Lien Notes, on the one hand, and the collateral agent for the Second Lien Notes, on the other hand.

<u>Mandatory Redemption</u> :                     None.

<u>Optional Redemption</u> :                     Prior to the first anniversary of the Closing Date, the Issuer may redeem the Notes at a make-whole price based on U.S. Treasury notes with a maturity closest to the first anniversary of the Closing Date plus 50 basis points.

Prior to the first anniversary of the Closing Date, the Issuer may redeem up to 35% of the Notes in an amount equal to the amount of proceeds from an equity offering at a price equal to par plus the coupon on such Notes.

After the first anniversary of the Closing Date, the Notes will be callable at par plus accrued interest plus a premium equal to

3

3.0%, which premium shall decline to 2.0% on the second anniversary of the Closing Date, to 1.0% on the third anniversary of the Closing Date and to zero on the fourth anniversary of the Closing Date.

All redemptions shall be made on a pro rata basis among the Notes.

**Offer to Purchase from Asset Sale Proceeds**: The Issuer will be required to make an offer to repurchase the First Lien Notes at par with the net cash proceeds from any non-ordinary course asset sales or dispositions by the Issuer or any Note Guarantor in accordance with the Documentation Precedent to the extent any such proceeds are not otherwise applied in a manner consistent with the Documentation Precedent.

**Offer to Repurchase with Proceeds of Debt Issuance**: The Issuer will be required to make an offer to repurchase the First Lien Notes at par in an amount equal to the First Lien Noteholders' pro rata share (to be defined as the ratio of funded debt outstanding that consists of the First Loan Notes to the sum of the total funded debt that consists of the First Lien Notes and First Lien Term Facility) of 100% of the net cash proceeds of issuances, offerings or placements of debt obligations of the Issuer and its subsidiaries (other than debt permitted to be incurred under the indenture governing the First Lien Notes unless otherwise provided as a condition to the incurrence thereof).

**Offer to Repurchase Upon a Change of Control**: The Issuer will be required to make an offer to repurchase the First Lien Notes following the occurrence of a " ***change of control*** " (to be defined in a manner consistent with the Documentation Precedent) at a price in cash equal to 101.0% of the outstanding principal amount thereof, plus accrued and unpaid interest to the date of repurchase.

**Offer to Purchase from Excess Cash Flow**: Beginning with the first full fiscal year of the Issuer after the Closing Date, the Issuer will be required to make an offer to repurchase the First Lien Notes at par in an amount equal to the First Lien Noteholders' pro rata share (to be defined as the ratio of funded debt outstanding that consists of the First Loan Notes to the sum of the total funded debt that consists of the First Lien Notes and First Lien Term Facility) of Excess Cash Flow (to be defined in a manner consistent with the Credit Agreement and subject to the same minimum threshold therein) of the Issuer and its restricted subsidiaries.

**Defeasance and Discharge Provisions**: Customary for high yield debt securities consistent with the Documentation Precedent.

4

| | |
|---|---|
| <u>Modification</u> : | Customary for high yield debt securities consistent with the Documentation Precedent. Notes held by the Issuer and its affiliates, including the Sponsors, shall not have voting rights. |
| <u>Registration Rights</u> : | Customary registration rights. |
| <u>Covenants</u> : | Substantially the same as those in the Documentation Precedent (including in respect of baskets and carveouts to such covenants; *provided* , that such baskets and covenants shall conform to the corresponding amounts in the Credit Agreement (including with respect to the Mandatory REIT Distributions)). For the avoidance of doubt, there shall be no financial maintenance covenants. |
| | [CPLV Sub] shall constitute an unrestricted subsidiary of the Issuer on the Closing Date. |
| | The provisions limiting dividends and stock repurchases and optional redemptions (and optional prepayments) of subordinated debt shall be subject to only those very limited carveouts that shall be agreed to by the Issuer and the Requisite Consenting Creditors, but shall in any event permit the Mandatory REIT Distributions. |
| | The indenture for the First Lien Notes will provide that any management or similar fees paid to Caesars Entertainment Corporation or any of its subsidiaries or affiliates will be made on an arm's-length basis and on "market" terms (including caps on amounts and consent rights relating to modifications of applicable agreements relating thereto). |
| <u>Events of Default</u> : | Customary for high yield debt securities and consistent with the Documentation Precedent. |
| <u>Governing Law</u> : | New York. |
| <u>Regulatory Matters</u> : | Consistent with the Documentation Precedent. |
| <u>Counsel to the Notes Lead Arranger</u> : | [            ]. |

5

<u>New Second Lien PropCo Debt</u>
<u>$[          ] Second Lien Notes</u>
<u>Summary of Principal Terms</u> [1]

<u>Issuer</u> :

[REIT PropCo], in its capacity as the issuer of the Second Lien Notes (the " ***Issuer*** ").

<u>Issue</u> :

The Second Lien Notes in an amount set forth in the Restructuring Term Sheet will be issued under and have the benefit of an indenture and security documentation typical and customary in the case of second lien senior secured notes issued pursuant to an exit financing, taking into consideration (i) the indenture for the second-priority senior secured notes issued on October 11, 2013 by Caesars Entertainment Resort Properties, LLC, Caesars Entertainment Resort Properties Finance, Inc., Harrah's Atlantic City Holding, Inc., Harrah's Las Vegas, LLC, Harrah's Laughlin, LLC, Flamingo Las Vegas Holding, LLC, Paris Las Vegas Holding, LLC, Rio Properties, LLC and (ii) the operating lease structure and the REIT structure of the Issuer and its subsidiaries, and otherwise be reasonably satisfactory to the Issuer and the Requisite Consenting Creditors (the " ***Documentation Precedent*** ").

<u>Purpose</u> :

On the Closing Date, the Second Lien Notes will be issued to each First Lien Noteholder in accordance with the Restructuring Term Sheet.

<u>Maturity</u> :

The Second Lien Notes will mature on the date that is six (6) years after the Closing Date.

<u>Interest Rate</u> :

A fixed rate equal to 8.0%.

<u>Ranking</u> :

The Second Lien Notes will constitute senior second-priority secured indebtedness of the Issuer, and will rank pari passu in right of payment with all obligations under the Senior Facilities (the " ***Credit Agreement*** ") and all other senior indebtedness of the Issuer.

<u>Guarantees</u> :

The Second Lien Notes and all obligations under the indenture related thereto will be unconditionally guaranteed by each existing and subsequently acquired or organized wholly owned domestic subsidiary of the Issuer that guarantees the Credit Agreement or the First Lien Notes (the " ***Note Guarantors*** "), subject to exceptions consistent with the Documentation

---

[1]    All capitalized terms used but not defined herein shall have the meanings assigned thereto in the Restructuring Term Sheet to which this Term Sheet is attached (the " ***Restructuring Term Sheet*** "), or in the New First Lien PropCo Debt Term Sheet attached thereto.

1

Precedent and others, if any, to be agreed upon, on a senior second-priority secured basis (the " ***Note Guarantees*** "). The Note Guarantees will rank pari passu in right of payment with all obligations under the Credit Agreement and all other senior indebtedness of the Note Guarantors. The Note Guarantees will be automatically released upon release of the corresponding guarantees of the Credit Agreement and First Lien Notes; *provided* that such released guarantees shall be reinstated if such released guarantors thereof are required to subsequently guarantee the Credit Agreement or First Lien Notes. The Note Guarantees will be guarantees of payment and performance and not of collection.

| | |
|---|---|
| <u>Security</u> : | Subject to the limitations set forth below and limitations consistent with the Documentation Precedent, the Second Lien Notes and the Note Guarantees will be secured by a second-priority security interest in those assets of the Issuer and the Note Guarantors that secure the First Lien Notes (the " ***Collateral*** "), *provided* that (i) assets securing the Second Lien Notes shall not include property excluded from the Collateral securing the First Lien Notes and (ii) the pledge of equity interests and other securities will be subject to customary Rule 3-16 cut-back provisions. |
| | The relative rights and priorities in the Collateral for each of the Credit Agreement, the First Lien Notes and the Second Lien Notes will be set forth in the First Lien/Second Lien Intercreditor Agreement as between the collateral agent for the Credit Agreement and the First Lien Notes, on the one hand, and the collateral agent for the Second Lien Notes, on the other hand. |
| <u>Mandatory Redemption</u> : | None. |
| <u>Optional Redemption</u> : | Prior to the third anniversary of the Closing Date, the Issuer may redeem the Notes at a make-whole price based on U.S. Treasury notes with a maturity closest to the third anniversary of the Closing Date plus 50 basis points. |
| | Prior to the third anniversary of the Closing Date, the Issuer may redeem up to 35% of the Notes in an amount equal to the amount of proceeds from an equity offering at a price equal to par plus the coupon on such Notes. |
| | After the third anniversary of the Closing Date, the Notes will be callable at par plus accrued interest plus a premium equal to one-half of the coupon on such Notes, which premium shall decline ratably on each anniversary of the Closing Date thereafter to zero on the date that is two years prior to the maturity date. |

2

All redemptions shall be made on a pro rata basis among the Notes.

Offer to Purchase from Asset Sale Proceeds :

The Issuer will be required to make an offer to repurchase the Second Lien Notes at par with the net cash proceeds from any non-ordinary course asset sales or dispositions by the Issuer or any Note Guarantor in accordance with the Documentation Precedent to the extent any such proceeds are not otherwise applied in a manner consistent with the Documentation Precedent.

Offer to Repurchase Upon a Change of Control :

The Issuer will be required to make an offer to repurchase the Second Lien Notes following the occurrence of a " ***change of control*** " (to be defined in a manner consistent with the Documentation Precedent) at a price in cash equal to 101.0% of the outstanding principal amount thereof, plus accrued and unpaid interest to the date of repurchase.

Defeasance and Discharge Provisions :

Customary for high yield debt securities consistent with the Documentation Precedent.

Modification :

Customary for high yield debt securities consistent with the Documentation Precedent. Notes held by the Issuer or its affiliates, including the Sponsors, shall not have voting rights.

Registration Rights :

Customary registration rights.

Covenants :

Substantially the same as those in the Documentation Precedent (including in respect of baskets and carveouts to such covenants); *provided* , that such covenants shall in no event be more restrictive than the corresponding covenant in the First Lien Notes (including, without limitation, with respect to the Mandatory REIT Distributions). For the avoidance of doubt, there shall be no financial maintenance covenants.

[CPLV Sub] shall constitute an unrestricted subsidiary of the Issuer on the Closing Date.

The indenture for the Second Lien Notes will provide that any management or similar fees paid to Caesars Entertainment Corporation or any of its subsidiaries or affiliates will be made on an arm's-length basis and on "market" terms (including caps on amounts and consent rights relating to modifications of applicable agreements relating thereto).

3

Events of Default :

Customary for high yield debt securities and consistent with the Documentation Precedent.

Governing Law :

New York.

Regulatory Matters :

Consistent with the Documentation Precedent.

Counsel to the Notes Lead Arranger :

[          ].

4

<div align="center">

CPLV Mezz Debt
$[        ] Term Facility
Summary of Principal Terms [1]

</div>

| | |
|---|---|
| Borrower : | [CPLV Holdings] (the " ***Borrower*** "), a newly-formed holding company that owns 100% of the outstanding stock of the subsidiary (or subsidiaries) of PropCo that own CPLV and have issued the CPLV Market Debt (as defined below) (collectively, the " ***CPLV Sub*** "). |
| Agent : | [        ] will act as sole administrative agent and collateral agent for the Term Facility (in such capacity and together with its permitted successors and assigns, the " ***Agent*** "), and will perform the duties customarily associated with such roles. |
| Facilities : | A secured non-guaranteed term loan facility in an aggregate principal amount equal to the difference in the amount of CPLV Market Debt (as defined below) issued in accordance with the Restructuring Term Sheet and $2,600 million (the " ***CPLV Mezz Facility*** " and loans thereunder, the " ***CPLV Mezz Loans*** "), which will be issued to each First Lien Bank Lender and First Lien Noteholder in accordance with the Restructuring Term Sheet (in such capacity, the " ***Lenders*** "). [2] In accordance with the Restructuring Term Sheet, at least $2,000 million of real estate financing shall be issued to third party investors for cash proceeds on or before consummation of the Restructuring, which shall be senior to the CPLV Mezz Debt (with 100% of the net proceeds being used to repay the holders of the CPLV Term Loans) (the " ***CPLV Market Debt*** "). |
| Definitive Documentation : | The definitive documentation for the CPLV Mezz Facility (the " ***Mezz Facility Documentation*** ") shall be based on customary documentation for commercial real estate mezzanine financings, as modified to reflect (i) agency and operational matters acceptable to the Borrower and Agent and (ii) the operating lease structure and the REIT structure of the Borrower (the " ***Documentation Precedent*** "). |
| Purpose : | On the Closing Date, the CPLV Mezz Loans will be issued to each First Lien Bank Lender and First Lien Noteholder in accordance with the Restructuring Term Sheet. |

---

1   All capitalized terms used but not defined herein shall have the meaning assigned thereto in the Restructuring Term Sheet to which this Term Sheet is attached (the " ***Restructuring Term Sheet*** ").

2   For the avoidance of doubt, the Lenders will be issued notes backed by the CPLV Mezz Loans through a customary securitization structure.

<div align="center">

1

</div>

Availability :

The full amount of the CPLV Mezz Facility will be issued on the Closing Date. Amounts under the CPLV Mezz Facility that are repaid or prepaid may not be reborrowed.

Interest Rates :

A rate equal to 8.00% if the principal amount of the CPLV Mezz Facility is equal to $600 million, increasing by 0.25% for every $25 million reduction in the principal amount of the CPLV Mezz Facility below $600 million on the Closing Date (up to a maximum interest rate of 13.0%).

Default Rate :

With respect to principal, the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount (including overdue interest), the interest rate applicable to ABR loans plus 2.00% per annum and in each case, shall be payable on demand.

Final Maturity and Amortization :

The CPLV Mezz Facility will mature on the date that is six (6) years after the Closing Date.

Guarantees :

None.

Security :

Subject to customary exceptions, the CPLV Mezz Facility will be secured on a first-priority basis by a pledge of the equity interests in CPLV Sub. There shall be neither lockbox arrangements nor any control agreements relating to the Borrower's and its subsidiaries' bank accounts or securities accounts. The operating lease with [Caesars Entertainment Operating Company, Inc.] shall be subject to a customary subordination and non-disturbance agreement as provided in the Lease Term Sheet attached to the Restructuring Support Agreement.

The relative rights and priorities in the Collateral for the CPLV Mezz Facility and the CPLV Market Debt will be set forth in a customary intercreditor agreement, as between the collateral agent for the CPLV Mezz Facility, on the one hand, and the collateral agent for the CPLV Market Debt, on the other hand.

Mandatory Prepayments :

Customary for commercial real estate mezzanine financings.

Voluntary Prepayments and Reductions in Commitments :

Voluntary reductions of the unutilized portion of the commitments under the CPLV Mezz Facility and prepayments of borrowings thereunder will be permitted at any time, in minimum principal amounts to be agreed upon, without premium or penalty, pro rata among the Lenders

2

subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period. All voluntary prepayments of the Term Facility will be applied to the remaining amortization payments under the CPLV Mezz Facility in such order as the Borrower may direct.

Representations and Warranties :

The following representations and warranties will apply (to be applicable to the Borrower and its restricted subsidiaries, subject to customary and other exceptions and qualifications to be agreed upon, consistent with the Documentation Precedent): organization, existence, and power; qualification; authorization and enforceability; no conflict; governmental consents; subsidiaries; accuracy of financial statements and other information in all material respects; projections; no material adverse change since the Closing Date; absence of litigation; compliance with laws (including PATRIOT Act, OFAC, FCPA, ERISA, margin regulations, environmental laws and laws with respect to sanctioned persons); payment of taxes; ownership of properties; governmental regulation; inapplicability of the Investment Company Act; Closing Date solvency on a consolidated basis; labor matters; validity, priority and perfection of security interests in the Collateral; intellectual property; treatment as designated senior debt under subordinated debt documents (if any); use of proceeds; and insurance.

Affirmative Covenants :

The following affirmative covenants will apply (to be applicable to the Borrower and its restricted subsidiaries, subject to customary (consistent with the Documentation Precedent) and other baskets, exceptions and qualifications to be agreed upon: maintenance of corporate existence and rights; performance and payment of obligations; delivery of annual and quarterly consolidated financial statements (accompanied by customary management discussion and analysis and (annually) by an audit opinion from nationally recognized auditors that is not subject to any qualification as to scope of such audit or going concern) (other than solely with respect to, or resulting solely from an upcoming maturity date under any series of indebtedness occurring within one year from the time such opinion is delivered) (with extended time periods for delivery of the first annual and certain quarterly financial statements to be delivered after the Closing Date) and an annual budget (it being understood that the public REIT reporting that includes the Borrower shall satisfy the Borrower's reporting obligations so long as it includes a consolidating income statement and balance sheet for the

3

Borrower); delivery of notices of default and material adverse litigation, ERISA events and material adverse change; maintenance of properties in good working order; maintenance of books and records; maintenance of customary insurance; commercially reasonable efforts to maintain ratings (but not a specific rating); compliance with laws; inspection of books and properties; environmental; additional guarantors and additional collateral (subject to limitations set forth under the captions " ***Guarantees*** " and " ***Security*** "); further assurances in respect of collateral matters; use of proceeds; and payment of taxes.

<u>Negative Covenants</u> :

The following negative covenants, among others, if any, to be negotiated in the Mezz Facility Documentation, will apply (to be applicable to the Borrower and its restricted subsidiaries), subject to customary exceptions and qualifications (consistent with the Documentation Precedent) and others to be agreed upon:

1. Limitation on dispositions of assets.

2. Limitation on mergers and acquisitions.

3. Limitation on dividends and stock repurchases and optional redemptions (and optional prepayments) of subordinated debt; provided that, any distributions required to be made to distribute 100% of REIT taxable income or satisfy any REIT-related requirements shall be permitted (such distributions, the " ***Mandatory REIT Distributions*** ").

4. Limitation on indebtedness (including guarantees and other contingent obligations) and preferred stock.

5. Limitation on loans and investments.

6. Limitation on liens and further negative pledges.

7. Limitation on transactions with affiliates.

8. Limitation on sale/leaseback transactions.

9. Limitation on changes in the business of the Borrower and its subsidiaries.

10. Limitation on restrictions on ability of subsidiaries to pay dividends or make distributions.

4

11. Limitation on changes to fiscal year.

12. Limitation on modifications to subordinated debt documents.

13. Limitation on material modifications to the MLSA, lease and other arrangements entered into in connection with the lease structure.

EBITDA shall be defined in a manner consistent with the Documentation Precedent.

All ratios and calculations shall be measured on a Pro Forma Basis (to be defined in a manner consistent with the Documentation Precedent, and including the annualized effect of addbacks in the definition of EBITDA).

The Mezz Facility Documentation will provide that any management or similar fees paid to Caesars Entertainment Corporation or any of its subsidiaries or affiliates will be made on an arm's-length basis and on "market" terms (including caps on amounts and consent rights relating to modifications of applicable agreements relating thereto).

Financial Covenant :                       CPLV Mezz Facility: None.

Events of Default :                        The following (subject to customary and other thresholds and grace periods to be agreed upon, consistent with the Documentation Precedent, and applicable to the Borrower and its restricted subsidiaries): nonpayment of principal, interest or other amounts; violation of covenants; incorrectness of representations and warranties in any material respect; cross event of default and cross acceleration to material indebtedness (including CLV Market Debt); bankruptcy and similar events; material judgments; ERISA events; invalidity of the Guarantees or any security document, in each case, representing a material portion of the Guarantees or the Collateral; and Change of Control (to be defined in a manner consistent with the Documentation Precedent).

Voting :                                   Usual for facilities and transactions of this type and consistent with the Documentation Precedent; provided that the Borrower and its affiliates, including the Sponsors, shall not have voting rights with respect to loans and commitments held by them. .

Cost and Yield Protection :                Usual for facilities and transactions of this type, consistent with the Documentation Precedent.

5

Assignments and Participations :

The Lenders will be permitted to assign loans and commitments under the CPLV Mezz Facility with the consent of the Borrower (not to be unreasonably withheld or delayed, but which consent under the CPLV Mezz Facility shall be deemed granted if the Borrower fails to respond to a request for consent by a Lender within ten business days of such request being made); *provided* , that such consent of the Borrower shall not be required (i) if such assignment is made, in the case of the CPLV Mezz Facility, to another Lender under the CPLV Mezz Facility or an affiliate or approved fund of a Lender under the Term Facility or (ii) after the occurrence and during the continuance of an event of default relating to payment default or bankruptcy. All assignments will also require the consent of the Agent (subject to exceptions consistent with the Documentation Precedent) not to be unreasonably withheld or delayed. Each assignment, in the case of the CPLV Mezz Facility, will be in an amount of an integral multiple of $1,000,000. The Agent will receive a processing and recordation fee of $3,500, payable by the assignor and/or the assignee, with each assignment. Assignments will be by novation.

The Lenders will be permitted to sell participations in loans subject to the restrictions set forth herein and consistent with the Documentation Precedent. Voting rights of participants shall (i) be limited to matters in respect of (a) increases in commitments of such participant, (b) reductions of principal, interest or fees payable to such participant, (c) extensions of final maturity or scheduled amortization of the loans or commitments in which such participant participates and (d) releases of all or substantially all of the value of the Guarantees, or all or substantially all of the Collateral and (ii) for clarification purposes, not include the right to vote on waivers of defaults or events of default.

Notwithstanding the foregoing, assignments (and, to the extent such list is made available to all Lenders, participations) shall not be permitted to ineligible institutions identified to the Agent on or prior to the Closing Date and, with the consent of the Agent, thereafter; provided that the Agent shall not be held liable or responsible for any monitoring or enforcing of the foregoing.

Assignments shall not be deemed non-pro rata payments. Non-pro rata prepayments will be permitted to the extent

6

required to permit "extension" transactions and "replacement" facility transactions (with existing and/or new Lenders), subject to customary restrictions consistent with the Documentation Precedent.

Assignments to the Sponsors and their respective affiliates (other than the Borrower and its subsidiaries) (each, an " ***Affiliated Lender*** ") shall be permitted subject to customary restrictions consistent with the Documentation Precedent.

Non-Pro Rata Repurchases :

The Borrower and its subsidiaries may purchase from any Lender (other than the Borrower and its affiliates, including the Sponsors), at individually negotiated prices, outstanding principal amounts or commitments under the CPLV Mezz Facility in a non-pro rata manner; *provided* that (i) the purchaser shall make a representation to the seller at the time of assignment that it does not possess material non-public information with respect to the Borrower and its subsidiaries that has not been disclosed to the seller or Lenders generally (other than the Lenders that have elected not to receive material non-public information), (ii) any commitments or loans so repurchased shall be immediately cancelled and (iii) no default or event of default exists or would result therefrom.

Expenses and Indemnification :

Consistent with the Documentation Precedent.

Regulatory Matters :

Customary for facilities of this type and consistent with the Documentation Precedent.

Governing Law and Forum :

New York.

Counsel to Agent :

[                    ].

7

**Exhibit C**

[INTENTIONALLY OMITTED]

37

**Exhibit D**

**Milestones**

The failure to comply with any of the following Milestones will result in a Creditor Termination Event under <u>Section 8</u> of this Agreement:

1.  The Company shall commence the Chapter 11 Cases in the Bankruptcy Court on or after January 15, 2015, but no later than January 20, 2015.

2.  Within 5 Business Days after the Petition Date, an order approving the interim use of cash collateral, on the terms and conditions substantially consistent with those set forth in the Cash Collateral Stipulation, shall have been entered by the Bankruptcy Court;

3.  Within 20 days after the Petition Date, the Company shall have filed a motion with the Bankruptcy Court seeking authorization to assume this Agreement (the " <u>RSA Assumption Motion</u> ") in form, scope and substance materially consistent with this Agreement and otherwise reasonably acceptable to the Company, CEC, and the Requisite Consenting Creditors.

4.  Within 45 days after the Petition Date, the Company shall have filed the Plan and Disclosure Statement, in each case in form, scope and substance reasonably satisfactory to the Requisite Consenting Creditors and the Company; for the avoidance of doubt, any supplement to the Plan must be in form, scope and substance materially consistent with the Restructuring Term Sheet and otherwise reasonably satisfactory to the Requisite Consenting Creditors and the Company.

5.  Within 75 days after the Petition Date, the Company shall have obtained entry by the Bankruptcy Court of an order approving the use of cash collateral on a final basis on terms and conditions substantially consistent with those set forth in the Cash Collateral Stipulation.

6.  Within 90 days after filing the RSA Assumption Motion, the Company shall have obtained entry by the Bankruptcy Court of an order approving the assumption of this Agreement in form, scope and substance materially consistent with this Agreement and otherwise reasonably acceptable to the Company, CEC, and the Requisite Consenting Creditors.

7.  Within 150 days after the Petition Date, the Company shall have obtained entry by the Bankruptcy Court of (a) an order approving the Disclosure Statement, and (b) an order approving solicitation procedures in relation to the Plan and Disclosure Statement; in each case materially consistent with the Restructuring Term Sheet and otherwise in in form, scope and substance reasonably satisfactory to the Requisite Consenting Creditors and the Company.

8.  Within 120 days after the Bankruptcy Court's approval of the Disclosure Statement, the Company shall have obtained entry by the Bankruptcy Court of an order confirming the Plan that is materially consistent with the Restructuring Term Sheet and otherwise reasonably satisfactory to the Requisite Consenting Creditors and the Company (the " <u>Confirmation Order</u> ").

38

9.    Within 120 days after the Confirmation Order has become a final order (the " Outside Date "), the Effective Date shall have occurred. In the event the Company has failed to obtain required regulatory approvals for certain of its assets as of the Outside Date, the Company shall close and proceed to effectiveness with respect to those assets for which it does have regulatory approval, unless the Company determines in good faith, after consultation with the Requisite Consenting Creditors, that to do so would have a materially adverse effect on the Company, in which case the Company shall have an additional sixty (60) days in which to obtain the additional required regulatory approvals and close on those assets. Any further extensions of the Outside Date shall require the consent of the Requisite Consenting Creditors.

*    *    *    *    *

39

**Exhibit E**

**Transfer Agreement**

**PROVISION FOR TRANSFER AGREEMENT**

The undersigned (" Transferee ") (a) hereby acknowledges that it has read and understands the Restructuring Support and Forbearance Agreement, dated as of          (the " Agreement "), [1] by and among the Caesars Parties and each of the Consenting Creditors party thereto, (b) desires to acquire the Claims described below (the " Transferred Claims ") from one of the Restructuring Support Parties (the " Transferor ") and (c) hereby irrevocably agrees to be bound by the terms and conditions of the Agreement to the same extent Transferor was thereby bound with respect to the Transferred Claims, and shall be deemed a Consenting Creditor for all purposes under the Agreement, including with respect to any election made such Transferor with respect to any Put Option applicable to the OpCo New Common Stock that has been exercised by such Transferor.

The Transferee hereby specifically and irrevocably agrees (i) to be bound by the terms and conditions of the **[First Lien Indentures / Credit Agreement]** and the Agreement, to the same extent applicable to the Transferred Claims, (ii) to be bound by the vote of the Transferor if cast prior to the effectiveness of the transfer of the Transferred Claims, except as otherwise provided in the Agreement and (iii) that each of the Parties shall be an express third-party beneficiary of this Provision for Transfer Agreement and shall have the same recourse against the Transferee under the Agreement as such Party would have had against the Transferor with respect to the Transferred Claims.

Date Executed:          ,

|  |  |
|---|---|
| | **Print name of Transferee** |
| | |
| | **Name:** |
| | **Title:** |
| | |
| | **Address:** _____ |
| | _____ |
| | _____ |
| | **Attention:** _____ |
| | **Telephone:** _____ |
| | **Facsimile:** _____ |

---
[1]    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

**Principal Amount Held**

| Claim | Amount |
| --- | --- |
| Claims (specify type) | |

41

**EXHIBIT 4**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| UMB BANK, solely in its capacity as Indenture Trustee under that certain indenture, dated as of February 14, 2012, governing Caesars Entertainment Operating Company, Inc.'s 8.5% Senior Secured Notes due 2020, | : : : : : : : : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : : | Civil Action No. 10393-VCG |
| CAESARS ENTERTAINMENT CORP., CAESARS ENTERTAINMENT OPERATING COMPANY, INC., CAESARS ENTERTAINMENT RESORT PROPERTIES, CAESARS ACQUISITION COMPANY, CAESARS GROWTH PARTNERS, LLC, CAESARS ENTERPRISE SERVICES, LLC, GARY LOVEMAN, JEFFREY BENJAMIN, DAVID BONDERMAN, DONALD COLVIN, KELVIN DAVIS, FRED J. KLEISNER, ERIC PRESS, MARC ROWAN, DAVID SAMBUR, LYNN C. SWANN, CHRISTOPHER J. WILIAMS, JEFFREY HOUSENBOLD, MICHAEL COHEN, ERIC HESSION, RONEN STAUBER and STEVEN WINOGRAD, | : : : : : : : : : : : : : : : | |
| | : | |
| Defendants, | : : | |
| and | : | |
| | : | |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., | : : : | |
| | : | |
| Nominal Defendant. | : | |

- - -

Chancery Court Chambers
33 The Circle
Georgetown, Delaware
Wednesday, December 17, 2014
9:00 a.m.

1    are not prepared to wait.  We want to move forward.

2    Perhaps we waited -- perhaps we shouldn't have entered

3    the waiver agreement.  Perhaps we should have not

4    taken the company up.  And we need to move forward

5    now.  Damage and harm is being done every day.  We

6    need to get on top of this company's situation and

7    stop the bleeding.

8                    Thank you, Your Honor.

9                    THE COURT:  All right.  I got that,

10   counsel.  Thank you.  I appreciate the argument

11   particularly on the time frame.  It was very helpful.

12                   It appears to me that this is the way

13   we should go forward.  I've got a motion before me to

14   either dismiss or stay, and there is a fully briefed

15   companion motion in the WSFS case.

16                   I am going to hear the briefing here

17   on that motion on a fairly advanced schedule from what

18   I have been told.  I can accommodate you with oral

19   argument on that motion the week of the 12th, and I'll

20   have my secretary contact you to set up an oral

21   argument time.

22                   I intend to decide that motion

23   quickly.  I've got the other motion.  As I say, it's

24   fully briefed and argued.  I think I can very rapidly

1  have a decision for you on the motion to dismiss.

2                    So that colors my consideration of how

3  we need to go forward, it seems to me, with the

4  substantive part of this receivership application.

5                    The question before me here today is

6  whether I expedite the receivership application.  You

7  are both well aware of the very simple standard that I

8  need to apply in considering that.  It's whether

9  there's a colorable claim, which there is here; and

10  whether there is a threat of irreparable harm that

11  justifies the considerable expense of an expedited

12  proceeding.

13                    Complicating the matter here, I think,

14  is the fact that there are other parties who also have

15  standing creditor positions to the defendants here who

16  are involved in negotiations.  There's a suggestion

17  that the Court is being used in some sense as a

18  stalking horse.

19                    Set against all the argument that I

20  have had here is expedition in a summary matter.  This

21  is a summary proceeding under Section 291.  It is, of

22  its very nature, to be developed on a quick record and

23  disposed of quickly.  So whether I call it expedition

24  or whether I call it a summary proceeding in some ways

1   is a distinction without a difference.

2                    It appears to me that what needs to

3   happen is this.  The discovery that is outstanding

4   should go forward notwithstanding the fact that there

5   is a motion to dismiss or stay outstanding.  As I have

6   pledged to you, I am going to hear and dispose of that

7   quickly.

8                    I am going to ask you, counsel, in the

9   briefing, to concentrate on, assuming that portions of

10  this, the substantive underlying damages claims,

11  notwithstanding whether those belong in another court,

12  whether the receiver claims should stay or should go,

13  and what the jurisdiction of the New York court and

14  the practicalities of the New York court imposing a

15  receivership are, because that is a question that I

16  have.

17                    I am going to move this forward.  I am

18  granting the motion for expedition for whatever that's

19  worth because I think this matter needs to be teed up

20  quickly and disposed of quickly.  However, I am not

21  going to impose any schedule on expedition until I

22  dispose of the motion to dismiss which I will do

23  quickly.

24                    I would suggest, in light of that,

1   counsel, in light of the fact that I granted the

2   motion to expedite, that during the remaining two

3   weeks or so that it will take to brief this motion to

4   dismiss or stay and get it in front of me, that you

5   work out a schedule for presenting this motion for a

6   receiver or request for a receiver on a summary track.

7              If you can't do that, then at the

8   close of the oral argument, we are going to discuss

9   that and we'll have a scheduling conference in the

10  courtroom, and I will impose some kind of a schedule.

11  But I would far prefer that the parties put it in

12  place.

13             Let me address this question or this

14  allegation that the Court may be used as a for

15  leverage or as a stalking horse for the negotiations

16  by the note holders with the companies.  I am aware

17  that there are other entities involved, that there are

18  sensitive negotiations ongoing.

19             I am also aware that despite the fact

20  that there is a colorable claim here that the

21  appointment of a receiver is always within the

22  discretion of the Court; that it is to be done for the

23  benefit of the company or to preserve assets for the

24  creditors, and that that may not be, even if the

1  statutory considerations are met, there's still a

2  discretionary aspect.

3                I can assure you that I am sensitive

4  to allegations that putting a receiver in place, given

5  the complex negotiations ongoing, and given the

6  complex nature of the business that is being run here,

7  may not be in the best interests of the corporation.

8                I take that suggestion very seriously.

9  It's only a suggestion at this point.  But it remains

10  to be seen whether this Court's discretion can be

11  moved to replace the board with a receiver or to limit

12  the power of the board.

13                I am cognizant of that, and I suspect

14  strongly that with the team opposing the receivership

15  that is in place here and the very fine lawyers on

16  that team, that you will not let me issue an opinion

17  ignorant of all the facts that may militate against

18  such an order.

19                So I am not particularly concerned

20  about that.

21                Is anything I have said unclear here,

22  Mr. Rand?

23                MR. RAND:  No, Your Honor.  Thank you.

24                THE COURT:  Mr. Adler, is anything I

**EXHIBIT 5**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

———————————————

**FORM 10-Q**

———————————————

**(Mark One)**

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the Quarterly Period Ended September 30, 2014

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File No. N/A

———————————————

# CAESARS ENTERTAINMENT OPERATING COMPANY, INC.

**(Exact name of registrant as specified in its charter)**

———————————————

| | |
|---|---|
| **Delaware** | **75-1941623** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **One Caesars Palace Drive, Las Vegas, Nevada** | **89109** |
| (Address of principal executive offices) | (Zip Code) |

**(702) 407-6000**
**(Registrant's telephone number, including area code)**

**N/A**
**(Former name, former address and former fiscal year, if changed since last report)**

———————————————

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒      No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒      No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | |
|---|---|---|
| Large accelerated filer ☐ | | Accelerated filer ☐ |
| Non-accelerated filer ☒ (Do not check if a smaller reporting company) | | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐      No ☒

As of November 1, 2014, the Registrant had 1,448,936 shares of common stock outstanding. There is not a market for the Registrant's common stock; therefore, the aggregate market value of the Registrant's common stock held by non-affiliates is not calculable.

## CAESARS ENTERTAINMENT OPERATING COMPANY, INC.
### NOTES TO CONSOLIDATED CONDENSED FINANCIAL STATEMENTS
### (UNAUDITED)

*In these notes, the words "Company," "CEOC," "we," "our," and "us" refer to Caesars Entertainment Operating Company, Inc. and its consolidated subsidiaries, unless otherwise stated or the context requires otherwise.*

## Note 1 — Organization and Basis of Presentation

### Organization

We are a majority-owned subsidiary of Caesars Entertainment Corporation ("Caesars Entertainment", "Caesars" or "CEC"), a Delaware corporation. As of September 30, 2014 , we owned and operated or managed, through various subsidiaries, 50 casinos in 14 U.S. states and 5 countries. We view each casino property as an operating segment and aggregate such casino properties into one reportable segment.

On January 28, 2008, Caesars Entertainment was acquired by affiliates of Apollo Global Management, LLC (together with such affiliates, "Apollo") and affiliates of TPG Capital, LP (together with such affiliates, "TPG" and, together with Apollo, the "Sponsors") in an all-cash transaction (the "Acquisition"). A substantial portion of the financing of the Acquisition was comprised of bank and bond financing obtained by us. As a result of Caesars Entertainment's sale of five percent of its ownership in CEOC (see Note 10 , " Stockholders' Equity "), this financing became neither secured nor guaranteed for payment by Caesars Entertainment or its other wholly-owned subsidiaries.

Pursuant to a shared services agreement and management services agreement, we provide properties owned by Caesars Entertainment Resort Properties ("CERP") and Caesars Growth Partners, LLC ("CGP LLC") with certain corporate management and administrative operations and such costs are reimbursed to us for providing such services (see Note 21 , " Caesars Enterprise Services, LLC "). CERP and CGP LLC are not included in our consolidated condensed financial statements.

### Basis of Presentation and Use of Estimates

The accompanying unaudited consolidated condensed financial statements of the Company have been prepared under the rules and regulations of the Securities and Exchange Commission ("SEC") applicable for interim periods and, therefore, do not include all information necessary for complete financial statements in conformity with accounting principles generally accepted in the United States ("U.S. GAAP"). Our financial statements require the use of estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses and the disclosure of contingent liabilities. Actual amounts could differ from those estimates. The results for the interim periods reflect all adjustments (consisting primarily of normal recurring adjustments) that management considers necessary for a fair presentation of financial position, results of operations, and cash flows. The results of operations for our interim periods are not necessarily indicative of the results of operations that may be achieved for the entire 2014 fiscal year.

The financial information for the three and nine months ended September 30, 2014 and 2013 reflects the results of operations and cash flows of the Alea Leeds, Golden Nugget, Showboat Atlantic City and Harrah's Tunica casinos as discontinued operations. See Note 4 , " Dispositions, Divestitures, and Other Property Matters ."

In May 2014, Caesars Entertainment completed the sale of five percent of its ownership interest in us to certain qualified institutional buyers. Upon completion of this sale, the automatic release of Caesars Entertainment's parent guarantee of certain debt issued by us was triggered in accordance with the applicable bond indentures (see Note 10 , " Stockholders' Equity "). As a result, Caesars Entertainment no longer could rely upon the exception for guarantor financial statements provided by Rule 3-10 of the SEC's Regulation S-X ("Rule 3-10 exception"), which allows registrants to provide condensed consolidating financial information of guarantors and issuers if certain conditions are met. Accordingly, beginning in the second quarter of 2014, we began filing separately under the Securities Exchange Act of 1934, including the required standalone financial statements required by SEC Regulation S-X. Because we relied upon the Rule 3-10 exception as of December 31, 2013, we did not file an Annual Report on Form 10-K with the SEC; accordingly this Form 10-Q contains expanded disclosures on an interim basis.

Due to our continuing involvement with The LINQ subsequent to its sale to CERP, we consolidated the net assets and income statement impacts of The LINQ from the date of sale to CERP in October 2013 through May 5, 2014. As a result of our sale of The LINQ Hotel and Casino ("LINQ Hotel") as described in Note 5 , " Property Transaction with CGP LLC " and the resulting assumption by CGP LLC of our lease of certain space in The LINQ, we no longer had such continuing involvement and no longer consolidated The LINQ in our Consolidated Condensed Financial Statements.

CAESARS ENTERTAINMENT OPERATING COMPANY, INC.
NOTES TO CONSOLIDATED CONDENSED FINANCIAL STATEMENTS (CONTINUED)
(UNAUDITED)

Due to our continuing involvement with Octavius Tower subsequent to its sale to CERP in October 2013, we continue to consolidate the related assets and liabilities, as well as the results of operations, in our Consolidated Condensed Financial Statements.

The Company, CEC, CERP, and Caesars Growth Properties Holdings, LLC ("CGPH") entered into a services joint venture, Caesars Enterprise Services, LLC ("CES"). CES manages certain enterprise assets and employs certain of the corresponding employees and other employees who currently provide services to CEOC, CERP and CGPH, their affiliates and their respective properties and systems under each property's corresponding property management agreement (see Note 22 , " Related Party Transactions ").

*Properties*

As presented in the following table, as of September 30, 2014 , of the 50 casinos that we own and operate or manage, we own and operate 20 casinos in the United States and nine internationally, most of which are located in the United Kingdom. We manage an additional 21 casinos, of which six are owned by CERP and six are owned by CGP LLC. Casinos in the United States primarily consist of land-based and riverboat or dockside casinos, and all international casinos are land-based.

### DOMESTIC PROPERTIES OWNED [(d)]

| | | |
|---|---|---|
| Bally's Atlantic City | Harrah's Louisiana Downs | Horseshoe Council Bluffs [(b)(c)] |
| Caesars Atlantic City | Harrah's Metropolis | Horseshoe Hammond |
| Caesars Palace Las Vegas | Harrah's North Kansas City | Horseshoe Southern Indiana |
| Harrah's Council Bluffs | Harrah's Philadelphia [(a)] | Horseshoe Tunica |
| Harrah's Gulf Coast | Harrah's Reno | Hot Spot Oasis |
| Harrah's Joliet [(a)] | Harvey's Lake Tahoe | Tunica Roadhouse Hotel & Casino |
| Harrah's Lake Tahoe | Horseshoe Bossier City | |

### INTERNATIONAL PROPERTIES OWNED

| | | |
|---|---|---|
| Alea Glasgow | Emerald Safari [(a)] | Rendezvous Brighton |
| Alea Nottingham | Manchester235 | Rendezvous Southend-on-Sea |
| The Casino at the Empire | Playboy Club London | The Sportsman |

[(a)]  We have a majority ownership interest in and manage this property.
[(b)]  The property is leased to the operator and managed by CEOC.
[(c)]  We will cease greyhound racing at this facility by December 31, 2015. See Note 4 , " Dispositions, Divestitures, and Other Property Matters ."
[(d)]  Harrah's Tunica, Showboat Atlantic City, Alea Leeds, and Golden Nugget have been closed and are presented in discontinued operations for all periods presented.

*Liquidity Considerations*

We are a highly leveraged company, and a significant amount of our liquidity needs are for debt service, including significant interest payments. As of September 30, 2014 , we had $18,415.2 million face value of outstanding indebtedness and our current debt service obligation over the next twelve months is $1,829.5 million , consisting of $82.1 million in principal maturities and $1,747.4 million in required interest payments. See Note 9, "Debt," for details on our debt outstanding and restrictive covenants related to certain of our borrowings. This detail includes, among other things, a table presenting details of our individual borrowings outstanding as of September 30, 2014 and December 31, 2013 , as well as discussion of recent changes in our debt outstanding, and any changes in the terms of existing debt subsequent to December 31, 2013 .

As a result of our debt service requirements and a general decline in gaming activity since 2007, with Atlantic City properties and our regional markets being more heavily impacted by this trend, we have experienced substantial net losses and operating losses in recent years, resulting in total stockholders' deficit of $7,518.8 million as of September 30, 2014 . Further, we expect to experience net losses and operating losses for the foreseeable future.

On a consolidated basis, cash and cash equivalents, excluding restricted cash, totaled $1,479.9 million at September 30, 2014 compared with $1,438.7 million at December 31, 2013 . We experienced negative operating cash flows of $548.7 million for the nine months ended September 30, 2014 , and we expect to experience negative operating cash flows for the foreseeable future.

Case 15-10047-KG Doc 9 Filed 01/12/15 Page 219 of 732

CAESARS ENTERTAINMENT OPERATING COMPANY, INC.
NOTES TO CONSOLIDATED CONDENSED FINANCIAL STATEMENTS (CONTINUED)
(UNAUDITED)

We do not currently expect that our cash flows from operations will be sufficient to repay our indebtedness and we will need to pursue additional debt or equity offerings or seek a refinancing, amendment, private restructuring or a reorganization under Chapter 11 of the Bankruptcy Code.

We have sufficient liquidity at present, including our ability to borrow under any of our credit arrangements as described in Note 9, "Debt." However, we estimate, that absent a refinancing, amendment, private restructuring or a reorganization under Chapter 11 of the Bankruptcy Code, based on our current operating forecasts and their underlying assumptions, we will require additional sources of liquidity to fund our operations and obligations beginning during the fourth quarter of 2015. These factors raise substantial doubt as to our ability to continue as a going concern beyond the fourth quarter of 2015. These financial statements do not include any adjustments that might result from the outcome of this uncertainty.

During the nine months ended September 30, 2014 , we have been undertaking a number of actions to mitigate this uncertainty. For more information on these actions and the impact that the related transactions have on our liquidity and capital structure, see Note 5 , " Property Transaction with CGP LLC ," Note 9 , " Debt ," and Note 10 , " Stockholders' Equity ."

Also see Note 15 , " Litigation, Contractual Commitments and Contingent Liabilities ," and Note 23 , " Subsequent Events " for more information regarding Noteholder disputes and claims related to these actions and transactions. If a court were to find in favor of the claimants in any of these disputes, such determination could have a material adverse effect on our business, financial condition, results of operations, and prospects and on the ability of lenders and Noteholders to recover on claims under our indebtedness.

On September 12, 2014, it was announced that the Company and its parent, CEC, had executed non-disclosure agreements ("NDAs") with certain first lien creditors of the Company's 11.25% senior secured notes due 2017, our 8.5% senior secured notes due 2020, and our 9% senior secured notes due 2020 in an effort to restructure the Company's debt.

On October 17, 2014, it was announced that the Company and its parent, CEC, had executed NDAs with certain beneficial holders of debt, including senior secured term loans, issued by the Company pursuant to the Third Amended and Restated Credit Agreement dated July 25, 2014, by and among CEC, CEOC, the lender parties and Credit Suisse AG, Cayman Islands Branch, as administrative agent, in an effort to restructure the Company's debt.

On October 29, 2014, it was announced that one of the first lien creditors that had previously executed an NDA did not extend its NDA. While no agreement has been reached yet on the terms of a restructuring, the Company and CEC are continuing discussions with the remaining first lien creditors, excluding the one which failed to extend its NDA.

On October 16, 2014, the Company entered into certain control arrangements with the Collateral Agent in order to provide the first lien secured creditors with a perfected lien on its cash. Such arrangements do not restrict our ability to utilize cash and are not expected to have an operational impact on CEOC (see Note 9 , " Debt ").

From time to time, depending upon market, pricing, and other conditions, and on our cash balances and liquidity, we may seek to acquire or exchange notes or other indebtedness through open market purchases, privately negotiated transactions, tender offers, redemption, exchange offers or otherwise, upon such terms and at such prices as we may determine (or as may be provided for in the indentures governing the notes), for cash or other consideration, including our common stock. In addition, we have considered and will continue to evaluate potential transactions to reduce net debt, such as debt for debt exchanges, debt for equity exchanges or restructuring transactions.

Our ability to refinance or restructure our debt, or to issue additional debt or equity, will depend upon, among other things:

- the condition of the capital markets at the time, which is beyond our control;
- our future financial and operating performance, which will be affected by prevailing economic conditions and financial, business, regulatory and other factors, many of which are beyond our control;
- our continued compliance with the terms and covenants in our credit facilities, indentures and loan agreements that govern our debt; and
- the results of ongoing discussions with the Company's Noteholders and lenders.

The foregoing are forward-looking statements based on assumptions as of the date of this filing that may or may not prove to be correct. Actual results may differ materially from our present expectations. Factors that may cause actual results to differ materially from present expectations include, without limitation, the results of ongoing discussion with our lenders and noteholders and the impact positive or negative changes in the operational and other matters assumed in preparing our forecasts would have on our ability to continue as a going concern.

**EXHIBIT 6**

**HARRAH'S OPERATING COMPANY, INC.**
as Issuer
and
**HARRAH'S ENTERTAINMENT, INC.**
as Parent Guarantor

10.00% Second-Priority Senior Secured Notes due 2018
10.00% Second-Priority Senior Secured Notes due 2015

───────────────────

INDENTURE

Dated as of December 24, 2008

───────────────────

U.S. Bank National Association,
as Trustee

TABLE OF CONTENTS

**Page**

ARTICLE I
DEFINITIONS AND INCORPORATION BY REFERENCE

| | | |
|---|---|---|
| Section 1.01. | Definitions | 1 |
| Section 1.02. | Other Definitions | 42 |
| Section 1.03. | Incorporation by Reference of Trust Indenture Act | 43 |
| Section 1.04. | Rules of Construction | 43 |

ARTICLE II
THE NOTES

| | | |
|---|---|---|
| Section 2.01. | Amount of Notes | 44 |
| Section 2.02. | Form and Dating | 45 |
| Section 2.03. | Execution and Authentication | 46 |
| Section 2.04. | Registrar and Paying Agent | 46 |
| Section 2.05. | Paying Agent to Hold Money in Trust | 47 |
| Section 2.06. | Holder Lists | 47 |
| Section 2.07. | Transfer and Exchange | 47 |
| Section 2.08. | Replacement Notes | 48 |
| Section 2.09. | Outstanding Notes | 49 |
| Section 2.10. | Temporary Notes | 49 |
| Section 2.11. | Cancellation | 49 |
| Section 2.12. | Defaulted Interest | 49 |
| Section 2.13. | CUSIP Numbers, ISINs, Etc | 50 |
| Section 2.14. | Calculation of Principal Amount of Notes | 50 |
| Section 2.15. | Mandatory Disposition Pursuant to Gaming Laws | 50 |

ARTICLE III
REDEMPTION

| | | |
|---|---|---|
| Section 3.01. | Redemption | 51 |
| Section 3.02. | Applicability of Article | 51 |
| Section 3.03. | Notices to Trustee | 51 |
| Section 3.04. | Selection of Notes to Be Redeemed | 51 |
| Section 3.05. | Notice of Optional Redemption | 51 |
| Section 3.06. | Effect of Notice of Redemption | 52 |
| Section 3.07. | Deposit of Redemption Price | 52 |
| Section 3.08. | Notes Redeemed in Part | 53 |

ARTICLE IV
COVENANTS

| | | |
|---|---|---|
| Section 4.01. | Payment of Notes | 53 |
| Section 4.02. | Reports and Other Information | 53 |

i

TABLE OF CONTENTS
(cont'd)

| | | Page |
|---|---|---|
| Section 4.03. | Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock | 55 |
| Section 4.04. | Limitation on Restricted Payments | 61 |
| Section 4.05. | Dividend and Other Payment Restrictions Affecting Subsidiaries | 68 |
| Section 4.06. | Asset Sales | 70 |
| Section 4.07. | Transactions with Affiliates | 73 |
| Section 4.08. | Change of Control | 76 |
| Section 4.09. | Compliance Certificate | 78 |
| Section 4.10. | Further Instruments and Acts | 78 |
| Section 4.11. | Future Subsidiary Pledgors | 78 |
| Section 4.12. | Liens | 78 |
| Section 4.13. | After-Acquired Property | 79 |
| Section 4.14. | Maintenance of Office or Agency | 79 |
| Section 4.15. | Amendment of Security Documents | 80 |
| Section 4.16. | Covenant Suspension | 80 |
| Section 4.17. | Maintenance of Insurance | 81 |

ARTICLE V
SUCCESSOR COMPANY

| Section 5.01. | When Issuer May Merge or Transfer Assets | 81 |

ARTICLE VI
DEFAULTS AND REMEDIES

| Section 6.01. | Events of Default | 84 |
| Section 6.02. | Acceleration | 86 |
| Section 6.03. | Other Remedies | 87 |
| Section 6.04. | Waiver of Past Defaults | 87 |
| Section 6.05. | Control by Majority | 87 |
| Section 6.06. | Limitation on Suits | 87 |
| Section 6.07. | Rights of the Holders to Receive Payment | 88 |
| Section 6.08. | Collection Suit by Trustee | 88 |
| Section 6.09. | Trustee May File Proofs of Claim | 88 |
| Section 6.10. | Priorities | 88 |
| Section 6.11. | Undertaking for Costs | 89 |
| Section 6.12. | Waiver of Stay or Extension Laws | 89 |

ARTICLE VII
TRUSTEE

| Section 7.01. | Duties of Trustee | 89 |
| Section 7.02. | Rights of Trustee | 91 |

TABLE OF CONTENTS
(cont'd)

|  |  | **Page** |
|---|---|---|
| Section 7.03. | Individual Rights of Trustee | 92 |
| Section 7.04. | Trustee's Disclaimer | 92 |
| Section 7.05. | Notice of Defaults | 93 |
| Section 7.06. | Reports by Trustee to the Holders | 93 |
| Section 7.07. | Compensation and Indemnity | 93 |
| Section 7.08. | Replacement of Trustee | 94 |
| Section 7.09. | Successor Trustee by Merger | 95 |
| Section 7.10. | Eligibility; Disqualification | 95 |
| Section 7.11. | Preferential Collection of Claims Against the Issuer | 96 |

ARTICLE VIII
DISCHARGE OF INDENTURE; DEFEASANCE

| Section 8.01. | Discharge of Liability on Notes; Defeasance | 96 |
|---|---|---|
| Section 8.02. | Conditions to Defeasance | 97 |
| Section 8.03. | Application of Trust Money | 98 |
| Section 8.04. | Repayment to Issuer | 99 |
| Section 8.05. | Indemnity for U.S. Government Obligations | 99 |
| Section 8.06. | Reinstatement | 99 |

ARTICLE IX
AMENDMENTS AND WAIVERS

| Section 9.01. | Without Consent of the Holders | 99 |
|---|---|---|
| Section 9.02. | With Consent of the Holders | 100 |
| Section 9.03. | Compliance with Trust Indenture Act | 102 |
| Section 9.04. | Revocation and Effect of Consents and Waivers | 102 |
| Section 9.05. | Notation on or Exchange of Notes | 102 |
| Section 9.06. | Trustee to Sign Amendments | 102 |
| Section 9.07. | Payment for Consent | 103 |
| Section 9.08. | Additional Voting Terms; Calculation of Principal Amount | 103 |

ARTICLE X
RANKING OF NOTE LIENS

| Section 10.01. | Relative Rights | 103 |
|---|---|---|

ARTICLE XI
COLLATERAL

| Section 11.01. | Security Documents | 104 |
|---|---|---|
| Section 11.02. | Collateral Agent | 105 |
| Section 11.03. | Authorization of Actions to Be Taken | 106 |

iii

TABLE OF CONTENTS
(cont'd)

|  |  | **Page** |
|---|---|---|
| Section 11.04. | Release of Liens | 107 |
| Section 11.05. | Filing, Recording and Opinions | 108 |
| Section 11.06. | [Intentionally omitted] | 109 |
| Section 11.07. | Powers Exercisable by Receiver or Trustee | 109 |
| Section 11.08. | Release Upon Termination of the Issuer's Obligations | 109 |
| Section 11.09. | Designations | 109 |
| Section 11.10. | Taking and Destruction | 110 |

ARTICLE XII
GUARANTEE

| Section 12.01. | Guarantee | 110 |
|---|---|---|
| Section 12.02. | Limitation on Liability | 112 |
| Section 12.03. | Successors and Assigns | 113 |
| Section 12.04. | No Waiver | 113 |
| Section 12.05. | Modification | 113 |
| Section 12.06. | Execution of Supplemental Indenture for Future Note Guarantors | 113 |
| Section 12.07. | Non-Impairment | 113 |

ARTICLE XIII
MISCELLANEOUS

| Section 13.01. | Trust Indenture Act Controls | 113 |
|---|---|---|
| Section 13.02. | Notices | 114 |
| Section 13.03. | Communication by the Holders with Other Holders | 115 |
| Section 13.04. | Certificate and Opinion as to Conditions Precedent | 115 |
| Section 13.05. | Statements Required in Certificate or Opinion | 115 |
| Section 13.06. | When Notes Disregarded | 115 |
| Section 13.07. | Rules by Trustee, Paying Agent and Registrar | 115 |
| Section 13.08. | Legal Holidays | 116 |
| Section 13.09. | GOVERNING LAW | 116 |
| Section 13.10. | No Recourse Against Others | 116 |
| Section 13.11. | Successors | 116 |
| Section 13.12. | Multiple Originals | 116 |
| Section 13.13. | Table of Contents; Headings | 116 |
| Section 13.14. | Indenture Controls | 116 |
| Section 13.15. | Severability | 116 |
| Section 13.16. | Intercreditor Agreement | 116 |

| Appendix A | – | Provisions Relating to Initial Notes, Additional Notes and Exchange Notes | |

EXHIBIT INDEX

| Exhibit A-1 | – | Form of Initial 2018 Note | A-1-1 |
|---|---|---|---|
| Exhibit A-2 | – | Form of Initial 2015 Note | A-2-1 |

iv

TABLE OF CONTENTS
(cont'd)

| | | Page |
|---|---|---|
| Exhibit B-1 | – Form of 2018 Exchange Note | B-1-1 |
| Exhibit B-2 | – Form of 2015 Exchange Note | B-2-1 |
| Exhibit C | – Form of Transferee Letter of Representation | C-1 |
| Exhibit D | – Form of Supplemental Indenture | D-1 |

v

CROSS-REFERENCE TABLE

| TIA Section | | Indenture Section |
|---|---|---|
| 310 | (a)(1) | 7.10 |
| | (a)(2) | 7.10 |
| | (a)(3) | N.A. |
| | (a)(4) | N.A. |
| | (b) | 7.08; 7.10 |
| | (c) | N.A. |
| 311 | (a) | 7.11 |
| | (b) | 7.11 |
| | (c) | N.A. |
| 312 | (a) | 2.06 |
| | (b) | 13.03 |
| | (c) | 13.03 |
| 313 | (a) | 7.06 |
| | (b)(1) | N.A. |
| | (b)(2) | 7.06 |
| | (c) | 7.06 |
| | (d) | 4.02; 4.09 |
| 314 | (a) | 4.02; 4.09 |
| | (b) | N.A. |
| | (c)(1) | 13.04 |
| | (c)(2) | 13.04 |
| | (c)(3) | N.A. |
| | (d) | N.A. |
| | (e) | 13.05 |
| | (f) | 4.10 |
| 315 | (a) | 7.01 |
| | (b) | 7.05 |
| | (c) | 7.01 |
| | (d) | 7.01 |
| | (e) | 6.11 |
| 316 | (a)(last sentence) | 13.06 |
| | (a)(1)(A) | 6.05 |
| | (a)(1)(B) | 6.04 |
| | (a)(2) | N.A. |
| | (b) | 6.07 |
| 317 | (a)(1) | 6.08 |
| | (a)(2) | 6.09 |
| | (b) | 2.05 |
| 318 | (a) | 13.01 |

N.A. Means Not Applicable.

Note: This Cross-Reference Table shall not, for any purposes, be deemed to be part of this Indenture.

INDENTURE dated as of December 24, 2008 among HARRAH'S OPERATING COMPANY, INC., a Delaware corporation (the " Issuer "), HARRAH'S ENTERTAINMENT, INC., a Delaware corporation (the " Parent Guarantor ") and U.S. BANK NATIONAL ASSOCIATION, as trustee (the " Trustee ").

Each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the holders of (i) $847,621,000 aggregate principal amount of the Issuer's 10.00% Second-Priority Senior Secured Notes due 2018 issued on the date hereof (the " 2018 Notes "), (ii) $214,800,000 aggregate principal amount of the Issuer's 10.00% Second-Priority Senior Secured Notes due 2015 issued on the date hereof (the " 2015 Notes " and, together with the 2018 Notes, the " Initial Notes "), (iii) exchange notes issued in exchange for the Initial Notes pursuant to the Registration Rights Agreement or pursuant to an effective registration statement under the Securities Act (the " Exchange Notes ") and (iv) Additional Notes issued from time to time as either Initial Notes or Exchanges Notes (together with the Initial Notes and any Exchange Notes, the " Notes "):

# ARTICLE I
## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01. Definitions .

" Acquired Indebtedness " means, with respect to any specified Person:

(1) Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person, and

(2) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

" Acquisition " means the acquisition by Affiliates of the Sponsors of substantially all of the outstanding shares of capital stock of Harrah's Entertainment, Inc., pursuant to the Merger Agreement.

" Acquisition Documents " means the Merger Agreement and any other document entered into in connection therewith, in each case as amended, supplemented or modified from time to time prior to the Issue Date or thereafter.

" Acquisition Transactions " means the transactions described in the Offering Memorandum under the section titled "Acquisition Transactions."

" Additional Notes " means 2018 Notes or 2015 Notes issued under the terms of this Indenture subsequent to the Issue Date.

" Affiliate " of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, " control " (including, with correlative meanings, the terms

" controlling ," " controlled by " and " under common control with "), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

" Applicable Premium " means, with respect to any Note on any applicable redemption date, the greater of:

(1) 1% of the then outstanding principal amount of the Note; and

(2) the excess of:

(a) the present value at such redemption date of (i) the redemption price of the Note at December 15, 2013 (in the case of the 2018 Notes) and December 15, 2012 (in the case of the 2015 Notes) (such redemption price being set forth in Paragraph 5 of the applicable Note) *plus* (ii) all required interest payments due on the Note through December 15, 2013 (in the case of the 2018 Notes) and December 15, 2012 (in the case of the 2015 Notes) (excluding accrued but unpaid interest), computed using a discount rate equal to the Treasury Rate as of such redemption date *plus* 50 basis points; over

(b) the then outstanding principal amount of the Note.

" Asset Sale " means:

(1) the sale, conveyance, transfer or other disposition (whether in a single transaction or a series of related transactions) of property or assets (including by way of a Sale/ Leaseback Transaction) outside the ordinary course of business of the Issuer or any Restricted Subsidiary of the Issuer (each referred to in this definition as a " disposition ") or

(2) the issuance or sale of Equity Interests (other than directors' qualifying shares and shares issued to foreign nationals or other third parties to the extent required by applicable law) of any Restricted Subsidiary (other than to the Issuer or another Restricted Subsidiary of the Issuer) (whether in a single transaction or a series of related transactions),

in each case other than:

(a) a disposition of Cash Equivalents or Investment Grade Securities or obsolete, damaged or worn out property or equipment in the ordinary course of business;

(b) the disposition of all or substantially all of the assets of the Issuer in a manner permitted pursuant to Section 5.01 or any disposition that constitutes a Change of Control;

2

(c) any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under Section 4.04;

(d) any disposition of assets of the Issuer or any Restricted Subsidiary or issuance or sale of Equity Interests of any Restricted Subsidiary, which assets or Equity Interests so disposed or issued have an aggregate Fair Market Value (as determined in good faith by the Issuer) of less than $50.0 million;

(e) any disposition of property or assets, or the issuance of securities, by a Restricted Subsidiary of the Issuer to the Issuer or by the Issuer or a Restricted Subsidiary of the Issuer to a Restricted Subsidiary of the Issuer;

(f) any exchange of assets (including a combination of assets and Cash Equivalents) for assets related to a Similar Business of comparable or greater market value or usefulness to the business of the Issuer and its Restricted Subsidiaries as a whole, as determined in good faith by the Issuer;

(g) foreclosure or any similar action with respect to any property or other asset of the Issuer or any of its Restricted Subsidiaries;

(h) any sale of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary;

(i) the lease, assignment or sublease of any real or personal property in the ordinary course of business;

(j) any sale of inventory or other assets in the ordinary course of business;

(k) any grant in the ordinary course of business of any license of patents, trademarks, know-how or any other intellectual property;

(l) in the ordinary course of business, any swap of assets, or lease, assignment or sublease of any real or personal property, in exchange for services (including in connection with any outsourcing arrangements) of comparable or greater value or usefulness to the business of the Issuer and its Restricted Subsidiaries as a whole, as determined in good faith by the Issuer;

(m) a transfer of accounts receivable and related assets of the type specified in the definition of " Receivables Financing " (or a fractional undivided interest therein) by a Receivables Subsidiary in a Qualified Receivables Financing;

(n) any financing transaction with respect to property built or acquired by the Issuer or any Restricted Subsidiary after the Issue Date, including any Sale/Leaseback Transaction or asset securitization permitted by this Indenture;

(o) dispositions in connection with Permitted Liens;

3

(p) any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Issuer or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and in each case comprising all or a portion of the consideration in respect of such sale or acquisition;

(q) any disposition made pursuant to an Operations Management Agreement;

(r) the sale of any property in a Sale/Leaseback Transaction within six months of the acquisition of such property;

(s) dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements; and

(t) any surrender or waiver of contract rights or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind.

" Bank Indebtedness " means any and all amounts payable under or in respect of the Credit Agreement and the other Credit Agreement Documents as amended, restated, supplemented, waived, replaced, restructured, repaid, refunded, refinanced or otherwise modified from time to time (including after termination of the Credit Agreement), including principal, premium (if any), interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Issuer whether or not a claim for post-filing interest is allowed in such proceedings), fees, charges, expenses, reimbursement obligations, guarantees and all other amounts payable thereunder or in respect thereof.

" Board of Directors " means, as to any Person, the board of directors or managers, as applicable, of such Person (or, if such Person is a partnership, the board of directors or other governing body of the general partner of such Person) or any duly authorized committee thereof.

" Business Day " means a day other than a Saturday, Sunday or other day on which banking institutions are authorized or required by law to close in New York City.

" Capital Stock " means:

(1) in the case of a corporation, corporate stock or shares;

(2) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

4

(4) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

" Capitalized Lease Obligation " means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

" Capitalized Software Expenditures " means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Restricted Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of such Person and such Restricted Subsidiaries.

" Cash Equivalents " means:

(1) U.S. dollars, pounds sterling, euros, the national currency of any member state in the European Union or, in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

(2) securities issued or directly and fully guaranteed or insured by the U.S. government or any country that is a member of the European Union or any agency or instrumentality thereof in each case maturing not more than two years from the date of acquisition;

(3) certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances, in each case with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus in excess of $250.0 million and whose long-term debt is rated "A" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency);

(4) repurchase obligations for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5) commercial paper issued by a corporation (other than an Affiliate of the Issuer) rated at least "A-1" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) and in each case maturing within one year after the date of acquisition;

(6) readily marketable direct obligations issued by any state of the United States of America or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

5

(7) Indebtedness issued by Persons (other than the Sponsors or any of their Affiliates) with a rating of "A" or higher from S&P or "A-2" or higher from Moody's (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition; and

(8) investment funds investing at least 95% of their assets in securities of the types described in clauses (1) through (7) above.

" Change of Control " means the occurrence of either of the following:

(1) the sale, lease or transfer, in one or a series of related transactions, of all or substantially all the assets of the Issuer and its Subsidiaries, taken as a whole, to a Person other than any of the Permitted Holders; or

(2) the Issuer becomes aware (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) of the acquisition by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), including any group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act), other than any of the Permitted Holders, in a single transaction or in a related series of transactions, by way of merger, consolidation, amalgamation or other business combination or purchase of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision), of more than 50% of the total voting power of the Voting Stock of (prior to a Qualified IPO or upon or after an Issuer IPO) the Issuer or (upon or after a Holdco Qualified IPO) the Holdco Issuer.

" Code " means the Internal Revenue Code of 1986, as amended.

" Collateral " means all property subject or purported to be subject, from time to time, to a Lien under any Security Documents.

" Collateral Agent " means the Trustee in its capacity as " Collateral Agent " under this Indenture and under the Security Documents and any successor thereto in such capacity.

" Collateral Agreement " means the collateral agreement among the Issuer, each Subsidiary Pledgor and U.S. Bank National Association, as Collateral Agent, dated as of the date hereof, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms and this Indenture.

" Consolidated Depreciation and Amortization Expense " means, with respect to any Person for any period, the total amount of depreciation and amortization expense, including the amortization of intangible assets, deferred financing fees and Capitalized Software Expenditures and amortization of unrecognized prior service costs and actuarial gains and losses related to pensions and other post-employment benefits, of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

6

" Consolidated Interest Expense " means, with respect to any Person for any period, the sum, without duplication, of:

(1) consolidated interest expense of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted in computing Consolidated Net Income (including amortization of original issue discount, the interest component of Capitalized Lease Obligations, and net payments and receipts (if any) pursuant to interest rate Hedging Obligations and excluding additional interest in respect of the Notes, amortization of deferred financing fees, debt issuance costs, commissions, fees and expenses and expensing of any bridge, commitment or other financing fees); *plus*

(2) consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued; *plus*

(3) commissions, discounts, yield and other fees and charges Incurred in connection with any Receivables Financing which are payable to Persons other than the Issuer and its Restricted Subsidiaries; *minus*

(4) interest income for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by the Issuer to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

" Consolidated Leverage Ratio " means, with respect to any Person, at any date the ratio of (i) Indebtedness (other than Qualified Non-Recourse Debt) of such Person and its Restricted Subsidiaries as of such date of calculation (determined on a consolidated basis in accordance with GAAP) less the amount of cash and Cash Equivalents in excess of any Restricted Cash that would be stated on the balance sheet of such Person and its Restricted Subsidiaries and held by such Person and its Restricted Subsidiaries as of such date of determination to (ii) EBITDA of such Person for the four full fiscal quarters for which internal financial statements are available immediately preceding such date on which such additional Indebtedness is Incurred. In the event that the Issuer or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness subsequent to the commencement of the period for which the Consolidated Leverage Ratio is being calculated but prior to the event for which the calculation of the Consolidated Leverage Ratio is made (the " Consolidated Leverage Calculation Date "), then the Consolidated Leverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness as if the same had occurred at the beginning of the applicable four-quarter period; *provided* that the Issuer may elect pursuant to an Officer's Certificate delivered to the Trustee to treat all or any portion of the commitment under any Indebtedness as being Incurred at such time, in which case any subsequent Incurrence of Indebtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

7

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions) and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Issuer or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Consolidated Leverage Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions), discontinued operations and other operational changes (and the change of any associated Indebtedness and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Consolidated Leverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period. For purposes of making the computation referred to above, with respect to each New Project that commences operations and records not less than one full fiscal quarter's operations during the four-quarter reference period, the operating results of such New Project will be annualized on a straight-line basis during such period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Issuer. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Issuer as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event (including, to the extent applicable, from the Acquisition Transactions) and (2) all adjustments of the nature used in connection with the calculation of "Adjusted EBITDA" as set forth in "Debt Covenant Compliance" in Exhibit 99.1 to the Quarterly Report on Form 10-Q for the nine months ended September 30, 2008 for Harrah's Entertainment to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

For purposes of this definition, any amount in a currency other than U.S. dollars will be converted to U.S. dollars based on the average exchange rate for such currency for the most recent twelve month period immediately prior to the date of determination in a manner consistent with that used in calculating EBITDA for the applicable period.

" Consolidated Net Income " means, with respect to any Person for any period, the aggregate of the Net Income of such Person and its Restricted Subsidiaries for such period, on a consolidated basis; *provided, however,* that:

(1) any net after-tax extraordinary, nonrecurring or unusual gains or losses (less all fees and expenses relating thereto) or expenses or charges, any severance

8

expenses, relocation expenses, curtailments or modifications to pension and post-retirement employee benefit plans, any expenses related to any reconstruction, decommissioning, recommissioning or reconfiguration of fixed assets for alternate uses and fees, expenses or charges relating to facilities closing costs, acquisition integration costs, facilities opening costs, project start-up costs, business optimization costs, signing, retention or completion bonuses, expenses or charges related to any issuance of Equity Interests, Investment, acquisition, disposition, recapitalization or issuance, repayment, refinancing, amendment or modification of Indebtedness (in each case, whether or not successful), and any fees, expenses, charges or change in control payments made under the Acquisition Documents or otherwise related to the Acquisition Transactions or the Transactions, in each case, shall be excluded;

(2) effects of purchase accounting adjustments (including the effects of such adjustments pushed down to such Person and such Restricted Subsidiaries) in amounts required or permitted by GAAP, resulting from the application of purchase accounting in relation to the Acquisition Transactions or any consummated acquisition or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded;

(3) the Net Income for such period shall not include the cumulative effect of a change in accounting principles during such period;

(4) any net after-tax income or loss from disposed, abandoned, transferred, closed or discontinued operations and any net after-tax gains or losses on disposal of disposed, abandoned, transferred, closed or discontinued operations shall be excluded;

(5) any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course of business (as determined in good faith by management of the Issuer) shall be excluded;

(6) any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of indebtedness, Hedging Obligations or other derivative instruments shall be excluded;

(7) the Net Income for such period of any Person that is not a Subsidiary of such Person, or is an Unrestricted Subsidiary or a Qualified Non-Recourse Subsidiary, or that is accounted for by the equity method of accounting, shall be included only to the extent of the amount of dividends or distributions or other payments paid in cash (or to the extent converted into cash) to the referent Person or a Restricted Subsidiary thereof (other than a Qualified Non-Recourse Subsidiary of such referent Person) in respect of such period;

(8) solely for the purpose of determining the amount available for Restricted Payments under clause (1) of the definition of " Cumulative Credit ," the Net Income for such period of any Restricted Subsidiary (other than any Subsidiary Pledgor) shall be excluded to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary of its Net Income is not at the date of

9

determination permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders, unless such restrictions with respect to the payment of dividends or similar distributions have been legally waived; *provided* that the Consolidated Net Income of such Person shall be increased by the amount of dividends or other distributions or other payments actually paid in cash (or converted into cash) by any such Restricted Subsidiary to such Person, to the extent not already included therein;

(9) an amount equal to the amount of Tax Distributions actually made to any parent or equity holder of such Person in respect of such period in accordance with Section 4.04(b)(xii) shall be included as though such amounts had been paid as income taxes directly by such Person for such period;

(10) any impairment charges or asset write-offs, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP shall be excluded;

(11) any non-cash expense realized or resulting from stock option plans, employee benefit plans or post-employment benefit plans, or grants or sales of stock, stock appreciation or similar rights, stock options, restricted stock, preferred stock or other rights, shall be excluded;

(12) any (a) one-time non-cash compensation charges, (b) costs and expenses after the Issue Date related to employment of terminated employees, or (c) costs or expenses realized in connection with or resulting from stock appreciation or similar rights, stock options or other rights existing on the Issue Date of officers, directors and employees, in each case of such Person or any of its Restricted Subsidiaries, shall be excluded;

(13) accruals and reserves that are established or adjusted within 12 months after the Issue Date and that are so required to be established or adjusted in accordance with GAAP or as a result of adoption or modification of accounting policies shall be excluded;

(14) solely for purposes of calculating EBITDA, (a) the Net Income of any Person and its Restricted Subsidiaries shall be calculated without deducting the income attributable to, or adding the losses attributable to, the minority equity interests of third parties in any non-Wholly Owned Restricted Subsidiary except to the extent of dividends declared or paid in respect of such period or any prior period on the shares of Capital Stock of such Restricted Subsidiary held by such third parties and (b) any ordinary course dividend, distribution or other payment paid in cash and received from any Person in excess of amounts included in clause (7) above shall be included;

(15) (a)(i) the non-cash portion of " straight-line " rent expense shall be excluded and (ii) the cash portion of " straight-line " rent expense which exceeds the amount expensed in respect of such rent expense shall be included and (b) non-cash gains, losses, income and expenses resulting from fair value accounting required by the applicable standard under GAAP and related interpretations shall be excluded;

10

(16) any currency translation gains and losses related to currency remeasurements of Indebtedness, and any net loss or gain resulting from hedging transactions for currency exchange risk, shall be excluded; and

(17) to the extent covered by insurance and actually reimbursed, or, so long as such Person has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (a) not denied by the applicable carrier in writing within 180 days and (b) in fact reimbursed within 365 days of the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within 365 days), expenses with respect to liability or casualty events or business interruption shall be excluded.

Notwithstanding the foregoing, for the purpose of Section 4.04 only, there shall be excluded from Consolidated Net Income any dividends, repayments of loans or advances or other transfers of assets from Unrestricted Subsidiaries of the Issuer or a Restricted Subsidiary of the Issuer to the extent such dividends, repayments or transfers increase the amount of Restricted Payments permitted under such Section pursuant to clauses (D) and (E) of the definition of " Cumulative Credit ."

" Consolidated Non-cash Charges " means, with respect to any Person for any period, the non-cash expenses (other than Consolidated Depreciation and Amortization Expense) of such Person and its Restricted Subsidiaries reducing Consolidated Net Income of such Person for such period on a consolidated basis and otherwise determined in accordance with GAAP, *provided* that if any such non-cash expenses represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from EBITDA in such future period to the extent paid, but excluding from this proviso, for the avoidance of doubt, amortization of a prepaid cash item that was paid in a prior period.

" Consolidated Taxes " means, with respect to any Person for any period, the provision for taxes based on income, profits or capital, including, without limitation, state, franchise, property and similar taxes, foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations) and any Tax Distributions taken into account in calculating Consolidated Net Income.

" Contingent Obligations " means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness (" primary obligations ") of any other Person (the " primary obligor ") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

(1) to purchase any such primary obligation or any property constituting direct or indirect security therefor,

(2) to advance or supply funds:

(a) for the purchase or payment of any such primary obligation; or

11

(b) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

" Credit Agreement " means (i) the credit agreement, dated as of January 28, 2008, entered in connection with the consummation of the Acquisition, among the Issuer, the pledgors named therein, the financial institutions named therein, and Bank of America, N.A., as Administrative Agent and Collateral Agent, as amended, restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original lenders or otherwise), restructured, repaid, refunded, refinanced or otherwise modified from time to time, including any agreement or indenture extending the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the Indebtedness under such agreement or agreements or indenture or indentures or any successor or replacement agreement or agreements or indenture or indentures or increasing the amount loaned or issued thereunder or altering the maturity thereof and (ii) whether or not the credit agreement referred to in clause (i) remains outstanding, if designated by the Issuer to be included in the definition of "Credit Agreement," one or more (A) debt facilities or commercial paper facilities, providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to lenders or to special purpose entities formed to borrow from lenders against such receivables) or letters of credit, (B) debt securities, indentures or other forms of debt financing (including convertible or exchangeable debt instruments or bank guarantees or bankers' acceptances), or (C) instruments or agreements evidencing any other Indebtedness, in each case, with the same or different borrowers or issuers and, in each case, as amended, supplemented, modified, extended, restructured, renewed, refinanced, restated, replaced or refunded in whole or in part from time to time.

" Credit Agreement Documents " means the collective reference to any Credit Agreement, any notes issued pursuant thereto and the guarantees thereof, and the collateral documents relating thereto, as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified, in whole or in part, from time to time.

" Cumulative Credit " means the sum of (without duplication):

(A) 50% of the Consolidated Net Income of the Issuer for the period (taken as one accounting period), from January 1, 2008 to the end of the Issuer's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, in the case such Consolidated Net Income for such period is a deficit, minus 100% of such deficit), *plus*

(B) 100% of the aggregate net proceeds, including cash and the Fair Market Value (as determined in good faith by the Issuer) of property other than cash, received by the Issuer after February 1, 2008 (other than net proceeds to the extent such net proceeds have been used to Incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to Section

12

4.03(b)(xiii)) from the issue or sale of Equity Interests of the Issuer (excluding Refunding Capital Stock, Designated Preferred Stock, Excluded Contributions and Disqualified Stock), including Equity Interests issued upon exercise of warrants or options (other than an issuance or sale to a Restricted Subsidiary of the Issuer), *plus*

(C) 100% of the aggregate amount of contributions to the capital of the Issuer received in cash and the Fair Market Value (as determined in good faith by the Issuer) of property other than cash after February 1, 2008 (other than Excluded Contributions, Refunding Capital Stock, Designated Preferred Stock and Disqualified Stock and other than contributions to the extent such contributions have been used to Incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to Section 4.03(b)(xiii)), *plus*

(D) 100% of the principal amount of any Indebtedness or the liquidation preference or maximum fixed repurchase price, as the case may be, of any Disqualified Stock of the Issuer or any Restricted Subsidiary thereof issued after February 1, 2008 (other than Indebtedness or Disqualified Stock issued to a Restricted Subsidiary) which has been converted into or exchanged for Equity Interests in the Issuer (other than Disqualified Stock) or any direct or indirect parent of the Issuer ( *provided* in the case of any parent, such Indebtedness or Disqualified Stock is retired or extinguished), *plus*

(E) 100% of the aggregate amount received by the Issuer or any Restricted Subsidiary in cash and the Fair Market Value (as determined in good faith by the Issuer) of property other than cash received by the Issuer or any Restricted Subsidiary from:

(I) the sale or other disposition (other than to the Issuer or a Restricted Subsidiary of the Issuer) of Restricted Investments made by the Issuer and its Restricted Subsidiaries and from repurchases and redemptions of such Restricted Investments from the Issuer and its Restricted Subsidiaries by any Person (other than the Issuer or any of its Restricted Subsidiaries) and from repayments of loans or advances, and releases of guarantees, which constituted Restricted Investments (other than in each case to the extent that the Restricted Investment was made pursuant to clause (vii) of Section 4.04(b)),

(II) the sale (other than to the Issuer or a Restricted Subsidiary of the Issuer) of the Capital Stock of an Unrestricted Subsidiary, or

(III) a distribution or dividend from an Unrestricted Subsidiary, *plus*

(F) in the event any Unrestricted Subsidiary of the Issuer has been redesignated as a Restricted Subsidiary or has been merged, consolidated or amalgamated with or into, or transfers or conveys its assets to, or is liquidated into, the Issuer or a Restricted Subsidiary of the Issuer, the Fair Market Value (as determined in good faith by the Issuer) of the Investment of the Issuer in such Unrestricted Subsidiary (which, if the Fair Market Value of such investment shall exceed $250.0 million, shall be determined by the Board of Directors of the Issuer, a copy of the resolution of which with respect thereto shall be delivered to the Trustee) at the time of such redesignation, combination or transfer (or of the assets transferred or conveyed, as applicable) (other than in each case to the extent that the designation of such Subsidiary as an Unrestricted Subsidiary was made pursuant to clause (vii) of Section 4.04(b) or constituted a Permitted Investment).

13

" <u>Default</u> " means any event which is, or after notice or passage of time or both would be, an Event of Default.

" <u>Designated Non-cash Consideration</u> " means the Fair Market Value (as determined in good faith by the Issuer) of non-cash consideration received by the Issuer or one of its Restricted Subsidiaries in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officer's Certificate, setting forth the basis of such valuation, less the amount of Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration.

" <u>Designated Preferred Stock</u> " means Preferred Stock of the Issuer or any direct or indirect parent of the Issuer (other than Disqualified Stock), that is issued for cash (other than to the Issuer or any of its Subsidiaries or an employee stock ownership plan or trust established by the Issuer or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate, on the issuance date thereof.

" <u>Destruction</u> " means any damage to, loss or destruction of all or any portion of the Collateral.

" <u>Discharge of Senior Lender Claims</u> " shall mean, except to the extent otherwise provided in the Intercreditor Agreement, payment in full in cash (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of (a) all Obligations in respect of all outstanding First Priority Lien Obligations and, with respect to letters of credit or letter of credit guaranties outstanding thereunder, delivery of cash collateral or backstop letters of credit in respect thereof in compliance with the Credit Agreement, in each case after or concurrently with the termination of all commitments to extend credit thereunder and (b) any other First Priority Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid; *provided* that the Discharge of Senior Lender Claims shall not be deemed to have occurred if such payments are made with the proceeds of other First Priority Lien Obligations that constitute an exchange or replacement for or a refinancing of such Obligations or First Priority Lien Obligations. In the event the First Priority Lien Obligations are modified and the Obligations are paid over time or otherwise modified pursuant to Section 1129 of the Bankruptcy Code, the First Priority Lien Obligations shall be deemed to be discharged when the final payment is made, in cash, in respect of such indebtedness and any obligations pursuant to such new indebtedness shall have been satisfied.

" <u>Disqualified Stock</u> " means, with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable), or upon the happening of any event:

(1) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (other than as a result of a change of control or asset sale),

(2) is convertible or exchangeable for Indebtedness or Disqualified Stock of such Person, or

14

(3) is redeemable at the option of the holder thereof, in whole or in part (other than solely as a result of a change of control or asset sale),

in each case prior to 91 days after the earlier of the maturity date of the Notes or the date the Notes are no longer outstanding; *provided, however,* that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; *provided, further, however* , that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of the Issuer or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Issuer in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; *provided, further,* that any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Capital Stock that is not Disqualified Stock shall not be deemed to be Disqualified Stock.

" Domestic Subsidiary " means a Restricted Subsidiary that is not a Foreign Subsidiary.

" EBITDA " means, with respect to any Person for any period, the Consolidated Net Income of such Person for such period plus, without duplication, to the extent the same was deducted in calculating Consolidated Net Income:

(1) Consolidated Taxes; *plus*

(2) Fixed Charges; *plus*

(3) Consolidated Depreciation and Amortization Expense; *plus*

(4) Consolidated Non-cash Charges; *plus*

(5) any expenses or charges (other than Consolidated Depreciation and Amortization Expense) related to any issuance of Equity Interests, Investment, acquisition, disposition, recapitalization or the Incurrence or repayment of Indebtedness permitted to be Incurred by this Indenture (including a refinancing thereof) (whether or not successful), including (i) such fees, expenses or charges related to the offering of the Notes and the Bank Indebtedness, (ii) any amendment or other modification of the Notes or other Indebtedness, (iii) any additional interest in respect of the Notes and (iv) commissions, discounts, yield and other fees and charges (including any interest expense) related to any Qualified Receivables Financing; *plus*

(6) business optimization expenses and other restructuring charges, reserves or expenses (which, for the avoidance of doubt, shall include, without limitation, the effect of inventory optimization programs, facility consolidations, retention, systems establishment costs, contract termination costs, future lease commitments and excess pension charges); *plus*

15

(7) the amount of management, monitoring, consulting, transaction and advisory fees and related expenses paid to the Sponsors (or any accruals relating to such fees and related expenses) during such period to the extent otherwise permitted by Section 4.07; *plus*

(8) the amount of loss on sale of receivables and related assets to a Receivables Subsidiary in connection with a Qualified Receivables Financing; *plus*

(9) any costs or expense Incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such cost or expenses are funded with cash proceeds contributed to the capital of the Issuer or a Subsidiary Pledgor or net cash proceeds of an issuance of Equity Interests of the Issuer (other than Disqualified Stock) solely to the extent that such net cash proceeds are excluded from the calculation of the Cumulative Credit; *plus*

(10) Pre-Opening Expenses;

*less* , without duplication,

(11) non-cash items increasing Consolidated Net Income for such period (excluding the recognition of deferred revenue or any items which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges that reduced EBITDA in any prior period and any items for which cash was received in a prior period).

" Equity Interests " means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

" Equity Offering " means any public or private sale after the Issue Date of common stock or Preferred Stock of the Issuer or any direct or indirect parent of the Issuer, as applicable (other than Disqualified Stock), other than:

(1) public offerings with respect to the Issuer's or such direct or indirect parent's common stock registered on Form S-4 or Form S-8;

(2) issuances to any Subsidiary of the Issuer; and

(3) any such public or private sale that constitutes an Excluded Contribution.

" Exchange Act " means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

" Exchange Offer Registration Statement " means the registration statement filed with the SEC in connection with the Registered Exchange Offer.

16

" <u>Excluded Contributions</u> " means the Cash Equivalents or other assets (valued at their Fair Market Value as determined in good faith by senior management or the Board of Directors of the Issuer) received by the Issuer after the Issue Date from:

(1) contributions to its common equity capital, and

(2) the sale (other than to a Subsidiary of the Issuer or to any Subsidiary management equity plan or stock option plan or any other management or employee benefit plan or agreement) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Issuer,

in each case designated as Excluded Contributions pursuant to an Officer's Certificate executed by an Officer of the Issuer on or promptly after the date such capital contributions are made or the date such Capital Stock is sold, as the case may be.

" <u>Existing Notes</u> " means the Issuer's 5.500% Senior Notes due 2010, 8.00% Senior Notes due 2011, 5.375% Senior Notes due 2013, 7.875% Senior Subordinated Notes due 2010, 8.125% Senior Subordinated Notes due 2011, 5.625% Senior Notes due 2015, 6.500% Senior Notes due 2016, 5.75% Senior Notes due 2017, 10.75% Senior Notes due 2016 and 10.75%/11.50% Senior Toggle Notes due 2018, in each case to the extent outstanding after completion of the Transactions.

" <u>Fair Market Value</u> " means, with respect to any asset or property, the price which could be negotiated in an arm's-length transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction.

" <u>First Lien Agent</u> " has the meaning given to such term in the Intercreditor Agreement.

" <u>First Priority After-Acquired Property</u> " means any property of the Issuer or any Subsidiary Pledgor that secures any Secured Bank Indebtedness that is not already subject to the Lien under the Security Documents other than any securities or other equity interests of the Issuer or any of the Issuer's Subsidiaries.

" <u>First Priority Lien Obligations</u> " means (i) all Secured Bank Indebtedness and (ii) all other Obligations of the Issuer or any of its Restricted Subsidiaries in respect of Hedging Obligations or Obligations in respect of cash management services in each case owing to a Person that is a holder of Secured Bank Indebtedness or an Affiliate of such holder at the time of entry into such Hedging Obligations or Obligations in respect of cash management services.

" <u>Fixed Charge Coverage Ratio</u> " means, with respect to any Person for any period, the ratio of EBITDA of such Person for such period to the Fixed Charges (other than Fixed Charges in respect of Qualified Non-Recourse Debt) of such Person for such period. In the event that the Issuer or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness (other than in the case of revolving credit borrowings or revolving advances under any Qualified Receivables Financing, in which case interest expense shall be computed based upon the average daily balance of such Indebtedness during the applicable period) or issues,

17

repurchases or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated but prior to the event for which the calculation of the Fixed Charge Coverage Ratio is made (the " Calculation Date "), then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness, or such issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions) and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Issuer or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions), discontinued operations and operational changes (and the change of any associated fixed charge obligations and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period. For purposes of making the computation referred to above, with respect to each New Project that commences operations and records not less than one full fiscal quarter's operations during the four-quarter reference period, the operating results of such New Project will be annualized on a straight line basis during such period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Issuer. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Issuer as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event (including, to the extent applicable, from the Acquisition Transactions), and (2) all adjustments of the nature used in connection with the calculation of "Adjusted EBITDA" as set forth in "Debt Covenant Compliance" in Exhibit 99.1 to the Quarterly Report on Form 10-Q for the nine months ended September 30, 2008 for Harrah's Entertainment to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any

18

Hedging Obligations applicable to such Indebtedness if such Hedging Obligation has a remaining term in excess of 12 months). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Issuer to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a *pro forma* basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Issuer may designate.

For purposes of this definition, any amount in a currency other than U.S. dollars will be converted to U.S. dollars based on the average exchange rate for such currency for the most recent twelve-month period immediately prior to the date of determination in a manner consistent with that used in calculating EBITDA for the applicable period.

" Fixed Charges " means, with respect to any Person for any period, the sum, without duplication, of:

(1) Consolidated Interest Expense of such Person for such period, and

(2) all cash dividend payments (excluding items eliminated in consolidation) on any series of Preferred Stock or Disqualified Stock of such Person and its Restricted Subsidiaries.

" Foreign Subsidiary " means a Restricted Subsidiary not organized or existing under the laws of the United States of America or any state or territory thereof or the District of Columbia and any direct or indirect subsidiary of such Restricted Subsidiary.

" GAAP " means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect on the Issue Date. For the purposes of this Indenture, the term " consolidated " with respect to any Person shall mean such Person consolidated with its Restricted Subsidiaries, and shall not include any Unrestricted Subsidiary, but the interest of such Person in an Unrestricted Subsidiary will be accounted for as an Investment.

" Gaming Authorities " means, in any jurisdiction in which Issuer or any of its subsidiaries manages or conducts any casino, gaming business or activities, the applicable gaming board, commission, or other governmental gaming regulatory body or agency which (a) has, or may at any time after issuance of the Notes have, jurisdiction over the gaming activities of the Issuer or any of its subsidiaries, or any successor to such authority or (b) is, or may at any time after the issuance of the Notes be, responsible for interpreting, administering and enforcing the Gaming Laws.

19

" <u>Gaming Laws</u> " means all applicable constitutions, treaties, laws and statutes pursuant to which any Gaming Authority possesses regulatory, licensing or permit authority over gaming, gambling or casino activities, and all rules, rulings, orders, ordinances or regulations of any Gaming Authority applicable to the gambling, casino or gaming businesses or activities of the Issuer or any of its subsidiaries in any jurisdiction, as in effect from time to time, including the policies, interpretations and administration thereof by the Gaming Authorities.

" <u>guarantee</u> " means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including, without limitation, letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

" <u>Harrah's Entertainment</u> " means Harrah's Entertainment, Inc., a Delaware corporation.

" <u>Hedging Obligations</u> " means, with respect to any Person, the obligations of such Person under:

(1) currency exchange, interest rate or commodity swap agreements, currency exchange, interest rate or commodity cap agreements and currency exchange, interest rate or commodity collar agreements; and

(2) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange, interest rates or commodity prices.

" <u>Holdco Issuer</u> " means the issuer in any Holdco Qualified IPO.

" <u>Holdco Qualified IPO</u> " means any Qualified IPO in which a direct or indirect parent of the Issuer is the issuer.

" <u>holder</u> " or " <u>noteholder</u> " means the Person in whose name a Note is registered on the Registrar's books.

" <u>Incur</u> " means issue, assume, guarantee, incur or otherwise become liable for; *provided, however,* that any Indebtedness or Capital Stock of a Person existing at the time such person becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Subsidiary.

" <u>Indebtedness</u> " means, with respect to any Person:

(1) the principal and premium (if any) of any indebtedness of such Person, whether or not contingent, (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof), (c) representing the deferred and unpaid purchase price of any property (except any such balance that constitutes (i) a trade payable or similar obligation to a trade creditor Incurred in the ordinary course of business, (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and (iii) liabilities

20

accrued in the ordinary course of business), which purchase price is due more than six months after the date of placing the property in service or taking delivery and title thereto, (d) in respect of Capitalized Lease Obligations, or (e) representing any Hedging Obligations, if and to the extent that any of the foregoing indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2) to the extent not otherwise included, any obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, the obligations referred to in clause (1) of another Person (other than by endorsement of negotiable instruments for collection in the ordinary course of business); and

(3) to the extent not otherwise included, Indebtedness of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); *provided, however,* that the amount of such Indebtedness will be the lesser of: (a) the Fair Market Value (as determined in good faith by the Issuer) of such asset at such date of determination, and (b) the amount of such Indebtedness of such other Person;

*provided, however,* that notwithstanding the foregoing, Indebtedness shall be deemed not to include (1) Contingent Obligations Incurred in the ordinary course of business and not in respect of borrowed money; (2) deferred or prepaid revenues; (3) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller; (4) Obligations under or in respect of Qualified Receivables Financing or (5) obligations under the Acquisition Documents.

Notwithstanding anything in this Indenture to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Indenture as a result of accounting for any embedded derivatives created by the terms of such Indebtedness; and any such amounts that would have constituted Indebtedness under this Indenture but for the application of this sentence shall not be deemed an Incurrence of Indebtedness under this Indenture.

" Indenture " means this Indenture as amended or supplemented from time to time.

" Independent Financial Advisor " means an accounting, appraisal or investment banking firm or consultant, in each case nationally recognized standing, that is, in the good faith determination of the Issuer, qualified to perform the task for which it has been engaged.

" Intercreditor Agreement " means the intercreditor agreement among the First Lien Agent, the Trustee and the other parties from time to time party thereto, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms and this Indenture.

" Interest Payment Date " has the meaning set forth in Exhibits A-1 and A-2 and Exhibits B-1 and B-2 hereto.

21

" Investment Grade Rating " means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

" Investment Grade Securities " means:

(1) securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents),

(2) securities that have a rating equal to or higher than Baa3 (or equivalent) by Moody's and BBB- (or equivalent) by S&P, but excluding any debt securities or loans or advances between and among the Issuer and its Subsidiaries,

(3) investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment and/or distribution, and

(4) corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition.

" Investments " means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet of the Issuer in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. For purposes of the definition of "Unrestricted Subsidiary" and Section 4.04:

(1) "Investments" shall include the portion (proportionate to the Issuer's equity interest in such Subsidiary) of the Fair Market Value (as determined in good faith by the Issuer) of the net assets of a Subsidiary of the Issuer at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided, however,* that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Issuer shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to:

(a) the Issuer's "Investment" in such Subsidiary at the time of such redesignation *less*

(b) the portion (proportionate to the Issuer's equity interest in such Subsidiary) of the Fair Market Value (as determined in good faith by the Issuer) of the net assets of such Subsidiary at the time of such redesignation; and

(2) any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value (as determined in good faith by the Issuer) at the time of such transfer, in each case as determined in good faith by the Board of Directors of the Issuer.

22

" <u>Issue Date</u> " means the date on which the Notes are originally issued.

" <u>Lien</u> " means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or similar encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction); *provided* that in no event shall an operating lease be deemed to constitute a Lien.

" <u>Long-Term Retained Notes</u> " means the Issuer's 5.625% Senior Notes due 2015, 6.500% Senior Notes due 2016 and 5.75% Senior Notes due 2017.

" <u>Management Group</u> " means the group consisting of the directors, executive officers and other management personnel of the Issuer or any direct or indirect parent of the Issuer, as the case may be, on the Issue Date together with (1) any new directors whose election by such boards of directors or whose nomination for election by the shareholders of the Issuer or any direct or indirect parent of the Issuer, as applicable, was approved by a vote of a majority of the directors of the Issuer or any direct or indirect parent of the Issuer, as applicable, then still in office who were either directors on the Issue Date or whose election or nomination was previously so approved and (2) executive officers and other management personnel of the Issuer or any direct or indirect parent of the Issuer, as applicable, hired at a time when the directors on the Issue Date together with the directors so approved constituted a majority of the directors of the Issuer or any direct or indirect parent of the Issuer, as applicable.

" <u>Merger Agreement</u> " means the Agreement and Plan of Merger among Hamlet Holdings LLC, Hamlet Merger Inc. and Harrah's Entertainment, dated as of December 19, 2006, as amended, supplemented or modified from time to time prior to the Issue Date or thereafter, in accordance with its terms.

" <u>Moody's</u> " means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

" <u>Net Income</u> " means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

" <u>Net Insurance Proceeds</u> " means the insurance proceeds (excluding liability insurance proceeds payable to the Trustee for any loss, liability or expense incurred by it and excluding the proceeds of business interruption insurance) or condemnation awards actually received by the Issuer or any Restricted Subsidiary as a result of the Destruction or Taking of all or any portion of the Collateral, net of:

(1) reasonable out-of-pocket expenses and fees relating to such Taking or Destruction (including, without limitation, expenses of attorneys and insurance adjusters); and

23

(2) repayment of Indebtedness that is secured by the property or assets that are the subject of such Taking or Destruction; *provided* that, in the case of any Destruction or Taking involving Collateral, the Lien securing such Indebtedness constitutes a Lien permitted by this Indenture to be senior to the Second Priority Liens.

" Net Proceeds " means the aggregate cash proceeds received by the Issuer or any of its Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received in respect of or upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale and any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding the assumption by the acquiring Person of Indebtedness relating to the disposed assets or other consideration received in any other non-cash form), net of the direct costs relating to such Asset Sale and the sale or disposition of such Designated Non-cash Consideration (including, without limitation, legal, accounting and investment banking fees, and brokerage and sales commissions), and any relocation expenses Incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements related thereto), amounts required to be applied to the repayment of principal, premium (if any) and interest on Indebtedness required (other than pursuant to Section 4.06(b)(i)) to be paid as a result of such transaction, and any deduction of appropriate amounts to be provided by the Issuer as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Issuer after such sale or other disposition thereof, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

" New Project " means each capital project which is either a new project or a new feature of an existing project owned by the Issuer or its Restricted Subsidiaries which receives a certificate of completion or occupancy and all relevant licenses, and in fact commences operations.

" Note Guarantee " means any guarantee of the obligations of the Issuer under this Indenture and the Notes by any Person in accordance with the provisions of this Indenture.

" Obligations " means any principal, interest, penalties, fees, indemnifications, reimbursements (including, without limitation, reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any Indebtedness; *provided* that Obligations with respect to the Notes shall not include fees or indemnifications in favor of the Trustee and other third parties other than the holders of the Notes.

" Offering Memorandum " means the confidential offering memorandum, dated November 14, 2008, relating to the issuance of the Initial Notes.

" Officer " means the Chairman of the Board, Chief Executive Officer, Chief Financial Officer, President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of the Issuer.

24

" <u>Officer's Certificate</u> " means a certificate signed on behalf of the Issuer by an Officer of the Issuer, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Issuer, which meets the requirements set forth in this Indenture.

" <u>Operations Management Agreement</u> " means each of the real estate management agreements and any other operating management agreement entered into by the Issuer or any of its Restricted Subsidiaries with Harrah's Entertainment or with any other direct or indirect Subsidiary of Harrah's Entertainment, including, without limitation, any Real Estate Subsidiary, and any and all modifications thereto, substitutions therefor and replacements thereof so long as such modifications, substitutions and replacements are not materially less favorable, taken as a whole, to the Issuer and its Restricted Subsidiaries than the terms of such agreements as in effect on the Issue Date.

" <u>Opinion of Counsel</u> " means a written opinion from legal counsel who is acceptable to the Trustee. The counsel may be an employee of or counsel to the Issuer or the Trustee.

" <u>Other Second-Lien Obligations</u> " means other Indebtedness of the Issuer and its Restricted Subsidiaries that is equally and ratably secured with the Notes as permitted by this Indenture and is designated by the Issuer as an Other Second-Lien Obligation; *provided* that an authorized representative on behalf of the holders of such Indebtedness has executed joinders to the Security Documents in the form provided therein.

" <u>Parent Guarantee</u> " means a Note Guarantee of Harrah's Entertainment and its successors.

" <u>Parent Guarantor</u> " means Harrah's Entertainment and its successors.

" <u>Pari Passu Indebtedness</u> " means:

(1) with respect to the Issuer, the Notes and any Indebtedness which ranks pari passu in right of payment to the Notes; and

(2) with respect to any Subsidiary Pledgor, its obligations in respect of the Notes and any Indebtedness which ranks pari passu in right of payment to such Subsidiary Pledgor's obligations in respect of the Notes.

" <u>Permitted Holders</u> " means, at any time, each of (i) the Sponsors, (ii) the Management Group, (iii) any Person that has no material assets other than the Capital Stock of the Issuer and, directly or indirectly, holds or acquires 100% of the total voting power of the Voting Stock of the Issuer, and of which no other Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), other than any of the other Permitted Holders specified in clauses (i) and (ii) above, holds more than 50% of the total voting power of the Voting Stock thereof and (iv) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) the members of which include any of the Permitted Holders specified in clauses (i) and (ii) above and that, directly or indirectly, hold or acquire beneficial ownership of the Voting Stock of the

25

Issuer (a " Permitted Holder Group "), so long as (1) each member of the Permitted Holder Group has voting rights proportional to the percentage of ownership interests held or acquired by such member and (2) no Person or other " group " (other than the Permitted Holders specified in clauses (i) and (ii) above) beneficially owns more than 50% on a fully diluted basis of the Voting Stock held by the Permitted Holder Group. Any Person or group whose acquisition of beneficial ownership constitutes a Change of Control in respect of which a Change of Control Offer is made in accordance with the requirements of this Indenture will thereafter, together with its Affiliates, constitute an additional Permitted Holder.

" Permitted Investments " means:

(1) any Investment in the Issuer or any Restricted Subsidiary;

(2) any Investment in Cash Equivalents or Investment Grade Securities;

(3) any Investment by the Issuer or any Restricted Subsidiary of the Issuer in a Person if as a result of such Investment (a) such Person becomes a Restricted Subsidiary of the Issuer, or (b) such Person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys all or substantially all of its assets to, or is liquidated into, the Issuer or a Restricted Subsidiary of the Issuer;

(4) any Investment in securities or other assets not constituting Cash Equivalents and received in connection with an Asset Sale made pursuant to the provisions of Section 4.06 or any other disposition of assets not constituting an Asset Sale;

(5) any Investment existing on, or made pursuant to binding commitments existing on, the Issue Date or an Investment consisting of any extension, modification or renewal of any Investment existing on the Issue Date; *provided* that the amount of any such Investment may be increased (x) as required by the terms of such Investment as in existence on the Issue Date or (y) as otherwise permitted under this Indenture;

(6) advances to employees, taken together with all other advances made pursuant to this clause (6), not to exceed $25.0 million at any one time outstanding;

(7) any Investment acquired by the Issuer or any of its Restricted Subsidiaries (a) in exchange for any other Investment or accounts receivable held by the Issuer or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable, or (b) as a result of a foreclosure by the Issuer or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(8) Hedging Obligations permitted under Section 4.03(b)(x);

(9) any Investment by the Issuer or any of its Restricted Subsidiaries in a Similar Business having an aggregate Fair Market Value (as determined in good faith by

26

the Issuer), taken together with all other Investments made pursuant to this clause (9) that are at that time outstanding, not to exceed the greater of (x) $500.0 million and (y) 4.5% of Total Assets at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value); *provided, however,* that if any Investment pursuant to this clause (9) is made in any Person that is not a Restricted Subsidiary of the Issuer at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Issuer after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (9) for so long as such Person continues to be a Restricted Subsidiary;

(10) additional Investments by the Issuer or any of its Restricted Subsidiaries having an aggregate Fair Market Value (as determined in good faith by the Issuer), taken together with all other Investments made pursuant to this clause (10) that are at that time outstanding, not to exceed the greater of (x) $950.0 million and (y) 4.5% of Total Assets at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value); *provided, however,* that if any Investment pursuant to this clause (10) is made in any Person that is not a Restricted Subsidiary of the Issuer at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Issuer after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (10) for so long as such Person continues to be a Restricted Subsidiary;

(11) loans and advances to officers, directors or employees for business-related travel expenses, moving expenses and other similar expenses, in each case Incurred in the ordinary course of business or consistent with past practice or to fund such person's purchase of Equity Interests of the Issuer or any direct or indirect parent of the Issuer;

(12) Investments the payment for which consists of Equity Interests of the Issuer (other than Disqualified Stock) or any direct or indirect parent of the Issuer, as applicable; *provided, however,* that such Equity Interests will not increase the amount available for Restricted Payments under clause (C) of the definition of " Cumulative Credit ";

(13) any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with the provisions of Section 4.07(b) (except transactions described in clauses (ii), (vi), (vii), (xi) and (xii)(b) of such Section);

(14) Investments consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(15) guarantees issued in accordance with Section 4.03 and Section 4.11, including, without limitation, any guarantee or other obligation issued or Incurred under the Credit Agreement in connection with any letter of credit issued for the account of Harrah's Entertainment or any of its subsidiaries (including with respect to the issuance of, or payments in respect of drawings under, such letters of credit);

27

(16) Investments consisting of or to finance purchases and acquisitions of inventory, supplies, materials, services or equipment or purchases of contract rights or licenses or leases of intellectual property;

(17) any Investment in a Receivables Subsidiary or any Investment by a Receivables Subsidiary in any other Person in connection with a Qualified Receivables Financing, including Investments of funds held in accounts permitted or required by the arrangements governing such Qualified Receivables Financing or any related Indebtedness;

(18) any Investment in an entity or purchase of a business or assets in each case owned (or previously owned) by a customer of a Restricted Subsidiary as a condition or in connection with such customer (or any member of such customer's group) contracting with a Restricted Subsidiary, in each case in the ordinary course of business;

(19) any Investment in an entity which is not a Restricted Subsidiary to which a Restricted Subsidiary sells accounts receivable pursuant to a Qualified Receivables Financing;

(20) additional Investments in joint ventures not to exceed at any one time in the aggregate outstanding under this clause (20) the greater of $350.0 million and 2.0% of Total Assets; *provided, however,* that if any Investment pursuant to this clause (20) is made in any Person that is not a Restricted Subsidiary of the Issuer at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Issuer after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (20) for so long as such Person continues to be a Restricted Subsidiary;

(21) Investments of a Restricted Subsidiary of the Issuer acquired after the Issue Date or of an entity merged into, amalgamated with or consolidated with the Issuer or a Restricted Subsidiary of the Issuer in a transaction that is not prohibited by Section 5.01 after the Issue Date to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation; and

(22) any Investment in any Subsidiary of the Issuer or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business.

" Permitted Liens " means, with respect to any Person:

(1) pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case Incurred in the ordinary course of business;

28

(2) Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet due or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review;

(3) Liens for taxes, assessments or other governmental charges not yet due or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings;

(4) Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5) minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not Incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6) (A) Liens on assets of a Restricted Subsidiary that is not a Subsidiary Pledgor securing Indebtedness of such Restricted Subsidiary permitted to be Incurred pursuant to Section 4.03, (B) Liens securing First Priority Lien Obligations in an aggregate principal amount not to exceed the greater of (x) the aggregate principal amount of Indebtedness permitted to be Incurred pursuant to Section 4.03 (b)(i) and (y) the maximum principal amount of Indebtedness that, as of the date such Indebtedness was Incurred, and after giving effect to the incurrence of such indebtedness and the application of proceeds therefrom on such date, would not cause the Secured Indebtedness Leverage Ratio of the Issuer to exceed 4.50 to 1.00, and (C) Liens securing Indebtedness permitted to be Incurred pursuant to clause (iv), (xii), (xvi), (xx) or (xxiii) of Section 4.03(b) ( *provided* that (1) in the case of clause (iv), such Lien extends only to the assets and/or Capital Stock, the acquisition, lease, construction, repair, replacement or improvement of which is financed thereby and any proceeds or products thereof, (2) in the case of clause (xx), such Lien does not extend to the property or assets of any Subsidiary of the Issuer other than a Foreign Subsidiary, and (3) in the case of clause (xxiii) such Lien applies solely to acquired property or asset of the acquired entity, as the case may be);

(7) Liens existing on the Issue Date (other than Liens in favor of the lenders under the Credit Agreement);

(8) Liens on assets, property or shares of stock of a Person at the time such Person becomes a Subsidiary; *provided, however,* that such Liens are not created or Incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided, further,* however, that such Liens may not extend to any other property owned by the Issuer or any Restricted Subsidiary of the Issuer;

29

(9) Liens on assets or property at the time the Issuer or a Restricted Subsidiary of the Issuer acquired the assets or property, including any acquisition by means of a merger, amalgamation or consolidation with or into the Issuer or any Restricted Subsidiary of the Issuer; *provided, however,* that such Liens are not created or Incurred in connection with, or in contemplation of, such acquisition; *provided, further,* however, that the Liens may not extend to any other property owned by the Issuer or any Restricted Subsidiary of the Issuer;

(10) Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Issuer or another Restricted Subsidiary of the Issuer permitted to be Incurred in accordance with Section 4.03;

(11) Liens securing Hedging Obligations not Incurred in violation of this Indenture; *provided* that with respect to Hedging Obligations relating to Indebtedness, such Lien extends only to the property securing such Indebtedness;

(12) Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(13) leases and subleases of real property which do not materially interfere with the ordinary conduct of the business of the Issuer or any of its Restricted Subsidiaries;

(14) Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Issuer and its Restricted Subsidiaries in the ordinary course of business;

(15) Liens in favor of the Issuer or any Subsidiary Pledgor;

(16) Liens on accounts receivable and related assets of the type specified in the definition of " Receivables Financing " Incurred in connection with a Qualified Receivables Financing;

(17) deposits made in the ordinary course of business to secure liability to insurance carriers;

(18) Liens on the Equity Interests of Unrestricted Subsidiaries;

(19) grants of software and other technology licenses in the ordinary course of business;

(20) Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or

30

replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8), (9), (10), (11) and (15); *provided, however,* that (x) such new Lien shall be limited to all or part of the same property that secured the original Lien ( *plus* improvements on such property), and (y) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (A) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), (9), (10), (11) and (15) at the time the original Lien became a Permitted Lien under this Indenture, and (B) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement; *provided further* , however, that in the case of any Liens to secure any refinancing, refunding, extension or renewal of Indebtedness secured by a Lien referred to in clause (6)(B), the principal amount of any Indebtedness Incurred for such refinancing, refunding, extension or renewal shall be deemed secured by a Lien under clause (6)(B) and not this clause (20) for purposes of determining the principal amount of Indebtedness outstanding under clause (6)(B), for purposes of Section 11.04(a)(1) and for purposes of the definition of Secured Bank Indebtedness;

(21) Liens on equipment of the Issuer or any Restricted Subsidiary granted in the ordinary course of business to the Issuer's or such Restricted Subsidiary's client at which such equipment is located;

(22) judgment and attachment Liens not giving rise to an Event of Default and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(23) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(24) Liens Incurred to secure cash management services or to implement cash pooling arrangements in the ordinary course of business;

(25) other Liens securing obligations Incurred in the ordinary course of business which obligations do not exceed $100.0 million at any one time outstanding;

(26) any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(27) any amounts held by a trustee in the funds and accounts under an indenture securing any revenue bonds issued for the benefit of the Issuer or any Restricted Subsidiary; and

(28) Liens arising by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depository or financial institution.

31

For purposes of this definition, notwithstanding anything in the foregoing clauses (1) through (28), any Lien that secures Retained Notes or Long-Term Retained Notes shall not under any circumstances be deemed Permitted Liens.

" Person " means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

" Preferred Stock " means any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution, or winding up.

" Pre-Opening Expenses " means, with respect to any fiscal period, the amount of expenses (other than interest expense) Incurred with respect to capital projects that are classified as " pre-opening expenses " on the applicable financial statements of the Issuer and its Restricted Subsidiaries for such period, prepared in accordance with GAAP.

" Project Financing " means (1) any Capitalized Lease Obligations, mortgage financing, purchase money Indebtedness or other Indebtedness Incurred in connection with the acquisition, lease, construction, repair, replacement, improvement or financing related to any of the Margaritaville Casino & Resort in Biloxi, Mississippi, the retail facilities related to the Margaritaville Casino & Resort and the planned casino and hotel in the community of Ciudad Real, Spain or any refinancing of any such Indebtedness that does not extend to any assets other than the assets listed above and (2) any Sale/Leaseback Transaction with respect to any of Margaritaville Casino & Resort in Biloxi, Mississippi, the retail facilities related to the Margaritaville Casino & Resort and the planned casino and hotel in the community of Ciudad Real, Spain.

" Qualified IPO " means any underwritten public Equity Offering.

" Qualified Non-Recourse Debt " means Indebtedness that (1) is (a) Incurred by a Qualified Non-Recourse Subsidiary to finance (whether prior to or within 270 days after) the acquisition, lease, construction, repair, replacement or improvement of any property (real or personal) or equipment (whether through the direct purchase of property or the Equity Interests of any person owning such property and whether in a single acquisition or a series of related acquisitions) or (b) assumed by a Qualified Non-Recourse Subsidiary, (2) is non-recourse to the Issuer and any Subsidiary Pledgor and (3) is non-recourse to any Restricted Subsidiary that is not a Qualified Non-Recourse Subsidiary.

" Qualified Non-Recourse Subsidiary " means (1) a Restricted Subsidiary that is not a Subsidiary Pledgor and that is formed or created after the Issue Date in order to finance an acquisition, lease, construction, repair, replacement or improvement of any property or equipment (directly or through one of its Subsidiaries) that secures Qualified Non-Recourse Debt and (2) any Restricted Subsidiary of a Qualified Non-Recourse Subsidiary.

" Qualified Receivables Financing " means any Receivables Financing of a Receivables Subsidiary that meets the following conditions:

(1) the Board of Directors of the Issuer shall have determined in good faith that such Qualified Receivables Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Issuer and the Receivables Subsidiary;

32

(2) all sales of accounts receivable and related assets to the Receivables Subsidiary are made at Fair Market Value (as determined in good faith by the Issuer); and

(3) the financing terms, covenants, termination events and other provisions thereof shall be market terms (as determined in good faith by the Issuer) and may include Standard Securitization Undertakings.

The grant of a security interest in any accounts receivable of the Issuer or any of its Restricted Subsidiaries (other than a Receivables Subsidiary) to secure Bank Indebtedness, Indebtedness in respect of the Notes or any Refinancing Indebtedness with respect to the Notes shall not be deemed a Qualified Receivables Financing.

" Rating Agency " means (1) each of Moody's and S&P and (2) if Moody's or S&P ceases to rate the Notes for reasons outside of the Issuer's control, a "nationally recognized statistical rating organization" within the meaning of Rule 15cs-1(c)(2)(vi)(F) under the Exchange Act selected by the Issuer or any direct or indirect parent of the Issuer as a replacement agency for Moody's or S&P, as the case may be.

" Real Estate Facility " means the mortgage financing and mezzanine financing arrangements between the Real Estate Subsidiaries, which are direct or indirect subsidiaries of Harrah's Entertainment, and JPMorgan Chase Bank N.A. and its successors and assigns, on behalf of the noteholders dated as of January 28, 2008, as amended, restated, supplemented, extended, waived, replaced, restructured, repaid, refunded, refinanced or otherwise modified from time to time.

" Real Estate Subsidiary " means those Subsidiaries of Harrah's Entertainment that are party to (prior to, on or after the Issue Date) the Real Estate Facility (and their respective Subsidiaries) secured by the Real Property collateralizing such facility on the Issue Date *plus* any additional Real Property sold, contributed or transferred to such Subsidiaries by the Issuer or any Restricted Subsidiary (whether directly or indirectly through the sale, contribution or transfer of the Capital Stock of a Subsidiary the assets of which are comprised solely of such Real Property) subsequent to the Issue Date pursuant to Section 4.06.

" Real Property " means, collectively, all right, title and interests (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all buildings, structures, parking areas and improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

" Record Date " has the meaning specified in Exhibits A-1 , A-2 , B-1 and B-2 hereto.

33

" <u>Receivables Fees</u> " means distributions or payments made directly or by means of discounts with respect to any participation interests issued or sold in connection with, and all other fees paid to a Person that is not a Restricted Subsidiary in connection with, any Receivables Financing.

" <u>Receivables Financing</u> " means any transaction or series of transactions that may be entered into by the Issuer or any of its Subsidiaries pursuant to which the Issuer or any of its Subsidiaries may sell, convey or otherwise transfer to (a) a Receivables Subsidiary (in the case of a transfer by the Issuer or any of its Subsidiaries); and (b) any other Person (in the case of a transfer by a Receivables Subsidiary), or may grant a security interest in, any accounts receivable (whether now existing or arising in the future) of the Issuer or any of its Subsidiaries, and any assets related thereto including, without limitation, all collateral securing such accounts receivable, all contracts and all guarantees or other obligations in respect of such accounts receivable, proceeds of such accounts receivable and other assets which are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving accounts receivable and any Hedging Obligations entered into by the Issuer or any such Subsidiary in connection with such accounts receivable.

" <u>Receivables Repurchase Obligation</u> " means any obligation of a seller of receivables in a Qualified Receivables Financing to repurchase receivables arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, off-set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

" <u>Receivables Subsidiary</u> " means a Wholly Owned Restricted Subsidiary of the Issuer (or another Person formed for the purposes of engaging in Qualified Receivables Financing with the Issuer in which the Issuer or any Subsidiary of the Issuer makes an Investment and to which the Issuer or any Subsidiary of the Issuer transfers accounts receivable and related assets) which engages in no activities other than in connection with the financing of accounts receivable of the Issuer and its Subsidiaries, all proceeds thereof and all rights (contractual or other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and which is designated by the Board of Directors of the Issuer (as provided below) as a Receivables Subsidiary and:

(a) no portion of the Indebtedness or any other obligations (contingent or otherwise) of which (i) is guaranteed by the Issuer or any other Subsidiary of the Issuer (excluding guarantees of obligations (other than the principal of and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is recourse to or obligates the Issuer or any other Subsidiary of the Issuer in any way other than pursuant to Standard Securitization Undertakings, or (iii) subjects any property or asset of the Issuer or any other Subsidiary of the Issuer, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings;

(b) with which neither the Issuer nor any other Subsidiary of the Issuer has any material contract, agreement, arrangement or understanding other than on terms which the Issuer reasonably believes to be no less favorable to the Issuer or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Issuer; and

34

(c) to which neither the Issuer nor any other Subsidiary of the Issuer has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.

Any such designation by the Board of Directors of the Issuer shall be evidenced to the Trustee by filing with the Trustee a certified copy of the resolution of the Board of Directors of the Issuer giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing conditions.

" Representative " means the trustee, agent or representative (if any) for an issue of Indebtedness; *provided* that if, and for so long as, such Indebtedness lacks such a Representative, then the Representative for such Indebtedness shall at all times constitute the holder or holders of a majority in outstanding principal amount of obligations under such Indebtedness.

" Responsible Officer " means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

" Restricted Cash " means cash and Cash Equivalents held by Restricted Subsidiaries that are contractually restricted from being distributed to the Issuer, except for (i) such cash and Cash Equivalents subject only to such restrictions that are contained in agreements governing Indebtedness permitted under this Indenture and that are secured by such cash or Cash Equivalents and (ii) cash and Cash Equivalents constituting " cage cash ."

" Restricted Investment " means an Investment other than a Permitted Investment.

" Restricted Subsidiary " means, with respect to any Person, any Subsidiary of such Person other than an Unrestricted Subsidiary of such Person. Unless otherwise indicated in this Indenture, all references to Restricted Subsidiaries shall mean Restricted Subsidiaries of the Issuer.

" Retained Notes " means the Issuer's 5.500% Senior Notes due 2010, 8.00% Senior Notes due 2011, 5.375% Senior Notes due 2013, 7.875% Senior Subordinated Notes due 2010, and 8.125% Senior Subordinated Notes due 2011, in each case to the extent outstanding after completion of the Transactions.

" Reversion Date " means the date on which one or both of the Rating Agencies withdraw their Investment Grade Rating or downgrade the rating assigned to the Notes below an Investment Grade Rating.

35

" <u>Sale/Leaseback Transaction</u> " means an arrangement relating to property now owned or hereafter acquired by the Issuer or a Restricted Subsidiary whereby the Issuer or a Restricted Subsidiary transfers such property to a Person and the Issuer or such Restricted Subsidiary leases it from such Person, other than leases between the Issuer and a Restricted Subsidiary of the Issuer or between Restricted Subsidiaries of the Issuer.

" <u>S&P</u> " means Standard & Poor's Ratings Group or any successor to the rating agency business thereof.

" <u>SEC</u> " means the Securities and Exchange Commission.

" <u>Second Priority Liens</u> " means the Liens securing the Obligations of the Issuer in respect of the Notes and this Indenture.

" <u>Secured Bank Indebtedness</u> " means any Bank Indebtedness that is secured by a Permitted Lien incurred or deemed incurred pursuant to clause (6)(B) of the definition of Permitted Liens.

" <u>Secured Indebtedness</u> " means any Indebtedness secured by a Lien.

" <u>Secured Indebtedness Leverage Ratio</u> " means, with respect to any Person, at any date the ratio of (i) Secured Indebtedness constituting First Priority Lien Obligations of such Person and its Restricted Subsidiaries as of such date of calculation (determined on a consolidated basis in accordance with GAAP) less the amount of cash and Cash Equivalents in excess of any Restricted Cash held by such Person and its Restricted Subsidiaries as of such date of determination to (ii) EBITDA of such Person for the four full fiscal quarters for which internal financial statements are available immediately preceding such date on which such additional Indebtedness is Incurred. In the event that the Issuer or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness subsequent to the commencement of the period for which the Secured Indebtedness Leverage Ratio is being calculated but prior to the event for which the calculation of the Secured Indebtedness Leverage Ratio is made (the " <u>Secured Leverage Calculation Date</u> "), then the Secured Indebtedness Leverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness as if the same had occurred at the beginning of the applicable four-quarter period; *provided* that the Issuer may elect pursuant to an Officer's Certificate delivered to the Trustee to treat all or any portion of the commitment under any Indebtedness as being Incurred at such time, in which case any subsequent Incurrence of Indebtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions) and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Issuer or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Secured Leverage Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including

36

the Acquisition Transactions), discontinued operations and other operational changes (and the change of any associated Indebtedness and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Secured Indebtedness Leverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period. For purposes of making the computation referred to above, with respect to each New Project that commences operations and records not less than one full fiscal quarter's operations during the four-quarter reference period, the operating results of such New Project will be annualized on a straight line basis during such period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Issuer. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Issuer as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event (including, to the extent applicable, from the Acquisition Transactions) and (2) all adjustments of the nature used in connection with the calculation of "Adjusted EBITDA" as set forth in "Debt Covenant Compliance" in Exhibit 99.1 to the Quarterly Report on Form 10-Q for the nine months ended September 30, 2008 for Harrah's Entertainment to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

For purposes of this definition, any amount in a currency other than U.S. dollars will be converted to U.S. dollars based on the average exchange rate for such currency for the most recent twelve-month period immediately prior to the date of determination in a manner consistent with that used in calculating EBITDA for the applicable period.

" Securities Act " means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

" Security Documents " means the Collateral Agreement and the security agreements, pledge agreements, collateral assignments, mortgages and related agreements, as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified from time to time, creating the security interests in the Collateral as contemplated by this Indenture.

" Senior Interim Loan Facility " means the interim loan agreement, dated as of January 28, 2008, by and among the Issuer, as borrower, the lenders party thereto in their capacities as lenders thereunder and Citibank, N.A. as administrative agent, including any guarantees, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications or restatements thereof.

37

" <u>Significant Subsidiary</u> " means any Restricted Subsidiary that would be a " <u>Significant Subsidiary</u> " of the Issuer within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC (or any successor provision).

" <u>Similar Business</u> " means a business, the majority of whose revenues are derived from the activities of the Issuer and its Subsidiaries as of the Issue Date or any business or activity that is reasonably similar or complementary thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

" <u>Sponsors</u> " means (i) Apollo Management, L.P. and any of its respective Affiliates other than any portfolio companies (collectively, the " <u>Apollo Sponsors</u> "), (ii) Texas Pacific Group and any of its respective Affiliates other than any portfolio companies (collectively, the " <u>Texas Pacific Sponsors</u> "), (iii) any individual who is a partner or employee of an Apollo Sponsor or a Texas Pacific Sponsor that is licensed by a relevant gaming authority on the Issue Date or thereafter replaces such licensee and (iv) any Person that forms a group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) with any Apollo Sponsors and/or Texas Pacific Sponsors; *provided* that the Apollo Sponsors and/or the Texas Pacific Sponsors (x) own a majority of the voting power and (y) control a majority of the Board of Directors of the Issuer.

" <u>Standard Securitization Undertakings</u> " means representations, warranties, covenants, indemnities and guarantees of performance entered into by the Issuer or any Subsidiary of the Issuer which the Issuer has determined in good faith to be customary in a Receivables Financing including, without limitation, those relating to the servicing of the assets of a Receivables Subsidiary, it being understood that any Receivables Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking.

" <u>Stated Maturity</u> " means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency beyond the control of the issuer unless such contingency has occurred).

" <u>Subordinated Indebtedness</u> " means (a) with respect to the Issuer, any Indebtedness of the Issuer which is by its terms subordinated in right of payment to the Notes, and (b) with respect to any Subsidiary Pledgor, any Indebtedness of such Subsidiary Pledgor which is by its terms subordinated in right of payment to obligations in respect of the Notes.

" <u>Subsidiary</u> " means, with respect to any Person, (1) any corporation, association or other business entity (other than a partnership, joint venture or limited liability company) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, and (2) any partnership, joint venture or limited liability company of which (x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited

38

partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise, and (y) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

" Subsidiary Pledgor " means any Subsidiary of the Issuer that pledges its property and assets to secure the Notes, as provided in the Security Documents; *provided* that upon the release or discharge of such Subsidiary of the Issuer from its obligations to pledge its assets and property to secure the Notes in accordance with this Indenture or the Security Documents, such Subsidiary of the Issuer ceases to be a Subsidiary Pledgor.

" Suspension Period " means the period of time between a Covenant Suspension Event and the related Reversion Date.

" Taking " means any taking of all or any portion of the Collateral by condemnation or other eminent domain proceedings, pursuant to any law, general or special, or by reason of the temporary requisition of the use or occupancy of all or any portion of the Collateral by any governmental authority, civil or military, or any sale pursuant to the exercise by any such governmental authority of any right which it may then have to purchase or designate a purchaser or to order a sale of all or any portion of the Collateral.

" Tax Distributions " means any distributions described in Section 4.04(b)(xii).

" TIA " means the Trust Indenture Act of 1939 (15 U.S.C. Sections 77aaa-77bbbb) as in effect on the date of this Indenture.

" Total Assets " means the total consolidated assets of the Issuer and its Restricted Subsidiaries, as shown on the most recent balance sheet of the Issuer, without giving effect to any amortization of the amount of intangible assets since the February 1, 2008.

" Transactions " means the transactions described under "General Terms of the Exchange Offers" in the Offering Memorandum.

" Treasury Rate " means, as of the applicable redemption date, the yield to maturity as of such redemption date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two business days prior to such redemption date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such redemption date to December 15, 2013, (in the case of the 2018 Notes) or December 15, 2012 (in the case of the 2015 Notes); *provided, however,* that if the period from such redemption date to December 15, 2013 (in the case of the 2018 Notes) or December 15, 2012 (in the case of the 2015 Notes), is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

" Trust Officer " means:

(1) any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject, and

39

(2) who shall have direct responsibility for the administration of this Indenture.

" Trustee " means the party named as such in this Indenture until a successor replaces it and, thereafter, means the successor.

" Uniform Commercial Code " means the New York Uniform Commercial Code as in effect from time to time.

" Unrestricted Subsidiary " means:

(1) any Subsidiary of the Issuer that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors of such Person in the manner provided below; and

(2) any Subsidiary of an Unrestricted Subsidiary;

The Issuer may designate any Subsidiary of the Issuer (including any newly acquired or newly formed Subsidiary of the Issuer) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on any property of, the Issuer or any other Subsidiary of the Issuer that is not a Subsidiary of the Subsidiary to be so designated; *provided, however,* that the Subsidiary to be so designated and its Subsidiaries do not at the time of designation have and do not thereafter Incur any Indebtedness pursuant to which the lender has recourse to any of the assets of the Issuer or any of its Restricted Subsidiaries; *provided, further, however* , that either:

(a) the Subsidiary to be so designated has total consolidated assets of $1,000 or less; or

(b) if such Subsidiary has consolidated assets greater than $1,000, then such designation would be permitted under Section 4.04.

The Issuer may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided, however,* that immediately after giving effect to such designation:

(x) (1) the Issuer could Incur $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a), or (2) the Fixed Charge Coverage Ratio for the Issuer and its Restricted Subsidiaries would be greater than such ratio for the Issuer and its Restricted Subsidiaries immediately prior to such designation, in each case on a *pro forma* basis taking into account such designation, and

40

(y) no Event of Default shall have occurred and be continuing.

Any such designation by Issuer shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the resolution of the Board of Directors or any committee thereof of the Issuer giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing provisions.

" U.S. Government Obligations " means securities that are:

(1) direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged, or

(2) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America, the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America,

which, in each case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act) as custodian with respect to any such U.S. Government Obligations or a specific payment of principal of or interest on any such U.S. Government Obligations held by such custodian for the account of the holder of such depository receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Obligations or the specific payment of principal of or interest on the U.S. Government Obligations evidenced by such depository receipt.

" Voting Stock " of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

" Weighted Average Life to Maturity " means, when applied to any Indebtedness or Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing (1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment, by (2) the sum of all such payments.

" Wholly Owned Restricted Subsidiary " is any Wholly Owned Subsidiary that is a Restricted Subsidiary.

" Wholly Owned Subsidiary " of any Person means a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares required to be held by Foreign Subsidiaries) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

41

SECTION 1.02. <u>Other Definitions</u> .

| Term | Defined in Section |
|------|-------------------|
| "2015 Notes" | Preamble |
| "2018 Notes" | Preamble |
| "Additional Interest" | Appendix A |
| "Affiliate Transaction" | 4.07 |
| "Asset Sale Offer" | 4.06(b) |
| "Bankruptcy Law" | 6.01 |
| "Change of Control Offer" | 4.08 |
| "covenant defeasance option" | 8.01(c) |
| "Covenant Suspension Event" | 4.16 |
| "Custodian" | 6.01 |
| "Dealer Manager Agreement" | Appendix A |
| "Dealer Managers" | Appendix A |
| "Definitive Note" | Appendix A |
| "Depository" | Appendix A |
| "Disqualified Holder" | 2.15 |
| "Euroclear" | Appendix A |
| "Event of Default" | 6.01 |
| "Excess Proceeds" | 4.06(b) |
| "Exchange Notes" | Preamble |
| "Global Notes" | Appendix A |
| "Global Notes Legend" | Appendix A |
| "Guaranteed Obligations" | 11.01(a) |
| "IAI" | Appendix A |
| "incorporated provision" | 13.01 |
| "Initial Notes" | Preamble |
| "Issuer" | Preamble |
| "legal defeasance option" | 8.01 |
| "Notes" | Preamble |
| "Notes Custodian" | Appendix A |
| "Notice of Default" | 6.01 |
| "Offer Period" | 4.06(d) |
| "Paying Agent" | 2.04(a) |
| "protected purchaser" | 2.08 |
| "QIB" | Appendix A |
| "Refinancing Indebtedness" | 4.03(b) |
| "Refunding Capital Stock" | 4.04(b) |
| "Registered Exchange Offer" | Appendix A |
| "Registrar" | 2.04(a) |
| "Registration Rights Agreement" | Appendix A |
| "Regulation S" | Appendix A |
| "Regulation S Notes" | Appendix A |
| "Restricted Notes Legend" | Appendix A |
| "Restricted Payment" | 4.04(a) |
| "Restricted Period" | Appendix A |

42

| Term | Defined in Section |
|---|---|
| "Retired Capital Stock" | 4.04(b) |
| "Reversion Date" | 4.16 |
| "Rule 501" | Appendix A |
| "Rule 144A" | Appendix A |
| "Rule 144A Notes" | Appendix A |
| "Second Commitment" | 4.06 |
| "Shelf Registration Statement" | Appendix A |
| "Successor Issuer" | 5.01(a) |
| "Successor Parent Guarantor" | 5.01 |
| "Successor Subsidiary Pledgor" | 5.01(b) |
| "Suspended Covenants" | 4.16 |
| "Transfer" | 5.01(b) |
| "Transfer Restricted Definitive Notes" | Appendix A |
| "Transfer Restricted Global Notes" | Appendix A |
| "Unrestricted Definitive Notes" | Appendix A |
| "Unrestricted Global Notes" | Appendix A |

SECTION 1.03. Incorporation by Reference of Trust Indenture Act . This Indenture incorporates by reference certain provisions of the TIA. The following TIA terms have the following meanings:

" Commission " means the SEC.

" indenture securities " means the Notes and any Note Guarantee.

" indenture security holder " means a holder.

" indenture to be qualified " means this Indenture.

" indenture trustee " or " institutional trustee " means the Trustee.

" obligor " on the indenture securities means the Issuer and the Parent Guarantor and any other obligor on the Notes.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule have the meanings assigned to them by such definitions.

SECTION 1.04. Rules of Construction . Unless the context otherwise requires:

(a) a term has the meaning assigned to it;

(b) an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

43

(c) " or " is not exclusive;

(d) " including " means including without limitation;

(e) words in the singular include the plural and words in the plural include the singular;

(f) unsecured Indebtedness shall not be deemed to be subordinate or junior to Secured Indebtedness merely by virtue of its nature as unsecured Indebtedness;

(g) the principal amount of any non-interest bearing or other discount security at any date shall be the principal amount thereof that would be shown on a balance sheet of the issuer dated such date prepared in accordance with GAAP;

(h) the principal amount of any Preferred Stock shall be (i) the maximum liquidation value of such Preferred Stock or (ii) the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock, whichever is greater;

(i) unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP;

(j) " $ " and " U.S. dollars " each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts; and

(k) whenever in this Indenture or the Notes there is mentioned, in any context, principal, interest or any other amount payable under or with respect to any Notes, such mention shall be deemed to include mention of the payment of Additional Interest, to the extent that, in such context, Additional Interest is, were or would be payable in respect thereof.

## ARTICLE II

## THE NOTES

SECTION 2.01. Amount of Notes . The aggregate principal amount of Notes which may be authenticated and delivered under this Indenture on the Issue Date is $1,062,421,000, comprised of $847,621,000 in initial aggregate principal amount of 2018 Notes and $214,800,000 in aggregate principal amount of 2015 Notes.

The Issuer may from time to time after the Issue Date issue Additional Notes under this Indenture in an unlimited principal amount, so long as (i) the Incurrence of the Indebtedness represented by such Additional Notes is at such time permitted by Section 4.03 and (ii) such Additional Notes are issued in compliance with the other applicable provisions of this Indenture. With respect to any Additional Notes issued after the Issue Date (except for Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.07, 2.08, 2.09, 2.10, 3.06, 4.06(g), 4.08(c) or Appendix A), there shall be (a) established in or pursuant to a resolution of the Board of Directors and (b) (i) set forth or determined in the manner provided in an Officer's Certificate or (ii) established in one or more indentures supplemental hereto, prior to the issuance of such Additional Notes:

(1) the aggregate principal amount of such Additional Notes which may be authenticated and delivered under this Indenture,

44

(2) the issue price and issuance date of such Additional Notes, including the date from which interest on such Additional Notes shall accrue;

(3) if applicable, that such Additional Notes shall be issuable in whole or in part in the form of one or more Global Notes and, in such case, the respective depositaries for such Global Notes, the form of any legend or legends which shall be borne by such Global Notes in addition to or in lieu of those set forth in Exhibits A-1 and A-2 hereto and any circumstances in addition to or in lieu of those set forth in Section 2.2 of Appendix A in which any such Global Note may be exchanged in whole or in part for Additional Notes registered, or any transfer of such Global Note in whole or in part may be registered, in the name or names of Persons other than the depositary for such Global Note or a nominee thereof; and

(4) if applicable, that such Additional Notes that are not Transfer Restricted Notes shall not be issued in the form of Initial Notes as set forth in Exhibits A-1 and A-2 , but shall be issued in the form of Exchange Notes as set forth in Exhibits B-1 and B-2 .

If any of the terms of any Additional Notes are established by action taken pursuant to a resolution of the Board of Directors, a copy of an appropriate record of such action shall be certified by the Secretary or any Assistant Secretary of the Issuer and delivered to the Trustee at or prior to the delivery of the Officers' Certificate or the indenture supplemental hereto setting forth the terms of the Additional Notes.

The 2018 Notes, including any Additional Notes issued as 2018 Notes, may, at the Issuer's option, be treated as a single class for all purposes under this Indenture, including, without limitation, waivers, amendments, redemptions and offers to purchase. The 2015 Notes, including any Additional Notes issued as 2015 Notes, may, at the Issuer's option, be treated as a single class for all purposes under this Indenture, including, without limitation, waivers, amendments, redemptions and offers to purchase.

SECTION 2.02. Form and Dating . Provisions relating to the Initial Notes and the Exchange Notes are set forth in Appendix A, which is hereby incorporated in and expressly made a part of this Indenture. The (i) Initial Notes and the Trustee's certificate of authentication and (ii) any Additional Notes (if issued as Transfer Restricted Notes) and the Trustee's certificate of authentication shall each be substantially in the form of Exhibits A-1 and A-2 , which are hereby incorporated in and expressly made a part of this Indenture. The (i) Exchange Notes and the Trustee's certificate of authentication and (ii) any Additional Notes issued other than as Transfer Restricted Notes and the Trustee's certificate of authentication shall each be substantially in the form of Exhibits B-1 and B-2 hereto, which are hereby incorporated in and expressly made a part of this Indenture. The Notes may have notations, legends or endorsements required by law, stock exchange rule, agreements to which the Issuer, the Parent Guarantor or

45

any Subsidiary Pledgor is subject, if any, or usage ( *provided* that any such notation, legend or endorsement is in a form acceptable to the Issuer). Each Note shall be dated the date of its authentication. The Notes shall be issuable only in registered form without interest coupons and in denominations of $2,000 and any integral multiples of $1,000.

SECTION 2.03. <u>Execution and Authentication</u> . The Trustee shall authenticate and make available for delivery upon a written order of the Issuer signed by one Officer (a) Initial Notes for original issue on the date hereof in an aggregate principal amount of $1,062,421,000, consisting of $847,621,000 aggregate principal amount of 2018 Notes and $214,800,000 aggregate principal amount of 2015 Notes, (b) subject to the terms of this Indenture, Additional Notes in an aggregate principal amount to be determined at the time of issuance and specified therein and (c) the Exchange Notes for issue in a Registered Exchange Offer pursuant to the Registration Agreement for a like principal amount of Initial Notes exchanged pursuant thereto or otherwise pursuant to an effective registration statement under the Securities Act. Such order shall specify the amount of separate Note certificates to be authenticated, the principal amount of each of the Notes to be authenticated, the date on which the original issue of Notes is to be authenticated, the registered holder of each of the Notes and delivery instructions and whether the Notes are to be Initial Notes or Exchange Notes. Notwithstanding anything to the contrary in this Indenture or Appendix A, any issuance of Additional Notes after the Issue Date shall be in a principal amount of at least $2,000 and integral multiples of $1,000 in excess of $2,000.

One Officer shall sign the Notes for the Issuer by manual or facsimile signature.

If an Officer whose signature is on a Note no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

A Note shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Note. The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee may appoint one or more authenticating agents reasonably acceptable to the Issuer to authenticate the Notes. Any such appointment shall be evidenced by an instrument signed by a Trust Officer, a copy of which shall be furnished to the Issuer. Unless limited by the terms of such appointment, an authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as any Registrar, Paying Agent or agent for service of notices and demands.

SECTION 2.04. <u>Registrar and Paying Agent</u> .

(a) The Issuer shall maintain (i) an office or agency where Notes may be presented for registration of transfer or for exchange (the " <u>Registrar</u> ") and (ii) an office or agency where Notes may be presented for payment (the " <u>Paying Agent</u> "). The Registrar shall keep a register of the Notes and of their transfer and exchange. The Issuer may have one or more co-registrars and one or more additional paying agents. The term " <u>Registrar</u> " includes any co-registrars. The term " <u>Paying Agent</u> " includes the Paying Agent and any additional paying agents. The Issuer initially appoints the Trustee as Registrar, Paying Agent and the Notes Custodian with respect to the Global Notes.

46

(b) The Issuer may enter into an appropriate agency agreement with any Registrar or Paying Agent not a party to this Indenture, which shall incorporate the terms of the TIA. The agreement shall implement the provisions of this Indenture that relate to such agent. The Issuer shall notify the Trustee in writing of the name and address of any such agent. If the Issuer fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.07. The Issuer or any of its domestically organized Wholly Owned Subsidiaries may act as Paying Agent or Registrar.

(c) The Issuer may remove any Registrar or Paying Agent upon written notice to such Registrar or Paying Agent and to the Trustee; *provided, however,* that no such removal shall become effective until (i) if applicable, acceptance of an appointment by a successor as evidenced by an appropriate agreement entered into by the Issuer and such successor Registrar or Paying Agent, as the case may be, and delivered to the Trustee or (ii) notification to the Trustee that the Trustee shall serve as Registrar or Paying Agent until the appointment of a successor in accordance with clause (i) above. The Registrar or Paying Agent may resign at any time upon written notice to the Issuer and the Trustee; *provided, however,* that the Trustee may resign as Paying Agent or Registrar only if the Trustee also resigns as Trustee in accordance with Section 7.08.

SECTION 2.05. <u>Paying Agent to Hold Money in Trust</u> . Prior to each due date of the principal of and interest on any Note, the Issuer shall deposit with each Paying Agent (or if the Issuer or a Wholly Owned Subsidiary is acting as Paying Agent, segregate and hold in trust for the benefit of the Persons entitled thereto) a sum sufficient to pay such principal and interest when so becoming due. The Issuer shall require each Paying Agent (other than the Trustee) to agree in writing that a Paying Agent shall hold in trust for the benefit of holders or the Trustee all money held by a Paying Agent for the payment of principal of and interest on the Notes, and shall notify the Trustee of any default by the Issuer in making any such payment. If the Issuer or a Wholly Owned Subsidiary of the Issuer acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it in trust for the benefit of the Persons entitled thereto. The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by such Paying Agent. Upon complying with this Section, a Paying Agent shall have no further liability for the money delivered to the Trustee.

SECTION 2.06. <u>Holder Lists</u> . The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of holders. If the Trustee is not the Registrar, the Issuer shall furnish, or cause the Registrar to furnish, to the Trustee, in writing at least five Business Days before each interest payment date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of holders.

SECTION 2.07. <u>Transfer and Exchange</u> . The Notes shall be issued in registered form and shall be transferable only upon the surrender of a Note for registration of transfer and in compliance with Appendix A. When a Note is presented to the Registrar with a request to register a transfer, the Registrar shall register the transfer as requested if its requirements therefor

47

are met. When Notes are presented to the Registrar with a request to exchange them for an equal principal amount of Notes of other denominations, the Registrar shall make the exchange as requested if the same requirements are met. To permit registration of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate Notes at the Registrar's request. The Issuer may require payment of a sum sufficient to pay all taxes, assessments or other governmental charges in connection with any transfer or exchange pursuant to this Section. The Issuer shall not be required to make, and the Registrar need not register, transfers or exchanges of Notes selected for redemption (except, in the case of Notes to be redeemed in part, the portion thereof not to be redeemed) or of any Notes for a period of 15 days before a selection of Notes to be redeemed.

Prior to the due presentation for registration of transfer of any Note, the Issuer, the Parent Guarantor, the Trustee, the Paying Agent and the Registrar may deem and treat the Person in whose name a Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest, if any, on such Note and for all other purposes whatsoever, whether or not such Note is overdue, and none of the Issuer, the Parent Guarantor, the Trustee, the Paying Agent or the Registrar shall be affected by notice to the contrary.

Any holder of a beneficial interest in a Global Note shall, by acceptance of such beneficial interest, agree that transfers of beneficial interests in such Global Note may be effected only through a book-entry system maintained by (a) the holder of such Global Note (or its agent) or (b) any holder of a beneficial interest in such Global Note, and that ownership of a beneficial interest in such Global Note shall be required to be reflected in a book entry.

All Notes issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Notes surrendered upon such transfer or exchange.

SECTION 2.08. Replacement Notes . If a mutilated Note is surrendered to the Registrar or if the holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Issuer shall issue and the Trustee shall authenticate a replacement Note if the requirements of Section 8-405 of the Uniform Commercial Code are met, such that the holder (a) satisfies the Issuer or the Trustee within a reasonable time after such holder has notice of such loss, destruction or wrongful taking and the Registrar does not register a transfer prior to receiving such notification, (b) makes such request to the Issuer or the Trustee prior to the Note being acquired by a protected purchaser as defined in Section 8-303 of the Uniform Commercial Code (a " protected purchaser ") and (c) satisfies any other reasonable requirements of the Trustee. If required by the Trustee or the Issuer, such holder shall furnish an indemnity bond sufficient in the judgment of the Trustee and the Issuer to protect the Issuer, the Trustee, a Paying Agent and the Registrar from any loss or liability that any of them may suffer if a Note is replaced and subsequently presented or claimed for payment. The Issuer and the Trustee may charge the holder for their expenses in replacing a Note (including without limitation, attorneys' fees and disbursements in replacing such Note). In the event any such mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Issuer in its discretion may pay such Note instead of issuing a new Note in replacement thereof.

Every replacement Note is an additional obligation of the Issuer.

48

The provisions of this Section 2.08 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, lost, destroyed or wrongfully taken Notes.

SECTION 2.09. Outstanding Notes . Notes outstanding at any time are all Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation and those described in this Section as not outstanding. Subject to Section 13.06, a Note does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Note.

If a Note is replaced pursuant to Section 2.08 (other than a mutilated Note surrendered for replacement), it ceases to be outstanding unless the Trustee and the Issuer receive proof satisfactory to them that the replaced Note is held by a protected purchaser. A mutilated Note ceases to be outstanding upon surrender of such Note and replacement thereof pursuant to Section 2.08.

If a Paying Agent segregates and holds in trust, in accordance with this Indenture, on a redemption date or maturity date money sufficient to pay all principal and interest payable on that date with respect to the Notes (or portions thereof) to be redeemed or maturing, as the case may be, and no Paying Agent is prohibited from paying such money to the holders on that date pursuant to the terms of this Indenture, then on and after that date such Notes (or portions thereof) cease to be outstanding and interest on them ceases to accrue.

SECTION 2.10. Temporary Notes . In the event that Definitive Notes are to be issued under the terms of this Indenture, until such Definitive Notes are ready for delivery, the Issuer may prepare and the Trustee shall authenticate temporary Notes. Temporary Notes shall be substantially in the form of Definitive Notes but may have variations that the Issuer considers appropriate for temporary Notes. Without unreasonable delay, the Issuer shall prepare and the Trustee shall authenticate Definitive Notes and make them available for delivery in exchange for temporary Notes upon surrender of such temporary Notes at the office or agency of the Issuer, without charge to the holder. Until such exchange, temporary Notes shall be entitled to the same rights, benefits and privileges as Definitive Notes.

SECTION 2.11. Cancellation . The Issuer at any time may deliver Notes to the Trustee for cancellation. The Registrar and each Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment or cancellation and shall dispose of canceled Notes in accordance with its customary procedures. The Issuer may not issue new Notes to replace Notes it has redeemed, paid or delivered to the Trustee for cancellation. The Trustee shall not authenticate Notes in place of canceled Notes other than pursuant to the terms of this Indenture.

SECTION 2.12. Defaulted Interest . If the Issuer defaults in a payment of interest on the Notes, the Issuer shall pay the defaulted interest then borne by the Notes ( *plus* interest on such defaulted interest to the extent lawful) in any lawful manner. The Issuer may pay the defaulted interest to the Persons who are holders on a subsequent special record date. The Issuer shall fix or cause to be fixed any such special record date and payment date to the reasonable satisfaction of the Trustee and shall promptly mail or cause to be mailed to each affected holder a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

49

SECTION 2.13. <u>CUSIP Numbers, ISINs, Etc</u>. The Issuer in issuing the Notes may use CUSIP numbers, ISINs and " <u>Common Code</u> " numbers (if then generally in use) and, if so, the Trustee shall use CUSIP numbers, ISINs and " <u>Common Code</u> " numbers in notices of redemption as a convenience to holders; *provided, however,* that any such notice may state that no representation is made as to the correctness of such numbers, either as printed on the Notes or as contained in any notice of a redemption that reliance may be placed only on the other identification numbers printed on the Notes and that any such redemption shall not be affected by any defect in or omission of such numbers. The Issuer shall advise the Trustee of any change in the CUSIP numbers, ISINs and " <u>Common Code</u> " numbers.

SECTION 2.14. <u>Calculation of Principal Amount of Notes</u>. The aggregate principal amount of the Notes, at any date of determination, shall be the principal amount of the Notes at such date of determination. With respect to any matter requiring consent, waiver, approval or other action of the holders of a specified percentage of the principal amount of all the Notes, such percentage shall be calculated, on the relevant date of determination, by dividing (a) the principal amount, as of such date of determination, of Notes, the holders of which have so consented, by (b) the aggregate principal amount, as of such date of determination, of the Notes then outstanding, in each case, as determined in accordance with the preceding sentence, Section 2.09 and Section 13.06 of this Indenture. Any such calculation made pursuant to this Section 2.14 shall be made by the Issuer and delivered to the Trustee pursuant to an Officers' Certificate.

SECTION 2.15. <u>Mandatory Disposition Pursuant to Gaming Laws</u>. Each person that holds or acquires beneficial ownership of any of the Notes shall be deemed to have agreed, by accepting such Notes, that if any Gaming Authority requires such person to be approved, licensed, qualified or found suitable under applicable Gaming Laws, such holder or beneficial owner, as the case may be, shall apply for a license, qualification or finding of suitability within the required time period.

If a person required to apply or become licensed or qualified or be found suitable fails to do so (a " <u>Disqualified Holder</u> "), the Issuer shall have the right, at its election, (1) to require such person to dispose of its Notes or beneficial interest therein within 30 days of receipt of notice of such election or such earlier date as may be required by such Gaming Authority or (2) to redeem such Notes at a redemption price that, unless otherwise directed by such Gaming Authority, shall be at a redemption price that is equal to the lesser of:

(a) such person's cost, or

(b) 100% of the principal amount thereof, *plus* accrued and unpaid interest, if any, to the earlier of (i) the redemption date or (ii) the date such person became a Disqualified Holder.

The Issuer shall notify the Trustee and applicable Gaming Authority in writing of any such redemption as soon as practicable. The Issuer shall not be responsible for any costs or expenses any such holder may Incur in connection with its application for a license, qualification or finding of suitability.

50

## ARTICLE III

## REDEMPTION

SECTION 3.01. <u>Redemption</u> . The Notes may be redeemed, in whole, or from time to time in part, subject to the conditions and at the redemption prices set forth in Paragraph 5 of the forms of Note set forth in <u>Exhibits A-1</u> and <u>A-2</u> and <u>Exhibits B-1</u> and <u>B-2</u> hereto, which are hereby incorporated by reference and made a part of this Indenture, together with accrued and unpaid interest to the redemption date.

SECTION 3.02. <u>Applicability of Article</u> . Redemption of Notes at the election of the Issuer or otherwise, as permitted or required by any provision of this Indenture, shall be made in accordance with such provision and this Article.

SECTION 3.03. <u>Notices to Trustee</u> . If the Issuer elects to redeem Notes pursuant to the optional redemption provisions of Paragraph 5 of the Note, it shall notify the Trustee in writing of (i) the Section of this Indenture pursuant to which the redemption shall occur, (ii) the redemption date, (iii) the principal amount of Notes to be redeemed and (iv) the redemption price. The Issuer shall give notice to the Trustee provided for in this paragraph at least 30 days but not more than 60 days before a redemption date if the redemption is pursuant to Paragraph 5 of the Note, unless a shorter period is acceptable to the Trustee. Such notice shall be accompanied by an Officers' Certificate and Opinion of Counsel from the Issuer to the effect that such redemption will comply with the conditions herein, as well as such notice required to be delivered under Section 3.05 below. If fewer than all the Notes are to be redeemed, the record date relating to such redemption shall be selected by the Issuer and given to the Trustee, which record date shall be not fewer than 15 days after the date of notice to the Trustee. Any such notice may be canceled at any time prior to notice of such redemption being mailed to any holder and shall thereby be void and of no effect.

SECTION 3.04. <u>Selection of Notes to Be Redeemed</u> . In the case of any partial redemption, selection of the Notes for redemption will be made by the Trustee on a pro rata basis to the extent practicable; *provided* that no Notes of $2,000 or less shall be redeemed in part. The Trustee shall make the selection from outstanding Notes not previously called for redemption. The Trustee may select for redemption portions of the principal of Notes that have denominations larger than $2,000. Notes and portions of them the Trustee selects shall be in amounts of $2,000 or any integral multiple of $1,000. Provisions of this Indenture that apply to Notes called for redemption also apply to portions of Notes called for redemption. The Trustee shall notify the Issuer promptly of the Notes or portions of Notes to be redeemed.

SECTION 3.05. <u>Notice of Optional Redemption</u> .

(a) At least 30 days but not more than 60 days before a redemption date pursuant to Paragraph 5 of the Note, the Issuer shall mail or cause to be mailed by first-class mail a notice of redemption to each holder whose Notes are to be redeemed.

51

Any such notice shall identify the Notes to be redeemed and shall state:

(i) the redemption date;

(ii) the redemption price and the amount of accrued interest to the redemption date;

(iii) the name and address of the Paying Agent;

(iv) that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price, *plus* accrued interest;

(v) if fewer than all the outstanding Notes are to be redeemed, the certificate numbers and principal amounts of the particular Notes to be redeemed, the aggregate principal amount of Notes to be redeemed and the aggregate principal amount of Notes to be outstanding after such partial redemption;

(vi) that, unless the Issuer defaults in making such redemption payment or the Paying Agent is prohibited from making such payment pursuant to the terms of this Indenture, interest on Notes (or portion thereof) called for redemption ceases to accrue on and after the redemption date;

(vii) the CUSIP number, ISIN and/or " Common Code " number, if any, printed on the Notes being redeemed; and

(viii) that no representation is made as to the correctness or accuracy of the CUSIP number or ISIN and/or " Common Code " number, if any, listed in such notice or printed on the Notes.

(b) At the Issuer's request, the Trustee shall give the notice of redemption in the Issuer's name and at the Issuer's expense. In such event, the Issuer shall provide the Trustee with the information required by this Section at least one Business Day prior to the date such notice is to be provided to holders in the final form such notice is to be delivered to holders and such notice may not be canceled.

SECTION 3.06. Effect of Notice of Redemption . Once notice of redemption is mailed in accordance with Section 3.05, Notes called for redemption become due and payable on the redemption date and at the redemption price stated in the notice, except as provided in the final sentence of paragraph 5 of the Notes. Upon surrender to the Paying Agent, such Notes shall be paid at the redemption price stated in the notice, *plus* accrued interest, to, but not including, the redemption date; *provided, however,* that if the redemption date is after a regular record date and on or prior to the interest payment date, the accrued interest shall be payable to the holder of the redeemed Notes registered on the relevant record date. Failure to give notice or any defect in the notice to any holder shall not affect the validity of the notice to any other holder.

SECTION 3.07. Deposit of Redemption Price . With respect to any Notes, prior to 10:00 a.m., New York City time, on the redemption date, the Issuer shall deposit with the

52

Paying Agent (or, if the Issuer or a Wholly Owned Subsidiary is the Paying Agent, shall segregate and hold in trust) money sufficient to pay the redemption price of and accrued interest on all Notes or portions thereof to be redeemed on that date other than Notes or portions of Notes called for redemption that have been delivered by the Issuer to the Trustee for cancellation. On and after the redemption date, interest shall cease to accrue on Notes or portions thereof called for redemption so long as the Issuer has deposited with the Paying Agent funds sufficient to pay the principal of, *plus* accrued and unpaid interest on, the Notes to be redeemed, unless the Paying Agent is prohibited from making such payment pursuant to the terms of this Indenture.

SECTION 3.08. Notes Redeemed in Part . Upon surrender of a Note that is redeemed in part, the Issuer shall execute and the Trustee shall authenticate for the holder (at the Issuer's expense) a new Note equal in principal amount to the unredeemed portion of the Note surrendered.

## ARTICLE IV

## COVENANTS

SECTION 4.01. Payment of Notes . The Issuer shall promptly pay the principal of and interest on the Notes on the dates and in the manner provided in the Notes and in this Indenture. An installment of principal of or interest shall be considered paid on the date due if on such date the Trustee or the Paying Agent holds as of 12:00 p.m. Eastern time money sufficient to pay all principal and interest then due and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the holders on that date pursuant to the terms of this Indenture.

The Issuer shall pay interest on overdue principal at the rate specified therefor in the Notes, and it shall pay interest on overdue installments of interest at the same rate borne by the Notes to the extent lawful.

SECTION 4.02. Reports and Other Information .

(a) Notwithstanding that the Issuer may not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act or otherwise report on an annual and quarterly basis on forms provided for such annual and quarterly reporting pursuant to rules and regulations promulgated by the SEC, the Issuer shall file with the SEC (and provide the Trustee and holders with copies thereof, without cost to each holder, within 15 days after it files them with the SEC),

(i) within the time period specified in the SEC's rules and regulations for non-accelerated filers, annual reports on Form 10-K (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form),

(ii) within the time period specified in the SEC's rules and regulations for non-accelerated filers, reports on Form 10-Q (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form),

53

(iii) promptly from time to time after the occurrence of an event required to be therein reported (and in any event within the time period specified in the SEC's rules and regulations), such other reports on Form 8-K (or any successor or comparable form), and

(iv) any other information, documents and other reports which the Issuer would be required to file with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act;

*provided, however,* that the Issuer shall not be so obligated to file such reports with the SEC if the SEC does not permit such filing, in which event the Issuer will make available such information to prospective purchasers of Notes in addition to providing such information to the Trustee and the holders, in each case within 15 days after the time the Issuer would be required to file such information with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act, subject, in the case of any such information, certificates or reports provided prior to the effectiveness of the Exchange Offer Registration Statement or Shelf Registration Statement, to exceptions consistent with the presentation of financial information in the Offering Memorandum.

Notwithstanding the foregoing, the Issuer shall not be required to furnish any information, certificates or reports required by Items 307 or 308 of Regulation S-K prior to the effectiveness of the Exchange Offer Registration Statement or Shelf Registration Statement.

(b) In the event that:

(i) the rules and regulations of the SEC permit the Issuer and any direct or indirect parent of the Issuer to report at such parent entity's level on a consolidated basis and such parent entity is not engaged in any business in any material respect other than incidental to its ownership, directly or indirectly, of the capital stock of the Issuer, or

(ii) any direct or indirect parent of the Issuer is or becomes a guarantor of the Notes,

consolidating reporting at the parent entity's level in a manner consistent with that described in this Section 4.02 and furnishing financial information relating to such direct or indirect parent for the Issuer will satisfy this Section 4.02; *provided* that such financial information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such direct or indirect parent and any of its Subsidiaries other than the Issuer and its Subsidiaries, on the one hand, and the information relating to the Issuer, the Subsidiary Pledgors and the other Subsidiaries of the Issuer on a standalone basis, on the other hand.

(c) The Issuer will make such information available to prospective investors upon request. In addition, the Issuer has agreed that, for so long as any Notes remain outstanding during any period when it is not subject to Section 13 or 15(d) of the Exchange Act, or otherwise permitted to furnish the SEC with certain information pursuant to Rule 12g3-2(b) of the Exchange Act, it will furnish to the holders of the Notes and to prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

Notwithstanding the foregoing, the Issuer will be deemed to have furnished such reports referred to above to the Trustee and the holders if the Issuer has filed such reports with the SEC via the EDGAR filing system and such reports are publicly available. In addition, the requirements of this Section 4.02 shall be deemed satisfied prior to the commencement of the exchange offers contemplated by the Registration Rights Agreement relating to the Notes or the effectiveness of the Shelf Registration Statement by (1) the filing with the SEC of the Exchange Offer Registration Statement and/or Shelf Registration Statement in accordance with the provisions of such Registration Rights Agreement, and any amendments thereto, if such registration statement and/or amendments thereto are filed at times that otherwise satisfy the time requirements set forth in Section 4.02(a) and/or (2) the posting of reports that would be required to be provided to the Trustee and the holders on the Issuer's website (or that of any of its parent companies).

SECTION 4.03.  <u>Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock</u> .

(a) (i) The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness (including Acquired Indebtedness) or issue any shares of Disqualified Stock; and (ii) the Issuer shall not permit any of its Restricted Subsidiaries (other than a Subsidiary Pledgor) to issue any shares of Preferred Stock; *provided, however,* that the Issuer and any Subsidiary Pledgor may Incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified Stock, and, subject to Section 4.03(c), any Restricted Subsidiary of the Issuer that is not a Subsidiary Pledgor may Incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock or issue shares of Preferred Stock, in each case if the Fixed Charge Coverage Ratio of the Issuer for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is Incurred or such Disqualified Stock or Preferred Stock is issued would have been at least 2.00 to 1.00 determined on a *pro forma* basis (including a *pro forma* application of the net proceeds therefrom), as if the additional Indebtedness had been Incurred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, and the application of proceeds therefrom had occurred at the beginning of such four-quarter period.

(b) The limitations set forth in Section 4.03(a) shall not apply to:

(i) the Incurrence by the Issuer or its Restricted Subsidiaries of Indebtedness under the Credit Agreement and the issuance and creation of letters of credit and bankers' acceptances thereunder up to an aggregate principal amount of $11,000 million;

(ii) the Incurrence of Indebtedness represented by the Notes (not including any Additional Notes, but including any Exchange Notes);

(iii) Indebtedness existing on the Issue Date (other than Indebtedness described in clauses (i) and (ii) of this Section 4.03(b));

(iv) Indebtedness (including Capitalized Lease Obligations) Incurred by the Issuer or any of its Restricted Subsidiaries, Disqualified Stock issued by the Issuer or any

55

of its Restricted Subsidiaries and Preferred Stock issued by any Restricted Subsidiaries of the Issuer to finance (whether prior to or within 270 days after) the acquisition, lease, construction, repair, replacement or improvement of property (real or personal) or equipment (whether through the direct purchase of assets or the Capital Stock of any Person owning such assets);

(v) Indebtedness Incurred by the Issuer or any of its Restricted Subsidiaries constituting reimbursement obligations with respect to letters of credit and bank guarantees issued in the ordinary course of business, including without limitation letters of credit in respect of workers' compensation claims, health, disability or other benefits to employees or former employees or their families or property, casualty or liability insurance or self-insurance, and letters of credit in connection with the maintenance of, or pursuant to the requirements of, environmental or other permits or licenses from governmental authorities, or other Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims;

(vi) Indebtedness arising from agreements of the Issuer or a Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations, in each case, Incurred in connection with the Acquisition Transactions or any other acquisition or disposition of any business, assets or a Subsidiary of the Issuer in accordance with the terms of this Indenture, other than guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition;

(vii) Indebtedness of the Issuer to a Restricted Subsidiary; *provided* that (except in respect of intercompany current liabilities Incurred in the ordinary course of business in connection with the cash management operations of the Issuer and its Subsidiaries) any such Indebtedness owed to a Restricted Subsidiary that is not a Subsidiary Pledgor is subordinated in right of payment to the obligations of the Issuer under the Notes; *provided, further,* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Issuer or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (vii);

(viii) shares of Preferred Stock of a Restricted Subsidiary issued to the Issuer or another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary that holds such shares of Preferred Stock of another Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to the Issuer or another Restricted Subsidiary) shall be deemed, in each case, to be an issuance of shares of Preferred Stock not permitted by this clause (viii);

(ix) Indebtedness of a Restricted Subsidiary to the Issuer or another Restricted Subsidiary; *provided* that if a Subsidiary Pledgor Incurs such Indebtedness to a Restricted Subsidiary that is not a Subsidiary Pledgor (except in respect of intercompany current

56

liabilities Incurred in the ordinary course of business in connection with the cash management operations of the Issuer and its Subsidiaries), such Indebtedness is subordinated in right of payment to the obligations of such Subsidiary Pledgor in respect of the Notes; *provided, further,* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary holding such Indebtedness ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Issuer or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (ix);

(x) (A) Hedging Obligations entered into in connection with the Acquisition Transactions and (B) Hedging Obligations that are not Incurred for speculative purposes but (1) for the purpose of fixing or hedging interest rate risk with respect to any Indebtedness that is permitted by the terms of this Indenture to be outstanding; (2) for the purpose of fixing or hedging currency exchange rate risk with respect to any currency exchanges; or (3) for the purpose of fixing or hedging commodity price risk with respect to any commodity purchases or sales;

(xi) obligations (including reimbursement obligations with respect to letters of credit and bank guarantees) in respect of performance, bid, appeal and surety bonds and completion guarantees provided by the Issuer or any Restricted Subsidiary in the ordinary course of business or consistent with past practice or industry practice;

(xii) Indebtedness or Disqualified Stock of the Issuer or, subject to Section 4.03(c), Indebtedness, Disqualified Stock or Preferred Stock of any Restricted Subsidiary of the Issuer not otherwise permitted hereunder in an aggregate principal amount or liquidation preference which, when aggregated with the principal amount or liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and Incurred pursuant to this clause (xii), does not exceed the greater of $1,100 million and 5.0% of Total Assets at the time of Incurrence (it being understood that any Indebtedness Incurred pursuant to this clause (xii) shall cease to be deemed Incurred or outstanding for purposes of this clause (xii) but shall be deemed Incurred for purposes of Section 4.03(a) from and after the first date on which the Issuer, or the Restricted Subsidiary, as the case may be, could have Incurred such Indebtedness under Section 4.03 (a) without reliance upon this clause (xii));

(xiii) Indebtedness or Disqualified Stock of the Issuer or any Restricted Subsidiary of the Issuer and Preferred Stock of any Restricted Subsidiary of the Issuer not otherwise permitted hereunder in an aggregate principal amount or liquidation preference not greater than 200.0% of the net cash proceeds received by the Issuer and its Restricted Subsidiaries since immediately after the Issue Date from the issue or sale of Equity Interests of the Issuer or any direct or indirect parent entity of the Issuer (which proceeds are contributed to the Issuer or its Restricted Subsidiary) or cash contributed to the capital of the Issuer (in each case other than proceeds of Disqualified Stock or sales of Equity Interests to, or contributions received from, the Issuer or any of its Subsidiaries) as determined in accordance with clauses (B) and (C) of the definition of "Cumulative Credit" to the extent such net cash proceeds or cash has not been applied pursuant to such

57

clauses to make Restricted Payments or to make other Investments, payments or exchanges pursuant to Section 4.04(b) or to make Permitted Investments (other than Permitted Investments specified in clauses (1) and (3) of the definition thereof);

(xiv) any guarantee by the Issuer or any Restricted Subsidiary of the Issuer of Indebtedness or other obligations of the Issuer or any of its Restricted Subsidiaries so long as the Incurrence of such Indebtedness Incurred by the Issuer or such Restricted Subsidiary is permitted under the terms of this Indenture; *provided* that (i) if such Indebtedness is by its express terms subordinated in right of payment to the Notes or the obligations of such Restricted Subsidiary in respect of the Notes, as applicable, any such guarantee of such Subsidiary Pledgor with respect to such Indebtedness shall be subordinated in right of payment to such Subsidiary Pledgor's obligations with respect to the Notes substantially to the same extent as such Indebtedness is subordinated to the Notes or the obligations of such Subsidiary Pledgor in respect of the Notes, as applicable and (ii) if such guarantee is of Indebtedness of the Issuer, such guarantee is Incurred in accordance with Section 4.11 solely to the extent such Section is applicable;

(xv) the Incurrence by the Issuer or any of its Restricted Subsidiaries of Indebtedness or Disqualified Stock or Preferred Stock of a Restricted Subsidiary of the Issuer which serves to refund, refinance or defease any Indebtedness Incurred or Disqualified Stock or Preferred Stock issued as permitted under Section 4.03(a) and clauses (ii), (iii), (iv), (xii), (xiii), (xv), (xvi), (xx) and (xxiv) of this Section 4.03(b) or any Indebtedness, Disqualified Stock or Preferred Stock Incurred to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock, including any additional Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay premiums (including tender premiums), expenses, defeasance costs and fees in connection therewith (subject to the following proviso, " <u>Refinancing Indebtedness</u> ") prior to its respective maturity; *provided, however,* that such Refinancing Indebtedness:

(1) has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded, refinanced or defeased and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Indebtedness, Disqualified Stock and Preferred Stock being refunded or refinanced that were due on or after the date that is one year following the last maturity date of any Notes then outstanding were instead due on such date;

(2) to the extent such Refinancing Indebtedness refinances (a) Indebtedness junior to the Notes or the obligations of such Restricted Subsidiary in respect of the Notes, as applicable, such Refinancing Indebtedness is junior to the Notes or such obligations of such Restricted Subsidiary, as applicable, or (b) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness is Disqualified Stock or Preferred Stock; and

(3) shall not include (x) Indebtedness of a Restricted Subsidiary of the Issuer that is not a Subsidiary Pledgor that refinances Indebtedness of the Issuer or a Subsidiary Pledgor, or (y) Indebtedness of the Issuer or a Restricted Subsidiary that refinances Indebtedness of an Unrestricted Subsidiary:

58

*provided, further,* that subclause (1) of this clause (xv) will not apply to any refunding or refinancing of any Secured Indebtedness constituting First Priority Lien Obligations and subclauses (1) and (2) of this clause (xv) will not apply to any refunding or refinancing of any of the Retained Notes;

(xvi) Indebtedness, Disqualified Stock or Preferred Stock of (x) the Issuer or, subject to Section 4.03(b), any of its Restricted Subsidiaries Incurred to finance an acquisition or (y) Persons that are acquired by the Issuer or any of its Restricted Subsidiaries or merged, consolidated or amalgamated with or into the Issuer or any of its Restricted Subsidiaries in accordance with the terms of this Indenture; *provided* that after giving effect to such acquisition or merger, consolidation or amalgamation, either:

(1) the Issuer would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a); or

(2) the Fixed Charge Coverage Ratio of the Issuer would be greater than immediately prior to such acquisition or merger, consolidation or amalgamation;

(xvii) Indebtedness Incurred by a Receivables Subsidiary in a Qualified Receivables Financing that is not recourse to the Issuer or any Restricted Subsidiary other than a Receivables Subsidiary (except for Standard Securitization Undertakings);

(xviii) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within five Business Days of its Incurrence;

(xix) Indebtedness of the Issuer or any Restricted Subsidiary supported by a letter of credit or bank guarantee issued pursuant to the Credit Agreement, in a principal amount not in excess of the stated amount of such letter of credit;

(xx) Indebtedness of Foreign Subsidiaries; *provided, however,* that the aggregate principal amount of Indebtedness Incurred under this clause (xx), when aggregated with the principal amount of all other Indebtedness then outstanding and Incurred pursuant to this clause (xx), does not exceed the greater of $250.0 million and 7.5% of Total Assets of the Foreign Subsidiaries at any one time outstanding (it being understood that any Indebtedness Incurred pursuant to this clause (xx) shall cease to be deemed Incurred or outstanding for purposes of this clause (xx) but shall be deemed Incurred for the purposes of Section 4.03(a) from and after the first date on which such Foreign Subsidiary could have Incurred such Indebtedness under Section 4.03(a) without reliance upon this clause (xx));

(xxi) Indebtedness of the Issuer or any Restricted Subsidiary consisting of (1) the financing of insurance premiums or (2) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(xxii) Indebtedness consisting of Indebtedness issued by the Issuer or a Restricted Subsidiary of the Issuer to current or former officers, directors and employees thereof or any direct or indirect parent thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Issuer or any of its direct or indirect parent companies to the extent described in Section 4.04(b)(iv);

(xxiii) Indebtedness Incurred in connection with any Project Financing; and

(xxiv) Indebtedness Incurred on behalf of, or representing guarantees of Indebtedness of, joint ventures of the Issuer or any Restricted Subsidiary not in excess, at any one time outstanding, of $300.0 million.

(c) Restricted Subsidiaries that are not Subsidiary Pledgors may not Incur Indebtedness or issue Disqualified Stock or Preferred Stock under Section 4.03(a) or clauses (xii) or (xvi)(x) of Section 4.03(b) if, after giving *pro forma* effect to such Incurrence or issuance (including a *pro forma* application of the net proceeds therefrom), the aggregate amount of Indebtedness and Disqualified Stock and Preferred Stock of Restricted Subsidiaries that are not Subsidiary Pledgors Incurred or issued pursuant to Section 4.03(a) and clauses (xii) or (xvi)(x) of Section 4.03(b), collectively, would exceed the greater of $2,000 million and 5.0% of Total Assets.

(d) For purposes of determining compliance with this Section 4.03:

(i) in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness described in clauses (i) through (xxiv) above or is entitled to be Incurred pursuant to Section 4.03(a), the Issuer shall, in its sole discretion, classify or reclassify, or later divide, classify or reclassify, such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) in any manner that complies with this Section 4.03; and

(ii) at the time of Incurrence, the Issuer will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in Section 4.03(a) and (b) without giving *pro forma* effect to the Indebtedness Incurred pursuant to Section 4.03(b) when calculating the amount of Indebtedness that may be Incurred pursuant to Section 4.03(a).

Accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock, as applicable, amortization of original issue discount, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an Incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 4.03. Guarantees of, or obligations in

respect of letters of credit relating to, Indebtedness which is otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness; *provided* that the Incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this Section 4.03.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the Incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed or first Incurred (whichever yields the lower U.S. dollar equivalent), in the case of revolving credit debt; *provided* that if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

(e) Notwithstanding any other provision of this Section 4.03, the maximum amount of Indebtedness that the Issuer and its Restricted Subsidiaries may Incur pursuant to this Section 4.03 shall not be deemed to be exceeded, with respect to any outstanding Indebtedness, solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

SECTION 4.04. <u>Limitation on Restricted Payments</u>.

(a) The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

(i) declare or pay any dividend or make any distribution on account of the Issuer's or any of its Restricted Subsidiaries' Equity Interests, including any payment made in connection with any merger, amalgamation or consolidation involving the Issuer (other than (A) dividends or distributions by the Issuer payable solely in Equity Interests (other than Disqualified Stock) of the Issuer; or (B) dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a Wholly Owned Restricted Subsidiary, the Issuer or a Restricted Subsidiary receives at least its pro rata share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities);

(ii) purchase or otherwise acquire or retire for value any Equity Interests of the Issuer or any direct or indirect parent of the Issuer;

61

(iii) make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case prior to any scheduled repayment or scheduled maturity, any Subordinated Indebtedness or Long-Term Retained Notes of the Issuer or any of its Restricted Subsidiaries (other than the payment, redemption, repurchase, defeasance, acquisition or retirement of (A) Subordinated Indebtedness or Long-Term Retained Notes in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such payment, redemption, repurchase, defeasance, acquisition or retirement and (B) Indebtedness permitted under clauses (vii) and (ix) of Section 4.03(b)); or

(iv) make any Restricted Investment

(all such payments and other actions set forth in clauses (i) through (iv) above being collectively referred to as " Restricted Payments "), unless, at the time of such Restricted Payment:

(1) no Default shall have occurred and be continuing or would occur as a consequence thereof;

(2) immediately after giving effect to such transaction on a *pro forma* basis, the Issuer could Incur $1.00 of additional Indebtedness under Section 4.03(a); and

(3) such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Issuer and its Restricted Subsidiaries after the Issue Date (including Restricted Payments permitted by clauses (i), (ii) (with respect to the payment of dividends on Refunding Capital Stock (as defined below) pursuant to clause (C) thereof), (vi)(C), (viii), (xiii)(B) and (xix) of Section 4.04(b), but excluding all other Restricted Payments permitted by Section 4.04(b)), is less than the amount equal to the Cumulative Credit.

(b) The provisions of Section 4.04(a) shall not prohibit:

(i) the payment of any dividend or distribution within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Indenture;

(ii) (A) the redemption, repurchase, retirement or other acquisition of any Equity Interests (" Retired Capital Stock ") or Subordinated Indebtedness of the Issuer, any direct or indirect parent of the Issuer or any Subsidiary Pledgor in exchange for, or out of the proceeds of, the substantially concurrent sale of, Equity Interests of the Issuer or any direct or indirect parent of the Issuer or contributions to the equity capital of the Issuer (other than any Disqualified Stock or any Equity Interests sold to a Subsidiary of the Issuer) (collectively, including any such contributions, " Refunding Capital Stock "),

(B) the declaration and payment of dividends on the Retired Capital Stock out of the proceeds of the substantially concurrent sale (other than to a Subsidiary of the Issuer) of Refunding Capital Stock, and

62

(C) if immediately prior to the retirement of Retired Capital Stock, the declaration and payment of dividends thereon was permitted under clause (vi) of this Section 4.04(b) and not made pursuant to clause (ii)(B), the declaration and payment of dividends on the Refunding Capital Stock (other than Refunding Capital Stock the proceeds of which were used to redeem, repurchase, retire or otherwise acquire any Equity Interests of any direct or indirect parent of the Issuer) in an aggregate amount per year no greater than the aggregate amount of dividends per annum that were declarable and payable on such Retired Capital Stock immediately prior to such retirement;

(iii) the redemption, repurchase, defeasance, or other acquisition or retirement of Subordinated Indebtedness of the Issuer or any Subsidiary Pledgor made by exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Issuer or a Subsidiary Pledgor which is Incurred in accordance with Section 4.03 so long as:

(A) the principal amount (or accreted value, if applicable) of such new Indebtedness does not exceed the principal amount (or accreted value, if applicable), *plus* any accrued and unpaid interest, of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired for value ( *plus* the amount of any premium required to be paid under the terms of the instrument governing the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired, any tender premiums, *plus* any defeasance costs, fees and expenses Incurred in connection therewith),

(B) such Indebtedness is subordinated to the Notes or such Subsidiary Pledgor's obligations in respect of the Notes, as the case may be, at least to the same extent as such Subordinated Indebtedness so purchased, exchanged, redeemed, repurchased, defeased, acquired or retired for value,

(C) such Indebtedness has a final scheduled maturity date equal to or later than the earlier of (x) the final scheduled maturity date of the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired and (y) 91 days following the last maturity date of any Notes then outstanding, and

(D) such Indebtedness has a Weighted Average Life to Maturity at the time Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired that were due on or after the date that is one year following the last maturity date of any Notes then outstanding were instead due on such date;

(iv) a Restricted Payment to pay for the repurchase, retirement or other acquisition for value of Equity Interests of the Issuer or any direct or indirect parent of the Issuer held by any future, present or former employee, director or consultant of the

63

Issuer or any direct or indirect parent of the Issuer or any Subsidiary of the Issuer pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or other agreement or arrangement; *provided, however,* that the aggregate Restricted Payments made under this clause (iv) do not exceed $50.0 million in any calendar year (with unused amounts in any calendar year being permitted to be carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $100.0 million in any calendar year (which shall increase to $150.0 million subsequent to the consummation of an underwritten public Equity Offering of common stock); *provided, further,* however, that such amount in any calendar year may be increased by an amount not to exceed:

(A) the cash proceeds received by the Issuer or any of its Restricted Subsidiaries from the sale of Equity Interests (other than Disqualified Stock) of the Issuer or any direct or indirect parent of the Issuer (to the extent contributed to the Issuer) to members of management, directors or consultants of the Issuer and its Restricted Subsidiaries or any direct or indirect parent of the Issuer that occurs after the Issue Date ( *provided* that the amount of such cash proceeds utilized for any such repurchase, retirement, other acquisition or dividend will not increase the amount available for Restricted Payments under Section 4.04(a)(iii)), *plus*

(B) the cash proceeds of key man life insurance policies received by the Issuer or any direct or indirect parent of the Issuer (to the extent contributed to the Issuer) or the Issuer's Restricted Subsidiaries after the Issue Date, *plus*

(C) the amount of any cash bonuses otherwise payable to members of management, directors or consultants of the Issuer and its Restricted Subsidiaries or any direct or indirect parent of the Issuer in connection with the Acquisition Transactions that are forgone in return for the receipt of Equity Interests;

*provided* that the Issuer may elect to apply all or any portion of the aggregate increase contemplated by clauses (A), (B) and (C) above in any calendar year; and *provided, further,* that cancellation of Indebtedness owing to the Issuer or any Restricted Subsidiary from any present or former employees, directors, officers or consultants of the Issuer, any of its Restricted Subsidiaries or its direct or indirect parents in connection with a repurchase of Equity Interests of the Issuer or any of its direct or indirect parents will not be deemed to constitute a Restricted Payment for purposes of this Section 4.04 or any other provision of this Indenture;

(v) the declaration and payment of dividends or distributions to holders of any class or series of Disqualified Stock of the Issuer or any of its Restricted Subsidiaries issued or Incurred in accordance with Section 4.03 to the extent such dividends are included in the definition of "Fixed Charges";

(vi) (A) the declaration and payment of dividends or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date;

64

(B) a Restricted Payment to any direct or indirect parent of the Issuer, the proceeds of which will be used to fund the payment of dividends to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) of any direct or indirect parent of the Issuer issued after the Issue Date; *provided* that the aggregate amount of dividends declared and paid pursuant to this clause (B) does not exceed the net cash proceeds actually received by the Issuer from any such sale of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date; and

(C) the declaration and payment of dividends on Refunding Capital Stock that is Preferred Stock in excess of the dividends declarable and payable thereon pursuant to Section 4.04(b)(ii);

*provided, however,* in the case of each of (A) and (C) above of this clause (vi), that for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock, after giving effect to such issuance (and the payment of dividends or distributions) on a *pro forma* basis, the Issuer would have had a Fixed Charge Coverage Ratio of at least 2.00 to 1.00;

(vii) Investments in Unrestricted Subsidiaries having an aggregate Fair Market Value (as determined in good faith by the Issuer), taken together with all other Investments made pursuant to this clause (vii) that are at that time outstanding, not to exceed $250.0 million at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(viii) the payment of dividends on the Issuer's common stock (or a Restricted Payment to any direct or indirect parent of the Issuer to fund the payment by such direct or indirect parent of the Issuer of dividends on such entity's common stock) of up to 6% per annum of the net proceeds received by the Issuer from any public offering of common stock of the Issuer or any direct or indirect parent of the Issuer, other than public offerings with respect to the Issuer's (or such direct or indirect parent's) common stock registered on Form S-4 or Form S-8 and other than any public sale constituting an Excluded Contribution;

(ix) Restricted Payments that are made with Excluded Contributions;

(x) other Restricted Payments in an aggregate amount not to exceed the greater of $500.0 million and 2.5% of Total Assets at the time made;

(xi) the distribution, as a dividend or otherwise, of shares of Capital Stock of, or Indebtedness owed to the Issuer or a Restricted Subsidiary of the Issuer by, Unrestricted Subsidiaries;

(xii) the payment of dividends or other distributions to any direct or indirect parent of the Issuer that files a consolidated tax return that includes the Issuer and its subsidiaries (including, without limitation, by virtue of such parent being the common parent of a consolidated or combined tax group of which the Issuer and/or its Restricted

65

Subsidiaries are members) in an amount not to exceed the amount that the Issuer and its Restricted Subsidiaries would have been required to pay in respect of federal, state or local taxes (as the case may be) if the Issuer and its Restricted Subsidiaries paid such taxes as a stand-alone taxpayer (or stand-alone group);

(xiii) the payment of Restricted Payment, if applicable:

(A) in amounts required for any direct or indirect parent of the Issuer to pay fees and expenses (including franchise or similar taxes) required to maintain its corporate existence, customary salary, bonus and other benefits payable to, and indemnities *provided* on behalf of, officers and employees of any direct or indirect parent of the Issuer and general corporate operating and overhead expenses of any direct or indirect parent of the Issuer in each case to the extent such fees and expenses are attributable to the ownership or operation of the Issuer, if applicable, and its Subsidiaries;

(B) in amounts required for any direct or indirect parent of the Issuer, if applicable, to pay interest and/or principal on Indebtedness the proceeds of which have been contributed to the Issuer or any of its Restricted Subsidiaries and that has been guaranteed by, or is otherwise considered Indebtedness of, the Issuer Incurred in accordance with Section 4.03; and

(C) in amounts required for any direct or indirect parent of the Issuer to pay fees and expenses, other than to Affiliates of the Issuer, related to any unsuccessful equity or debt offering of such parent;

(xiv) any Restricted Payment used to fund the Acquisition Transactions or the Transactions and the payment of fees and expenses Incurred in connection with the Acquisition Transactions or the Transactions or owed by the Issuer or any direct or indirect parent of the Issuer or Restricted Subsidiaries of the Issuer to Affiliates, and any other payments made, including any such payments made to any direct or indirect parent of the Issuer to enable it to make payments, in connection with the consummation of the Transactions or as contemplated by the Acquisition Documents, whether payable on the Issue Date or thereafter, in each case to the extent permitted by Section 4.07;

(xv) any Restricted Payment made under the Operations Management Agreement;

(xvi) repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(xvii) purchases of receivables pursuant to a Receivables Repurchase Obligation in connection with a Qualified Receivables Financing and the payment or distribution of Receivables Fees;

(xviii) Restricted Payments by the Issuer or any Restricted Subsidiary to allow the payment of cash in lieu of the issuance of fractional shares upon the exercise of options or warrants or upon the conversion or exchange of Capital Stock of any such Person;

66

(xix) the repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness pursuant to the provisions similar to those described under Sections 4.06 and 4.08; *provided* that all Notes tendered by holders of the Notes in connection with a Change of Control Offer or Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value;

(xx) payments or distributions to dissenting stockholders pursuant to applicable law, pursuant to or in connection with a consolidation, amalgamation, merger or transfer of all or substantially all of the assets of the Issuer and its Restricted Subsidiaries, taken as a whole, that complies with Section 5.01; *provided* that as a result of such consolidation, amalgamation, merger or transfer of assets, the Issuer shall have made a Change of Control Offer (if required by this Indenture) and that all Notes tendered by holders in connection with such Change of Control Offer have been repurchased, redeemed or acquired for value;

(xxi) payments made to repay, defease, discharge or otherwise refinance Retained Notes or to service Retained Notes; and

(xxii) Restricted Payments made in connection with the Incurrence of Indebtedness under the revolving portion of the Credit Agreement for the account or benefit of the Subsidiaries of Harrah's Entertainment other than the Issuer or any of its Subsidiaries (including the distribution of the proceeds of any such Indebtedness and with respect to the issuance of, or payments in respect of drawings under, letters of credit), in each case for general corporate purposes of such Subsidiaries (including, without limitation, for business acquisitions and project development and, in the case of letters of credit, for the back-up or replacement of existing letters of credit) in an aggregate amount not to exceed $250.0 million at any time outstanding, so long as such proceeds are not distributed to the stockholders of Harrah's Entertainment;

*provided, however,* that at the time of, and after giving effect to, any Restricted Payment permitted under clauses (vi)(B), (vii), (x), (xi) and (xiii) (B) of this Section 4.04(b), no Default shall have occurred and be continuing or would occur as a consequence thereof.

(c) The Issuer will not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the definition of "Unrestricted Subsidiary." For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by the Issuer and its Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated will be deemed to be Restricted Payments in an amount determined as set forth in the last sentence of the definition of "Investments." Such designation will only be permitted if a Restricted Payment or Permitted Investment in such amount would be permitted at such time and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.

Notwithstanding the foregoing provisions of this Section 4.04, the Issuer will not, and will not permit any of its Restricted Subsidiaries to, pay any cash dividend or make any cash

67

distribution on, or in respect of, the Issuer's Capital Stock or purchase for cash or otherwise acquire for cash any Capital Stock of the Issuer or any direct or indirect parent of the Issuer for the purpose of paying any cash dividend or making any cash distribution to, or acquiring Capital Stock of any direct or indirect parent of the Issuer for cash from, the Sponsors, or guarantee any Indebtedness of any Affiliate of the Issuer for the purpose of paying such dividend, making such distribution or so acquiring such Capital Stock to or from the Sponsors, in each case by means of utilization of the cumulative Restricted Payment credit provided by Section 4.04(a), or the exceptions *provided* by clause (i), (vii) or (x) of Section 4.04(b) or clause (9), (10), (15) or (20) of the definition of "Permitted Investments," if (x) at the time and after giving effect to such payment, the Consolidated Leverage Ratio of the Issuer would be greater than 7.25 to 1.00 or (y) such payment is not otherwise in compliance with this Section 4.04.

SECTION 4.05. <u>Dividend and Other Payment Restrictions Affecting Subsidiaries</u> . The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary to:

(a) (i) pay dividends or make any other distributions to the Issuer or any of its Restricted Subsidiaries (1) on its Capital Stock; or (2) with respect to any other interest or participation in, or measured by, its profits; or (ii) pay any Indebtedness owed to the Issuer or any of its Restricted Subsidiaries;

(b) make loans or advances to the Issuer or any of its Restricted Subsidiaries; or

(c) sell, lease or transfer any of its properties or assets to the Issuer or any of its Restricted Subsidiaries;

except in each case for such encumbrances or restrictions existing under or by reason of:

(1) contractual encumbrances or restrictions in effect on the Issue Date, including pursuant to the Credit Agreement and the other Credit Agreement Documents;

(2) this Indenture, the Notes (and any Exchange Notes);

(3) applicable law or any applicable rule, regulation or order;

(4) any agreement or other instrument of a Person acquired by the Issuer or any Restricted Subsidiary which was in existence at the time of such acquisition (but not created in contemplation thereof or to provide all or any portion of the funds or credit support utilized to consummate such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired;

(5) contracts or agreements for the sale of assets, including any restriction with respect to a Restricted Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Capital Stock or assets of such Restricted Subsidiary;

68

(6) Secured Indebtedness otherwise permitted to be Incurred pursuant to Sections 4.03 and 4.12 that limit the right of the debtor to dispose of the assets securing such Indebtedness;

(7) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(8) customary provisions in joint venture agreements and other similar agreements entered into in the ordinary course of business;

(9) purchase money obligations for property acquired and Capitalized Lease Obligations in the ordinary course of business;

(10) customary provisions contained in leases, licenses and other similar agreements entered into in the ordinary course of business;

(11) any encumbrance or restriction of a Receivables Subsidiary effected in connection with a Qualified Receivables Financing; *provided, however,* that such restrictions apply only to such Receivables Subsidiary;

(12) other Indebtedness, Disqualified Stock or Preferred Stock (a) of any Restricted Subsidiary of the Issuer that is a Subsidiary Pledgor or a Foreign Subsidiary, (b) of any Restricted Subsidiary that is not a Subsidiary Pledgor or a Foreign Subsidiary so long as such encumbrances and restrictions contained in any agreement or instrument will not materially affect the Issuer's ability to make anticipated principal or interest payments on the Notes (as determined in good faith by the Issuer) or (c) of any Restricted Subsidiary Incurred in connection with any Project Financing, provided that in the case of each of clauses (a) and (b), such Indebtedness, Disqualified Stock or Preferred Stock is permitted to be Incurred subsequent to the Issue Date pursuant to Section 4.03;

(13) any Restricted Investment not prohibited by Section 4.04 and any Permitted Investment; or

(14) any encumbrances or restrictions of the type referred to in clauses (a), (b) and (c) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (1) through (13) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Issuer, no more restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

For purposes of determining compliance with this Section 4.05, (i) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock shall not be deemed a restriction on the ability to make distributions on Capital Stock and (ii) the subordination of loans or advances made to the Issuer or a Restricted Subsidiary of the Issuer to other Indebtedness Incurred by the Issuer or any such Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

SECTION 4.06. <u>Asset Sales</u> .

(a) The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, cause or make an Asset Sale, unless (x) the Issuer or any of its Restricted Subsidiaries, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value (as determined in good faith by the Issuer) of the assets sold or otherwise disposed of, and (y) at least 75% of the consideration therefor received by the Issuer or such Restricted Subsidiary, as the case may be, is in the form of Cash Equivalents; *provided* that the amount of:

(i) any liabilities (as shown on the Issuer's or such Restricted Subsidiary's most recent balance sheet or in the Notes thereto) of the Issuer or any Restricted Subsidiary of the Issuer (other than liabilities that are by their terms subordinated to the Notes or such Restricted Subsidiary's obligations in respect of the Notes) that are assumed by the transferee of any such assets,

(ii) any notes or other obligations or other securities or assets received by the Issuer or such Restricted Subsidiary of the Issuer from such transferee that are converted by the Issuer or such Restricted Subsidiary of the Issuer into cash within 180 days of the receipt thereof (to the extent of the cash received), and

(iii) any Designated Non-cash Consideration received by the Issuer or any of its Restricted Subsidiaries in such Asset Sale having an aggregate Fair Market Value (as determined in good faith by the Issuer), taken together with all other Designated Non-cash Consideration received pursuant to this Section 4.06(a)(iii) that is at that time outstanding, not to exceed the greater of 5.0% of Total Assets and $850.0 million at the time of the receipt of such Designated Non-cash Consideration (with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value)

shall be deemed to be Cash Equivalents for the purposes of this Section 4.06(a).

(b) Within 15 months after the Issuer's or any Restricted Subsidiary of the Issuer's receipt of the Net Proceeds of any Asset Sale, the Issuer or such Restricted Subsidiary of the Issuer may apply the Net Proceeds from such Asset Sale, at its option:

(i) to repay (A) Indebtedness constituting First Priority Lien Obligations and other Pari Passu Indebtedness that is secured by a Lien permitted under this Indenture (and, if the Indebtedness repaid is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto), (B) Indebtedness of a Restricted Subsidiary that is not a Subsidiary Pledgor, (C) Obligations under the Notes or (D) other Pari Passu

70

Indebtedness ( *provided* that if the Issuer or any Subsidiary Pledgor shall so reduce Obligations under Pari Passu Indebtedness that does not constitute First Priority Lien Obligations, the Issuer will equally and ratably reduce Obligations under the Notes pursuant to Section 3.01 through open-market purchases ( *provided* that such purchases are at or above 100% of the principal amount thereof) or by making an offer (in accordance with the procedures set forth below for an Asset Sale Offer) to all holders to purchase at a purchase price equal to 100% of the principal amount thereof, *plus* accrued and unpaid interest and Additional Interest, if any, the pro rata principal amount of Notes), in each case other than Indebtedness owed to the Issuer or an Affiliate of the Issuer; or

(ii) to make an Investment in any one or more businesses ( *provided* that if such Investment is in the form of the acquisition of Capital Stock of a Person, such acquisition results in such Person becoming a Restricted Subsidiary of the Issuer), assets, or property or capital expenditures, in each case (a) used or useful in a Similar Business or (b) that replace the properties and assets that are the subject of such Asset Sale.

In the case of Section 4.06(b)(ii), a binding commitment shall be treated as a permitted application of the Net Proceeds from the date of such commitment; *provided* that in the event such binding commitment is later canceled or terminated for any reason before such Net Proceeds are so applied, the Issuer or such Restricted Subsidiary enters into another binding commitment (a " Second Commitment ") within six months of such cancellation or termination of the prior binding commitment; *provided* , *further* that the Issuer or such Restricted Subsidiary may only enter into a Second Commitment under the foregoing provision one time with respect to each Asset Sale and to the extent such Second Commitment is later cancelled or terminated for any reason before such Net Proceeds are applied, then such Net Proceeds shall constitute Excess Proceeds.

Pending the final application of any such Net Proceeds, the Issuer or such Restricted Subsidiary of the Issuer may temporarily reduce Indebtedness under a revolving credit facility, if any, or otherwise invest such Net Proceeds in any manner not prohibited by this Indenture. Any Net Proceeds from any Asset Sale that are not applied as provided and within the time period set forth in the first sentence of this Section 4.06(b) (it being understood that any portion of such Net Proceeds used to make an offer to purchase Notes, as described in clause (i) of this Section 4.06 (b), shall be deemed to have been invested whether or not such offer is accepted) will be deemed to constitute " Excess Proceeds ." When the aggregate amount of Excess Proceeds exceeds $200.0 million, the Issuer shall make an offer to all holders of Notes (and, at the option of the Issuer, to holders of any Pari Passu Indebtedness) (an " Asset Sale Offer ") to purchase the maximum principal amount of Notes (and such Pari Passu Indebtedness), that is at least $2,000 and an integral multiple of $1,000 in excess thereof that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof (or, in the event such Pari Passu Indebtedness was issued with significant original issue discount, 100% of the accreted value thereof), *plus* accrued and unpaid interest and Additional Interest, if any (or, in respect of such Pari Passu Indebtedness, such lesser price, if any, as may be provided for by the terms of such Pari Passu Indebtedness), to the date fixed for the closing of such offer, in accordance with the procedures set forth in this Section 4.06. The Issuer will commence an Asset Sale Offer with respect to Excess Proceeds within ten (10) Business Days

71

after the date that Excess Proceeds exceed $200.0 million by mailing the notice required pursuant to the terms of Section 4.06(f), with a copy to the Trustee. To the extent that the aggregate amount of Notes (and such Pari Passu Indebtedness) tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Issuer may use any remaining Excess Proceeds for any purpose that is not prohibited by this Indenture. If the aggregate principal amount of Notes (and such Pari Passu Indebtedness) surrendered by holders thereof exceeds the amount of Excess Proceeds, the Trustee shall select the Notes to be purchased in the manner described in Section 4.06(e). Upon completion of any such Asset Sale Offer, the amount of Excess Proceeds shall be reset at zero.

(c) The Issuer shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to an Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in this Indenture by virtue thereof.

(d) Not later than the date upon which written notice of an Asset Sale Offer is delivered to the Trustee as provided above, the Issuer shall deliver to the Trustee an Officer's Certificate as to (i) the amount of the Excess Proceeds, (ii) the allocation of the Net Proceeds from the Asset Sales pursuant to which such Asset Sale Offer is being made and (iii) the compliance of such allocation with the provisions of Section 4.06 (b). On such date, the Issuer shall also irrevocably deposit with the Trustee or with a paying agent (or, if the Issuer or a Wholly Owned Restricted Subsidiary is acting as the Paying Agent, segregate and hold in trust) an amount equal to the Excess Proceeds to be invested in Cash Equivalents, as directed in writing by the Issuer, and to be held for payment in accordance with the provisions of this Section 4.06. Upon the expiration of the period for which the Asset Sale Offer remains open (the " Offer Period "), the Issuer shall deliver to the Trustee for cancellation the Notes or portions thereof that have been properly tendered to and are to be accepted by the Issuer. The Trustee (or the Paying Agent, if not the Trustee) shall, on the date of purchase, mail or deliver payment to each tendering holder in the amount of the purchase price. In the event that the Excess Proceeds delivered by the Issuer to the Trustee are greater than the purchase price of the Notes tendered, the Trustee shall deliver the excess to the Issuer immediately after the expiration of the Offer Period for application in accordance with Section 4.06.

(e) Holders electing to have a Note purchased shall be required to surrender the Note, with an appropriate form duly completed, to the Issuer at the address specified in the notice at least three Business Days prior to the purchase date. Holders shall be entitled to withdraw their election if the Trustee or the Issuer receives not later than one Business Day prior to the purchase date, a telegram, telex, facsimile transmission or letter setting forth the name of the holder, the principal amount of the Note which was delivered by the holder for purchase and a statement that such holder is withdrawing his election to have such Note purchased. If at the end of the Offer Period more Notes (and such Pari Passu Indebtedness) are tendered pursuant to an Asset Sale Offer than the Issuer is required to purchase, selection of such Notes for purchase shall be made by the Trustee in compliance with the requirements of the principal national securities exchange, if any, on which such Notes are listed, or if such Notes are not so listed, on a pro rata basis, by lot or by such other method as the Trustee shall deem fair and appropriate (and

72

in such manner as complies with applicable legal requirements); *provided* that no Notes of $2,000 or less shall be purchased in part. Selection of such Pari Passu Indebtedness shall be made pursuant to the terms of such Pari Passu Indebtedness.

(f) Notices of an Asset Sale Offer shall be mailed by first class mail, postage prepaid, at least 30 but not more than 60 days before the purchase date to each holder of Notes at such holder's registered address. If any Note is to be purchased in part only, any notice of purchase that relates to such Note shall state the portion of the principal amount thereof that has been or is to be purchased.

SECTION 4.07. Transactions with Affiliates .

(a) The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Issuer (each of the foregoing, an " Affiliate Transaction ") involving aggregate consideration in excess of $25.0 million, unless:

(i) such Affiliate Transaction is on terms that are not materially less favorable to the Issuer or the relevant Restricted Subsidiary than those that could have been obtained in a comparable transaction by the Issuer or such Restricted Subsidiary with an unrelated Person; and

(ii) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $75.0 million, the Issuer delivers to the Trustee a resolution adopted in good faith by the majority of the Board of Directors of the Issuer, approving such Affiliate Transaction and set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with clause (a) above.

(b) The provisions of Section 4.07(a) shall not apply to the following:

(i) transactions between or among the Issuer and/or any of its Restricted Subsidiaries (or an entity that becomes a Restricted Subsidiary as a result of such transaction) and any merger, consolidation or amalgamation of the Issuer and any direct parent of the Issuer; *provided* that such parent shall have no material liabilities and no material assets other than cash, Cash Equivalents and the Capital Stock of the Issuer and such merger, consolidation or amalgamation is otherwise in compliance with the terms of this Indenture and effected for a bona fide business purpose;

(ii) Restricted Payments permitted by Section 4.04 and Permitted Investments;

(iii) (x) the entering into of any agreement (and any amendment or modification of any such agreement so long as, in the good faith judgment of the Board of Directors of the Issuer, any such amendment is not disadvantageous to the holders when taken as a whole, as compared to such agreement as in effect on the Issue Date) to pay, and the payment of, management, consulting, monitoring and advisory fees to the Sponsors in an aggregate amount in any fiscal year not to exceed the greater of (A) $30.0

73

million and (B) 1.0% of EBITDA of the Issuer and its Restricted Subsidiaries for the immediately preceding fiscal year, *plus* out-of-pocket expense reimbursement; *provided, however,* that any payment not made in any fiscal year may be carried forward and paid in the following two fiscal years and (y) the payment of the present value of all amounts payable pursuant to any agreement described in clause (iii)(x) of Section 4.07(b) in connection with the termination of such agreement;

(iv) the payment of reasonable and customary fees and reimbursement of expenses paid to, and indemnity provided on behalf of, officers, directors, employees or consultants of the Issuer or any Restricted Subsidiary, any direct or indirect parent of the Issuer;

(v) payments by the Issuer or any of its Restricted Subsidiaries to the Sponsors made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including, without limitation, in connection with acquisitions or divestitures, which payments are (x) made pursuant to the agreements with the Sponsors described in the Offering Memorandum or (y) approved by a majority of the Board of Directors of the Issuer in good faith;

(vi) transactions in which the Issuer or any of its Restricted Subsidiaries, as the case may be, delivers to the Trustee a letter from an Independent Financial Advisor stating that such transaction is fair to the Issuer or such Restricted Subsidiary from a financial point of view or meets the requirements of clause (i) of Section 4.07(a);

(vii) payments or loans (or cancellation of loans) to officers, directors, employees or consultants which are approved by a majority of the Board of Directors of the Issuer in good faith;

(viii) any agreement as in effect as of the Issue Date or any amendment thereto (so long as any such agreement together with all amendments thereto, taken as a whole, is not more disadvantageous to the holders of the Notes in any material respect than the original agreement as in effect on the Issue Date) or any transaction contemplated thereby as determined in good faith by the Issuer;

(ix) the existence of, or the performance by the Issuer or any of its Restricted Subsidiaries of its obligations under the terms of, Acquisition Documents, any stockholders agreement (including any registration rights agreement or purchase agreement related thereto) to which it is a party as of the Issue Date, and any transaction, agreement or arrangement described in the Offering Memorandum and, in each case, any amendment thereto or similar transactions, agreements or arrangements which it may enter into thereafter; *provided, however,* that the existence of, or the performance by the Issuer or any of its Restricted Subsidiaries of its obligations under, any future amendment to any such existing transaction, agreement or arrangement or under any similar transaction, agreement or arrangement entered into after the Issue Date shall only be permitted by this clause (ix) to the extent that the terms of any such existing transaction, agreement or arrangement together with all amendments thereto, taken as a whole, or new transaction, agreement or arrangement are not otherwise more disadvantageous to the holders of the Notes in any material respect than the original transaction, agreement or arrangement as in effect on the Issue Date;

74

(x) the execution of the Acquisition Transactions, and the payment of all fees and expenses related to the Acquisition Transactions, including fees to the Sponsors, which are described in the Offering Memorandum or contemplated by the Acquisition Documents;

(xi) any transactions made pursuant to any Operations Management Agreement and any transactions in connection with the use of the revolving credit facility under the Credit Agreement for the account or benefit of the Subsidiaries of Harrah's Entertainment other than the Issuer and its Subsidiaries (including the distribution of the proceeds of any such revolving credit Indebtedness and with respect to the issuance of, or payments in respect of drawings under, letters of credit);

(xii) (A) transactions with customers, clients, suppliers or purchasers or sellers of goods or services, or transactions otherwise relating to the purchase or sale of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Indenture, which are fair to the Issuer and its Restricted Subsidiaries in the reasonable determination of the Board of Directors or the senior management of the Issuer, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party or (B) transactions with joint ventures or Unrestricted Subsidiaries entered into in the ordinary course of business and consistent with past practice or industry norm;

(xiii) any transaction effected as part of a Qualified Receivables Financing;

(xiv) the issuance of Equity Interests (other than Disqualified Stock) of the Issuer to any Person;

(xv) the issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock option and stock ownership plans or similar employee benefit plans approved by the Board of Directors of the Issuer or any direct or indirect parent of the Issuer or of a Restricted Subsidiary of the Issuer, as appropriate, in good faith;

(xvi) the entering into of any tax sharing agreement or arrangement that complies with Section 4.04(b)(xii);

(xvii) any contribution to the capital of the Issuer;

(xviii) transactions permitted by, and complying with, Section 5.01;

(xix) transactions between the Issuer or any of its Restricted Subsidiaries and any Person, a director of which is also a director of the Issuer or any direct or indirect parent of the Issuer; *provided, however,* that such director abstains from voting as a director of the Issuer or such direct or indirect parent, as the case may be, on any matter involving such other Person;

75

(xx) pledges of Equity Interests of Unrestricted Subsidiaries;

(xxi) the formation and maintenance of any consolidated group or subgroup for tax, accounting or cash pooling or management purposes in the ordinary course of business;

(xxii) any employment agreements entered into by the Issuer or any of its Restricted Subsidiaries in the ordinary course of business;

(xxiii) transactions undertaken in good faith (as certified by a responsible financial or accounting officer of the Issuer in an Officer's Certificate) for the purpose of improving the consolidated tax efficiency of the Issuer and its Subsidiaries and not for the purpose of circumventing any provision set forth in this Indenture; and

(xxiv) the execution of the Transactions and the payment of all fees and expenses related to the Transactions.

SECTION 4.08. <u>Change of Control</u> .

(a) Upon a Change of Control, each holder shall have the right to require the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant record date to receive interest due on the relevant interest payment date), in accordance with the terms contemplated in this Section 4.08; *provided* , *however* , that notwithstanding the occurrence of a Change of Control, the Issuer shall not be obligated to purchase any Notes pursuant to this Section 4.08 in the event that it has exercised its right to redeem such Notes in accordance with Article III of this Indenture. In the event that at the time of such Change of Control the terms of the Bank Indebtedness restrict or prohibit the repurchase of Notes pursuant to this Section 4.08, then prior to the mailing of the notice to the holders provided for in Section 4.08(b) but in any event within 30 days following any Change of Control, the Issuer shall (i) repay in full all Bank Indebtedness or, if doing so will allow the purchase of Notes, offer to repay in full all Bank Indebtedness and repay the Bank Indebtedness of each lender and/or noteholder who has accepted such offer, or (ii) obtain the requisite consent under the agreements governing the Bank Indebtedness to permit the repurchase of the Notes as provided for in Section 4.08(b).

(b) Within 30 days following any Change of Control, except to the extent that the Issuer has exercised its right to redeem the Notes in accordance with Article III of this Indenture, the Issuer shall mail a notice (a " <u>Change of Control Offer</u> ") to each holder with a copy to the Trustee stating:

(i) that a Change of Control has occurred and that such holder has the right to require the Issuer to repurchase such holder's Notes at a repurchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest and Additional Interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant record date to receive interest on the relevant interest payment date);

(ii) the circumstances and relevant facts and financial information regarding such Change of Control;

(iii) the repurchase date (which shall be no earlier than 30 days nor later than 60 days from the date such notice is mailed); and

(iv) the instructions determined by the Issuer, consistent with this Section 4.08, that a holder must follow in order to have its Notes purchased.

(c) holders electing to have a Note purchased shall be required to surrender the Note, with an appropriate form duly completed, to the Issuer at the address specified in the notice at least three Business Days prior to the purchase date. The holders shall be entitled to withdraw their election if the Trustee or the Issuer receives not later than one Business Day prior to the purchase date a telegram, telex, facsimile transmission or letter setting forth the name of the holder, the principal amount of the Note which was delivered for purchase by the holder and a statement that such holder is withdrawing his election to have such Note purchased. Holders whose Notes are purchased only in part shall be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered.

(d) On the purchase date, all Notes purchased by the Issuer under this Section shall be delivered to the Trustee for cancellation, and the Issuer shall pay the purchase price *plus* accrued and unpaid interest to the holders entitled thereto.

(e) A Change of Control Offer may be made in advance of a Change of Control, and conditioned upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

(f) Notwithstanding the foregoing provisions of this Section, the Issuer shall not be required to make a Change of Control Offer upon a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in Section 4.08 applicable to a Change of Control Offer made by the Issuer and purchases all Notes properly tendered and not withdrawn under such Change of Control Offer.

(g) Notes repurchased by the Issuer pursuant to a Change of Control Offer will have the status of Notes issued but not outstanding or will be retired and canceled at the option of the Issuer. Notes purchased by a third party pursuant to the preceding clause (f) will have the status of Notes issued and outstanding.

(h) At the time the Issuer delivers Notes to the Trustee which are to be accepted for purchase, the Issuer shall also deliver an Officers' Certificate stating that such Notes are to be accepted by the Issuer pursuant to and in accordance with the terms of this Section 4.08. A Note shall be deemed to have been accepted for purchase at the time the Trustee, directly or through an agent, mails or delivers payment therefor to the surrendering holder.

(i) Prior to any Change of Control Offer, the Issuer shall deliver to the Trustee an Officers' Certificate stating that all conditions precedent contained herein to the right of the Issuer to make such offer have been complied with.

77

(j) The Issuer shall comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes pursuant to this Section. To the extent that the provisions of any securities laws or regulations conflict with provisions of this Section 4.08, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section by virtue thereof.

SECTION 4.09. Compliance Certificate . The Issuer shall deliver to the Trustee within 120 days after the end of each fiscal year of the Issuer, beginning with the fiscal year end on March 31, 2008, an Officer's Certificate stating that in the course of the performance by the signer of his or her duties as an Officer of the Issuer he or she would normally have knowledge of any Default and whether or not the signer knows of any Default that occurred during such period. If he or she does, the certificate shall describe the Default, its status and what action the Issuer is taking or proposes to take with respect thereto. The Issuer also shall comply with Section 314(a)(4) of the TIA. Except with respect to receipt of payments of principal and interest on the Notes and any Default or Event of Default information contained in the Officer's Certificate delivered to it pursuant to this Section 4.09, the Trustee shall have no duty to review, ascertain or confirm the Issuer's compliance with or the breach of any representation, warranty or covenant made in this Indenture.

SECTION 4.10. Further Instruments and Acts . Upon request of the Trustee, the Issuer shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

SECTION 4.11. Future Subsidiary Pledgors .

(a) The Issuer shall cause each Wholly Owned Restricted Subsidiary that is a Domestic Subsidiary (unless such Subsidiary is a Receivables Subsidiary or a Domestic Subsidiary that is wholly owned by one or more Foreign Subsidiaries and created to enhance the tax efficiency of the Issuer and its Subsidiaries) and that provides a pledge of, or grants a Lien on, its assets to secure any First Priority Lien Obligations to execute and deliver to the Trustee the Security Documents necessary to cause such Restricted Subsidiary to become a Subsidiary Pledgor (or grantor) and take all actions required thereunder to perfect Liens created thereunder, as well as to execute and deliver to the Trustee a joinder to the Intercreditor Agreement.

(b) The Issuer shall cause each Wholly Owned Restricted Subsidiary that is a Domestic Subsidiary (unless such Subsidiary is a Receivables Subsidiary or a Domestic Subsidiary that is wholly owned by one or more Foreign Subsidiaries and created to enhance the tax efficiency of the Issuer and its Subsidiaries) and that guarantees any First Priority Lien Obligations to execute and deliver to the Trustee a supplemental indenture substantially in the form of Exhibit D pursuant to which such Subsidiary shall guarantee the Issuer's Obligations under the Notes and this Indenture and shall comply with the additional requirements of Section 12.06.

SECTION 4.12. Liens . (a) The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create, Incur or suffer to exist (i) any Lien on any asset or property of the Issuer or such Restricted Subsidiary securing Indebtedness unless the

78

Notes are equally and ratably secured with (or on a senior basis to, in the case of obligations subordinated in right of payment to the Notes) the obligations so secured until such time as such obligations are no longer secured by a Lien; *provided*, *however*, that this Section 4.12(a)(i) shall not require the Issuer or a Restricted Subsidiary of the Issuer to secure the Notes if the Lien consists of a Permitted Lien, or (ii) any Lien securing any First Priority Lien Obligation of the Issuer or any Subsidiary Pledgor without effectively providing that the Notes or the obligations of such Subsidiary Pledgor in respect of the Notes, as the case may be, shall be granted a second priority security interest (subject to Permitted Liens) upon the assets or property constituting the collateral for such First Priority Lien Obligations, except to the extent that such assets or property constitute securities or other equity interest of the Issuer or any of its Subsidiaries.

(b) Any Lien which is granted to secure the Notes or the obligations of any Subsidiary Pledgor in respect of the Notes under clause (i) of Section 4.12(a) (unless also granted under clause (ii) of Section 4.12(a)) shall be automatically released and discharged at the same time as the release of the Lien that gave rise to the obligation to secure the Notes or such Subsidiary Pledgors obligations under clause (i) of Section 4.12 (a).

SECTION 4.13. <u>After-Acquired Property</u>. Upon the acquisition by the Issuer or any Subsidiary Pledgor of any First Priority After-Acquired Property, the Issuer or such Subsidiary Pledgor shall execute and deliver such mortgages, deeds of trust, deeds to secure debt, preferred ship mortgages, security instruments, financing statements and certificates, opinions of counsel or such other documentation substantially similar to the documentation delivered to secure First Priority Lien Obligations (including, without limitation title insurance policies, surveys and other documentation as may be reasonably required by the Collateral Agent and consistent with the requirements for similar Collateral in which security interest or Liens were taken on the Issue Date) as shall be reasonably necessary to vest in the Collateral Agent, for the benefit of the Secured Parties (as defined in the Collateral Agreement), a perfected security interest or lien, subject only to Permitted Liens, in such First Priority After-Acquired Property and to have such First Priority After-Acquired Property (but subject to certain limitations, if applicable, including as described in Article XI and the Security Documents) added to the Collateral, and thereupon all provisions of this Indenture relating to the Collateral shall be deemed to relate to such First Priority After-Acquired Property to the same extent and with the same force and effect.

SECTION 4.14. <u>Maintenance of Office or Agency</u>.

(a) The Issuer shall maintain an office or agency (which may be an office of the Trustee or an affiliate of the Trustee or Registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served. The Issuer shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Issuer shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the corporate trust office of the Trustee as set forth in Section 13.02.

(b) The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and

79

may from time to time rescind such designations; *provided* , *however* , that no such designation or rescission shall in any manner relieve the Issuer of its obligation to maintain an office or agency for such purposes. The Issuer shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

(c) The Issuer hereby designates the corporate trust office of the Trustee or its agent as such office or agency of the Issuer in accordance with Section 2.04.

SECTION 4.15. Amendment of Security Documents . The Issuer will not amend, modify or supplement, or permit or consent to any amendment, modification or supplement of, the Security Documents in any way that would be adverse to the holders of the Notes in any material respect, except as set forth in Article XI and the Security Documents or as permitted under Article IX.

SECTION 4.16. Covenant Suspension . If on any date following the Issue Date, (i) the Notes have Investment Grade Ratings from both Rating Agencies, and (ii) no Default has occurred and is continuing under this Indenture, then, beginning on that day and continuing at all times thereafter regardless of any subsequent changes in the rating of the Notes (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a " Covenant Suspension Event "), and subject to the provisions of the following paragraph, the Issuer and the Restricted Subsidiaries shall not be subject to Sections 4.03, 4.04, 4.05, 4.06, 4.07 and 5.01(a)(iv) (collectively the " Suspended Covenants ").

If and while the Issuer and its Restricted Subsidiaries are not subject to the Suspended Covenants, the Notes will be entitled to substantially less covenant protection. In the event that the Issuer and its Restricted Subsidiaries are not subject to the Suspended Covenants under this Indenture for any period of time as a result of the foregoing, and on any subsequent date (the " Reversion Date ") one or both of the Rating Agencies withdraw their Investment Grade Rating or downgrade the rating assigned to the Notes below an Investment Grade Rating, then the Issuer and its Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants under this Indenture with respect to future events.

On each Reversion Date, all Indebtedness Incurred, or Disqualified Stock or Preferred Stock issued, during the Suspension Period will be classified as having been Incurred or issued pursuant to Section 4.03(a) or 4.03(b) (to the extent such Indebtedness or Disqualified Stock or Preferred Stock would be permitted to be Incurred or issued thereunder as of the Reversion Date and after giving effect to Indebtedness Incurred or issued prior to the Suspension Period and outstanding on the Reversion Date). To the extent such Indebtedness or Disqualified Stock or Preferred Stock would not be so permitted to be Incurred or issued pursuant to Section 4.03 such Indebtedness or Disqualified Stock or Preferred Stock will be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under Section 4.03(b)(iii). Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under Section 4.04 will be made as though Section 4.04 had been in effect since the Issue Date and throughout the Suspension Period. Accordingly, Restricted Payments made during the Suspension Period will reduce the amount available to be made as Restricted Payments under Section 4.04(a). As described above, however, no Default or Event of Default will be deemed to have occurred on the Reversion Date as a result of any actions taken by the Issuer or its Restricted Subsidiaries during the Suspension Period.

80

For purposes of Section 4.06, on the Reversion Date, the unutilized Excess Proceeds amount will be reset to zero.

SECTION 4.17. <u>Maintenance of Insurance</u> . The Issuer shall maintain, with financially sound and reputable insurance companies, insurance (subject to customary deductibles and retentions) in such amounts and against such risks as are customarily maintained by similarly situated companies engaged in the same or similar businesses operating in the same or similar locations and cause the Issuer and the Subsidiary Pledgors to be listed as insured and the Collateral Agent to be listed as co-loss payee on property and property casualty policies and as an additional insured on liability policies. Notwithstanding the foregoing, the Issuer and the Subsidiary Pledgors may self-insure with respect to such risks with respect to which companies of established reputation in the same general line of business in the same general area usually self-insure.

# ARTICLE V

# SUCCESSOR COMPANY

SECTION 5.01. <u>When Issuer May Merge or Transfer Assets</u> .

(a) The Issuer shall not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not the Issuer is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless:

(i) the Issuer is the surviving person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding up or conversion (if other than the Issuer) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (the Issuer or such Person, as the case may be, being herein called the " <u>Successor Issuer</u> "); *provided* that in the case where the surviving Person is not a corporation, a co-obligor of the Notes is a corporation;

(ii) the Successor Issuer (if other than the Issuer) expressly assumes all the obligations of the Issuer under this Indenture and the Notes pursuant to supplemental indentures or other documents or instruments in form reasonably satisfactory to the Trustee;

(iii) immediately after giving effect to such transaction (and treating any Indebtedness which becomes an obligation of the Successor Issuer or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Issuer or such Restricted Subsidiary at the time of such transaction) no Default shall have occurred and be continuing;

81

(iv) immediately after giving *pro forma* effect to such transaction, as if such transaction had occurred at the beginning of the applicable four-quarter period (and treating any Indebtedness which becomes an obligation of the Successor Issuer or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Issuer or such Restricted Subsidiary at the time of such transaction), either

(A) the Successor Issuer would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a); or

(B) the Fixed Charge Coverage Ratio for the Successor Issuer and its Restricted Subsidiaries would be greater than such ratio for the Issuer and its Restricted Subsidiaries immediately prior to such transaction;

(v) if the Issuer is not the Successor Issuer, each Subsidiary Pledgor, unless it is the other party to the transactions described above, shall have by supplemental indenture confirmed that its obligations in respect of the Notes shall apply to such Person's obligations under this Indenture and the Notes; and

(vi) the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, amalgamation or transfer and such supplemental indentures (if any) comply with this Indenture.

The Successor Issuer (if other than the Issuer) will succeed to, and be substituted for, the Issuer under this Indenture and the Notes, and in such event the Issuer will automatically be released and discharged from its obligations under this Indenture and the Notes. Notwithstanding the foregoing clauses (iii) and (iv) of this Section 5.01, (a) any Restricted Subsidiary may merge, consolidate or amalgamate with or transfer all or part of its properties and assets to the Issuer or to another Restricted Subsidiary, and (b) the Issuer may merge, consolidate or amalgamate with an Affiliate incorporated solely for the purpose of reincorporating the Issuer in another state of the United States, the District of Columbia or any territory of the United States or may convert into a limited liability company, so long as the amount of Indebtedness of the Issuer and its Restricted Subsidiaries is not increased thereby. This Article V will not apply to a sale, assignment, transfer, conveyance or other disposition of assets between or among the Issuer and its Restricted Subsidiaries.

(b) Subject to the provisions of Section 11.04 (which govern the release of assets and property securing the Notes upon the sale or disposition of a Restricted Subsidiary of the Issuer that is a Subsidiary Pledgor), no Subsidiary Pledgor shall, and the Issuer shall not permit any Subsidiary Pledgor to, consolidate, amalgamate or merge with or into or wind up into (whether or not such Subsidiary Pledgor is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, any Person unless:

(i) either (A) such Subsidiary Pledgor is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation or merger (if other than such Subsidiary Pledgor) or to which such sale, assignment, transfer, lease, conveyance

82

or other disposition shall have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Subsidiary Pledgor or such Person, as the case may be, being herein called the " Successor Subsidiary Pledgor ") and the Successor Subsidiary Pledgor (if other than such Subsidiary Pledgor) expressly assumes all the obligations of such Subsidiary Pledgor under this Indenture, the Security Documents and such Subsidiary Pledgor's obligations in respect of the Notes pursuant to documents or instruments in form reasonably satisfactory to the Trustee, or (b) such sale or disposition or consolidation, amalgamation or merger is not in violation of Section 4.06; and

(ii) the Successor Subsidiary Pledgor (if other than such Subsidiary Pledgor) shall have delivered or caused to be delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, amalgamation, merger or transfer and such supplemental indenture (if any) comply with this Indenture.

Except as otherwise provided in this Indenture, the Successor Subsidiary Pledgor (if other than such Subsidiary Pledgor) will succeed to, and be substituted for, such Subsidiary Pledgor under this Indenture and such Subsidiary Pledgor's obligations in respect of the Notes, and such Subsidiary Pledgor will automatically be released and discharged from its obligations under this Indenture and such Subsidiary Pledgor's obligations in respect of the Notes. Notwithstanding the foregoing, (1) a Subsidiary Pledgor may merge, amalgamate or consolidate with an Affiliate incorporated solely for the purpose of reincorporating such Subsidiary Pledgor in another state of the United States, the District of Columbia or any territory of the United States so long as the amount of Indebtedness of the Subsidiary Pledgor is not increased thereby and (2) a Subsidiary Pledgor may merge, amalgamate or consolidate with another Subsidiary Pledgor or the Issuer.

In addition, notwithstanding the foregoing, any Subsidiary Pledgor may consolidate, amalgamate or merge with or into or wind up into, or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets (collectively, a " Transfer ") to the Issuer or any Subsidiary Pledgor.

Except as otherwise provided in this Indenture, Harrah's Entertainment will not consolidate, amalgamate or merge with or into or wind up into (whether or not Harrah's Entertainment is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, any Person unless:

(1) either Harrah's Entertainment or the Issuer ( *provided* that if the Issuer is to be the surviving Person, then such transaction shall comply with Section 5.01(a) or 5.01(b)) is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation or merger (if other than Harrah's Entertainment) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (Harrah's

83

Entertainment or such Person, as the case may be, being herein called the " <u>Successor Parent Guarantor</u> ") and the Successor Parent Guarantor (if other than Harrah's Entertainment) expressly assumes all the obligations of Harrah's Entertainment under this Indenture and Harrah's Entertainment's Note Guarantee pursuant to a supplemental indenture or other documents or instruments in form reasonably satisfactory to the Trustee; and

(2) the Successor Parent Guarantor (if other than Harrah's Entertainment) shall have delivered or caused to be delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, amalgamation, merger or transfer and such supplemental indenture (if any) comply with this Indenture.

Except as otherwise provided in this Indenture, the Successor Parent Guarantor (if other than Harrah's Entertainment) will succeed to, and be substituted for, Harrah's Entertainment under this Indenture, Harrah's Entertainment's Note Guarantee, and Harrah's Entertainment will automatically be released and discharged from its obligations under this Indenture and such Note Guarantee.

## ARTICLE VI

### DEFAULTS AND REMEDIES

SECTION 6.01. <u>Events of Default</u> . An " <u>Event of Default</u> " occurs with respect to a series of Notes if:

(a) there is a default in any payment of interest (including any additional interest) on any Note of such series when the same becomes due and payable, and such default continues for a period of 30 days,

(b) there is a default in the payment of principal or premium, if any, of any Note of such series when due at its Stated Maturity, upon optional redemption, upon required repurchase, upon declaration or otherwise,

(c) the failure by the Issuer or any Restricted Subsidiary to comply for 60 days after notice with its other agreements contained in the Notes of such series or this Indenture,

(d) the failure by the Issuer or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) to pay any Indebtedness (other than Indebtedness owing to the Issuer or a Restricted Subsidiary) within any applicable grace period after final maturity or the acceleration of any such Indebtedness by the holders thereof because of a default, in each case, if the total amount of such Indebtedness unpaid or accelerated exceeds $150.0 million or its foreign currency equivalent,

(e) either the Issuer or any Significant Subsidiary of the Issuer pursuant to or within the meaning of any Bankruptcy Law:

(i) commences a voluntary case;

84

(ii) consents to the entry of an order for relief against it in an involuntary case;

(iii) consents to the appointment of a Custodian of it or for any substantial part of its property; or

(iv) makes a general assignment for the benefit of its creditors or takes any comparable action under any foreign laws relating to insolvency,

(f) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i) is for relief against either the Issuer or any Significant Subsidiary of the Issuer in an involuntary case;

(ii) appoints a Custodian of either the Issuer or any Significant Subsidiary of the Issuer or for any substantial part of its property; or

(iii) orders the winding up or liquidation of either the Issuer or any Significant Subsidiary of the Issuer; or any similar relief is granted under any foreign laws and the order or decree remains unstayed and in effect for 60 days,

(g) failure by the Issuer or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) to pay final judgments aggregating in excess of $150.0 million or its foreign currency equivalent (net of any amounts which are covered by enforceable insurance policies issued by solvent carriers), which judgments are not discharged, waived or stayed for a period of 60 days,

(h) the Parent Guarantee of the Parent Guarantor ceases to be in full force and effect (except as contemplated by the terms thereof) or the Parent Guarantor denies or disaffirms its obligations under this Indenture or its Parent Guarantee and such Default continues for 10 days,

(i) unless all of the Collateral has been released from the Second Priority Liens in accordance with the provisions of Article XI and the Security Documents, the Second Priority Liens on all or substantially all of the Collateral cease to be valid or enforceable and such Default continues for 30 days, or the Issuer shall assert or any Subsidiary Pledgor shall assert, in any pleading in any court of competent jurisdiction, that any such security interest is invalid or unenforceable and, in the case of any such Person that is a Subsidiary of the Issuer, the Issuer fails to cause such Subsidiary to rescind such assertions within 30 days after the Issuer has actual knowledge of such assertions, or

(j) the failure by the Issuer or any Subsidiary Pledgor to comply for 60 days after notice with its other agreements contained in the Security Documents except for a failure that would not be material to the holders of the Notes and would not materially affect the value of the Collateral taken as a whole.

85

The foregoing shall constitute Events of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

The term " Bankruptcy Law " means Title 11, United States Code, or any similar Federal or state law for the relief of debtors. The term "Custodian" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

However, a default under clauses (c) or (j) above shall not constitute an Event of Default until the Trustee or the holders of 30% in principal amount of outstanding Notes of such series notify the Issuer of the default and the Issuer does not cure such default within the time specified in clauses (c) or (j) hereof after receipt of such notice. Such notice must specify the Default, demand that it be remedied and state that such notice is a " Notice of Default ." The Issuer shall deliver to the Trustee, within five (5) Business Days after the occurrence thereof, written notice in the form of an Officers' Certificate of any event which is, or with the giving of notice or the lapse of time or both would become, an Event of Default, its status and what action the Issuer is taking or propose to take with respect thereto.

SECTION 6.02. Acceleration . If an Event of Default (other than an Event of Default specified in Section 6.01(e) or 6.01(f) hereof with respect to the Issuer) occurs with respect to a series of Notes and is continuing, the Trustee or the holders of at least 30% in principal amount of outstanding Notes of such series by notice to the Issuer may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes of such series to be due and payable; *provided* , *however* , that so long as any Bank Indebtedness remains outstanding, no such acceleration shall be effective until the earlier of (1) five Business Days after the giving of written notice to the Issuer and the Representative under the Credit Agreement and (2) the day on which any Bank Indebtedness is accelerated. Upon such a declaration, such principal and interest shall be due and payable immediately. If an Event of Default specified in Section 6.01(e) or (f) with respect to the Issuer occurs, the principal of, premium, if any, and interest on all the Notes will become immediately due and payable without any declaration or other act on the part of the Trustee or any holders. Under certain circumstances, the holders of a majority in principal amount of outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

In the event of any Event of Default specified in Section 6.01(d) above, such Event of Default and all consequences thereof (excluding, however, any resulting payment default) shall be annulled, waived and rescinded, automatically and without any action by the Trustee or the holders of the Notes, if within 20 days after such Event of Default arose the Issuer delivers an Officer's Certificate to the Trustee stating that (x) the Indebtedness or guarantee that is the basis for such Event of Default has been discharged or (y) the holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default or (z) the default that is the basis for such Event of Default has been cured, it being understood that in no event shall an acceleration of the principal amount of the Notes as described above be annulled, waived or rescinded upon the happening of any such events.

86

SECTION 6.03. <u>Other Remedies</u> . If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy at law or in equity to collect the payment of principal of or interest on the Notes or to enforce the performance of any provision of the Notes, this Indenture or the Security Documents.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. No remedy is exclusive of any other remedy. To the extent required by law, all available remedies are cumulative.

SECTION 6.04. <u>Waiver of Past Defaults</u> . Provided the Notes are not then due and payable by reason of a declaration of acceleration, the holders of a majority in principal amount of the Notes by written notice to the Trustee may waive an existing Default and its consequences except (a) a Default in the payment of the principal of or interest on a Note, (b) a Default arising from the failure to redeem or purchase any Note when required pursuant to the terms of this Indenture or (c) a Default in respect of a provision that under Section 9.02 cannot be amended without the consent of each holder affected. When a Default is waived, it is deemed cured and the Issuer, the Trustee and the holders will be restored to their former positions and rights under this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any consequent right.

SECTION 6.05. <u>Control by Majority</u> . The holders of a majority in principal amount of each series of Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture or, if the Trustee, being advised by counsel, determines that the action or proceeding so directed may not lawfully be taken or if the Trustee in good faith by its board of directors or trustees, executive committee, or a trust committee of directors or trustees and/or Responsible Officers shall determine that the action or proceeding so directed would involve the Trustee in personal liability or expense for which it is not adequately indemnified, or subject to Section 7.01, that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability. Prior to taking any action under this Indenture, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

SECTION 6.06. <u>Limitation on Suits</u> .

(a) Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder may pursue any remedy with respect to this Indenture or the Notes unless:

(i) such holder has previously given the Trustee notice that an Event of Default is continuing,

87

(ii) holders of at least 30% in principal amount of the outstanding Notes of the applicable series have requested the Trustee to pursue the remedy,

(iii) such holders have offered the Trustee reasonable security or indemnity satisfactory to the Trustee against any loss, liability or expense,

(iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity, and

(v) the holders of a majority in principal amount of the outstanding Notes of the applicable series have not given the Trustee a direction inconsistent with such request within such 60-day period.

(b) A holder may not use this Indenture to prejudice the rights of another holder or to obtain a preference or priority over another holder.

SECTION 6.07. <u>Rights of the Holders to Receive Payment</u> . Notwithstanding any other provision of this Indenture, the right of any holder to receive payment of principal of and interest on the Notes held by such holder, on or after the respective due dates expressed or provided for in the Notes, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder.

SECTION 6.08. <u>Collection Suit by Trustee</u> . If an Event of Default specified in Section 6.01(a) or (b) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer or any other obligor on the Notes for the whole amount then due and owing (together with interest on overdue principal and (to the extent lawful) on any unpaid interest at the rate provided for in the Notes) and the amounts provided for in Section 7.07.

SECTION 6.09. <u>Trustee May File Proofs of Claim</u> . The Trustee may file such proofs of claim, statements of interest and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation, expenses disbursements and advances of the Trustee (including counsel, accountants, experts or such other professionals as the Trustee deems necessary, advisable or appropriate)) and the holders allowed in any judicial proceedings relative to the Issuer or the Parent Guarantor, any Subsidiary Pledgor, their creditors or their property, shall be entitled to participate as a member, voting or otherwise, of any official committee of creditors appointed in such matters and, unless prohibited by law or applicable regulations, may vote on behalf of the holders in any election of a trustee in bankruptcy or other Person performing similar functions, and any Custodian in any such judicial proceeding is hereby authorized by each holder to make payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the holders, to pay to the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and its counsel, and any other amounts due the Trustee under Section 7.07.

SECTION 6.10. <u>Priorities</u> . Subject to the terms of the Intercreditor Agreement and the Security Documents, any money or property collected by the Trustee pursuant to this Article VI and any other money or property distributable in respect of the Issuer's or the Parent Guarantor's obligations under this Indenture after an Event of Default shall be applied in the following order:

FIRST: to the Trustee for amounts due under Section 7.07;

88

SECOND: to the holders for amounts due and unpaid on the Notes for principal, premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal and interest, respectively; and

THIRD: to the Issuer or, to the extent the Trustee collects any amount for the Parent Guarantor, to the Parent Guarantor.

The Trustee may fix a record date and payment date for any payment to the holders pursuant to this Section. At least 15 days before such record date, the Trustee shall mail to each holder and the Issuer a notice that states the record date, the payment date and amount to be paid.

SECTION 6.11. Undertaking for Costs . In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section does not apply to a suit by the Trustee, a suit by a holder pursuant to Section 6.07 or a suit by holders of more than 10% in principal amount of the Notes.

SECTION 6.12. Waiver of Stay or Extension Laws . Neither the Issuer nor the Parent Guarantor (to the extent it may lawfully do so) shall at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the Issuer and the Parent Guarantor (to the extent that it may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

## ARTICLE VII

## TRUSTEE

SECTION 7.01. Duties of Trustee .

(a) The Trustee, prior to the occurrence of an Event of Default with respect to the Notes and after the curing or waiving of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture. If an Event of Default has occurred and is continuing, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

89

(b) Except during the continuance of an Event of Default:

(i) the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee (it being agreed that the permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty); and

(ii) in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. The Trustee shall be under no duty to make any investigation as to any statement contained in any such instance, but may accept the same as conclusive evidence of the truth and accuracy of such statement or the correctness of such opinions. However, in the case of certificates or opinions required by any provision hereof to be provided to it, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c) The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i) this paragraph does not limit the effect of paragraph (b) of this Section;

(ii) the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts;

(iii) the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05; and

(iv) no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise Incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers.

(d) Every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b) and (c) of this Section.

(e) The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer.

(f) Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

90

(g) Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section and to the provisions of the TIA.

SECTION 7.02. Rights of Trustee .

(a) The Trustee may conclusively rely on any document believed by it to be genuine and to have been signed or presented by the proper person. The Trustee need not investigate any fact or matter stated in the document.

(b) Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officers' Certificate or Opinion of Counsel.

(c) The Trustee may act through agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d) The Trustee shall not be responsible or liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; provided , however , that the Trustee's conduct does not constitute willful misconduct or negligence.

(e) The Trustee may consult with counsel of its own selection and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

(f) The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture, note or other paper or document unless requested in writing to do so by the holders of not less than a majority in principal amount of the Notes at the time outstanding, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney, at the expense of the Issuer and shall Incur no liability of any kind by reason of such inquiry or investigation.

(g) The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the holders pursuant to this Indenture, unless such holders shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be Incurred by it in compliance with such request or direction.

(h) The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

91

(i) The Trustee shall not be responsible or liable for any action taken or omitted by it in good faith at the direction of the holders of not less than a majority in principal amount of the Notes as to the time, method and place of conducting any proceedings for any remedy available to the Trustee or the exercising of any power conferred by this Indenture.

(j) Any action taken, or omitted to be taken, by the Trustee in good faith pursuant to this Indenture upon the request or authority or consent of any person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding upon future holders of Notes and upon Notes executed and delivered in exchange therefor or in place thereof.

(k) The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a Default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

(l) The Trustee may request that the Issuer deliver an Officer's Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any Person authorized to sign an Officer's Certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

(m) The Trustee shall not be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of actions.

(n) The Trustee shall not be required to give any bond or surety in respect of the execution of the trusts and powers under this Indenture.

(o) The Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; interruptions; loss or malfunction of utilities, computer (hardware or software) or communication services; accidents; labor disputes; and acts of civil or military authorities and governmental action.

SECTION 7.03. <u>Individual Rights of Trustee</u>. The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee. Any Paying Agent or Registrar may do the same with like rights. However, the Trustee must comply with Sections 7.10 and 7.11.

SECTION 7.04. <u>Trustee's Disclaimer</u>. The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture, the Parent Guarantee or the Notes, it shall not be accountable for the Issuer's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Issuer or the Parent Guarantor in

92

this Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Trustee's certificate of authentication. The Trustee shall not be charged with knowledge of any Default or Event of Default under Sections 6.01(c), (d), (e), (h), or (i) or of the identity of any Significant Subsidiary unless either (a) a Trust Officer shall have actual knowledge thereof or (b) the Trustee shall have received written notice thereof in accordance with Section 13.02 hereof from the Issuer, any Subsidiary Pledgor or any holder. In accepting the trust hereby created, the Trustee acts solely as Trustee for the holders of the Notes and not in its individual capacity and all persons, including without limitation the holders of Notes and the Issuer having any claim against the Trustee arising from this Indenture shall look only to the funds and accounts held by the Trustee hereunder for payment except as otherwise provided herein.

SECTION 7.05. <u>Notice of Defaults</u> . If a Default occurs and is continuing and if it is actually known to the Trustee, the Trustee shall mail to each holder notice of the Default within the earlier of 90 days after it occurs or 30 days after it is actually known to a Trust Officer or written notice of it is received by the Trustee. Except in the case of a Default in the payment of principal of, premium (if any) or interest on any Note, the Trustee may withhold the notice if and so long as a committee of its Trust Officers in good faith determines that withholding the notice is in the interests of the holders. The Issuer is required to deliver to the Trustee, annually, a certificate indicating whether the signers thereof know of any Default that occurred during the previous year. The Issuer also is required to deliver to the Trustee, within 30 days after the occurrence thereof, written notice of any event which would constitute certain Defaults, their status and what action the Issuer is taking or proposes to take in respect thereof.

SECTION 7.06. <u>Reports by Trustee to the Holders</u> . As promptly as practicable after each June 30 beginning with the June 30 following the date of this Indenture, and in any event prior to June 30 in each year, the Trustee shall mail to each holder a brief report dated as of such June 30 that complies with Section 313(a) of the TIA if and to the extent required thereby. The Trustee shall also comply with Section 313 (b) of the TIA.

A copy of each report at the time of its mailing to the holders shall be filed with the SEC and each stock exchange (if any) on which the Notes are listed. The Issuer agrees to notify promptly the Trustee whenever the Notes become listed on any stock exchange and of any delisting thereof.

SECTION 7.07. <u>Compensation and Indemnity</u> . The Issuer shall pay to the Trustee from time to time such compensation, as the Issuer and the Trustee shall from time to time agree in writing, for the Trustee's acceptance of this Indenture and its services hereunder. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Issuer shall reimburse the Trustee upon request for all reasonable out-of-pocket expenses Incurred or made by it, including costs of collection, in addition to the compensation for its services. Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Trustee's agents, counsel, accountants and experts. The Issuer and the Parent Guarantor, jointly and severally shall indemnify the Trustee against any and all loss, liability, claim, damage or expense (including reasonable attorneys' fees and expenses) Incurred by or in connection with the acceptance or administration of this trust and the performance of its duties hereunder, including the costs and expenses of enforcing this Indenture

or Note Guarantee against the Issuer or a Parent Guarantor (including this Section 7.07) and defending itself against or investigating any claim (whether asserted by the Issuer, the Parent Guarantor, any holder or any other Person). The obligation to pay such amounts shall survive the payment in full or defeasance of the Notes or the removal or resignation of the Trustee. The Trustee shall notify the Issuer of any claim for which it may seek indemnity promptly upon obtaining actual knowledge thereof; *provided* , *however* , that any failure so to notify the Issuer shall not relieve the Issuer or the Parent Guarantor of its indemnity obligations hereunder. The Issuer shall defend the claim and the indemnified party shall provide reasonable cooperation at the Issuer's expense in the defense. Such indemnified parties may have separate counsel and the Issuer and the Parent Guarantor, as applicable shall pay the fees and expenses of such counsel; *provided* , *however* , that the Issuer shall not be required to pay such fees and expenses if it assumes such indemnified parties' defense and, in such indemnified parties' reasonable judgment, there is no conflict of interest between the Issuer and the Parent Guarantor, as applicable, and such parties in connection with such defense. The Issuer needs not reimburse any expense or indemnify against any loss, liability or expense Incurred by an indemnified party through such party's own willful misconduct, negligence or bad faith.

To secure the Issuer's and the Parent Guarantor's payment obligations in this Section, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee other than money or property held in trust to pay principal of and interest on particular Notes.

The Issuer's and the Parent Guarantor's payment obligations pursuant to this Section shall survive the satisfaction or discharge of this Indenture, any rejection or termination of this Indenture under any bankruptcy law or the resignation or removal of the Trustee. Without prejudice to any other rights available to the Trustee under applicable law, when the Trustee Incurs expenses after the occurrence of a Default specified in Section 6.01(f) or (g) with respect to the Issuer, the expenses are intended to constitute expenses of administration under the Bankruptcy Law.

No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise Incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if repayment of such funds or adequate indemnity against such risk or liability is not assured to its satisfaction.

SECTION 7.08. <u>Replacement of Trustee</u> .

(a) The Trustee may resign at any time by so notifying the Issuer. The holders of a majority in principal amount of the Notes may remove the Trustee by so notifying the Trustee and may appoint a successor Trustee. The Issuer shall remove the Trustee if:

(i) the Trustee fails to comply with Section 7.10;

(ii) the Trustee is adjudged bankrupt or insolvent;

(iii) a receiver or other public officer takes charge of the Trustee or its property; or

94

(iv) the Trustee otherwise becomes incapable of acting.

(b) If the Trustee resigns, is removed by the Issuer or by the holders of a majority in principal amount of the Notes and such holders do not reasonably promptly appoint a successor Trustee, or if a vacancy exists in the office of Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee), the Issuer shall promptly appoint a successor Trustee.

(c) A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer. Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall mail a notice of its succession to the holders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the Lien provided for in Section 7.07.

(d) If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee or the holders of 10% in principal amount of the Notes may petition at the expense of the Issuer any court of competent jurisdiction for the appointment of a successor Trustee.

(e) If the Trustee fails to comply with Section 7.10, unless the Trustee's duty to resign is stayed as provided in Section 310(b) of the TIA, any holder who has been a bona fide holder of a Note for at least six months may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f) Notwithstanding the replacement of the Trustee pursuant to this Section, the Issuer's obligations under Section 7.07 shall continue for the benefit of the retiring Trustee.

SECTION 7.09. Successor Trustee by Merger . If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee shall have.

SECTION 7.10. Eligibility; Disqualification . The Trustee shall at all times satisfy the requirements of Section 310(a) of the TIA. The Trustee shall have a combined capital and surplus of at least $100 million as set forth in its most recent published annual report of condition. The Trustee shall comply with Section 310(b) of the TIA, subject to its right to apply for a stay of its duty to resign under the penultimate paragraph of Section 310(b) of the TIA;

95

*provided* , *however* , that there shall be excluded from the operation of Section 310(b)(1) of the TIA any series of securities issued under this Indenture and any indenture or indentures under which other securities or certificates of interest or participation in other securities of the Issuer are outstanding if the requirements for such exclusion set forth in Section 310(b)(1) of the TIA are met.

SECTION 7.11. Preferential Collection of Claims Against the Issuer . The Trustee shall comply with Section 311(a) of the TIA, excluding any creditor relationship listed in Section 311(b) of the TIA. A Trustee who has resigned or been removed shall be subject to Section 311(a) of the TIA to the extent indicated.

# ARTICLE VIII

## DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 8.01. Discharge of Liability on Notes; Defeasance .

(a) This Indenture shall be discharged and shall cease to be of further effect (except as to surviving rights of registration of transfer or exchange of Notes, as expressly provided for in this Indenture) as to all outstanding Notes when:

(i) either (a) all the Notes theretofore authenticated and delivered (except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust) have been delivered to the Trustee for cancellation or (b) all of the Notes (1) have become due and payable, (2) will become due and payable at their stated maturity within one year or (3) if redeemable at the option of the Issuer, are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer, and the Issuer has irrevocably deposited or caused to be deposited with the Trustee funds in an amount sufficient to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of deposit together with irrevocable instructions from the Issuer directing the Trustee to apply such funds to the payment thereof at maturity or redemption, as the case may be;

(ii) the Issuer and/or the Parent Guarantor has paid all other sums payable under this Indenture; and

(iii) the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent under this Indenture relating to the satisfaction and discharge of this Indenture have been complied with.

Subject to Sections 8.01(c) and 8.02, the Issuer at any time may terminate (i) all of its obligations under the Notes and this Indenture (with respect to the holders of the Notes) ("legal defeasance option") or (ii) its obligations under Sections 4.02, 4.03, 4.04, 4.05, 4.06, 4.07, 4.08, 4.09, 4.11, 4.12, 4.13 and 4.15 and the operation of Section 5.01 for the benefit of the holders of the Notes, and Sections 6.01(c), 6.01(d) and Sections 6.01(e) and 6.01(f) (with respect

96

to Significant Subsidiaries of the Issuer only), 6.01(g), 6.01(h), 6.01(i) and 6.01(j) ("covenant defeasance option"). The Issuer may exercise its legal defeasance option notwithstanding its prior exercise of its covenant defeasance option. In the event that the Issuer terminates all of its obligations under the Notes and this Indenture (with respect to such Notes) by exercising its legal defeasance option or its covenant defeasance option, the obligations of each Subsidiary Pledgor with respect to the Notes and the Security Documents shall be terminated simultaneously with the termination of such obligations.

If the Issuer exercises its legal defeasance option, payment of the Notes so defeased may not be accelerated because of an Event of Default. If the Issuer exercises its covenant defeasance option, payment of the Notes so defeased may not be accelerated because of an Event of Default specified in Section 6.01(c), 6.01(d), 6.01(e) and 6.01(f) (with respect to Significant Subsidiaries of the Issuer only), 6.01(g), 6.01(h), 6.01(i) or 6.01(j) or because of the failure of the Issuer to comply with Section 5.01.

Upon satisfaction of the conditions set forth herein and upon request of the Issuer, the Trustee shall acknowledge in writing the discharge of those obligations that the Issuer terminates.

(b) Notwithstanding clauses (a) and (b) above, the Issuer's obligations in Sections 2.04, 2.05, 2.06, 2.07, 2.08, 2.09, 7.07, 7.08 and in this Article VIII shall survive until the Notes have been paid in full. Thereafter, the Issuer's obligations in Sections 7.07, 8.05 and 8.06 shall survive such satisfaction and discharge.

SECTION 8.02. <u>Conditions to Defeasance</u> .

(a) The Issuer may exercise its legal defeasance option or its covenant defeasance option only if:

(i) the Issuer irrevocably deposits in trust with the Trustee cash in U.S. Dollars, U.S. Government Obligations or a combination thereof in an amount sufficient or U.S. Government Obligations, the principal of and the interest on which will be sufficient, or a combination thereof sufficient, to pay the principal of and premium (if any) and interest on the Notes when due at maturity or redemption, as the case may be, including interest thereon to maturity or such redemption date;

(ii) the Issuer delivers to the Trustee a certificate from a nationally recognized firm of independent accountants expressing their opinion that the payments of principal and interest when due and without reinvestment on the deposited U.S. Government Obligations *plus* any deposited money without investment will provide cash at such times and in such amounts as will be sufficient to pay principal, premium, if any, and interest when due on all the Notes to maturity or redemption, as the case may be;

(iii) 123 days pass after the deposit is made and during the 123-day period no Default specified in Section 6.01(e) or (f) with respect to the Issuer occurs which is continuing at the end of the period;

97

(iv) the deposit does not constitute a default under any other agreement binding on the Issuer and is not prohibited by Article X;

(v) in the case of the legal defeasance option, the Issuer shall have delivered to the Trustee an Opinion of Counsel stating that (1) the Issuer have received from, or there has been published by, the Internal Revenue Service a ruling, or (2) since the date of this Indenture there has been a change in the applicable Federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the holders will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred. Notwithstanding the foregoing, the Opinion of Counsel required by the immediately preceding sentence with respect to a legal defeasance need not be delivered if all of the Notes not theretofore delivered to the Trustee for cancellation (x) have become due and payable or (y) will become due and payable at their Stated Maturity within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer;

(vi) impair the right of any holder to receive payment of principal of, premium, if any, and interest on such holder's Notes on or after the due dates therefore or to institute suit for the enforcement of any payment on or with respect to such holder's Notes;

(vii) in the case of the covenant defeasance option, the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that the holders will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred; and

(viii) the Issuer delivers to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent to the defeasance and discharge of the Notes to be so defeased and discharged as contemplated by this Article VIII have been complied with.

(b) Before or after a deposit, the Issuer may make arrangements satisfactory to the Trustee for the redemption of such Notes at a future date in accordance with Article III.

SECTION 8.03. Application of Trust Money . The Trustee shall hold in trust money or U.S. Government Obligations (including proceeds thereof) deposited with it pursuant to this Article VIII. It shall apply the deposited money and the money from U.S. Government Obligations through each Paying Agent and in accordance with this Indenture to the payment of principal of and interest on the Notes so discharged or defeased. Money and securities so held in trust are not subject to Articles X or XII.

SECTION 8.04. <u>Repayment to Issuer</u> . Each of the Trustee and each Paying Agent shall promptly turn over to the Issuer upon request any money or U.S. Government Obligations held by it as provided in this Article which, in the written opinion of nationally recognized firm of independent public accountants delivered to the Trustee (which delivery shall only be required if U.S. Government Obligations have been so deposited), are in excess of the amount thereof which would then be required to be deposited to effect an equivalent discharge or defeasance in accordance with this Article.

Subject to any applicable abandoned property law, the Trustee and each Paying Agent shall pay to the Issuer upon written request any money held by them for the payment of principal or interest that remains unclaimed for two years, and, thereafter, holders entitled to the money must look to the Issuer for payment as general creditors, and the Trustee and each Paying Agent shall have no further liability with respect to such monies.

SECTION 8.05. <u>Indemnity for U.S. Government Obligations</u> . The Issuer shall pay and shall indemnify the Trustee against any tax, fee or other charge imposed on or assessed against deposited U.S. Government Obligations or the principal and interest received on such U.S. Government Obligations.

SECTION 8.06. <u>Reinstatement</u> . If the Trustee or any Paying Agent is unable to apply any money or U.S. Government Obligations in accordance with this Article VIII by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's obligations under this Indenture and the Notes so discharged or defeased shall be revived and reinstated as though no deposit had occurred pursuant to this Article VIII until such time as the Trustee or any Paying Agent is permitted to apply all such money or U.S. Government Obligations in accordance with this Article VIII; *provided* , *however* , that, if the Issuer has made any payment of principal of, or interest on, any such Notes because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the holders of such Notes to receive such payment from the money or U.S. Government Obligations held by the Trustee or any Paying Agent.

# ARTICLE IX

## AMENDMENTS AND WAIVERS

SECTION 9.01. <u>Without Consent of the Holders</u> .

(a) The Issuer and the Trustee may amend this Indenture, the Security Documents, the Intercreditor Agreement or the Notes without notice to or consent of any holder:

(i) to cure any ambiguity, omission, defect or inconsistency;

(ii) to provide for the assumption by a Successor Issuer of the obligations of the Issuer under this Indenture and the Notes;

(iii) to provide for the assumption by a Successor Subsidiary Pledgor of the obligations of a Subsidiary Pledgor under this Indenture and the Security Documents;

99

(iv) [reserved];

(v) to provide for uncertificated Notes in addition to or in place of certificated Notes; *provided, however,* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code;

(vi) to conform the text of this Indenture, the Notes, the Security Documents, or the Intercreditor Agreement, to any provision of the " Description of New Second Lien Notes " in the Offering Memorandum to the extent that such provision in the " Description of New Second Lien Notes " was intended to be a verbatim recitation of a provision of this Indenture, the Notes, the Security Documents, or the Intercreditor Agreement;

(vii) to add a Subsidiary Pledgor with respect to the Notes or to add Collateral to secure the Notes;

(viii) to release Collateral as permitted by this Indenture or the Intercreditor Agreement;

(ix) to add additional secured creditors holding Other Second-Lien Obligations so long as such obligations are not prohibited by this Indenture or the Security Documents;

(x) to add to the covenants of the Issuer for the benefit of the holders or to surrender any right or power herein conferred upon the Issuer;

(xi) to comply with any requirement of the SEC in connection with qualifying or maintaining the qualification of, this Indenture under the TIA;

(xii) to make any change that does not adversely affect the rights of any holder; or

(xiii) to provide for the issuance of the Exchange Notes or Additional Notes, which shall have terms substantially identical in all material respects to the Initial Notes, and which shall be treated, together with any outstanding Initial Notes, as a single issue of securities.

(b) After an amendment under this Section 9.01 becomes effective, the Issuer shall mail to the holders a notice briefly describing such amendment. The failure to give such notice to all holders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.01.

SECTION 9.02. With Consent of the Holders .

(a) The Issuer and the Trustee may, with respect to each series of Notes, amend this Indenture and the Security Documents with the written consent of the holders of at least a majority in principal amount of the Notes of such series then outstanding voting as a single class (including consents obtained in connection with a tender offer or exchange for the Notes). However, without the consent of each holder of an outstanding Note of such series affected, an amendment may not:

(1) reduce the amount of Notes whose holders must consent to an amendment,

100

(2) reduce the rate of or extend the time for payment of interest on any Note,

(3) reduce the principal of or change the Stated Maturity of any Note,

(4) reduce the premium payable upon the redemption of any Note or change the time at which any Note may be redeemed in accordance with Article III,

(5) make any Note payable in money other than that stated in such Note,

(6) expressly subordinate the Notes to any other Indebtedness of the Issuer or any Subsidiary Pledgor,

(7) impair the right of any holder to receive payment of principal of, premium, if any, and interest on such holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such holder's Notes,

(8) make any change in the amendment provisions which require each holder's consent or in the waiver provisions, or

(9) make any change in the provisions in the Intercreditor Agreement or this Indenture dealing with the application of proceeds of Collateral that would adversely affect the holders of the Notes.

In addition, without the consent of the holders of at least 66 2/3% in aggregate principal amount of Notes then outstanding, no amendment or waiver may release all or substantially all of the Collateral from the Lien of this Indenture and the Security Documents with respect to the Notes.

It shall not be necessary for the consent of the holders under this Section 9.02 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this Section 9.02 becomes effective, the Issuer shall mail to the holders a notice briefly describing such amendment. The failure to give such notice to all holders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.02.

SECTION 9.03. <u>Compliance with Trust Indenture Act</u> . From the date on which this Indenture is qualified under the TIA, every amendment, waiver or supplement to this Indenture or the Notes shall comply with the TIA as then in effect.

SECTION 9.04. <u>Revocation and Effect of Consents and Waivers</u> .

(a) A consent to an amendment or a waiver by a holder of a Note shall bind the holder and every subsequent holder of that Note or portion of the Note that evidences the same debt as the consenting holder's Note, even if notation of the consent or waiver is not made on the Note. However, any such holder or subsequent holder may revoke the consent or waiver as to such holder's Note or portion of the Note if the Trustee receives the notice of revocation before the date on which the Trustee receives an Officers' Certificate from the Issuer certifying that the requisite principal amount of Notes have consented. After an amendment or waiver becomes effective, it shall bind every holder. An amendment or waiver becomes effective upon the (i) receipt by the Issuer or the Trustee of consents by the holders of the requisite principal amount of securities, (ii) satisfaction of conditions to effectiveness as set forth in this Indenture and any indenture supplemental hereto containing such amendment or waiver and (iii) execution of such amendment or waiver (or supplemental indenture) by the Issuer and the Trustee.

(b) The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the holders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture. If a record date is fixed, then notwithstanding the immediately preceding paragraph, those Persons who were holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be holders after such record date. No such consent shall be valid or effective for more than 120 days after such record date.

SECTION 9.05. <u>Notation on or Exchange of Notes</u> . If an amendment, supplement or waiver changes the terms of a Note, the Issuer may require the holder of the Note to deliver it to the Trustee. The Trustee may place an appropriate notation on the Note regarding the changed terms and return it to the holder. Alternatively, if the Issuer or the Trustee so determines, the Issuer in exchange for the Note shall issue and the Trustee shall authenticate a new Note that reflects the changed terms. Failure to make the appropriate notation or to issue a new Note shall not affect the validity of such amendment, supplement or waiver.

SECTION 9.06. <u>Trustee to Sign Amendments</u> . The Trustee shall sign any amendment, supplement or waiver authorized pursuant to this Article IX if the amendment does not adversely affect the rights, duties, liabilities or immunities of the Trustee. If it does, the Trustee may but need not sign it. In signing such amendment, the Trustee shall be entitled to receive indemnity reasonably satisfactory to it and shall be provided with, and (subject to Section 7.01) shall be fully protected in relying upon, an Officers' Certificate and an Opinion of Counsel stating that such amendment, supplement or waiver is authorized or permitted by this Indenture and that such amendment, supplement or waiver is the legal, valid and binding obligation of the Issuer and the Parent Guarantor, enforceable against them in accordance with its terms, subject to customary exceptions, and complies with the provisions hereof (including Section 9.03).

<div align="center">102</div>

SECTION 9.07. <u>Payment for Consent</u> . Neither the Issuer nor any Affiliate of the Issuer shall, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to be paid to all holders that so consent, waive or agree to amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement.

SECTION 9.08. <u>Additional Voting Terms; Calculation of Principal Amount</u> . All Notes issued under this Indenture shall vote and consent together on all matters (as to which any of such Notes may vote) as one class and no series of Notes will have the right to vote or consent as a separate class on any matter. Determinations as to whether holders of the requisite aggregate principal amount of Notes have concurred in any direction, waiver or consent shall be made in accordance with this Article IX and Section 2.14.

# ARTICLE X

# RANKING OF NOTE LIENS

SECTION 10.01. <u>Relative Rights</u> . The Intercreditor Agreement defines the relative rights, as lienholders, of holders of Second Priority Liens and holders of Liens securing First Priority Lien Obligations. Nothing in this Indenture or the Intercreditor Agreement will:

(a) impair, as between the Issuer and holders of each series of Notes, the obligation of the Issuer, which is absolute and unconditional, to pay principal of, premium and interest on such series of Notes in accordance with their terms or to perform any other obligation of the Issuer or any other obligor under this Indenture, the Notes, the Parent Guarantee and the Security Documents;

(b) restrict the right of any holder to sue for payments that are then due and owing, in a manner not inconsistent with the provisions of the Intercreditor Agreement;

(c) prevent the Trustee, the Collateral Agent or any holder from exercising against the Issuer or any other obligor any of its other available remedies upon a Default or Event of Default (other than its rights as a secured party, which are subject to the Intercreditor Agreement); or

(d) restrict the right of the Trustee, the Collateral Agent or any holder:

(1) to file and prosecute a petition seeking an order for relief in an involuntary bankruptcy case as to any obligor or otherwise to commence, or seek relief commencing, any insolvency or liquidation proceeding involuntarily against any obligor;

(2) to make, support or oppose any request for an order for dismissal, abstention or conversion in any insolvency or liquidation proceeding;

(3) to make, support or oppose, in any insolvency or liquidation proceeding, any request for an order extending or terminating any period during which the debtor (or any other Person) has the exclusive right to propose a plan of reorganization or other dispositive restructuring or liquidation plan therein;

103

(4) to seek the creation of, or appointment to, any official committee representing creditors (or certain of the creditors) in any insolvency or liquidation proceedings and, if appointed, to serve and act as a member of such committee without being in any respect restricted or bound by, or liable for, any of the obligations under this Article X;

(5) to seek or object to the appointment of any professional person to serve in any capacity in any insolvency or liquidation proceeding or to support or object to any request for compensation made by any professional person or others therein;

(6) to make, support or oppose any request for order appointing a trustee or examiner in any insolvency or liquidation proceedings; or

(7) otherwise to make, support or oppose any request for relief in any insolvency or liquidation proceeding that it is permitted by law to make, support or oppose:

if it were a holder of unsecured claims; or

(x) as to any matter relating to any plan of reorganization or other

(y) restructuring or liquidation plan or as to any matter relating to the administration of the estate or the disposition of the case or proceeding (in each case except as set forth in the Intercreditor Agreement).

# ARTICLE XI

## COLLATERAL

SECTION 11.01. <u>Security Documents</u> . The payment of the principal of and interest and premium, if any, on the Notes of each series when due, whether on an interest payment date, at maturity, by acceleration, repurchase, redemption or otherwise and whether by the Issuer pursuant to the Notes or by the Parent Guarantor pursuant to its Parent Guarantee, the payment of all other Obligations and the performance of all other obligations of the Issuer and the Parent Guarantor under this Indenture, the Notes, the Parent Guarantee and the Security Documents are secured as provided in the Security Documents which the Issuer, the Parent Guarantor and the Subsidiary Pledgors have entered into simultaneously with the execution of this Indenture and will be secured by Security Documents hereafter delivered as required or permitted by this Indenture. The Issuer shall, and shall cause each Restricted Subsidiary to, and each Restricted Subsidiary shall, make all filings (including filings of continuation statements and amendments to UCC financing statements that may be necessary to continue the effectiveness of such UCC financing statements) and all other actions as are necessary or required by the Security Documents to maintain (at the sole cost and expense of the Issuer and its Restricted Subsidiaries) the security interest created by the Security Documents in the Collateral

104

(other than with respect to any Collateral the security interest in which is not required to be perfected under the Security Documents) as a perfected second priority security interest subject only to Permitted Liens.

SECTION 11.02. <u>Collateral Agent</u> . (a) The Collateral Agent is authorized and empowered to appoint one or more co-Collateral Agents as it deems necessary or appropriate.

(b) Subject to Section 7.01, neither the Trustee nor the Collateral Agent nor any of their respective officers, directors, employees, attorneys or agents will be responsible or liable for the existence, genuineness, value or protection of any Collateral, for the legality, enforceability, effectiveness or sufficiency of the Security Documents, for the creation, perfection, priority, sufficiency or protection of any Second Priority Lien, or for any defect or deficiency as to any such matters, or for any failure to demand, collect, foreclose or realize upon or otherwise enforce any of the Second Priority Liens or Security Documents or any delay in doing so.

(c) The Collateral Agent will be subject to such directions as may be given it by the Trustee from time to time (as required or permitted by this Indenture). Except as directed by the Trustee as required or permitted by this Indenture and any other representatives, the Collateral Agent will not be obligated:

(1) to act upon directions purported to be delivered to it by any other Person; or

(2) to foreclose upon or otherwise enforce any Second Priority Lien; or

(3) to take any other action whatsoever with regard to any or all of the Second Priority Liens, Security Documents or Collateral.

(d) The Collateral Agent will be accountable only for amounts that it actually receives as a result of the enforcement of the Second Priority Liens or Security Documents.

(e) In acting as Collateral Agent or Co-Collateral Agent, the Collateral Agent and each Co-Collateral Agent may rely upon and enforce each and all of the rights, powers, immunities, indemnities and benefits of the Trustee under Article VII hereof.

(f) The holders of Notes agree that the Collateral Agent shall be entitled to the rights, privileges, protections, immunities, indemnities and benefits provided to the Collateral Agent by the Security Documents. Furthermore, each holder of a Note, by accepting such Note, consents to the terms of and authorizes and directs the Trustee (in each of its capacities) and the Collateral Agent to enter into and perform the Intercreditor Agreement and Security Documents in each of its capacities thereunder.

(g) If the Issuer (i) Incurs First Priority Lien Obligations at any time when no intercreditor agreement is in effect or at any time when Indebtedness constituting First Priority Lien Obligations entitled to the benefit of an existing Intercreditor Agreement is

105

concurrently retired, and (ii) delivers to the Collateral Agent an Officers' Certificate so stating and requesting the Collateral Agent to enter into an intercreditor agreement (on substantially the same terms as the Intercreditor Agreement in effect on the Issue Date) in favor of a designated agent or representative for the holders of the First Priority Lien Obligations so Incurred, the Collateral Agent shall (and is hereby authorized and directed to) enter into such intercreditor agreement, bind the holders on the terms set forth therein and perform and observe its obligations thereunder.

SECTION 11.03. <u>Authorization of Actions to Be Taken</u> . (a) Each holder of Notes of each such series, by its acceptance thereof, consents and agrees to the terms of each Security Document and the Intercreditor Agreement, as originally in effect and as amended, supplemented or replaced from time to time in accordance with its terms or the terms of this Indenture, authorizes and directs the Trustee and the Collateral Agent to enter into the Security Documents to which it is a party, authorizes and empowers the Trustee to direct the Collateral Agent to enter into, and the Collateral Agent to execute and deliver, the Intercreditor Agreement, and authorizes and empowers the Trustee and the Collateral Agent to bind the holders of Notes of each such series and other holders of Obligations as set forth in the Security Documents to which it is a party and the Intercreditor Agreement and to perform its obligations and exercise its rights and powers thereunder.

(b) The Collateral Agent and the Trustee are authorized and empowered to receive for the benefit of the holders of Notes of each series any funds collected or distributed under the Security Documents to which the Collateral Agent or Trustee is a party and to make further distributions of such funds to the holders of Notes of each series according to the provisions of this Indenture.

(c) Subject to the provisions of Section 7.01, Section 7.02, and the Intercreditor Agreement, the Trustee may, in its sole discretion and without the consent of the holders, direct, on behalf of the holders, the Collateral Agent to take all actions it deems necessary or appropriate in order to:

(1) foreclose upon or otherwise enforce any or all of the Second Priority Liens;

(2) enforce any of the terms of the Security Documents to which the Collateral Agent or Trustee is a party; or

(3) collect and receive payment of any and all Obligations.

Subject to the Intercreditor Agreement, the Trustee is authorized and empowered to institute and maintain, or direct the Collateral Agent to institute and maintain, such suits and proceedings as it may deem expedient to protect or enforce the Second Priority Liens or the Security Documents to which the Collateral Agent or Trustee is a party or to prevent any impairment of Collateral by any acts that may be unlawful or in violation of the Security Documents to which the Collateral Agent or Trustee is a party or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent may deem expedient to preserve or protect its interests and the interests of the holders of Notes of such series in the Collateral,

106

including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of holders, the Trustee or the Collateral Agent.

SECTION 11.04. <u>Release of Liens</u>. (a) Subject to subsections (b) and (c) of this Section 11.04, Collateral may be released from the Lien and security interest created by the Security Documents at any time or from time to time in accordance with the provisions of the Security Documents, the Intercreditor Agreement or as provided hereby. The applicable assets included in the Collateral shall be released from the Liens securing the Notes at the Issuer's sole cost and expense, under any one or more of the following circumstances:

(1) upon the Discharge of Senior Lender Claims and concurrent release of all other Liens on such property or assets securing First Priority Lien Obligations (including all commitments and letters of credit thereunder); *provided*, *however*, that if the Issuer or the Parent Guarantor subsequently incurs First Priority Lien Obligations that are secured by Liens on property or assets of the Issuer or the Parent Guarantor of the type constituting the Collateral and the related Liens are incurred in reliance on clause (6)(B) of the definition of Permitted Liens, then the Issuer and its Restricted Subsidiaries will be required to reinstitute the security arrangements with respect to the Collateral in favor of the Notes, which, in the case of any such subsequent First Priority Lien Obligations, will be Second Priority Liens on the Collateral securing such First Priority Lien Obligations to the same extent provided by the Security Documents and on the terms and conditions of the security documents relating to such First Priority Lien Obligations, with the Second Priority Lien held either by the administrative agent, collateral agent or other representative for such First Priority Lien Obligations or by a collateral agent or other representative designated by the Issuer to hold the Second Priority Liens for the benefit of the holders of the Notes and subject to an intercreditor agreement that provides the administrative agent or collateral agent substantially the same rights and powers as afforded under the Intercreditor Agreement; *provided, however*, that the Issuer will provide the Trustee and Collateral Agent under the Collateral Agreement with prompt written notification of such reinstitution;

(2) to enable the Issuer or the Parent Guarantor to consummate the disposition (other than any disposition to the Issuer or another Subsidiary Pledgor) of such property or assets to the extent not prohibited under Section 4.06, and to enable any release described in Sections 7.15(b), (c), (d), or (f) of the Collateral Agreement;

(3) in respect of the property and assets of a Subsidiary Pledgor, upon the designation of such Subsidiary Pledgor to be an Unrestricted Subsidiary in accordance with Section 4.04 and the definition of "Unrestricted Subsidiary";

(4) in respect of the property and assets of a Subsidiary Pledgor, upon the release or discharge of the pledge by such Subsidiary Pledgor of the Credit Agreement or other Indebtedness or the guarantee of any other Indebtedness which resulted in the obligation to become a Subsidiary Pledgor; and

107

(5) as described under Article IX.

Notwithstanding the foregoing, if an Event of Default under this Indenture exists on the date of Discharge of Senior Lender Claims, the Second Priority Liens on the Collateral securing the Notes will not be released, except to the extent the Collateral or any portion thereof was disposed of in order to repay the First Priority Lien Obligations secured by the Collateral, and thereafter the Trustee (or another designated representative acting at the direction of the holders of a majority of outstanding principal amount of the Notes and Other Second-Lien Obligations) will have the right to direct the First Lien Agent to foreclose upon the Collateral (but in such event, the Liens on the Collateral securing the Notes will be released when such Event of Default and all other Events of Default under this Indenture cease to exist).

Upon the receipt of an Officers' Certificate from the Issuer, as described in Section 11.04(b) below, if applicable, and any necessary or proper instruments of termination, satisfaction or release prepared by the Issuer, the Collateral Agent shall execute, deliver or acknowledge such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Security Documents or the Intercreditor Agreement.

(b) In connection with (x) any release of Collateral pursuant to Section 11.04(a)(1), (3), (4) or (5) above, such Collateral may not be released from the Lien and security interest created by the Security Documents and (y) any release of Collateral pursuant to Section 11.04 (a)(2), the Collateral Agent shall not be required to execute, deliver or acknowledge any instruments of termination, satisfaction or release unless an Officers' Certificate and Opinion of Counsel certifying that all conditions precedent, including, without limitation, this Section 11.04, have been met and stating under which of the circumstances set forth in Section 11.04(a) above the Collateral is being released have been delivered to the Collateral Agent on or prior to the date of such release.

(c) At any time when a Default or Event of Default has occurred and is continuing and the maturity of the Notes has been accelerated (whether by declaration or otherwise) and the Trustee has delivered a notice of acceleration to the Collateral Agent, no release of Collateral pursuant to the provisions of this Indenture or the Security Documents will be effective as against the holders, except as otherwise provided in the Intercreditor Agreement.

SECTION 11.05. Filing, Recording and Opinions . (a) The Issuer will comply with the provisions of TIA Sections 314(b), 314(c) and 314(d), in each case following qualification of this Indenture pursuant to the TIA and except to the extent not required as set forth in any SEC regulation or interpretation (including any no-action letter issued by the Staff of the SEC, whether issued to the Issuer or any other Person). Following such qualification, to the extent the Issuer is required to furnish to the Trustee an Opinion of Counsel pursuant to TIA Section 314(b) (2), the Issuer will furnish such opinion not more than 60 but not less than 30 days prior to each September 30.

Any release of Collateral permitted by Section 11.04 hereof will be deemed not to impair the Liens under this Indenture and the Security Documents in contravention thereof and any person that is required to deliver an Officers' Certificate or Opinion of Counsel pursuant to

108

Section 314(d) of the TIA, shall be entitled to rely upon the foregoing as a basis for delivery of such certificate or opinion. The Trustee may, to the extent permitted by Section 7.01 and 7.02 hereof, accept as conclusive evidence of compliance with the foregoing provisions the appropriate statements contained in such documents and Opinion of Counsel.

(b) If any Collateral is released in accordance with this Indenture or any Security Document and if the Issuer has delivered the certificates and documents required by the Security Documents and Section 11.04, the Trustee will determine whether it has received all documentation required by TIA Section 314(d) in connection with such release and, based on such determination and the Opinion of Counsel delivered pursuant to Section 11.04, will, upon request, deliver a certificate to the Collateral Agent setting forth such determination.

SECTION 11.06. [Intentionally omitted].

SECTION 11.07. <u>Powers Exercisable by Receiver or Trustee</u> . In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article XI upon the Issuer or the Parent Guarantor with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Issuer or the Parent Guarantor or of any officer or officers thereof required by the provisions of this Article XI; and if the Trustee shall be in the possession of the Collateral under any provision of this Indenture, then such powers may be exercised by the Trustee.

SECTION 11.08. <u>Release Upon Termination of the Issuer's Obligations</u> . In the event (i) that the Issuer delivers to the Trustee, in form and substance acceptable to it, an Officers' Certificate and Opinion of Counsel certifying that all the obligations under this Indenture, the Notes and the Security Documents have been satisfied and discharged by the payment in full of the Issuer's obligations under the Notes, this Indenture and the Security Documents, and all such obligations have been so satisfied, or (ii) a discharge, legal defeasance or covenant defeasance of this Indenture occurs under Article VIII, the Trustee shall deliver to the Issuer and the Collateral Agent a notice stating that the Trustee, on behalf of the holders, disclaims and gives up any and all rights it has in or to the Collateral, and any rights it has under the Security Documents, and upon receipt by the Collateral Agent of such notice, the Collateral Agent shall be deemed not to hold a Lien in the Collateral on behalf of the Trustee and shall do or cause to be done all acts reasonably necessary to release such Lien as soon as is reasonably practicable.

SECTION 11.09. <u>Designations</u> . Except as provided in the next sentence, for purposes of the provisions hereof and the Intercreditor Agreement requiring the Issuer to designate Indebtedness for the purposes of the terms First Priority Lien Obligations and Other Second-Lien Obligations or any other such designations hereunder or under the Intercreditor Agreement, any such designation shall be sufficient if the relevant designation provides in writing that such First Priority Lien Obligations or Other Second-Lien Obligations are permitted under this Indenture and is signed on behalf of the Issuer by an Officer and delivered to the Trustee, the Collateral Agent and the First Lien Agent. For all purposes hereof and the Intercreditor Agreement, the Issuer hereby designates the Obligations pursuant to the Credit Agreement as in effect on the Issue Date as First Priority Lien Obligations.

109

SECTION 11.10. <u>Taking and Destruction</u> . Following the Discharge of Senior Lender Claims, upon any Taking or Destruction of any Collateral, all Net Insurance Proceeds received by the Issuer or any Restricted Subsidiary shall be deemed Net Proceeds and shall be applied in accordance with Section 4.06.

# ARTICLE XII

# GUARANTEE

SECTION 12.01. <u>Guarantee</u> .

(a) The Parent Guarantor hereby irrevocably and unconditionally guarantees on an unsecured basis, as a primary obligor and not merely as a surety, to each holder and to the Trustee and its successors and assigns (i) the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all obligations of the Issuer under this Indenture (including obligations to the Trustee) and the Notes, whether for payment of principal of, premium, if any, or interest on in respect of the Notes and all other monetary obligations of the Issuer under this Indenture and the Notes and (ii) the full and punctual performance within applicable grace periods of all other obligations of the Issuer whether for fees, expenses, indemnification or otherwise under this Indenture and the Notes (all the foregoing being hereinafter collectively called the " <u>Guaranteed Obligations</u> "). The Parent Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from the Parent Guarantor, and that the Parent Guarantor shall remain bound under this Article XII notwithstanding any extension or renewal of any Guaranteed Obligation.

(b) The Parent Guarantor waives presentation to, demand of payment from and protest to the Issuer of any of the Guaranteed Obligations and also waives notice of protest for nonpayment. The Parent Guarantor waives notice of any default under the Notes or the Guaranteed Obligations. The obligations of the Parent Guarantor hereunder shall not be affected by (i) the failure of any holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Issuer or any other Person under this Indenture, the Notes or any other agreement or otherwise; (ii) any extension or renewal of this Indenture, the Notes or any other agreement; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by any holder or the Trustee for the Guaranteed Obligations or the Parent Guarantor; (v) the failure of any holder or Trustee to exercise any right or remedy against any other guarantor of the Guaranteed Obligations; or (vi) any change in the ownership of the Parent Guarantor, except as provided in Section 12.02(b).

(c) The Parent Guarantor hereby waives any right to which it may be entitled to have the assets of the Issuer first be used and depleted as payment of the Issuer's or the Parent Guarantor's obligations hereunder prior to any amounts being claimed from or paid by the Parent Guarantor hereunder. The Parent Guarantor hereby waives any right to which it may be entitled to require that the Issuer be sued prior to an action being initiated against the Parent Guarantor.

110

(d) The Parent Guarantor further agrees that its Parent Guarantee herein constitutes a guarantee of payment, performance and compliance when due (and not a guarantee of collection) and waives any right to require that any resort be had by any holder or the Trustee to any security held for payment of the Guaranteed Obligations.

(e) The Parent Guarantee of the Parent Guarantor is, to the extent and in the manner set forth in Article XII, equal in right of payment to all existing and future Pari Passu Indebtedness, senior in right of payment to all existing and future Subordinated Indebtedness of the Issuer and subordinated and subject in right of payment to the prior payment in full of the principal of and premium, if any, and interest on all Secured Indebtedness of the Parent Guarantor and is made subject to such provisions of this Indenture.

(f) Except as expressly set forth in Sections 8.01(b), 12.02 and 12.06, the obligations of the Parent Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of the Parent Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of any holder or the Trustee to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of the Parent Guarantor or would otherwise operate as a discharge of the Parent Guarantor as a matter of law or equity.

(g) The Parent Guarantor agrees that its Parent Guarantee shall remain in full force and effect until payment in full of all the Guaranteed Obligations. The Parent Guarantor further agrees that its Parent Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest on any Guaranteed Obligation is rescinded or must otherwise be restored by any holder or the Trustee upon the bankruptcy or reorganization of the Issuer or otherwise.

(h) In furtherance of the foregoing and not in limitation of any other right which any holder or the Trustee has at law or in equity against the Parent Guarantor by virtue hereof, upon the failure of the Issuer to pay the principal of or interest on any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, by redemption or otherwise, or to perform or comply with any other Guaranteed Obligation, the Parent Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the holders or the Trustee an amount equal to the sum of (i) the unpaid principal amount of such Guaranteed Obligations, (ii) accrued and unpaid interest on such Guaranteed Obligations (but only to the extent not prohibited by applicable law) and (iii) all other monetary obligations of the Issuer to the holders and the Trustee.

<div align="center">111</div>

(i) The Parent Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the holders in respect of any Guaranteed Obligations guaranteed hereby until payment in full of all Guaranteed Obligations and all obligations to which the Guaranteed Obligations are subordinated as provided in Article XI. The Parent Guarantor further agrees that, as between it, on the one hand, and the holders and the Trustee, on the other hand, (i) the maturity of the Guaranteed Obligations guaranteed hereby may be accelerated as provided in Article VI for the purposes of the Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Guaranteed Obligations as provided in Article VI, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by the Parent Guarantor for the purposes of this Section 12.01.

(j) The Parent Guarantor also agrees to pay any and all costs and expenses (including reasonable attorneys' fees and expenses) Incurred by the Trustee or any holder in enforcing any rights under this Section 12.01.

(k) Upon request of the Trustee, the Parent Guarantor shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

SECTION 12.02. Limitation on Liability .

(a) Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations guaranteed hereunder by the Parent Guarantor shall not exceed the maximum amount that can be hereby guaranteed without rendering this Indenture, as it relates to the Parent Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

(b) The Parent Guarantee shall terminate and be of no further force or effect and the Parent Guarantor shall be deemed to be released from all obligations under this Article XII upon:

(i) the Issuer ceasing to be a Wholly Owned Subsidiary of Harrah's Entertainment;

(ii) the Issuer's transfer of all or substantially all of its assets to, or merger with, an entity that is not a Wholly Owned Subsidiary of Harrah's Entertainment in accordance with Section 5.01 and such transferee entity assumes the Issuer's obligations under this Indenture; and

(iii) the Issuer's exercise of its legal defeasance option or covenant defeasance option under Article VIII or if the Issuer's obligations under this Indenture are discharged in accordance with the terms of this Indenture.

In addition, the Parent Guarantee will be automatically released upon the election of the Issuer and Notice to the Trustee if the guarantee by Harrah's Entertainment of the Credit Agreement, the Retained Notes or any Indebtedness which resulted in the obligation to guarantee the Notes has been released or discharged.

112

SECTION 12.03. <u>Successors and Assigns</u> . This Article XII shall be binding upon the Parent Guarantor and its successors and assigns and shall inure to the benefit of the successors and assigns of the Trustee and the holders and, in the event of any transfer or assignment of rights by any holder or the Trustee, the rights and privileges conferred upon that party in this Indenture and in the Notes shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions of this Indenture.

SECTION 12.04. <u>No Waiver</u> . Neither a failure nor a delay on the part of either the Trustee or the holders in exercising any right, power or privilege under this Article XII shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege. The rights, remedies and benefits of the Trustee and the holders herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which either may have under this Article XII at law, in equity, by statute or otherwise.

SECTION 12.05. <u>Modification</u> . No modification, amendment or waiver of any provision of this Article XII, nor the consent to any departure by the Parent Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Trustee, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Parent Guarantor in any case shall entitle the Parent Guarantor to any other or further notice or demand in the same, similar or other circumstances.

SECTION 12.06. <u>Execution of Supplemental Indenture for Future Note Guarantors</u> . Each Subsidiary and other Person which is required to become a guarantor of the Notes pursuant to Section 4.11 shall promptly execute and deliver to the Trustee a joinder to the Intercreditor Agreement and a supplemental indenture in the form of <u>Exhibit D</u> hereto pursuant to which such Subsidiary or other Person shall become a guarantor under this Article XII and shall guarantee the Notes. Concurrently with the execution and delivery of such supplemental indenture, the Issuer shall deliver to the Trustee an Opinion of Counsel and an Officer's Certificate to the effect that such supplemental indenture has been duly authorized, executed and delivered by such Subsidiary or other Person and that, subject to the application of bankruptcy, insolvency, moratorium, fraudulent conveyance or transfer and other similar laws relating to creditors' rights generally and to the principles of equity, whether considered in a proceeding at law or in equity, the Note Guarantee of such guarantor is a valid and binding obligation of such guarantor, enforceable against such guarantor in accordance with its terms and/or to such other matters as the Trustee may reasonably request.

SECTION 12.07. <u>Non-Impairment</u> . The failure to endorse a Guarantee on any Note shall not affect or impair the validity thereof.

113

**ARTICLE XIII**

**MISCELLANEOUS**

SECTION 13.01. <u>Trust Indenture Act Controls</u> . If and to the extent that any provision of this Indenture limits, qualifies or conflicts with the duties imposed by, or with another provision (an " <u>incorporated provision</u> ") included in this Indenture by operation of, Sections 310 to 318 of the TIA, inclusive, such imposed duties or incorporated provision shall control.

SECTION 13.02. <u>Notices</u> .

(a) Any notice or communication required or permitted hereunder shall be in writing and delivered in person, via facsimile or mailed by first-class mail addressed as follows:

if to the Issuer or the Parent Guarantor:

Harrah's Operating Company, Inc.
One Caesar's Palace Drive
Las Vegas, Nevada 89101-8969
Telephone: (702) 407-6000
Facsimile: (702) 407-6418
Attn: General Counsel

if to the Trustee:

U.S. Bank National Association
60 Livingston Avenue
St. Paul, Minnesota 55107-1419
Telephone: (651) 495-3909
Facsimile: (651) 495-8097
Attn: Corporate Trust Services, Raymond S. Haverstock

The Issuer or the Trustee by notice to the other may designate additional or different addresses for subsequent notices or communications.

(b) Any notice or communication mailed to a holder shall be mailed, first class mail, to the holder at the holder's address as it appears on the registration books of the Registrar and shall be sufficiently given if so mailed within the time prescribed.

(c) Failure to mail a notice or communication to a holder or any defect in it shall not affect its sufficiency with respect to other holders. If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it, except that notices to the Trustee are effective only if received.

SECTION 13.03. <u>Communication by the Holders with Other Holders</u> . The holders may communicate pursuant to Section 312(b) of the TIA with other holders with respect to their rights under this Indenture or the Notes. The Issuer, the Trustee, the Registrar and other Persons shall have the protection of Section 312(c) of the TIA.

114

SECTION 13.04. <u>Certificate and Opinion as to Conditions Precedent</u> . Upon any request or application by the Issuer to the Trustee to take or refrain from taking any action under this Indenture, the Issuer shall furnish to the Trustee at the request of the Trustee:

(a) an Officers' Certificate in form reasonably satisfactory to the Trustee stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(b) an Opinion of Counsel in form reasonably satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

SECTION 13.05. <u>Statements Required in Certificate or Opinion</u> . Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture (other than pursuant to Section 4.09) shall include:

(a) a statement that the individual making such certificate or opinion has read such covenant or condition;

(b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c) a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d) a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with; *provided* , *however* , that with respect to matters of fact an Opinion of Counsel may rely on an Officers' Certificate or certificates of public officials.

SECTION 13.06. <u>When Notes Disregarded</u> . In determining whether the holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Issuer, the Parent Guarantor or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Issuer or the Parent Guarantor shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes which the Trustee knows are so owned shall be so disregarded. Subject to the foregoing, only Notes outstanding at the time shall be considered in any such determination.

SECTION 13.07. <u>Rules by Trustee, Paying Agent and Registrar</u> . The Trustee may make reasonable rules for action by or a meeting of the holders. The Registrar and a Paying Agent may make reasonable rules for their functions.

115

SECTION 13.08. <u>Legal Holidays</u> . If a payment date is not a Business Day, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue on any amount that would have been otherwise payable on such payment date if it were a Business Day for the intervening period. If a regular record date is not a Business Day, the record date shall not be affected.

SECTION 13.09. <u>GOVERNING LAW</u> . **THIS INDENTURE AND THE SECURITIES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

SECTION 13.10. <u>No Recourse Against Others</u> . No director, officer, employee, manager, incorporator or holder of any Equity Interests in the Issuer or of the Parent Guarantor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Issuer or the Parent Guarantor under the Notes or this Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

SECTION 13.11. <u>Successors</u> . All agreements of the Issuer and the Parent Guarantor in this Indenture and the Notes shall bind its successors. All agreements of the Trustee in this Indenture shall bind its successors.

SECTION 13.12. <u>Multiple Originals</u> . The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. One signed copy is enough to prove this Indenture.

SECTION 13.13. <u>Table of Contents; Headings</u> . The table of contents, cross-reference sheet and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 13.14. <u>Indenture Controls</u> . If and to the extent that any provision of the Notes limits, qualifies or conflicts with a provision of this Indenture, such provision of this Indenture shall control.

SECTION 13.15. <u>Severability</u> . In case any provision in this Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

SECTION 13.16. <u>Intercreditor Agreement</u> . The terms of this Indenture are subject to the terms of the Intercreditor Agreement, dated as of December 24, 2008, by and among Bank of America, N.A., as First Lien Agent, U.S. Bank National Association, as Trustee, and other parties thereto from time to time.

**[Remainder of page intentionally left blank]**

116

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

**Harrah's Entertainment, Inc.**

By: _____
Name: Jonathan S. Halkyard
Title:  Senior Vice President CFO & Treasurer

[Indenture]

**Harrah's Operating Company, Inc.**

By: _____
Name: Jonathan S. Halkyard
Title:   Senior Vice President CFO & Treasurer

[Indenture]

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By: _____
Name: Raymond S. Haverstock
Title:   Vice President

[Indenture]

PROVISIONS RELATING TO INITIAL SECURITIES, ADDITIONAL SECURITIES
AND EXCHANGE SECURITIES

1. Definitions.

1.1 Definitions.

For the purposes of this Appendix A the following terms shall have the meanings indicated below:

" Additional Interest " has the meaning set forth in the Registration Rights Agreement.

" Dealer Manager Agreement " means (a) the Dealer Manager Agreement dated November 14, 2008, among the Issuer, the Parent Guarantor and the Dealer Managers and (b) any other similar Dealer Managers Agreement relating to Additional Notes.

" Dealer Managers " means Citigroup Global Markets Inc. and Banc of America Securities LLC party to the Dealer Manager Agreement entered into in connection with the offers of the Notes.

" Definitive Note " means a certificated Initial Note or Exchange Note (bearing the Restricted Notes Legend if the transfer of such Note is restricted by applicable law) that does not include the Global Notes Legend.

" Depository " means The Depository Trust Issuer, its nominees and their respective successors.

" Global Notes Legend " means the legend set forth under that caption in the applicable Exhibit to this Indenture.

" IAI " means an institutional "accredited investor" as described in Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

" QIB " means a " qualified institutional buyer " as defined in Rule 144A.

" Registered Exchange Offer " means the offer by the Issuer, pursuant to the Registration Agreement, to certain holders of Initial Notes, to issue and deliver to such holders, in exchange for their Initial Notes, a like aggregate principal amount of Exchange Notes registered under the Securities Act.

" Registration Rights Agreement " means (a) the Registration Rights Agreement dated as of December 24, 2008 among the Issuer, the Parent Guarantor and the Dealer Managers relating to the Notes and (b) any other similar Registration Rights Agreement relating to Additional Notes.

" Regulation S " means Regulation S under the Securities Act.

Appendix A-1

" <u>Regulation S Notes</u> " means all Initial Notes offered and sold outside the United States in reliance on Regulation S.

" <u>Restricted Period</u> ," with respect to any Notes, means the period of 40 consecutive days beginning on and including the later of (a) the day on which such Notes are first offered to persons other than distributors (as defined in Regulation S under the Securities Act) in reliance on Regulation S, notice of which day shall be promptly given by the Issuer to the Trustee, and (b) the Issue Date, and with respect to any Additional Notes that are Transfer Restricted Notes, it means the comparable period of 40 consecutive days.

" <u>Restricted Notes Legend</u> " means the legend set forth in Section 2.2(f)(i) herein.

" <u>Rule 501</u> " means Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

" <u>Rule 506</u> " means Rule 506 under the Securities Act.

" <u>Rule 144A</u> " means Rule 144A under the Securities Act.

" <u>Rule 144A Notes</u> " means all Initial Notes offered and sold to QIBs in reliance on Rule 144A and all Initial Notes offered and sold to IAIs in reliance on Rule 506.

" <u>Notes Custodian</u> " means the custodian with respect to a Global Note (as appointed by the Depository) or any successor person thereto, who shall initially be the Trustee.

" <u>Shelf Registration Statement</u> " means a registration statement filed by the Issuer in connection with the offer and sale of Initial Notes pursuant to the Registration Agreement.

" <u>Transfer Restricted Definitive Notes</u> " means Definitive Notes that bear or are required to bear or are subject to the Restricted Notes Legend.

" <u>Transfer Restricted Global Notes</u> " means Global Notes that bear or are required to bear or are subject to the Restricted Notes Legend.

" <u>Unrestricted Definitive Notes</u> " means Definitive Notes that are not required to bear, or are not subject to, the Restricted Notes Legend.

" <u>Unrestricted Global Notes</u> " means Global Notes that are not required to bear, or are not subject to, the Restricted Notes Legend.

1.2 <u>Other Definitions</u> .

| Term: | Defined in Section: |
|---|---|
| Agent Members | 2.1(b) |
| Global Notes | 2.1(b) |
| Regulation S Global Notes | 2.1(b) |
| Rule 144A Global Notes | 2.1(b) |

Appendix A-2

2. The Notes.

2.1 Form and Dating; Global Notes.

(a) The Initial Notes issued on the date hereof will be (i) privately placed by the Issuer pursuant to the Offering Memorandum and (ii) sold, initially only to (1) QIBs in reliance on Rule 144A, (2) Persons other than U.S. Persons (as defined in Regulation S) in reliance on Regulation S and (3) IAIs in reliance on Rule 506. Such Initial Notes may thereafter be transferred to, among others, QIBs, purchasers in reliance on Regulation S and, except as set forth below, IAIs in accordance with Rule 501. Additional Notes offered after the date hereof may be offered and sold by the Issuer from time to time pursuant to one or more agreements in accordance with applicable law.

(b) <u>Global Notes</u> . (i) Except as provided in clause (c) below, Rule 144A Notes initially shall be represented by one or more Notes in definitive, fully registered, global form without interest coupons (collectively, the " <u>Rule 144A Global Notes</u> ").

Regulation S Notes initially shall be represented by one or more Notes in fully registered, global form without interest coupons (collectively, the " <u>Regulation S Global Notes</u> "), which shall be registered in the name of the Depository or the nominee of the Depository for the accounts of designated agents holding on behalf of Euroclear or Clearstream.

The term " <u>Global Notes</u> " means the Rule 144A Global Notes and the Regulation S Global Notes. The Global Notes shall bear the Global Note Legend. The Global Notes initially shall (i) be registered in the name of the Depository or the nominee of such Depository, in each case for credit to an account of an Agent Member, (ii) be delivered to the Trustee as custodian for such Depository and (iii) bear the Restricted Notes Legend.

Members of, or direct or indirect participants in, the Depository (collectively, the " <u>Agent Members</u> ") shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Depository, or the Trustee as its custodian, or under the Global Notes. The Depository may be treated by the Issuer, the Trustee and any agent of the Issuer or the Trustee as the absolute owner of the Global Notes for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Trustee or any agent of the Issuer or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depository, or impair, as between the Depository and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any Note.

(ii) Transfers of Global Notes shall be limited to transfer in whole, but not in part, to the Depository, its successors or their respective nominees. Interests of beneficial owners in the Global Notes may be transferred or exchanged for Definitive Notes only in accordance with the applicable rules and procedures of the Depository and the provisions of Section 2.2. In addition, a Global Note shall be exchangeable for Definitive Notes if (x) the Depository (1) notifies the Issuer that it is unwilling or unable to continue as depository for such Global Note and the Issuer thereupon fails to appoint a successor depository or (2) has ceased to be a clearing agency registered under the Exchange Act or (y) there shall have occurred and be continuing an Event of Default with respect to such Global Note; *provided* that in no event shall the Regulation S Global Note be exchanged by the Issuer for Definitive Notes prior to (x) the expiration of the Restricted Period and (y) the receipt by the Registrar of any certificates required pursuant to Rule 903(b)(3)(ii)(B) under the Securities Act. In all cases, Definitive Notes delivered in

Appendix A-3

exchange for any Global Note or beneficial interests therein shall be registered in the names, and issued in any approved denominations, requested by or on behalf of the Depository in accordance with its customary procedures.

(iii) In connection with the transfer of a Global Note as an entirety to beneficial owners pursuant to subsection (i) of this Section 2.1 (b), such Global Note shall be deemed to be surrendered to the Trustee for cancellation, and the Issuer shall execute, and the Trustee shall authenticate and make available for delivery, to each beneficial owner identified by the Depository in writing in exchange for its beneficial interest in such Global Note, an equal aggregate principal amount of Definitive Notes of authorized denominations.

(iv) Any Transfer Restricted Note delivered in exchange for an interest in a Global Note pursuant to Section 2.2 shall, except as otherwise provided in Section 2.2, bear the Restricted Notes Legend.

(v) Notwithstanding the foregoing, through the Restricted Period, a beneficial interest in such Regulation S Global Note may be held only through Euroclear or Clearstream unless delivery is made in accordance with the applicable provisions of Section 2.2.

(vi) The holder of any Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a holder is entitled to take under this Indenture or the Notes.

(c) Definitive Notes . To the extent that the purchaser of a Rule 144A Note is an IAI and is not an Agent Member or otherwise cannot hold a beneficial interest in a Global Note, then such Rule 144A Note shall be represented by one or more Definitive Notes.

2.2 Transfer and Exchange.

(a) Transfer and Exchange of Global Notes . A Global Note may not be transferred as a whole except as set forth in Section 2.1(b). Global Notes will not be exchanged by the Issuer for Definitive Notes except under the circumstances described in Section in Section 2.1(b)(ii). Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.08 and 2.10 of this Indenture. Beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.2(b) or 2.2(g).

(b) Transfer and Exchange of Beneficial Interests in Global Notes . The transfer and exchange of beneficial interests in the Global Notes shall be effected through the Depository, in accordance with the provisions of this Indenture and the applicable rules and procedures of the Depository. Beneficial interests in Transfer Restricted Global Notes shall be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Beneficial interests in Global Notes shall be transferred or exchanged only for beneficial interests in Global Notes. Transfers and exchanges of beneficial interests in the Global Notes also shall require compliance with either subparagraph (i) or (ii) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(i) Transfer of Beneficial Interests in the Same Global Note . Beneficial interests in any Transfer Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Transfer Restricted Global Note in accordance with the transfer restrictions set forth in the Restricted Notes Legend; provided , however , that prior to the expiration of the Restricted Period, transfers of beneficial interests in a Regulation S Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person. A beneficial interest in an Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.2(b)(i).

Appendix A-4

(ii) <u>All Other Transfers and Exchanges of Beneficial Interests in Global Notes</u> . In connection with all transfers and exchanges of beneficial interests in any Global Note that is not subject to Section 2.2(b)(i), the transferor of such beneficial interest must deliver to the Registrar (1) a written order from an Agent Member given to the Depository in accordance with the applicable rules and procedures of the Depository directing the Depository to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given in accordance with the applicable rules and procedures of the Depository containing information regarding the Agent Member account to be credited with such increase. Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note pursuant to Section 2.2(g).

(iii) <u>Transfer of Beneficial Interests to Another Restricted Global Note</u> . A beneficial interest in a Transfer Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Transfer Restricted Global Note if the transfer complies with the requirements of Section 2.2(b)(ii) above and the Registrar receives the following:

(A) if the transferee will take delivery in the form of a beneficial interest in a Rule 144A Global Note, then the transferor must deliver a certificate in the form attached to the applicable Note; and

(B) if the transferee will take delivery in the form of a beneficial interest in a Regulation S Global Note, then the transferor must deliver a certificate in the form attached to the applicable Note.

(iv) <u>Transfer and Exchange of Beneficial Interests in a Transfer Restricted Global Note for Beneficial Interests in an Unrestricted Global Note</u> . A beneficial interest in a Transfer Restricted Global Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.2(b)(ii) above and the Registrar receives the following:

(A) if the holder of such beneficial interest in a Transfer Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form attached to the applicable Note; or

Appendix A-5

(B) if the holder of such beneficial interest in a Transfer Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form attached to the applicable Note,

and, in each such case, if the Issuer or the Registrar so requests or if the applicable rules and procedures of the Depository so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Restricted Notes Legend are no longer required in order to maintain compliance with the Securities Act. If any such transfer or exchange is effected pursuant to this subparagraph (iv) at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an written order of the Issuer in the form of an Officers' Certificate in accordance with Section 2.01, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred or exchanged pursuant to this subparagraph (iv).

(v) <u>Transfer and Exchange of Beneficial Interests in an Unrestricted Global Note for Beneficial Interests in a Transfer Restricted Global Note</u> . Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Transfer Restricted Global Note.

(c) <u>Transfer and Exchange of Beneficial Interests in Global Notes for Definitive Notes</u> . A beneficial interest in a Global Note may not be exchanged for a Definitive Note except under the circumstances described in Section 2.1(b)(ii). A beneficial interest in a Global Note may not be transferred to a Person who takes delivery thereof in the form of a Definitive Note except under the circumstances described in Section 2.1(b)(ii). In any case, beneficial interests in Global Notes shall be transferred or exchanged only for Definitive Notes.

(d) <u>Transfer and Exchange of Definitive Notes for Beneficial Interests in Global Notes</u> . Transfers and exchanges of beneficial interests in the Global Notes also shall require compliance with either subparagraph (i), (ii) or (ii) below, as applicable:

(i) <u>Transfer Restricted Definitive Notes to Beneficial Interests in Transfer Restricted Global Notes</u> . If any holder of a Transfer Restricted Definitive Note proposes to exchange such Transfer Restricted Definitive Note for a beneficial interest in a Transfer Restricted Global Note or to transfer such Transfer Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A) if the holder of such Transfer Restricted Definitive Note proposes to exchange such Transfer Restricted Note for a beneficial interest in a Transfer Restricted Global Note, a certificate from such holder in the form attached to the applicable Note;

Appendix A-6

(B) if such Transfer Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A under the Securities Act, a certificate from such holder in the form attached to the applicable Note;

(C) if such Transfer Restricted Definitive Note is being transferred to a Non U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904 under the Securities Act, a certificate from such holder in the form attached to the applicable Note;

(D) if such Transfer Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144 under the Securities Act, a certificate from such holder in the form attached to the applicable Note;

(E) if such Transfer Restricted Definitive Note is being transferred to an IAI in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate from such holder in the form attached to the applicable Note, including the certifications, certificates and Opinion of Counsel, if applicable; or

(F) if such Transfer Restricted Definitive Note is being transferred to the Issuer or a Subsidiary thereof, a certificate from such holder in the form attached to the applicable Note;

the Trustee shall cancel the Transfer Restricted Definitive Note, and increase or cause to be increased the aggregate principal amount of the appropriate Transfer Restricted Global Note.

(ii) <u>Transfer Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes</u> . A holder of a Transfer Restricted Definitive Note may exchange such Transfer Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note or transfer such Transfer Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if the Registrar receives the following:

(A) if the holder of such Transfer Restricted Definitive Note proposes to exchange such Transfer Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form attached to the applicable Note; or

(B) if the holder of such Transfer Restricted Definitive Notes proposes to transfer such Transfer Restricted Definitive Note to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form attached to the applicable Note,

Appendix A-7

and, in each such case, if the Issuer or the Registrar so requests or if the applicable rules and procedures of the Depository so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Restricted Notes Legend are no longer required in order to maintain compliance with the Securities Act. Upon satisfaction of the conditions of this subparagraph (ii), the Trustee shall cancel the Transfer Restricted Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note. If any such transfer or exchange is effected pursuant to this subparagraph (ii) at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an written order of the Issuer in the form of an Officers' Certificate, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of Transfer Restricted Notes transferred or exchanged pursuant to this subparagraph (ii).

(iii) <u>Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes</u> . A holder of an Unrestricted Definitive Note may exchange such Unrestricted Definitive Note for a beneficial interest in an Unrestricted Global Note or transfer such Unrestricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer, the Trustee shall cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes. If any such transfer or exchange is effected pursuant to this subparagraph (iii) at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an written order of the Issuer in the form of an Officers' Certificate, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of Unrestricted Definitive Notes transferred or exchanged pursuant to this subparagraph (iii).

(iv) <u>Unrestricted Definitive Notes to Beneficial Interests in Transfer Restricted Global Notes</u> . An Unrestricted Definitive Note cannot be exchanged for, or transferred to a Person who takes delivery thereof in the form of, a beneficial interest in a Transfer Restricted Global Note.

(e) <u>Transfer and Exchange of Definitive Notes for Definitive Notes</u> . Upon request by a holder of Definitive Notes and such holder's compliance with the provisions of this Section 2.2(e), the Registrar shall register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting holder shall present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such holder or by its attorney, duly authorized in writing. In addition, the requesting holder shall provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.2(e).

(i) <u>Transfer Restricted Definitive Notes to Transfer Restricted Definitive Notes</u> . A Transfer Restricted Note may be transferred to and registered in the name of a Person who takes delivery thereof in the form of a Transfer Restricted Definitive Note if the Registrar receives the following:

(A) if the transfer will be made pursuant to Rule 144A under the Securities Act, then the transferor must deliver a certificate in the form attached to the applicable Note;

Appendix A-8

(B) if the transfer will be made pursuant to Rule 903 or Rule 904 under the Securities Act, then the transferor must deliver a certificate in the form attached to the applicable Note;

(C) if the transfer will be made pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144 under the Securities Act, a certificate in the form attached to the applicable Note;

(D) if the transfer will be made to an IAI in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (A) through (D) above, a certificate in the form attached to the applicable Note; and

(E) if such transfer will be made to the Issuer or a Subsidiary thereof, a certificate in the form attached to the applicable Note.

(ii) <u>Transfer Restricted Definitive Notes to Unrestricted Definitive Notes</u> . Any Transfer Restricted Definitive Note may be exchanged by the holder thereof for an Unrestricted Definitive Note or transferred to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note if the Registrar receives the following:

(A) if the holder of such Transfer Restricted Definitive Note proposes to exchange such Transfer Restricted Definitive Note for an Unrestricted Definitive Note, a certificate from such holder in the form attached to the applicable Note; or

(B) if the holder of such Transfer Restricted Definitive Note proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder in the form attached to the applicable Note,

and, in each such case, if the Registrar so requests, an Opinion of Counsel in form reasonably acceptable to the Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Restricted Notes Legend are no longer required in order to maintain compliance with the Securities Act.

(iii) <u>Unrestricted Definitive Notes to Unrestricted Definitive Notes</u> . A holder of an Unrestricted Definitive Note may transfer such Unrestricted Definitive Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note at any time. Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the holder thereof.

Appendix A-9

(iv) <u>Unrestricted Definitive Notes to Transfer Restricted Definitive Notes</u> . An Unrestricted Definitive Note cannot be exchanged for, or transferred to a Person who takes delivery thereof in the form of, a Transfer Restricted Definitive Note.

At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.11. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depository at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depository at the direction of the Trustee to reflect such increase.

(f) Legend.

(i) Except as permitted by the following paragraph (ii), (iii) or (iv), each Note certificate evidencing the Global Notes and the Definitive Notes (and all Notes issued in exchange therefor or in substitution thereof) shall bear a legend in substantially the following form (each defined term in the legend being defined as such for purposes of the legend only):

"THIS SECURITY (OR ITS PREDECESSOR) HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND, ACCORDINGLY, MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER: (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) (A "QIB"), (B) IT IS NOT A U.S. PERSON, IS NOT ACQUIRING THIS SECURITY FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT OR (C) IT IS AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a)(1), (2), (3) or (7) UNDER REGULATION D OF THE SECURITIES ACT (AN "IAI"), (2) AGREES THAT IT WILL NOT, WITHIN THE TIME PERIOD REFERRED TO UNDER RULE 144(d)(1) (TAKING INTO

Appendix A-10

ACCOUNT THE PROVISIONS OF RULE 144(d) UNDER THE SECURITIES ACT, IF APPLICABLE) UNDER THE SECURITIES ACT AS IN EFFECT ON THE DATE OF THE TRANSFER OF THIS SECURITY, RESELL OR OTHERWISE TRANSFER THIS SECURITY EXCEPT (A) TO THE ISSUER, HET OR ANY OF ITS SUBSIDIARIES, (B) TO A PERSON WHOM THE HOLDER REASONABLY BELIEVES IS A QIB OR PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QIB IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) IN COMPLIANCE WITH AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED THAT PRIOR TO SUCH TRANSFER, THE TRUSTEE IS FURNISHED WITH AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT), (D) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT, (E) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE AND PROVIDED THAT PRIOR TO SUCH TRANSFER, THE TRUSTEE IS FURNISHED WITH AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT), (F) TO AN IAI THAT, PRIOR TO SUCH TRANSFER, FURNISHES THE TRUSTEE A SIGNED LETTER CONTAINING CERTAIN REPRESENTATIONS AND AGREEMENTS RELATING TO THE TRANSFER OF THIS SECURITY (THE FORM OF WHICH CAN BE OBTAINED FROM THE TRUSTEE) AND, IF SUCH TRANSFER IS IN RESPECT OF AN AGGREGATE PRINCIPAL AMOUNT OF NEW SECOND LIEN NOTES LESS THAN $250,000, AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER AND THE TRUSTEE THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT OR (G) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND, IN EACH CASE, IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS, AND (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS SECURITY OR AN INTEREST HEREIN IS TRANSFERRED (OTHER THAN A TRANSFER PURSUANT TO CLAUSE (2)(D) OR 2(E) ABOVE) A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. IN CONNECTION WITH ANY TRANSFER OF THIS SECURITY OR ANY INTEREST HEREIN WITHIN THE TIME PERIOD REFERRED TO ABOVE, THE HOLDER MUST CHECK THE APPROPRIATE BOX SET FORTH ON THE REVERSE

Appendix A-11

HEREOF RELATING TO THE MANNER OF SUCH TRANSFER AND SUBMIT THIS CERTIFICATE TO THE TRUSTEE. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANINGS GIVEN TO THEM BY RULE 902 OF REGULATION S UNDER THE SECURITIES ACT."

Each Definitive Note shall bear the following additional legends:

"IN CONNECTION WITH ANY TRANSFER, THE HOLDER WILL DELIVER TO THE REGISTRAR AND TRANSFER AGENT SUCH CERTIFICATES AND OTHER INFORMATION AS SUCH TRANSFER AGENT MAY REASONABLY REQUIRE TO CONFIRM THAT THE TRANSFER COMPLIES WITH THE FOREGOING RESTRICTIONS."

"THE TERMS OF THIS SECURITY ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED DECEMBER 24, 2008, BY AND AMONG BANK OF AMERICA, N.A., AS FIRST LIEN AGENT, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE AND THE OTHER PARTIES THERETO FROM TIME TO TIME."

"THIS NOTE IS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE INTERNAL REVENUE CODE. A HOLDER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY FOR SUCH NOTES BY SUBMITTING A REQUEST FOR SUCH INFORMATION TO THE BORROWER AT THE FOLLOWING ADDRESS: HARRAH'S OPERATING COMPANY, INC., ONE CAESAR'S PALACE DRIVE, LAS VEGAS, NEVADA, 89101-8969, ATTENTION: GENERAL COUNSEL."

(ii) Upon any sale or transfer of a Transfer Restricted Definitive Note, the Registrar shall permit the holder thereof to exchange such Transfer Restricted Note for a Definitive Note that does not bear the legends set forth above and rescind any restriction on the transfer of such Transfer Restricted Definitive Note if the holder certifies in writing to the Registrar that its request for such exchange was made in reliance on Rule 144 (such certification to be in the form set forth on the reverse of the Initial Note).

(iii) After a transfer of any Initial Notes during the period of the effectiveness of a Shelf Registration Statement with respect to such Initial Notes, all requirements pertaining to the Restricted Notes Legend on such Initial Notes shall cease to apply and the requirements that any such Initial Notes be issued in global form shall continue to apply.

(iv) Upon the consummation of a Registered Exchange Offer with respect to the Initial Notes pursuant to which holders of such Initial Notes are offered Exchange

Appendix A-12

Notes in exchange for their Initial Notes, all requirements pertaining to Initial Notes that Initial Notes be issued in global form shall continue to apply, and Exchange Notes in global form without the Restricted Notes Legend shall be available to holders that exchange such Initial Notes in such Registered Exchange Offer.

(v) Upon a sale or transfer after the expiration of the Restricted Period of any Initial Note acquired pursuant to Regulation S, all requirements that such Initial Note bear the Restricted Notes Legend shall cease to apply and the requirements requiring any such Initial Note be issued in global form shall continue to apply.

(vi) Any Additional Notes sold in a registered offering shall not be required to bear the Restricted Notes Legend.

(g) <u>Cancellation or Adjustment of Global Note</u> . At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.11 of this Indenture. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depository at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depository at the direction of the Trustee to reflect such increase.

(h) <u>Obligations with Respect to Transfers and Exchanges of Notes</u> .

(i) To permit registrations of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate, Definitive Notes and Global Notes at the Registrar's request.

(ii) No service charge shall be made for any registration of transfer or exchange, but the Issuer may require payment of a sum sufficient to cover any transfer tax, assessments, or similar governmental charge payable in connection therewith (other than any such transfer taxes, assessments or similar governmental charge payable upon exchanges pursuant to Sections 3.06, 4.06, 4.08 and 9.05 of this Indenture).

(iii) Prior to the due presentation for registration of transfer of any Note, the Issuer, the Trustee, a Paying Agent or the Registrar may deem and treat the person in whose name a Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Note and for all other purposes whatsoever, whether or not such Note is overdue, and none of the Issuer, the Trustee, the Paying Agent or the Registrar shall be affected by notice to the contrary.

Appendix A-13

(iv) All Notes issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Notes surrendered upon such transfer or exchange.

(i) No Obligation of the Trustee.

(i) The Trustee shall have no responsibility or obligation to any beneficial owner of a Global Note, a member of, or a participant in the Depository or any other Person with respect to the accuracy of the records of the Depository or its nominee or of any participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any participant, member, beneficial owner or other Person (other than the Depository) of any notice (including any notice of redemption or repurchase) or the payment of any amount, under or with respect to such Notes. All notices and communications to be given to the holders and all payments to be made to the holders under the Notes shall be given or made only to the registered holders (which shall be the Depository or its nominee in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through the Depository subject to the applicable rules and procedures of the Depository. The Trustee may rely and shall be fully protected in relying upon information furnished by the Depository with respect to its members, participants and any beneficial owners.

(ii) The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among Depository participants, members or beneficial owners in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

Appendix A-14

[FORM OF FACE OF INITIAL 2018 NOTE]

[Global Notes Legend]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), NEW YORK, NEW YORK, TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO., OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO DTC, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

[Restricted Notes Legend]

"THIS SECURITY (OR ITS PREDECESSOR) HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND, ACCORDINGLY, MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER: (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) (A "QIB"), (B) IT IS NOT A U.S. PERSON, IS NOT ACQUIRING THIS SECURITY FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT OR (C) IT IS AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a)(1), (2), (3) or (7) UNDER REGULATION D OF THE SECURITIES ACT (AN "IAI"), (2) AGREES THAT IT WILL NOT, WITHIN THE TIME PERIOD REFERRED TO UNDER RULE 144(d)(1) (TAKING INTO

A-1-1

ACCOUNT THE PROVISIONS OF RULE 144(d) UNDER THE SECURITIES ACT, IF APPLICABLE) UNDER THE SECURITIES ACT AS IN EFFECT ON THE DATE OF THE TRANSFER OF THIS SECURITY, RESELL OR OTHERWISE TRANSFER THIS SECURITY EXCEPT (A) TO THE ISSUER, HET OR ANY OF ITS SUBSIDIARIES, (B) TO A PERSON WHOM THE HOLDER REASONABLY BELIEVES IS A QIB OR PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QIB IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) IN COMPLIANCE WITH AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED THAT PRIOR TO SUCH TRANSFER, THE TRUSTEE IS FURNISHED WITH AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT), (D) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT, (E) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE AND PROVIDED THAT PRIOR TO SUCH TRANSFER, THE TRUSTEE IS FURNISHED WITH AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT), (F) TO AN IAI THAT, PRIOR TO SUCH TRANSFER, FURNISHES THE TRUSTEE A SIGNED LETTER CONTAINING CERTAIN REPRESENTATIONS AND AGREEMENTS RELATING TO THE TRANSFER OF THIS SECURITY (THE FORM OF WHICH CAN BE OBTAINED FROM THE TRUSTEE) AND, IF SUCH TRANSFER IS IN RESPECT OF AN AGGREGATE PRINCIPAL AMOUNT OF NEW SECOND LIEN NOTES LESS THAN $250,000, AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER AND THE TRUSTEE THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT OR (G) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND, IN EACH CASE, IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS, AND (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS SECURITY OR AN INTEREST HEREIN IS TRANSFERRED (OTHER THAN A TRANSFER PURSUANT TO CLAUSE (2)(D) OR 2(E) ABOVE) A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. IN CONNECTION WITH ANY TRANSFER OF THIS SECURITY OR ANY INTEREST HEREIN WITHIN THE TIME PERIOD REFERRED TO ABOVE, THE HOLDER MUST CHECK THE APPROPRIATE BOX SET FORTH ON THE REVERSE

A-1-2

HEREOF RELATING TO THE MANNER OF SUCH TRANSFER AND SUBMIT THIS CERTIFICATE TO THE TRUSTEE. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANINGS GIVEN TO THEM BY RULE 902 OF REGULATION S UNDER THE SECURITIES ACT."

Each Definitive Note shall bear the following additional legend:

"IN CONNECTION WITH ANY TRANSFER, THE HOLDER WILL DELIVER TO THE REGISTRAR AND TRANSFER AGENT SUCH CERTIFICATES AND OTHER INFORMATION AS SUCH TRANSFER AGENT MAY REASONABLY REQUIRE TO CONFIRM THAT THE TRANSFER COMPLIES WITH THE FOREGOING RESTRICTIONS."

"THE TERMS OF THIS SECURITY ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED DECEMBER 24, 2008, BY AND AMONG BANK OF AMERICA, N.A., AS FIRST LIEN AGENT, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE AND THE OTHER PARTIES THERETO FROM TIME TO TIME."

"THIS NOTE IS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE INTERNAL REVENUE CODE. A HOLDER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY FOR SUCH NOTES BY SUBMITTING A REQUEST FOR SUCH INFORMATION TO THE BORROWER AT THE FOLLOWING ADDRESS: HARRAH'S OPERATING COMPANY, INC., ONE CAESAR'S PALACE DRIVE, LAS VEGAS, NEVADA, 89101-8969, ATTENTION: GENERAL COUNSEL."

A-1-3

[FORM OF INITIAL 2018 NOTE]

No.                                                                                          $ _____

10.00% Second-Priority Senior Secured Note due 2018

144A CUSIP No. 413627 BC3
144A ISIN No. US413627BC37

REG S CUSIP No. U24658 AM5
REG S ISIN No. USU24658AM51

HARRAH'S OPERATING COMPANY, INC., a Delaware corporation, promises to pay to Cede & Co., or registered assigns, the principal sum of [          ] Dollars on December 15, 2018.

Interest Payment Dates: June 15 and December 15

Record Dates: June 1 and December 1

Additional provisions of this Note are set forth on the other side of this Note.

A-1-4

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed.

HARRAH'S OPERATING COMPANY, INC.

By: _____
Name:
Title:

Dated:

A-1-5

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

U.S. BANK NATIONAL ASSOCIATION
as Trustee, certifies that this is one of the Notes
referred to in the Indenture.

By: _____
                Authorized Signatory

\*/    If the Note is to be issued in global form, add the Global Notes Legend and the attachment from <u>Exhibit A</u> captioned "TO BE
       ATTACHED TO GLOBAL SECURITIES - SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY."

A-1-6

[FORM OF REVERSE SIDE OF INITIAL 2018 NOTE]

10.00% Second-Priority Senior Secured Note Due 2018

1.    <u>Interest</u>

HARRAH'S OPERATING COMPANY, INC., a Delaware corporation (such corporation, and its successors and assigns under the Indenture hereinafter referred to, being herein called the " <u>Issuer</u> "), promises to pay interest on the principal amount of this Note at the rate per annum shown above. The Issuer shall pay interest semiannually on June 15 and December 15 of each year (each an " <u>Interest Payment Date</u> "), commencing June 15, 2009. Interest on the Notes shall accrue from the most recent date to which interest has been paid or duly provided for or, if no interest has been paid or duly provided for, from December 24, 2008, until the principal hereof is due. Interest shall be computed on the basis of a 360-day year of twelve 30-day months. The Issuer shall pay interest on overdue principal at the rate borne by the Notes, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

2.    <u>Method of Payment</u>

The Issuer shall pay interest on the Notes (except defaulted interest) to the Persons who are registered holders at the close of business on June 1 or December 1 (each a " <u>Record Date</u> ") next preceding the interest payment date even if Notes are canceled after the record date and on or before the interest payment date (whether or not a Business Day). Holders must surrender Notes to the Paying Agent to collect principal payments. The Issuer shall pay principal, premium, if any, and interest in money of the United States of America that at the time of payment is legal tender for payment of public and private debts. Payments in respect of the Notes represented by a Global Note (including principal, premium, if any, and interest) shall be made by wire transfer of immediately available funds to the accounts specified by The Depository Trust Issuer or any successor depositary. The Issuer shall make all payments in respect of a certificated Note (including principal, premium, if any, and interest) at the office of the Paying Agent, except that, at the option of the Issuer, payment of interest may be made by mailing a check to the registered address of each holder thereof; *provided* , *however* , that payments on the Notes may also be made, in the case of a holder of at least $1,000,000 aggregate principal amount of Notes, by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such holder elects payment by wire transfer by giving written notice to the Trustee or Paying Agent to such effect designating such account no later than 30 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion).

3.    <u>Paying Agent and Registrar</u>

Initially, U.S. Bank National Association (the " <u>Trustee</u> "), will act as Paying Agent and Registrar. The Issuer may appoint and change any Paying Agent or Registrar without notice. The Issuer or any of its domestically incorporated Wholly Owned Subsidiaries may act as Paying Agent or Registrar.

A-1-7

4.    <u>Indenture</u>

        The Issuer issued the Notes under an Indenture dated as of December 24, 2008 (the " <u>Indenture</u> "), among the Issuer, the Parent Guarantor and the Trustee. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa 77bbbb) as in effect on the date of the Indenture (the " <u>TIA</u> "). Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture. The Notes are subject to all terms and provisions of the Indenture, and the holders (as defined in the Indenture) are referred to the Indenture and the TIA for a statement of such terms and provisions

        The Notes are second-priority senior secured obligations of the Issuer. This Note is one of the Initial Notes referred to in the Indenture. The Notes include the Initial Notes, any Additional Notes and any Exchange Notes issued in exchange for the Initial Notes or any Additional Notes pursuant to the Indenture. The Initial Notes, any Additional Notes and any Exchange Notes are treated as a single class of securities under the Indenture. The Indenture imposes certain limitations on the ability of the Issuer and its Restricted Subsidiaries to, among other things, make certain Investments and other Restricted Payments, pay dividends and other distributions, Incur Indebtedness, enter into consensual restrictions upon the payment of certain dividends and distributions by such Restricted Subsidiaries, issue or sell shares of capital stock of the Issuer and such Restricted Subsidiaries, enter into or permit certain transactions with Affiliates, create or Incur Liens and make Asset Sales. The Indenture also imposes limitations on the ability of the Issuer, each Subsidiary Pledgor and the Parent Guarantor to consolidate or merge with or into any other Person or convey, transfer or lease all or substantially all of its property.

        To guarantee the due and punctual payment of the principal and interest on the Notes and all other amounts payable by the Issuer under the Indenture and the Notes when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Notes and the Indenture, the Parent Guarantor has unconditionally guaranteed the Guaranteed Obligations on a senior unsecured basis pursuant to the terms of the Indenture.

5.    <u>Optional Redemption</u>

        On or after December 15, 2013, the Issuer may redeem the 2018 Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at the following redemption prices (expressed as a percentage of principal amount), *plus* accrued and unpaid interest and additional interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the 12-month period commencing on December 15 of the years set forth below:

| Period | Redemption Price |
|---|---|
| 2013 | 105.000% |
| 2014 | 103.333% |
| 2015 | 101.667% |
| 2016 and thereafter | 100.000% |

A-1-8

In addition, prior to December 15, 2013, the Issuer may redeem the 2018 Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at a redemption price equal to 100% of the principal amount of the 2018 Notes redeemed *plus* the Applicable Premium as of, and accrued and unpaid interest and additional interest, if any, to, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

Notwithstanding the foregoing, at any time and from time to time on or prior to December 15, 2011, the Issuer may redeem in the aggregate up to 35% of the original aggregate principal amount of the 2018 Notes (calculated after giving effect to any issuance of additional 2018 Notes) with the net cash proceeds of one or more Equity Offerings (1) by the Issuer or (2) by any direct or indirect parent of the Issuer to the extent the net cash proceeds thereof are contributed to the common equity capital of the Issuer or used to purchase Capital Stock (other than Disqualified Stock) of the Issuer from it, at a redemption price (expressed as a percentage of principal amount thereof) of 110.00%, *plus* accrued and unpaid interest and additional interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date); *provided* , *however* , that at least 50% of the original aggregate principal amount of the 2018 Notes (calculated after giving effect to any issuance of additional 2018 Notes) must remain outstanding after each such redemption; *provided* , *further* , that such redemption shall occur within 90 days after the date on which any such Equity Offering is consummated upon not less than 30 nor more than 60 days' notice mailed to each holder of 2018 Notes being redeemed and otherwise in accordance with the procedures set forth in the Indenture.

6. <u>Mandatory Redemption</u>

a. Except as set forth below, the Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the 2018 Notes.

b. If the 2018 Notes would otherwise constitute "applicable high yield discount obligations" within the meaning of 163(i)(1) of the Code, at the end of each accrual period ending after the fifth anniversary of the 2018 Notes' issuance (each, any " <u>AHYDO redemption date</u> "), the Issuer will be required to redeem for cash a portion of each 2018 Note then outstanding equal to the "Mandatory Principal Redemption Amount" (such redemption a " <u>Mandatory Principal Redemption</u> "). The redemption price for the portion of each 2018 Note redeemed pursuant to a Mandatory Principal Redemption will be 100% of the principal amount of such portion *plus* any accrued interest thereon on the date of redemption. The "Mandatory Principal Redemption Amount" means the portion of a 2018 Note that must be required to be redeemed to prevent such 2018 Note from being treated as an "applicable high yield discount obligation" within the meaning of Section 163(i)(1) of the Code. No partial redemption or repurchase of the 2018 Notes prior to the AHYDO redemption date pursuant to any other provision of the indenture will alter the Issuer's obligation to make the Mandatory Principal Redemption with respect to any 2018 Notes that remain outstanding on the AHYDO redemption date.

<div align="center">A-1-9</div>

7.    Notice of Redemption

Notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the redemption date to each holder of Notes to be redeemed at his, her or its registered address. Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1,000. If money sufficient to pay the redemption price of and accrued and unpaid interest on all Notes (or portions thereof) to be redeemed on the redemption date is deposited with a Paying Agent on or before the redemption date and certain other conditions are satisfied, on and after such date, interest ceases to accrue on such Notes (or such portions thereof) called for redemption.

8.    Repurchase of Notes at the Option of the holders upon Change of Control and Asset Sales

Upon the occurrence of a Change of Control, each holder shall have the right, subject to certain conditions specified in the Indenture, to cause the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant record date to receive interest due on the relevant interest payment date), as provided in, and subject to the terms of, the Indenture.

In accordance with Section 4.06 of the Indenture, the Issuer will be required to offer to purchase Notes upon the occurrence of certain events.

9.    Ranking and Collateral

These Notes are secured by a second-priority security interest in the Collateral pursuant to certain Security Documents. The Second Priority Liens upon any and all Collateral are, to the extent and in the manner provided in the Intercreditor Agreement, subordinate in ranking to all present and future First Priority Liens and will be of equal ranking with all present and future Liens securing Other Second-Lien Obligations as set forth in the Intercreditor Agreement.

10.    Denominations; Transfer; Exchange

The Notes are in registered form, without coupons, in denominations of $2,000 and any integral multiple of $1,000. A holder shall register the transfer of or exchange of Notes in accordance with the Indenture. Upon any registration of transfer or exchange, the Registrar and the Trustee may require a holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes required by law or permitted by the Indenture. The Registrar need not register the transfer of or exchange any Notes selected for redemption (except, in the case of a Note to be redeemed in part, the portion of the Note not to be redeemed) or to transfer or exchange any Notes for a period of 15 days prior to a selection of Notes to be redeemed.

11.    Persons Deemed Owners

The registered holder of this Note shall be treated as the owner of it for all purposes.

<div align="center">A-1-10</div>

12.    Unclaimed Money

If money for the payment of principal or interest remains unclaimed for two years, the Trustee and a Paying Agent shall pay the money back to the Issuer at their written request unless an abandoned property law designates another Person. After any such payment, the holders entitled to the money must look to the Issuer for payment as general creditors and the Trustee and a Paying Agent shall have no further liability with respect to such monies.

13.    Discharge and Defeasance

Subject to certain conditions, the Issuer at any time may terminate some of or all its obligations under the Notes and the Indenture if the Issuer deposits with the Trustee money or U.S. Government Obligations for the payment of principal and interest on the Notes to redemption or maturity, as the case may be.

14.    Amendment; Waiver

Subject to certain exceptions set forth in the Indenture, (i) the Indenture or the Notes may be amended with the written consent of the holders of at least a majority in aggregate principal amount of the outstanding Notes of such series and (ii) any past default or compliance with any provisions may be waived with the written consent of the holders of at least a majority in principal amount of the outstanding Notes. Subject to certain exceptions set forth in the Indenture, without the consent of any holder, the Issuer and the Trustee may amend the Indenture, the Security Documents, the Intercreditor Agreement or the Notes (i) to cure any ambiguity, omission, defect or inconsistency; (ii) to provide for the assumption by a Successor Issuer of the obligations of the Issuer under the Indenture and the Notes; (iii) to provide for the assumption by a Successor Subsidiary Pledgor of the obligations of a Subsidiary Pledgor under the Indenture and the Security Documents; (iv) to provide for uncertificated Notes in addition to or in place of certificated Notes ( *provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code); (v) to conform the text of the Indenture, the Notes, the Security Documents, or the Intercreditor Agreement, to any provision of the " Description of New Second Lien Notes " in the Offering Memorandum to the extent that such provision in the " Description of New Second Lien Notes " was intended to be a verbatim recitation of a provision of the Indenture, the Notes, the Security Documents, or the Intercreditor Agreement; (vi) to add a Subsidiary Pledgor with respect to the Notes or to add Collateral to secure the Notes; (vii) to add additional covenants of the Issuer for the benefit of the holders or to surrender rights and powers conferred on the Issuer; (viii) to comply with the requirements of the SEC in order to effect or maintain the qualification of the Indenture under the TIA; (ix) to make any change that does not adversely affect the rights of any holder; (x) to provide for the issuance of the Exchange Notes or Additional Notes; (xi) to release Collateral as permitted by the Indenture or the Intercreditor Agreement; or (xii) to add additional secured creditors holding Other Second-Lien Obligations so long as such obligations are not prohibited by the Indenture or the Security Documents.

15.    Defaults and Remedies

If an Event of Default occurs (other than an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer) and is continuing, the Trustee

A-1-11

or the holders of at least 30% in principal amount of the outstanding Notes of such series, in each case, by notice to the Issuer, may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable. If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer occurs, the principal of, premium, if any, and interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any holders. Under certain circumstances, the holders of a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

If an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders unless such holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense and certain other conditions are complied with. Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder may pursue any remedy with respect to the Indenture or the Notes unless (i) such holder has previously given the Trustee notice that an Event of Default is continuing, (ii) the holders of at least 30% in principal amount of the outstanding Notes of the applicable series have requested the Trustee in writing to pursue the remedy, (iii) such holders have offered the Trustee reasonable security or indemnity against any loss, liability or expense, (iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity and (v) the holders of a majority in principal amount of the outstanding Notes of the applicable series have not given the Trustee a direction inconsistent with such request within such 60-day period. Subject to certain restrictions, the holders of a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability. Prior to taking any action under the Indenture, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

16.    <u>Trustee Dealings with the Issuer</u>

Subject to certain limitations imposed by the TIA, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with and collect obligations owed to it by the Issuer or its Affiliates and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee.

17.    <u>No Recourse Against Others</u>

No director, officer, employee, incorporator or holder of any equity interests in the Issuer or of the Parent Guarantor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Issuer or the Parent Guarantor under the Notes, the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each holder of Notes by accepting a Note waives and releases all such liability.

A-1-12

18.    Authentication

This Note shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Note.

19.    Abbreviations

Customary abbreviations may be used in the name of a holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

20.    Governing Law

THIS SECURITY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

21.    CUSIP Numbers; ISINs

The Issuer has caused CUSIP numbers and ISINs to be printed on the Notes and has directed the Trustee to use CUSIP numbers and ISINs in notices of redemption as a convenience to the holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

**The Issuer will furnish to any holder of Notes upon written request and without charge to the holder a copy of the Indenture which has in it the text of this Note.**

A-1-13

### ASSIGNMENT FORM

To assign this Note, fill in the form below:

I or we assign and transfer this Note to:

_____

(Print or type assignee's name, address and zip code)

_____

(Insert assignee's soc. sec. or tax I.D. No.)

and irrevocably appoint _____ agent to transfer this Note on the books of the Issuer. The agent may substitute another to act for him.

Date: _____          Your Signature: _____

Sign exactly as your name appears on the other side of this Note.

Signature Guarantee:

Date: _____

Signature must be guaranteed by a participant in a recognized signature guaranty medallion program or other signature guarantor program reasonably acceptable to the Trustee

_____

Signature of Signature Guarantee

A-1-14

CERTIFICATE TO BE DELIVERED UPON EXCHANGE OR

REGISTRATION OF TRANSFER RESTRICTED SECURITIES

This certificate relates to $ _____ principal amount of Notes held in (check applicable space) _____ book-entry or _____ definitive form by the undersigned.

The undersigned (check one box below):

☐   has requested the Trustee by written order to deliver in exchange for its beneficial interest in the Global Note held by the Depository a Note or Notes in definitive, registered form of authorized denominations and an aggregate principal amount equal to its beneficial interest in such Global Note (or the portion thereof indicated above);

☐   has requested the Trustee by written order to exchange or register the transfer of a Note or Notes.

In connection with any transfer of any of the Notes evidenced by this certificate occurring prior to the expiration of the period referred to in Rule 144(k) under the Securities Act, the undersigned confirms that such Notes are being transferred in accordance with its terms:

CHECK ONE BOX BELOW

(1) ☐  to the Issuer; or

(2) ☐  to the Registrar for registration in the name of the holder, without transfer; or

(3) ☐  pursuant to an effective registration statement under the Securities Act of 1933; or

(4) ☐  inside the United States to a " qualified institutional buyer " (as defined in Rule 144A under the Securities Act of 1933) that purchases for its own account or for the account of a qualified institutional buyer to whom notice is given that such transfer is being made in reliance on Rule 144A, in each case pursuant to and in compliance with Rule 144A under the Securities Act of 1933; or

(5) ☐  outside the United States in an offshore transaction within the meaning of Regulation S under the Securities Act in compliance with Rule 904 under the Securities Act of 1933 and such Note shall be held immediately after the transfer through Euroclear or Clearstream until the expiration of the Restricted Period (as defined in the Indenture); or

(6) ☐  to an institutional " accredited investor " (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act of 1933) that has furnished to the Trustee a signed letter containing certain representations and agreements; or

(7) ☐  pursuant to another available exemption from registration provided by Rule 144 under the Securities Act of 1933.

Unless one of the boxes is checked, the Trustee will refuse to register any of the Notes evidenced by this certificate in the name of any Person other than the registered holder

A-1-15

thereof; *provided* , *however* , that if box (5), (6) or (7) is checked, the Issuer or the Trustee may require, prior to registering any such transfer of the Notes, such legal opinions, certifications and other information as the Issuer or the Trustee have reasonably requested to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act of 1933.

Date: _____                         Your Signature: _____

Sign exactly as your name appears on the other side of this Note.

Signature Guarantee:

Date: _____

Signature must be guaranteed by a participant in a recognized              _____
signature guaranty medallion program or other signature guarantor         Signature of Signature Guarantee
program reasonably acceptable to the Trustee

<div align="center">A-1-16</div>

TO BE COMPLETED BY PURCHASER IF (4) ABOVE IS CHECKED.

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a " qualified institutional buyer " within the meaning of Rule 144A under the Securities Act of 1933, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Date: _____

_____

NOTICE: To be executed by an executive officer

A-1-17

[TO BE ATTACHED TO GLOBAL SECURITIES]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The initial principal amount of this Global Note is $ _____. The following increases or decreases in this Global Note have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Notes Custodian |
|---|---|---|---|---|

A-1-18

OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, check the box:

Asset Sale  ☐                                      Change of Control  ☐

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, state the amount ($2,000 or any integral multiple of $1,000):

$

Date: _____                    Your Signature: _____
                                                     (Sign exactly as your name appears on the other side of this Note)

Signature Guarantee: _____
                     Signature must be guaranteed by a participant in a
                     recognized signature guaranty medallion program or other
                     signature guarantor program reasonably acceptable to the
                     Trustee

A-1-19

[FORM OF FACE OF INITIAL 2015 NOTE]

[Global Notes Legend]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), NEW YORK, NEW YORK, TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO., OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO DTC, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

[Restricted Notes Legend]

"THIS SECURITY (OR ITS PREDECESSOR) HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND, ACCORDINGLY, MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER: (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) (A "QIB"), (B) IT IS NOT A U.S. PERSON, IS NOT ACQUIRING THIS SECURITY FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT OR (C) IT IS AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a)(1), (2), (3) or (7) UNDER REGULATION D OF THE SECURITIES ACT (AN "IAI"), (2)

AGREES THAT IT WILL NOT, WITHIN THE TIME PERIOD REFERRED TO UNDER RULE 144(d)(1) (TAKING INTO ACCOUNT THE PROVISIONS OF RULE 144(d) UNDER THE SECURITIES ACT, IF APPLICABLE) UNDER THE SECURITIES ACT AS IN EFFECT ON THE DATE OF THE TRANSFER OF THIS SECURITY, RESELL OR OTHERWISE TRANSFER THIS SECURITY EXCEPT (A) TO THE ISSUER, HET OR ANY OF ITS SUBSIDIARIES, (B) TO A PERSON WHOM THE HOLDER REASONABLY BELIEVES IS A QIB OR PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QIB IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) IN COMPLIANCE WITH AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED THAT PRIOR TO SUCH TRANSFER, THE TRUSTEE IS FURNISHED WITH AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT), (D) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT, (E) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE AND PROVIDED THAT PRIOR TO SUCH TRANSFER, THE TRUSTEE IS FURNISHED WITH AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT), (F) TO AN IAI THAT, PRIOR TO SUCH TRANSFER, FURNISHES THE TRUSTEE A SIGNED LETTER CONTAINING CERTAIN REPRESENTATIONS AND AGREEMENTS RELATING TO THE TRANSFER OF THIS SECURITY (THE FORM OF WHICH CAN BE OBTAINED FROM THE TRUSTEE) AND, IF SUCH TRANSFER IS IN RESPECT OF AN AGGREGATE PRINCIPAL AMOUNT OF NEW SECOND LIEN NOTES LESS THAN $250,000, AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER AND THE TRUSTEE THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT OR (G) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND, IN EACH CASE, IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS, AND (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS SECURITY OR AN INTEREST HEREIN IS TRANSFERRED (OTHER THAN A TRANSFER PURSUANT TO CLAUSE (2)(D) OR 2(E) ABOVE) A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. IN

A-2-2

CONNECTION WITH ANY TRANSFER OF THIS SECURITY OR ANY INTEREST HEREIN WITHIN THE TIME PERIOD REFERRED TO ABOVE, THE HOLDER MUST CHECK THE APPROPRIATE BOX SET FORTH ON THE REVERSE HEREOF RELATING TO THE MANNER OF SUCH TRANSFER AND SUBMIT THIS CERTIFICATE TO THE TRUSTEE. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANINGS GIVEN TO THEM BY RULE 902 OF REGULATION S UNDER THE SECURITIES ACT."

Each Definitive Note shall bear the following additional legend:

"IN CONNECTION WITH ANY TRANSFER, THE HOLDER WILL DELIVER TO THE REGISTRAR AND TRANSFER AGENT SUCH CERTIFICATES AND OTHER INFORMATION AS SUCH TRANSFER AGENT MAY REASONABLY REQUIRE TO CONFIRM THAT THE TRANSFER COMPLIES WITH THE FOREGOING RESTRICTIONS."

"THE TERMS OF THIS SECURITY ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED DECEMBER 24, 2008, BY AND AMONG BANK OF AMERICA, N.A., AS FIRST LIEN AGENT, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE AND THE OTHER PARTIES THERETO FROM TIME TO TIME."

"THIS NOTE IS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE INTERNAL REVENUE CODE. A HOLDER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY FOR SUCH NOTES BY SUBMITTING A REQUEST FOR SUCH INFORMATION TO THE BORROWER AT THE FOLLOWING ADDRESS: HARRAH'S OPERATING COMPANY, INC., ONE CAESAR'S PALACE DRIVE, LAS VEGAS, NEVADA, 89101-8969, ATTENTION: GENERAL COUNSEL."

A-2-3

[FORM OF INITIAL 2015 NOTE]

No.                                                                                                    $ _____

10.00% Second-Priority Senior Secured Note due 2015

144A CUSIP No. 413627 BA7
144A ISIN No. US413627BA70

REG S CUSIP No. U24658 AL7
REG S ISIN No. USU24658AL78

HARRAH'S OPERATING COMPANY, INC., a Delaware corporation, promises to pay to Cede & Co., or registered assigns, the principal sum of [          ] Dollars on December 15, 2015.

Interest Payment Dates: June 15 and December 15

Record Dates: June 1 and December 1

Additional provisions of this Note are set forth on the other side of this Note.

A-2-4

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed.

HARRAH'S OPERATING COMPANY, INC.

By: _____
Name:
Title:

Dated:

A-2-5

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

U.S. BANK NATIONAL ASSOCIATION as Trustee,
   certifies that this is one of the Notes referred to in the
   Indenture.

By: _____
     Authorized Signatory

*/    If the Note is to be issued in global form, add the Global Notes Legend and the attachment from <u>Exhibit A</u> captioned "TO BE
      ATTACHED TO GLOBAL SECURITIES - SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY."

<div align="center">A-2-6</div>

[FORM OF REVERSE SIDE OF INITIAL 2015 NOTE]

10.00% Second-Priority Senior Secured Note Due 2015

1. <u>Interest</u>

HARRAH'S OPERATING COMPANY, INC., a Delaware corporation (such corporation, and its successors and assigns under the Indenture hereinafter referred to, being herein called the " <u>Issuer</u> "), promises to pay interest on the principal amount of this 2015 Note at the rate per annum shown above. The Issuer shall pay interest semiannually on June 15 and December 15 of each year (each an " <u>Interest Payment Date</u> "), commencing June 15, 2009. Interest on the Notes shall accrue from the most recent date to which interest has been paid or duly provided for or, if no interest has been paid or duly provided for, from December 24, 2008, until the principal hereof is due. Interest shall be computed on the basis of a 360-day year of twelve 30-day months. The Issuer shall pay interest on overdue principal at the rate borne by the Notes, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

2. <u>Method of Payment</u>

The Issuer shall pay interest on the Notes (except defaulted interest) to the Persons who are registered holders at the close of business on June 1 or December 1 (each a " <u>Record Date</u> ") next preceding the interest payment date even if Notes are canceled after the record date and on or before the interest payment date (whether or not a Business Day). Holders must surrender Notes to the Paying Agent to collect principal payments. The Issuer shall pay principal, premium, if any, and interest in money of the United States of America that at the time of payment is legal tender for payment of public and private debts. Payments in respect of the Notes represented by a Global Note (including principal, premium, if any, and interest) shall be made by wire transfer of immediately available funds to the accounts specified by The Depository Trust Issuer or any successor depositary. The Issuer shall make all payments in respect of a certificated Note (including principal, premium, if any, and interest) at the office of the Paying Agent, except that, at the option of the Issuer, payment of interest may be made by mailing a check to the registered address of each holder thereof; *provided, however,* that payments on the Notes may also be made, in the case of a holder of at least $1,000,000 aggregate principal amount of Notes, by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such holder elects payment by wire transfer by giving written notice to the Trustee or Paying Agent to such effect designating such account no later than 30 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion).

3. <u>Paying Agent and Registrar</u>

Initially, U.S. Bank National Association (the " <u>Trustee</u> "), will act as Paying Agent and Registrar. The Issuer may appoint and change any Paying Agent or Registrar without notice. The Issuer or any of its domestically incorporated Wholly Owned Subsidiaries may act as Paying Agent or Registrar.

A-2-7

4. <u>Indenture</u>

The Issuer issued the Notes under an Indenture dated as of December 24, 2008 (the " <u>Indenture</u> "), among the Issuer, the Parent Guarantor and the Trustee. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa 77bbbb) as in effect on the date of the Indenture (the " <u>TIA</u> "). Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture. The Notes are subject to all terms and provisions of the Indenture, and the holders (as defined in the Indenture) are referred to the Indenture and the TIA for a statement of such terms and provisions

The Notes are second-priority senior secured obligations of the Issuer. This Note is one of the Initial Notes referred to in the Indenture. The Notes include the Initial Notes, any Additional Notes and any Exchange Notes issued in exchange for the Initial Notes or any Additional Notes pursuant to the Indenture. The Initial Notes, any Additional Notes and any Exchange Notes are treated as a single class of securities under the Indenture. The Indenture imposes certain limitations on the ability of the Issuer and its Restricted Subsidiaries to, among other things, make certain Investments and other Restricted Payments, pay dividends and other distributions, Incur Indebtedness, enter into consensual restrictions upon the payment of certain dividends and distributions by such Restricted Subsidiaries, issue or sell shares of capital stock of the Issuer and such Restricted Subsidiaries, enter into or permit certain transactions with Affiliates, create or Incur Liens and make Asset Sales. The Indenture also imposes limitations on the ability of the Issuer, each Subsidiary Pledgor and the Parent Guarantor to consolidate or merge with or into any other Person or convey, transfer or lease all or substantially all of its property.

To guarantee the due and punctual payment of the principal and interest on the Notes and all other amounts payable by the Issuer under the Indenture and the Notes when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Notes and the Indenture, the Parent Guarantor has unconditionally guaranteed the Guaranteed Obligations on a senior unsecured basis pursuant to the terms of the Indenture.

5. <u>Optional Redemption</u>

On or after December 15, 2012, the Issuer may redeem the 2015 Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at the following redemption prices (expressed as a percentage of principal amount), *plus* accrued and unpaid interest and additional interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the 12-month period commencing on December 15 of the years set forth below:

| Period | Redemption Price |
|---|---|
| 2012 | 105.000% |
| 2013 | 102.500% |
| 2014 and thereafter | 100.000% |

A-2-8

In addition, prior to December 15, 2012, the Issuer may redeem the 2015 Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at a redemption price equal to 100% of the principal amount of the 2015 Notes redeemed *plus* the Applicable Premium as of, and accrued and unpaid interest and additional interest, if any, to, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

Notwithstanding the foregoing, at any time and from time to time on or prior to December 15, 2011, the Issuer may redeem in the aggregate up to 35% of the original aggregate principal amount of the 2015 Notes (calculated after giving effect to any issuance of additional 2015 Notes) with the net cash proceeds of one or more Equity Offerings (1) by the Issuer or (2) by any direct or indirect parent of the Issuer to the extent the net cash proceeds thereof are contributed to the common equity capital of the Issuer or used to purchase Capital Stock (other than Disqualified Stock) of the Issuer from it, at a redemption price (expressed as a percentage of principal amount thereof) of 110.00%, *plus* accrued and unpaid interest and additional interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date); *provided, however,* that at least 50% of the original aggregate principal amount of the 2015 Notes (calculated after giving effect to any issuance of additional 2015 Notes) must remain outstanding after each such redemption; *provided, further,* that such redemption shall occur within 90 days after the date on which any such Equity Offering is consummated upon not less than 30 nor more than 60 days' notice mailed to each holder of 2015 Notes being redeemed and otherwise in accordance with the procedures set forth in the Indenture.

6. Mandatory Redemption

a. Except as set forth below, the Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the 2018 Notes.

b. If the 2015 Notes would otherwise constitute "applicable high yield discount obligations" within the meaning of 163(i)(1) of the Code, at the end of each accrual period ending after the fifth anniversary of the 2015 Notes' issuance (each, any " AHYDO redemption date "), the Issuer will be required to redeem for cash a portion of each 2018 Note then outstanding equal to the "Mandatory Principal Redemption Amount" (such redemption a " Mandatory Principal Redemption "). The redemption price for the portion of each 2018 Note redeemed pursuant to a Mandatory Principal Redemption will be 100% of the principal amount of such portion *plus* any accrued interest thereon on the date of redemption. The "Mandatory Principal Redemption Amount" means the portion of a 2015 Note that must be required to be redeemed to prevent such 2015 Note from being treated as an "applicable high yield discount obligation" within the meaning of Section 163(i)(1) of the Code. No partial redemption or repurchase of the 2015 Notes prior to the AHYDO redemption date pursuant to any other provision of the indenture will alter the Issuer's obligation to make the Mandatory Principal Redemption with respect to any 2015 Notes that remain outstanding on the AHYDO redemption date.

A-2-9

7. <u>Notice of Redemption</u>

Notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the redemption date to each holder of Notes to be redeemed at his, her or its registered address. Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1,000. If money sufficient to pay the redemption price of and accrued and unpaid interest on all Notes (or portions thereof) to be redeemed on the redemption date is deposited with a Paying Agent on or before the redemption date and certain other conditions are satisfied, on and after such date, interest ceases to accrue on such Notes (or such portions thereof) called for redemption.

8. <u>Repurchase of Notes at the Option of the holders upon Change of Control and Asset Sales</u>

Upon the occurrence of a Change of Control, each holder shall have the right, subject to certain conditions specified in the Indenture, to cause the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant record date to receive interest due on the relevant interest payment date), as provided in, and subject to the terms of, the Indenture.

In accordance with Section 4.06 of the Indenture, the Issuer will be required to offer to purchase Notes upon the occurrence of certain events.

9. <u>Ranking and Collateral</u>

These Notes are secured by a second-priority security interest in the Collateral pursuant to certain Security Documents. The Second Priority Liens upon any and all Collateral are, to the extent and in the manner provided in the Intercreditor Agreement, subordinate in ranking to all present and future First Priority Liens and will be of equal ranking with all present and future Liens securing Other Second-Lien Obligations as set forth in the Intercreditor Agreement.

10. <u>Denominations; Transfer; Exchange</u>

The Notes are in registered form, without coupons, in denominations of $2,000 and any integral multiple of $1,000. A holder shall register the transfer of or exchange of Notes in accordance with the Indenture. Upon any registration of transfer or exchange, the Registrar and the Trustee may require a holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes required by law or permitted by the Indenture. The Registrar need not register the transfer of or exchange any Notes selected for redemption (except, in the case of a Note to be redeemed in part, the portion of the Note not to be redeemed) or to transfer or exchange any Notes for a period of 15 days prior to a selection of Notes to be redeemed.

<div align="center">A-2-10</div>

11. Persons Deemed Owners

The registered holder of this Note shall be treated as the owner of it for all purposes.

12. Unclaimed Money

If money for the payment of principal or interest remains unclaimed for two years, the Trustee and a Paying Agent shall pay the money back to the Issuer at their written request unless an abandoned property law designates another Person. After any such payment, the holders entitled to the money must look to the Issuer for payment as general creditors and the Trustee and a Paying Agent shall have no further liability with respect to such monies.

13. Discharge and Defeasance

Subject to certain conditions, the Issuer at any time may terminate some of or all its obligations under the Notes and the Indenture if the Issuer deposits with the Trustee money or U.S. Government Obligations for the payment of principal and interest on the Notes to redemption or maturity, as the case may be.

14. Amendment; Waiver

Subject to certain exceptions set forth in the Indenture, (i) the Indenture or the Notes may be amended with the written consent of the holders of at least a majority in aggregate principal amount of the outstanding Notes of such series and (ii) any past default or compliance with any provisions may be waived with the written consent of the holders of at least a majority in principal amount of the outstanding Notes. Subject to certain exceptions set forth in the Indenture, without the consent of any holder, the Issuer and the Trustee may amend the Indenture, the Security Documents, the Intercreditor Agreement or the Notes (i) to cure any ambiguity, omission, defect or inconsistency; (ii) to provide for the assumption by a Successor Issuer of the obligations of the Issuer under the Indenture and the Notes; (iii) to provide for the assumption by a Successor Subsidiary Pledgor of the obligations of a Subsidiary Pledgor under the Indenture and the Security Documents; (iv) to provide for uncertificated Notes in addition to or in place of certificated Notes ( *provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code); (v) to conform the text of the Indenture, the Notes or the Intercreditor Agreement, to any provision of the " Description of New Second Lien Notes " in the Offering Memorandum to the extent that such provision in the " Description of New Second Lien Notes " was intended to be a verbatim recitation of a provision of the Indenture, the Notes, the Security Documents or the Intercreditor Agreement; (vi) to add a Subsidiary Pledgor with respect to the Notes or to add Collateral to secure the Notes; (vii) to add additional covenants of the Issuer for the benefit of the holders or to surrender rights and powers conferred on the Issuer; (viii) to comply with the requirements of the SEC in order to effect or maintain the qualification of the Indenture under the TIA; (ix) to make any change that does not adversely affect the rights of any holder; or (x) to provide for the issuance of the Exchange Notes or Additional Notes; (xi) to release Collateral as permitted by the Indenture or the Intercreditor Agreement; or (xii) to add additional secured creditors holding Other Second-Lien Obligations so long as such obligations are not prohibited by the Indenture or the Security Documents

A-2-11

15. Defaults and Remedies

If an Event of Default occurs (other than an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer) and is continuing, the Trustee or the holders of at least 30% in principal amount of the outstanding Notes of such series, in each case, by notice to the Issuer, may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable. If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer occurs, the principal of, premium, if any, and interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any holders. Under certain circumstances, the holders of a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

If an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders unless such holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense and certain other conditions are complied with. Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder may pursue any remedy with respect to the Indenture or the Notes unless (i) such holder has previously given the Trustee notice that an Event of Default is continuing, (ii) the holders of at least 30% in principal amount of the outstanding Notes of the applicable series have requested the Trustee in writing to pursue the remedy, (iii) such holders have offered the Trustee reasonable security or indemnity against any loss, liability or expense, (iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity and (v) the holders of a majority in principal amount of the outstanding Notes of the applicable series have not given the Trustee a direction inconsistent with such request within such 60-day period. Subject to certain restrictions, the holders of a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability. Prior to taking any action under the Indenture, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

16. Trustee Dealings with the Issuer

Subject to certain limitations imposed by the TIA, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with and collect obligations owed to it by the Issuer or its Affiliates and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee.

A-2-12

17. No Recourse Against Others

No director, officer, employee, incorporator or holder of any equity interests in the Issuer or of the Parent Guarantor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Issuer or the Parent Guarantor under the Notes, the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each holder of Notes by accepting a Note waives and releases all such liability.

18. Authentication

This Note shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Note.

19. Abbreviations

Customary abbreviations may be used in the name of a holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

20. Governing Law

THIS SECURITY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

21. CUSIP Numbers; ISINs

The Issuer has caused CUSIP numbers and ISINs to be printed on the Notes and has directed the Trustee to use CUSIP numbers and ISINs in notices of redemption as a convenience to the holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

**The Issuer will furnish to any holder of Notes upon written request and without charge to the holder a copy of the Indenture which has in it the text of this Note.**

A-2-13

ASSIGNMENT FORM

To assign this Note, fill in the form below:

I or we assign and transfer this Note to:

_____

(Print or type assignee's name, address and zip code)

_____

(Insert assignee's soc. sec. or tax I.D. No.)

and irrevocably appoint _____ agent to transfer this Note on the books of the Issuer. The agent may substitute another to act for him.

Date: _____    Your Signature: _____

_____

Sign exactly as your name appears on the other side of this Note.

Signature Guarantee:

Date: _____    _____

Signature must be guaranteed by a          Signature of Signature Guarantee
participant in a recognized signature
guaranty medallion program or other
signature guarantor program reasonably
acceptable to the Trustee

A-2-14

CERTIFICATE TO BE DELIVERED UPON EXCHANGE OR

REGISTRATION OF TRANSFER RESTRICTED SECURITIES

This certificate relates to $ _____principal amount of Notes held in (check applicable space) _____book-entry or _____definitive form by the undersigned.

The undersigned (check one box below):

☐   has requested the Trustee by written order to deliver in exchange for its beneficial interest in the Global Note held by the Depository a Note or Notes in definitive, registered form of authorized denominations and an aggregate principal amount equal to its beneficial interest in such Global Note (or the portion thereof indicated above);

☐   has requested the Trustee by written order to exchange or register the transfer of a Note or Notes.

In connection with any transfer of any of the Notes evidenced by this certificate occurring prior to the expiration of the period referred to in Rule 144(k) under the Securities Act, the undersigned confirms that such Notes are being transferred in accordance with its terms:

CHECK ONE BOX BELOW

(1)    ☐    to the Issuer; or

(2)    ☐    to the Registrar for registration in the name of the holder, without transfer; or

(3)    ☐    pursuant to an effective registration statement under the Securities Act of 1933; or

(4)    ☐    inside the United States to a " qualified institutional buyer " (as defined in Rule 144A under the Securities Act of 1933) that purchases for its own account or for the account of a qualified institutional buyer to whom notice is given that such transfer is being made in reliance on Rule 144A, in each case pursuant to and in compliance with Rule 144A under the Securities Act of 1933; or

(5)    ☐    outside the United States in an offshore transaction within the meaning of Regulation S under the Securities Act in compliance with Rule 904 under the Securities Act of 1933 and such Note shall be held immediately after the transfer through Euroclear or Clearstream until the expiration of the Restricted Period (as defined in the Indenture); or

(6)    ☐    to an institutional " accredited investor " (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act of 1933) that has furnished to the Trustee a signed letter containing certain representations and agreements; or

(7)    ☐    pursuant to another available exemption from registration provided by Rule 144 under the Securities Act of 1933.

A-2-15

Unless one of the boxes is checked, the Trustee will refuse to register any of the Notes evidenced by this certificate in the name of any Person other than the registered holder thereof; *provided, however,* that if box (5), (6) or (7) is checked, the Issuer or the Trustee may require, prior to registering any such transfer of the Notes, such legal opinions, certifications and other information as the Issuer or the Trustee have reasonably requested to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act of 1933.

Date: _____     Your Signature: _____

_____

Sign exactly as your name appears on the other side of this Note.

Signature Guarantee:

Date: _____     _____

Signature must be guaranteed by a participant     Signature of Signature Guarantee
in a recognized signature guaranty medallion
program or other signature guarantor program
reasonably acceptable to the Trustee

A-2-16

TO BE COMPLETED BY PURCHASER IF (4) ABOVE IS CHECKED.

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a " qualified institutional buyer " within the meaning of Rule 144A under the Securities Act of 1933, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Date: _____

_____
NOTICE: To be executed by an executive officer

A-2-17

[TO BE ATTACHED TO GLOBAL SECURITIES]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The initial principal amount of this Global Note is $ _____. The following increases or decreases in this Global Note have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Notes Custodian |
|---|---|---|---|---|

A-2-18

OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, check the box:

Asset Sale ☐                    Change of Control ☐

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, state the amount ($2,000 or any integral multiple of $1,000):

$

Date: _____        Your Signature: _____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee: _____

Signature must be guaranteed by a participant in a recognized signature guaranty medallion program or other signature guarantor program reasonably acceptable to the Trustee

A-2-19

[FORM OF FACE OF 2018 EXCHANGE NOTE]
[Global Notes Legend]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), NEW YORK, NEW YORK, TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO., OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO DTC, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

THE TERMS OF THIS SECURITY ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED DECEMBER 24, 2008, BY AND AMONG BANK OF AMERICA, N.A., AS FIRST LIEN AGENT AND U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE AND THE OTHER PARTIES THERETO FROM TIME TO TIME.

B-1-1

No.                                                                                              $ _____

<div align="center">10.00% Second-Priority Senior Secured Note due 2018</div>

CUSIP No. _____
ISIN No. _____

HARRAH'S OPERATING COMPANY, INC., a Delaware corporation, promises to pay to Cede & Co., or registered assigns, the principal sum of Dollars on December 15, 2018.

Interest Payment Dates: June 15 and December 15

Record Dates: June 1 and December 1

Additional provisions of this Note are set forth on the other side of this Note.

<div align="center">B-1-2</div>

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed.

HARRAH'S OPERATING COMPANY, INC.

By: _____
Name:
Title:

Dated:

B-1-3

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

U.S. BANK NATIONAL ASSOCIATION,
    as Trustee, certifies that this is one of the Notes
    referred to in the Indenture.


By: _____
    Authorized Signatory
_____

\*/     If the Note is to be issued in global form, add the Global Notes Legend and the attachment from <u>Exhibit A</u> captioned "TO BE ATTACHED TO GLOBAL SECURITIES - SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY."

<div align="center">B-1-4</div>

[FORM OF REVERSE SIDE OF 2018 EXCHANGE NOTE]

10.00% Second-Priority Senior Secured Note due 2018

1. <u>Interest</u>

Harrah's Operating Company, Inc., a Delaware corporation (such corporation, and its successors and assigns under the indenture hereinafter referred to, being herein called the " <u>Issuer</u> "), promises to pay interest on the principal amount of this Note at the rate per annum shown above. The Issuer shall pay interest semiannually on June 15 and December 15 of each year (each an " <u>Interest Payment Date</u> "), commencing June 15, 2009. Interest on the Notes shall accrue from the most recent date to which interest has been paid or duly provided for or, if no interest has been paid or duly provided for, from December 24, 2008 until the principal hereof is due. Interest shall be computed on the basis of a 360-day year of twelve 30-day months. The Issuer shall pay interest on overdue principal at the rate borne by the Notes, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

2. <u>Method of Payment</u>

The Issuer shall pay interest on the Notes (except defaulted interest) to the Persons who are registered holders at the close of business on June 1 or December 1 (each a " <u>Record Date</u> ") next preceding the interest payment date even if Notes are canceled after the record date and on or before the interest payment date (whether or not a Business Day). Holders must surrender Notes to the Paying Agent to collect principal payments. The Issuer shall pay principal, premium, if any, and interest in money of the United States of America that at the time of payment is legal tender for payment of public and private debts. Payments in respect of the Notes represented by a Global Note (including principal, premium, if any, and interest) shall be made by wire transfer of immediately available funds to the accounts specified by The Depository Trust Issuer or any successor depositary. The Issuer shall make all payments in respect of a certificated Note (including principal, premium, if any, and interest), at the office of the Paying Agent, except that, at the option of the Issuer, payment of interest may be made by mailing a check to the registered address of each holder thereof; *provided, however,* that payments on the Notes may also be made, in the case of a holder of at least $1,000,000 aggregate principal amount of Notes, by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such holder elects payment by wire transfer by giving written notice to the Trustee or Paying Agent to such effect designating such account no later than 30 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion).

3. <u>Paying Agent and Registrar</u>

Initially, U.S. Bank National Association (the " <u>Trustee</u> "), will act as Paying Agent and Registrar. The Issuer may appoint and change any Paying Agent or Registrar without notice. The Issuer or any of its domestically incorporated Wholly Owned Subsidiaries may act as Paying Agent or Registrar.

B-1-5

4. <u>Indenture</u>

       The Issuer issued the Notes under an Indenture dated as of December 24, 2008 (the " <u>Indenture</u> "), among the Issuer, the Parent Guarantor and the Trustee. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa 77bbbb) as in effect on the date of the Indenture (the " <u>TIA</u> "). Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture. The Notes are subject to all terms and provisions of the Indenture, and the holders (as defined in the Indenture) are referred to the Indenture and the TIA for a statement of such terms and provisions.

       The Notes are second-priority senior secured obligations of the Issuer. This Note is one of the Exchange Notes referred to in the Indenture. The Notes include the Initial Notes, any Additional Notes and any Exchange Notes issued in exchange for the Initial Notes or any Additional Notes pursuant to the Indenture. The Initial Notes, any Additional Notes and any Exchange Notes are treated as a single class of securities under the Indenture. The Indenture imposes certain limitations on the ability of the Issuer and its Restricted Subsidiaries to, among other things, make certain Investments and other Restricted Payments, pay dividends and other distributions, Incur Indebtedness, enter into consensual restrictions upon the payment of certain dividends and distributions by such Restricted Subsidiaries, issue or sell shares of capital stock of the Issuer and such Restricted Subsidiaries, enter into or permit certain transactions with Affiliates, create or Incur Liens and make Asset Sales. The Indenture also imposes limitations on the ability of the Issuer, each Subsidiary Pledgor and the Parent Guarantor to consolidate or merge with or into any other Person or convey, transfer or lease all or substantially all of its property.

       To guarantee the due and punctual payment of the principal and interest on the Notes and all other amounts payable by the Issuer under the Indenture and the Notes when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Notes and the Indenture, the Parent Guarantor has unconditionally guaranteed the Guaranteed Obligations on a second-priority senior unsecured basis pursuant to the terms of the Indenture.

5. <u>Optional Redemption</u>

       On or after December 15, 2013, the Issuer may redeem the 2018 Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at the following redemption prices (expressed as a percentage of principal amount), *plus* accrued and unpaid interest and additional interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the 12-month period commencing on December 15 of the years set forth below:

| Period | Redemption Price |
|---|---|
| 2013 | 105.000% |
| 2014 | 103.333% |
| 2015 | 101.667% |
| 2016 and thereafter | 100.000% |

<div align="center">B-1-6</div>

In addition, prior to December 15, 2013, the Issuer may redeem the 2018 Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at a redemption price equal to 100% of the principal amount of the 2018 Notes redeemed *plus* the Applicable Premium as of, and accrued and unpaid interest and additional interest, if any, to, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

Notwithstanding the foregoing, at any time and from time to time on or prior to December 15, 2011, the Issuer may redeem in the aggregate up to 35% of the original aggregate principal amount of the 2018 Notes (calculated after giving effect to any issuance of additional 2018 Notes) with the net cash proceeds of one or more Equity Offerings (1) by the Issuer or (2) by any direct or indirect parent of the Issuer to the extent the net cash proceeds thereof are contributed to the common equity capital of the Issuer or used to purchase Capital Stock (other than Disqualified Stock) of the Issuer from it, at a redemption price (expressed as a percentage of principal amount thereof) of 110.00%, *plus* accrued and unpaid interest and additional interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date); *provided, however,* that at least 50% of the original aggregate principal amount of the 2018 Notes (calculated after giving effect to any issuance of additional 2018 Notes) must remain outstanding after each such redemption; *provided, further,* that such redemption shall occur within 90 days after the date on which any such Equity Offering is consummated upon not less than 30 nor more than 60 days' notice mailed to each holder of 2018 Notes being redeemed and otherwise in accordance with the procedures set forth in the Indenture.

6. <u>Mandatory Redemption</u>

a. Except as set forth below, the Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the 2018 Notes.

b. If the 2018 Notes would otherwise constitute "applicable high yield discount obligations" within the meaning of 163(i)(1) of the Code, at the end of each accrual period ending after the fifth anniversary of the 2018 Notes' issuance (each, any " <u>AHYDO redemption date</u> "), the Issuer will be required to redeem for cash a portion of each 2018 Note then outstanding equal to the "Mandatory Principal Redemption Amount" (such redemption a " <u>Mandatory Principal Redemption</u> "). The redemption price for the portion of each 2018 Note redeemed pursuant to a Mandatory Principal Redemption will be 100% of the principal amount of such portion *plus* any accrued interest thereon on the date of redemption. The "Mandatory Principal Redemption Amount" means the portion of a 2018 Note that must be required to be redeemed to prevent such 2018 Note from being treated as an "applicable high yield discount obligation" within the meaning of Section 163(i)(1) of the Code. No partial redemption or repurchase of the 2018 Notes prior to the AHYDO redemption date pursuant to any other provision of the indenture will alter the Issuer's obligation to make the Mandatory Principal Redemption with respect to any 2018 Notes that remain outstanding on the AHYDO redemption date.

B-1-7

7. <u>Notice of Redemption</u>

Notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the redemption date to each holder of Notes to be redeemed at his, her or its registered address. Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1,000. If money sufficient to pay the redemption price of and accrued and unpaid interest on all Notes (or portions thereof) to be redeemed on the redemption date is deposited with a Paying Agent on or before the redemption date and certain other conditions are satisfied, on and after such date interest ceases to accrue on such Notes (or such portions thereof) called for redemption.

8. <u>Repurchase of Notes at the Option of the holders upon Change of Control and Asset Sales</u>

Upon the occurrence of a Change of Control, each holder shall have the right, subject to certain conditions specified in the Indenture, to cause the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant record date to receive interest due on the relevant interest payment date), as provided in, and subject to the terms of, the Indenture.

In accordance with Section 4.06 of the Indenture, the Issuer will be required to offer to purchase Notes upon the occurrence of certain events.

9. <u>Ranking and Collateral</u>

These Notes are secured by a second-priority security interest in the Collateral pursuant to certain Security Documents. The Second Priority Liens upon any and all Collateral are, to the extent and in the manner provided in the Intercreditor Agreement, subordinate in ranking to all present and future First Priority Liens and will be of equal ranking with all present and future Liens securing Other Second-Lien Obligations as set forth in the Intercreditor Agreement.

10. <u>Denominations; Transfer; Exchange</u>

The Notes are in registered form, without coupons, in denominations of $2,000 and any integral multiple of $1,000. A holder shall register the transfer of or exchange of Notes in accordance with the Indenture. Upon any registration of transfer or exchange, the Registrar and the Trustee may require a holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes required by law or permitted by the Indenture. The Registrar need not register the transfer of or exchange any Notes selected for redemption (except, in the case of a Note to be redeemed in part, the portion of the Note not to be redeemed) or to transfer or exchange any Notes for a period of 15 days prior to a selection of Notes to be redeemed.

11. <u>Persons Deemed Owners</u>

The registered holder of this Note shall be treated as the owner of it for all purposes.

<div align="center">B-1-8</div>

12. Unclaimed Money

If money for the payment of principal or interest remains unclaimed for two years, the Trustee and a Paying Agent shall pay the money back to the Issuer at their written request unless an abandoned property law designates another Person. After any such payment, the holders entitled to the money must look to the Issuer for payment as general creditors and the Trustee and a Paying Agent shall have no further liability with respect to such monies.

13. Discharge and Defeasance

Subject to certain conditions, the Issuer at any time may terminate some of or all its obligations under the Notes and the Indenture if the Issuer deposits with the Trustee money or U.S. Government Obligations for the payment of principal and interest on the Notes to redemption or maturity, as the case may be.

14. Amendment; Waiver

Subject to certain exceptions set forth in the Indenture, (i) the Indenture or the Notes may be amended with the written consent of the holders of at least a majority in aggregate principal amount of the outstanding Notes of each series and (ii) any past default or compliance with any provisions may be waived with the written consent of the holders of at least a majority in principal amount of the outstanding Notes. Subject to certain exceptions set forth in the Indenture, without the consent of any holder, the Issuer and the Trustee may amend the Indenture, the Security Documents, the Intercreditor Agreement or the Notes (i) to cure any ambiguity, omission, defect or inconsistency; (ii) to provide for the assumption by a Successor Issuer of the obligations of the Issuer under the Indenture and the Notes; (iii) to provide for the assumption by a Successor Subsidiary Pledgor of the obligations of a Subsidiary Pledgor under the Indenture and the Security Documents; (iv) to provide for uncertificated Notes in addition to or in place of certificated Notes ( *provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code); (v) to conform the text of the Indenture, the Notes, the Security Documents or the Intercreditor Agreement, to any provision of the " Description of New Second Lien Notes " in the Offering Memorandum to the extent that such provision in the " Description of New Second Lien Notes " was intended to be a verbatim recitation of a provision of the Indenture, the Notes, the Security Documents or the Intercreditor Agreement; (vi) to add a Subsidiary Pledgor with respect to the Notes or to add Collateral to secure the Notes; (vii) to add additional covenants of the Issuer for the benefit of the holders or to surrender rights and powers conferred on the Issuer; (viii) to comply with the requirements of the SEC in order to effect or maintain the qualification of the Indenture under the TIA; (ix) to make any change that does not adversely affect the rights of any holder; (x) to provide for the issuance of the Exchange Notes or Additional Notes; (xi) to release Collateral as permitted by the Indenture or the Intercreditor Agreement; or (xi) to add additional secured creditors holding Other Second-Lien Obligations so long as such obligations are not prohibited by the Indenture or the Security Documents.

15. Defaults and Remedies

If an Event of Default occurs (other than an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer) and is continuing, the Trustee

B-1-9

or the holders of at least 30% in principal amount of the outstanding Notes, in each case, by notice to the Issuer, may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable. If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer occurs, the principal of, premium, if any, and interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any holders. Under certain circumstances, the holders of a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

If an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders unless such holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense and certain other conditions are complied with. Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder may pursue any remedy with respect to the Indenture or the Notes unless (i) such holder has previously given the Trustee notice that an Event of Default is continuing, (ii) the holders of at least 30% in principal amount of the outstanding Notes of the applicable series have requested the Trustee in writing to pursue the remedy, (iii) such holders have offered the Trustee reasonable security or indemnity against any loss, liability or expense, (iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity and (v) the holders of a majority in principal amount of the outstanding Notes of the applicable series have not given the Trustee a direction inconsistent with such request within such 60-day period. Subject to certain restrictions, the holders of a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability. Prior to taking any action under the Indenture, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

16. Trustee Dealings with the Issuer

Subject to certain limitations imposed by the TIA, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with and collect obligations owed to it by the Issuer or its Affiliates and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee.

17. No Recourse Against Others

No director, officer, employee, incorporator or holder of any equity interests in the Issuer or of any Subsidiary Pledgor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Issuer or the Subsidiary Pledgors under the Notes, the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each holder of Notes by accepting a Note waives and releases all such liability.

B-1-10

18. <u>Authentication</u>

This Note shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Note.

19. <u>Abbreviations</u>

Customary abbreviations may be used in the name of a holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

20. <u>Governing Law</u>

THIS SECURITY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

21. <u>CUSIP Numbers; ISINs</u>

The Issuer has caused CUSIP numbers and ISINs to be printed on the Notes and has directed the Trustee to use CUSIP numbers and ISINs in notices of redemption as a convenience to the holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

**The Issuer will furnish to any holder of Notes upon written request and without charge to the holder a copy of the Indenture which has in it the text of this Note.**

B-1-11

ASSIGNMENT FORM

To assign this Note, fill in the form below:

I or we assign and transfer this Note to:

_____

(Print or type assignee's name, address and zip code)

_____

(Insert assignee's soc. sec. or tax I.D. No.)

and irrevocably appoint _____ agent to transfer this Note on the books of the Issuer. The agent may substitute another to act for him.

Date: _____          Your Signature: _____

Sign exactly as your name appears on the other side of this Note.

Signature Guarantee:

Date: _____

Signature must be guaranteed by a participant in a recognized          _____
signature guaranty medallion program or other signature guarantor          Signature of Signature Guarantee
program reasonably acceptable to the Trustee

B-1-12

OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, check the box:

Asset Sale    ☐                    Change of Control    ☐

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, state the amount ($2,000 or any integral multiple of $1,000):

$

Date: _____            Your Signature _____
                                                (Sign exactly as your name appears on the other side of this Note)

Signature Guarantee: _____
                            Signature must be guaranteed by a participant in a recognized signature guaranty medallion program or other signature guarantor program reasonably acceptable to the Trustee

B-1-13

[TO BE ATTACHED TO GLOBAL SECURITIES]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The initial principal amount of this Global Note is $ _____. The following increases or decreases in this Global Note have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Notes Custodian |
|---|---|---|---|---|

B-1-14

[FORM OF FACE OF 2015 EXCHANGE NOTE]
[Global Notes Legend]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), NEW YORK, NEW YORK, TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO., OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO DTC, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

THE TERMS OF THIS SECURITY ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED DECEMBER 24, 2008, BY AND AMONG BANK OF AMERICA, N.A., AS FIRST LIEN AGENT AND U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE AND THE OTHER PARTIES THERETO FROM TIME TO TIME.

B-2-1

No.                                                                                $ _____

<center>10.00% Second-Priority Senior Secured Note due 2015</center>

<div align="right">CUSIP No. _____<br>ISIN No. _____</div>

HARRAH'S OPERATING COMPANY, INC., a Delaware corporation, promises to pay to Cede & Co., or registered assigns, the principal sum of                 Dollars on December 15, 2015.

Interest Payment Dates: June 15 and December 15

Record Dates: June 1 and December 1

Additional provisions of this Note are set forth on the other side of this Note.

<center>B-2-2</center>

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed.

HARRAH'S OPERATING COMPANY, INC.

By: _____

Name:

Title:

Dated:

B-2-3

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

U.S. BANK NATIONAL ASSOCIATION,
    as Trustee, certifies that this is one of the Notes
    referred to in the Indenture.


By: _____
    Authorized Signatory
_____

*/    If the Note is to be issued in global form, add the Global Notes Legend and the attachment from <u>Exhibit A</u> captioned "TO BE ATTACHED TO GLOBAL SECURITIES - SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY."

<div align="center">B-2-4</div>

[FORM OF REVERSE SIDE OF 2015 EXCHANGE NOTE]

10.00% Second-Priority Senior Secured Note due 2015

1. Interest

Harrah's Operating Company, Inc., a Delaware corporation (such corporation, and its successors and assigns under the indenture hereinafter referred to, being herein called the " Issuer "), promises to pay interest on the principal amount of this Note at the rate per annum shown above. The Issuer shall pay interest semiannually on June 15 and December 15 of each year (each an " Interest Payment Date "), commencing June 15, 2009. Interest on the Notes shall accrue from the most recent date to which interest has been paid or duly provided for or, if no interest has been paid or duly provided for, from December 24, 2008 until the principal hereof is due. Interest shall be computed on the basis of a 360-day year of twelve 30-day months. The Issuer shall pay interest on overdue principal at the rate borne by the Notes, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

2. Method of Payment

The Issuer shall pay interest on the Notes (except defaulted interest) to the Persons who are registered holders at the close of business on June 1 or December 1 (each a " Record Date ") next preceding the interest payment date even if Notes are canceled after the record date and on or before the interest payment date (whether or not a Business Day). Holders must surrender Notes to the Paying Agent to collect principal payments. The Issuer shall pay principal, premium, if any, and interest in money of the United States of America that at the time of payment is legal tender for payment of public and private debts. Payments in respect of the Notes represented by a Global Note (including principal, premium, if any, and interest) shall be made by wire transfer of immediately available funds to the accounts specified by The Depository Trust Issuer or any successor depositary. The Issuer shall make all payments in respect of a certificated Note (including principal, premium, if any, and interest), at the office of the Paying Agent, except that, at the option of the Issuer, payment of interest may be made by mailing a check to the registered address of each holder thereof; *provided, however,* that payments on the Notes may also be made, in the case of a holder of at least $1,000,000 aggregate principal amount of Notes, by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such holder elects payment by wire transfer by giving written notice to the Trustee or Paying Agent to such effect designating such account no later than 30 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion).

3. Paying Agent and Registrar

Initially, U.S. Bank National Association (the " Trustee "), will act as Paying Agent and Registrar. The Issuer may appoint and change any Paying Agent or Registrar without notice. The Issuer or any of its domestically incorporated Wholly Owned Subsidiaries may act as Paying Agent or Registrar.

B-2-5

4. Indenture

      The Issuer issued the Notes under an Indenture dated as of December 24, 2008 (the " Indenture "), among the Issuer, the Parent Guarantor and the Trustee. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa 77bbbb) as in effect on the date of the Indenture (the " TIA "). Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture. The Notes are subject to all terms and provisions of the Indenture, and the holders (as defined in the Indenture) are referred to the Indenture and the TIA for a statement of such terms and provisions.

      The Notes are second-priority senior secured obligations of the Issuer. This Note is one of the Exchange Notes referred to in the Indenture. The Notes include the Initial Notes, any Additional Notes and any Exchange Notes issued in exchange for the Initial Notes or any Additional Notes pursuant to the Indenture. The Initial Notes, any Additional Notes and any Exchange Notes are treated as a single class of securities under the Indenture. The Indenture imposes certain limitations on the ability of the Issuer and its Restricted Subsidiaries to, among other things, make certain Investments and other Restricted Payments, pay dividends and other distributions, Incur Indebtedness, enter into consensual restrictions upon the payment of certain dividends and distributions by such Restricted Subsidiaries, issue or sell shares of capital stock of the Issuer and such Restricted Subsidiaries, enter into or permit certain transactions with Affiliates, create or Incur Liens and make Asset Sales. The Indenture also imposes limitations on the ability of the Issuer, each Subsidiary Pledgor and the Parent Guarantor to consolidate or merge with or into any other Person or convey, transfer or lease all or substantially all of its property.

      To guarantee the due and punctual payment of the principal and interest on the Notes and all other amounts payable by the Issuer under the Indenture and the Notes when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Notes and the Indenture, the Parent Guarantor has unconditionally guaranteed the Guaranteed Obligations on a second-priority senior unsecured basis pursuant to the terms of the Indenture.

5. Optional Redemption

      On or after December 15, 2013, the Issuer may redeem the 2015 Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at the following redemption prices (expressed as a percentage of principal amount), *plus* accrued and unpaid interest and additional interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the 12-month period commencing on December 15 of the years set forth below:

| Period | Redemption Price |
|---|---|
| 2012 | 105.000% |
| 2013 | 102.500% |
| 2014 and thereafter | 100.000% |

B-2-6

In addition, prior to December 15, 2012, the Issuer may redeem the 2015 Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at a redemption price equal to 100% of the principal amount of the 2015 Notes redeemed *plus* the Applicable Premium as of, and accrued and unpaid interest and additional interest, if any, to, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

Notwithstanding the foregoing, at any time and from time to time on or prior to December 15, 2011, the Issuer may redeem in the aggregate up to 35% of the original aggregate principal amount of the 2015 Notes (calculated after giving effect to any issuance of additional 2015 Notes) with the net cash proceeds of one or more Equity Offerings (1) by the Issuer or (2) by any direct or indirect parent of the Issuer to the extent the net cash proceeds thereof are contributed to the common equity capital of the Issuer or used to purchase Capital Stock (other than Disqualified Stock) of the Issuer from it, at a redemption price (expressed as a percentage of principal amount thereof) of 110.00%, *plus* accrued and unpaid interest and additional interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date); *provided, however,* that at least 50% of the original aggregate principal amount of the 2015 Notes (calculated after giving effect to any issuance of additional 2015 Notes) must remain outstanding after each such redemption; *provided, further,* that such redemption shall occur within 90 days after the date on which any such Equity Offering is consummated upon not less than 30 nor more than 60 days' notice mailed to each holder of 2015 Notes being redeemed and otherwise in accordance with the procedures set forth in the Indenture.

6. Mandatory Redemption

a. Except as set forth below, the Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the 2018 Notes.

b. If the 2015 Notes would otherwise constitute "applicable high yield discount obligations" within the meaning of 163(i)(1) of the Code, at the end of each accrual period ending after the fifth anniversary of the 2015 Notes' issuance (each, any " AHYDO redemption date "), the Issuer will be required to redeem for cash a portion of each 2015 Note then outstanding equal to the "Mandatory Principal Redemption Amount" (such redemption a " Mandatory Principal Redemption "). The redemption price for the portion of each 2015 Note redeemed pursuant to a Mandatory Principal Redemption will be 100% of the principal amount of such portion *plus* any accrued interest thereon on the date of redemption. The "Mandatory Principal Redemption Amount" means the portion of a 2015 Note that must be required to be redeemed to prevent such 2015 Note from being treated as an "applicable high yield discount obligation" within the meaning of Section 163(i)(1) of the Code. No partial redemption or repurchase of the 2015 Notes prior to the AHYDO redemption date pursuant to any other provision of the indenture will alter the Issuer's obligation to make the Mandatory Principal Redemption with respect to any 2015 Notes that remain outstanding on the AHYDO redemption date.

7. <u>Notice of Redemption</u>

Notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the redemption date to each holder of Notes to be redeemed at his, her or its registered address. Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1,000. If money sufficient to pay the redemption price of and accrued and unpaid interest on all Notes (or portions thereof) to be redeemed on the redemption date is deposited with a Paying Agent on or before the redemption date and certain other conditions are satisfied, on and after such date interest ceases to accrue on such Notes (or such portions thereof) called for redemption.

8. <u>Repurchase of Notes at the Option of the holders upon Change of Control and Asset Sales</u>

Upon the occurrence of a Change of Control, each holder shall have the right, subject to certain conditions specified in the Indenture, to cause the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant record date to receive interest due on the relevant interest payment date), as provided in, and subject to the terms of, the Indenture.

In accordance with Section 4.06 of the Indenture, the Issuer will be required to offer to purchase Notes upon the occurrence of certain events.

9. <u>Ranking and Collateral</u>

These Notes are secured by a second-priority security interest in the Collateral pursuant to certain Security Documents. The Second Priority Liens upon any and all Collateral are, to the extent and in the manner provided in the Intercreditor Agreement, subordinate in ranking to all present and future First Priority Liens and will be of equal ranking with all present and future Liens securing Other Second-Lien Obligations as set forth in the Intercreditor Agreement.

10. <u>Denominations; Transfer; Exchange</u>

The Notes are in registered form, without coupons, in denominations of $2,000 and any integral multiple of $1,000. A holder shall register the transfer of or exchange of Notes in accordance with the Indenture. Upon any registration of transfer or exchange, the Registrar and the Trustee may require a holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes required by law or permitted by the Indenture. The Registrar need not register the transfer of or exchange any Notes selected for redemption (except, in the case of a Note to be redeemed in part, the portion of the Note not to be redeemed) or to transfer or exchange any Notes for a period of 15 days prior to a selection of Notes to be redeemed.

11. <u>Persons Deemed Owners</u>

The registered holder of this Note shall be treated as the owner of it for all purposes.

<div align="center">B-2-8</div>

12. <u>Unclaimed Money</u>

If money for the payment of principal or interest remains unclaimed for two years, the Trustee and a Paying Agent shall pay the money back to the Issuer at their written request unless an abandoned property law designates another Person. After any such payment, the holders entitled to the money must look to the Issuer for payment as general creditors and the Trustee and a Paying Agent shall have no further liability with respect to such monies.

13. <u>Discharge and Defeasance</u>

Subject to certain conditions, the Issuer at any time may terminate some of or all its obligations under the Notes and the Indenture if the Issuer deposits with the Trustee money or U.S. Government Obligations for the payment of principal and interest on the Notes to redemption or maturity, as the case may be.

14. <u>Amendment; Waiver</u>

Subject to certain exceptions set forth in the Indenture, (i) the Indenture or the Notes may be amended with the written consent of the holders of at least a majority in aggregate principal amount of the outstanding Notes of each series and (ii) any past default or compliance with any provisions may be waived with the written consent of the holders of at least a majority in principal amount of the outstanding Notes. Subject to certain exceptions set forth in the Indenture, without the consent of any holder, the Issuer and the Trustee may amend the Indenture, the Security Documents, the Intercreditor Agreement or the Notes (i) to cure any ambiguity, omission, defect or inconsistency; (ii) to provide for the assumption by a Successor Issuer of the obligations of the Issuer under the Indenture and the Notes; (iii) to provide for the assumption by a Successor Subsidiary Pledgor of the obligations of a Subsidiary Pledgor under the Indenture and the Security Documents; (iv) to provide for uncertificated Notes in addition to or in place of certificated Notes ( *provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code); (v) to conform the text of the Indenture, the Parent Guarantee, the Notes, the Security Documents or the Intercreditor Agreement, to any provision of the " <u>Description of New Second Lien Notes</u> " in the Offering Memorandum to the extent that such provision in the " <u>Description of New Second Lien Notes</u> " was intended to be a verbatim recitation of a provision of the Indenture, the Security Documents, the Notes or the Intercreditor Agreement; (vi) to add a Subsidiary Pledgor with respect to the Notes or to add Collateral to secure the Notes; (vii) to add additional covenants of the Issuer for the benefit of the holders or to surrender rights and powers conferred on the Issuer; (viii) to comply with the requirements of the SEC in order to effect or maintain the qualification of the Indenture under the TIA; (ix) to make any change that does not adversely affect the rights of any holder; (x) to provide for the issuance of the Exchange Notes or Additional Notes; (xi) to release Collateral as permitted by the Indenture or the Intercreditor Agreement; or (xii) to add additional secured creditors holding Other Second-Lien Obligations so long as such obligations are not prohibited by the Indenture or the Security Documents

15. <u>Defaults and Remedies</u>

If an Event of Default occurs (other than an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer) and is continuing, the Trustee

<div align="center">B-2-9</div>

or the holders of at least 30% in principal amount of the outstanding Notes, in each case, by notice to the Issuer, may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable. If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer occurs, the principal of, premium, if any, and interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any holders. Under certain circumstances, the holders of a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

If an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders unless such holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense and certain other conditions are complied with. Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder may pursue any remedy with respect to the Indenture or the Notes unless (i) such holder has previously given the Trustee notice that an Event of Default is continuing, (ii) the holders of at least 30% in principal amount of the outstanding Notes of the applicable series have requested the Trustee in writing to pursue the remedy, (iii) such holders have offered the Trustee reasonable security or indemnity against any loss, liability or expense, (iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity and (v) the holders of a majority in principal amount of the outstanding Notes of the applicable series have not given the Trustee a direction inconsistent with such request within such 60-day period. Subject to certain restrictions, the holders of a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability. Prior to taking any action under the Indenture, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

16. Trustee Dealings with the Issuer

Subject to certain limitations imposed by the TIA, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with and collect obligations owed to it by the Issuer or its Affiliates and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee.

17. No Recourse Against Others

No director, officer, employee, incorporator or holder of any equity interests in the Issuer or of any Subsidiary Pledgor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Issuer or the Subsidiary Pledgors under the Notes, the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each holder of Notes by accepting a Note waives and releases all such liability.

B-2-10

18. <u>Authentication</u>

This Note shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Note.

19. <u>Abbreviations</u>

Customary abbreviations may be used in the name of a holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

20. <u>Governing Law</u>

THIS SECURITY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

21. <u>CUSIP Numbers; ISINs</u>

The Issuer has caused CUSIP numbers and ISINs to be printed on the Notes and has directed the Trustee to use CUSIP numbers and ISINs in notices of redemption as a convenience to the holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

**The Issuer will furnish to any holder of Notes upon written request and without charge to the holder a copy of the Indenture which has in it the text of this Note.**

B-2-11

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

I or we assign and transfer this Note to:

_____

(Print or type assignee's name, address and zip code)

_____

(Insert assignee's soc. sec. or tax I.D. No.)

and irrevocably appoint _____ agent to transfer this Note on the books of the Issuer. The agent may substitute another to act for him.

Date: _____          Your Signature: _____

Sign exactly as your name appears on the other side of this Note.

Signature Guarantee:

Date: _____

Signature must be guaranteed by a participant in a recognized          _____
signature guaranty medallion program or other signature guarantor          Signature of Signature Guarantee
program reasonably acceptable to the Trustee

B-2-12

OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, check the box:

Asset Sale  ☐                        Change of Control  ☐

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, state the amount ($2,000 or any integral multiple of $1,000):

$

Date: _____                Your Signature _____

                                 (Sign exactly as your name appears on the other side of this Note)

Signature Guarantee: _____

                     Signature must be guaranteed by a participant in a
                     recognized signature guaranty medallion program or other
                     signature guarantor program reasonably acceptable to the
                     Trustee

B-2-13

[TO BE ATTACHED TO GLOBAL SECURITIES]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The initial principal amount of this Global Note is $ _____. The following increases or decreases in this Global Note have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Notes Custodian |
|---|---|---|---|---|

B-2-14

EXHIBIT C

[FORM OF]

TRANSFEREE LETTER OF REPRESENTATION

Harrah's Operating Company, Inc.
c/o U.S. Bank National Association
Corporate Trust Services
EP-MN-W53C
60 Livingston Avenue
St. Paul, Minnesota 55107-1419
Attention: Vice President

Ladies and Gentlemen:

This certificate is delivered to request a transfer of $[          ] principal amount of the [10.00% Second-Priority Senior Secured Notes due 2018] [10.00% Second-Priority Senior Secured Notes due 2015] (the " Notes ") of Harrah's Operating Company, Inc. (the " Issuer ").

Upon transfer, the Notes would be registered in the name of the new beneficial owner as follows:

Name: _____

Address: _____

Taxpayer ID Number: _____

The undersigned represents and warrants to you that:

1. We are an institutional " accredited investor " (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act of 1933, as amended (the " Securities Act ")), purchasing for our own account or for the account of such an institutional " accredited investor " at least $100,000 principal amount of the Notes, and we are acquiring the Notes not with a view to, or for offer or sale in connection with, any distribution in violation of the Securities Act. We have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we invest in or purchase securities similar to the Notes in the normal course of our business. We, and any accounts for which we are acting, are each able to bear the economic risk of our or its investment.

2. We understand that the Notes have not been registered under the Securities Act and, unless so registered, may not be sold except as permitted in the following sentence. We agree on our own behalf and on behalf of any investor account for which we are purchasing Notes to offer, sell or otherwise transfer such Notes prior to the date that is two years after the later of the date of original issue and the last date on which either the Issuer or any affiliate of such Issuer was the owner of such Notes (or any predecessor thereto) (the " Resale Restriction Termination Date ") only (a) in the United States to a person whom we reasonably believe is a qualified institutional buyer (as defined in rule 144A under the Securities Act) in a transaction meeting the requirements of Rule 144A, (b) outside the United States in an offshore

C-1

transaction in accordance with Rule 904 of Regulation S under the Securities Act, (c) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder (if applicable) or (d) pursuant to an effective registration statement under the Securities Act, in each of cases (a) through (d) in accordance with any applicable securities laws of any state of the United States. In addition, we will, and each subsequent holder is required to, notify any purchaser of the Note evidenced hereby of the resale restrictions set forth above. The foregoing restrictions on resale will not apply subsequent to the Resale Restriction Termination Date. If any resale or other transfer of the Notes is proposed to be made to an institutional " accredited investor " prior to the Resale Restriction Termination Date, the transferor shall deliver a letter from the transferee substantially in the form of this letter to the Issuer and the Trustee, which shall provide, among other things, that the transferee is an institutional " accredited investor " within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act and that it is acquiring such Notes for investment purposes and not for distribution in violation of the Securities Act. Each purchaser acknowledges that the Issuer and the Trustee reserve the right prior to the offer, sale or other transfer prior to the Resale Restriction Termination Date of the Notes pursuant to clause 1(b), 1(c) or 1(d) above to require the delivery of an opinion of counsel, certifications or other information satisfactory to the Issuer and the Trustee.

Dated: _____

TRANSFEREE: _____ ,

By: _____

C-2

EXHIBIT D

[FORM OF SUPPLEMENTAL INDENTURE]

SUPPLEMENTAL INDENTURE (this " Supplemental Indenture ") dated as of [          ], among [GUARANTOR] (the " New Guarantor "), a subsidiary of HARRAH'S OPERATING COMPANY, INC. (or its successor), a Delaware corporation (the " Issuer "), and U.S. BANK NATIONAL ASSOCIATION, a national banking association, as trustee under the indenture referred to below (the " Trustee ").

WITNESSETH:

WHEREAS the Issuer and the Parent Guarantor have heretofore executed and delivered to the Trustee an indenture (as amended, supplemented or otherwise modified, the " Indenture ") dated as of December 24, 2008, providing for the issuance of the Issuer's Second-Priority Senior Secured Notes due 2018 and Second-Priority Senior Secured Notes due 2015 (collectively, the " Notes "), initially in the aggregate principal amount of $1,062,421,000;

WHEREAS Section 4.11 of the Indenture provides that under certain circumstances the Issuer is required to cause the New Guarantor to execute and deliver to the Trustee a supplemental indenture pursuant to which the New Guarantor shall unconditionally guarantee all the Issuer's Obligations under the Notes and the Indenture pursuant to a Note Guarantee on the terms and conditions set forth herein; and

WHEREAS pursuant to Section 9.01 of the Indenture, the Trustee, the Issuer, the Parent Guarantor and other existing guarantors, if any, are authorized to execute and deliver this Supplemental Indenture;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the New Note Guarantor, the Parent Guarantor, the Issuer and the Trustee mutually covenant and agree for the equal and ratable benefit of the holders of the Notes as follows:

1. Defined Terms . As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined, except that the term " holders " in this Supplemental Indenture shall refer to the term " holders " as defined in the Indenture and the Trustee acting on behalf of and for the benefit of such holders. The words " herein ," " hereof " and " hereby " and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

2. Agreement to Guarantee . The New Note Guarantor hereby agrees, jointly and severally with all existing guarantors (if any), to unconditionally guarantee the Issuer's Obligations under the Notes and the Indenture on the terms and subject to the conditions set forth in Articles XII and XIII of the Indenture and to be bound by all other applicable provisions of the Indenture and the Notes and to perform all of the obligations and agreements of a guarantor under the Indenture.

D-1

3. <u>Notices</u> . All notices or other communications to the New Note Guarantor shall be given as provided in Section 13.02 of the Indenture.

4. <u>Ratification of Indenture; Supplemental Indentures Part of Indenture</u> . Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

5. <u>Governing Law</u> . **THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

6. <u>Trustee Makes No Representation</u> . The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture.

7. <u>Counterparts</u> . The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

8. <u>Effect of Headings</u> . The Section headings herein are for convenience only and shall not effect the construction thereof.

D-2

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

[NEW GUARANTOR]

By: _____
Name:
Title:

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By: _____
Name:
Title:

D-3

**EXHIBIT 7**

EX-4.1 2 dex41.htm INDENTURE, DATED AS OF APRIL 15, 2009

**Exhibit 4.1**

**HARRAH'S OPERATING COMPANY, INC.**
as Issuer
and
**HARRAH'S ENTERTAINMENT, INC.**
as Parent Guarantor

10.00% Second-Priority Senior Secured Notes due 2018

---

INDENTURE

Dated as of April 15, 2009

---

U.S. Bank National Association,
as Trustee

and

U.S. Bank National Association,
as Collateral Agent

---

TABLE OF CONTENTS

| | | **Page** |
|---|---|---|
| **ARTICLE I** | | |
| **DEFINITIONS AND INCORPORATION BY REFERENCE** | | 1 |
| Section 1.01. | Definitions | 1 |
| Section 1.02. | Other Definitions | 44 |
| Section 1.03. | Incorporation by Reference of Trust Indenture Act | 46 |
| Section 1.04. | Rules of Construction | 46 |
| **ARTICLE II** | | |
| **THE NOTES** | | 47 |
| Section 2.01. | Amount of Notes | 47 |
| Section 2.02. | Form and Dating | 48 |
| Section 2.03. | Execution and Authentication | 48 |
| Section 2.04. | Registrar and Paying Agent | 49 |
| Section 2.05. | Paying Agent to Hold Money in Trust | 50 |
| Section 2.06. | Holder Lists | 50 |
| Section 2.07. | Transfer and Exchange | 50 |
| Section 2.08. | Replacement Notes | 51 |
| Section 2.09. | Outstanding Notes | 51 |
| Section 2.10. | Temporary Notes | 52 |
| Section 2.11. | Cancellation | 52 |
| Section 2.12. | Defaulted Interest | 52 |
| Section 2.13. | CUSIP Numbers, ISINs, Etc. | 52 |
| Section 2.14. | Calculation of Principal Amount of Notes | 52 |
| Section 2.15. | Mandatory Disposition Pursuant to Gaming Laws | 53 |
| **ARTICLE III** | | |
| **REDEMPTION** | | 53 |

| Section 3.01. | Redemption | 53 |
| Section 3.02. | Applicability of Article | 53 |
| Section 3.03. | Notices to Trustee | 54 |
| Section 3.04. | Selection of Notes to Be Redeemed | 54 |
| Section 3.05. | Notice of Optional Redemption | 54 |
| Section 3.06. | Effect of Notice of Redemption | 55 |
| Section 3.07. | Deposit of Redemption Price | 55 |
| Section 3.08. | Notes Redeemed in Part | 55 |

ARTICLE IV
COVENANTS                                                                              56

| Section 4.01. | Payment of Notes | 56 |
| Section 4.02. | Reports and Other Information | 56 |

TABLE OF CONTENTS
(cont'd)

| | | **Page** |
| Section 4.03. | Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock | 58 |
| Section 4.04. | Limitation on Restricted Payments | 64 |
| Section 4.05. | Dividend and Other Payment Restrictions Affecting Subsidiaries | 70 |
| Section 4.06. | Asset Sales | 72 |
| Section 4.07. | Transactions with Affiliates | 76 |
| Section 4.08. | Change of Control | 79 |
| Section 4.09. | Compliance Certificate | 80 |
| Section 4.10. | Further Instruments and Acts | 81 |
| Section 4.11. | Future Subsidiary Pledgors; Future Subsidiary Guarantors | 81 |
| Section 4.12. | Liens | 82 |
| Section 4.13. | After-Acquired Property | 83 |
| Section 4.14. | Maintenance of Office or Agency | 83 |
| Section 4.15. | Amendment of Security Documents | 84 |
| Section 4.16. | Covenant Suspension | 84 |
| Section 4.17. | Maintenance of Insurance | 85 |

ARTICLE V
SUCCESSOR COMPANY                                                                       85

| Section 5.01. | When Issuer May Merge or Transfer Assets | 85 |

ARTICLE VI
DEFAULTS AND REMEDIES                                                                   88

| Section 6.01. | Events of Default | 88 |
| Section 6.02. | Acceleration | 90 |
| Section 6.03. | Other Remedies | 91 |
| Section 6.04. | Waiver of Past Defaults | 91 |
| Section 6.05. | Control by Majority | 91 |
| Section 6.06. | Limitation on Suits | 91 |
| Section 6.07. | Rights of the Holders to Receive Payment | 92 |
| Section 6.08. | Collection Suit by Trustee | 92 |
| Section 6.09. | Trustee May File Proofs of Claim | 92 |
| Section 6.10. | Priorities | 93 |
| Section 6.11. | Undertaking for Costs | 93 |
| Section 6.12. | Waiver of Stay or Extension Laws | 93 |

ARTICLE VII
TRUSTEE                                                                                93

| Section 7.01. | Duties of Trustee | 93 |

| Section 7.02. | Rights of Trustee | 95 |
| Section 7.03. | Individual Rights of Trustee | 96 |
| Section 7.04. | Trustee's Disclaimer | 97 |

ii

## TABLE OF CONTENTS
### (cont'd)

| | | **Page** |
|---|---|---|
| Section 7.05. | Notice of Defaults | 97 |
| Section 7.06. | Reports by Trustee to the Holders | 97 |
| Section 7.07. | Compensation and Indemnity | 97 |
| Section 7.08. | Replacement of Trustee | 98 |
| Section 7.09. | Successor Trustee by Merger | 99 |
| Section 7.10. | Eligibility; Disqualification | 100 |
| Section 7.11. | Preferential Collection of Claims Against the Issuer | 100 |

ARTICLE VIII
DISCHARGE OF INDENTURE; DEFEASANCE ......... 100

| Section 8.01. | Discharge of Liability on Notes; Defeasance | 100 |
| Section 8.02. | Conditions to Defeasance | 101 |
| Section 8.03. | Application of Trust Money | 102 |
| Section 8.04. | Repayment to Issuer | 103 |
| Section 8.05. | Indemnity for U.S. Government Obligations | 103 |
| Section 8.06. | Reinstatement | 103 |

ARTICLE IX
AMENDMENTS AND WAIVERS ......... 103

| Section 9.01. | Without Consent of the Holders | 103 |
| Section 9.02. | With Consent of the Holders | 105 |
| Section 9.03. | Compliance with Trust Indenture Act | 106 |
| Section 9.04. | Revocation and Effect of Consents and Waivers | 106 |
| Section 9.05. | Notation on or Exchange of Notes | 106 |
| Section 9.06. | Trustee to Sign Amendments | 107 |
| Section 9.07. | Additional Voting Terms; Calculation of Principal Amount | 107 |

ARTICLE X
RANKING OF NOTE LIENS ......... 107

| Section 10.01. | Relative Rights | 107 |

ARTICLE XI
COLLATERAL ......... 108

| Section 11.01. | Security Documents | 108 |
| Section 11.02. | Collateral Agent | 109 |
| Section 11.03. | Authorization of Actions to Be Taken | 110 |
| Section 11.04. | Release of Liens | 111 |
| Section 11.05. | Filing, Recording and Opinions | 114 |
| Section 11.06. | [Intentionally omitted] | 114 |
| Section 11.07. | Powers Exercisable by Receiver or Trustee | 114 |

iii

## TABLE OF CONTENTS
### (cont'd)

|  |  | Page |
|---|---|---|
| Section 11.08. | Release Upon Termination of the Issuer's Obligations | 114 |
| Section 11.09. | Designations | 115 |
| Section 11.10. | Taking and Destruction | 115 |

ARTICLE XII
GUARANTEE                                                                                           115

| Section 12.01. | Guarantee | 115 |
| Section 12.02. | Limitation on Liability | 117 |
| Section 12.03. | Successors and Assigns | 118 |
| Section 12.04. | No Waiver | 119 |
| Section 12.05. | Modification | 119 |
| Section 12.06. | Execution of Supplemental Indenture for Future Note Guarantors | 119 |
| Section 12.07. | Non-Impairment | 119 |

ARTICLE XIII
MISCELLANEOUS                                                                                  120

| Section 13.01. | Trust Indenture Act Controls | 120 |
| Section 13.02. | Notices | 120 |
| Section 13.03. | Communication by the Holders with Other Holders | 120 |
| Section 13.04. | Certificate and Opinion as to Conditions Precedent | 121 |
| Section 13.05. | Statements Required in Certificate or Opinion | 121 |
| Section 13.06. | When Notes Disregarded | 121 |
| Section 13.07. | Rules by Trustee, Paying Agent and Registrar | 121 |
| Section 13.08. | Legal Holidays | 122 |
| Section 13.09. | GOVERNING LAW | 122 |
| Section 13.10. | No Recourse Against Others | 122 |
| Section 13.11. | Successors | 122 |
| Section 13.12. | Multiple Originals | 122 |
| Section 13.13. | Table of Contents; Headings | 122 |
| Section 13.14. | Indenture Controls | 122 |
| Section 13.15. | Severability | 122 |
| Section 13.16. | Intercreditor Agreement | 122 |

Appendix A    –    Provisions Relating to Initial Notes, Additional Notes and Exchange Notes

EXHIBIT INDEX

| Exhibit A | – | Form of Initial Note |
| Exhibit B | – | Form of Exchange Note |
| Exhibit C | – | Form of Transferee Letter of Representation |
| Exhibit D | – | Form of Supplemental Indenture |

iv

CROSS-REFERENCE TABLE

| TIA Section | Indenture Section |
|---|---|
| 310 (a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (b) | 7.08; 7.10 |
| (c) | N.A. |
| 311 (a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312 (a) | 2.06 |

| | |
|---|---|
| (b) | 13.03 |
| (c) | 13.03 |
| 313 (a) | 7.06 |
| (b)(1) | N.A. |
| (b)(2) | 7.06 |
| (c) | 7.06 |
| (d) | 4.02; 4.09 |
| 314 (a) | 4.02; 4.09 |
| (b) | N.A. |
| (c)(1) | 13.04 |
| (c)(2) | 13.04 |
| (c)(3) | N.A. |
| (d) | N.A. |
| (e) | 13.05 |
| (f) | 4.10 |
| 315 (a) | 7.01 |
| (b) | 7.05 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.11 |
| 316 (a)(last sentence) | 13.06 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| 317 (a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.05 |
| 318 (a) | 13.01 |

N.A. Means Not Applicable.

Note:  This Cross-Reference Table shall not, for any purposes, be deemed to be part of this Indenture.

---

INDENTURE dated as of April 15, 2009 among HARRAH'S OPERATING COMPANY, INC., a Delaware corporation (the "Issuer"), HARRAH'S ENTERTAINMENT, INC., a Delaware corporation (the "Parent Guarantor"), U.S. BANK NATIONAL ASSOCIATION, as trustee (the "Trustee"), and U.S. BANK NATIONAL ASSOCIATION, as Collateral Agent.

Each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the holders of (i) $3,705,498,000 aggregate principal amount of the Issuer's 10.00% Second-Priority Senior Secured Notes due 2018 issued on the date hereof (the "Initial Notes"), (ii) exchange notes issued in exchange for the Initial Notes pursuant to the Registration Rights Agreement or pursuant to an effective registration statement under the Securities Act (the "Exchange Notes") and (iii) Additional Notes issued from time to time as either Initial Notes or Exchange Notes (together with the Initial Notes and any Exchange Notes, the "Notes"):

## ARTICLE I

## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01. Definitions.

"Acquired Indebtedness" means, with respect to any specified Person:

(1) Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person, and

(2) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"Acquisition" means the acquisition by Affiliates of the Sponsors of substantially all of the outstanding shares of capital stock of Harrah's Entertainment, Inc., pursuant to the Merger Agreement.

"Acquisition Documents" means the Merger Agreement and any other document entered into in connection therewith, in each case as amended, supplemented or modified from time to time prior to the Issue Date or thereafter.

"Acquisition Transactions" means the transactions described in the Offering Memorandum under the section titled "Acquisition Transactions."

"Additional Notes" means Notes issued under the terms of this Indenture subsequent to the Issue Date.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

---

"Applicable Premium" means, with respect to any Note on any applicable redemption date, the greater of:

(1) 1% of the then outstanding principal amount of the Note; and

(2) the excess of:

(a) the present value at such redemption date of (i) the redemption price of the Note at December 15, 2013 (such redemption price being set forth in Paragraph 5 of the Note) *plus* (ii) all required interest payments due on the Note through December 15, 2013 (excluding accrued but unpaid interest), computed using a discount rate equal to the Treasury Rate as of such redemption date *plus* 50 basis points; over

(b) the then outstanding principal amount of the Note.

"Asset Sale" means:

(1) the sale, conveyance, transfer or other disposition (whether in a single transaction or a series of related transactions) of property or assets (including by way of a Sale/ Leaseback Transaction) outside the ordinary course of business of the Issuer or any Restricted Subsidiary of the Issuer (each referred to in this definition as a "disposition") or

(2) the issuance or sale of Equity Interests (other than directors' qualifying shares and shares issued to foreign nationals or other third parties to the extent required by applicable law) of any Restricted Subsidiary (other than to the Issuer or another Restricted Subsidiary of the Issuer) (whether in a single transaction or a series of related transactions),

in each case other than:

(a) a disposition of Cash Equivalents or Investment Grade Securities or obsolete, damaged or worn out property or equipment in the ordinary course of business;

(b) the disposition of all or substantially all of the assets of the Issuer in a manner permitted pursuant to Section 5.01 or any disposition that constitutes a Change of Control;

(c) any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under Section 4.04;

2

---

(d) any disposition of assets of the Issuer or any Restricted Subsidiary or issuance or sale of Equity Interests of any Restricted Subsidiary, which assets or Equity Interests so disposed or issued have an aggregate Fair Market Value (as determined in good faith by the Issuer) of less than $50.0 million;

(e) any disposition of property or assets, or the issuance of securities, by a Restricted Subsidiary of the Issuer to the Issuer or by the Issuer or a Restricted Subsidiary of the Issuer to a Restricted Subsidiary of the Issuer;

(f) any exchange of assets (including a combination of assets and Cash Equivalents) for assets related to a Similar Business of comparable or greater market value or usefulness to the business of the Issuer and its Restricted Subsidiaries as a whole, as determined in good faith by the Issuer;

(g) foreclosure or any similar action with respect to any property or other asset of the Issuer or any of its Restricted Subsidiaries;

(h) any sale of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary;

(i) the lease, assignment or sublease of any real or personal property in the ordinary course of business;

(j) any sale of inventory or other assets in the ordinary course of business;

(k) any grant in the ordinary course of business of any license of patents, trademarks, know-how or any other intellectual property;

(l) in the ordinary course of business, any swap of assets, or lease, assignment or sublease of any real or personal property, in exchange for services (including in connection with any outsourcing arrangements) of comparable or greater value or usefulness to the business of the Issuer and its Restricted Subsidiaries as a whole, as determined in good faith by the Issuer;

(m) a transfer of accounts receivable and related assets of the type specified in the definition of "Receivables Financing" (or a fractional undivided interest therein) by a Receivables Subsidiary in a Qualified Receivables Financing;

(n) any financing transaction with respect to property built or acquired by the Issuer or any Restricted Subsidiary after the Issue Date, including any Sale/Leaseback Transaction or asset securitization permitted by this Indenture;

(o) dispositions in connection with Permitted Liens;

<div align="center">3</div>

(p) any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Issuer or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and in each case comprising all or a portion of the consideration in respect of such sale or acquisition;

(q) any disposition made pursuant to an Operations Management Agreement;

(r) the sale of any property in a Sale/Leaseback Transaction within six months of the acquisition of such property;

(s) dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements; and

(t) any surrender or waiver of contract rights or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind.

"Bank Indebtedness" means any and all amounts payable under or in respect of the Credit Agreement and the other Credit Agreement Documents as amended, restated, supplemented, waived, replaced, restructured, repaid, refunded, refinanced or otherwise modified from time to time (including after termination of the Credit Agreement), including principal, premium (if any), interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Issuer whether or not a claim for post-filing interest is allowed in such proceedings), fees, charges, expenses, reimbursement obligations, guarantees and all other amounts payable thereunder or in respect thereof.

"Board of Directors" means, as to any Person, the board of directors or managers, as applicable, of such Person (or, if such Person is a partnership, the board of directors or other governing body of the general partner of such Person) or any duly authorized committee thereof.

"Business Day" means a day other than a Saturday, Sunday or other day on which banking institutions are authorized or required by law to close in New York City.

"Capital Stock" means:

(1) in the case of a corporation, corporate stock or shares;

(2) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

<div align="center">4</div>

(4) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Capitalized Lease Obligation" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"Capitalized Software Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Restricted Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of such Person and such Restricted Subsidiaries.

"Cash Equivalents" means:

(1) U.S. dollars, pounds sterling, euros, the national currency of any member state in the European Union or, in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

(2) securities issued or directly and fully guaranteed or insured by the U.S. government or any country that is a member of the European Union or any agency or instrumentality thereof in each case maturing not more than two years from the date of acquisition;

(3) certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition,

bankers' acceptances, in each case with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus in excess of $250.0 million and whose long-term debt is rated "A" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency);

(4) repurchase obligations for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5) commercial paper issued by a corporation (other than an Affiliate of the Issuer) rated at least "A-1" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) and in each case maturing within one year after the date of acquisition;

(6) readily marketable direct obligations issued by any state of the United States of America or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

5

(7) Indebtedness issued by Persons (other than the Sponsors or any of their Affiliates) with a rating of "A" or higher from S&P or "A-2" or higher from Moody's (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition; and

(8) investment funds investing at least 95% of their assets in securities of the types described in clauses (1) through (7) above.

"Change of Control" means the occurrence of either of the following:

(1) the sale, lease or transfer, in one or a series of related transactions, of all or substantially all the assets of the Issuer and its Subsidiaries, taken as a whole, to a Person other than any of the Permitted Holders; or

(2) the Issuer becomes aware (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) of the acquisition by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), including any group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act), other than any of the Permitted Holders, in a single transaction or in a related series of transactions, by way of merger, consolidation, amalgamation or other business combination or purchase of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision), of more than 50% of the total voting power of the Voting Stock of (prior to a Qualified IPO or upon or after an Issuer IPO) the Issuer or (upon or after a Holdco Qualified IPO) the Holdco Issuer.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all property subject or purported to be subject, from time to time, to a Lien under any Security Documents.

"Collateral Agent" means U.S. Bank National Association in its capacity as "Collateral Agent" under this Indenture and under the Security Documents and any successor thereto in such capacity.

"Collateral Agreement" means the collateral agreement among the Issuer, each Subsidiary Pledgor and U.S. Bank National Association, as Collateral Agent, dated as of December 24, 2008, as supplemented by the additional secured party consent by the Trustee, as Authorized Representative, and acknowledged by the Issuer and the Collateral Agent, dated as of the date hereof, and as it may be further amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, and this Indenture and the Indenture governing the Existing Second Lien Notes.

6

"Consolidated Depreciation and Amortization Expense" means, with respect to any Person for any period, the total amount of depreciation and amortization expense, including the amortization of intangible assets, deferred financing fees and Capitalized Software Expenditures and amortization of unrecognized prior service costs and actuarial gains and losses related to pensions and other post-employment benefits, of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"Consolidated Interest Expense" means, with respect to any Person for any period, the sum, without duplication, of:

(1) consolidated interest expense of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted in computing Consolidated Net Income (including amortization of original issue discount, the interest component of Capitalized Lease Obligations, and net payments and receipts (if any) pursuant to interest rate Hedging Obligations and excluding additional interest in respect of the Notes, amortization of deferred financing fees, debt issuance costs, commissions, fees and expenses and expensing of any bridge, commitment or other financing fees); *plus*

(2) consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued; *plus*

(3) commissions, discounts, yield and other fees and charges Incurred in connection with any Receivables Financing which are payable

to Persons other than the Issuer and its Restricted Subsidiaries; *minus*

(4) interest income for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by the Issuer to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"Consolidated Leverage Ratio" means, with respect to any Person, at any date the ratio of (i) Indebtedness (other than Qualified Non-Recourse Debt) of such Person and its Restricted Subsidiaries as of such date of calculation (determined on a consolidated basis in accordance with GAAP) less the amount of cash and Cash Equivalents in excess of any Restricted Cash that would be stated on the balance sheet of such Person and its Restricted Subsidiaries and held by such Person and its Restricted Subsidiaries as of such date of determination to (ii) EBITDA of such Person for the four full fiscal quarters for which internal financial statements are available immediately preceding such date on which such additional Indebtedness is Incurred. In the event that the Issuer or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness subsequent to the commencement of the period for which the Consolidated Leverage Ratio is being calculated but prior to the event for which the calculation of the Consolidated Leverage Ratio is made (the "Consolidated Leverage Calculation Date"), then the Consolidated Leverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness as if the same

had occurred at the beginning of the applicable four-quarter period; *provided* that the Issuer may elect pursuant to an Officer's Certificate delivered to the Trustee to treat all or any portion of the commitment under any Indebtedness as being Incurred at such time, in which case any subsequent Incurrence of Indebtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions) and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Issuer or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Consolidated Leverage Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions), discontinued operations and other operational changes (and the change of any associated Indebtedness and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Consolidated Leverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period. For purposes of making the computation referred to above, with respect to each New Project that commences operations and records not less than one full fiscal quarter's operations during the four-quarter reference period, the operating results of such New Project will be annualized on a straight-line basis during such period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Issuer. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Issuer as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event (including, to the extent applicable, from the Acquisition Transactions) and (2) all adjustments of the nature used in connection with the calculation of "Adjusted EBITDA" as set forth in "Debt Covenant Compliance" in Exhibit 99.1 to the Quarterly Report on Form 10-Q for the nine months ended September 30, 2008 for Harrah's Entertainment to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

For purposes of this definition, any amount in a currency other than U.S. dollars will be converted to U.S. dollars based on the average exchange rate for such currency for the most recent twelve month period immediately prior to the date of determination in a manner consistent with that used in calculating EBITDA for the applicable period.

"Consolidated Net Income" means, with respect to any Person for any period, the aggregate of the Net Income of such Person and its Restricted Subsidiaries for such period, on a consolidated basis; *provided, however*, that:

(1) any net after-tax extraordinary, nonrecurring or unusual gains or losses (less all fees and expenses relating thereto) or expenses or charges, any severance expenses, relocation expenses, curtailments or modifications to pension and post-retirement employee benefit plans, any expenses related to any reconstruction, decommissioning, recommissioning or reconfiguration of fixed assets for alternate uses and fees, expenses or charges relating to facilities closing costs, acquisition integration costs, facilities opening costs, project start-up costs, business optimization costs, signing, retention or completion bonuses, expenses or charges related to any issuance of Equity Interests, Investment,

acquisition, disposition, recapitalization or issuance, repayment, refinancing, amendment or modification of Indebtedness (in each case, whether or not successful), and any fees, expenses, charges or change in control payments made under the Acquisition Documents or otherwise related to the Acquisition Transactions or the Transactions, in each case, shall be excluded;

(2) effects of purchase accounting adjustments (including the effects of such adjustments pushed down to such Person and such Restricted Subsidiaries) in amounts required or permitted by GAAP, resulting from the application of purchase accounting in relation to the Acquisition Transactions or any consummated acquisition or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded;

(3) the Net Income for such period shall not include the cumulative effect of a change in accounting principles during such period;

(4) any net after-tax income or loss from disposed, abandoned, transferred, closed or discontinued operations and any net after-tax gains or losses on disposal of disposed, abandoned, transferred, closed or discontinued operations shall be excluded;

(5) any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course of business (as determined in good faith by management of the Issuer) shall be excluded;

(6) any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of indebtedness, Hedging Obligations or other derivative instruments shall be excluded;

(7) the Net Income for such period of any Person that is not a Subsidiary of such Person, or is an Unrestricted Subsidiary or a Qualified Non-Recourse Subsidiary, or that is accounted for by the equity method of accounting, shall be included only to the extent of the amount of dividends or distributions or other payments paid in cash (or to the extent converted into cash) to the referent Person or a Restricted Subsidiary thereof (other than a Qualified Non-Recourse Subsidiary of such referent Person) in respect of such period;

9

(8) solely for the purpose of determining the amount available for Restricted Payments under clause (1) of the definition of "<u>Cumulative Credit</u>," the Net Income for such period of any Restricted Subsidiary (other than any Subsidiary Pledgor) shall be excluded to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary of its Net Income is not at the date of determination permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders, unless such restrictions with respect to the payment of dividends or similar distributions have been legally waived; *provided* that the Consolidated Net Income of such Person shall be increased by the amount of dividends or other distributions or other payments actually paid in cash (or converted into cash) by any such Restricted Subsidiary to such Person, to the extent not already included therein;

(9) an amount equal to the amount of Tax Distributions actually made to any parent or equity holder of such Person in respect of such period in accordance with Section 4.04(b)(xii) shall be included as though such amounts had been paid as income taxes directly by such Person for such period;

(10) any impairment charges or asset write-offs, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP shall be excluded;

(11) any non-cash expense realized or resulting from stock option plans, employee benefit plans or post-employment benefit plans, or grants or sales of stock, stock appreciation or similar rights, stock options, restricted stock, preferred stock or other rights, shall be excluded;

(12) any (a) one-time non-cash compensation charges, (b) costs and expenses after the Issue Date related to employment of terminated employees, or (c) costs or expenses realized in connection with or resulting from stock appreciation or similar rights, stock options or other rights existing on the Issue Date of officers, directors and employees, in each case of such Person or any of its Restricted Subsidiaries, shall be excluded;

(13) accruals and reserves that are established or adjusted within 12 months after the Issue Date and that are so required to be established or adjusted in accordance with GAAP or as a result of adoption or modification of accounting policies shall be excluded;

(14) solely for purposes of calculating EBITDA, (a) the Net Income of any Person and its Restricted Subsidiaries shall be calculated without deducting the income attributable to, or adding the losses attributable to, the minority equity interests of third parties in any non-Wholly Owned Restricted Subsidiary except to the extent of dividends declared or paid in respect of such period or any prior period on the shares of Capital Stock of such Restricted Subsidiary held by such third parties and (b) any ordinary course dividend, distribution or other payment paid in cash and received from any Person in excess of amounts included in clause (7) above shall be included;

10

(15) (a)(i) the non-cash portion of "<u>straight-line</u>" rent expense shall be excluded and (ii) the cash portion of "<u>straight-line</u>" rent expense which exceeds the amount expensed in respect of such rent expense shall be included and (b) non-cash gains, losses, income and expenses resulting from fair value accounting required by the applicable standard under GAAP and related interpretations shall be excluded;

(16) any currency translation gains and losses related to currency remeasurements of Indebtedness, and any net loss or gain resulting

from hedging transactions for currency exchange risk, shall be excluded; and

(17) to the extent covered by insurance and actually reimbursed, or, so long as such Person has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (a) not denied by the applicable carrier in writing within 180 days and (b) in fact reimbursed within 365 days of the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within 365 days), expenses with respect to liability or casualty events or business interruption shall be excluded.

Notwithstanding the foregoing, for the purpose of Section 4.04 only, there shall be excluded from Consolidated Net Income any dividends, repayments of loans or advances or other transfers of assets from Unrestricted Subsidiaries of the Issuer or a Restricted Subsidiary of the Issuer to the extent such dividends, repayments or transfers increase the amount of Restricted Payments permitted under such Section pursuant to clauses (D) and (E) of the definition of "Cumulative Credit."

"Consolidated Non-cash Charges" means, with respect to any Person for any period, the non-cash expenses (other than Consolidated Depreciation and Amortization Expense) of such Person and its Restricted Subsidiaries reducing Consolidated Net Income of such Person for such period on a consolidated basis and otherwise determined in accordance with GAAP, *provided* that if any such non-cash expenses represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from EBITDA in such future period to the extent paid, but excluding from this proviso, for the avoidance of doubt, amortization of a prepaid cash item that was paid in a prior period.

"Consolidated Taxes" means, with respect to any Person for any period, the provision for taxes based on income, profits or capital, including, without limitation, state, franchise, property and similar taxes, foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations) and any Tax Distributions taken into account in calculating Consolidated Net Income.

"Contingent Obligations" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

(1) to purchase any such primary obligation or any property constituting direct or indirect security therefor,

11

(2) to advance or supply funds:

(a) for the purchase or payment of any such primary obligation; or

(b) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Credit Agreement" means (i) the credit agreement, dated as of January 28, 2008, entered into in connection with the consummation of the Acquisition, among the Issuer, the pledgors named therein, the financial institutions named therein, and Bank of America, N.A., as Administrative Agent and Collateral Agent, as amended, restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original lenders or otherwise), restructured, repaid, refunded, refinanced or otherwise modified from time to time, including any agreement or indenture extending the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the Indebtedness under such agreement or agreements or indenture or indentures or any successor or replacement agreement or agreements or indenture or indentures or increasing the amount loaned or issued thereunder or altering the maturity thereof and (ii) whether or not the credit agreement referred to in clause (i) remains outstanding, if designated by the Issuer to be included in the definition of "Credit Agreement," one or more (A) debt facilities or commercial paper facilities, providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to lenders or to special purpose entities formed to borrow from lenders against such receivables) or letters of credit, (B) debt securities, indentures or other forms of debt financing (including convertible or exchangeable debt instruments or bank guarantees or bankers' acceptances), or (C) instruments or agreements evidencing any other Indebtedness, in each case, with the same or different borrowers or issuers and, in each case, as amended, supplemented, modified, extended, restructured, renewed, refinanced, restated, replaced or refunded in whole or in part from time to time.

"Credit Agreement Documents" means the collective reference to any Credit Agreement, any notes issued pursuant thereto and the guarantees thereof, and the collateral documents relating thereto, as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified, in whole or in part, from time to time.

"Cumulative Credit" means the sum of (without duplication):

(A) 50% of the Consolidated Net Income of the Issuer for the period (taken as one accounting period), from January 1, 2008 to the end of the Issuer's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, in the case such Consolidated Net Income for such period is a deficit, minus 100% of such deficit), *plus*

(B) 100% of the aggregate net proceeds, including cash and the Fair Market Value (as determined in good faith by the Issuer) of property other than cash, received by the Issuer after February 1, 2008 (other than net proceeds to the extent such net proceeds have been used to Incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to Section 4.03(b)(xiii)) from the issue or sale of Equity Interests of the Issuer (excluding Refunding Capital Stock, Designated Preferred Stock, Excluded Contributions and Disqualified Stock), including Equity Interests issued upon exercise of warrants or options (other than an issuance or sale to a Restricted Subsidiary of the Issuer), *plus*

(C) 100% of the aggregate amount of contributions to the capital of the Issuer received in cash and the Fair Market Value (as determined in good faith by the Issuer) of property other than cash after February 1, 2008 (other than Excluded Contributions, Refunding Capital Stock, Designated Preferred Stock and Disqualified Stock and other than contributions to the extent such contributions have been used to Incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to Section 4.03(b)(xiii)), *plus*

(D) 100% of the principal amount of any Indebtedness or the liquidation preference or maximum fixed repurchase price, as the case may be, of any Disqualified Stock of the Issuer or any Restricted Subsidiary thereof issued after February 1, 2008 (other than Indebtedness or Disqualified Stock issued to a Restricted Subsidiary) which has been converted into or exchanged for Equity Interests in the Issuer (other than Disqualified Stock) or any direct or indirect parent of the Issuer (*provided* in the case of any parent, such Indebtedness or Disqualified Stock is retired or extinguished), *plus*

(E) 100% of the aggregate amount received by the Issuer or any Restricted Subsidiary in cash and the Fair Market Value (as determined in good faith by the Issuer) of property other than cash received by the Issuer or any Restricted Subsidiary from:

(I) the sale or other disposition (other than to the Issuer or a Restricted Subsidiary of the Issuer) of Restricted Investments made by the Issuer and its Restricted Subsidiaries and from repurchases and redemptions of such Restricted Investments from the Issuer and its Restricted Subsidiaries by any Person (other than the Issuer or any of its Restricted Subsidiaries) and from repayments of loans or advances, and releases of guarantees, which constituted Restricted Investments (other than in each case to the extent that the Restricted Investment was made pursuant to clause (vii) of Section 4.04(b)),

(II) the sale (other than to the Issuer or a Restricted Subsidiary of the Issuer) of the Capital Stock of an Unrestricted Subsidiary, or

(III) a distribution or dividend from an Unrestricted Subsidiary, *plus*

(F) in the event any Unrestricted Subsidiary of the Issuer has been redesignated as a Restricted Subsidiary or has been merged, consolidated or amalgamated with or into, or transfers or conveys its assets to, or is liquidated into, the Issuer or a Restricted Subsidiary of the Issuer, the Fair Market Value (as determined in good faith by the Issuer) of the

13

Investment of the Issuer in such Unrestricted Subsidiary (which, if the Fair Market Value of such investment shall exceed $250.0 million, shall be determined by the Board of Directors of the Issuer, a copy of the resolution of which with respect thereto shall be delivered to the Trustee) at the time of such redesignation, combination or transfer (or of the assets transferred or conveyed, as applicable) (other than in each case to the extent that the designation of such Subsidiary as an Unrestricted Subsidiary was made pursuant to clause (vii) of Section 4.04(b) or constituted a Permitted Investment).

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"Designated Non-cash Consideration" means the Fair Market Value (as determined in good faith by the Issuer) of non-cash consideration received by the Issuer or one of its Restricted Subsidiaries in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officer's Certificate, setting forth the basis of such valuation, less the amount of Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration.

"Designated Preferred Stock" means Preferred Stock of the Issuer or any direct or indirect parent of the Issuer (other than Disqualified Stock), that is issued for cash (other than to the Issuer or any of its Subsidiaries or an employee stock ownership plan or trust established by the Issuer or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate, on the issuance date thereof.

"Destruction" means any damage to, loss or destruction of all or any portion of the Collateral.

"Discharge of Senior Lender Claims" shall mean, except to the extent otherwise provided in the Intercreditor Agreement, payment in full in cash (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of (a) all Obligations in respect of all outstanding First Priority Lien Obligations and, with respect to letters of credit or letter of credit guaranties outstanding thereunder, delivery of cash collateral or backstop letters of credit in respect thereof in compliance with the Credit Agreement, in each case after or concurrently with the termination of all commitments to extend credit thereunder and (b) any other First Priority Lien Obligations that are due and

payable or otherwise accrued and owing at or prior to the time such principal and interest are paid; *provided* that the Discharge of Senior Lender Claims shall not be deemed to have occurred if such payments are made with the proceeds of other First Priority Lien Obligations that constitute an exchange or replacement for or a refinancing of such Obligations or First Priority Lien Obligations. In the event the First Priority Lien Obligations are modified and the Obligations are paid over time or otherwise modified pursuant to Section 1129 of the Bankruptcy Code, the First Priority Lien Obligations shall be deemed to be discharged when the final payment is made, in cash, in respect of such indebtedness and any obligations pursuant to such new indebtedness shall have been satisfied.

14

"<u>Disqualified Stock</u>" means, with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable), or upon the happening of any event:

(1) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (other than as a result of a change of control or asset sale),

(2) is convertible or exchangeable for Indebtedness or Disqualified Stock of such Person, or

(3) is redeemable at the option of the holder thereof, in whole or in part (other than solely as a result of a change of control or asset sale),

in each case prior to 91 days after the earlier of the maturity date of the Notes or the date the Notes are no longer outstanding; *provided, however,* that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; *provided, further, however*, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of the Issuer or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Issuer in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; *provided, further,* that any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Capital Stock that is not Disqualified Stock shall not be deemed to be Disqualified Stock.

"<u>Domestic Subsidiary</u>" means a Restricted Subsidiary that is not a Foreign Subsidiary.

"<u>EBITDA</u>" means, with respect to any Person for any period, the Consolidated Net Income of such Person for such period plus, without duplication, to the extent the same was deducted in calculating Consolidated Net Income:

(1) Consolidated Taxes; *plus*

(2) Fixed Charges; *plus*

(3) Consolidated Depreciation and Amortization Expense; plus

(4) Consolidated Non-cash Charges; *plus*

(5) any expenses or charges (other than Consolidated Depreciation and Amortization Expense) related to any issuance of Equity Interests, Investment, acquisition, disposition, recapitalization or the Incurrence or repayment of Indebtedness permitted to be Incurred by this Indenture (including a refinancing thereof) (whether or not successful), including (i) such fees, expenses or charges related to the offering of the Notes and the Bank Indebtedness, (ii) any amendment or other modification of the Notes or other Indebtedness, (iii) any additional interest in respect of the Notes and (iv) commissions, discounts, yield and other fees and charges (including any interest expense) related to any Qualified Receivables Financing; *plus*

15

(6) business optimization expenses and other restructuring charges, reserves or expenses (which, for the avoidance of doubt, shall include, without limitation, the effect of inventory optimization programs, facility consolidations, retention, systems establishment costs, contract termination costs, future lease commitments and excess pension charges); *plus*

(7) the amount of management, monitoring, consulting, transaction and advisory fees and related expenses paid to the Sponsors (or any accruals relating to such fees and related expenses) during such period to the extent otherwise permitted by Section 4.07; *plus*

(8) the amount of loss on sale of receivables and related assets to a Receivables Subsidiary in connection with a Qualified Receivables Financing; *plus*

(9) any costs or expense Incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such cost or expenses are funded with cash proceeds contributed to the capital of the Issuer or a Subsidiary Pledgor or net cash proceeds of an issuance of Equity Interests of the Issuer (other than Disqualified Stock) solely to the extent that such net cash proceeds are excluded from the calculation of the Cumulative Credit; *plus*

(10) Pre-Opening Expenses;

*less*, without duplication,

(11) non-cash items increasing Consolidated Net Income for such period (excluding the recognition of deferred revenue or any items which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges that reduced EBITDA in any prior period and any items for which cash was received in a prior period).

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"Equity Offering" means any public or private sale after the Issue Date of common stock or Preferred Stock of the Issuer or any direct or indirect parent of the Issuer, as applicable (other than Disqualified Stock), other than:

(1) public offerings with respect to the Issuer's or such direct or indirect parent's common stock registered on Form S-4 or Form S-8;

(2) issuances to any Subsidiary of the Issuer; and

(3) any such public or private sale that constitutes an Excluded Contribution.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

16

"Exchange Offer Registration Statement" means the registration statement filed with the SEC in connection with the Registered Exchange Offer.

"Exchanged Indebtedness" means unsecured Indebtedness of the Issuer or any of its Restricted Subsidiaries that has been issued in exchange for any of the Existing Notes or in exchange for any such Exchanged Indebtedness.

"Excluded Contributions" means the Cash Equivalents or other assets (valued at their Fair Market Value as determined in good faith by senior management or the Board of Directors of the Issuer) received by the Issuer after the Issue Date from:

(1) contributions to its common equity capital, and

(2) the sale (other than to a Subsidiary of the Issuer or to any Subsidiary management equity plan or stock option plan or any other management or employee benefit plan or agreement) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Issuer,

in each case designated as Excluded Contributions pursuant to an Officer's Certificate executed by an Officer of the Issuer on or promptly after the date such capital contributions are made or the date such Capital Stock is sold, as the case may be.

"Existing Notes" means the Issuer's 5.500% Senior Notes due 2010, 8.00% Senior Notes due 2011, 5.375% Senior Notes due 2013, 7.875% Senior Subordinated Notes due 2010, 8.125% Senior Subordinated Notes due 2011, 5.625% Senior Notes due 2015, 6.500% Senior Notes due 2016, 5.75% Senior Notes due 2017, 10.75% Senior Notes due 2016 and 10.75%/11.50% Senior Toggle Notes due 2018, in each case to the extent outstanding after completion of the Transactions.

"Existing Second Lien Notes" means the Issuer's 10.00% Second-Priority Senior Secured Notes due 2018 and the 10.00% Second-Priority Senior Secured Notes due 2015 issued pursuant to the Existing Second Lien Notes Indenture.

"Existing Second Lien Notes Indenture" means the indenture dated as of December 24, 2008, by and among the Issuer, Harrah's Entertainment and the 2008 Notes Trustee.

"Fair Market Value" means, with respect to any asset or property, the price which could be negotiated in an arm's-length transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction.

"First Lien Agent" has the meaning given to such term in the Intercreditor Agreement.

"First Priority After-Acquired Property" means any property of the Issuer or any Subsidiary Pledgor that secures any Secured Bank Indebtedness that is not already subject to the Lien under the Security Documents other than any securities or other equity interests of the Issuer or any of the Issuer's Subsidiaries.

17

"First Priority Lien Obligations" means (i) all Secured Bank Indebtedness and (ii) all other Obligations of the Issuer or any of its Restricted Subsidiaries in respect of Hedging Obligations or Obligations in respect of cash management services in each case owing to a Person that is a holder of Secured Bank Indebtedness or an Affiliate of such holder at the time of entry into such Hedging Obligations or Obligations in respect of cash management services.

"<u>Fixed Charge Coverage Ratio</u>" means, with respect to any Person for any period, the ratio of EBITDA of such Person for such period to the Fixed Charges (other than Fixed Charges in respect of Qualified Non-Recourse Debt) of such Person for such period. In the event that the Issuer or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness (other than in the case of revolving credit borrowings or revolving advances under any Qualified Receivables Financing, in which case interest expense shall be computed based upon the average daily balance of such Indebtedness during the applicable period) or issues, repurchases or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated but prior to the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "<u>Calculation Date</u>"), then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness, or such issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions) and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Issuer or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions), discontinued operations and operational changes (and the change of any associated fixed charge obligations and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period. For purposes of making the computation referred to above, with respect to each New Project that commences operations and records not less than one full fiscal quarter's operations during the four-quarter reference period, the operating results of such New Project will be annualized on a straight line basis during such period.

18

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Issuer. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Issuer as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event (including, to the extent applicable, from the Acquisition Transactions), and (2) all adjustments of the nature used in connection with the calculation of "Adjusted EBITDA" as set forth in "Debt Covenant Compliance" in Exhibit 99.1 to the Quarterly Report on Form 10-Q for the nine months ended September 30, 2008 for Harrah's Entertainment to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness if such Hedging Obligation has a remaining term in excess of 12 months). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Issuer to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a *pro forma* basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Issuer may designate.

For purposes of this definition, any amount in a currency other than U.S. dollars will be converted to U.S. dollars based on the average exchange rate for such currency for the most recent twelve-month period immediately prior to the date of determination in a manner consistent with that used in calculating EBITDA for the applicable period.

"<u>Fixed Charges</u>" means, with respect to any Person for any period, the sum, without duplication, of:

(1) Consolidated Interest Expense of such Person for such period, and

(2) all cash dividend payments (excluding items eliminated in consolidation) on any series of Preferred Stock or Disqualified Stock of such Person and its Restricted Subsidiaries.

"<u>Foreign Subsidiary</u>" means a Restricted Subsidiary not organized or existing under the laws of the United States of America or any state or territory thereof or the District of Columbia and any direct or indirect subsidiary of such Restricted Subsidiary.

19

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect on the Issue Date. For the purposes of this Indenture, the term "consolidated" with respect to any Person shall mean such Person consolidated with its Restricted Subsidiaries, and shall not include any Unrestricted Subsidiary, but the interest of such Person in an Unrestricted Subsidiary will be accounted for as an Investment.

"Gaming Authorities" means, in any jurisdiction in which Issuer or any of its subsidiaries manages or conducts any casino, gaming business or activities, the applicable gaming board, commission, or other governmental gaming regulatory body or agency which (a) has, or may at any time after issuance of the Notes have, jurisdiction over the gaming activities of the Issuer or any of its subsidiaries, or any successor to such authority or (b) is, or may at any time after the issuance of the Notes be, responsible for interpreting, administering and enforcing the Gaming Laws.

"Gaming Laws" means all applicable constitutions, treaties, laws and statutes pursuant to which any Gaming Authority possesses regulatory, licensing or permit authority over gaming, gambling or casino activities, and all rules, rulings, orders, ordinances or regulations of any Gaming Authority applicable to the gambling, casino or gaming businesses or activities of the Issuer or any of its subsidiaries in any jurisdiction, as in effect from time to time, including the policies, interpretations and administration thereof by the Gaming Authorities.

"guarantee" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including, without limitation, letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"Guaranteed Notes Indenture" means the indenture dated as of February 1, 2008, among the Issuer, the note guarantors named therein and U.S. Bank National Assocation, as trustee relating to the Issuer's 10.75% Senior Notes due 2016 and 10.75% / 11.5% Senior Toggle Notes due 2018, as it may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms.

"Guarantor" means the Parent Guarantor and any Subsidiary that executes a supplemental indenture and provides a guarantee in accordance with Section 4.11 hereof.

"Guarantor Intercreditor Agreement" means the intercreditor agreement dated as of January 28, 2008, among Bank of America, N.A., as agent under the Credit Agreement Documents, U.S. Bank National Association, as trustee under the Guaranteed Notes Indenture, Citibank N.A., in its capacity as administrative agent under the Senior Interim Loan Facility and the Issuer, as it may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms.

"Harrah's Entertainment" means Harrah's Entertainment, Inc., a Delaware corporation.

"Hedging Obligations" means, with respect to any Person, the obligations of such Person under:

(1) currency exchange, interest rate or commodity swap agreements, currency exchange, interest rate or commodity cap agreements and currency exchange, interest rate or commodity collar agreements; and

(2) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange, interest rates or commodity prices.

"Holdco Issuer" means the issuer in any Holdco Qualified IPO.

"Holdco Qualified IPO" means any Qualified IPO in which a direct or indirect parent of the Issuer is the issuer.

"holder" or "noteholder" means the Person in whose name a Note is registered on the Registrar's books.

"Incur" means issue, assume, guarantee, incur or otherwise become liable for; *provided, however,* that any Indebtedness or Capital Stock of a Person existing at the time such person becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Subsidiary.

"Indebtedness" means, with respect to any Person:

(1) the principal and premium (if any) of any indebtedness of such Person, whether or not contingent, (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof), (c) representing the deferred and unpaid purchase price of any property (except any such balance that constitutes (i) a trade payable or similar obligation to a trade creditor Incurred in the ordinary course of business, (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and (iii) liabilities accrued in the ordinary course of business), which purchase price is due more than six months after the date of placing the property in service or taking delivery and title thereto, (d) in respect of Capitalized Lease Obligations, or (e) representing any Hedging Obligations, if and to the extent that any of the foregoing indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability on a balance

sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2) to the extent not otherwise included, any obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, the obligations referred to in clause (1) of another Person (other than by endorsement of negotiable instruments for collection in the ordinary course of business); and

(3) to the extent not otherwise included, Indebtedness of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); *provided, however,* that the amount of such Indebtedness will be the lesser of: (a) the Fair Market Value (as determined in good faith by the Issuer) of such asset at such date of determination, and (b) the amount of such Indebtedness of such other Person;

21

*provided, however,* that notwithstanding the foregoing, Indebtedness shall be deemed not to include (1) Contingent Obligations Incurred in the ordinary course of business and not in respect of borrowed money; (2) deferred or prepaid revenues; (3) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller; (4) Obligations under or in respect of Qualified Receivables Financing or (5) obligations under the Acquisition Documents.

Notwithstanding anything in this Indenture to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Indenture as a result of accounting for any embedded derivatives created by the terms of such Indebtedness; and any such amounts that would have constituted Indebtedness under this Indenture but for the application of this sentence shall not be deemed an Incurrence of Indebtedness under this Indenture.

"Indenture" means this Indenture as amended or supplemented from time to time.

"Independent Financial Advisor" means an accounting, appraisal or investment banking firm or consultant, in each case of nationally recognized standing, that is, in the good faith determination of the Issuer, qualified to perform the task for which it has been engaged.

"Intercreditor Agreement" means the intercreditor agreement among the First Lien Agent, the 2008 Notes Trustee, and the other parties from time to time party thereto, dated as of December 24, 2008, as supplemented by the joinder and supplement to the intercreditor agreement by the Trustee, as New Trustee and Second Priority Agent, and acknowledged by the Issuer, First Lien Agent and the 2008 Notes Trustee, dated as of the date hereof, as it may be further amended, restated, supplemented or otherwise modified from time to time in accordance with its terms and this Indenture.

"Interest Payment Date" has the meaning set forth in Exhibit A and Exhibit B hereto.

"Investment Grade Rating" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

"Investment Grade Securities" means:

(1) securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents),

22

(2) securities that have a rating equal to or higher than Baa3 (or equivalent) by Moody's and BBB- (or equivalent) by S&P, but excluding any debt securities or loans or advances between and among the Issuer and its Subsidiaries,

(3) investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment and/or distribution, and

(4) corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition.

"Investments" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet of the Issuer in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. For purposes of the definition of "Unrestricted Subsidiary" and Section 4.04:

(1) "Investments" shall include the portion (proportionate to the Issuer's equity interest in such Subsidiary) of the Fair Market Value (as determined in good faith by the Issuer) of the net assets of a Subsidiary of the Issuer at the time that such Subsidiary is designated an

Unrestricted Subsidiary; *provided, however,* that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Issuer shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to:

(a) the Issuer's "Investment" in such Subsidiary at the time of such redesignation *less*

(b) the portion (proportionate to the Issuer's equity interest in such Subsidiary) of the Fair Market Value (as determined in good faith by the Issuer) of the net assets of such Subsidiary at the time of such redesignation; and

(2) any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value (as determined in good faith by the Issuer) at the time of such transfer, in each case as determined in good faith by the Board of Directors of the Issuer.

"Issue Date" means the date on which the Notes are originally issued.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or similar encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or

23

give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction); *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"Long-Term Retained Notes" means the Issuer's 5.625% Senior Notes due 2015, 6.500% Senior Notes due 2016 and 5.75% Senior Notes due 2017, in each case, to the extent outstanding after completion of the Transactions.

"Management Group" means the group consisting of the directors, executive officers and other management personnel of the Issuer or any direct or indirect parent of the Issuer, as the case may be, on the Issue Date together with (1) any new directors whose election by such boards of directors or whose nomination for election by the shareholders of the Issuer or any direct or indirect parent of the Issuer, as applicable, was approved by a vote of a majority of the directors of the Issuer or any direct or indirect parent of the Issuer, as applicable, then still in office who were either directors on the Issue Date or whose election or nomination was previously so approved and (2) executive officers and other management personnel of the Issuer or any direct or indirect parent of the Issuer, as applicable, hired at a time when the directors on the Issue Date together with the directors so approved constituted a majority of the directors of the Issuer or any direct or indirect parent of the Issuer, as applicable.

"Merger Agreement" means the Agreement and Plan of Merger among Hamlet Holdings LLC, Hamlet Merger Inc. and Harrah's Entertainment, dated as of December 19, 2006, as amended, supplemented or modified from time to time prior to the Issue Date or thereafter, in accordance with its terms.

"Moody's" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"Net Income" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"Net Insurance Proceeds" means the insurance proceeds (excluding liability insurance proceeds payable to the Trustee for any loss, liability or expense incurred by it and excluding the proceeds of business interruption insurance) or condemnation awards actually received by the Issuer or any Restricted Subsidiary as a result of the Destruction or Taking of all or any portion of the Collateral, net of:

(1) reasonable out-of-pocket expenses and fees relating to such Taking or Destruction (including, without limitation, expenses of attorneys and insurance adjusters); and

(2) repayment of Indebtedness that is secured by the property or assets that are the subject of such Taking or Destruction; *provided* that, in the case of any Destruction or Taking involving Collateral, the Lien securing such Indebtedness constitutes a Lien permitted by this Indenture to be senior to the Second Priority Liens.

24

"Net Proceeds" means the aggregate cash proceeds received by the Issuer or any of its Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received in respect of or upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale and any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding the assumption by the acquiring Person of Indebtedness relating to the disposed assets or other consideration received in any other non-cash form), net of the direct costs relating to such Asset Sale and the sale or disposition of such Designated Non-cash Consideration (including, without limitation, legal, accounting and investment banking fees, and brokerage and sales commissions), and any relocation expenses Incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements related thereto), amounts required to be applied to the repayment of principal, premium (if any) and interest on Indebtedness required (other than pursuant to Section 4.06(b)(i)) to be paid as a result of such transaction, and any

deduction of appropriate amounts to be provided by the Issuer as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Issuer after such sale or other disposition thereof, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"New Project" means each capital project which is either a new project or a new feature of an existing project owned by the Issuer or its Restricted Subsidiaries which receives a certificate of completion or occupancy and all relevant licenses, and in fact commences operations.

"Note Guarantee" means any guarantee of the obligations of the Issuer under this Indenture and the Notes by any Person in accordance with the provisions of this Indenture.

"Obligations" means any principal, interest, penalties, fees, indemnifications, reimbursements (including, without limitation, reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any Indebtedness; *provided* that Obligations with respect to the Notes shall not include fees or indemnifications in favor of the Trustee and other third parties other than the holders of the Notes.

"Offering Memorandum" means the confidential offering memorandum, dated March 5, 2009, as supplemented or amended from time to time, relating to the issuance of the Initial Notes.

"Officer" means the Chairman of the Board, Chief Executive Officer, Chief Financial Officer, President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of the Issuer.

"Officer's Certificate" means a certificate signed on behalf of the Issuer by an Officer of the Issuer, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Issuer, which meets the requirements set forth in this Indenture.

25

"Operations Management Agreement" means each of the real estate management agreements and any other operating management agreement entered into by the Issuer or any of its Restricted Subsidiaries with Harrah's Entertainment or with any other direct or indirect Subsidiary of Harrah's Entertainment, including, without limitation, any Real Estate Subsidiary, and any and all modifications thereto, substitutions therefor and replacements thereof so long as such modifications, substitutions and replacements are not materially less favorable, taken as a whole, to the Issuer and its Restricted Subsidiaries than the terms of such agreements as in effect on the Issue Date.

"Opinion of Counsel" means a written opinion from legal counsel who is acceptable to the Trustee. The counsel may be an employee of or counsel to the Issuer or the Trustee.

"Other Second-Lien Obligations" means other Indebtedness of the Issuer and its Restricted Subsidiaries that is equally and ratably secured with the Notes as permitted by this Indenture and is designated by the Issuer as an Other Second-Lien Obligation; *provided* that an authorized representative on behalf of the holders of such Indebtedness has executed joinders to the Security Documents in the form or substantially in the form provided therein.

"Parent Guarantee" means a Note Guarantee of Harrah's Entertainment and its successors.

"Parent Guarantor" means Harrah's Entertainment and its successors.

"Pari Passu Indebtedness" means:

(1) with respect to the Issuer, the Notes and any Indebtedness which ranks pari passu in right of payment to the Notes; and

(2) with respect to any Subsidiary Pledgor, its obligations in respect of the Notes and any Indebtedness which ranks pari passu in right of payment to such Subsidiary Pledgor's obligations in respect of the Notes.

"Permitted Holders" means, at any time, each of (i) the Sponsors, (ii) the Management Group, (iii) any Person that has no material assets other than the Capital Stock of the Issuer and, directly or indirectly, holds or acquires 100% of the total voting power of the Voting Stock of the Issuer, and of which no other Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), other than any of the other Permitted Holders specified in clauses (i) and (ii) above, holds more than 50% of the total voting power of the Voting Stock thereof and (iv) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) the members of which include any of the Permitted Holders specified in clauses (i) and (ii) above and that, directly or indirectly, hold or acquire beneficial ownership of the Voting Stock of the Issuer (a "Permitted Holder Group"), so long as (1) each member of the Permitted Holder Group has voting rights proportional to the percentage of ownership interests held or acquired by such member and (2) no Person or other "group" (other than the Permitted Holders specified in clauses (i) and (ii) above) beneficially owns more than 50% on a fully diluted basis of the Voting Stock held by the Permitted Holder Group. Any Person or group whose acquisition of beneficial ownership constitutes a Change of Control in respect of which a Change of Control Offer is made in accordance with the requirements of this Indenture will thereafter, together with its

Affiliates, constitute an additional Permitted Holder.

26

"Permitted Investments" means:

(1) any Investment in the Issuer or any Restricted Subsidiary;

(2) any Investment in Cash Equivalents or Investment Grade Securities;

(3) any Investment by the Issuer or any Restricted Subsidiary of the Issuer in a Person if as a result of such Investment (a) such Person becomes a Restricted Subsidiary of the Issuer, or (b) such Person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys all or substantially all of its assets to, or is liquidated into, the Issuer or a Restricted Subsidiary of the Issuer;

(4) any Investment in securities or other assets not constituting Cash Equivalents and received in connection with an Asset Sale made pursuant to the provisions of Section 4.06 or any other disposition of assets not constituting an Asset Sale;

(5) any Investment existing on, or made pursuant to binding commitments existing on, the Issue Date or an Investment consisting of any extension, modification or renewal of any Investment existing on the Issue Date; *provided* that the amount of any such Investment may be increased (x) as required by the terms of such Investment as in existence on the Issue Date or (y) as otherwise permitted under this Indenture;

(6) advances to employees, taken together with all other advances made pursuant to this clause (6), not to exceed $25.0 million at any one time outstanding;

(7) any Investment acquired by the Issuer or any of its Restricted Subsidiaries (a) in exchange for any other Investment or accounts receivable held by the Issuer or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable, or (b) as a result of a foreclosure by the Issuer or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(8) Hedging Obligations permitted under Section 4.03(b)(x);

(9) any Investment by the Issuer or any of its Restricted Subsidiaries in a Similar Business having an aggregate Fair Market Value (as determined in good faith by the Issuer), taken together with all other Investments made pursuant to this clause (9) that are at that time outstanding, not to exceed the greater of (x) $500.0 million and (y) 4.5% of Total Assets at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value); *provided, however,* that if any Investment pursuant to this clause (9) is

27

made in any Person that is not a Restricted Subsidiary of the Issuer at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Issuer after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (9) for so long as such Person continues to be a Restricted Subsidiary;

(10) additional Investments by the Issuer or any of its Restricted Subsidiaries having an aggregate Fair Market Value (as determined in good faith by the Issuer), taken together with all other Investments made pursuant to this clause (10) that are at that time outstanding, not to exceed the greater of (x) $950.0 million and (y) 4.5% of Total Assets at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value); *provided, however,* that if any Investment pursuant to this clause (10) is made in any Person that is not a Restricted Subsidiary of the Issuer at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Issuer after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (10) for so long as such Person continues to be a Restricted Subsidiary;

(11) loans and advances to officers, directors or employees for business-related travel expenses, moving expenses and other similar expenses, in each case Incurred in the ordinary course of business or consistent with past practice or to fund such person's purchase of Equity Interests of the Issuer or any direct or indirect parent of the Issuer;

(12) Investments the payment for which consists of Equity Interests of the Issuer (other than Disqualified Stock) or any direct or indirect parent of the Issuer, as applicable; *provided, however,* that such Equity Interests will not increase the amount available for Restricted Payments under clause (C) of the definition of "Cumulative Credit";

(13) any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with the provisions of Section 4.07(b) (except transactions described in clauses (ii), (vi), (vii), (xi) and (xii)(b) of such Section);

(14) Investments consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(15) guarantees issued in accordance with Section 4.03 and Section 4.11, including, without limitation, any guarantee or other obligation

issued or Incurred under the Credit Agreement in connection with any letter of credit issued for the account of Harrah's Entertainment or any of its subsidiaries (including with respect to the issuance of, or payments in respect of drawings under, such letters of credit);

(16) Investments consisting of or to finance purchases and acquisitions of inventory, supplies, materials, services or equipment or purchases of contract rights or licenses or leases of intellectual property;

<div align="center">28</div>

(17) any Investment in a Receivables Subsidiary or any Investment by a Receivables Subsidiary in any other Person in connection with a Qualified Receivables Financing, including Investments of funds held in accounts permitted or required by the arrangements governing such Qualified Receivables Financing or any related Indebtedness;

(18) any Investment in an entity or purchase of a business or assets in each case owned (or previously owned) by a customer of a Restricted Subsidiary as a condition or in connection with such customer (or any member of such customer's group) contracting with a Restricted Subsidiary, in each case in the ordinary course of business;

(19) any Investment in an entity which is not a Restricted Subsidiary to which a Restricted Subsidiary sells accounts receivable pursuant to a Qualified Receivables Financing;

(20) additional Investments in joint ventures not to exceed at any one time in the aggregate outstanding under this clause (20) the greater of $350.0 million and 2.0% of Total Assets; *provided, however,* that if any Investment pursuant to this clause (20) is made in any Person that is not a Restricted Subsidiary of the Issuer at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Issuer after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (20) for so long as such Person continues to be a Restricted Subsidiary;

(21) Investments of a Restricted Subsidiary of the Issuer acquired after the Issue Date or of an entity merged into, amalgamated with or consolidated with the Issuer or a Restricted Subsidiary of the Issuer in a transaction that is not prohibited by Section 5.01 after the Issue Date to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation; and

(22) any Investment in any Subsidiary of the Issuer or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business.

"<u>Permitted Liens</u>" means, with respect to any Person:

(1) pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case Incurred in the ordinary course of business;

(2) Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet due or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review;

<div align="center">29</div>

(3) Liens for taxes, assessments or other governmental charges not yet due or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings;

(4) Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5) minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not Incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6) (A) Liens on assets of a Restricted Subsidiary that is not a Subsidiary Pledgor securing Indebtedness of such Restricted Subsidiary permitted to be Incurred pursuant to Section 4.03, (B) Liens securing First Priority Lien Obligations in an aggregate principal amount not to exceed the greater of (x) the aggregate principal amount of Indebtedness permitted to be Incurred pursuant to Section 4.03(b)(i) and (y) the maximum principal amount of Indebtedness that, as of the date such Indebtedness was Incurred, and after giving effect to the Incurrence of such Indebtedness and the application of proceeds therefrom on such date, would not cause the Secured Indebtedness Leverage Ratio of the Issuer to exceed 4.50 to 1.00, and (C) Liens securing Indebtedness permitted to be Incurred pursuant to clause (iv), (xii), (xvi), (xx) or (xxiii) of Section 4.03(b) (*provided* that (1) in the case of clause (iv), such Lien extends only to the assets and/or Capital Stock, the acquisition, lease, construction, repair, replacement or improvement of which is financed thereby and any proceeds or products thereof, (2) in

the case of clause (xx), such Lien does not extend to the property or assets of any Subsidiary of the Issuer other than a Foreign Subsidiary, and (3) in the case of clause (xxiii) such Lien applies solely to acquired property or asset of the acquired entity, as the case may be);

(7) Liens existing on the Issue Date (other than Liens in favor of the lenders under the Credit Agreement);

(8) Liens on assets, property or shares of stock of a Person at the time such Person becomes a Subsidiary; *provided, however,* that such Liens are not created or Incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided, further,* however, that such Liens may not extend to any other property owned by the Issuer or any Restricted Subsidiary of the Issuer;

30

(9) Liens on assets or property at the time the Issuer or a Restricted Subsidiary of the Issuer acquired the assets or property, including any acquisition by means of a merger, amalgamation or consolidation with or into the Issuer or any Restricted Subsidiary of the Issuer; *provided, however,* that such Liens are not created or Incurred in connection with, or in contemplation of, such acquisition; *provided, further,* however, that the Liens may not extend to any other property owned by the Issuer or any Restricted Subsidiary of the Issuer;

(10) Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Issuer or another Restricted Subsidiary of the Issuer permitted to be Incurred in accordance with Section 4.03;

(11) Liens securing Hedging Obligations not Incurred in violation of this Indenture; *provided* that with respect to Hedging Obligations relating to Indebtedness, such Lien extends only to the property securing such Indebtedness;

(12) Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(13) leases and subleases of real property which do not materially interfere with the ordinary conduct of the business of the Issuer or any of its Restricted Subsidiaries;

(14) Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Issuer and its Restricted Subsidiaries in the ordinary course of business;

(15) Liens in favor of the Issuer or any Subsidiary Pledgor;

(16) Liens on accounts receivable and related assets of the type specified in the definition of "Receivables Financing" Incurred in connection with a Qualified Receivables Financing;

(17) deposits made in the ordinary course of business to secure liability to insurance carriers;

(18) Liens on the Equity Interests of Unrestricted Subsidiaries;

(19) grants of software and other technology licenses in the ordinary course of business;

(20) Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8), (9), (10), (11) and (15); *provided, however,* that (x) such new Lien shall be limited to all or part of the same property that secured the original

31

Lien (*plus* improvements on such property), and (y) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (A) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), (9), (10), (11) and (15) at the time the original Lien became a Permitted Lien under this Indenture, and (B) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement; *provided further,* however, that in the case of any Liens to secure any refinancing, refunding, extension or renewal of Indebtedness secured by a Lien referred to in clause (6)(B), the principal amount of any Indebtedness Incurred for such refinancing, refunding, extension or renewal shall be deemed secured by a Lien under clause (6)(B) and not this clause (20) for purposes of determining the principal amount of Indebtedness outstanding under clause (6)(B), for purposes of Section 11.04(a)(1) and for purposes of the definition of Secured Bank Indebtedness;

(21) Liens on equipment of the Issuer or any Restricted Subsidiary granted in the ordinary course of business to the Issuer's or such Restricted Subsidiary's client at which such equipment is located;

(22) judgment and attachment Liens not giving rise to an Event of Default and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(23) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(24) Liens Incurred to secure cash management services or to implement cash pooling arrangements in the ordinary course of business;

(25) other Liens securing obligations Incurred in the ordinary course of business which obligations do not exceed $100.0 million at any one time outstanding;

(26) any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(27) any amounts held by a trustee in the funds and accounts under an indenture securing any revenue bonds issued for the benefit of the Issuer or any Restricted Subsidiary; and

(28) Liens arising by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depository or financial institution.

For purposes of this definition, notwithstanding anything in the foregoing clauses (1) through (28), any Lien that secures Retained Notes or Long-Term Retained Notes shall not under any circumstances be deemed Permitted Liens.

<div align="center">32</div>

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"Preferred Stock" means any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution, or winding up.

"Pre-Opening Expenses" means, with respect to any fiscal period, the amount of expenses (other than interest expense) Incurred with respect to capital projects that are classified as "pre-opening expenses" on the applicable financial statements of the Issuer and its Restricted Subsidiaries for such period, prepared in accordance with GAAP.

"Project Financing" means (1) any Capitalized Lease Obligations, mortgage financing, purchase money Indebtedness or other Indebtedness Incurred in connection with the acquisition, lease, construction, repair, replacement, improvement or financing related to any of the Margaritaville Casino & Resort in Biloxi, Mississippi, the retail facilities related to the Margaritaville Casino & Resort and the planned casino and hotel in the community of Ciudad Real, Spain or any refinancing of any such Indebtedness that does not extend to any assets other than the assets listed above and (2) any Sale/Leaseback Transaction with respect to any of Margaritaville Casino & Resort in Biloxi, Mississippi, the retail facilities related to the Margaritaville Casino & Resort and the planned casino and hotel in the community of Ciudad Real, Spain.

"Qualified IPO" means any underwritten public Equity Offering.

"Qualified Non-Recourse Debt" means Indebtedness that (1) is (a) Incurred by a Qualified Non-Recourse Subsidiary to finance (whether prior to or within 270 days after) the acquisition, lease, construction, repair, replacement or improvement of any property (real or personal) or equipment (whether through the direct purchase of property or the Equity Interests of any person owning such property and whether in a single acquisition or a series of related acquisitions) or (b) assumed by a Qualified Non-Recourse Subsidiary, (2) is non-recourse to the Issuer and any Subsidiary Pledgor and (3) is non-recourse to any Restricted Subsidiary that is not a Qualified Non-Recourse Subsidiary.

"Qualified Non-Recourse Subsidiary" means (1) a Restricted Subsidiary that is not a Subsidiary Pledgor and that is formed or created after the Issue Date in order to finance an acquisition, lease, construction, repair, replacement or improvement of any property or equipment (directly or through one of its Subsidiaries) that secures Qualified Non-Recourse Debt and (2) any Restricted Subsidiary of a Qualified Non-Recourse Subsidiary.

"Qualified Receivables Financing" means any Receivables Financing of a Receivables Subsidiary that meets the following conditions:

(1) the Board of Directors of the Issuer shall have determined in good faith that such Qualified Receivables Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Issuer and the Receivables Subsidiary;

<div align="center">33</div>

(2) all sales of accounts receivable and related assets to the Receivables Subsidiary are made at Fair Market Value (as determined in good faith by the Issuer); and

(3) the financing terms, covenants, termination events and other provisions thereof shall be market terms (as determined in good faith by the Issuer) and may include Standard Securitization Undertakings.

The grant of a security interest in any accounts receivable of the Issuer or any of its Restricted Subsidiaries (other than a Receivables Subsidiary) to secure Bank Indebtedness, Indebtedness in respect of the Notes or any Refinancing Indebtedness with respect to the Notes shall not be deemed a Qualified Receivables Financing.

"Rating Agency" means (1) each of Moody's and S&P and (2) if Moody's or S&P ceases to rate the Notes for reasons outside of the Issuer's control, a "nationally recognized statistical rating organization" within the meaning of Rule 15cs-1(c)(2)(vi)(F) under the Exchange Act selected by the Issuer or any direct or indirect parent of the Issuer as a replacement agency for Moody's or S&P, as the case may be.

"Real Estate Facility" means the mortgage financing and mezzanine financing arrangements between the Real Estate Subsidiaries, which are direct or indirect subsidiaries of Harrah's Entertainment, and JPMorgan Chase Bank N.A. and its successors and assigns, on behalf of the noteholders dated as of January 28, 2008, as amended, restated, supplemented, extended, waived, replaced, restructured, repaid, refunded, refinanced or otherwise modified from time to time.

"Real Estate Subsidiary" means those Subsidiaries of Harrah's Entertainment that are party to (prior to, on or after the Issue Date) the Real Estate Facility (and their respective Subsidiaries) secured by the Real Property collateralizing such facility on the Issue Date *plus* any additional Real Property sold, contributed or transferred to such Subsidiaries by the Issuer or any Restricted Subsidiary (whether directly or indirectly through the sale, contribution or transfer of the Capital Stock of a Subsidiary the assets of which are comprised solely of such Real Property) subsequent to the Issue Date pursuant to Section 4.06.

"Real Property" means, collectively, all right, title and interests (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all buildings, structures, parking areas and improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"Record Date" has the meaning specified in Exhibits A and B hereto.

"Receivables Fees" means distributions or payments made directly or by means of discounts with respect to any participation interests issued or sold in connection with, and all other fees paid to a Person that is not a Restricted Subsidiary in connection with, any Receivables Financing.

34

"Receivables Financing" means any transaction or series of transactions that may be entered into by the Issuer or any of its Subsidiaries pursuant to which the Issuer or any of its Subsidiaries may sell, convey or otherwise transfer to (a) a Receivables Subsidiary (in the case of a transfer by the Issuer or any of its Subsidiaries); and (b) any other Person (in the case of a transfer by a Receivables Subsidiary), or may grant a security interest in, any accounts receivable (whether now existing or arising in the future) of the Issuer or any of its Subsidiaries, and any assets related thereto including, without limitation, all collateral securing such accounts receivable, all contracts and all guarantees or other obligations in respect of such accounts receivable, proceeds of such accounts receivable and other assets which are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving accounts receivable and any Hedging Obligations entered into by the Issuer or any such Subsidiary in connection with such accounts receivable.

"Receivables Repurchase Obligation" means any obligation of a seller of receivables in a Qualified Receivables Financing to repurchase receivables arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, off-set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"Receivables Subsidiary" means a Wholly Owned Restricted Subsidiary of the Issuer (or another Person formed for the purposes of engaging in Qualified Receivables Financing with the Issuer in which the Issuer or any Subsidiary of the Issuer makes an Investment and to which the Issuer or any Subsidiary of the Issuer transfers accounts receivable and related assets) which engages in no activities other than in connection with the financing of accounts receivable of the Issuer and its Subsidiaries, all proceeds thereof and all rights (contractual or other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and which is designated by the Board of Directors of the Issuer (as provided below) as a Receivables Subsidiary and:

(a) no portion of the Indebtedness or any other obligations (contingent or otherwise) of which (i) is guaranteed by the Issuer or any other Subsidiary of the Issuer (excluding guarantees of obligations (other than the principal of and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is recourse to or obligates the Issuer or any other Subsidiary of the Issuer in any way other than pursuant to Standard Securitization Undertakings, or (iii) subjects any property or asset of the Issuer or any other Subsidiary of the Issuer, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings;

(b) with which neither the Issuer nor any other Subsidiary of the Issuer has any material contract, agreement, arrangement or understanding other than on terms which the Issuer reasonably believes to be no less favorable to the Issuer or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Issuer; and

(c) to which neither the Issuer nor any other Subsidiary of the Issuer has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.

35

Any such designation by the Board of Directors of the Issuer shall be evidenced to the Trustee by filing with the Trustee a certified copy of the resolution of the Board of Directors of the Issuer giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing conditions.

"Representative" means the trustee, agent or representative (if any) for an issue of Indebtedness; *provided* that if, and for so long as, such Indebtedness lacks such a Representative, then the Representative for such Indebtedness shall at all times constitute the holder or holders of a majority in outstanding principal amount of obligations under such Indebtedness.

"Responsible Officer" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"Restricted Cash" means cash and Cash Equivalents held by Restricted Subsidiaries that are contractually restricted from being distributed to the Issuer, except for (i) such cash and Cash Equivalents subject only to such restrictions that are contained in agreements governing Indebtedness permitted under this Indenture and that are secured by such cash or Cash Equivalents and (ii) cash and Cash Equivalents constituting "cage cash."

"Restricted Investment" means an Investment other than a Permitted Investment.

"Restricted Subsidiary" means, with respect to any Person, any Subsidiary of such Person other than an Unrestricted Subsidiary of such Person. Unless otherwise indicated in this Indenture, all references to Restricted Subsidiaries shall mean Restricted Subsidiaries of the Issuer.

"Retained Notes" means the Issuer's 5.500% Senior Notes due 2010, 8.00% Senior Notes due 2011, 5.375% Senior Notes due 2013, 7.875% Senior Subordinated Notes due 2010, and 8.125% Senior Subordinated Notes due 2011, in each case to the extent outstanding after completion of the Transactions.

"Reversion Date" means the date on which one or both of the Rating Agencies withdraw their Investment Grade Rating or downgrade the rating assigned to the Notes below an Investment Grade Rating.

"Sale/Leaseback Transaction" means an arrangement relating to property now owned or hereafter acquired by the Issuer or a Restricted Subsidiary whereby the Issuer or a Restricted Subsidiary transfers such property to a Person and the Issuer or such Restricted Subsidiary leases it from such Person, other than leases between the Issuer and a Restricted Subsidiary of the Issuer or between Restricted Subsidiaries of the Issuer.

"S&P" means Standard & Poor's Ratings Group or any successor to the rating agency business thereof.

"SEC" means the Securities and Exchange Commission.

"Second Priority Liens" means the Liens securing the Obligations of the Issuer in respect of the Notes and this Indenture and the Existing Second Lien Notes and all present and future Liens securing Other Second-Lien Obligations as set forth in the Collateral Agreement.

"Secured Bank Indebtedness" means any Bank Indebtedness that is secured by a Permitted Lien incurred or deemed incurred pursuant to clause (6)(B) of the definition of Permitted Liens.

"Secured Indebtedness" means any Indebtedness secured by a Lien.

"Secured Indebtedness Leverage Ratio" means, with respect to any Person, at any date the ratio of (i) Secured Indebtedness constituting First Priority Lien Obligations of such Person and its Restricted Subsidiaries as of such date of calculation (determined on a consolidated basis in accordance with GAAP) less the amount of cash and Cash Equivalents in excess of any Restricted Cash held by such Person and its Restricted Subsidiaries as of such date of determination to (ii) EBITDA of such Person for the four full fiscal quarters for which internal financial statements are available immediately preceding such date on which such additional Indebtedness is Incurred. In the event that the Issuer or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness subsequent to the commencement of the period for which the Secured Indebtedness Leverage Ratio is being calculated but prior to the event for which the calculation of the Secured Indebtedness Leverage Ratio is made (the "Secured Leverage Calculation Date"), then the Secured Indebtedness Leverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness as if the same had occurred at the beginning of the applicable four-quarter period; *provided* that the Issuer may elect pursuant to an Officer's Certificate delivered to the Trustee to treat all or any portion of the commitment under any Indebtedness as being Incurred at such time, in which case any subsequent Incurrence of Indebtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions) and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Issuer or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Secured Leverage Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions), discontinued operations and other operational changes (and the change of any associated

Indebtedness and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Secured Indebtedness

<center>37</center>

Leverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period. For purposes of making the computation referred to above, with respect to each New Project that commences operations and records not less than one full fiscal quarter's operations during the four-quarter reference period, the operating results of such New Project will be annualized on a straight line basis during such period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Issuer. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Issuer as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event (including, to the extent applicable, from the Acquisition Transactions) and (2) all adjustments of the nature used in connection with the calculation of "Adjusted EBITDA" as set forth in "Debt Covenant Compliance" in Exhibit 99.1 to the Quarterly Report on Form 10-Q for the nine months ended September 30, 2008 for Harrah's Entertainment to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

For purposes of this definition, any amount in a currency other than U.S. dollars will be converted to U.S. dollars based on the average exchange rate for such currency for the most recent twelve-month period immediately prior to the date of determination in a manner consistent with that used in calculating EBITDA for the applicable period.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Security Documents" means the Collateral Agreement and the security agreements, pledge agreements, collateral assignments, mortgages and related agreements, as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified from time to time, creating the security interests in the Collateral as contemplated by this Indenture.

"Senior Interim Loan Facility" means the interim loan agreement, dated as of January 28, 2008, by and among the Issuer, as borrower, the lenders party thereto in their capacities as lenders thereunder and Citibank, N.A. as administrative agent, including any guarantees, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications or restatements thereof.

"Significant Subsidiary" means any Restricted Subsidiary that would be a "Significant Subsidiary" of the Issuer within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC (or any successor provision).

"Similar Business" means a business, the majority of whose revenues are derived from the activities of the Issuer and its Subsidiaries as of the Issue Date or any business or activity that is reasonably similar or complementary thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

<center>38</center>

"Sponsor Indebtedness" means Indebtedness issued to any of the Sponsors for cash proceeds by the Issuer or any of its Restricted Subsidiaries after the Issue Date or any Indebtedness issued under the Real Estate Facility held by any Sponsor.

"Sponsors" means (i) Apollo Management, L.P. and any of its respective Affiliates other than any portfolio companies (collectively, the "Apollo Sponsors"), (ii) Texas Pacific Group and any of its respective Affiliates other than any portfolio companies (collectively, the "Texas Pacific Sponsors"), (iii) any individual who is a partner or employee of an Apollo Sponsor or a Texas Pacific Sponsor that is licensed by a relevant gaming authority on the Issue Date or thereafter replaces such licensee and (iv) any Person that forms a group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) with any Apollo Sponsors and/or Texas Pacific Sponsors; *provided* that the Apollo Sponsors and/or the Texas Pacific Sponsors (x) own a majority of the voting power and (y) control a majority of the Board of Directors of the Issuer.

"Standard Securitization Undertakings" means representations, warranties, covenants, indemnities and guarantees of performance entered into by the Issuer or any Subsidiary of the Issuer which the Issuer has determined in good faith to be customary in a Receivables Financing including, without limitation, those relating to the servicing of the assets of a Receivables Subsidiary, it being understood that any Receivables Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking.

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of

principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency beyond the control of the issuer unless such contingency has occurred).

"Subordinated Indebtedness" means (a) with respect to the Issuer, any Indebtedness of the Issuer which is by its terms subordinated in right of payment to the Notes, and (b) with respect to any Subsidiary Pledgor, any Indebtedness of such Subsidiary Pledgor which is by its terms subordinated in right of payment to obligations in respect of the Notes.

"Subsidiary" means, with respect to any Person, (1) any corporation, association or other business entity (other than a partnership, joint venture or limited liability company) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, and (2) any partnership, joint venture or limited liability company of which (x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether

39

in the form of membership, general, special or limited partnership interests or otherwise, and (y) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"Subsidiary Pledgor" means any Subsidiary of the Issuer that pledges its property and assets to secure the Notes, as provided in the Security Documents; provided that upon the release or discharge of such Subsidiary of the Issuer from its obligations to pledge its assets and property to secure the Notes in accordance with this Indenture, such Subsidiary of the Issuer ceases to be a Subsidiary Pledgor.

"Suspension Period" means the period of time between a Covenant Suspension Event and the related Reversion Date.

"Taking" means any taking of all or any portion of the Collateral by condemnation or other eminent domain proceedings, pursuant to any law, general or special, or by reason of the temporary requisition of the use or occupancy of all or any portion of the Collateral by any governmental authority, civil or military, or any sale pursuant to the exercise by any such governmental authority of any right which it may then have to purchase or designate a purchaser or to order a sale of all or any portion of the Collateral.

"Tax Distributions" means any distributions described in Section 4.04(b)(xii).

"TIA" means the Trust Indenture Act of 1939 (15 U.S.C. Sections 77aaa-77bbbb) as in effect on the date of this Indenture.

"Total Assets" means the total consolidated assets of the Issuer and its Restricted Subsidiaries, as shown on the most recent balance sheet of the Issuer, without giving effect to any amortization of the amount of intangible assets since February 1, 2008.

"Total Secured Leverage Ratio" means, with respect to any Person, at any date the ratio of (i) Secured Indebtedness (other than Qualified Non-Recourse Debt and Indebtedness secured by Liens that are junior in priority to the Liens securing the Notes) of such Person and its Restricted Subsidiaries as of such date of calculation (determined on a consolidated basis in accordance with GAAP) less the amount of cash and Cash Equivalents in excess of any Restricted Cash held by such Person and its Restricted Subsidiaries as of such date of determination to (ii) EBITDA of such Person for the four full fiscal quarters for which internal financial statements are available immediately preceding such date on which such additional Indebtedness is Incurred. In the event that the Issuer or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness subsequent to the commencement of the period for which the Total Secured Leverage Ratio is being calculated but prior to the event for which the calculation of the Total Secured Leverage Ratio is made (the "Total Secured Leverage Calculation Date"), then the Total Secured Leverage Ratio shall be calculated giving pro forma effect to such Incurrence, repayment, repurchase or redemption of Indebtedness as if the same had occurred at the beginning of the applicable four-quarter period; provided that the Issuer may elect pursuant to an Officer's Certificate delivered to the Trustee to treat all or any portion of the commitment under any Indebtedness as being Incurred at such time, in which case any subsequent Incurrence of Indebtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

40

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions) and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Issuer or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Total Secured Leverage Calculation Date shall be calculated on a pro forma basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions), discontinued operations and other operational changes (and the change of any associated Indebtedness and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If

since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Total Secured Leverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period. For purposes of making the computation referred to above, with respect to each New Project that commences operations and records not less than one full fiscal quarter's operations during the four-quarter reference period, the operating results of such New Project will be annualized on a straight line basis during such period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Issuer. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Issuer as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event (including, to the extent applicable, from the Acquisition Transactions) and (2) all adjustments of the nature used in connection with the calculation of "Adjusted EBITDA" as set forth in "Debt Covenant Compliance" in Exhibit 99.1 to the Quarterly Report on Form 10-Q for the nine months ended September 30, 2008 for Harrah's Entertainment to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

For purposes of this definition, any amount in a currency other than U.S. dollars will be converted to U.S. dollars based on the average exchange rate for such currency for the most recent twelve month period immediately prior to the date of determination in a manner consistent with that used in calculating EBITDA for the applicable period.

"Transactions" means the transactions described under "Summary—Retail Tender Offers," "Summary—Interim Loans Amendment and Exchange Offer" and "General Terms of the Exchange Offers, the HBC Tender Offers and Consent Solicitations" in the Offering Memorandum.

"Treasury Rate" means, as of the applicable redemption date, the yield to maturity as of such redemption date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two business days prior to such redemption date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such redemption date to December 15, 2013; *provided, however,* that if the period from such redemption date to December 15, 2013, is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"Trust Officer" means:

(1) any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject, and

(2) who shall have direct responsibility for the administration of this Indenture.

"Trustee" means the party named as such in this Indenture until a successor replaces it and, thereafter, means the successor.

"2008 Notes Trustee" means U.S. Bank National Association in its capacity as trustee under the Existing Second Lien Notes Indenture.

"Uniform Commercial Code" means the New York Uniform Commercial Code as in effect from time to time.

"Unrestricted Subsidiary" means:

(1) any Subsidiary of the Issuer that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors of such Person in the manner provided below; and

(2) any Subsidiary of an Unrestricted Subsidiary;

The Issuer may designate any Subsidiary of the Issuer (including any newly acquired or newly formed Subsidiary of the Issuer) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on any property of, the Issuer or any other Subsidiary of the Issuer that is not a Subsidiary of the Subsidiary to be so designated; *provided, however,* that the Subsidiary to be so designated and its Subsidiaries do not at the time of designation have and do not thereafter Incur any Indebtedness pursuant to which the lender has recourse to any of the assets of the Issuer or any of its Restricted Subsidiaries; *provided, further, however,* that either:

(a) the Subsidiary to be so designated has total consolidated assets of $1,000 or less; or

(b) if such Subsidiary has consolidated assets greater than $1,000, then such designation would be permitted under Section 4.04.

The Issuer may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided, however,* that immediately after giving effect to such designation:

(x) (1) the Issuer could Incur $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a), or (2) the Fixed Charge Coverage Ratio for the Issuer and its Restricted Subsidiaries would be greater than such ratio for the Issuer and its Restricted Subsidiaries immediately prior to such designation, in each case on a *pro forma* basis taking into account such designation, and

(y) no Event of Default shall have occurred and be continuing.

Any such designation by Issuer shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the resolution of the Board of Directors or any committee thereof of the Issuer giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing provisions.

"U.S. Government Obligations" means securities that are:

(1) direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged, or

(2) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America, the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America,

which, in each case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act) as custodian with respect to any such U.S. Government Obligations or a specific payment of principal of or interest on any such U.S. Government Obligations held by such custodian for the account of the holder of such depository receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Obligations or the specific payment of principal of or interest on the U.S. Government Obligations evidenced by such depository receipt.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

43

"Weighted Average Life to Maturity" means, when applied to any Indebtedness or Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing (1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment, by (2) the sum of all such payments.

"Wholly Owned Restricted Subsidiary" is any Wholly Owned Subsidiary that is a Restricted Subsidiary.

"Wholly Owned Subsidiary" of any Person means a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares required to be held by Foreign Subsidiaries) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

SECTION 1.02. Other Definitions.

| Term | Defined in Section |
|---|---|
| "Additional Interest" | Appendix A |
| "Additional Second Priority Debt" | 4.12(c) |
| "Affiliate Transaction" | 4.07 |
| "AI" | Appendix A |
| "Asset Sale Offer" | 4.06(b) |
| "Bankruptcy Law" | 6.01 |
| "Change of Control Offer" | 4.08 |
| "covenant defeasance option" | 8.01(b) |
| "Covenant Suspension Event" | 4.16 |
| "Custodian" | 6.01 |
| "Dealer Manager Agreement" | Appendix A |
| "Dealer Managers" | Appendix A |
| "Definitive Note" | Appendix A |
| "Depository" | Appendix A |
| "Disqualified Holder" | 2.15 |

"Euroclear"                                    Appendix A
"Event of Default"                             6.01
"Excess Proceeds"                              4.06(b)
"Exchange Notes"                               Preamble
"Global Notes"                                 Appendix A
"Global Notes Legend"                          Appendix A
"Guaranteed Obligations"                       12.01(a)
"Hamlet Tender Offer"                          Appendix A
"HOC Exchange Offers"                          Appendix A
"IAI"                                          Appendix A
"incorporated provision"                       13.01
"Initial Guarantee Event"                      4.11(c)
"Initial Notes"                                Preamble

44

---

| Term | Defined in Section |
|---|---|
| "Issuer" | Preamble |
| "legal defeasance option" | 8.01(b) |
| "Notes" | Preamble |
| "Notes Custodian" | Appendix A |
| "Notice of Default" | 6.01 |
| "Offer Period" | 4.06(d) |
| "Paying Agent" | 2.04(a) |
| "Permanent Global Notes" | Appendix A |
| "Permanent Regulation S Global Notes" | Appendix A |
| "Permanent Rule 144A Global Notes" | Appendix A |
| "protected purchaser" | 2.08 |
| "QIB" | Appendix A |
| "Refinancing Indebtedness" | 4.03(b) |
| "Refunding Capital Stock" | 4.04(b) |
| "Registered Exchange Offer" | Appendix A |
| "Registrar" | 2.04(a) |
| "Registration Rights Agreement" | Appendix A |
| "Regulation S" | Appendix A |
| "Regulation S Notes" | Appendix A |
| "Restricted Notes Legend" | Appendix A |
| "Restricted Payment" | 4.04(a) |
| "Restricted Period" | Appendix A |
| "Retired Capital Stock" | 4.04(b) |
| "Reversion Date" | 4.16 |
| "Rule 501" | Appendix A |
| "Rule 144A" | Appendix A |
| "Rule 144A Notes" | Appendix A |
| "Second Commitment" | 4.06 |
| "Second Priority Debt" | 4.12(c) |
| "Shelf Registration Statement" | Appendix A |
| "Successor Issuer" | 5.01(a) |
| "Successor Parent Guarantor" | 5.01 |
| "Successor Subsidiary Pledgor" | 5.01(b) |
| "Suspended Covenants" | 4.16 |
| "Temporary Global Notes Legend" | Appendix A |
| "Temporary Global Notes" | Appendix A |
| "Temporary Regulation S Global Notes" | Appendix A |
| "Temporary Rule 144A Global Notes" | Appendix A |
| "Transfer" | 5.01(b) |
| "Transfer Restricted Definitive Notes" | Appendix A |
| "Transfer Restricted Global Notes" | Appendix A |
| "Unrestricted Definitive Notes" | Appendix A |
| "Unrestricted Global Notes" | Appendix A |

SECTION 1.03. <u>Incorporation by Reference of Trust Indenture Act</u>. This Indenture incorporates by reference certain provisions of the TIA. The following TIA terms have the following meanings:

"<u>Commission</u>" means the SEC.

"<u>indenture securities</u>" means the Notes and any Note Guarantee.

"<u>indenture security holder</u>" means a holder.

"<u>indenture to be qualified</u>" means this Indenture.

"<u>indenture trustee</u>" or "<u>institutional trustee</u>" means the Trustee.

"<u>obligor</u>" on the indenture securities means the Issuer and each Guarantor and any other obligor on the Notes.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule have the meanings assigned to them by such definitions.

SECTION 1.04. <u>Rules of Construction</u>. Unless the context otherwise requires:

(a) a term has the meaning assigned to it;

(b) an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c) "<u>or</u>" is not exclusive;

(d) "<u>including</u>" means including without limitation;

(e) words in the singular include the plural and words in the plural include the singular;

(f) unsecured Indebtedness shall not be deemed to be subordinate or junior to Secured Indebtedness merely by virtue of its nature as unsecured Indebtedness;

(g) the principal amount of any non-interest bearing or other discount security at any date shall be the principal amount thereof that would be shown on a balance sheet of the issuer dated such date prepared in accordance with GAAP;

(h) the principal amount of any Preferred Stock shall be (i) the maximum liquidation value of such Preferred Stock or (ii) the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock, whichever is greater;

(i) unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP;

(j) "<u>$</u>" and "<u>U.S. dollars</u>" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts; and

(k) whenever in this Indenture or the Notes there is mentioned, in any context, principal, interest or any other amount payable under or with respect to any Notes, such mention shall be deemed to include mention of the payment of Additional Interest, to the extent that, in such context, Additional Interest is, were or would be payable in respect thereof.

<div align="center">

**ARTICLE II**

**THE NOTES**

</div>

SECTION 2.01. <u>Amount of Notes</u>. The aggregate principal amount of Notes which may be authenticated and delivered under this Indenture on the Issue Date is $3,705,498,000.

The Issuer may from time to time after the Issue Date issue Additional Notes under this Indenture in an unlimited principal amount, so long as (i) the Incurrence of the Indebtedness represented by such Additional Notes is at such time permitted by Section 4.03 and (ii) such Additional Notes are issued in compliance with the other applicable provisions of this Indenture. With respect to any Additional Notes issued after the Issue Date (except for Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to

Section 2.07, 2.08, 2.09, 2.10, 3.06, 4.06(e), 4.08(c) or Appendix A), there shall be (a) established in or pursuant to a resolution of the Board of Directors and (b) (i) set forth or determined in the manner provided in an Officer's Certificate or (ii) established in one or more indentures supplemental hereto, prior to the issuance of such Additional Notes:

(1) the aggregate principal amount of such Additional Notes which may be authenticated and delivered under this Indenture,

(2) the issue price and issuance date of such Additional Notes, including the date from which interest on such Additional Notes shall accrue;

(3) if applicable, that such Additional Notes shall be issuable in whole or in part in the form of one or more Global Notes and, in such case, the respective depositaries for such Global Notes, the form of any legend or legends which shall be borne by such Global Notes in addition to or in lieu of those set forth in Exhibit A hereto and any circumstances in addition to or in lieu of those set forth in Section 2.2 of Appendix A in which any such Global Note may be exchanged in whole or in part for

47

Additional Notes registered, or any transfer of such Global Note in whole or in part may be registered, in the name or names of Persons other than the depositary for such Global Note or a nominee thereof; and

(4) if applicable, that such Additional Notes that are not Transfer Restricted Notes shall not be issued in the form of Initial Notes as set forth in Exhibit A, but shall be issued in the form of Exchange Notes as set forth in Exhibit B.

If any of the terms of any Additional Notes are established by action taken pursuant to a resolution of the Board of Directors, a copy of an appropriate record of such action shall be certified by the Secretary or any Assistant Secretary of the Issuer and delivered to the Trustee at or prior to the delivery of the Officers' Certificate or the indenture supplemental hereto setting forth the terms of the Additional Notes.

The Initial Notes, including any Additional Notes, may, at the Issuer's option, be treated as a single class for all purposes under this Indenture, including, without limitation, waivers, amendments, redemptions and offers to purchase.

SECTION 2.02. Form and Dating. Provisions relating to the Initial Notes and the Exchange Notes are set forth in Appendix A, which is hereby incorporated in and expressly made a part of this Indenture. The (i) Initial Notes and the Trustee's certificate of authentication and (ii) any Additional Notes (if issued as Transfer Restricted Notes) and the Trustee's certificate of authentication shall each be substantially in the form of Exhibit A hereto, which is hereby incorporated in and expressly made a part of this Indenture. The (i) Exchange Notes and the Trustee's certificate of authentication and (ii) any Additional Notes issued other than as Transfer Restricted Notes and the Trustee's certificate of authentication shall each be substantially in the form of Exhibit B hereto, which is hereby incorporated in and expressly made a part of this Indenture. The Notes may have notations, legends or endorsements required by law, stock exchange rule, agreements to which the Issuer, the Parent Guarantor or any Subsidiary Pledgor is subject, if any, or usage (*provided* that any such notation, legend or endorsement is in a form acceptable to the Issuer). Each Note shall be dated the date of its authentication. The Notes shall be issuable only in registered form without interest coupons and in denominations of $2,000 and any integral multiples of $1,000.

SECTION 2.03. Execution and Authentication. The Trustee shall authenticate and make available for delivery upon a written order of the Issuer signed by one Officer (a) Initial Notes for original issue on the date hereof in an aggregate principal amount of $3,705,498,000, (b) subject to the terms of this Indenture, Additional Notes in an aggregate principal amount to be determined at the time of issuance and specified therein and (c) the Exchange Notes for issue in a Registered Exchange Offer pursuant to the Registration Agreement for a like principal amount of Initial Notes exchanged pursuant thereto or otherwise pursuant to an effective registration statement under the Securities Act. Such order shall specify the amount of separate Note certificates to be authenticated, the principal amount of each of the Notes to be authenticated, the date on which the original issue of Notes is to be authenticated, the registered holder of each of the Notes and delivery instructions and whether the Notes are to be Initial Notes or Exchange Notes. Notwithstanding anything to the contrary in this Indenture or Appendix A, any issuance of Additional Notes after the Issue Date shall be in a principal amount of at least $2,000 and integral multiples of $1,000 in excess of $2,000.

48

One Officer shall sign the Notes for the Issuer by manual or facsimile signature.

If an Officer whose signature is on a Note no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

A Note shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Note. The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee may appoint one or more authenticating agents reasonably acceptable to the Issuer to authenticate the Notes. Any such appointment shall be evidenced by an instrument signed by a Trust Officer, a copy of which shall be furnished to the Issuer. Unless limited by the terms of such appointment, an authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as any Registrar, Paying Agent or

agent for service of notices and demands.

SECTION 2.04. <u>Registrar and Paying Agent</u>.

(a) The Issuer shall maintain (i) an office or agency where Notes may be presented for registration of transfer or for exchange (the "<u>Registrar</u>") and (ii) an office or agency where Notes may be presented for payment (the "<u>Paying Agent</u>"). The Registrar shall keep a register of the Notes and of their transfer and exchange. The Issuer may have one or more co-registrars and one or more additional paying agents. The term "<u>Registrar</u>" includes any co-registrars. The term "<u>Paying Agent</u>" includes the Paying Agent and any additional paying agents. The Issuer initially appoints the Trustee as Registrar, Paying Agent and the Notes Custodian with respect to the Global Notes.

(b) The Issuer may enter into an appropriate agency agreement with any Registrar or Paying Agent not a party to this Indenture, which shall incorporate the terms of the TIA. The agreement shall implement the provisions of this Indenture that relate to such agent. The Issuer shall notify the Trustee in writing of the name and address of any such agent. If the Issuer fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.07. The Issuer or any of its domestically organized Wholly Owned Subsidiaries may act as Paying Agent or Registrar.

(c) The Issuer may remove any Registrar or Paying Agent upon written notice to such Registrar or Paying Agent and to the Trustee; *provided, however,* that no such removal shall become effective until (i) if applicable, acceptance of an appointment by a successor as evidenced by an appropriate agreement entered into by the Issuer and such successor Registrar or Paying Agent, as the case may be, and delivered to the Trustee or (ii) notification to the Trustee that the Trustee shall serve as Registrar or Paying Agent until the appointment of a successor in accordance with clause (i) above. The Registrar or Paying Agent may resign at any time upon written notice to the Issuer and the Trustee; *provided, however,* that the Trustee may resign as Paying Agent or Registrar only if the Trustee also resigns as Trustee in accordance with Section 7.08.

49

SECTION 2.05. <u>Paying Agent to Hold Money in Trust</u>. Prior to each due date of the principal of and interest on any Note, the Issuer shall deposit with each Paying Agent (or if the Issuer or a Wholly Owned Subsidiary is acting as Paying Agent, segregate and hold in trust for the benefit of the Persons entitled thereto) a sum sufficient to pay such principal and interest when so becoming due. The Issuer shall require each Paying Agent (other than the Trustee) to agree in writing that a Paying Agent shall hold in trust for the benefit of holders or the Trustee all money held by a Paying Agent for the payment of principal of and interest on the Notes, and shall notify the Trustee of any default by the Issuer in making any such payment. If the Issuer or a Wholly Owned Subsidiary of the Issuer acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it in trust for the benefit of the Persons entitled thereto. The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by such Paying Agent. Upon complying with this Section, a Paying Agent shall have no further liability for the money delivered to the Trustee.

SECTION 2.06. <u>Holder Lists</u>. The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of holders. If the Trustee is not the Registrar, the Issuer shall furnish, or cause the Registrar to furnish, to the Trustee, in writing at least five Business Days before each interest payment date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of holders.

SECTION 2.07. <u>Transfer and Exchange</u>. The Notes shall be issued in registered form and shall be transferable only upon the surrender of a Note for registration of transfer and in compliance with <u>Appendix A</u>. When a Note is presented to the Registrar with a request to register a transfer, the Registrar shall register the transfer as requested if its requirements therefor are met. When Notes are presented to the Registrar with a request to exchange them for an equal principal amount of Notes of other denominations, the Registrar shall make the exchange as requested if the same requirements are met. To permit registration of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate Notes at the Registrar's request. The Issuer may require payment of a sum sufficient to pay all taxes, assessments or other governmental charges in connection with any transfer or exchange pursuant to this Section. The Issuer shall not be required to make, and the Registrar need not register, transfers or exchanges of Notes selected for redemption (except, in the case of Notes to be redeemed in part, the portion thereof not to be redeemed) or of any Notes for a period of 15 days before a selection of Notes to be redeemed.

Prior to the due presentation for registration of transfer of any Note, the Issuer, the Parent Guarantor, the Trustee, the Paying Agent and the Registrar may deem and treat the Person in whose name a Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest, if any, on such Note and for all other purposes whatsoever, whether or not such Note is overdue, and none of the Issuer, the Parent Guarantor, the Trustee, the Paying Agent or the Registrar shall be affected by notice to the contrary.

50

Any holder of a beneficial interest in a Global Note shall, by acceptance of such beneficial interest, agree that transfers of beneficial interests in such Global Note may be effected only through a book-entry system maintained by (a) the holder of such Global Note (or its agent) or (b) any holder of a beneficial interest in such Global Note, and that ownership of a beneficial interest in such Global Note shall be required to be reflected in a book entry.

All Notes issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Notes surrendered upon such transfer or exchange.

SECTION 2.08. Replacement Notes. If a mutilated Note is surrendered to the Registrar or if the holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Issuer shall issue and the Trustee shall authenticate a replacement Note if the requirements of Section 8-405 of the Uniform Commercial Code are met, such that the holder (a) satisfies the Issuer or the Trustee within a reasonable time after such holder has notice of such loss, destruction or wrongful taking and the Registrar does not register a transfer prior to receiving such notification, (b) makes such request to the Issuer or the Trustee prior to the Note being acquired by a protected purchaser as defined in Section 8-303 of the Uniform Commercial Code (a "protected purchaser") and (c) satisfies any other reasonable requirements of the Trustee. If required by the Trustee or the Issuer, such holder shall furnish an indemnity bond sufficient in the judgment of the Trustee and the Issuer to protect the Issuer, the Trustee, a Paying Agent and the Registrar from any loss or liability that any of them may suffer if a Note is replaced and subsequently presented or claimed for payment. The Issuer and the Trustee may charge the holder for their expenses in replacing a Note (including without limitation, attorneys' fees and disbursements in replacing such Note). In the event any such mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Issuer in its discretion may pay such Note instead of issuing a new Note in replacement thereof.

Every replacement Note is an additional obligation of the Issuer.

The provisions of this Section 2.08 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, lost, destroyed or wrongfully taken Notes.

SECTION 2.09. Outstanding Notes. Notes outstanding at any time are all Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation and those described in this Section as not outstanding. Subject to Section 13.06, a Note does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Note.

If a Note is replaced pursuant to Section 2.08 (other than a mutilated Note surrendered for replacement), it ceases to be outstanding unless the Trustee and the Issuer receive proof satisfactory to them that the replaced Note is held by a protected purchaser. A mutilated Note ceases to be outstanding upon surrender of such Note and replacement thereof pursuant to Section 2.08.

51

If a Paying Agent segregates and holds in trust, in accordance with this Indenture, on a redemption date or maturity date money sufficient to pay all principal and interest payable on that date with respect to the Notes (or portions thereof) to be redeemed or maturing, as the case may be, and no Paying Agent is prohibited from paying such money to the holders on that date pursuant to the terms of this Indenture, then on and after that date such Notes (or portions thereof) cease to be outstanding and interest on them ceases to accrue.

SECTION 2.10. Temporary Notes. In the event that Definitive Notes are to be issued under the terms of this Indenture, until such Definitive Notes are ready for delivery, the Issuer may prepare and the Trustee shall authenticate temporary Notes. Temporary Notes shall be substantially in the form of Definitive Notes but may have variations that the Issuer considers appropriate for temporary Notes. Without unreasonable delay, the Issuer shall prepare and the Trustee shall authenticate Definitive Notes and make them available for delivery in exchange for temporary Notes upon surrender of such temporary Notes at the office or agency of the Issuer, without charge to the holder. Until such exchange, temporary Notes shall be entitled to the same rights, benefits and privileges as Definitive Notes.

SECTION 2.11. Cancellation. The Issuer at any time may deliver Notes to the Trustee for cancellation. The Registrar and each Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment or cancellation and shall dispose of canceled Notes in accordance with its customary procedures. The Issuer may not issue new Notes to replace Notes it has redeemed, paid or delivered to the Trustee for cancellation. The Trustee shall not authenticate Notes in place of canceled Notes other than pursuant to the terms of this Indenture.

SECTION 2.12. Defaulted Interest. If the Issuer defaults in a payment of interest on the Notes, the Issuer shall pay the defaulted interest then borne by the Notes (plus interest on such defaulted interest to the extent lawful) in any lawful manner. The Issuer may pay the defaulted interest to the Persons who are holders on a subsequent special record date. The Issuer shall fix or cause to be fixed any such special record date and payment date to the reasonable satisfaction of the Trustee and shall promptly mail or cause to be mailed to each affected holder a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

SECTION 2.13. CUSIP Numbers, ISINs, Etc. The Issuer in issuing the Notes may use CUSIP numbers, ISINs and "Common Code" numbers (if then generally in use) and, if so, the Trustee shall use CUSIP numbers, ISINs and "Common Code" numbers in notices of redemption as a convenience to holders; provided, however, that any such notice may state that no representation is made as to the correctness of such numbers, either as printed on the Notes or as contained in any notice of a redemption that reliance may be placed only on the other identification numbers printed on the Notes and that any such redemption shall not be affected by any defect in or omission of such numbers. The Issuer shall advise the Trustee of any change in the CUSIP numbers, ISINs and "Common Code" numbers.

SECTION 2.14. Calculation of Principal Amount of Notes. The aggregate principal amount of the Notes, at any date of determination, shall be the principal amount of the Notes at such date of determination. With respect to any matter requiring consent, waiver, approval or other action of

the holders of a specified percentage of the principal amount of all the

52

Notes, such percentage shall be calculated, on the relevant date of determination, by dividing (a) the principal amount, as of such date of determination, of Notes, the holders of which have so consented, by (b) the aggregate principal amount, as of such date of determination, of the Notes then outstanding, in each case, as determined in accordance with the preceding sentence, Section 2.09 and Section 13.06 of this Indenture. Any such calculation made pursuant to this Section 2.14 shall be made by the Issuer and delivered to the Trustee pursuant to an Officers' Certificate.

SECTION 2.15. Mandatory Disposition Pursuant to Gaming Laws. Each person that holds or acquires beneficial ownership of any of the Notes shall be deemed to have agreed, by accepting such Notes, that if any Gaming Authority requires such person to be approved, licensed, qualified or found suitable under applicable Gaming Laws, such holder or beneficial owner, as the case may be, shall apply for a license, qualification or finding of suitability within the required time period.

If a person required to apply or become licensed or qualified or be found suitable fails to do so (a "Disqualified Holder"), the Issuer shall have the right, at its election, (1) to require such person to dispose of its Notes or beneficial interest therein within 30 days of receipt of notice of such election or such earlier date as may be required by such Gaming Authority or (2) to redeem such Notes at a redemption price that, unless otherwise directed by such Gaming Authority, shall be at a redemption price that is equal to the lesser of:

(a) such person's cost, or

(b) 100% of the principal amount thereof, *plus* accrued and unpaid interest, if any, to the earlier of (i) the redemption date or (ii) the date such person became a Disqualified Holder.

The Issuer shall notify the Trustee and applicable Gaming Authority in writing of any such redemption as soon as practicable. The Issuer shall not be responsible for any costs or expenses any such holder may Incur in connection with its application for a license, qualification or finding of suitability.

## ARTICLE III

## REDEMPTION

SECTION 3.01. Redemption. The Notes may be redeemed, in whole, or from time to time in part, subject to the conditions and at the redemption prices set forth in Paragraph 5 of the forms of Note set forth in Exhibit A and B hereto, which are hereby incorporated by reference and made a part of this Indenture, together with accrued and unpaid interest to the redemption date.

SECTION 3.02. Applicability of Article. Redemption of Notes at the election of the Issuer or otherwise, as permitted or required by any provision of this Indenture, shall be made in accordance with such provision and this Article.

53

SECTION 3.03. Notices to Trustee. If the Issuer elects to redeem Notes pursuant to the optional redemption provisions of Paragraph 5 of the Note, it shall notify the Trustee in writing of (i) the Section of this Indenture pursuant to which the redemption shall occur, (ii) the redemption date, (iii) the principal amount of Notes to be redeemed and (iv) the redemption price. The Issuer shall give notice to the Trustee provided for in this paragraph at least 30 days but not more than 60 days before a redemption date if the redemption is pursuant to Paragraph 5 of the Note, unless a shorter period is acceptable to the Trustee. Such notice shall be accompanied by an Officers' Certificate and Opinion of Counsel from the Issuer to the effect that such redemption will comply with the conditions herein, as well as such notice required to be delivered under Section 3.05 below. If fewer than all the Notes are to be redeemed, the record date relating to such redemption shall be selected by the Issuer and given to the Trustee, which record date shall be not fewer than 15 days after the date of notice to the Trustee. Any such notice may be canceled at any time prior to notice of such redemption being mailed to any holder and shall thereby be void and of no effect.

SECTION 3.04. Selection of Notes to Be Redeemed. In the case of any partial redemption, selection of the Notes for redemption will be made by the Trustee on a pro rata basis to the extent practicable; *provided* that no Notes of $2,000 or less shall be redeemed in part. The Trustee shall make the selection from outstanding Notes not previously called for redemption. The Trustee may select for redemption portions of the principal of Notes that have denominations larger than $2,000. Notes and portions of them the Trustee selects shall be in amounts of $2,000 or any integral multiple of $1,000. Provisions of this Indenture that apply to Notes called for redemption also apply to portions of Notes called for redemption. The Trustee shall notify the Issuer promptly of the Notes or portions of Notes to be redeemed.

SECTION 3.05. Notice of Optional Redemption.

(a) At least 30 days but not more than 60 days before a redemption date pursuant to Paragraph 5 of the Note, the Issuer shall mail or cause to

be mailed by first-class mail a notice of redemption to each holder whose Notes are to be redeemed.

Any such notice shall identify the Notes to be redeemed and shall state:

(i) the redemption date;

(ii) the redemption price and the amount of accrued interest to the redemption date;

(iii) the name and address of the Paying Agent;

(iv) that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price, *plus* accrued interest;

(v) if fewer than all the outstanding Notes are to be redeemed, the certificate numbers and principal amounts of the particular Notes to be redeemed, the aggregate principal amount of Notes to be redeemed and the aggregate principal amount of Notes to be outstanding after such partial redemption;

(vi) that, unless the Issuer defaults in making such redemption payment or the Paying Agent is prohibited from making such payment pursuant to the terms of this Indenture, interest on Notes (or portion thereof) called for redemption ceases to accrue on and after the redemption date;

54

(vii) the CUSIP number, ISIN and/or "Common Code" number, if any, printed on the Notes being redeemed; and

(viii) that no representation is made as to the correctness or accuracy of the CUSIP number or ISIN and/or "Common Code" number, if any, listed in such notice or printed on the Notes.

(b) At the Issuer's request, the Trustee shall give the notice of redemption in the Issuer's name and at the Issuer's expense. In such event, the Issuer shall provide the Trustee with the information required by this Section at least one Business Day prior to the date such notice is to be provided to holders in the final form such notice is to be delivered to holders and such notice may not be canceled.

SECTION 3.06. Effect of Notice of Redemption. Once notice of redemption is mailed in accordance with Section 3.05, Notes called for redemption become due and payable on the redemption date and at the redemption price stated in the notice, except as provided in the final sentence of paragraph 5 of the Notes. Upon surrender to the Paying Agent, such Notes shall be paid at the redemption price stated in the notice, *plus* accrued interest, to, but not including, the redemption date; *provided, however,* that if the redemption date is after a regular record date and on or prior to the interest payment date, the accrued interest shall be payable to the holder of the redeemed Notes registered on the relevant record date. Failure to give notice or any defect in the notice to any holder shall not affect the validity of the notice to any other holder.

SECTION 3.07. Deposit of Redemption Price. With respect to any Notes, prior to 10:00 a.m., New York City time, on the redemption date, the Issuer shall deposit with the Paying Agent (or, if the Issuer or a Wholly Owned Subsidiary is the Paying Agent, shall segregate and hold in trust) money sufficient to pay the redemption price of and accrued interest on all Notes or portions thereof to be redeemed on that date other than Notes or portions of Notes called for redemption that have been delivered by the Issuer to the Trustee for cancellation. On and after the redemption date, interest shall cease to accrue on Notes or portions thereof called for redemption so long as the Issuer has deposited with the Paying Agent funds sufficient to pay the principal of, *plus* accrued and unpaid interest on, the Notes to be redeemed, unless the Paying Agent is prohibited from making such payment pursuant to the terms of this Indenture.

SECTION 3.08. Notes Redeemed in Part. Upon surrender of a Note that is redeemed in part, the Issuer shall execute and the Trustee shall authenticate for the holder (at the Issuer's expense) a new Note equal in principal amount to the unredeemed portion of the Note surrendered.

55

## ARTICLE IV

## COVENANTS

SECTION 4.01. Payment of Notes. The Issuer shall promptly pay the principal of and interest on the Notes on the dates and in the manner provided in the Notes and in this Indenture. An installment of principal of or interest shall be considered paid on the date due if on such date the Trustee or the Paying Agent holds as of 12:00 p.m. Eastern time money sufficient to pay all principal and interest then due and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the holders on that date pursuant to the terms of this Indenture.

The Issuer shall pay interest on overdue principal at the rate specified therefor in the Notes, and it shall pay interest on overdue installments of interest at the same rate borne by the Notes to the extent lawful.

SECTION 4.02. Reports and Other Information.

(a) Notwithstanding that the Issuer may not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act or otherwise report on an annual and quarterly basis on forms provided for such annual and quarterly reporting pursuant to rules and regulations promulgated by

the SEC, the Issuer shall file with the SEC (and provide the Trustee and holders with copies thereof, without cost to each holder, within 15 days after it files them with the SEC),

(i) within the time period specified in the SEC's rules and regulations for non-accelerated filers, annual reports on Form 10-K (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form),

(ii) within the time period specified in the SEC's rules and regulations for non-accelerated filers, reports on Form 10-Q (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form),

(iii) promptly from time to time after the occurrence of an event required to be therein reported (and in any event within the time period specified in the SEC's rules and regulations), such other reports on Form 8-K (or any successor or comparable form), and

(iv) any other information, documents and other reports which the Issuer would be required to file with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act;

*provided, however,* that the Issuer shall not be so obligated to file such reports with the SEC if the SEC does not permit such filing, in which event the Issuer will make available such information to prospective purchasers of Notes in addition to providing such information to the Trustee and the holders, in each case within 15 days after the time the Issuer would be required to file such information with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act, subject, in the case of any such information, certificates or reports provided prior to the effectiveness of the Exchange Offer Registration Statement or Shelf Registration Statement, to exceptions consistent with the presentation of financial information in the Offering Memorandum.

56

Notwithstanding the foregoing, the Issuer shall not be required to furnish any information, certificates or reports required by Items 307 or 308 of Regulation S-K prior to the effectiveness of the Exchange Offer Registration Statement or Shelf Registration Statement.

(b) In the event that:

(i) the rules and regulations of the SEC permit the Issuer and any direct or indirect parent of the Issuer to report at such parent entity's level on a consolidated basis and such parent entity is not engaged in any business in any material respect other than incidental to its ownership, directly or indirectly, of the capital stock of the Issuer, or

(ii) any direct or indirect parent of the Issuer is or becomes a Guarantor of the Notes,

consolidating reporting at the parent entity's level in a manner consistent with that described in this Section 4.02 and furnishing financial information relating to such direct or indirect parent for the Issuer will satisfy this Section 4.02; *provided* that such financial information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such direct or indirect parent and any of its Subsidiaries other than the Issuer and its Subsidiaries, on the one hand, and the information relating to the Issuer, the Subsidiary Pledgors and the other Subsidiaries of the Issuer on a standalone basis, on the other hand.

(c) The Issuer will make such information available to prospective investors upon request. In addition, the Issuer has agreed that, for so long as any Notes remain outstanding during any period when it is not subject to Section 13 or 15(d) of the Exchange Act, or otherwise permitted to furnish the SEC with certain information pursuant to Rule 12g3-2(b) of the Exchange Act, it will furnish to the holders of the Notes and to prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

Notwithstanding the foregoing, the Issuer will be deemed to have furnished such reports referred to above to the Trustee and the holders if the Issuer has filed such reports with the SEC via the EDGAR filing system and such reports are publicly available. In addition, the requirements of this Section 4.02 shall be deemed satisfied prior to the commencement of the exchange offers contemplated by the Registration Rights Agreement relating to the Notes or the effectiveness of the Shelf Registration Statement by (1) the filing with the SEC of the Exchange Offer Registration Statement and/or Shelf Registration Statement in accordance with the provisions of such Registration Rights Agreement, and any amendments thereto, if such registration statement and/or amendments thereto are filed at times that otherwise satisfy the time requirements set forth in Section 4.02(a) and/or (2) the posting of reports that would be required to be provided to the Trustee and the holders on the Issuer's website (or that of any of its parent companies).

57

SECTION 4.03. Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock.

(a) (i) The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness (including Acquired Indebtedness) or issue any shares of Disqualified Stock; and (ii) the Issuer shall not permit any of its Restricted Subsidiaries (other than a Subsidiary Pledgor) to issue any shares of Preferred Stock; *provided, however,* that the Issuer and any Subsidiary Pledgor may Incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified Stock, and, subject to Section 4.03(c), any Restricted Subsidiary of the Issuer that

is not a Subsidiary Pledgor may Incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock or issue shares of Preferred Stock, in each case if the Fixed Charge Coverage Ratio of the Issuer for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is Incurred or such Disqualified Stock or Preferred Stock is issued would have been at least 2.00 to 1.00 determined on a *pro forma* basis (including a *pro forma* application of the net proceeds therefrom), as if the additional Indebtedness had been Incurred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, and the application of proceeds therefrom had occurred at the beginning of such four-quarter period.

(b) The limitations set forth in Section 4.03(a) shall not apply to:

(i) the Incurrence by the Issuer or its Restricted Subsidiaries of Indebtedness under the Credit Agreement and the issuance and creation of letters of credit and bankers' acceptances thereunder up to an aggregate principal amount of $11,000 million;

(ii) the Incurrence of Indebtedness represented by the Notes (not including any Additional Notes, but including any Exchange Notes);

(iii) Indebtedness existing on the Issue Date (other than Indebtedness described in clauses (i) and (ii) of this Section 4.03(b));

(iv) Indebtedness (including Capitalized Lease Obligations) Incurred by the Issuer or any of its Restricted Subsidiaries, Disqualified Stock issued by the Issuer or any of its Restricted Subsidiaries and Preferred Stock issued by any Restricted Subsidiary of the Issuer to finance (whether prior to or within 270 days after) the acquisition, lease, construction, repair, replacement or improvement of property (real or personal) or equipment (whether through the direct purchase of assets or the Capital Stock of any Person owning such assets);

(v) Indebtedness Incurred by the Issuer or any of its Restricted Subsidiaries constituting reimbursement obligations with respect to letters of credit and bank guarantees issued in the ordinary course of business, including without limitation letters of credit in respect of workers' compensation claims, health, disability or other benefits to employees or former employees or their families or property, casualty or liability insurance or self-insurance, and letters of credit in connection with the maintenance of, or pursuant to the requirements of, environmental or other permits or licenses from governmental authorities, or other Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims;

(vi) Indebtedness arising from agreements of the Issuer or a Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations, in each case, Incurred in connection with the Acquisition Transactions or any other acquisition or disposition of any business, assets or a Subsidiary of the Issuer in accordance with the terms of this Indenture, other than guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition;

(vii) Indebtedness of the Issuer to a Restricted Subsidiary; *provided* that (except in respect of intercompany current liabilities Incurred in the ordinary course of business in connection with the cash management operations of the Issuer and its Subsidiaries) any such Indebtedness owed to a Restricted Subsidiary that is not a Subsidiary Pledgor is subordinated in right of payment to the obligations of the Issuer under the Notes; *provided, further,* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Issuer or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (vii);

(viii) shares of Preferred Stock of a Restricted Subsidiary issued to the Issuer or another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary that holds such shares of Preferred Stock of another Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to the Issuer or another Restricted Subsidiary) shall be deemed, in each case, to be an issuance of shares of Preferred Stock not permitted by this clause (viii);

(ix) Indebtedness of a Restricted Subsidiary to the Issuer or another Restricted Subsidiary; *provided* that if a Subsidiary Pledgor Incurs such Indebtedness to a Restricted Subsidiary that is not a Subsidiary Pledgor (except in respect of intercompany current liabilities Incurred in the ordinary course of business in connection with the cash management operations of the Issuer and its Subsidiaries), such Indebtedness is subordinated in right of payment to the obligations of such Subsidiary Pledgor in respect of the Notes; *provided, further,* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary holding such Indebtedness ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Issuer or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (ix);

(x) (A) Hedging Obligations entered into in connection with the Acquisition Transactions and (B) Hedging Obligations that are not Incurred for speculative purposes but (1) for the purpose of fixing or hedging interest rate risk with respect to any Indebtedness that is permitted by the terms of this Indenture to be outstanding; (2) for the purpose of fixing or hedging currency exchange rate risk with respect to any currency exchanges; or (3) for the purpose of fixing or hedging commodity price risk with respect to any commodity purchases or sales;

http://www.sec.gov/Archives/edgar/data/858339/000119312509082553/dex41.htm[8/7/2014 10:22:16 AM]

(xi) obligations (including reimbursement obligations with respect to letters of credit and bank guarantees) in respect of performance, bid, appeal and surety bonds and completion guarantees provided by the Issuer or any Restricted Subsidiary in the ordinary course of business or consistent with past practice or industry practice;

(xii) Indebtedness or Disqualified Stock of the Issuer or, subject to Section 4.03(c), Indebtedness, Disqualified Stock or Preferred Stock of any Restricted Subsidiary of the Issuer not otherwise permitted hereunder in an aggregate principal amount or liquidation preference which, when aggregated with the principal amount or liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and Incurred pursuant to this clause (xii), does not exceed the greater of $1,100 million and 5.0% of Total Assets at the time of Incurrence (it being understood that any Indebtedness Incurred pursuant to this clause (xii) shall cease to be deemed Incurred or outstanding for purposes of this clause (xii) but shall be deemed Incurred for purposes of Section 4.03(a) from and after the first date on which the Issuer, or the Restricted Subsidiary, as the case may be, could have Incurred such Indebtedness under Section 4.03(a) without reliance upon this clause (xii));

(xiii) Indebtedness or Disqualified Stock of the Issuer or any Restricted Subsidiary of the Issuer and Preferred Stock of any Restricted Subsidiary of the Issuer not otherwise permitted hereunder in an aggregate principal amount or liquidation preference not greater than 200.0% of the net cash proceeds received by the Issuer and its Restricted Subsidiaries since immediately after the Issue Date from the issue or sale of Equity Interests of the Issuer or any direct or indirect parent entity of the Issuer (which proceeds are contributed to the Issuer or its Restricted Subsidiary) or cash contributed to the capital of the Issuer (in each case other than proceeds of Disqualified Stock or sales of Equity Interests to, or contributions received from, the Issuer or any of its Subsidiaries) as determined in accordance with clauses (B) and (C) of the definition of "Cumulative Credit" to the extent such net cash proceeds or cash have not been applied pursuant to such clauses to make Restricted Payments or to make other Investments, payments or exchanges pursuant to Section 4.04(b) or to make Permitted Investments (other than Permitted Investments specified in clauses (1) and (3) of the definition thereof);

(xiv) any guarantee by the Issuer or any Restricted Subsidiary of the Issuer of Indebtedness or other obligations of the Issuer or any of its Restricted Subsidiaries so long as the Incurrence of such Indebtedness Incurred by the Issuer or such Restricted Subsidiary is permitted under the terms of this Indenture; *provided* that (i) if such Indebtedness is by its express terms subordinated in right of payment to the Notes or the obligations of such Restricted Subsidiary in respect of the Notes, as applicable, any such guarantee of such Subsidiary Pledgor with respect to such Indebtedness shall be subordinated in right of payment to such Subsidiary Pledgor's obligations with respect to the Notes substantially to the same extent as such Indebtedness is subordinated to the Notes or the obligations of such Subsidiary Pledgor in respect of the Notes, as applicable and (ii) if such guarantee is of Indebtedness of the Issuer, such guarantee is Incurred in accordance with Section 4.11 solely to the extent such Section is applicable;

60

(xv) the Incurrence by the Issuer or any of its Restricted Subsidiaries of Indebtedness or Disqualified Stock or Preferred Stock of a Restricted Subsidiary of the Issuer which serves to refund, refinance or defease any Indebtedness Incurred or Disqualified Stock or Preferred Stock issued as permitted under Section 4.03(a) and clauses (ii), (iii), (iv), (xii), (xiii), (xv), (xvi), (xx) and (xxiv) of this Section 4.03(b) or any Indebtedness, Disqualified Stock or Preferred Stock Incurred to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock, including any additional Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay premiums (including tender premiums), expenses, defeasance costs and fees in connection therewith (subject to the following proviso, "Refinancing Indebtedness") prior to its respective maturity; *provided, however,* that such Refinancing Indebtedness:

(1) has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded, refinanced or defeased and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Indebtedness, Disqualified Stock and Preferred Stock being refunded or refinanced that were due on or after the date that is one year following the last maturity date of any Notes then outstanding were instead due on such date;

(2) to the extent such Refinancing Indebtedness refinances (a) Indebtedness junior to the Notes or the obligations of such Restricted Subsidiary in respect of the Notes, as applicable, such Refinancing Indebtedness is junior to the Notes or such obligations of such Restricted Subsidiary, as applicable, or (b) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness is Disqualified Stock or Preferred Stock; and

(3) shall not include (x) Indebtedness of a Restricted Subsidiary of the Issuer that is not a Subsidiary Pledgor that refinances Indebtedness of the Issuer or a Subsidiary Pledgor, or (y) Indebtedness of the Issuer or a Restricted Subsidiary that refinances Indebtedness of an Unrestricted Subsidiary:

*provided, further,* that subclause (1) of this clause (xv) will not apply to any refunding or refinancing of any Secured Indebtedness constituting First Priority Lien Obligations and subclauses (1) and (2) of this clause (xv) will not apply to any refunding or refinancing of any of the Retained Notes;

(xvi) Indebtedness, Disqualified Stock or Preferred Stock of (x) the Issuer or, subject to Section 4.03(c), any of its Restricted Subsidiaries Incurred to finance an acquisition or (y) Persons that are acquired by the Issuer or any of its Restricted Subsidiaries or merged, consolidated or amalgamated with or into the Issuer or any of its Restricted Subsidiaries in accordance with the terms of this Indenture; *provided* that after giving effect to such acquisition or merger, consolidation or amalgamation, either:

(1) the Issuer would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a); or

61

(2) the Fixed Charge Coverage Ratio of the Issuer would be greater than immediately prior to such acquisition or merger, consolidation or amalgamation;

(xvii) Indebtedness Incurred by a Receivables Subsidiary in a Qualified Receivables Financing that is not recourse to the Issuer or any Restricted Subsidiary other than a Receivables Subsidiary (except for Standard Securitization Undertakings);

(xviii) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within five Business Days of its Incurrence;

(xix) Indebtedness of the Issuer or any Restricted Subsidiary supported by a letter of credit or bank guarantee issued pursuant to the Credit Agreement, in a principal amount not in excess of the stated amount of such letter of credit;

(xx) Indebtedness of Foreign Subsidiaries; *provided, however,* that the aggregate principal amount of Indebtedness Incurred under this clause (xx), when aggregated with the principal amount of all other Indebtedness then outstanding and Incurred pursuant to this clause (xx), does not exceed the greater of $250.0 million and 7.5% of Total Assets of the Foreign Subsidiaries at any one time outstanding (it being understood that any Indebtedness Incurred pursuant to this clause (xx) shall cease to be deemed Incurred or outstanding for purposes of this clause (xx) but shall be deemed Incurred for the purposes of Section 4.03(a) from and after the first date on which such Foreign Subsidiary could have Incurred such Indebtedness under Section 4.03(a) without reliance upon this clause (xx));

(xxi) Indebtedness of the Issuer or any Restricted Subsidiary consisting of (1) the financing of insurance premiums or (2) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(xxii) Indebtedness consisting of Indebtedness issued by the Issuer or a Restricted Subsidiary of the Issuer to current or former officers, directors and employees thereof or any direct or indirect parent thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Issuer or any of its direct or indirect parent companies to the extent described in Section 4.04(b)(iv);

(xxiii) Indebtedness Incurred in connection with any Project Financing; and

(xxiv) Indebtedness Incurred on behalf of, or representing guarantees of Indebtedness of, joint ventures of the Issuer or any Restricted Subsidiary not in excess, at any one time outstanding, of $300.0 million.

62

(c) Restricted Subsidiaries that are not Subsidiary Pledgors may not Incur Indebtedness or issue Disqualified Stock or Preferred Stock under Section 4.03(a) or clauses (xii) or (xvi)(x) of Section 4.03(b) if, after giving *pro forma* effect to such Incurrence or issuance (including a *pro forma* application of the net proceeds therefrom), the aggregate amount of Indebtedness and Disqualified Stock and Preferred Stock of Restricted Subsidiaries that are not Subsidiary Pledgors Incurred or issued pursuant to Section 4.03(a) and clauses (xii) or (xvi)(x) of Section 4.03(b), collectively, would exceed the greater of $2,000 million and 5.0% of Total Assets.

(d) For purposes of determining compliance with this Section 4.03:

(i) in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness described in clauses (i) through (xxiv) above or is entitled to be Incurred pursuant to Section 4.03(a), the Issuer shall, in its sole discretion, classify or reclassify, or later divide, classify or reclassify, such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) in any manner that complies with this Section 4.03; and

(ii) at the time of Incurrence, the Issuer will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in Section 4.03(a) and (b) without giving *pro forma* effect to the Indebtedness Incurred pursuant to Section 4.03(b) when calculating the amount of Indebtedness that may be Incurred pursuant to Section 4.03(a).

Accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock, as applicable, amortization of original issue discount, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an Incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 4.03. Guarantees of, or obligations in respect of letters of credit relating to, Indebtedness which is otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness; *provided* that the Incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this Section 4.03.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the Incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in

effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed or first Incurred (whichever yields the lower U.S. dollar equivalent), in the case of revolving credit debt; *provided* that if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

<div align="center">63</div>

(e) Notwithstanding any other provision of this Section 4.03, the maximum amount of Indebtedness that the Issuer and its Restricted Subsidiaries may Incur pursuant to this Section 4.03 shall not be deemed to be exceeded, with respect to any outstanding Indebtedness, solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

SECTION 4.04. Limitation on Restricted Payments.

(a) The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

(i) declare or pay any dividend or make any distribution on account of the Issuer's or any of its Restricted Subsidiaries' Equity Interests, including any payment made in connection with any merger, amalgamation or consolidation involving the Issuer (other than (A) dividends or distributions by the Issuer payable solely in Equity Interests (other than Disqualified Stock) of the Issuer; or (B) dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a Wholly Owned Restricted Subsidiary, the Issuer or a Restricted Subsidiary receives at least its pro rata share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities);

(ii) purchase or otherwise acquire or retire for value any Equity Interests of the Issuer or any direct or indirect parent of the Issuer;

(iii) make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case prior to any scheduled repayment or scheduled maturity, any Subordinated Indebtedness or Long-Term Retained Notes of the Issuer or any of its Restricted Subsidiaries (other than the payment, redemption, repurchase, defeasance, acquisition or retirement of (A) Subordinated Indebtedness or Long-Term Retained Notes in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such payment, redemption, repurchase, defeasance, acquisition or retirement and (B) Indebtedness permitted under clauses (vii) and (ix) of Section 4.03(b)); or

(iv) make any Restricted Investment

(all such payments and other actions set forth in clauses (i) through (iv) above being collectively referred to as "Restricted Payments"), unless, at the time of such Restricted Payment:

(1) no Default shall have occurred and be continuing or would occur as a consequence thereof;

<div align="center">64</div>

(2) immediately after giving effect to such transaction on a *pro forma* basis, the Issuer could Incur $1.00 of additional Indebtedness under Section 4.03(a); and

(3) such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Issuer and its Restricted Subsidiaries after the Issue Date (including Restricted Payments permitted by clauses (i), (ii) (with respect to the payment of dividends on Refunding Capital Stock (as defined below) pursuant to clause (C) thereof), (vi)(C), (viii), (xiii)(B) and (xix) of Section 4.04(b), but excluding all other Restricted Payments permitted by Section 4.04(b)), is less than the amount equal to the Cumulative Credit.

(b) The provisions of Section 4.04(a) shall not prohibit:

(i) the payment of any dividend or distribution within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Indenture;

(ii) (A) the redemption, repurchase, retirement or other acquisition of any Equity Interests ("Retired Capital Stock") or Subordinated Indebtedness of the Issuer, any direct or indirect parent of the Issuer or any Subsidiary Pledgor in exchange for, or out of the proceeds of, the substantially concurrent sale of, Equity Interests of the Issuer or any direct or indirect parent of the Issuer or contributions to the equity capital of the Issuer (other than any Disqualified Stock or any Equity Interests sold to a Subsidiary of the Issuer) (collectively, including any such contributions, "Refunding Capital Stock"),

(B) the declaration and payment of dividends on the Retired Capital Stock out of the proceeds of the substantially concurrent sale (other than to a Subsidiary of the Issuer) of Refunding Capital Stock, and

(C) if immediately prior to the retirement of Retired Capital Stock, the declaration and payment of dividends thereon was

permitted under clause (vi) of this Section 4.04(b) and not made pursuant to clause (ii)(B), the declaration and payment of dividends on the Refunding Capital Stock (other than Refunding Capital Stock the proceeds of which were used to redeem, repurchase, retire or otherwise acquire any Equity Interests of any direct or indirect parent of the Issuer) in an aggregate amount per year no greater than the aggregate amount of dividends per annum that were declarable and payable on such Retired Capital Stock immediately prior to such retirement;

65

(iii) the redemption, repurchase, defeasance, or other acquisition or retirement of Subordinated Indebtedness of the Issuer or any Subsidiary Pledgor made by exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Issuer or a Subsidiary Pledgor which is Incurred in accordance with Section 4.03 so long as:

(A) the principal amount (or accreted value, if applicable) of such new Indebtedness does not exceed the principal amount (or accreted value, if applicable), *plus* any accrued and unpaid interest, of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired for value (*plus* the amount of any premium required to be paid under the terms of the instrument governing the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired, any tender premiums, *plus* any defeasance costs, fees and expenses Incurred in connection therewith),

(B) such Indebtedness is subordinated to the Notes or such Subsidiary Pledgor's obligations in respect of the Notes, as the case may be, at least to the same extent as such Subordinated Indebtedness so purchased, exchanged, redeemed, repurchased, defeased, acquired or retired for value,

(C) such Indebtedness has a final scheduled maturity date equal to or later than the earlier of (x) the final scheduled maturity date of the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired and (y) 91 days following the last maturity date of any Notes then outstanding, and

(D) such Indebtedness has a Weighted Average Life to Maturity at the time Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Subordinated Indebtedness being redeemed, repurchased, defeased, acquired or retired that were due on or after the date that is one year following the last maturity date of any Notes then outstanding were instead due on such date;

(iv) a Restricted Payment to pay for the repurchase, retirement or other acquisition for value of Equity Interests of the Issuer or any direct or indirect parent of the Issuer held by any future, present or former employee, director or consultant of the Issuer or any direct or indirect parent of the Issuer or any Subsidiary of the Issuer pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or other agreement or arrangement; *provided, however,* that the aggregate Restricted Payments made under this clause (iv) do not exceed $50.0 million in any calendar year (with unused amounts in any calendar year being permitted to be carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $100.0 million in any calendar year (which shall increase to $150.0 million subsequent to the consummation of an underwritten public Equity Offering of common stock); *provided, further,* however, that such amount in any calendar year may be increased by an amount not to exceed:

(A) the cash proceeds received by the Issuer or any of its Restricted Subsidiaries from the sale of Equity Interests (other than Disqualified Stock) of the Issuer or any direct or indirect parent of the Issuer (to the extent contributed to the Issuer) to members of management, directors or consultants of the Issuer and its Restricted Subsidiaries or any direct or indirect parent of the Issuer that occurs

66

after the Issue Date (*provided that* the amount of such cash proceeds utilized for any such repurchase, retirement, other acquisition or dividend will not increase the amount available for Restricted Payments under Section 4.04(a)(iii)), *plus*

(B) the cash proceeds of key man life insurance policies received by the Issuer or any direct or indirect parent of the Issuer (to the extent contributed to the Issuer) or the Issuer's Restricted Subsidiaries after the Issue Date, *plus*

(C) the amount of any cash bonuses otherwise payable to members of management, directors or consultants of the Issuer and its Restricted Subsidiaries or any direct or indirect parent of the Issuer in connection with the Acquisition Transactions that are forgone in return for the receipt of Equity Interests;

*provided* that the Issuer may elect to apply all or any portion of the aggregate increase contemplated by clauses (A), (B) and (C) above in any calendar year; and *provided, further,* that cancellation of Indebtedness owing to the Issuer or any Restricted Subsidiary from any present or former employees, directors, officers or consultants of the Issuer, any of its Restricted Subsidiaries or its direct or indirect parents in connection with a repurchase of Equity Interests of the Issuer or any of its direct or indirect parents will not be deemed to constitute a Restricted Payment for purposes of this Section 4.04 or any other provision of this Indenture;

(v) the declaration and payment of dividends or distributions to holders of any class or series of Disqualified Stock of the Issuer or any of its Restricted Subsidiaries issued or Incurred in accordance with Section 4.03 to the extent such dividends are included in the definition of

"Fixed Charges";

(vi) (A) the declaration and payment of dividends or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date;

(B) a Restricted Payment to any direct or indirect parent of the Issuer, the proceeds of which will be used to fund the payment of dividends to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) of any direct or indirect parent of the Issuer issued after the Issue Date; *provided* that the aggregate amount of dividends declared and paid pursuant to this clause (B) does not exceed the net cash proceeds actually received by the Issuer from any such sale of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date; and

(C) the declaration and payment of dividends on Refunding Capital Stock that is Preferred Stock in excess of the dividends declarable and payable thereon pursuant to Section 4.04(b)(ii);

*provided, however,* in the case of each of (A) and (C) above of this clause (vi), that for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock, after giving effect to such issuance (and the payment of dividends or distributions) on a *pro forma* basis, the Issuer would have had a Fixed Charge Coverage Ratio of at least 2.00 to 1.00;

(vii) Investments in Unrestricted Subsidiaries having an aggregate Fair Market Value (as determined in good faith by the Issuer), taken together with all other Investments made pursuant to this clause (vii) that are at that time outstanding, not to exceed $250.0 million at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(viii) the payment of dividends on the Issuer's common stock (or a Restricted Payment to any direct or indirect parent of the Issuer to fund the payment by such direct or indirect parent of the Issuer of dividends on such entity's common stock) of up to 6% per annum of the net proceeds received by the Issuer from any public offering of common stock of the Issuer or any direct or indirect parent of the Issuer, other than public offerings with respect to the Issuer's (or such direct or indirect parent's) common stock registered on Form S-4 or Form S-8 and other than any public sale constituting an Excluded Contribution;

(ix) Restricted Payments that are made with Excluded Contributions;

(x) other Restricted Payments in an aggregate amount not to exceed the greater of $500.0 million and 2.5% of Total Assets at the time made;

(xi) the distribution, as a dividend or otherwise, of shares of Capital Stock of, or Indebtedness owed to the Issuer or a Restricted Subsidiary of the Issuer by, Unrestricted Subsidiaries;

(xii) the payment of dividends or other distributions to any direct or indirect parent of the Issuer that files a consolidated tax return that includes the Issuer and its subsidiaries (including, without limitation, by virtue of such parent being the common parent of a consolidated or combined tax group of which the Issuer and/or its Restricted Subsidiaries are members) in an amount not to exceed the amount that the Issuer and its Restricted Subsidiaries would have been required to pay in respect of federal, state or local taxes (as the case may be) if the Issuer and its Restricted Subsidiaries paid such taxes as a stand-alone taxpayer (or stand-alone group);

(xiii) the payment of Restricted Payment, if applicable:

(A) in amounts required for any direct or indirect parent of the Issuer to pay fees and expenses (including franchise or similar taxes) required to maintain its corporate existence, customary salary, bonus and other benefits payable to, and indemnities *provided* on behalf of, officers and employees of any direct or indirect parent of the Issuer and general corporate operating and overhead expenses of any direct or indirect parent of the Issuer in each case to the extent such fees and expenses are attributable to the ownership or operation of the Issuer, if applicable, and its Subsidiaries;

(B) in amounts required for any direct or indirect parent of the Issuer, if applicable, to pay interest and/or principal on Indebtedness the proceeds of which have been contributed to the Issuer or any of its Restricted Subsidiaries and that has been guaranteed by, or is otherwise considered Indebtedness of, the Issuer Incurred in accordance with Section 4.03; and

(C) in amounts required for any direct or indirect parent of the Issuer to pay fees and expenses, other than to Affiliates of the Issuer, related to any unsuccessful equity or debt offering of such parent;

(xiv) any Restricted Payment used to fund the Acquisition Transactions or the Transactions and the payment of fees and expenses Incurred in connection with the Acquisition Transactions or the Transactions or owed by the Issuer or any direct or indirect parent of the Issuer or Restricted Subsidiaries of the Issuer to Affiliates, and any other payments made, including any such payments made to any direct or indirect parent of the Issuer to enable it to make payments, in connection with the consummation of the Transactions or as contemplated by

the Acquisition Documents, whether payable on the Issue Date or thereafter, in each case to the extent permitted by Section 4.07;

(xv) any Restricted Payment made under the Operations Management Agreement;

(xvi) repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(xvii) purchases of receivables pursuant to a Receivables Repurchase Obligation in connection with a Qualified Receivables Financing and the payment or distribution of Receivables Fees;

(xviii) Restricted Payments by the Issuer or any Restricted Subsidiary to allow the payment of cash in lieu of the issuance of fractional shares upon the exercise of options or warrants or upon the conversion or exchange of Capital Stock of any such Person;

(xix) the repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness pursuant to the provisions similar to those described under Sections 4.06 and 4.08; *provided* that all Notes tendered by holders of the Notes in connection with a Change of Control Offer or Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value;

(xx) payments or distributions to dissenting stockholders pursuant to applicable law, pursuant to or in connection with a consolidation, amalgamation, merger or transfer of all or substantially all of the assets of the Issuer and its Restricted Subsidiaries, taken as a whole, that complies with Section 5.01; *provided* that as a result of such consolidation, amalgamation, merger or transfer of assets, the Issuer shall have made a Change of Control Offer (if required by this Indenture) and that all Notes tendered by holders in connection with such Change of Control Offer have been repurchased, redeemed or acquired for value;

69

(xxi) payments made to repay, defease, discharge or otherwise refinance Retained Notes or to service Retained Notes; and

(xxii) Restricted Payments made in connection with the Incurrence of Indebtedness under the revolving portion of the Credit Agreement for the account or benefit of the Subsidiaries of Harrah's Entertainment other than the Issuer or any of its Subsidiaries (including the distribution of the proceeds of any such Indebtedness and with respect to the issuance of, or payments in respect of drawings under, letters of credit), in each case for general corporate purposes of such Subsidiaries (including, without limitation, for business acquisitions and project development and, in the case of letters of credit, for the back-up or replacement of existing letters of credit) in an aggregate amount not to exceed $250.0 million at any time outstanding, so long as such proceeds are not distributed to the stockholders of Harrah's Entertainment;

*provided, however,* that at the time of, and after giving effect to, any Restricted Payment permitted under clauses (vi)(B), (vii), (x), (xi) and (xiii)(B) of this Section 4.04(b), no Default shall have occurred and be continuing or would occur as a consequence thereof.

(c) The Issuer will not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the definition of "Unrestricted Subsidiary." For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by the Issuer and its Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated will be deemed to be Restricted Payments in an amount determined as set forth in the last sentence of the definition of "Investments." Such designation will only be permitted if a Restricted Payment or Permitted Investment in such amount would be permitted at such time and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.

Notwithstanding the foregoing provisions of this Section 4.04, the Issuer will not, and will not permit any of its Restricted Subsidiaries to, pay any cash dividend or make any cash distribution on, or in respect of, the Issuer's Capital Stock or purchase for cash or otherwise acquire for cash any Capital Stock of the Issuer or any direct or indirect parent of the Issuer for the purpose of paying any cash dividend or making any cash distribution to, or acquiring Capital Stock of any direct or indirect parent of the Issuer for cash from, the Sponsors, or guarantee any Indebtedness of any Affiliate of the Issuer for the purpose of paying such dividend, making such distribution or so acquiring such Capital Stock to or from the Sponsors, in each case by means of utilization of the cumulative Restricted Payment credit provided by Section 4.04(a), or the exceptions *provided* by clause (i), (vii) or (x) of Section 4.04(b) or clause (9), (10), (15) or (20) of the definition of "Permitted Investments," if (x) at the time and after giving effect to such payment, the Consolidated Leverage Ratio of the Issuer would be greater than 7.25 to 1.00 or (y) such payment is not otherwise in compliance with this Section 4.04.

SECTION 4.05. Dividend and Other Payment Restrictions Affecting Subsidiaries. The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary to:

(a) (i) pay dividends or make any other distributions to the Issuer or any of its Restricted Subsidiaries (1) on its Capital Stock; or (2) with respect to any other interest or participation in, or measured by, its profits; or (ii) pay any Indebtedness owed to the Issuer or any of its Restricted Subsidiaries;

70

(b) make loans or advances to the Issuer or any of its Restricted Subsidiaries;

or

    (c) sell, lease or transfer any of its properties or assets to the Issuer or any of its Restricted Subsidiaries;

except in each case for such encumbrances or restrictions existing under or by reason of:

    (1) contractual encumbrances or restrictions in effect on the Issue Date, including pursuant to the Credit Agreement and the other Credit Agreement Documents;

    (2) this Indenture, the Notes (and any Exchange Notes);

    (3) applicable law or any applicable rule, regulation or order;

    (4) any agreement or other instrument of a Person acquired by the Issuer or any Restricted Subsidiary which was in existence at the time of such acquisition (but not created in contemplation thereof or to provide all or any portion of the funds or credit support utilized to consummate such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired;

    (5) contracts or agreements for the sale of assets, including any restriction with respect to a Restricted Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Capital Stock or assets of such Restricted Subsidiary;

    (6) Secured Indebtedness otherwise permitted to be Incurred pursuant to Sections 4.03 and 4.12 that limit the right of the debtor to dispose of the assets securing such Indebtedness;

    (7) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

    (8) customary provisions in joint venture agreements and other similar agreements entered into in the ordinary course of business;

    (9) purchase money obligations for property acquired and Capitalized Lease Obligations in the ordinary course of business;

71

    (10) customary provisions contained in leases, licenses and other similar agreements entered into in the ordinary course of business;

    (11) any encumbrance or restriction of a Receivables Subsidiary effected in connection with a Qualified Receivables Financing; *provided, however,* that such restrictions apply only to such Receivables Subsidiary;

    (12) other Indebtedness, Disqualified Stock or Preferred Stock (a) of any Restricted Subsidiary of the Issuer that is a Subsidiary Pledgor or a Foreign Subsidiary, (b) of any Restricted Subsidiary that is not a Subsidiary Pledgor or a Foreign Subsidiary so long as such encumbrances and restrictions contained in any agreement or instrument will not materially affect the Issuer's ability to make anticipated principal or interest payments on the Notes (as determined in good faith by the Issuer) or (c) of any Restricted Subsidiary Incurred in connection with any Project Financing, provided that in the case of each of clauses (a) and (b), such Indebtedness, Disqualified Stock or Preferred Stock is permitted to be Incurred subsequent to the Issue Date pursuant to Section 4.03;

    (13) any Restricted Investment not prohibited by Section 4.04 and any Permitted Investment; or

    (14) any encumbrances or restrictions of the type referred to in clauses (a), (b) and (c) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (1) through (13) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Issuer, no more restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

For purposes of determining compliance with this Section 4.05, (i) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock shall not be deemed a restriction on the ability to make distributions on Capital Stock and (ii) the subordination of loans or advances made to the Issuer or a Restricted Subsidiary of the Issuer to other Indebtedness Incurred by the Issuer or any such Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

SECTION 4.06. Asset Sales.

(a) The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, cause or make an Asset Sale, unless (x) the Issuer or any of its Restricted Subsidiaries, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value (as determined in good faith by the Issuer) of the assets sold or otherwise disposed of, and (y) at least 75% of the consideration therefor received by the Issuer or such Restricted Subsidiary, as the case may be, is in the form of Cash Equivalents; *provided* that the amount of:

    (i) any liabilities (as shown on the Issuer's or such Restricted Subsidiary's most recent balance sheet or in the Notes thereto) of the Issuer or any Restricted Subsidiary of the Issuer (other than liabilities that are by their terms subordinated to the Notes or such Restricted Subsidiary's obligations in respect of the Notes) that are assumed by the transferee of any such assets,

(ii) any notes or other obligations or other securities or assets received by the Issuer or such Restricted Subsidiary of the Issuer from such transferee that are converted by the Issuer or such Restricted Subsidiary of the Issuer into cash within 180 days of the receipt thereof (to the extent of the cash received), and

(iii) any Designated Non-cash Consideration received by the Issuer or any of its Restricted Subsidiaries in such Asset Sale having an aggregate Fair Market Value (as determined in good faith by the Issuer), taken together with all other Designated Non-cash Consideration received pursuant to this Section 4.06(a)(iii) that is at that time outstanding, not to exceed the greater of 5.0% of Total Assets and $850.0 million at the time of the receipt of such Designated Non-cash Consideration (with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value)

shall be deemed to be Cash Equivalents for the purposes of this Section 4.06(a).

(b) Within 15 months after the Issuer's or any Restricted Subsidiary of the Issuer's receipt of the Net Proceeds of any Asset Sale, the Issuer or such Restricted Subsidiary of the Issuer may apply the Net Proceeds from such Asset Sale, at its option:

(i) to repay (A) Indebtedness constituting First Priority Lien Obligations and other Pari Passu Indebtedness that is secured by a Lien permitted under this Indenture (and, if the Indebtedness repaid is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto), (B) Indebtedness of a Restricted Subsidiary that is not a Subsidiary Pledgor, (C) Obligations under the Notes or (D) other Pari Passu Indebtedness (*provided* that if the Issuer or any Subsidiary Pledgor shall so reduce Obligations under any Pari Passu Indebtedness that does not constitute First Priority Lien Obligations, the Issuer will equally and ratably reduce Obligations under the Notes pursuant to Section 3.01 through open-market purchases (*provided* that such purchases are at or above 100% of the principal amount thereof) or by making an offer (in accordance with the procedures set forth below for an Asset Sale Offer) to all holders to purchase at a purchase price equal to 100% of the principal amount thereof, *plus* accrued and unpaid interest and Additional Interest, if any, the pro rata principal amount of Notes), in each case other than Indebtedness owed to the Issuer or an Affiliate of the Issuer; or

(ii) to make an Investment in any one or more businesses (*provided* that if such Investment is in the form of the acquisition of Capital Stock of a Person, such acquisition results in such Person becoming a Restricted Subsidiary of the Issuer), assets, or property or capital expenditures, in each case (a) used or useful in a Similar Business or (b) that replace the properties and assets that are the subject of such Asset Sale.

In the case of Section 4.06(b)(ii), a binding commitment shall be treated as a permitted application of the Net Proceeds from the date of such commitment; *provided* that in the event such binding commitment is later canceled or terminated for any reason before such Net Proceeds are so applied, the Issuer or such Restricted Subsidiary enters into another binding commitment (a "Second Commitment") within six months of such cancellation or termination of the prior binding commitment; *provided, further* that the Issuer or such Restricted Subsidiary may only enter into a Second Commitment under the foregoing provision one time with respect to each Asset Sale and to the extent such Second Commitment is later cancelled or terminated for any reason before such Net Proceeds are applied, then such Net Proceeds shall constitute Excess Proceeds.

Pending the final application of any such Net Proceeds, the Issuer or such Restricted Subsidiary of the Issuer may temporarily reduce Indebtedness under a revolving credit facility, if any, or otherwise invest such Net Proceeds in any manner not prohibited by this Indenture. Any Net Proceeds from any Asset Sale that are not applied as provided and within the time period set forth in the first sentence of this Section 4.06(b) (it being understood that any portion of such Net Proceeds used to make an offer to purchase Notes, as described in clause (i) of this Section 4.06(b), shall be deemed to have been invested whether or not such offer is accepted) will be deemed to constitute "Excess Proceeds." When the aggregate amount of Excess Proceeds exceeds $200.0 million, the Issuer shall make an offer to all holders of Notes (and, at the option of the Issuer, to holders of any Pari Passu Indebtedness) (an "Asset Sale Offer") to purchase the maximum principal amount of Notes (and such Pari Passu Indebtedness), that is at least $2,000 and an integral multiple of $1,000 in excess thereof that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof (or, in the event such Pari Passu Indebtedness was issued with significant original issue discount, 100% of the accreted value thereof), *plus* accrued and unpaid interest and Additional Interest, if any (or, in respect of such Pari Passu Indebtedness, such lesser price, if any, as may be provided for by the terms of such Pari Passu Indebtedness), to the date fixed for the closing of such offer, in accordance with the procedures set forth in this Section 4.06. The Issuer will commence an Asset Sale Offer with respect to Excess Proceeds within ten (10) Business Days after the date that Excess Proceeds exceed $200.0 million by mailing the notice required pursuant to the terms of Section 4.06(f), with a copy to the Trustee. To the extent that the aggregate amount of Notes (and such Pari Passu Indebtedness) tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Issuer may use any remaining Excess Proceeds for any purpose that is not prohibited by this Indenture. If the aggregate principal amount of Notes (and such Pari Passu Indebtedness) surrendered by holders thereof exceeds the amount of Excess Proceeds, the Trustee shall select the Notes to be purchased in the manner described in Section 4.06(e). Upon completion of any such Asset Sale Offer, the amount of Excess Proceeds shall be reset at zero.

(c) The Issuer shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to an Asset Sale Offer.

To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in this Indenture by virtue thereof.

(d) Not later than the date upon which written notice of an Asset Sale Offer is delivered to the Trustee as provided above, the Issuer shall deliver to the Trustee an Officer's Certificate as to (i) the amount of the Excess Proceeds, (ii) the allocation of the Net Proceeds from the Asset Sales pursuant to which such Asset Sale Offer is being made and (iii) the compliance of such allocation with the provisions of Section 4.06(b). On such date, the Issuer shall also irrevocably deposit with the Trustee or with a paying agent (or, if the Issuer or a Wholly Owned Restricted Subsidiary is acting as the Paying Agent, segregate and hold in trust) an amount equal to the Excess Proceeds to be invested in Cash Equivalents, as directed in writing by the Issuer, and to be held for payment in accordance with the provisions of this Section 4.06. Upon the expiration of the period for which the Asset Sale Offer remains open (the "Offer Period"), the Issuer shall deliver to the Trustee for cancellation the Notes or portions thereof that have been properly tendered to and are to be accepted by the Issuer. The Trustee (or the Paying Agent, if not the Trustee) shall, on the date of purchase, mail or deliver payment to each tendering holder in the amount of the purchase price. In the event that the Excess Proceeds delivered by the Issuer to the Trustee are greater than the purchase price of the Notes tendered, the Trustee shall deliver the excess to the Issuer immediately after the expiration of the Offer Period for application in accordance with Section 4.06.

(e) Holders electing to have a Note purchased shall be required to surrender the Note, with an appropriate form duly completed, to the Issuer at the address specified in the notice at least three Business Days prior to the purchase date. Holders shall be entitled to withdraw their election if the Trustee or the Issuer receives not later than one Business Day prior to the purchase date, a telegram, telex, facsimile transmission or letter setting forth the name of the holder, the principal amount of the Note which was delivered by the holder for purchase and a statement that such holder is withdrawing his election to have such Note purchased. If at the end of the Offer Period more Notes (and such Pari Passu Indebtedness) are tendered pursuant to an Asset Sale Offer than the Issuer is required to purchase, selection of such Notes for purchase shall be made by the Trustee in compliance with the requirements of the principal national securities exchange, if any, on which such Notes are listed, or if such Notes are not so listed, on a pro rata basis, by lot or by such other method as the Trustee shall deem fair and appropriate (and in such manner as complies with applicable legal requirements); *provided* that no Notes of $2,000 or less shall be purchased in part. Selection of such Pari Passu Indebtedness shall be made pursuant to the terms of such Pari Passu Indebtedness.

(f) Notices of an Asset Sale Offer shall be mailed by first class mail, postage prepaid, at least 30 but not more than 60 days before the purchase date to each holder of Notes at such holder's registered address. If any Note is to be purchased in part only, any notice of purchase that relates to such Note shall state the portion of the principal amount thereof that has been or is to be purchased.

75

SECTION 4.07. Transactions with Affiliates.

(a) The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Issuer (each of the foregoing, an "Affiliate Transaction") involving aggregate consideration in excess of $25.0 million, unless:

(i) such Affiliate Transaction is on terms that are not materially less favorable to the Issuer or the relevant Restricted Subsidiary than those that could have been obtained in a comparable transaction by the Issuer or such Restricted Subsidiary with an unrelated Person; and

(ii) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $75.0 million, the Issuer delivers to the Trustee a resolution adopted in good faith by the majority of the Board of Directors of the Issuer, approving such Affiliate Transaction and set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with clause (a) above.

(b) The provisions of Section 4.07(a) shall not apply to the following:

(i) transactions between or among the Issuer and/or any of its Restricted Subsidiaries (or an entity that becomes a Restricted Subsidiary as a result of such transaction) and any merger, consolidation or amalgamation of the Issuer and any direct parent of the Issuer; *provided* that such parent shall have no material liabilities and no material assets other than cash, Cash Equivalents and the Capital Stock of the Issuer and such merger, consolidation or amalgamation is otherwise in compliance with the terms of this Indenture and effected for a bona fide business purpose;

(ii) Restricted Payments permitted by Section 4.04 and Permitted Investments;

(iii) (x) the entering into of any agreement (and any amendment or modification of any such agreement so long as, in the good faith judgment of the Board of Directors of the Issuer, any such amendment is not disadvantageous to the holders when taken as a whole, as compared to such agreement as in effect on the Issue Date) to pay, and the payment of, management, consulting, monitoring and advisory fees to the Sponsors in an aggregate amount in any fiscal year not to exceed the greater of (A) $30.0 million and (B) 1.0% of EBITDA of the

Issuer and its Restricted Subsidiaries for the immediately preceding fiscal year, *plus* out-of-pocket expense reimbursement; *provided, however,* that any payment not made in any fiscal year may be carried forward and paid in the following two fiscal years and (y) the payment of the present value of all amounts payable pursuant to any agreement described in clause (iii)(x) of this Section 4.07(b) in connection with the termination of such agreement;

(iv) the payment of reasonable and customary fees and reimbursement of expenses paid to, and indemnity provided on behalf of, officers, directors, employees or consultants of the Issuer or any Restricted Subsidiary, any direct or indirect parent of the Issuer;

76

(v) payments by the Issuer or any of its Restricted Subsidiaries to the Sponsors made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including, without limitation, in connection with acquisitions or divestitures, which payments are (x) made pursuant to the agreements with the Sponsors described in the Offering Memorandum or (y) approved by a majority of the Board of Directors of the Issuer in good faith;

(vi) transactions in which the Issuer or any of its Restricted Subsidiaries, as the case may be, delivers to the Trustee a letter from an Independent Financial Advisor stating that such transaction is fair to the Issuer or such Restricted Subsidiary from a financial point of view or meets the requirements of clause (i) of Section 4.07(a);

(vii) payments or loans (or cancellation of loans) to officers, directors, employees or consultants which are approved by a majority of the Board of Directors of the Issuer in good faith;

(viii) any agreement as in effect as of the Issue Date or any amendment thereto (so long as any such agreement together with all amendments thereto, taken as a whole, is not more disadvantageous to the holders of the Notes in any material respect than the original agreement as in effect on the Issue Date) or any transaction contemplated thereby as determined in good faith by the Issuer;

(ix) the existence of, or the performance by the Issuer or any of its Restricted Subsidiaries of its obligations under the terms of, Acquisition Documents, any stockholders agreement (including any registration rights agreement or purchase agreement related thereto) to which it is a party as of the Issue Date, and any transaction, agreement or arrangement described in the Offering Memorandum and, in each case, any amendment thereto or similar transactions, agreements or arrangements which it may enter into thereafter; *provided, however,* that the existence of, or the performance by the Issuer or any of its Restricted Subsidiaries of its obligations under, any future amendment to any such existing transaction, agreement or arrangement or under any similar transaction, agreement or arrangement entered into after the Issue Date shall only be permitted by this clause (ix) to the extent that the terms of any such existing transaction, agreement or arrangement together with all amendments thereto, taken as a whole, or new transaction, agreement or arrangement are not otherwise more disadvantageous to the holders of the Notes in any material respect than the original transaction, agreement or arrangement as in effect on the Issue Date;

(x) the execution of the Acquisition Transactions, and the payment of all fees and expenses related to the Acquisition Transactions, including fees to the Sponsors, which are described in the Offering Memorandum or contemplated by the Acquisition Documents;

(xi) any transactions made pursuant to any Operations Management Agreement and any transactions in connection with the use of the revolving credit facility under the Credit Agreement for the account or benefit of the Subsidiaries of Harrah's Entertainment other than the Issuer and its Subsidiaries (including the distribution of the proceeds of any such revolving credit Indebtedness and with respect to the issuance of, or payments in respect of drawings under, letters of credit);

77

(xii) (A) transactions with customers, clients, suppliers or purchasers or sellers of goods or services, or transactions otherwise relating to the purchase or sale of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Indenture, which are fair to the Issuer and its Restricted Subsidiaries in the reasonable determination of the Board of Directors or the senior management of the Issuer, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party or (B) transactions with joint ventures or Unrestricted Subsidiaries entered into in the ordinary course of business and consistent with past practice or industry norm;

(xiii) any transaction effected as part of a Qualified Receivables Financing;

(xiv) the issuance of Equity Interests (other than Disqualified Stock) of the Issuer to any Person;

(xv) the issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock option and stock ownership plans or similar employee benefit plans approved by the Board of Directors of the Issuer or any direct or indirect parent of the Issuer or of a Restricted Subsidiary of the Issuer, as appropriate, in good faith;

(xvi) the entering into of any tax sharing agreement or arrangement that complies with Section 4.04(b)(xii);

(xvii) any contribution to the capital of the Issuer;

(xviii) transactions permitted by, and complying with, Section 5.01;

(xix) transactions between the Issuer or any of its Restricted Subsidiaries and any Person, a director of which is also a director of the Issuer or any direct or indirect parent of the Issuer; *provided, however,* that such director abstains from voting as a director of the Issuer or such direct or indirect parent, as the case may be, on any matter involving such other Person;

(xx) pledges of Equity Interests of Unrestricted Subsidiaries;

(xxi) the formation and maintenance of any consolidated group or subgroup for tax, accounting or cash pooling or management purposes in the ordinary course of business;

(xxii) any employment agreements entered into by the Issuer or any of its Restricted Subsidiaries in the ordinary course of business;

(xxiii) transactions undertaken in good faith (as certified by a responsible financial or accounting officer of the Issuer in an Officer's Certificate) for the purpose of improving the consolidated tax efficiency of the Issuer and its Subsidiaries and not for the purpose of circumventing any provision set forth in this Indenture; and

78

(xxiv) the execution of the Transactions and the payment of all fees and expenses related to the Transactions.

SECTION 4.08. <u>Change of Control</u>.

(a) Upon a Change of Control, each holder shall have the right to require the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant record date to receive interest due on the relevant interest payment date), in accordance with the terms contemplated in this Section 4.08; *provided*, *however*, that notwithstanding the occurrence of a Change of Control, the Issuer shall not be obligated to purchase any Notes pursuant to this Section 4.08 in the event that it has exercised its right to redeem such Notes in accordance with Article III of this Indenture. In the event that at the time of such Change of Control the terms of the Bank Indebtedness restrict or prohibit the repurchase of Notes pursuant to this Section 4.08, then prior to the mailing of the notice to the holders provided for in Section 4.08(b) but in any event within 30 days following any Change of Control, the Issuer shall (i) repay in full all Bank Indebtedness or, if doing so will allow the purchase of Notes, offer to repay in full all Bank Indebtedness and repay the Bank Indebtedness of each lender and/or noteholder who has accepted such offer, or (ii) obtain the requisite consent under the agreements governing the Bank Indebtedness to permit the repurchase of the Notes as provided for in Section 4.08(b).

(b) Within 30 days following any Change of Control, except to the extent that the Issuer has exercised its right to redeem the Notes in accordance with Article III of this Indenture, the Issuer shall mail a notice (a "<u>Change of Control Offer</u>") to each holder with a copy to the Trustee stating:

(i) that a Change of Control has occurred and that such holder has the right to require the Issuer to repurchase such holder's Notes at a repurchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest and Additional Interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant record date to receive interest on the relevant interest payment date);

(ii) the circumstances and relevant facts and financial information regarding such Change of Control;

(iii) the repurchase date (which shall be no earlier than 30 days nor later than 60 days from the date such notice is mailed); and

(iv) the instructions determined by the Issuer, consistent with this Section 4.08, that a holder must follow in order to have its Notes purchased.

(c) holders electing to have a Note purchased shall be required to surrender the Note, with an appropriate form duly completed, to the Issuer at the address specified in the notice at least three Business Days prior to the purchase date. The holders shall be entitled to

79

withdraw their election if the Trustee or the Issuer receives not later than one Business Day prior to the purchase date a telegram, telex, facsimile transmission or letter setting forth the name of the holder, the principal amount of the Note which was delivered for purchase by the holder and a statement that such holder is withdrawing his election to have such Note purchased. Holders whose Notes are purchased only in part shall be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered.

(d) On the purchase date, all Notes purchased by the Issuer under this Section shall be delivered to the Trustee for cancellation, and the Issuer shall pay the purchase price *plus* accrued and unpaid interest to the holders entitled thereto.

(e) A Change of Control Offer may be made in advance of a Change of Control, and conditioned upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

(f) Notwithstanding the foregoing provisions of this Section, the Issuer shall not be required to make a Change of Control Offer upon a

Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in Section 4.08 applicable to a Change of Control Offer made by the Issuer and purchases all Notes properly tendered and not withdrawn under such Change of Control Offer.

(g) Notes repurchased by the Issuer pursuant to a Change of Control Offer will have the status of Notes issued but not outstanding or will be retired and canceled at the option of the Issuer. Notes purchased by a third party pursuant to the preceding clause (f) will have the status of Notes issued and outstanding.

(h) At the time the Issuer delivers Notes to the Trustee which are to be accepted for purchase, the Issuer shall also deliver an Officers' Certificate stating that such Notes are to be accepted by the Issuer pursuant to and in accordance with the terms of this Section 4.08. A Note shall be deemed to have been accepted for purchase at the time the Trustee, directly or through an agent, mails or delivers payment therefor to the surrendering holder.

(i) Prior to any Change of Control Offer, the Issuer shall deliver to the Trustee an Officers' Certificate stating that all conditions precedent contained herein to the right of the Issuer to make such offer have been complied with.

(j) The Issuer shall comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes pursuant to this Section. To the extent that the provisions of any securities laws or regulations conflict with provisions of this Section 4.08, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section by virtue thereof.

SECTION 4.09. Compliance Certificate. The Issuer shall deliver to the Trustee within 120 days after the end of each fiscal year of the Issuer, beginning with the fiscal year end on March 31, 2009, an Officer's Certificate stating that in the course of the performance by the signer of his or her duties as an Officer of the Issuer he or she would normally have knowledge

80

of any Default and whether or not the signer knows of any Default that occurred during such period. If he or she does, the certificate shall describe the Default, its status and what action the Issuer is taking or proposes to take with respect thereto. The Issuer also shall comply with Section 314(a)(4) of the TIA. Except with respect to receipt of payments of principal and interest on the Notes and any Default or Event of Default information contained in the Officer's Certificate delivered to it pursuant to this Section 4.09, the Trustee shall have no duty to review, ascertain or confirm the Issuer's compliance with or the breach of any representation, warranty or covenant made in this Indenture.

SECTION 4.10. Further Instruments and Acts. Upon request of the Trustee, the Issuer shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

SECTION 4.11. Future Subsidiary Pledgors; Future Subsidiary Guarantors.

(a) The Issuer shall cause each Wholly Owned Restricted Subsidiary that is a Domestic Subsidiary (unless such Subsidiary is a Receivables Subsidiary or a Domestic Subsidiary that is wholly owned by one or more Foreign Subsidiaries and created to enhance the tax efficiency of the Issuer and its Subsidiaries) and that provides a pledge of, or grants a Lien on, its assets to secure any First Priority Lien Obligations to execute and deliver to the Trustee the Security Documents necessary to cause such Restricted Subsidiary to become a Subsidiary Pledgor (or grantor) and take all actions required thereunder to perfect Liens created thereunder, as well as to execute and deliver to the Trustee a joinder to the Intercreditor Agreement.

(b) The Issuer shall cause each Wholly Owned Restricted Subsidiary that is a Domestic Subsidiary (unless such Subsidiary is a Receivables Subsidiary or a Domestic Subsidiary that is wholly owned by one or more Foreign Subsidiaries and created to enhance the tax efficiency of the Issuer and its Subsidiaries) and that guarantees any First Priority Lien Obligations to execute and deliver to the Trustee a supplemental indenture substantially in the form of Exhibit D pursuant to which such Subsidiary shall guarantee the Issuer's Obligations under the Notes and this Indenture and shall comply with the additional requirements of Section 12.06.

(c) Promptly following (i) the terms of the Issuer's Indebtedness existing on the Issue Date no longer prohibiting the guarantee of the Notes by the Subsidiary Pledgors (as determined in good faith by the Issuer) and (ii) receipt of the requisite approvals from the applicable gaming authorities (the "Initial Guarantee Event"), each Subsidiary Pledgor will execute and deliver to the Trustee a supplemental indenture substantially in the form of Exhibit D pursuant to which such Subsidiary Pledgor shall guarantee the Issuer's obligations under the Notes and this Indenture and shall comply with the additional requirements of Section 12.06, as well as execute and deliver to the Trustee a joinder to the Guarantor Intercreditor Agreement. The Issuer will not, and will not permit any of its Restricted Subsidiaries to, Incur any Indebtedness the terms of which prohibit or restrict the ability of a Subsidiary Pledgor to provide such a guarantee.

81

(d) From and after the Initial Guarantee Event, the Issuer will cause each Wholly Owned Restricted Subsidiary that is a Domestic Subsidiary

(unless such Subsidiary is a Receivables Subsidiary or a Domestic Subsidiary that is wholly owned by one or more Foreign Subsidiaries and created to enhance the tax efficiency of the Issuer and its Subsidiaries) that guarantees any Indebtedness of the Issuer or any other Guarantor of the Notes to execute and deliver to the Trustee a supplemental indenture substantially in the form of Exhibit D pursuant to which such Subsidiary will guarantee the Issuer's obligations under the Notes and this Indenture and shall comply with the additional requirements of Section 12.06, as well as to execute and deliver a joinder to the Guarantor Intercreditor Agreement.

SECTION 4.12. Liens.

(a) The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create, Incur or suffer to exist (i) any Lien on any asset or property of the Issuer or such Restricted Subsidiary securing Indebtedness unless the Notes are equally and ratably secured with (or on a senior basis to, in the case of obligations subordinated in right of payment to the Notes) the obligations so secured until such time as such obligations are no longer secured by a Lien; *provided*, *however*, that this Section 4.12(a)(i) shall not require the Issuer or a Restricted Subsidiary of the Issuer to secure the Notes if the Lien consists of a Permitted Lien, or (ii) any Lien securing any First Priority Lien Obligation of the Issuer or any Subsidiary Pledgor without effectively providing that the Notes or the obligations of such Subsidiary Pledgor in respect of the Notes, as the case may be, shall be granted a second priority security interest (subject to Permitted Liens) upon the assets or property constituting the collateral for such First Priority Lien Obligations, except to the extent that such assets or property constitute securities or other equity interest of the Issuer or any of its Subsidiaries.

(b) Any Lien which is granted to secure the Notes or the obligations of any Subsidiary Pledgor in respect of the Notes under clause (i) of Section 4.12(a) (unless also granted under clause (ii) of Section 4.12(a)) shall be automatically released and discharged at the same time as the release of the Lien that gave rise to the obligation to secure the Notes or such Subsidiary Pledgors obligations under clause (i) of Section 4.12(a).

(c) Notwithstanding the foregoing, the Issuer will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or Incur any Lien on the Collateral securing Indebtedness with any Lien that is pari passu with the Liens securing the Notes that is issued in exchange for any of the Existing Notes or any Exchanged Indebtedness ("Additional Second Priority Debt"), unless either (i) the Total Secured Leverage Ratio of the Issuer for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such Lien is created or Incurred would have been equal to or less than 7.25 to 1.00, determined on a *pro forma* basis after giving effect to the Incurrence of such Lien and related Additional Second Priority Debt (including a *pro forma* application of the net proceeds of such Additional Second Priority Debt), as if such Lien and related Additional Second Priority Debt had been Incurred and the application of the proceeds from such Indebtedness had occurred, at the beginning of such four quarter period or (ii) the aggregate principal amount of the sum of all outstanding Additional Second Priority Debt, Notes and Existing Second Lien Notes (collectively, "Second Priority Debt") would be equal to or less than the greater of $5,562 million and the aggregate principal amount of such Second Priority Debt outstanding immediately after the Notes are issued on the Issue Date, after giving *pro forma* effect to the Incurrence of such Lien and related Additional Second Priority Debt (including a

82

*pro forma* application of the net proceeds of such Additional Second Priority Debt); provided that the foregoing will not restrict the Incurrence or creation by the Issuer or its Restricted Subsidiaries of Liens on the Collateral securing Additional Second Priority Debt otherwise permitted to be Incurred under this Indenture in an aggregate principal amount not to exceed $500 million outstanding at any one time, so long as the Issuer or a Restricted Subsidiary receives only cash proceeds in connection with the Incurrence of such Additional Second Priority Debt pursuant to this proviso.

(d) The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create or Incur any Lien on the Collateral (including any Permitted Lien) securing Indebtedness with a Lien that is junior in priority to the Liens securing First Priority Lien Obligations unless such Lien is pari passu with, or junior in priority to, the Liens securing the Notes. Further, the Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, exchange any Indebtedness secured by any Lien on the Collateral (or on the Collateral securing the First Priority Lien Obligations) that is senior in priority to the Liens securing the Notes for any of the Existing Notes, the Existing Second Lien Notes, the Notes or Additional Second Priority Debt.

(e) In addition, the Issuer will not, and will not permit any of its Restricted Subsidiaries to, exchange any Indebtedness secured by any Lien for any Sponsor Indebtedness held by any Sponsor.

SECTION 4.13. After-Acquired Property. Upon the acquisition by the Issuer or any Subsidiary Pledgor of any First Priority After-Acquired Property, the Issuer or such Subsidiary Pledgor shall execute and deliver such mortgages, deeds of trust, deeds to secure debt, preferred ship mortgages, security instruments, financing statements and certificates, opinions of counsel or such other documentation substantially similar to the documentation delivered to secure First Priority Lien Obligations (including, without limitation title insurance policies, surveys and other documentation as may be reasonably required by the Collateral Agent and consistent with the requirements for similar Collateral in which security interest or Liens were taken on the Issue Date) as shall be reasonably necessary to vest in the Collateral Agent, for the benefit of the Secured Parties (as defined in the Collateral Agreement), a perfected security interest or lien, subject only to Permitted Liens, in such First Priority After-Acquired Property and to have such First Priority After-Acquired Property (but subject to certain limitations, if applicable, including as described in Article XI and the Security Documents) added to the Collateral, and thereupon all provisions of this Indenture relating to the Collateral shall be deemed to relate to such First Priority After-Acquired Property to the same extent and with the same force and effect.

SECTION 4.14. <u>Maintenance of Office or Agency</u>.

(a) The Issuer shall maintain an office or agency (which may be an office of the Trustee or an affiliate of the Trustee or Registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served. The Issuer shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Issuer shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the corporate trust office of the Trustee as set forth in Section 13.02.

(b) The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided, however,* that no such designation or rescission shall in any manner relieve the Issuer of its obligation to maintain an office or agency for such purposes. The Issuer shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

(c) The Issuer hereby designates the corporate trust office of the Trustee or its agent as such office or agency of the Issuer in accordance with Section 2.04.

SECTION 4.15. <u>Amendment of Security Documents</u>. The Issuer will not amend, modify or supplement, or permit or consent to any amendment, modification or supplement of, the Security Documents in any way that would be adverse to the holders of the Notes in any material respect, except as set forth in Article XI or as permitted under Article IX.

SECTION 4.16. <u>Covenant Suspension</u>. If on any date following the Issue Date, (i) the Notes have Investment Grade Ratings from both Rating Agencies, and (ii) no Default has occurred and is continuing under this Indenture, then, beginning on that day and continuing at all times thereafter regardless of any subsequent changes in the rating of the Notes (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "<u>Covenant Suspension Event</u>"), and subject to the provisions of the following paragraph, the Issuer and the Restricted Subsidiaries shall not be subject to Sections 4.03, 4.04, 4.05, 4.06, 4.07 and 5.01(a)(iv) (collectively the "<u>Suspended Covenants</u>").

If and while the Issuer and its Restricted Subsidiaries are not subject to the Suspended Covenants, the Notes will be entitled to substantially less covenant protection. In the event that the Issuer and its Restricted Subsidiaries are not subject to the Suspended Covenants under this Indenture for any period of time as a result of the foregoing, and on any subsequent date (the "<u>Reversion Date</u>") one or both of the Rating Agencies withdraw their Investment Grade Rating or downgrade the rating assigned to the Notes below an Investment Grade Rating, then the Issuer and its Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants under this Indenture with respect to future events.

On each Reversion Date, all Indebtedness Incurred, or Disqualified Stock or Preferred Stock issued, during the Suspension Period will be classified as having been Incurred or issued pursuant to Section 4.03(a) or 4.03(b) (to the extent such Indebtedness or Disqualified Stock or Preferred Stock would be permitted to be Incurred or issued thereunder as of the Reversion Date and after giving effect to Indebtedness Incurred or issued prior to the Suspension Period and outstanding on the Reversion Date). To the extent such Indebtedness or Disqualified Stock or Preferred Stock would not be so permitted to be Incurred or issued pursuant to Section 4.03 such Indebtedness or Disqualified Stock or Preferred Stock will be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under Section 4.03(b)(iii). Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under Section 4.04 will be made as though Section 4.04 had been in effect since the

Issue Date and throughout the Suspension Period. Accordingly, Restricted Payments made during the Suspension Period will reduce the amount available to be made as Restricted Payments under Section 4.04(a). As described above, however, no Default or Event of Default will be deemed to have occurred on the Reversion Date as a result of any actions taken by the Issuer or its Restricted Subsidiaries during the Suspension Period.

For purposes of Section 4.06, on the Reversion Date, the unutilized Excess Proceeds amount will be reset to zero.

SECTION 4.17. <u>Maintenance of Insurance</u>. The Issuer shall maintain, with financially sound and reputable insurance companies, insurance (subject to customary deductibles and retentions) in such amounts and against such risks as are customarily maintained by similarly situated companies engaged in the same or similar businesses operating in the same or similar locations and cause the Issuer and the Subsidiary Pledgors to be listed as insured and the Collateral Agent to be listed as co-loss payee on property and property casualty policies and as an additional insured on liability policies. Notwithstanding the foregoing, the Issuer and the Subsidiary Pledgors may self-insure with respect to such risks with respect to which companies of established reputation in the same general line of business in the same general area usually self-insure.

**ARTICLE V**

SECTION 5.01. When Issuer May Merge or Transfer Assets.

(a) The Issuer shall not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not the Issuer is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless:

(i) the Issuer is the surviving person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding up or conversion (if other than the Issuer) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (the Issuer or such Person, as the case may be, being herein called the "Successor Issuer"); *provided* that in the case where the surviving Person is not a corporation, a co-obligor of the Notes is a corporation;

(ii) the Successor Issuer (if other than the Issuer) expressly assumes all the obligations of the Issuer under this Indenture and the Notes pursuant to supplemental indentures or other documents or instruments in form reasonably satisfactory to the Trustee;

(iii) immediately after giving effect to such transaction (and treating any Indebtedness which becomes an obligation of the Successor Issuer or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Issuer or such Restricted Subsidiary at the time of such transaction) no Default shall have occurred and be continuing;

85

(iv) immediately after giving *pro forma* effect to such transaction, as if such transaction had occurred at the beginning of the applicable four-quarter period (and treating any Indebtedness which becomes an obligation of the Successor Issuer or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Issuer or such Restricted Subsidiary at the time of such transaction), either

(A) the Successor Issuer would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a); or

(B) the Fixed Charge Coverage Ratio for the Successor Issuer and its Restricted Subsidiaries would be greater than such ratio for the Issuer and its Restricted Subsidiaries immediately prior to such transaction;

(v) if the Issuer is not the Successor Issuer, each Subsidiary Pledgor, unless it is the other party to the transactions described above, shall have by supplemental indenture confirmed that its obligations in respect of the Notes shall apply to such Person's obligations under this Indenture and the Notes; and

(vi) the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, amalgamation or transfer and such supplemental indentures (if any) comply with this Indenture.

The Successor Issuer (if other than the Issuer) will succeed to, and be substituted for, the Issuer under this Indenture and the Notes, and in such event the Issuer will automatically be released and discharged from its obligations under this Indenture and the Notes. Notwithstanding the foregoing clauses (iii) and (iv) of this Section 5.01, (a) any Restricted Subsidiary may merge, consolidate or amalgamate with or transfer all or part of its properties and assets to the Issuer or to another Restricted Subsidiary, and (b) the Issuer may merge, consolidate or amalgamate with an Affiliate incorporated solely for the purpose of reincorporating the Issuer in another state of the United States, the District of Columbia or any territory of the United States or may convert into a limited liability company, so long as the amount of Indebtedness of the Issuer and its Restricted Subsidiaries is not increased thereby. This Article V will not apply to a sale, assignment, transfer, conveyance or other disposition of assets between or among the Issuer and its Restricted Subsidiaries.

86

(b) Subject to the provisions of Section 11.04 (which govern the release of assets and property securing the Notes upon the sale or disposition of a Restricted Subsidiary of the Issuer that is a Subsidiary Pledgor), no Subsidiary Pledgor shall, and the Issuer shall not permit any Subsidiary Pledgor to, consolidate, amalgamate or merge with or into or wind up into (whether or not such Subsidiary Pledgor is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, any Person unless:

(i) either (A) such Subsidiary Pledgor is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation or merger (if other than such Subsidiary Pledgor) or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Subsidiary Pledgor or such Person, as the case may be, being herein called the "Successor Subsidiary Pledgor") and the Successor Subsidiary Pledgor (if other than such Subsidiary Pledgor) expressly assumes all the obligations of such Subsidiary Pledgor under this Indenture, the Security Documents and such Subsidiary Pledgor's obligations in respect of the Notes pursuant to documents or instruments in form reasonably satisfactory to the Trustee, or (b) such sale or

disposition or consolidation, amalgamation or merger is not in violation of Section 4.06; and

(ii) the Successor Subsidiary Pledgor (if other than such Subsidiary Pledgor) shall have delivered or caused to be delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, amalgamation, merger or transfer and such supplemental indenture (if any) comply with this Indenture.

Except as otherwise provided in this Indenture, the Successor Subsidiary Pledgor (if other than such Subsidiary Pledgor) will succeed to, and be substituted for, such Subsidiary Pledgor under this Indenture and such Subsidiary Pledgor's obligations in respect of the Notes, and such Subsidiary Pledgor will automatically be released and discharged from its obligations under this Indenture and such Subsidiary Pledgor's obligations in respect of the Notes. Notwithstanding the foregoing, (1) a Subsidiary Pledgor may merge, amalgamate or consolidate with an Affiliate incorporated solely for the purpose of reincorporating such Subsidiary Pledgor in another state of the United States, the District of Columbia or any territory of the United States so long as the amount of Indebtedness of the Subsidiary Pledgor is not increased thereby and (2) a Subsidiary Pledgor may merge, amalgamate or consolidate with another Subsidiary Pledgor or the Issuer.

In addition, notwithstanding the foregoing, any Subsidiary Pledgor may consolidate, amalgamate or merge with or into or wind up into, or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets (collectively, a "Transfer") to the Issuer or any Subsidiary Pledgor.

Except as otherwise provided in this Indenture, Harrah's Entertainment will not consolidate, amalgamate or merge with or into or wind up into (whether or not Harrah's Entertainment is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, any Person unless:

(1) either Harrah's Entertainment or the Issuer (*provided* that if the Issuer is to be the surviving Person, then such transaction shall comply with Section 5.01(a) or 5.01(b)) is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation or merger (if other than Harrah's Entertainment) or to which such sale, assignment, transfer, lease, conveyance or

87

---

other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (Harrah's Entertainment or such Person, as the case may be, being herein called the "Successor Parent Guarantor") and the Successor Parent Guarantor (if other than Harrah's Entertainment) expressly assumes all the obligations of Harrah's Entertainment under this Indenture and Harrah's Entertainment's Note Guarantee pursuant to a supplemental indenture or other documents or instruments in form reasonably satisfactory to the Trustee; and

(2) the Successor Parent Guarantor (if other than Harrah's Entertainment) shall have delivered or caused to be delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, amalgamation, merger or transfer and such supplemental indenture (if any) comply with this Indenture.

Except as otherwise provided in this Indenture, the Successor Parent Guarantor (if other than Harrah's Entertainment) will succeed to, and be substituted for, Harrah's Entertainment under this Indenture, Harrah's Entertainment's Note Guarantee, and Harrah's Entertainment will automatically be released and discharged from its obligations under this Indenture and such Note Guarantee.

## ARTICLE VI

### DEFAULTS AND REMEDIES

SECTION 6.01. Events of Default. An "Event of Default" occurs with respect to Notes if:

(a) there is a default in any payment of interest (including any additional interest) on any Note when the same becomes due and payable, and such default continues for a period of 30 days,

(b) there is a default in the payment of principal or premium, if any, of any Note when due at its Stated Maturity, upon optional redemption, upon required repurchase, upon declaration or otherwise,

(c) the failure by the Issuer or any Restricted Subsidiary to comply for 60 days after notice with its other agreements contained in the Notes or this Indenture,

(d) the failure by the Issuer or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) to pay any Indebtedness (other than Indebtedness owing to the Issuer or a Restricted Subsidiary) within any applicable grace period after final maturity or the acceleration of any such Indebtedness by the holders thereof because of a default, in each case, if the total amount of such Indebtedness unpaid or accelerated exceeds $150.0 million or its foreign currency equivalent,

88

(e) either the Issuer or any Significant Subsidiary of the Issuer pursuant to or within the meaning of any Bankruptcy Law:

(i) commences a voluntary case;

(ii) consents to the entry of an order for relief against it in an involuntary case;

(iii) consents to the appointment of a Custodian of it or for any substantial part of its property; or

(iv) makes a general assignment for the benefit of its creditors or takes any comparable action under any foreign laws relating to insolvency,

(f) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i) is for relief against either the Issuer or any Significant Subsidiary of the Issuer in an involuntary case;

(ii) appoints a Custodian of either the Issuer or any Significant Subsidiary of the Issuer or for any substantial part of its property; or

(iii) orders the winding up or liquidation of either the Issuer or any Significant Subsidiary of the Issuer; or any similar relief is granted under any foreign laws and the order or decree remains unstayed and in effect for 60 days,

(g) failure by the Issuer or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) to pay final judgments aggregating in excess of $150.0 million or its foreign currency equivalent (net of any amounts which are covered by enforceable insurance policies issued by solvent carriers), which judgments are not discharged, waived or stayed for a period of 60 days,

(h) the Note Guarantee of the Parent Guarantor or a Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) ceases to be in full force and effect (except as contemplated by the terms thereof) or the Parent Guarantor denies or disaffirms its obligations under this Indenture or its Parent Guarantee and such Default continues for 10 days,

(i) unless all of the Collateral has been released from the Second Priority Liens in accordance with the provisions of Article XI, the Second Priority Liens on all or substantially all of the Collateral cease to be valid or enforceable and such Default continues for 30 days, or the Issuer shall assert or any Subsidiary Pledgor shall assert, in any pleading in any court of competent jurisdiction, that any such security interest is invalid or unenforceable and, in the case of any such Person that is a Subsidiary of the Issuer, the Issuer fails to cause such Subsidiary to rescind such assertions within 30 days after the Issuer has actual knowledge of such assertions, or

89

(j) the failure by the Issuer or any Subsidiary Pledgor to comply for 60 days after notice with its other agreements contained in the Security Documents except for a failure that would not be material to the holders of the Notes and would not materially affect the value of the Collateral taken as a whole.

The foregoing shall constitute Events of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

The term "Bankruptcy Law" means Title 11, United States Code, or any similar Federal or state law for the relief of debtors. The term "Custodian" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

However, a default under clauses (c) or (j) above shall not constitute an Event of Default until the Trustee or the holders of 30% in principal amount of outstanding Notes notify the Issuer of the default and the Issuer does not cure such default within the time specified in clauses (c) or (j) hereof after receipt of such notice. Such notice must specify the Default, demand that it be remedied and state that such notice is a "Notice of Default." The Issuer shall deliver to the Trustee, within five (5) Business Days after the occurrence thereof, written notice in the form of an Officers' Certificate of any event which is, or with the giving of notice or the lapse of time or both would become, an Event of Default, its status and what action the Issuer is taking or propose to take with respect thereto.

SECTION 6.02. Acceleration. If an Event of Default (other than an Event of Default specified in Section 6.01(e) or 6.01(f) hereof with respect to the Issuer) occurs and is continuing, the Trustee or the holders of at least 30% in principal amount of outstanding Notes by notice to the Issuer may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable; *provided, however*, that so long as any Bank Indebtedness remains outstanding, no such acceleration shall be effective until the earlier of (1) five Business Days after the giving of written notice to the Issuer and the Representative under the Credit Agreement and (2) the day on which any Bank Indebtedness is accelerated. Upon such a declaration, such principal and interest shall be due and payable immediately. If an Event of Default specified in Section 6.01(e) or (f) with respect to the Issuer occurs, the principal of, premium, if any, and interest on all the Notes will become immediately due and payable without any declaration or other act on the part of the Trustee or any holders. Under certain circumstances, the holders of a majority in principal amount of outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

In the event of any Event of Default specified in Section 6.01(d) above, such Event of Default and all consequences thereof (excluding, however, any resulting payment default) shall be annulled, waived and rescinded, automatically and without any action by the Trustee or the holders of the Notes, if within 20 days after such Event of Default arose the Issuer delivers an Officer's Certificate to the Trustee stating that (x) the

Indebtedness or guarantee that is the basis for such Event of Default has been discharged or (y) the holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default or (z) the default that is the basis for such Event of Default has been cured, it being understood that in no event shall an acceleration of the principal amount of the Notes as described above be annulled, waived or rescinded upon the happening of any such events.

<div align="center">90</div>

---

SECTION 6.03. Other Remedies. If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy at law or in equity to collect the payment of principal of or interest on the Notes or to enforce the performance of any provision of the Notes, this Indenture or the Security Documents.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. No remedy is exclusive of any other remedy. To the extent required by law, all available remedies are cumulative.

SECTION 6.04. Waiver of Past Defaults. Provided the Notes are not then due and payable by reason of a declaration of acceleration, the holders of a majority in principal amount of the Notes by written notice to the Trustee may waive an existing Default and its consequences except (a) a Default in the payment of the principal of or interest on a Note, (b) a Default arising from the failure to redeem or purchase any Note when required pursuant to the terms of this Indenture or (c) a Default in respect of a provision that under Section 9.02 cannot be amended without the consent of each holder affected. When a Default is waived, it is deemed cured and the Issuer, the Trustee and the holders will be restored to their former positions and rights under this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any consequent right.

SECTION 6.05. Control by Majority. The holders of a majority in principal amount of Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture or, if the Trustee, being advised by counsel, determines that the action or proceeding so directed may not lawfully be taken or if the Trustee in good faith by its board of directors or trustees, executive committee, or a trust committee of directors or trustees and/or Responsible Officers shall determine that the action or proceeding so directed would involve the Trustee in personal liability or expense for which it is not adequately indemnified, or subject to Section 9.02, that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability. Prior to taking any action under this Indenture, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

SECTION 6.06. Limitation on Suits.

(a) Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder may pursue any remedy with respect to this Indenture or the Notes unless:

(i) such holder has previously given the Trustee notice that an Event of Default is continuing,

<div align="center">91</div>

---

(ii) holders of at least 30% in principal amount of the outstanding Notes have requested the Trustee to pursue the remedy,

(iii) such holders have offered the Trustee reasonable security or indemnity satisfactory to the Trustee against any loss, liability or expense,

(iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity, and

(v) the holders of a majority in principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.

(b) A holder may not use this Indenture to prejudice the rights of another holder or to obtain a preference or priority over another holder.

SECTION 6.07. Rights of the Holders to Receive Payment. Notwithstanding any other provision of this Indenture, the right of any holder to receive payment of principal of and interest on the Notes held by such holder, on or after the respective due dates expressed or provided for in the Notes, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder.

SECTION 6.08. Collection Suit by Trustee. If an Event of Default specified in Section 6.01(a) or (b) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer or any other obligor on the Notes for the whole amount then due and owing (together with interest on overdue principal and (to the extent lawful) on any unpaid interest at the rate provided for in the Notes) and the amounts provided for in Section 7.07.

SECTION 6.09. <u>Trustee May File Proofs of Claim</u>. The Trustee may file such proofs of claim, statements of interest and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation, expenses disbursements and advances of the Trustee (including counsel, accountants, experts or such other professionals as the Trustee deems necessary, advisable or appropriate)) and the holders allowed in any judicial proceedings relative to the Issuer or the Parent Guarantor, any Subsidiary Pledgor, their creditors or their property, shall be entitled to participate as a member, voting or otherwise, of any official committee of creditors appointed in such matters and, unless prohibited by law or applicable regulations, may vote on behalf of the holders in any election of a trustee in bankruptcy or other Person performing similar functions, and any Custodian in any such judicial proceeding is hereby authorized by each holder to make payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the holders, to pay to the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and its counsel, and any other amounts due the Trustee under Section 7.07.

SECTION 6.10. <u>Priorities</u>. Subject to the terms of the Intercreditor Agreement, the Guarantor Intercreditor Agreement and the Security Documents, any money or property collected by the Trustee pursuant to this Article VI and any other money or property distributable in respect of the Issuer's or any Guarantor's obligations under this Indenture after an Event of Default shall be applied in the following order:

FIRST: to the Trustee for amounts due under Section 7.07;

SECOND: to the holders for amounts due and unpaid on the Notes for principal, premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal and interest, respectively; and

THIRD: to the Issuer or, to the extent the Trustee collects any amount for any Guarantor, to the such Guarantor.

The Trustee may fix a record date and payment date for any payment to the holders pursuant to this Section. At least 15 days before such record date, the Trustee shall mail to each holder and the Issuer a notice that states the record date, the payment date and amount to be paid.

SECTION 6.11. <u>Undertaking for Costs</u>. In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section does not apply to a suit by the Trustee, a suit by a holder pursuant to Section 6.07 or a suit by holders of more than 10% in principal amount of the Notes.

SECTION 6.12. <u>Waiver of Stay or Extension Laws</u>. Neither the Issuer nor any Guarantor (to the extent it may lawfully do so) shall at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the Issuer and the Guarantors (to the extent that it may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

## ARTICLE VII

## TRUSTEE

SECTION 7.01. <u>Duties of Trustee</u>.

(a) The Trustee, prior to the occurrence of an Event of Default with respect to the Notes and after the curing or waiving of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this

Indenture. If an Event of Default has occurred and is continuing, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b) Except during the continuance of an Event of Default:

(i) the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee (it being agreed that the permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty); and

(ii) in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. The

Trustee shall be under no duty to make any investigation as to any statement contained in any such instance, but may accept the same as conclusive evidence of the truth and accuracy of such statement or the correctness of such opinions. However, in the case of certificates or opinions required by any provision hereof to be provided to it, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c) The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i) this paragraph does not limit the effect of paragraph (b) of this Section;

(ii) the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts;

(iii) the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05; and

(iv) no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise Incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers.

(d) Every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b) and (c) of this Section.

(e) The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer.

94

(f) Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(g) Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section and to the provisions of the TIA.

SECTION 7.02. Rights of Trustee.

(a) The Trustee may conclusively rely on any document believed by it to be genuine and to have been signed or presented by the proper person. The Trustee need not investigate any fact or matter stated in the document.

(b) Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officers' Certificate or Opinion of Counsel.

(c) The Trustee may act through agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d) The Trustee shall not be responsible or liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; *provided*, *however*, that the Trustee's conduct does not constitute willful misconduct or negligence.

(e) The Trustee may consult with counsel of its own selection and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

(f) The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture, note or other paper or document unless requested in writing to do so by the holders of not less than a majority in principal amount of the Notes at the time outstanding, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney, at the expense of the Issuer and shall Incur no liability of any kind by reason of such inquiry or investigation.

(g) The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the holders pursuant to this Indenture, unless such holders shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be Incurred by it in compliance with such request or direction.

95

(h) The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(i) The Trustee shall not be responsible or liable for any action taken or omitted by it in good faith at the direction of the holders of not less

than a majority in principal amount of the Notes as to the time, method and place of conducting any proceedings for any remedy available to the Trustee or the exercising of any power conferred by this Indenture.

(j) Any action taken, or omitted to be taken, by the Trustee in good faith pursuant to this Indenture upon the request or authority or consent of any person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding upon future holders of Notes and upon Notes executed and delivered in exchange therefor or in place thereof.

(k) The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a Default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

(l) The Trustee may request that the Issuer deliver an Officer's Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any Person authorized to sign an Officer's Certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

(m) The Trustee shall not be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of actions.

(n) The Trustee shall not be required to give any bond or surety in respect of the execution of the trusts and powers under this Indenture.

(o) The Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; interruptions; loss or malfunction of utilities, computer (hardware or software) or communication services; accidents; labor disputes; and acts of civil or military authorities and governmental action.

SECTION 7.03. Individual Rights of Trustee. The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee. Any Paying Agent or Registrar may do the same with like rights. However, the Trustee must comply with Sections 7.10 and 7.11.

96

SECTION 7.04. Trustee's Disclaimer. The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture, the Note Guarantees or the Notes, it shall not be accountable for the Issuer's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Issuer or any Guarantor in this Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Trustee's certificate of authentication. The Trustee shall not be charged with knowledge of any Default or Event of Default under Sections 6.01(c), (d), (e), (h), or (i) or of the identity of any Significant Subsidiary unless either (a) a Trust Officer shall have actual knowledge thereof or (b) the Trustee shall have received written notice thereof in accordance with Section 13.02 hereof from the Issuer, any Subsidiary Pledgor or any holder. In accepting the trust hereby created, the Trustee acts solely as Trustee for the holders of the Notes and not in its individual capacity and all persons, including without limitation the holders of Notes and the Issuer having any claim against the Trustee arising from this Indenture shall look only to the funds and accounts held by the Trustee hereunder for payment except as otherwise provided herein.

SECTION 7.05. Notice of Defaults. If a Default occurs and is continuing and if it is actually known to the Trustee, the Trustee shall mail to each holder notice of the Default within the earlier of 90 days after it occurs or 30 days after it is actually known to a Trust Officer or written notice of it is received by the Trustee. Except in the case of a Default in the payment of principal of, premium (if any) or interest on any Note, the Trustee may withhold the notice if and so long as a committee of its Trust Officers in good faith determines that withholding the notice is in the interests of the holders. The Issuer is required to deliver to the Trustee, annually, a certificate indicating whether the signers thereof know of any Default that occurred during the previous year. The Issuer also is required to deliver to the Trustee, within 30 days after the occurrence thereof, written notice of any event which would constitute certain Defaults, their status and what action the Issuer is taking or proposes to take in respect thereof.

SECTION 7.06. Reports by Trustee to the Holders. As promptly as practicable after each June 30 beginning with the June 30 following the date of this Indenture, and in any event prior to June 30 in each year, the Trustee shall mail to each holder a brief report dated as of such June 30 that complies with Section 313(a) of the TIA if and to the extent required thereby. The Trustee shall also comply with Section 313(b) of the TIA.

A copy of each report at the time of its mailing to the holders shall be filed with the SEC and each stock exchange (if any) on which the Notes are listed. The Issuer agrees to notify promptly the Trustee whenever the Notes become listed on any stock exchange and of any delisting thereof.

SECTION 7.07. Compensation and Indemnity. The Issuer shall pay to the Trustee from time to time such compensation, as the Issuer and the Trustee shall from time to time agree in writing, for the Trustee's acceptance of this Indenture and its services hereunder. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Issuer shall reimburse the Trustee upon request for all reasonable out-of-pocket expenses Incurred or made by it, including costs of collection, in addition to the compensation for its services. Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Trustee's agents, counsel, accountants

and experts. The Issuer and the Guarantors, jointly and severally shall indemnify the Trustee against any and

97

all loss, liability, claim, damage or expense (including reasonable attorneys' fees and expenses) Incurred by or in connection with the acceptance or administration of this trust and the performance of its duties hereunder, including the costs and expenses of enforcing this Indenture and Note Guarantee against the Issuer or any Guarantor (including this Section 7.07) and defending itself against or investigating any claim (whether asserted by the Issuer, any Guarantor, any holder or any other Person). The obligation to pay such amounts shall survive the payment in full or defeasance of the Notes or the removal or resignation of the Trustee. The Trustee shall notify the Issuer of any claim for which it may seek indemnity promptly upon obtaining actual knowledge thereof; *provided*, *however*, that any failure so to notify the Issuer shall not relieve the Issuer or any Guarantor of its indemnity obligations hereunder. The Issuer shall defend the claim and the indemnified party shall provide reasonable cooperation at the Issuer's expense in the defense. Such indemnified parties may have separate counsel and the Issuer and such Guarantor, as applicable shall pay the fees and expenses of such counsel; *provided*, *however*, that the Issuer shall not be required to pay such fees and expenses if it assumes such indemnified parties' defense and, in such indemnified parties' reasonable judgment, there is no conflict of interest between the Issuer and the Guarantor, as applicable, and such parties in connection with such defense. The Issuer needs not reimburse any expense or indemnify against any loss, liability or expense Incurred by an indemnified party through such party's own willful misconduct, negligence or bad faith.

To secure the Issuer's and the Guarantors' payment obligations in this Section, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee other than money or property held in trust to pay principal of and interest on particular Notes.

The Issuer's and the Guarantors' payment obligations pursuant to this Section shall survive the satisfaction or discharge of this Indenture, any rejection or termination of this Indenture under any bankruptcy law or the resignation or removal of the Trustee. Without prejudice to any other rights available to the Trustee under applicable law, when the Trustee Incurs expenses after the occurrence of a Default specified in Section 6.01(f) or (g) with respect to the Issuer, the expenses are intended to constitute expenses of administration under the Bankruptcy Law.

No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise Incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if repayment of such funds or adequate indemnity against such risk or liability is not assured to its satisfaction.

SECTION 7.08. Replacement of Trustee.

(a) The Trustee may resign at any time by so notifying the Issuer. The holders of a majority in principal amount of the Notes may remove the Trustee by so notifying the Trustee and may appoint a successor Trustee. The Issuer shall remove the Trustee if:

(i) the Trustee fails to comply with Section 7.10;

(ii) the Trustee is adjudged bankrupt or insolvent;

98

(iii) a receiver or other public officer takes charge of the Trustee or its property; or

(iv) the Trustee otherwise becomes incapable of acting.

(b) If the Trustee resigns, is removed by the Issuer or by the holders of a majority in principal amount of the Notes and such holders do not reasonably promptly appoint a successor Trustee, or if a vacancy exists in the office of Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee), the Issuer shall promptly appoint a successor Trustee.

(c) A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer. Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall mail a notice of its succession to the holders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the Lien provided for in Section 7.07.

(d) If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee or the holders of 10% in principal amount of the Notes may petition at the expense of the Issuer any court of competent jurisdiction for the appointment of a successor Trustee.

(e) If the Trustee fails to comply with Section 7.10, unless the Trustee's duty to resign is stayed as provided in Section 310(b) of the TIA, any holder who has been a bona fide holder of a Note for at least six months may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f) Notwithstanding the replacement of the Trustee pursuant to this Section, the Issuer's obligations under Section 7.07 shall continue for the benefit of the retiring Trustee.

SECTION 7.09. <u>Successor Trustee by Merger</u>. If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee shall have.

<center>99</center>

SECTION 7.10. <u>Eligibility; Disqualification</u>. The Trustee shall at all times satisfy the requirements of Section 310(a) of the TIA. The Trustee shall have a combined capital and surplus of at least $100 million as set forth in its most recent published annual report of condition. The Trustee shall comply with Section 310(b) of the TIA, subject to its right to apply for a stay of its duty to resign under the penultimate paragraph of Section 310(b) of the TIA; *provided*, *however*, that there shall be excluded from the operation of Section 310(b)(1) of the TIA any series of securities issued under this Indenture and any indenture or indentures under which other securities or certificates of interest or participation in other securities of the Issuer are outstanding if the requirements for such exclusion set forth in Section 310(b)(1) of the TIA are met.

SECTION 7.11. <u>Preferential Collection of Claims Against the Issuer</u>. The Trustee shall comply with Section 311(a) of the TIA, excluding any creditor relationship listed in Section 311(b) of the TIA. A Trustee who has resigned or been removed shall be subject to Section 311(a) of the TIA to the extent indicated.

<center>**ARTICLE VIII**</center>

<center>**DISCHARGE OF INDENTURE; DEFEASANCE**</center>

SECTION 8.01. <u>Discharge of Liability on Notes; Defeasance</u>.

(a) This Indenture shall be discharged and shall cease to be of further effect (except as to surviving rights of registration of transfer or exchange of Notes, as expressly provided for in this Indenture) as to all outstanding Notes when:

(i) either (a) all the Notes theretofore authenticated and delivered (except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust) have been delivered to the Trustee for cancellation or (b) all of the Notes (1) have become due and payable, (2) will become due and payable at their stated maturity within one year or (3) if redeemable at the option of the Issuer, are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer, and the Issuer has irrevocably deposited or caused to be deposited with the Trustee funds in an amount sufficient to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of deposit together with irrevocable instructions from the Issuer directing the Trustee to apply such funds to the payment thereof at maturity or redemption, as the case may be;

(ii) the Issuer and/or the Parent Guarantor has paid all other sums payable under this Indenture; and

(iii) the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent under this Indenture relating to the satisfaction and discharge of this Indenture have been complied with.

<center>100</center>

(b) Subject to Sections 8.01(c) and 8.02, the Issuer at any time may terminate (i) all of its obligations under the Notes and this Indenture ("legal defeasance option") or (ii) its obligations under Sections 4.02, 4.03, 4.04, 4.05, 4.06, 4.07, 4.08, 4.09, 4.11, 4.12, 4.13 and 4.15 and the operation of Section 5.01 for the benefit of the holders of the Notes, and Sections 6.01(c), 6.01(d) and Sections 6.01(e) and 6.01(f) (with respect to Significant Subsidiaries of the Issuer only), 6.01(g), 6.01(h), 6.01(i) and 6.01(j) ("covenant defeasance option"). The Issuer may exercise its legal defeasance option notwithstanding its prior exercise of its covenant defeasance option. In the event that the Issuer terminates all of its obligations under the Notes and this Indenture (with respect to such Notes) by exercising its legal defeasance option or its covenant defeasance option, the obligations of each Subsidiary Pledgor with respect to the Notes and the Security Documents shall be terminated simultaneously with the termination of such obligations.

If the Issuer exercises its legal defeasance option, payment of the Notes so defeased may not be accelerated because of an Event of Default. If the Issuer exercises its covenant defeasance option, payment of the Notes so defeased may not be accelerated because of an Event of Default specified in Section 6.01(c), 6.01(d), 6.01(e) and 6.01(f) (with respect to Significant Subsidiaries of the Issuer only), 6.01(g), 6.01(h), 6.01(i) or 6.01(j) or because of the failure of the Issuer to comply with Section 5.01.

Upon satisfaction of the conditions set forth herein and upon request of the Issuer, the Trustee shall acknowledge in writing the discharge of those obligations that the Issuer terminates.

(c) Notwithstanding clauses (a) and (b) above, the Issuer's obligations in Sections 2.04, 2.05, 2.06, 2.07, 2.08, 2.09, 7.07, 7.08 and in this Article VIII shall survive until the Notes have been paid in full. Thereafter, the Issuer's obligations in Sections 7.07, 8.05 and 8.06 shall survive such satisfaction and discharge.

SECTION 8.02. Conditions to Defeasance.

(a) The Issuer may exercise its legal defeasance option or its covenant defeasance option only if:

(i) the Issuer irrevocably deposits in trust with the Trustee cash in U.S. Dollars, U.S. Government Obligations or a combination thereof in an amount sufficient or U.S. Government Obligations, the principal of and the interest on which will be sufficient, or a combination thereof sufficient, to pay the principal of and premium (if any) and interest on the Notes when due at maturity or redemption, as the case may be, including interest thereon to maturity or such redemption date;

(ii) the Issuer delivers to the Trustee a certificate from a nationally recognized firm of independent accountants expressing their opinion that the payments of principal and interest when due and without reinvestment on the deposited U.S. Government Obligations *plus* any deposited money without investment will provide cash at such times and in such amounts as will be sufficient to pay principal, premium, if any, and interest when due on all the Notes to maturity or redemption, as the case may be;

(iii) 123 days pass after the deposit is made and during the 123-day period no Default specified in Section 6.01(e) or (f) with respect to the Issuer occurs which is continuing at the end of the period;

(iv) the deposit does not constitute a default under any other agreement binding on the Issuer and is not prohibited by Article X;

(v) in the case of the legal defeasance option, the Issuer shall have delivered to the Trustee an Opinion of Counsel stating that (1) the Issuer have received from, or there has been published by, the Internal Revenue Service a ruling, or (2) since the date of this Indenture there has been a change in the applicable Federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the holders will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred. Notwithstanding the foregoing, the Opinion of Counsel required by the immediately preceding sentence with respect to a legal defeasance need not be delivered if all of the Notes not theretofore delivered to the Trustee for cancellation (x) have become due and payable or (y) will become due and payable at their Stated Maturity within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer;

(vi) impair the right of any holder to receive payment of principal of, premium, if any, and interest on such holder's Notes on or after the due dates therefore or to institute suit for the enforcement of any payment on or with respect to such holder's Notes;

(vii) in the case of the covenant defeasance option, the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that the holders will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred; and

(viii) the Issuer delivers to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent to the defeasance and discharge of the Notes to be so defeased and discharged as contemplated by this Article VIII have been complied with.

(b) Before or after a deposit, the Issuer may make arrangements satisfactory to the Trustee for the redemption of such Notes at a future date in accordance with Article III.

SECTION 8.03. Application of Trust Money. The Trustee shall hold in trust money or U.S. Government Obligations (including proceeds thereof) deposited with it pursuant to this Article VIII. It shall apply the deposited money and the money from U.S. Government Obligations through each Paying Agent and in accordance with this Indenture to the payment of principal of and interest on the Notes so discharged or defeased.

SECTION 8.04. Repayment to Issuer. Each of the Trustee and each Paying Agent shall promptly turn over to the Issuer upon request any money or U.S. Government Obligations held by it as provided in this Article which, in the written opinion of nationally recognized firm of independent public accountants delivered to the Trustee (which delivery shall only be required if U.S. Government Obligations have been so deposited), are in excess of the amount thereof which would then be required to be deposited to effect an equivalent discharge or defeasance in accordance with this Article.

Subject to any applicable abandoned property law, the Trustee and each Paying Agent shall pay to the Issuer upon written request any money held by them for the payment of principal or interest that remains unclaimed for two years, and, thereafter, holders entitled to the money must look to the Issuer for payment as general creditors, and the Trustee and each Paying Agent shall have no further liability with respect to such monies.

SECTION 8.05. <u>Indemnity for U.S. Government Obligations</u>. The Issuer shall pay and shall indemnify the Trustee against any tax, fee or other charge imposed on or assessed against deposited U.S. Government Obligations or the principal and interest received on such U.S. Government Obligations.

SECTION 8.06. <u>Reinstatement</u>. If the Trustee or any Paying Agent is unable to apply any money or U.S. Government Obligations in accordance with this Article VIII by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's obligations under this Indenture and the Notes so discharged or defeased shall be revived and reinstated as though no deposit had occurred pursuant to this Article VIII until such time as the Trustee or any Paying Agent is permitted to apply all such money or U.S. Government Obligations in accordance with this Article VIII; *provided*, *however*, that, if the Issuer has made any payment of principal of, or interest on, any such Notes because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the holders of such Notes to receive such payment from the money or U.S. Government Obligations held by the Trustee or any Paying Agent.

## ARTICLE IX

## AMENDMENTS AND WAIVERS

SECTION 9.01. <u>Without Consent of the Holders</u>.

(a) The Issuer and the Trustee may amend this Indenture, the Security Documents, the Intercreditor Agreement, the Guarantor Intercreditor Agreement or the Notes without notice to or consent of any holder:

(i) to cure any ambiguity, omission, defect or inconsistency;

(ii) to provide for the assumption by a Successor Issuer of the obligations of the Issuer under this Indenture and the Notes;

(iii) to provide for the assumption by a Successor Subsidiary Pledgor of the obligations of a Subsidiary Pledgor under this Indenture and the Security Documents;

(iv) to add a Guarantor with respect to the Notes pursuant to Section 4.11;

(v) to provide for uncertificated Notes in addition to or in place of certificated Notes; *provided, however,* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code;

(vi) to conform the text of this Indenture, the Notes, the Security Documents, the Intercreditor Agreement, or the Guarantor Intercreditor Agreement to any provision of the "<u>Description of New Second Lien Notes</u>" in the Offering Memorandum to the extent that such provision in the "<u>Description of New Second Lien Notes</u>" was intended to be a verbatim recitation of a provision of this Indenture, the Notes, the Security Documents, the Intercreditor Agreement or the Guarantor Intercreditor Agreement;

(vii) to add a Subsidiary Pledgor with respect to the Notes or to add Collateral to secure the Notes;

(viii) to release Collateral as permitted by this Indenture or the Intercreditor Agreement;

(ix) to add additional secured creditors holding Other Second-Lien Obligations so long as such obligations are not prohibited by this Indenture or the Security Documents;

(x) to add to the covenants of the Issuer for the benefit of the holders or to surrender any right or power herein conferred upon the Issuer;

(xi) to comply with any requirement of the SEC in connection with qualifying or maintaining the qualification of, this Indenture under the TIA;

(xii) to make any change that does not adversely affect the rights of any holder; or

(xiii) to provide for the issuance of the Exchange Notes or Additional Notes, which shall have terms substantially identical in all material respects to the Initial Notes, and which shall be treated, together with any outstanding Initial Notes, as a single issue of securities.

(b) After an amendment under this Section 9.01 becomes effective, the Issuer shall mail to the holders a notice briefly describing such amendment. The failure to give such notice to all holders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.01.

http://www.sec.gov/Archives/edgar/data/858339/000119312509082553/dex41.htm[8/7/2014 10:22:16 AM]

SECTION 9.02. <u>With Consent of the Holders</u>.

(a) The Issuer and the Trustee may amend this Indenture and the Security Documents with the written consent of the holders of at least a majority in principal amount of the Notes then outstanding voting as a single class (including consents obtained in connection with a tender offer or exchange for the Notes). However, without the consent of each holder of an outstanding Note affected, an amendment may not:

(1) reduce the amount of Notes whose holders must consent to an amendment,

(2) reduce the rate of or extend the time for payment of interest on any Note,

(3) reduce the principal of or change the Stated Maturity of any Note,

(4) reduce the premium payable upon the redemption of any Note or change the time at which any Note may be redeemed in accordance with Article III,

(5) make any Note payable in money other than that stated in such Note,

(6) expressly subordinate the Notes to any other Indebtedness of the Issuer or any Subsidiary Pledgor,

(7) impair the right of any holder to receive payment of principal of, premium, if any, and interest on such holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such holder's Notes,

(8) make any change in the amendment provisions which require each holder's consent or in the waiver provisions,

(9) make any change in the provisions in the Intercreditor Agreement or the Guarantor Intercreditor Agreement or this Indenture dealing with the application of proceeds of Collateral that would adversely affect the holders of the Notes, or

(10) except as expressly provided by this Indenture, modify or release the Note Guarantee of any Significant Subsidiary in any manner adverse to the holders of the Notes.

In addition, without the consent of the holders of at least 66 2/3% in aggregate principal amount of Notes then outstanding, no amendment or waiver may release all or substantially all of the Collateral from the Lien of this Indenture and the Security Documents with respect to the Notes.

<div align="center">105</div>

It shall not be necessary for the consent of the holders under this Section 9.02 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this Section 9.02 becomes effective, the Issuer shall mail to the holders a notice briefly describing such amendment. The failure to give such notice to all holders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.02.

SECTION 9.03. <u>Compliance with Trust Indenture Act</u>. From the date on which this Indenture is qualified under the TIA, every amendment, waiver or supplement to this Indenture or the Notes shall comply with the TIA as then in effect.

SECTION 9.04. <u>Revocation and Effect of Consents and Waivers</u>.

(a) A consent to an amendment or a waiver by a holder of a Note shall bind the holder and every subsequent holder of that Note or portion of the Note that evidences the same debt as the consenting holder's Note, even if notation of the consent or waiver is not made on the Note. However, any such holder or subsequent holder may revoke the consent or waiver as to such holder's Note or portion of the Note if the Trustee receives the notice of revocation before the date on which the Trustee receives an Officers' Certificate from the Issuer certifying that the requisite principal amount of Notes have consented. After an amendment or waiver becomes effective, it shall bind every holder. An amendment or waiver becomes effective upon the (i) receipt by the Issuer or the Trustee of consents by the holders of the requisite principal amount of securities, (ii) satisfaction of conditions to effectiveness as set forth in this Indenture and any indenture supplemental hereto containing such amendment or waiver and (iii) execution of such amendment or waiver (or supplemental indenture) by the Issuer and the Trustee.

(b) The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the holders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture. If a record date is fixed, then notwithstanding the immediately preceding paragraph, those Persons who were holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be holders after such record date. No such consent shall be valid or effective for more than 120 days after such record date.

SECTION 9.05. <u>Notation on or Exchange of Notes</u>. If an amendment, supplement or waiver changes the terms of a Note, the Issuer may require the holder of the Note to deliver it to the Trustee. The Trustee may place an appropriate notation on the Note regarding the changed terms and return it to the holder. Alternatively, if the Issuer or the Trustee so determines, the Issuer in exchange for the Note shall issue and the Trustee shall authenticate a new Note that reflects the changed terms. Failure to make the appropriate notation or to issue a new Note shall not affect the validity of such amendment, supplement or waiver.

SECTION 9.06. <u>Trustee to Sign Amendments</u>. The Trustee shall sign any amendment, supplement or waiver authorized pursuant to this Article IX if the amendment does not adversely affect the rights, duties, liabilities or immunities of the Trustee. If it does, the Trustee may but need not sign it. In signing such amendment, the Trustee shall be entitled to receive indemnity reasonably satisfactory to it and shall be provided with, and (subject to Section 7.01) shall be fully protected in relying upon, an Officers' Certificate and an Opinion of Counsel stating that such amendment, supplement or waiver is authorized or permitted by this Indenture and that such amendment, supplement or waiver is the legal, valid and binding obligation of the Issuer and the Parent Guarantor, enforceable against them in accordance with its terms, subject to customary exceptions, and complies with the provisions hereof (including Section 9.03).

SECTION 9.07. <u>Additional Voting Terms; Calculation of Principal Amount</u>. All Notes issued under this Indenture shall vote and consent together on all matters (as to which any of such Notes may vote) as one class and no Notes will have the right to vote or consent as a separate class on any matter. Determinations as to whether holders of the requisite aggregate principal amount of Notes have concurred in any direction, waiver or consent shall be made in accordance with this Article IX and Section 2.14.

<p align="center">**ARTICLE X**</p>

<p align="center">**RANKING OF NOTE LIENS**</p>

SECTION 10.01. <u>Relative Rights</u>. The Intercreditor Agreement defines the relative rights, as lienholders, of holders of Second Priority Liens and holders of Liens securing First Priority Lien Obligations. Nothing in this Indenture or the Intercreditor Agreement will:

(a) impair, as between the Issuer and holders of Notes, the obligation of the Issuer, which is absolute and unconditional, to pay principal of, premium and interest on Notes in accordance with their terms or to perform any other obligation of the Issuer or any other obligor under this Indenture, the Notes, the Parent Guarantee and the Security Documents;

(b) restrict the right of any holder to sue for payments that are then due and owing, in a manner not inconsistent with the provisions of the Intercreditor Agreement;

(c) prevent the Trustee, the Collateral Agent or any holder from exercising against the Issuer or any other obligor any of its other available remedies upon a Default or Event of Default (other than its rights as a secured party, which are subject to the Intercreditor Agreement); or

(d) restrict the right of the Trustee, the Collateral Agent or any holder:

(1) to file and prosecute a petition seeking an order for relief in an involuntary bankruptcy case as to any obligor or otherwise to commence, or seek relief commencing, any insolvency or liquidation proceeding involuntarily against any obligor;

(2) to make, support or oppose any request for an order for dismissal, abstention or conversion in any insolvency or liquidation proceeding;

<p align="center">107</p>

(3) to make, support or oppose, in any insolvency or liquidation proceeding, any request for an order extending or terminating any period during which the debtor (or any other Person) has the exclusive right to propose a plan of reorganization or other dispositive restructuring or liquidation plan therein;

(4) to seek the creation of, or appointment to, any official committee representing creditors (or certain of the creditors) in any insolvency or liquidation proceedings and, if appointed, to serve and act as a member of such committee without being in any respect restricted or bound by, or liable for, any of the obligations under this Article X;

(5) to seek or object to the appointment of any professional person to serve in any capacity in any insolvency or liquidation proceeding or to support or object to any request for compensation made by any professional person or others therein;

(6) to make, support or oppose any request for order appointing a trustee or examiner in any insolvency or liquidation proceedings; or

(7) otherwise to make, support or oppose any request for relief in any insolvency or liquidation proceeding that it is permitted by law to make, support or oppose:

if it were a holder of unsecured claims; or

(x) as to any matter relating to any plan of reorganization or other

(y) restructuring or liquidation plan or as to any matter relating to the administration of the estate or the disposition of the case or proceeding (in each case except as set forth in the Intercreditor Agreement).

<p align="center">**ARTICLE XI**</p>

**COLLATERAL**

SECTION 11.01. <u>Security Documents</u>. The payment of the principal of and interest and premium, if any, on the Notes when due, whether on an interest payment date, at maturity, by acceleration, repurchase, redemption or otherwise and whether by the Issuer pursuant to the Notes or by the Guarantors pursuant to the Note Guarantees, the payment of all other Obligations and the performance of all other obligations of the Issuer and the Guarantors under this Indenture, the Notes, the Note Guarantees and the Security Documents are secured as provided in the Security Documents which the Issuer, the Guarantors and the Subsidiary Pledgors have entered into simultaneously with the execution of the Existing Second Lien Notes Indenture and will be secured by Security Documents hereafter delivered as required or permitted by this Indenture. The Issuer shall, and shall cause each Restricted Subsidiary to, and each Restricted Subsidiary shall, make all filings (including filings of continuation statements and amendments to UCC financing statements that may be necessary to continue the effectiveness of such UCC financing statements) and all other actions as are necessary or

108

required by the Security Documents to maintain (at the sole cost and expense of the Issuer and its Restricted Subsidiaries) the security interest created by the Security Documents in the Collateral (other than with respect to any Collateral the security interest in which is not required to be perfected under the Security Documents) as a perfected second priority security interest subject only to Permitted Liens.

SECTION 11.02. <u>Collateral Agent</u>. (a) The Collateral Agent is authorized and empowered to appoint one or more co-Collateral Agents as it deems necessary or appropriate.

(b) Subject to Section 7.01, neither the Trustee nor the Collateral Agent nor any of their respective officers, directors, employees, attorneys or agents will be responsible or liable for the existence, genuineness, value or protection of any Collateral, for the legality, enforceability, effectiveness or sufficiency of the Security Documents, for the creation, perfection, priority, sufficiency or protection of any Second Priority Lien, or for any defect or deficiency as to any such matters, or for any failure to demand, collect, foreclose or realize upon or otherwise enforce any of the Second Priority Liens or Security Documents or any delay in doing so.

(c) The Collateral Agent will be subject to such directions as may be given it by the Trustee from time to time (as required or permitted by this Indenture); *provided* that in the event of conflict between directions received pursuant to the Security Documents and directions received hereunder, the Collateral Agent will be subject to directions received pursuant to the Security Documents. Except as directed by the Trustee as required or permitted by this Indenture and any other representatives or pursuant to the Security Documents, the Collateral Agent will not be obligated:

(1) to act upon directions purported to be delivered to it by any other Person;

(2) to foreclose upon or otherwise enforce any Second Priority Lien; or

(3) to take any other action whatsoever with regard to any or all of the Second Priority Liens, Security Documents or Collateral.

(d) The Collateral Agent will be accountable only for amounts that it actually receives as a result of the enforcement of the Second Priority Liens or Security Documents.

(e) In acting as Collateral Agent or Co-Collateral Agent, the Collateral Agent and each Co-Collateral Agent may rely upon and enforce each and all of the rights, powers, immunities, indemnities and benefits of the Trustee under Article VII hereof.

(f) The holders of Notes agree that the Collateral Agent shall be entitled to the rights, privileges, protections, immunities, indemnities and benefits provided to the Collateral Agent by the Security Documents. Furthermore, each holder of a Note, by accepting such Note, consents to the terms of and authorizes and directs the Trustee (in each of its capacities) and the Collateral Agent to enter into and perform the Intercreditor Agreement and Security Documents in each of its capacities thereunder.

109

(g) If the Issuer (i) Incurs First Priority Lien Obligations at any time when no intercreditor agreement is in effect or at any time when Indebtedness constituting First Priority Lien Obligations entitled to the benefit of an existing Intercreditor Agreement is concurrently retired, and (ii) delivers to the Collateral Agent an Officers' Certificate so stating and requesting the Collateral Agent to enter into an intercreditor agreement (on substantially the same terms as the Intercreditor Agreement in effect on the Issue Date) in favor of a designated agent or representative for the holders of the First Priority Lien Obligations so Incurred, the Collateral Agent shall (and is hereby authorized and directed to) enter into such intercreditor agreement, bind the holders on the terms set forth therein and perform and observe its obligations thereunder.

SECTION 11.03. <u>Authorization of Actions to Be Taken</u>. (a) Each holder of Notes, by its acceptance thereof, consents and agrees to the terms of each Security Document, the Intercreditor Agreement, and the Guarantor Intercreditor Agreement as originally in effect and as amended, supplemented or replaced from time to time in accordance with its terms or the terms of this Indenture, authorizes and directs the Trustee and the Collateral Agent to enter into the Security Documents to which it is a party, authorizes and empowers the Trustee to direct the Collateral Agent to enter into, and the Collateral Agent to execute and deliver, the Intercreditor Agreement, and the Guarantor Intercreditor Agreement and authorizes

and empowers the Trustee and the Collateral Agent to bind the holders of Notes and other holders of Obligations as set forth in the Security Documents to which it is a party and the Intercreditor Agreement and the Guarantor Intercreditor Agreement and to perform its obligations and exercise its rights and powers thereunder.

(b) The Collateral Agent and the Trustee are authorized and empowered to receive for the benefit of the holders of Notes any funds collected or distributed under the Security Documents to which the Collateral Agent or Trustee is a party and to make further distributions of such funds to the holders of Notes according to the provisions of this Indenture.

(c) Subject to the provisions of Section 7.01 and Section 7.02 hereof, the Intercreditor Agreement, the Guarantor Intercreditor Agreement and the Security Documents, the Trustee may, in its sole discretion and without the consent of the holders, direct, on behalf of the holders, the Collateral Agent to take all actions it deems necessary or appropriate in order to:

(1) foreclose upon or otherwise enforce any or all of the Second Priority Liens;

(2) enforce any of the terms of the Security Documents to which the Collateral Agent or Trustee is a party; or

(3) collect and receive payment of any and all Obligations.

<div align="center">110</div>

Subject to the Intercreditor Agreement, the Trustee is authorized and empowered to institute and maintain, or direct the Collateral Agent to institute and maintain, such suits and proceedings as it may deem expedient to protect or enforce the Second Priority Liens or the Security Documents to which the Collateral Agent or Trustee is a party or to prevent any impairment of Collateral by any acts that may be unlawful or in violation of the Security Documents to which the Collateral Agent or Trustee is a party or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent may deem expedient to preserve or protect its interests and the interests of the holders of Notes in the Collateral, including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of holders, the Trustee or the Collateral Agent.

SECTION 11.04. <u>Release of Liens</u>. (a) Notwithstanding anything to the contrary in the Collateral Agreement and subject to subsections (b) and (c) of this Section 11.04, Collateral may be released from the Lien and security interest created by the Security Documents to secure the Notes and obligations under this Indenture at any time or from time to time in accordance with the provisions of the Intercreditor Agreement or as provided hereby. The applicable assets included in the Collateral shall be automatically released from the Liens securing the Notes, and the applicable Subsidiary Pledgor shall be automatically released from its obligations under this Indenture and the Security Documents, under any one or more of the following circumstances:

(1) upon the Discharge of Senior Lender Claims and concurrent release of all other Liens on such property or assets securing First Priority Lien Obligations (including all commitments and letters of credit thereunder); *provided*, *however*, that if the Issuer or the Parent Guarantor subsequently incurs First Priority Lien Obligations that are secured by Liens on property or assets of the Issuer or the Parent Guarantor of the type constituting the Collateral and the related Liens are incurred in reliance on clause (6)(B) of the definition of Permitted Liens, then the Issuer and its Restricted Subsidiaries will be required to reinstitute the security arrangements with respect to the Collateral in favor of the Notes, which, in the case of any such subsequent First Priority Lien Obligations, will be Second Priority Liens on the Collateral securing such First Priority Lien Obligations to the same extent provided by the Security Documents and on the terms and conditions of the security documents relating to such First Priority Lien Obligations, with the Second Priority Lien held either by the administrative agent, collateral agent or other representative for such First Priority Lien Obligations or by a collateral agent or other representative designated by the Issuer to hold the Second Priority Liens for the benefit of the holders of the Notes and subject to an intercreditor agreement that provides the administrative agent or collateral agent substantially the same rights and powers as afforded under the Intercreditor Agreement; *provided, however*, that the Issuer will provide the Trustee and Collateral Agent under the Collateral Agreement with prompt written notification of such reinstitution;

(2) in respect of the property and assets of a Subsidiary Pledgor, upon the consummation of any transaction permitted by this Indenture as a result of which such Subsidiary Pledgor ceases to be a Subsidiary or otherwise ceases to be a Pledgor (as defined in

<div align="center">111</div>

the Collateral Agreement), and such Subsidiary Pledgor shall be automatically released from its obligations hereunder and under the Security Documents, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to such Subsidiary Pledgor;

(3) upon any sale or other transfer by the Issuer or any Subsidiary Pledgor of any Collateral that is permitted under this Indenture to any person that is not the Issuer or a Subsidiary Pledgor (including in connection with an Event of Loss (as defined in the Collateral Agreement)), or upon the effectiveness of any written consent to the release of the security interest granted by the Collateral Agreement in any Collateral pursuant to this Indenture, the security interest in such Collateral shall be automatically released, all without delivery of any instrument or performance of any act by any party;

(4) as to all or any portion of any Collateral (including any Mortgaged Property), following the delivery of a Project Notice (as defined

in the Credit Agreement) to the First Lien Agent that is applicable to all or such portion of the Collateral and Mortgaged Property, in each case upon the release of the security interest securing the Senior Lender Claims in such Collateral or Mortgaged Properties;

(5) to enable the Issuer, the Parent Guarantor or any Subsidiary Pledgor to consummate the disposition (other than any disposition to the Issuer or another Subsidiary Pledgor) of such property or assets to the extent not prohibited under Section 4.06, and to enable any release described in Section 7.15(f) of the Collateral Agreement;

(6) in respect of the property and assets of a Subsidiary Pledgor, upon the designation of such Subsidiary Pledgor to be an Unrestricted Subsidiary in accordance with Section 4.04 and the definition of "Unrestricted Subsidiary", and such Subsidiary Pledgor shall be automatically released from its obligations hereunder and under the Security Documents;

(7) in respect of the property and assets of a Subsidiary Pledgor, upon the release or discharge of the pledge by such Subsidiary Pledgor of the Credit Agreement or other Indebtedness or the guarantee of any other Indebtedness which resulted in the obligation to become a Subsidiary Pledgor; and

(8) as described under Article IX.

Notwithstanding the foregoing, if an Event of Default under this Indenture exists on the date of Discharge of Senior Lender Claims, the Second Priority Liens on the Collateral securing the Notes will not be released, except to the extent the Collateral or any portion thereof was disposed of in order to repay the First Priority Lien Obligations secured by the Collateral, and thereafter the Trustee (or another designated representative acting at the direction of the holders of a majority of outstanding principal amount of the Notes and Other Second-Lien Obligations) will have the right to direct the First Lien Agent to foreclose upon the Collateral (but in such event, the Liens on the Collateral securing the Notes will be released when such Event of Default and all other Events of Default under this Indenture cease to exist).

In addition, (i) the security interests granted pursuant to the Security Documents securing the Obligations shall automatically terminate and/or be released all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the applicable Pledgors (as defined in the Collateral Agreement), as of the date when all the Obligations (other than contingent or unliquidated obligations or liabilities not then due) have been paid in full in cash or immediately available funds; and (ii) the security interests granted pursuant to the Security Documents securing the Obligations shall automatically terminate as of the date when the Holders of at least two thirds in aggregate principal amount of all Notes issued under this Indenture consent to the termination of the Security Documents.

In connection with any termination or release pursuant to this Section 11.04(a), the Collateral Agent shall execute and deliver to any Pledgor (as defined in the Collateral Agreement), at such Pledgor's expense, all documents that such Pledgor shall reasonably request to evidence such termination or release (including, without limitation, UCC termination statements), and will duly assign and transfer to such Pledgor, such of the Pledged Collateral (as defined in the Collateral Agreement) that may be in the possession of the Collateral Agent and has not theretofore been sold or otherwise applied or released pursuant to this Indenture or the Security Documents. Any execution and delivery of documents pursuant to this Section 11.04(a) shall be without recourse to or warranty by the Collateral Agent. In connection with any release pursuant to this Section 11.04(a), the Pledgors shall be permitted to take any action in connection therewith consistent with such release including, without limitation, the filing of UCC termination statements.

Upon the receipt of an Officers' Certificate from the Issuer, as described in Section 11.04(b) below, if applicable, and any necessary or proper instruments of termination, satisfaction or release prepared by the Issuer, the Collateral Agent shall execute, deliver or acknowledge such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Security Documents or the Intercreditor Agreement.

(b) Notwithstanding anything herein to the contrary, in connection with (x) any release of Collateral pursuant to Section 11.04(a)(1), (6), (7) or (8) above, such Collateral may not be released from the Lien and security interest created by the Security Documents and (y) any release of Collateral pursuant to Section 11.04(a)(2), (3), (4) and (5), the Collateral Agent shall not be required to execute, deliver or acknowledge any instruments of termination, satisfaction or release unless, in each case, an Officers' Certificate and Opinion of Counsel certifying that all conditions precedent, including, without limitation, this Section 11.04, have been met and stating under which of the circumstances set forth in Section 11.04(a) above the Collateral is being released have been delivered to the Collateral Agent on or prior to the date of such release or, in the case of clause (y) above, the date on which the Collateral Agent executes any such instrument.

(c) Notwithstanding anything herein to the contrary, at any time when a Default or Event of Default has occurred and is continuing and the maturity of the Notes has been accelerated (whether by declaration or otherwise) and the Trustee has delivered a notice of acceleration to the Collateral Agent, no release of Collateral pursuant to the provisions of this Indenture or the Security Documents will be effective as against the holders, except as otherwise provided in the Intercreditor Agreement.

SECTION 11.05. <u>Filing, Recording and Opinions</u>. (a) The Issuer will comply with the provisions of TIA Sections 314(b), 314(c) and 314(d), in each case following qualification of this Indenture pursuant to the TIA and except to the extent not required as set forth in any SEC regulation or

http://www.sec.gov/Archives/edgar/data/858339/000119312509082553/dex41.htm[8/7/2014 10:22:16 AM]

interpretation (including any no-action letter issued by the Staff of the SEC, whether issued to the Issuer or any other Person). Following such qualification, to the extent the Issuer is required to furnish to the Trustee an Opinion of Counsel pursuant to TIA Section 314(b)(2), the Issuer will furnish such opinion not more than 60 but not less than 30 days prior to each September 30.

Any release of Collateral permitted by Section 11.04 hereof will be deemed not to impair the Liens under this Indenture and the Security Documents in contravention thereof and any person that is required to deliver an Officers' Certificate or Opinion of Counsel pursuant to Section 314(d) of the TIA, shall be entitled to rely upon the foregoing as a basis for delivery of such certificate or opinion. The Trustee may, to the extent permitted by Section 7.01 and 7.02 hereof, accept as conclusive evidence of compliance with the foregoing provisions the appropriate statements contained in such documents and Opinion of Counsel.

(b) If any Collateral is released in accordance with this Indenture and if the Issuer has delivered the certificates and documents required by the Security Documents and Section 11.04, the Trustee will determine whether it has received all documentation required by TIA Section 314(d) in connection with such release and, based on such determination and the Opinion of Counsel delivered pursuant to Section 11.04, will, upon request, deliver a certificate to the Collateral Agent setting forth such determination.

SECTION 11.06. [Intentionally omitted].

SECTION 11.07. <u>Powers Exercisable by Receiver or Trustee</u>. In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article XI upon the Issuer or the Parent Guarantor with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Issuer or the Parent Guarantor or of any officer or officers thereof required by the provisions of this Article XI; and if the Trustee shall be in the possession of the Collateral under any provision of this Indenture, then such powers may be exercised by the Trustee.

SECTION 11.08. <u>Release Upon Termination of the Issuer's Obligations</u>. In the event (i) that the Issuer delivers to the Trustee, in form and substance acceptable to it, an Officers' Certificate and Opinion of Counsel certifying that all the obligations under this Indenture, the Notes and the Security Documents have been satisfied and discharged by the payment in full of the Issuer's obligations under the Notes, this Indenture and the Security Documents, and all such obligations have been so satisfied, or (ii) a discharge, legal defeasance or covenant defeasance of this Indenture occurs under Article VIII, the Trustee shall deliver to the Issuer and the Collateral Agent a notice stating that the Trustee, on behalf of the holders, disclaims and gives up any and all rights it has in or to the Collateral, and any rights it has under the Security Documents, and upon receipt by the Collateral Agent of such notice, the Collateral Agent shall be deemed not to hold a Lien in the Collateral on behalf of the Trustee and shall do or cause to be done all acts reasonably necessary to release such Lien as soon as is reasonably practicable.

114

SECTION 11.09. <u>Designations</u>. Except as provided in the next sentence, for purposes of the provisions hereof and the Intercreditor Agreement requiring the Issuer to designate Indebtedness for the purposes of the terms First Priority Lien Obligations and Other Second-Lien Obligations or any other such designations hereunder or under the Intercreditor Agreement, any such designation shall be sufficient if the relevant designation provides in writing that such First Priority Lien Obligations or Other Second-Lien Obligations are permitted under this Indenture and is signed on behalf of the Issuer by an Officer and delivered to the Trustee, the Collateral Agent and the First Lien Agent. For all purposes hereof and the Intercreditor Agreement, the Issuer hereby designates the Obligations pursuant to the Credit Agreement as in effect on the Issue Date as First Priority Lien Obligations.

SECTION 11.10. <u>Taking and Destruction</u>. Following the Discharge of Senior Lender Claims, upon any Taking or Destruction of any Collateral, all Net Insurance Proceeds received by the Issuer or any Restricted Subsidiary shall be deemed Net Proceeds and shall be applied in accordance with Section 4.06.

## ARTICLE XII

## GUARANTEE

SECTION 12.01. <u>Guarantee</u>.

(a) Each Guarantor hereby jointly and severally, irrevocably and unconditionally guarantees, (x) in the case of the Parent Guarantor, on an unsecured basis, and (y) in the case of a guarantee by a Subsidiary Pledgor, on a second-priority secured basis, and in the case of each of (x) and (y) as a primary obligor and not merely as a surety, to each holder and to the Trustee and its successors and assigns (i) the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all obligations of the Issuer under this Indenture (including obligations to the Trustee) and the Notes, whether for payment of principal of, premium, if any, or interest on in respect of the Notes and all other monetary obligations of the Issuer under this Indenture and the Notes and (ii) the full and punctual performance within applicable grace periods of all other obligations of the Issuer whether for fees, expenses, indemnification or otherwise under this Indenture and the Notes (all the foregoing being hereinafter collectively called the "<u>Guaranteed Obligations</u>"). Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from any Guarantor, and that each Guarantor shall remain bound under this Article XII notwithstanding any extension or renewal of any Guaranteed Obligation.

(b) Each Guarantor waives presentation to, demand of payment from and protest to the Issuer of any of the Guaranteed Obligations and also waives notice of protest for nonpayment. Each Guarantor waives notice of any default under the Notes or the Guaranteed Obligations. The obligations of each Guarantor hereunder shall not be affected by (i) the failure of any holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Issuer or any other Person under this Indenture, the Notes or any other agreement or

115

otherwise; (ii) any extension or renewal of this Indenture, the Notes or any other agreement; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by any holder or the Trustee for the Guaranteed Obligations or each Guarantor; (v) the failure of any holder or Trustee to exercise any right or remedy against any other guarantor of the Guaranteed Obligations; or (vi) any change in the ownership of each Guarantor, except as provided in Section 12.02(b) or Section 12.02(c). Each Guarantor hereby waives any right to which it may be entitled to have its obligations hereunder divided among the Guarantors, such that such Guarantor's obligations would be less than the full amount claimed.

(c) Each Guarantor hereby waives any right to which it may be entitled to have the assets of the Issuer first be used and depleted as payment of the Issuer's or such Guarantor's obligations hereunder prior to any amounts being claimed from or paid by such Guarantor hereunder. Each Guarantor hereby waives any right to which it may be entitled to require that the Issuer be sued prior to an action being initiated against such Guarantor.

(d) Each Guarantor further agrees that its Note Guarantee herein constitutes a guarantee of payment, performance and compliance when due (and not a guarantee of collection) and waives any right to require that any resort be had by any holder or the Trustee to any security held for payment of the Guaranteed Obligations.

(e) The Note Guarantee of each Guarantor is, to the extent and in the manner set forth in Article XII, equal in right of payment to all existing and future Pari Passu Indebtedness, senior in right of payment to all existing and future Subordinated Indebtedness of the Issuer and subordinated and subject in right of payment to the prior payment in full of the principal of and premium, if any, and interest on all Secured Indebtedness of the relevant Guarantor and is made subject to such provisions of this Indenture.

(f) Except as expressly set forth in Sections 8.01(b), 12.02 and 12.06, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of any holder or the Trustee to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Guarantor or would otherwise operate as a discharge of any Guarantor as a matter of law or equity.

(g) Each Guarantor agrees that its Note Guarantee shall remain in full force and effect until payment in full of all the Guaranteed Obligations. Each Guarantor further agrees that its Note Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest on any Guaranteed Obligation is rescinded or must otherwise be restored by any holder or the Trustee upon the bankruptcy or reorganization of the Issuer or otherwise.

116

(h) In furtherance of the foregoing and not in limitation of any other right which any holder or the Trustee has at law or in equity against any Guarantor by virtue hereof, upon the failure of the Issuer to pay the principal of or interest on any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, by redemption or otherwise, or to perform or comply with any other Guaranteed Obligation, each Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the holders or the Trustee an amount equal to the sum of (i) the unpaid principal amount of such Guaranteed Obligations, (ii) accrued and unpaid interest on such Guaranteed Obligations (but only to the extent not prohibited by applicable law) and (iii) all other monetary obligations of the Issuer to the holders and the Trustee.

(i) Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the holders in respect of any Guaranteed Obligations guaranteed hereby until payment in full of all Guaranteed Obligations. Each Guarantor further agrees that, as between it, on the one hand, and the holders and the Trustee, on the other hand, (i) the maturity of the Guaranteed Obligations guaranteed hereby may be accelerated as provided in Article VI for the purposes of the Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Guaranteed Obligations as provided in Article VI, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by the Parent Guarantor for the purposes of this Section 12.01.

(j) Each Guarantor also agrees to pay any and all costs and expenses (including reasonable attorneys' fees and expenses) Incurred by the Trustee or any holder in enforcing any rights under this Section 12.01.

(k) Upon request of the Trustee, each Guarantor shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

SECTION 12.02. Limitation on Liability.

(a) Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations guaranteed hereunder by each Guarantor shall not exceed the maximum amount that can be hereby guaranteed without rendering this Indenture, as it relates to such Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

(b) A Note Guarantee as to any Subsidiary that executes a supplemental indenture in accordance with Section 4.11 hereof and provides a guarantee shall terminate and be of no further force or effect and such Guarantor shall be deemed to be released from all obligations under this Article XII upon:

(i) the sale, disposition, exchange or other transfer (including through merger, consolidation, amalgamation or otherwise) of the Capital Stock (including any sale, disposition or other transfer following which the applicable Guarantor is no longer a Wholly-Owned Restricted Subsidiary), of the applicable Guarantor if such sale, disposition, exchange or other transfer is made in a manner not in violation of this Indenture;

117

(ii) the Issuer designating such Guarantor to be an Unrestricted Subsidiary in accordance with the provisions of Section 4.04 and the definition of "Unrestricted Subsidiary";

(iii) the release or discharge of the pledge by such Guarantor of the Credit Agreement or other Indebtedness (including the Existing Second Lien Notes) or the guarantee of any other Indebtedness which resulted in the obligation to guarantee the Notes; and

(iv) the Issuer's exercise of its legal defeasance option or covenant defeasance option under Article VIII or if the Issuer's obligations under this Indenture are discharged in accordance with the terms of this Indenture.

A Note Guarantee as to any Subsidiary also will be automatically released upon the applicable Subsidiary ceasing to be a Subsidiary as a result of any foreclosure of any pledge or security interest securing Bank Indebtedness or other exercise of remedies in respect thereof.

(c) The Parent Guarantee shall terminate and be of no further force or effect and the Parent Guarantor shall be deemed to be released from all obligations under this Article XII upon:

(i) the Issuer ceasing to be a Wholly Owned Subsidiary of Harrah's Entertainment;

(ii) the Issuer's transfer of all or substantially all of its assets to, or merger with, an entity that is not a Wholly Owned Subsidiary of Harrah's Entertainment in accordance with Section 5.01 and such transferee entity assumes the Issuer's obligations under this Indenture; and

(iii) the Issuer's exercise of its legal defeasance option or covenant defeasance option under Article VIII or if the Issuer's obligations under this Indenture are discharged in accordance with the terms of this Indenture.

In addition, the Parent Guarantee will be automatically released upon the election of the Issuer and Notice to the Trustee if the guarantee by Harrah's Entertainment of the Credit Agreement, the Retained Notes or any Indebtedness which resulted in the obligation to guarantee the Notes has been released or discharged.

118

SECTION 12.03. Successors and Assigns. This Article XII shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit of the successors and assigns of the Trustee and the holders and, in the event of any transfer or assignment of rights by any holder or the Trustee, the rights and privileges conferred upon that party in this Indenture and in the Notes shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions of this Indenture.

SECTION 12.04. No Waiver. Neither a failure nor a delay on the part of either the Trustee or the holders in exercising any right, power or privilege under this Article XII shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege. The rights, remedies and benefits of the Trustee and the holders herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which either may have under this Article XII at law, in equity, by statute or otherwise.

SECTION 12.05. Modification. No modification, amendment or waiver of any provision of this Article XII, nor the consent to any departure by any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Trustee, and then such waiver or

consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on any Guarantor in any case shall entitle any Guarantor to any other or further notice or demand in the same, similar or other circumstances.

SECTION 12.06. <u>Execution of Supplemental Indenture for Future Note Guarantors</u>. Each Subsidiary and other Person which is required to become a Guarantor of the Notes pursuant to Section 4.11 shall promptly execute and deliver to the Trustee a joinder to the Guarantor Intercreditor Agreement and a supplemental indenture in the form of <u>Exhibit D</u> hereto pursuant to which such Subsidiary or other Person shall become a Guarantor under this Article XII and shall guarantee the Notes. Concurrently with the execution and delivery of such supplemental indenture, the Issuer shall deliver to the Trustee an Opinion of Counsel and an Officer's Certificate to the effect that such supplemental indenture has been duly authorized, executed and delivered by such Subsidiary or other Person and that, subject to the application of bankruptcy, insolvency, moratorium, fraudulent conveyance or transfer and other similar laws relating to creditors' rights generally and to the principles of equity, whether considered in a proceeding at law or in equity, the Guarantee of such Guarantor is a valid and binding obligation of such guarantor, enforceable against such Guarantor in accordance with its terms and/or to such other matters as the Trustee may reasonably request.

SECTION 12.07. <u>Non-Impairment</u>. The failure to endorse a Guarantee on any Note shall not affect or impair the validity thereof.

119

---

# ARTICLE XIII

## MISCELLANEOUS

SECTION 13.01. <u>Trust Indenture Act Controls</u>. If and to the extent that any provision of this Indenture limits, qualifies or conflicts with the duties imposed by, or with another provision (an "<u>incorporated provision</u>") included in this Indenture by operation of, Sections 310 to 318 of the TIA, inclusive, such imposed duties or incorporated provision shall control.

SECTION 13.02. <u>Notices</u>.

(a) Any notice or communication required or permitted hereunder shall be in writing and delivered in person, via facsimile or mailed by first-class mail addressed as follows:

if to the Issuer or a Guarantor:

Harrah's Operating Company, Inc.
One Caesar's Palace Drive
Las Vegas, Nevada 89101-8969
Telephone: (702) 407-6000
Facsimile: (702) 407-6418
Attn: General Counsel

if to the Trustee:

U.S. Bank National Association
60 Livingston Avenue
St. Paul, Minnesota 55107-1419
Telephone: (651) 495-3909
Facsimile: (651) 495-8097
Attn: Corporate Trust Services, Raymond S. Haverstock

The Issuer or the Trustee by notice to the other may designate additional or different addresses for subsequent notices or communications.

(b) Any notice or communication mailed to a holder shall be mailed, first class mail, to the holder at the holder's address as it appears on the registration books of the Registrar and shall be sufficiently given if so mailed within the time prescribed.

(c) Failure to mail a notice or communication to a holder or any defect in it shall not affect its sufficiency with respect to other holders. If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it, except that notices to the Trustee are effective only if received.

SECTION 13.03. <u>Communication by the Holders with Other Holders</u>. The holders may communicate pursuant to Section 312(b) of the TIA with other holders with respect to their rights under this Indenture or the Notes. The Issuer, the Trustee, the Registrar and other Persons shall have the protection of Section 312(c) of the TIA.

120

---

SECTION 13.04. <u>Certificate and Opinion as to Conditions Precedent</u>. Upon any request or application by the Issuer to the Trustee to take or refrain from taking any action under this Indenture, the Issuer shall furnish to the Trustee at the request of the Trustee:

(a) an Officers' Certificate in form reasonably satisfactory to the Trustee stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(b) an Opinion of Counsel in form reasonably satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

SECTION 13.05. <u>Statements Required in Certificate or Opinion</u>. Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture (other than pursuant to Section 4.09) shall include:

(a) a statement that the individual making such certificate or opinion has read such covenant or condition;

(b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c) a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d) a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with; *provided*, *however*, that with respect to matters of fact an Opinion of Counsel may rely on an Officers' Certificate or certificates of public officials.

SECTION 13.06. <u>When Notes Disregarded</u>. In determining whether the holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Issuer, the Parent Guarantor or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Issuer or the Parent Guarantor shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes which the Trustee knows are so owned shall be so disregarded. Subject to the foregoing, only Notes outstanding at the time shall be considered in any such determination.

SECTION 13.07. <u>Rules by Trustee, Paying Agent and Registrar</u>. The Trustee may make reasonable rules for action by or a meeting of the holders. The Registrar and a Paying Agent may make reasonable rules for their functions.

SECTION 13.08. <u>Legal Holidays</u>. If a payment date is not a Business Day, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue on any amount that would have been otherwise payable on such payment date if it were a Business Day for the intervening period. If a regular record date is not a Business Day, the record date shall not be affected.

SECTION 13.09. <u>GOVERNING LAW</u>. **THIS INDENTURE AND THE SECURITIES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

SECTION 13.10. <u>No Recourse Against Others</u>. No director, officer, employee, manager, incorporator or holder of any Equity Interests in the Issuer or of any Guarantor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Issuer or any Guarantor under the Notes or this Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

SECTION 13.11. <u>Successors</u>. All agreements of the Issuer and the Parent Guarantor in this Indenture and the Notes shall bind its successors. All agreements of the Trustee in this Indenture shall bind its successors.

SECTION 13.12. <u>Multiple Originals</u>. The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. One signed copy is enough to prove this Indenture.

SECTION 13.13. <u>Table of Contents; Headings</u>. The table of contents, cross-reference sheet and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 13.14. <u>Indenture Controls</u>. If and to the extent that any provision of the Notes limits, qualifies or conflicts with a provision of this Indenture, such provision of this Indenture shall control.

SECTION 13.15. <u>Severability</u>. In case any provision in this Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

SECTION 13.16. <u>Intercreditor Agreement</u>. The terms of this Indenture are subject to the terms of the Intercreditor Agreement.

**[Remainder of page intentionally left blank]**

122

---

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

**HARRAH'S OPERATING COMPANY, INC.**

By: /s/ Jonathan S. Halkyard
    Name: Jonathan S. Halkyard
    Title:  Senior Vice President
            CFO & Treasurer

**HARRAH'S ENTERTAINMENT, INC.,**
as Parent Guarantor

By: /s/ Jonathan S. Halkyard
    Name: Jonathan S. Halkyard
    Title:  Senior Vice President
            CFO & Treasurer

[Indenture]

---

U.S. BANK NATIONAL ASSOCIATION, as Trustee and
Collateral Agent

By: /s/ Raymond S. Haverstock
    Name: Raymond S. Haverstock
    Title:   Vice President

[Signature Page to Indenture]

---

APPENDIX A

PROVISIONS RELATING TO INITIAL SECURITIES, ADDITIONAL SECURITIES
AND EXCHANGE SECURITIES

1. Definitions.

1.1 Definitions.

For the purposes of this Appendix A the following terms shall have the meanings indicated below:

"Additional Interest" has the meaning set forth in the Registration Rights Agreement.

"AI" means an "accredited investor" as described in Rule 501(a).

"Dealer Manager Agreement" means (a) the Dealer Manager Agreement dated March 5, 2009, among the Issuer, the Parent Guarantor, Harrah's BC and the Dealer Managers and (b) any other similar dealer managers agreement or purchase agreement relating to Additional Notes.

"Dealer Mangers" means Citigroup Global Markets Inc. and J.P. Morgan Securities Inc. party to the Dealer Manager Agreement entered into in connection with the HOC Exchange Offers.

"Definitive Note" means a certificated Initial Note or Exchange Note (bearing the Restricted Notes Legend if the transfer of such Note is restricted by applicable law) that does not include the Global Notes Legend.

"Depository" means The Depository Trust Issuer, its nominees and their respective successors.

"Global Notes Legend" means the legend set forth under that caption in the applicable Exhibit to this Indenture.

"Hamlet Tender Offer" means that certain cash tender offer made on the Issue Date to holders of Notes by Hamlet Tender, LLC and Hamlet FW LLC, together with one or more additional investment vehicles formed or to be formed by any of the Sponsors and/or certain other co-

investors, as set forth in the Offer to Purchase dated March 5, 2009, as supplemented from time to time thereafter.

"Harrah's BC" means Harrah's BC, Inc., a Delaware corporation.

"HOC Exchange Offers" means the offer by the Issuer to exchange the Notes on the Issue Date for the Retained Notes, Long-Term Retained Notes and the Issuer's 10.75%/11.5% Senior Toggle Notes due 2018 and 10.75% Senior Notes due 2016, as set forth in the Offering Memorandum.

Appendix A-1

"IAI" means an institutional "accredited investor" as described in Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

"Permanent Global Notes" means all Permanent Regulation S Global Notes and all Permanent Rule 144A Global Notes.

"Permanent Regulation S Global Notes" means all Regulation S Global Notes that do not bear the Temporary Global Notes Legend.

"Permanent Rule 144A Global Notes" means all Rule 144A Global Notes that do not bear the Temporary Global Notes Legend.

"QIB" means a "qualified institutional buyer" as defined in Rule 144A.

"Registered Exchange Offer" means the offer by the Issuer, pursuant to the Registration Agreement, to certain holders of Initial Notes, to issue and deliver to such holders, in exchange for their Initial Notes, a like aggregate principal amount of Exchange Notes registered under the Securities Act.

"Registration Rights Agreement" means (a) the Registration Rights Agreement dated as of April 15, 2009 among the Issuer, the Parent Guarantor and the Dealer Managers relating to the Notes and (b) any other similar registration rights agreement relating to Additional Notes.

"Regulation S" means Regulation S under the Securities Act.

"Regulation S Notes" means all Initial Notes offered and sold outside the United States in reliance on Regulation S.

"Restricted Period," with respect to any Notes, means the period of 40 consecutive days beginning on and including the later of (a) the day on which such Notes are first offered to persons other than distributors (as defined in Regulation S under the Securities Act) in reliance on Regulation S, notice of which day shall be promptly given by the Issuer to the Trustee, and (b) the Issue Date, and with respect to any Additional Notes that are Transfer Restricted Notes, it means the comparable period of 40 consecutive days.

"Restricted Notes Legend" means the legend set forth in Section 2.2(h)(i) herein.

"Rule 501" means Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

"Rule 506" means Rule 506 under the Securities Act.

"Rule 144A" means Rule 144A under the Securities Act.

"Rule 144A Notes" means all Initial Notes offered and sold to QIBs in reliance on Rule 144A and all Initial Notes offered and sold to AIs in reliance on Rule 506.

Appendix A-2

"Notes Custodian" means the custodian with respect to a Global Note (as appointed by the Depository) or any successor person thereto, who shall initially be the Trustee.

"Shelf Registration Statement" means a registration statement filed by the Issuer in connection with the offer and sale of Initial Notes pursuant to the Registration Rights Agreement.

"Temporary Global Notes" means all Temporary Regulation S Global Notes and all Temporary Rule 144A Global Notes.

"Temporary Global Notes Legend" means the legend set forth in Section 2.2(h)(ii) herein.

"Temporary Regulation S Global Notes" means all Regulation S Global Notes bearing the Temporary Global Notes Legend and issued in an aggregate denomination equal to the outstanding principal amount of the Regulation S Notes initially sold to holders that indicated their intention to participate in the Hamlet Tender Offer prior to the expiration of the HOC Exchange Offers in accordance with the terms thereof.

"Temporary Rule 144A Global Notes" means all Rule 144A Global Notes bearing the Temporary Global Notes Legend and issued in an aggregate denomination equal to the outstanding principal amount of the Rule 144A Global Notes initially sold to holders that indicated their intention to participate in the Hamlet Tender Offer prior to the expiration of the HOC Exchange Offers in accordance with the terms thereof.

"Transfer Restricted Definitive Notes" means Definitive Notes that bear or are required to bear or are subject to the Restricted Notes Legend.

"Transfer Restricted Global Notes" means Global Notes that bear or are required to bear or are subject to the Restricted Notes Legend.

"Unrestricted Definitive Notes" means Definitive Notes that are not required to bear, or are not subject to, the Restricted Notes Legend.

"Unrestricted Global Notes" means Global Notes that are not required to bear, or are not subject to, the Restricted Notes Legend.

1.2 Other Definitions.

| Term: | Defined in Section: |
| --- | --- |
| Agent Members | 2.1(b) |
| Global Notes | 2.1(b) |
| Regulation S Global Notes | 2.1(b) |
| Rule 144A Global Notes | 2.1(b) |

Appendix A-3

---

2. The Notes.

2.1 Form and Dating; Global Notes.

(a) The Initial Notes issued on the date hereof will be (i) privately placed by the Issuer pursuant to the Offering Memorandum and (ii) sold, initially only to (1) QIBs in reliance on Rule 144A, (2) Persons other than U.S. Persons (as defined in Regulation S) in reliance on Regulation S and (3) AIs in reliance on Rule 506. Such Initial Notes may thereafter be transferred to, among others, QIBs, purchasers in reliance on Regulation S and, except as set forth below, IAIs in accordance with Rule 501. Additional Notes offered after the date hereof may be offered and sold by the Issuer from time to time pursuant to one or more agreements in accordance with applicable law.

(b) Global Notes. (i) Except as provided in clause (d) below, Rule 144A Notes initially shall be represented by one or more Notes in definitive, fully registered, global form without interest coupons (collectively, the "Rule 144A Global Notes").

Regulation S Notes initially shall be represented by one or more Notes in fully registered, global form without interest coupons (collectively, the "Regulation S Global Notes"), which shall be registered in the name of the Depository or the nominee of the Depository for the accounts of designated agents holding on behalf of Euroclear or Clearstream.

The term "Global Notes" means the Rule 144A Global Notes and the Regulation S Global Notes. The Global Notes shall bear the Global Note Legend. The Global Notes initially shall (i) be registered in the name of the Depository or the nominee of such Depository, in each case for credit to an account of an Agent Member, (ii) be delivered to the Trustee as custodian for such Depository and (iii) bear the Restricted Notes Legend.

Members of, or direct or indirect participants in, the Depository (collectively, the "Agent Members") shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Depository, or the Trustee as its custodian, or under the Global Notes. The Depository may be treated by the Issuer, the Trustee and any agent of the Issuer or the Trustee as the absolute owner of the Global Notes for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Trustee or any agent of the Issuer or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depository, or impair, as between the Depository and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any Note.

(ii) Transfers of Global Notes shall be limited to transfer in whole, but not in part, to the Depository, its successors or their respective nominees. Interests of beneficial owners in the Global Notes may be transferred or exchanged for Definitive Notes only in accordance with the applicable rules and procedures of the Depository and the provisions of Section 2.2. In addition, a Global Note shall be exchangeable for Definitive Notes if (x) the Depository (1) notifies the Issuer that it is unwilling or unable to continue as depository for such Global Note and the Issuer thereupon fails to appoint a successor depository or (2) has ceased to be a clearing agency registered under the Exchange Act or (y) there shall have occurred and be continuing an Event of Default with respect to such Global Note; *provided* that in no event shall the Regulation S Global Note be exchanged by the Issuer for Definitive Notes prior to (x) the expiration of the Restricted Period and

Appendix A-4

---

(y) the receipt by the Registrar of any certificates required pursuant to Rule 903(b)(3)(ii)(B) under the Securities Act. In all cases, Definitive Notes delivered in exchange for any Global Note or beneficial interests therein shall be registered in the names, and issued in any approved denominations, requested by or on behalf of the Depository in accordance with its customary procedures.

(iii) In connection with the transfer of a Global Note as an entirety to beneficial owners pursuant to subsection (i) of this Section 2.1(b), such Global Note shall be deemed to be surrendered to the Trustee for cancellation, and the Issuer shall execute, and the Trustee shall

authenticate and make available for delivery, to each beneficial owner identified by the Depository in writing in exchange for its beneficial interest in such Global Note, an equal aggregate principal amount of Definitive Notes of authorized denominations.

(iv) Any Transfer Restricted Note delivered in exchange for an interest in a Global Note pursuant to Section 2.2 shall, except as otherwise provided in Section 2.2, bear the Restricted Notes Legend.

(v) Notwithstanding the foregoing, through the Restricted Period, a beneficial interest in a Regulation S Global Note may be held only through Euroclear or Clearstream unless delivery is made in accordance with the applicable provisions of Section 2.2.

(vi) The holder of any Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a holder is entitled to take under this Indenture or the Notes.

(c) <u>Temporary Global Notes</u>. In addition to the requirements for Global Notes set forth in Section 2.1(b) above, Notes initially issued in the form of Temporary Global Notes shall bear the Temporary Global Notes Legend and shall be subject to the additional transfer restrictions set forth therein and as set forth below under Section 2.2.

Upon the completion or cancellation of the Hamlet Tender Offer, beneficial interests in the Temporary Global Notes shall be exchanged for beneficial interests in Permanent Global Notes; *provided* that beneficial interests in Temporary Global Notes acquired by affiliates (as defined in Rule 405 of the Securities Act) of the Issuer in the Hamlet Tender Offer shall be exchanged for Definitive Notes in accordance with the requirements set forth below under Section 2.2(g). In order to effect such exchange, the Issuer shall provide written notice to the Trustee instructing the Trustee to (i) direct the Depositary to transfer the specified amount of the outstanding beneficial interests in each Temporary Rule 144A Global Note and Temporary Regulation S Global Note to a corresponding Permanent Rule 144A Global Note or Permanent Regulation S Global Note, as applicable, and provide the Depositary with all such information as is necessary for the Depositary to appropriately credit and debit the relevant holder accounts and (ii) provide prior written notice to all holders of such exchange, which notice must include the date such exchange is proposed to occur, the CUSIP numbers of the relevant Temporary Global Notes and the CUSIP numbers of the relevant Permanent Global Notes into which such holders'

beneficial interests shall be exchanged. Upon such exchange of beneficial interests pursuant to this Section 2.1(c), the Registrar shall reflect on its books and records the date of such transfer and a decrease and increase, respectively, in the principal amount of the applicable Temporary Global Notes and Permanent Global Notes, respectively, equal to the principal amount of beneficial interests so transferred. Following any such transfer pursuant to this Section 2.1(c) (and/or Section 2.2(g), if applicable), of all of the beneficial interests in a Temporary Global Note, such Temporary Global Note shall be canceled.

(d) <u>Definitive Notes</u>. To the extent that the purchaser of a Rule 144A Note is an AI and is not an Agent Member or otherwise cannot hold a beneficial interest in a Global Note, then such Rule 144A Note shall be represented by one or more Definitive Notes.

2.2 Transfer and Exchange.

(a) <u>Transfer and Exchange of Global Notes</u>. A Global Note may not be transferred as a whole except as set forth in Section 2.1(b). Global Notes will not be exchanged by the Issuer for Definitive Notes except under the circumstances described in Section 2.1(b)(ii). Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.08 and 2.10 of this Indenture. Beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.2(b) or 2.2(g).

(b) <u>Transfer and Exchange of Beneficial Interests in Global Notes</u>. The transfer and exchange of beneficial interests in the Global Notes shall be effected through the Depository, in accordance with the provisions of this Indenture and the applicable rules and procedures of the Depository. Beneficial interests in Transfer Restricted Global Notes shall be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Beneficial interests in Global Notes shall be transferred or exchanged only for beneficial interests in Global Notes. Transfers and exchanges of beneficial interests in the Global Notes also shall require compliance with either subparagraph (i) or (ii) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(i) <u>Transfer of Beneficial Interests in the Same Global Note</u>. Beneficial interests in any Transfer Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Transfer Restricted Global Note in accordance with the transfer restrictions set forth in the Restricted Notes Legend; *provided, however*, that (A) prior to the expiration of the Restricted Period, transfers of beneficial interests in a Regulation S Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person and (B) transfers of beneficial interests in a Temporary Global Note may not be made to any person other than the offerors in the Hamlet Tender Offer that are not subject to Section 2.2(g). A beneficial interest in an Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.2(b)(i).

(ii) <u>All Other Transfers and Exchanges of Beneficial Interests in Global Notes</u>. In connection with all transfers and exchanges of

beneficial interests in any Global Note that is not subject to Section 2.2(b)(i), the transferor of such beneficial interest must deliver to the Registrar (1) a written order from an Agent Member given to the Depository in accordance with the applicable rules and procedures of the Depository directing the Depository to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given in accordance with the applicable rules and procedures of the Depository containing information regarding the Agent Member account to be credited with such increase; *provided* that no transfers or exchanges of beneficial interests in a Global Note may be made for a beneficial interest in a Temporary Global Note. Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note pursuant to Section 2.2(i).

(iii) <u>Transfer of Beneficial Interests to Another Restricted Global Note</u>. A beneficial interest in a Transfer Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Transfer Restricted Global Note if the transfer complies with the requirements of Section 2.2(b)(ii) above and the Registrar receives the following:

(A) if the transferee will take delivery in the form of a beneficial interest in a Rule 144A Global Note, then the transferor must deliver a certificate in the form attached to the applicable Note; and

(B) if the transferee will take delivery in the form of a beneficial interest in a Regulation S Global Note, then the transferor must deliver a certificate in the form attached to the applicable Note.

(iv) <u>Transfer and Exchange of Beneficial Interests in a Transfer Restricted Global Note for Beneficial Interests in an Unrestricted Global Note</u>. A beneficial interest in a Transfer Restricted Global Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.2(b)(ii) above and the Registrar receives the following:

(A) if the holder of such beneficial interest in a Transfer Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form attached to the applicable Note; or

(B) if the holder of such beneficial interest in a Transfer Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form attached to the applicable Note,

and, in each such case, if the Issuer or the Registrar so requests or if the applicable rules and procedures of the Depository so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Restricted Notes Legend are no longer required in order to maintain compliance with the Securities Act. If any such transfer or exchange is effected pursuant to this subparagraph (iv) at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an written order of the Issuer in the form of an Officers' Certificate in accordance with Section 2.01, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred or exchanged pursuant to this subparagraph (iv).

(v) <u>Transfer and Exchange of Beneficial Interests in an Unrestricted Global Note for Beneficial Interests in a Transfer Restricted Global Note</u>. Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Transfer Restricted Global Note.

(vi) <u>Exchange of Beneficial Interests in Temporary Global Notes for Beneficial Interests in Permanent Global Notes</u>. In connection with any holder's exchange of its beneficial interest in a Temporary Global Note for a beneficial interest in a Permanent Global Note, the exchanging holder must deliver to the Registrar (1) a written order from an Agent Member given to the Depository in accordance with the applicable rules and procedures of the Depository directing the Depository to credit or cause to be credited a beneficial interest in a Permanent Global Note in an amount equal to the beneficial interest to be exchanged and (2) instructions given in accordance with the applicable rules and procedures of the Depository containing information regarding the Agent Member account to be credited with such increase. Upon satisfaction of all of the requirements for exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Notes pursuant to Section 2.2(i).

(c) <u>Transfer and Exchange of Beneficial Interests in Global Notes for Definitive Notes</u>. A beneficial interest in a Global Note may not be exchanged for a Definitive Note except under the circumstances described in Section 2.1(b)(ii). A beneficial interest in a Global Note may not be transferred to a Person who takes delivery thereof in the form of a Definitive Note except under the circumstances described in Section 2.1(b)(ii). In any case, beneficial interests in Global Notes shall be transferred or exchanged only for Definitive Notes.

(d) <u>Transfer and Exchange of Definitive Notes for Beneficial Interests in Global Notes</u>. Transfers and exchanges of Definitive Notes for beneficial interests in the Global Notes also shall require compliance with either subparagraph (i), (ii) or (iii) below, as applicable:

(i) <u>Transfer Restricted Definitive Notes to Beneficial Interests in Transfer Restricted Global Notes</u>. If any holder of a Transfer Restricted Definitive Note proposes to exchange such Transfer Restricted Definitive Note for a beneficial interest in a Transfer Restricted

Global Note or to transfer such Transfer Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A) if the holder of such Transfer Restricted Definitive Note proposes to exchange such Transfer Restricted Note for a beneficial interest in a Transfer Restricted Global Note, a certificate from such holder in the form attached to the applicable Note;

(B) if such Transfer Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A under the Securities Act, a certificate from such holder in the form attached to the applicable Note;

(C) if such Transfer Restricted Definitive Note is being transferred to a Non U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904 under the Securities Act, a certificate from such holder in the form attached to the applicable Note;

(D) if such Transfer Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144 under the Securities Act, a certificate from such holder in the form attached to the applicable Note;

(E) if such Transfer Restricted Definitive Note is being transferred to an IAI in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate from such holder in the form attached to the applicable Note, including the certifications, certificates and Opinion of Counsel, if applicable; or

(F) if such Transfer Restricted Definitive Note is being transferred to the Issuer or a Subsidiary thereof, a certificate from such holder in the form attached to the applicable Note;

the Trustee shall cancel the Transfer Restricted Definitive Note, and increase or cause to be increased the aggregate principal amount of the appropriate Transfer Restricted Global Note.

(ii) _Transfer Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes_. A holder of a Transfer Restricted Definitive Note may exchange such Transfer Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note or transfer such Transfer Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if the Registrar receives the following:

(A) if the holder of such Transfer Restricted Definitive Note proposes to exchange such Transfer Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form attached to the applicable Note; or

(B) if the holder of such Transfer Restricted Definitive Notes proposes to transfer such Transfer Restricted Definitive Note to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form attached to the applicable Note,

and, in each such case, if the Issuer or the Registrar so requests or if the applicable rules and procedures of the Depository so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Restricted Notes Legend are no longer required in order to maintain compliance with the Securities Act. Upon satisfaction of the conditions of this subparagraph (ii), the Trustee shall cancel the Transfer Restricted Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note. If any such transfer or exchange is effected pursuant to this subparagraph (ii) at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an written order of the Issuer in the form of an Officers' Certificate, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of Transfer Restricted Notes transferred or exchanged pursuant to this subparagraph (ii).

(iii) _Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes_. A holder of an Unrestricted Definitive Note may exchange such Unrestricted Definitive Note for a beneficial interest in an Unrestricted Global Note or transfer such Unrestricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer, the Trustee shall cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes. If any such transfer or exchange is effected pursuant to this subparagraph (iii) at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an written order of the Issuer in the form of an Officers' Certificate, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of Unrestricted Definitive Notes transferred or exchanged pursuant to this subparagraph (iii).

(iv) _Unrestricted Definitive Notes to Beneficial Interests in Transfer Restricted Global Notes_. An Unrestricted Definitive Note cannot be exchanged for, or transferred to a Person who takes delivery thereof in the form of, a beneficial interest in a Transfer Restricted Global Note.

(v) _Definitive Notes to Beneficial Interests in Temporary Global Notes_. Notwithstanding anything else contained in this Section 2.2(d),

a Definitive Note cannot be exchanged for, or transferred to a Person who takes delivery thereof in the form of, a beneficial interest in a Temporary Global Note.

Appendix A-10

---

(e) <u>Transfer and Exchange of Definitive Notes for Definitive Notes</u>. Upon request by a holder of Definitive Notes and such holder's compliance with the provisions of this Section 2.2(e), the Registrar shall register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting holder shall present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such holder or by its attorney, duly authorized in writing. In addition, the requesting holder shall provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.2(e).

(i) <u>Transfer Restricted Definitive Notes to Transfer Restricted Definitive Notes</u>. A Transfer Restricted Note may be transferred to and registered in the name of a Person who takes delivery thereof in the form of a Transfer Restricted Definitive Note if the Registrar receives the following:

(A) if the transfer will be made pursuant to Rule 144A under the Securities Act, then the transferor must deliver a certificate in the form attached to the applicable Note;

(B) if the transfer will be made pursuant to Rule 903 or Rule 904 under the Securities Act, then the transferor must deliver a certificate in the form attached to the applicable Note;

(C) if the transfer will be made pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144 under the Securities Act, a certificate in the form attached to the applicable Note;

(D) if the transfer will be made to an IAI in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (A) through (D) above, a certificate in the form attached to the applicable Note; and

(E) if such transfer will be made to the Issuer or a Subsidiary thereof, a certificate in the form attached to the applicable Note.

(ii) <u>Transfer Restricted Definitive Notes to Unrestricted Definitive Notes</u>. Any Transfer Restricted Definitive Note may be exchanged by the holder thereof for an Unrestricted Definitive Note or transferred to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note if the Registrar receives the following:

(A) if the holder of such Transfer Restricted Definitive Note proposes to exchange such Transfer Restricted Definitive Note for an Unrestricted Definitive Note, a certificate from such holder in the form attached to the applicable Note; or

(B) if the holder of such Transfer Restricted Definitive Note proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder in the form attached to the applicable Note,

Appendix A-11

---

and, in each such case, if the Registrar so requests, an Opinion of Counsel in form reasonably acceptable to the Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Restricted Notes Legend are no longer required in order to maintain compliance with the Securities Act.

(iii) <u>Unrestricted Definitive Notes to Unrestricted Definitive Notes</u>. A holder of an Unrestricted Definitive Note may transfer such Unrestricted Definitive Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note at any time. Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the holder thereof.

(iv) <u>Unrestricted Definitive Notes to Transfer Restricted Definitive Notes</u>. An Unrestricted Definitive Note cannot be exchanged for, or transferred to a Person who takes delivery thereof in the form of, a Transfer Restricted Definitive Note.

At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.11. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depository at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depository at the direction of the Trustee to reflect such increase.

(f) <u>Automatic Exchange from Transfer Restricted Global Notes to Unrestricted Global Notes</u>. At the option of the Issuer and upon compliance with the following procedures, beneficial interests in a Transfer Restricted Global Note shall be exchanged for beneficial interests in an Unrestricted Global Note. In order to effect such exchange, the Issuer shall, subject to Section 7.07, provide written notice to the Trustee

requesting the Trustee to (i) direct the Depository to transfer the specified amount of the outstanding beneficial interests in a particular Transfer Restricted Global Note to an Unrestricted Global Note and provide the Depository with all such information as is required by the Depository for the Depository to appropriately credit and debit the relevant holder accounts and (ii) provide prior written notice to all holders of such exchange, which notice must include the date such exchange is proposed to occur, the CUSIP number of the relevant Transfer Restricted Global Note and the CUSIP number of the Unrestricted Global Note into which such holders' beneficial interests will be exchanged. As a condition to any such exchange pursuant to this Section 2.2(f), the Trustee shall be entitled to receive from the Issuer, and rely conclusively without any liability, upon an Officer's Certificate and an Opinion of Counsel to the Issuer, in form and in substance reasonably satisfactory to the Trustee, to the effect that such transfer of beneficial interests to the Unrestricted Global Note shall be effected in compliance with the Securities Act. The Issuer

<div align="center">Appendix A-12</div>

may request from holders such information it reasonably determines is required in order to be able to deliver such Officer's Certificate and Opinion of Counsel. Upon such exchange of beneficial interests pursuant to this Section 2.2(f), the Registrar shall reflect on its books and records the date of such transfer and a decrease and increase, respectively, in the principal amount of the applicable Transfer Restricted Global Notes and the Unrestricted Global Notes, respectively, equal to the principal amount of beneficial interests transferred. Following any such transfer pursuant to Section 2.2(f) of all of the beneficial interests in a Transfer Restricted Global Note, such Transfer Restricted Global Note shall be cancelled.

(g) Transfers of Notes Held by Affiliates. Any certificate (i) evidencing a Note that has been transferred to an affiliate (as defined in Rule 405 of the Securities Act) of the Issuer, pursuant to the Hamlet Tender Offer or otherwise as evidenced by a notation on the certificate of transfer and certificate of exchange for such transfer or in the representation letter delivered in respect thereof or (ii) evidencing a Note that has been acquired from an affiliate (other than by an affiliate) in a transaction or a chain of transactions not involving any public offering, shall, until six months after the last date on which either the Issuer or any affiliate of the Issuer was the owner of such Security, in each case, be in the form of a permanent Definitive Note and bear the Restricted Notes Legend subject to the restrictions in this Section 2.2. The Registrar shall retain copies of all letters, notices and other written communications received pursuant to this Section 2.2. The Issuer, at its sole cost and expense, shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable advance written notice to the Registrar and the Trustee.

(h) Legend.

(i) Except as permitted by the following paragraph (iii), (iv) or (v), each Note certificate evidencing the Global Notes and the Definitive Notes (and all Notes issued in exchange therefor or in substitution thereof) shall bear a legend in substantially the following form (each defined term in the legend being defined as such for purposes of the legend only):

"THIS SECURITY (OR ITS PREDECESSOR) HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND, ACCORDINGLY, MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER: (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) (A "QIB"), (B) IT IS NOT A U.S. PERSON, IS NOT ACQUIRING THIS SECURITY FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE

<div align="center">Appendix A-13</div>

TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT OR (C) IT IS AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a) UNDER REGULATION D OF THE SECURITIES ACT (AN "AI"), (2) AGREES THAT IT WILL NOT, WITHIN THE TIME PERIOD REFERRED TO UNDER RULE 144(d)(1) (TAKING INTO ACCOUNT THE PROVISIONS OF RULE 144(d) UNDER THE SECURITIES ACT, IF APPLICABLE) UNDER THE SECURITIES ACT AS IN EFFECT ON THE DATE OF THE TRANSFER OF THIS SECURITY, RESELL OR OTHERWISE TRANSFER THIS SECURITY EXCEPT (A) TO THE ISSUER, HET OR ANY OF ITS SUBSIDIARIES, (B) TO A PERSON WHOM THE HOLDER REASONABLY BELIEVES IS A QIB OR PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QIB IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) IN COMPLIANCE WITH AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED THAT PRIOR TO SUCH TRANSFER, THE TRUSTEE IS FURNISHED WITH AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT), (D) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT, (E) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE AND PROVIDED THAT PRIOR TO SUCH TRANSFER, THE TRUSTEE IS FURNISHED WITH AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT), (F) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a)(1), (2), (3) OR (7) UNDER REGULATION D OF THE SECURITIES ACT (AN "IAI") THAT, PRIOR TO SUCH TRANSFER, FURNISHES THE TRUSTEE A SIGNED LETTER

CONTAINING CERTAIN REPRESENTATIONS AND AGREEMENTS RELATING TO THE TRANSFER OF THIS SECURITY (THE FORM OF WHICH CAN BE OBTAINED FROM THE TRUSTEE) AND, IF SUCH TRANSFER IS IN RESPECT OF AN AGGREGATE PRINCIPAL AMOUNT OF NEW SECOND LIEN NOTES LESS THAN $250,000, AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER AND THE TRUSTEE THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT OR (G) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES

Appendix A-14

ACT AND, IN EACH CASE, IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS, AND (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS SECURITY OR AN INTEREST HEREIN IS TRANSFERRED (OTHER THAN A TRANSFER PURSUANT TO CLAUSE (2)(D) OR 2(E) ABOVE) A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. IN CONNECTION WITH ANY TRANSFER OF THIS SECURITY OR ANY INTEREST HEREIN WITHIN THE TIME PERIOD REFERRED TO ABOVE, THE HOLDER MUST CHECK THE APPROPRIATE BOX SET FORTH ON THE REVERSE HEREOF RELATING TO THE MANNER OF SUCH TRANSFER AND SUBMIT THIS CERTIFICATE TO THE TRUSTEE. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANINGS GIVEN TO THEM BY RULE 902 OF REGULATION S UNDER THE SECURITIES ACT."

"THE TERMS OF THIS SECURITY ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED DECEMBER 24, 2008, BY AND AMONG BANK OF AMERICA, N.A., AS FIRST LIEN AGENT, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE AND THE OTHER PARTIES THERETO FROM TIME TO TIME."

"THIS NOTE IS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE INTERNAL REVENUE CODE. A HOLDER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY FOR SUCH NOTES BY SUBMITTING A REQUEST FOR SUCH INFORMATION TO THE BORROWER AT THE FOLLOWING ADDRESS: HARRAH'S OPERATING COMPANY, INC., ONE CAESAR'S PALACE DRIVE, LAS VEGAS, NEVADA, 89101-8969, ATTENTION: GENERAL COUNSEL."

To be inserted if Notes are guaranteed by the Subsidiaries pursuant to Section 4.11(c):

"THE TERMS OF THIS AGREEMENT ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED AS OF JANUARY 28, 2008, BY AND AMONG BANK OF AMERICA, N.A., U.S. BANK NATIONAL ASSOCIATION, CITIBANK, N.A. AND THE OTHER PARTIES THERETO FROM TIME TO TIME."

Appendix A-15

Each Definitive Note shall bear the following additional legends:

"IN CONNECTION WITH ANY TRANSFER, THE HOLDER WILL DELIVER TO THE REGISTRAR AND TRANSFER AGENT SUCH CERTIFICATES AND OTHER INFORMATION AS SUCH TRANSFER AGENT MAY REASONABLY REQUIRE TO CONFIRM THAT THE TRANSFER COMPLIES WITH THE FOREGOING RESTRICTIONS."

(ii) Temporary Global Notes Legend. Each Temporary Global Note shall bear the following Temporary Global Notes Legend:

"THIS SECURITY (OR ITS PREDECESSOR) IS A TEMPORARY GLOBAL NOTE; AS SUCH, IT IS NOT A TRANSFERABLE INTEREST UNLESS FIRST EXCHANGED FOR A BENEFICIAL INTEREST IN A PERMANENT GLOBAL NOTE IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THE INDENTURE. UPON CONSUMMATION OF THE SECOND LIEN TENDER OFFERS AS DESCRIBED IN THE OFFERING MEMORANDUM OF MARCH 5, 2009 (AS SUPPLEMENTED FROM TIME TO TIME, INCLUDING ON MARCH 17, 2009 AND MARCH 26, 2009), ANY REMAINING INTEREST IN THIS SECURITY WILL BE EXCHANGED FOR A CORRESPONDING BENEFICIAL INTEREST IN A PERMANENT GLOBAL NOTE."

(iii) Upon any sale or transfer of a Transfer Restricted Definitive Note, the Registrar shall permit the holder thereof to exchange such Transfer Restricted Note for a Definitive Note that does not bear the legends set forth above and rescind any restriction on the transfer of such Transfer Restricted Definitive Note if the holder certifies in writing to the Registrar that its request for such exchange was made in reliance on Rule 144 (such certification to be in the form set forth on the reverse of the Initial Note).

(iv) After a transfer of any Initial Notes during the period of the effectiveness of a Shelf Registration Statement with respect to such Initial Notes, all requirements pertaining to the Restricted Notes Legend on such Initial Notes shall cease to apply and the requirements that any such Initial Notes be issued in global form shall continue to apply.

(v) Upon the consummation of a Registered Exchange Offer with respect to the Initial Notes pursuant to which holders of such Initial Notes are offered Exchange Notes in exchange for their Initial Notes, all requirements pertaining to Initial Notes that Initial Notes be issued in global form shall continue to apply, and Exchange Notes in global form without the Restricted Notes Legend shall be available to holders that exchange such Initial Notes in such Registered Exchange Offer.

(vi) Upon a sale or transfer after the expiration of the Restricted Period of any Initial Note acquired pursuant to Regulation S, all

requirements that such Initial Note bear the Restricted Notes Legend shall cease to apply and the requirements requiring any such Initial Note be issued in global form shall continue to apply.

Appendix A-16

(vii) Any Additional Notes sold in a registered offering shall not be required to bear the Restricted Notes Legend.

(i) <u>Cancellation or Adjustment of Global Note</u>. At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.11 of this Indenture. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depository at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depository at the direction of the Trustee to reflect such increase.

(j) <u>Obligations with Respect to Transfers and Exchanges of Notes</u>.

(i) To permit registrations of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate, Definitive Notes and Global Notes at the Registrar's request.

(ii) No service charge shall be made for any registration of transfer or exchange, but the Issuer may require payment of a sum sufficient to cover any transfer tax, assessments, or similar governmental charge payable in connection therewith (other than any such transfer taxes, assessments or similar governmental charge payable upon exchanges pursuant to Sections 3.06, 4.06, 4.08 and 9.05 of this Indenture).

(iii) Prior to the due presentation for registration of transfer of any Note, the Issuer, the Trustee, a Paying Agent or the Registrar may deem and treat the person in whose name a Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Note and for all other purposes whatsoever, whether or not such Note is overdue, and none of the Issuer, the Trustee, the Paying Agent or the Registrar shall be affected by notice to the contrary.

(iv) All Notes issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Notes surrendered upon such transfer or exchange.

(k) No Obligation of the Trustee.

(i) The Trustee shall have no responsibility or obligation to any beneficial owner of a Global Note, a member of, or a participant in the Depository or any other Person with respect to the accuracy of the records of the Depository or its nominee or of any participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any participant, member, beneficial owner or other Person

Appendix A-17

(other than the Depository) of any notice (including any notice of redemption or repurchase) or the payment of any amount, under or with respect to such Notes. All notices and communications to be given to the holders and all payments to be made to the holders under the Notes shall be given or made only to the registered holders (which shall be the Depository or its nominee in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through the Depository subject to the applicable rules and procedures of the Depository. The Trustee may rely and shall be fully protected in relying upon information furnished by the Depository with respect to its members, participants and any beneficial owners.

(ii) The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among Depository participants, members or beneficial owners in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

Appendix A-18

EXHIBIT A

[FORM OF FACE OF INITIAL NOTE]

[Global Notes Legend]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST

COMPANY, A NEW YORK CORPORATION ("DTC"), NEW YORK, NEW YORK, TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO., OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO DTC, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

[Temporary Global Note Legend]

"THIS SECURITY (OR ITS PREDECESSOR) IS A TEMPORARY GLOBAL NOTE; AS SUCH, INTERESTS IN THIS SECURITY MAY NOT BE TRANSFERRED AND MAY ONLY BE EXCHANGED FOR A BENEFICIAL INTEREST IN A PERMANENT GLOBAL NOTE IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF. UPON CONSUMMATION OF THE SECOND LIEN TENDER OFFERS AS DESCRIBED IN THE OFFERING MEMORANDUM OF MARCH 5, 2009 (AS SUPPLEMENTED FROM TIME TO TIME, INCLUDING ON MARCH 17, 2009 AND MARCH 26, 2009), ANY REMAINING INTEREST IN THIS SECURITY WILL BE EXCHANGED FOR A CORRESPONDING BENEFICIAL INTEREST IN A PERMANENT GLOBAL NOTE."

[Restricted Notes Legend]

"THIS SECURITY (OR ITS PREDECESSOR) HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND, ACCORDINGLY, MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER

A-1

(1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) (A "QIB"), (B) IT IS NOT A U.S. PERSON, IS NOT ACQUIRING THIS SECURITY FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT OR (C) IT IS AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a) UNDER REGULATION D OF THE SECURITIES ACT (AN "AI"), (2) AGREES THAT IT WILL NOT, WITHIN THE TIME PERIOD REFERRED TO UNDER RULE 144(d)(1) (TAKING INTO ACCOUNT THE PROVISIONS OF RULE 144(d) UNDER THE SECURITIES ACT, IF APPLICABLE) UNDER THE SECURITIES ACT AS IN EFFECT ON THE DATE OF THE TRANSFER OF THIS SECURITY, RESELL OR OTHERWISE TRANSFER THIS SECURITY EXCEPT (A) TO THE ISSUER, (B) TO A PERSON WHOM THE HOLDER REASONABLY BELIEVES IS A QIB OR PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QIB IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) IN COMPLIANCE WITH AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED THAT PRIOR TO SUCH TRANSFER, THE TRUSTEE IS FURNISHED WITH AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT), (D) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT, (E) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE AND PROVIDED THAT PRIOR TO SUCH TRANSFER, THE TRUSTEE IS FURNISHED WITH AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT), (F) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a)(1), (2), (3) OR (7) UNDER REGULATION D OF THE SECURITIES ACT (AN "IAI") THAT, PRIOR TO SUCH TRANSFER, FURNISHES THE TRUSTEE A SIGNED LETTER CONTAINING CERTAIN REPRESENTATIONS AND AGREEMENTS RELATING TO THE TRANSFER OF THIS SECURITY (THE FORM OF WHICH CAN BE OBTAINED FROM THE TRUSTEE) AND, IF SUCH TRANSFER IS IN RESPECT OF AN AGGREGATE PRINCIPAL AMOUNT OF NEW SECOND LIEN NOTES LESS THAN $250,000, AN OPINION OF COUNSEL ACCEPTABLE

A-2

TO THE ISSUER AND THE TRUSTEE THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT OR

(G) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND, IN EACH CASE, IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS, AND (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS SECURITY OR AN INTEREST HEREIN IS TRANSFERRED (OTHER THAN A TRANSFER PURSUANT TO CLAUSE (2)(D) OR 2(E) ABOVE) A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. IN CONNECTION WITH ANY TRANSFER OF THIS SECURITY OR ANY INTEREST HEREIN WITHIN THE TIME PERIOD REFERRED TO ABOVE, THE HOLDER MUST CHECK THE APPROPRIATE BOX SET FORTH ON THE REVERSE HEREOF RELATING TO THE MANNER OF SUCH TRANSFER AND SUBMIT THIS CERTIFICATE TO THE TRUSTEE. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANINGS GIVEN TO THEM BY RULE 902 OF REGULATION S UNDER THE SECURITIES ACT."

"THE TERMS OF THIS SECURITY ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED DECEMBER 24, 2008, BY AND AMONG BANK OF AMERICA, N.A., AS FIRST LIEN AGENT, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE AND THE OTHER PARTIES THERETO FROM TIME TO TIME."

"THIS NOTE IS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE INTERNAL REVENUE CODE. A HOLDER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY FOR SUCH NOTES BY SUBMITTING A REQUEST FOR SUCH INFORMATION TO THE BORROWER AT THE FOLLOWING ADDRESS: HARRAH'S OPERATING COMPANY, INC., ONE CAESAR'S PALACE DRIVE, LAS VEGAS, NEVADA, 89101-8969, ATTENTION: GENERAL COUNSEL."

To be inserted if Notes are guaranteed by the Subsidiaries pursuant to Section 4.11(c):

"THE TERMS OF THIS AGREEMENT ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED AS OF JANUARY 28, 2008, BY AND AMONG BANK OF AMERICA, N.A., U.S. BANK NATIONAL ASSOCIATION, CITIBANK, N.A. AND THE OTHER PARTIES THERETO FROM TIME TO TIME."

A-3

---

Each Definitive Note shall bear the following additional legends:

"IN CONNECTION WITH ANY TRANSFER, THE HOLDER WILL DELIVER TO THE REGISTRAR AND TRANSFER AGENT SUCH CERTIFICATES AND OTHER INFORMATION AS SUCH TRANSFER AGENT MAY REASONABLY REQUIRE TO CONFIRM THAT THE TRANSFER COMPLIES WITH THE FOREGOING RESTRICTIONS."

A-4

---

[FORM OF INITIAL NOTE]

No.
                                          [TEMPORARY (1) 144A] CUSIP No. 413627 BH2
                                          [TEMPORARY (1) 144A] ISIN No. US413627BH24
                                          [TEMPORARY (2) 144A] CUSIP No. 413627 BJ8
                                          [TEMPORARY (2) 144A] ISIN No. US413627BJ89
                                          [PERMANENT 144A] CUSIP No. 413627 BG4
                                          [PERMANENT 144A] ISIN No. US413627BG41

                                          [TEMPORARY (1) REG S] CUSIP No. U24658 AP8
                                          [TEMPORARY (1) REG S] ISIN No. USU24658AP82
                                          [TEMPORARY (2) REG S] CUSIP No. U24658 AQ6
                                          [TEMPORARY (2) REG S] ISIN No. USU24658AQ65
                                          [PERMANENT REG S] CUSIP No. U24658 AN3
                                          [PERMANENT REG S] ISIN No. USU24658AN35

10.00% Second-Priority Senior Secured Note due 2018

HARRAH'S OPERATING COMPANY, INC., a Delaware corporation, promises to pay to Cede & Co., or registered assigns, the principal sum set forth on the Schedule of Increases or Decreases in Global Security attached hereto on December 15, 2018.

Interest Payment Dates: June 15 and December 15

Record Dates: June 1 and December 1

Additional provisions of this Note are set forth on the other side of this Note.

A-5

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed.

HARRAH'S OPERATING COMPANY, INC.

By: _____
      Name:
      Title:

Dated: April 15, 2009

A-6

---

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

U. S. BANK NATIONAL ASSOCIATION
    as Trustee, certifies that this is one of the Notes referred
    to in the Indenture.

By: _____
              Authorized Signatory

\*/   If the Note is to be issued in global form, add the Global Notes Legend and the attachment from Exhibit A captioned "TO BE ATTACHED TO GLOBAL SECURITIES - SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY."

A-7

---

[FORM OF REVERSE SIDE INITIAL NOTE]

10.00% Second-Priority Senior Secured Note Due 2018

1.   Interest

    HARRAH'S OPERATING COMPANY, INC., a Delaware corporation (such corporation, and its successors and assigns under the Indenture hereinafter referred to, being herein called the "Issuer"), promises to pay interest on the principal amount of this Note at the rate per annum shown above. The Issuer shall pay interest semiannually on June 15 and December 15 of each year (each an "Interest Payment Date"), commencing June 15, 2009. Interest on the Notes shall accrue from the most recent date to which interest has been paid or duly provided for or, if no interest has been paid or duly provided for, from April 15, 2009, until the principal hereof is due. Interest shall be computed on the basis of a 360-day year of twelve 30-day months. The Issuer shall pay interest on overdue principal at the rate borne by the Notes, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

2.   Method of Payment

    The Issuer shall pay interest on the Notes (except defaulted interest) to the Persons who are registered holders at the close of business on June 1 or December 1 (each a "Record Date") next preceding the interest payment date even if Notes are canceled after the record date and on or before the interest payment date (whether or not a Business Day). Holders must surrender Notes to the Paying Agent to collect principal payments. The Issuer shall pay principal, premium, if any, and interest in money of the United States of America that at the time of payment is legal tender for payment of public and private debts. Payments in respect of the Notes represented by a Global Note (including principal, premium, if any, and interest) shall be made by wire transfer of immediately available funds to the accounts specified by The Depository Trust Issuer or any successor depositary. The Issuer shall make all payments in respect of a certificated Note (including principal, premium, if any, and interest) at the office of the Paying Agent, except that, at the option of the Issuer, payment of interest may be made by mailing a check to the registered address of each holder thereof; *provided, however,* that payments on the Notes may also be made, in the case of a holder of at least $1,000,000 aggregate principal amount of Notes, by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such holder elects payment by wire transfer by giving written notice to the Trustee or Paying Agent to such effect designating such account no later than 30 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion).

3.   Paying Agent and Registrar

    Initially, U.S. Bank National Association (the "Trustee"), will act as Paying Agent and Registrar. The Issuer may appoint and change any Paying Agent or Registrar without notice. The Issuer or any of its domestically incorporated Wholly Owned Subsidiaries may act as Paying Agent or Registrar.

4.    <u>Indenture</u>

    The Issuer issued the Notes under an Indenture dated as of April 15, 2009 (the "Indenture"), among the Issuer, the Parent Guarantor and the Trustee. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa 77bbbb) as in effect on the date of the Indenture (the "TIA"). Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture. The Notes are subject to all terms and provisions of the Indenture, and the holders (as defined in the Indenture) are referred to the Indenture and the TIA for a statement of such terms and provisions.

    The Notes are second-priority senior secured obligations of the Issuer. This Note is one of the Initial Notes referred to in the Indenture. The Notes include the Initial Notes, any Additional Notes and any Exchange Notes issued in exchange for the Initial Notes or any Additional Notes pursuant to the Indenture. The Initial Notes, any Additional Notes and any Exchange Notes are treated as a single class of securities under the Indenture. The Indenture imposes certain limitations on the ability of the Issuer and its Restricted Subsidiaries to, among other things, make certain Investments and other Restricted Payments, pay dividends and other distributions, Incur Indebtedness, enter into consensual restrictions upon the payment of certain dividends and distributions by such Restricted Subsidiaries, issue or sell shares of capital stock of the Issuer and such Restricted Subsidiaries, enter into or permit certain transactions with Affiliates, create or Incur Liens and make Asset Sales. The Indenture also imposes limitations on the ability of the Issuer, each Subsidiary Pledgor and the Parent Guarantor to consolidate or merge with or into any other Person or convey, transfer or lease all or substantially all of its property.

    To guarantee the due and punctual payment of the principal and interest on the Notes and all other amounts payable by the Issuer under the Indenture and the Notes when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Notes and the Indenture, the Parent Guarantor has unconditionally guaranteed the Guaranteed Obligations pursuant to the terms of the Indenture and any Subsidiary Pledgor that executes a Note Guarantee will unconditionally guarantee the Guaranteed Obligations on a second-priority senior secured basis pursuant to the terms of the Indenture.

5.    <u>Optional Redemption</u>

    On or after December 15, 2013, the Issuer may redeem the Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at the following redemption prices (expressed as a percentage of principal amount), *plus* accrued and unpaid interest and additional interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the 12-month period commencing on December 15 of the years set forth below:

| Period | Redemption Price |
| --- | --- |
| 2013 | 105.000% |
| 2014 | 103.333% |
| 2015 | 101.667% |
| 2016 and thereafter | 100.000% |

A-9

    In addition, prior to December 15, 2013 the Issuer may redeem the Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at a redemption price equal to 100% of the principal amount of the Notes redeemed *plus* the Applicable Premium as of, and accrued and unpaid interest and additional interest, if any, to, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

    Notwithstanding the foregoing, at any time and from time to time on or prior to December 15, 2011, the Issuer may redeem in the aggregate up to 35% of the original aggregate principal amount of the Notes (calculated after giving effect to any issuance of Additional Notes) with the net cash proceeds of one or more Equity Offerings (1) by the Issuer or (2) by any direct or indirect parent of the Issuer to the extent the net cash proceeds thereof are contributed to the common equity capital of the Issuer or used to purchase Capital Stock (other than Disqualified Stock) of the Issuer from it, at a redemption price (expressed as a percentage of principal amount thereof) of 110.00%, *plus* accrued and unpaid interest and additional interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date); *provided, however,* that at least 50% of the original aggregate principal amount of the Notes (calculated after giving effect to any issuance of Additional Notes) must remain outstanding after each such redemption; *provided, further,* that such redemption shall occur within 90 days after the date on which any such Equity Offering is consummated upon not less than 30 nor more than 60 days' notice mailed to each holder of Notes being redeemed and otherwise in accordance with the procedures set forth in the Indenture.

6.    <u>Mandatory Redemption</u>

    The Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

7.    Notice of Redemption

Notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the redemption date to each holder of Notes to be redeemed at his, her or its registered address. Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1,000. If money sufficient to pay the redemption price of and accrued and unpaid interest on all Notes (or portions thereof) to be redeemed on the redemption date is deposited with a Paying Agent on or before the redemption date and certain other conditions are satisfied, on and after such date, interest ceases to accrue on such Notes (or such portions thereof) called for redemption.

A-10

8.    Repurchase of Notes at the Option of the holders upon Change of Control and Asset Sales

Upon the occurrence of a Change of Control, each holder shall have the right, subject to certain conditions specified in the Indenture, to cause the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant record date to receive interest due on the relevant interest payment date), as provided in, and subject to the terms of, the Indenture.

In accordance with Section 4.06 of the Indenture, the Issuer will be required to offer to purchase Notes upon the occurrence of certain events.

9.    Ranking and Collateral

These Notes and any Note Guarantee by a Subsidiary Pledgor are secured by a second-priority security interest in the Collateral pursuant to certain Security Documents. The Second Priority Liens upon any and all Collateral are, to the extent and in the manner provided in the Intercreditor Agreement, subordinate in ranking to all present and future First Priority Liens and will be of equal ranking with all present and future Liens securing Other Second-Lien Obligations as set forth in the Intercreditor Agreement.

10.    Denominations; Transfer; Exchange

The Notes are in registered form, without coupons, in denominations of $2,000 and any integral multiple of $1,000. A holder shall register the transfer of or exchange of Notes in accordance with the Indenture. Upon any registration of transfer or exchange, the Registrar and the Trustee may require a holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes required by law or permitted by the Indenture. The Registrar need not register the transfer of or exchange any Notes selected for redemption (except, in the case of a Note to be redeemed in part, the portion of the Note not to be redeemed) or to transfer or exchange any Notes for a period of 15 days prior to a selection of Notes to be redeemed.

11.    Persons Deemed Owners

The registered holder of this Note shall be treated as the owner of it for all purposes.

12.    Unclaimed Money

If money for the payment of principal or interest remains unclaimed for two years, the Trustee and a Paying Agent shall pay the money back to the Issuer at their written request unless an abandoned property law designates another Person. After any such payment, the holders entitled to the money must look to the Issuer for payment as general creditors and the Trustee and a Paying Agent shall have no further liability with respect to such monies.

13.    Discharge and Defeasance

Subject to certain conditions, the Issuer at any time may terminate some of or all its obligations under the Notes and the Indenture if the Issuer deposits with the Trustee money or U.S. Government Obligations for the payment of principal and interest on the Notes to redemption or maturity, as the case may be.

A-11

14.    Amendment; Waiver

Subject to certain exceptions set forth in the Indenture, (i) the Indenture or the Notes may be amended with the written consent of the holders of at least a majority in aggregate principal amount of the outstanding Notes and (ii) any past default or compliance with any provisions may be waived with the written consent of the holders of at least a majority in principal amount of the outstanding Notes. Subject to certain exceptions set forth in the Indenture, without the consent of any holder, the Issuer and the Trustee may amend the Indenture, the Security Documents, the Intercreditor Agreement or the Notes (i) to cure any ambiguity, omission, defect or inconsistency; (ii) to provide for the assumption by a Successor Issuer of the obligations of the Issuer under the Indenture and the Notes; (iii) to provide for the assumption by a Successor Subsidiary Pledgor of

the obligations of a Subsidiary Pledgor under the Indenture and the Security Documents; (iv) to add a Guarantor with respect to the Notes pursuant to Section 4.11 of the Indenture; (v) to provide for uncertificated Notes in addition to or in place of certificated Notes (*provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code); (vi) to conform the text of the Indenture, the Notes, the Security Documents, the Intercreditor Agreement, or the Guarantor Intercreditor Agreement to any provision of the "Description of New Second Lien Notes" in the Offering Memorandum to the extent that such provision in the "Description of New Second Lien Notes" was intended to be a verbatim recitation of a provision of the Indenture, the Notes, the Security Documents, the Intercreditor Agreement or the Guarantor Intercreditor Agreement; (vii) to add a Subsidiary Pledgor with respect to the Notes or to add Collateral to secure the Notes; (viii) to add additional covenants of the Issuer for the benefit of the holders or to surrender rights and powers conferred on the Issuer; (ix) to comply with the requirements of the SEC in order to effect or maintain the qualification of the Indenture under the TIA; (x) to make any change that does not adversely affect the rights of any holder; (xi) to provide for the issuance of the Exchange Notes or Additional Notes; (xii) to release Collateral as permitted by the Indenture or the Intercreditor Agreement; or (xiii) to add additional secured creditors holding Other Second-Lien Obligations so long as such obligations are not prohibited by the Indenture or the Security Documents.

15.   Defaults and Remedies

If an Event of Default occurs (other than an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer) and is continuing, the Trustee or the holders of at least 30% in principal amount of the outstanding Notes, in each case, by notice to the Issuer, may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable. If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer occurs, the principal of, premium, if any, and interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any holders. Under certain circumstances, the holders of a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

If an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders unless such holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense and certain other conditions are complied with. Except to enforce the right to receive payment of principal, premium (if any) or interest when

<div align="center">A-12</div>

due, no holder may pursue any remedy with respect to the Indenture or the Notes unless (i) such holder has previously given the Trustee notice that an Event of Default is continuing, (ii) the holders of at least 30% in principal amount of the outstanding Notes have requested the Trustee in writing to pursue the remedy, (iii) such holders have offered the Trustee reasonable security or indemnity against any loss, liability or expense, (iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity and (v) the holders of a majority in principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period. Subject to certain restrictions, the holders of a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability. Prior to taking any action under the Indenture, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

16.   Trustee Dealings with the Issuer

Subject to certain limitations imposed by the TIA, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with and collect obligations owed to it by the Issuer or its Affiliates and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee.

17.   No Recourse Against Others

No director, officer, employee, incorporator or holder of any equity interests in the Issuer or of any Guarantor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Issuer or any Guarantor under the Notes, the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each holder of Notes by accepting a Note waives and releases all such liability.

18.   Authentication

This Note shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Note.

19.  <u>Abbreviations</u>

Customary abbreviations may be used in the name of a holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

A-13

20.  <u>Governing Law</u>

THIS SECURITY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

21.  <u>CUSIP Numbers; ISINs</u>

The Issuer has caused CUSIP numbers and ISINs to be printed on the Notes and has directed the Trustee to use CUSIP numbers and ISINs in notices of redemption as a convenience to the holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

**The Issuer will furnish to any holder of Notes upon written request and without charge to the holder a copy of the Indenture which has in it the text of this Note.**

A-14

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

I or we assign and transfer this Note to:

(Print or type assignee's name, address and zip code)

(Insert assignee's soc. sec. or tax I.D. No.)

and irrevocably appoint _____ agent to transfer this Note on the books of the Issuer. The agent may substitute another to act for him.

Date: _____    Your Signature: _____

Sign exactly as your name appears on the other side of this Note.

Signature Guarantee:

Date: _____

Signature must be guaranteed by a participant in a recognized signature guaranty medallion program or other signature guarantor program reasonably acceptable to the Trustee

_____
Signature of Signature Guarantee

A-15

## CERTIFICATE TO BE DELIVERED UPON EXCHANGE OR

## REGISTRATION OF TRANSFER RESTRICTED SECURITIES

This certificate relates to $_____ principal amount of Notes held in (check applicable space) _____ book-entry or _____ definitive form by the undersigned.

The undersigned (check one box below):

☐  has requested the Trustee by written order to deliver in exchange for its beneficial interest in the Global Note held by the Depository a Note or Notes in definitive, registered form of authorized denominations and an aggregate principal amount equal to its beneficial interest in such

Global Note (or the portion thereof indicated above);

☐ has requested the Trustee by written order to exchange or register the transfer of a Note or Notes.

In connection with any transfer of any of the Notes evidenced by this certificate occurring while this Note is still a Transfer Restricted Definitive Note or a Transfer Restricted Global Note, the undersigned confirms that such Notes are being transferred in accordance with its terms:

**CHECK ONE BOX BELOW**

(1) ☐ to the Issuer; or

(2) ☐ to the Registrar for registration in the name of the holder, without transfer; or

(3) ☐ pursuant to an effective registration statement under the Securities Act of 1933; or

(4) ☐ inside the United States to a "<u>qualified institutional buyer</u>" (as defined in Rule 144A under the Securities Act of 1933) that purchases for its own account or for the account of a qualified institutional buyer to whom notice is given that such transfer is being made in reliance on Rule 144A, in each case pursuant to and in compliance with Rule 144A under the Securities Act of 1933; or

(5) ☐ outside the United States in an offshore transaction within the meaning of Regulation S under the Securities Act in compliance with Rule 904 under the Securities Act of 1933 and such Note shall be held immediately after the transfer through Euroclear or Clearstream until the expiration of the Restricted Period (as defined in the Indenture); or

(6) ☐ to an institutional "<u>accredited investor</u>" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act of 1933) that has furnished to the Trustee a signed letter containing certain representations and agreements; or

(7) ☐ pursuant to another available exemption from registration provided by Rule 144 under the Securities Act of 1933.

A-16

---

Unless one of the boxes is checked, the Trustee will refuse to register any of the Notes evidenced by this certificate in the name of any Person other than the registered holder thereof; *provided, however,* that if box (5), (6) or (7) is checked, the Issuer or the Trustee may require, prior to registering any such transfer of the Notes, such legal opinions, certifications and other information as the Issuer or the Trustee have reasonably requested to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act of 1933.

Date: _____          Your Signature: _____

Sign exactly as your name appears on the other side of this Note.

Signature Guarantee:

Date: _____

Signature must be guaranteed by a participant in a recognized signature          Signature of Signature Guarantee
guaranty medallion program or other signature guarantor program
reasonably acceptable to the Trustee

A-17

---

**TO BE COMPLETED BY PURCHASER IF (4) ABOVE IS CHECKED.**

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "<u>qualified institutional buyer</u>" within the meaning of Rule 144A under the Securities Act of 1933, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Date: _____

NOTICE: To be executed by an executive officer

A-18

---

[TO BE ATTACHED TO GLOBAL SECURITIES] SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The initial principal amount of this Global Note is $_____$. The following increases or decreases in this Global Note have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Notes Custodian |
| --- | --- | --- | --- | --- |
| | | | | |

A-19

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, check the box:

Asset Sale ☐        Change of Control ☐

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, state the amount ($2,000 or any integral multiple of $1,000):

$

Date: _____        Your Signature: _____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee: _____

Signature must be guaranteed by a participant in a recognized signature guaranty medallion program or other signature guarantor program reasonably acceptable to the Trustee

A-20

EXHIBIT B

[FORM OF FACE OF EXCHANGE NOTE]

[Global Notes Legend]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), NEW YORK, NEW YORK, TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO., OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO DTC, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

"THE TERMS OF THIS SECURITY ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED DECEMBER 24, 2008, BY AND AMONG BANK OF AMERICA, N.A., AS FIRST LIEN AGENT, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE AND THE OTHER PARTIES THERETO FROM TIME TO TIME."

"THIS NOTE IS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE INTERNAL REVENUE CODE. A HOLDER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND

YIELD TO MATURITY FOR SUCH NOTES BY SUBMITTING A REQUEST FOR SUCH INFORMATION TO THE BORROWER AT THE FOLLOWING ADDRESS: HARRAH'S OPERATING COMPANY, INC., ONE CAESAR'S PALACE DRIVE, LAS VEGAS, NEVADA, 89101-8969, ATTENTION: GENERAL COUNSEL."

To be inserted if Notes are guaranteed by the Subsidiaries pursuant to Section 4.11(c):

"THE TERMS OF THIS AGREEMENT ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED AS OF JANUARY 28, 2008, BY AND AMONG BANK OF AMERICA, N.A., U.S. BANK NATIONAL ASSOCIATION, CITIBANK, N.A. AND THE OTHER PARTIES THERETO FROM TIME TO TIME."

B-1

---

[FORM OF EXCHANGE NOTE]

No.                                                                                          $_____

10.00% Second-Priority Senior Secured Note due 2018

CUSIP No.   [        ]
ISIN No.    [        ]

HARRAH'S OPERATING COMPANY, INC., a Delaware corporation, promises to pay to Cede & Co., or registered assigns, the principal sum of [        ] Dollars on December 15, 2018.

Interest Payment Dates: June 15 and December 15

Record Dates: June 1 and December 1

Additional provisions of this Note are set forth on the other side of this Note.

B-2

---

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed.

HARRAH'S OPERATING COMPANY, INC.

By: _____
    Name:
    Title:

Dated:

*/    If the Note is to be issued in global form, add the Global Notes Legend and the attachment from Exhibit A captioned "TO BE ATTACHED TO GLOBAL SECURITIES - SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY."

B-3

---

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

U. S. BANK NATIONAL ASSOCIATION
    as Trustee, certifies that this is one of the Notes referred
    to in the Indenture.

By: _____
            Authorized Signatory

B-4

---

[FORM OF REVERSE SIDE OF EXCHANGE NOTE]

10.00% Second-Priority Senior Secured Note Due 2018

1.    Interest

HARRAH'S OPERATING COMPANY, INC., a Delaware corporation (such corporation, and its successors and assigns under the Indenture hereinafter referred to, being herein called the "Issuer"), promises to pay interest on the principal amount of this Note at the rate per annum shown above. The Issuer shall pay interest semiannually on June 15 and December 15 of each year (each an "Interest Payment Date"), commencing June 15, 2009. Interest on the Notes shall accrue from the most recent date to which interest has been paid or duly provided for or, if no interest has been paid or duly provided for, from April 15, 2009, until the principal hereof is due. Interest shall be computed on the basis of a 360-day year of twelve 30-day months. The Issuer shall pay interest on overdue principal at the rate borne by the Notes, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

2.  Method of Payment

The Issuer shall pay interest on the Notes (except defaulted interest) to the Persons who are registered holders at the close of business on June 1 or December 1 (each a "Record Date") next preceding the interest payment date even if Notes are canceled after the record date and on or before the interest payment date (whether or not a Business Day). Holders must surrender Notes to the Paying Agent to collect principal payments. The Issuer shall pay principal, premium, if any, and interest in money of the United States of America that at the time of payment is legal tender for payment of public and private debts. Payments in respect of the Notes represented by a Global Note (including principal, premium, if any, and interest) shall be made by wire transfer of immediately available funds to the accounts specified by The Depository Trust Issuer or any successor depositary. The Issuer shall make all payments in respect of a certificated Note (including principal, premium, if any, and interest) at the office of the Paying Agent, except that, at the option of the Issuer, payment of interest may be made by mailing a check to the registered address of each holder thereof; *provided, however,* that payments on the Notes may also be made, in the case of a holder of at least $1,000,000 aggregate principal amount of Notes, by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such holder elects payment by wire transfer by giving written notice to the Trustee or Paying Agent to such effect designating such account no later than 30 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion).

3.  Paying Agent and Registrar

Initially, U.S. Bank National Association (the "Trustee"), will act as Paying Agent and Registrar. The Issuer may appoint and change any Paying Agent or Registrar without notice. The Issuer or any of its domestically incorporated Wholly Owned Subsidiaries may act as Paying Agent or Registrar.

<center>B-5</center>

4.  Indenture

The Issuer issued the Notes under an Indenture dated as of [_____] 2009 (the "Indenture"), among the Issuer, the Parent Guarantor and the Trustee. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa 77bbbb) as in effect on the date of the Indenture (the "TIA"). Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture. The Notes are subject to all terms and provisions of the Indenture, and the holders (as defined in the Indenture) are referred to the Indenture and the TIA for a statement of such terms and provisions

The Notes are second-priority senior secured obligations of the Issuer. This Note is one of the Exchange Notes referred to in the Indenture. The Notes include the Initial Notes, any Additional Notes and any Exchange Notes issued in exchange for the Initial Notes or any Additional Notes pursuant to the Indenture. The Initial Notes, any Additional Notes and any Exchange Notes are treated as a single class of securities under the Indenture. The Indenture imposes certain limitations on the ability of the Issuer and its Restricted Subsidiaries to, among other things, make certain Investments and other Restricted Payments, pay dividends and other distributions, Incur Indebtedness, enter into consensual restrictions upon the payment of certain dividends and distributions by such Restricted Subsidiaries, issue or sell shares of capital stock of the Issuer and such Restricted Subsidiaries, enter into or permit transactions with Affiliates, create or Incur Liens and make Asset Sales. The Indenture also imposes limitations on the ability of the Issuer, each Subsidiary Pledgor and the Parent Guarantor to consolidate or merge with or into any other Person or convey, transfer or lease all or substantially all of its property.

To guarantee the due and punctual payment of the principal and interest on the Notes and all other amounts payable by the Issuer under the Indenture and the Notes when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Notes and the Indenture, each Parent Guarantor has unconditionally guaranteed the Guaranteed Obligations pursuant to the terms of the Indenture and any Subsidiary Pledgor that executes a Note Guarantee will unconditionally guarantee the Guaranteed Obligations on a second-priority senior secured basis pursuant to the terms of the Indenture.

5.  Optional Redemption

On or after December 15, 2013, the Issuer may redeem the Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at the following redemption prices (expressed as a percentage of principal amount), *plus* accrued and unpaid interest and additional interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the 12-month period commencing on December 15 of the years set forth below:

| Period | Redemption Price |
|---|---|
| 2013 | 105.000% |
| 2014 | 103.333% |
| 2015 | 101.667% |
| 2016 and thereafter | 100.000% |

B-6

In addition, prior to December 15, 2013 the Issuer may redeem the Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at a redemption price equal to 100% of the principal amount of the Notes redeemed *plus* the Applicable Premium as of, and accrued and unpaid interest and additional interest, if any, to, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

Notwithstanding the foregoing, at any time and from time to time on or prior to December 15, 2011, the Issuer may redeem in the aggregate up to 35% of the original aggregate principal amount of the Notes (calculated after giving effect to any issuance of Additional Notes) with the net cash proceeds of one or more Equity Offerings (1) by the Issuer or (2) by any direct or indirect parent of the Issuer to the extent the net cash proceeds thereof are contributed to the common equity capital of the Issuer or used to purchase Capital Stock (other than Disqualified Stock) of the Issuer from it, at a redemption price (expressed as a percentage of principal amount thereof) of 110.00%, *plus* accrued and unpaid interest and additional interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date); *provided, however,* that at least 50% of the original aggregate principal amount of the Notes (calculated after giving effect to any issuance of Additional Notes) must remain outstanding after each such redemption; *provided, further,* that such redemption shall occur within 90 days after the date on which any such Equity Offering is consummated upon not less than 30 nor more than 60 days' notice mailed to each holder of Notes being redeemed and otherwise in accordance with the procedures set forth in the Indenture.

6.    Mandatory Redemption

The Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

7.    Notice of Redemption

Notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the redemption date to each holder of Notes to be redeemed at his, her or its registered address. Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1,000. If money sufficient to pay the redemption price of and accrued and unpaid interest on all Notes (or portions thereof) to be redeemed on the redemption date is deposited with a Paying Agent on or before the redemption date and certain other conditions are satisfied, on and after such date, interest ceases to accrue on such Notes (or such portions thereof) called for redemption.

B-7

8.    Repurchase of Notes at the Option of the holders upon Change of Control and Asset Sales

Upon the occurrence of a Change of Control, each holder shall have the right, subject to certain conditions specified in the Indenture, to cause the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant record date to receive interest due on the relevant interest payment date), as provided in, and subject to the terms of, the Indenture.

In accordance with Section 4.06 of the Indenture, the Issuer will be required to offer to purchase Notes upon the occurrence of certain events.

9.    Ranking and Collateral

These Notes and any Note Guarantee by a Subsidiary Pledgor are secured by a second-priority security interest in the Collateral pursuant to certain Security Documents. The Second Priority Liens upon any and all Collateral are, to the extent and in the manner provided in the Intercreditor Agreement, subordinate in ranking to all present and future First Priority Liens and will be of equal ranking with all present and future Liens securing Other Second-Lien Obligations as set forth in the Intercreditor Agreement.

10.    Denominations; Transfer; Exchange

The Notes are in registered form, without coupons, in denominations of $2,000 and any integral multiple of $1,000. A holder shall register the transfer of or exchange of Notes in accordance with the Indenture. Upon any registration of transfer or exchange, the Registrar and the Trustee may require a holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes required by law or permitted by the Indenture. The Registrar need not register the transfer of or exchange any Notes selected for redemption (except, in the case of a

Note to be redeemed in part, the portion of the Note not to be redeemed) or to transfer or exchange any Notes for a period of 15 days prior to a selection of Notes to be redeemed.

11.   Persons Deemed Owners

The registered holder of this Note shall be treated as the owner of it for all purposes.

12.   Unclaimed Money

If money for the payment of principal or interest remains unclaimed for two years, the Trustee and a Paying Agent shall pay the money back to the Issuer at their written request unless an abandoned property law designates another Person. After any such payment, the holders entitled to the money must look to the Issuer for payment as general creditors and the Trustee and a Paying Agent shall have no further liability with respect to such monies.

13.   Discharge and Defeasance

Subject to certain conditions, the Issuer at any time may terminate some of or all its obligations under the Notes and the Indenture if the Issuer deposits with the Trustee money or U.S. Government Obligations for the payment of principal and interest on the Notes to redemption or maturity, as the case may be.

<div align="center">B-8</div>

14.   Amendment; Waiver

Subject to certain exceptions set forth in the Indenture, (i) the Indenture or the Notes may be amended with the written consent of the holders of at least a majority in aggregate principal amount of the outstanding Notes and (ii) any past default or compliance with any provisions may be waived with the written consent of the holders of at least a majority in principal amount of the outstanding Notes. Subject to certain exceptions set forth in the Indenture, without the consent of any holder, the Issuer and the Trustee may amend the Indenture, the Security Documents, the Intercreditor Agreement or the Notes (i) to cure any ambiguity, omission, defect or inconsistency; (ii) to provide for the assumption by a Successor Issuer of the obligations of the Issuer under the Indenture and the Notes; (iii) to provide for the assumption by a Successor Subsidiary Pledgor of the obligations of a Subsidiary Pledgor under the Indenture and the Security Documents; (iv) to add a Guarantor with respect to the Notes pursuant to Section 4.11 of the Indenture; (v) to provide for uncertificated Notes in addition to or in place of certificated Notes (*provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code); (vi) to conform the text of the Indenture, the Notes, the Security Documents, the Intercreditor Agreement, or the Guarantor Intercreditor Agreement to any provision of the "Description of New Second Lien Notes" in the Offering Memorandum to the extent that such provision in the "Description of New Second Lien Notes" was intended to be a verbatim recitation of a provision of the Indenture, the Notes, the Security Documents, the Intercreditor Agreement or the Guarantor Intercreditor Agreement; (vii) to add a Subsidiary Pledgor with respect to the Notes or to add Collateral to secure the Notes; (viii) to add additional covenants of the Issuer for the benefit of the holders or to surrender rights and powers conferred on the Issuer; (ix) to comply with the requirements of the SEC in order to effect or maintain the qualification of the Indenture under the TIA; (x) to make any change that does not adversely affect the rights of any holder; (xi) to provide for the issuance of the Exchange Notes or Additional Notes; (xii) to release Collateral as permitted by the Indenture or the Intercreditor Agreement; or (xiii) to add additional secured creditors holding Other Second-Lien Obligations so long as such obligations are not prohibited by the Indenture or the Security Documents.

15.   Defaults and Remedies

If an Event of Default occurs (other than an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer) and is continuing, the Trustee or the holders of at least 30% in principal amount of the outstanding Notes, in each case, by notice to the Issuer, may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable. If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer occurs, the principal of, premium, if any, and interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any holders. Under certain circumstances, the holders of a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

If an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders unless such holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense and certain other conditions are complied with. Except to enforce the right to receive payment of principal, premium (if any) or interest when

<div align="center">B-9</div>

due, no holder may pursue any remedy with respect to the Indenture or the Notes unless (i) such holder has previously given the Trustee notice that

an Event of Default is continuing, (ii) the holders of at least 30% in principal amount of the outstanding Notes have requested the Trustee in writing to pursue the remedy, (iii) such holders have offered the Trustee reasonable security or indemnity against any loss, liability or expense, (iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity and (v) the holders of a majority in principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period. Subject to certain restrictions, the holders of a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability. Prior to taking any action under the Indenture, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

16. <u>Trustee Dealings with the Issuer</u>

Subject to certain limitations imposed by the TIA, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with and collect obligations owed to it by the Issuer or its Affiliates and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee.

17. <u>No Recourse Against Others</u>

No director, officer, employee, incorporator or holder of any equity interests in the Issuer or of any Guarantor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Issuer or any Guarantor under the Notes, the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each holder of Notes by accepting a Note waives and releases all such liability.

18. <u>Authentication</u>

This Note shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Note.

19. <u>Abbreviations</u>

Customary abbreviations may be used in the name of a holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

<div align="center">B-10</div>

20. <u>Governing Law</u>

THIS SECURITY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

21. <u>CUSIP Numbers; ISINs</u>

The Issuer has caused CUSIP numbers and ISINs to be printed on the Notes and has directed the Trustee to use CUSIP numbers and ISINs in notices of redemption as a convenience to the holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

**The Issuer will furnish to any holder of Notes upon written request and without charge to the holder a copy of the Indenture which has in it the text of this Note.**

<div align="center">B-11</div>

<div align="center">ASSIGNMENT FORM</div>

To assign this Note, fill in the form below:

I or we assign and transfer this Note to:

<div align="center">(Print or type assignee's name, address and zip code)</div>

(Insert assignee's soc. sec. or tax I.D. No.)

and irrevocably appoint _____ agent to transfer this Note on the books of the Issuer. The agent may substitute another to act for him.

Date: _____    Your Signature: _____

Sign exactly as your name appears on the other side of this Note.

Signature Guarantee:

Date: _____
Signature must be guaranteed by a participant in a recognized signature          Signature of Signature Guarantee
guaranty medallion program or other signature guarantor program
reasonably acceptable to the Trustee

B-12

---

**[TO BE ATTACHED TO GLOBAL SECURITIES] SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY**

The initial principal amount of this Global Note is $_____. The following increases or decreases in this Global Note have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Notes Custodian |
|---|---|---|---|---|
| | | | | |

B-13

---

**OPTION OF HOLDER TO ELECT PURCHASE**

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, check the box:

Asset Sale ☐          Change of Control ☐

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, state the amount ($2,000 or any integral multiple of $1,000):

$

Date: _____    Your Signature: _____
                                 (Sign exactly as your name appears on the other side of
                                 this Note)

Signature Guarantee: _____
                     Signature must be guaranteed by
                     a participant in a recognized
                     signature guaranty medallion
                     program or other signature
                     guarantor program reasonably
                     acceptable to the Trustee

B-14

---

EXHIBIT C

[FORM OF]

TRANSFEREE LETTER OF REPRESENTATION

Harrah's Operating Company, Inc.
c/o U.S. Bank National Association
Corporate Trust Services
EP-MN-W53C
60 Livingston Avenue
St. Paul, Minnesota 55107-1419
Attention: Vice President

Ladies and Gentlemen:

This certificate is delivered to request a transfer of $[     ] principal amount of the 10.00% Second-Priority Senior Secured Notes due 2018 (the "Notes") of Harrah's Operating Company, Inc. (the "Issuer").

Upon transfer, the Notes would be registered in the name of the new beneficial owner as follows:

Name: _____

Address: _____

Taxpayer ID Number: _____

The undersigned represents and warrants to you that:

1. We are an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act of 1933, as amended (the "Securities Act")), purchasing for our own account or for the account of such an institutional "accredited investor" at least $100,000 principal amount of the Notes, and we are acquiring the Notes not with a view to, or for offer or sale in connection with, any distribution in violation of the Securities Act. We have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we invest in or purchase securities similar to the Notes in the normal course of our business. We, and any accounts for which we are acting, are each able to bear the economic risk of our or its investment.

2. We understand that the Notes have not been registered under the Securities Act and, unless so registered, may not be sold except as permitted in the following sentence. We agree on our own behalf and on behalf of any investor account for which we are purchasing Notes to offer, sell or otherwise transfer such Notes prior to the date that is two years after the later of the date of original issue and the last date on which either the Issuer or any affiliate of such Issuer was the owner of such Notes (or any predecessor thereto) (the "Resale Restriction Termination Date") only (a) in the United States to a person whom we reasonably

C-1

believe is a qualified institutional buyer (as defined in rule 144A under the Securities Act) in a transaction meeting the requirements of Rule 144A, (b) outside the United States in an offshore transaction in accordance with Rule 904 of Regulation S under the Securities Act, (c) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder (if applicable) or (d) pursuant to an effective registration statement under the Securities Act, in each of cases (a) through (d) in accordance with any applicable securities laws of any state of the United States. In addition, we will, and each subsequent holder is required to, notify any purchaser of the Note evidenced hereby of the resale restrictions set forth above. The foregoing restrictions on resale will not apply subsequent to the Resale Restriction Termination Date. If any resale or other transfer of the Notes is proposed to be made to an institutional "accredited investor" prior to the Resale Restriction Termination Date, the transferor shall deliver a letter from the transferee substantially in the form of this letter to the Issuer and the Trustee, which shall provide, among other things, that the transferee is an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act and that it is acquiring such Notes for investment purposes and not for distribution in violation of the Securities Act. Each purchaser acknowledges that the Issuer and the Trustee reserve the right prior to the offer, sale or other transfer prior to the Resale Restriction Termination Date of the Notes pursuant to clause 1(b), 1(c) or 1(d) above to require the delivery of an opinion of counsel, certifications or other information satisfactory to the Issuer and the Trustee.

Dated: _____

TRANSFEREE: _____,

By: _____

C-2

[FORM OF SUPPLEMENTAL INDENTURE]

SUPPLEMENTAL INDENTURE (this "Supplemental Indenture") dated as of [          ], among [GUARANTOR] (the "New Guarantor"), a subsidiary of HARRAH'S OPERATING COMPANY, INC. (or its successor), a Delaware corporation (the "Issuer"), and U.S. BANK NATIONAL ASSOCIATION, a national banking association, as trustee under the indenture referred to below (the "Trustee").

W I T N E S S E T H :

WHEREAS the Issuer and the Parent Guarantor have heretofore executed and delivered to the Trustee an indenture (as amended, supplemented or otherwise modified, the "Indenture") dated as of April 15, 2009, providing for the issuance of the Issuer's Second-Priority Senior Secured Notes due 2018 ( the "Notes"), initially in the aggregate principal amount of $3,705,498,000;

WHEREAS Section 4.11 of the Indenture provides that under certain circumstances the Issuer is required to cause the New Guarantor to execute and deliver to the Trustee a supplemental indenture pursuant to which the New Guarantor shall unconditionally guarantee all the Issuer's Obligations under the Notes and the Indenture pursuant to a Note Guarantee on the terms and conditions set forth herein; and

WHEREAS pursuant to Section 9.01 of the Indenture, the Trustee, the Issuer, the Parent Guarantor and other existing Guarantors, if any, are authorized to execute and deliver this Supplemental Indenture;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the New Guarantor, the Parent Guarantor, the Issuer and the Trustee mutually covenant and agree for the equal and ratable benefit of the holders of the Notes as follows:

1. Defined Terms. As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined, except that the term "holders" in this Supplemental Indenture shall refer to the term "holders" as defined in the Indenture and the Trustee acting on behalf of and for the benefit of such holders. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

2. Agreement to Guarantee. The New Guarantor hereby agrees, jointly and severally with all existing guarantors (if any), to unconditionally guarantee the Issuer's Obligations under the Notes and the Indenture on the terms and subject to the conditions set forth in Article XII of the Indenture and to be bound by all other applicable provisions of the Indenture and the Notes and to perform all of the obligations and agreements of a guarantor under the Indenture.

D-1

3. Notices. All notices or other communications to the New Note Guarantor shall be given as provided in Section 13.02 of the Indenture.

4. Ratification of Indenture; Supplemental Indentures Part of Indenture. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

5. Governing Law. **THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

6. Trustee Makes No Representation. The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture.

7. Counterparts. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

8. Effect of Headings. The Section headings herein are for convenience only and shall not effect the construction thereof.

D-2

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

[NEW GUARANTOR]

By: _____
        Name:
        Title:

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By: _____

     Name:
     Title:

D-3

**EXHIBIT 8**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 8-K

---

### CURRENT REPORT
### Pursuant to Section 13 or 15(d)
### of the Securities Exchange Act of 1934

### August 22, 2014 (August 22, 2014)
### Date of Report (Date of earliest event reported)

---

# Caesars Entertainment Corporation
### (Exact name of registrant as specified in its charter)

---

| **Delaware** | **001-10410** | **62-1411755** |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

**One Caesars Palace Drive**
**Las Vegas, Nevada 89109**
(Address of principal executive offices) (Zip Code)

**(702) 407-6000**
(Registrant's telephone number, including area code)

**N/A**
(Former Name or Former Address, if Changed Since Last Report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01 Other Events**

On May 5, 2014, Caesars Entertainment Operating Company, Inc. (" <u>CEOC</u> ") ceased to be a wholly owned subsidiary of Caesars Entertainment Corporation (" <u>CEC</u> "), as a result of which CEC's guarantee of CEOC's outstanding secured and unsecured notes was automatically released in accordance with the terms of the indentures governing the applicable notes. Please refer to CEC's and CEOC's Current Report on Form 8-K filed on May 6, 2014 for additional details.

In June 2014, CEOC previously provided notice to the trustees of its outstanding first-priority senior secured notes, second-priority senior secured notes, 10.75% senior notes due 2016 and 10.75% / 11.5% senior toggle notes due 2018 that CEOC elected to effect the automatic release of CEC's guarantee of each such series of notes for the additional reason that CEC's guarantee of other notes specified in the applicable indentures had been released. Please refer to CEC's and CEOC's Current Reports on Form 8-K filed on June 27, 2014 for additional details.

On August 22, 2014, in connection with the effectiveness of the supplemental indentures to the indentures governing CEOC's 6.50% Senior Notes due 2016 and 5.75% Senior Notes due 2017 that removed provisions relating to CEC's guarantee of such notes (as disclosed in CEC's Current Report on Form 8-K filed on August 22, 2014), CEOC provided notice to the trustees of its outstanding first-priority senior secured notes and second-priority senior secured notes reaffirming CEOC's prior notices issued in June 2014 regarding the automatic release of CEC's guarantee of all of CEOC's first-priority senior secured notes and second-priority senior secured notes as a result of the guarantee of CEOC's unsecured senior notes being released.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

CAESARS ENTERTAINMENT CORPORATION

Date: August 22, 2014

By: /s/ SCOTT E. WIEGAND
   Name:  Scott E. Wiegand
   Title:   Senior Vice President, Deputy General
        Counsel and Corporate Secretary

**EXHIBIT 9**

First Lien Bondholder, Through its Counsel Kramer Levin, Discloses Information Provid...

Case 15-10047-KG    Doc 9    Filed 01/12/15    Page 539 of 732



News

## First Lien Bondholder, Through its Counsel Kramer Levin, Discloses Information Provided by Caesars During Settlement Negotiations

December 11, 2014 11:31 PM Eastern Time

NEW YORK--(EON: Enhanced Online News)--Pursuant to the terms of a Confidentiality Agreement dated September 11, 2014 (as subsequently amended and restated from time to time, the "Confidentiality Agreement") among Caesars Entertainment Operating Company ("CEOC") and Caesars Entertainment Corporation (together with CEOC, "Caesars"), on the one hand, and a holder of first lien bonds issued by CEOC (the "First Lien Bondholder"), on the other hand, the First Lien Bondholder today is disclosing certain information received from Caesars under the Confidentiality Agreements.

Pursuant to the Confidentiality Agreement, the First Lien Bondholder and its representatives are permitted to make public disclosure of certain information upon termination of the Confidentiality Agreement. The First Lien Bondholder's Confidentiality Agreement with Caesars has terminated and, accordingly, the First Lien Bondholder is hereby disclosing materials that were provided to it pursuant to its Confidentiality Agreement, as well as materials prepared by it and/or its advisors and provided to the Company pursuant to the Confidentiality Agreement.

The information being disclosed was prepared by the Company or its advisors or, to the extent prepared by the First Lien Bondholder or its advisors, was based on information provided by the Company pursuant to the Confidentiality Agreement or publicly available information. Accordingly, the First Lien Bondholder and the advisors to the First Lien Bondholder make no representations or warranties as to the factual accuracy or reliability of any of the disclosed information or of its materiality for any purpose.

**Contacts**

Kramer Levin Naftalis & Frankel LLP
Daniel Eggermann, 212-715-9100

## Recent Stories



November 11, 2014
**Statement from Kramer Levin Naftalis & Frankel LLP Regarding COP Holders' Acceleration and Assignment Agreements with FGIC**
NEW YORK--(EON: Enhanced Online News)--Holders of more than $1 billion principal amount of Certificates of Participation ("COPs") insured by Financial Guaranty Insurance Company ("FGIC"), and class... More »

November 06, 2014
**LBS Trustee Considers Possible Wind Down of Bankruptcy Estate**
CURACAO, Dutch Caribbean--(EON: Enhanced Online News)--Lehman Brothers Securities N.V. ("LBS") today announced that Michiel Gorsira (the "LBS Trustee"), in his capacity as bankruptcy trustee (curat... More »

October 28, 2014
**Kramer Levin Names Norman C. Simon Co-Chair of the Advertising Litigation Group**
NEW YORK--(EON: Enhanced Online News)--Kramer Levin Naftalis & Frankel LLP announced today that Norman C. Simon has been named co-chair of the Advertising Litigation Group alongside Harold P. W... More »

📑 **More Stories**

Smart Multimedia Gallery





**<u>EXHIBIT 10</u>**

PWRW&G DRAFT – 10/28/2014
Privileged & Confidential

## RESTRUCTURING SUPPORT AND FORBEARANCE AGREEMENT

RESTRUCTURING SUPPORT AND FORBEARANCE AGREEMENT dated as of _____ __, 2014 (this "Agreement"), among (i) Caesars Entertainment Operating Company, Inc. ("CEOC") and each of the undersigned Subsidiary Loan Parties (as defined in the Credit Agreement (as defined below)) (collectively, the "Company") and Caesars Entertainment Company, Inc. ("CEC"), (ii) each of the undersigned lenders, each of which is the holder of, or the investment advisor to a holder or holders of (and in such capacity having the power to bind such holder), certain indebtedness of the Company incurred pursuant to the Credit Agreement (as defined below) (including any permitted assignees under this Agreement, collectively, the "Consenting First Lien Bank Lenders"), and (iii) each of the undersigned lenders, each of which is the holder of, or the investment advisor to a holder or holders of (and in such capacity having the power to bind such holder), certain indebtedness of the Company incurred pursuant to the First Lien Indentures (as defined below) (including any permitted assignees under this Agreement, collectively, the "Consenting First Lien Bond Lenders" and, together with the Consenting First Lien Bank Lenders, the "Consenting Lenders" and together with the Company and CEC, each referred to as a "party" and collectively referred to as the "Parties").  All capitalized terms not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet (as defined below).

### RECITALS:

WHEREAS, before the date hereof, the Parties and their representatives have engaged in arm's length good faith negotiations regarding a potential restructuring of the Company's indebtedness and other obligations pursuant to the terms and conditions of this Agreement and the terms and conditions set forth on the term sheet annexed hereto as Exhibit A (the "Restructuring") (which term sheet is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (as such term sheet may be modified in accordance with Section 14 hereof, the "Restructuring Term Sheet"));

WHEREAS, the Restructuring will resolve all Claims between the Parties, including any litigation related Claims against the Company and CEC.

WHEREAS, the Company is considering commencing voluntary Chapter 11 Cases under the Bankruptcy Code in the Bankruptcy Court (all as defined below) to effect the Restructuring through a prenegotiated chapter 11 plan of reorganization;

WHEREAS, in the event Chapter 11 Cases are commenced, the Parties have agreed that the Company may use Cash Collateral (as defined below) on the terms and subject to the conditions set forth in the Cash Collateral stipulation, which includes adequate protection, annexed hereto as Exhibit B (which stipulation is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (as such term sheet may be modified in accordance with Section 14 hereof, the "Cash Collateral Stipulation"));

WHEREAS, the Parties have agreed to take certain actions in support of the Restructuring on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which each of the Parties hereby acknowledges, each Party, intending to be legally bound hereby, agrees as follows:

1.    <u>Definitions</u>.  The following terms shall have the following definitions:

"<u>Administrative Agent</u>" has the meaning ascribed to it in the Credit Agreement.

"<u>Agreement</u>" has the meaning set forth in the recitals hereof.

"<u>Affiliate</u>" means, with respect to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

"<u>Alternative Proposal</u>" means any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of material assets or equity interests or restructuring (other than the Restructuring) involving the Company;

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§101 *et seq.*

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware.

"<u>Business Day</u>" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"<u>Caesars Cases</u>" means the cases captioned (a) *Wilmington Savings Fund Society, FSB, solely in its capacity as successor Indenture Trustee for the 10% Second-Priority Senior Secured Notes due 2018, on behalf of itself and derivatively on behalf of Caesars Entertainment Operating Company, Inc.* v. *Caesars Entertainment Corporation, et. al.,* Case No. 10004-VCG (Del. Ch.), (b) *MeehanCombs Global Credit Opportunities Master Fund, LP, et. al.* v. *Caesars Entertainment Corporation and Caesars Entertainment Operating Company, Inc.,* No. 14-cv-7097 (S.D.N.Y.), (c) *Frederick Barton Danner* v. *Caesars Entertainment Corporation and Caesars Entertainment Operating Company, Inc.,* No. 14-cv-7973 (S.D.N.Y.), and (d) all claims in, and causes of action relating to, the Caesars Cases.

"<u>Case</u>" means the case captioned *Caesars Entertainment Operating Company, Inc. and Caesars Entertainment Corporation* v. *Appaloosa Investment Limited Partnership I, et.al.,* Index No. 652392/2014 (N.Y. Sup., N.Y. Co.)

"Cash Collateral" means the Company's cash to the extent that such cash is "Collateral" and subject to a perfected "Lien," both as defined under the First Lien Indentures.

"CEC Transactions" means the transactions consummated pursuant to, in contemplation of, or in connection with (a) the Amended and Restated Credit Agreement, dated as of November 14, 2012, among CEOC, as borrower, and CEC, as lenders, and (b) the Global Intercompany Note, dated as of January 28, 2008, among CEC and certain Affiliates.

"Chapter 11 Cases" means the voluntary chapter 11 cases that the Company may commence to effectuate the Restructuring.

"Claims" means all claims arising under or related to the Credit Agreement, First Lien Indentures and Non-First Lien Indentures.

"Collateral Agent" has the meaning ascribed to it in the Credit Agreement and First Lien Indentures.

"Consenting Lenders" has the meaning set forth in the recitals hereof.

"Consenting First Lien Bank Lenders" has the meaning set forth in the recitals hereof.

"Consenting First Lien Bond Lenders" has the meaning set forth in the recitals hereof.

"Credit Agreement" means the means the Third Amended and Restated Credit Agreement, dated as of July 25, 2014, among CEC, CEOC, as borrower, the lenders party thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent.

"EMC" means Elliott Management Corporation and any entities or accounts managed by it.

"Event of Default" has the meaning ascribed to it in the Credit Agreement or the First Lien Indentures, as the case may be.

"First Lien Indentures" means (i) the Indenture dated as of June 10, 2009, as it may have been amended and supplemented from time to time, governing CEOC's 11.25% Senior Secured Notes due 2017, (ii) the Indenture dated as of February 14, 2012, as it may have been amended and supplemented from time to time, governing CEOC's 8.5% Senior Secured Notes due 2020, (iii) the Indenture dated as of August 22, 2012, as it may have been amended and supplemented from time to time, governing CEOC's 9% Senior Secured Notes due 2020 and (iv) the Indenture dated as of February 15, 2013, as it may have been amended and supplemented from time to time, governing CEOC's 9% Senior Secured Notes due 2020.

"Forbearance Defaults" means defaults or Events of Default arising from or in connection with [(a) the May 2014 Transactions, (b) the Services Transactions, (c) the CEC Transactions, (d) the Incurrence Transactions, (e) the Restricted Transactions, (f) the Caesars Cases and (g) the December 1, 2014 interest payment due under the Indenture dated as of June 10, 2009,

as it may have been amended and supplemented from time to time, governing CEOC's 11.25% Senior Secured Notes due 2017][1].

"Forbearance Termination Event" has the meaning set forth in Section 3 hereto.

"Incurrence Transactions" means the transactions consummated pursuant to, in contemplation of, or in connection with the Incremental Facility Amendment and Term B-7 Agreement, dated as of June 11, 2014, among CEC, Caesars Operating Escrow LLC, the Incremental Lenders party thereto, Bank of America, N.A., Credit Suisse AG, Cayman Islands Branch, and upon the assumption of the Term B-7 Loans, CEOC.

"May 2014 Transactions" means the transactions consummated pursuant to, in contemplation of, or in connection with the Transaction Agreement dated as of March 1, 2014, as amended, by and among CEC, CEOC, Caesars License Company, LLC, Harrah's New Orleans Management Company, Corner Investment Company, LLC, 3535 LV Corp., Parball Corporation, JCC Holding Company II, LLC, Caesars Acquisition Company and Caesars Growth Partners, LLC.

"Non-First Lien Indentures" means the indentures governing CEOC's (a) 10.00% second-priority senior secured notes due 2015, (b) 10.00% second-priority senior secured notes due 2018, (c) 12.75% second-priority senior secured notes due 2018, (d) 10.75% senior notes due 2016, (e) 10.75%/11.5% senior toggle notes due 2018, (f) 6.5% senior notes due 2016, (g) 5.75% senior notes due 2017 and (h) floating rate contingent convertible senior notes due 2024, in each case, as it may have been amended and supplemented from time to time.

"Outside Date" means [June 15, 2016].

"Parties" has the meaning set forth in the recitals hereof.

"Person" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any legal entity or association.

"Requisite Consenting Lenders" means, collectively, Requisite Consenting First Lien Bank Lenders and Requisite Consenting First Lien Bond Lenders, each voting separately.

"Requisite Consenting First Lien Bank Lenders" means Consenting First Lien Bank Lenders holding at least [one-half] in Claim amount under the Credit Agreement held at such time by the Consenting First Lien Bank Lenders.

"Requisite Consenting First Lien Bond Lenders" means Consenting First Lien Bond Lenders holding at least [one-half] in Claim amount under the First Lien Indentures held at such time by the Consenting First Lien Bond Lenders.

"Restricted Transactions" means the transactions consummated pursuant to, in contemplation of, or in connection with the Note Purchase and Support Agreement entered into

---

[1] NTD:  Other defaults/events of default we want to include as Forbearance Defaults?

4

among CEOC, CEC and certain holders of CEOC's outstanding 6.50% Senior Notes due 2016 and 5.7% Notes due 2017.

"Restructuring" has the meaning set forth in the recitals hereof.

"Restructuring Term Sheet" has the meaning set forth in the recitals hereof.

"Restructuring Support Party" means CEC and each of the Consenting Lenders and their respective Affiliates, subsidiaries, managed funds, representatives, agents and employees, in each case to the extent controlled by such Restructuring Support Party.

"Services Transactions" means the transactions consummated pursuant to, in contemplation of, or in connection with the Omnibus License and Enterprise Services Agreement, dated May 20, 2014, by and among Caesars Enterprise Services, LLC, CEOC, Caesars Entertainment Resort Properties LLC, Caesars Growth Partners, LLC, Caesars Licenses Company, LLC and Caesars World, Inc.

"Transfer" has the meaning set forth in Section 12 hereto.

"Trustee" has the meaning ascribed to it in the First Lien Indentures.

2.    Commitment of Restructuring Support Parties.  Subject to the terms and conditions hereof, but prior to the termination of this Agreement as provided herein, each Restructuring Support Party shall:

(a)    negotiate in good faith the definitive documentation in form and substance consistent in all material respects with the Restructuring Term Sheet and as contemplated by this Agreement or otherwise necessary to effectuate the Restructuring, on the terms and subject to the conditions set forth in this Agreement (for the avoidance of doubt, upon the execution of this Agreement, the Restructuring Term Sheet shall be binding on all the Parties);

(b)    consent to those actions contemplated by this Agreement or otherwise required to be taken to effectuate the Restructuring, including entering into all such documents and agreements necessary to consummate the Restructuring;

(c)    support the Restructuring and vote, when properly solicited to do so, all Claims now or hereafter beneficially owned by such Restructuring Support Party or for which it now or hereafter serves as the nominee, investment manager or advisor for beneficial holders thereof in favor of the Restructuring (and not withdraw or revoke its tender, consent or vote with respect to the Restructuring);

(d)    upon execution of its signature page, complete an election form in respect being a Put Participant, Backstop Party and/or Right Participant as attached hereto as Exhibit C, which election shall be binding on them;

(e)    not seek, solicit, support, vote its Claims for, or consent to, an Alternative Proposal;

(f)      not take any action inconsistent with the transactions expressly contemplated by this Agreement or that would materially delay or obstruct the consummation of the Restructuring, including, without limitation, commencing, or joining with any person in commencing, any litigation or involuntary case for relief under the Bankruptcy Code against the Company or CEC; and

(g)      direct the Administrative Agent, Collateral Agent and/or the Trustee as applicable not to take any action contemplated by (e) and (f) of this Section 2.

Notwithstanding the foregoing, nothing in this Agreement shall prohibit any Party from (a) appearing as a party-in-interest in any matter arising in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement or the Restructuring and do not hinder, delay or prevent consummation of the Restructuring and (b) taking or directing any action relating to maintenance, protection or preservation of any collateral.

3.      <u>Consenting Lenders' Forbearance</u>.

(a)      Until the earliest to occur of (i) the termination of this Agreement and (ii) the occurrence of any Event of Default (other than any Forbearance Default) that continues unremedied for five (5) Business Days after the notice thereof from the Administrative Agent or the Trustee to the Company (a "<u>Forbearance Termination Event</u>"), each Consenting Lender agrees to forbear from exercising its default-related rights and remedies against the Company and its property and interests in property (and to direct the Administrative Agent, Collateral Agent or the Trustee, as applicable, not to exercise such rights on such Consenting Lender's behalf or otherwise), solely to the extent that the availability of such rights and remedies arises exclusively as a result of the Forbearance Defaults.

(b)      Upon the occurrence of a Forbearance Termination Event, the agreement of the Consenting Lenders hereunder to forbear from exercising rights and remedies in respect of the Forbearance Defaults (and to direct the Administrative Agent, Collateral Agent or the Trustee, as applicable, to forbear from doing so), shall immediately terminate without requirement of any demand, presentment, protest, or notice of any kind, all of which the Company hereby waives.

(c)      The Company agrees that, upon the occurrence of, and at any time after the occurrence of, a Forbearance Termination Event, the Consenting Lenders or the Administrative Agent, Collateral Agent or the Trustee, as applicable, may proceed, subject to the terms of the Credit Agreement, the First Lien Indentures or applicable law, to exercise any or all rights and remedies under the Credit Agreement, the First Lien Indentures or applicable law, including, without limitation, the rights and remedies on account of the Forbearance Defaults, all of which rights and remedies are fully reserved.

(d)      Execution of this Agreement constitutes a direction by the Consenting Lenders that the Administrative Agent, Collateral Agent or the Trustee, as applicable, act or forbear from acting in accordance with its terms.  Each Consenting Lender agrees that, notwithstanding anything to the contrary in the Credit Agreement or First Lien Indenture, the Administrative Agent,

Collateral Agent or the Trustee, as applicable, shall not be required to act if directed against the Company or its property or interest in property if such action is contrary to the terms of this Agreement.

4.    <u>Dismissal of the Case</u>.

(a)    Within [__] Business Days from the date hereof, (i) the Company and CEC will dismiss, without prejudice, the claims asserted against EMC in the Case (<u>provided</u>, <u>however</u>, that the Company and CEC may pursue all claims in the action against any other entity) and (ii) EMC will withdraw, without prejudice, its pending motion to dismiss.

(b)    Upon the occurrence of a Forbearance Termination Event, the agreements between the Company, CEC and EMC in respect of the Case as set forth above shall immediately terminate; <u>provided</u>, <u>however</u>, that EMC agrees not to commence any litigation arising from or relating to the First Lien Indentures or any of the matters alleged in the Case for five (5) Business Days following the occurrence of a Forbearance Termination Event.

(c)    If any of the Company, CEC, and EMC commence any litigation or assert any claim relating to or arising from the First Lien Indentures or any matters at issue in the Case following the date hereof (including but not limited to the assertion of claims by the Company or CEC against EMC in the Case), the time between the date hereof and five (5) Business Days following the occurrence of a Forbearance Termination Event shall not be counted for purposes of determining whether any such litigation was commenced or claim interposed within the applicable statute of limitations or in compliance with any similar rule or doctrine of timeliness.

5.    <u>Commitment of the Company</u>.  The Company agrees to use its commercially reasonable efforts to (a) support and complete the Restructuring and all transactions contemplated under the Restructuring Term Sheet, (b) negotiate in good faith the definitive documentation contemplated by this Agreement or otherwise necessary to effectuate the Restructuring, on the terms and subject to the conditions set forth in this Agreement, (c) obtain any and all required regulatory or third-party approvals for the Restructuring, and (d) operate its business in the ordinary course based on historic practices and the operations contemplated pursuant to the Company's business plan, taking into account the Restructuring.  The Company represents and warrants to the Restructuring Support Parties that there are no pending agreements (oral or written), understandings, negotiations or discussions with respect to any Alternative Proposal.  Except with the prior written consent of the Requisite Consenting Lenders, the Company and CEC and each of their respective advisors and representatives shall not, directly or indirectly, take any action to solicit, initiate, encourage or assist the submission of an Alternative Transaction.  If the Company or CEC receives an unsolicited proposal or expression of interest in undertaking an Alternative Proposal, so long as the Consenting Lenders have agreed to comply with any applicable confidentiality restrictions related thereto, the Company or CEC, as the case may be, shall promptly notify their respective counsel of the receipt of any oral or written offer, indication of interest, proposal or inquiry relating to an Alternative Proposal, with such notice to include the material terms thereof, including the identity of the person or group of persons involved.  So long as the Consenting Lenders have agreed to comply with any applicable confidentiality restrictions related thereto, the Company or CEC, as applicable, shall promptly furnish their respective counsel, on behalf of the Consenting Lenders, with copies of any written offer or other information that it receives relating to an Alternative Proposal and shall keep

their respective counsel, on behalf of the Consenting Lenders, fully informed of any negotiations, discussions, amendments, modifications or other changes to such offer or information.

6.    <u>Mutual Representations and Warranties</u>.  Each of the Parties, severally and not jointly, represents and warrants to each other Party, as of the date of this Agreement, as follows:

(a)    it is validly existing and in good standing under the laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws;

(b)    except as expressly provided in this Agreement or the Bankruptcy Code (if applicable), no consent or approval is required by any other person or entity for it to carry out the Restructuring contemplated by, and perform the respective obligations under, this Agreement;

(c)    except as expressly provided in this Agreement or the Bankruptcy Code (if applicable), it has all requisite power and authority to enter into this Agreement and to carry out the Restructuring contemplated by, and perform its respective obligations under, this Agreement;

(d)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part;

(e)    it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement; and

(f)    it is not aware of the occurrence of any event that, due to any fiduciary or similar duty to any other person, would prevent it from taking any action required of it under this Agreement.

7.    <u>Ownership of Consenting Lenders' Claims</u>.  Each Consenting Lender severally and not jointly, represents and warrants as follows:

(i)    as of the date of this Agreement, it is (i) either (A) the sole beneficial owner of the principal amount of Claims set forth below its signature hereto, or (B) has sole investment or voting discretion with respect to the principal amount of Claims set forth below its signature hereto and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement, (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Claims and dispose of, exchange, assign and transfer such Claims and (iii) holds no other Claims;

(ii)    other than pursuant to this Agreement, such Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrance of any kind, that would adversely affect in any way such Consenting Lender's performance of its obligations contained in this Agreement at the time such obligations are required to be performed; and

(iii)    this Agreement is a legal, valid, and binding obligation of each Consenting Lender, enforceable against it in accordance with its terms, except as enforcement may be limited

8

by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

8.      <u>Termination by Requisite Consenting Lenders</u>.  This Agreement may be terminated by delivery to the Company of a written notice in accordance with Section 26 hereof by the Requisite Consenting Lenders, upon the occurrence and continuance of any of the following events:

(a)      the breach by the Company of any of its representations, warranties or covenants set forth in this Agreement that would have a material adverse impact on the Consenting Lenders or consummation of the Restructuring, which breach remains uncured for a period of five (5) business days after the Company's receipt of notice from the Requisite Consenting Lenders of such breach;

(b)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring, which remains uncured for a period of five (5) business days after the receipt by the Company and the Consenting Lenders of notice of such event;

(c)      a trustee shall have been appointed in the Chapter 11 Cases and the Bankruptcy Court shall have entered a final order approving any motion or pleading filed by the trustee that is not consistent in any material respect with this Agreement;

(d)      the Chapter 11 Cases shall have been converted to cases under chapter 7 of the Bankruptcy Code or the Chapter 11 Cases shall have been dismissed by order of the Bankruptcy Court;

(e)      the Company files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with this Agreement and such motion or pleading has not been withdrawn within two (2) Business Days of the Company receiving notice from the Requisite Consenting Lenders that such motion or pleading is inconsistent with this Agreement;

(f)      the Bankruptcy Court grants relief in a final order that is materially inconsistent with this Agreement in any material respect;

(g)      the Company exercises its "fiduciary out" as a debtor-in-possession;

(h)      the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material assets of the Company, without the written consent of the Requisite Consenting Lenders;

(i)      [at 11:59 p.m. prevailing Eastern Time if the Company fails to commence the Chapter 11 Cases on or before [January 15,] 2015 without the written consent of the Requisite Consenting Lenders;]

(j)      at 11:59 p.m. prevailing Eastern Time upon the date of entry of an order by the Bankruptcy Court invalidating or disallowing, as applicable, either (i) the enforceability, priority, or validity of all of the liens securing the obligations owed under the Credit Agreement or (ii) the claims in respect of the Credit Agreement;

(k)      at 11:59 p.m. prevailing Eastern Time upon the date of entry of an order by the Bankruptcy Court invalidating or disallowing, as applicable, either (i) the enforceability, priority, or validity of all of the liens securing the obligations owed under the First Lien Indentures or (ii) the claims in respect of the First Lien Indentures; or

(l)      at 11:59 p.m. prevailing Eastern Time on the Outside Date if all of the transactions contemplated hereby have not been consummated.

9.      <u>Mutual Termination</u>.  This Agreement and the obligations of the Parties hereunder, may be terminated by mutual agreement among (a) the Company, (b) the Requisite Consenting First Lien Bank Lenders, (c) the Requisite Consenting First Lien Bond Lenders and (d) CEC.

10.      <u>Company Termination Events</u>.  This Agreement may be terminated by delivery to the other Parties of a written notice, delivered in accordance with Section 26 of this Agreement hereof by the Company upon the occurrence of any of the following events: (a) the breach by any of the Consenting Lenders of any of the representations, warranties or covenants of such Consenting Lenders set forth in this Agreement that would have a material adverse impact on the Company, or the consummation of the Restructuring, which breach remains uncured for a period of five (5) business days after the receipt by the Consenting Lenders of notice of such breach; (b) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring, which remains uncured for a period of five (5) business days after the receipt by the Consenting Lenders of notice of such event; or (c) the exercise by the Company of its fiduciary duties as a debtor in possession.

11.      <u>Termination</u>.  No Party may terminate this Agreement pursuant to Sections 8, 10 or 11 if such terminating Party (or Parties) failed to perform or comply in all material respects with the terms and conditions of this Agreement, with such failure to perform or comply causing, or resulting in, the occurrence of the termination event specified herein.  Upon the termination of this Agreement pursuant to Sections 8, 9, 10 or 11 of this Agreement, all Parties shall be released from their commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any Party; <u>provided</u>, that in no event shall any such termination relieve a party hereto from (i) liability for its breach or non-performance of its obligations hereunder prior to the termination date and (ii) obligations under this Agreement which by their terms expressly survive a termination date; <u>provided</u>, <u>however,</u> that, notwithstanding anything to the contrary herein, any event of termination (including any automatic termination) may be waived in accordance with the procedures established by Section 14 hereof, in which case such termination event so waived shall be deemed not to have occurred, this Agreement consequently shall be deemed to continue in full force and effect, and the rights and obligations of the Parties shall be restored, subject to any modification set forth in such waiver.  Upon an event of termination, unless otherwise agreed to in writing by such Consenting Lender, any and all votes, approvals or consents delivered by a Consenting Lender and, as applicable, its Affiliates, subsidiaries, managed funds, representatives, agents and employees in connection with the Restructuring prior to such termination date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Company.

12.     Transfer of Claims.  The Consenting Lenders agree, with the exception of the permitted transfers and purchases enumerated in (i) and (ii) below, that no Consenting Lender will, directly or indirectly, sell, contract to sell, give, assign, hypothecate, pledge, encumber, grant a security interest in, offer, sell any option or contract to purchase, or otherwise transfer or dispose of, any economic, voting or other rights in or to, by operation of law or otherwise (collectively, "Transfer"), all or any portion of its Claims now or hereafter owned, and no such Transfer will be effective, unless: (a) the transferee executes and provides a transfer agreement in the form attached hereto as Exhibit D, pursuant to which the transferee agrees to be bound by all of the terms and conditions of this Agreement and (b) the Consenting Lender effecting such Transfer notifies counsel to the other Parties hereto in writing of such Transfer within two (2) Business Days of the execution of an agreement (or trade confirmation) in respect of such Transfer.  In addition to the foregoing Transfer, the following Transfers shall be permitted:

              (i)     any Transfer by one Consenting Lender to an Affiliate of such Consenting Lender or one or more of its affiliated funds or an affiliated entity or entities with a common investment advisor (in each case, other than portfolio companies); and

              (ii)    any Transfer by one Consenting Lender to another Consenting Lender.

Any Transfer of any Consenting Lender's Claim that does not comply with the foregoing shall be deemed void *ab initio*; provided, however, for the avoidance of doubt, that upon any purchase, acquisition or assumption by any Consenting Lender of any Claims, such Claims shall automatically be deemed to be subject to all the terms of this Agreement.  The restrictions in this Agreement are in addition to any Transfer restrictions in the Credit Agreement, the First Lien Indentures and Non-First Lien Indentures and in the event of a conflict the Transfer restrictions contained in this Agreement shall control.

13.     Cooperation.  Before the filing of and during the Chapter 11 Cases, (i) the Company shall provide to counsel for the Consenting Lenders (a) drafts of all motions or applications and other documents the Company intends to file with the Bankruptcy Court within [two (2)] Business Days before the date when the Company intends to file any such document unless such advance notice is impossible or impracticable under the circumstances in which case the Company shall notify telephonically or by electronic mail counsel to the Consenting Lenders to advise it of the documents to be filed and the facts that make the provision of advance copies within [two (2)] Business Days before submission impossible or impracticable, and (b) copies of all documents actually filed by the Company with the Bankruptcy Court promptly but not later than one (1) day after such filing.

14.     Amendments.  No amendment, modification, waiver or other supplement of the terms of this Agreement (including the Restructuring Term Sheet) shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by the Company, CEC, and Requisite Consenting Lenders.

15.     Condition of Effectiveness.  For the avoidance of doubt, this Agreement (and the obligations of all Parties thereunder) shall not become effective or enforceable against or by any of the Parties until (i) it is executed by (a) the Company and CEC, (b) lenders under the Credit Agreement holding in the aggregate at least [___]% of the outstanding amount of the Company's obligations (including its swap obligations) under the Credit Agreement as of the date hereof and (d) lenders

under the First Lien Indentures holding in the aggregate at least [___]% of the outstanding amount of the Company's obligations under the First Lien Indentures as of the date hereof.

16. _Entire Agreement_. This Agreement, including the Restructuring Term Sheet constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement; provided, however, that any confidentiality agreement executed by any Restructuring Support Party shall survive this Agreement and shall continue to be in full force and effect in accordance with its terms.

17. _Survival of Agreement_. Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible restructuring of the Company and in contemplation of possible filings by the Company under Chapter 11 of the Bankruptcy Code, and (a) the exercise of the rights granted in this Agreement (including giving of notice or termination) shall not be a violation of the automatic stay provisions of section 362 of the Bankruptcy Code and (b) the Company hereby waives its right to assert a contrary position in the Chapter 11 Cases, if any, with respect to the foregoing.

18. _Waiver_. If the transactions contemplated herein are not consummated, or following the occurrence of the termination of this Agreement, if applicable, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses.

19. _Counterparts_. This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

20. _Company Fiduciary Duties_. Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the Company or any directors, officers or members of the Company, each in its capacity as a director, officer or member of the Company, to take any action, or to refrain from taking any action, to the extent inconsistent with its or their fiduciary obligations (as determined by them in good faith after consultation with legal counsel).

21. _Headings_. The headings of the Sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

22. _Relationship Among Parties_. Notwithstanding anything herein to the contrary, the duties and obligations of the Restructuring Support Parties under this Agreement shall be several, not joint. No Restructuring Support Party shall, as a result of its entering into and performing its obligations under this Agreement, be deemed to be part of a "group" (as that term is used in Section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder) with any of the other Restructuring Support Parties.

23. _Specific Performance_. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of

competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

24.     No Commitment.  No Restructuring Support Party shall be obligated to fund or otherwise be committed to provide funding in connection with the Rights Offering, except as a Backstop Lender or in accordance with a commitment letter or definitive documentation that has been (i) executed by such Restructuring Support Party in connection with the Rights Offering and (ii) approved by the Bankruptcy Court, as necessary, along with the satisfaction of any conditions precedent to such funding requirements.

25.     Governing Law and Dispute Resolution.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. Any dispute, controversy or claim arising under or related to this Agreement, regardless of the legal theory upon which it is based, will be settled by final, binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect.  All such arbitration shall take place in New York, NY.  Unless the Parties agree otherwise, there will be a single arbitrator selected by agreement between the Parties.  The arbitrator will be entitled to award monetary and equitable relief, including specific performance and other injunctive relief.  If the dispute involves the form or substance of the definitive documents, the Parties agree that prior to the start of the arbitration, the Parties shall supply the arbitrator with what each Party believes to be the version(s) of the definitive documents that conform to the Restructuring Term Sheet.  The Parties agree that the arbitrator shall determine which version(s) of the definitive documents are most consistent in all material respects with the Restructuring Term Sheet and, pursuant to specific performance, such definitive documents shall be binding on the Parties.  Each Party will bear the expenses of its own counsel and will jointly bear the expenses of the arbitrator.  The arbitrator will allocate the remaining costs of the arbitration proceeding.  The award or decision rendered by the arbitrator will be final, binding and conclusive and judgment may be entered upon such award by any court.  Notwithstanding the foregoing consent to binding arbitration, if and when the Chapter 11 Cases are filed, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

26.     Notices.  All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by facsimile transmission or mailed (first class postage prepaid) to the parties at the following addresses or facsimile numbers:

If to the Company:

_____

_____

_____

With a copy to (which shall not constitute notice):

13

Kirkland & Ellis
601 Lexington Ave
New York, NY 10022
Attn: Paul M. Basta
Fascimile:  (212) 446 4900

If to CEC:

_____

_____

_____


With a copy to (which shall not
constitute notice):

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:   Alan W. Kornberg
        Jeffrey D. Saferstein
Telephone: (212) 373-3000
Facsimile  (212) 373-2053


If to a Consenting First Lien Bank Lender, to the address set forth beneath such lender's signature block.

with a copy to (which shall not constitute notice):

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
Attn:   Kristopher M. Hansen
        Jon Canfield
Telephone: (212) 806-5400
Facsimile: (212) 806-6056

If to a Consenting First Lien Bond Lender, to the address set forth beneath such lender's signature block.

with a copy to (which shall not constitute notice):

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attn: Kenneth H. Eckstein
        Daniel M. Eggermann
Telephone: (212) 715-9100
Facsimile: (212) 715-8229

27.    Third-Party Beneficiaries.  Unless expressly stated herein and except as provided in the proviso at the end of this sentence, the terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

28.    Conflicts Between the Restructuring Term Sheet and this Agreement.  In the event of any conflict among the terms and provisions in the Restructuring Term Sheet and this Agreement, the terms and provisions of the Restructuring Term Sheet shall control.  Nothing contained in this Section 29 shall affect, in any way, the requirements set forth herein for the amendment of this Agreement and the Restructuring Term Sheet as set forth in Section 14 herein.

29.    Settlement Discussions.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto. Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

30.    Good-Faith Cooperation; Further Assurances.  The parties hereto shall cooperate with each other in good faith in respect of matters concerning the implementation and consummation of the Restructuring.

31.    Access.  The Company will provide the Parties and their respective attorneys, consultants, accountants, and other authorized representatives reasonable access, upon reasonable notice, during normal business hours to relevant properties, books, contracts, commitments, records, management personnel, and advisors of the Company; provided, however that the Company's obligations hereunder shall be conditioned upon such party being party to an appropriate confidentiality agreement or undertaking.

**[Signature Pages Follow]**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**CAESARS ENTERTAINMENT OPERATING COMPANY, INC.**

By: _____

Name:

Title:

**[SIGNATURE PAGE FOR CONSENTING LENDERS]**

_____,

By: _____


By: _____

Name:

Title:

Address: _____

_____

_____


Principal Amount of Credit Agreement Obligations held

($)_____


Date:_____


Principal Amount of First Lien Indentures Obligation held

($)_____


Date:_____


Principal Amount of Non-First Lien Indentures Obligation held

($)_____


Date:_____

**<u>Exhibit A</u>**

**<u>Restructuring Term Sheet</u>**

**Exhibit B**

**Cash Collateral Stipulation**

**Exhibit C**

**Put Partipant, Backstop Party and Right Participant Election Form**

## Exhibit D

### Transfer Agreement

**PROVISION FOR TRANSFER AGREEMENT**

The undersigned ("Transferee") (a) hereby acknowledges that it has read and understands the Restructuring Support and Forbearance Agreement, dated as of _____ (the "Agreement"),[1] by and among Caesars Entertainment Operating Company, Inc., its subsidiaries party thereto, and each of the Consenting Lenders party thereto, (b) desires to acquire the Claims described below from one of the Consenting Lenders (the "Transferor") and (c) hereby irrevocably agrees to be bound by the terms and conditions of the Agreement to the same extent Transferor was thereby bound, and shall be deemed a Consenting Lender for all purposes under the Agreement.

The Transferee hereby specifically and irrevocably agrees (i) to be bound by the terms and conditions of the [Credit Agreement and/or First Lien Indentures], as applicable, and the Agreement, to the same extent applicable to the Transferred Claims, (ii) to be bound by the vote of the Transferor if cast prior to the effectiveness of the transfer of the Claims, and (iii) that each of the Parties shall be an express third-party beneficiary of this Provision for Transfer Agreement and shall have the same recourse against the Transferee under the Agreement as such Party would have had against the Transferor.

Date Executed:  _____,

_____
**Print name of Transferee**

_____
**Name:**
**Title:**

**Address:**        _____

_____

_____
**Attention:**        _____
**Telephone:**        _____
**Facsimile:**        _____

| Principal Amount Held | |
|---|---|
| **Claim** | **Amount** |
| Claims (specify type) | |

---

[1] Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

**EXHIBIT 11**

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

**RESTRUCTURING SUPPORT AND FORBEARANCE AGREEMENT**

      RESTRUCTURING SUPPORT AND FORBEARANCE AGREEMENT dated as of _____ __, 2014 (this "Agreement"), among (i) Caesars Entertainment Operating Company, Inc. ("CEOC") and each of the undersigned Subsidiary Loan Parties (as defined in the Credit Agreement (as defined below)) (collectively, the "Company"), (ii) Caesars Entertainment Company, Inc. and those of its subsidiaries not otherwise identified in this preamble (whether now or hereinafter in existence) (collectively, "CEC"), (iii) Caesars Acquisition Company and its subsidiaries (whether now or hereinafter in existence) (collectively, "CAC"), (iv) Caesars Entertainment Resort Properties and its subsidiaries (whether now or hereinafter in existence) (collectively, "CERP"), (v) Caesars Growth Partners, LLC and its subsidiaries (whether now or hereinafter in existence) (collectively, "CGP"), (vi) Apollo Global Management, LLC, on behalf of itself and its Affiliates (together with such Affiliates, "Apollo"), (vii) TPG Capital, LP, on behalf of itself and its Affiliates (together with such Affiliates, "TPG," and collectively with the Company, CEC, CAC, CERP, CGP and Apollo, the "Company Parties"), (viii) each of the undersigned investors, each of which is the holder of, or the investment advisor to a holder or holders of (and in such capacity having the power to bind such holder), certain indebtedness of the Company incurred pursuant to the Credit Agreement (as defined below), and (ix) each of the undersigned noteholders, each of which is the holder of, or the investment advisor to a holder or holders of (and in such capacity having the power to bind such holder), notes of the Company issued pursuant to the First Lien Indentures (as defined below) (together with the Consenting First Lien Bank Lenders, the "Consenting Creditors," and together with the Company Parties, each referred to as a "Party" and collectively referred to as the "Parties").  All capitalized terms not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet (as defined below).

**RECITALS:**

      **WHEREAS**, before the date hereof, the Parties and their representatives have engaged in arm's length good faith negotiations regarding a potential restructuring of the Company's indebtedness and other obligations pursuant to the terms and conditions of this Agreement and the terms and conditions set forth on the term sheet annexed hereto as Exhibit A (the "Restructuring") (which term sheet is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (as such term sheet may be modified in accordance with Section 14 hereof, the "Restructuring Term Sheet")));

      **WHEREAS**, the Restructuring will resolve all claims between the Consenting Creditors (including EMC) and the Company Parties, including any litigation-related claims against the Company and CEC and those at issue in the Caesars-Commenced Litigation.

      **WHEREAS**, the Company will be implementing the Restructuring through a prenegotiated chapter 11 plan of reorganization;

      **WHEREAS**, after the Chapter 11 Cases are commenced, the Parties have agreed that the Company may use Cash Collateral (as defined below) on the terms and subject to the conditions set forth in the Cash Collateral stipulation, which includes adequate protection, annexed

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

hereto as <u>Exhibit B</u> (which stipulation is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (as such stipulation may be modified in accordance with Section 14 hereof, the "<u>Cash Collateral Stipulation</u>"));

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which each of the Parties hereby acknowledges, each Party, intending to be legally bound hereby, agrees as follows:

1.    <u>Definitions</u>.  The following terms shall have the following definitions:

"<u>Additional Litigation Parties</u>" means those entities and individuals listed on <u>Exhibit F</u> hereto.

"<u>Administrative Agent</u>" has the meaning ascribed to it in the Credit Agreement.

"<u>Agreement</u>" has the meaning set forth in the preamble hereof.

"<u>Affiliate</u>" means, with respect to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

"<u>Alternative Proposal</u>" means any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of material assets or equity interests or restructuring (other than the Restructuring) involving the Company.

"<u>Amended and Restated Waiver Agreement</u>" means that agreement, dated as of August 12, 2014, described in the Form 8-K filed by the Company on September 19, 2014, executed by the Company and CEC for the benefit of UMB Bank, National Association, as Trustee under the First Lien Indentures.

"<u>Apollo</u>" has the meaning set forth in the preamble hereof.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§101 *et seq*.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York, are authorized by law or other governmental action to close.

"CAC" has the meaning set forth in the preamble hereof.

"Caesars-Commenced Litigation" means the case captioned *Caesars Entertainment Operating Company, Inc. and Caesars Entertainment Corporation* v. *Appaloosa Investment Limited Partnership I, et.al.,* Index No. 652392/2014 (N.Y. Sup. Ct., N.Y. Cty.).

"Cash Collateral" means the Company's cash to the extent that such cash is "Collateral" and subject to a "Lien," both as defined under the First Lien Indentures.

"Cash Collateral Stipulation" has the meaning set forth in the recitals hereof.

"CEC" has the meaning set forth in the preamble hereof.

"CEC Second Lien Coupon Deposit" has the meaning set forth in section 5 hereof.

"CEC Transactions" means the transactions consummated pursuant to, in contemplation of, or in connection with (a) the Amended and Restated Credit Agreement, dated as of November 14, 2012, among CEOC, as borrower, and CEC, as lenders, and (b) the Global Intercompany Note, dated as of January 28, 2008, among CEC and certain Affiliates.

"CEOC" has the meaning set forth in the preamble hereof.

"CERP" has the meaning set forth in the preamble hereof.

"CGP" has the meaning set forth in the preamble hereof.

"Chapter 11 Cases" means the voluntary chapter 11 cases that the Company will commence to effectuate the Restructuring.

"Claim" means any claim on account of indebtedness issued by CEOC pursuant to the Credit Agreement, the First Lien Indentures or the Non-First Lien Indentures, other than a claim for which the holder does not have the right to control voting. For the avoidance of doubt (i) "Claim" shall not include any claims in respect of derivatives related to or referencing such indebtedness and (ii) if the holder of a claim ceases to have the right to control voting with respect to such claim, such claim shall no longer be deemed a "Claim" for purposes of this Agreement, unless and until such holder subsequently acquires the right to control voting with respect to such claim.

"Claim Holder" refers to (i) each Consenting Creditor and (ii) each Company Party, to the extent such Company Party, as of the date of execution of this Agreement, either (a) is a beneficial owner of Claims or (b) has sole investment or voting discretion with respect to Claims and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement.

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

"Collateral Agent" has the meaning ascribed to it in the Credit Agreement and First Lien Indentures.

"Company" has the meaning set forth in the preamble hereof.

"Company Parties" has the meaning set forth in the preamble hereof.

"Company Termination Event" has the meaning set forth in Section 10 hereof.

"Confidential Claims Information" has the meaning set forth in Section 5 hereof.

"Confirmation Order" has the meaning set forth on Exhibit C hereto.

"Consenting Creditors" has the meaning set forth in the recitals hereof.

"Consenting First Lien Bank Lender" means a Consenting Creditor that holds First Lien Bank Claims; provided that to the extent a Consenting Creditor holds both First Lien Bank Claims and First Lien Bond Claims, such Consenting Creditor shall be considered a Consenting First Lien Bank Lender only if the principal amount of its First Lien Bank Claims exceeds that of its First Lien Bond Claims.

"Consenting First Lien Bond Holder" means a Consenting Creditor that holds First Lien Bond Claims; provided that to the extent a Consenting Creditor holds both First Lien Bond Claims and First Lien Bank Claims, such Consenting Creditor shall be considered a Consenting First Lien Bond Holder only if the principal amount of its First Lien Bond Claims is equal to or exceeds that of its First Lien Bank Claims.

"Credit Agreement" means the Third Amended and Restated Credit Agreement, dated as of July 25, 2014, among CEC, CEOC, as borrower, the lenders party thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent.

"Creditor Termination Event" has the meaning set forth in Section 8 hereof.

"Creditor Termination Right" has the meaning set forth in Section 8 hereof.

"December Second Lien Interest Payment" means the payment of interest due December 15, 2014, on those second-priority senior secured notes issued by CEOC under that certain indenture dated as of December 24, 2008.

"Deposit Accounts" means (i) account number 153910104436 held at U.S. Bank National Association and (ii) account number 4159556448 held at Wells Fargo Bank, National Association, or such other account(s) as may be designated in the event that applicable control agreements are breached or if a notice of exclusive control is delivered with respect to such account(s).

"EMC" means certain entities or accounts managed or controlled by Elliott Management Corporation who are named as defendants in the Caesars-Commenced Litigation.

"Event of Default" has the meaning ascribed to it in the Credit Agreement or the First Lien Indentures, as the case may be.

"First Lien Bank Debt" means indebtedness incurred by the Company pursuant to the Credit Agreement.

"First Lien Bank Claim" means a Claim in respect of First Lien Bank Debt.

"First Lien Bond Debt" means indebtedness incurred by the Company pursuant to the First Lien Indentures.

"First Lien Bond Claim" means a Claim in respect of First Lien Bond Debt.

"First Lien Claim" means any Claim on account of indebtedness issued by CEOC pursuant to the Credit Agreement or the First Lien Indentures, and, for the avoidance of doubt, excluding any claims in respect of derivatives related to or referencing such indebtedness.

"First Lien Indebtedness" means First Lien Bank Debt and/or First Lien Bond Debt.

"First Lien Indentures" means (i) the Indenture dated as of June 10, 2009, as it may have been amended and supplemented from time to time, governing CEOC's 11.25% Senior Secured Notes due 2017, (ii) the Indenture dated as of February 14, 2012, as it may have been amended and supplemented from time to time, governing CEOC's 8.5% Senior Secured Notes due 2020, (iii) the Indenture dated as of August 22, 2012, as it may have been amended and supplemented from time to time, governing CEOC's 9% Senior Secured Notes due 2020 and (iv) the Indenture dated as of February 15, 2013, as it may have been amended and supplemented from time to time, governing CEOC's 9% Senior Secured Notes due 2020.

"First Lien Fees and Expenses" means (i) all out-of-pocket expenses incurred by any Initial Consenting Creditor in connection with the negotiation and implementation of the Restructuring plus (ii) First Lien Professional Fees.

"First Lien Professional Fees" means all fees and expenses of the First Lien Professionals incurred in their representation of holders of First Lien Indebtedness in connection with the Company, from the date of the First Lien Professionals' respective retentions by such holders of First Lien Indebtedness through and including the later of either (i) the termination of this Agreement pursuant to Sections 8 or 9 of this Agreement or (ii) the entry of a final, non-appealable order by the Bankruptcy Court or another court of competent jurisdiction approving the Restructuring.

"First Lien Professionals" means Kramer Levin Naftalis & Frankel LLP, Breazeale, Sachse & Wilson, L.L.P., Ballard Spahr LLP, Vedder Price P.C., Stroock & Stroock & Lavan LLP, Miller Buckfire & Co., Rothschild Inc., and such other legal, consulting, financial and/or other professional advisors as may be retained or may have been retained from time to time by any of the Initial Consenting Creditors.

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

"Forbearance Defaults" means defaults or Events of Default arising from or in connection with (a) the May 2014 Transactions, (b) the Services Transactions, (c) the CEC Transactions, (d) the Incurrence Transactions, and (e) the Restricted Transactions.

"Forbearance Termination Event" has the meaning set forth in Section 3 hereof.

"Incurrence Transactions" means the transactions consummated pursuant to, in contemplation of, or in connection with the Incremental Facility Amendment and Term B-7 Agreement, dated as of June 11, 2014, among CEC, Caesars Operating Escrow LLC, the Incremental Lenders party thereto, Bank of America, N.A., Credit Suisse AG, Cayman Islands Branch, and upon the assumption of the Term B-7 Loans, CEOC.

"Initial Consenting Creditor" means [identify entities].

"Intervening Event" has the meaning set forth in Section 5 hereof.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

"May 2014 Transactions" means the transactions consummated pursuant to, in contemplation of, or in connection with the Transaction Agreement dated as of March 1, 2014, as amended, by and among CEC, CEOC, Caesars License Company, LLC, Harrah's New Orleans Management Company, Corner Investment Company, LLC, 3535 LV Corp., Parball Corporation, JCC Holding Company II, LLC, Caesars Acquisition Company and Caesars Growth Partners, LLC.

"Milestones" means those milestones set forth on Exhibit C hereto.

"Non-First Lien Indentures" means the indentures governing CEOC's (a) 10.00% second-priority senior secured notes due 2015, (b) 10.00% second-priority senior secured notes due 2018, (c) 12.75% second-priority senior secured notes due 2018, (d) 10.75% senior notes due 2016, (e) 10.75%/11.5% senior toggle notes due 2018, (f) 6.5% senior notes due 2016, (g) 5.75% senior notes due 2017 and (h) floating rate contingent convertible senior notes due 2024, in each case, as it may have been amended and supplemented from time to time.

"Outside Date" has the meaning set forth on Exhibit C hereto.

"Parties" has the meaning set forth in the recitals hereof.

"Person" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any legal entity or association.

"Petition Date" means the date on which the Company commences the Chapter 11 Cases.

"Qualified Marketmaker" means an entity that holds itself out to the public or applicable private markets as standing ready in the ordinary course of business to purchase from

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

customers and sell to customers claims against the Company, in its capacity as a dealer or market maker in claims against the Company.

"Requisite Consenting Creditors" means, collectively, Requisite Consenting First Lien Bank Lenders and Requisite Consenting First Lien Bond Holders, each voting separately.

"Requisite Consenting First Lien Bank Lenders" means Consenting First Lien Bank Lenders holding at least [one-half] in Claim amount under the Credit Agreement held at such time by the Consenting First Lien Bank Lenders.

"Requisite Consenting First Lien Bond Holders" means Consenting First Lien Bond Holders holding at least [one-half] in Claim amount under the First Lien Indentures held at such time by the Consenting First Lien Bond Holders.

"Restricted Transactions"  means the transactions consummated pursuant to, in contemplation of, or in connection with the Note Purchase and Support Agreement entered into among CEOC, CEC and certain holders of CEOC's outstanding 6.5% Senior Notes due 2016 and 5.7% Notes due 2017.

"Restructuring" has the meaning set forth in the recitals hereof.

"Restructuring Term Sheet" has the meaning set forth in the recitals hereof.

"Restructuring Support Party" means CEC, CAC, CERP, CPG, Apollo, TPG and the Consenting Creditors, together with their respective Affiliates, subsidiaries, managed funds, representatives, agents and employees, in each case to the extent controlled by such Restructuring Support Party.

 "Services Transactions" means the transactions consummated pursuant to, in contemplation of, or in connection with the Omnibus License and Enterprise Services Agreement, dated May 20, 2014, by and among Caesars Enterprise Services, LLC, CEOC, Caesars Entertainment Resort Properties LLC, Caesars Growth Partners, LLC, Caesars Licenses Company, LLC and Caesars World, Inc.

"Solicitation Procedures" has the meaning set forth on Exhibit C hereto.

"Termination Events" has the meaning set forth in Section 10 hereof.

"TPG" has the meaning set forth in the preamble hereof.

"Transfer" has the meaning set forth in Section 12 hereto.

"Trustee" has the meaning(s) ascribed to it in the applicable First Lien Indentures.

2.    Commitment of Restructuring Support Parties.  Subject to the terms and conditions hereof, but prior to the termination of this Agreement as provided herein, each Restructuring Support Party shall:

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

(a)     negotiate in good faith the definitive documentation in form and substance consistent in all material respects with the Restructuring Term Sheet and as contemplated by this Agreement or otherwise necessary to effectuate the Restructuring, on the terms and subject to the conditions set forth in this Agreement (for the avoidance of doubt, upon the occurrence of the conditions to effectiveness set forth in Section 15 hereof, the Restructuring Term Sheet shall be binding on all the Parties);

(b)     consent to those actions contemplated by this Agreement or otherwise required to be taken to effectuate the Restructuring, including entering into all such documents and agreements necessary to consummate the Restructuring;

(c)     support the Restructuring and vote, when properly solicited to do so, all Claims now or hereafter beneficially owned by such Restructuring Support Party or for which it now or hereafter serves as the nominee, investment manager or advisor for beneficial holders thereof in favor of the Restructuring (and not withdraw or revoke its tender, consent or vote with respect to the Restructuring) (it being understood and agreed that no Restructuring Support Party shall enter into any arrangement whereby it transfers voting rights for the purpose of avoiding any obligations under this Agreement);

(d)     upon execution of its signature page, complete an election form in respect of being a Put Participant, Backstop Party and/or Rights Participant[1] as attached hereto as Exhibit D, which election shall be binding on them;

(e)     not seek, solicit, support, vote its Claims for, or consent to, an Alternative Proposal;

(f)     not take any action inconsistent with the transactions expressly contemplated by this Agreement or that would materially delay or obstruct the consummation of the Restructuring, including, without limitation, commencing, or joining with any person in commencing, any litigation or involuntary case for relief under the Bankruptcy Code against the Company or CEC; and

(g)     Unless and until a Forbearance Termination Event occurs, refrain from directing the Administrative Agent, Collateral Agent and/or the Trustee, as applicable, to take any action prohibited by subsections (e) and (f) of this Section 2.

Notwithstanding the foregoing, nothing in this Agreement shall prohibit any Party from (a) appearing as a party-in-interest in any matter arising in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement or the Restructuring and do not hinder, delay or prevent consummation of the Restructuring and (b) taking or directing any action relating to maintenance, protection or preservation of any collateral.

---

[1] [Put Participant, Backstop Party and Rights Participant to be defined.]

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

3.    <u>Forbearance</u>.

(a)    Until the earliest to occur of (i) any Creditor Termination Event (without regard to any cure periods or notice requirements, and even if such Creditor Termination Event does not result in the exercise of a Creditor Termination Right) or any termination of this Agreement under Sections 9 or 10 of this Agreement and  (ii) the occurrence of any default (other than any Forbearance Default) under any First Lien Indenture or the Credit Agreement (a "<u>Forbearance Termination Event</u>"), each Consenting Creditor agrees to forbear from exercising its default-related rights and remedies against the Company and its property and interests in property (and to refrain from directing the Administrative Agent, Collateral Agent or the Trustee, as applicable, to exercise such rights on such Consenting Creditor's behalf or otherwise), solely to the extent that the availability of such rights and remedies arises exclusively as a result of the Forbearance Defaults.

(b)    Upon the occurrence of a Forbearance Termination Event, the agreement of the Consenting Creditors hereunder to forbear from exercising rights and remedies in respect of the Forbearance Defaults (and to forbear from directing the Administrative Agent, Collateral Agent or the Trustee, as applicable, from doing so), shall immediately terminate without requirement of any demand, presentment, protest, or notice of any kind, all of which the Company hereby waives.

(c)    The Company agrees that, upon the occurrence of, and at any time after the occurrence of, a Forbearance Termination Event, the Consenting Creditors or the Administrative Agent, Collateral Agent or the Trustee, as applicable, may proceed, subject to the terms of the Credit Agreement, the First Lien Indentures or applicable law, to exercise any or all rights and remedies under the Credit Agreement, the First Lien Indentures and/or applicable law, including, without limitation, rights and remedies on account of the Forbearance Defaults, all of which rights and remedies are fully reserved.

(d)    The Company Parties agree that, prior to the termination of this Agreement with respect to any particular Consenting Creditor, the Company Parties shall not commence any litigation or interpose any claim arising from or in any way related to the First Lien Indebtedness against any such Consenting Creditor.

4.    <u>Withdrawal of Litigation and Tolling</u>.

(a)    Within two (2) Business Days from the date hereof, (i) the Company and CEC will dismiss, with prejudice, the claims asserted against EMC in the Caesars-Commenced Litigation (and, for the avoidance of doubt, shall not attempt to or otherwise cause the retraction revocation or termination of the dismissal with prejudice) (<u>provided</u>, <u>however</u>, that the Company and CEC may pursue all claims in the Caesars-Commenced Litigation against entity that is not an affiliate of EMC or directly or indirectly controlled or managed by Elliott Management Corporation or its Affiliates) and (ii) EMC will withdraw, without prejudice, its pending motion to dismiss.  No Company Party shall prosecute or pursue against EMC any of the claims asserted against EMC in the Caesars-Commenced Litigation or any similar or related claims.

(b)    The Company Parties acknowledge and agree that the time from the date hereof through and including the date that is five (5) Business Days after the date that this

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

Agreement has been terminated with respect to all Parties shall not be counted for purposes of determining whether any litigation commenced or claim interposed by any of the Consenting Creditors, the Trustee, the Collateral Agent or the Administrative Agent against any Company Party, which litigation or claim relates in any way to the Company or its Affiliates (including, but not limited to, any claims relating to any transaction by or among, or approved by, the Company Parties or the Additional Litigation Parties), was commenced or interposed within the applicable statute of limitations or in compliance with any other rule or doctrine of timeliness.  If the Company or CEC commences any litigation or asserts any claim against any particular Consenting Creditor, which litigation or claim relates to or arises from the First Lien Indentures or any matters at issue in the Caesars-Commenced Litigation (including but not limited to the assertion of claims by the Company or CEC against EMC in the Caesars-Commenced Litigation), the time between the date hereof through and including the date that is five (5) Business Days after the date that this Agreement has been terminated with respect such Consenting Creditor shall not be counted for purposes of determining whether any such litigation was commenced or claim interposed within the applicable statute of limitations or in compliance with any similar rule or doctrine of timeliness.

5.      Company Party Commitments, Representations and Warranties.

(a)      The Company Parties agree to (i) support and complete the Restructuring and all transactions contemplated under the Restructuring Term Sheet, in accordance with the milestones set forth on Exhibit C hereto (the "Milestones"), (ii) negotiate in good faith the definitive documentation contemplated by this Agreement or otherwise necessary to effectuate the Restructuring, on the terms and subject to the conditions set forth in this Agreement and in all cases satisfactory in form, scope and substance to the Consenting First Lien Bank Lenders and the Consenting First Lien Bond Holders, (iii) obtain any and all required regulatory or third-party approvals for the Restructuring, (iv) use best efforts to lift or otherwise reverse the effect of any injunction or other order or ruling of a court or regulatory body that would impede the consummation of a material aspect of the Restructuring, and (v) operate the Company in the ordinary course consistent with industry practice and the operations contemplated pursuant to the Company's business plan, taking into account the Restructuring.

(b)      The Company Parties represent and warrant to the Restructuring Support Parties that there are no pending agreements (oral or written), understandings, negotiations or discussions with respect to any Alternative Proposal.  Except with the prior written consent of the Requisite Consenting Creditors, none of the Company Parties nor their respective advisors or representatives will, directly or indirectly, take any action to solicit, initiate, encourage or assist the submission of an Alternative Transaction.

(c)      If, prior to the Petition Date, any of the Company Parties receives any expression of interest in undertaking an Alternative Proposal, the applicable Company Party shall notify counsel to the Consenting Creditors of the material terms of such Alternative Proposal within one (1) Business Day, including the identity of the person or group of persons involved.  In addition, such Company Party, shall within one (1) Business Day of the date on which any Consenting Creditor agrees to comply with applicable customary and reasonable confidentiality restrictions, provide such Consenting Creditor with the material terms of such Alternative Proposal, including the identity of the person or group of persons involved.  The Company Parties shall not

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

consider any Alternative Proposal unless (x) there is a material development or change in circumstance that both (a) was not known or reasonably foreseeable to the Company Parties before the date of this Agreement (it being understood and agreed that litigation with creditors and negotiations with creditors are reasonably foreseeable) and (b) does not relate to (i) any restructuring proposal by a Consenting Creditor, (ii) Apollo, TPG or any of the Consenting Creditors or (iii) the meeting of any projections or changes in the market price or trading volume of CEC's common stock or credit rating (but including the underlying cause of such change) (any such development or change in circumstance, an "<u>Intervening Event</u>") and (y) the boards of directors of each of CEC and the Company determine in good faith and in a reasonable manner, and receive an opinion of reputable external counsel to such effect, that the failure to consider such Alternative Proposal would reasonably constitute a breach of its fiduciary duties under applicable law.  If an Intervening Event occurs, the Consenting Creditors shall have five (5) Business Days from the later of the date of the applicable Alternative Proposal or the Intervening Event to propose changes to the terms of this Agreement, including the Restructuring Term Sheet.  Any change to the material facts and circumstances relating to an Intervening Event shall trigger a new five (5) Business Day period for Consenting Creditors to propose such changes and/or additional changes.  To the extent an Alternative Proposal is being considered by any Company Party, and provided that any Consenting Creditors have agreed to comply with any applicable customary and reasonable confidentiality restrictions related thereto, the applicable Company Party shall keep such Consenting Creditors fully and immediately informed of any negotiations, discussions, amendments, modifications or other changes to such Alternative Proposal and any material information related to such Alternative Proposal.

(d)     On and after the Petition Date, the Company may consider an Alternative Proposal that is superior to the Restructuring if its board of directors determines in good faith and in a reasonable manner, taking into account the reasonable likelihood that such Alternative Proposal will be effectuated on the terms and timing proposed, and receives an opinion of reputable external counsel to such effect, that failure to consider such Alternative Proposal would reasonably constitute a breach of its fiduciary duties under applicable law; <u>provided</u> (i) the Bankruptcy Court will resolve any disputes concerning the purported exercise of fiduciary duties by the Company and its respective directors, officers and members, as applicable, (ii) the Company shall have the burden of proof in demonstrating that its fiduciary duties as debtor-in-possession compel its termination of this Agreement and (iii) such termination shall be effective only if the Bankruptcy Court enters an order finding that the Company's (and its directors', officers' and members', as applicable) fiduciary duties require the Company to act with respect to an Alternative Proposal; <u>provided, further</u>, that in the event the Company determines it must consider an Alternative Proposal hereunder, the Consenting Creditors shall have five (5) Business Days after notice by the Company of such determination to propose changes to the terms of this Agreement, including the Restructuring Term Sheet.  To the extent an Alternative Proposal is being considered by any of the Company Parties under this subsection, and provided that any Consenting Creditors have agreed to comply with any applicable customary and reasonable confidentiality restrictions related thereto, the Company shall keep such Consenting Creditors fully and immediately informed of any negotiations, discussions, amendments, modifications or other changes to such Alternative Proposal and any material information related to such Alternative Proposal.

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

(e)    The Company and CEC agree to promptly notify the Consenting Creditors upon becoming aware of any of the following occurrences:  (i) an additional person becomes a Consenting Creditor after the date of this Agreement; (ii) any representation or warranty made by any of the Company Parties under this Agreement is not true and correct at any time or any covenant by any Company Party has not been complied with; (iii) a Termination Event has occurred; or (iv) any person has challenged the validity or priority of, or has sought to avoid, any lien securing the First Lien Indebtedness.

(f)    The Company agrees to promptly pay, upon execution of this Agreement, all accrued First Lien Fees and Expenses for which invoices or receipts are furnished by the First Lien Professionals and/or Consenting Creditors.  The Company also agrees to promptly pay all First Lien Fees and Expenses incurred after the date of this Agreement from time to time, any in any event within ten (10) Business Days of delivery to the Company of any applicable invoice or receipt.  For the avoidance of doubt, (a) invoices on account of First Lien Professional Fees need only be summary in nature and need not include any billing detail and (b) CEC's joint and several obligations with respect to the First Lien Fees and Expenses shall survive (i) any finding by a court of competent jurisdiction that CEOC or the Company may not be held liable for the payment of any of the First Lien Fees and Expenses, (ii) any disgorgement or recharacterization of any such First Lien Fees and Expenses and (iii) the failure of the Bankruptcy Court and/or another court of competent jurisdiction to approve this Agreement.  The Company's and CEC's obligations to pay the First Lien Professional Fees shall not be affected or reduced by the payment of any First Lien Professional Fees by any holder of First Lien Indebtedness, irrespective of whether such holder remains a holder of First Lien Indebtedness as of the date of this Agreement or is a Consenting Creditor.

(g)    Unless the Company obtains the prior written consent of a Consenting Creditor: (i) the Company Parties will use the information regarding any Claims owned at any time by such Consenting Creditor (the "Confidential Claims Information") solely in connection with this Agreement; and (ii) except as required by law, rule or regulation or by order of a court or as requested or required by the Securities and Exchange Commission or by any other federal or state regulatory, judicial, governmental, or supervisory authority or body, the Company Parties will keep the Confidential Claims Information strictly confidential and will not disclose the Confidential Claims Information to any other person; provided, however, that the Company Parties may combine the Confidential Claims Information provided to the Company Parties by a Consenting Creditor with the corresponding data provided to the Company by the Consenting Creditors and freely disclose such combined data on an aggregate basis.  In the event that the any of the Company Parties is required (by law, rule, regulation, deposition, interrogatories, requests for information or documents in legal or administrative proceedings, subpoena, civil investigative demand or other similar process or by any governmental, judicial, regulatory, or supervisory body) to disclose the Confidential Claims Information or the contents thereof, the Company Parties shall, to the extent legally permissible, provide affected Consenting Creditors with prompt notice of any such request or requirement so that such Consenting Creditors may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this section.  If, in the absence of a protective order or other remedy or the receipt of a waiver from a Consenting Creditor, a Company Party believes that it is nonetheless, following consultation with counsel, required to disclose the

Confidential Claims Information, such Company Party may disclose only that portion of the Confidential Claims Information which it believes, following consultation with counsel, that it is required to disclose, provided that it exercises reasonable efforts to preserve the confidentiality of the Confidential Claims Information, including, without limitation, by marking the Confidential Claims Information "Confidential – Attorneys' Eyes Only" and by reasonably cooperating with the affected Consenting Creditor to obtain an appropriate protective order or other reliable assurance that confidential and attorneys' eyes only treatment will be accorded the Confidential Claims Information.  In no event shall this Agreement be construed to impose on a Consenting Creditor an obligation to disclose the price for which it acquired or disposed of any Claim.  The Company Parties' obligations under this Subsection 5(d) shall survive termination of this Agreement.

(h)    CEC agrees that if the Company pays any portion of the December Second Lien Interest Payment, CEC shall deposit into one or both of the Deposit Accounts cash in an amount equal in the aggregate to such portion of the December Second Lien Interest Payment (the "CEC Second Lien Coupon Deposit").

(i)    The Company represents and warrants that it is not aware of the existence of any default under the Credit Agreement or the First Lien Indentures, or an Event of Default, other than a Forbearance Default as of the execution of this Agreement.  For the avoidance of doubt, nothing herein shall be construed as an acknowledgment or admission by the Company that a Forbearance Default exists or has existed at any time.

(j)    The Company agrees to provide to counsel and financial advisors for, and such other professionals as may be designated by, the Consenting First Lien Bank Lenders and the Consenting First Lien Bond Holders the following financial reporting, calculated in accordance with GAAP to the extent applicable, relating to the Company on the dates and intervals set forth below:

(i)    [TBD]

6.    <u>Mutual Representations and Warranties</u>.  Each of the Parties, severally and not jointly, represents and warrants to each other Party, as of the date of this Agreement, as follows:

(a)    it is validly existing and in good standing under the laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws;

(b)    except as expressly provided in this Agreement or the Bankruptcy Code (if applicable), no consent or approval is required by any other person or entity for it to carry out the Restructuring contemplated by, and perform the respective obligations under, this Agreement;

(c)    except as expressly provided in this Agreement or the Bankruptcy Code (if applicable), it has all requisite power and authority to enter into this Agreement and to carry out the Restructuring contemplated by, and perform its respective obligations under, this Agreement;

(d)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part;

(e)    it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement;

(f)    it has reviewed this Agreement and has decided to enter into this Agreement in the exercise of any applicable fiduciary duties; and

(g)    it is not aware of the occurrence of any event that, due to any fiduciary or similar duty to any other person, would prevent it from taking any action required of it under this Agreement.

7.    Ownership of Claims.  Each Claim Holder, severally and not jointly, represents and warrants as follows:

(a)    as of the date of this Agreement, other than with respect to any Claims in respect of First Lien Bank Debt that it holds pursuant to a participation agreement with voting provisions substantially similar to those set forth in the form of participation agreement produced by the Loan Syndications & Trading Association, it (i) either (A) is the sole beneficial owner of the principal amount of Claims set forth below its signature hereto, or (B) has sole investment or voting discretion with respect to the principal amount of Claims set forth below its signature hereto and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement, (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Claims and dispose of, exchange, assign and transfer such Claims and (iii) holds no Claims not identified below its signature hereto;

(b)    other than pursuant to this Agreement, such Claims that are subject to Section 7(a) hereof are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrance of any kind, that would adversely affect in any way such Consenting Creditor's performance of its obligations contained in this Agreement at the time such obligations are required to be performed; and

(c)    this Agreement is a legal, valid, and binding obligation of each Claim Holder, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

To the extent a Consenting Creditor who is a Consenting First Lien Bank Lender acquires or disposes of Claims such that the principal amount of its First Lien Bond Claims becomes equal to or exceeds that of its First Lien Bank Claims, such Consenting Creditor shall be deemed a Consenting First Lien Bond Holder and shall no longer be considered a Consenting First Lien Bank Lender for purposes of this Agreement.  To the extent a Consenting Creditor who is a Consenting First Lien Bond Holder acquires or disposes of Claims such that the principal amount of its First Lien Bank Claims exceeds that of its First Lien Bond Claims, such Consenting Creditor shall be deemed a Consenting First Lien Bank Lender and shall no longer be considered a Consenting First Lien Bond Holder for purposes of this Agreement.  Any Consenting First Lien Bank Lender who becomes a Consenting First Lien Bond Holder or Consenting First Lien Bond Holder who becomes a

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

Consenting First Lien Bank Lender pursuant to this Section 7 shall deliver to the Company a written notice in accordance with Section 27 hereof within one (1) Business Day of such occurrence.

8.      Termination by Consenting Creditors.  The Requisite Consenting First Lien Bank Lenders and the Requisite Consenting First Lien Bond Holders shall each be entitled to cause the termination of this Agreement (a "Creditor Termination Right") by the Consenting First Lien Bank Lenders and the Consenting First Lien Bond Holders, respectively, and this Agreement shall be deemed terminated with respect to such Consenting First Lien Bank Lenders or Consenting First Lien Bond Holders, as applicable, upon delivery to the Company of a written notice in accordance with Section 27 hereof of the occurrence and continuance of any of the following events (each a "Creditor Termination Event"):[2]

(a)      the breach by any of the Company Parties of any of their representations, warranties or covenants set forth in this Agreement, which breach remains uncured for a period of five (5) business days after such Company Party's receipt of notice from the Requisite Consenting Creditors of such breach;

(b)      the Company's failure to comply with any Milestone;

(c)      the issuance by any governmental entity, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining or otherwise restricting the consummation of a material portion of the Restructuring, which remains uncured for a period of five (5) business days after the receipt by the Company and the Consenting Creditors of notice of such event;

(d)      a trustee shall have been appointed in the Chapter 11 Cases and the Bankruptcy Court enters a final order approving any motion or pleading filed by the trustee that is not consistent in any material respect with this Agreement;

(e)      the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code or the Chapter 11 Cases shall have been dismissed by order of the Bankruptcy Court;

(f)      the Company files any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement and such motion or pleading has not been withdrawn within two (2) Business Days of the Company receiving notice from the Requisite Consenting Creditors that such motion or pleading is inconsistent with this Agreement;

(g)      the Requisite Consenting First Lien Bank Lenders or the Requisite Consenting First Lien Bond Holders determine, in good faith and in their reasonable discretion, that a material adverse change regarding the feasibility of the Restructuring has occurred;

(h)      the Bankruptcy Court grants relief in a final order that is materially inconsistent with this Agreement;

---

[2] [NTD:  Treatment of banks if banks terminate TBD.]

(i)  the Company exercises its "fiduciary out" in accordance with Section 5(c) or (d) of this Agreement;

(j)  the Company makes any portion of the December Second Lien Interest Payment and CEC fails to make the corresponding CEC Second Lien Coupon Deposit;

(k)  the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Company, without the written consent of the Requisite Consenting Creditors;

(l)  any Person obtains standing or commences an action to challenge the validity or priority of, or to avoid, the liens on any asset or assets comprising any portion of the collateral securing the First Lien Indebtedness;

(m)  [PropCo] fails to be organized and operated in conformity with the requirements for qualification and taxation as a real estate investment trust subject to taxation under the provisions of Sections 856 *et seq.* of the Internal Revenue Code or the requirements for a tax-free spinoff under the Internal Revenue Code, in each case as contemplated in the Restructuring Term Sheet;

(n)  at 11:59 p.m. prevailing Eastern Time upon the date of entry of an order by the Bankruptcy Court invalidating or disallowing, as applicable, either (i) the enforceability, priority, or validity of all of the liens securing the obligations owed under the Credit Agreement or (ii) the claims in respect of the Credit Agreement;

(o)  at 11:59 p.m. prevailing Eastern Time upon the date of entry of an order by the Bankruptcy Court invalidating or disallowing, as applicable, either (i) the enforceability, priority, or validity of all of the liens securing the obligations owed under the First Lien Indentures or (ii) the claims in respect of the First Lien Indentures; or

(p)  at 11:59 p.m. prevailing Eastern Time on the Outside Date if all of the transactions contemplated hereby have not been consummated.

The exercise by either the Requisite Consenting First Lien Bank Lenders or the Requisite Consenting First Lien Bond Holders of a Creditor Termination Right shall not relieve any Party other than the Consenting First Lien Bank Lenders or Consenting First Lien Bond Holders, as applicable, of any of its obligations under this Agreement.  The failure by either the Requisite First Lien Bank Lenders or the Requisite First Lien Bond Holders to exercise any Creditor Termination Right upon the other's exercise of a Creditor Termination Right shall not be deemed a waiver of any such Creditor Termination Right, and such Parties shall retain all rights with respect thereto.  For the avoidance of doubt: (x) the termination of this Agreement (i) with respect to any Consenting First Lien Bank Lender shall be with respect to all Claims held by such Consenting First Lien Bank Lender, irrespective of whether it holds First Lien Bond Debt, and (ii) with respect to any Consenting First Lien Bond Holder shall be with respect to all Claims held by such Consenting First Lien Bond Holder, irrespective of whether it holds First Lien Bank Debt; and (y) upon the exercise of a Creditor Termination Right by either of the Requisite Consenting First Lien Bank Lenders or

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

the Requisite Consenting First Lien Bond Holders, any provision of this Agreement requiring the consent, approval or satisfaction of both the Requisite Consenting First Lien Bank Lenders and the Requisite Consenting First Lien Bond Holders shall be deemed to require only the consent of (i) the Requisite Consenting First Lien Bank Lenders, in the event the Requisite Consenting First Lien Bond Holders have exercised a Creditor Termination Right, or (ii) the Requisite Consenting First Lien Bond Holders, in the event the Requisite Consenting First Lien Bank Lenders have exercised a Creditor Termination Right.

9.    <u>Mutual Termination</u>.  This Agreement and the obligations of the Parties hereunder may be terminated by mutual agreement among (a) the Company Parties, (b) the Requisite Consenting First Lien Bank Lenders, and (c) the Requisite Consenting First Lien Bond Holders.

10.    <u>Company Termination Events</u>.  This Agreement may be terminated by delivery to the other Parties of a written notice, delivered in accordance with Section 27 of this Agreement by the Company upon the occurrence of any of the following events (each a "<u>Company Termination Event</u>," and, together with the Creditor Termination Events, the "<u>Termination Events</u>"): (a) only with respect to the applicable Consenting Creditor, the breach by such Consenting Creditor of any of the representations, warranties or covenants of such Consenting Creditor set forth in this Agreement that would have a material adverse impact on the Company, or the consummation of the Restructuring, which breach remains uncured for a period of five (5) business days after the receipt by such Consenting Creditor of notice of such breach; (b) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring, which remains uncured for a period of five (5) business days after the receipt by the Consenting Creditors of notice of such event, <u>provided</u>, that the Company Parties have complied with their obligations under Section 5(a)(iv) of this Agreement; (c) the exercise by the Company and CEC (and/or their officers, directors and/or members, as applicable) of their fiduciary duties pursuant to and in accordance with Section 5(c) or (d) of this Agreement; (d) solely with respect to the Consenting First Lien Bank Lenders, if 66 2/3% of the holders of First Lien Bank Debt are not Consenting Creditors as of January 15, 2015; and (e) solely with respect to the Consenting First Lien Bond Holders, if 66 2/3% of the holders of First Lien Bond Debt are not Consenting Creditors as of January 15, 2015.

11.    <u>Termination</u>.  No Party may terminate this Agreement pursuant to Sections 8, 10 or 11 if such terminating Party (or Parties) failed to perform or comply in all material respects with the terms and conditions of this Agreement, with such failure to perform or comply causing, or resulting in, the occurrence of the Termination Event specified herein.  No termination of this Agreement shall relieve any Party hereto from (i) liability for its breach or non-performance of its obligations hereunder prior to the applicable termination date, including but not limited to CEC's and the Company's obligations to pay the First Lien Professional Fees, or (ii) obligations under this Agreement which by their terms expressly survive a termination date; <u>provided</u>, <u>however,</u> that, notwithstanding anything to the contrary herein, any Termination Event (including any automatic termination) may be waived in accordance with the procedures established by Section 14 hereof, in which case such Termination Event so waived shall be deemed not to have occurred, this Agreement consequently shall be deemed to continue in full force and effect, and the rights and obligations of the Parties shall be restored, subject to any modification set forth in such waiver.

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

Upon termination of this Agreement in accordance with its terms, unless otherwise agreed to in writing by a Consenting Creditor, any and all votes, approvals or consents delivered by such Consenting Creditor and, as applicable, its Affiliates, subsidiaries, managed funds, representatives, agents and employees, in connection with the Restructuring prior to such termination date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Company.

12.    <u>Transfer of Claims</u>.  The Consenting Creditors agree, with the exception of the permitted transfers and purchases enumerated in (i) and (ii) below, that no Consenting Creditor will, directly or indirectly, sell, contract to sell, give, assign, hypothecate, pledge, encumber, grant a security interest in, offer, sell any option or contract to purchase, or otherwise transfer or dispose of, any economic, voting or other rights in or to, by operation of law or otherwise (collectively, "<u>Transfer</u>"), all or any portion of its First Lien Claims now or hereafter owned, and no such Transfer will be effective, unless: (a) the transferee executes and provides a transfer agreement (a "<u>Transfer Agreement</u>") in the form attached hereto as <u>Exhibit E</u>, pursuant to which the transferee agrees to be bound by all of the terms and conditions of this Agreement and (b) the Consenting Creditor effecting such Transfer notifies counsel to the other Parties hereto in writing of such Transfer within two (2) Business Days of the execution of an agreement (or trade confirmation) in respect of such Transfer.  In addition to the foregoing Transfer, the following Transfers shall be permitted:

(i)    any Transfer by one Consenting Creditor to an Affiliate of such Consenting Creditor or one or more of its affiliated funds or an affiliated entity or entities with a common investment advisor (in each case, other than portfolio companies); and

(ii)    any Transfer by one Consenting Creditor to another Consenting Creditor.

Any Transfer of any First Lien Claim of a Consenting Creditor that does not comply with the foregoing shall be deemed void *ab initio*; <u>provided</u>, <u>however</u>, for the avoidance of doubt, that upon any purchase, acquisition or assumption by any Consenting Creditor of any Claims (including but not limited to First Lien Claims), such Claims shall automatically be deemed to be subject to all the terms of this Agreement.  The restrictions in this Agreement are in addition to any Transfer restrictions in the Credit Agreement, the First Lien Indentures and Non-First Lien Indentures, and in the event of a conflict the Transfer restrictions contained in this Agreement shall control.

Notwithstanding the foregoing, a Qualified Marketmaker that acquires any First Lien Claim subject to this Agreement with the purpose and intent of acting as a Qualified Marketmaker for such First Lien Claim shall not be required to execute a Transfer Agreement or otherwise agree to be bound by the terms and conditions set forth herein if such Qualified Marketmaker sells or assigns such First Lien Claim within ten (10) Business Days of its acquisition and the purchaser or assignee of such First Lien Claim is a Consenting Creditor or an entity that executes and provides a Transfer Agreement in accordance with the terms set forth herein.

Notwithstanding anything herein to the contrary: (a) to the extent that a Consenting Creditor effects the transfer of all of its First Lien Claims, such Consenting Creditor shall cease to be a Party to this Agreement in all respects and shall have no further obligations hereunder; <u>provided</u>, <u>however</u>, that if such Consenting Creditor acquires a First Lien Claim at any point thereafter, it shall be deemed to

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

be a Party to this Agreement on the same terms as if had it not effected a Transfer of all of its First Lien Claims; and (b) subject to Section 2(c) hereof, to the extent that a Consenting Creditor effects the Transfer of a First Lien Claim that it holds as a participant (and not grantor) pursuant to a participation agreement with voting provisions substantially similar to those set forth in the form of participation agreement produced by the Loan Syndications & Trading Association, the transferee thereof shall not be required to execute a Transfer Agreement.

13.    Cooperation.  Before the filing of and during the Chapter 11 Cases, (i) the Company shall provide to counsel for the Consenting Creditors (a) drafts of all motions or applications and other documents the Company intends to file with the Bankruptcy Court at least three (3) Business Days before the date when the Company intends to file any such document unless such advance notice is impossible or impracticable under the circumstances, in which case the Company shall notify telephonically or by electronic mail counsel to the Consenting Creditors to advise it of the documents to be filed and the facts that make the provision of advance copies within three (3) Business Days before submission impossible or impracticable, and shall provide such copies as soon as possible thereafter, and (b) copies of all documents actually filed by the Company with the Bankruptcy Court promptly but not later than one (1) day after such filing.

14.    Amendments.  Other than to cure any ambiguity, omission, defect or inconsistency herein, which shall require the consent of the Requisite Consenting Creditors, no amendment, modification, waiver or other supplement of the terms of this Agreement (including, for the avoidance of doubt, the Restructuring Term Sheet and the Cash Collateral Stipulation) shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by the Company, CEC, and each Consenting Creditor.

15.    Condition of Effectiveness.  For the avoidance of doubt, this Agreement (and the obligations of all Parties thereunder) shall not become effective or enforceable against or by any of the Parties until: (i) it is executed by (a) the Company Parties, (b) the Initial Consenting Creditors; (ii) the Additional Litigation Parties listed on Exhibit F hereto have each executed and delivered to the Consenting Creditors' counsel a tolling agreement in substantially the form attached hereto as Exhibit G; and (iii) the Company has executed account control agreements with respect to the Deposit Accounts in the forms attached hereto as Exhibit H and Exhibit I, respectively.

16.    Entire Agreement.  This Agreement, including the Restructuring Term Sheet and the Cash Collateral Stipulation, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement; provided, however, that any confidentiality agreement executed by any Restructuring Support Party shall survive this Agreement and shall continue to be in full force and effect in accordance with its terms.

17.    Survival of Agreement.  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible restructuring of the Company and in contemplation of possible filings by the Company under Chapter 11 of the Bankruptcy Code, and (a) the exercise of the rights granted in this Agreement (including giving of notice or termination) shall not be a violation of the automatic stay provisions of section 362 of the

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

Bankruptcy Code and (b) the Company hereby waives its right to assert a contrary position in the Chapter 11 Cases, if any, with respect to the foregoing.

18.     Waiver.  If the transactions contemplated herein are not consummated, or following the occurrence of the termination of this Agreement with respect to all Parties, if applicable, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims and defenses, and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses.

19.     Counterparts.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

20.     Company Termination Fee.  Notwithstanding anything to the contrary herein, to the extent either (i) the Company terminates this Agreement pursuant to Section 5(c) or (d) and Section 10 of this Agreement or (ii) the Company or CEC breaches any of their representations, warranties or covenants under this Agreement in any material respect, without limiting the availability of other remedies and rights hereunder, at law or in equity (including specific performance and/or breach of contract claims), CEC shall pay to the Consenting Creditors at such time an amount equal to $600,000,000 (the "Termination Fee").  The Termination Fee shall be allocated *pro rata* among the Consenting Creditors based on their respective holdings of First Lien Claims as of the date of such occurrence.

21.     Specific Performance; Remedies Cumulative.  This Agreement is intended as a  binding commitment enforceable in accordance with its terms.  Each Party acknowledges and agrees that the exact nature and extent of damages resulting from a breach of this Agreement are uncertain at the time of entering into this Agreement and that any such breach of this Agreement would result in damages that would be difficult to determine with certainty.  In the event of a breach of this Agreement by the Company or CEC, CEC shall be liable to the non-breaching Consenting Creditors in an amount equal to no less than the Termination Fee plus any additional provable damages.  It is understood and agreed that money damages may not be a sufficient remedy for any such breach of this Agreement, and that any non-breaching Party shall be entitled to seek specific performance and injunctive relief as remedies for any such breach, and each Party further agrees to waive, and to cause each of their representatives to waive, any requirement for the securing or posting of any bond in connection with requesting such remedy.  Such remedies shall not be deemed to be the exclusive remedies for the breach of this Agreement by any Party or its representatives.  All rights, powers and remedies provided under this Agreement or otherwise available in respect  hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy by any Party hereto shall not preclude the simultaneous or later exercise of any other such right, power or remedy hereunder.

22.     Headings.  The headings of the Sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

23.     Relationship Among Parties.  Notwithstanding anything herein to the contrary, the duties and obligations of the Restructuring Support Parties under this Agreement shall be several, not

joint.  No Restructuring Support Party shall, as a result of its entering into and performing its obligations under this Agreement, be deemed to be part of a "group" (as that term is used in Section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder) with any of the other Restructuring Support Parties.

24.     <u>Joint and Several Liability of Company and CEC</u>.  The Company and CEC each acknowledge and agree that they are jointly and severally liable for the other's performance of all obligations under this Agreement.

25.     <u>No Commitment</u>.  No Restructuring Support Party (other than CEC, as expressly set forth herein) shall be obligated to fund or otherwise be committed to provide funding in connection with the Restructuring, except pursuant to a separate commitment letter or definitive documentation relating specifically to such funding, if any, that has been (i) executed by such Restructuring Support Party in connection with the Rights Offering[3] and (ii) approved by the Bankruptcy Court, as necessary.

26.     <u>Governing Law and Dispute Resolution</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. Each of the Parties hereby irrevocably and unconditionally agrees that the United States District Court for the Southern District of New York shall have jurisdiction to enforce this Agreement, provided, that upon commencement of the Chapter 11 Cases, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement

27.     <u>Notices</u>.  All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by electronic mail or facsimile transmission, or mailed (first class postage prepaid) to the parties at the following addresses or facsimile numbers:

If to the Company:

_____

_____

_____

With a copy to (which shall not constitute notice):

_____

[3] [Not defined.]

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

Kirkland & Ellis
601 Lexington Ave
New York, NY 10022
Attn: Paul M. Basta
paul.basta@kirkland.com
Fascimile:  (212) 446 4900
If to CEC:

_____

_____

_____

[ADDITIONAL COMPANY PARTIES]


With a copy to (which shall not
constitute notice):

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:   Alan W. Kornberg
          Jeffrey D. Saferstein
akornberg@paulweiss.com
jsaferstein@paulweiss.com
Telephone: (212) 373-3000
Facsimile  (212) 373-2053

If to a Consenting First Lien Bank Lender, to the address set forth beneath such lender's signature
block.

with a copy to (which shall not constitute notice):

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
Attn:   Kristopher M. Hansen
          Jon Canfield
khansen@stroock.com
jcanfield@stroock.com
Telephone: (212) 806-5400
Facsimile: (212) 806-6056

If to a Consenting First Lien Bond Lender, to the address set forth beneath such lender's signature block.

with a copy to (which shall not constitute notice):

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attn: Kenneth H. Eckstein
    Daniel M. Eggermann
keckstein@kramerlevin.com
deggermann@kramerlevin.com
Telephone: (212) 715-9100
Facsimile: (212) 715-8229

28.    Third-Party Beneficiaries.  Unless expressly stated herein and except as provided in the proviso at the end of this sentence, the terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

29.    Conflicts Between the Restructuring Term Sheet and this Agreement.  In the event of any conflict among the terms and provisions in the Restructuring Term Sheet and this Agreement, the terms and provisions of the Restructuring Term Sheet shall control.  Nothing contained in this Section 29 shall affect, in any way, the requirements set forth herein for the amendment of this Agreement and the Restructuring Term Sheet as set forth in Section 14 herein.

30.    Settlement Discussions.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto. Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

31.    Good-Faith Cooperation; Further Assurances.  The parties hereto shall cooperate with each other in good faith in respect of matters concerning the implementation and consummation of the Restructuring.

32.    Access.  The Company will provide the Parties and their respective attorneys, consultants, accountants, and other authorized representatives reasonable access, upon reasonable notice, during normal business hours to relevant properties, books, contracts, commitments, records, management personnel, and advisors of the Company; provided, however that the Company's obligations hereunder shall be conditioned upon such Party being party to an appropriate confidentiality agreement or undertaking.

33.    Qualification on Consenting Creditor Representations.  The Parties acknowledge that all representations, warranties, covenants and other agreements made by any Consenting Creditor that

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

is a separately managed account of an investment manager are being made only with respect to the Claims managed by such investment manager (in the amount identified on the signature pages hereto), and shall not apply to (or be deemed to be made in relation to) any Claims that may be beneficially owned by such Consenting Creditor that are not held through accounts managed by such investment manager.

34.     _Amendment of Amended and Restated Waiver Agreement._  Section 7 of the Amended and Restated Waiver Agreement is hereby amended by agreement of the Company and CEC such that the second sentence of that section reads:

> Subject to written extension by the Caesars Entities, any Notice of Default that is provided after [120 days after execution of RSA] shall not have the benefit of paragraph 2 of this Agreement.

The Company and CEC expressly affirm those covenants, representations, warranties and acknowledgments made in Sections 3, 4, 6 and 9 of Amended and Restated Waiver Agreement.

35.     _No Restraint on Notices of Default or Remedies._  Except as expressly provided in this Agreement, each of the Company Parties agrees that none of the Trustee, the Collateral Agent, the Administrative Agent, or any holders of First Lien Indebtedness shall be restricted, limited or prohibited from providing a Notice of Default with respect to any or all defaults (as such terms are used in the Credit Agreement and the First Lien Indentures) under any or all of the Credit Agreement or First Lien Indentures at any time on or after the Company's execution of this Agreement, or from taking such other actions and enforcing such other rights as are available under the Credit Agreement, the First Lien Indentures, any agreement related to the Credit Agreement and/or the First Lien Indentures, and applicable law.

**[Signature Pages Follow]**

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.


**CAESARS ENTERTAINMENT OPERATING COMPANY, INC.**


By:    _____

Name:

Title:

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

**[SIGNATURE PAGES FOR CEC, CAC, CERP, CGP, APOLLO AND TPG]**

_____,

By: _____

By: _____

Name:

Title:

Address: _____

_____

_____

Principal Amount of First Lien Bank Claims held

($)_____

Date:_____

Principal Amount of First Lien Bond Claims held

($)_____

Date:_____

Principal Amount of Non-First Lien Indentures Obligations held

($)_____

Date:_____

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

**[SIGNATURE PAGE FOR CONSENTING CREDITORS]**

_____,

By: _____


By: _____
      Name:
      Title:

Address: _____
         _____
         _____


Principal Amount of First Lien Bank Claims held

($)_____

Date:_____


Principal Amount of First Lien Bond Claims held

($)_____

Date:_____


Principal Amount of Non-First Lien Indentures
Obligations held

($)_____

Date:_____

## Exhibit A

## Restructuring Term Sheet

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

**Exhibit B**

**Cash Collateral Stipulation**

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

## Exhibit C

## Milestones[4]

The failure to comply with any of the following Milestones will result in a Creditor Termination Event under Section 8 of this Agreement:

1. The Company shall commence the Chapter 11 Cases on January 15, 2015, or within five (5) Business Days thereafter.

2. On the Petition Date, the Company shall have filed a motion seeking the Bankruptcy Court's approval of the assumption of this Agreement, in form, scope and substance satisfactory to the Requisite Consenting First Lien Bank Lenders and Requisite Consenting First Lien Bond Holders.

3. Within 30 days of the Petition Date, the Company shall have filed the Plan and Disclosure Statment, in each case in form, scope and substance satisfactory to the Requisite Consenting First Lien Bank Lenders and Requisite Consenting First Lien Bond Holders; for the avoidance of doubt, any supplement to the Plan must be in form, scope and substance satisfactory to the Requisite Consenting First Lien Bank Lenders and Requisite Consenting First Lien Bond Holders.

4. Within 45 days of the Petition Date, the Company shall have obtained entry by the Bankruptcy Court of (a) a final Cash Collateral Order that is consistent in all material respects with the terms of the Cash Collateral Stipulation attached to this Agreement as Exhibit B and (b) an order approving the assumption of this Agreement, in each case in form, scope and substance satisfactory to the Requisite Consenting First Lien Bank Lenders and Requisite Consenting First Lien Bond Holders.

5. Within 120 days of the Petition Date, the Company shall have obtained entry by the Bankruptcy Court of (a) an order approving the Disclosure Statement and (b) an order approving solicitation procedures (the "Solicitation Procedures") in relation to the Plan and Disclosure Statement, in each case in form, scope and substance satisfactory to the Requisite Consenting First Lien Bank Lenders and Requisite Consenting First Lien Bond Holders.

6. Prior to the Solicitation Date (as such term is defined in the Solicitation Procedures), the Company shall have filed with the Bankruptcy Court a proposed order confirming the Plan (the "Confirmation Order") in form, scope and substance satisfactory to the Requisite Consenting First Lien Bank Lenders and Requisite Consenting First Lien Bond Holders

7. Within 90 days of the Bankruptcy Court's approval of the Disclosure Statement, the Company shall have obtained entry by the Bankruptcy Court of the Confirmation Order, as such Confirmation Order may have been amended by the Bankruptcy Court; provided that any such amendments shall be in form, scope and substance satisfactory to the Requisite Consenting First Lien Bank Lenders and the Requisite Consenting First Lien Bond Holders.

8. Within 120 days of the entry by the Bankruptcy Court of the Confirmation Order (the "Outside Date"), the Plan Effective Date shall have occurred.

---

[4] [Note:  Certain capitalized terms herein will need to be defined in the Term Sheet.]

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

## **Exhibit D**

## **Put Partipant, Backstop Party and Right Participant Election Form**

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

## Exhibit E

### Transfer Agreement

**PROVISION FOR TRANSFER AGREEMENT**

The undersigned ("Transferee") (a) hereby acknowledges that it has read and understands the Restructuring Support and Forbearance Agreement, dated as of _____ (the "Agreement"),[1] by and among the Company Parties and each of the Consenting Creditors party thereto, (b) desires to acquire the Claim(s) described below from one of the Consenting Creditors (the "Transferor") and (c) hereby irrevocably agrees to be bound by the terms and conditions of the Agreement to the same extent Transferor was thereby bound, and shall be deemed a Consenting Creditor for all purposes under the Agreement.

The Transferee hereby specifically and irrevocably agrees (i) to be bound by the terms and conditions of the Credit Agreement and/or First Lien Indentures, as applicable, and the Agreement, to the same extent applicable to the Transferred Claims, (ii) to be bound by the vote of the Transferor if cast prior to the effectiveness of the transfer of the Claims, and (iii) that each of the Parties shall be an express third-party beneficiary of this Provision for Transfer Agreement and shall have the same recourse against the Transferee under the Agreement as such Party would have had against the Transferor.

Date Executed:  _____,

_____

**Print name of Transferee**

_____

**Name:**
**Title:**

**Address:**  _____

_____

**Attention:**  _____
**Telephone:**  _____
**Facsimile:**  _____

| Principal Amount Held | |
|---|---|
| **Claim** | **Amount** |
| Claims (specify type) | |

---

[1]    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

## **Exhibit F**

## **Additional Litigation Parties**

Gary Loveman

Jeffrey Benjamin

David Bonderman

Kelvin Davis

Fred J. Kleisner

Eric Press

Marc Rowan

David Sambur

Lynn C. Swann

Christopher J. Williams

Jeffrey Housenbold

Eric Hession

Michael Cohen

Ronen Stauber

Steven Winograd

Donald Colvin

Caesars Enterprise Services LLC

Caesars Growth Bonds, LLC

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

## Exhibit G

## Tolling Agreement

Reference is made to that certain Restructuring Support and Forbearance Agreement, dated as of _____ (the "Agreement"),[1] by and among the Company Parties and each of the Consenting Creditors party thereto.  In exchange for the consideration provided by the Consenting Creditors pursuant to the Agreement, the value and sufficiency of which is hereby acknowledged, the undersigned ("Tolling Party") acknowledges and agrees that the time from the date of the Agreement through and including the date that is five (5) Business Days after the date that the Agreement has been terminated with respect to all Parties shall not be counted for purposes of determining whether any litigation commenced or claim interposed by any of the Consenting Creditors, the Trustee, the Collateral Agent or the Administrative Agent against Tolling Party, which litigation or claim relates in any way to the Company or its Affiliates (including, but not limited to, any claims relating to any transaction by or among, or approved by, the Company Parties or the Additional Litigation Parties), was commenced or interposed within the applicable statute of limitations or in compliance with any other rule or doctrine of timeliness.

Date Executed:    _____,

_____
**Print name of Tolling Party**

_____
**Name:**
**Title:**

**Address:**    _____

_____

_____

**Attention:**    _____
**Telephone:**    _____
**Facsimile:**    _____

---

[1]    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

## Exhibit H

## Account Control Agreement

11/14 KL Comments to PW Draft
PRIVILEGED & CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY / SUBJECT TO FRE 408

**<u>Exhibit I</u>**

**<u>Account Control Agreement</u>**

**EXHIBIT 12**

<div align="right">

**Draft –10/30/2014**
**Privileged & Confidential**
**For Discussion Purposes Only**
**Subject to FRE 408**

</div>

<div align="right">

**This document and any related communications shall not be**
**used for any purpose in any litigation or proceeding**

</div>

**This Term Sheet is highly confidential and this Term Sheet, its contents and its existence may not be distributed, disclosed or discussed to or with any party other than in accordance with the express terms of confidentiality agreements/arrangements among the respective parties and the Company.**

<br>

SUMMARY TERM SHEET FOR PROPOSED RESTRUCTURING[12]

<br>

CAESARS ENTERTAINMENT OPERATING COMPANY, INC.
*and certain of its direct or indirect subsidiaries*
("**_CEOC_**" and together with certain of its direct or indirect subsidiaries, the "**_Company_**")

---

[1] Nothing herein shall be deemed to be the solicitation of an acceptance or rejection of a plan of reorganization; any such solicitation shall be in compliance with the relevant provisions of securities laws, the Bankruptcy Code and other applicable statutes and rules.

[2] This Term Sheet is an exhibit to, and part of, the Restructuring Support and Forbearance Agreement (the "**_RSA_**"), which contains additional descriptive language and legal terms in respect of the Company's restructuring.

## I.    Summary of Proposed Treatment[3]

| | |
|---|---|
| Holders of the obligations (the "***First Lien Bank Obligations***") under the First Lien Credit Agreement ($5,364 million plus interest thereon) and swaps entered into pursuant to the First Lien Credit Agreement ($42 million) (collectively, the "***First Lien Bank Lenders***") | Each First Lien Bank Lender shall receive a recovery equal in value to [100]% of the amounts outstanding under the First Lien Credit Agreement, with such recovery consisting of its pro rata share of (a) [8.0]% in cash, (b) [28.7]% in New First Lien OpCo Debt, (c) [36.3]% in New First Lien PropCo Debt, and (d) [27.0]% in CPLV Debt or additional cash if the CPLV Debt is financed for cash. |
| Holders of the obligations (the "***First Lien Note Obligations***") under the First Lien Indentures ($6,345 million plus interest thereon) (the "***First Lien Noteholders***") | Each First Lien Noteholder shall receive a recovery equal in value to [93.8]% of the amounts outstanding under the First Lien Indentures, with such recovery, prior to exercise of the Put Option and Equity Right (if applicable), consisting of its pro rata share of (a) [4.6]% in cash, (b) [8.5]% in New First Lien OpCo Debt, (c) [6.8]% in New First Lien PropCo Debt, (d)[22.5]% in New Second Lien PropCo Debt, (e) [18.1]% in CPLV Debt or additional cash if the CPLV Debt is financed for cash, (f) [19.2]% in PropCo New Common Stock, (g) [11.0]% in OpCo New Common Stock, and (h) [3.2]% in PropCo New Preferred Stock.<br><br>As more fully described under Put Option and Equity Right, the First Lien Noteholders (a) will have the opportunity to be a Put Participant and sell some or all of their equity to other parties for cash and/or (b) may receive cash for some or all of their equity from the Non-First Lien Noteholders in connection with the exercise of the Equity Rights.<br><br>If the Put Participants fully subscribe to the Put Options, then each First Lien Noteholder will receive a [18.9]% cash recovery increase and a corresponding decrease in its equity recovery. |
| Holders of the obligations (the "***Non-First Lien Obligations***") under (a) the Second Lien | If the Non-First Lien Noteholders vote as a class to accept the Plan, then each Non-First Lien Noteholder shall receive its pro rata share of an amount of PropCo New Common Stock to be determined,[4] which includes |

---

[3] Administrative, priority and critical trade claims shall be paid in full in cash as soon as practicable following consummation of the Restructuring or as otherwise provided for in definitive documentation.  Treatment of noncritical trade claims to be determined.

[4] If the Non-First Lien Noteholders as a class vote to accept the Plan, the PropCo New Common Stock they are to receive will increase the amount of PropCo New Common Stock to be issued and will dilute all other holders of PropCo New Common Stock.   CEOC can substitute up to [__]% of PropCo New Common Stock for up to [__]% of OpCo New Common Stock.

| Indentures ($5,252 million plus interest thereon) (the "**Second Lien Noteholders**"), (b) the guaranteed unsecured indentures ($495 million plus interest thereon) (the "**Unsecured Guaranteed Noteholders**"), and (c) the unsecured note indentures ($820 million plus interest thereon) (the "**Unsecured Noteholders**," collectively with the Second Lien Noteholders and Unsecured Guaranteed Noteholders, the "**Non-First Lien Noteholders**") | consideration for the value of any unencumbered assets.[5]  And, as more fully described under the Equity Right, if the Non-First Lien Noteholders vote as a class to accept the Plan, each Non-First Lien Noteholder shall also have the option to be a Rights Participant. <br><br>If the Non-First Lien Noteholders do not vote as a class to accept the Plan, then each Non-First Lien Noteholder shall only receive its pro rata share of consideration in an amount equal to the value of any unencumbered assets (subject to the First Lien Noteholders' deficiency claims) to be paid in PropCo New Common Stock and/or OpCo New Common Stock. |

## II.   Put Option and Equity Rights[6]

| Put Option | Each First Lien Noteholder shall have the option (which option shall be selected upon execution of the RSA in the case of any First Lien Noteholder executing the RSA) to put its pro rata portion of (i) all $[700] million of the OpCo New Common Stock (the "**OpCo New Common Stock Put Option**"); (ii) $[300] million of the PropCo New Common Stock (the "**PropCo New Common Stock Put Option**"); and/or (iii) all $[200] million of the PropCo New Preferred Stock (the "**PropCo New Preferred Stock Put Option**" and, together with (i) and (ii), the "**Put Option**"), it is to receive under the Plan to Caesars Entertainment Company or its designee ("**CEC**") and funds controlled or managed by the First Lien Noteholders listed in Annex I (CEC and such parties, the "**Initial Backstop Parties**"). <br><br>Each First Lien Noteholder that exercises its Put Option shall be referred to herein as a "**Put Participant**." |
| Put Option Allocation Between the Backstop Parties | As detailed in Annex I, CEC shall purchase all the OpCo New Common Stock Put Options.[7]  Subject to the next paragraph, the Initial Backstop Parties shall purchase (a) the PropCo New Common Stock subject to the PropCo New Common Stock Put Options exercised by the Put Participants and (b) the PropCo New Preferred Stock subject to the PropCo New Preferred Stock Put Options exercised by the Put Participants. <br><br>The First Lien Noteholders that are not Initial Backstop Parties may elect to become backstop parties (together with the Initial Backstop Parties, the "**Backstop Parties**") and purchase (a) the PropCo New Preferred Stock |

---

[5] If the Non-First Lien Noteholders vote as a class to accept the Plan, the First Lien Noteholders will waive their deficiency claim.

[6] For tax efficiency purposes, the proceeds from the Put Option and Equity Rights may flow through the Company to the First Lien Noteholders as part of their recovery under the Plan.

[7] NTD:  It is assumed that the First Lien Noteholders executing the RSA select to put at least 50.1% of the OpCo New Common Stock to CEC.

| | |
|---|---|
| | subject to the PropCo New Preferred Put Options and/or (b) the PropCo New Common Stock subject to the PropCo New Common Put Options. Such election will dilute the Initial Backstop Parties; provided, however that the PropCo New Common Stock purchased by CEC pursuant to the Put Option cannot be diluted below 5% of the total amount of PropCo New Common Stock.  First Lien Noteholders executing the RSA must elect to become Backstop Parties (and the amount of their backstop) at the time of executing the RSA.  All First Lien Noteholders not executing the RSA will have to join the backstop within 30 calendar days of the filing of an 8-K announcing the execution of the RSA.<br><br>The Backstop Parties shall receive no fee for purchasing the equity subject to the Put Participants' Put Options. |
| Put Option Price | The Put Option shall be at a price per share implying a total value of $[700] million for all OpCo New Common Stock, $[1,218] million for all PropCo New Common Stock (which excludes the value of the PropCo New Common Stock the Non-First Lien Noteholders will receive if they vote as a class to accept the Plan) and $[200] million for all PropCo New Preferred Stock. |
| Equity Rights | If the Non-First Lien Noteholders vote as a class to accept the Plan, the "**Equity Rights**" as detailed below shall occur and each Non-First Lien Noteholder shall have the right to be a "**Right Participant**."  If the Non-First Lien Noteholders do not vote as a class to accept the Plan, there shall be no Equity Rights.<br><br>Each Right Participant may elect (which election shall be selected upon execution of the RSA in the case of any Non-First Lien Noteholder executing the RSA) to have the right to purchase (with the purchase occurring after the closing of the Put Option) up to (a) all of the PropCo New Common Stock held by the First Lien Noteholders and the Backstop Parties (the "**PropCo Common Equity Rights**"), and/or (b) all of the PropCo New Preferred Stock held by the First Lien Noteholders and the Backstop Parties (the "**PropCo Preferred Equity Rights**" and together with the PropCo Common Equity Rights, the "**Equity Rights**"), subject to being cut back to a pro rata basis based on the PropCo Common Equity Rights and PropCo Preferred Equity Rights subscribed for.<br><br>The Right Participants must purchase the PropCo New Common Stock and/or the PropCo New Preferred Stock first from the First Lien Noteholders (pro rata among the First Lien Noteholders), second from the non-CEC Backstop Parties (pro rata among the non-CEC Backstop Parties), and third from CEC, subject to CEC maintaining a minimum ownership percentage of 5% of the total amount of PropCo New Common Stock.<br><br>For the avoidance of doubt, the First Lien Noteholders and the Backstop Parties, as applicable, must sell their respective equity, pursuant to the terms of the Equity Rights, to the Right Participants.  The Right Participants shall receive no fee for acting as Right Participants. |

| | |
|---|---|
| Equity Rights Price | The Equity Rights shall be at the same price per share as the Put Option. |
| Regulatory Requirements | Any party receiving OpCo New Common Stock, PropCo New Common Stock and/or PropCo New Preferred Stock agrees to abide by, and use its best efforts to obtain, any regulatory and licensing requirements or approvals that may arise as a result of such party's equity holdings in PropCo or OpCo, as the case may be.  To ensure regulatory approvals and prompt consummation of the Restructuring, any party signing the RSA must irrevocably elect upon execution of the RSA to be a Put Participant or a Right Participant and the amount of its Put Options or Equity Rights, as applicable.<br><br>The Company will assist with required regulatory approvals and structuring issues.  To the extent any required regulatory approvals are not obtained by the Closing of the Restructuring, the parties agree to take such actions as may be necessary or desirable to permit consummation of the Restructuring at such time, including entering into transactions to permit the Closing to occur while such regulatory approvals are pending (alternate temporary structures) or selling down their equity securities if regulatory approval is not obtained.  In furtherance of the foregoing, such parties agree that to the extent they are to receive in excess of 9.9% of the equity and regulatory approvals are not obtained by the Closing, all equity securities of such party in excess of 9.9% shall be put into escrow, or the parties shall cooperate to find an acceptable structure to allow for closing, pending the required regulatory approvals, including selling down below any regulatory thresholds. |
| Closing | The Put Option and Equity Rights will close immediately following distribution of the equity securities under the Plan (it being understood that the exercise date for the Put Options and Equity Rights will be set forth in the solicitation materials and shall occur on a date determined by the Company prior to the projected effective date of the Plan). |
| Put Option and Equity Rights Conditions Precedent | The Put Option and Equity Rights will be subject to customary conditions precedent including:<br><br>• the Bankruptcy Court shall have entered orders (a) approving the disclosure statement in respect of the Plan, (b) authorizing and approving the RSA, and (c) confirming the Plan;<br><br>• the effective date of the Plan shall have occurred;<br><br>• all regulatory approvals, or waiting periods, shall have been received or expired;<br><br>• there shall have been no Material Adverse Change (to be defined in the definitive documents); and<br><br>• other customary conditions precedent in form and substance |

|  | satisfactory to the Company, the Backstop Parties. |
|---|---|

## III. New Common and Preferred Stock

| Common Stock | The common equity securities to be issued will consist of new shares of common stock (a) of PropCo (such stock, the "***PropCo New Common Stock***") and (b) of OpCo (such stock, the "***OpCo New Common Stock***"). |
|---|---|
|  | The Boards of Directors of OpCo and PropCo shall each use its reasonable best efforts to have the OpCo New Common Stock, if more than 30% of the OpCo New Common Stock is owned by the First Lien Noteholders and Non-First Lien Noteholders (the "***Non-CEC Holders***"), and PropCo New Common Stock, respectively, (a) registered under US securities laws and (b) listed on a nationally recognized exchange. |
| PropCo New Preferred Stock | The preferred equity securities to be issued will consist of new shares of preferred stock of PropCo (such stock, the "***PropCo New Preferred Stock***"). The PropCo New Preferred Stock will have a [___]% coupon and will be convertible to PropCo New Common Stock at a [___]% premium to the value ascribed to PropCo New Common Stock under the Plan, mandatory conversation at PropCo's election starting in year 5; additional terms of the PropCo New Preferred Stock are described in Annex II. |

## IV. CEC

| Cash Contribution | $100 million to be used by the Company for general corporate purposes. |
|---|---|
| CEC Put Option Purchases | CEC or an affiliated entity shall, pursuant to the Put Option, purchase up to $[300] million of PropCo New Common Stock and $[700] million of OpCo New Common Stock. |
| Domestic Acquisitions and New Building Opportunities | CEC and its non-debtor subsidiaries shall give PropCo a right of first refusal to own the real estate, and have CEC or OpCo lease, all non-destination domestic (U.S.) real estate acquisitions and new building opportunities with CES retaining management rights with respect to such opportunities. |
|  | PropCo shall give CEC a right of first refusal to operate and manage all properties that PropCo acquires. |
| CEC Lease Guaranty | CEC, OpCo and PropCo will enter into a Management and Lease Support Agreement (the "***MLSA***") pursuant to which (i) CEC, or a wholly-owned subsidiary, will manage the properties on behalf of OpCo and (ii) CEC will provide a limited guaranty in respect of the OpCo's operating lease obligations, in each case while such lease remains in effect. The terms of the MLSA are described more fully in the term sheet attached as Annex III. |
| Releases | The Plan shall provide that CEC's participation in the Plan through its entry into the RSA and performance of the terms thereunder in facilitating the |

<table>
<tr><td></td><td>transactions contemplated by the Restructuring shall be a full and complete settlement under Bankruptcy Rule 9019 of any claims or causes of action, known or unknown, that the Company, its estate and third parties have or could have against CEC and its respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees, advisors, managers, attorneys, professionals, advisors and representatives.<br><br>As part of the settlement embodied in the Plan and the RSA, effective on the date the Restructuring is consummated, as consideration for the Cash Contribution, the CEC Put Option Purchases, the Domestic Acquisitions and New Building Opportunities, entry into the MLSA and other valuable consideration, the Company, its estate and all of the Company's creditors shall be deemed to have released CEC and its respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees, advisors, managers, attorneys, professionals, advisors and representatives (the "**CEC Released Parties**") from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, relating to or based upon any act or omission which occurred prior to the effectiveness of the Restructuring, including a release and waiver of any obligations arising under the Guaranty and Pledge Agreement of CEC dated as of July 25, 2014.  The Plan shall also include standard injunction and exculpation provisions in respect of the CEC Released Parties.</td></tr>
</table>

## V.     Caesars Palace Las Vegas ("CPLV")

| | |
|---|---|
| Transfer to Unrestricted Subsidiary | CPLV shall be transferred to a newly formed wholly owned unrestricted subsidiary of PropCo ("**CPLV Sub**") and its property shall be leased to OpCo. |
| CPLV Debt | CPLV Sub shall issue $2,600 million of secured non-guaranteed debt (the "**CPLV Debt**").  6 year term. Interest at LIBOR plus 2.5% with a 1% floor. |
| CPLV Sub and Third Party CPLV Debt | CPLV Sub shall use its commercially reasonable efforts to finance the CPLV Debt with third party investors for cash proceeds on or before consummation of the Restructuring (with 100% of the net proceeds being used to repay the holders of the CPLV Debt) (the "**Third Party CPLV Debt**").<br><br>If the CPLV Debt is only partially financed, then, subject to the Requisite Consenting Lenders (as defined in the RSA), the Third Party CPLV Debt shall be senior to any CPLV Debt issued (so long as the principal amount of the Third Party CPLV Debt is greater than the principal amount of the CPLV Debt).  If the principal amount of the Third Party CPLV Debt is less than the principal amount of the CPLV Debt, then the Third Party CPLV Debt will be *pari passu* with the CPLV Debt |

## VI.     REIT

| | |
|---|---|
| REIT | The Company shall restructure itself upon consummation of the Restructuring as a REIT. |
| PropCo Call Rights | Subject to the terms of the CERP debt documents and in no event in a manner that is dilutive of covenant compliance, PropCo shall have the right, for up to [180] days following the date the Restructuring is consummated, to enter into a binding agreement to purchase the real estate underlying Harrah's Atlantic City and Harrah's Laughlin for a cash purchase price equal to ten times the agreed annual rent for such properties, with the closing of such purchase(s) to occur following regulatory approvals. |

## VII.    New Capital Structure

| | |
|---|---|
| New First Lien OpCo Debt | $[2,073] million in principal amount of first lien debt.  6 year term. Callable at par.  Interest at LIBOR plus [3.5]% with a 1% LIBOR floor. Additional terms listed in <u>Annex IV</u>.<br><br>$[1,537] million distributed to First Lien Bank Lenders and $[536] million distributed to First Lien Noteholders. |
| New First Lien PropCo Debt | $[2,377] million in principal amount of first lien debt.  5 year term. Callable at par.  Interest at LIBOR plus [2.5]% with a 1% LIBOR floor. Additional terms listed in <u>Annex V</u>.<br><br>$[1,946] million distributed to the First Lien Bank Lenders and $[431] million distributed to First Lien Noteholders. |
| New Second Lien PropCo Debt | $[1,425] million in principal amount of second lien debt.  6 year term. Callable at par.  Interest [7.0]%.  Additional terms listed in <u>Annex VI</u>.<br><br>Distributed to First Lien Noteholders. |
| CPLV Debt | $[2,600] million.  6 year term.  Callable [at par].    Interest at LIBOR plus 2.5% with a 1% LIBOR floor.  Additional terms listed in <u>Annex VII</u>.<br><br>To be sold to third party lenders as per CPLV section above.<br><br>$[1,450] million distributed to the First Lien Bank Lenders and $[1,150] million distributed to First Lien Noteholders, if not so sold. |

## VIII.    Charter Documents and By-Laws of the Equity Issuers

| | |
|---|---|
| Corporate Governance | OpCo will be organized under the laws of Delaware and will have charter documents and by-laws that are reasonably acceptable to the Company and CEC.<br><br>PropCo will be organized under the laws of Delaware and will have charter documents and by-laws that are reasonably acceptable to the Company, |

8

| | |
|---|---|
| | CEC and counsel to the First Lien Noteholders. |
| Board of Directors | The board of directors of OpCo shall consist of 3 members, all of which shall be designated by CEC.<br><br>At Closing, the initial board of directors of PropCo shall consist of 3 members, with the Non-CEC Holders appointing 2 members and CEC appointing 1.  All directors must be licensed by the required regulatory authorities.  If the Non-CEC Holders' directors are, at closing, not licensed, then to assist with closing up to 2 of the independent members of CEOC shall be designated to the PropCo board so that there will be 3 members at Closing.<br><br>Post-Closing, if more than 30% of the PropCo New Common Stock is owned by the Non-CEC Holders, then (a) the Non-CEC Holders and CEC shall appoint directors pro rata and the Board may be expanded to up to 7 members and (b) until such time as the CEOC independents and members designated by CEC are a minority of the board, PropCo shall be prohibited from taking major transactions without shareholder approval. |

## IX.    Implementation

| | |
|---|---|
| In-Court Restructuring:  Use of Cash Collateral | In any chapter 11 case filed by the Company to effectuate the Restructuring, the First Lien Bank Lenders and the First Lien Noteholders will support entry of a cash collateral order that will allow the Company to use cash collateral for working capital and general corporate purposes and to pay costs associated with the Company's Restructuring.  The cash collateral arrangements shall allow such use of cash, without significant case-related milestones or budgeting constraints, for the earlier of [18] months and an event of default under such cash collateral order.[8]<br><br>In exchange for the Company's use of cash collateral, the First Lien Noteholders and the First Lien Bank Lenders shall receive the following:<br><br>• adequate protection liens<br><br>• liens on proceeds of avoidance actions |

---

[8] Events of Default to include, (a) entry of an order modifying the automatic stay with respect to material assets, (b) the Company seeks to create any additional post-petition liens, (c) the Company commences or joins in a proceeding against the First Lien Noteholders or First Lien Bank Lenders, (d) any modification to the Cash Collateral Order without the bank agent's consent, (e) entry of a final order terminating or requiring repayment of the Adequate Protection Payments, (f) dismissal or conversion of the Company's chapter 11 case, (g) termination of the Company's exclusive right to file a Plan, (h) failure to make an Adequate Protection Payment (5 business day grace period), and (i) failure to perform any other material term of the Cash Collateral Order (5 business day cure period).

| | |
|---|---|
| | • payment of legal and financial advisory fees<br><br>• Adequate Protection Payments at a rate equal to LIBOR plus [__]%[9]<br><br>• receipt of quarterly budgets [in the form attached as <u>Annex VIII</u>], a monthly variance report and an annual business plan and projections |

## X.  **Other**

| | |
|---|---|
| Definitive Agreements | Subject to the terms of the RSA, as soon as reasonably practicable, the parties will execute definitive documents and agreements implementing the Restructuring in form and substance consistent in all material respects with this Term Sheet. |
| Non Transfer | Under the RSA and subject to its terms, each member of the First Lien Bank Group and First Lien Bond Group will agree, on behalf of itself and its affiliates, not to transfer any First Lien Bank Obligations, First Lien Note Obligations or Non-First Lien Obligations held by such party and its affiliates from the date of execution of the RSA through the consummation of the Restructuring unless such the transferee(s) agree(s) to be bound by all of the terms and conditions of the RSA and this Term Sheet. |

---

[9] Such payments shall be in consideration for any claims that the First Lien Bank Lenders and First Lien Noteholders may have for diminution of their collateral occasioned by use of their collateral by the Debtors in Possession and shall not under any circumstances be deemed payments of principal.

**Annex I**
**Backstop Parties**

| Party | New PropCo Common Stock | New OpCo Common Stock | New PropCo Preferred Stock | Total Amount |
|---|---|---|---|---|
| CEC | $[300] million[10] | $[700] million | $[0] | $[1,000] million |
| Elliott | [$0] | $[0] | $[200] million[11] | $[200] million |
| | | | | |
| | | | | |

---

[10] Subject to dilution (not below 5% of the total amount of PropCo New Common Stock) if other First Lien Noteholders elect to become Backstop Parties.

[11] Subject to dilution if other First Lien Noteholders elect to become Backstop Parties.

11

## **Annex II**
## **PropCo New Preferred Stock**

[to come]

**<u>Annex III</u>**
**<u>Management and Lease Support Agreement</u>**

[to come]

**<u>Annex IV</u>**
**<u>New First Lien OpCo Debt</u>**

[to come]

**<u>Annex V</u>**
**<u>New First Lien PropCo Debt</u>**


[to come]

**<u>Annex VI</u>**
**<u>New Second Lien PropCo Debt</u>**

[to come]

## **Annex VII**
## **CPLV Debt**

[to come]

**<u>Annex VIII</u>**
**<u>Form of Quarterly Budget</u>**

[to come]

**EXHIBIT 13**

**KL Comments to PW Draft –11-8-14**
**Privileged & Confidential**
**For Discussion Purposes Only**
**Subject to FRE 408**

**This document and any related communications shall not be
used for any purpose in any litigation or proceeding.**

**This Term Sheet is highly confidential and this Term Sheet, its contents and its existence may not
be distributed, disclosed or discussed to or with any party other than in accordance with the
express terms of confidentiality agreements/arrangements
among the respective parties and the Company.**

SUMMARY TERM SHEET FOR PROPOSED RESTRUCTURING[12]

CAESARS ENTERTAINMENT OPERATING COMPANY, INC.
*and certain of its direct or indirect subsidiaries*
("**CEOC**" and together with certain of its direct or indirect subsidiaries, the "**Company**")

---

[1] Nothing herein shall be deemed to be the solicitation of an acceptance or rejection of a plan of reorganization; any such solicitation shall be in compliance with the relevant provisions of securities laws, the Bankruptcy Code and other applicable statutes and rules.

[2] This Term Sheet is an exhibit to, and part of, the Restructuring Support and Forbearance Agreement (the "**RSA**"), which contains additional descriptive language and legal terms in respect of the Company's restructuring.

I.       **Summary of Proposed Treatment**[3]

| | |
|---|---|
| Holders of the obligations (the "***First Lien Bank Obligations***") under the First Lien Credit Agreement ($5,364 million plus interest thereon accrued through the Petition Date) and swaps entered into pursuant to the First Lien Credit Agreement ($42 million) (collectively, the "***First Lien Bank Lenders***") | Each First Lien Bank Lender shall receive its pro rata share of (a) [$430 million] in cash, (b) [$1,537 million] in New First Lien OpCo Bank Debt, (c) [$1,946 million] in New First Lien PropCo Bank Debt, and (d) [$1,450 million] in CPLV Debt or in additional cash generated by the sale of the CPLV Debt or other sources.  Each First Lien Bank Lender waives any entitlement to post-petition interest to the extent First Lien Noteholders do not receive post-petition interest. |
| Secured claims of Holders of the obligations (the "***First Lien Note Obligations***") under the First Lien Indentures ($6,345 million plus interest thereon accrued through the Petition Date) (the "***First Lien Noteholders***") | In the event that the Non-First Lien Noteholders, and with respect to their deficiency claims, the First Lien Noteholders, vote as a class to accept the Plan, then each First Lien Noteholder shall receive in respect of its secured claim, prior to exercise of the Put Options (if applicable), its pro rata share of (a) [$292 million] in cash, (b) [$536 million] in New First Lien OpCo Bond Debt, (c) [$431 million] in New First Lien PropCo Bond Debt, (d) [$1,425 million] in New Second Lien PropCo Bond Debt, (e) [$1,150 million] in additional cash generated by the sale of the CPLV Debt or other sources, (f) [57.4]% of the PropCo New Common Stock on a fully diluted basis, (g) [100]% of the OpCo New Common Stock, and (h) [100]% of the PropCo New Preferred Stock.[4]<br><br>In the event that the Non-First Lien Noteholders, and with respect to their deficiency claims, the First Lien Noteholders, do not vote as a class to accept the Plan, then in addition to the consideration described in the preceding paragraph, each First Lien Noteholder shall also receive, in respect of its secured claim, its pro rata share of [_____].  **[Note:  need to fix cram down recoveries prior to signing RSA]**<br><br>As more fully described under Put Options (and subject to the limitations set forth therein), the First Lien Noteholders will have the opportunity to be Put Participants and sell some or all of their right to receive OpCo New Common Stock, PropCo New Common Stock and/or PropCo New Preferred Stock to the Backstop Parties for cash. |

---

[3] Administrative, priority and critical trade claims shall be paid in full in cash as soon as practicable following consummation of the Restructuring or as otherwise provided for in definitive documentation.  Treatment of noncritical trade claims to be determined.  **[NOTE:  needs to be determined prior to signing RSA in a manner that is acceptable to the group]**

[4] [NTD: Equity percentages used throughout this term sheet assumes New Preferred Stock is converted on a 1 to 1 basis.  Actual conversion rate is an open issue and all equity percentages remain subject to change]

| | If the Put Participants fully exercise the Put Options, the First Lien Noteholders, on an aggregate basis, will receive an additional [$1,200 million] in cash and a corresponding decrease in their equity recoveries. |
|---|---|
| Deficiency Claims of First Lien Noteholders and all claims of Holders of the obligations (collectively the "***Non-First Lien Obligations***") under (a) the Second Lien Indentures ($5,252 million plus interest thereon accrued through the Petition Date) (the "***Second Lien Noteholders***"), (b) the guaranteed unsecured indentures ($495 million plus interest thereon accrued through the Petition Date) (the "***Unsecured Guaranteed Noteholders***"), and (c) the unsecured note indentures ($820 million plus interest thereon accrued through the Petition Date) (the "***Unsecured Noteholders***," collectively with the Second Lien Noteholders and Unsecured Guaranteed Noteholders, the "***Non-First Lien Noteholders***") | If the Non-First Lien Noteholders, and with respect to their deficiency claims, the First Lien Noteholders, vote as a class to accept the Plan, then First Lien Noteholders will waive distributions in respect of their deficiency claims and each Non-First Lien Noteholder shall receive its pro rata share of [28.4]% of the PropCo New Common Stock on a fully diluted basis,[5] which includes consideration for the value of any unencumbered assets.<br><br>If the Non-First Lien Noteholders, and with respect to their deficiency claims, the First Lien Noteholders, do not vote as a class to accept the Plan, then each Non-First Lien Noteholder shall only receive its pro rata share of consideration in an amount equal to [what such Non-First Lien Noteholders would otherwise be entitled to if the Company were liquidated under chapter 7 of the Bankruptcy Code on the effective date of the Plan as required by Section 1129(a)(7) of the Bankruptcy Code (and subject to the First Lien Noteholders' deficiency claims)] to be paid in PropCo New Common Stock and/or OpCo New Common Stock. **[Note: Need to fix cram down recoveries prior to signing RSA]** |

## II.    Put Options[6]

| Put Options | Each First Lien Noteholder shall have the option (which option shall be selected on their voting ballots) to put some or all of (i) the OpCo New Common Stock (the "***OpCo New Common Stock Put Options***"); (ii) the PropCo New Common Stock (the "***PropCo New Common Stock Put Options***"); and/or [(iii) the PropCo New Preferred Stock] (the "***PropCo New Preferred Stock Put Options***" and, together with (i) and (ii), the "***Put Options***"), it is to receive under the Plan to Caesars Entertainment Company or its designee ("***CEC***") [and funds controlled or managed by the First Lien Noteholders listed in Annex I (CEC and such parties, the "***Initial Backstop Parties***").] **[NOTE: Noteholder backstop mechanics under discussion]**<br><br>Each First Lien Noteholder that exercises any of its Put Options in whole or in part shall be referred to herein as a "***Put Participant***." |
|---|---|

---

[5]CEOC can substitute up to [___]% of PropCo New Common Stock for up to [___]% of OpCo New Common Stock. **[Note: this needs to be fixed prior to signing RSA]**

[6] For tax efficiency purposes, the proceeds from the Put Options may flow through the Company to the First Lien Noteholders as part of their recovery under the Plan.

| | |
|---|---|
| Put Options Allocation Between the Backstop Parties | As detailed in <u>Annex I</u>, CEC shall purchase all the OpCo New Common Stock subject to the OpCo New Common Stock Put Options exercised by the Put Participants.[7]  [Subject to the next paragraph, the Initial Backstop Parties shall purchase (a) the PropCo New Common Stock subject to the PropCo New Common Stock Put Options exercised by the Put Participants and (b) the PropCo New Preferred Stock subject to the PropCo New Preferred Stock Put Options exercised by the Put Participants.]<br><br>[The First Lien Noteholders that are not Initial Backstop Parties may elect to become backstop parties (together with the Initial Backstop Parties, the "***Backstop Parties***") and purchase a portion of (a) the PropCo New Preferred Stock subject to the PropCo New Preferred Stock Put Options and/or (b) the PropCo New Common Stock subject to the PropCo New Common Put Options.  Such election will dilute the Initial Backstop Parties; <u>provided</u>, <u>however,</u> that the PropCo New Common Stock purchased by CEC pursuant to the Put Options cannot be diluted by such election below 5% of the total amount of PropCo New Common Stock issued pursuant to the Plan, on a fully diluted basis (and to the extent it otherwise would be, all other participants shall be cut back pro rata so that CEC maintains such 5% ownership).  First Lien Noteholders who wish to become Backstop Parties must elect to become Backstop Parties (and specify the amount of their backstop in the aggregate and as to each class of stock subject thereto) at the time of executing the RSA.]<br><br>[The Backstop Parties shall receive no fee for purchasing or agreeing to purchase the equity subject to the Put Participants' Put Options.]<br><br>**[NOTE:  Noteholder backstop mechanics under discussion]** |
| Put Options Price | The Put Options shall be at a price per share implying a total value of $[700] million for 100% of the OpCo New Common Stock, $[300] million for [14.8%] of the PropCo New Common Stock on a fully diluted basis [and $[200] million for 100% of the PropCo New Preferred Stock.]<br><br>**[NOTE:  Noteholder backstop mechanics under discussion]** |
| Regulatory Requirements | Any party receiving OpCo New Common Stock, PropCo New Common Stock and/or PropCo New Preferred Stock agrees to abide by, and use its best efforts to obtain, any regulatory and licensing requirements or approvals that may arise as a result of such party's equity holdings in PropCo or OpCo, as the case may be.<br><br>The Company and its affiliates will assist with required regulatory approvals and structuring issues, including common stock voting structures to ensure compliance with regulatory requirements.  To the extent any required regulatory approvals are not obtained by the Closing of the |

---

[7] NTD:  It is assumed that the First Lien Noteholders executing the RSA will elect to put at least 50.1% of the OpCo New Common Stock to CEC.

| | |
|---|---|
| | Restructuring, the parties agree to take such actions as may be necessary or desirable to permit consummation of the Restructuring at such time, including entering into transactions to permit the Closing to occur while such regulatory approvals are pending (alternate temporary structures) or selling down their equity securities if regulatory approval is not obtained. In furtherance of the foregoing, such parties agree that to the extent such parties, or entities with which such parties' equity securities holdings would be aggregated for regulatory purposes, are to receive in excess of [9.9]% of the equity [of either PropCo or OpCo?] and regulatory approvals are not obtained by the Closing, all equity securities of such party in excess of [9.9]% [at either PropCo or OpCo, as applicable?] shall be put into escrow, or the parties shall cooperate to find an acceptable structure to allow for closing, pending the required regulatory approvals, including selling down below any regulatory thresholds.<br><br>**[NOTE: we would like a better explanation for the significance of the 9.9%]** |
| Closing | The Put Options will close immediately following distribution of the equity securities under the Plan (it being understood that the exercise date for the Put Options will be set forth in the solicitation materials and shall occur on a date determined by the Company prior to the projected effective date of the Plan). **[NOTE: consider whether put should be right to receive equity so that equity does not pass through creditors]** |
| Put Options Conditions Precedent | The exercise of the Put Options will be subject to customary conditions precedent including:<br><br>• the Bankruptcy Court shall have entered orders (a) approving the disclosure statement in respect of the Plan, (b) authorizing and approving the RSA, and (c) confirming the Plan;<br><br>• [the effective date of the Plan shall have occurred]; **[NOTE: consider whether put should be right to receive equity so that equity does not pass through creditors]**<br><br>• all regulatory approvals, or waiting periods, shall have been received or expired;<br><br>• other customary conditions precedent in form and substance satisfactory to the Company, the Backstop Parties, and the Requisite Consenting First Lien Bond Holders (as defined in the RSA, the "***Requisite Consenting First Lien Bond Holders***"). |

## III.    New Common and Preferred Stock

| | |
|---|---|
| Common Stock | The common equity securities to be issued will consist of new shares of common stock (a) of PropCo (such stock, the "***PropCo New Common Stock***") and (b) of OpCo (such stock, the "***OpCo New Common Stock***"). |

|  | The OpCo New Common Stock, if more than 30% of the OpCo New Common Stock is owned by the First Lien Noteholders and Non-First Lien Noteholders (the "***Non-CEC Holders***"), and PropCo New Common Stock, respectively, shall be (a) registered under US securities laws and (b) listed on a nationally recognized exchange, as of the effective date of the Plan. |
| --- | --- |
| PropCo New Preferred Stock | The preferred equity securities to be issued will consist of new shares of preferred stock of PropCo (such stock, the "***PropCo New Preferred Stock***"). The PropCo New Preferred Stock will have a [__]% coupon and will be convertible into [14.2]% of the PropCo New Common Stock, mandatory conversion at PropCo's election starting in year 5; additional terms of the PropCo New Preferred Stock are described in <u>Annex II</u>. |

## IV.   CEC

| Cash Contribution | $100 million to be used by the Company for general corporate purposes. |
| --- | --- |
| CEC Put Options Purchases | CEC or an affiliated entity shall, pursuant to the Put Options, purchase up to (a) $[300] million of PropCo New Common Stock at a price per share implying a total value of $[300] million for 14.8% of the PropCo New Common Stock on a fully diluted basis and (b) $[700] million of OpCo New Common Stock at a price per share implying a total value of $[700] million for 100% of the OpCo New Common Stock. |
| Domestic Acquisitions and New Building Opportunities | CEC and its non-debtor subsidiaries shall give PropCo a right of first refusal to own the real estate, and have CEC or OpCo lease, all non-destination domestic (U.S.) real estate acquisitions and new building opportunities with [CES/OpCo?] retaining management rights with respect to such opportunities.<br><br>PropCo shall give [CEC/OpCo/CES???] a right of first refusal to operate and manage all properties that PropCo acquires.<br><br>The material terms of these rights of first refusal are described more fully on <u>Annex III</u>. |
| CEC Lease Guaranty | CEC, OpCo and PropCo will enter into a Management and Lease Support Agreement (the "***MLSA***") pursuant to which (i) CEC, or a wholly-owned subsidiary, will manage the properties on behalf of OpCo and (ii) CEC will provide a guaranty in respect of the OpCo's operating lease obligations, in each case while such lease (including any extensions, renewals or replacements) remains in effect. The terms of the MLSA are described more fully in the term sheet attached as <u>Annex IV</u>.<br><br>The terms of the operating lease between OpCo and PropCo are described more fully in the term sheet attached as <u>Annex V</u>. |
| Releases | The Plan shall provide that CEC's participation in the Plan through its entry into the RSA and performance of the terms thereunder in facilitating the transactions contemplated by the Restructuring shall be a full and complete |

6

<table>
<tr><td></td><td>settlement under Bankruptcy Rule 9019 of any claims or causes of action, known or unknown, that the Company, its estate and third parties have or could have against CEC and its respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees,  managers, attorneys, professionals, advisors and representatives, relating to the Company.

As part of the settlement embodied in the Plan and the RSA, effective on the date the Restructuring is consummated, as consideration for the Cash Contribution, the CEC Put Options Purchases, the Domestic Acquisitions and New Building Opportunities, entry into the MLSA and other valuable consideration, the Company, its estate and all of the Company's creditors shall be deemed to have released CEC and its respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees, managers, attorneys, professionals, advisors and representatives (the "***CEC Released Parties***") from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, at law, in equity or otherwise, relating to or based upon any act or omission relating to the Company which occurred prior to the effectiveness of the Restructuring, including a release and waiver of any obligations arising under the Guaranty and Pledge Agreement of CEC dated as of July 25, 2014.  The Plan shall also include standard injunction and exculpation provisions in respect of the CEC Released Parties.

As part of the settlement embodied in the Plan and the RSA, effective on the date the Restructuring is consummated, as consideration for their entry into the RSA and other valuable consideration, the Company and the CEC Released Parties shall be deemed to have released the Consenting Creditors (as defined in the RSA) and their respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees, managers, attorneys, professionals, advisors and representatives from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, at law, in equity or otherwise, relating to or based upon any act or omission relating to the Company which occurred prior to the effectiveness of the Restructuring.</td></tr>
</table>

## V.    Caesars Palace Las Vegas ("CPLV")

| | |
|---|---|
| Transfer to Unrestricted Subsidiary | CPLV shall be transferred to a newly formed wholly owned unrestricted subsidiary of PropCo ("***CPLV Sub***") and its property shall be leased to OpCo.

The terms of the operating lease between CPLV Sub and OpCo are described more fully in the term sheet annexed hereto as <u>Annex VI</u>. |
| CPLV Debt | CPLV Sub shall issue $2,600 million of secured non-guaranteed debt (the "***CPLV Debt***").  6 year term. Interest at LIBOR plus 2.5% with a 1% LIBOR floor and 4% total interest cap.  Additional terms listed in <u>Annex</u> |

| | VII. |
|---|---|
| CPLV Sub and sale of CPLV Debt | CPLV Sub shall finance the CPLV Debt with third party investors for cash proceeds on or before consummation of the Restructuring (with 100% of the net proceeds being used to fund distributions to First Lien Bank Debt Lenders and First Lien Noteholders, provided that, up to $1,450 million of the CPLV Debt may be distributed in respect of First Lien Bank Obligations. |

## VI.    REIT

| REIT | The Company shall restructure itself upon consummation of the Restructuring as a REIT. |
|---|---|
| PropCo Call Rights | Subject to the terms of the CERP and CGP debt documents and in no event in a manner that is dilutive of covenant compliance, PropCo shall have the right, for up to [180] days following the date the Restructuring is consummated, to enter into a binding agreement to purchase the real estate underlying Harrah's Atlantic City and Harrah's Laughlin for a cash purchase price equal to ten times the agreed annual rent for such properties, and on other customary terms and conditions, with the closing of such purchase(s) to occur following regulatory approvals.  **[NOTE:  Other properties being considered to optimize REIT Portfolio]**<br><br>Other material terms of the PropCo call rights are set forth in Annex VIII. |
| Joint Services Agreement | **[Note: Services JV modifications TBD]** |

## VII.    New Capital Structure

| New First Lien OpCo Bank Debt | $[1,537] million in principal amount of first lien bank debt. *Pari passu* with New First Lien OpCo Bond Debt.  6 year term.  Callable at par. Interest at LIBOR plus [4.0]% with a 1% LIBOR floor.  Additional terms listed in Annex IX.<br><br>Distributed to First Lien Bank Lenders. |
|---|---|
| New First Lien OpCo Bond Debt | $[536 million] in principal amount of first lien notes. *Pari passu* with New First Lien OpCo Bank Debt.  6 year term.  Callable at par. Interest at LIBOR plus [4.0]% with a 1% LIBOR floor.  Additional terms listed in Annex IX.<br><br>Distributed to First Lien Noteholders. |
| New First Lien PropCo Bank Debt | $[1,946] million in principal amount of first lien bank debt. *Pari passu* with New First Lien PropCo Bond Debt  5 year term.  [Callable at par.] Interest at LIBOR plus [3.0]% with a 1% LIBOR floor.  Additional terms listed in Annex X. |

8

| | |
|---|---|
| | Distributed to First Lien Bank Lenders. |
| New First Lien PropCo Bond Debt | $[431] million in principal amount of first lien debt. *Pari passu* with New First Lien PropCo Bank Debt.  5 year term.  Callable at par.  Interest at LIBOR plus [3.0]% with a 1% LIBOR floor.  Additional terms listed in <u>Annex X</u>.<br><br>Distributed to First Lien Noteholders. |
| New Second Lien PropCo Bond Debt | $[1,425] million in principal amount of second lien debt.  6 year term.  Interest [TBD].  Non-callable for 3 years.  Callable after three years as follows: during the 4th year, callable at par + [1/2] Coupon; during the 5th year, callable at par + [1/4] Coupon; during the 6th year, callable at [par].  Additional terms listed in <u>Annex XI</u>.<br><br>Distributed to First Lien Noteholders. |
| CPLV Debt | $[2,600] million.  6 year term.  Callable [at par].    Interest at LIBOR plus 2.5% with a 1% LIBOR floor and 4% total interest cap.  Additional terms listed in <u>Annex VII</u>.<br><br>To be issued by CPLV Sub to third party lenders as per CPLV section above.<br><br>Up to $[1,450] million distributed to the First Lien Bank Lenders, if not issued to third party lenders. |

## VIII.    Charter Documents and By-Laws of the Equity Issuers

| | |
|---|---|
| Corporate Governance | OpCo will be organized under the laws of Delaware and will have charter documents and by-laws that are acceptable to the Company, CEC and the Requisite Consenting First Lien Bond Holders.<br><br>PropCo will be organized under the laws of Delaware and will have charter documents and by-laws that are reasonably acceptable to the Company, CEC and the Requisite Consenting First Lien Bond Holders. |
| Board of Directors | The board of directors of OpCo shall consist of (a) 3 voting members to be designated by CEC, 1 of which shall be independent and acceptable to the Requisite First Lien Bond Holders (as defined in the RSA) and (b) 1 non-voting observer to be designated by the Requisite Consenting First Lien Bond Holders, each to be identified in a plan supplement.  The independent director shall be a member of all committees of the Board and the observer shall be given notice of and an opportunity to attend all committee meetings (and receive all materials given to Board members in connection with Board or committee meetings).  **[Note:  need to provide mechanism for noteholders to appoint director(s) if noteholders end up owning more than a specific threshold of the OpCo equity]**<br><br>At Closing, the initial board of directors of PropCo shall consist of (a) [7] |

| | voting members to be designated by the Requisite Consenting First Lien Bond Holders and (b) 1 non-voting observer to be designated by CEC, each to be identified in a Plan Supplement. The observer shall be given notice of and an opportunity to attend all portions of committee meetings (and receive all materials given to Board members in connection with Board or committee meetings), except in situations where there would be a conflict of interest with CEC. At least 3 voting members must be licensed by the required regulatory authorities by closing. To the extent any of the other designated voting members are not so licensed by closing, they shall be non-voting members until so licensed. |
|---|---|

## IX.    **Implementation**

| In-Court Restructuring: Use of Cash Collateral | In the chapter 11 cases filed by the Company to effectuate the Restructuring, the First Lien Bank Lenders and the First Lien Noteholders will support entry of a cash collateral order that will allow the Company to use cash collateral for working capital and general corporate purposes and to pay costs associated with the Company's Restructuring on the terms, including milestones and budgeting constraints, set forth in the Cash Collateral Stipulation (as defined in the RSA).[8] |
|---|---|
| | As more fully set forth in the Cash Collateral Stipulation, in exchange for the Company's use of cash collateral, the First Lien Noteholders and the First Lien Bank Lenders and/or their respective legal and financial advisors shall receive, among other things, the following: |
| | • adequate protection liens |
| | • liens on proceeds of avoidance actions |
| | • payment of legal and financial advisory fees |
| | • Adequate Protection Payments at a rate equal to [___]%[9] |
| | • receipt of quarterly budgets [in the form attached as <u>Annex XII</u>], a monthly variance report, an annual business plan and projections, |

---

[8] Events of Default to include, among other things, (a) entry of an order modifying the automatic stay with respect to material assets, (b) the Company seeks to create any additional post-petition liens, (c) the Company commences, joins or assists in a proceeding against the First Lien Noteholders or First Lien Bank Lenders, (d) any modification to the Cash Collateral Order without the bank agent's or the Requisite Consenting First Lien Bond Holders' consent, (e) entry of a final order terminating or requiring repayment of the Adequate Protection Payments, (f) dismissal or conversion of the Company's chapter 11 cases, (g) termination of the Company's exclusive right to file a Plan, (h) failure to make an Adequate Protection Payment (5 business day grace period), and (i) failure to perform any other material term of the Cash Collateral Order (5 business day cure period).

[9] Such payments shall be in consideration for any claims that the First Lien Bank Lenders and First Lien Noteholders may have for diminution in the value of their collateral occasioned by the automatic stay and the use of their collateral by the Debtors in Possession and shall not under any circumstances be deemed payments of principal.

| | and such other reports and information to the extent required by the Cash Collateral Stipulation. |
|---|---|

**X.      Other**

| Definitive Agreements | Subject to the terms of the RSA, as soon as reasonably practicable, the parties will execute definitive documents and agreements implementing the Restructuring in form and substance consistent in all material respects with this Term Sheet and acceptable to the Consenting First Lien Bond Holders (as defined in the RSA). |
|---|---|
| Non Transfer | As set forth in the RSA and subject to its terms and certain exceptions contained therein, each Consenting Creditor and the Company Parties (as each is defined in the RSA) will agree, on behalf of itself and its affiliates, not to transfer any First Lien Bank Obligations, First Lien Note Obligations or Non-First Lien Obligations held by such party and its affiliates from the date of execution of the RSA through the consummation of the Restructuring unless such the transferee(s) agree(s) to be bound by all of the terms and conditions of the RSA and this Term Sheet. |

**Annex I**
**Backstop Parties**

| Party | PropCo New Common Stock | OpCo New Common Stock | PropCo New Preferred Stock | Total Amount |
|---|---|---|---|---|
| CEC | $[300] million[10] | $[700] million | $[0] | $[1,000] million |
| Elliott | [$0] | $[0] | $[200] million[11] | $[200] million |
| | | | | |
| | | | | |

---

[10] Subject to dilution (not below 5% of the total amount of PropCo New Common Stock) if other First Lien Noteholders elect to become Backstop Parties.

[11] Subject to dilution if other First Lien Noteholders elect to become Backstop Parties.

12

**<u>Annex II</u>**
**<u>PropCo New Preferred Stock</u>**

[to come]

**<u>Annex III</u>**
**<u>Rights of First Refusal</u>**

[to come]

**<u>Annex IV</u>**
**<u>Management and Lease Support Agreement</u>**

[to come]

**<u>Annex V</u>**
**<u>PropCo/OpCo Operating Lease</u>**

[to come]

**<u>Annex VI</u>**
**<u>CPLV Sub/OpCo Operating Lease</u>**

[to come]

**<u>Annex VII</u>**
**<u>CPLV Debt</u>**

[to come]

**<u>Annex VIII</u>**
**<u>PropCo Call Rights</u>**

[to come]

**<u>Annex IX</u>**
**<u>New First Lien OpCo Debt</u>**

[to come]

**<u>Annex X</u>**
**<u>New First Lien PropCo Debt</u>**


[to come]

**<u>Annex XI</u>**
**<u>New Second Lien PropCo Bond Debt</u>**

[to come]

**<u>Annex XII</u>**
**<u>Form of Quarterly Budget</u>**

[to come]

**<u>EXHIBIT 14</u>**

**PW Comments – 11/24/2014**
**Privileged & Confidential**
**For Discussion Purposes Only**
**Subject to FRE 408**

**This document and any related communications shall not be
used for any purpose in any litigation or proceeding.**

**This Term Sheet is highly confidential and this Term Sheet, its contents and its existence may not
be distributed, disclosed or discussed to or with any party other than in accordance with the
express terms of confidentiality agreements/arrangements
among the respective parties and the Company.**

SUMMARY TERM SHEET FOR PROPOSED RESTRUCTURING[1][2]

CAESARS ENTERTAINMENT OPERATING COMPANY, INC.
*and certain of its direct or indirect subsidiaries*
("**CEOC**" and together with certain of its direct or indirect subsidiaries, the "**Company**")

---

[1] Nothing herein shall be deemed to be the solicitation of an acceptance or rejection of a plan of reorganization; any such solicitation shall be in compliance with the relevant provisions of securities laws, the Bankruptcy Code and other applicable statutes and rules.

[2] This Term Sheet is an exhibit to, and part of, the Restructuring Support and Forbearance Agreement (the "**RSA**"), which contains additional descriptive language and legal terms in respect of the Company's restructuring.

## I.      Summary of Proposed Treatment[3]

| | |
|---|---|
| Holders of the obligations (the "***First Lien Bank Obligations***") under the First Lien Credit Agreement ($5,364 million plus interest thereon accrued through the Petition Date) and swaps entered into pursuant to the First Lien Credit Agreement ($42 million) (collectively, the "***First Lien Bank Lenders***") | Each First Lien Bank Lender shall receive a recovery equal in value to 100% of the amounts outstanding under the First Lien Credit Agreement, with such recovery consisting of its pro rata share of (a) $705 million in cash, (b) $883 million in New First Lien OpCo Debt, (c) $406 million[4] of New Second Lien OpCo Debt (such amount to be reduced, and replaced, by the ratable amount of Available Cash in accordance with the provisions below), (d) $1,961 million in New First Lien PropCo Debt, and (e) $1,450 million in CPLV Debt, additional cash if the CPLV Debt is financed for cash or, if not fully financed, Mezzanine CPLV Debt; provided, however, that the First Lien Bank Lenders may choose to have up to $100 million of Mezzanine CPLV Debt they are to receive converted to a corresponding amount of New First Lien OpCo Debt, New Second Lien OpCo Debt, New First Lien PropCo Debt, New Second Lien PropCo Debt or equity in PropCo.  Each First Lien Bank Lender waives any entitlement to post-petition interest to the extent First Lien Noteholders do not receive post-petition interest. |
| Secured claims of Holders of the obligations (the "***First Lien Note Obligations***") under the First Lien Indentures ($6,345 million plus interest thereon accrued through the Petition Date) (the "***First Lien Noteholders***") | Each First Lien Noteholder shall receive in respect of its secured claim, a recovery equal in value to 93.8% of the amounts outstanding under the First Lien Indentures, with such recovery, consisting of its pro rata share of (a) $382 million in cash, (b) $306 million in New First Lien OpCo Debt, (c) $141 million[5] of New Second Lien OpCo Debt (such amount to be reduced, and replaced, by the ratable amount of Available Cash in accordance with the provisions below), (d) $431 million in New First Lien PropCo Debt, (e) $1,425 million in New Second Lien PropCo Debt, (f) $1,150 million in CPLV Debt, additional cash if the CPLV Debt is financed for cash or, if not fully financed, Mezzanine CPLV Debt, (g) 55.1% directly or indirectly of PropCo[6] on a fully diluted basis,[7] (or cash to the extent of any Equity Rights exercised and/ or such Holder exercises its Put Option, as further described |

---

[3] Administrative, priority and critical trade claims shall be paid in full in cash as soon as practicable following consummation of the Restructuring or as otherwise provided for in definitive documentation.  Treatment of noncritical trade claims to be determined.  **[NOTE: K&E determining quantum and treatment of noncritical trade claims, likely to be included with the Non-First Lien Obligations.]**

[4] Principal amount of New Second Lien OpCo Debt is net of assumed $350 million reduction of New Second Lien OpCo Debt upon Exit to be funded by CEOC balance sheet cash or, to the extent of any shortfall, CEC (such shortfall, an "Additional CEC Contribution").

[5] Principal amount of New Second Lien OpCo Debt is net of assumed $350 million reduction of New Second Lien OpCo Debt upon Exit to be funded by CEOC balance sheet cash or, to the extent of any shortfall, an Additional CEC Contribution.

[6] Pending regulatory and REIT requirements, the First Lien Noteholders will receive their interest in PropCo indirectly through REIT New Common Stock (as opposed to directly through PropCo New LP Interests as CEC and CEOC will).

[7] Drafted as such to remove details of what is available for Non-First Lien Noteholders.

| | |
|---|---|
| | below) and (h) 100% of the OpCo New Common Stock (or, at its option, cash in the event such Holder exercises its Put Option, as further described below).<br><br>In the event that the Non-First Lien Noteholders, and with respect to their deficiency claims, the First Lien Noteholders, do not vote as a class to accept the Plan, then in addition to the consideration described in the preceding paragraph, each First Lien Noteholder shall also receive, in respect of its deficiency claim, its pro rata share of the unencumbered assets.<br><br>As more fully described under Put Options and Equity Rights (and subject to the limitations set forth therein), the First Lien Noteholders (a) will have the opportunity to be a Put Participant and sell the right to receive under the Plan some or all of their equity to the Backstop Parties for cash and/or (b) may receive cash from the Non-First Lien Noteholders for the right to receive some or all of their equity in connection with the exercise of the Equity Rights.<br><br>If the Put Participants fully exercise the Put Options, the First Lien Noteholders, on an aggregate basis, will receive an additional [$1,000 million] in cash and a corresponding decrease in their equity recoveries, as more fully described in Section II below under "Put Options Price." |
| Deficiency Claims of First Lien Noteholders and all claims of Holders of the obligations (collectively the "***Non-First Lien Obligations***") under (a) the Second Lien Indentures ($5,252 million plus interest thereon accrued through the Petition Date) (the "***Second Lien Noteholders***"), (b) the guaranteed unsecured indentures ($495 million plus interest thereon accrued through the Petition Date) (the "***Unsecured Guaranteed Noteholders***"), and (c) the unsecured note indentures ($820 million plus interest thereon accrued through the Petition Date) (the "***Unsecured Noteholders***," collectively with the Second Lien Noteholders and Unsecured Guaranteed Noteholders, the "***Non-First Lien Noteholders***") | If the Non-First Lien Noteholders, and with respect to their deficiency claims, the First Lien Noteholders, vote as a class to accept the Plan, then the First Lien Noteholders will waive distributions in respect of their deficiency claims and each Non-First Lien Noteholder shall receive its pro rata share of an amount of equity to be determined, directly or indirectly, in Opco or PropCo from the equity that Caesars Entertainment Company or its designee ("***CEC***") is to receive, which includes consideration for the value of any unencumbered assets.  And, as more fully described under the Equity Right, if the Non-First Lien Noteholders vote as a class to accept the Plan, each Non-First Lien Noteholder shall also have the option to be a Rights Participant.<br><br>If the Non-First Lien Noteholders, and with respect to their deficiency claims, the First Lien Noteholders, do not vote as a class to accept the Plan, then each Non-First Lien Noteholder shall only receive its pro rata share of consideration in an amount equal to the value of any unencumbered assets (subject to the First Lien Noteholders' deficiency claims) to be paid in Opco or Propco equity.<br><br>The Plan may provide for the separate classification of Non-First Lien Noteholders in separate classes or subclasses in a manner not inconsistent with this Term Sheet. |

## II.    Put Options and Equity Rights[8]

| | |
|---|---|
| Put Options | Each First Lien Noteholder shall have the option to put some or all of its right under the Plan to receive (i) the OpCo New Common Stock it would otherwise receive pursuant to the Plan (the "***OpCo New Common Stock Put Options***"); and/ or (ii) the direct or indirect interests in PropCo it would otherwise receive pursuant to the Plan (the "***REIT New Common Stock Put Options***" and, together with OpCo New Common Stock Put Options, the "***Put Options***"),  and to instead receive cash as described below under "Put Options Price," in which case CEC and any other Backstop Parties will purchase such equity interests as further described below, subject in the case of PropCo equity interests to the exercise of the Equity Rights described below.  The Put Options must be selected upon execution of the RSA in the case of any First Lien Noteholder executing the RSA.<br><br>Each First Lien Noteholder that exercises any of its Put Options in whole or in part shall be referred to herein as a "***Put Participant***." |
| Put Options Allocation Between the Backstop Parties | As detailed in <u>Annex I</u>, CEC shall purchase the right to receive all the OpCo New Common Stock subject to the OpCo New Common Stock Put Options and REIT New Common Stock (or PropCo New LP Interests if applicable) subject to the REIT New Common Stock Put Options exercised by the Put Participants.[9]<br><br>The First Lien Noteholders may elect to become backstop parties (together with CEC, the "***Backstop Parties***") and purchase a portion of the REIT New Common Stock (or PropCo New LP Interests if applicable) subject to the REIT New Common Put Options.  First Lien Noteholders who wish to become Backstop Parties must make any required investor representations required for federal and state securities law purposes and, if executing the RSA, must elect to become Backstop Parties (and specify the amount of their backstop in the aggregate and as to each class of stock subject thereto) at the time of executing the RSA.<br><br>The Backstop Parties shall receive no fee for purchasing or agreeing to purchase the equity subject to the Put Participants' Put Options. |
| Put Options Price | The Put Options shall be at a price per share implying a total value of $[700] million for 100% of the OpCo New Common Stock and $[300] million for [14.8%] of PropCo (directly or indirectly) on a fully diluted basis. |

---

[8] For tax efficiency or other purposes, (i) the cash consideration to be paid to First Lien Noteholders exercising their Put Options may flow through the Company to the First Lien Noteholders as part of their recovery under the Plan as direct payments of cash, rather than be paid in respect of the receipt of stock or be paid directly by the Backstop Parties and (ii) the First Lien Noteholders may be deemed to be selling either their right to receive the stock or the actual stock itself.

[9] For regulatory purposes, it is assumed that the First Lien Noteholders executing the RSA will elect to put at least 50.1% of the OpCo New Common Stock to CEC.

4

| Equity Rights | If the Non-First Lien Noteholders vote as a class to accept the Plan, the "**Equity Rights**" as detailed below shall occur and each Non-First Lien Noteholder shall have the right to be a "**Right Participant**." If the Non-First Lien Noteholders do not vote as a class to accept the Plan, there shall be no Equity Rights. |
| --- | --- |
| | Each Right Participant may elect to purchase (with the purchase occurring after the closing of the Put Option) the right to receive up to (a) all of the direct or indirect interest in PropCo to be received by the First Lien Noteholders and the Backstop Parties (the "**Equity Rights**"), subject to being cut back on a pro rata basis based on the amount of Equity Rights subscribed for. Any Non-First Lien Noteholder exercising an Equity Right must make any required investor representations required for federal and state securities law purposes and, if executing the RSA, shall elect whether to exercise its Equity Right upon execution of the RSA. |
| | The Right Participants must make their purchases <u>first</u> from the First Lien Noteholders (pro rata among the First Lien Noteholders), <u>second</u> from the non-CEC Backstop Parties (pro rata among the non-CEC Backstop Parties), and <u>third</u> from CEC.[10] |
| | For the avoidance of doubt, the First Lien Noteholders and the Backstop Parties, as applicable, must sell their respective right to receive equity, pursuant to the terms of the Equity Rights, to the Right Participants. The Right Participants shall receive no fee for acting as Right Participants. |
| Equity Rights Price | The Equity Rights shall be at the same price per share as the Put Option. |
| Regulatory Requirements | Any party receiving OpCo New Common Stock, REIT New Common Stock and/or PropCo New LP Interests agrees to abide by, and use its best efforts to obtain, any regulatory and licensing requirements or approvals that may arise as a result of such party's equity holdings in the REIT, PropCo or OpCo, as the case may be. To ensure regulatory approvals and prompt consummation of the Restructuring, any party signing the RSA must irrevocably elect upon execution of the RSA the amount of Put Options. |
| | The Company and its affiliates will assist with required regulatory approvals and structuring issues, including common stock voting structures to ensure compliance with regulatory requirements. To the extent any required regulatory approvals are not obtained by the Closing of the Restructuring, the parties agree to take such actions as may be necessary or desirable to permit consummation of the Restructuring at such time, including entering into transactions to permit the Closing to occur while such regulatory approvals are pending (alternate temporary structures) or selling down their equity securities if regulatory approval is not obtained. In furtherance of the foregoing, such parties agree that to the extent such parties, or entities with which such parties' equity securities holdings would |

---

[10] NTD: If the First Lien Noteholders wish to not sell their equity, we can alter the waterfall.

| | |
|---|---|
| | be aggregated for regulatory purposes, are to receive any equity in either OpCo or PropCo (directly or indirectly) and required regulatory approvals are not obtained by the Closing, all equity securities of such party in excess of the threshold(s) where the required regulatory approval is required, as applicable, shall be put into escrow, or the parties shall cooperate to find an acceptable structure to allow for closing, pending the required regulatory approvals, including selling down below any regulatory thresholds. |
| REIT Requirements | To the extent any party would otherwise receive more than 9.8% of the outstanding REIT New Common Stock, such party shall instead receive direct PropCo New LP Interests equal to the value of such REIT New Common Stock above 9.8%. |
| Closing | The Put Options and Equity Rights will close immediately following distribution of the equity securities under the Plan (it being understood that the exercise date for the Put Options and Equity Rights will be set forth in the solicitation materials and shall occur on a date determined by the Company prior to the projected effective date of the Plan).[11] |
| Put Options Conditions Precedent | The exercise of the Put Options and Equity Rights will be subject to customary conditions precedent including: <br><br> • the Bankruptcy Court shall have entered orders (a) approving the disclosure statement in respect of the Plan and (b) confirming the Plan; <br><br> • the effective date of the Plan shall have occurred; <br><br> • all regulatory approvals, or waiting periods, shall have been received or expired; <br><br> • there shall have been no Material Adverse Change (to be defined in the definitive documents); and <br><br> • other customary conditions precedent in form and substance satisfactory to the Company, the Backstop Parties, and the Requisite Consenting First Lien Bond Holders (as defined in the RSA). |

---

[11] For tax efficiency or other purposes, (i) the cash consideration to be paid to First Lien Noteholders exercising their Put Options may flow through the Company to the First Lien Noteholders as part of their recovery under the Plan as direct payments of cash, rather than be paid in respect of the receipt of stock or be paid directly by the Backstop Parties and (ii) the First Lien Noteholders may be deemed to be selling either their right to receive the stock or the actual stock itself.

## III.     The REIT and Equity Securities

| | |
|---|---|
| REIT | The Company shall restructure itself upon consummation of the Restructuring as a separate operating company ("*OpCo*"), and property company ("*PropCo*").  Pursuant to the Restructuring a real estate investment trust (the "*REIT*") will be formed to own and control the general partner of PropCo ("*PropCo GP*") and to hold PropCo New LP Interests. |
| | The separation of the Company into OpCo, Propco and the REIT will be accomplished, at the election of the Company and CEC, either through a tax-free contribution of PropCo assets to the PropCo partnership in a transaction qualifying under section 721 of the Internal Revenue Code (the "*Code*") or through the tax free contribution of PropCo assets to the REIT in a tax-free reorganization qualifying under Section 368(a)(1)(G) of the Code and in either event the distribution of the new equity and debt will be made in a manner that will not generate taxable income to the Company other than cancellation of indebtedness income. See Annex II for proposed structures following closing. |
| Equity Securities | The common equity securities to be issued will consist of new shares of common stock (a) of the REIT (such stock, the "*REIT New Common Stock*") and (b) of OpCo (such stock, the "*OpCo New Common Stock*"). |
| | The Boards of Directors of CEOC, OpCo and the REIT shall each use its reasonable best efforts to have the OpCo New Common Stock, if more than 30% of the OpCo New Common Stock is owned by the First Lien Noteholders and Non-First Lien Noteholders (the "*Non-CEC Holders*"), and the REIT New Common Stock, respectively, (a) registered under US securities laws and (b) listed on a nationally recognized exchange, as soon as practicable subject to meeting applicable listing requirements following the effective date of the Plan. |
| | In order to meet the requirement that a REIT have at least 100 shareholders, the REIT will have the right to issue, for cash, up to $125,000 of non-voting preferred stock (125 shares, $1,000 liquidation preference and approximately 12% dividend). |
| Contribution by CEOC of Properties to PropCo | Depending on the structure and method used to create PropCo and the REIT, CEOC may be required to receive [at least] 5% of the PropCo New LP Interests on account of its contribution of real estate into PropCo.  In such case, CEOC's interest in PropCo on account of such contribution may not decrease below 5% (even accounting for future issuances).  Any such issuance of Propco equity to CEOC will reduce the amount of CEC's purchased interests in Propco equity by a corresponding amount. |

## IV.     CEC

| | |
|---|---|
| Cash Contribution | $100 million to be used by the Company for general corporate purposes. |

| | |
|---|---|
| CEC Put Options Purchases | CEC or an affiliated entity shall, pursuant to the Put Options, purchase up to (a) $[300] million of PropCo New LP Interests or REIT New Common Stock at a price implying a total value of $[300] million for 14.8% of the PropCo on a fully diluted basis and (b) $[700] million of OpCo New Common Stock at a price per share implying a total value of $[700] million for 100% of the OpCo New Common Stock. |
| Domestic Acquisitions and New Building Opportunities | CEC and its non-debtor subsidiaries shall give PropCo a right of first refusal to own the real estate, and have CEC or OpCo lease, all non-Las Vegas domestic (U.S.) real estate acquisitions and new building opportunities with CEC retaining management rights with respect to such opportunities.<br><br>PropCo shall give CEC a right of first refusal to operate and manage all non-Las Vegas properties that PropCo acquires.<br><br>The material terms of these rights of first refusal are described (along with the lease terms) more fully on Annex III. |
| CEC Lease Guaranty | CEC, OpCo and PropCo will enter into a Management and Lease Support Agreement (the "*MLSA*") pursuant to which (i) CEC, or a wholly-owned subsidiary, will manage the properties on behalf of OpCo and (ii) CEC will provide a guaranty in respect of the OpCo's operating lease obligations, in each case while such lease (including any extensions, renewals or replacements) remains in effect.  The terms of the MLSA are described more fully in the term sheet attached as Annex IV.<br><br>The terms of the operating lease between OpCo and PropCo are described more fully in the term sheet attached as Annex III. |
| Releases | The Plan shall provide that CEC's participation in the Plan through its entry into the RSA and performance of the terms thereunder in facilitating the transactions contemplated by the Restructuring shall be a full and complete settlement under Bankruptcy Rule 9019 of any claims or causes of action, known or unknown, that the Company, its estate and third parties have or could have against CEC and its respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees,  managers, attorneys, professionals, advisors and representatives (each of the foregoing in their capacity as such) relating to the Company, other than claims under the RSA.<br><br>As part of the settlement embodied in the Plan and the RSA, effective on the date the Restructuring is consummated, as consideration for the Cash Contribution, the CEC Put Options Purchases, the Domestic Acquisitions and New Building Opportunities, entry into the MLSA and other valuable consideration, the Company, its estate and all of the Company's creditors shall be deemed to have released CEC and its respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees, managers, attorneys, professionals, advisors and representatives (each of the foregoing in their capacities as such, the "*CEC Released Parties*") from any and all claims, obligations, suits, judgments, damages, rights, causes of action and |

| | liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, at law, in equity or otherwise, relating to or based upon any act or omission relating to the Company which occurred prior to the effectiveness of the Restructuring (other than claims under the RSA), including a release and waiver of any obligations arising under the Guaranty and Pledge Agreement of CEC dated as of July 25, 2014.  The Plan shall also include standard injunction and exculpation provisions in respect of the CEC Released Parties. <br><br> As part of the settlement embodied in the Plan and the RSA, effective on the date the Restructuring is consummated, as consideration for their entry into the RSA and other valuable consideration, the Company and the CEC Released Parties shall be deemed to have released the Consenting Creditors (as defined in the RSA) and their respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees, managers, attorneys, professionals, advisors and representatives (each of the foregoing in their capacity as such) from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, at law, in equity or otherwise, relating to or based upon any act or omission relating to the Company which occurred prior to the effectiveness of the Restructuring. |
|---|---|

## V.     Caesars Palace Las Vegas ("CPLV")

| Transfer to Unrestricted Subsidiary | CPLV shall be transferred to a newly formed wholly owned unrestricted subsidiary of PropCo ("**CPLV Sub**") and its property shall be leased to OpCo. <br><br> The terms of the operating lease between CPLV Sub and OpCo are described more fully in the term sheet annexed hereto as <u>Annex III</u>. |
|---|---|
| Issuance of CPLV Market Debt | CPLV Sub shall use its commercially reasonable efforts to finance $2,600 million of CPLV Debt with third party investors for cash proceeds (the "**CPLV Market Debt**") on or before consummation of the Restructuring (with 100% of the net proceeds being used to increase the cash payments to the holders of the CPLV Debt).  If $2,000 million or more but less than $2,600 million of CPLV Market Debt is issued, the remainder will be issued to the First Lien Bank Lenders and the First Lien Noteholders in the form of CPLV Mezzanine Debt.  The principal amount of CPLV Market Debt and CPLV Mezzanine Debt shall collectively total $2,600 million. <br><br> The weighted average yield on the CPLV Market Debt and CPLV Mezzanine Debt will be capped at 5%. |
| CPLV Debt | If $2,000 million of CPLV Market Debt cannot be issued to the market on the terms contemplated herein, then no CPLV Market Debt will be issued and CPLV Sub shall issue $2,600 million of secured non-guaranteed debt (the "**CPLV Debt**") to the First Lien Bank Lenders and First Lien Noteholders.  6 year term. Interest at LIBOR plus 3.5% with a 1% LIBOR |

| | floor. Additional terms listed in Annex V. |
|---|---|
| CPLV Mezzanine Debt | If CPLV Market Debt is issued in an amount greater than $2,000 million, but less than $2,600 million, then CPLV Holding shall issue secured non-guaranteed debt (the "**CPLV Mezzanine Debt**") in an amount of the difference to the First Lien Bank Lenders and the First Lien Noteholders. 6 year term. Interest at 8% (if $600 million of CPLV Mezzanine Debt issued) and increasing by 0.25% for every $25 million reduction in the principal amount of CPLV Mezzanine Debt issued below $600 million. Additional terms listed in Annex VI.<br><br>"**CPLV Holding**" will be a newly formed holding company that owns 100% of CPLV Sub. |
| Receipt of CPLV Mezzanine Debt | If CPLV Mezzanine Debt is issued, then it shall be distributed as follows:<br><br>• The first $300 million of CPLV Mezzanine Debt shall be distributed 1/3 to the First Lien Bank Lenders and 2/3 to the First Lien Noteholders; and<br><br>• Any CPLV Mezzanine Debt over $300 million shall be distributed 1/2 to the First Lien Bank Lenders and 1/2 to the First Lien Noteholders.<br><br>The $2,600 million aggregate total amount of cash proceeds from the CPLV Market Debt and the principal amount of CPLV Mezzanine Debt will be allocated as follows:<br><br>• $1,450 for First Lien Bank Holders and<br><br>• $1,150 for First Lien Bondholders,<br><br>with the amount of CPLV Mezzanine Debt to be issued to each in accordance with the above formula. |

## VI.    New Capital Structure[12]

| New First Lien OpCo Debt | Up to $1,188 million in principal amount of first lien debt. 6 year term. Non-call year 1, thereafter callable at 103/102/101/par for the next three years respectively. Interest at LIBOR plus 4.00%, with a 1% LIBOR floor; provided that if the principal amount of the New Second Lien OpCo Debt on the Exit Date is less than $497 million (after giving effect to the application of the Available Cash), the interest rate will be LIBOR plus 4.50%, with a 1% LIBOR floor. Additional terms listed in Annex VII. |
|---|---|

---

[12] All amounts subject to the ability of the First Lien Bank Lenders to convert $100 million of CPLV Mezzanine Debt to New First Lien OpCo Debt, New Second Lien OpCo Debt, New First Lien PropCo Debt, New Second Lien PropCo Debt or equity in PropCo.

| | $883 million distributed to First Lien Bank Lenders and $306 million distributed to First Lien Noteholders, subject to adjustment as set forth herein.<br><br>OpCo will use its commercially reasonable efforts to syndicate the New First Lien OpCo Debt to the market and, to the extent so syndicated, the cash proceeds will be used to increase the cash payments to the First Lien Bank Lenders and First Lien Noteholders, ratably based on the amount of New First Lien OpCo Debt otherwise to be issued to them.  The New First Lien OpCo Debt will be marketed at an interest rate less than or equal to the rates contemplated above. |
|---|---|
| New Second Lien OpCo Debt | Up to $547 million in principal amount of second lien debt (as reduced by Available Cash).  7 year term.  Non-call year 1, thereafter callable at 103/102/101/par for the next three years respectively.  Interest at 8.5%.  Additional terms listed in <u>Annex VIII</u>.<br><br>$406 million distributed to First Lien Bank Lenders and $141 million distributed to First Lien Noteholders, subject to adjustment as set forth herein. |
| New First Lien PropCo Debt | $2,392 million in principal amount of first lien debt.  5 year term.  Non-call year 1, thereafter callable at 103/102/101/par for the next three years respectively.  Interest at LIBOR plus 3.5% with a 1% LIBOR floor.  Additional terms listed in <u>Annex IX</u>.<br><br>$1,961 million distributed to the First Lien Bank Lenders and $431 million distributed to First Lien Noteholders, subject to adjustment as set forth herein. |
| New Second Lien PropCo Debt | $1,425 million in principal amount of second lien debt.  6 year term.  Customary NC3, with step-downs thereafter.  Interest 7.0%.  Additional terms listed in <u>Annex X</u>.<br><br>Distributed to First Lien Noteholders, subject to adjustment as set forth herein. |

## VII.    Charter Documents and By-Laws of the Equity Issuers

| | |
|---|---|
| Corporate Governance | CEOC, a Delaware corporation will become OpCo and will have charter documents and by-laws that are acceptable to CEC and the Requisite Consenting First Lien Bond Holders.<br><br>PropCo will be a limited partnership organized under the laws of Delaware and will have a limited partnership agreement that is customary for an UPREIT structure and reasonably acceptable to CEOC, CEC and the Requisite Consenting First Lien Bond Holders.<br><br>PropCo GP will be a limited liability company organized under the laws of Delaware and will have an operating agreement that is reasonably |

|  | acceptable to CEOC, CEC and the Requisite Consenting First Lien Bond Holders.<br><br>The REIT will be a corporation organized under the laws of Maryland and will have charter documents and by-laws that are reasonably acceptable to CEOC, CEC and the Requisite Consenting First Lien Bond Holders. |
|---|---|
| OpCo Board of Directors | If CEC owns 90% or more of the OpCo New Common Stock, then the board of directors of OpCo shall consist of 3 voting members to be designated by CEC, each to be identified in a plan supplement.<br><br>If CEC owns less than 90% of the OpCo New Common Stock, then the board of directors of OpCo shall consist of 3 voting members, 2 designated by CEC and 1 designed by the Requisite Consenting First Lien Bond Holders, each to be identified in a plan supplement. |
| REIT Board of Directors | If CEC owns less than 10% of PropCo (directly or indirectly), then the board of directors of the REIT shall consist of 7 voting members to be designated by the Requisite Consenting First Lien Bond Holders, each to be identified in a Plan Supplement.<br><br>If CEC owns 10% or more of PropCo (directly or indirectly), then the board of directors of the REIT shall consist of 7 voting members, 6 to be designated by the Requisite Consenting First Lien Bond Holders and 1 designated by CEC, each to be identified in a Plan Supplement.<br><br>At least 3 voting members must be licensed by the required regulatory authorities by closing. If there are not at closing at least 3 voting members licensed, then to assist with closing up to 2 of the independent members of CEOC shall be designated to the REIT board so that there will be 3 voting members at closing, with such members being removed as the non-voting members are licensed. Until such time as the CEOC independents and members designated by CEC are a minority of the board, the REIT shall be prohibited from taking major transactions without shareholder approval. To the extent any of members are not so licensed by closing, they shall be non-voting members until so licensed. |
| PropCo | PropCo will be controlled by its PropCo GP, whose sole shareholder will be the REIT. |

## VIII.    Implementation

| In-Court Restructuring: Use of Cash Collateral | In the chapter 11 cases filed by the Company to effectuate the Restructuring, the First Lien Bank Lenders and the First Lien Noteholders will support entry of a cash collateral order that will allow the Company to use cash collateral for working capital and general corporate purposes and to pay costs associated with the Company's Restructuring. The cash collateral arrangements shall allow such use of cash, without significant case-related milestones or budgeting constraints, for the earlier of 18 months and an event of default under such cash collateral order on the terms |
|---|---|

| | set forth in the Cash Collateral Stipulation (as defined in the RSA).[13]<br><br>As more fully set forth in the Cash Collateral Stipulation, in exchange for the Company's use of cash collateral, the First Lien Noteholders and the First Lien Bank Lenders and/or their respective legal and financial advisors shall receive, among other things, the following:<br><br>• adequate protection liens<br><br>• liens on proceeds of avoidance actions<br><br>• payment of legal and financial advisory fees<br><br>• Adequate Protection Payments at a rate equal to LIBOR plus [1.5]%[14]<br><br>• receipt of quarterly budgets [in the form attached as Annex XI], a monthly variance report, an annual business plan and projections, and such other reports and information to the extent required by the Cash Collateral Stipulation. |
|---|---|
| Additional CEC Contribution | If CEC makes any Additional CEC Contribution to fund any shortfall of the $350 million reduction in the New Second Lien Opco Debt, then such contribution will impact the pro forma equity account of CEOC/Opco accordingly |
| Available Cash | 100% of Available Cash shall be used to decrease the principal amount of New OpCo Second Lien Debt below the $547 million in the aggregate contemplated to be issued and correspondingly increase the amount of cash that the First Lien Bank Lenders and First Lien Noteholders receive (on a ratable basis, based on ownership of New OpCo Second Lien Debt).<br><br>"Available Cash" means (i) the pro forma amount of CEOC balance sheet cash available after giving effect to the Exit, the consummation of the Plan, all debt reductions and repayments, the payment of all fees, expenses and related uses of cash on the Exit Date in accordance with the plan over (ii) $400 million of minimum required CEOC liquidity.  For the avoidance of |

---

[13] Events of Default to include, among other things, (a) entry of an order modifying the automatic stay with respect to material assets, (b) the Company seeks to create any additional post-petition liens, (c) the Company commences, joins or assists in a proceeding against the First Lien Noteholders or First Lien Bank Lenders, (d) any modification to the Cash Collateral Order without the bank agent's or the Requisite Consenting First Lien Bond Holders' consent, (e) entry of a final order terminating or requiring repayment of the Adequate Protection Payments, (f) dismissal or conversion of the Company's chapter 11 cases, (g) termination of the Company's exclusive right to file a Plan, (h) failure to make an Adequate Protection Payment (5 business day grace period), and (i) failure to perform any other material term of the Cash Collateral Order (5 business day cure period).

[14] Such payments shall be in consideration for any claims that the First Lien Bank Lenders and First Lien Noteholders may have for diminution in the value of their collateral occasioned by the automatic stay and the use of their collateral by the Debtors in Possession and shall not under any circumstances be deemed payments of principal.

|  | doubt, if CEC makes any Additional CEC Contribution, then Available Cash shall be zero. |
|---|---|

## IX.    Other

| PropCo Call Rights | Subject to the terms of the CERP debt documents and in no event in a manner that is dilutive of covenant compliance, PropCo shall have the right, for up to [180] days following the date the Restructuring is consummated, to enter into a binding agreement to purchase the real estate underlying Harrah's Atlantic City and Harrah's Laughlin for a cash purchase price equal to ten times the agreed annual rent for such properties, and on other customary terms and conditions, with the closing of such purchase(s) to occur following regulatory approvals.[15] <br><br> Other material terms of the PropCo call rights are set forth in <u>Annex XII</u>. |
|---|---|
| Definitive Agreements | Subject to the terms of the RSA, as soon as reasonably practicable, the parties will execute definitive documents and agreements implementing the Restructuring in form and substance consistent in all material respects with this Term Sheet. |
| Non Transfer | As set forth in the RSA and subject to its terms and certain exceptions contained therein, each Consenting Creditor and the Company Parties (as each is defined in the RSA) will agree, on behalf of itself and its affiliates, not to transfer any First Lien Bank Obligations, First Lien Note Obligations or Non-First Lien Obligations held by such party and its affiliates from the date of execution of the RSA through the consummation of the Restructuring (including without limitation closing all Put Options and Equity Rights) unless the transferee(s) agree(s) to be bound by all of the terms and conditions of the RSA and this Term Sheet. |
| Intercreditor Agreements | Plan distributions shall be made in compliance with and shall enforce all applicable intercreditor and subordination agreements. |
| Fiduciary Duties | The RSA and applicable documents effectuating the Restructuring shall provide that nothing in the Plan, the RSA, or any such document shall require the Company or any directors, officers, or members of the Company, each in its capacity as a director, officer, or member of the Company, to take any action, or to refrain from taking any action, to the extent inconsistent with its or their fiduciary obligations (as determined by them in good faith after consultation with legal counsel). |

---

[15] NTD:  First Lien Noteholders to promptly let the Company know if they want other properties added to the PropCo Call Rights.

**Annex I**
**Backstop Parties**

| Party | PropCo New LP Interests / REIT New Common Stock | OpCo New Common Stock | Total Amount |
|---|---|---|---|
| CEC | $[300] million[16] | $[700] million | $[1,000] million |
|  |  |  |  |
|  |  |  |  |

---

[16] Subject to dilution if other First Lien Noteholders elect to become Backstop Parties.

**Annex II**
**REIT Structures**

[to come]

**<u>Annex III</u>**
**<u>Lease and Rights of First Refusal Term Sheet</u>**

[to come]

17

**Annex IV**
**Management and Lease Support Agreement Term Sheet**

[to come]

**Annex V**
**CPLV Debt**

[to come]

**<u>Annex VI</u>**
**<u>CPLV Mezzanine Debt</u>**

[to come]

**<u>Annex VII</u>**
**<u>New First Lien OpCo Debt</u>**

[to come]

**<u>Annex VIII</u>**
**<u>New Second Lien OpCo Debt</u>**

[to come]

**Annex IX**
**New First Lien PropCo Debt**

[to come]

**<u>Annex X</u>**
**<u>New Second Lien PropCo Debt</u>**


[to come]

**<u>Annex XI</u>**
**<u>Form of Quarterly Budget</u>**

**<u>PropCo Call Rights</u>**

[to come]

**<u>Annex XII</u>**
**<u>PropCo Call Rights</u>**

[to come]

**<u>EXHIBIT 15</u>**

**Confidential**
**Prepared at the Direction of Counsel**
**For Settlement Purposes Only**

# Project Julii
# Revised Proposal to First Lien Noteholders

October 24th, 2014



Confidential
Prepared at the Direction of Counsel
For Settlement Purposes Only

## Disclaimer

The information and data contained herein is subject to the confidentiality agreements between the recipients and the Company.  The information is confidential and may not be divulged to any person or entity or reproduced, disseminated, or disclosed, in whole or in part, except pursuant to the terms of the confidentiality agreements.

Confidential
Prepared at the Direction of Counsel
For Settlement Purposes Only

## Revised Proposal Summary

▶ CEC increases contribution from $900mm to $1,100mm

▶ OpCo substantially deleveraged from 7.0x to 5.3x via (i) $700mm cash equity from CEC (vs $394mm) and (ii) movement of OpCo 2L debt to PropCo equity (resulting in $683mm less total debt at OpCo)

▶ Recovery increased from 90.0 cents to 93.8 cents for 1L noteholders

▶ $200mm third party backstop and equity to 1L (can be replaced with cash if backstop grows)

▶ CEC guarantees PropCo lease on terms TBD

Project Julii

**Confidential**
Prepared at the Direction of Counsel
For Settlement Purposes Only

## Summary of Proposals

| | 10/15 Company Proposal | 10/23 Revised Company Proposal |
|---|---|---|
| **Equity Account** | ▶ $801mm backstop from CEC<br>  • $394mm into OpCo, $407mm into PropCo<br>▶ $801mm backstop from 3rd parties<br>▶ $612mm PropCo equity to 2L if 2L consent | ▶ $1,000mm backstop from CEC<br>  • $700mm into OpCo, $300mm into PropCo<br>▶ $200mm preferred backstop from 3rd parties<br>▶ $918mm equity distribution to 1L (can be converted to cash if backstop grows or 2Ls buy equity<br>▶ $612mm PropCo equity to 2L if 2L consent |
| **CEC Contribution** | ▶ $801mm for rights + $100mm to balance sheet = $901mm total | ▶ $1,000mm for rights + $100mm to balance sheet = $1,100mm total |
| **PropCo / OpCo 1L / 2L Debt Split** | ▶ 1L noteholders to receive 100% of new 2L debt | ▶ No OpCo 2l debt<br>▶ Free cash flow during bankruptcy reduces debt dollar for dollar (split TBD) |
| **Debt Maturities** | ▶ OpCo: 6yr 1L and 7yr 2L<br>▶ PropCo: 6yr 1L, 6yr CPLV and 7yr 2L | ▶ OpCo: 6yr 1L<br>▶ PropCo: 5yr 1L, 5yr CPLV and 6yr 2L |
| **Total Recovery** | ▶ 90.0 cents to 1L | ▶ 93.8 cents to 1L |
| **Adequate Protection** | ▶ N/A | ▶ Bank debt and 1L bonds treated the same |

Project Julii

Confidential
Prepared at the Direction of Counsel
For Settlement Purposes Only

## Proposal Details – CEC Contribution and Capital Structure

| CEC contribution | 10/15 Company Proposal | 10/24 Revised Company Proposal |
|---|---|---|
| CEC backstop | 801 | 1,000 |
| Non-CEC backstop | 801 | 200 |
| Rights cash | 1,602 | 1,200 |
| Equity to 1L | - | 918 |
| Equity to 2L | 612 | 612 |
| Total equity | 2,213 | 2,730 |
| | | |
| CEOC cash | 622 | 622 |
| CEC contribution | 100 | 100 |
| Total | 722 | 722 |
| | | |
| Total CEC cash contribution | 901 | 1,100 |

| Capital Structure [1] | OpCo | PropCo | Combined | OpCo | PropCo | Combined |
|---|---|---|---|---|---|---|
| EBITDA (ex-CPLV) | 295 | 475 | 770 | 295 | 475 | 770 |
| CPLV | 99 | 160 | 259 | 99 | 160 | 259 |
| Total | 394 | 635 | 1,029 | 394 | 635 | 1,029 |

| | $ | Leverage | $ | Leverage | $ | Leverage | $ | Leverage | $ | Leverage | $ | Leverage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| First lien debt | 1,969 | 5.0x | 2,377 | 5.0x | 4,346 | 4.2x | 2,073 | 5.3x | 2,377 | 5.0x | 4,450 | 4.3x |
| Second lien debt | 788 | 2.0x | 1,017 | 2.1x | 1,804 | 1.8x | - | - | 1,425 | 3.0x | 1,425 | 1.4x |
| CPLV debt | - | - | 2,600 | - | 2,600 | 2.5x | - | - | 2,600 | - | 2,600 | 2.5x |
| Chester & Other | 439 | 1.1x | - | - | 439 | 1.1x | 439 | 1.1x | - | - | 439 | 0.4x |
| Total | 3,195 | 8.1x | 5,994 | 9.4x | 9,189 | 9.6x | 2,512 | 6.4x | 6,402 | 10.1x | 8,914 | 8.7x |
| Preferred | - | | - | | - | | - | | 200 | | 200 | |
| Equity | 394 | | 1,820 | | 2,213 | | 700 | | 1,830 | | 2,530 | |
| Implied TEV | 3,589 | | 7,813 | | 11,402 | | 3,212 | | 8,432 | | 11,644 | |

| | Maturity | Rate [2] | Maturity | Rate [2] | Avg. Rate | Maturity | Rate [2] | Maturity | Rate [2] | Avg. Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| First lien debt | 6.0 | 5.0% | 6.0 | 4.0% | 4.5% | 6.0 | 5.0% | 5.0 | 4.0% | 4.5% |
| Second lien debt | 7.0 | 7.0% | 7.0 | 7.0% | 7.0% | NA | NA | 6.0 | 7.0% | 7.0% |
| CPLV debt | NA | NA | 6.0 | 4.0% | 4.0% | NA | NA | 5.0 | 4.0% | 4.0% |

(1) Cash split between OpCo and PropCo to be consistent with market precedent. Working capital and cage cash expected to remain at OpCo. PropCo to receive amount necessary for liquidity and general corporate purposes. For reference, as of 6/30/14 PENN had $251mm and GLPI had $42mm of cash.

(2) OpCo 1st lien debt, PropCo 1st lien debt and CPLV debt expected to be floating-rate at L+350 (1% floor), L+250 (1% floor) and L+250, respectively. LIBOR spreads derived from current 5 year swap rate of 1.61%.

Blackstone   4

Project Julii

Confidential
Prepared at the Direction of Counsel
For Settlement Purposes Only

## Proposal Details – Equity Ownership and Cash Flow

### Equity ownership

| | 10/15 Company Proposal | | | | | | 10/24 Revised Company Proposal | | | | | |
| | OpCo | | PropCo | | Combined | | OpCo | | PropCo | | Combined | |
| Equity ownership | $ | % | $ | % | $ | % | $ | % | $ | % | $ | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2L Consent (Pref. not Converted)** | | | | | | | | | | | | |
| 1L | - | - | - | - | - | - | - | - | 918 | 50.2% | 918 | 36.3% |
| 2L | - | - | 612 | 33.6% | 612 | 27.6% | - | - | 612 [1] | 33.4% | 612 | 24.2% |
| CEC backstop | 394 | 100.0% | 407 | 22.4% | 801 | 36.2% | 700 | 100.0% | 300 | 16.4% | 1,000 | 39.5% |
| Non-CEC backstop | - | - | 801 | 44.0% | 801 | 36.2% | - | - | - | - | - | - |
| Total | 394 | 100.0% | 1,820 | 100.0% | 2,213 | 100.0% | 700 | 100.0% | 1,830 | 100.0% | 2,530 | 100.0% |
| | | | | | | | | | | | | |
| **2L Consent (Pref. Converted)** | | | | | | | | | | | | |
| 1L | - | - | - | - | - | - | - | - | 918 | 45.2% | 918 | 33.6% |
| 2L | - | - | 612 | 33.6% | 612 | 27.6% | - | - | 612 [1] | 30.1% | 612 | 22.4% |
| CEC backstop | 394 | 100.0% | 407 | 22.4% | 801 | 36.2% | 700 | 100.0% | 300 | 14.8% | 1,000 | 36.6% |
| Non-CEC backstop | - | - | 801 | 44.0% | 801 | 36.2% | - | - | 200 | 9.9% | 200 | 7.3% |
| Total | 394 | 100.0% | 1,820 | 100.0% | 2,213 | 100.0% | 700 | 100.0% | 2,030 | 100.0% | 2,730 | 100.0% |

### Cash flow

| | 10/15 Company Proposal | | | | | | 10/24 Revised Company Proposal | | | | | |
| | OpCo | | PropCo | | Combined | | OpCo | | PropCo | | Combined | |
| Cash flow | $ | Interest | $ | Interest | $ | Interest | $ | Interest | $ | Interest | $ | Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EBITDA | 394 | | 635 | | 1,029 | | 394 | | 635 | | 1,029 | |
| (-) CapEx | (145) [2] | | (78) | | (223) | | (145) [2] | | (78) | | (223) | |
| (-) Other / Non-operating | (88) [2] | | - | | (88) | | (88) [2] | | - | | (88) | |
| EBITDA - Capex | 161 | | 557 | | 718 | | 161 | | 557 | | 718 | |
| (-) 1L interest | (98) | 5.0% | (95) | 4.0% | (194) | 4.5% | (104) | 5.0% | (95) | 4.0% | (199) | 4.5% |
| (-) 2L interest | (55) | 7.0% | (71) | 7.0% | (126) | 7.0% | - | | (100) | 7.0% | (100) | 7.0% |
| (-) CPLV interest | - | | (104) | 4.0% | (104) | 4.0% | - | | (104) | 4.0% | (104) | 4.0% |
| (-) Other | (6) [3] | | - | | (6) | | (6) [3] | | - | | (6) | |
| EBT | 1 | | 287 | | 288 | | 51 | | 259 | | 310 | |
| (-) Taxes (40%) | (0) | | - | | (0) | | (20) | | - | | (20) | |
| FCF | 1 | | 287 | | 288 | | 31 | | 259 | | 289 | |

(1)    Potential for 2L recovery to be a mix of PropCo and OpCo equity (up to 25% of OpCo) versus all PropCo equity.
(2)    Adjusts for Chester cash flow and non-recurring remediation costs.
(3)    Includes interest on slot financing and capital lease.

Confidential
Prepared at the Direction of Counsel
For Settlement Purposes Only

# Proposal Details – Recoveries and Guarantee

| | 10/15 Company Proposal | | | | | | 10/24 Revised Company Proposal | | | | | |
| | OpCo | | PropCo | | Combined | | OpCo | | PropCo | | Combined | |
| **Recoveries** | $ | % | $ | % | $ | % | $ | % | $ | % | $ | % |
| Bank debt | | | | | | | | | | | | |
| Balance Sheet | 409 | 7.6% | - | - | 409 | 7.6% | 430 | 8.0% | - | - | 430 | 8.0% |
| CPLV | - | - | 1,472 | 27.4% | 1,472 | 27.4% | - | - | 1,450 | 27.0% | 1,450 | 27.0% |
| CEC rights | - | - | - | - | - | - | - | - | - | - | - | - |
| 3rd party rights | - | - | - | - | - | - | - | - | - | - | - | - |
|   Subtotal: cash | 409 | 7.6% | 1,472 | 27.4% | 1,881 | 35.1% | 430 | 8.0% | 1,450 | 27.0% | 1,881 | 35.1% |
| 1L debt | 1,577 | 29.4% | 1,905 | 35.5% | 3,482 | 64.9% | 1,537 | 28.7% | 1,946 | 36.3% | 3,482 | 64.9% |
| 2L debt | - | - | - | - | - | - | - | - | - | - | - | - |
|   Subtotal: cash + debt | 1,986 | 37.0% | 3,377 | 63.0% | 5,363 | 100.0% | 1,967 | 36.7% | 3,396 | 63.3% | 5,363 | 100.0% |
| Equity | - | - | - | - | - | - | - | - | - | - | - | - |
|   Total recovery | 1,986 | 37.0% | 3,377 | 63.0% | 5,363 | 100.0% | 1,967 | 36.7% | 3,396 | 63.3% | 5,363 | 100.0% |
| | | | | | | | | | | | | |
| 1L debt | | | | | | | | | | | | |
| Balance Sheet | 313 | 4.9% | - | - | 313 | 4.9% | 292 | 4.6% | - | - | 292 | 4.6% |
| CPLV | - | - | 1,128 | 17.8% | 1,128 | 17.8% | - | - | 1,150 | 18.1% | 1,150 | 18.1% |
| CEC rights | 394 | 6.2% | 407 | 6.4% | 801 | 12.6% | 700 | 11.0% | 300 | 4.7% | 1,000 | 15.8% |
| 3rd party rights | - | - | 801 | 12.6% | 801 | 12.6% | - | - | 200 | 3.2% | 200 | 3.2% |
|   Subtotal: cash | 707 | 11.1% | 2,336 | 36.8% | 3,043 | 48.0% | 992 | 15.6% | 1,650 | 26.0% | 2,642 | 41.6% |
| 1L debt | 392 | 6.2% | 472 | 7.4% | 864 | 13.6% | 536 | 8.5% | 431 | 6.8% | 967 | 15.2% |
| 2L debt | 788 | 12.4% | 1,017 | 16.0% | 1,804 | 28.4% | - | - | 1,425 | 22.5% | 1,425 | 22.5% |
|   Subtotal: cash + debt | 1,886 | 29.7% | 3,825 | 60.3% | 5,711 | 90.0% | 1,528 | 24.1% | 3,506 | 55.3% | 5,034 | 79.3% |
| Equity | - | - | - | - | - | - | - | - | 918 | 14.5% | 918 | 14.5% |
|   Total recovery | 1,886 | 29.7% | 3,825 | 60.3% | 5,711 | 90.0% | 1,528 | 24.1% | 4,424 | 69.7% | 5,952 | 93.8% |

| **Guarantee** | - No | - Yes |
| --- | --- | --- |

**EXHIBIT 16**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

### CURRENT REPORT
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**December 12, 2014**
**Date of Report (Date of earliest event reported)**

---

# Caesars Entertainment
# Operating Company, Inc.
**(Exact name of registrant as specified in its charter)**

---

| **Delaware** | **001-10413** | **75-1941623** |
|:---:|:---:|:---:|
| (State | (Commission | (IRS Employer |
| of Incorporation) | File Number) | Identification Number) |

**One Caesars Palace Drive**
**Las Vegas, Nevada 89109**
(Address of principal executive offices) (Zip Code)

**(702) 407-6000**
(Registrant's telephone number, including area code)

**N/A**
(Former Name or Former Address, if Changed Since Last Report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 7.01 Regulation FD Disclosure.**

As described in the Current Reports on Form 8-K filed on September 12, 2014 and October 17, 2014, Caesars Entertainment Corporation ("CEC") and Caesars Entertainment Operating Company, Inc., a majority owned subsidiary of CEC ("CEOC"), announced that they have been engaged in confidential discussions with certain beneficial holders of CEOC's 11.25% senior secured notes due 2017, CEOC's 8.5% senior secured notes due 2020 and CEOC's 9% senior secured notes due 2020 (the "First Lien Bondholders") and certain beneficial holders of CEOC's senior secured credit facilities (the "First Lien Bank Lenders" and together with the First Lien Bondholders, the "First Lien Creditors") in furtherance of their efforts to restructure CEOC's debt (a "Restructuring"). In connection with the discussions, CEC and CEOC provided certain confidential information to the First Lien Creditors pursuant to non-disclosure agreements ("NDAs") between CEC, CEOC and the First Lien Creditors.

The NDAs with all of the First Lien Bank Lenders and one First Lien Bondholder (the "Non-Extending Creditors") have expired and the Non-Extending Creditors have independently released information from their discussions with CEC and CEOC. Discussions with the First Lien Bank Lenders had progressed and CEC and CEOC believed an oral agreement in principle had been reached between certain parties, which was contingent on, among other things, CEOC and CEC reaching an economic deal with the First Lien Bondholders that the First Lien Bank Lenders found acceptable. The First Lien Bank Lenders state in their press release that an agreement has not been reached with the First Lien Bondholders on the terms of a Restructuring that are acceptable to the First Lien Bank Lenders. The First Lien Bank Lenders' press release can be found at http://www.prnewswire.com/news-releases/informal-committee-of-certain-first-lien-bank-lenders-of-caesars-entertainment-releases-information-about-restructuring-discussions-300008934.html . The non-extending First Lien Bondholder's press release can be found at http://www.businesswire.com/multimedia/home/20141211006615/en/#.VIp0tmo5DIU .

Notwithstanding the actions by the Non-Extending Creditors, the NDAs with certain First Lien Bondholders have been extended and CEC and CEOC are continuing discussions with them with respect to finalizing the material economic terms of a Restructuring.

No assurances can be made that (a) the Restructuring as disclosed in the released materials will be implemented or (b) an agreement will be reached between CEC, CEOC and CEOC's creditors on the terms of a Restructuring.

The information set forth in this Item 7.01 of this Current Report on Form 8-K is being furnished pursuant to Item 7.01 of Form 8-K and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference into any of CEOC's filings under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made before or after the date hereof and regardless of any general incorporation language in such filings, except to the extent expressly set forth by specific reference in such a filing. The filing of this Item 7.01 of this Current Report on Form 8-K shall not be deemed an admission as to the materiality of any information herein that is required to be disclosed solely by reason of Regulation FD.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

CAESARS ENTERTAINMENT OPERATING
COMPANY, INC.

Date: December 12, 2014

By: /s/ SCOTT E. WIEGAND

Name:  Scott E. Wiegand
Title:   Senior Vice President, Deputy General
        Counsel and Corporate Secretary

**EXHIBIT 17**

EFiled: Jan 07 2015 04:24PM EST
Transaction ID 56567180
Case No. 10393-VCG

**Morris, Nichols, Arsht & Tunnell llp**

1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347

302 658 9200
302 658 3989 Fax

Kenneth J. Nachbar
302 351 9294
302 425 3013 Fax
knachbar@mnat.com

January 7, 2015

***BY E-FILING AND BY FEDERAL EXPRESS***

The Honorable Sam Glasscock, III
Court of Chancery
34 The Circle
Georgetown, DE  19947

Re:  *UMB Bank v. Caesars Entertainment*
     *Corporation, et al.*, C.A. No. 10393-VCG

Dear Vice Chancellor Glasscock:

We represent certain of the defendants, including defendant Caesars

Entertainment Operating Company, Inc. ("CEOC"), in the above-referenced

matter.  We write to advise the Court that, on December 19, 2014, CEOC

announced that it had entered into a Restructuring Support and Forbearance

Agreement ("RSA") with certain of its first-lien note-holders (the "Consenting

Creditors") regarding the terms of a financial restructuring plan for CEOC.  CEOC

further announced that, in connection with this restructuring plan, it contemplates

that it will voluntarily commence a reorganization under Chapter 11 of the U.S.

Bankruptcy Code on or around January 15, 2015, which will automatically stay

this action as to CEOC.  Section 3(f) of the RSA, which CEOC disclosed in a Form

The Honorable Sam Glasscock, III
January 7, 2015
Page 2

8-K/A filed on December 22, 2014 and which is annexed hereto as Exhibit A, provides that, upon CEOC's filing of a bankruptcy petition, the Consenting Creditors "shall not seek to modify or otherwise oppose the imposition of the automatic stay under Section 362 of the Bankruptcy Code" and, "to the extent a Consenting Creditor has directed the Trustee [*i.e.*, plaintiff UMB Bank ("UMB")] in connection with" this action, "such Consenting Creditor shall direct the Trustee to agree to a consensual stay" of this action.

We will immediately advise the Court of any further developments relating to a bankruptcy filing by CEOC or any direction by a Consenting Creditor to UMB to stay this action.

Respectfully,

*/s/ Kenneth J. Nachbar*

Kenneth J. Nachbar (#2067)

Attachment

cc:    Collins J. Seitz, Jr., Esquire (By E-Filing)
       Andrew D. Cordo, Esquire (By E-Filing)
       Gregory P. Williams, Esquire (By E-Filing)
       Brian M. Rostocki, Esquire (By E-Filing)

**<u>EXHIBIT 18</u>**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 8-K

---

### CURRENT REPORT
### Pursuant to Section 13 or 15(d)
### of the Securities Exchange Act of 1934

### January 5, 2015
### Date of Report (Date of earliest event reported)

---

# Caesars Entertainment Corporation
### (Exact name of registrant as specified in its charter)

---

| Delaware | 001-10410 | 62-1411755 |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

**One Caesars Palace Drive**
**Las Vegas, Nevada 89109**
(Address of principal executive offices) (Zip Code)

**(702) 407-6000**
(Registrant's telephone number, including area code)

**N/A**
(Former Name or Former Address, if Changed Since Last Report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 7.01      Regulation FD Disclosure.**

On January 5, 2015, Caesars Entertainment Corporation (" <u>CEC</u> ") and Caesars Entertainment Operating Company, Inc., a majority owned subsidiary of CEC (" <u>CEOC</u> "), announced a proposed amended and restated term sheet (the " <u>Term Sheet Amendment</u> ") to the Amended and Restated Restructuring Support and Forbearance Agreement, dated as of December 31, 2014 (the " <u>RSA</u> "), among CEC, CEOC and the Consenting Creditors (as defined in the RSA), which was previously filed by CEC and CEOC on their Current Reports on Form 8-K, filed with the Securities and Exchange Commission on December 31, 2014. The Term Sheet Amendment is subject to consent by certain of the Consenting Creditors. Pursuant to the Term Sheet Amendment, CEC would agree to pay all holders of claims in respect of CEOC's 11.25% senior secured notes due 2017, CEOC's 8.5% senior secured notes due 2020 and CEOC's 9% senior secured notes due 2020 (collectively, the " <u>First Lien Notes</u> " and, the claims with respect thereto, the " <u>First Lien Bond Claims</u> ") that sign the RSA and become Consenting Creditors on or prior to January 12, 2015 at 5:00 p.m., New York City time, for forbearing from exercising their default-related rights and remedies, a fee in an amount equal to (i) 1.625% of the First Lien Bond Claims held by such Consenting Creditors paid at the earlier of the date when (A) holders of 66.66% of the obligations under the First Lien Notes and obligations of CEOC under its credit agreement (the " <u>First Lien Bank Obligations</u> ") sign the RSA (or, in respect of the First Lien Bank Obligations, a similar restructuring support and forbearance agreement agreeable to CEOC and CEC) and (B) the bankruptcy court, in which chapter 11 cases regarding the restructuring of CEOC are commenced, enters an order approving the disclosure statement and (ii) 1.625% of the First Lien Bond Claims held by such Consenting Creditors, paid when the restructuring closes. In addition, the Term Sheet Amendment would decrease the cash amount of the recovery to the holders of the First Lien Notes from $413 million to $207 million. No assurances can be made that CEC and CEOC will receive the consents required to effectuate the Term Sheet Amendment.

The information set forth in this Item 7.01 of this Current Report on Form 8-K is being furnished pursuant to Item 7.01 of Form 8-K and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference into any of CEC's filings under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made before or after the date hereof and regardless of any general incorporation language in such filings, except to the extent expressly set forth by specific reference in such a filing. The filing of this Item 7.01 of this Current Report on Form 8-K shall not be deemed an admission as to the materiality of any information herein that is required to be disclosed solely by reason of Regulation FD.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

CAESARS ENTERTAINMENT CORPORATION

Date: January 5, 2015

By:  /s/ S COTT E. W IEGAND

Name:  Scott E. Wiegand
Title:  Senior Vice President, Deputy General
Counsel and Corporate Secretary

**EXHIBIT 19**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

### CURRENT REPORT
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**November 10, 2014 ( November 10, 2014 )**
Date of Report (Date of earliest event reported)

# Caesars Entertainment Corporation
(Exact name of registrant as specified in its charter)

| **Delaware** | **001-10410** | **62-1411755** |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

**One Caesars Palace Drive**
**Las Vegas, Nevada 89109**
(Address of principal executive offices)
(Zip Code)

**(702) 407-6000**
(Registrant's telephone number, including area code)
**N/A**
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02    Results of Operations and Financial Condition.**

        Attached and incorporated herein by reference as Exhibit 99.1 and Exhibit 99.2, respectively, are copies of the press release and prepared remarks of the Registrant, each dated November 10, 2014 , reporting the Registrant's financial results for the quarter ended September 30, 2014.

**Item 9.01    Financial Statements and Exhibits.**

        (d) Exhibits. The following exhibits are being filed herewith:

              99.1      Text of press release, dated November 10, 2014 .

              99.2      Prepared remarks, dated November 10, 2014 .

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

CAESARS ENTERTAINMENT CORPORATION

Date: November 10, 2014          By:                    /S/ DONALD A. COLVIN

**Donald A. Colvin**
**Executive Vice President and Chief Financial Officer**

**Exhibit 99.1**



| Contact: | Gary Thompson - Media | Jennifer Chen - Investors |
| | Caesars Entertainment Corporation | Caesars Entertainment Corporation |
| | (702) 407-6529 | (702) 407-6407 |

## Caesars Entertainment Reports Financial Results for the Third Quarter 2014

LAS VEGAS, November 10, 2014 - Caesars Entertainment Corporation (NASDAQ: CZR) today reported the following third quarter 2014 results and recent developments:

- *Consolidated net revenue up 6.0% year-over-year driven by growth at CERP and CGP*
- *Consolidated results reflect strength in social and mobile games and sequential improvement in regional markets offset by several items such as out of service rooms and unfavorable hold at Caesars Palace*
- *CERP continued to invest in hospitality offerings and drive awareness around The LINQ and the High Roller*
- *CGP integrated the Total Rewards loyalty program into CIE's real-money online gaming platform and celebrated successful opening of Horseshoe Baltimore in August*
- *CEOC commenced formal discussions with several creditor groups as part of the company's efforts to improve the entity's financial condition*

### Summary Financial Data

The table below highlights certain GAAP and non-GAAP financial measures on a consolidated basis:

| (Dollars in millions, except per share data) | Three Months Ended September 30, | | Percent Favorable/ (Unfavorable) | Nine Months Ended September 30, | | Percent Favorable/ (Unfavorable) |
| --- | --- | --- | --- | --- | --- | --- |
| | 2014 | 2013 | | 2014 | 2013 | |
| Casino revenues [1] | $ 1,395.6 | $ 1,391.5 | 0.3 % | $ 4,046.5 | $ 4,178.7 | (3.2)% |
| Net revenues [1] | 2,212.4 | 2,087.4 | 6.0 % | 6,385.2 | 6,216.0 | 2.7 % |
| Loss from operations [1] | (327.8) | (524.0) | 37.4 % | (50.3) | (248.5) | 79.8 % |
| Loss from continuing operations, net of income taxes [1] | (931.7) | (699.2) | (33.3)% | (1,618.3) | (1,077.5) | (50.2)% |
| Loss from discontinued operations, net of income taxes | (48.4) | (62.6) | 22.7 % | (177.4) | (110.3) | (60.8)% |
| Net loss attributable to Caesars | (908.1) | (761.4) | (19.3)% | (1,761.0) | (1,191.3) | (47.8)% |
| Basic and diluted loss per share | (6.29) | (6.03) | (4.3)% | (12.41) | (9.47) | (31.0)% |
| Property EBITDA [2] | 444.7 | 510.0 | (12.8)% | 1,330.3 | 1,490.1 | (10.7)% |
| Adjusted EBITDA [3] | 442.5 | 508.0 | (12.9)% | 1,320.8 | 1,448.2 | (8.8)% |

[1] - [3] See footnotes following Basis of Presentation later in this release

1

## Management Commentary

"Our third quarter results reflect strength in the interactive business, stabilizing trends regionally, and generally good performance in Las Vegas considering an operating income impact of over $35 million due to unfavorable hold at Caesars Palace" said Gary Loveman, chairman, chief executive officer and president of Caesars Entertainment Corporation. "Moving forward, we see several dynamics that bode well for our future including signs of improvement in regional markets given limited supply growth and greater traction from our investments in hospitality and entertainment offerings across our network. We expect progress on these fronts to yield a positive effect on our business, as we continue capital structure initiatives intended to reduce leverage at CEOC."

## Other Key Matters During the Quarter

Third quarter Adjusted EBITDA for Caesars Entertainment Corporation was $442.5 million and was negatively impacted year-over-year by approximately $39 million of unfavorable hold, approximately $23 million in bad debt expense, and approximately $52 million driven by lower volumes and lower marginal returns on marketing investment. The year over year increase in bad debt expense was d ue to a prior year favorable comparison. General weakness in VIP volumes, the reduction of room nights available in Las Vegas as a result of The LINQ Hotel renovation, and business disruption at Caesars Palace due to construction and show cancellations resulted in lower core business volumes versus the prior year quarter. Marketing expense also increased in the quarter, resulting in reduced profitability in our core markets. This marketing spend increase was largely driven by programs aimed at retaining guests in Atlantic City following the closure of the Showboat Atlantic City casino. These items were partially offset by the addition of The Cromwell, Horseshoe Baltimore, and The LINQ, which together accounted over $20 million in EBITDA in the quarter. Furthermore, strong growth in CIE provided approximately $23 million in incremental EBITDA in the quarter.

We are intensely focused on ensuring operating costs are aligned with the current environment to enhance CEC's profitability. To that end, we are acting to reduce expenses and increase EBITDA across the company through a variety of identified initiatives in operations, marketing and corporate expenses. We expect to produce an incremental $250 to $300 million of EBITDA in 2015 as a result of these actions. The overwhelming majority of this increase will be driven by cost savings.

We have commenced formal discussions with several groups of creditors related to our collective efforts to improve the financial condition of CEOC. We are keenly focused on deleveraging at CEOC and we refer you to our Form 10-Q to be filed later this week for a further discussion of CEOC's capital structure and liquidity position.

## Basis of Presentation

In the discussion below, the words "Company," "Caesars," "Caesars Entertainment," "CEC," "we," and "our" refer to Caesars Entertainment Corporation and its consolidated entities, unless otherwise stated or the context requires otherwise.

The financial results presented herein include Caesars with its consolidated entities, Caesars Entertainment Operating Company, Inc. ("CEOC") and Caesars Entertainment Resort Properties ("CERP"), and with Caesars Growth Partners, LLC ("CGP LLC"), which is consolidated as a variable interest entity.

Due to CEOC's continuing involvement with The LINQ and Octavius Tower of Caesars Palace Las Vegas, CEOC continued to consolidate both of these properties and their related net assets and income statement impacts into CEOC's financial results subsequent to CERP's ownership of The LINQ and Octavius Tower in October 2013, through May 5, 2014, at which point CEOC no longer consolidated the results of The LINQ due to the sale of The LINQ Hotel & Casino ("The LINQ Hotel") to CGP LLC. CEOC continues to consolidate the results of the Octavius Tower in its GAAP results as presented in the reconciliation of Property EBITDA and Adjusted EBITDA. The impact is removed from final reported Property EBITDA and Adjusted EBITDA measures for CEOC.

When CEOC results herein are presented on a consolidated view ("CEOC adjusted"), the presentation eliminates the impact of consolidating The LINQ and Octavius Tower subsequent to its transfer from CEOC to CERP. This transaction has been accounted for as a financing transaction in accordance with GAAP instead of as a completed real estate sale. This accounting treatment results in these properties being reported as part of both CEOC and CERP on a stand-alone basis, and

therefore, they are not presented within the CEOC results in this earnings release when results are designated as CEOC adjusted.

CGP LLC results below (Net Revenues and Income from Operations) are reflective of CGP LLC as consolidated into CEC results; accordingly, the results of the four properties which CGP LLC acquired in 2014 from CEOC are included in the CGP LLC results only after the date of acquisition. As a result, the presentation of CGP LLC's results in this release differs from CGP LLC's presentation of its results on a stand-alone basis. Property EBITDA and Adjusted EBITDA are reported as reported by CGP LLC on a stand-alone basis.

<div align="center">2</div>

"Other" includes consolidating adjustments, eliminating adjustments and other adjustments to reconcile to consolidated CEC results. For example, management fees paid to CEOC related to Planet Hollywood by CGP LLC are included in CEOC adjusted net revenues below, and eliminated in Other.

---

[1]    Casino revenues, net revenues, income from operations, and loss from continuing operations, net of income taxes for all periods presented in the table above exclude the results of Alea Leeds casino (closed in March 2013), Golden Nugget casino (closed in February 2014), Harrah's Tunica casino (closed in June 2014), Showboat casino (closed in August 2014) and the subsidiaries that held the Company's land concession in Macau (sold in November 2013) because all of these are presented as discontinued operations.

[2]    Property EBITDA is a non-GAAP financial measure that is defined and reconciled to its most comparable GAAP measure later in this release. Property EBITDA is included because the Company's management uses Property EBITDA to measure performance and allocate resources, and believes that Property EBITDA provides investors with additional information consistent with that used by management.

[3]    Adjusted EBITDA is a non-GAAP financial measure that is defined and reconciled to its most comparable GAAP measure later in this release. Adjusted EBITDA is included because management believes that Adjusted EBITDA provides investors with additional information that allows a better understanding of the results of operational activities separate from the financial impact of decisions made for the long-term benefit of the Company.

## Financial Results

### Net Revenues [a]

| (Dollars in millions) | Three Months Ended September 30, | | Percent Favorable/ (Unfavorable) | Nine Months Ended September 30, | | Percent Favorable/ (Unfavorable) |
|---|---|---|---|---|---|---|
| | 2014 | 2013 | | 2014 | 2013 | |
| CEOC adjusted | $ 1,253.3 | $ 1,519.3 | (17.5)% | $ 3,939.1 | $ 4,528.5 | (13.0)% |
| CERP | 535.7 | 507.2 | 5.6 % | 1,565.8 | 1,516.0 | 3.3 % |
| CGP LLC | 485.8 | 80.0 | * | 1,064.6 | 222.3 | * |
| Parent | 15.9 | 17.7 | (10.2)% | 51.1 | 52.1 | (1.9)% |
| Other | (78.3) | (36.8) | (112.8)% | (235.4) | (102.9) | (128.8)% |
| Total | $ 2,212.4 | $ 2,087.4 | 6.0 % | $ 6,385.2 | $ 6,216.0 | 2.7 % |

### Income/(loss) from Operations [a]

| (Dollars in millions) | Three Months Ended September 30, | | Percent Favorable/ (Unfavorable) | Nine Months Ended September 30, | | Percent Favorable/ (Unfavorable) |
|---|---|---|---|---|---|---|
| | 2014 | 2013 | | 2014 | 2013 | |
| CEOC adjusted | $ (304.3) | $ (601.7) | 49.4 % | $ (158.8) | $ (412.1) | 61.5 % |
| CERP | (49.3) | 72.5 | (168.0)% | 78.7 | 188.9 | (58.3)% |
| CGP LLC | 80.7 | 21.6 | * | 50.6 | (6.1) | * |
| Parent | (9.7) | 0.2 | * | (12.5) | (4.5) | (177.8)% |
| Other | (45.2) | (16.6) | (172.3)% | (8.3) | (14.7) | 43.5 % |
| Total | $ (327.8) | $ (524.0) | 37.4 % | $ (50.3) | $ (248.5) | 79.8 % |

### Property EBITDA [b]

| (Dollars in millions) | Three Months Ended September 30, | | Percent Favorable/ (Unfavorable) | Nine Months Ended September 30, | | Percent Favorable/ (Unfavorable) |
|---|---|---|---|---|---|---|
| | 2014 | 2013 | | 2014 | 2013 | |
| CEOC adjusted | $ 231.8 | $ 354.5 | (34.6)% | $ 711.4 | $ 1,026.3 | (30.7)% |
| CERP | 130.4 | 132.9 | (1.9)% | 403.4 | 426.1 | (5.3)% |
| CGP LLC | 81.2 | 75.7 | 7.3 % | 259.0 | 239.2 | 8.3 % |

| | | | | | | |
|---|---|---|---|---|---|---|
| Other | | 1.3 | | (53.1) | 102.4 % | (43.5) | (201.5) | 78.4 % |
| Total | $ | 444.7 | $ | 510.0 | (12.8)% | $ | 1,330.3 | $ | 1,490.1 | (10.7)% |

3

*Adjusted EBITDA* [b]

| (Dollars in millions) | Three Months Ended September 30, | | | | | Percent Favorable/ (Unfavorable) | Nine Months Ended September 30, | | | | | Percent Favorable/ (Unfavorable) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2014 | | 2013 | | | | 2014 | | 2013 | | |
| CEOC adjusted | $ | 232.2 | $ | 352.1 | | (34.1)% | $ | 717.2 | $ | 997.3 | | (28.1)% |
| CERP | | 122.6 | | 123.8 | | (1.0)% | | 363.7 | | 398.4 | | (8.7)% |
| CGP LLC | | 105.4 | | 78.7 | | 33.9 % | | 312.8 | | 254.0 | | 23.1 % |
| Other | | (17.7) | | (46.6) | | 62.0 % | | (72.9) | | (201.5) | | 63.8 % |
| Total | $ | 442.5 | $ | 508.0 | | (12.9)% | $ | 1,320.8 | $ | 1,448.2 | | (8.8)% |

_____

\*      Not meaningful

[a]     As consolidated, and adjusted, see Basis of Presentation

[b]     As reported, see Basis of Presentation

### Liquidity

Each of the entities comprising Caesars Entertainment's consolidated financial statements have separate debt agreements with restrictions on usage of the respective entity's capital resources. CGP LLC is a variable interest entity that is consolidated by Caesars Entertainment, but is controlled by its sole voting member, Caesars Acquisition Company ("CAC"). CAC is a managing member of CGP LLC and therefore controls all decisions regarding liquidity and capital resources of CGP LLC.

| (In millions) | September 30, 2014 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | CEOC | | CERP | | CGP LLC | | Parent |
| Cash and cash equivalents | $ | 1,479.9 | $ | 200.8 | $ | 989.2 | $ | 512.5 |
| Revolver capacity | | 106.1 | | 269.5 | | 150.0 | | — |
| Revolver capacity drawn or committed to letters of credit | | (98.3) | | (75.0) | | (0.1) | | — |
| Total Liquidity | $ | 1,487.7 | $ | 395.3 | $ | 1,139.1 | $ | 512.5 |

### Conference Call Information

Caesars Entertainment Corporation (NASDAQ: CZR) will host a conference call at 1:30 p.m. Pacific Time Monday, November 10, 2014 to review its third-quarter results. The call will be accessible in the Investor Relations section of www.caesars.com .

If you would like to ask questions and be an active participant in the call, you may dial 877-637-3723, or 832-412-1752 for international callers, and enter Conference ID 20797507 approximately 10 minutes before the call start time. A recording of the live call will be available on the Company's website for 90 days after the event.

### About Caesars

Caesars Entertainment Corporation (CEC) is the world's most diversified casino-entertainment provider and the most geographically diverse U.S. casino-entertainment company. CEC is mainly comprised of the following three entities: the majority owned operating subsidiary Caesars Entertainment Operating Company, wholly owned Caesars Entertainment Resort Properties and Caesars Growth Properties, in which we hold a variable economic interest. Since its beginning in Reno, Nevada, 75 years ago, CEC has grown through development of new resorts, expansions and acquisitions and its portfolio of subsidiaries now operate 50 casinos in 14 U.S. states and five countries. The Company's resorts operate primarily under the Caesars®, Harrah's® and Horseshoe® brand names. CEC's portfolio also includes the London Clubs International family of casinos. CEC is focused on building loyalty and value with its guests through a unique combination of great service, excellent products, unsurpassed distribution, operational excellence and technology leadership. The Company is committed to environmental sustainability and energy conservation and recognizes the importance of being a responsible steward of the environment. For more information, please visit www.caesars.com .

4

**Forward Looking Information**

This release includes "forward-looking statements" intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995. You can identify these statements by the fact that they do not relate strictly to historical or current facts. These statements contain words such as "may," "will," "expect," "believe," "anticipate," "intended," "would," "estimate," "continue," "bode well," "future," or the negative or other variations thereof or comparable terminology. In particular, they include statements relating to, among other things, future actions, new projects, strategies, future performance, the outcomes of contingencies, and future financial results of Caesars. These forward-looking statements are based on current expectations and projections about future events.

Investors are cautioned that forward-looking statements are not guarantees of future performance or results and involve risks and uncertainties that cannot be predicted or quantified, and, consequently, the actual performance of Caesars may differ materially from those expressed or implied by such forward-looking statements. Such risks and uncertainties include, but are not limited to, the following factors, and other factors described from time to time in the Company's reports filed with the Securities and Exchange Commission (including the sections entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" contained therein):

- the impact of the Company's substantial indebtedness and the restrictions in the Company's debt agreements, and the outcome of discussions with CEOC's creditors regarding CEOC's capital structure;

- litigation outcomes and judicial and governmental body actions, including gaming legislative action, referenda, regulatory disciplinary actions, and fines and taxation, including but not limited to, the assertion and outcome of litigation or other claims that have been or may be brought against the Company by certain creditors, some of whom have notified the Company of their objection to various transactions undertaken by the Company in 2013 and 2014;

- the effects of local and national economic, credit, and capital market conditions on the economy, in general, and on the gaming industry, in particular;

- the ability to realize the expense reductions from cost savings programs, including the program to increase its working capital and excess cash by $500 million;

- changes in laws, including increased tax rates, smoking bans, regulations or accounting standards, third-party relations and approvals, and decisions, disciplines, and fines of courts, regulators, and governmental bodies;

- the ability of the Company's customer-tracking, customer loyalty, and yield-management programs to continue to increase customer loyalty and same-store or hotel sales;

- the effects of competition, including locations of competitors, competition for new licenses and operating and market competition;

- the ability to recoup costs of capital investments through higher revenues;

- abnormal gaming holds ("gaming hold" is the amount of money that is retained by the casino from wagers by customers);

- the ability to timely and cost-effectively integrate companies that the Company acquires into its operations;

- the potential difficulties in employee retention and recruitment as a result of the Company's substantial indebtedness, the ongoing downturn in the U.S. regional gaming industry, or any other factor;

- construction factors, including delays, increased costs of labor and materials, availability of labor and materials, zoning issues, environmental restrictions, soil and water conditions, weather and other hazards, site access matters, and building permit issues;

- severe weather conditions or natural disasters, including losses therefrom, including losses in revenues and damage to property, and the impact of severe weather conditions on the Company's ability to attract customers to

certain of its facilities, such as the amount of losses and disruption to us as a result of Hurricane Sandy in late October 2012;

• acts of war or terrorist incidents or uprisings, including losses therefrom, including losses in revenues and damage to property,

• the effects of environmental and structural building conditions relating to the Company's properties;

• access to insurance on reasonable terms for the Company's assets; and

5

- the impact, if any, of unfunded pension benefits under multi-employer pension plans.

Any forward-looking statements are made pursuant to the Private Securities Litigation Reform Act of 1995 and, as such, speak only as of the date made. Caesars disclaims any obligation to update the forward-looking statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date stated or, if no date is stated, as of the date of this filing.

6

**CAESARS ENTERTAINMENT CORPORATION**
**CONSOLIDATED CONDENSED STATEMENTS OF OPERATIONS**
**(UNAUDITED)**

| (In millions, except per share data) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2014 | 2013 | 2014 | 2013 |
| Revenues | | | | |
| Casino | $ 1,395.6 | $ 1,391.5 | $ 4,046.5 | $ 4,178.7 |
| Food and beverage | 394.3 | 367.3 | 1,143.8 | 1,103.5 |
| Rooms | 301.3 | 302.5 | 915.0 | 887.5 |
| Management fees | 16.0 | 14.5 | 44.4 | 42.3 |
| Other | 337.6 | 220.2 | 892.3 | 628.3 |
| Reimbursable management costs | 62.6 | 72.7 | 196.8 | 203.2 |
| Less: casino promotional allowances | (295.0) | (281.3) | (853.6) | (827.5) |
| Net revenues | 2,212.4 | 2,087.4 | 6,385.2 | 6,216.0 |
| Operating expenses | | | | |
| Direct | | | | |
| Casino | 833.9 | 760.0 | 2,412.5 | 2,329.6 |
| Food and beverage | 183.4 | 163.5 | 516.0 | 488.3 |
| Rooms | 81.9 | 74.2 | 241.6 | 225.0 |
| Property, general, administrative, and other | 605.6 | 511.3 | 1,680.5 | 1,490.0 |
| Reimbursable management costs | 62.6 | 72.7 | 196.8 | 203.2 |
| Depreciation and amortization | 131.9 | 124.9 | 371.1 | 410.4 |
| Write-downs, reserves, and project opening costs, net of recoveries | 19.2 | 0.5 | 95.1 | 44.7 |
| Impairment of intangible and tangible assets | 498.6 | 818.6 | 548.8 | 945.9 |
| Loss on interests in non-consolidated affiliates | 6.6 | 4.0 | 9.4 | 20.4 |
| Corporate expense | 73.9 | 37.0 | 192.5 | 114.3 |
| Acquisition and integration costs | 8.8 | 3.2 | 71.0 | 69.6 |
| Amortization of intangible assets | 33.8 | 41.5 | 100.2 | 123.1 |
| Total operating expenses | 2,540.2 | 2,611.4 | 6,435.5 | 6,464.5 |
| Income/(loss) from operations | (327.8) | (524.0) | (50.3) | (248.5) |
| Interest expense | (708.3) | (562.9) | (1,954.1) | (1,677.4) |
| Gain/(loss) on early extinguishment of debt | (66.5) | 13.0 | (95.2) | 17.5 |
| Gain/(loss) on partial sale of subsidiary | — | — | (3.1) | 44.1 |
| Other income, including interest income | 1.0 | 0.5 | 5.1 | 8.9 |
| Loss from continuing operations before income taxes | (1,101.6) | (1,073.4) | (2,097.6) | (1,855.4) |
| Income tax benefit | 169.9 | 374.2 | 479.3 | 777.9 |
| Loss from continuing operations, net of income taxes | (931.7) | (699.2) | (1,618.3) | (1,077.5) |
| Discontinued operations | | | | |
| Loss from discontinued operations | (46.1) | (98.7) | (188.4) | (151.5) |
| Income tax benefit | (2.3) | 36.1 | 11.0 | 41.2 |
| Loss from discontinued operations, net of income taxes | (48.4) | (62.6) | (177.4) | (110.3) |
| Net loss | (980.1) | (761.8) | (1,795.7) | (1,187.8) |
| Net (income)/loss attributable to noncontrolling interests | 72.0 | 0.4 | 34.7 | (3.5) |
| Net loss attributable to Caesars | $ (908.1) | $ (761.4) | $ (1,761.0) | $ (1,191.3) |
| Loss per share - basic and diluted | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Loss per share from continuing operations | $ | (5.96) | $ | (5.54) | $ | (11.16) | $ | (8.60) |
| Loss per share from discontinued operations | | (0.33) | | (0.49) | | (1.25) | | (0.87) |
| Net loss per share | $ | (6.29) | $ | (6.03) | $ | (12.41) | $ | (9.47) |

7

**CAESARS ENTERTAINMENT CORPORATION**
**CONSOLIDATED CONDENSED SUMMARY BALANCE SHEETS**
**(UNAUDITED)**
**(In millions)**

| | September 30, 2014 | December 31, 2013 |
|---|---|---|
| ***Assets*** | | |
| Current assets | | |
|     Cash and cash equivalents | $    3,182.4 | $    2,771.2 |
|     Restricted cash | 61.5 | 87.5 |
|     Other current assets | 917.9 | 911.6 |
|         Total current assets | 4,161.8 | 3,770.3 |
| Property and equipment, net | 13,484.8 | 13,237.9 |
| Goodwill and other intangible assets | 5,996.1 | 6,551.0 |
| Restricted cash | 42.5 | 336.8 |
| Assets held for sale | 2.9 | 11.9 |
| Other long-term assets | 803.4 | 781.0 |
|         Total assets | $    24,491.5 | $    24,688.9 |
| ***Liabilities and Stockholders' Deficit*** | | |
| Current liabilities | | |
|     Current portion of long-term debt | $    140.6 | $    197.1 |
|     Other current liabilities | 2,657.9 | 2,333.7 |
|         Total current liabilities | 2,798.5 | 2,530.8 |
| Long-term debt | 22,888.9 | 20,918.4 |
| Other long-term liabilities | 2,518.5 | 3,143.5 |
|         Total liabilities | 28,205.9 | 26,592.7 |
| Total Caesars stockholders' deficit | (4,012.2) | (3,122.0) |
| Noncontrolling interests | 297.8 | 1,218.2 |
|         Total deficit | (3,714.4) | (1,903.8) |
|         Total liabilities and stockholders' deficit | $    24,491.5 | $    24,688.9 |

8

**CAESARS ENTERTAINMENT CORPORATION**
**SUPPLEMENTAL INFORMATION**
**RECONCILIATION OF NET LOSS ATTRIBUTABLE TO CAESARS ENTERTAINMENT CORPORATION**
**TO PROPERTY EBITDA AND ADJUSTED EBITDA**

Property earnings before interest, taxes, depreciation and amortization ("EBITDA") is presented as a supplemental measure of the Company's performance. Property EBITDA is defined as revenues less property operating expenses and is comprised of net income/(loss) before (i) interest expense, net of interest capitalized and interest income, (ii) (benefit)/provision for income taxes, (iii) depreciation and amortization, (iv) corporate expenses, and (v) certain items that the Company does not consider indicative of its ongoing operating performance at an operating property level. In evaluating Property EBITDA you should be aware that, in the future, the Company may incur expenses that are the same or similar to some of the adjustments in this presentation. The presentation of Property EBITDA should not be construed as an inference that future results will be unaffected by unusual or unexpected items.

Property EBITDA is a non-GAAP financial measure commonly used in our industry and should not be construed as an alternative to net income/(loss) as an indicator of operating performance or as an alternative to cash flow provided by operating activities as a measure of liquidity (as determined in accordance with GAAP). Property EBITDA may not be comparable to similarly titled measures reported by other companies within the industry. Property EBITDA is included because management uses Property EBITDA to measure performance and allocate resources, and believes that Property EBITDA provides investors with additional information consistent with that used by management.

Adjusted EBITDA is defined as EBITDA further adjusted to exclude certain non-cash and other items required or permitted in calculating covenant compliance under the indenture governing CEOC's secured credit facilities.

Adjusted EBITDA is presented as a supplemental measure of the Company's performance and management believes that Adjusted EBITDA provides investors with additional information and allows a better understanding of the results of operational activities separate from the financial impact of decisions made for the long-term benefit of the Company.

Because not all companies use identical calculations, the presentation of Adjusted EBITDA may not be comparable to other similarly titled measures of other companies.

The following tables reconcile net income/(loss) attributable to the companies presented to Property EBITDA and Adjusted EBITDA for the periods indicated.

9

**CAESARS ENTERTAINMENT CORPORATION**
**SUPPLEMENTAL INFORMATION**
**RECONCILIATION OF NET LOSS ATTRIBUTABLE TO CAESARS ENTERTAINMENT CORPORATION**
**TO PROPERTY EBITDA AND ADJUSTED EBITDA**

| (In millions) | Three Months Ended September 30, 2014 | | | | | Three Months Ended September 30, 2013 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | CEOC [i] | CERP [j] | CGP LLC [k] | Other [l] | CEC | CEOC [i] | CERP [j] | Predecessor [k] | Other [l] | CEC |
| Net income/(loss) attributable to company | $ (875.1) | $ (141.9) | 61.2 | $ 47.7 | $ (908.1) | $(1,066.1) | $ 23.6 | $ 50.5 | $ 230.6 | $ (761.4) |
| Net income/(loss) attributable to noncontrolling interests | (0.4) | — | (5.1) | (66.5) | (72.0) | (2.1) | — | (3.7) | 5.4 | (0.4) |
| Net income/(loss) | (875.5) | (141.9) | 56.1 | (18.8) | (980.1) | (1,068.2) | 23.6 | 46.8 | 236.0 | (761.8) |
| Net (income)/loss from discontinued operations | 48.0 | — | 14.6 | (14.2) | 48.4 | 99.4 | — | — | (36.8) | 62.6 |
| Net (income)/loss from continuing operations | (827.5) | (141.9) | 70.7 | (33.0) | (931.7) | (968.8) | 23.6 | 46.8 | 199.2 | (699.2) |
| Income tax (benefit)/provision | (168.6) | (6.2) | 22.1 | (17.2) | (169.9) | (173.3) | 12.9 | 22.3 | (236.1) | (374.2) |
| Income/(loss) from continuing operations before income taxes | (996.1) | (148.1) | 92.8 | (50.2) | (1,101.6) | (1,142.1) | 36.5 | 69.1 | (36.9) | (1,073.4) |
| Other (income)/loss, including interest income | (12.6) | — | (19.0) | 30.6 | (1.0) | 0.3 | — | (45.0) | 44.2 | (0.5) |
| (Gain)/loss on early extinguishments of debt [a] | 113.5 | — | — | (47.0) | 66.5 | 0.3 | (13.4) | 0.3 | (0.2) | (13.0) |
| Interest expense | 583.9 | 98.8 | 44.2 | (18.6) | 708.3 | 539.8 | 49.4 | 21.6 | (47.9) | 562.9 |
| Income/(loss) from operations | (311.3) | (49.3) | 118.0 | (85.2) | (327.8) | (601.7) | 72.5 | 46.0 | (40.8) | (524.0) |
| Depreciation and amortization | 76.7 | 35.5 | 37.8 | (18.1) | 131.9 | 96.2 | 36.8 | 24.6 | (32.7) | 124.9 |
| Amortization of intangible assets | 11.3 | 12.4 | — | 10.1 | 33.8 | 22.5 | 14.8 | — | 4.2 | 41.5 |
| Impairment of intangible and tangible assets [b] | 388.3 | 117.8 | 63.5 | (71.0) | 498.6 | 795.9 | 5.5 | — | 17.2 | 818.6 |
| Write-downs, reserves, and project opening costs, net of recoveries [c] | 2.8 | 4.7 | 12.3 | (0.6) | 19.2 | 11.5 | (8.0) | 4.8 | (7.8) | 0.5 |
| Acquisition and integration costs [d] | 4.1 | 0.1 | 5.5 | (0.9) | 8.8 | 3.1 | — | 0.3 | (0.2) | 3.2 |
| (Income)/loss on interests in non-consolidated affiliates | 6.5 | — | — | 0.1 | 6.6 | 4.3 | (0.3) | — | — | 4.0 |
| Corporate expense | 54.7 | 9.2 | — | 10.0 | 73.9 | 18.6 | 11.6 | — | 6.8 | 37.0 |
| Impact of consolidating The LINQ and Octavius Tower [e] | (1.2) | — | — | 1.2 | — | — | — | — | — | — |
| Change in fair value of contingently issuable non-voting membership units | — | — | (56.4) | 56.4 | — | — | — | — | — | — |
| Change in fair value of contingent consideration | — | — | 0.1 | (0.1) | — | — | — | — | — | — |
| Gain on sale of bonds | — | — | (99.4) | 99.4 | — | — | — | — | — | — |
| EBITDA attributable to discontinued operations | (0.1) | — | (0.2) | — | (0.3) | 4.1 | — | — | 0.2 | 4.3 |
| Property EBITDA | $ 231.8 | $ 130.4 | $ 81.2 | $ 1.3 | $ 444.7 | $ 354.5 | $ 132.9 | $ 75.7 | $ (53.1) | $ 510.0 |
| Corporate expense | (54.7) | (9.2) | — | (10.0) | (73.9) | (18.6) | (11.6) | — | (6.8) | (37.0) |
| Stock-based compensation expense [f] | 10.7 | 0.3 | 22.6 | (0.4) | 33.2 | 5.8 | 0.2 | 2.0 | 0.4 | 8.4 |
| Adjustments to include 100% of Baluma S.A.'s adjusted EBITDA [g] | (2.0) | — | — | — | (2.0) | (0.7) | — | — | — | (0.7) |
| Depreciation in corporate expense | 16.5 | — | — | — | 16.5 | 3.1 | — | — | 0.1 | 3.2 |
| Other items [h] | 29.9 | 1.1 | 1.6 | (8.6) | 24.0 | 8.0 | 2.3 | 1.0 | 12.8 | 24.1 |
| Adjusted EBITDA | $ 232.2 | $ 122.6 | $ 105.4 | $ (17.7) | $ 442.5 | $ 352.1 | $ 123.8 | $ 78.7 | $ (46.6) | $ 508.0 |

10

**CAESARS ENTERTAINMENT CORPORATION**
**SUPPLEMENTAL INFORMATION**
**RECONCILIATION OF NET LOSS ATTRIBUTABLE TO CAESARS ENTERTAINMENT CORPORATION**
**TO PROPERTY EBITDA AND ADJUSTED EBITDA**

| (In millions) | Nine Months Ended September 30, 2014 | | | | | Nine Months Ended September 30, 2013 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | CEOC [i] | CERP [j] | CGP LLC [k] | Other [l] | CEC | CEOC [i] | CERP [j] | Predecessor [k] | Other [l] | CEC |
| Net income/(loss) attributable to company | $ (1,654.0) | $ (181.1) | $ 66.5 | $ 7.6 | $ (1,761.0) | $ (1,681.8) | $ 57.6 | $ 121.1 | $ 311.8 | $ (1,191.3) |
| Net income/(loss) attributable to noncontrolling interests | 2.8 | — | (14.5) | (23.0) | (34.7) | 2.8 | — | (4.9) | 5.6 | 3.5 |
| Net income/(loss) | (1,651.2) | (181.1) | 52.0 | (15.4) | (1,795.7) | (1,679.0) | 57.6 | 116.2 | 317.4 | (1,187.8) |
| Net (income)/loss from discontinued operations | 149.0 | — | 15.6 | 12.8 | 177.4 | 124.9 | — | — | (14.6) | 110.3 |
| Net (income)/loss from continuing operations | (1,502.2) | (181.1) | 67.6 | (2.6) | (1,618.3) | (1,554.1) | 57.6 | 116.2 | 302.8 | (1,077.5) |
| Income tax (benefit)/provision | (424.0) | (28.6) | 31.9 | (58.6) | (479.3) | (449.2) | 26.0 | 55.9 | (410.6) | (777.9) |
| Income/(loss) from continuing operations before income taxes | (1,926.2) | (209.7) | 99.5 | (61.2) | (2,097.6) | (2,003.3) | 83.6 | 172.1 | (107.8) | (1,855.4) |
| Other (income)/loss, including interest income | (18.4) | — | (120.1) | 133.4 | (5.1) | (7.4) | (0.1) | (128.6) | 127.2 | (8.9) |
| (Gain)/loss on partial sale of subsidiary | 3.1 | — | — | — | 3.1 | (44.1) | — | — | — | (44.1) |
| (Gain)/loss on early extinguishments of debt [a] | 113.5 | — | 23.8 | (42.1) | 95.2 | 29.8 | (52.4) | 0.5 | 4.6 | (17.5) |
| Interest expense | 1,667.4 | 288.4 | 123.8 | (125.5) | 1,954.1 | 1,612.9 | 157.8 | 56.2 | (149.5) | 1,677.4 |
| Income/(loss) from operations | (160.6) | 78.7 | 127.0 | (95.4) | (50.3) | (412.1) | 188.9 | 100.2 | (125.5) | (248.5) |
| Depreciation and amortization | 231.9 | 116.2 | 98.8 | (75.8) | 371.1 | 316.4 | 118.5 | 73.8 | (98.3) | 410.4 |
| Amortization of intangible assets | 39.0 | 37.3 | — | 23.9 | 100.2 | 67.6 | 44.3 | — | 11.2 | 123.1 |
| Impairment of intangible and tangible assets [b] | 418.1 | 117.6 | 63.5 | (50.4) | 548.8 | 898.8 | 29.9 | — | 17.2 | 945.9 |
| Write-downs, reserves, and project opening costs, net of recoveries [c] | 61.9 | 10.4 | 34.3 | (11.5) | 95.1 | 38.6 | 10.7 | 15.8 | (20.4) | 44.7 |
| Acquisition and integration costs [d] | 17.3 | 0.3 | 11.5 | 41.9 | 71.0 | 20.5 | — | 0.5 | 48.6 | 69.6 |
| (Income)/loss on interests in non-consolidated affiliates | 9.4 | — | — | — | 9.4 | 23.0 | (3.0) | — | 0.4 | 20.4 |
| Corporate expense | 133.4 | 42.9 | — | 16.2 | 192.5 | 62.8 | 36.8 | — | 14.7 | 114.3 |
| Impact of consolidating The LINQ and Octavius Tower [e] | (33.0) | — | — | 33.0 | — | — | — | — | — | — |
| Change in fair value of contingently issuable non-voting membership units | — | — | (7.9) | 7.9 | — | — | — | — | — | — |
| Change in fair value of contingent consideration | — | — | 32.7 | (32.7) | — | — | — | — | 48.9 | (48.9) |
| Gain on sale of bonds | — | — | (99.4) | 99.4 | — | — | — | — | — | — |
| EBITDA attributable to discontinued operations | (6.0) | — | (1.5) | — | (7.5) | 10.7 | — | — | (0.5) | 10.2 |
| Property EBITDA | $ 711.4 | $ 403.4 | $ 259.0 | $ (43.5) | $ 1,330.3 | $ 1,026.3 | $ 426.1 | $ 239.2 | $ (201.5) | $ 1,490.1 |
| Corporate expense | (133.4) | (42.9) | — | (16.2) | (192.5) | (62.8) | (36.8) | — | (14.7) | (114.3) |
| Stock-based compensation expense [f] | 32.9 | 1.3 | 49.0 | — | 83.2 | 15.7 | 0.5 | 12.5 | (10.6) | 18.1 |
| Adjustments to include 100% of Baluma S.A.'s adjusted EBITDA [g] | 21.4 | — | — | — | 21.4 | (0.8) | — | — | 0.1 | (0.7) |
| Depreciation in corporate expense | 38.7 | — | — | — | 38.7 | 9.7 | — | — | — | 9.7 |
| Other items [h] | 46.2 | 1.9 | 4.8 | (13.2) | 39.7 | 9.2 | 8.6 | 2.3 | 25.2 | 45.3 |
| Adjusted EBITDA | $ 717.2 | $ 363.7 | $ 312.8 | $ (72.9) | $ 1,320.8 | $ 997.3 | $ 398.4 | $ 254.0 | $ (201.5) | $ 1,448.2 |

11

**CAESARS ENTERTAINMENT CORPORATION**
**NOTES TO SUPPLEMENTAL INFORMATION**
**RECONCILIATION OF NET LOSS ATTRIBUTABLE TO CAESARS ENTERTAINMENT CORPORATION**
**TO PROPERTY EBITDA AND ADJUSTED EBITDA**

_____

(a)  Amounts represent the difference between the fair value of consideration paid and the book value, net of deferred financing costs, of debt retired through debt extinguishment transactions, which are capital structure-related, rather than operational-type costs.

(b)  Amounts represent non-cash charges to impair intangible and tangible assets primarily resulting from changes in the business outlook in light of competitive conditions.

(c)  Amounts primarily represent pre-opening costs incurred in connection with new property openings and expansion projects at existing properties, as well as any non-cash write-offs of abandoned development projects.

(d)  Amounts include certain costs associated with acquisition and development activities and reorganization activities, which are infrequently occurring costs.

(e)  Amounts represent the EBITDA of The LINQ and Octavius Tower as consolidated in CEOC. Because The LINQ and Octavius Tower are not legally owned by CEOC the related EBITDA impact is removed from Property EBITDA and Adjusted EBITDA measures.

(f)  Amounts represent stock-based compensation expense related to shares, stock options, and restricted stock granted to the Company's employees.

(g)  Amounts represent adjustments to include 100% of Baluma S.A. (Conrad Punta del Este) adjusted EBITDA as permitted under the indentures governing CEOC's existing notes and the credit agreement governing CEOC's senior secured credit facilities.

(h)  Amounts represent add-backs and deductions from EBITDA, whether permitted and/or required under the indentures governing CEOC's existing notes and the credit agreement governing CEOC's senior secured credit facilities, but not separately identified. Such add-backs and deductions include litigation awards and settlements, severance and relocation costs, sign-on and retention bonuses, permit remediation costs, gains and losses from disposals of assets, costs incurred in connection with implementing the Company's efficiency and cost-saving programs, business optimization expenses, the Company's insurance policy deductibles incurred as a result of catastrophic events such as floods and hurricanes, one time sales tax assessments and accruals, project start-up costs, and non-cash equity in earnings of non-consolidated affiliates (net of distributions). Additionally, in the current period CEOC includes $12.4 million of dividends from HIE Holdings.

(i)  Amounts include the results and adjustments of CEOC on a consolidated basis without the exclusion of CEOC's unrestricted subsidiaries, and therefore, are different than the calculations used to determine compliance with debt covenants under the credit facility.

(j)  Amounts include the results and adjustments of CERP on a stand-alone basis.

(k)  Amounts include the results and adjustments attributable to CGP LLC and Predecessor Growth Partners ("Predecessor") on a consolidated or combined, stand-alone basis. The financial information for the three and nine months ended September 30, 2013 does not reflect the impacts of the Formation Transaction, including the recording of non-controlling interest or the determination of taxes in accordance with the limited liability company structure of CGP LLC. Instead, the financial information, referred to as "Predecessor", presents the combination of the assets and entities that were purchased by or contributed to CGP LLC for the periods presented as that financial information was initially recorded in the underlying accounting records of Caesars Entertainment. The financial statement information of CGP LLC presented below have been prepared consistent with CGP LLC's presentation of its results presented on a stand-alone basis. As the properties were acquired from CEOC, CGP LLC has treated these acquisitions as a reorganization of entities under common control; accordingly all properties results are reported as if acquired as of the earliest period presented.

(l)  Amounts include consolidating adjustments, eliminating adjustments and other adjustments to reconcile to consolidated CEC Property EBITDA and Adjusted EBITDA.

12

**CAESARS ENTERTAINMENT CORPORATION**
**SUPPLEMENTAL INFORMATION**
**LTM ADJUSTED EBITDA-PRO FORMA**

Last twelve months ("LTM") Adjusted EBITDA-Pro Forma is defined as Adjusted EBITDA further adjusted to include Pro Forma adjustments related to properties and estimated cost savings yet-to-be-realized, as set forth in our secured credit facilities.

LTM Adjusted EBITDA-Pro Forma is presented as a supplemental measure of performance and management believes that LTM Adjusted EBITDA-Pro Forma provides investors with additional information and allows a better understanding of the results of operational activities separate from the financial impact of decisions made for the long-term benefit of the Company.

Because not all companies use identical calculations, the presentation of LTM Adjusted EBITDA-Pro Forma may not be comparable to other similarly titled measures of other companies.

The following table reconciles net income to LTM Adjusted EBITDA-Pro Forma for the last twelve months ended September 30, 2014.

| (In millions) | Twelve Months Ended September 30, 2014 | |
| --- | --- | --- |
| | CEOC | CERP |
| Net income/(loss) attributable to company | $ (3,030.6) | $ (876.9) |
| Interest Expense | 2,199.7 | 376.5 |
| Interest Income | (14.7) | — |
| Benefit for income taxes | (500.2) | (438.1) |
| Depreciation and amortization | 326.5 | 154.6 |
| Depreciation in corporate expenses | 41.8 | — |
| Amortization of intangible assets | 59.9 | 52.1 |
| Discontinued operations | 23.3 | — |
| EBITDA | (894.3) | (731.8) |
| Write-downs, reserves, and project opening costs, net of recoveries [a] | 114.7 | 15.1 |
| Acquisition and integration costs [b] | 10.2 | 0.3 |
| Loss on early extinguishment of debt [c] | 115.8 | 37.1 |
| Net income attributable to noncontrolling interests | 4.4 | — |
| Impairment of tangible and intangible assets [d] | 1,328.1 | 1,133.6 |
| Stock-based compensation expense [e] | 52.4 | 1.7 |
| Adjustments to include 100% of Baluma S.A.'s adjusted EBITDA [f] | 31.2 | — |
| Discontinued operations write-downs, reserves, and project opening costs, net of recoveries and impairments | 208.6 | — |
| Impact of consolidating The LINQ and Octavius Tower [g] | (37.2) | — |
| Other items [h] | 59.1 | 2.6 |
| Adjusted EBITDA | 993.0 | 458.6 |
| Pro Forma adjustments related to properties [i] | 0.2 | 0.1 |
| Pro Forma adjustment for estimated cost savings yet-to-be-realized [j] | 94.8 | 14.0 |
| Pro forma quarterly add back for Caesars Linq LLC [k] | — | 60.7 |
| LTM Adjusted EBITDA-Pro Forma | 1,088.0 | $ 533.4 |
| Adjusted EBITDA-Pro Forma of CEOC's unrestricted subsidiaries | (12.4) | |
| Adjusted EBITDA-Pro Forma of CEOC's discontinued operations [l] | 9.9 | |
| LTM Adjusted EBITDA-ProForma - CEOC Restricted | 1,085.5 | |
| LTM Adjusted EBITDA-ProForma - CEOC Property Sales [m] | (108.9) | |
| LTM Adjusted EBITDA-ProForma - Management Fees [n] | 7.2 | |

| | | |
|---|---|---|
| LTM Adjusted EBITDA-ProForma - CEOC Adjusted for Property Sales and Management Fees | $ | 983.8 |

13

(a) Amounts primarily represent pre-opening costs incurred in connection with new property openings and expansion projects at existing properties, as well as any non-cash write-offs of abandoned development projects.

(b) Amounts include certain costs associated with acquisition and development activities and reorganization activities, which are infrequently occurring costs.

(c) Amounts represent the difference between the fair value of consideration paid and the book value, net of deferred financing costs, of debt retired through debt extinguishment transactions, which are capital structure-related, rather than operational-type costs.

(d) Amounts represent non-cash charges to impair intangible and tangible assets primarily resulting from changes in the business outlook in light of competitive conditions.

(e) Amounts represent stock-based compensation expense related to shares, stock options, and restricted stock granted to the Company's employees.

(f) Amounts represent adjustments to include 100% of Baluma S.A. (Conrad Punta del Este) adjusted EBITDA as permitted under the indentures governing CEOC's existing notes and the credit agreement governing CEOC's senior secured credit facilities.

(g) Amounts represent the EBITDA of The LINQ and Octavius Tower as consolidated in CEOC. Because The LINQ and Octavius Tower are not legally owned by CEOC, the related EBITDA impact is removed from the Adjusted EBITDA measure.

(h) Amounts represent add-backs and deductions from EBITDA, whether permitted and/or required under the indentures governing CEOC's existing notes and the credit agreement governing CEOC's senior secured credit facilities, included in arriving at LTM Adjusted EBITDA-Pro Forma but not separately identified. Such add-backs and deductions include litigation awards and settlements, severance and relocation costs, sign-on and retention bonuses, permit remediation costs, gains and losses from disposals of assets, costs incurred in connection with implementing the Company's efficiency and cost-saving programs, business optimization expenses, the Company's insurance policy deductibles incurred as a result of catastrophic events such as floods and hurricanes, one time sales tax assessments and accruals, project start-up costs, and non-cash equity in earnings of non-consolidated affiliates (net of distributions).

(i) Amounts represent the estimated annualized impact of operating results related to newly completed construction projects, combined with the estimated annualized EBITDA impact associated with properties acquired during the period.

(j) Amount represents adjustments to reflect the impact of annualized run-rate cost-savings and anticipated future cost savings to be realized from profitability improvement and cost savings programs. These amounts do not include the cost savings programs announced in this press release, as those measures were not finalized at September 30, 2014.

(k) In accordance with the CERP Financing, EBITDA of the Linq for each fiscal quarter, through the fourth quarter of 2014, will be deemed to be equal to the greater of (i) $24.75 million or (ii) actual EBITDA.

(l) Per CEOC's senior secured credit facilities, EBITDA related to the Company's discontinued operations are deducted from LTM Adjusted EBITDA - Pro Forma. Amount represents a loss of $9.9 million in discontinued operations for the last twelve months ended September 30, 2014.

(m) Per CEOC's senior secured credit facilities, EBITDA related to the Company's divested properties is deducted from LTM Adjusted EBITDA - Pro Forma. Amount represents $108.9 million in Adjusted EBITDA related to CEOC's sale of four properties (The Cromwell, Bally's Las Vegas, The LINQ Hotel & Casino (formerly The Quad Resort & Casino), and Harrah's New Orleans) to CGP LLC in May 2014, following the sale of Planet Hollywood Resort & Casino to CGP LLC in October 2013 (the "Property Sales") for the last twelve months ended September 30, 2014.

(n) Per CEOC's senior secured facilities, management fees related to the Company's divested properties are added to LTM Adjusted EBITDA-Pro Forma. Amount represents $7.2 million in management fees CEOC will receive from properties included in the Property Sales.

14

Exhibit 99.2

# Caesars Entertainment Corporation (CZR)

## Third Quarter 2014 Earnings Announcement

## November 10, 2014

Caesars is posting a copy of these prepared remarks and its press release to its Investor Relations website. These prepared remarks are offered to provide stockholders and analysts with additional time and detail for analyzing our results in advance of our quarterly conference call. As previously scheduled, the conference call will begin today, November 10 at 1:30 p.m. PT (4:30 p.m. ET). To access the live broadcast, please visit the Investor Relations section of Caesars' website at www.caesars.com. A reconciliation between GAAP and non-GAAP results is provided in the tables in the press release.

## Prepared Remarks

**Eric Hession:**

Good afternoon, and welcome to the Caesars Entertainment Third Quarter 2014 Results Conference Call. Joining me today from Caesars Entertainment Corporation are Gary Loveman, Chief Executive Officer; and Donald Colvin, Chief Financial Officer. Following our prepared remarks, we'll turn the call over to your questions.

A copy of our press release, today's prepared remarks and a replay of this conference call will be available in the Investor Relations section on our website at caesars.com.

Before I turn the call over to Gary, I'd like to call your attention to the following information. The Safe Harbor disclaimer in our public documents covers this call and the simultaneous webcast at caesars.com. The forward-looking statements made during this conference call reflect the opinion of management as of the date of this call. There are risks and uncertainties with such statements, which are detailed in our filings with the SEC. Please be advised that developments subsequent to this call are likely to cause these statements to become outdated with the passage of time. We do not intend, however, to update the information provided today prior to our next quarterly conference call.

Further, today, we are reporting third quarter 2014 results. These results are not necessarily indicative of results in

future periods. Also, please note that, prior to this call, we furnished a Form 8-K of this afternoon's press release to the SEC.

Property EBITDA and adjusted EBITDA are non-GAAP financial measures. Reconciliations of net income and loss to property EBITDA and net income and loss to adjusted EBITDA can be found in the tables of our press release.

This call, the webcast and its replay are the property of Caesars Entertainment Corporation. It's not for rebroadcast or use by any other party without the prior written consent of Caesars Entertainment Corporation. If you do not agree with these terms, please disconnect now. By remaining on the line, you agree to be bound by these terms.

Recall, Caesars Entertainment is a holding company, consisting of three primary entities in which Caesars Entertainment holds an economic interest:

•       Caesars Entertainment Resort Properties;

•       Caesars Growth Partners, and;

•       Caesars Entertainment Operating Co.

CERP and CGP have outsized exposure to destination markets, particularly in Las Vegas. As I have described in the past, CGP is the primary growth vehicle for the company's online and offline distribution channels. CEOC, which remains heavily levered, is the focus of our ongoing work to address its capital structure.

The holding company structure that has emerged, along with the implementation of Caesars Enterprise Services in certain jurisdictions, facilitates ongoing access to Total Rewards and other shared services for properties within CERP, CGP, and CEOC. The structure also creates an efficient mechanism for ongoing investment in the growth of the Total Rewards network, the benefits of which will accrue to each of our entities.

Today we filed a form extending the time in which we will file our Form 10-Q. The Company does not expect any material changes to its financial results to be reflected in the Form 10-Q when filed, relative to what is contained in today's press release. The Company intends to file the Form 10-Q within the five day extension period.

As we move forward with this call, the words "company", "Caesars", "Caesars Entertainment", "we", "our" and "us" refer to Caesars Entertainment Corporation and its consolidated entities, unless otherwise stated, or context requires otherwise.

Let me turn it over to Gary.

**Gary Loveman:**

Thank you Eric.

The third quarter of 2014 was marked by several milestones in our efforts to expand distribution into high-growth

markets and further enhance Caesars' hospitality and entertainment assets. However, expenses related to some of these items negatively impacted results in the period. Among these expenses were construction disruption, adverse hold, higher start-up costs related to ramp of several dining options across our network and higher marketing expenses. As

a result, we saw revenue increases associated with these assets, though did not realize the positive impact to profitability we expect to see in future periods.

That said, I am enthusiastic about our new and refreshed assets and believe they better position Caesars Entertainment to capitalize on the strong underlying fundamentals in Las Vegas. The investment impact is most evident in our CERP entity, where several new offerings have recently come online. Also, CGP is beginning to realize returns from previous investments.

Since our last call, we have commenced formal discussions with several groups of creditors related to our collective efforts to improve the financial condition of CEOC. As discussed on prior calls, we are keenly focused on deleveraging at CEOC and we refer you to our Form 10-Q to be filed later this week for a further discussion of CEOC's capital structure and liquidity position. While it is premature to report on the details of these negotiations with creditors, it is fair to say that the talks have been constructive. Further, we are intensely focused on ensuring operating costs are aligned with the current environment to enhance CEC's profitability. To that end, we are acting to reduce expenses and enhance EBITDA across the company through a variety of initiatives in operations, marketing and corporate expenses. We expect to produce an incremental $250 to $300 million of EBITDA in 2015 as a result of these actions. The overwhelming majority of this increase will be driven by cost savings.

I will now turn to the performance of our business in the third quarter.

In Las Vegas, I am encouraged by year-over-year increases in key tourism indicators, including Strip occupancy, airport traffic, ADR, RevPAR and convention attendance. This is a positive sign for the market as a whole and for our business. The trend reinforces our confidence in the investments we have made on the Strip. While our new investments in Las Vegas have added significant value to our portfolio, our Las Vegas properties did not fully benefit from the market growth this quarter due to several costs; namely unfavorable hold, bad debt expense, and rooms out of service for renovation. With the exception of the renovation impact, which we anticipate will continue for several quarters, we expect these issues to normalize in future quarters, and continue to view the Las Vegas market with optimism.

Ultimately, we anticipate the ongoing recovery in Las Vegas, coupled with growing awareness of our new attractions, will drive increases in our profitability over time. At Caesars Entertainment Resort Properties, third quarter revenue increased due to contributions from the LINQ and High Roller and growth in hotel and food and beverage offerings. CERP's Strip properties posted 2% growth in lodging revenue driven largely by an increase in cash ADR as a result of various hospitality initiatives. Gaming revenues declined as an increase in promotional allowances coupled with lower volumes was partially offset by favorable hold in Atlantic City.

Direct operating expenses at CERP's properties were higher in the quarter due primarily to the opening of several new dining outlets and higher marketing expenses compared with last year. The increase in marketing expenses was largely a result of programs aimed at retaining guests in Atlantic City following the closure of the Showboat. These incentives increased guest reinvestment in an effort to entice customers to visit our other properties in the market. We are

encouraged by the increased visitation, and hope to retain these players at more normalized investment levels going forward.

Our marketing activities at the LINQ and the High Roller are generating greater customer awareness and engagement. The Happy (Half) Hour on the High Roller and the weekly BLOQ party have been particularly successful in generating F&B revenue and garnering a strong ticket price as well driving additional riders to the wheel and foot traffic through the corridor. We are currently rolling out the next phase of our advertising and marketing activities to stimulate even more traffic to the LINQ promenade.

The properties on the East side of the Strip have benefited from this additional traffic, particularly Flamingo, which witnessed double digit growth in slot volume in the third quarter. During the period, we opened the Fulton Street Food Hall at Harrah's Las Vegas - a chef driven marketplace and the first food hall concept on the Strip. The Food Hall is open 24 hours a day and combines a sit down restaurant experience with the convenience of a to-go café.

In Atlantic City, we recently celebrated the "topping off" of CERP's waterfront meetings facility adjacent to Harrah's. We are pleased to have already booked multiple events at the facility, including a 1,400-person trade show and network event for UniPro next fall. Overall, our meetings and convention team has secured 25 bookings with 36,000 committed room nights and is currently in negotiation with 22 additional groups for 37,000 room nights. Our early success here supports our investment thesis that the city will benefit from a robust meetings business. We are optimistic the addition of this center to Atlantic City will help stimulate new visitation, particularly mid-week.

Turning to Growth Partners, CIE delivered another strong quarter. CIE's third-quarter revenue and EBITDA set new records for the business. Compared to the prior year, revenue increased 105% and EBITDA rose 75%. As Mitch detailed this morning, these results are attributable to the team's emphasis on driving higher monetization and conversion, the release of new game content and broadening the distribution of CIE's social and mobile games across various platforms. The social and mobile games business delivered a 103% year over year increase in revenues and grew paying users and average revenue per user.

In real-money online gaming, CIE launched new slot content and a mobile app for CaesarsCasino.com in New Jersey. In addition, the Total Rewards loyalty program was integrated into CaesarsCasino.com, an important technological step as it enables customers to earn TR credit for online casino play.

Growth Partners' brick and mortar properties also showed aggregate year over year growth mainly due to the addition of The Cromwell and Horseshoe Baltimore. In Las Vegas, activity at The Cromwell is picking up nicely,

with quarter over quarter improvement in occupancy since opening in May. Giada's also continues to generate high demand. The restaurant is consistently fully booked, and began serving lunch in mid-July and breakfast in September. We are expanding the main dining room and adding a second private dining area with a patio that overlooks the Strip to capitalize on the venue's popularity. Performance at Drai's continues to exceed expectations, even after a strong initial debut.

At The LINQ Hotel & Casino, formerly The Quad, performance was negatively impacted by room closures related to the property's transformation, which amounted to an estimated $7 to $10 million impact to revenue in the quarter as approximately half of the rooms were out of service. The property began welcoming its first hotel guests on October 30, bringing over 800 rooms back online. The remaining rooms have been taken out of service, beginning the final phase of room upgrades, which is projected to be completed in the first half of 2015. The newly renovated rooms are yielding more than double the cash ADR of the former Quad. Despite construction disruption, the casino has experienced increased foot traffic and visitation due to its proximity to the LINQ and High Roller and previously completed renovations to the lobby, including the casino floor. Slot and table volumes were up 26% and 22%, respectively. We expect additional enhancements, which include amenities such as a pool, cabanas, spa, salon and signature lobby bar, to boost the property's appeal and drive improved operating performance.

We are looking forward to the imminent opening of the Grand Bazaar Shops at Bally's. The new third- party retail attraction will be accessible directly from the Strip, Bally's and Paris, and via the bridges from The Cromwell and Caesars Palace. Designed as a 21st-century bazaar, the Grand Bazaar Shops will feature approximately 150 shops and dining establishments, and special attractions, including a vibrantly-colored rooftop design and a giant crystal starburst that creates a celebratory New Year's Eve-like experience daily. Tenants will include well-known brands like Superdry and Swatch as well as new experiences.

In August, we celebrated the opening of Horseshoe Baltimore with an event that welcomed visitors to what we believe will be Charm City's next great attraction. We are quite pleased with the property's performance since its opening, and have been experiencing strong food and beverage results. The property was designed to appeal to gamers and non-gamers alike. This approach is clearly resonating with customers, who are taking advantage of the wide array of entertainment options at the property.

Turning to CEOC - Caesars Palace experienced a particularly challenging quarter, which was the primary driver of the entity's weak results. Caesars Palace suffered from more than $35 million of unfavorable hold, somewhat lower volumes and an approximately $20 million increase in bad debt expense. The year ago period at Caesars Palace experienced exceedingly favorable hold on Baccarat, which made for a tough year over year comparison. Volume declines were largely attributable to a decline in high-end international play. Looking ahead, this particularly frustrating period of bad luck has continued into the fourth Quarter. On a year-over-year basis, we currently estimate more than $85 million of unfavorable hold impact in the second half of 2014.

Additionally, hospitality revenues were unfavorably impacted by the cancellation of Celine Dion shows. We are in the process of securing acts to fill the Colosseum while Celine is on leave and look forward to her return.

Also at Caesars Palace, we anticipate opening our newest nightclub addition, Omnia. Set to open in Spring 2015, Omnia will take over the former space of the iconic PURE Nightclub with a multi-level venue that will encompass a seductive ultra-lounge, a high-energy main room and mezzanine, as well as a breathtaking rooftop garden, showcasing panoramic views of the Las Vegas Strip.

Performance in Atlantic City also weighed heavily on CEOC's results as the market continued to struggle with oversupply. While the closures of Showboat and other properties have been challenging for the city, we are optimistic that Atlantic City's transformation is under way and that, over time, revenues will stabilize and margins will improve. For quite some time, we have pursued the diversification and enhancement of our offerings there to attract new visitors. This year, CEOC has opened several new dining outlets at Bally's, which produced increases in visitation and an improvement in customer experience. The transformation of Atlantic City won't happen overnight, but we believe new offerings will create new reasons for guests to visit and enhance the appeal of the destination.

Similar to CERP, CEOC expenses in the third quarter were higher due to the dining outlets ramping up as well as higher marketing expenses compared with last year. While it is still too early to quantify the impact that the Showboat and other property closings will have on our remaining three properties in the market, we believe that the reduction of gaming capacity will help create a more sustainable operational environment over the long term.

On a more positive note, regional markets appear to be showing signs of stabilization. Net revenues at same store CEOC properties excluding Las Vegas and Atlantic Coast were flat with growth in several regions such as Louisiana and Northern Nevada regions offset by declines from regions such as Illinois and Indiana. The dynamics in the regional markets are looking better than they have for quite some time, particularly as there is limited new supply coming online throughout the country. In Tunica, for example, EBITDA grew despite the fact we operate one less property than we did a year ago. As a result, we are cautiously optimistic about slowing declines and signs of growth in some markets. In the meantime, we are focused on maximizing EBITDA at CEOC by improving operational performance and reducing leverage.

Also in the quarter, the company made ongoing progress on the roll-out of Caesars Enterprise Services. The first employees of the shared-services entity officially transferred in early October following the receipt of regulatory approval in New Jersey.

Now, let me now turn it over to Donald to review consolidated financial performance for the third quarter.

**Donald Colvin:**

Thank you Gary.

I will provide a brief recap of the company's consolidated third quarter performance.

Third quarter consolidated net revenues were up 6.0% from the prior year to $2.2 billion primarily due to growth

in social and mobile games at CIE. Casino revenue increased 0.3% driven mainly by the opening of Horseshoe Baltimore and The Cromwell, offset by significant unfavorable hold and lower volumes at Caesars Palace. Room revenue decreased 0.4% year over year as fewer available room nights at The LINQ Hotel & Casino due to renovations were partially offset by an 8.7% rise in cash ADR due to hospitality initiatives. RevPAR in the quarter increased 5.4%.

---

Groups business was a highlight in Q3, generating a 10.6% revenue increase and a 4.9% operating income increase. As we look forward, we expect groups to continue to produce strong results in the remainder of 2014 and into 2015, with double digit increases in room nights and revenue. F&B revenue was up 7.4% year over year due to the strong performance of several new restaurant openings this year in Las Vegas including Giada's and Drai's at The Cromwell and the opening of Horseshoe Baltimore. Other revenue rose 53.3% year over year due to strong growth in social and mobile games at CIE and third party rent and entertainment revenue from the LINQ, High Roller, Planet Hollywood and the Cromwell. Consolidated adjusted EBITDA declined 12.9% year over year to $443 million due to higher property operating costs offset by strength in CIE margins.

Additionally, CERP and CGP each made initial cash payments to CES related to its launch in the amount of $42.5 million and $22.5 million respectively.

In conclusion, we are committed to driving efficiency, decreasing working capital, generating EBITDA growth and further improving our balance sheet with a particular focus on CEOC's capital structure.

On that note, I will turn it back to Gary for his closing remarks.

**Gary Loveman:**

Thank you, Donald.

Some closing thoughts on the quarter, while we were generally encouraged by revenue performance in most markets, the combination of certain expenses and poor hold put significant pressure on our results for the quarter. We are optimistic that the absence of these items in the future combined with our actions to reduce operating costs across the enterprise will lead to improved results in future periods.

During today's Q&A session, we will not be able to provide any additional disclosures related to company's capital structure and liquidity position, as we will have additional disclosure around these topics when we file our 10Q later this week. We have provided as much detail as we are presently able to and will release additional details as they become available.

Operator, we are now happy to take questions on the company's operations.

---

**Forward Looking Information**

This release includes "forward-looking statements" intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995. You can identify these statements by the fact that they do not relate strictly to historical or current facts. These statements contain words such as "may," "will," "expect," "believe," "anticipate," "intended," "would," "estimate," "continue," "bode well," "future," or the negative or other variations thereof or comparable terminology. In particular, they include statements relating to, among other things, future actions, new projects, strategies, future performance, the outcomes of contingencies, and future financial results of Caesars. These forward-looking statements are based on current expectations and projections about future events.

Investors are cautioned that forward-looking statements are not guarantees of future performance or results and involve risks and uncertainties that cannot be predicted or quantified, and, consequently, the actual performance of Caesars may differ materially from those expressed or implied by such forward-looking statements. Such risks and uncertainties include, but are not limited to, the following factors, and other factors described from time to time in the Company's reports filed with the Securities and Exchange Commission (including the sections entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" contained therein):

- the impact of the Company's substantial indebtedness and the restrictions in the Company's debt agreements, and the outcome of discussions with CEOC's creditors regarding CEOC's capital structure;

- litigation outcomes and judicial and governmental body actions, including gaming legislative action, referenda, regulatory disciplinary actions, and fines and taxation, including but not limited to, the assertion and outcome of litigation or other claims that have been or may be brought against the Company by certain creditors, some of whom have notified the Company of their objection to various transactions undertaken by the Company in 2013 and 2014;

- the effects of local and national economic, credit, and capital market conditions on the economy, in general, and on the gaming industry, in particular;

- the ability to realize the expense reductions from cost savings programs, including the program to increase its working capital and excess cash by $500 million;

- changes in laws, including increased tax rates, smoking bans, regulations or accounting standards, third-party relations and approvals, and decisions, disciplines, and fines of courts, regulators, and governmental

bodies;

- the ability of the Company's customer-tracking, customer loyalty, and yield-management programs to continue to increase customer loyalty and same-store or hotel sales;

- the effects of competition, including locations of competitors, competition for new licenses and operating and market competition;

- the ability to recoup costs of capital investments through higher revenues;

- abnormal gaming holds ("gaming hold" is the amount of money that is retained by the casino from wagers by customers);

- the ability to timely and cost-effectively integrate companies that the Company acquires into its operations;

- the potential difficulties in employee retention and recruitment as a result of the Company's substantial indebtedness, the ongoing downturn in the U.S. regional gaming industry, or any other factor;

- construction factors, including delays, increased costs of labor and materials, availability of labor and materials, zoning issues, environmental restrictions, soil and water conditions, weather and other hazards, site access matters, and building permit issues;

- severe weather conditions or natural disasters, including losses therefrom, including losses in revenues and damage to property, and the impact of severe weather conditions on the Company's ability to attract customers to certain of its facilities, such as the amount of losses and disruption to us as a result of Hurricane Sandy in late October 2012;

- acts of war or terrorist incidents or uprisings, including losses therefrom, including losses in revenues and damage to property,

- the effects of environmental and structural building conditions relating to the Company's properties;

- access to insurance on reasonable terms for the Company's assets; and

- the impact, if any, of unfunded pension benefits under multi-employer pension plans.

Any forward-looking statements are made pursuant to the Private Securities Litigation Reform Act of 1995 and, as such, speak only as of the date made. Caesars disclaims any obligation to update the forward-looking statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date stated or, if no date is stated, as of the date of this filing.