**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CAESARS ENTERTAINMENT<br>OPERATING COMPANY, INC.,<br><br>       Alleged Debtor. | Chapter 11<br><br>Case No. 15-10047 (__)<br><br>**Objection Deadline:  To be determined**<br>**Hearing Date:  To be determined** |

**MOTION FOR APPOINTMENT OF EXAMINER
WITH ACCESS TO AND AUTHORITY TO DISCLOSE PRIVILEGED MATERIALS**

Appaloosa Investment Limited Partnership I, OCM Opportunities Fund VI, L.P. and Special Value Expansion Fund, LLC (collectively, the "Petitioning Creditors") request the appointment of an examiner to investigate and report on a series of prepetition insider transactions by which the parent of Caesars Entertainment Operating Company, Inc. (the "Debtor") systematically stripped the Debtor of many billions of dollars of assets and cash in the fifteen months prior to bankruptcy.  The Petitioning Creditors request that the examiner be granted authority to (a) review all relevant documents and information, including material that may be subject to a privilege held by any of the Debtors, and (b) include all such information in the examiner's report to the extent appropriate under the circumstances. A proposed form of order is attached as Exhibit A.

This Motion is based on the *Declaration of Joshua M. Mester* and the following:

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   JURISDICTION AND VENUE .............................................................. 5

III.  BACKGROUND ........................................................................................ 6

    A.    The Petitioning Creditors' Interest As Holders of
        Second Lien Notes. ....................................................................... 6

    B.    The Caesars Empire And The Total Rewards Network....................... 7

    C.    Caesars' Financial Performance. .................................................... 10

    D.    The Plundering Of The Debtor's Assets, And The Seizure Of
        The Total Rewards Network By Caesars Parent And
        The LBO Sponsors.......................................................................... 11

        1.    Secret Transfer Of Valuable  Trademarks For
            No Consideration........................................................................ 12

        2.    Secret Transfer Of Online Gaming Business For
            No Consideration........................................................................ 13

        3.    Transfer Of Octavius Tower And The LINQ. ............................. 15

        4.    Formation Of Caesars Growth And  Caesars Acquisition
            To Seize Valuable Assets. .......................................................... 17

        5.    Transfer of Planet Hollywood And Horseshoe Baltimore. ......... 17

        6.    The "Four Properties Transaction"............................................. 20

        7.    The Caesars Services Agreements. ............................................ 23

    E.    Additional Insider Transactions Benefit Caesars Parent And
        Others At The Expense Of The Debtor.............................................. 26

        1.    Sham Sale Of 5% Of The Debtor's Equity. ............................... 26

        2.    Uneconomic $1.75 Billion Refinancing..................................... 26

        3.    Closure Of The Showboat Casino. ............................................ 28

        4.    The Insider Legacy Notes Repurchase....................................... 30

        5.    Repayment Of Caesars Parent Insider Intercompany Loan. ....... 31

6.      Early Repurchase Of PIK Toggle Notes At More
Than Five Times Market Price In Order To Benefit
Insiders And Eliminate Insider Guarantees.................................................. 32

F.      The Debtor Changes Officers and Directors And Initiates
The New York Action........................................................................................... 32

IV.      ARGUMENT ................................................................................................. 33

A.      Section 1104(c)(2) Mandates Appointment of an Examiner. ............................... 34

B.      In the Alternative, Appointment of an Examiner Is Necessary
Because It Is in the Interests of Creditors. ............................................................ 39

C.      An Examination Of The Debtor's Prepetition Transactions
With Affiliates And Insiders Between 2010 And The Petition
Date  Is Necessary And Appropriate. .................................................................... 45

D.      The Examiner Should Be Granted Unfettered Access To Privileged
Materials And Control Over The Debtor's Privileges With Respect
To The Transactions Under Investigation.............................................................. 50

V.      CONCLUSION............................................................................................... 54

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alabama v. Bozeman,*
    533 U.S. 146 (2001) ................................................................. 35

*Ams. Mining Corp. v. Theriault,*
    51 A.3d 1213, 1239 (Del. 2012) .............................................. 48

*Anderson v. Yungkau,*
    329 U.S. 482 (1947) ................................................................. 35

*Asarco, LLC v. Ams. Mining Corp. (In re Asarco LLC),*
    396 B.R. 278 (S.D. Tex. 2008) ................................................ 49

*Barbieri v. RAJ Acquisition Corp. (In re Barbieri),*
    199 F.3d 616 (2d Cir. 1999) .................................................... 35

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994) ................................................................. 48

*Commodity Futures Trading Commission v. Weintraub,*
    471 U.S. 343 (1985) ................................................................. 51

*Griffin v. Oceanic Contractors, Inc.,*
    458 U.S. 564 (1982) ................................................................. 38

*Hall Fin. Grp., Inc. v. DP Partners, LP (In re DP Partners, LP),*
    106 F.3d 667 (5th Cir. 1997) ................................................... 35

*In re 1243 20th St., Inc.,*
    6 B.R. 683 (Bankr. D.D.C. 1980) ............................... 36, 40, 44, 49

*In re The Bible Speaks,*
    74 B.R. 511 (Bankr. D. Mass. 1987) ....................................... 36

*In re Boileau,*
    736 F.2d 503 (9th Cir. 1984) ................................................... 52

*In re Collins & Aikman Corp.,*
    368 B.R. 623 (Bankr. E.D. Mich. 2007) .................................. 36

*In re Dynegy Holdings, LLC,*
    Case No. 11-38111 (CGM)
    (Bankr. S.D.N.Y. Dec. 29, 2011) (Docket No. 276) ............ 41, 53

*In re FiberMark,*
    339 B.R. 321, 325 (Bankr. D. Vt. 2006) ................................. 41

# TABLE OF AUTHORITIES CONT'D

**Page**

## Cases Cont'd

*In the Matter of First American Health Care of Georgia, Inc.,*
208 B.R. 992 (Bankr. S.D. Ga. 1996) ............................................................. 43

*In re Gilman Services, Inc.,*
46 B.R. 322 (Bankr. D. Mass. 1985) ............................................................... 40

*In re Gitto Global Corp.,*
Nos. Civ.A. 05-10334-DPW, Civ.A. 05-10532-DPW,
2005 WL 1027348 (D. Mass. May 2, 2005) ..................................................... 41

*In re JNL Funding Corp.,*
No. 10-73724, 2010 WL 3448221 (Bankr. E.D.N.Y. Aug. 26, 2010) ............................ 40

*In re Lenihan,*
4 B.R. 209 (Bankr. D.R.I. 1980) ..................................................................... 36

*In re Loral Space & Commc'ns, Ltd.,*
No. 04-CV-8645-RPP, 2004 WL 2979785 (S.D.N.Y. Dec. 23, 2004) ............................ 36

*In re Mechem Fin. of Ohio, Inc.,*
92 B.R. 760 (Bankr. N.D. Ohio 1988) ............................................................. 36

*In re Residential Capital, LLC,*
474 B.R. 112 (Bankr. S.D.N.Y. 2012) ....................................................... 36, 39, 41, 44

*In re Schepps Food Stores, Inc.,*
148 B.R. 27 (S.D. Tex. 1992) ......................................................................... 36

*In re UAL Corp.,*
307 B.R. 80 (Bankr. N.D. Ill. 2004) ............................................................. 36, 37, 38

*In re Vision Dev. Grp. of Broward Cnty., LLC,*
No. 07-17778-BKC-RBR, 2008 WL 2676827 (Bankr. S.D. Fla. June 30, 2008) ............ 36

*In re Washington Mutual, Inc.,*
No. 08-12229 (MFW) (Bankr. D. Del., May 5, 2010)
(ECF No. 3699)....................................................................................... 39

*Keene Corp. v. Coleman (In re Keene Corp.),*
164 B.R. 844 (Bankr. S.D.N.Y. 1994)........................................................... 40, 44

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
523 U.S. 26 (1998)..................................................................................... 35

*Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.),*
898 F.2d 498 (6th Cir. 1990) ................................................................. 35, 36, 45

## TABLE OF AUTHORITIES CONT'D

**Page**

**Cases Cont'd**

*Official Comm. of Unsecured Creditors of Grand Eagle Cos. v. Asea Brown Boveri, Inc.,*
    313 B.R. 219 (N.D. Ohio. 2004) .................................................................. 44

*Our Children's Earth Found. v. EPA,*
    527 F.3d 842 (9th Cir. 2008) ....................................................................... 35

*Quadrant Structured Prods. Co. v. Vertin,*
    C.A. No. 6990-VCL, 2014 WL 5099428 (Del. Ch. Oct. 1, 2014) ............. 47, 48

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997) ..................................................................................... 36

*Sacks v. Office of Foreign Assets Control,*
    466 F.3d 764 (9th Cir. 2006) ....................................................................... 35

*Tronox Inc. v. Kerr McGee Corp. (In re Tronox, Inc.),*
    503 B.R. 239, (Bankr. S.D.N.Y. 2013) ...................................................... 49

*United States v. Ledlin (In re Mark Anthony Constr., Inc.),*
    886 F.2d 1101 (9th Cir. 1989) ..................................................................... 48

*United States v. Monsanto,*
    491 U.S. 600 (1989) ..................................................................................... 35

*United States v. Ron Pair Enters., Inc.,*
    489 U.S. 235 (1989) .......................................................................... 36, 37, 38

*U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.),*
    426 B.R. 114 (Bankr. D. Del. 2010) ...................................................... 36, 39

*Walton v. Cornerstone Ministries Invs., Inc.,*
    398 B.R. 77 (N.D. Ga. 2008) ...................................................................... 36

*Weinberger v. UOP, Inc.,*
    457 A.2d 701 (Del. 1983) ............................................................................ 42

**Statutes**

11 U.S.C. § 102(3) ........................................................................................... 48

11 U.S.C. § 1103(c)(2) ..................................................................................... 44

11 U.S.C. § 1104(c) .................................................................................. *passim*

11 U.S.C. § 1106(a) ............................................................................ 42, 48, 50, 51

## TABLE OF AUTHORITIES CONT'D

**Page**

**Statutes Cont'd**

11 U.S.C. § 1106(b) ................................................................................................ 42, 48, 51

11 U.S.C. § 1107(a) ...................................................................................................... 42, 52

28 U.S.C. § 157 ..................................................................................................................... 5

28 U.S.C. § 157(b)(2) ........................................................................................................... 5

28 U.S.C. § 1334 ................................................................................................................... 5

28 U.S.C. § 1408 ................................................................................................................... 5

28 U.S.C. § 1409 ................................................................................................................... 5

**Other Authorities**

124 Cong. Rec. H11,100 (daily ed. Sept. 28.1978) *reprinted in* 1978 U.S.C.C.A.N. 6465 ......... 38

124 Cong. Rec. S17,417 (daily ed. Oct. 6, 1978) *reprinted in* 1978 U.S.C.C.A.N. 6456 ........... 38

BLACK'S LAW DICTIONARY (5th ed. 1979) ................................................................. 35, 37

BLACK'S LAW DICTIONARY (10th ed. 2014) ...................................................................... 37

THE MERRIAM-WEBSTER DICTIONARY (1974) ............................................................... 37

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986) ................................. 37

# I.

## PRELIMINARY STATEMENT

The Petitioning Creditors filed this involuntary bankruptcy case on the heels of a series of suspicious transactions in which insiders plundered many billions of dollars of value from the Debtor. Those transactions, which resulted in five separate lawsuits now pending in Delaware and New York courts, ensured that the Debtor could not pay its debts and eventually would wind up seeking bankruptcy relief. There is no question that the legitimacy of the transactions will be the single most important issue in this case.

In similar situations in recent large chapter 11 cases, including those involving the Dynegy companies and the Residential Capital debtors who filed under a cloud of suspicion resulting from prepetition insider dealing, bankruptcy courts have not hesitated to appoint examiners in the first weeks of the chapter 11 proceedings. The Petitioning Creditors urge this Court to do the same here. Absent the appointment of an examiner, this case will be mired in litigation for the foreseeable future, with no reasonable prospect of consensus or reorganization.

Specifically, the appointment of a disinterested and impartial examiner is necessary to investigate and report on multiple transactions between the Debtor and insiders, most of which occurred during the past fifteen months and all of which were consummated during applicable reach back periods for fraudulent transfers. All were transacted under the cloak of secrecy, with little or no disclosure of material facts, and without any apparent attempt to market test their value. All were consummated without meaningful independent review of the transfers, and the Debtor's board, dominated by its controlling shareholders, was hopelessly conflicted, and without a single independent director. Nothing short of the appointment an examiner, and one vested with unfettered access to the facts underlying these transfers, will uncover the truth.

As explained in detail below, the transactions fall into three general categories: a) transfers of valuable assets to insiders for inadequate or no consideration, without the benefit of any marketing process, occurring when the Debtor had no independent directors; b) direct payments of hundreds of millions of dollars to insiders; and c) other actions taken by the Debtor for the benefit of insiders resulting in harm to the Debtor.  They include:

1)      The transfer to subsidiaries of the Debtor's parent company (Caesars Entertainment Corporation, or "Caesars Parent") of valuable trademarks, with a book value of $45 million, for no apparent consideration.

2)      The transfer to Caesars Parent, for no apparent consideration, of the Debtor's indirect ownership interest in an online gaming business (Caesars Interactive Entertainment, Inc., or "Caesars Interactive") which was ascribed a value of as much as $779 million in 2013.

3)      The transfer to a newly-formed affiliate (Caesars Entertainment Resort Properties, or "Caesars Resort") of two properties – a luxury tower for high-end guests of Caesars Palace and a newly constructed shopping, dining and entertainment district – for just $600 million, an unreasonably low sum given that the Debtor had just paid at least $750 million to construct the properties.

4)      The transfer to another newly-formed affiliate (Caesars Growth, LLC, or "Caesars Growth") of two more properties, one in Las Vegas (Planet Hollywood) and the other under construction in Baltimore (the Horseshoe Baltimore), along with 50% of the management fees and other valuable rights under a "Management Services Agreement" relating to those properties, for an unreasonably low price of $360 million.

5)      The transfer to Caesars Growth of four valuable destination properties, three in Las Vegas (The Quad, The Cromwell, and Bally's Las Vegas) and a fourth located in New

Orleans (Harrah's New Orleans), along with 50% of the management fees payable to the Debtor for those properties, for an unreasonably low price of $2 billion.

6)      The transfer to yet another newly-formed affiliate (Caesars Enterprise Services, LLC, or "Caesars Services"), for no apparent consideration, of ownership and control of perhaps the Debtor's most valuable asset – the intellectual property and data comprising the "proprietary and industry leading" customer-loyalty program known as Total Rewards.

7)      The sham sale of 5% of the Debtor's common stock to undisclosed investors for $6.15 million.

8)      The repayment of unsecured notes held by insider Caesars Growth that were not scheduled to mature for a full year and carried a favorable low interest rate (5.625%) far below that of the new debt incurred by the Debtor to obtain funds to repay the existing notes (9.8%). The Debtor repaid the insider debt notwithstanding its purported need for liquidity, which was repeatedly offered as justification for the insider transfers to Caesars Resort and Caesars Growth described above.

9)      The agreement to pay $155 million to certain holders of unsecured "Legacy Notes," but not others, coupled with the agreement of those selected holders to amend the governing indentures to eliminate the guarantee of Caesars Parent for the debt.

10)      The "repayment" to Caesars Parent of unsecured, low-interest intercompany obligations, including apparent payments of $285.4 million during the first nine months of calendar year 2014 prior to maturity.

11)      The repurchase last month of $16.5 million in outstanding PIK Toggle Notes, guaranteed by Caesars Parent, that were not scheduled to mature until 2018.  The Debtor paid 103.5 cents on the dollar despite the fact that the PIK Toggle Notes were trading at less than 17

cents on the dollar at the time. It has been reported that $4 million of the PIK Toggle Notes were owned by Caesars Parent or other insiders.

12)    The closure in August 2014 of the Showboat Atlantic City casino and resort despite the positive EBITDA generated by the property, redirecting customers of the Debtor to a competing property owned by insider Caesars Resort.

These insider transactions stripped the Debtor of most of its valuable income-generating assets and hundreds of millions of dollars of cash, leaving the Debtor burdened with massive debt that cannot be repaid. They are the subject of a lawsuit (the "Delaware Action") filed on August 4, 2014 by Wilmington Savings Fund Society, FSB ("WSFS"), the indenture trustee for $3.7 billion in Second Lien Notes (as defined below), challenging many of the transactions as avoidable fraudulent transfers, breaches of fiduciary duty, and waste.[1] Other lawsuits have since been filed, two by holders of "Legacy Notes" who were not among the selected holders allowed to participate in the insider transaction purporting to eliminate the guarantee of Caesars Parent[2] and another by UMB Bank, as indenture trustee for the 8.5% Senior Secured Notes due 2020, alleging fraudulent transfers and breaches of fiduciary duty and seeking appointment of a receiver.[3]

---

[1]    *Wilmington Savings Fund Society, FSB v. Caesars Entertainment Corp.*, C.A. No. 10004-VCG (Del. Ch. Aug. 4, 2014). The complaint filed by WSFS in that action is referred to as the "Delaware Compl." Subsequently, Caesars Parent and the Debtor initiated an action in the Supreme Court of the State of New York, adding WSFS as a defendant on September 15, 2014. *Caesars Entertainment Operating Company, Inc v. Appaloosa Investment Limited Partnership I*, Index No. 652392/2014 (N.Y. Sup. Ct. Aug. 5, 2014) (the "New York Action"). The complaint filed in the New York Action is referred to as the "New York Compl." and the amended complaint filed on September 15, 2014 is referred to as the "New York Am. Compl."

[2]    *Meehancombs Global Credit Opportunities Master Fund, LP v. Caesars Entm't Corp.*, No. 14-cv-7091 (S.D.N.Y. Sept. 3, 2014); *Danner v. Caesars Entertainment Corp.*, Case No. 14-CV-7973-SAS (S.D.N.Y. Oct. 2, 2014).

[3]    *UMB Bank v. Caesars Entertainment Corp.*, C.A. No. 10393-VCG (Del. Ch. Nov. 25, 2014) (the "UMB Action").

At least parts of those actions are now stayed.  With the commencement of this case, the Petitioning Creditors and all unsecured creditors are entitled to the appointment of an impartial and disinterested examiner charged with investigating the Debtor's insider transactions.  The examiner's investigation and report will be of value to the Court, creditors and other parties in interest, not only to identify and provide an objective evaluation of the merits of potential estate causes of action (including those asserting in the prepetition actions) but also in moving the case forward.  Indeed, at least while the Debtor remains under the control of the same insiders who orchestrated and approved the transactions at issue, progress will be impossible without a thorough independent examination.

The Petitioning Creditors have no desire to delay a reorganization in this case or impose unnecessary expense.  To that end, they propose that the Court order the examiner to promptly file a work plan, and to generate a report as soon as reasonably practicable.  Finally, so that the examiner will have a full and complete understanding of the transactions to be investigated, the Petitioning Creditors request that the Court grant the examiner unfettered access to documents and information that may be subject to any privilege held by the Debtor or any of its subsidiaries (including the attorney-client privilege and work-product protection) and authorize the examiner to include such information in the examiner's report.

## II.

## JURISDICTION AND VENUE

This Court has jurisdiction to appoint an examiner under 28 U.S.C. §§ 157 and 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

# III.

# BACKGROUND

On January 11, 2015, the Petitioning Creditors filed an involuntary bankruptcy petition against the Debtor under chapter 11 of the Bankruptcy Code.  No trustee has been appointed, and the Debtors remain in possession.

## A.    The Petitioning Creditors' Interest As Holders of Second Lien Notes.

On April 15, 2009, the Debtor issued 10.00% second-priority senior secured notes due 2018 in an aggregate outstanding principal amount of $3.68 billion pursuant to an Indenture dated as of April 15, 2009 (as supplemented or amended, the "2009 Indenture").[4]  Each of the Petitioning Creditors is the holder of notes issued under the 2009 Indenture, and certain of the Petitioning Creditors also hold second-priority senior secured notes (together with the notes issued under the 2009 Indenture, the "Second Lien Notes") issued pursuant to an indenture dated as of December 24, 2008 (as supplemented or amended, the "2008 Indenture" and together with the 2009 Indenture, the "Indentures").

The Second Lien Notes are secured by second-priority liens on substantially all of the Debtors' assets.  Pursuant to Section 12.01 of the 2009 Indenture (the "Parent Guarantee"), Caesars Parent unconditionally guaranteed the Second Lien Notes.[5]  Caesars Parent has taken the (incorrect) position that, pursuant to Section 12.02(c) of the 2009 Indenture, the Parent Guarantee is no longer in effect due to certain of the insider transactions discussed below.[6]  The Debtor and Caesars Parent also take the position that the Second Lien Notes are entirely

---

[4]    On July 29, 2014, WSFS became the successor indenture trustee under the 2009 Indenture.

[5]    *Declaration of Joshua M. Mester in Support of Motion for Appointment of Examiner with Access to and Authority to Disclose Privileged Materials* (the "Mester Decl."), filed contemporaneously herewith, Ex. 1, at ¶ 12.01.

[6]    *Id*. at ¶ 12.02.  The Petitioning Creditors dispute this contention and reserve all of their rights and remedies related to the Parent Guarantee.

unsecured, as reflected in term sheet for a plan of reorganization attached to the Amended and

Restated Restructuring Support and Forbearance Agreement that they have filed.[7]  The

contemplated plan also includes releases of all claims against the transferees of the assets

transferred in the insider transactions and of the persons who orchestrated and approved the

transactions for inadequate or no  consideration.

### B. The Caesars Empire And The Total Rewards Network.

The "Caesars"[8] resort and gaming empire spans 38 casino resorts located in the United

States and 12 in other countries.[9]  Caesars' North American network comprises nine destination

casino resorts in Las Vegas, as well as a large and widely-dispersed collection of properties in

other geographic regions throughout the U.S. and Canada.[10]

The large size of its network enables Caesars to pursue a "cross-market strategy" that

allows it "to capture a disproportionate share of [its] customers' entertainment spending when

they travel among markets."[11]  A key competitive strategy for Caesars has been to maintain a

high concentration of distinctly-branded properties in premier markets, particularly Las Vegas.[12]

In Las Vegas, for example, Caesars Parent has stated that its diverse collection of casinos –

Caesars Palace, Harrah's Las Vegas, Rio All-Suite Hotel & Casino, Bally's Las Vegas, Flamingo

Las Vegas, Paris Las Vegas, Planet Hollywood Resort & Casino ("Planet Hollywood"), The

Quad Resort & Casino ("The Quad"), and the newly-opened and rebranded boutique hotel and

casino, The Cromwell – has led to a certain "customer stickiness in the center strip" that

---

[7]   Mester Decl., Ex 35, Ex. B at 3.

[8]   For convenience, Caesars Parent and its various subsidiaries are sometimes collectively referred to as "Caesars."

[9]   Mester Decl., Ex. 3, at 3 .

[10]   *Id*. at 30-31.

[11]   *Id*. at 5.

[12]   *Id.*

generates increased revenues for all of its properties.[13]  That "stickiness" has been enhanced by a newly-completed shopping, dining and entertainment district known as The LINQ, located between the Flamingo Las Vegas and The Quad,[14] which boasts the world's largest observation wheel (the "High Roller"), drawing customers to the surrounding properties and generating additional income without need for redundant hotel rooms and casino space.[15]

Caesars also owns an online gaming business that, as described below, has long been regarded by Caesars as "the next great distribution chapter in gaming," along with rights to the well-known World Series of Poker.[16]  The Caesars online gaming business has enjoyed exponential year-over-year growth in revenue and EBITDA over the past three years.[17]

The glue that ties these properties and businesses together, and binds customers to Caesars' many distinct brands and properties in Las Vegas and elsewhere, is its proprietary and "industry-leading customer loyalty program" known as Total Rewards.[18] According to Caesars, Total Rewards has more than 46 million members,[19] of which about 6.8 million are active.[20]  The program functions in part "like a frequent flyer arrangement" that "allows visitors to any Caesars-affiliated property to earn credits redeemable at any property throughout the Caesars system."[21]  In addition, through Total Rewards' proprietary data tracking system, Caesars tracks every aspect of a customer's spending while at a Caesars property, including time spent gaming,

---

[13]  *Id.*

[14]  The Quad has recently been renamed The LINQ Hotel & Casino, which is located adjacent to The LINQ shopping district.

[15]  Mester Decl. Ex. 5, at 19.

[16]  *Id.*, at 25.

[17]  Mester Decl., Ex. 36, Ex. 37, at 27.

[18]  Mester Decl., Ex. 3, at 5.

[19]  Mester Decl., Ex. 3, at 3.

[20]  Mester Decl., Ex. 38, at 10.

[21]  Mester Decl., Ex. 6, at ¶ 66.

the size of each wager, wins, losses, games played, and food and entertainment purchased.[22]

Using the information (referred to as Big Data), Caesars targets marketing efforts and prices to

capture ever greater shares of customer's spending.  Due to the synergy created by Total

Rewards, the Debtor has routinely boasted of its ability to operate more profitably than its

competitors in many markets, with casino properties generating as much as a one-third revenue

premium relative to its competitors.[23]  Given the importance of Total Rewards, one Caesars

executive has characterized the information that it generates as "more important than a gaming

license."[24]

   Before 2011, the Debtor owned nearly all of the assets in the combined Caesars network,

including five casino resorts in Las Vegas, a large network of regional casinos including the

profitable Harrah's New Orleans, the online gaming business, the rights to the World Series of

Poker and, perhaps most importantly, the Debtor owned all of the intellectual property and data

comprising the Total Rewards network itself.  The only exception to the Debtor's ownership

within the Total Rewards network were several properties (The Flamingo, Rio, Paris, Harrah's

Las Vegas, Harrah's Atlantic City, and Harrah's Laughlin) that served as collateral for a CMBS

financing obtained in 2008.[25]

   The value of the intact Total Rewards network enabled the Debtor to attract tens

of billions of dollars in secured and unsecured debt financing – capital which was used to fund a

$30 billion leveraged buyout by affiliates of Apollo Global Management, LLC and TPG Capital,

---

[22]  It has been reported that, through Total Rewards, Caesars can trace up to 85% of the money
       spent by customers in 2013, an increase from 58% in 2004.  Mester Decl., Ex. 39.

[23]  Mester Decl., Ex. 3, at 5 ("our collection of distinctly branded properties in Las Vegas, tied
       together through Total Rewards, helps us capture a greater share of wallet with customers
       than we would otherwise achieve"); Mester Decl., Ex 7, at 9; Mester Decl., Ex. 40, at 7;
       Mester Decl., Ex. 5, at 9.

[24]  Mester Decl., Ex. 39.

[25]  Mester Decl., Ex. 9.

LP (the "LBO Sponsors") in January 2008[26] and thereafter to acquire and construct new properties and businesses, improve existing ones, and build out the Caesars infrastructure.

### C.    Caesars' Financial Performance.

Despite Total Rewards and other competitive advantages, Caesars has struggled with the massive debt obligations incurred by the Debtor in the 2008 leveraged buyout, and Caesars Parent has incurred losses each year since 2007, particularly in the last three years.  For 2011, Caesars Parent reported a loss from continuing operations, net of income taxes, of roughly $731 million.  The losses nearly doubled in 2012, to roughly $1.4 billion, and then doubled again in 2013, to over $2.9 billion.[27]  Continuing this trend, for the nine months ended September 30, 2014, Caesars Parent reported a loss from continuing operations, net of income taxes, of more than $2 billion.[28]

Caesars Parent attributes these losses to "a general decline in gaming activity since 2007, with Atlantic City properties and our regional markets being more heavily impacted by this trend."[29]  But there have been bright spots.  Caesars' Las Vegas and New Orleans properties have performed well and are a continuing source of growth.[30]  Caesars' online gaming and interactive operations have also enjoyed extraordinary growth in recent quarters.[31]

---

[26]    Mester Decl., Ex. 3, at 3.

[27]    Mester Decl., Ex. 3, at 62.

[28]    Mester Decl., Ex. 4, at 4.

[29]    Id. at 8.

[30]    Mester Decl., Ex. 10, at 2 ("We are encouraged by visitation and spending trends in Las Vegas, which positively impacted results at our entities"); Mester Decl., Ex. 41, at 38.

[31]    Mester Decl., Ex. 10, at 3 .("Within [Caesars Interactive], the social and mobile games business posted an exceptionally strong quarter.").

**D.    The Plundering Of The Debtor's Assets, And The Seizure Of The Total Rewards Network By Caesars Parent And The LBO Sponsors.**

The Debtor's heavy debt load, combined with the weak performance in its Atlantic City and regional markets, left the Debtor unable to pay its debts once they matured.  Faced with the inevitable reality of losing ownership and control of the Debtor and its valuable assets, Caesars Parent and the LBO Sponsors engaged in a series of transactions that took many of the most valuable assets out of the Debtor, including its ownership and control over the Total Rewards network, and moved them to newly-formed insider affiliates owned and controlled by the LBO Sponsors.  Contrary to Caesars Parent's stated intent of "deleveraging" the Debtor, these transactions materially worsened the Debtor's financial condition.

Among the properties known to have been taken from the Debtor are:  1) a collection of trademarks with a book value of $45 million; 2) the Debtor's online gaming business; 3) Octavius Tower, the newest and most valuable hotel tower of Caesars Palace; 4) The LINQ; 5) five destination Caesars Resorts casinos (four in Las Vegas and one in New Orleans), along with the Debtor's interest in the recently opened Horseshoe Baltimore; and 6) ownership and control of the intellectual property comprising Total Rewards.  No effort to market any of these assets to third parties, or to obtain project-specific or other debt financing that would have allowed the Debtor to retain ownership, has been disclosed.  The assets were transferred away from the Debtor to insiders at a time when the Debtor was insolvent and did not have any independent directors.  Moreover, as discussed below, many of the properties were strategically sold at times when their EBITDA was artificially depressed – for example, during periods of construction and, in the case of the online gaming business, shortly before its predicted legalization in the United States.

Caesars Parent claims that it obtained "fairness opinions" relating to the transactions, but it appears those were never (with one possible exception) delivered to or prepared for the Debtor – the entity with ownership of the assets – and Caesars Parent has never disclosed any of the alleged "fairness opinions," meaning that the assumptions on which they were based and the scope and quality of the work actually performed by the authors of the "fairness opinions" is not known.

1.    Secret Transfer Of Valuable
Trademarks For No Consideration.

In August 2010, Caesars Parent caused one or more of the Debtor's subsidiaries to transfer certain trademarks to subsidiaries of Caesars Parent.  Those trademarks carried a book value of $45.3 million.[32]  Caesars Parent did not disclose this transaction until nearly two years later in March 2012, and even then buried it in a note contained in its10-K, where the property and its book value was described as "certain trademark assets" and without any disclosure of what trademarks were transferred, the terms of the transfer, whether any consideration was provided, or the identity of the transferees (other than a cryptic reference to "the CMBS properties, which are non-guarantor subsidiaries of the Company [Caesars Parent]").[33]

Faced with WSFS's fraudulent transfer claim in the Delaware Action, the Debtor and Caesars Parent now assert that the transferred trademarks were "property-specific" for three of the CMBS properties now owned by Caesars – the Rio, Paris Las Vegas, and Flamingo Las Vegas.[34]  Conspicuously, that belated disclosure omitted any mention of consideration paid

---

[32]   Mester Decl., Ex. 11, at 91.

[33]   *Id.*

[34]   Mester Decl., Ex. 12, at ¶¶ 76-77.

to the Debtor for the trademark rights, other than a note that the Debtor retained a "royalty-free

license" to use the very trademarks and intellectual property that it previously owned outright.[35]

       2.      Secret Transfer Of Online
               Gaming Business For No Consideration.

Caesars Interactive was an indirect subsidiary of the Debtor formed in May 2009 for the

purpose of developing and promoting Caesars' business and brands through online gaming, and

developing the rights to the well-known World Series of Poker.[36]  Caesars Parent repeatedly has

represented to investors and others that some of its most promising opportunities are in the

development of internet-based gaming.  For example, in a March 2, 2010 presentation, Caesars

Parent told investors that online opportunities "could change the game" and was one of the "key

drivers" of Caesars' future value.[37]  On May 19, 2011, Caesars' chief executive officer made a

presentation at the UBS Leveraged Finance Conference, where he stated that "[o]nline is the next

great distribution chapter in gaming" and "the 'next big thing' in the development of our

business."[38]  In anticipation of legalization of on-line gaming in the United States – which has

since occurred in three states (Delaware, Nevada and New Jersey) – Caesars Parent stated that it

was "focused on building out" the "digital and offline footprint" for the World Series of Poker.

What Caesars Parent did not say at the time of those predictions was that, by March 2011,

Caesars Parent and the LBO Sponsors had caused the Debtor to transfer to Caesars Parent nearly

all of its valuable interest in Caesars Interactive and the online gaming business.  Indeed, only by

comparing the side-by-side list of subsidiaries of Caesars Parent and the Debtor contained in

---

[35]  *Id.*

[36]  Mester Decl., Ex. 13, at 100.

[37]  Mester Decl., Ex. 14, at 20, 23.

[38]  Mester Decl., Ex. 5, at 25, 27.

exhibits to various public filings during that period is it possible to piece together when that transfer may have occurred.[39]

No explanation has ever been offered for this transfer – not in public filings and not even in the pleadings filed by the Debtor and Caesars Parent in litigation with WSFS and holders of Second Lien Notes, including the Petitioning Creditors. There has never been any disclosure of any of the terms of that transfer, including what (if any) consideration was paid by Caesars Parent to acquire Caesars Interactive from the Debtor, and there has been no disclosure of the existence (let alone substance) of any fairness opinion regarding the transfer.

What is known is that the value of the Debtor's former interest in Caesars Interactive has skyrocketed. In October 2013, Caesars Parent ascribed a value of up to $750 million for its interest in Caesars Interactive that it had taken from the Debtor two years earlier.[40] In the year since then, Caesars Interactive's revenues and EBITDA have doubled. For just the third quarter of 2014, it was reported that, year-over-year, Caesars Interactive's net revenues had doubled to $161.6 million, and Adjusted EBITDA had increased to $53.4 million over that three-month period alone (an year-over-year increase of 74.5% over the third quarter of 2013).[41]

---

[39]   According to a list of subsidiaries contained in an exhibit attached to the annual report filed by Caesars Parent on March 4, 2011, as of that date, the Debtor indirectly owned 100% of Caesars Interactive's preferred stock and 96.4% of Caesars Interactive's common stock. Mester Decl., Ex. 9. Two weeks later, on March 17, 2011, Caesars Parent filed a Form S-4 Registration Statement showing the same indirect ownership of Caesars Interactive by the Debtor, but with a new footnote stating that Caesars Parent now owned 100% of Caesars Interactive's direct parent, along with a portion of preferred stock issued by Caesars Interactive's direct parent, also as of March 4, 2011. Mester Decl., Ex. 15, at n.3. Thereafter, an S-1 Registration Statement filed on November 15, 2011 no longer showed the Debtor as owning any indirect interest in Caesars Interactive, other than a footnote reflecting its ownership of a portion of the preferred stock. Mester Decl., Ex. 16. It is unclear whether the Debtor continues to own any of the preferred stock in Caesars Interactive.

[40]   Mester Decl., Ex. 17.

[41]   Mester Decl., Ex. 18.

3.    Transfer Of Octavius Tower And The LINQ.

In September 2013, Caesars Parent caused the Debtor to transfer two of its Las Vegas properties to Caesars Parent, which in turn contributed them to newly-created insider Caesars Resort.[42]  One of the properties is a newly completed shopping, dining and entertainment district known as "The LINQ," which includes the unique 550-foot ferris wheel attraction called the "High Roller."[43]  The other is a luxury tower called Octavius Tower, completed in 2012 as part of Caesars Palace.[44]  Octavius Tower was designed and developed to "operate[] seamlessly" with the rest of Caesars Palace's gaming, dining, and entertainment offerings.[45]  It contains Caesars Palace's newest and most luxurious rooms and caters to many of Caesars Palace's high-end customers.[46]

In exchange for the The LINQ and Octavius Tower, the Debtor received approximately $150 million in cash and bonds, along with the assumption by Caesars Resort of $450 million in non-recourse bank debt associated with the construction of the properties – a total price of $600 million.[47]  That is far below the reasonably equivalent value of the assets, as shown by the fact, among others, that the Debtor recently had paid more than $750 million to acquire and improve the properties.[48]

Caesars Parent and the Debtor now insist that The LINQ and Octavius Tower "provided very little value to [noteholders] because the limited cash flow they generated was dedicated to

---

[42]  Mester Decl., Ex. 12, at ¶ 80.

[43]  *Id*.

[44]  *Id*.

[45]  Mester Decl., Ex. 19, at 11.

[46]  Mester Decl., Ex. 42, at 24.

[47]  Mester Decl., Ex. 12, at ¶ 81.

[48]  Mester Decl., Ex. 11, at 55-56, 66-67.

servicing debt on those properties and not available to pay interest on the Notes."[49]  This ignores

the fact that at the time of the transfer, The LINQ was not yet complete and its main attraction,

the High Roller, had not opened.  In Caesars Parent's most recent earnings call, its Chief

Executive Officer highlighted the growing revenue contributions of The LINQ, and particularly

the High Roller, noting that the company was "pleased with the High Roller's performance to

date," and that it has "quickly become one of the top-paid admission destinations in

Las Vegas."[50]  That performance should have come as no surprise to Mr. Loveman, who has

stated that the decision to build The LINQ was:

> probably the simplest thing to convince people of of [sic] anything
> that I've dealt with since the financial crisis.  People really got the
> idea that if you put a new kind of attraction in the middle of the
> strip with the kind of foot traffic that we have coming north and
> south of the strip with this kind of attraction at its core, it was very
> likely to do well.  And the economics are not too daunting.  It's not
> a multi-billion dollar project.  And so this one was really quite
> easy.  And many of our better known shareholders, including
> people like John Paulson, were really fascinated with this idea.
> And thought something like this could be catalytic for our whole
> neighborhood.[51]

Caesars Parent further claims that the Debtor's board – which did not have a single

independent member – retained an "independent financial advisor" to provide a fairness opinion

and that, "[f]ollowing due diligence, the advisor opined that the value of the consideration was in

fact reasonably equivalent to the value of the transferred assets."[52]  That opinion, the identity of

the financial advisor, and what the financial advisor actually did have never been publicly

disclosed.  In any event, there was never any attempt by the Debtor to market either property to

---

[49]   Mester Decl., Ex. 12, at ¶ 80.

[50]   Mester Decl., Ex. 10, at 3.

[51]   Caesars' Big Vegas Gamble:  A 550-Foot Ferris Wheel (April 28, 2014),
       https://www.youtube.com/watch?v=Z_suL3-nT5g

[52]   Mester Decl., Ex. 12, at ¶ 82.

third parties in order to maximize the sale price, or to obtain additional project specific financing to complete The LINQ.

        4.      Formation Of Caesars Growth And
                   Caesars Acquisition To Seize Valuable Assets.

Also in 2013, Caesars Parent formed Caesars Growth as a joint venture with another new insider entity, a financing vehicle called Caesars Acquisition Company ("Caesars Acquisition"), ostensibly for the purpose of funding "capital-intensive properties" that the Debtor could not sustain.[53]  In reality, Caesars Growth became the primary vehicle for Caesars Parent to seize, for itself, the Debtor's most valuable assets.

        5.      Transfer of Planet Hollywood And Horseshoe Baltimore.

Caesars Growth used the capital that it received from Caesars Parent and Caesars Acquisition to purchase assets from the Debtor in two primary transactions, one consummated in 2013 and the other in 2014.  Under the agreement for the 2013 transaction (the "2013 Transaction Agreement"),[54] Caesars Growth purchased the Debtor's interest in two casinos, Planet Hollywood in Las Vegas and the Horseshoe Baltimore, which was then under construction and in which the Debtor had a 40% economic interest.  Caesars Growth also purchased 50% of the management fees payable to the Debtor from those properties.  The Debtor received total consideration of approximately $360 million from the sale.[55]

Caesars Parent has tried to justify the sale by claiming that the Debtor "did not have the capital these properties needed to succeed."[56]  This is false.  At the time of the sale, the entity

---

[53]  *Id*. at ¶ 67.  Caesars Parent also formed Caesars Acquisition and distributed the equity to the existing shareholders of Caesars Parent, which effectively gave the LBO Sponsors a controlling interest in Caesars Acquisition.

[54]  Mester Decl., Ex. 17.

[55]  Mester Decl. Ex. 12, at ¶ 70.

[56]  *Id.*, at ¶ 71.

that owned Planet Hollywood had substantial cash on hand, and construction on the Baltimore casino was underway.[57]  There is no indication that the Debtor sought project-specific financing for any required capital investment in a manner that would have enabled the Debtor to retain its ownership in the assets.  Instead, Caesars Parent forced the Debtor to abandon its stake in these ventures for inadequate consideration and without any attempt to market them to outside buyers.

Caesars Parent states that the transaction was "negotiated over several months" by an independent committee of *Caesars Parent's board*, and that the committee was able to obtain "significant concessions and price increases" from the LBO Sponsors.[58]  Even if that were true, *the Debtor's* board apparently did not itself form any committee, independent or otherwise, to negotiate or evaluate the transaction on behalf of the Debtor.  Indeed, at the time, the Debtor did not have any independent board members.  Caesars Parent also claims that the independent Caesars Parent committee engaged financial advisors, who opined that "the value of the consideration to be received in exchange for the assets to be sold or contributed by Caesars Parent or its subsidiaries to or with Growth was not less than the fair market value for the assets to be sold or exchanged."[59]  Once again, this opinion was not disclosed and there was no attempt to maximize the value that the Debtor might receive for these assets by marketing the properties to other potential buyers.  In any event, no fairness opinion was obtained by the Debtor or its board.

One condition to the closing of the 2013 Transaction Agreement was that the Debtor, Caesars Growth and Caesars Acquisition enter into a "Management Services Agreement."[60]  As Caesars Parent explained in a public filing, the purpose of the Management Services Agreement

---

[57]  Mester Decl., Ex. 43, at 2.

[58]  Mester Decl., Ex. 12, at ¶ 73-4.

[59]  *Id.*, at ¶ 75.

[60]  Mester Decl., Ex. 22.

was to "allow[] [Caesars Acquisition], Caesars Growth and their subsidiaries to leverage Caesars' infrastructure."[61]  Although the infrastructure that Caesars Growth sought to "leverage" was owned by the Debtor, the Management Services Agreement granted current and future subsidiaries of Caesars Growth and Caesars Acquisition unfettered access to the Total Rewards network and the value of the synergies generated from Total Rewards and the Debtor's infrastructure.  For all this, the Debtor received a "services fee" equal to an allocation of personnel time and out-of-pocket costs, plus a 10% profit margin, but minus any discounts, rebates or similar incentives the Debtor earned because of its efficiency or hard work.[62]

Incredibly, the Debtor has no control over the duration of the Management Services Agreement and no ability to terminate the agreement absent an Event of Default.  Instead, the agreement remains in effect until Caesars Growth is liquidated, which could occur as far into the future as April 21, 2022 – or longer if the liquidation date for Caesars Growth were extended further by Caesars Parent and Caesars Acquisition.[63]  On the other hand, Caesars Growth was given complete discretion to unilaterally terminate certain or all of the services provided by the Debtor on 180 days' notice, in which case, Caesars Growth could withdraw its properties from Total Rewards and deprive the Debtor's remaining properties of the value of the synergy – including the incentives and the data base – associated with the valuable destination properties that Caesars Parent had caused the Debtor to transfer to Caesars Growth.[64]

It is hard to conceive of a more lopsided and unfair arrangement – except perhaps the Caesars Services agreements, discussed below.

---

[61]  Mester Decl., Ex. 23, at 6.

[62]  Mester Decl., Ex. 22, at § 3.09.

[63]  *Id.*, at §10.1

[64]  *Id.*  The agreement also requires the Debtor to provide "transition assistance," including the transfer of all data and proprietary information regarding the properties, if and when they do choose to terminate the agreement.  *Id.* at §10.3.

6.    The "Four Properties Transaction".

During the first half of 2014, Caesars Parent orchestrated the "Four Properties Transaction" – forcing the Debtor to transfer to Caesars Growth three of its prime Las Vegas destination properties (Bally's, the Quad, and the Cromwell) and Harrah's New Orleans, along with various ancillary assets,  for total consideration of $2 billion.[65]  Those Las Vegas and New Orleans destination properties not only capture much of the EBITDA generated from the Total Rewards network but also serve as prime incentives to attract customers to visit less profitable regional casinos.

As it did with the sale of Planet Hollywood and the Horseshoe Baltimore, Caesars Parent claimed that the transaction was warranted in part because "[a]ll of these were capital-intensive properties that [the Debtor] could not afford to renovate, maintain and improve."[66]  Specifically, Caesars Parent maintained that "[t]wo of the Las Vegas properties were in the midst of substantial, costly renovations ($225 million for the Quad and $200 million for the Cromwell) and generating *de minimus* cash flow (in the case of the Quad) or no cash flow at all (the Cromwell)."[67]  What Caesars Parent failed to acknowledge was that the Debtor already had paid for the bulk of the renovations at the Cromwell, which opened its doors shortly after the transfer was announced, and that Caesars Parent actually was forcing the Debtor to fund the "Remaining Cromwell Costs" associated with opening the property into an escrow as part of the sale.[68]  Similarly, renovations at The Quad were well underway, and Caesars Parent forced the Debtor to agree to indemnify Caesars Growth for up to $33.465 million of potential cost overruns relating

---

[65]   Mester Decl., Ex. 24; Mester Decl. Ex. 12, at ¶ 85.

[66]   Mester Decl. Ex. 12, at ¶ 85.

[67]   *Id.*

[68]   Mester Decl., Ex. 24.

to the project.[69]  The New Orleans property only required $8 million of capital expenditures in

2014.[70]  In other words, using the smoke screen of alleged capital needs, Caesars Parent caused

the Debtor to transfer away assets in which it had invested substantial capital just as those assets

were about to come online and generate significant new revenues for the Debtor.

The responsibility for reviewing and approving the Four Properties Transaction was

supposedly assigned to an independent committee of the board of *Caesars Parent*, consisting of

two purportedly independent directors who did not have ties to the LBO Sponsors.[71]  Given the

conflicts of interest between Caesars Parent and the Debtor – including, specifically, Caesars

Parent's majority equity ownership of Caesars Growth, the buyer of the Four Properties – those

directors could never be regarded as independent of Caesars Parent, even if they were

unaffiliated with the LBO Sponsors.  Once again, there was no review and approval of the

transaction by independent directors of *the Debtor*.  Although financial advisors retained by

Caesars Parent apparently opined that the transaction was fair to Caesars Parent and "was on

terms that were no less favorable to [the Debtor] than terms obtainable in a comparable arm's

length transaction with a non-[Caesars Parent] affiliate," Caesars Parent does not and cannot

claim that such an opinion was obtained by the *Debtor's* board.[72]  Caesars Parent also has

admitted to Louisiana regulators reviewing the transaction that there were no efforts to market

any of the properties to third party buyers.[73]

It is difficult to conceive what facts Caesars Parent's financial advisors could have relied

upon to render their opinions.  One thing is clear – the market disagreed with the alleged

---

[69]   *Id.* at § 11.2(f).

[70]   Mester Decl., Ex. 25, at 36:7-23.

[71]   Mester Decl., Ex. 12, at ¶ 86.

[72]   *Id.*, at 88.

[73]   Mester Decl., Ex. 25, at 33:16-34:3.

conclusion of fairness.  In the trading days immediately following the March 3, 2014

announcement of the Four Properties Transaction, the stock price of Caesars Acquisition jumped

by nearly 20%, a considerable increase not reflected in the stock prices of other gaming

companies.  At the same time, the 10% Second Lien Notes, regarded at the time as the Debtor's

fulcrum security, dropped nearly 15% in value.  The following chart shows the contrast between

the direction of the price of Caesars Acquisition stock and the 10% Second Lien Notes in the

three week period following the announcement.



Major ratings agencies viewed the transaction negatively from the Debtor's point of

view.  On March 28, 2014, Moody's downgraded the Debtor's credit rating to Caa3 and lowered

the rating of the 10% Second Lien Notes from Caa3 to Ca to reflect its "concern that the loss of

EBITDA from the proposed sale of four casinos to [Caesars Growth] will cause [the Debtor]'s

already high leverage to increase as well as reduce bondholders' recovery prospects."[74]  On April

---

[74]    Mester Decl., Ex. 45.

8, 2014 Standard & Poor's followed suit, lowering its recovery rating on the Debtor's first lien debt to "3" (50% to 70% recovery) and its issue-level rating to CCC-.[75]

The inadequate consideration and resulting decrease in the Debtor's revenue and EBITDA harmed the Debtor and its creditors. Even worse, the transfers left a gaping hole in the Debtor's Total Rewards network that severely impaired the ability of the Debtor – or its creditors – to realize or monetize the value of the network's synergy.

> 7.    The Caesars Services Agreements.

The transfer of many of the most valuable Caesars properties to affiliates other than the Debtor presented a challenge for Caesars Parent – given the inevitable bankruptcy of the Debtor caused by its confiscation of the Debtor's assets, Caesars Parent somehow had to ensure that the properties shifted to Caesars Resort and Caesars Growth would have uninterrupted access to the Debtor's valuable intellectual property, including the Total Rewards network.[76]

Thus, as it did with the Debtor's other valuable assets, in May 2014 Caesars Parent simply took the assets it wanted, by causing the Debtor to transfer control over and ownership of the Total Rewards network. This was accomplished via two agreements among the Debtor, Caesars Resort and Caesars Growth: one, a limited liability company agreement[77] that created what Caesars Growth' management described to its investors as a new "bankruptcy remote" entity ("Caesars Services") controlled by Caesars Resort and Caesars Growth; and the other, entitled "Omnibus License and Enterprise Services Agreement"[78] (the "Omnibus Agreement," and together with the limited liability company agreement, the "Caesars Services Agreements").

---

[75]   Mester Decl., Ex. 46.

[76]   Mester Decl., Ex. 25, at 114:12-115:25.

[77]   Mester Decl., Ex. 26.

[78]   Mester Decl., Ex. 27.

Under the agreements, Caesars Services assumed the Debtor's role as the provider of centralized "enterprise services" to Caesars Resort, Caesars Growth and the Debtor – but on economic terms that are grossly unfavorable to the Debtor.  For example, even though the Debtor currently generates about 50% of the Adjusted EBITDA among the three entities, it is saddled with 69% of the expenses.[79]  Far more injurious, the Omnibus Agreement purports to grant to Caesars Services "the sole and exclusive right, title and ownership" to the "Service Provider Proprietary Information and Systems" that form the core of the Total Rewards network itself. This astonishing transfer of the Debtor's most valuable asset is not disclosed in the 8-K report summarizing the transaction, but instead is buried in Section 8.8(b) of the Omnibus Agreement.[80] Indeed, the chief financial officer of Caesars Growth misled Louisiana gaming regulators by claiming that "[t]he Total Rewards IP is staying at Caesars CEOC [the Debtor]" and "is not part of the Services Co [Caesars Services]" or "getting pulled out of the Debtor," when that was obviously not their intent.[81]

Simply put, the practical effect of the Caesars Services Agreements was to transfer virtually all of the attributes of ownership and control of Total Rewards from the Debtor to Caesars Parent.  By controlling the Total Rewards network, Caesars Parent now is in a position to favor Caesars Growth and Caesars Resort at the expense of the Debtor, including by encouraging users of Total Rewards to visit the destination properties previously owned by the Debtor but now owned by Caesars Growth and Caesars Resort rather than the one remaining destination property owned by the Debtor (Caesars Palace, minus the Octavius Tower).

---

[79]    Mester Decl., Ex. 47.

[80]    Mester Decl., Ex. 27, at § 8.8(b) (emphasis added).

[81]    Mester Decl., Ex. 25, at 120:10-16.

In exchange for its ownership and control over Total Rewards, earned through years of investment in that property, the Debtor was given a 69% ownership interest and a $33\frac{1}{3}$% voting interest in Caesars Services.  Incredibly, that interest cannot be sold, encumbered, or otherwise disposed of, except to Caesars Parent or entities controlled by it.[82]  Moreover, the Debtor cannot assign its rights under the Omnibus Agreement except as part of a financing or a sale of all stock or assets of the Debtor, and then not to a "competitor" of the Debtor engaged in the gaming business, thereby excluding nearly all potential buyers.[83]  Moreover, upon any liquidation of Caesars Services (an event over which Caesars Resort and Caesars Growth would have veto power), the Debtor will receive no distributions on account of its interest until initial contributions by Caesars Resort and Caesars Growth, totaling about $65 million have been fully repaid.[84]  And if the Debtor misses a payment or files for bankruptcy and rejects the Caesars Services Agreements, the Debtor will forfeit any right to receive the centralized "enterprise services"[85] – meaning that, as a practical matter, the Debtor will lose access to the Total Rewards network that it owned and controlled until recently.

As with the other transactions, there appears to have been no effort to maximize the value of Total Rewards for its owner by marketing Total Rewards or offering its services to third parties, nor were any independent directors of the Debtor even involved in determining the fate of Total Rewards.  Here again, it is hard to conceive of a more lopsided and unfair arrangement.

---

[82]   Mester Decl., Ex. 26, at § 3.4.

[83]   Mester Decl., Ex. 27, at § 16.4.

[84]   Mester Decl., Ex. 26, at § 12.2.

[85]   Mester Decl., Ex. 27, at §14.4(b).

### E.   Additional Insider Transactions Benefit Caesars Parent And Others At The Expense Of The Debtor.

Once Caesars Parent and the LBO Sponsors had plucked the Total Rewards network from the Debtor, they turned their attention to extracting remaining value from the Debtor and securing other benefits for their insider affiliates.  None of the following transactions provided any benefit to the Debtor.

### 1.   Sham Sale Of 5% Of The Debtor's Equity.

On May 6, 2014, Caesars Parent announced that it had agreed to sell 5% of the Debtor's common stock to unidentified investors.  The purpose was clearly not to raise capital for the Debtor – the $6.15 million raised is dwarfed by the more than $700 million that, as detailed below, the Debtor had paid in 2014 to affiliates.  Nor, for that matter, is there any rational explanation for the payment by the unidentified investor(s) of a price that imputed an equity value in excess of $120 million[86] at a time when the Debtor was burdened by more than $19 billion in debt trading at a substantial discount and Caesars Parent was suggesting publicly that all of the Debtor's debts would be significantly impaired.[87]  There are serious questions as to whether the sale of equity was a *bona fide* transaction.

### 2.   Uneconomic $1.75 Billion Refinancing.

On May 6, 2014, Caesars Parent announced that the Debtor had entered into an amendment to its existing first lien credit agreement, under which the Debtor would borrow $1.75 billion in new first priority "B-7" term loans at a rate of 9.8% per annum and use the proceeds to repay outstanding debt that, for the most part, had lower interest rates and, in many instances, later maturity dates.

---

[86]   If the value of equity in the Debtor does exceed $100 million, as suggested by the sale price of the stock in May 2014, then the Debtor's plan under which creditors would receive less than 10% on account of their claims cannot be confirmed.

[87]   Mester Decl., Ex. 28, at ¶ 179.

Thereafter, the Debtor used the proceeds of the refinancing to funnel $427 million to Caesars Growth through an exchange offer to redeem its 5.625% unsecured notes – not scheduled to mature for another year –at a price above par ($1,048.75 per $1,000 principal amount).[88]  By virtue of that repayment, Caesars Growth booked a gain of $99 million from the price it paid to acquire the notes about nine months earlier.[89]  At the same time, the Debtor was left with substituted first lien secured debt at an interest rate nearly double the rate it had been paying to its affiliate.

This repayment of insider debt – bearing a low interest rate and not maturing for another year – cannot be reconciled with statements made by Caesars Parent and Caesars Growth to justify the Debtor's transfers of its valuable assets to affiliates.  Indeed, at a hearing before regulators in Louisiana to approve the Debtor's transfer of Harrah's New Orleans to Caesars Growth, Eric Hession – at the time an officer of the Debtor and now the chief financial officer of Caesars Parent – insisted that the transfers were motivated by the Debtor's need for liquidity:

> ***The asset sale will provide much needed liquidity and bolster our current liquidity***, and it will relieve [the Debtor] from ongoing capex expenses required in these large properties that are industry leading and require capex to retain that position.  ***The asset sale that we're proposing today is an important step in the efforts to improve [the Debtor]'s liquidity and our overall financial position***.  The proceeds from this sale, as we mentioned, will be the $2 billion which consists of slightly over $1.8 billion of cash and the assumption of the $1.85 billion of debt that's existing on the Cromwell, and it can be used for a number of different options, including paying down existing debt on the [Debtor] side, funding improvements at our other properties, including the properties here in Louisiana and other capital expenditures throughout the organization, ***and increasing our overall liquidity position to provide flexibility in the future***.  It has negative cash flow, and this transaction will enable the company to improve the liquidity position and be able to have [the Debtor] then move forward and

---

[88]  Mester Decl., Ex. 48, at Item 7.01.

[89]  Mester Decl., Ex. 49, at 44.

> continue to operate in the form that it's traditionally operated in,
> continue to invest in the properties **and to be able to deploy that
> cash for -- in the best uses of [the Debtor]**. [90]

The story told to regulators is contradicted by the massive outflow of funds from the Debtor to

its affiliates over the past several months.  Rather than using that money to pay insiders, the

funds could have been deployed to pay for the very capital expenditures that the Debtor used as a

pretense to justify the sale of the properties at depressed prices to Caesars Growth.

Another benefit to Caesars Parent and its affiliates from the Debtor's unfavorable

$1.75 billion refinancing was the modification that resulted to the existing Credit Agreement,

which, among other things, mysteriously converted Caesars Parent's guarantee from a payment

guarantee to a collection guarantee, and also imposed a hard dollar cap on the liability of Caesars

Parent.[91]

3.    Closure Of The Showboat Casino.

On June 27, 2014, Caesars Parent announced that it intended to close the Showboat

Atlantic City resort and casino (the "Showboat Casino") effective as of August 31, 2014.[92]  The

Showboat Casino was one of four Caesars properties operated in Atlantic City – along with

Harrah's Atlantic City (which is owned by Caesars Resort), Caesars Atlantic City, and Bally's

Atlantic City – and it has been alleged that the Showboat Casino experienced positive EBITDA

throughout its operation.

---

[90]   Mester Decl. Ex. 25, at 31:9-32:3 (emphasis added).

[91]   Mester Decl., Ex. 50.  Importantly, any release of Caesars Parent guarantee under the last
paragraph of Section 12.02(c) of the Indenture only becomes effective "upon the election of
[the Debtor] and Notice to the Trustee."  Mester Decl., Ex. 1, at §12.02.  The authority of the
Debtor to make or refrain from making that election is a valuable right, which the Debtor was
in a position to use as leverage to extract concessions from Caesars Parent or, alternatively,
from the creditors who received the guaranties.  Instead, acting under Caesars Parent's
control and for Caesars Parent's benefit, the Debtor gave notice to WSFS's predecessor in
May 2014 that the Debtor had made the election.  By doing so, the Debtor transferred away a
valuable right for no consideration.

[92]   Mester Decl., Ex. 29.

Caesars Parent stated this is a "necessary [step] … to help stabilize our business in [Atlantic City] and support the viability of our remaining operations in the vicinity."[93]  Notably, however, only two of those "remaining operations in the vicinity" are owned by the Debtor – Caesars Atlantic City and Bally's Atlantic City.  Several market observers and regulators have noted that it is likely that the former customers of the Showboat Casino will be redirected toward other Caesars properties, with Harrah's Atlantic City (a Caesars Resorts property) primed to receive the greatest benefit of the closure.[94]  This is no accident.  As stated by Gary Loveman during an earnings call on November 10, 2014, Caesars Resorts increased its marketing expenses during the third quarter of 2014 "largely [as] a result of programs aimed at retaining guests in Atlantic City following the closure of our Showboat properties."[95]  Mr. Loveman further spoke of "increased guest reinvestment in an effort to entice loyal customers to visit our other properties in the market, *especially CERP member Harrah's Atlantic City*."[96]  No comparable increase in marketing activity was reported for the Debtor.[97]

Notably, the Debtor does not appear to have marketed the Showboat Casino to third party casino operators or investors.  On November 12, 2014, it was announced that the Debtor had entered into letter of intent to sell the Showboat Casino to Stockton College to be used as a new campus.[98]  According to press reports, that transaction closed on December 12, 2014, generating

---

[93]  *Id.*

[94]  Mester Decl., Ex. 58.

[95]  Mester Decl., Ex. 57, at 3 of 12.

[96]  *Id*. (emphasis added).

[97]  *Id*. at 4 of 12 ("While the closures of Showboat and other properties have been challenging for the city, we are optimistic that Atlantic City's transformation is under way and that, over time, revenues will stabilize and margins will improve").

[98]  Mester Decl., Ex. 51.

just $18 million in cash proceeds[99] – a dramatic reduction from the $577.8 million in book value

for the property recorded in 2011, or even the $116.8 million in book value in 2012.[100]

Moreover, Caesars Resort does not appear to have provided any consideration to the Debtor for

the additional revenues it will receive from the Showboat Casino's customers.  Based upon the

information publicly available, it seems the Debtor closed an operationally profitable property in

order to improve the value of an asset of Caesars Resorts, at no cost to Caesars Resorts.

           4.     The Insider Legacy Notes Repurchase.

On August 12, 2014, Caesars Parent and the Debtor entered into an agreement with

certain undisclosed holders (the "Selected Noteholders") of the Debtor's 6.50% Notes due 2016

and the 5.75% Notes due 2017 (the "Legacy Notes"), by which Caesars Parent and the Debtor

agreed to pay the Selected Noteholders cash totaling $155.4 million in return for which the

Selected Noteholders agreed:  (i) to sell their Legacy Notes *at par* (plus accrued and unpaid

interest); (ii) to vote all of their remaining Legacy Notes in favor of removing Caesars Parent's

guarantee of the debt; (iii) to vote all of their remaining Legacy Notes in favor of modifying

covenants restricting sales of substantially all of the Debtor's assets; and (iv) to support future

restructurings proposed by Caesars Parent.[101]  These payments occurred at a time when the

Debtor claims that it was struggling to raise enough money to invest in the Debtor's properties

and was therefore compelled to sell them.

---

[99]   Mester Decl., Ex. 52.

[100]   Mester Decl., Ex. 53, at 8-9.  According to the Showboat Casino's financial statements, the
book value of the property declined to $35.8 million in 2013, but there was no citation to a
third party valuation of the property at that time.  Mester Decl., Ex. 54, at 9.  Notably, the
Showboat Casino's financial statements also reflected a receivable owed to Showboat by
Caesars Parent of $242 million, which thereafter disappeared without any apparent
explanation.  *Id*. at 8.

[101]   Mester Decl., Ex. 30.

On August 22, 2014, the Debtor announced the closing of the transaction.[102]  Certain

holders of Legacy Notes who were not included among the Selected Noteholders,

understandably outraged by Caesars Parent's blatant self-dealing at their expense, subsequently

challenged the validity of the transaction and the effectiveness of the amended indentures.[103]

     5.     Repayment Of Caesars Parent Insider Intercompany Loan.

On November 14, 2014, the Debtor announced an amendment to an existing

intercompany agreement between Caesars Parent and the Debtor, which had authorized Caesars

Parent to loan money to the Debtor in its discretion.[104]  The amendment contemplated the

repayment of the $260.4 million of intercompany loans by Caesars Parent, in exchange for a

commitment to reloan such amounts, assuming all other conditions for making the loan were

satisfied.

The Debtor's most recent cash flow statement in its 10-Q for the quarter ending

September 30, 2014 shows a repayment of $285.4 million by the Debtor to Caesars Parent during

the first nine months of 2014.[105]  That amount is in addition to another $231 million paid by the

Debtor to Caesars Parent during the first nine months of 2013.[106]

---

[102]  Mester Decl., Ex. 31.  In that report, the Debtor stated that it had "provided notice to the trustees of its outstanding first-priority senior secured notes and second-priority senior secured notes reaffirming [the Debtor]'s prior notices issued in June 2014 regarding the automatic release of Caesars Parent's guarantee of all of [the Debtor]'s first-priority senior secured notes and second-priority senior secured notes as a result of the guarantee of [the Debtor]'s unsecured senior notes being released."  While the Petitioning Creditors believe that the scope of the examiner's investigation need not address the enforceability of the guarantees, the likelihood that Caesars Parent was motivated by self-interest to enter into this irregular transaction is a subject that an examiner should explore.

[103]  *See* Complaint for Declaratory Relief and Damages, *Meehancombs Global Credit Opportunities Master Fund, LP v. Caesars Entm't Corp.*, No. 14-cv-7091 (S.D.N.Y. Sept. 3, 2014); Class Action Complaint, *Danner v. Caesars Entm't Corp.*, No. 14-cv-7973 (S.D.N.Y. Oct. 2, 2014).

[104]  Mester Decl., Ex. 32.

[105]  Mester Decl., Ex. 4, at p. 20.

[106]  *Id*. at p. 4.

The forced repayment of insider debt to Caesars Parent at a time when Caesars Parent itself was stating that the Debtor was insolvent and unable to fund capital expenditures on existing properties is suspicious, to say the least, and something that an examiner must investigate.

6.    Early Repurchase Of PIK Toggle Notes
At More Than Five Times Market Price In
Order To Benefit Insiders And Eliminate Insider Guarantees.

On December 3, 2014, the Debtor repurchased $16.5 million in outstanding PIK Toggle Notes, guaranteed by Caesars Parent, that were not scheduled to mature until 2018.  According to UMB, about $4 million of the PIK Toggle Notes were owned by Caesars Parent or affiliates, and the PIK Toggle Notes were trading at less than 17 cents on the dollar before the Debtor called them on November 4, 2014 at a price of 103.5 cents on the dollar.[107]  Like the other repayments described above, the use of funds to pay obligations not due for many years is difficult to reconcile with the Debtor's claim that it could not afford the cost of capital expenditures to preserve its ownership of valuable properties that were transferred to Caesars Growth and Caesars Resorts.

**F.    The Debtor Changes Officers and Directors And
Initiates The New York Action.**

As of June 27, 2014, the Debtor had two directors, each of whom were interested by virtue of their employment by Caesars Parent – Gary Loveman, the CEO of Caesars Parent, and Eric Hession, who at the time served as Vice President of Finance and Treasurer for Caesars Parent[108] and now is Caesars Parent's chief financial officer.[109]

---

[107] Mester Decl., Ex. 28, at ¶¶ 195-96.

[108] Mester Decl, Ex. 56.

[109] Mester Decl., Ex. 59.

On June 27, 2014 – after Caesars Parent had caused the Debtor to agree to the transfers of property described above – the Debtor announced that Eric Hession had resigned from the board and that a new slate of directors had been elected.[110]  The current board of the Debtors consists of five individuals who are also members of Caesars Parent's board – David Bonderman, Kelvin Davis, Marc Rowan, David Sambur and Mr. Loveman (who was the sole remaining incumbent director following Mr. Hession's resignation), and two individuals (Ronen Stauber and Steven Winograd) who are said by Caesars Parent to be "independent" but who, according to the UMB Complaint, appear to have longstanding ties to the LBO Sponsors and their founders.[111]

On July 30, 2014, the Debtor announced that its board had appointed three new officers: John Payne as President and Chief Executive Officer, Mary Elizabeth Higgins as Chief Financial Officer, and Tim Lambert as general counsel.  Neither Mr. Payne nor Mr. Lambert are newcomers to Caesars.  Mr. Payne held positions within Caesars Parent over the last 19 years, most recently as President, Central Markets & Partnership Development.[112]  Mr. Lambert has also worked for Caesars Parent over the past 19 years, most recently as Vice President and Chief Counsel Regional Operations, Regulatory & Compliance.[113]

## IV.

### ARGUMENT

Section 1104(c) of the Bankruptcy Code mandates the appointment of an examiner under circumstances such as those present here:

---

[110]  Mester Decl., Ex. 33.

[111]  Mester Decl., Ex. 28 , at ¶¶ 239-43.

[112]  Mr. Payne also served as President of Enterprise Shared Services from July 2011 to May 2013, Central Division President, and held general manager roles of several Caesars properties, including Harrah's New Orleans.  Mester Decl., Ex. 34.

[113]  *Id*.

(c)   If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court ***shall*** order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including ***an investigation of any allegations*** of fraud, dishonesty, incompetence, misconduct, mismanagement, ***or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor***, if

> (1)   such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; ***or***
>
> (2)   the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.[114]

Under the statute, the four requirements for an examiner are that:  (1) no trustee has been appointed; (2) no plan has been confirmed; (3) a party in interest or the U.S. Trustee has requested an examiner; and (4) *either* (i) appointment is in the interests of creditors of the estate – *or* – (ii) the debtor has more than $5 million in fixed, liquidated, unsecured debts to non-insiders.  The first three conditions are plainly satisfied here – no trustee has been appointed, no plan has been confirmed, and parties in interest (the Petitioning Creditors) have requested appointment of an examiner.  As discussed below, although either would be sufficient, both prongs of the last condition also are satisfied.

### A.    Section 1104(c)(2) Mandates Appointment of an Examiner.

Where, as here, "the Debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000,"[115] the appointment of an examiner is mandatory.

---

[114]  11 U.S.C. § 1104(c) (emphasis added).

[115]  As shown in the Debtor's most recent 10-Q, the Debtor has multiple series of senior unsecured notes with an aggregate outstanding balance in excess of $1 billion, including $290.7 million in 6.5% Senior Notes due 2016, $233.3 in 5.75% Senior Notes due 2017, $478.6 million in 10.75% Senior Notes due 2016, $46.9 million in Special Improvement District Bonds, and $33.6 million in "other" unsecured debt.  Mester Decl., Ex. 4, at p. 20.

The use of the word "shall" in section 1104(c)(2) expresses a mandatory statutory

direction and removes any discretion the Court otherwise might have.  Simply, "Congress's or an

agency's use of the word 'shall' indicates a mandatory duty that is not subject to discretion."[116]

The Sixth Circuit – the only Court of Appeals to addressed the issue in the context of

section 1104(c)(2) – has held that the statute "plainly means that the bankruptcy court 'shall'

order the appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds

$5 million, if the U.S. trustee requests one."[117]  In so holding, the Circuit commented that, if

section 1104(c)(2) were discretionary, it would become "indistinguishable" from

---

(continued…)

    Moreover, the 10.75% Senior Notes due 2016 in the principal amount of $478.6 million, are guaranteed by the Debtor's subsidiaries.  *Id.* at 20.  The plan term sheets circulated by the Debtor further asserted that the $5.252 billion of Second Lien Notes are unsecured deficiency claims.  Mester Decl., Ex. 35, at 3.

[116]  *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 778 (9th Cir. 2006); *accord Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("the mandatory 'shall,'... normally creates an obligation impervious to judicial discretion") (*citing Anderson v. Yungkau*, 329 U.S. 482, 485 (1947)); *United States v. Monsanto*, 491 U.S. 600, 607 (1989) (where word "shall" appears in a statutory directive, "Congress could not have chosen stronger words to express its intent that [the specified action] be mandatory"); *Our Children's Earth Found. v. EPA*, 527 F.3d 842, 847 (9th Cir. 2008) ("When Congress specifies an obligation and uses the word 'shall,' this denomination usually connotes a mandatory command") (*citing Alabama v. Bozeman*, 533 U.S. 146, 153 (2001)); *Barbieri v. RAJ Acquisition Corp.* (*In re Barbieri*), 199 F.3d 616, 619 (2d Cir. 1999) ("The term 'shall,' . . . generally is mandatory and leaves no room for the exercise of discretion by the trial court"); *Hall Fin. Grp., Inc. v. DP Partners, LP* (*In re DP Partners, LP*), 106 F.3d 667, 670-71 (5th Cir. 1997) ("Use of the word 'shall' connotes a mandatory intent.")

[117]  In *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500-01 (6th Cir. 1990).  The Sixth Circuit relied in part on the following definition of "shall" as used in Black's Law Dictionary 1233 (5th ed. 1979):  "As used in statutes, contracts, or the like, this word is ***generally imperative or mandatory***.  In common and ordinary parlance . . . the term 'shall' is a word of command, and one which . . . must be given a compulsory meaning; as denoting obligation."  (Emphasis added).

section 1104(c)(1).[118]  Many lower courts, including a number of district courts acting in an

appellate capacity, have reached the same conclusion.[119]

Several recent decisions of bankruptcy courts in Delaware and New York have reached a

contrary conclusion, holding that courts have discretion to deny a motion to appoint an examiner

even in cases where the debtor has more than $5 million of qualifying debt.[120]  Those decisions

have read the phrase "as is appropriate" in the introductory language of section 1104(c) to

provide discretion to deny appointment of an examiner if not "appropriate."[121]

Respectfully, those courts failed to give sufficient regard to the plain language and

context of the statute.[122]  To start, the phrase "as is appropriate" as used in section 1104(c)

clearly modifies the phrase "such an investigation of the debtor" that immediately precedes it,

and not the phrase "shall order the appointment of an examiner" located earlier in the

sentence.[123]  Also significant is the statute's choice of the words "such" and "as," both of which

---

[118]  *Revco*, 898 F.2d at 501.

[119]  *Walton v. Cornerstone Ministries Invs., Inc.*, 398 B.R. 77, 81-82 (N.D. Ga. 2008) ("[E]very district court and nearly every bankruptcy court that has confronted the question has also read the provision to be mandatory on its face."); *see, e.g.*, *In re Vision Dev. Grp. of Broward Cnty., LLC*, No. 07-17778-BKC-RBR, 2008 WL 2676827 (Bankr. S.D. Fla. June 30, 2008); *In re Collins & Aikman Corp.*, 368 B.R. 623 (Bankr. E.D. Mich. 2007); *In re Loral Space & Commc'ns, Ltd.*, No. 04-CV-8645-RPP, 2004 WL 2979785 (S.D.N.Y. Dec. 23, 2004); *In re UAL Corp.*, 307 B.R. 80 (Bankr. N.D. Ill. 2004); *In re Schepps Food Stores, Inc.*, 148 B.R. 27 (S.D. Tex. 1992); *In re Mechem Fin. of Ohio, Inc.*, 92 B.R. 760 (Bankr. N.D. Ohio 1988); *In re The Bible Speaks*, 74 B.R. 511 (Bankr. D. Mass. 1987); *In re 1243 20th St., Inc.*, 6 B.R. 683 (Bankr. D.D.C. 1980); *In re Lenihan*, 4 B.R. 209 (Bankr. D.R.I. 1980).

[120]  *E.g., In re Residential Capital, LLC*, 474 B.R. 112, 121 (Bankr. S.D.N.Y. 2012) ("*ResCap*") (citing *U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 128 (Bankr. D. Del. 2010), and several unreported bench rulings in other Delaware cases).

[121]  *ResCap*, 474 B.R. at 121; *Spansion*, 426 B.R. at 128.

[122]  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241-42 (1989) (plain reading of Section 506 "mandated by the grammatical structure of the statute").

[123]  11 U.S.C. § 1104(c) (emphasis added); *e.g.*, *Schepps Food Stores*, 148 B.R. at 30 ("National argues that the phrase 'as is appropriate' modifies 'shall,' providing the discretion that it

refer to the "kind" or "character" or "quality" of something."[124]  In the context of

section 1104(c), the word "appropriate" is being used to describe the character or quality –

otherwise described by courts interpreting section 1104(c) as the "nature, extent and duration" –

of the mandatory "investigation" to be conducted.[125]

The phrase "as is appropriate" does not operate as a separate, fifth condition precedent to

the appointment of an examiner.[126]  Had Congress intended the latter, it could have omitted the

word "such" and substituted "if" for "as is," or moved the phrase "as is appropriate" earlier in the

sentence so as to modify "shall order."[127]  Congress did not do so.  Only by interpreting the

phrase "as is appropriate" to modify "such an investigation" is it possible to harmonize that

language with the use of the word "shall."

As stated by the Supreme Court, "[t]he plain meaning of legislation should be conclusive,

except in the 'rare cases [in which] the literal application of a statute will produce a result

---

seeks.  This reasoning is both grammatically and contextually wrong.  In the provision, 'as is appropriate' modifies 'investigation.'  The statute allows the court to determine the scope, length, and conduct of the investigation, rather than the appointment itself.").

[124]  For definitions of such, *see, e.g.*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "such" to mean "of that or that kind"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986) ("such" means "of this or that character or quality or extent," or "of a kind or character about to be indicated, suggested, or exemplified"); THE MERRIAM-WEBSTER DICTIONARY (1974) ("such" means "having a quality just specified or to be specified").  For definitions of "as," *see, e.g.*, BLACK'S LAW DICTIONARY (5th ed. 1979) (defining "as" to mean "in the character or under the name of with significance of in degree"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986) ("as" means "in the character, role, function, capacity, condition or sense of"); THE MERRIAM-WEBSTER DICTIONARY (1974) ("as" as used as preposition means "in the capacity or character of").

[125]  *See UAL Corp.*, 307 B.R. at 86 (court has "authority to limit examiner investigations to 'appropriate' subjects, methods, and duration") (citing *Revco*, 898 F.2d at 501).

[126]  *Id.*

[127]  *Cf. Ron Pair*, 489 U.S. at 242 n.4 (pointing out alternative ways in which Congress could have written section 506(b) had its intended meaning been different than as written).

demonstrably at odds with the intentions of its drafters.'"[128]  Far from being "demonstrably at

odds" with the plain language, the legislative history behind of section 1104(c) "forcefully

indicates that appointment of an examiner was intended to be mandatory in cases exceeding the

debt threshold."[129]  At the time section 1104 was enacted, "the focus of the debate over § 1104

was whether appointment of a trustee should be mandatory for public companies (as it was under

Chapter X of the former Bankruptcy Act), or whether the debtor should remain in possession in

all cases unless a trustee was appointed for cause." [130]  Congress resolved this disagreement with

a compromise that rejected mandatory appointment of a trustee but "provided for mandatory

appointment of an examiner in large cases as an alternative form of protection against corporate

mismanagement."[131]  As reflected in the legislative history:

> In order to insure that adequate investigation of the debtor is
> conducted to determine fraud or wrongdoing on the part of present
> management, *an examiner is required to be appointed in all cases
> in which the debtor's fixed, liquidated, and unsecured debts, other
> than debts for goods, services, or taxes, or owing to an insider
> exceed $5 million*.  This should adequately represent the needs of
> public security holders in most cases.[132]

Accordingly, the appointment of an examiner is mandatory because the Debtor's

qualifying debts exceed $5 million.  In any event, even under the minority view that, as a fifth

condition, any appointment must also be "appropriate," that standard is easily met here.  In

*ResCap*, for example, the court pointed to three factors in determining whether an investigation

would be "inappropriate" notwithstanding satisfaction of the statutory criteria:  (1) the filing of

---

[128]  *Id*. at 242 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).

[129]  *UAL*, 307 B.R. at 85.

[130]  *Id*. at 85-86.

[131]  *Id*.

[132]  124 Cong. Rec. H11,100 (daily ed. Sept. 28.1978) *reprinted in* 1978 U.S.C.C.A.N. 6465; 124
Cong. Rec. S17,417 (daily ed. Oct. 6, 1978) *reprinted in* 1978 U.S.C.C.A.N. 6456
(statements of Rep. Edwards and Sen. DeConcini) (emphasis added).

the motion for an improper purpose, such as a litigation tactic to delay the case;[133] (2) the absence of any factual basis to conclude that an investigation needs to be conducted;[134] or (3) an "appropriate and thorough investigation has already been conducted (or is nearly complete) by a creditors committee or a governmental agency."[135]  Notably, the *ResCap* court found none of those factors to be present where the investigation was requested just three weeks after the petition date, the subject of the investigation included transactions with the debtor's parent company, and the committee's investigation, though begun, was not complete.[136]  Finding that the investigation was "appropriate," the court concluded that "an examiner must be appointed."[137]

The same is true here.  This motion was filed on the involuntary petition date, the Petitioning Creditors seek an investigation of mismanagement and irregularities involving the Debtor's transactions with affiliated entities, and no investigation by a committee or government agency has been conducted.

### B.    In the Alternative, Appointment of an Examiner Is Necessary Because It Is in the Interests of Creditors.

Appointment of an examiner is also required under section 1104(c)(1), which mandates an examiner where in the "interests of creditors, any equity security holders, and other interests

---

[133]  Many of the decisions denying appointment of an examiner involved motions filed long after the commencement of the case, such as on the eve of a confirmation hearing, leading courts to deny the motion on laches, waiver, or similar grounds.  *E.g., Spansion*, 426 B.R. at 128 (denying request for appointment of examiner in context of motion to vacate a disclosure statement order); *In re Washington Mutual, Inc.*, No. 08-12229 (MFW) (Bankr. D. Del., May 5, 2010), Hrg. Tr. At 101:12 (ECF No. 3699).

[134]  *E.g.*, *Spansion*, 426 B.R. at 127 (court declined to appoint examiner to resolve valuation dispute in confirmation proceeding, where "[n]o evidence has been offered to this Court indicating fraud, mismanagement or irregularities in the management of the debtor or the debtor-in-possession").

[135]  *ResCap*, 474 B.R. at 121.

[136]  *Id*.

[137]  *Id*.

of the estate."[138]  An examiner is in the interests of creditors where "such appointment allows for a thorough, independent, and expeditious examination to be made into serious allegations."[139]

The existence of potential avoidance claims and other actions against insiders and related parties presents "a textbook case calling for the appointment of an examiner in the interest of creditors."[140]  In *Keene Corp.*, for example, the debtor faced a multitude of prepetition lawsuits relating to a prepetition restructuring in which assets of the debtor had been transferred to affiliates for the ultimate benefit of the debtor's equity holders.[141]  The court found that the interests of creditors would be served by appointment of an examiner, finding it especially significant that the debtor's chairman and president was a defendant in certain of the prepetition actions.[142]  Similarly, in *In re Gilman Services, Inc.,*[143] the court held that "[a] debtor's sale of assets to a related corporation before the commencement of the bankruptcy case warrants an investigation by an examiner where there are unanswered questions concerning the transaction and interrelationships of the parties involved."[144]  And in *In re 1243 20th Street, Inc.*, the court ordered appointment of an examiner to investigate the debtor's prepetition transfers, while insolvent, to an entity that shared the same president and director as the debtor, finding that "the relationship of the debtor herein to the 1716 H Street corporation does form the factual basis for the appointment of an examiner in this case."[145]

---

[138]  11 U.S.C. § 1104(c)(1).

[139]  *In re JNL Funding Corp.*, No. 10-73724, 2010 WL 3448221, at *3 (Bankr. E.D.N.Y. Aug. 26, 2010).

[140]  *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 856 (Bankr. S.D.N.Y. 1994).

[141]  *Id*.

[142]  *Id.*

[143]  46 B.R. 322 (Bankr. D. Mass. 1985).

[144]  *Id*. at 327.

[145]  6 B.R. at 685-86.

Here, too, the investigation will focus on prepetition insider transactions involving allegations of self-dealing and include, as subjects, affiliates of the Debtor along with certain of the Debtor's current and former officers and directors who are named as defendants in the prepetition Delaware Complaint.  Immediate appointment of an examiner will lead to a credible, unbiased and public report assessing the merits of these claims and perhaps facilitate negotiations among all parties in interest as they work to achieve a global resolution of this chapter 11 case.[146]

Consistent with such objectives, examiners have been appointed at the outset of several recent large chapter 11 cases involving debtors that had engaged in questionable prepetition transactions involving related parties.  In *Dynegy Holdings*, the court appointed an examiner within 42 days of the commencement of the cases to investigate, among other things, the debtors' prepetition transfers of more than half of the debtors' revenue generating assets to an affiliate.[147]  Similarly, in *ResCap*, the court ordered the appointment of an examiner within 37 days of the commencement of the cases to investigate claims related to dozens of transactions between the debtors and its parent that resulted in the prepetition transfer of billions of dollars of assets.[148]

Given the nature of the alleged misconduct and the obvious conflicts of interest, it is evident that the Debtor, its current management, and its professionals are in no position to

---

[146] *In re FiberMark*, 339 B.R. 321, 325 (Bankr. D. Vt. 2006) (examiner can perform objective investigation of claims, "thereby allowing the parties to make an informed determination as to their substantive rights"); *see also In re Gitto Global Corp.*, Nos. Civ.A. 05-10334-DPW, Civ.A. 05-10532-DPW, 2005 WL 1027348, at *2 (D. Mass. May 2, 2005) (examiner is "first and foremost disinterested and nonadversarial.").

[147] *In re Dynegy Holdings, LLC*, Case No. 11-38111 (CGM) (Bankr. S.D.N.Y. Dec. 29, 2011)(Docket No. 276) (appointing examiner to investigate "the conduct of the Debtors in connection with the prepetition 2011 restructuring and reorganization of the Debtors and their non-Debtor affiliates").

[148] *ResCap*, 474 B.R. 112.

investigate the claims and provide an impartial report upon which creditors, such as the

Petitioning Creditors, can rely.[149]  Indeed, section 1107(a) of the Bankruptcy Code explicitly

excludes, from the "rights, duties and powers" of a debtor-in-possession, the very powers under

section 1106(a)(3) and (4) that are conferred upon an examiner pursuant to section 1106(b).[150]

Even if the Debtor had such statutory authority, the Debtor's seven member board continues to

be dominated by five individuals who are also directors of Caesars Parent,[151] targets of potential

claims of the estate, and, in certain instances, founders or employees of the LBO Sponsors.[152]

Moreover, questions have been raised by UMB Bank concerning the purported independence of

the remaining two directors, given their apparent longstanding ties to the LBO Sponsors and

their founders.[153]

As for the Debtor's current officers, hired on July 30, 2014, two of the three (the chief

executive officer and the general counsel) have been employed by Caesars Parent and its

affiliates for the past nineteen years, raising obvious concerns about their independence.[154]  Any

---

[149]  *E.g.*, *In re Syntax-Brillian Corp.*, Case No. 08-11407 (BLS), Transcript of Hearing held August 4, 2008, at 131 and order dated August 22, 2008 (Bankr. D. Del.) (court ordered the appointment of an examiner notwithstanding an ongoing investigation by the debtor in conjunction with the U.S. Securities and Exchange Commission; court acknowledged the debtor's efforts, but held it "appropriate that the investigation ***actually be conducted by an independent third party***")(emphasis added).

[150]  11 U.S.C. §§ 1106(a)(3) and (4), 1106(b), 1107(a).

[151]  The Debtor's creditors obviously are not protected by the supposedly independent committee of the board of Caesars Parent that allegedly approved certain of the prepetition transactions. Due to its majority economic stake in both the Debtor and Caesars Growth, Caesars Parent was on both sides of the table and *all* of its directors were inherently conflicted in any matter in which both Caesars Parent and the Debtor were both involved, even those with no apparent ties to the LBO Sponsors.  *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) ("When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain.").

[152]  Mester Decl., Ex. 33.

[153]  Mester Decl., Ex. 28, at ¶ 239-43.

[154]  Mester Decl., Ex. 34.

pretense that they would act in an impartial manner was quickly laid to rest just six days after being hired, when they allowed the Debtor to file a complaint in New York that characterized, using words such as "bogus" and "baseless," the allegations of fraudulent transfer and breach of fiduciary duty made by the Debtor's noteholders.[155]  Rather than conduct any thorough, independent review of the allegations when it was needed most, the Debtor's newly appointed CEO and general counsel hastily endorsed the complaint's baseless conclusion that the transactions in question had "provided [the Debtor] with billions of dollars in cash, dramatically improved its finances and extended its ability to make payments of its obligations as they come due, totaling billions of dollars of payments to debt-holders, including holders of the Notes."[156]

If nothing else, the fact that the current directors and officers were selected by Caesars Parent and the LBO Sponsors is, by itself, sufficient reason to appoint an examiner.  As held in *In the Matter of First American Health Care of Georgia, Inc.*,[157] "the fact that current management was selected by Mr. Mills, the convicted CEO of Debtors, ***creates an appearance, or the potential appearance, that prior management has chartered the course Debtor is following***.  This connection, tenuous as it hopefully is between Mr. Mills [the convicted CEO] and Chamberlain and Cansler [current management] ***creates a fog of uncertainty surrounding the issue of the independence of current management***.  The credibility of Debtors' future acts will be well served by the involvement of an examiner."[158]  So, too, here.

Similarly, the existence of an official creditors committee for unsecured creditors does not obviate the need for appointment of an examiner.  As explained in *1243 20th Street*, where the court ordered appointment of an examiner to investigate allegations of corporate fraud or

---

[155]  Mester Decl., Ex. 6, at ¶¶ 1-2.

[156]  *Id.* at ¶ 6.

[157]  208 B.R. 992 (Bankr. S.D. Ga. 1996)

[158]  *Id.* at 994-95 (emphasis added).

misconduct, "[w]hile a creditors' committee is well suited to overseeing the operations of a business, especially the financial and economic aspects of the debtor's operations, the examiner is far better able to undertake an in-depth investigation, a function warranted by the facts presented here."[159]  That view finds support in the Bankruptcy Code's language, which explicitly provides for an examiner to investigate and provide a report regarding "any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor."[160]

While a committee has general authority under section 1103(c)(2) to investigate "the acts, conduct, assets, liabilities, and financial condition of the debtor,"[161] an examiner is a disinterested person who, akin to a trustee, represents the interests of the entire estate – not just a subset of unsecured creditors, equity holders, or some other constituency.[162]  Moreover, as discussed below, an examiner, like a trustee, can be granted "unfettered" access to privileged materials and can provide the Court with a report that includes such materials without effecting a waiver of the privilege.  No comparable mechanism exists for an official committee to access and review such materials.

Indeed, courts regularly appointed examiners where committees also exist.  In *ResCap*, the court appointed an examiner even though the committee in that case had started an

---

[159]  6 B.R. at 686, quoted in *Keene Corp.*, 164 B.R. at 856.

[160]  11 U.S.C. § 1104(c).

[161]  11 U.S.C. § 1103(c)(2).

[162]  *E.g.*, *Official Comm. of Unsecured Creditors of Grand Eagle Cos. v. Asea Brown Boveri, Inc.*, 313 B.R. 219, 224 (N.D. Ohio 2004) ("A trustee acts for the benefit of the estate and owes a fiduciary duty to all creditors of the estate.  In contrast, a committee of unsecured creditors is a fiduciary only to the creditors it represents and must act vigorously to pursue their interests.  A creditors' committee need not consider the best interests of the estate.  As the bankruptcy court notes, the interests of a creditors' committee and the trustee may sometimes align.  Yet the interests of a creditor's committee and the trustee are not identical") (citations omitted).

investigation and was ably represented, finding that such appointment was required when the other conditions of section 1104(c)(2) were met.[163]  In other recent cases, such as *Dynegy Holdings*, *Tribune*, and *Syntax-Brillian*, courts have appointed examiners notwithstanding the existence of a committee – and in the case of *Tribune*, over the committee's initial objection.[164]

In sum, the appointment of an examiner is mandated on the alternative ground that such appointment is in the best interest of creditors.

**C.   An Examination Of The Debtor's Prepetition Transactions With Affiliates And Insiders Between 2010 And The Petition Date Is Necessary And Appropriate.**

Although section 1104(c) mandates the appointment of an examiner, the Court has discretion to direct the "nature, extent and duration" of the investigation "as is appropriate."[165] The Petitioning Creditors seek appointment of an examiner to investigate and provide a report to the Court and parties in interest regarding the following prepetition transactions that occurred between August 2010 and the Petition Date, as described in greater detail above, and any causes of action that may exist as a result of those transactions:

1.   The transfer by the Debtor[166] to Caesars Parent of certain intellectual property and trademark assets.

2.   The transfer by the Debtor to Caesars Parent of its ownership interest in Caesars' online gaming businesses and related assets, including Caesars Interactive.

3.   The transaction in which the Debtor transferred to Caesars Growth its ownership interest in the Planet Hollywood and the Horseshoe Baltimore properties, along with 50% of the management fees from those properties,

---

[163]   *ResCap*, 474 B.R. at 121.

[164]   *In re Tribune Co.*, Case No. 08-13141 (KJC)(ECF Nos. 3360, 4120).

[165]   *Revco*, 898 F.2d at 501.

[166]   For convenience, as used in the list of matters to be investigated, "the Debtor" refers to both the Debtor and its subsidiaries, and "Caesars Parent" refers to Caesars Parent and its subsidiaries other than the Debtor.

and entered into the Management Services Agreement allowing Caesars Growth to "leverage" the Total Rewards network.

4.    The transfer by the Debtor to Caesars Resort of Project LINQ and Octavius Tower, as well as any subsequent lease agreements involving Octavius Tower to which the Debtor was a party.

5.    The transfers by the Debtor to Caesars Growth of Harrah's New Orleans, Bally's Las Vegas, The Cromwell, and the Quad, along with 50% of the management fees from those properties payable to the Debtor.

6.    The formation of Caesars Services and the Debtor's execution of the Caesars Services Agreements, along with any other transfers by the Debtor of ownership or control of the intellectual property that comprises the Total Rewards network.

7.    The sale of 5% of the Debtor's common stock to certain undisclosed investors for the sum of $6.15 million

8.    The Debtor's $1.75 billion refinancing transaction consummated in July 2014, including the amendments to the Credit Agreement and the use of the proceeds of that refinancing to repay certain unsecured debt in full (with a premium), including $427 million in notes held by Caesars Growth.

9.    The "Note Purchase and Support Agreement" entered into among the Debtor, Caesars Parent, and certain preferred holders of unsecured notes, resulting in payment by the Debtor of $155.4 million to preferred holders and amendments to the indentures governing those notes.

10.   The Debtor's payment to Caesars Parent of substantial intercompany obligations, including repayment of $285.4 million during calendar year 2014 and $230 million during the first nine months of 2013.

11.   The Debtor's redemption of the PIK Toggle Notes effective as of December 3, 2014.

12.   The closure of the Showboat Atlantic City.

The above list was prepared based upon publicly available information.  It is entirely

possible that the unfair and inappropriate dealing among entities under common control with the

Debtor is even broader than publicly reported, and the examiner should not be precluded from

seeking authority to expand the investigation based on the information that he or she will receive

which has not, to date, been made publicly available.  That said, the Petitioning Creditors have

narrowly tailored the list above to identify the most troubling of the Debtor's transactions with

its affiliates and has focused on matters that the Debtor's board and officers are not qualified to

investigate given their lack of impartiality and independence – not to mention the fact that

certain members of the Debtor's board are defendants on the claims asserted by WSFS and other

parties in the pending state court litigation, and would be defendants in any action brought by on

behalf of the Debtor's estate.[167]

The proposed scope of the investigation is clearly "appropriate" under section 1104(c),

which provides an illustrative list of "such . . . appropriate investigations:

> *including an investigation* of any *allegations* of fraud, dishonesty,
> incompetence, misconduct, mismanagement, or *irregularity in the*
> *management of the affairs of the debtor of or by current or*
> *former management of the debtor*, . . . ."[168]

Notably, that illustrative list– which includes "allegations" of "misconduct,

mismanagement or irregularity in the management" by "current *or former*" management – is

more expansive than the relatively narrower illustrative list of grounds that constitute "cause" for

appointment of a trustee.[169]  The duties of an examiner largely track the language of section

1104(c) and require not only an investigation but also the filing of a report that includes "any fact

ascertained pertaining to fraud, dishonesty, incompetence, **misconduct, mismanagement, or**

**irregularity in the management of the affairs of the debtor**, **or to a cause of action available to**

---

[167] *E.g.*, *Quadrant Structured Prods. Co. v. Vertin*, C.A. No. 6990-VCL, 2014 WL 5099428 (Del. Ch. Oct. 1, 2014).

[168] 11 U.S.C. § 1104(c) (emphasis added).

[169] *Compare* 11 U.S.C. § 1104(a)(1) ("for cause, including fraud, dishonesty, incompetence, or *gross mismanagement* of the affairs of the debtor by *current* management . . . .")(emphasis added) *with* 11 U.S.C. § 1104(c) ("as is appropriate, including an investigation of *any allegations* of fraud, dishonesty, incompetence, *misconduct*, *mismanagement*, or *irregularity in the management* of the affairs of the debtor of or by *current or former* management . . . .") (emphasis added).

*the estate*."[170]   While the lists of subject matters to be investigated in section 1104(c) and section

1106(a)(4) are by no means exhaustive,[171] the allegations that the Petitioning Creditors seek to

have investigated by the examiner fall squarely within the bounds of those provisions.   The

prepetition conduct of Debtor's current and former management alleged by the Petitioning

Creditors is, to say the very least, "irregular" – there is nothing "regular" about the systematic

dismantling of the Total Rewards network through a series of transactions with affiliates, without

any marketing process or oversight by independent directors, when alternative financing

arrangements were available, often without any or limited disclosure, and during a period when

the Debtor was insolvent.   Under Delaware law, challenges to self-dealing transactions by

controlling shareholders are subject to "entire fairness" which is Delaware's "most onerous

standard of review."[172]   Indeed, the allegations of self-dealing by Caesars Parent and the LBO

Sponsors at the expense of the Debtor and its creditors also comprise many "badges of fraud"

found to exist in some of the more notorious chapter 11 cases of the past decade, such as

*Dynegy*,[173] *Tronox*,[174] and *Asarco*,[175] all of which involved transactions among affiliates and

---

[170]   11 U.S.C. §§ 1106(a)(3), (4), (b).

[171]   The Ninth Circuit has recognized that "[i]n construing a statute, the use of a form of the word 'include' is significant, and generally thought to imply that terms listed immediately afterwards are an inexhaustive list *of examples*, rather than a bounded set of applicable items."   *United States v. Ledlin* (*In re Mark Anthony Constr., Inc.*), 886 F.2d 1101, 1106 (9th Cir. 1989) (emphasis added).   While the term "including" as used in a statute is never limiting, *see* 11 U.S.C. § 102(3) (providing, as a rule of construction to interpret the Bankruptcy Code, "'includes' and 'including' are not limiting"), the list of "appropriate" investigations in section 1104(c) should be regarded as "illustrative" and providing "general guidance."   *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994) ("[t]he text employs the terms 'including' and 'such as' in the preamble paragraph to indicate the 'illustrative and not limitative' function of the examples given, § 101; which thus provide only general guidance about the sorts of copying that courts and Congress most commonly had found to be fair uses") (citations omitted).

[172]   *E.g.*, *Quadrant Structured Prods.*, 2014 WL 5099428, *17, *quoting, Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012).

[173]   *In re Dynegy Holdings*, LLC, Case No. 11-38111, Report of Susheel Kirpalani, Examiner (ECF No. 490), at 4 (concluding that the conveyance of asset to parent of debt was both an actual fraudulent transfer and, if debtor was insolvent, a constructive fraudulent transfer).

resulted in massive judgments for intentional fraudulent transfers or the complete unwinding of such transactions in the face of the examiner's findings.

It is not necessary at this juncture for this Court to "reach the merits of a particular transaction or transactions in which the debtor may have been involved" – that is, as an initial matter, the function of the examiner.[176]  Here, the occurrence of massive transfers and payments by the Debtor to affiliates and other insiders, during a period when the Debtor was insolvent and without any marketing process or independent director to review and approve the transactions, constitutes "credible evidence" of potential causes of action that warrant investigation and a report by a court-appointed examiner.

In conducting the examination, the examiner should be authorized to retain counsel and other professionals, with such retention and compensation to be subject to Court approval under standards equivalent to those set forth in Sections 327 and 330 of the Bankruptcy Code.  The examiner should also be required, promptly after the U.S. Trustee's filing of notice of the examiner's appointment, to propose a work plan, including an estimated budget of the costs and expenses related to the examiner's investigation and a proposed timeline for requesting and obtaining information from the Debtors and other parties and conducting the investigation, and parties in interest should be provided an opportunity to be heard on the proposed work plan.

---

(continued…)

[174]  *Tronox Inc. v. Kerr McGee Corp.* (*In re Tronox, Inc.*), 503 B.R. 239, 291, 319 (Bankr. S.D.N.Y. 2013) (finding both actual and constructive fraudulent transfer).

[175]  *Asarco, LLC v. Ams. Mining Corp.* (*In re Asarco LLC*), 396 B.R. 278, 364-86 (S.D. Tex. 2008) (finding actual fraudulent transfer where, among other things, parent company took "crown jewel" asset and paid itself but not other creditors).

[176]  *1243 20th Street*, 6 B.R. at 686.

Consistent with section 1106(a)(4) which requires the filing of a report "as soon as practicable,"[177] the Petitioning Creditors propose that the examiner be required to prepare and file a report (the "Report"), as required by 11 U.S.C. § 1106(a)(4), before any party is required to vote to accept or reject any plan of reorganization that includes a settlement or release of any claims based on the transactions and before the court considers any disposition or transaction involving the claims.[178]

Finally, the order appointing an examiner should direct the Debtor and all of its officers, directors, affiliates and subsidiaries to coordinate and cooperate with the examiner and other parties in interest in connection with the performance of the examiner's duties, including by producing to the examiner, as promptly as practicable, all documents and information relevant to the investigation that the examiner requests.

> **D.    The Examiner Should Be Granted Unfettered Access To Privileged Materials And Control Over The Debtor's Privileges With Respect To The Transactions Under Investigation.**

The Court's order appointing an examiner also should provide that the examiner has (a) unfettered access to documents and information otherwise subject to a privilege held by the Debtor or any of its subsidiaries, including the attorney-client privilege, and (b) the right to include such privileged information in the report provided to the Court, with a redacted copy to be made available to other interested parties.  The examiner should also be granted control over the privilege, including the right, in his or her discretion, to include otherwise privileged

---

[177]  11 U.S.C. § 1106(a)(4).

[178]  The range of time periods imposed in other recent cases involving investigations of comparable magnitude have ranged from 60 days in *Dynegy Holdings* (ECF No. 276, at 3), to 120 days for an initial report in *Enron* (ECF No. 2838, at 5), to six months in *ResCap* (ECF No. 925, Ex. A, at 5-6),

information in his publicly filed report, even if doing so could operate to waive any such privilege.[179]

Section 1106(b) explicitly empowers an examiner to perform the duties of a trustee under section 1106(a)(3) and (4), along with "any other duties of the trustee that the court orders the debtor in possession not to perform."[180]  In *Commodity Futures Trading Commission v. Weintraub*,[181] the Supreme Court held that the trustee controls the debtor's attorney-client privilege, including the right to waive such privilege.[182]  In so holding, the Court specifically cited to the trustee's duty under section 1106(a)(3) to investigate the debtor's financial affairs, along with the power to "to sue officers, directors, and other insiders to recover, on behalf of the estate, fraudulent or preferential transfers of the debtor's property."[183]  The Court explained that the trustee's performance of those duties would be "frustrated" and "thwarted" if management remained in control of the privilege:

> The rule suggested by respondents – that the debtor's directors have this power [to control the privilege] – would frustrate an important goal of the bankruptcy laws.  In seeking to maximize the value of the estate, the trustee must investigate the conduct of prior management to uncover and assert causes of action against the debtor's officers and directors.  ***It would often be extremely difficult to conduct this inquiry if the former management were allowed to control the corporation's attorney-client privilege and therefore to control access to the corporation's legal files.  To the extent that management had wrongfully diverted or appropriated corporate assets, it could use the privilege as a shield against the trustee's efforts to identify those assets.***  The Code's goal of

---

[179]  At a minimum, in addition to being granted access to all privileged materials and the right to include such materials in his or her report, the examiner should be authorized to seek approval of this Court to waive the privilege, if the examiner deems such waiver to be in the best interest of the estate

[180]  11 U.S.C. §1106(b).

[181]  471 U.S. 343 (1985).

[182]  *Id.* at 351-52.

[183]  *Id*. at 352.

> uncovering insider fraud would be substantially defeated if the debtor's directors were to retain the one management power *that might effectively thwart an investigation into their own conduct*.[184]

In response to arguments that a trustee could adequately investigate fraud without controlling the debtor's attorney-client privilege, under the crime-fraud exception or otherwise, the Court observed "[t]he problem . . . [of] making the threshold showing of fraud necessary to defeat the privilege. Without control over the privilege, the trustee might not be able to discover hidden assets or looting schemes, and therefore might not be able to make the necessary showing."[185]

The above rationale applies with equal force to an examiner appointed to perform the duties otherwise vested in a trustee under section 1106(a)(3) and (4) to investigate and report on the misconduct of current or former management. If allowed to control access to privileged documents and information, the Debtor's management could use the privilege as a "shield" to "frustrate" and "thwart" the examiner's investigation and report. The fact that section 1107 specifically excludes section 1106(a)(3) and (4) from the duties to be performed by a debtor-in-possession, coupled with the Court's decision in *Weintraub*, confirms that the Debtor's management should not retain any right or power to control the privilege with respect to the matters and causes of action to be investigated and pursued.

A number of courts have recognized that an examiner is entitled to access to privileged documents and has the right to waive the privilege. In *In re Boileau*,[186] decided prior to *Weintraub*, the Ninth Circuit held that an examiner with expanded powers had the authority to waive the privilege. Because of the facts of that case, the Ninth Circuit was not required to and

---

[184]  *Id*. at 353-54 (emphasis added, citations omitted).

[185]  *Id* at 354 (citation omitted).

[186]  736 F.2d 503 (9th Cir. 1984).

did not decide in *Boileau* whether an examiner with "customary duties" would also have authority to waive the privilege.  Other courts have granted examiners not exercising expanded powers access to privileged information and the power to waive the privilege.  For example, in *In re Enron Corp.*,[187] the bankruptcy court appointed an examiner to investigate various transactions and ordered the Debtors to provide the examiner with "all documents and information that the Enron Examiner deems relevant to discharge duties under this Order," without any exception for privileged materials.[188]  The court further granted the examiner the power to waive the privilege on a limited, issue-by-issue basis subject to consultation with the debtors and creditors' committee and, upon prompt objection, further court order:

> [T]he Examiner shall have the power to waive, on an issue-by-issue basis, the attorney-client privilege of the Debtors' estates with respect to pre-petition communications relating to matters to be investigated by the Examiner hereunder.  In making any such determination, the Examiner shall act in the best interests of the Debtors' estates after consultation with the Debtors and the Committee of Unsecured Creditors preserving the right in the Debtors and the Committee to make prompt objection to the Court on two business days' notice.  Such waiver shall be a limited and not a general waiver . . . .[189]

More recently, in *Dynegy Holdings*, the court ordered that the examiner's investigation would be "unfettered," and must include access to information designated as "privileged" or "work product" by the Debtors.[190]  The court further authorized the examiner to include "confidential or privileged material in any report submitted to the Court," with the caveat that the complete report would be filed under seal and, to the extent any party claimed privilege or confidentiality as to any portion of the report, a redacted copy would be transmitted to other

---

[187]  Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Apr. 9, 2002) (ECF No. 2838).

[188]  *Id*. at 2.

[189]  *Id*. at 3.

[190]  *In re Dynegy Holdings, LLC*, Case No. 11-38111-cgm (ECF No. 276)

parties and filed on the public docket.[191]  The order further provided that all privileges and protections, including the attorney-client privilege and work product doctrine, would "remain in full force and effect as to any information provided to the examiner . . . ."[192]

The protocols regarding privileged materials implemented by the courts in *Enron* and *Dynegy Holdings* appropriately balance, on the one hand, the need for an examiner and the Court to have "unfettered" access to privileged materials in a manner that does not "thwart" the examiner's investigative and reporting functions and, on the other hand, the need to protect privileged information from inadvertent waiver.  The Petitioning Creditors propose that this Court adopt similar protocols set forth in the proposed order attached as Exhibit A, which is consistent with those adopted in *Enron* and *Dynegy Holdings*.

## V.

### CONCLUSION

Based on the foregoing, the Petitioning Creditors respectfully request that the Court order the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code to investigate and prepare a report concerning the transactions identified in Section IV.C above, in the manner proposed therein, and that any such order provide that the examiner have unfettered access to documents and information subject to the attorney-client privilege, work-product doctrine and other privileges and be authorized to include such materials in the examiner's report.

---

[191]  *Id.* at 3.

[192]  *Id.* at 4.

Dated: January 12, 2015
          Wilmington, Delaware

Respectfully submitted,

*/s/ Robert F. Poppiti, Jr.*
Robert S. Brady  (No. 2847)
Edmon L. Morton  (No. 3856)
Robert F. Poppiti, Jr. (No. 5052)
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware  19801
Telephone:   (302) 571-6600
Facsimile:    (302) 571-1253

-and-

Bruce Bennett
James O. Johnston
Sidney P. Levinson
Joshua M. Mester
Monika S. Wiener
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:   (213) 489-3939
Facsimile:    (213) 243-2539

Attorneys for Appaloosa Investment Limited
Partnership I, OCM Opportunities Fund VI,
L.P. and Special Value Expansion Fund, LLC