**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CAESARS ENTERTAINMENT<br>OPERATING COMPANY, INC.,<br><br>              Alleged Debtor. | Chapter 11<br><br>Case No. 15-10047 (__) |

**DECLARATION OF JOSHUA M. MESTER IN SUPPORT OF**
**MOTION FOR APPOINTMENT OF EXAMINER WITH ACCESS**
**TO AND AUTHORITY TO DISCLOSE PRIVILEGED MATERIALS**

I, Joshua M. Mester, being duly sworn, state the following under penalty of perjury:

1.    I am a partner with the law firm Jones Day, located at 555 South Flower Street, 50th Floor, Los Angeles, California 90071.  I am a member in good standing of the Bar of the State of California.  There are no disciplinary proceedings pending against me.

2.    Attached hereto as <u>Exhibit 1</u> is a true and correct copy of the Indenture, dated as of April 15, 2009, between Harrah's Operating Company, Inc., as Issuer and Harrah's Entertainment, Inc., as Parent Guarantor.

3.    Attached hereto as <u>Exhibit 3</u> is a true and correct copy of excerpts of the Caesars Entertainment Corporation's 10-K for the Fiscal Year Ended December 31, 2013, filed on March 17, 2014.

4.    Attached hereto as <u>Exhibit 4</u> is a true and correct copy of excerpts of Caesars Entertainment Corporation's 10-Q for the Quarterly Period Ended September 20, 2014, filed on November 14, 2014.

5.    Attached hereto as <u>Exhibit 5</u> is a true and correct copy of "An Emergent Model in a Recovering Industry," dated May 2011, from the 2011 UBS Leveraged Finance Conference.

6.    Attached hereto as <u>Exhibit 6</u> is a true and correct copy of the Complaint, filed

on August 5, 2014 in *Caesars Entertainment Operating Company, Inc v. Appaloosa Investment Limited Partnership I*, Index No. 652392/2014 (N.Y. Sup. Ct. Aug. 5, 2014).

7.      Attached hereto as <u>Exhibit 7</u> is a true and correct copy of the "Caesars New York Presentation to New York State Gaming Commission," dated September 9, 2014.

8.      Attached hereto as <u>Exhibit 9</u> is a true and correct copy of Exhibit 21 to Caesars Entertainment Corporation's 10-K for the Fiscal Year Ended December 31, 2010, filed on March 4, 2011 (List of Subsidiaries as of March 4, 2011).

9.      Attached hereto as <u>Exhibit 10</u> is a true and correct copy of Caesars Entertainment Corporation's Second Quarter 2014 Earnings Announcement, dated August 11, 2014.

10.      Attached hereto as <u>Exhibit 11</u> is a true and correct copy of excerpts of Caesars Entertainment Corporation's 10-K for the Fiscal Year Ended December 31, 2011, filed on March 15, 2012.

11.      Attached hereto as <u>Exhibit 12</u> is a true and correct copy of the Amended and Supplemental Complaint, filed on September 15, 2014 in *Caesars Entertainment Operating Company, Inc v. Appaloosa Investment Limited Partnership I*, Index No. 652392/2014 (N.Y. Sup. Ct. Aug. 5, 2014).

12.      Attached hereto as <u>Exhibit 13</u> is a true and correct copy of excerpts of Caesars Acquisition Company's 10-K for the Fiscal Year Ended December 31, 2013, filed on March 28, 2014.

13.      Attached hereto as <u>Exhibit 14</u> is a true and correct copy of the "Harrah's Entertainment, Inc. 2010 Investor Presentation."

14.      Attached hereto as <u>Exhibit 15</u> is a true and correct copy of Exhibit 21 to Caesars Entertainment Corporation's S-4 Registration Statement, filed on March 17, 2011 (the List of Subsidiaries as of March 4, 2011).

15.      Attached hereto as <u>Exhibit 16</u> is a true and correct copy of Exhibit 21 to Caesars Entertainment Corporation's S-1 Registration Statement, filed on November 15,

2011 (the List of Subsidiaries as of November 1, 2011).

16.     Attached hereto as <u>Exhibit 17</u> is a true and correct copy of Exhibit 10.1 to Caesars Entertainment Corporation's 8-K, filed on October 23, 2013 (the Transaction Agreement).

17.     Attached hereto as <u>Exhibit 18</u> is a true and correct copy of Exhibit 99.1 to Caesars Acquisition Company's 8-K, filed on November 10, 2014 (Press Release).

18.     Attached hereto as <u>Exhibit 19</u> is a true and correct copy of "Project Linq + Octavius Tower Financing Presentation," dated February 25, 2011.

19.     Attached hereto as <u>Exhibit 22</u> is a true and correct copy of Exhibit 10.3 to Caesars Entertainment Corporation's 8-K, filed on October 23, 2013 (the Management Services Agreement).

20.     Attached hereto as <u>Exhibit 23</u> is a true and correct copy of Caesars Entertainment Corporation's 8-K, filed on October 23, 2013.

21.     Attached hereto as <u>Exhibit 24</u> is a true and correct copy of Exhibit 2.1 to Caesars Entertainment Corporation's 8-K, filed on March 3, 2014 (the Transaction Agreement).

22.     Attached hereto as <u>Exhibit 25</u> is a true and correct copy of the Transcript from the April 24, 2014 Meeting of the Board of Directors of the Louisiana Gaming Control Board.

23.     Attached hereto as <u>Exhibit 26</u> is a true and correct copy of Exhibit 99.1 to Caesars Entertainment Corporation's 8-K, filed on May 21, 2014 (the Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC).

24.     Attached hereto as <u>Exhibit 27</u> is a true and correct copy of Exhibit 2.1 to Caesars Entertainment Corporation's 8-K, filed on May 21, 2014 (the Omnibus License and Enterprise Services Agreement).

25.     Attached hereto as <u>Exhibit 28</u> is a true and correct copy of excerpts from the Verified Complaint, filed on November 25, 2014 in *UMB Bank v. Caesars Entertainment*

*Corp.*, C.A. No. 10393-VCG (Del. Ch. Nov. 25, 2014).

26.     Attached hereto as <u>Exhibit 29</u> is a true and correct copy of Exhibit 99.1 to Caesars Entertainment Corporation's 8-K, filed on June 27, 2014 (Press Release).

27.     Attached hereto as <u>Exhibit 30</u> is a true and correct copy of Caesars Entertainment Corporation's 8-K, filed on August 12, 2014.

28.     Attached hereto as <u>Exhibit 31</u> is a true and correct copy of Caesars Entertainment Corporation's 8-K, filed on August 22, 2014.

29.     Attached hereto as <u>Exhibit 32</u> is a true and correct copy of Exhibit 10.7 to Caesars Entertainment Operating Company, Inc.'s 10-Q for the Quarterly Period Ended September 30, 2014, filed on November 14, 2014 (Amendment to Amended and Restated Credit Agreement).

30.     Attached hereto as <u>Exhibit 33</u> is a true and correct copy of Caesars Entertainment Operating Company, Inc.'s 8-K, filed on June 27, 2014.

31.     Attached hereto as <u>Exhibit 34</u> is a true and correct copy of the Caesars Entertainment Operating Company, Inc. Press Release, dated July 30, 2014.

32.     Attached hereto as <u>Exhibit 35</u> is a true and correct copy of Exhibit 10.1 to the Caesars Entertainment Operating Company, Inc. 8-K filed on December 31, 2014 (Amended and Restated Restructuring Support and Forbearance Agreement), omitting certain exhibits.

33.     Attached hereto as <u>Exhibit 36</u> is a true and correct copy of Exhibit 99.1 to Caesars Acquisition Company's 8-K, filed on May 7, 2014 (Press Release).

34.     Attached hereto as <u>Exhibit 37</u> is a true and correct copy of excerpts of Caesars Acquisition Company's S-1/A, filed on August 20, 2013.

35.     Attached hereto as <u>Exhibit 38</u> is a true and correct copy of "Caesars Entertainment Discussion Materials – November 2014."

36.     Attached hereto as Exhibit 39 is a true and correct copy of the Loyalty360.org article "Big Data Means Big Benefits for Entertainment: Caesars Exec", dated February 20, 2013.

37.     Attached hereto as Exhibit 40 is a true and correct copy of "Caesars Entertainment Corporation Presentation from the Bank of America 2013 Leveraged Finance Conference," dated December 4, 2013.

38.     Attached hereto as Exhibit 41 is a true and correct copy of the "Caesars Growth Partners Confidential Information Memorandum, Public Version," dated March 2014.

39.     Attached hereto as Exhibit 42 is a true and correct copy of Exhibit 99.1 to Caesars Entertainment Corporation's 8-K, filed on September 19, 2013 (the Executive Summary).

40.     Attached hereto as Exhibit 43 is a true and correct copy of Exhibit 99.1 to Caesars Acquisition Company's 8-K, filed on March 26, 2014 (the Executive Summary).

41.     Attached hereto as Exhibit 45 is a true and correct copy of the Moody's Investors Service Press Release, dated March 28, 2014.

42.     Attached hereto as Exhibit 46 is a true and correct copy of the S&P Capital IQ Research Update: Caesars Entertainment Corp. Ratings Lowered to 'CCC-'; Outlook Negative on Unsustainable Capital Structure, dated April 8, 2014.

43.     Attached hereto as Exhibit 47 is a true and correct copy of Exhibit 99.1 to Caesars Entertainment Operating Company, Inc.'s 8-K, filed on November 10, 2014 (Press Release).

44.     Attached hereto as Exhibit 48 is a true and correct copy of Caesars Entertainment Corporation's 8-K, filed on May 6, 2014.

45.     Attached hereto as Exhibit 49 is a true and correct copy of excerpts of Caesars Acquisition Company's 10-Q for the Quarterly Period Ended September 30, 2014, filed on November 14, 2014.

46.     Attached hereto as <u>Exhibit 50</u> is a true and correct copy of Exhibit 99.3 to Caesars Entertainment Corporation's 8-K, filed on May 6, 2014 (Press Release).

47.     Attached hereto as <u>Exhibit 51</u> is a true and correct copy of the Stockton College article "Stockton Signs Letter of Intent to Purchase Showboat Atlantic City from Caesars Entertainment", dated November 12, 2014.

48.     Attached hereto as <u>Exhibit 52</u> is a true and correct copy of the Stockton College article "Stockton College to Convert Former Showboat Casino into Branch Campus in Atlantic City", dated December 12, 2014.

49.     Attached hereto as <u>Exhibit 53</u> is a true and correct copy of the Atlantic City Showboat, Inc. Quarterly Report for the Quarter Ended December 31, 2012.

50.     Attached hereto as <u>Exhibit 54</u> is a true and correct copy of the Atlantic City Showboat, Inc. Quarterly Report for the Quarter Ended December 31, 2013.

51.     Attached hereto as <u>Exhibit 56</u> is a true and correct copy of Caesars Entertainment Corporation's 8-K filed November 12, 2014.

52.     Attached hereto as <u>Exhibit 57</u> is a copy of the transcript of Caesars Entertainment Corporation's Third Quarter 2014 Earnings call on November 10, 2014.

53.     Attached hereto as <u>Exhibit 58</u> is a true and correct copy of the press release by Fitch Ratings dated September 17, 2014.

54.     Attached hereto as <u>Exhibit 59</u> is a true and correct copy of the Caesars Entertainment Corporation Press Release, dated November 10, 2014.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: January 11, 2015

Joshua M. Mester

LAI-383228181v3

# **EXHIBIT 1**

EX-4.1 2 dex41.htm INDENTURE, DATED AS OF APRIL 15, 2009

**Exhibit 4.1**

**HARRAH'S OPERATING COMPANY, INC.**
as Issuer
and
**HARRAH'S ENTERTAINMENT, INC.**
as Parent Guarantor

10.00% Second-Priority Senior Secured Notes due 2018

———————————

INDENTURE

Dated as of April 15, 2009

———————————

U.S. Bank National Association,
as Trustee

and

U.S. Bank National Association,
as Collateral Agent

TABLE OF CONTENTS

|  |  | **Page** |
|---|---|---|
| | ARTICLE I | |
| | DEFINITIONS AND INCORPORATION BY REFERENCE | 1 |
| Section 1.01. | Definitions | 1 |
| Section 1.02. | Other Definitions | 44 |
| Section 1.03. | Incorporation by Reference of Trust Indenture Act | 46 |
| Section 1.04. | Rules of Construction | 46 |
| | ARTICLE II | |
| | THE NOTES | 47 |
| Section 2.01. | Amount of Notes | 47 |
| Section 2.02. | Form and Dating | 48 |
| Section 2.03. | Execution and Authentication | 48 |
| Section 2.04. | Registrar and Paying Agent | 49 |
| Section 2.05. | Paying Agent to Hold Money in Trust | 50 |
| Section 2.06. | Holder Lists | 50 |
| Section 2.07. | Transfer and Exchange | 50 |
| Section 2.08. | Replacement Notes | 51 |
| Section 2.09. | Outstanding Notes | 51 |
| Section 2.10. | Temporary Notes | 52 |
| Section 2.11. | Cancellation | 52 |
| Section 2.12. | Defaulted Interest | 52 |
| Section 2.13. | CUSIP Numbers, ISINs, Etc. | 52 |
| Section 2.14. | Calculation of Principal Amount of Notes | 52 |
| Section 2.15. | Mandatory Disposition Pursuant to Gaming Laws | 53 |
| | ARTICLE III | |
| | REDEMPTION | 53 |

| | | |
|---|---|---|
| Section 3.01. | Redemption | 53 |
| Section 3.02. | Applicability of Article | 53 |
| Section 3.03. | Notices to Trustee | 54 |
| Section 3.04. | Selection of Notes to Be Redeemed | 54 |
| Section 3.05. | Notice of Optional Redemption | 54 |
| Section 3.06. | Effect of Notice of Redemption | 55 |
| Section 3.07. | Deposit of Redemption Price | 55 |
| Section 3.08. | Notes Redeemed in Part | 55 |

ARTICLE IV
COVENANTS                                                                                                   56

| | | |
|---|---|---|
| Section 4.01. | Payment of Notes | 56 |
| Section 4.02. | Reports and Other Information | 56 |

TABLE OF CONTENTS
(cont'd)

| | | Page |
|---|---|---|
| Section 4.03. | Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock | 58 |
| Section 4.04. | Limitation on Restricted Payments | 64 |
| Section 4.05. | Dividend and Other Payment Restrictions Affecting Subsidiaries | 70 |
| Section 4.06. | Asset Sales | 72 |
| Section 4.07. | Transactions with Affiliates | 76 |
| Section 4.08. | Change of Control | 79 |
| Section 4.09. | Compliance Certificate | 80 |
| Section 4.10. | Further Instruments and Acts | 81 |
| Section 4.11. | Future Subsidiary Pledgors; Future Subsidiary Guarantors | 81 |
| Section 4.12. | Liens | 82 |
| Section 4.13. | After-Acquired Property | 83 |
| Section 4.14. | Maintenance of Office or Agency | 83 |
| Section 4.15. | Amendment of Security Documents | 84 |
| Section 4.16. | Covenant Suspension | 84 |
| Section 4.17. | Maintenance of Insurance | 85 |

ARTICLE V
SUCCESSOR COMPANY                                                                                   85

| | | |
|---|---|---|
| Section 5.01. | When Issuer May Merge or Transfer Assets | 85 |

ARTICLE VI
DEFAULTS AND REMEDIES                                                                            88

| | | |
|---|---|---|
| Section 6.01. | Events of Default | 88 |
| Section 6.02. | Acceleration | 90 |
| Section 6.03. | Other Remedies | 91 |
| Section 6.04. | Waiver of Past Defaults | 91 |
| Section 6.05. | Control by Majority | 91 |
| Section 6.06. | Limitation on Suits | 91 |
| Section 6.07. | Rights of the Holders to Receive Payment | 92 |
| Section 6.08. | Collection Suit by Trustee | 92 |
| Section 6.09. | Trustee May File Proofs of Claim | 92 |
| Section 6.10. | Priorities | 93 |
| Section 6.11. | Undertaking for Costs | 93 |
| Section 6.12. | Waiver of Stay or Extension Laws | 93 |

ARTICLE VII
TRUSTEE                                                                                                       93

| | | |
|---|---|---|
| Section 7.01. | Duties of Trustee | 93 |

| | | |
|---|---|---:|
| Section 7.02. | Rights of Trustee | 95 |
| Section 7.03. | Individual Rights of Trustee | 96 |
| Section 7.04. | Trustee's Disclaimer | 97 |

ii

---

## TABLE OF CONTENTS
### (cont'd)

| | | Page |
|---|---|---:|
| Section 7.05. | Notice of Defaults | 97 |
| Section 7.06. | Reports by Trustee to the Holders | 97 |
| Section 7.07. | Compensation and Indemnity | 97 |
| Section 7.08. | Replacement of Trustee | 98 |
| Section 7.09. | Successor Trustee by Merger | 99 |
| Section 7.10. | Eligibility; Disqualification | 100 |
| Section 7.11. | Preferential Collection of Claims Against the Issuer | 100 |

### ARTICLE VIII
### DISCHARGE OF INDENTURE; DEFEASANCE

| | | 100 |
|---|---|---:|
| Section 8.01. | Discharge of Liability on Notes; Defeasance | 100 |
| Section 8.02. | Conditions to Defeasance | 101 |
| Section 8.03. | Application of Trust Money | 102 |
| Section 8.04. | Repayment to Issuer | 103 |
| Section 8.05. | Indemnity for U.S. Government Obligations | 103 |
| Section 8.06. | Reinstatement | 103 |

### ARTICLE IX
### AMENDMENTS AND WAIVERS

| | | 103 |
|---|---|---:|
| Section 9.01. | Without Consent of the Holders | 103 |
| Section 9.02. | With Consent of the Holders | 105 |
| Section 9.03. | Compliance with Trust Indenture Act | 106 |
| Section 9.04. | Revocation and Effect of Consents and Waivers | 106 |
| Section 9.05. | Notation on or Exchange of Notes | 106 |
| Section 9.06. | Trustee to Sign Amendments | 107 |
| Section 9.07. | Additional Voting Terms; Calculation of Principal Amount | 107 |

### ARTICLE X
### RANKING OF NOTE LIENS

| | | 107 |
|---|---|---:|
| Section 10.01. | Relative Rights | 107 |

### ARTICLE XI
### COLLATERAL

| | | 108 |
|---|---|---:|
| Section 11.01. | Security Documents | 108 |
| Section 11.02. | Collateral Agent | 109 |
| Section 11.03. | Authorization of Actions to Be Taken | 110 |
| Section 11.04. | Release of Liens | 111 |
| Section 11.05. | Filing, Recording and Opinions | 114 |
| Section 11.06. | [Intentionally omitted] | 114 |
| Section 11.07. | Powers Exercisable by Receiver or Trustee | 114 |

iii

---

## TABLE OF CONTENTS
### (cont'd)

|  |  | Page |
|---|---|---|
| Section 11.08. | Release Upon Termination of the Issuer's Obligations | 114 |
| Section 11.09. | Designations | 115 |
| Section 11.10. | Taking and Destruction | 115 |

ARTICLE XII
GUARANTEE

|  |  | 115 |
|---|---|---|
| Section 12.01. | Guarantee | 115 |
| Section 12.02. | Limitation on Liability | 117 |
| Section 12.03. | Successors and Assigns | 118 |
| Section 12.04. | No Waiver | 119 |
| Section 12.05. | Modification | 119 |
| Section 12.06. | Execution of Supplemental Indenture for Future Note Guarantors | 119 |
| Section 12.07. | Non-Impairment | 119 |

ARTICLE XIII
MISCELLANEOUS

|  |  | 120 |
|---|---|---|
| Section 13.01. | Trust Indenture Act Controls | 120 |
| Section 13.02. | Notices | 120 |
| Section 13.03. | Communication by the Holders with Other Holders | 120 |
| Section 13.04. | Certificate and Opinion as to Conditions Precedent | 121 |
| Section 13.05. | Statements Required in Certificate or Opinion | 121 |
| Section 13.06. | When Notes Disregarded | 121 |
| Section 13.07. | Rules by Trustee, Paying Agent and Registrar | 121 |
| Section 13.08. | Legal Holidays | 122 |
| Section 13.09. | GOVERNING LAW | 122 |
| Section 13.10. | No Recourse Against Others | 122 |
| Section 13.11. | Successors | 122 |
| Section 13.12. | Multiple Originals | 122 |
| Section 13.13. | Table of Contents; Headings | 122 |
| Section 13.14. | Indenture Controls | 122 |
| Section 13.15. | Severability | 122 |
| Section 13.16. | Intercreditor Agreement | 122 |

| Appendix A | – | Provisions Relating to Initial Notes, Additional Notes and Exchange Notes |

EXHIBIT INDEX

| Exhibit A | – | Form of Initial Note |
|---|---|---|
| Exhibit B | – | Form of Exchange Note |
| Exhibit C | – | Form of Transferee Letter of Representation |
| Exhibit D | – | Form of Supplemental Indenture |

iv

CROSS-REFERENCE TABLE

| TIA Section | | Indenture Section |
|---|---|---|
| 310 (a)(1) | | 7.10 |
| (a)(2) | | 7.10 |
| (a)(3) | | N.A. |
| (a)(4) | | N.A. |
| (b) | | 7.08; 7.10 |
| (c) | | N.A. |
| 311 (a) | | 7.11 |
| (b) | | 7.11 |
| (c) | | N.A. |
| 312 (a) | | 2.06 |

| | |
|---|---|
| (b) | 13.03 |
| (c) | 13.03 |
| 313 (a) | 7.06 |
| (b)(1) | N.A. |
| (b)(2) | 7.06 |
| (c) | 7.06 |
| (d) | 4.02; 4.09 |
| 314 (a) | 4.02; 4.09 |
| (b) | N.A. |
| (c)(1) | 13.04 |
| (c)(2) | 13.04 |
| (c)(3) | N.A. |
| (d) | N.A. |
| (e) | 13.05 |
| (f) | 4.10 |
| 315 (a) | 7.01 |
| (b) | 7.05 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.11 |
| 316 (a)(last sentence) | 13.06 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| 317 (a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.05 |
| 318 (a) | 13.01 |

N.A. Means Not Applicable.

Note:  This Cross-Reference Table shall not, for any purposes, be deemed to be part of this Indenture.

---

INDENTURE dated as of April 15, 2009 among HARRAH'S OPERATING COMPANY, INC., a Delaware corporation (the "Issuer"), HARRAH'S ENTERTAINMENT, INC., a Delaware corporation (the "Parent Guarantor"), U.S. BANK NATIONAL ASSOCIATION, as trustee (the "Trustee"), and U.S. BANK NATIONAL ASSOCIATION, as Collateral Agent.

Each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the holders of (i) $3,705,498,000 aggregate principal amount of the Issuer's 10.00% Second-Priority Senior Secured Notes due 2018 issued on the date hereof (the "Initial Notes"), (ii) exchange notes issued in exchange for the Initial Notes pursuant to the Registration Rights Agreement or pursuant to an effective registration statement under the Securities Act (the "Exchange Notes") and (iii) Additional Notes issued from time to time as either Initial Notes or Exchange Notes (together with the Initial Notes and any Exchange Notes, the "Notes"):

## ARTICLE I

## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01. Definitions.

"Acquired Indebtedness" means, with respect to any specified Person:

(1) Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person, and

(2) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"Acquisition" means the acquisition by Affiliates of the Sponsors of substantially all of the outstanding shares of capital stock of Harrah's Entertainment, Inc., pursuant to the Merger Agreement.

"Acquisition Documents" means the Merger Agreement and any other document entered into in connection therewith, in each case as amended, supplemented or modified from time to time prior to the Issue Date or thereafter.

"Acquisition Transactions" means the transactions described in the Offering Memorandum under the section titled "Acquisition Transactions."

"Additional Notes" means Notes issued under the terms of this Indenture subsequent to the Issue Date.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"Applicable Premium" means, with respect to any Note on any applicable redemption date, the greater of:

(1) 1% of the then outstanding principal amount of the Note; and

(2) the excess of:

(a) the present value at such redemption date of (i) the redemption price of the Note at December 15, 2013 (such redemption price being set forth in Paragraph 5 of the Note) *plus* (ii) all required interest payments due on the Note through December 15, 2013 (excluding accrued but unpaid interest), computed using a discount rate equal to the Treasury Rate as of such redemption date *plus* 50 basis points; over

(b) the then outstanding principal amount of the Note.

"Asset Sale" means:

(1) the sale, conveyance, transfer or other disposition (whether in a single transaction or a series of related transactions) of property or assets (including by way of a Sale/ Leaseback Transaction) outside the ordinary course of business of the Issuer or any Restricted Subsidiary of the Issuer (each referred to in this definition as a "disposition") or

(2) the issuance or sale of Equity Interests (other than directors' qualifying shares and shares issued to foreign nationals or other third parties to the extent required by applicable law) of any Restricted Subsidiary (other than to the Issuer or another Restricted Subsidiary of the Issuer) (whether in a single transaction or a series of related transactions),

in each case other than:

(a) a disposition of Cash Equivalents or Investment Grade Securities or obsolete, damaged or worn out property or equipment in the ordinary course of business;

(b) the disposition of all or substantially all of the assets of the Issuer in a manner permitted pursuant to Section 5.01 or any disposition that constitutes a Change of Control;

(c) any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under Section 4.04;

2

(d) any disposition of assets of the Issuer or any Restricted Subsidiary or issuance or sale of Equity Interests of any Restricted Subsidiary, which assets or Equity Interests so disposed or issued have an aggregate Fair Market Value (as determined in good faith by the Issuer) of less than $50.0 million;

(e) any disposition of property or assets, or the issuance of securities, by a Restricted Subsidiary of the Issuer to the Issuer or by the Issuer or a Restricted Subsidiary of the Issuer to a Restricted Subsidiary of the Issuer;

(f) any exchange of assets (including a combination of assets and Cash Equivalents) for assets related to a Similar Business of comparable or greater market value or usefulness to the business of the Issuer and its Restricted Subsidiaries as a whole, as determined in good faith by the Issuer;

(g) foreclosure or any similar action with respect to any property or other asset of the Issuer or any of its Restricted Subsidiaries;

(h) any sale of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary;

(i) the lease, assignment or sublease of any real or personal property in the ordinary course of business;

(j) any sale of inventory or other assets in the ordinary course of business;

(k) any grant in the ordinary course of business of any license of patents, trademarks, know-how or any other intellectual property;

(l) in the ordinary course of business, any swap of assets, or lease, assignment or sublease of any real or personal property, in exchange for services (including in connection with any outsourcing arrangements) of comparable or greater value or usefulness to the business of the Issuer and its Restricted Subsidiaries as a whole, as determined in good faith by the Issuer;

(m) a transfer of accounts receivable and related assets of the type specified in the definition of "Receivables Financing" (or a fractional undivided interest therein) by a Receivables Subsidiary in a Qualified Receivables Financing;

(n) any financing transaction with respect to property built or acquired by the Issuer or any Restricted Subsidiary after the Issue Date, including any Sale/Leaseback Transaction or asset securitization permitted by this Indenture;

(o) dispositions in connection with Permitted Liens;

3

(p) any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Issuer or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and in each case comprising all or a portion of the consideration in respect of such sale or acquisition;

(q) any disposition made pursuant to an Operations Management Agreement;

(r) the sale of any property in a Sale/Leaseback Transaction within six months of the acquisition of such property;

(s) dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements; and

(t) any surrender or waiver of contract rights or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind.

"Bank Indebtedness" means any and all amounts payable under or in respect of the Credit Agreement and the other Credit Agreement Documents as amended, restated, supplemented, waived, replaced, restructured, repaid, refunded, refinanced or otherwise modified from time to time (including after termination of the Credit Agreement), including principal, premium (if any), interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Issuer whether or not a claim for post-filing interest is allowed in such proceedings), fees, charges, expenses, reimbursement obligations, guarantees and all other amounts payable thereunder or in respect thereof.

"Board of Directors" means, as to any Person, the board of directors or managers, as applicable, of such Person (or, if such Person is a partnership, the board of directors or other governing body of the general partner of such Person) or any duly authorized committee thereof.

"Business Day" means a day other than a Saturday, Sunday or other day on which banking institutions are authorized or required by law to close in New York City.

"Capital Stock" means:

(1) in the case of a corporation, corporate stock or shares;

(2) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

4

(4) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Capitalized Lease Obligation" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"Capitalized Software Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Restricted Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of such Person and such Restricted Subsidiaries.

"Cash Equivalents" means:

(1) U.S. dollars, pounds sterling, euros, the national currency of any member state in the European Union or, in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

(2) securities issued or directly and fully guaranteed or insured by the U.S. government or any country that is a member of the European Union or any agency or instrumentality thereof in each case maturing not more than two years from the date of acquisition;

(3) certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition,

bankers' acceptances, in each case with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus in excess of $250.0 million and whose long-term debt is rated "A" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency);

(4) repurchase obligations for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5) commercial paper issued by a corporation (other than an Affiliate of the Issuer) rated at least "A-1" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) and in each case maturing within one year after the date of acquisition;

(6) readily marketable direct obligations issued by any state of the United States of America or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

5

(7) Indebtedness issued by Persons (other than the Sponsors or any of their Affiliates) with a rating of "A" or higher from S&P or "A-2" or higher from Moody's (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition; and

(8) investment funds investing at least 95% of their assets in securities of the types described in clauses (1) through (7) above.

"Change of Control" means the occurrence of either of the following:

(1) the sale, lease or transfer, in one or a series of related transactions, of all or substantially all the assets of the Issuer and its Subsidiaries, taken as a whole, to a Person other than any of the Permitted Holders; or

(2) the Issuer becomes aware (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) of the acquisition by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), including any group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act), other than any of the Permitted Holders, in a single transaction or in a related series of transactions, by way of merger, consolidation, amalgamation or other business combination or purchase of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision), of more than 50% of the total voting power of the Voting Stock of (prior to a Qualified IPO or upon or after an Issuer IPO) the Issuer or (upon or after a Holdco Qualified IPO) the Holdco Issuer.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all property subject or purported to be subject, from time to time, to a Lien under any Security Documents.

"Collateral Agent" means U.S. Bank National Association in its capacity as "Collateral Agent" under this Indenture and under the Security Documents and any successor thereto in such capacity.

"Collateral Agreement" means the collateral agreement among the Issuer, each Subsidiary Pledgor and U.S. Bank National Association, as Collateral Agent, dated as of December 24, 2008, as supplemented by the additional secured party consent by the Trustee, as Authorized Representative, and acknowledged by the Issuer and the Collateral Agent, dated as of the date hereof, and as it may be further amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, and this Indenture and the Indenture governing the Existing Second Lien Notes.

6

"Consolidated Depreciation and Amortization Expense" means, with respect to any Person for any period, the total amount of depreciation and amortization expense, including the amortization of intangible assets, deferred financing fees and Capitalized Software Expenditures and amortization of unrecognized prior service costs and actuarial gains and losses related to pensions and other post-employment benefits, of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"Consolidated Interest Expense" means, with respect to any Person for any period, the sum, without duplication, of:

(1) consolidated interest expense of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted in computing Consolidated Net Income (including amortization of original issue discount, the interest component of Capitalized Lease Obligations, and net payments and receipts (if any) pursuant to interest rate Hedging Obligations and excluding additional interest in respect of the Notes, amortization of deferred financing fees, debt issuance costs, commissions, fees and expenses and expensing of any bridge, commitment or other financing fees); *plus*

(2) consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued; *plus*

(3) commissions, discounts, yield and other fees and charges Incurred in connection with any Receivables Financing which are payable

to Persons other than the Issuer and its Restricted Subsidiaries; *minus*

(4) interest income for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by the Issuer to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"Consolidated Leverage Ratio" means, with respect to any Person, at any date the ratio of (i) Indebtedness (other than Qualified Non-Recourse Debt) of such Person and its Restricted Subsidiaries as of such date of calculation (determined on a consolidated basis in accordance with GAAP) less the amount of cash and Cash Equivalents in excess of any Restricted Cash that would be stated on the balance sheet of such Person and its Restricted Subsidiaries and held by such Person and its Restricted Subsidiaries as of such date of determination to (ii) EBITDA of such Person for the four full fiscal quarters for which internal financial statements are available immediately preceding such date on which such additional Indebtedness is Incurred. In the event that the Issuer or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness subsequent to the commencement of the period for which the Consolidated Leverage Ratio is being calculated but prior to the event for which the calculation of the Consolidated Leverage Ratio is made (the "Consolidated Leverage Calculation Date"), then the Consolidated Leverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness as if the same

7

had occurred at the beginning of the applicable four-quarter period; *provided* that the Issuer may elect pursuant to an Officer's Certificate delivered to the Trustee to treat all or any portion of the commitment under any Indebtedness as being Incurred at such time, in which case any subsequent Incurrence of Indebtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions) and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Issuer or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Consolidated Leverage Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions), discontinued operations and other operational changes (and the change of any associated Indebtedness and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Consolidated Leverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period. For purposes of making the computation referred to above, with respect to each New Project that commences operations and records not less than one full fiscal quarter's operations during the four-quarter reference period, the operating results of such New Project will be annualized on a straight-line basis during such period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Issuer. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Issuer as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event (including, to the extent applicable, from the Acquisition Transactions) and (2) all adjustments of the nature used in connection with the calculation of "Adjusted EBITDA" as set forth in "Debt Covenant Compliance" in Exhibit 99.1 to the Quarterly Report on Form 10-Q for the nine months ended September 30, 2008 for Harrah's Entertainment to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

For purposes of this definition, any amount in a currency other than U.S. dollars will be converted to U.S. dollars based on the average exchange rate for such currency for the most recent twelve month period immediately prior to the date of determination in a manner consistent with that used in calculating EBITDA for the applicable period.

8

"Consolidated Net Income" means, with respect to any Person for any period, the aggregate of the Net Income of such Person and its Restricted Subsidiaries for such period, on a consolidated basis; *provided, however,* that:

(1) any net after-tax extraordinary, nonrecurring or unusual gains or losses (less all fees and expenses relating thereto) or expenses or charges, any severance expenses, relocation expenses, curtailments or modifications to pension and post-retirement employee benefit plans, any expenses related to any reconstruction, decommissioning, recommissioning or reconfiguration of fixed assets for alternate uses and fees, expenses or charges relating to facilities closing costs, acquisition integration costs, facilities opening costs, project start-up costs, business optimization costs, signing, retention or completion bonuses, expenses or charges related to any issuance of Equity Interests, Investment,

acquisition, disposition, recapitalization or issuance, repayment, refinancing, amendment or modification of Indebtedness (in each case, whether or not successful), and any fees, expenses, charges or change in control payments made under the Acquisition Documents or otherwise related to the Acquisition Transactions or the Transactions, in each case, shall be excluded;

(2) effects of purchase accounting adjustments (including the effects of such adjustments pushed down to such Person and such Restricted Subsidiaries) in amounts required or permitted by GAAP, resulting from the application of purchase accounting in relation to the Acquisition Transactions or any consummated acquisition or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded;

(3) the Net Income for such period shall not include the cumulative effect of a change in accounting principles during such period;

(4) any net after-tax income or loss from disposed, abandoned, transferred, closed or discontinued operations and any net after-tax gains or losses on disposal of disposed, abandoned, transferred, closed or discontinued operations shall be excluded;

(5) any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course of business (as determined in good faith by management of the Issuer) shall be excluded;

(6) any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of indebtedness, Hedging Obligations or other derivative instruments shall be excluded;

(7) the Net Income for such period of any Person that is not a Subsidiary of such Person, or is an Unrestricted Subsidiary or a Qualified Non-Recourse Subsidiary, or that is accounted for by the equity method of accounting, shall be included only to the extent of the amount of dividends or distributions or other payments paid in cash (or to the extent converted into cash) to the referent Person or a Restricted Subsidiary thereof (other than a Qualified Non-Recourse Subsidiary of such referent Person) in respect of such period;

9

(8) solely for the purpose of determining the amount available for Restricted Payments under clause (1) of the definition of "Cumulative Credit," the Net Income for such period of any Restricted Subsidiary (other than any Subsidiary Pledgor) shall be excluded to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary of its Net Income is not at the date of determination permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders, unless such restrictions with respect to the payment of dividends or similar distributions have been legally waived; *provided* that the Consolidated Net Income of such Person shall be increased by the amount of dividends or other distributions or other payments actually paid in cash (or converted into cash) by any such Restricted Subsidiary to such Person, to the extent not already included therein;

(9) an amount equal to the amount of Tax Distributions actually made to any parent or equity holder of such Person in respect of such period in accordance with Section 4.04(b)(xii) shall be included as though such amounts had been paid as income taxes directly by such Person for such period;

(10) any impairment charges or asset write-offs, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP shall be excluded;

(11) any non-cash expense realized or resulting from stock option plans, employee benefit plans or post-employment benefit plans, or grants or sales of stock, stock appreciation or similar rights, stock options, restricted stock, preferred stock or other rights, shall be excluded;

(12) any (a) one-time non-cash compensation charges, (b) costs and expenses after the Issue Date related to employment of terminated employees, or (c) costs or expenses realized in connection with or resulting from stock appreciation or similar rights, stock options or other rights existing on the Issue Date of officers, directors and employees, in each case of such Person or any of its Restricted Subsidiaries, shall be excluded;

(13) accruals and reserves that are established or adjusted within 12 months after the Issue Date and that are so required to be established or adjusted in accordance with GAAP or as a result of adoption or modification of accounting policies shall be excluded;

(14) solely for purposes of calculating EBITDA, (a) the Net Income of any Person and its Restricted Subsidiaries shall be calculated without deducting the income attributable to, or adding the losses attributable to, the minority equity interests of third parties in any non-Wholly Owned Restricted Subsidiary except to the extent of dividends declared or paid in respect of such period or any prior period on the shares of Capital Stock of such Restricted Subsidiary held by such third parties and (b) any ordinary course dividend, distribution or other payment paid in cash and received from any Person in excess of amounts included in clause (7) above shall be included;

10

(15) (a)(i) the non-cash portion of "straight-line" rent expense shall be excluded and (ii) the cash portion of "straight-line" rent expense which exceeds the amount expensed in respect of such rent expense shall be included and (b) non-cash gains, losses, income and expenses resulting from fair value accounting required by the applicable standard under GAAP and related interpretations shall be excluded;

(16) any currency translation gains and losses related to currency remeasurements of Indebtedness, and any net loss or gain resulting

from hedging transactions for currency exchange risk, shall be excluded; and

(17) to the extent covered by insurance and actually reimbursed, or, so long as such Person has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (a) not denied by the applicable carrier in writing within 180 days and (b) in fact reimbursed within 365 days of the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within 365 days), expenses with respect to liability or casualty events or business interruption shall be excluded.

Notwithstanding the foregoing, for the purpose of Section 4.04 only, there shall be excluded from Consolidated Net Income any dividends, repayments of loans or advances or other transfers of assets from Unrestricted Subsidiaries of the Issuer or a Restricted Subsidiary of the Issuer to the extent such dividends, repayments or transfers increase the amount of Restricted Payments permitted under such Section pursuant to clauses (D) and (E) of the definition of "Cumulative Credit."

"Consolidated Non-cash Charges" means, with respect to any Person for any period, the non-cash expenses (other than Consolidated Depreciation and Amortization Expense) of such Person and its Restricted Subsidiaries reducing Consolidated Net Income of such Person for such period on a consolidated basis and otherwise determined in accordance with GAAP, *provided* that if any such non-cash expenses represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from EBITDA in such future period to the extent paid, but excluding from this proviso, for the avoidance of doubt, amortization of a prepaid cash item that was paid in a prior period.

"Consolidated Taxes" means, with respect to any Person for any period, the provision for taxes based on income, profits or capital, including, without limitation, state, franchise, property and similar taxes, foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations) and any Tax Distributions taken into account in calculating Consolidated Net Income.

"Contingent Obligations" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

(1) to purchase any such primary obligation or any property constituting direct or indirect security therefor,

11

(2) to advance or supply funds:

(a) for the purchase or payment of any such primary obligation; or

(b) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Credit Agreement" means (i) the credit agreement, dated as of January 28, 2008, entered into in connection with the consummation of the Acquisition, among the Issuer, the pledgors named therein, the financial institutions named therein, and Bank of America, N.A., as Administrative Agent and Collateral Agent, as amended, restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original lenders or otherwise), restructured, repaid, refunded, refinanced or otherwise modified from time to time, including any agreement or indenture extending the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the Indebtedness under such agreement or agreements or indenture or indentures or any successor or replacement agreement or agreements or indenture or indentures or increasing the amount loaned or issued thereunder or altering the maturity thereof and (ii) whether or not the credit agreement referred to in clause (i) remains outstanding, if designated by the Issuer to be included in the definition of "Credit Agreement," one or more (A) debt facilities or commercial paper facilities, providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to lenders or to special purpose entities formed to borrow from lenders against such receivables) or letters of credit, (B) debt securities, indentures or other forms of debt financing (including convertible or exchangeable debt instruments or bank guarantees or bankers' acceptances), or (C) instruments or agreements evidencing any other Indebtedness, in each case, with the same or different borrowers or issuers and, in each case, as amended, supplemented, modified, extended, restructured, renewed, refinanced, restated, replaced or refunded in whole or in part from time to time.

"Credit Agreement Documents" means the collective reference to any Credit Agreement, any notes issued pursuant thereto and the guarantees thereof, and the collateral documents relating thereto, as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified, in whole or in part, from time to time.

"Cumulative Credit" means the sum of (without duplication):

(A) 50% of the Consolidated Net Income of the Issuer for the period (taken as one accounting period), from January 1, 2008 to the end of the Issuer's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, in the case such Consolidated Net Income for such period is a deficit, minus 100% of such deficit), *plus*

(B) 100% of the aggregate net proceeds, including cash and the Fair Market Value (as determined in good faith by the Issuer) of property other than cash, received by the Issuer after February 1, 2008 (other than net proceeds to the extent such net proceeds have been used to Incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to Section 4.03(b)(xiii)) from the issue or sale of Equity Interests of the Issuer (excluding Refunding Capital Stock, Designated Preferred Stock, Excluded Contributions and Disqualified Stock), including Equity Interests issued upon exercise of warrants or options (other than an issuance or sale to a Restricted Subsidiary of the Issuer), *plus*

(C) 100% of the aggregate amount of contributions to the capital of the Issuer received in cash and the Fair Market Value (as determined in good faith by the Issuer) of property other than cash after February 1, 2008 (other than Excluded Contributions, Refunding Capital Stock, Designated Preferred Stock and Disqualified Stock and other than contributions to the extent such contributions have been used to Incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to Section 4.03(b)(xiii)), *plus*

(D) 100% of the principal amount of any Indebtedness or the liquidation preference or maximum fixed repurchase price, as the case may be, of any Disqualified Stock of the Issuer or any Restricted Subsidiary thereof issued after February 1, 2008 (other than Indebtedness or Disqualified Stock issued to a Restricted Subsidiary) which has been converted into or exchanged for Equity Interests in the Issuer (other than Disqualified Stock) or any direct or indirect parent of the Issuer (*provided* in the case of any parent, such Indebtedness or Disqualified Stock is retired or extinguished), *plus*

(E) 100% of the aggregate amount received by the Issuer or any Restricted Subsidiary in cash and the Fair Market Value (as determined in good faith by the Issuer) of property other than cash received by the Issuer or any Restricted Subsidiary from:

(I) the sale or other disposition (other than to the Issuer or a Restricted Subsidiary of the Issuer) of Restricted Investments made by the Issuer and its Restricted Subsidiaries and from repurchases and redemptions of such Restricted Investments from the Issuer and its Restricted Subsidiaries by any Person (other than the Issuer or any of its Restricted Subsidiaries) and from repayments of loans or advances, and releases of guarantees, which constituted Restricted Investments (other than in each case to the extent that the Restricted Investment was made pursuant to clause (vii) of Section 4.04(b)),

(II) the sale (other than to the Issuer or a Restricted Subsidiary of the Issuer) of the Capital Stock of an Unrestricted Subsidiary, or

(III) a distribution or dividend from an Unrestricted Subsidiary, *plus*

(F) in the event any Unrestricted Subsidiary of the Issuer has been redesignated as a Restricted Subsidiary or has been merged, consolidated or amalgamated with or into, or transfers or conveys its assets to, or is liquidated into, the Issuer or a Restricted Subsidiary of the Issuer, the Fair Market Value (as determined in good faith by the Issuer) of the

Investment of the Issuer in such Unrestricted Subsidiary (which, if the Fair Market Value of such investment shall exceed $250.0 million, shall be determined by the Board of Directors of the Issuer, a copy of the resolution of which with respect thereto shall be delivered to the Trustee) at the time of such redesignation, combination or transfer (or of the assets transferred or conveyed, as applicable) (other than in each case to the extent that the designation of such Subsidiary as an Unrestricted Subsidiary was made pursuant to clause (vii) of Section 4.04(b) or constituted a Permitted Investment).

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"Designated Non-cash Consideration" means the Fair Market Value (as determined in good faith by the Issuer) of non-cash consideration received by the Issuer or one of its Restricted Subsidiaries in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officer's Certificate, setting forth the basis of such valuation, less the amount of Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration.

"Designated Preferred Stock" means Preferred Stock of the Issuer or any direct or indirect parent of the Issuer (other than Disqualified Stock), that is issued for cash (other than to the Issuer or any of its Subsidiaries or an employee stock ownership plan or trust established by the Issuer or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate, on the issuance date thereof.

"Destruction" means any damage to, loss or destruction of all or any portion of the Collateral.

"Discharge of Senior Lender Claims" shall mean, except to the extent otherwise provided in the Intercreditor Agreement, payment in full in cash (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of (a) all Obligations in respect of all outstanding First Priority Lien Obligations and, with respect to letters of credit or letter of credit guaranties outstanding thereunder, delivery of cash collateral or backstop letters of credit in respect thereof in compliance with the Credit Agreement, in each case after or concurrently with the termination of all commitments to extend credit thereunder and (b) any other First Priority Lien Obligations that are due and

payable or otherwise accrued and owing at or prior to the time such principal and interest are paid; *provided* that the Discharge of Senior Lender Claims shall not be deemed to have occurred if such payments are made with the proceeds of other First Priority Lien Obligations that constitute an exchange or replacement for or a refinancing of such Obligations or First Priority Lien Obligations. In the event the First Priority Lien Obligations are modified and the Obligations are paid over time or otherwise modified pursuant to Section 1129 of the Bankruptcy Code, the First Priority Lien Obligations shall be deemed to be discharged when the final payment is made, in cash, in respect of such indebtedness and any obligations pursuant to such new indebtedness shall have been satisfied.

<center>14</center>

"<u>Disqualified Stock</u>" means, with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable), or upon the happening of any event:

(1) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (other than as a result of a change of control or asset sale),

(2) is convertible or exchangeable for Indebtedness or Disqualified Stock of such Person, or

(3) is redeemable at the option of the holder thereof, in whole or in part (other than solely as a result of a change of control or asset sale),

in each case prior to 91 days after the earlier of the maturity date of the Notes or the date the Notes are no longer outstanding; *provided, however,* that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; *provided, further, however*, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of the Issuer or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Issuer in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; *provided, further,* that any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Capital Stock that is not Disqualified Stock shall not be deemed to be Disqualified Stock.

"<u>Domestic Subsidiary</u>" means a Restricted Subsidiary that is not a Foreign Subsidiary.

"<u>EBITDA</u>" means, with respect to any Person for any period, the Consolidated Net Income of such Person for such period plus, without duplication, to the extent the same was deducted in calculating Consolidated Net Income:

(1) Consolidated Taxes; *plus*

(2) Fixed Charges; *plus*

(3) Consolidated Depreciation and Amortization Expense; plus

(4) Consolidated Non-cash Charges; *plus*

(5) any expenses or charges (other than Consolidated Depreciation and Amortization Expense) related to any issuance of Equity Interests, Investment, acquisition, disposition, recapitalization or the Incurrence or repayment of Indebtedness permitted to be Incurred by this Indenture (including a refinancing thereof) (whether or not successful), including (i) such fees, expenses or charges related to the offering of the Notes and the Bank Indebtedness, (ii) any amendment or other modification of the Notes or other Indebtedness, (iii) any additional interest in respect of the Notes and (iv) commissions, discounts, yield and other fees and charges (including any interest expense) related to any Qualified Receivables Financing; *plus*

<center>15</center>

(6) business optimization expenses and other restructuring charges, reserves or expenses (which, for the avoidance of doubt, shall include, without limitation, the effect of inventory optimization programs, facility consolidations, retention, systems establishment costs, contract termination costs, future lease commitments and excess pension charges); *plus*

(7) the amount of management, monitoring, consulting, transaction and advisory fees and related expenses paid to the Sponsors (or any accruals relating to such fees and related expenses) during such period to the extent otherwise permitted by Section 4.07; *plus*

(8) the amount of loss on sale of receivables and related assets to a Receivables Subsidiary in connection with a Qualified Receivables Financing; *plus*

(9) any costs or expense Incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such cost or expenses are funded with cash proceeds contributed to the capital of the Issuer or a Subsidiary Pledgor or net cash proceeds of an issuance of Equity Interests of the Issuer (other than Disqualified Stock) solely to the extent that such net cash proceeds are excluded from the calculation of the Cumulative Credit; *plus*

(10) Pre-Opening Expenses;

*less*, without duplication,

(11) non-cash items increasing Consolidated Net Income for such period (excluding the recognition of deferred revenue or any items which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges that reduced EBITDA in any prior period and any items for which cash was received in a prior period).

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"Equity Offering" means any public or private sale after the Issue Date of common stock or Preferred Stock of the Issuer or any direct or indirect parent of the Issuer, as applicable (other than Disqualified Stock), other than:

(1) public offerings with respect to the Issuer's or such direct or indirect parent's common stock registered on Form S-4 or Form S-8;

(2) issuances to any Subsidiary of the Issuer; and

(3) any such public or private sale that constitutes an Excluded Contribution.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

16

"Exchange Offer Registration Statement" means the registration statement filed with the SEC in connection with the Registered Exchange Offer.

"Exchanged Indebtedness" means unsecured Indebtedness of the Issuer or any of its Restricted Subsidiaries that has been issued in exchange for any of the Existing Notes or in exchange for any such Exchanged Indebtedness.

"Excluded Contributions" means the Cash Equivalents or other assets (valued at their Fair Market Value as determined in good faith by senior management or the Board of Directors of the Issuer) received by the Issuer after the Issue Date from:

(1) contributions to its common equity capital, and

(2) the sale (other than to a Subsidiary of the Issuer or to any Subsidiary management equity plan or stock option plan or any other management or employee benefit plan or agreement) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Issuer,

in each case designated as Excluded Contributions pursuant to an Officer's Certificate executed by an Officer of the Issuer on or promptly after the date such capital contributions are made or the date such Capital Stock is sold, as the case may be.

"Existing Notes" means the Issuer's 5.500% Senior Notes due 2010, 8.00% Senior Notes due 2011, 5.375% Senior Notes due 2013, 7.875% Senior Subordinated Notes due 2010, 8.125% Senior Subordinated Notes due 2011, 5.625% Senior Notes due 2015, 6.500% Senior Notes due 2016, 5.75% Senior Notes due 2017, 10.75% Senior Notes due 2016 and 10.75%/11.50% Senior Toggle Notes due 2018, in each case to the extent outstanding after completion of the Transactions.

"Existing Second Lien Notes" means the Issuer's 10.00% Second-Priority Senior Secured Notes due 2018 and the 10.00% Second-Priority Senior Secured Notes due 2015 issued pursuant to the Existing Second Lien Notes Indenture.

"Existing Second Lien Notes Indenture" means the indenture dated as of December 24, 2008, by and among the Issuer, Harrah's Entertainment and the 2008 Notes Trustee.

"Fair Market Value" means, with respect to any asset or property, the price which could be negotiated in an arm's-length transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction.

"First Lien Agent" has the meaning given to such term in the Intercreditor Agreement.

"First Priority After-Acquired Property" means any property of the Issuer or any Subsidiary Pledgor that secures any Secured Bank Indebtedness that is not already subject to the Lien under the Security Documents other than any securities or other equity interests of the Issuer or any of the Issuer's Subsidiaries.

17

"First Priority Lien Obligations" means (i) all Secured Bank Indebtedness and (ii) all other Obligations of the Issuer or any of its Restricted Subsidiaries in respect of Hedging Obligations or Obligations in respect of cash management services in each case owing to a Person that is a holder of Secured Bank Indebtedness or an Affiliate of such holder at the time of entry into such Hedging Obligations or Obligations in respect of cash management services.

"<u>Fixed Charge Coverage Ratio</u>" means, with respect to any Person for any period, the ratio of EBITDA of such Person for such period to the Fixed Charges (other than Fixed Charges in respect of Qualified Non-Recourse Debt) of such Person for such period. In the event that the Issuer or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness (other than in the case of revolving credit borrowings or revolving advances under any Qualified Receivables Financing, in which case interest expense shall be computed based upon the average daily balance of such Indebtedness during the applicable period) or issues, repurchases or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated but prior to the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "<u>Calculation Date</u>"), then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness, or such issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions) and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Issuer or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions), discontinued operations and operational changes (and the change of any associated fixed charge obligations and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period. For purposes of making the computation referred to above, with respect to each New Project that commences operations and records not less than one full fiscal quarter's operations during the four-quarter reference period, the operating results of such New Project will be annualized on a straight line basis during such period.

18

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Issuer. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Issuer as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event (including, to the extent applicable, from the Acquisition Transactions), and (2) all adjustments of the nature used in connection with the calculation of "Adjusted EBITDA" as set forth in "Debt Covenant Compliance" in Exhibit 99.1 to the Quarterly Report on Form 10-Q for the nine months ended September 30, 2008 for Harrah's Entertainment to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness if such Hedging Obligation has a remaining term in excess of 12 months). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Issuer to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a *pro forma* basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Issuer may designate.

For purposes of this definition, any amount in a currency other than U.S. dollars will be converted to U.S. dollars based on the average exchange rate for such currency for the most recent twelve-month period immediately prior to the date of determination in a manner consistent with that used in calculating EBITDA for the applicable period.

"<u>Fixed Charges</u>" means, with respect to any Person for any period, the sum, without duplication, of:

(1) Consolidated Interest Expense of such Person for such period, and

(2) all cash dividend payments (excluding items eliminated in consolidation) on any series of Preferred Stock or Disqualified Stock of such Person and its Restricted Subsidiaries.

"<u>Foreign Subsidiary</u>" means a Restricted Subsidiary not organized or existing under the laws of the United States of America or any state or territory thereof or the District of Columbia and any direct or indirect subsidiary of such Restricted Subsidiary.

19

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect on the Issue Date. For the purposes of this Indenture, the term "consolidated" with respect to any Person shall mean such Person consolidated with its Restricted Subsidiaries, and shall not include any Unrestricted Subsidiary, but the interest of such Person in an Unrestricted Subsidiary will be accounted for as an Investment.

"Gaming Authorities" means, in any jurisdiction in which Issuer or any of its subsidiaries manages or conducts any casino, gaming business or activities, the applicable gaming board, commission, or other governmental gaming regulatory body or agency which (a) has, or may at any time after issuance of the Notes have, jurisdiction over the gaming activities of the Issuer or any of its subsidiaries, or any successor to such authority or (b) is, or may at any time after the issuance of the Notes be, responsible for interpreting, administering and enforcing the Gaming Laws.

"Gaming Laws" means all applicable constitutions, treaties, laws and statutes pursuant to which any Gaming Authority possesses regulatory, licensing or permit authority over gaming, gambling or casino activities, and all rules, rulings, orders, ordinances or regulations of any Gaming Authority applicable to the gambling, casino or gaming businesses or activities of the Issuer or any of its subsidiaries in any jurisdiction, as in effect from time to time, including the policies, interpretations and administration thereof by the Gaming Authorities.

"guarantee" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including, without limitation, letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"Guaranteed Notes Indenture" means the indenture dated as of February 1, 2008, among the Issuer, the note guarantors named therein and U.S. Bank National Assocation, as trustee relating to the Issuer's 10.75% Senior Notes due 2016 and 10.75% / 11.5% Senior Toggle Notes due 2018, as it may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms.

"Guarantor" means the Parent Guarantor and any Subsidiary that executes a supplemental indenture and provides a guarantee in accordance with Section 4.11 hereof.

"Guarantor Intercreditor Agreement" means the intercreditor agreement dated as of January 28, 2008, among Bank of America, N.A., as agent under the Credit Agreement Documents, U.S. Bank National Association, as trustee under the Guaranteed Notes Indenture, Citibank N.A., in its capacity as administrative agent under the Senior Interim Loan Facility and the Issuer, as it may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms.

"Harrah's Entertainment" means Harrah's Entertainment, Inc., a Delaware corporation.

<div align="center">20</div>

"Hedging Obligations" means, with respect to any Person, the obligations of such Person under:

(1) currency exchange, interest rate or commodity swap agreements, currency exchange, interest rate or commodity cap agreements and currency exchange, interest rate or commodity collar agreements; and

(2) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange, interest rates or commodity prices.

"Holdco Issuer" means the issuer in any Holdco Qualified IPO.

"Holdco Qualified IPO" means any Qualified IPO in which a direct or indirect parent of the Issuer is the issuer.

"holder" or "noteholder" means the Person in whose name a Note is registered on the Registrar's books.

"Incur" means issue, assume, guarantee, incur or otherwise become liable for; *provided, however,* that any Indebtedness or Capital Stock of a Person existing at the time such person becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Subsidiary.

"Indebtedness" means, with respect to any Person:

(1) the principal and premium (if any) of any indebtedness of such Person, whether or not contingent, (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof), (c) representing the deferred and unpaid purchase price of any property (except any such balance that constitutes (i) a trade payable or similar obligation to a trade creditor Incurred in the ordinary course of business, (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and (iii) liabilities accrued in the ordinary course of business), which purchase price is due more than six months after the date of placing the property in service or taking delivery and title thereto, (d) in respect of Capitalized Lease Obligations, or (e) representing any Hedging Obligations, if and to the extent that any of the foregoing indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability on a balance

sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2) to the extent not otherwise included, any obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, the obligations referred to in clause (1) of another Person (other than by endorsement of negotiable instruments for collection in the ordinary course of business); and

(3) to the extent not otherwise included, Indebtedness of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); *provided, however,* that the amount of such Indebtedness will be the lesser of: (a) the Fair Market Value (as determined in good faith by the Issuer) of such asset at such date of determination, and (b) the amount of such Indebtedness of such other Person;

21

*provided, however,* that notwithstanding the foregoing, Indebtedness shall be deemed not to include (1) Contingent Obligations Incurred in the ordinary course of business and not in respect of borrowed money; (2) deferred or prepaid revenues; (3) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller; (4) Obligations under or in respect of Qualified Receivables Financing or (5) obligations under the Acquisition Documents.

Notwithstanding anything in this Indenture to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Indenture as a result of accounting for any embedded derivatives created by the terms of such Indebtedness; and any such amounts that would have constituted Indebtedness under this Indenture but for the application of this sentence shall not be deemed an Incurrence of Indebtedness under this Indenture.

"Indenture" means this Indenture as amended or supplemented from time to time.

"Independent Financial Advisor" means an accounting, appraisal or investment banking firm or consultant, in each case of nationally recognized standing, that is, in the good faith determination of the Issuer, qualified to perform the task for which it has been engaged.

"Intercreditor Agreement" means the intercreditor agreement among the First Lien Agent, the 2008 Notes Trustee, and the other parties from time to time party thereto, dated as of December 24, 2008, as supplemented by the joinder and supplement to the intercreditor agreement by the Trustee, as New Trustee and Second Priority Agent, and acknowledged by the Issuer, First Lien Agent and the 2008 Notes Trustee, dated as of the date hereof, as it may be further amended, restated, supplemented or otherwise modified from time to time in accordance with its terms and this Indenture.

"Interest Payment Date" has the meaning set forth in Exhibit A and Exhibit B hereto.

"Investment Grade Rating" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

"Investment Grade Securities" means:

(1) securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents),

22

(2) securities that have a rating equal to or higher than Baa3 (or equivalent) by Moody's and BBB- (or equivalent) by S&P, but excluding any debt securities or loans or advances between and among the Issuer and its Subsidiaries,

(3) investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment and/or distribution, and

(4) corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition.

"Investments" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet of the Issuer in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. For purposes of the definition of "Unrestricted Subsidiary" and Section 4.04:

(1) "Investments" shall include the portion (proportionate to the Issuer's equity interest in such Subsidiary) of the Fair Market Value (as determined in good faith by the Issuer) of the net assets of a Subsidiary of the Issuer at the time that such Subsidiary is designated an

Unrestricted Subsidiary; *provided, however,* that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Issuer shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to:

(a) the Issuer's "Investment" in such Subsidiary at the time of such redesignation *less*

(b) the portion (proportionate to the Issuer's equity interest in such Subsidiary) of the Fair Market Value (as determined in good faith by the Issuer) of the net assets of such Subsidiary at the time of such redesignation; and

(2) any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value (as determined in good faith by the Issuer) at the time of such transfer, in each case as determined in good faith by the Board of Directors of the Issuer.

"Issue Date" means the date on which the Notes are originally issued.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or similar encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or

23

give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction); *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"Long-Term Retained Notes" means the Issuer's 5.625% Senior Notes due 2015, 6.500% Senior Notes due 2016 and 5.75% Senior Notes due 2017, in each case, to the extent outstanding after completion of the Transactions.

"Management Group" means the group consisting of the directors, executive officers and other management personnel of the Issuer or any direct or indirect parent of the Issuer, as the case may be, on the Issue Date together with (1) any new directors whose election by such boards of directors or whose nomination for election by the shareholders of the Issuer or any direct or indirect parent of the Issuer, as applicable, was approved by a vote of a majority of the directors of the Issuer or any direct or indirect parent of the Issuer, as applicable, then still in office who were either directors on the Issue Date or whose election or nomination was previously so approved and (2) executive officers and other management personnel of the Issuer or any direct or indirect parent of the Issuer, as applicable, hired at a time when the directors on the Issue Date together with the directors so approved constituted a majority of the directors of the Issuer or any direct or indirect parent of the Issuer, as applicable.

"Merger Agreement" means the Agreement and Plan of Merger among Hamlet Holdings LLC, Hamlet Merger Inc. and Harrah's Entertainment, dated as of December 19, 2006, as amended, supplemented or modified from time to time prior to the Issue Date or thereafter, in accordance with its terms.

"Moody's" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"Net Income" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"Net Insurance Proceeds" means the insurance proceeds (excluding liability insurance proceeds payable to the Trustee for any loss, liability or expense incurred by it and excluding the proceeds of business interruption insurance) or condemnation awards actually received by the Issuer or any Restricted Subsidiary as a result of the Destruction or Taking of all or any portion of the Collateral, net of:

(1) reasonable out-of-pocket expenses and fees relating to such Taking or Destruction (including, without limitation, expenses of attorneys and insurance adjusters); and

(2) repayment of Indebtedness that is secured by the property or assets that are the subject of such Taking or Destruction; *provided* that, in the case of any Destruction or Taking involving Collateral, the Lien securing such Indebtedness constitutes a Lien permitted by this Indenture to be senior to the Second Priority Liens.

24

"Net Proceeds" means the aggregate cash proceeds received by the Issuer or any of its Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received in respect of or upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale and any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding the assumption by the acquiring Person of Indebtedness relating to the disposed assets or other consideration received in any other non-cash form), net of the direct costs relating to such Asset Sale and the sale or disposition of such Designated Non-cash Consideration (including, without limitation, legal, accounting and investment banking fees, and brokerage and sales commissions), and any relocation expenses Incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements related thereto), amounts required to be applied to the repayment of principal, premium (if any) and interest on Indebtedness required (other than pursuant to Section 4.06(b)(i)) to be paid as a result of such transaction, and any

deduction of appropriate amounts to be provided by the Issuer as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Issuer after such sale or other disposition thereof, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"New Project" means each capital project which is either a new project or a new feature of an existing project owned by the Issuer or its Restricted Subsidiaries which receives a certificate of completion or occupancy and all relevant licenses, and in fact commences operations.

"Note Guarantee" means any guarantee of the obligations of the Issuer under this Indenture and the Notes by any Person in accordance with the provisions of this Indenture.

"Obligations" means any principal, interest, penalties, fees, indemnifications, reimbursements (including, without limitation, reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any Indebtedness; *provided* that Obligations with respect to the Notes shall not include fees or indemnifications in favor of the Trustee and other third parties other than the holders of the Notes.

"Offering Memorandum" means the confidential offering memorandum, dated March 5, 2009, as supplemented or amended from time to time, relating to the issuance of the Initial Notes.

"Officer" means the Chairman of the Board, Chief Executive Officer, Chief Financial Officer, President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of the Issuer.

"Officer's Certificate" means a certificate signed on behalf of the Issuer by an Officer of the Issuer, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Issuer, which meets the requirements set forth in this Indenture.

<div align="center">25</div>

"Operations Management Agreement" means each of the real estate management agreements and any other operating management agreement entered into by the Issuer or any of its Restricted Subsidiaries with Harrah's Entertainment or with any other direct or indirect Subsidiary of Harrah's Entertainment, including, without limitation, any Real Estate Subsidiary, and any and all modifications thereto, substitutions therefor and replacements thereof so long as such modifications, substitutions and replacements are not materially less favorable, taken as a whole, to the Issuer and its Restricted Subsidiaries than the terms of such agreements as in effect on the Issue Date.

"Opinion of Counsel" means a written opinion from legal counsel who is acceptable to the Trustee. The counsel may be an employee of or counsel to the Issuer or the Trustee.

"Other Second-Lien Obligations" means other Indebtedness of the Issuer and its Restricted Subsidiaries that is equally and ratably secured with the Notes as permitted by this Indenture and is designated by the Issuer as an Other Second-Lien Obligation; *provided* that an authorized representative on behalf of the holders of such Indebtedness has executed joinders to the Security Documents in the form or substantially in the form provided therein.

"Parent Guarantee" means a Note Guarantee of Harrah's Entertainment and its successors.

"Parent Guarantor" means Harrah's Entertainment and its successors.

"Pari Passu Indebtedness" means:

(1) with respect to the Issuer, the Notes and any Indebtedness which ranks pari passu in right of payment to the Notes; and

(2) with respect to any Subsidiary Pledgor, its obligations in respect of the Notes and any Indebtedness which ranks pari passu in right of payment to such Subsidiary Pledgor's obligations in respect of the Notes.

"Permitted Holders" means, at any time, each of (i) the Sponsors, (ii) the Management Group, (iii) any Person that has no material assets other than the Capital Stock of the Issuer and, directly or indirectly, holds or acquires 100% of the total voting power of the Voting Stock of the Issuer, and of which no other Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), other than any of the other Permitted Holders specified in clauses (i) and (ii) above, holds more than 50% of the total voting power of the Voting Stock thereof and (iv) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) the members of which include any of the Permitted Holders specified in clauses (i) and (ii) above and that, directly or indirectly, hold or acquire beneficial ownership of the Voting Stock of the Issuer (a "Permitted Holder Group"), so long as (1) each member of the Permitted Holder Group has voting rights proportional to the percentage of ownership interests held or acquired by such member and (2) no Person or other "group" (other than the Permitted Holders specified in clauses (i) and (ii) above) beneficially owns more than 50% on a fully diluted basis of the Voting Stock held by the Permitted Holder Group. Any Person or group whose acquisition of beneficial ownership constitutes a Change of Control in respect of which a Change of Control Offer is made in accordance with the requirements of this Indenture will thereafter, together with its

Affiliates, constitute an additional Permitted Holder.

26

"Permitted Investments" means:

(1) any Investment in the Issuer or any Restricted Subsidiary;

(2) any Investment in Cash Equivalents or Investment Grade Securities;

(3) any Investment by the Issuer or any Restricted Subsidiary of the Issuer in a Person if as a result of such Investment (a) such Person becomes a Restricted Subsidiary of the Issuer, or (b) such Person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys all or substantially all of its assets to, or is liquidated into, the Issuer or a Restricted Subsidiary of the Issuer;

(4) any Investment in securities or other assets not constituting Cash Equivalents and received in connection with an Asset Sale made pursuant to the provisions of Section 4.06 or any other disposition of assets not constituting an Asset Sale;

(5) any Investment existing on, or made pursuant to binding commitments existing on, the Issue Date or an Investment consisting of any extension, modification or renewal of any Investment existing on the Issue Date; *provided* that the amount of any such Investment may be increased (x) as required by the terms of such Investment as in existence on the Issue Date or (y) as otherwise permitted under this Indenture;

(6) advances to employees, taken together with all other advances made pursuant to this clause (6), not to exceed $25.0 million at any one time outstanding;

(7) any Investment acquired by the Issuer or any of its Restricted Subsidiaries (a) in exchange for any other Investment or accounts receivable held by the Issuer or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable, or (b) as a result of a foreclosure by the Issuer or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(8) Hedging Obligations permitted under Section 4.03(b)(x);

(9) any Investment by the Issuer or any of its Restricted Subsidiaries in a Similar Business having an aggregate Fair Market Value (as determined in good faith by the Issuer), taken together with all other Investments made pursuant to this clause (9) that are at that time outstanding, not to exceed the greater of (x) $500.0 million and (y) 4.5% of Total Assets at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value); *provided, however,* that if any Investment pursuant to this clause (9) is

27

made in any Person that is not a Restricted Subsidiary of the Issuer at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Issuer after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (9) for so long as such Person continues to be a Restricted Subsidiary;

(10) additional Investments by the Issuer or any of its Restricted Subsidiaries having an aggregate Fair Market Value (as determined in good faith by the Issuer), taken together with all other Investments made pursuant to this clause (10) that are at that time outstanding, not to exceed the greater of (x) $950.0 million and (y) 4.5% of Total Assets at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value); *provided, however,* that if any Investment pursuant to this clause (10) is made in any Person that is not a Restricted Subsidiary of the Issuer at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Issuer after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (10) for so long as such Person continues to be a Restricted Subsidiary;

(11) loans and advances to officers, directors or employees for business-related travel expenses, moving expenses and other similar expenses, in each case Incurred in the ordinary course of business or consistent with past practice or to fund such person's purchase of Equity Interests of the Issuer or any direct or indirect parent of the Issuer;

(12) Investments the payment for which consists of Equity Interests of the Issuer (other than Disqualified Stock) or any direct or indirect parent of the Issuer, as applicable; *provided, however,* that such Equity Interests will not increase the amount available for Restricted Payments under clause (C) of the definition of "Cumulative Credit";

(13) any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with the provisions of Section 4.07(b) (except transactions described in clauses (ii), (vi), (vii), (xi) and (xii)(b) of such Section);

(14) Investments consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(15) guarantees issued in accordance with Section 4.03 and Section 4.11, including, without limitation, any guarantee or other obligation

issued or Incurred under the Credit Agreement in connection with any letter of credit issued for the account of Harrah's Entertainment or any of its subsidiaries (including with respect to the issuance of, or payments in respect of drawings under, such letters of credit);

(16) Investments consisting of or to finance purchases and acquisitions of inventory, supplies, materials, services or equipment or purchases of contract rights or licenses or leases of intellectual property;

(17) any Investment in a Receivables Subsidiary or any Investment by a Receivables Subsidiary in any other Person in connection with a Qualified Receivables Financing, including Investments of funds held in accounts permitted or required by the arrangements governing such Qualified Receivables Financing or any related Indebtedness;

(18) any Investment in an entity or purchase of a business or assets in each case owned (or previously owned) by a customer of a Restricted Subsidiary as a condition or in connection with such customer (or any member of such customer's group) contracting with a Restricted Subsidiary, in each case in the ordinary course of business;

(19) any Investment in an entity which is not a Restricted Subsidiary to which a Restricted Subsidiary sells accounts receivable pursuant to a Qualified Receivables Financing;

(20) additional Investments in joint ventures not to exceed at any one time in the aggregate outstanding under this clause (20) the greater of $350.0 million and 2.0% of Total Assets; *provided, however,* that if any Investment pursuant to this clause (20) is made in any Person that is not a Restricted Subsidiary of the Issuer at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Issuer after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (20) for so long as such Person continues to be a Restricted Subsidiary;

(21) Investments of a Restricted Subsidiary of the Issuer acquired after the Issue Date or of an entity merged into, amalgamated with or consolidated with the Issuer or a Restricted Subsidiary of the Issuer in a transaction that is not prohibited by Section 5.01 after the Issue Date to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation; and

(22) any Investment in any Subsidiary of the Issuer or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business.

"Permitted Liens" means, with respect to any Person:

(1) pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case Incurred in the ordinary course of business;

(2) Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet due or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review;

(3) Liens for taxes, assessments or other governmental charges not yet due or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings;

(4) Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5) minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not Incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6) (A) Liens on assets of a Restricted Subsidiary that is not a Subsidiary Pledgor securing Indebtedness of such Restricted Subsidiary permitted to be Incurred pursuant to Section 4.03, (B) Liens securing First Priority Lien Obligations in an aggregate principal amount not to exceed the greater of (x) the aggregate principal amount of Indebtedness permitted to be Incurred pursuant to Section 4.03(b)(i) and (y) the maximum principal amount of Indebtedness that, as of the date such Indebtedness was Incurred, and after giving effect to the Incurrence of such Indebtedness and the application of proceeds therefrom on such date, would not cause the Secured Indebtedness Leverage Ratio of the Issuer to exceed 4.50 to 1.00, and (C) Liens securing Indebtedness permitted to be Incurred pursuant to clause (iv), (xii), (xvi), (xx) or (xxiii) of Section 4.03(b) (*provided* that (1) in the case of clause (iv), such Lien extends only to the assets and/or Capital Stock, the acquisition, lease, construction, repair, replacement or improvement of which is financed thereby and any proceeds or products thereof, (2) in

the case of clause (xx), such Lien does not extend to the property or assets of any Subsidiary of the Issuer other than a Foreign Subsidiary, and (3) in the case of clause (xxiii) such Lien applies solely to acquired property or asset of the acquired entity, as the case may be);

(7) Liens existing on the Issue Date (other than Liens in favor of the lenders under the Credit Agreement);

(8) Liens on assets, property or shares of stock of a Person at the time such Person becomes a Subsidiary; *provided, however,* that such Liens are not created or Incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided, further,* however, that such Liens may not extend to any other property owned by the Issuer or any Restricted Subsidiary of the Issuer;

(9) Liens on assets or property at the time the Issuer or a Restricted Subsidiary of the Issuer acquired the assets or property, including any acquisition by means of a merger, amalgamation or consolidation with or into the Issuer or any Restricted Subsidiary of the Issuer; *provided, however,* that such Liens are not created or Incurred in connection with, or in contemplation of, such acquisition; *provided, further,* however, that the Liens may not extend to any other property owned by the Issuer or any Restricted Subsidiary of the Issuer;

(10) Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Issuer or another Restricted Subsidiary of the Issuer permitted to be Incurred in accordance with Section 4.03;

(11) Liens securing Hedging Obligations not Incurred in violation of this Indenture; *provided* that with respect to Hedging Obligations relating to Indebtedness, such Lien extends only to the property securing such Indebtedness;

(12) Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(13) leases and subleases of real property which do not materially interfere with the ordinary conduct of the business of the Issuer or any of its Restricted Subsidiaries;

(14) Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Issuer and its Restricted Subsidiaries in the ordinary course of business;

(15) Liens in favor of the Issuer or any Subsidiary Pledgor;

(16) Liens on accounts receivable and related assets of the type specified in the definition of "Receivables Financing" Incurred in connection with a Qualified Receivables Financing;

(17) deposits made in the ordinary course of business to secure liability to insurance carriers;

(18) Liens on the Equity Interests of Unrestricted Subsidiaries;

(19) grants of software and other technology licenses in the ordinary course of business;

(20) Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8), (9), (10), (11) and (15); *provided, however,* that (x) such new Lien shall be limited to all or part of the same property that secured the original

Lien (*plus* improvements on such property), and (y) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (A) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), (9), (10), (11) and (15) at the time the original Lien became a Permitted Lien under this Indenture, and (B) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement; *provided further*, however, that in the case of any Liens to secure any refinancing, refunding, extension or renewal of Indebtedness secured by a Lien referred to in clause (6)(B), the principal amount of any Indebtedness Incurred for such refinancing, refunding, extension or renewal shall be deemed secured by a Lien under clause (6)(B) and not this clause (20) for purposes of determining the principal amount of Indebtedness outstanding under clause (6)(B), for purposes of Section 11.04(a)(1) and for purposes of the definition of Secured Bank Indebtedness;

(21) Liens on equipment of the Issuer or any Restricted Subsidiary granted in the ordinary course of business to the Issuer's or such Restricted Subsidiary's client at which such equipment is located;

(22) judgment and attachment Liens not giving rise to an Event of Default and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(23) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(24) Liens Incurred to secure cash management services or to implement cash pooling arrangements in the ordinary course of business;

(25) other Liens securing obligations Incurred in the ordinary course of business which obligations do not exceed $100.0 million at any one time outstanding;

(26) any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(27) any amounts held by a trustee in the funds and accounts under an indenture securing any revenue bonds issued for the benefit of the Issuer or any Restricted Subsidiary; and

(28) Liens arising by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depository or financial institution.

For purposes of this definition, notwithstanding anything in the foregoing clauses (1) through (28), any Lien that secures Retained Notes or Long-Term Retained Notes shall not under any circumstances be deemed Permitted Liens.

<center>32</center>

---

"<u>Person</u>" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"<u>Preferred Stock</u>" means any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution, or winding up.

"<u>Pre-Opening Expenses</u>" means, with respect to any fiscal period, the amount of expenses (other than interest expense) Incurred with respect to capital projects that are classified as "<u>pre-opening expenses</u>" on the applicable financial statements of the Issuer and its Restricted Subsidiaries for such period, prepared in accordance with GAAP.

"<u>Project Financing</u>" means (1) any Capitalized Lease Obligations, mortgage financing, purchase money Indebtedness or other Indebtedness Incurred in connection with the acquisition, lease, construction, repair, replacement, improvement or financing related to any of the Margaritaville Casino & Resort in Biloxi, Mississippi, the retail facilities related to the Margaritaville Casino & Resort and the planned casino and hotel in the community of Ciudad Real, Spain or any refinancing of any such Indebtedness that does not extend to any assets other than the assets listed above and (2) any Sale/Leaseback Transaction with respect to any of Margaritaville Casino & Resort in Biloxi, Mississippi, the retail facilities related to the Margaritaville Casino & Resort and the planned casino and hotel in the community of Ciudad Real, Spain.

"<u>Qualified IPO</u>" means any underwritten public Equity Offering.

"<u>Qualified Non-Recourse Debt</u>" means Indebtedness that (1) is (a) Incurred by a Qualified Non-Recourse Subsidiary to finance (whether prior to or within 270 days after) the acquisition, lease, construction, repair, replacement or improvement of any property (real or personal) or equipment (whether through the direct purchase of property or the Equity Interests of any person owning such property and whether in a single acquisition or a series of related acquisitions) or (b) assumed by a Qualified Non-Recourse Subsidiary, (2) is non-recourse to the Issuer and any Subsidiary Pledgor and (3) is non-recourse to any Restricted Subsidiary that is not a Qualified Non-Recourse Subsidiary.

"<u>Qualified Non-Recourse Subsidiary</u>" means (1) a Restricted Subsidiary that is not a Subsidiary Pledgor and that is formed or created after the Issue Date in order to finance an acquisition, lease, construction, repair, replacement or improvement of any property or equipment (directly or through one of its Subsidiaries) that secures Qualified Non-Recourse Debt and (2) any Restricted Subsidiary of a Qualified Non-Recourse Subsidiary.

"<u>Qualified Receivables Financing</u>" means any Receivables Financing of a Receivables Subsidiary that meets the following conditions:

(1) the Board of Directors of the Issuer shall have determined in good faith that such Qualified Receivables Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Issuer and the Receivables Subsidiary;

<center>33</center>

---

(2) all sales of accounts receivable and related assets to the Receivables Subsidiary are made at Fair Market Value (as determined in good faith by the Issuer); and

(3) the financing terms, covenants, termination events and other provisions thereof shall be market terms (as determined in good faith by the Issuer) and may include Standard Securitization Undertakings.

The grant of a security interest in any accounts receivable of the Issuer or any of its Restricted Subsidiaries (other than a Receivables Subsidiary) to secure Bank Indebtedness, Indebtedness in respect of the Notes or any Refinancing Indebtedness with respect to the Notes shall not be deemed a Qualified Receivables Financing.

"<u>Rating Agency</u>" means (1) each of Moody's and S&P and (2) if Moody's or S&P ceases to rate the Notes for reasons outside of the Issuer's control, a "nationally recognized statistical rating organization" within the meaning of Rule 15cs-1(c)(2)(vi)(F) under the Exchange Act selected by the Issuer or any direct or indirect parent of the Issuer as a replacement agency for Moody's or S&P, as the case may be.

"Real Estate Facility" means the mortgage financing and mezzanine financing arrangements between the Real Estate Subsidiaries, which are direct or indirect subsidiaries of Harrah's Entertainment, and JPMorgan Chase Bank N.A. and its successors and assigns, on behalf of the noteholders dated as of January 28, 2008, as amended, restated, supplemented, extended, waived, replaced, restructured, repaid, refunded, refinanced or otherwise modified from time to time.

"Real Estate Subsidiary" means those Subsidiaries of Harrah's Entertainment that are party to (prior to, on or after the Issue Date) the Real Estate Facility (and their respective Subsidiaries) secured by the Real Property collateralizing such facility on the Issue Date *plus* any additional Real Property sold, contributed or transferred to such Subsidiaries by the Issuer or any Restricted Subsidiary (whether directly or indirectly through the sale, contribution or transfer of the Capital Stock of a Subsidiary the assets of which are comprised solely of such Real Property) subsequent to the Issue Date pursuant to Section 4.06.

"Real Property" means, collectively, all right, title and interests (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all buildings, structures, parking areas and improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"Record Date" has the meaning specified in Exhibits A and B hereto.

"Receivables Fees" means distributions or payments made directly or by means of discounts with respect to any participation interests issued or sold in connection with, and all other fees paid to a Person that is not a Restricted Subsidiary in connection with, any Receivables Financing.

"Receivables Financing" means any transaction or series of transactions that may be entered into by the Issuer or any of its Subsidiaries pursuant to which the Issuer or any of its Subsidiaries may sell, convey or otherwise transfer to (a) a Receivables Subsidiary (in the case of a transfer by the Issuer or any of its Subsidiaries); and (b) any other Person (in the case of a transfer by a Receivables Subsidiary), or may grant a security interest in, any accounts receivable (whether now existing or arising in the future) of the Issuer or any of its Subsidiaries, and any assets related thereto including, without limitation, all collateral securing such accounts receivable, all contracts and all guarantees or other obligations in respect of such accounts receivable, proceeds of such accounts receivable and other assets which are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving accounts receivable and any Hedging Obligations entered into by the Issuer or any such Subsidiary in connection with such accounts receivable.

"Receivables Repurchase Obligation" means any obligation of a seller of receivables in a Qualified Receivables Financing to repurchase receivables arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, off-set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"Receivables Subsidiary" means a Wholly Owned Restricted Subsidiary of the Issuer (or another Person formed for the purposes of engaging in Qualified Receivables Financing with the Issuer in which the Issuer or any Subsidiary of the Issuer makes an Investment and to which the Issuer or any Subsidiary of the Issuer transfers accounts receivable and related assets) which engages in no activities other than in connection with the financing of accounts receivable of the Issuer and its Subsidiaries, all proceeds thereof and all rights (contractual or other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and which is designated by the Board of Directors of the Issuer (as provided below) as a Receivables Subsidiary and:

(a) no portion of the Indebtedness or any other obligations (contingent or otherwise) of which (i) is guaranteed by the Issuer or any other Subsidiary of the Issuer (excluding guarantees of obligations (other than the principal of and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is recourse to or obligates the Issuer or any other Subsidiary of the Issuer in any way other than pursuant to Standard Securitization Undertakings, or (iii) subjects any property or asset of the Issuer or any other Subsidiary of the Issuer, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings;

(b) with which neither the Issuer nor any other Subsidiary of the Issuer has any material contract, agreement, arrangement or understanding other than on terms which the Issuer reasonably believes to be no less favorable to the Issuer or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Issuer; and

(c) to which neither the Issuer nor any other Subsidiary of the Issuer has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.

Any such designation by the Board of Directors of the Issuer shall be evidenced to the Trustee by filing with the Trustee a certified copy of the resolution of the Board of Directors of the Issuer giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing conditions.

"Representative" means the trustee, agent or representative (if any) for an issue of Indebtedness; *provided* that if, and for so long as, such Indebtedness lacks such a Representative, then the Representative for such Indebtedness shall at all times constitute the holder or holders of a majority in outstanding principal amount of obligations under such Indebtedness.

"Responsible Officer" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"Restricted Cash" means cash and Cash Equivalents held by Restricted Subsidiaries that are contractually restricted from being distributed to the Issuer, except for (i) such cash and Cash Equivalents subject only to such restrictions that are contained in agreements governing Indebtedness permitted under this Indenture and that are secured by such cash or Cash Equivalents and (ii) cash and Cash Equivalents constituting "cage cash."

"Restricted Investment" means an Investment other than a Permitted Investment.

"Restricted Subsidiary" means, with respect to any Person, any Subsidiary of such Person other than an Unrestricted Subsidiary of such Person. Unless otherwise indicated in this Indenture, all references to Restricted Subsidiaries shall mean Restricted Subsidiaries of the Issuer.

"Retained Notes" means the Issuer's 5.500% Senior Notes due 2010, 8.00% Senior Notes due 2011, 5.375% Senior Notes due 2013, 7.875% Senior Subordinated Notes due 2010, and 8.125% Senior Subordinated Notes due 2011, in each case to the extent outstanding after completion of the Transactions.

"Reversion Date" means the date on which one or both of the Rating Agencies withdraw their Investment Grade Rating or downgrade the rating assigned to the Notes below an Investment Grade Rating.

"Sale/Leaseback Transaction" means an arrangement relating to property now owned or hereafter acquired by the Issuer or a Restricted Subsidiary whereby the Issuer or a Restricted Subsidiary transfers such property to a Person and the Issuer or such Restricted Subsidiary leases it from such Person, other than leases between the Issuer and a Restricted Subsidiary of the Issuer or between Restricted Subsidiaries of the Issuer.

"S&P" means Standard & Poor's Ratings Group or any successor to the rating agency business thereof.

"SEC" means the Securities and Exchange Commission.

"Second Priority Liens" means the Liens securing the Obligations of the Issuer in respect of the Notes and this Indenture and the Existing Second Lien Notes and all present and future Liens securing Other Second-Lien Obligations as set forth in the Collateral Agreement.

"Secured Bank Indebtedness" means any Bank Indebtedness that is secured by a Permitted Lien incurred or deemed incurred pursuant to clause (6)(B) of the definition of Permitted Liens.

"Secured Indebtedness" means any Indebtedness secured by a Lien.

"Secured Indebtedness Leverage Ratio" means, with respect to any Person, at any date the ratio of (i) Secured Indebtedness constituting First Priority Lien Obligations of such Person and its Restricted Subsidiaries as of such date of calculation (determined on a consolidated basis in accordance with GAAP) less the amount of cash and Cash Equivalents in excess of any Restricted Cash held by such Person and its Restricted Subsidiaries as of such date of determination to (ii) EBITDA of such Person for the four full fiscal quarters for which internal financial statements are available immediately preceding such date on which such additional Indebtedness is Incurred. In the event that the Issuer or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness subsequent to the commencement of the period for which the Secured Indebtedness Leverage Ratio is being calculated but prior to the event for which the calculation of the Secured Indebtedness Leverage Ratio is made (the "Secured Leverage Calculation Date"), then the Secured Indebtedness Leverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness as if the same had occurred at the beginning of the applicable four-quarter period; *provided* that the Issuer may elect pursuant to an Officer's Certificate delivered to the Trustee to treat all or any portion of the commitment under any Indebtedness as being Incurred at such time, in which case any subsequent Incurrence of Indebtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions) and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Issuer or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Secured Leverage Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions), discontinued operations and other operational changes (and the change of any associated

Indebtedness and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Secured Indebtedness

Leverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period. For purposes of making the computation referred to above, with respect to each New Project that commences operations and records not less than one full fiscal quarter's operations during the four-quarter reference period, the operating results of such New Project will be annualized on a straight line basis during such period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Issuer. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Issuer as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event (including, to the extent applicable, from the Acquisition Transactions) and (2) all adjustments of the nature used in connection with the calculation of "Adjusted EBITDA" as set forth in "Debt Covenant Compliance" in Exhibit 99.1 to the Quarterly Report on Form 10-Q for the nine months ended September 30, 2008 for Harrah's Entertainment to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

For purposes of this definition, any amount in a currency other than U.S. dollars will be converted to U.S. dollars based on the average exchange rate for such currency for the most recent twelve-month period immediately prior to the date of determination in a manner consistent with that used in calculating EBITDA for the applicable period.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Security Documents" means the Collateral Agreement and the security agreements, pledge agreements, collateral assignments, mortgages and related agreements, as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified from time to time, creating the security interests in the Collateral as contemplated by this Indenture.

"Senior Interim Loan Facility" means the interim loan agreement, dated as of January 28, 2008, by and among the Issuer, as borrower, the lenders party thereto in their capacities as lenders thereunder and Citibank, N.A. as administrative agent, including any guarantees, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications or restatements thereof.

"Significant Subsidiary" means any Restricted Subsidiary that would be a "Significant Subsidiary" of the Issuer within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC (or any successor provision).

"Similar Business" means a business, the majority of whose revenues are derived from the activities of the Issuer and its Subsidiaries as of the Issue Date or any business or activity that is reasonably similar or complementary thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

"Sponsor Indebtedness" means Indebtedness issued to any of the Sponsors for cash proceeds by the Issuer or any of its Restricted Subsidiaries after the Issue Date or any Indebtedness issued under the Real Estate Facility held by any Sponsor.

"Sponsors" means (i) Apollo Management, L.P. and any of its respective Affiliates other than any portfolio companies (collectively, the "Apollo Sponsors"), (ii) Texas Pacific Group and any of its respective Affiliates other than any portfolio companies (collectively, the "Texas Pacific Sponsors"), (iii) any individual who is a partner or employee of an Apollo Sponsor or a Texas Pacific Sponsor that is licensed by a relevant gaming authority on the Issue Date or thereafter replaces such licensee and (iv) any Person that forms a group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) with any Apollo Sponsors and/or Texas Pacific Sponsors; *provided* that the Apollo Sponsors and/or the Texas Pacific Sponsors (x) own a majority of the voting power and (y) control a majority of the Board of Directors of the Issuer.

"Standard Securitization Undertakings" means representations, warranties, covenants, indemnities and guarantees of performance entered into by the Issuer or any Subsidiary of the Issuer which the Issuer has determined in good faith to be customary in a Receivables Financing including, without limitation, those relating to the servicing of the assets of a Receivables Subsidiary, it being understood that any Receivables Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking.

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of

principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency beyond the control of the issuer unless such contingency has occurred).

"Subordinated Indebtedness" means (a) with respect to the Issuer, any Indebtedness of the Issuer which is by its terms subordinated in right of payment to the Notes, and (b) with respect to any Subsidiary Pledgor, any Indebtedness of such Subsidiary Pledgor which is by its terms subordinated in right of payment to obligations in respect of the Notes.

"Subsidiary" means, with respect to any Person, (1) any corporation, association or other business entity (other than a partnership, joint venture or limited liability company) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, and (2) any partnership, joint venture or limited liability company of which (x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether

39

in the form of membership, general, special or limited partnership interests or otherwise, and (y) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"Subsidiary Pledgor" means any Subsidiary of the Issuer that pledges its property and assets to secure the Notes, as provided in the Security Documents; provided that upon the release or discharge of such Subsidiary of the Issuer from its obligations to pledge its assets and property to secure the Notes in accordance with this Indenture, such Subsidiary of the Issuer ceases to be a Subsidiary Pledgor.

"Suspension Period" means the period of time between a Covenant Suspension Event and the related Reversion Date.

"Taking" means any taking of all or any portion of the Collateral by condemnation or other eminent domain proceedings, pursuant to any law, general or special, or by reason of the temporary requisition of the use or occupancy of all or any portion of the Collateral by any governmental authority, civil or military, or any sale pursuant to the exercise by any such governmental authority of any right which it may then have to purchase or designate a purchaser or to order a sale of all or any portion of the Collateral.

"Tax Distributions" means any distributions described in Section 4.04(b)(xii).

"TIA" means the Trust Indenture Act of 1939 (15 U.S.C. Sections 77aaa-77bbbb) as in effect on the date of this Indenture.

"Total Assets" means the total consolidated assets of the Issuer and its Restricted Subsidiaries, as shown on the most recent balance sheet of the Issuer, without giving effect to any amortization of the amount of intangible assets since February 1, 2008.

"Total Secured Leverage Ratio" means, with respect to any Person, at any date the ratio of (i) Secured Indebtedness (other than Qualified Non-Recourse Debt and Indebtedness secured by Liens that are junior in priority to the Liens securing the Notes) of such Person and its Restricted Subsidiaries as of such date of calculation (determined on a consolidated basis in accordance with GAAP) less the amount of cash and Cash Equivalents in excess of any Restricted Cash held by such Person and its Restricted Subsidiaries as of such date of determination to (ii) EBITDA of such Person for the four full fiscal quarters for which internal financial statements are available immediately preceding such date on which such additional Indebtedness is Incurred. In the event that the Issuer or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness subsequent to the commencement of the period for which the Total Secured Leverage Ratio is being calculated but prior to the event for which the calculation of the Total Secured Leverage Ratio is made (the "Total Secured Leverage Calculation Date"), then the Total Secured Leverage Ratio shall be calculated giving pro forma effect to such Incurrence, repayment, repurchase or redemption of Indebtedness as if the same had occurred at the beginning of the applicable four-quarter period; provided that the Issuer may elect pursuant to an Officer's Certificate delivered to the Trustee to treat all or any portion of the commitment under any Indebtedness as being Incurred at such time, in which case any subsequent Incurrence of Indebtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

40

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions) and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Issuer or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Total Secured Leverage Calculation Date shall be calculated on a pro forma basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations (including the Acquisition Transactions), discontinued operations and other operational changes (and the change of any associated Indebtedness and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If

since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Total Secured Leverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period. For purposes of making the computation referred to above, with respect to each New Project that commences operations and records not less than one full fiscal quarter's operations during the four-quarter reference period, the operating results of such New Project will be annualized on a straight line basis during such period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Issuer. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Issuer as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event (including, to the extent applicable, from the Acquisition Transactions) and (2) all adjustments of the nature used in connection with the calculation of "Adjusted EBITDA" as set forth in "Debt Covenant Compliance" in Exhibit 99.1 to the Quarterly Report on Form 10-Q for the nine months ended September 30, 2008 for Harrah's Entertainment to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

For purposes of this definition, any amount in a currency other than U.S. dollars will be converted to U.S. dollars based on the average exchange rate for such currency for the most recent twelve month period immediately prior to the date of determination in a manner consistent with that used in calculating EBITDA for the applicable period.

"Transactions" means the transactions described under "Summary—Retail Tender Offers," "Summary—Interim Loans Amendment and Exchange Offer" and "General Terms of the Exchange Offers, the HBC Tender Offers and Consent Solicitations" in the Offering Memorandum.

"Treasury Rate" means, as of the applicable redemption date, the yield to maturity as of such redemption date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two business days prior to such redemption date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such redemption date to December 15, 2013; *provided, however,* that if the period from such redemption date to December 15, 2013, is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"Trust Officer" means:

(1) any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject, and

(2) who shall have direct responsibility for the administration of this Indenture.

"Trustee" means the party named as such in this Indenture until a successor replaces it and, thereafter, means the successor.

"2008 Notes Trustee" means U.S. Bank National Association in its capacity as trustee under the Existing Second Lien Notes Indenture.

"Uniform Commercial Code" means the New York Uniform Commercial Code as in effect from time to time.

"Unrestricted Subsidiary" means:

(1) any Subsidiary of the Issuer that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors of such Person in the manner provided below; and

(2) any Subsidiary of an Unrestricted Subsidiary;

The Issuer may designate any Subsidiary of the Issuer (including any newly acquired or newly formed Subsidiary of the Issuer) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on any property of, the Issuer or any other Subsidiary of the Issuer that is not a Subsidiary of the Subsidiary to be so designated; *provided, however,* that the Subsidiary to be so designated and its Subsidiaries do not at the time of designation have and do not thereafter Incur any Indebtedness pursuant to which the lender has recourse to any of the assets of the Issuer or any of its Restricted Subsidiaries; *provided, further, however,* that either:

(a) the Subsidiary to be so designated has total consolidated assets of $1,000 or less; or

http://www.sec.gov/Archives/edgar/data/858339/000119312509082553/dex41.htm[8/7/2014 10:22:16 AM]

(b) if such Subsidiary has consolidated assets greater than $1,000, then such designation would be permitted under Section 4.04.

The Issuer may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided, however,* that immediately after giving effect to such designation:

(x) (1) the Issuer could Incur $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a), or (2) the Fixed Charge Coverage Ratio for the Issuer and its Restricted Subsidiaries would be greater than such ratio for the Issuer and its Restricted Subsidiaries immediately prior to such designation, in each case on a *pro forma* basis taking into account such designation, and

(y) no Event of Default shall have occurred and be continuing.

Any such designation by Issuer shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the resolution of the Board of Directors or any committee thereof of the Issuer giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing provisions.

"U.S. Government Obligations" means securities that are:

(1) direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged, or

(2) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America, the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America,

which, in each case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act) as custodian with respect to any such U.S. Government Obligations or a specific payment of principal of or interest on any such U.S. Government Obligations held by such custodian for the account of the holder of such depository receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Obligations or the specific payment of principal of or interest on the U.S. Government Obligations evidenced by such depository receipt.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

43

"Weighted Average Life to Maturity" means, when applied to any Indebtedness or Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing (1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment, by (2) the sum of all such payments.

"Wholly Owned Restricted Subsidiary" is any Wholly Owned Subsidiary that is a Restricted Subsidiary.

"Wholly Owned Subsidiary" of any Person means a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares required to be held by Foreign Subsidiaries) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

SECTION 1.02. Other Definitions.

| Term | Defined in Section |
| --- | --- |
| "Additional Interest" | Appendix A |
| "Additional Second Priority Debt" | 4.12(c) |
| "Affiliate Transaction" | 4.07 |
| "AI" | Appendix A |
| "Asset Sale Offer" | 4.06(b) |
| "Bankruptcy Law" | 6.01 |
| "Change of Control Offer" | 4.08 |
| "covenant defeasance option" | 8.01(b) |
| "Covenant Suspension Event" | 4.16 |
| "Custodian" | 6.01 |
| "Dealer Manager Agreement" | Appendix A |
| "Dealer Managers" | Appendix A |
| "Definitive Note" | Appendix A |
| "Depository" | Appendix A |
| "Disqualified Holder" | 2.15 |

| | |
|---|---|
| "Euroclear" | Appendix A |
| "Event of Default" | 6.01 |
| "Excess Proceeds" | 4.06(b) |
| "Exchange Notes" | Preamble |
| "Global Notes" | Appendix A |
| "Global Notes Legend" | Appendix A |
| "Guaranteed Obligations" | 12.01(a) |
| "Hamlet Tender Offer" | Appendix A |
| "HOC Exchange Offers" | Appendix A |
| "IAI" | Appendix A |
| "incorporated provision" | 13.01 |
| "Initial Guarantee Event" | 4.11(c) |
| "Initial Notes" | Preamble |

44

| Term | Defined in Section |
|---|---|
| "Issuer" | Preamble |
| "legal defeasance option" | 8.01(b) |
| "Notes" | Preamble |
| "Notes Custodian" | Appendix A |
| "Notice of Default" | 6.01 |
| "Offer Period" | 4.06(d) |
| "Paying Agent" | 2.04(a) |
| "Permanent Global Notes" | Appendix A |
| "Permanent Regulation S Global Notes" | Appendix A |
| "Permanent Rule 144A Global Notes" | Appendix A |
| "protected purchaser" | 2.08 |
| "QIB" | Appendix A |
| "Refinancing Indebtedness" | 4.03(b) |
| "Refunding Capital Stock" | 4.04(b) |
| "Registered Exchange Offer" | Appendix A |
| "Registrar" | 2.04(a) |
| "Registration Rights Agreement" | Appendix A |
| "Regulation S" | Appendix A |
| "Regulation S Notes" | Appendix A |
| "Restricted Notes Legend" | Appendix A |
| "Restricted Payment" | 4.04(a) |
| "Restricted Period" | Appendix A |
| "Retired Capital Stock" | 4.04(b) |
| "Reversion Date" | 4.16 |
| "Rule 501" | Appendix A |
| "Rule 144A" | Appendix A |
| "Rule 144A Notes" | Appendix A |
| "Second Commitment" | 4.06 |
| "Second Priority Debt" | 4.12(c) |
| "Shelf Registration Statement" | Appendix A |
| "Successor Issuer" | 5.01(a) |
| "Successor Parent Guarantor" | 5.01 |
| "Successor Subsidiary Pledgor" | 5.01(b) |
| "Suspended Covenants" | 4.16 |
| "Temporary Global Notes Legend" | Appendix A |
| "Temporary Global Notes" | Appendix A |
| "Temporary Regulation S Global Notes" | Appendix A |
| "Temporary Rule 144A Global Notes" | Appendix A |
| "Transfer" | 5.01(b) |
| "Transfer Restricted Definitive Notes" | Appendix A |
| "Transfer Restricted Global Notes" | Appendix A |
| "Unrestricted Definitive Notes" | Appendix A |
| "Unrestricted Global Notes" | Appendix A |

SECTION 1.03. <u>Incorporation by Reference of Trust Indenture Act</u>. This Indenture incorporates by reference certain provisions of the TIA. The following TIA terms have the following meanings:

"<u>Commission</u>" means the SEC.

"<u>indenture securities</u>" means the Notes and any Note Guarantee.

"<u>indenture security holder</u>" means a holder.

"<u>indenture to be qualified</u>" means this Indenture.

"<u>indenture trustee</u>" or "<u>institutional trustee</u>" means the Trustee.

"<u>obligor</u>" on the indenture securities means the Issuer and each Guarantor and any other obligor on the Notes.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule have the meanings assigned to them by such definitions.

SECTION 1.04. <u>Rules of Construction</u>. Unless the context otherwise requires:

(a) a term has the meaning assigned to it;

(b) an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c) "<u>or</u>" is not exclusive;

(d) "<u>including</u>" means including without limitation;

(e) words in the singular include the plural and words in the plural include the singular;

(f) unsecured Indebtedness shall not be deemed to be subordinate or junior to Secured Indebtedness merely by virtue of its nature as unsecured Indebtedness;

(g) the principal amount of any non-interest bearing or other discount security at any date shall be the principal amount thereof that would be shown on a balance sheet of the issuer dated such date prepared in accordance with GAAP;

(h) the principal amount of any Preferred Stock shall be (i) the maximum liquidation value of such Preferred Stock or (ii) the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock, whichever is greater;

(i) unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP;

(j) "<u>$</u>" and "<u>U.S. dollars</u>" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts; and

(k) whenever in this Indenture or the Notes there is mentioned, in any context, principal, interest or any other amount payable under or with respect to any Notes, such mention shall be deemed to include mention of the payment of Additional Interest, to the extent that, in such context, Additional Interest is, were or would be payable in respect thereof.

## ARTICLE II

## THE NOTES

SECTION 2.01. <u>Amount of Notes</u>. The aggregate principal amount of Notes which may be authenticated and delivered under this Indenture on the Issue Date is $3,705,498,000.

The Issuer may from time to time after the Issue Date issue Additional Notes under this Indenture in an unlimited principal amount, so long as (i) the Incurrence of the Indebtedness represented by such Additional Notes is at such time permitted by Section 4.03 and (ii) such Additional Notes are issued in compliance with the other applicable provisions of this Indenture. With respect to any Additional Notes issued after the Issue Date (except for Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to

Section 2.07, 2.08, 2.09, 2.10, 3.06, 4.06(e), 4.08(c) or Appendix A), there shall be (a) established in or pursuant to a resolution of the Board of Directors and (b) (i) set forth or determined in the manner provided in an Officer's Certificate or (ii) established in one or more indentures supplemental hereto, prior to the issuance of such Additional Notes:

(1) the aggregate principal amount of such Additional Notes which may be authenticated and delivered under this Indenture,

(2) the issue price and issuance date of such Additional Notes, including the date from which interest on such Additional Notes shall accrue;

(3) if applicable, that such Additional Notes shall be issuable in whole or in part in the form of one or more Global Notes and, in such case, the respective depositaries for such Global Notes, the form of any legend or legends which shall be borne by such Global Notes in addition to or in lieu of those set forth in <u>Exhibit A</u> hereto and any circumstances in addition to or in lieu of those set forth in Section 2.2 of Appendix A in which any such Global Note may be exchanged in whole or in part for

<div align="center">47</div>

Additional Notes registered, or any transfer of such Global Note in whole or in part may be registered, in the name or names of Persons other than the depositary for such Global Note or a nominee thereof; and

(4) if applicable, that such Additional Notes that are not Transfer Restricted Notes shall not be issued in the form of Initial Notes as set forth in <u>Exhibit A</u>, but shall be issued in the form of Exchange Notes as set forth in <u>Exhibit B</u>.

If any of the terms of any Additional Notes are established by action taken pursuant to a resolution of the Board of Directors, a copy of an appropriate record of such action shall be certified by the Secretary or any Assistant Secretary of the Issuer and delivered to the Trustee at or prior to the delivery of the Officers' Certificate or the indenture supplemental hereto setting forth the terms of the Additional Notes.

The Initial Notes, including any Additional Notes, may, at the Issuer's option, be treated as a single class for all purposes under this Indenture, including, without limitation, waivers, amendments, redemptions and offers to purchase.

SECTION 2.02. <u>Form and Dating</u>. Provisions relating to the Initial Notes and the Exchange Notes are set forth in <u>Appendix A</u>, which is hereby incorporated in and expressly made a part of this Indenture. The (i) Initial Notes and the Trustee's certificate of authentication and (ii) any Additional Notes (if issued as Transfer Restricted Notes) and the Trustee's certificate of authentication shall each be substantially in the form of <u>Exhibit A</u> hereto, which is hereby incorporated in and expressly made a part of this Indenture. The (i) Exchange Notes and the Trustee's certificate of authentication and (ii) any Additional Notes issued other than as Transfer Restricted Notes and the Trustee's certificate of authentication shall each be substantially in the form of <u>Exhibit B</u> hereto, which is hereby incorporated in and expressly made a part of this Indenture. The Notes may have notations, legends or endorsements required by law, stock exchange rule, agreements to which the Issuer, the Parent Guarantor or any Subsidiary Pledgor is subject, if any, or usage (*provided* that any such notation, legend or endorsement is in a form acceptable to the Issuer). Each Note shall be dated the date of its authentication. The Notes shall be issuable only in registered form without interest coupons and in denominations of $2,000 and any integral multiples of $1,000.

SECTION 2.03. <u>Execution and Authentication</u>. The Trustee shall authenticate and make available for delivery upon a written order of the Issuer signed by one Officer (a) Initial Notes for original issue on the date hereof in an aggregate principal amount of $3,705,498,000, (b) subject to the terms of this Indenture, Additional Notes in an aggregate principal amount to be determined at the time of issuance and specified therein and (c) the Exchange Notes for issue in a Registered Exchange Offer pursuant to the Registration Agreement for a like principal amount of Initial Notes exchanged pursuant thereto or otherwise pursuant to an effective registration statement under the Securities Act. Such order shall specify the amount of separate Note certificates to be authenticated, the principal amount of each of the Notes to be authenticated, the date on which the original issue of Notes is to be authenticated, the registered holder of each of the Notes and delivery instructions and whether the Notes are to be Initial Notes or Exchange Notes. Notwithstanding anything to the contrary in this Indenture or Appendix A, any issuance of Additional Notes after the Issue Date shall be in a principal amount at least $2,000 and integral multiples of $1,000 in excess of $2,000.

<div align="center">48</div>

One Officer shall sign the Notes for the Issuer by manual or facsimile signature.

If an Officer whose signature is on a Note no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

A Note shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Note. The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee may appoint one or more authenticating agents reasonably acceptable to the Issuer to authenticate the Notes. Any such appointment shall be evidenced by an instrument signed by a Trust Officer, a copy of which shall be furnished to the Issuer. Unless limited by the terms of such appointment, an authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as any Registrar, Paying Agent or

agent for service of notices and demands.

SECTION 2.04. Registrar and Paying Agent.

(a) The Issuer shall maintain (i) an office or agency where Notes may be presented for registration of transfer or for exchange (the "Registrar") and (ii) an office or agency where Notes may be presented for payment (the "Paying Agent"). The Registrar shall keep a register of the Notes and of their transfer and exchange. The Issuer may have one or more co-registrars and one or more additional paying agents. The term "Registrar" includes any co-registrars. The term "Paying Agent" includes the Paying Agent and any additional paying agent. The Issuer initially appoints the Trustee as Registrar, Paying Agent and the Notes Custodian with respect to the Global Notes.

(b) The Issuer may enter into an appropriate agency agreement with any Registrar or Paying Agent not a party to this Indenture, which shall incorporate the terms of the TIA. The agreement shall implement the provisions of this Indenture that relate to such agent. The Issuer shall notify the Trustee in writing of the name and address of any such agent. If the Issuer fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.07. The Issuer or any of its domestically organized Wholly Owned Subsidiaries may act as Paying Agent or Registrar.

(c) The Issuer may remove any Registrar or Paying Agent upon written notice to such Registrar or Paying Agent and to the Trustee; *provided, however,* that no such removal shall become effective until (i) if applicable, acceptance of an appointment by a successor as evidenced by an appropriate agreement entered into by the Issuer and such successor Registrar or Paying Agent, as the case may be, and delivered to the Trustee or (ii) notification to the Trustee that the Trustee shall serve as Registrar or Paying Agent until the appointment of a successor in accordance with clause (i) above. The Registrar or Paying Agent may resign at any time upon written notice to the Issuer and the Trustee; *provided, however,* that the Trustee may resign as Paying Agent or Registrar only if the Trustee also resigns as Trustee in accordance with Section 7.08.

49

SECTION 2.05. Paying Agent to Hold Money in Trust. Prior to each due date of the principal of and interest on any Note, the Issuer shall deposit with each Paying Agent (or if the Issuer or a Wholly Owned Subsidiary is acting as Paying Agent, segregate and hold in trust for the benefit of the Persons entitled thereto) a sum sufficient to pay such principal and interest when so becoming due. The Issuer shall require each Paying Agent (other than the Trustee) to agree in writing that a Paying Agent shall hold in trust for the benefit of holders or the Trustee all money held by a Paying Agent for the payment of principal of and interest on the Notes, and shall notify the Trustee of any default by the Issuer in making any such payment. If the Issuer or a Wholly Owned Subsidiary of the Issuer acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it in trust for the benefit of the Persons entitled thereto. The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by such Paying Agent. Upon complying with this Section, a Paying Agent shall have no further liability for the money delivered to the Trustee.

SECTION 2.06. Holder Lists. The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of holders. If the Trustee is not the Registrar, the Issuer shall furnish, or cause the Registrar to furnish, to the Trustee, in writing at least five Business Days before each interest payment date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of holders.

SECTION 2.07. Transfer and Exchange. The Notes shall be issued in registered form and shall be transferable only upon the surrender of a Note for registration of transfer and in compliance with Appendix A. When a Note is presented to the Registrar with a request to register a transfer, the Registrar shall register the transfer as requested if its requirements therefor are met. When Notes are presented to the Registrar with a request to exchange them for an equal principal amount of Notes of other denominations, the Registrar shall make the exchange as requested if the same requirements are met. To permit registration of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate Notes at the Registrar's request. The Issuer may require payment of a sum sufficient to pay all taxes, assessments or other governmental charges in connection with any transfer or exchange pursuant to this Section. The Issuer shall not be required to make, and the Registrar need not register, transfers or exchanges of Notes selected for redemption (except, in the case of Notes to be redeemed in part, the portion thereof not to be redeemed) or of any Notes for a period of 15 days before a selection of Notes to be redeemed.

Prior to the due presentation for registration of transfer of any Note, the Issuer, the Parent Guarantor, the Trustee, the Paying Agent and the Registrar may deem and treat the Person in whose name a Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest, if any, on such Note and for all other purposes whatsoever, whether or not such Note is overdue, and none of the Issuer, the Parent Guarantor, the Trustee, the Paying Agent or the Registrar shall be affected by notice to the contrary.

50

Any holder of a beneficial interest in a Global Note shall, by acceptance of such beneficial interest, agree that transfers of beneficial interests in such Global Note may be effected only through a book-entry system maintained by (a) the holder of such Global Note (or its agent) or (b) any holder of a beneficial interest in such Global Note, and that ownership of a beneficial interest in such Global Note shall be required to be reflected in a book entry.

All Notes issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Notes surrendered upon such transfer or exchange.

SECTION 2.08. Replacement Notes. If a mutilated Note is surrendered to the Registrar or if the holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Issuer shall issue and the Trustee shall authenticate a replacement Note if the requirements of Section 8-405 of the Uniform Commercial Code are met, such that the holder (a) satisfies the Issuer or the Trustee within a reasonable time after such holder has notice of such loss, destruction or wrongful taking and the Registrar does not register a transfer prior to receiving such notification, (b) makes such request to the Issuer or the Trustee prior to the Note being acquired by a protected purchaser as defined in Section 8-303 of the Uniform Commercial Code (a "protected purchaser") and (c) satisfies any other reasonable requirements of the Trustee. If required by the Trustee or the Issuer, such holder shall furnish an indemnity bond sufficient in the judgment of the Trustee and the Issuer to protect the Issuer, the Trustee, a Paying Agent and the Registrar from any loss or liability that any of them may suffer if a Note is replaced and subsequently presented or claimed for payment. The Issuer and the Trustee may charge the holder for their expenses in replacing a Note (including without limitation, attorneys' fees and disbursements in replacing such Note). In the event any such mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Issuer in its discretion may pay such Note instead of issuing a new Note in replacement thereof.

Every replacement Note is an additional obligation of the Issuer.

The provisions of this Section 2.08 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, lost, destroyed or wrongfully taken Notes.

SECTION 2.09. Outstanding Notes. Notes outstanding at any time are all Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation and those described in this Section as not outstanding. Subject to Section 13.06, a Note does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Note.

If a Note is replaced pursuant to Section 2.08 (other than a mutilated Note surrendered for replacement), it ceases to be outstanding unless the Trustee and the Issuer receive proof satisfactory to them that the replaced Note is held by a protected purchaser. A mutilated Note ceases to be outstanding upon surrender of such Note and replacement thereof pursuant to Section 2.08.

51

If a Paying Agent segregates and holds in trust, in accordance with this Indenture, on a redemption date or maturity date money sufficient to pay all principal and interest payable on that date with respect to the Notes (or portions thereof) to be redeemed or maturing, as the case may be, and no Paying Agent is prohibited from paying such money to the holders on that date pursuant to the terms of this Indenture, then on and after that date such Notes (or portions thereof) cease to be outstanding and interest on them ceases to accrue.

SECTION 2.10. Temporary Notes. In the event that Definitive Notes are to be issued under the terms of this Indenture, until such Definitive Notes are ready for delivery, the Issuer may prepare and the Trustee shall authenticate temporary Notes. Temporary Notes shall be substantially in the form of Definitive Notes but may have variations that the Issuer considers appropriate for temporary Notes. Without unreasonable delay, the Issuer shall prepare and the Trustee shall authenticate Definitive Notes and make them available for delivery in exchange for temporary Notes upon surrender of such temporary Notes at the office or agency of the Issuer, without charge to the holder. Until such exchange, temporary Notes shall be entitled to the same rights, benefits and privileges as Definitive Notes.

SECTION 2.11. Cancellation. The Issuer at any time may deliver Notes to the Trustee for cancellation. The Registrar and each Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment or cancellation and shall dispose of canceled Notes in accordance with its customary procedures. The Issuer may not issue new Notes to replace Notes it has redeemed, paid or delivered to the Trustee for cancellation. The Trustee shall not authenticate Notes in place of canceled Notes other than pursuant to the terms of this Indenture.

SECTION 2.12. Defaulted Interest. If the Issuer defaults in a payment of interest on the Notes, the Issuer shall pay the defaulted interest then borne by the Notes (plus interest on such defaulted interest to the extent lawful) in any lawful manner. The Issuer may pay the defaulted interest to the Persons who are holders on a subsequent special record date. The Issuer shall fix or cause to be fixed any such special record date and payment date to the reasonable satisfaction of the Trustee and shall promptly mail or cause to be mailed to each affected holder a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

SECTION 2.13. CUSIP Numbers, ISINs, Etc. The Issuer in issuing the Notes may use CUSIP numbers, ISINs and "Common Code" numbers (if then generally in use) and, if so, the Trustee shall use CUSIP numbers, ISINs and "Common Code" numbers in notices of redemption as a convenience to holders; provided, however, that any such notice may state that no representation is made as to the correctness of such numbers, either as printed on the Notes or as contained in any notice of a redemption that reliance may be placed only on the other identification numbers printed on the Notes and that any such redemption shall not be affected by any defect in or omission of such numbers. The Issuer shall advise the Trustee of any change in the CUSIP numbers, ISINs and "Common Code" numbers.

SECTION 2.14. Calculation of Principal Amount of Notes. The aggregate principal amount of the Notes, at any date of determination, shall be the principal amount of the Notes at such date of determination. With respect to any matter requiring consent, waiver, approval or other action of

the holders of a specified percentage of the principal amount of all the

52

Notes, such percentage shall be calculated, on the relevant date of determination, by dividing (a) the principal amount, as of such date of determination, of Notes, the holders of which have so consented, by (b) the aggregate principal amount, as of such date of determination, of the Notes then outstanding, in each case, as determined in accordance with the preceding sentence, Section 2.09 and Section 13.06 of this Indenture. Any such calculation made pursuant to this Section 2.14 shall be made by the Issuer and delivered to the Trustee pursuant to an Officers' Certificate.

SECTION 2.15. <u>Mandatory Disposition Pursuant to Gaming Laws</u>. Each person that holds or acquires beneficial ownership of any of the Notes shall be deemed to have agreed, by accepting such Notes, that if any Gaming Authority requires such person to be approved, licensed, qualified or found suitable under applicable Gaming Laws, such holder or beneficial owner, as the case may be, shall apply for a license, qualification or finding of suitability within the required time period.

If a person required to apply or become licensed or qualified or be found suitable fails to do so (a "<u>Disqualified Holder</u>"), the Issuer shall have the right, at its election, (1) to require such person to dispose of its Notes or beneficial interest therein within 30 days of receipt of notice of such election or such earlier date as may be required by such Gaming Authority or (2) to redeem such Notes at a redemption price that, unless otherwise directed by such Gaming Authority, shall be at a redemption price that is equal to the lesser of:

(a) such person's cost, or

(b) 100% of the principal amount thereof, *plus* accrued and unpaid interest, if any, to the earlier of (i) the redemption date or (ii) the date such person became a Disqualified Holder.

The Issuer shall notify the Trustee and applicable Gaming Authority in writing of any such redemption as soon as practicable. The Issuer shall not be responsible for any costs or expenses any such holder may Incur in connection with its application for a license, qualification or finding of suitability.

<div align="center">

**ARTICLE III**

**REDEMPTION**

</div>

SECTION 3.01. <u>Redemption</u>. The Notes may be redeemed, in whole, or from time to time in part, subject to the conditions and at the redemption prices set forth in Paragraph 5 of the forms of Note set forth in <u>Exhibit A</u> and <u>B</u> hereto, which are hereby incorporated by reference and made a part of this Indenture, together with accrued and unpaid interest to the redemption date.

SECTION 3.02. <u>Applicability of Article</u>. Redemption of Notes at the election of the Issuer or otherwise, as permitted or required by any provision of this Indenture, shall be made in accordance with such provision and this Article.

53

SECTION 3.03. <u>Notices to Trustee</u>. If the Issuer elects to redeem Notes pursuant to the optional redemption provisions of Paragraph 5 of the Note, it shall notify the Trustee in writing of (i) the Section of this Indenture pursuant to which the redemption shall occur, (ii) the redemption date, (iii) the principal amount of Notes to be redeemed and (iv) the redemption price. The Issuer shall give notice to the Trustee provided for in this paragraph at least 30 days but not more than 60 days before a redemption date if the redemption is pursuant to Paragraph 5 of the Note, unless a shorter period is acceptable to the Trustee. Such notice shall be accompanied by an Officers' Certificate and Opinion of Counsel from the Issuer to the effect that such redemption will comply with the conditions herein, as well as such notice required to be delivered under Section 3.05 below. If fewer than all the Notes are to be redeemed, the record date relating to such redemption shall be selected by the Issuer and given to the Trustee, which record date shall be not fewer than 15 days after the date of notice to the Trustee. Any such notice may be canceled at any time prior to notice of such redemption being mailed to any holder and shall thereby be void and of no effect.

SECTION 3.04. <u>Selection of Notes to Be Redeemed</u>. In the case of any partial redemption, selection of the Notes for redemption will be made by the Trustee on a pro rata basis to the extent practicable; *provided* that no Notes of $2,000 or less shall be redeemed in part. The Trustee shall make the selection from outstanding Notes not previously called for redemption. The Trustee may select for redemption portions of the principal of Notes that have denominations larger than $2,000. Notes and portions of them the Trustee selects shall be in amounts of $2,000 or any integral multiple of $1,000. Provisions of this Indenture that apply to Notes called for redemption also apply to portions of Notes called for redemption. The Trustee shall notify the Issuer promptly of the Notes or portions of Notes to be redeemed.

SECTION 3.05. <u>Notice of Optional Redemption</u>.

(a) At least 30 days but not more than 60 days before a redemption date pursuant to Paragraph 5 of the Note, the Issuer shall mail or cause to

be mailed by first-class mail a notice of redemption to each holder whose Notes are to be redeemed.

Any such notice shall identify the Notes to be redeemed and shall state:

(i) the redemption date;

(ii) the redemption price and the amount of accrued interest to the redemption date;

(iii) the name and address of the Paying Agent;

(iv) that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price, *plus* accrued interest;

(v) if fewer than all the outstanding Notes are to be redeemed, the certificate numbers and principal amounts of the particular Notes to be redeemed, the aggregate principal amount of Notes to be redeemed and the aggregate principal amount of Notes to be outstanding after such partial redemption;

(vi) that, unless the Issuer defaults in making such redemption payment or the Paying Agent is prohibited from making such payment pursuant to the terms of this Indenture, interest on Notes (or portion thereof) called for redemption ceases to accrue on and after the redemption date;

54

(vii) the CUSIP number, ISIN and/or "Common Code" number, if any, printed on the Notes being redeemed; and

(viii) that no representation is made as to the correctness or accuracy of the CUSIP number or ISIN and/or "Common Code" number, if any, listed in such notice or printed on the Notes.

(b) At the Issuer's request, the Trustee shall give the notice of redemption in the Issuer's name and at the Issuer's expense. In such event, the Issuer shall provide the Trustee with the information required by this Section at least one Business Day prior to the date such notice is to be provided to holders in the final form such notice is to be delivered to holders and such notice may not be canceled.

SECTION 3.06. Effect of Notice of Redemption. Once notice of redemption is mailed in accordance with Section 3.05, Notes called for redemption become due and payable on the redemption date and at the redemption price stated in the notice, except as provided in the final sentence of paragraph 5 of the Notes. Upon surrender to the Paying Agent, such Notes shall be paid at the redemption price stated in the notice, *plus* accrued interest, to, but not including, the redemption date; *provided, however,* that if the redemption date is after a regular record date and on or prior to the interest payment date, the accrued interest shall be payable to the holder of the redeemed Notes registered on the relevant record date. Failure to give notice or any defect in the notice to any holder shall not affect the validity of the notice to any other holder.

SECTION 3.07. Deposit of Redemption Price. With respect to any Notes, prior to 10:00 a.m., New York City time, on the redemption date, the Issuer shall deposit with the Paying Agent (or, if the Issuer or a Wholly Owned Subsidiary is the Paying Agent, shall segregate and hold in trust) money sufficient to pay the redemption price of and accrued interest on all Notes or portions thereof to be redeemed on that date other than Notes or portions of Notes called for redemption that have been delivered by the Issuer to the Trustee for cancellation. On and after the redemption date, interest shall cease to accrue on Notes or portions thereof called for redemption so long as the Issuer has deposited with the Paying Agent funds sufficient to pay the principal of, *plus* accrued and unpaid interest on, the Notes to be redeemed, unless the Paying Agent is prohibited from making such payment pursuant to the terms of this Indenture.

SECTION 3.08. Notes Redeemed in Part. Upon surrender of a Note that is redeemed in part, the Issuer shall execute and the Trustee shall authenticate for the holder (at the Issuer's expense) a new Note equal in principal amount to the unredeemed portion of the Note surrendered.

55

# ARTICLE IV

## COVENANTS

SECTION 4.01. Payment of Notes. The Issuer shall promptly pay the principal of and interest on the Notes on the dates and in the manner provided in the Notes and in this Indenture. An installment of principal of or interest shall be considered paid on the date due if on such date the Trustee or the Paying Agent holds as of 12:00 p.m. Eastern time money sufficient to pay all principal and interest then due and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the holders on that date pursuant to the terms of this Indenture.

The Issuer shall pay interest on overdue principal at the rate specified therefor in the Notes, and it shall pay interest on overdue installments of interest at the same rate borne by the Notes to the extent lawful.

SECTION 4.02. Reports and Other Information.

(a) Notwithstanding that the Issuer may not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act or otherwise report on an annual and quarterly basis on forms provided for such annual and quarterly reporting pursuant to rules and regulations promulgated by

the SEC, the Issuer shall file with the SEC (and provide the Trustee and holders with copies thereof, without cost to each holder, within 15 days after it files them with the SEC),

(i) within the time period specified in the SEC's rules and regulations for non-accelerated filers, annual reports on Form 10-K (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form),

(ii) within the time period specified in the SEC's rules and regulations for non-accelerated filers, reports on Form 10-Q (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form),

(iii) promptly from time to time after the occurrence of an event required to be therein reported (and in any event within the time period specified in the SEC's rules and regulations), such other reports on Form 8-K (or any successor or comparable form), and

(iv) any other information, documents and other reports which the Issuer would be required to file with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act;

*provided, however,* that the Issuer shall not be so obligated to file such reports with the SEC if the SEC does not permit such filing, in which event the Issuer will make available such information to prospective purchasers of Notes in addition to providing such information to the Trustee and the holders, in each case within 15 days after the time the Issuer would be required to file such information with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act, subject, in the case of any such information, certificates or reports provided prior to the effectiveness of the Exchange Offer Registration Statement or Shelf Registration Statement, to exceptions consistent with the presentation of financial information in the Offering Memorandum.

56

Notwithstanding the foregoing, the Issuer shall not be required to furnish any information, certificates or reports required by Items 307 or 308 of Regulation S-K prior to the effectiveness of the Exchange Offer Registration Statement or Shelf Registration Statement.

(b) In the event that:

(i) the rules and regulations of the SEC permit the Issuer and any direct or indirect parent of the Issuer to report at such parent entity's level on a consolidated basis and such parent entity is not engaged in any business in any material respect other than incidental to its ownership, directly or indirectly, of the capital stock of the Issuer, or

(ii) any direct or indirect parent of the Issuer is or becomes a Guarantor of the Notes,

consolidating reporting at the parent entity's level in a manner consistent with that described in this Section 4.02 and furnishing financial information relating to such direct or indirect parent for the Issuer will satisfy this Section 4.02; *provided* that such financial information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such direct or indirect parent and any of its Subsidiaries other than the Issuer and its Subsidiaries, on the one hand, and the information relating to the Issuer, the Subsidiary Pledgors and the other Subsidiaries of the Issuer on a standalone basis, on the other hand.

(c) The Issuer will make such information available to prospective investors upon request. In addition, the Issuer has agreed that, for so long as any Notes remain outstanding during any period when it is not subject to Section 13 or 15(d) of the Exchange Act, or otherwise permitted to furnish the SEC with certain information pursuant to Rule 12g3-2(b) of the Exchange Act, it will furnish to the holders of the Notes and to prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

Notwithstanding the foregoing, the Issuer will be deemed to have furnished such reports referred to above to the Trustee and the holders if the Issuer has filed such reports with the SEC via the EDGAR filing system and such reports are publicly available. In addition, the requirements of this Section 4.02 shall be deemed satisfied prior to the commencement of the exchange offers contemplated by the Registration Rights Agreement relating to the Notes or the effectiveness of the Shelf Registration Statement by (1) the filing with the SEC of the Exchange Offer Registration Statement and/or Shelf Registration Statement in accordance with the provisions of such Registration Rights Agreement, and any amendments thereto, if such registration statement and/or amendments thereto are filed at times that otherwise satisfy the time requirements set forth in Section 4.02(a) and/or (2) the posting of reports that would be required to be provided to the Trustee and the holders on the Issuer's website (or that of any of its parent companies).

57

SECTION 4.03. <u>Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock</u>.

(a) (i) The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness (including Acquired Indebtedness) or issue any shares of Disqualified Stock; and (ii) the Issuer shall not permit any of its Restricted Subsidiaries (other than a Subsidiary Pledgor) to issue any shares of Preferred Stock; *provided, however,* that the Issuer and any Subsidiary Pledgor may Incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified Stock, and, subject to Section 4.03(c), any Restricted Subsidiary of the Issuer that

is not a Subsidiary Pledgor may Incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock or issue shares of Preferred Stock, in each case if the Fixed Charge Coverage Ratio of the Issuer for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is Incurred or such Disqualified Stock or Preferred Stock is issued would have been at least 2.00 to 1.00 determined on a *pro forma* basis (including a *pro forma* application of the net proceeds therefrom), as if the additional Indebtedness had been Incurred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, and the application of proceeds therefrom had occurred at the beginning of such four-quarter period.

(b) The limitations set forth in Section 4.03(a) shall not apply to:

(i) the Incurrence by the Issuer or its Restricted Subsidiaries of Indebtedness under the Credit Agreement and the issuance and creation of letters of credit and bankers' acceptances thereunder up to an aggregate principal amount of $11,000 million;

(ii) the Incurrence of Indebtedness represented by the Notes (not including any Additional Notes, but including any Exchange Notes);

(iii) Indebtedness existing on the Issue Date (other than Indebtedness described in clauses (i) and (ii) of this Section 4.03(b));

(iv) Indebtedness (including Capitalized Lease Obligations) Incurred by the Issuer or any of its Restricted Subsidiaries, Disqualified Stock issued by the Issuer or any of its Restricted Subsidiaries and Preferred Stock issued by any Restricted Subsidiary of the Issuer to finance (whether prior to or within 270 days after) the acquisition, lease, construction, repair, replacement or improvement of property (real or personal) or equipment (whether through the direct purchase of assets or the Capital Stock of any Person owning such assets);

(v) Indebtedness Incurred by the Issuer or any of its Restricted Subsidiaries constituting reimbursement obligations with respect to letters of credit and bank guarantees issued in the ordinary course of business, including without limitation letters of credit in respect of workers' compensation claims, health, disability or other benefits to employees or former employees or their families or property, casualty or liability insurance or self-insurance, and letters of credit in connection with the maintenance of, or pursuant to the requirements of, environmental or other permits or licenses from governmental authorities, or other Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims;

(vi) Indebtedness arising from agreements of the Issuer or a Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations, in each case, Incurred in connection with the Acquisition Transactions or any other acquisition or disposition of any business, assets or a Subsidiary of the Issuer in accordance with the terms of this Indenture, other than guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition;

(vii) Indebtedness of the Issuer to a Restricted Subsidiary; *provided* that (except in respect of intercompany current liabilities Incurred in the ordinary course of business in connection with the cash management operations of the Issuer and its Subsidiaries) any such Indebtedness owed to a Restricted Subsidiary that is not a Subsidiary Pledgor is subordinated in right of payment to the obligations of the Issuer under the Notes; *provided, further,* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Issuer or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (vii);

(viii) shares of Preferred Stock of a Restricted Subsidiary issued to the Issuer or another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary that holds such shares of Preferred Stock of another Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to the Issuer or another Restricted Subsidiary) shall be deemed, in each case, to be an issuance of shares of Preferred Stock not permitted by this clause (viii);

(ix) Indebtedness of a Restricted Subsidiary to the Issuer or another Restricted Subsidiary; *provided* that if a Subsidiary Pledgor Incurs such Indebtedness to a Restricted Subsidiary that is not a Subsidiary Pledgor (except in respect of intercompany current liabilities Incurred in the ordinary course of business in connection with the cash management operations of the Issuer and its Subsidiaries), such Indebtedness is subordinated in right of payment to the obligations of such Subsidiary Pledgor in respect of the Notes; *provided, further,* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary holding such Indebtedness ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Issuer or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (ix);

(x) (A) Hedging Obligations entered into in connection with the Acquisition Transactions and (B) Hedging Obligations that are not Incurred for speculative purposes but (1) for the purpose of fixing or hedging interest rate risk with respect to any Indebtedness that is permitted by the terms of this Indenture to be outstanding; (2) for the purpose of fixing or hedging currency exchange rate risk with respect to any currency exchanges; or (3) for the purpose of fixing or hedging commodity price risk with respect to any commodity purchases or sales;

http://www.sec.gov/Archives/edgar/data/858339/000119312509082553/dex41.htm[8/7/2014 10:22:16 AM]

(xi) obligations (including reimbursement obligations with respect to letters of credit and bank guarantees) in respect of performance, bid, appeal and surety bonds and completion guarantees provided by the Issuer or any Restricted Subsidiary in the ordinary course of business or consistent with past practice or industry practice;

(xii) Indebtedness or Disqualified Stock of the Issuer or, subject to Section 4.03(c), Indebtedness, Disqualified Stock or Preferred Stock of any Restricted Subsidiary of the Issuer not otherwise permitted hereunder in an aggregate principal amount or liquidation preference which, when aggregated with the principal amount or liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and Incurred pursuant to this clause (xii), does not exceed the greater of $1,100 million and 5.0% of Total Assets at the time of Incurrence (it being understood that any Indebtedness Incurred pursuant to this clause (xii) shall cease to be deemed Incurred or outstanding for purposes of this clause (xii) but shall be deemed Incurred for purposes of Section 4.03(a) from and after the first date on which the Issuer, or the Restricted Subsidiary, as the case may be, could have Incurred such Indebtedness under Section 4.03(a) without reliance upon this clause (xii));

(xiii) Indebtedness or Disqualified Stock of the Issuer or any Restricted Subsidiary of the Issuer and Preferred Stock of any Restricted Subsidiary of the Issuer not otherwise permitted hereunder in an aggregate principal amount or liquidation preference not greater than 200.0% of the net cash proceeds received by the Issuer and its Restricted Subsidiaries since immediately after the Issue Date from the issue or sale of Equity Interests of the Issuer or any direct or indirect parent entity of the Issuer (which proceeds are contributed to the Issuer or its Restricted Subsidiary) or cash contributed to the capital of the Issuer (in each case other than proceeds of Disqualified Stock or sales of Equity Interests to, or contributions received from, the Issuer or any of its Subsidiaries) as determined in accordance with clauses (B) and (C) of the definition of "Cumulative Credit" to the extent such net cash proceeds or cash have not been applied pursuant to such clauses to make Restricted Payments or to make other Investments, payments or exchanges pursuant to Section 4.04(b) or to make Permitted Investments (other than Permitted Investments specified in clauses (1) and (3) of the definition thereof);

(xiv) any guarantee by the Issuer or any Restricted Subsidiary of the Issuer of Indebtedness or other obligations of the Issuer or any of its Restricted Subsidiaries so long as the Incurrence of such Indebtedness Incurred by the Issuer or such Restricted Subsidiary is permitted under the terms of this Indenture; *provided* that (i) if such Indebtedness is by its express terms subordinated in right of payment to the Notes or the obligations of such Restricted Subsidiary in respect of the Notes, as applicable, any such guarantee of such Subsidiary Pledgor with respect to such Indebtedness shall be subordinated in right of payment to such Subsidiary Pledgor's obligations with respect to the Notes substantially to the same extent as such Indebtedness is subordinated to the Notes or the obligations of such Subsidiary Pledgor in respect of the Notes, as applicable and (ii) if such guarantee is of Indebtedness of the Issuer, such guarantee is Incurred in accordance with Section 4.11 solely to the extent such Section is applicable;

(xv) the Incurrence by the Issuer or any of its Restricted Subsidiaries of Indebtedness or Disqualified Stock or Preferred Stock of a Restricted Subsidiary of the Issuer which serves to refund, refinance or defease any Indebtedness Incurred or Disqualified Stock or Preferred Stock issued as permitted under Section 4.03(a) and clauses (ii), (iii), (iv), (xii), (xiii), (xv), (xvi), (xx) and (xxiv) of this Section 4.03(b) or any Indebtedness, Disqualified Stock or Preferred Stock Incurred to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock, including any additional Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay premiums (including tender premiums), expenses, defeasance costs and fees in connection therewith (subject to the following proviso, "<u>Refinancing Indebtedness</u>") prior to its respective maturity; *provided, however,* that such Refinancing Indebtedness:

(1) has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded, refinanced or defeased and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Indebtedness, Disqualified Stock and Preferred Stock being refunded or refinanced that were due on or after the date that is one year following the last maturity date of any Notes then outstanding were instead due on such date;

(2) to the extent such Refinancing Indebtedness refinances (a) Indebtedness junior to the Notes or the obligations of such Restricted Subsidiary in respect of the Notes, as applicable, such Refinancing Indebtedness is junior to the Notes or such obligations of such Restricted Subsidiary, as applicable, or (b) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness is Disqualified Stock or Preferred Stock; and

(3) shall not include (x) Indebtedness of a Restricted Subsidiary of the Issuer that is not a Subsidiary Pledgor that refinances Indebtedness of the Issuer or a Subsidiary Pledgor, or (y) Indebtedness of the Issuer or a Restricted Subsidiary that refinances Indebtedness of an Unrestricted Subsidiary:

*provided, further,* that subclause (1) of this clause (xv) will not apply to any refunding or refinancing of any Secured Indebtedness constituting First Priority Lien Obligations and subclauses (1) and (2) of this clause (xv) will not apply to any refunding or refinancing of any of the Retained Notes;

(xvi) Indebtedness, Disqualified Stock or Preferred Stock of (x) the Issuer or, subject to Section 4.03(c), any of its Restricted Subsidiaries Incurred to finance an acquisition or (y) Persons that are acquired by the Issuer or any of its Restricted Subsidiaries or merged, consolidated or amalgamated with or into the Issuer or any of its Restricted Subsidiaries in accordance with the terms of this Indenture; *provided* that after giving effect to such acquisition or merger, consolidation or amalgamation, either:

(1) the Issuer would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a); or

61

(2) the Fixed Charge Coverage Ratio of the Issuer would be greater than immediately prior to such acquisition or merger, consolidation or amalgamation;

(xvii) Indebtedness Incurred by a Receivables Subsidiary in a Qualified Receivables Financing that is not recourse to the Issuer or any Restricted Subsidiary other than a Receivables Subsidiary (except for Standard Securitization Undertakings);

(xviii) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within five Business Days of its Incurrence;

(xix) Indebtedness of the Issuer or any Restricted Subsidiary supported by a letter of credit or bank guarantee issued pursuant to the Credit Agreement, in a principal amount not in excess of the stated amount of such letter of credit;

(xx) Indebtedness of Foreign Subsidiaries; *provided, however,* that the aggregate principal amount of Indebtedness Incurred under this clause (xx), when aggregated with the principal amount of all other Indebtedness then outstanding and Incurred pursuant to this clause (xx), does not exceed the greater of $250.0 million and 7.5% of Total Assets of the Foreign Subsidiaries at any one time outstanding (it being understood that any Indebtedness Incurred pursuant to this clause (xx) shall cease to be deemed Incurred or outstanding for purposes of this clause (xx) but shall be deemed Incurred for the purposes of Section 4.03(a) from and after the first date on which such Foreign Subsidiary could have Incurred such Indebtedness under Section 4.03(a) without reliance upon this clause (xx));

(xxi) Indebtedness of the Issuer or any Restricted Subsidiary consisting of (1) the financing of insurance premiums or (2) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(xxii) Indebtedness consisting of Indebtedness issued by the Issuer or a Restricted Subsidiary of the Issuer to current or former officers, directors and employees thereof or any direct or indirect parent thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Issuer or any of its direct or indirect parent companies to the extent described in Section 4.04(b)(iv);

(xxiii) Indebtedness Incurred in connection with any Project Financing; and

(xxiv) Indebtedness Incurred on behalf of, or representing guarantees of Indebtedness of, joint ventures of the Issuer or any Restricted Subsidiary not in excess, at any one time outstanding, of $300.0 million.

62

(c) Restricted Subsidiaries that are not Subsidiary Pledgors may not Incur Indebtedness or issue Disqualified Stock or Preferred Stock under Section 4.03(a) or clauses (xii) or (xvi)(x) of Section 4.03(b) if, after giving *pro forma* effect to such Incurrence or issuance (including a *pro forma* application of the net proceeds therefrom), the aggregate amount of Indebtedness and Disqualified Stock and Preferred Stock of Restricted Subsidiaries that are not Subsidiary Pledgors Incurred or issued pursuant to Section 4.03(a) and clauses (xii) or (xvi)(x) of Section 4.03(b), collectively, would exceed the greater of $2,000 million and 5.0% of Total Assets.

(d) For purposes of determining compliance with this Section 4.03:

(i) in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness described in clauses (i) through (xxiv) above or is entitled to be Incurred pursuant to Section 4.03(a), the Issuer shall, in its sole discretion, classify or reclassify, or later divide, classify or reclassify, such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) in any manner that complies with this Section 4.03; and

(ii) at the time of Incurrence, the Issuer will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in Section 4.03(a) and (b) without giving *pro forma* effect to the Indebtedness Incurred pursuant to Section 4.03(b) when calculating the amount of Indebtedness that may be Incurred pursuant to Section 4.03(a).

Accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock, as applicable, amortization of original issue discount, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an Incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 4.03. Guarantees of, or obligations in respect of letters of credit relating to, Indebtedness which is otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness; *provided* that the Incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this Section 4.03.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the Incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in

effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed or first Incurred (whichever yields the lower U.S. dollar equivalent), in the case of revolving credit debt; *provided* that if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

63

(e) Notwithstanding any other provision of this Section 4.03, the maximum amount of Indebtedness that the Issuer and its Restricted Subsidiaries may Incur pursuant to this Section 4.03 shall not be deemed to be exceeded, with respect to any outstanding Indebtedness, solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

SECTION 4.04. Limitation on Restricted Payments.

(a) The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

(i) declare or pay any dividend or make any distribution on account of the Issuer's or any of its Restricted Subsidiaries' Equity Interests, including any payment made in connection with any merger, amalgamation or consolidation involving the Issuer (other than (A) dividends or distributions by the Issuer payable solely in Equity Interests (other than Disqualified Stock) of the Issuer; or (B) dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a Wholly Owned Restricted Subsidiary, the Issuer or a Restricted Subsidiary receives at least its pro rata share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities);

(ii) purchase or otherwise acquire or retire for value any Equity Interests of the Issuer or any direct or indirect parent of the Issuer;

(iii) make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case prior to any scheduled repayment or scheduled maturity, any Subordinated Indebtedness or Long-Term Retained Notes of the Issuer or any of its Restricted Subsidiaries (other than the payment, redemption, repurchase, defeasance, acquisition or retirement of (A) Subordinated Indebtedness or Long-Term Retained Notes in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such payment, redemption, repurchase, defeasance, acquisition or retirement and (B) Indebtedness permitted under clauses (vii) and (ix) of Section 4.03(b)); or

(iv) make any Restricted Investment

(all such payments and other actions set forth in clauses (i) through (iv) above being collectively referred to as "Restricted Payments"), unless, at the time of such Restricted Payment:

(1) no Default shall have occurred and be continuing or would occur as a consequence thereof;

64

(2) immediately after giving effect to such transaction on a *pro forma* basis, the Issuer could Incur $1.00 of additional Indebtedness under Section 4.03(a); and

(3) such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Issuer and its Restricted Subsidiaries after the Issue Date (including Restricted Payments permitted by clauses (i), (ii) (with respect to the payment of dividends on Refunding Capital Stock (as defined below) pursuant to clause (C) thereof), (vi)(C), (viii), (xiii)(B) and (xix) of Section 4.04(b), but excluding all other Restricted Payments permitted by Section 4.04(b)), is less than the amount equal to the Cumulative Credit.

(b) The provisions of Section 4.04(a) shall not prohibit:

(i) the payment of any dividend or distribution within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Indenture;

(ii) (A) the redemption, repurchase, retirement or other acquisition of any Equity Interests ("Retired Capital Stock") or Subordinated Indebtedness of the Issuer, any direct or indirect parent of the Issuer or any Subsidiary Pledgor in exchange for, or out of the proceeds of, the substantially concurrent sale of, Equity Interests of the Issuer or any direct or indirect parent of the Issuer or contributions to the equity capital of the Issuer (other than any Disqualified Stock or any Equity Interests sold to a Subsidiary of the Issuer) (collectively, including any such contributions, "Refunding Capital Stock"),

(B) the declaration and payment of dividends on the Retired Capital Stock out of the proceeds of the substantially concurrent sale (other than to a Subsidiary of the Issuer) of Refunding Capital Stock, and

(C) if immediately prior to the retirement of Retired Capital Stock, the declaration and payment of dividends thereon was

permitted under clause (vi) of this Section 4.04(b) and not made pursuant to clause (ii)(B), the declaration and payment of dividends on the Refunding Capital Stock (other than Refunding Capital Stock the proceeds of which were used to redeem, repurchase, retire or otherwise acquire any Equity Interests of any direct or indirect parent of the Issuer) in an aggregate amount per year no greater than the aggregate amount of dividends per annum that were declarable and payable on such Retired Capital Stock immediately prior to such retirement;

65

(iii) the redemption, repurchase, defeasance, or other acquisition or retirement of Subordinated Indebtedness of the Issuer or any Subsidiary Pledgor made by exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Issuer or a Subsidiary Pledgor which is Incurred in accordance with Section 4.03 so long as:

(A) the principal amount (or accreted value, if applicable) of such new Indebtedness does not exceed the principal amount (or accreted value, if applicable), *plus* any accrued and unpaid interest, of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired for value (*plus* the amount of any premium required to be paid under the terms of the instrument governing the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired, any tender premiums, *plus* any defeasance costs, fees and expenses Incurred in connection therewith),

(B) such Indebtedness is subordinated to the Notes or such Subsidiary Pledgor's obligations in respect of the Notes, as the case may be, at least to the same extent as such Subordinated Indebtedness so purchased, exchanged, redeemed, repurchased, defeased, acquired or retired for value,

(C) such Indebtedness has a final scheduled maturity date equal to or later than the earlier of (x) the final scheduled maturity date of the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired and (y) 91 days following the last maturity date of any Notes then outstanding, and

(D) such Indebtedness has a Weighted Average Life to Maturity at the time Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Subordinated Indebtedness being redeemed, repurchased, defeased, acquired or retired that were due on or after the date that is one year following the last maturity date of any Notes then outstanding were instead due on such date;

(iv) a Restricted Payment to pay for the repurchase, retirement or other acquisition for value of Equity Interests of the Issuer or any direct or indirect parent of the Issuer held by any future, present or former employee, director or consultant of the Issuer or any direct or indirect parent of the Issuer or any Subsidiary of the Issuer pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or other agreement or arrangement; *provided, however,* that the aggregate Restricted Payments made under this clause (iv) do not exceed $50.0 million in any calendar year (with unused amounts in any calendar year being permitted to be carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $100.0 million in any calendar year (which shall increase to $150.0 million subsequent to the consummation of an underwritten public Equity Offering of common stock); *provided, further,* however, that such amount in any calendar year may be increased by an amount not to exceed:

(A) the cash proceeds received by the Issuer or any of its Restricted Subsidiaries from the sale of Equity Interests (other than Disqualified Stock) of the Issuer or any direct or indirect parent of the Issuer (to the extent contributed to the Issuer) to members of management, directors or consultants of the Issuer and its Restricted Subsidiaries or any direct or indirect parent of the Issuer that occurs

66

after the Issue Date (*provided* that the amount of such cash proceeds utilized for any such repurchase, retirement, other acquisition or dividend will not increase the amount available for Restricted Payments under Section 4.04(a)(iii)), *plus*

(B) the cash proceeds of key man life insurance policies received by the Issuer or any direct or indirect parent of the Issuer (to the extent contributed to the Issuer) or the Issuer's Restricted Subsidiaries after the Issue Date, *plus*

(C) the amount of any cash bonuses otherwise payable to members of management, directors or consultants of the Issuer and its Restricted Subsidiaries or any direct or indirect parent of the Issuer in connection with the Acquisition Transactions that are forgone in return for the receipt of Equity Interests;

*provided* that the Issuer may elect to apply all or any portion of the aggregate increase contemplated by clauses (A), (B) and (C) above in any calendar year; and *provided, further,* that cancellation of Indebtedness owing to the Issuer or any Restricted Subsidiary from any present or former employees, directors, officers or consultants of the Issuer, any of its Restricted Subsidiaries or its direct or indirect parents in connection with a repurchase of Equity Interests of the Issuer or any of its direct or indirect parents will not be deemed to constitute a Restricted Payment for purposes of this Section 4.04 or any other provision of this Indenture;

(v) the declaration and payment of dividends or distributions to holders of any class or series of Disqualified Stock of the Issuer or any of its Restricted Subsidiaries issued or Incurred in accordance with Section 4.03 to the extent such dividends are included in the definition of

"Fixed Charges";

(vi) (A) the declaration and payment of dividends or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date;

(B) a Restricted Payment to any direct or indirect parent of the Issuer, the proceeds of which will be used to fund the payment of dividends to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) of any direct or indirect parent of the Issuer issued after the Issue Date; *provided* that the aggregate amount of dividends declared and paid pursuant to this clause (B) does not exceed the net cash proceeds actually received by the Issuer from any such sale of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date; and

(C) the declaration and payment of dividends on Refunding Capital Stock that is Preferred Stock in excess of the dividends declarable and payable thereon pursuant to Section 4.04(b)(ii);

*provided, however,* in the case of each of (A) and (C) above of this clause (vi), that for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock, after giving effect to such issuance (and the payment of dividends or distributions) on a *pro forma* basis, the Issuer would have had a Fixed Charge Coverage Ratio of at least 2.00 to 1.00;

(vii) Investments in Unrestricted Subsidiaries having an aggregate Fair Market Value (as determined in good faith by the Issuer), taken together with all other Investments made pursuant to this clause (vii) that are at that time outstanding, not to exceed $250.0 million at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(viii) the payment of dividends on the Issuer's common stock (or a Restricted Payment to any direct or indirect parent of the Issuer to fund the payment by such direct or indirect parent of the Issuer of dividends on such entity's common stock) of up to 6% per annum of the net proceeds received by the Issuer from any public offering of common stock of the Issuer or any direct or indirect parent of the Issuer, other than public offerings with respect to the Issuer's (or such direct or indirect parent's) common stock registered on Form S-4 or Form S-8 and other than any public sale constituting an Excluded Contribution;

(ix) Restricted Payments that are made with Excluded Contributions;

(x) other Restricted Payments in an aggregate amount not to exceed the greater of $500.0 million and 2.5% of Total Assets at the time made;

(xi) the distribution, as a dividend or otherwise, of shares of Capital Stock of, or Indebtedness owed to the Issuer or a Restricted Subsidiary of the Issuer by, Unrestricted Subsidiaries;

(xii) the payment of dividends or other distributions to any direct or indirect parent of the Issuer that files a consolidated tax return that includes the Issuer and its subsidiaries (including, without limitation, by virtue of such parent being the common parent of a consolidated or combined tax group of which the Issuer and/or its Restricted Subsidiaries are members) in an amount not to exceed the amount that the Issuer and its Restricted Subsidiaries would have been required to pay in respect of federal, state or local taxes (as the case may be) if the Issuer and its Restricted Subsidiaries paid such taxes as a stand-alone taxpayer (or stand-alone group);

(xiii) the payment of Restricted Payment, if applicable:

(A) in amounts required for any direct or indirect parent of the Issuer to pay fees and expenses (including franchise or similar taxes) required to maintain its corporate existence, customary salary, bonus and other benefits payable to, and indemnities *provided* on behalf of, officers and employees of any direct or indirect parent of the Issuer and general corporate operating and overhead expenses of any direct or indirect parent of the Issuer in each case to the extent such fees and expenses are attributable to the ownership or operation of the Issuer, if applicable, and its Subsidiaries;

(B) in amounts required for any direct or indirect parent of the Issuer, if applicable, to pay interest and/or principal on Indebtedness the proceeds of which have been contributed to the Issuer or any of its Restricted Subsidiaries and that has been guaranteed by, or is otherwise considered Indebtedness of, the Issuer Incurred in accordance with Section 4.03; and

(C) in amounts required for any direct or indirect parent of the Issuer to pay fees and expenses, other than to Affiliates of the Issuer, related to any unsuccessful equity or debt offering of such parent;

(xiv) any Restricted Payment used to fund the Acquisition Transactions or the Transactions and the payment of fees and expenses Incurred in connection with the Acquisition Transactions or the Transactions or owed by the Issuer or any direct or indirect parent of the Issuer or Restricted Subsidiaries of the Issuer to Affiliates, and any other payments made, including any such payments made to any direct or indirect parent of the Issuer to enable it to make payments, in connection with the consummation of the Transactions or as contemplated by

the Acquisition Documents, whether payable on the Issue Date or thereafter, in each case to the extent permitted by Section 4.07;

(xv) any Restricted Payment made under the Operations Management Agreement;

(xvi) repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(xvii) purchases of receivables pursuant to a Receivables Repurchase Obligation in connection with a Qualified Receivables Financing and the payment or distribution of Receivables Fees;

(xviii) Restricted Payments by the Issuer or any Restricted Subsidiary to allow the payment of cash in lieu of the issuance of fractional shares upon the exercise of options or warrants or upon the conversion or exchange of Capital Stock of any such Person;

(xix) the repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness pursuant to the provisions similar to those described under Sections 4.06 and 4.08; *provided* that all Notes tendered by holders of the Notes in connection with a Change of Control Offer or Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value;

(xx) payments or distributions to dissenting stockholders pursuant to applicable law, pursuant to or in connection with a consolidation, amalgamation, merger or transfer of all or substantially all of the assets of the Issuer and its Restricted Subsidiaries, taken as a whole, that complies with Section 5.01; *provided* that as a result of such consolidation, amalgamation, merger or transfer of assets, the Issuer shall have made a Change of Control Offer (if required by this Indenture) and that all Notes tendered by holders in connection with such Change of Control Offer have been repurchased, redeemed or acquired for value;

69

(xxi) payments made to repay, defease, discharge or otherwise refinance Retained Notes or to service Retained Notes; and

(xxii) Restricted Payments made in connection with the Incurrence of Indebtedness under the revolving portion of the Credit Agreement for the account or benefit of the Subsidiaries of Harrah's Entertainment other than the Issuer or any of its Subsidiaries (including the distribution of the proceeds of any such Indebtedness and with respect to the issuance of, or payments in respect of drawings under, letters of credit), in each case for general corporate purposes of such Subsidiaries (including, without limitation, for business acquisitions and project development and, in the case of letters of credit, for the back-up or replacement of existing letters of credit) in an aggregate amount not to exceed $250.0 million at any time outstanding, so long as such proceeds are not distributed to the stockholders of Harrah's Entertainment;

*provided, however,* that at the time of, and after giving effect to, any Restricted Payment permitted under clauses (vi)(B), (vii), (x), (xi) and (xiii)(B) of this Section 4.04(b), no Default shall have occurred and be continuing or would occur as a consequence thereof.

(c) The Issuer will not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the definition of "Unrestricted Subsidiary." For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by the Issuer and its Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated will be deemed to be Restricted Payments in an amount determined as set forth in the last sentence of the definition of "Investments." Such designation will only be permitted if a Restricted Payment or Permitted Investment in such amount would be permitted at such time and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.

Notwithstanding the foregoing provisions of this Section 4.04, the Issuer will not, and will not permit any of its Restricted Subsidiaries to, pay any cash dividend or make any cash distribution on, or in respect of, the Issuer's Capital Stock or purchase for cash or otherwise acquire for cash any Capital Stock of the Issuer or any direct or indirect parent of the Issuer for the purpose of paying any cash dividend or making any cash distribution to, or acquiring Capital Stock of any direct or indirect parent of the Issuer for cash from, the Sponsors, or guarantee any Indebtedness of any Affiliate of the Issuer for the purpose of paying such dividend, making such distribution or so acquiring such Capital Stock to or from the Sponsors, in each case by means of utilization of the cumulative Restricted Payment credit provided by Section 4.04(a), or the exceptions *provided* by clause (i), (vii) or (x) of Section 4.04(b) or clause (9), (10), (15) or (20) of the definition of "Permitted Investments," if (x) at the time and after giving effect to such payment, the Consolidated Leverage Ratio of the Issuer would be greater than 7.25 to 1.00 or (y) such payment is not otherwise in compliance with this Section 4.04.

SECTION 4.05. <u>Dividend and Other Payment Restrictions Affecting Subsidiaries</u>. The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary to:

(a) (i) pay dividends or make any other distributions to the Issuer or any of its Restricted Subsidiaries (1) on its Capital Stock; or (2) with respect to any other interest or participation in, or measured by, its profits; or (ii) pay any Indebtedness owed to the Issuer or any of its Restricted Subsidiaries;

70

(b) make loans or advances to the Issuer or any of its Restricted Subsidiaries;

or

(c) sell, lease or transfer any of its properties or assets to the Issuer or any of its Restricted Subsidiaries;

except in each case for such encumbrances or restrictions existing under or by reason of:

(1) contractual encumbrances or restrictions in effect on the Issue Date, including pursuant to the Credit Agreement and the other Credit Agreement Documents;

(2) this Indenture, the Notes (and any Exchange Notes);

(3) applicable law or any applicable rule, regulation or order;

(4) any agreement or other instrument of a Person acquired by the Issuer or any Restricted Subsidiary which was in existence at the time of such acquisition (but not created in contemplation thereof or to provide all or any portion of the funds or credit support utilized to consummate such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired;

(5) contracts or agreements for the sale of assets, including any restriction with respect to a Restricted Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Capital Stock or assets of such Restricted Subsidiary;

(6) Secured Indebtedness otherwise permitted to be Incurred pursuant to Sections 4.03 and 4.12 that limit the right of the debtor to dispose of the assets securing such Indebtedness;

(7) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(8) customary provisions in joint venture agreements and other similar agreements entered into in the ordinary course of business;

(9) purchase money obligations for property acquired and Capitalized Lease Obligations in the ordinary course of business;

(10) customary provisions contained in leases, licenses and other similar agreements entered into in the ordinary course of business;

(11) any encumbrance or restriction of a Receivables Subsidiary effected in connection with a Qualified Receivables Financing; *provided, however,* that such restrictions apply only to such Receivables Subsidiary;

(12) other Indebtedness, Disqualified Stock or Preferred Stock (a) of any Restricted Subsidiary of the Issuer that is a Subsidiary Pledgor or a Foreign Subsidiary, (b) of any Restricted Subsidiary that is not a Subsidiary Pledgor or a Foreign Subsidiary so long as such encumbrances and restrictions contained in any agreement or instrument will not materially affect the Issuer's ability to make anticipated principal or interest payments on the Notes (as determined in good faith by the Issuer) or (c) of any Restricted Subsidiary Incurred in connection with any Project Financing, provided that in the case of each of clauses (a) and (b), such Indebtedness, Disqualified Stock or Preferred Stock is permitted to be Incurred subsequent to the Issue Date pursuant to Section 4.03;

(13) any Restricted Investment not prohibited by Section 4.04 and any Permitted Investment; or

(14) any encumbrances or restrictions of the type referred to in clauses (a), (b) and (c) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (1) through (13) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Issuer, no more restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

For purposes of determining compliance with this Section 4.05, (i) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock shall not be deemed a restriction on the ability to make distributions on Capital Stock and (ii) the subordination of loans or advances made to the Issuer or a Restricted Subsidiary of the Issuer to other Indebtedness Incurred by the Issuer or any such Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

SECTION 4.06. Asset Sales.

(a) The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, cause or make an Asset Sale, unless (x) the Issuer or any of its Restricted Subsidiaries, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value (as determined in good faith by the Issuer) of the assets sold or otherwise disposed of, and (y) at least 75% of the consideration therefor received by the Issuer or such Restricted Subsidiary, as the case may be, is in the form of Cash Equivalents; *provided* that the amount of:

(i) any liabilities (as shown on the Issuer's or such Restricted Subsidiary's most recent balance sheet or in the Notes thereto) of the Issuer or any Restricted Subsidiary of the Issuer (other than liabilities that are by their terms subordinated to the Notes or such Restricted Subsidiary's obligations in respect of the Notes) that are assumed by the transferee of any such assets,

(ii) any notes or other obligations or other securities or assets received by the Issuer or such Restricted Subsidiary of the Issuer from such transferee that are converted by the Issuer or such Restricted Subsidiary of the Issuer into cash within 180 days of the receipt thereof (to the extent of the cash received), and

(iii) any Designated Non-cash Consideration received by the Issuer or any of its Restricted Subsidiaries in such Asset Sale having an aggregate Fair Market Value (as determined in good faith by the Issuer), taken together with all other Designated Non-cash Consideration received pursuant to this Section 4.06(a)(iii) that is at that time outstanding, not to exceed the greater of 5.0% of Total Assets and $850.0 million at the time of the receipt of such Designated Non-cash Consideration (with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value)

shall be deemed to be Cash Equivalents for the purposes of this Section 4.06(a).

(b) Within 15 months after the Issuer's or any Restricted Subsidiary of the Issuer's receipt of the Net Proceeds of any Asset Sale, the Issuer or such Restricted Subsidiary of the Issuer may apply the Net Proceeds from such Asset Sale, at its option:

(i) to repay (A) Indebtedness constituting First Priority Lien Obligations and other Pari Passu Indebtedness that is secured by a Lien permitted under this Indenture (and, if the Indebtedness repaid is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto), (B) Indebtedness of a Restricted Subsidiary that is not a Subsidiary Pledgor, (C) Obligations under the Notes or (D) other Pari Passu Indebtedness (*provided* that if the Issuer or any Subsidiary Pledgor shall so reduce Obligations under any Pari Passu Indebtedness that does not constitute First Priority Lien Obligations, the Issuer will equally and ratably reduce Obligations under the Notes pursuant to Section 3.01 through open-market purchases (*provided* that such purchases are at or above 100% of the principal amount thereof) or by making an offer (in accordance with the procedures set forth below for an Asset Sale Offer) to all holders to purchase at a purchase price equal to 100% of the principal amount thereof, *plus* accrued and unpaid interest and Additional Interest, if any, the pro rata principal amount of Notes), in each case other than Indebtedness owed to the Issuer or an Affiliate of the Issuer; or

73

(ii) to make an Investment in any one or more businesses (*provided* that if such Investment is in the form of the acquisition of Capital Stock of a Person, such acquisition results in such Person becoming a Restricted Subsidiary of the Issuer), assets, or property or capital expenditures, in each case (a) used or useful in a Similar Business or (b) that replace the properties and assets that are the subject of such Asset Sale.

In the case of Section 4.06(b)(ii), a binding commitment shall be treated as a permitted application of the Net Proceeds from the date of such commitment; *provided* that in the event such binding commitment is later canceled or terminated for any reason before such Net Proceeds are so applied, the Issuer or such Restricted Subsidiary enters into another binding commitment (a "Second Commitment") within six months of such cancellation or termination of the prior binding commitment; *provided*, *further* that the Issuer or such Restricted Subsidiary may only enter into a Second Commitment under the foregoing provision one time with respect to each Asset Sale and to the extent such Second Commitment is later cancelled or terminated for any reason before such Net Proceeds are applied, then such Net Proceeds shall constitute Excess Proceeds.

Pending the final application of any such Net Proceeds, the Issuer or such Restricted Subsidiary of the Issuer may temporarily reduce Indebtedness under a revolving credit facility, if any, or otherwise invest such Net Proceeds in any manner not prohibited by this Indenture. Any Net Proceeds from any Asset Sale that are not applied as provided and within the time period set forth in the first sentence of this Section 4.06(b) (it being understood that any portion of such Net Proceeds used to make an offer to purchase Notes, as described in clause (i) of this Section 4.06(b), shall be deemed to have been invested whether or not such offer is accepted) will be deemed to constitute "Excess Proceeds." When the aggregate amount of Excess Proceeds exceeds $200.0 million, the Issuer shall make an offer to all holders of Notes (and, at the option of the Issuer, to holders of any Pari Passu Indebtedness) (an "Asset Sale Offer") to purchase the maximum principal amount of Notes (and such Pari Passu Indebtedness), that is at least $2,000 and an integral multiple of $1,000 in excess thereof that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof (or, in the event such Pari Passu Indebtedness was issued with significant original issue discount, 100% of the accreted value thereof), *plus* accrued and unpaid interest and Additional Interest, if any (or, in respect of such Pari Passu Indebtedness, such lesser price, if any, as may be provided for by the terms of such Pari Passu Indebtedness), to the date fixed for the closing of such offer, in accordance with the procedures set forth in this Section 4.06. The Issuer will commence an Asset Sale Offer with respect to Excess Proceeds within ten (10) Business Days after the date that Excess Proceeds exceed $200.0 million by mailing the notice required pursuant to the terms of Section 4.06(f), with a copy to the Trustee. To the extent that the aggregate amount of Notes (and such Pari Passu Indebtedness) tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Issuer may use any remaining Excess Proceeds for any purpose that is not prohibited by this Indenture. If the aggregate principal amount of Notes (and such Pari Passu Indebtedness) surrendered by holders thereof exceeds the amount of Excess Proceeds, the Trustee shall select the Notes to be purchased in the manner described in Section 4.06(e). Upon completion of any such Asset Sale Offer, the amount of Excess Proceeds shall be reset at zero.

(c) The Issuer shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to an Asset Sale Offer.

To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in this Indenture by virtue thereof.

(d) Not later than the date upon which written notice of an Asset Sale Offer is delivered to the Trustee as provided above, the Issuer shall deliver to the Trustee an Officer's Certificate as to (i) the amount of the Excess Proceeds, (ii) the allocation of the Net Proceeds from the Asset Sales pursuant to which such Asset Sale Offer is being made and (iii) the compliance of such allocation with the provisions of Section 4.06(b). On such date, the Issuer shall also irrevocably deposit with the Trustee or with a paying agent (or, if the Issuer or a Wholly Owned Restricted Subsidiary is acting as the Paying Agent, segregate and hold in trust) an amount equal to the Excess Proceeds to be invested in Cash Equivalents, as directed in writing by the Issuer, and to be held for payment in accordance with the provisions of this Section 4.06. Upon the expiration of the period for which the Asset Sale Offer remains open (the "Offer Period"), the Issuer shall deliver to the Trustee for cancellation the Notes or portions thereof that have been properly tendered to and are to be accepted by the Issuer. The Trustee (or the Paying Agent, if not the Trustee) shall, on the date of purchase, mail or deliver payment to each tendering holder in the amount of the purchase price. In the event that the Excess Proceeds delivered by the Issuer to the Trustee are greater than the purchase price of the Notes tendered, the Trustee shall deliver the excess to the Issuer immediately after the expiration of the Offer Period for application in accordance with Section 4.06.

(e) Holders electing to have a Note purchased shall be required to surrender the Note, with an appropriate form duly completed, to the Issuer at the address specified in the notice at least three Business Days prior to the purchase date. Holders shall be entitled to withdraw their election if the Trustee or the Issuer receives not later than one Business Day prior to the purchase date, a telegram, telex, facsimile transmission or letter setting forth the name of the holder, the principal amount of the Note which was delivered by the holder for purchase and a statement that such holder is withdrawing his election to have such Note purchased. If at the end of the Offer Period more Notes (and such Pari Passu Indebtedness) are tendered pursuant to an Asset Sale Offer than the Issuer is required to purchase, selection of such Notes for purchase shall be made by the Trustee in compliance with the requirements of the principal national securities exchange, if any, on which such Notes are listed, or if such Notes are not so listed, on a pro rata basis, by lot or by such other method as the Trustee shall deem fair and appropriate (and in such manner as complies with applicable legal requirements); *provided* that no Notes of $2,000 or less shall be purchased in part. Selection of such Pari Passu Indebtedness shall be made pursuant to the terms of such Pari Passu Indebtedness.

(f) Notices of an Asset Sale Offer shall be mailed by first class mail, postage prepaid, at least 30 but not more than 60 days before the purchase date to each holder of Notes at such holder's registered address. If any Note is to be purchased in part only, any notice of purchase that relates to such Note shall state the portion of the principal amount thereof that has been or is to be purchased.

SECTION 4.07. Transactions with Affiliates.

(a) The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Issuer (each of the foregoing, an "Affiliate Transaction") involving aggregate consideration in excess of $25.0 million, unless:

(i) such Affiliate Transaction is on terms that are not materially less favorable to the Issuer or the relevant Restricted Subsidiary than those that could have been obtained in a comparable transaction by the Issuer or such Restricted Subsidiary with an unrelated Person; and

(ii) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $75.0 million, the Issuer delivers to the Trustee a resolution adopted in good faith by the majority of the Board of Directors of the Issuer, approving such Affiliate Transaction and set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with clause (a) above.

(b) The provisions of Section 4.07(a) shall not apply to the following:

(i) transactions between or among the Issuer and/or any of its Restricted Subsidiaries (or an entity that becomes a Restricted Subsidiary as a result of such transaction) and any merger, consolidation or amalgamation of the Issuer and any direct parent of the Issuer; *provided* that such parent shall have no material liabilities and no material assets other than cash, Cash Equivalents and the Capital Stock of the Issuer and such merger, consolidation or amalgamation is otherwise in compliance with the terms of this Indenture and effected for a bona fide business purpose;

(ii) Restricted Payments permitted by Section 4.04 and Permitted Investments;

(iii) (x) the entering into of any agreement (and any amendment or modification of any such agreement so long as, in the good faith judgment of the Board of Directors of the Issuer, any such amendment is not disadvantageous to the holders when taken as a whole, as compared to such agreement as in effect on the Issue Date) to pay, and the payment of, management, consulting, monitoring and advisory fees to the Sponsors in an aggregate amount in any fiscal year not to exceed the greater of (A) $30.0 million and (B) 1.0% of EBITDA of the

Issuer and its Restricted Subsidiaries for the immediately preceding fiscal year, *plus* out-of-pocket expense reimbursement; *provided, however,* that any payment not made in any fiscal year may be carried forward and paid in the following two fiscal years and (y) the payment of the present value of all amounts payable pursuant to any agreement described in clause (iii)(x) of this Section 4.07(b) in connection with the termination of such agreement;

(iv) the payment of reasonable and customary fees and reimbursement of expenses paid to, and indemnity provided on behalf of, officers, directors, employees or consultants of the Issuer or any Restricted Subsidiary, any direct or indirect parent of the Issuer;

76

(v) payments by the Issuer or any of its Restricted Subsidiaries to the Sponsors made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including, without limitation, in connection with acquisitions or divestitures, which payments are (x) made pursuant to the agreements with the Sponsors described in the Offering Memorandum or (y) approved by a majority of the Board of Directors of the Issuer in good faith;

(vi) transactions in which the Issuer or any of its Restricted Subsidiaries, as the case may be, delivers to the Trustee a letter from an Independent Financial Advisor stating that such transaction is fair to the Issuer or such Restricted Subsidiary from a financial point of view or meets the requirements of clause (i) of Section 4.07(a);

(vii) payments or loans (or cancellation of loans) to officers, directors, employees or consultants which are approved by a majority of the Board of Directors of the Issuer in good faith;

(viii) any agreement as in effect as of the Issue Date or any amendment thereto (so long as any such agreement together with all amendments thereto, taken as a whole, is not more disadvantageous to the holders of the Notes in any material respect than the original agreement as in effect on the Issue Date) or any transaction contemplated thereby as determined in good faith by the Issuer;

(ix) the existence of, or the performance by the Issuer or any of its Restricted Subsidiaries of its obligations under the terms of, Acquisition Documents, any stockholders agreement (including any registration rights agreement or purchase agreement related thereto) to which it is a party as of the Issue Date, and any transaction, agreement or arrangement described in the Offering Memorandum and, in each case, any amendment thereto or similar transactions, agreements or arrangements which it may enter into thereafter; *provided, however,* that the existence of, or the performance by the Issuer or any of its Restricted Subsidiaries of its obligations under, any future amendment to any such existing transaction, agreement or arrangement or under any similar transaction, agreement or arrangement entered into after the Issue Date shall only be permitted by this clause (ix) to the extent that the terms of any such existing transaction, agreement or arrangement together with all amendments thereto, taken as a whole, or new transaction, agreement or arrangement are not otherwise more disadvantageous to the holders of the Notes in any material respect than the original transaction, agreement or arrangement as in effect on the Issue Date;

(x) the execution of the Acquisition Transactions, and the payment of all fees and expenses related to the Acquisition Transactions, including fees to the Sponsors, which are described in the Offering Memorandum or contemplated by the Acquisition Documents;

(xi) any transactions made pursuant to any Operations Management Agreement and any transactions in connection with the use of the revolving credit facility under the Credit Agreement for the account or benefit of the Subsidiaries of Harrah's Entertainment other than the Issuer and its Subsidiaries (including the distribution of the proceeds of any such revolving credit Indebtedness and with respect to the issuance of, or payments in respect of drawings under, letters of credit);

77

(xii) (A) transactions with customers, clients, suppliers or purchasers or sellers of goods or services, or transactions otherwise relating to the purchase or sale of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Indenture, which are fair to the Issuer and its Restricted Subsidiaries in the reasonable determination of the Board of Directors or the senior management of the Issuer, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party or (B) transactions with joint ventures or Unrestricted Subsidiaries entered into in the ordinary course of business and consistent with past practice or industry norm;

(xiii) any transaction effected as part of a Qualified Receivables Financing;

(xiv) the issuance of Equity Interests (other than Disqualified Stock) of the Issuer to any Person;

(xv) the issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock option and stock ownership plans or similar employee benefit plans approved by the Board of Directors of the Issuer or any direct or indirect parent of the Issuer or of a Restricted Subsidiary of the Issuer, as appropriate, in good faith;

(xvi) the entering into of any tax sharing agreement or arrangement that complies with Section 4.04(b)(xii);

(xvii) any contribution to the capital of the Issuer;

(xviii) transactions permitted by, and complying with, Section 5.01;

Indenture, dated as of April 15, 2009

Case 15-10047-KG    Doc 11    Filed 01/12/15    Page 57 of 138

(xix) transactions between the Issuer or any of its Restricted Subsidiaries and any Person, a director of which is also a director of the Issuer or any direct or indirect parent of the Issuer; *provided, however,* that such director abstains from voting as a director of the Issuer or such direct or indirect parent, as the case may be, on any matter involving such other Person;

(xx) pledges of Equity Interests of Unrestricted Subsidiaries;

(xxi) the formation and maintenance of any consolidated group or subgroup for tax, accounting or cash pooling or management purposes in the ordinary course of business;

(xxii) any employment agreements entered into by the Issuer or any of its Restricted Subsidiaries in the ordinary course of business;

(xxiii) transactions undertaken in good faith (as certified by a responsible financial or accounting officer of the Issuer in an Officer's Certificate) for the purpose of improving the consolidated tax efficiency of the Issuer and its Subsidiaries and not for the purpose of circumventing any provision set forth in this Indenture; and

<div align="center">78</div>

(xxiv) the execution of the Transactions and the payment of all fees and expenses related to the Transactions.

SECTION 4.08. <u>Change of Control</u>.

(a) Upon a Change of Control, each holder shall have the right to require the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant record date to receive interest due on the relevant interest payment date), in accordance with the terms contemplated in this Section 4.08; *provided, however,* that notwithstanding the occurrence of a Change of Control, the Issuer shall not be obligated to purchase any Notes pursuant to this Section 4.08 in the event that it has exercised its right to redeem such Notes in accordance with Article III of this Indenture. In the event that at the time of such Change of Control the terms of the Bank Indebtedness restrict or prohibit the repurchase of Notes pursuant to this Section 4.08, then prior to the mailing of the notice to the holders provided for in Section 4.08(b) but in any event within 30 days following any Change of Control, the Issuer shall (i) repay in full all Bank Indebtedness or, if doing so will allow the purchase of Notes, offer to repay in full all Bank Indebtedness and repay the Bank Indebtedness of each lender and/or noteholder who has accepted such offer, or (ii) obtain the requisite consent under the agreements governing the Bank Indebtedness to permit the repurchase of the Notes as provided for in Section 4.08(b).

(b) Within 30 days following any Change of Control, except to the extent that the Issuer has exercised its right to redeem the Notes in accordance with Article III of this Indenture, the Issuer shall mail a notice (a "<u>Change of Control Offer</u>") to each holder with a copy to the Trustee stating:

(i) that a Change of Control has occurred and that such holder has the right to require the Issuer to repurchase such holder's Notes at a repurchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest and Additional Interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant record date to receive interest on the relevant interest payment date);

(ii) the circumstances and relevant facts and financial information regarding such Change of Control;

(iii) the repurchase date (which shall be no earlier than 30 days nor later than 60 days from the date such notice is mailed); and

(iv) the instructions determined by the Issuer, consistent with this Section 4.08, that a holder must follow in order to have its Notes purchased.

(c) holders electing to have a Note purchased shall be required to surrender the Note, with an appropriate form duly completed, to the Issuer at the address specified in the notice at least three Business Days prior to the purchase date. The holders shall be entitled to

<div align="center">79</div>

withdraw their election if the Trustee or the Issuer receives not later than one Business Day prior to the purchase date a telegram, telex, facsimile transmission or letter setting forth the name of the holder, the principal amount of the Note which was delivered for purchase by the holder and a statement that such holder is withdrawing his election to have such Note purchased. Holders whose Notes are purchased only in part shall be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered.

(d) On the purchase date, all Notes purchased by the Issuer under this Section shall be delivered to the Trustee for cancellation, and the Issuer shall pay the purchase price *plus* accrued and unpaid interest to the holders entitled thereto.

(e) A Change of Control Offer may be made in advance of a Change of Control, and conditioned upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

(f) Notwithstanding the foregoing provisions of this Section, the Issuer shall not be required to make a Change of Control Offer upon a

Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in Section 4.08 applicable to a Change of Control Offer made by the Issuer and purchases all Notes properly tendered and not withdrawn under such Change of Control Offer.

(g) Notes repurchased by the Issuer pursuant to a Change of Control Offer will have the status of Notes issued but not outstanding or will be retired and canceled at the option of the Issuer. Notes purchased by a third party pursuant to the preceding clause (f) will have the status of Notes issued and outstanding.

(h) At the time the Issuer delivers Notes to the Trustee which are to be accepted for purchase, the Issuer shall also deliver an Officers' Certificate stating that such Notes are to be accepted by the Issuer pursuant to and in accordance with the terms of this Section 4.08. A Note shall be deemed to have been accepted for purchase at the time the Trustee, directly or through an agent, mails or delivers payment therefor to the surrendering holder.

(i) Prior to any Change of Control Offer, the Issuer shall deliver to the Trustee an Officers' Certificate stating that all conditions precedent contained herein to the right of the Issuer to make such offer have been complied with.

(j) The Issuer shall comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes pursuant to this Section. To the extent that the provisions of any securities laws or regulations conflict with provisions of this Section 4.08, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section by virtue thereof.

SECTION 4.09. <u>Compliance Certificate</u>. The Issuer shall deliver to the Trustee within 120 days after the end of each fiscal year of the Issuer, beginning with the fiscal year end on March 31, 2009, an Officer's Certificate stating that in the course of the performance by the signer of his or her duties as an Officer of the Issuer he or she would normally have knowledge

80

of any Default and whether or not the signer knows of any Default that occurred during such period. If he or she does, the certificate shall describe the Default, its status and what action the Issuer is taking or proposes to take with respect thereto. The Issuer also shall comply with Section 314(a)(4) of the TIA. Except with respect to receipt of payments of principal and interest on the Notes and any Default or Event of Default information contained in the Officer's Certificate delivered to it pursuant to this Section 4.09, the Trustee shall have no duty to review, ascertain or confirm the Issuer's compliance with or the breach of any representation, warranty or covenant made in this Indenture.

SECTION 4.10. <u>Further Instruments and Acts</u>. Upon request of the Trustee, the Issuer shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

SECTION 4.11. <u>Future Subsidiary Pledgors; Future Subsidiary Guarantors</u>.

(a) The Issuer shall cause each Wholly Owned Restricted Subsidiary that is a Domestic Subsidiary (unless such Subsidiary is a Receivables Subsidiary or a Domestic Subsidiary that is wholly owned by one or more Foreign Subsidiaries and created to enhance the tax efficiency of the Issuer and its Subsidiaries) and that provides a pledge of, or grants a Lien on, its assets to secure any First Priority Lien Obligations to execute and deliver to the Trustee the Security Documents necessary to cause such Restricted Subsidiary to become a Subsidiary Pledgor (or grantor) and take all actions required thereunder to perfect Liens created thereunder, as well as to execute and deliver to the Trustee a joinder to the Intercreditor Agreement.

(b) The Issuer shall cause each Wholly Owned Restricted Subsidiary that is a Domestic Subsidiary (unless such Subsidiary is a Receivables Subsidiary or a Domestic Subsidiary that is wholly owned by one or more Foreign Subsidiaries and created to enhance the tax efficiency of the Issuer and its Subsidiaries) and that guarantees any First Priority Lien Obligations to execute and deliver to the Trustee a supplemental indenture substantially in the form of <u>Exhibit D</u> pursuant to which such Subsidiary shall guarantee the Issuer's Obligations under the Notes and this Indenture and shall comply with the additional requirements of Section 12.06.

(c) Promptly following (i) the terms of the Issuer's Indebtedness existing on the Issue Date no longer prohibiting the guarantee of the Notes by the Subsidiary Pledgors (as determined in good faith by the Issuer) and (ii) receipt of the requisite approvals from the applicable gaming authorities (the "<u>Initial Guarantee Event</u>"), each Subsidiary Pledgor will execute and deliver to the Trustee a supplemental indenture substantially in the form of <u>Exhibit D</u> pursuant to which such Subsidiary Pledgor shall guarantee the Issuer's obligations under the Notes and this Indenture and shall comply with the additional requirements of Section 12.06, as well as execute and deliver to the Trustee a joinder to the Guarantor Intercreditor Agreement. The Issuer will not, and will not permit any of its Restricted Subsidiaries to, Incur any Indebtedness the terms of which prohibit or restrict the ability of a Subsidiary Pledgor to provide such a guarantee.

81

(d) From and after the Initial Guarantee Event, the Issuer will cause each Wholly Owned Restricted Subsidiary that is a Domestic Subsidiary

(unless such Subsidiary is a Receivables Subsidiary or a Domestic Subsidiary that is wholly owned by one or more Foreign Subsidiaries and created to enhance the tax efficiency of the Issuer and its Subsidiaries) that guarantees any Indebtedness of the Issuer or any other Guarantor of the Notes to execute and deliver to the Trustee a supplemental indenture substantially in the form of Exhibit D pursuant to which such Subsidiary will guarantee the Issuer's obligations under the Notes and this Indenture and shall comply with the additional requirements of Section 12.06, as well as to execute and deliver a joinder to the Guarantor Intercreditor Agreement.

SECTION 4.12. Liens.

(a) The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create, Incur or suffer to exist (i) any Lien on any asset or property of the Issuer or such Restricted Subsidiary securing Indebtedness unless the Notes are equally and ratably secured with (or on a senior basis to, in the case of obligations subordinated in right of payment to the Notes) the obligations so secured until such time as such obligations are no longer secured by a Lien; provided, however, that this Section 4.12(a)(i) shall not require the Issuer or a Restricted Subsidiary of the Issuer to secure the Notes if the Lien consists of a Permitted Lien, or (ii) any Lien securing any First Priority Lien Obligation of the Issuer or any Subsidiary Pledgor without effectively providing that the Notes or the obligations of such Subsidiary Pledgor in respect of the Notes, as the case may be, shall be granted a second priority security interest (subject to Permitted Liens) upon the assets or property constituting the collateral for such First Priority Lien Obligations, except to the extent that such assets or property constitute securities or other equity interest of the Issuer or any of its Subsidiaries.

(b) Any Lien which is granted to secure the Notes or the obligations of any Subsidiary Pledgor in respect of the Notes under clause (i) of Section 4.12(a) (unless also granted under clause (ii) of Section 4.12(a)) shall be automatically released and discharged at the same time as the release of the Lien that gave rise to the obligation to secure the Notes or such Subsidiary Pledgors obligations under clause (i) of Section 4.12(a).

(c) Notwithstanding the foregoing, the Issuer will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or Incur any Lien on the Collateral securing Indebtedness with any Lien that is pari passu with the Liens securing the Notes that is issued in exchange for any of the Existing Notes or any Exchanged Indebtedness ("Additional Second Priority Debt"), unless either (i) the Total Secured Leverage Ratio of the Issuer for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such Lien is created or Incurred would have been equal to or less than 7.25 to 1.00, determined on a pro forma basis after giving effect to the Incurrence of such Lien and related Additional Second Priority Debt (including a pro forma application of the net proceeds of such Additional Second Priority Debt), as if such Lien and related Additional Second Priority Debt had been Incurred and the application of the proceeds from such Indebtedness had occurred, at the beginning of such four quarter period or (ii) the aggregate principal amount of the sum of all outstanding Additional Second Priority Debt, Notes and Existing Second Lien Notes (collectively, "Second Priority Debt") would be equal to or less than the greater of $5,562 million and the aggregate principal amount of such Second Priority Debt outstanding immediately after the Notes are issued on the Issue Date, after giving pro forma effect to the Incurrence of such Lien and related Additional Second Priority Debt (including a

82

pro forma application of the net proceeds of such Additional Second Priority Debt); provided that the foregoing will not restrict the Incurrence or creation by the Issuer or its Restricted Subsidiaries of Liens on the Collateral securing Additional Second Priority Debt otherwise permitted to be Incurred under this Indenture in an aggregate principal amount not to exceed $500 million outstanding at any one time, so long as the Issuer or a Restricted Subsidiary receives only cash proceeds in connection with the Incurrence of such Additional Second Priority Debt pursuant to this proviso.

(d) The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create or Incur any Lien on the Collateral (including any Permitted Lien) securing Indebtedness with a Lien that is junior in priority to the Liens securing First Priority Lien Obligations unless such Lien is pari passu with, or junior in priority to, the Liens securing the Notes. Further, the Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, exchange any Indebtedness secured by any Lien on the Collateral (or on the Collateral securing the First Priority Lien Obligations) that is senior in priority to the Liens securing the Notes for any of the Existing Notes, the Existing Second Lien Notes, the Notes or Additional Second Priority Debt.

(e) In addition, the Issuer will not, and will not permit any of its Restricted Subsidiaries to, exchange any Indebtedness secured by any Lien for any Sponsor Indebtedness held by any Sponsor.

SECTION 4.13. After-Acquired Property. Upon the acquisition by the Issuer or any Subsidiary Pledgor of any First Priority After-Acquired Property, the Issuer or such Subsidiary Pledgor shall execute and deliver such mortgages, deeds of trust, deeds to secure debt, preferred ship mortgages, security instruments, financing statements and certificates, opinions of counsel or such other documentation substantially similar to the documentation delivered to secure First Priority Lien Obligations (including, without limitation title insurance policies, surveys and other documentation as may be reasonably required by the Collateral Agent and consistent with the requirements for similar Collateral in which security interest or Liens were taken on the Issue Date) as shall be reasonably necessary to vest in the Collateral Agent, for the benefit of the Secured Parties (as defined in the Collateral Agreement), a perfected security interest or lien, subject only to Permitted Liens, in such First Priority After-Acquired Property and to have such First Priority After-Acquired Property (but subject to certain limitations, if applicable, including as described in Article XI and the Security Documents) added to the Collateral, and thereupon all provisions of this Indenture relating to the Collateral shall be deemed to relate to such First Priority After-Acquired Property to the same extent and with the same force and effect.

SECTION 4.14. <u>Maintenance of Office or Agency</u>.

(a) The Issuer shall maintain an office or agency (which may be an office of the Trustee or an affiliate of the Trustee or Registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served. The Issuer shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Issuer shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the corporate trust office of the Trustee as set forth in Section 13.02.

83

(b) The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided, however*, that no such designation or rescission shall in any manner relieve the Issuer of its obligation to maintain an office or agency for such purposes. The Issuer shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

(c) The Issuer hereby designates the corporate trust office of the Trustee or its agent as such office or agency of the Issuer in accordance with Section 2.04.

SECTION 4.15. <u>Amendment of Security Documents</u>. The Issuer will not amend, modify or supplement, or permit or consent to any amendment, modification or supplement of, the Security Documents in any way that would be adverse to the holders of the Notes in any material respect, except as set forth in Article XI or as permitted under Article IX.

SECTION 4.16. <u>Covenant Suspension</u>. If on any date following the Issue Date, (i) the Notes have Investment Grade Ratings from both Rating Agencies, and (ii) no Default has occurred and is continuing under this Indenture, then, beginning on that day and continuing at all times thereafter regardless of any subsequent changes in the rating of the Notes (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "<u>Covenant Suspension Event</u>"), and subject to the provisions of the following paragraph, the Issuer and the Restricted Subsidiaries shall not be subject to Sections 4.03, 4.04, 4.05, 4.06, 4.07 and 5.01(a)(iv) (collectively the "<u>Suspended Covenants</u>").

If and while the Issuer and its Restricted Subsidiaries are not subject to the Suspended Covenants, the Notes will be entitled to substantially less covenant protection. In the event that the Issuer and its Restricted Subsidiaries are not subject to the Suspended Covenants under this Indenture for any period of time as a result of the foregoing, and on any subsequent date (the "<u>Reversion Date</u>") one or both of the Rating Agencies withdraw their Investment Grade Rating or downgrade the rating assigned to the Notes below an Investment Grade Rating, then the Issuer and its Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants under this Indenture with respect to future events.

On each Reversion Date, all Indebtedness Incurred, or Disqualified Stock or Preferred Stock issued, during the Suspension Period will be classified as having been Incurred or issued pursuant to Section 4.03(a) or 4.03(b) (to the extent such Indebtedness or Disqualified Stock or Preferred Stock would be permitted to be Incurred or issued thereunder as of the Reversion Date and after giving effect to Indebtedness Incurred or issued prior to the Suspension Period and outstanding on the Reversion Date). To the extent such Indebtedness or Disqualified Stock or Preferred Stock would not be so permitted to be Incurred or issued pursuant to Section 4.03 such Indebtedness or Disqualified Stock or Preferred Stock will be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under Section 4.03(b)(iii). Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under Section 4.04 will be made as though Section 4.04 had been in effect since the

84

Issue Date and throughout the Suspension Period. Accordingly, Restricted Payments made during the Suspension Period will reduce the amount available to be made as Restricted Payments under Section 4.04(a). As described above, however, no Default or Event of Default will be deemed to have occurred on the Reversion Date as a result of any actions taken by the Issuer or its Restricted Subsidiaries during the Suspension Period.

For purposes of Section 4.06, on the Reversion Date, the unutilized Excess Proceeds amount will be reset to zero.

SECTION 4.17. <u>Maintenance of Insurance</u>. The Issuer shall maintain, with financially sound and reputable insurance companies, insurance (subject to customary deductibles and retentions) in such amounts and against such risks as are customarily maintained by similarly situated companies engaged in the same or similar businesses operating in the same or similar locations and cause the Issuer and the Subsidiary Pledgors to be listed as insured and the Collateral Agent to be listed as co-loss payee on property and property casualty policies and as an additional insured on liability policies. Notwithstanding the foregoing, the Issuer and the Subsidiary Pledgors may self-insure with respect to such risks with respect to which companies of established reputation in the same general line of business in the same general area usually self-insure.

**ARTICLE V**

SECTION 5.01. When Issuer May Merge or Transfer Assets.

(a) The Issuer shall not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not the Issuer is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless:

(i) the Issuer is the surviving person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding up or conversion (if other than the Issuer) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (the Issuer or such Person, as the case may be, being herein called the "Successor Issuer"); *provided* that in the case where the surviving Person is not a corporation, a co-obligor of the Notes is a corporation;

(ii) the Successor Issuer (if other than the Issuer) expressly assumes all the obligations of the Issuer under this Indenture and the Notes pursuant to supplemental indentures or other documents or instruments in form reasonably satisfactory to the Trustee;

(iii) immediately after giving effect to such transaction (and treating any Indebtedness which becomes an obligation of the Successor Issuer or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Issuer or such Restricted Subsidiary at the time of such transaction) no Default shall have occurred and be continuing;

85

(iv) immediately after giving *pro forma* effect to such transaction, as if such transaction had occurred at the beginning of the applicable four-quarter period (and treating any Indebtedness which becomes an obligation of the Successor Issuer or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Issuer or such Restricted Subsidiary at the time of such transaction), either

(A) the Successor Issuer would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a); or

(B) the Fixed Charge Coverage Ratio for the Successor Issuer and its Restricted Subsidiaries would be greater than such ratio for the Issuer and its Restricted Subsidiaries immediately prior to such transaction;

(v) if the Issuer is not the Successor Issuer, each Subsidiary Pledgor, unless it is the other party to the transactions described above, shall have by supplemental indenture confirmed that its obligations in respect of the Notes shall apply to such Person's obligations under this Indenture and the Notes; and

(vi) the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, amalgamation or transfer and such supplemental indentures (if any) comply with this Indenture.

The Successor Issuer (if other than the Issuer) will succeed to, and be substituted for, the Issuer under this Indenture and the Notes, and in such event the Issuer will automatically be released and discharged from its obligations under this Indenture and the Notes. Notwithstanding the foregoing clauses (iii) and (iv) of this Section 5.01, (a) any Restricted Subsidiary may merge, consolidate or amalgamate with or transfer all or part of its properties and assets to the Issuer or to another Restricted Subsidiary, and (b) the Issuer may merge, consolidate or amalgamate with an Affiliate incorporated solely for the purpose of reincorporating the Issuer in another state of the United States, the District of Columbia or any territory of the United States or may convert into a limited liability company, so long as the amount of Indebtedness of the Issuer and its Restricted Subsidiaries is not increased thereby. This Article V will not apply to a sale, assignment, transfer, conveyance or other disposition of assets between or among the Issuer and its Restricted Subsidiaries.

86

(b) Subject to the provisions of Section 11.04 (which govern the release of assets and property securing the Notes upon the sale or disposition of a Restricted Subsidiary of the Issuer that is a Subsidiary Pledgor), no Subsidiary Pledgor shall, and the Issuer shall not permit any Subsidiary Pledgor to, consolidate, amalgamate or merge with or into or wind up into (whether or not such Subsidiary Pledgor is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, any Person unless:

(i) either (A) such Subsidiary Pledgor is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation or merger (if other than such Subsidiary Pledgor) or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Subsidiary Pledgor or such Person, as the case may be, being herein called the "Successor Subsidiary Pledgor") and the Successor Subsidiary Pledgor (if other than such Subsidiary Pledgor) expressly assumes all the obligations of such Subsidiary Pledgor under this Indenture, the Security Documents and such Subsidiary Pledgor's obligations in respect of the Notes pursuant to documents or instruments in form reasonably satisfactory to the Trustee, or (b) such sale or

disposition or consolidation, amalgamation or merger is not in violation of Section 4.06; and

(ii) the Successor Subsidiary Pledgor (if other than such Subsidiary Pledgor) shall have delivered or caused to be delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, amalgamation, merger or transfer and such supplemental indenture (if any) comply with this Indenture.

Except as otherwise provided in this Indenture, the Successor Subsidiary Pledgor (if other than such Subsidiary Pledgor) will succeed to, and be substituted for, such Subsidiary Pledgor under this Indenture and such Subsidiary Pledgor's obligations in respect of the Notes, and such Subsidiary Pledgor will automatically be released and discharged from its obligations under this Indenture and such Subsidiary Pledgor's obligations in respect of the Notes. Notwithstanding the foregoing, (1) a Subsidiary Pledgor may merge, amalgamate or consolidate with an Affiliate incorporated solely for the purpose of reincorporating such Subsidiary Pledgor in another state of the United States, the District of Columbia or any territory of the United States so long as the amount of Indebtedness of the Subsidiary Pledgor is not increased thereby and (2) a Subsidiary Pledgor may merge, amalgamate or consolidate with another Subsidiary Pledgor or the Issuer.

In addition, notwithstanding the foregoing, any Subsidiary Pledgor may consolidate, amalgamate or merge with or into or wind up into, or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets (collectively, a "Transfer") to the Issuer or any Subsidiary Pledgor.

Except as otherwise provided in this Indenture, Harrah's Entertainment will not consolidate, amalgamate or merge with or into or wind up into (whether or not Harrah's Entertainment is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, any Person unless:

(1) either Harrah's Entertainment or the Issuer (*provided* that if the Issuer is to be the surviving Person, then such transaction shall comply with Section 5.01(a) or 5.01(b)) is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation or merger (if other than Harrah's Entertainment) or to which such sale, assignment, transfer, lease, conveyance or

87

other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (Harrah's Entertainment or such Person, as the case may be, being herein called the "Successor Parent Guarantor") and the Successor Parent Guarantor (if other than Harrah's Entertainment) expressly assumes all the obligations of Harrah's Entertainment under this Indenture and Harrah's Entertainment's Note Guarantee pursuant to a supplemental indenture or other documents or instruments in form reasonably satisfactory to the Trustee; and

(2) the Successor Parent Guarantor (if other than Harrah's Entertainment) shall have delivered or caused to be delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, amalgamation, merger or transfer and such supplemental indenture (if any) comply with this Indenture.

Except as otherwise provided in this Indenture, the Successor Parent Guarantor (if other than Harrah's Entertainment) will succeed to, and be substituted for, Harrah's Entertainment under this Indenture, Harrah's Entertainment's Note Guarantee, and Harrah's Entertainment will automatically be released and discharged from its obligations under this Indenture and such Note Guarantee.

## ARTICLE VI

## DEFAULTS AND REMEDIES

SECTION 6.01. Events of Default. An "Event of Default" occurs with respect to Notes if:

(a) there is a default in any payment of interest (including any additional interest) on any Note when the same becomes due and payable, and such default continues for a period of 30 days,

(b) there is a default in the payment of principal or premium, if any, of any Note when due at its Stated Maturity, upon optional redemption, upon required repurchase, upon declaration or otherwise,

(c) the failure by the Issuer or any Restricted Subsidiary to comply for 60 days after notice with its other agreements contained in the Notes or this Indenture,

(d) the failure by the Issuer or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) to pay any Indebtedness (other than Indebtedness owing to the Issuer or a Restricted Subsidiary) within any applicable grace period after final maturity or the acceleration of any such Indebtedness by the holders thereof because of a default, in each case, if the total amount of such Indebtedness unpaid or accelerated exceeds $150.0 million or its foreign currency equivalent,

88

(e) either the Issuer or any Significant Subsidiary of the Issuer pursuant to or within the meaning of any Bankruptcy Law:

(i) commences a voluntary case;

(ii) consents to the entry of an order for relief against it in an involuntary case;

(iii) consents to the appointment of a Custodian of it or for any substantial part of its property; or

(iv) makes a general assignment for the benefit of its creditors or takes any comparable action under any foreign laws relating to insolvency,

(f) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i) is for relief against either the Issuer or any Significant Subsidiary of the Issuer in an involuntary case;

(ii) appoints a Custodian of either the Issuer or any Significant Subsidiary of the Issuer or for any substantial part of its property; or

(iii) orders the winding up or liquidation of either the Issuer or any Significant Subsidiary of the Issuer; or any similar relief is granted under any foreign laws and the order or decree remains unstayed and in effect for 60 days,

(g) failure by the Issuer or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) to pay final judgments aggregating in excess of $150.0 million or its foreign currency equivalent (net of any amounts which are covered by enforceable insurance policies issued by solvent carriers), which judgments are not discharged, waived or stayed for a period of 60 days,

(h) the Note Guarantee of the Parent Guarantor or a Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) ceases to be in full force and effect (except as contemplated by the terms thereof) or the Parent Guarantor denies or disaffirms its obligations under this Indenture or its Parent Guarantee and such Default continues for 10 days,

(i) unless all of the Collateral has been released from the Second Priority Liens in accordance with the provisions of Article XI, the Second Priority Liens on all or substantially all of the Collateral cease to be valid or enforceable and such Default continues for 30 days, or the Issuer shall assert or any Subsidiary Pledgor shall assert, in any pleading in any court of competent jurisdiction, that any such security interest is invalid or unenforceable and, in the case of any such Person that is a Subsidiary of the Issuer, the Issuer fails to cause such Subsidiary to rescind such assertions within 30 days after the Issuer has actual knowledge of such assertions, or

(j) the failure by the Issuer or any Subsidiary Pledgor to comply for 60 days after notice with its other agreements contained in the Security Documents except for a failure that would not be material to the holders of the Notes and would not materially affect the value of the Collateral taken as a whole.

The foregoing shall constitute Events of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

The term "Bankruptcy Law" means Title 11, United States Code, or any similar Federal or state law for the relief of debtors. The term "Custodian" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

However, a default under clauses (c) or (j) above shall not constitute an Event of Default until the Trustee or the holders of 30% in principal amount of outstanding Notes notify the Issuer of the default and the Issuer does not cure such default within the time specified in clauses (c) or (j) hereof after receipt of such notice. Such notice must specify the Default, demand that it be remedied and state that such notice is a "Notice of Default." The Issuer shall deliver to the Trustee, within five (5) Business Days after the occurrence thereof, written notice in the form of an Officers' Certificate of any event which is, or with the giving of notice or the lapse of time or both would become, an Event of Default, its status and what action the Issuer is taking or propose to take with respect thereto.

SECTION 6.02. Acceleration. If an Event of Default (other than an Event of Default specified in Section 6.01(e) or 6.01(f) hereof with respect to the Issuer) occurs and is continuing, the Trustee or the holders of at least 30% in principal amount of outstanding Notes by notice to the Issuer may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable; provided, however, that so long as any Bank Indebtedness remains outstanding, no such acceleration shall be effective until the earlier of (1) five Business Days after the giving of written notice to the Issuer and the Representative under the Credit Agreement and (2) the day on which any Bank Indebtedness is accelerated. Upon such a declaration, such principal and interest shall be due and payable immediately. If an Event of Default specified in Section 6.01(e) or (f) with respect to the Issuer occurs, the principal of, premium, if any, and interest on all the Notes will become immediately due and payable without any declaration or other act on the part of the Trustee or any holders. Under certain circumstances, the holders of a majority in principal amount of outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

In the event of any Event of Default specified in Section 6.01(d) above, such Event of Default and all consequences thereof (excluding, however, any resulting payment default) shall be annulled, waived and rescinded, automatically and without any action by the Trustee or the holders of the Notes, if within 20 days after such Event of Default arose the Issuer delivers an Officer's Certificate to the Trustee stating that (x) the

Indebtedness or guarantee that is the basis for such Event of Default has been discharged or (y) the holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default or (z) the default that is the basis for such Event of Default has been cured, it being understood that in no event shall an acceleration of the principal amount of the Notes as described above be annulled, waived or rescinded upon the happening of any such events.

<div align="center">90</div>

SECTION 6.03. Other Remedies. If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy at law or in equity to collect the payment of principal of or interest on the Notes or to enforce the performance of any provision of the Notes, this Indenture or the Security Documents.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. No remedy is exclusive of any other remedy. To the extent required by law, all available remedies are cumulative.

SECTION 6.04. Waiver of Past Defaults. Provided the Notes are not then due and payable by reason of a declaration of acceleration, the holders of a majority in principal amount of the Notes by written notice to the Trustee may waive an existing Default and its consequences except (a) a Default in the payment of the principal of or interest on a Note, (b) a Default arising from the failure to redeem or purchase any Note when required pursuant to the terms of this Indenture or (c) a Default in respect of a provision that under Section 9.02 cannot be amended without the consent of each holder affected. When a Default is waived, it is deemed cured and the Issuer, the Trustee and the holders will be restored to their former positions and rights under this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any consequent right.

SECTION 6.05. Control by Majority. The holders of a majority in principal amount of Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture or, if the Trustee, being advised by counsel, determines that the action or proceeding so directed may not lawfully be taken or if the Trustee in good faith by its board of directors or trustees, executive committee, or a trust committee of directors or trustees and/or Responsible Officers shall determine that the action or proceeding so directed would involve the Trustee in personal liability or expense for which it is not adequately indemnified, or subject to Section 7.01, that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability. Prior to taking any action under this Indenture, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

SECTION 6.06. Limitation on Suits.

(a) Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder may pursue any remedy with respect to this Indenture or the Notes unless:

(i) such holder has previously given the Trustee notice that an Event of Default is continuing,

<div align="center">91</div>

(ii) holders of at least 30% in principal amount of the outstanding Notes have requested the Trustee to pursue the remedy,

(iii) such holders have offered the Trustee reasonable security or indemnity satisfactory to the Trustee against any loss, liability or expense,

(iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity, and

(v) the holders of a majority in principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.

(b) A holder may not use this Indenture to prejudice the rights of another holder or to obtain a preference or priority over another holder.

SECTION 6.07. Rights of the Holders to Receive Payment. Notwithstanding any other provision of this Indenture, the right of any holder to receive payment of principal of and interest on the Notes held by such holder, on or after the respective due dates expressed or provided for in the Notes, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder.

SECTION 6.08. Collection Suit by Trustee. If an Event of Default specified in Section 6.01(a) or (b) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer or any other obligor on the Notes for the whole amount then due and owing (together with interest on overdue principal and (to the extent lawful) on any unpaid interest at the rate provided for in the Notes) and the amounts provided for in Section 7.07.

SECTION 6.09. <u>Trustee May File Proofs of Claim</u>. The Trustee may file such proofs of claim, statements of interest and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation, expenses disbursements and advances of the Trustee (including counsel, accountants, experts or such other professionals as the Trustee deems necessary, advisable or appropriate)) and the holders allowed in any judicial proceedings relative to the Issuer or the Parent Guarantor, any Subsidiary Pledgor, their creditors or their property, shall be entitled to participate as a member, voting or otherwise, of any official committee of creditors appointed in such matters and, unless prohibited by law or applicable regulations, may vote on behalf of the holders in any election of a trustee in bankruptcy or other Person performing similar functions, and any Custodian in any such judicial proceeding is hereby authorized by each holder to make payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the holders, to pay to the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and its counsel, and any other amounts due the Trustee under Section 7.07.

<div align="center">92</div>

SECTION 6.10. <u>Priorities</u>. Subject to the terms of the Intercreditor Agreement, the Guarantor Intercreditor Agreement and the Security Documents, any money or property collected by the Trustee pursuant to this Article VI and any other money or property distributable in respect of the Issuer's or any Guarantor's obligations under this Indenture after an Event of Default shall be applied in the following order:

FIRST: to the Trustee for amounts due under Section 7.07;

SECOND: to the holders for amounts due and unpaid on the Notes for principal, premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal and interest, respectively; and

THIRD: to the Issuer or, to the extent the Trustee collects any amount for any Guarantor, to the such Guarantor.

The Trustee may fix a record date and payment date for any payment to the holders pursuant to this Section. At least 15 days before such record date, the Trustee shall mail to each holder and the Issuer a notice that states the record date, the payment date and amount to be paid.

SECTION 6.11. <u>Undertaking for Costs</u>. In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section does not apply to a suit by the Trustee, a suit by a holder pursuant to Section 6.07 or a suit by holders of more than 10% in principal amount of the Notes.

SECTION 6.12. <u>Waiver of Stay or Extension Laws</u>. Neither the Issuer nor any Guarantor (to the extent it may lawfully do so) shall at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the Issuer and the Guarantors (to the extent that it may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

<div align="center">

**ARTICLE VII**

**TRUSTEE**

</div>

SECTION 7.01. <u>Duties of Trustee</u>.

(a) The Trustee, prior to the occurrence of an Event of Default with respect to the Notes and after the curing or waiving of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this

<div align="center">93</div>

Indenture. If an Event of Default has occurred and is continuing, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b) Except during the continuance of an Event of Default:

(i) the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee (it being agreed that the permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty); and

(ii) in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. The

Trustee shall be under no duty to make any investigation as to any statement contained in any such instance, but may accept the same as conclusive evidence of the truth and accuracy of such statement or the correctness of such opinions. However, in the case of certificates or opinions required by any provision hereof to be provided to it, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c) The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i) this paragraph does not limit the effect of paragraph (b) of this Section;

(ii) the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts;

(iii) the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05; and

(iv) no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise Incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers.

(d) Every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b) and (c) of this Section.

(e) The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer.

94

(f) Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(g) Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section and to the provisions of the TIA.

SECTION 7.02. <u>Rights of Trustee</u>.

(a) The Trustee may conclusively rely on any document believed by it to be genuine and to have been signed or presented by the proper person. The Trustee need not investigate any fact or matter stated in the document.

(b) Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officers' Certificate or Opinion of Counsel.

(c) The Trustee may act through agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d) The Trustee shall not be responsible or liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; *provided*, *however*, that the Trustee's conduct does not constitute willful misconduct or negligence.

(e) The Trustee may consult with counsel of its own selection and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

(f) The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture, note or other paper or document unless requested in writing to do so by the holders of not less than a majority in principal amount of the Notes at the time outstanding, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney, at the expense of the Issuer and shall Incur no liability of any kind by reason of such inquiry or investigation.

(g) The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the holders pursuant to this Indenture, unless such holders shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be Incurred by it in compliance with such request or direction.

95

(h) The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(i) The Trustee shall not be responsible or liable for any action taken or omitted by it in good faith at the direction of the holders of not less

than a majority in principal amount of the Notes as to the time, method and place of conducting any proceedings for any remedy available to the Trustee or the exercising of any power conferred by this Indenture.

(j) Any action taken, or omitted to be taken, by the Trustee in good faith pursuant to this Indenture upon the request or authority or consent of any person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding upon future holders of Notes and upon Notes executed and delivered in exchange therefor or in place thereof.

(k) The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a Default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

(l) The Trustee may request that the Issuer deliver an Officer's Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any Person authorized to sign an Officer's Certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

(m) The Trustee shall not be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of actions.

(n) The Trustee shall not be required to give any bond or surety in respect of the execution of the trusts and powers under this Indenture.

(o) The Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; interruptions; loss or malfunction of utilities, computer (hardware or software) or communication services; accidents; labor disputes; and acts of civil or military authorities and governmental action.

SECTION 7.03. <u>Individual Rights of Trustee</u>. The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee. Any Paying Agent or Registrar may do the same with like rights. However, the Trustee must comply with Sections 7.10 and 7.11.

SECTION 7.04. <u>Trustee's Disclaimer</u>. The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture, the Note Guarantees or the Notes, it shall not be accountable for the Issuer's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Issuer or any Guarantor in this Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Trustee's certificate of authentication. The Trustee shall not be charged with knowledge of any Default or Event of Default under Sections 6.01(c), (d), (e), (h), or (i) or of the identity of any Significant Subsidiary unless either (a) a Trust Officer shall have actual knowledge thereof or (b) the Trustee shall have received written notice thereof in accordance with Section 13.02 hereof from the Issuer, any Subsidiary Pledgor or any holder. In accepting the trust hereby created, the Trustee acts solely as Trustee for the holders of the Notes and not in its individual capacity and all persons, including without limitation the holders of Notes and the Issuer having any claim against the Trustee arising from this Indenture shall look only to the funds and accounts held by the Trustee hereunder for payment except as otherwise provided herein.

SECTION 7.05. <u>Notice of Defaults</u>. If a Default occurs and is continuing and if it is actually known to the Trustee, the Trustee shall mail to each holder notice of the Default within the earlier of 90 days after it occurs or 30 days after it is actually known to a Trust Officer or written notice of it is received by the Trustee. Except in the case of a Default in the payment of principal of, premium (if any) or interest on any Note, the Trustee may withhold the notice if and so long as a committee of its Trust Officers in good faith determines that withholding the notice is in the interests of the holders. The Issuer is required to deliver to the Trustee, annually, a certificate indicating whether the signers thereof know of any Default that occurred during the previous year. The Issuer also is required to deliver to the Trustee, within 30 days after the occurrence thereof, written notice of any event which would constitute certain Defaults, their status and what action the Issuer is taking or proposes to take in respect thereof.

SECTION 7.06. <u>Reports by Trustee to the Holders</u>. As promptly as practicable after each June 30 beginning with the June 30 following the date of this Indenture, and in any event prior to June 30 in each year, the Trustee shall mail to each holder a brief report dated as of such June 30 that complies with Section 313(a) of the TIA if and to the extent required thereby. The Trustee shall also comply with Section 313(b) of the TIA.

A copy of each report at the time of its mailing to the holders shall be filed with the SEC and each stock exchange (if any) on which the Notes are listed. The Issuer agrees to notify promptly the Trustee whenever the Notes become listed on any stock exchange and of any delisting thereof.

SECTION 7.07. <u>Compensation and Indemnity</u>. The Issuer shall pay to the Trustee from time to time such compensation, as the Issuer and the Trustee shall from time to time agree in writing, for the Trustee's acceptance of this Indenture and its services hereunder. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Issuer shall reimburse the Trustee upon request for all reasonable out-of-pocket expenses Incurred or made by it, including costs of collection, in addition to the compensation for its services. Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Trustee's agents, counsel, accountants

and experts. The Issuer and the Guarantors, jointly and severally shall indemnify the Trustee against any and

97

all loss, liability, claim, damage or expense (including reasonable attorneys' fees and expenses) Incurred by or in connection with the acceptance or administration of this trust and the performance of its duties hereunder, including the costs and expenses of enforcing this Indenture or Note Guarantee against the Issuer or any Guarantor (including this Section 7.07) and defending itself against or investigating any claim (whether asserted by the Issuer, any Guarantor, any holder or any other Person). The obligation to pay such amounts shall survive the payment in full or defeasance of the Notes or the removal or resignation of the Trustee. The Trustee shall notify the Issuer of any claim for which it may seek indemnity promptly upon obtaining actual knowledge thereof; *provided*, *however*, that any failure so to notify the Issuer shall not relieve the Issuer or any Guarantor of its indemnity obligations hereunder. The Issuer shall defend the claim and the indemnified party shall provide reasonable cooperation at the Issuer's expense in the defense. Such indemnified parties may have separate counsel and the Issuer and such Guarantor, as applicable shall pay the fees and expenses of such counsel; *provided*, *however*, that the Issuer shall not be required to pay such fees and expenses if it assumes such indemnified parties' defense and, in such indemnified parties' reasonable judgment, there is no conflict of interest between the Issuer and the Guarantor, as applicable, and such parties in connection with such defense. The Issuer needs not reimburse any expense or indemnify against any loss, liability or expense Incurred by an indemnified party through such party's own willful misconduct, negligence or bad faith.

To secure the Issuer's and the Guarantors' payment obligations in this Section, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee other than money or property held in trust to pay principal of and interest on particular Notes.

The Issuer's and the Guarantors' payment obligations pursuant to this Section shall survive the satisfaction or discharge of this Indenture, any rejection or termination of this Indenture under any bankruptcy law or the resignation or removal of the Trustee. Without prejudice to any other rights available to the Trustee under applicable law, when the Trustee Incurs expenses after the occurrence of a Default specified in Section 6.01(f) or (g) with respect to the Issuer, the expenses are intended to constitute expenses of administration under the Bankruptcy Law.

No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise Incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if repayment of such funds or adequate indemnity against such risk or liability is not assured to its satisfaction.

SECTION 7.08. Replacement of Trustee.

(a) The Trustee may resign at any time by so notifying the Issuer. The holders of a majority in principal amount of the Notes may remove the Trustee by so notifying the Trustee and may appoint a successor Trustee. The Issuer shall remove the Trustee if:

(i) the Trustee fails to comply with Section 7.10;

(ii) the Trustee is adjudged bankrupt or insolvent;

98

(iii) a receiver or other public officer takes charge of the Trustee or its property; or

(iv) the Trustee otherwise becomes incapable of acting.

(b) If the Trustee resigns, is removed by the Issuer or by the holders of a majority in principal amount of the Notes and such holders do not reasonably promptly appoint a successor Trustee, or if a vacancy exists in the office of Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee), the Issuer shall promptly appoint a successor Trustee.

(c) A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer. Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall mail a notice of its succession to the holders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the Lien provided for in Section 7.07.

(d) If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee or the holders of 10% in principal amount of the Notes may petition at the expense of the Issuer any court of competent jurisdiction for the appointment of a successor Trustee.

(e) If the Trustee fails to comply with Section 7.10, unless the Trustee's duty to resign is stayed as provided in Section 310(b) of the TIA, any holder who has been a bona fide holder of a Note for at least six months may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f) Notwithstanding the replacement of the Trustee pursuant to this Section, the Issuer's obligations under Section 7.07 shall continue for the benefit of the retiring Trustee.

SECTION 7.09. <u>Successor Trustee by Merger</u>. If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee shall have.

99

SECTION 7.10. <u>Eligibility; Disqualification</u>. The Trustee shall at all times satisfy the requirements of Section 310(a) of the TIA. The Trustee shall have a combined capital and surplus of at least $100 million as set forth in its most recent published annual report of condition. The Trustee shall comply with Section 310(b) of the TIA, subject to its right to apply for a stay of its duty to resign under the penultimate paragraph of Section 310(b) of the TIA; *provided*, *however*, that there shall be excluded from the operation of Section 310(b)(1) of the TIA any series of securities issued under this Indenture and any indenture or indentures under which other securities or certificates of interest or participation in other securities of the Issuer are outstanding if the requirements for such exclusion set forth in Section 310(b)(1) of the TIA are met.

SECTION 7.11. <u>Preferential Collection of Claims Against the Issuer</u>. The Trustee shall comply with Section 311(a) of the TIA, excluding any creditor relationship listed in Section 311(b) of the TIA. A Trustee who has resigned or been removed shall be subject to Section 311(a) of the TIA to the extent indicated.

## ARTICLE VIII

## DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 8.01. <u>Discharge of Liability on Notes; Defeasance</u>.

(a) This Indenture shall be discharged and shall cease to be of further effect (except as to surviving rights of registration of transfer or exchange of Notes, as expressly provided for in this Indenture) as to all outstanding Notes when:

(i) either (a) all the Notes theretofore authenticated and delivered (except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust) have been delivered to the Trustee for cancellation or (b) all of the Notes (1) have become due and payable, (2) will become due and payable at their stated maturity within one year or (3) if redeemable at the option of the Issuer, are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer, and the Issuer has irrevocably deposited or caused to be deposited with the Trustee funds in an amount sufficient to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of deposit together with irrevocable instructions from the Issuer directing the Trustee to apply such funds to the payment thereof at maturity or redemption, as the case may be;

(ii) the Issuer and/or the Parent Guarantor has paid all other sums payable under this Indenture; and

(iii) the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent under this Indenture relating to the satisfaction and discharge of this Indenture have been complied with.

100

(b) Subject to Sections 8.01(c) and 8.02, the Issuer at any time may terminate (i) all of its obligations under the Notes and this Indenture ("legal defeasance option") or (ii) its obligations under Sections 4.02, 4.03, 4.04, 4.05, 4.06, 4.07, 4.08, 4.09, 4.11, 4.12, 4.13 and 4.15 and the operation of Section 5.01 for the benefit of the holders of the Notes, and Sections 6.01(c), 6.01(d) and Sections 6.01(e) and 6.01(f) (with respect to Significant Subsidiaries of the Issuer only), 6.01(g), 6.01(h), 6.01(i) and 6.01(j) ("covenant defeasance option"). The Issuer may exercise its legal defeasance option notwithstanding its prior exercise of its covenant defeasance option. In the event that the Issuer terminates all of its obligations under the Notes and this Indenture (with respect to such Notes) by exercising its legal defeasance option or its covenant defeasance option, the obligations of each Subsidiary Pledgor with respect to the Notes and the Security Documents shall be terminated simultaneously with the termination of such obligations.

If the Issuer exercises its legal defeasance option, payment of the Notes so defeased may not be accelerated because of an Event of Default. If the Issuer exercises its covenant defeasance option, payment of the Notes so defeased may not be accelerated because of an Event of Default specified in Section 6.01(c), 6.01(d), 6.01(e) and 6.01(f) (with respect to Significant Subsidiaries of the Issuer only), 6.01(g), 6.01(h), 6.01(i) or 6.01(j) or because of the failure of the Issuer to comply with Section 5.01.

Upon satisfaction of the conditions set forth herein and upon request of the Issuer, the Trustee shall acknowledge in writing the discharge of those obligations that the Issuer terminates.

(c) Notwithstanding clauses (a) and (b) above, the Issuer's obligations in Sections 2.04, 2.05, 2.06, 2.07, 2.08, 2.09, 7.07, 7.08 and in this Article VIII shall survive until the Notes have been paid in full. Thereafter, the Issuer's obligations in Sections 7.07, 8.05 and 8.06 shall survive such satisfaction and discharge.

SECTION 8.02. <u>Conditions to Defeasance</u>.

(a) The Issuer may exercise its legal defeasance option or its covenant defeasance option only if:

(i) the Issuer irrevocably deposits in trust with the Trustee cash in U.S. Dollars, U.S. Government Obligations or a combination thereof in an amount sufficient or U.S. Government Obligations, the principal of and the interest on which will be sufficient, or a combination thereof sufficient, to pay the principal of and premium (if any) and interest on the Notes when due at maturity or redemption, as the case may be, including interest thereon to maturity or such redemption date;

(ii) the Issuer delivers to the Trustee a certificate from a nationally recognized firm of independent accountants expressing their opinion that the payments of principal and interest when due and without reinvestment on the deposited U.S. Government Obligations *plus* any deposited money without investment will provide cash at such times and in such amounts as will be sufficient to pay principal, premium, if any, and interest when due on all the Notes to maturity or redemption, as the case may be;

101

(iii) 123 days pass after the deposit is made and during the 123-day period no Default specified in Section 6.01(e) or (f) with respect to the Issuer occurs which is continuing at the end of the period;

(iv) the deposit does not constitute a default under any other agreement binding on the Issuer and is not prohibited by Article X;

(v) in the case of the legal defeasance option, the Issuer shall have delivered to the Trustee an Opinion of Counsel stating that (1) the Issuer have received from, or there has been published by, the Internal Revenue Service a ruling, or (2) since the date of this Indenture there has been a change in the applicable Federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the holders will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred. Notwithstanding the foregoing, the Opinion of Counsel required by the immediately preceding sentence with respect to a legal defeasance need not be delivered if all of the Notes not theretofore delivered to the Trustee for cancellation (x) have become due and payable or (y) will become due and payable at their Stated Maturity within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer;

(vi) impair the right of any holder to receive payment of principal of, premium, if any, and interest on such holder's Notes on or after the due dates therefore or to institute suit for the enforcement of any payment on or with respect to such holder's Notes;

(vii) in the case of the covenant defeasance option, the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that the holders will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred; and

(viii) the Issuer delivers to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent to the defeasance and discharge of the Notes to be so defeased and discharged as contemplated by this Article VIII have been complied with.

(b) Before or after a deposit, the Issuer may make arrangements satisfactory to the Trustee for the redemption of such Notes at a future date in accordance with Article III.

SECTION 8.03. <u>Application of Trust Money</u>. The Trustee shall hold in trust money or U.S. Government Obligations (including proceeds thereof) deposited with it pursuant to this Article VIII. It shall apply the deposited money and the money from U.S. Government Obligations through each Paying Agent and in accordance with this Indenture to the payment of principal of and interest on the Notes so discharged or defeased.

102

SECTION 8.04. <u>Repayment to Issuer</u>. Each of the Trustee and each Paying Agent shall promptly turn over to the Issuer upon request any money or U.S. Government Obligations held by it as provided in this Article which, in the written opinion of nationally recognized firm of independent public accountants delivered to the Trustee (which delivery shall only be required if U.S. Government Obligations have been so deposited), are in excess of the amount thereof which would then be required to be deposited to effect an equivalent discharge or defeasance in accordance with this Article.

Subject to any applicable abandoned property law, the Trustee and each Paying Agent shall pay to the Issuer upon written request any money held by them for the payment of principal or interest that remains unclaimed for two years, and, thereafter, holders entitled to the money must look to the Issuer for payment as general creditors, and the Trustee and each Paying Agent shall have no further liability with respect to such monies.

SECTION 8.05. Indemnity for U.S. Government Obligations. The Issuer shall pay and shall indemnify the Trustee against any tax, fee or other charge imposed on or assessed against deposited U.S. Government Obligations or the principal and interest received on such U.S. Government Obligations.

SECTION 8.06. Reinstatement. If the Trustee or any Paying Agent is unable to apply any money or U.S. Government Obligations in accordance with this Article VIII by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's obligations under this Indenture and the Notes so discharged or defeased shall be revived and reinstated as though no deposit had occurred pursuant to this Article VIII until such time as the Trustee or any Paying Agent is permitted to apply all such money or U.S. Government Obligations in accordance with this Article VIII; *provided*, *however*, that, if the Issuer has made any payment of principal of, or interest on, any such Notes because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the holders of such Notes to receive such payment from the money or U.S. Government Obligations held by the Trustee or any Paying Agent.

## ARTICLE IX

## AMENDMENTS AND WAIVERS

SECTION 9.01. Without Consent of the Holders.

(a) The Issuer and the Trustee may amend this Indenture, the Security Documents, the Intercreditor Agreement, the Guarantor Intercreditor Agreement or the Notes without notice to or consent of any holder:

(i) to cure any ambiguity, omission, defect or inconsistency;

(ii) to provide for the assumption by a Successor Issuer of the obligations of the Issuer under this Indenture and the Notes;

(iii) to provide for the assumption by a Successor Subsidiary Pledgor of the obligations of a Subsidiary Pledgor under this Indenture and the Security Documents;

(iv) to add a Guarantor with respect to the Notes pursuant to Section 4.11;

(v) to provide for uncertificated Notes in addition to or in place of certificated Notes; *provided, however,* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code;

(vi) to conform the text of this Indenture, the Notes, the Security Documents, the Intercreditor Agreement, or the Guarantor Intercreditor Agreement to any provision of the "Description of New Second Lien Notes" in the Offering Memorandum to the extent that such provision in the "Description of New Second Lien Notes" was intended to be a verbatim recitation of a provision of this Indenture, the Notes, the Security Documents, the Intercreditor Agreement or the Guarantor Intercreditor Agreement;

(vii) to add a Subsidiary Pledgor with respect to the Notes or to add Collateral to secure the Notes;

(viii) to release Collateral as permitted by this Indenture or the Intercreditor Agreement;

(ix) to add additional secured creditors holding Other Second-Lien Obligations so long as such obligations are not prohibited by this Indenture or the Security Documents;

(x) to add to the covenants of the Issuer for the benefit of the holders or to surrender any right or power herein conferred upon the Issuer;

(xi) to comply with any requirement of the SEC in connection with qualifying or maintaining the qualification of, this Indenture under the TIA;

(xii) to make any change that does not adversely affect the rights of any holder; or

(xiii) to provide for the issuance of the Exchange Notes or Additional Notes, which shall have terms substantially identical in all material respects to the Initial Notes, and which shall be treated, together with any outstanding Initial Notes, as a single issue of securities.

(b) After an amendment under this Section 9.01 becomes effective, the Issuer shall mail to the holders a notice briefly describing such amendment. The failure to give such notice to all holders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.01.

http://www.sec.gov/Archives/edgar/data/858339/000119312509082553/dex41.htm[8/7/2014 10:22:16 AM]

SECTION 9.02. <u>With Consent of the Holders</u>.

(a) The Issuer and the Trustee may amend this Indenture and the Security Documents with the written consent of the holders of at least a majority in principal amount of the Notes then outstanding voting as a single class (including consents obtained in connection with a tender offer or exchange for the Notes). However, without the consent of each holder of an outstanding Note affected, an amendment may not:

(1) reduce the amount of Notes whose holders must consent to an amendment,

(2) reduce the rate of or extend the time for payment of interest on any Note,

(3) reduce the principal of or change the Stated Maturity of any Note,

(4) reduce the premium payable upon the redemption of any Note or change the time at which any Note may be redeemed in accordance with Article III,

(5) make any Note payable in money other than that stated in such Note,

(6) expressly subordinate the Notes to any other Indebtedness of the Issuer or any Subsidiary Pledgor,

(7) impair the right of any holder to receive payment of principal of, premium, if any, and interest on such holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such holder's Notes,

(8) make any change in the amendment provisions which require each holder's consent or in the waiver provisions,

(9) make any change in the provisions in the Intercreditor Agreement or the Guarantor Intercreditor Agreement or this Indenture dealing with the application of proceeds of Collateral that would adversely affect the holders of the Notes, or

(10) except as expressly provided by this Indenture, modify or release the Note Guarantee of any Significant Subsidiary in any manner adverse to the holders of the Notes.

In addition, without the consent of the holders of at least 66 2/3% in aggregate principal amount of Notes then outstanding, no amendment or waiver may release all or substantially all of the Collateral from the Lien of this Indenture and the Security Documents with respect to the Notes.

<center>105</center>

It shall not be necessary for the consent of the holders under this Section 9.02 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this Section 9.02 becomes effective, the Issuer shall mail to the holders a notice briefly describing such amendment. The failure to give such notice to all holders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.02.

SECTION 9.03. <u>Compliance with Trust Indenture Act</u>. From the date on which this Indenture is qualified under the TIA, every amendment, waiver or supplement to this Indenture or the Notes shall comply with the TIA as then in effect.

SECTION 9.04. <u>Revocation and Effect of Consents and Waivers</u>.

(a) A consent to an amendment or a waiver by a holder of a Note shall bind the holder and every subsequent holder of that Note or portion of the Note that evidences the same debt as the consenting holder's Note, even if notation of the consent or waiver is not made on the Note. However, any such holder or subsequent holder may revoke the consent or waiver as to such holder's Note or portion of the Note if the Trustee receives the notice of revocation before the date on which the Trustee receives an Officers' Certificate from the Issuer certifying that the requisite principal amount of Notes have consented. After an amendment or waiver becomes effective, it shall bind every holder. An amendment or waiver becomes effective upon the (i) receipt by the Issuer or the Trustee of consents by the holders of the requisite principal amount of securities, (ii) satisfaction of conditions to effectiveness as set forth in this Indenture and any indenture supplemental hereto containing such amendment or waiver and (iii) execution of such amendment or waiver (or supplemental indenture) by the Issuer and the Trustee.

(b) The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the holders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture. If a record date is fixed, then notwithstanding the immediately preceding paragraph, those Persons who were holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be holders after such record date. No such consent shall be valid or effective for more than 120 days after such record date.

SECTION 9.05. <u>Notation on or Exchange of Notes</u>. If an amendment, supplement or waiver changes the terms of a Note, the Issuer may require the holder of the Note to deliver it to the Trustee. The Trustee may place an appropriate notation on the Note regarding the changed terms and return it to the holder. Alternatively, if the Issuer or the Trustee so determines, the Issuer in exchange for the Note shall issue and the Trustee shall authenticate a new Note that reflects the changed terms. Failure to make the appropriate notation or to issue a new Note shall not affect the validity of such amendment, supplement or waiver.

SECTION 9.06. <u>Trustee to Sign Amendments</u>. The Trustee shall sign any amendment, supplement or waiver authorized pursuant to this Article IX if the amendment does not adversely affect the rights, duties, liabilities or immunities of the Trustee. If it does, the Trustee may but need not sign it. In signing such amendment, the Trustee shall be entitled to receive indemnity reasonably satisfactory to it and shall be provided with, and (subject to Section 7.01) shall be fully protected in relying upon, an Officers' Certificate and an Opinion of Counsel stating that such amendment, supplement or waiver is authorized or permitted by this Indenture and that such amendment, supplement or waiver is the legal, valid and binding obligation of the Issuer and the Parent Guarantor, enforceable against them in accordance with its terms, subject to customary exceptions, and complies with the provisions hereof (including Section 9.03).

SECTION 9.07. <u>Additional Voting Terms; Calculation of Principal Amount</u>. All Notes issued under this Indenture shall vote and consent together on all matters (as to which any of such Notes may vote) as one class and no Notes will have the right to vote or consent as a separate class on any matter. Determinations as to whether holders of the requisite aggregate principal amount of Notes have concurred in any direction, waiver or consent shall be made in accordance with this Article IX and Section 2.14.

## ARTICLE X

## RANKING OF NOTE LIENS

SECTION 10.01. <u>Relative Rights</u>. The Intercreditor Agreement defines the relative rights, as lienholders, of holders of Second Priority Liens and holders of Liens securing First Priority Lien Obligations. Nothing in this Indenture or the Intercreditor Agreement will:

(a) impair, as between the Issuer and holders of Notes, the obligation of the Issuer, which is absolute and unconditional, to pay principal of, premium and interest on Notes in accordance with their terms or to perform any other obligation of the Issuer or any other obligor under this Indenture, the Notes, the Parent Guarantee and the Security Documents;

(b) restrict the right of any holder to sue for payments that are then due and owing, in a manner not inconsistent with the provisions of the Intercreditor Agreement;

(c) prevent the Trustee, the Collateral Agent or any holder from exercising against the Issuer or any other obligor any of its other available remedies upon a Default or Event of Default (other than its rights as a secured party, which are subject to the Intercreditor Agreement); or

(d) restrict the right of the Trustee, the Collateral Agent or any holder:

(1) to file and prosecute a petition seeking an order for relief in an involuntary bankruptcy case as to any obligor or otherwise to commence, or seek relief commencing, any insolvency or liquidation proceeding involuntarily against any obligor;

(2) to make, support or oppose any request for an order for dismissal, abstention or conversion in any insolvency or liquidation proceeding;

(3) to make, support or oppose, in any insolvency or liquidation proceeding, any request for an order extending or terminating any period during which the debtor (or any other Person) has the exclusive right to propose a plan of reorganization or other dispositive restructuring or liquidation plan therein;

(4) to seek the creation of, or appointment to, any official committee representing creditors (or certain of the creditors) in any insolvency or liquidation proceedings and, if appointed, to serve and act as a member of such committee without being in any respect restricted or bound by, or liable for, any of the obligations under this Article X;

(5) to seek or object to the appointment of any professional person to serve in any capacity in any insolvency or liquidation proceeding or to support or object to any request for compensation made by any professional person or others therein;

(6) to make, support or oppose any request for order appointing a trustee or examiner in any insolvency or liquidation proceedings; or

(7) otherwise to make, support or oppose any request for relief in any insolvency or liquidation proceeding that it is permitted by law to make, support or oppose:

if it were a holder of unsecured claims; or

(x) as to any matter relating to any plan of reorganization or other

(y) restructuring or liquidation plan or as to any matter relating to the administration of the estate or the disposition of the case or proceeding (in each case except as set forth in the Intercreditor Agreement).

## ARTICLE XI

## COLLATERAL

SECTION 11.01. <u>Security Documents</u>. The payment of the principal of and interest and premium, if any, on the Notes when due, whether on an interest payment date, at maturity, by acceleration, repurchase, redemption or otherwise and whether by the Issuer pursuant to the Notes or by the Guarantors pursuant to the Note Guarantees, the payment of all other Obligations and the performance of all other obligations of the Issuer and the Guarantors under this Indenture, the Notes, the Note Guarantees and the Security Documents are secured as provided in the Security Documents which the Issuer, the Guarantors and the Subsidiary Pledgors have entered into simultaneously with the execution of the Existing Second Lien Notes Indenture and will be secured by Security Documents hereafter delivered as required or permitted by this Indenture. The Issuer shall, and shall cause each Restricted Subsidiary to, and each Restricted Subsidiary shall, make all filings (including filings of continuation statements and amendments to UCC financing statements that may be necessary to continue the effectiveness of such UCC financing statements) and all other actions as are necessary or

108

required by the Security Documents to maintain (at the sole cost and expense of the Issuer and its Restricted Subsidiaries) the security interest created by the Security Documents in the Collateral (other than with respect to any Collateral the security interest in which is not required to be perfected under the Security Documents) as a perfected second priority security interest subject only to Permitted Liens.

SECTION 11.02. <u>Collateral Agent</u>. (a) The Collateral Agent is authorized and empowered to appoint one or more co-Collateral Agents as it deems necessary or appropriate.

(b) Subject to Section 7.01, neither the Trustee nor the Collateral Agent nor any of their respective officers, directors, employees, attorneys or agents will be responsible or liable for the existence, genuineness, value or protection of any Collateral, for the legality, enforceability, effectiveness or sufficiency of the Security Documents, for the creation, perfection, priority, sufficiency or protection of any Second Priority Lien, or for any defect or deficiency as to any such matters, or for any failure to demand, collect, foreclose or realize upon or otherwise enforce any of the Second Priority Liens or Security Documents or any delay in doing so.

(c) The Collateral Agent will be subject to such directions as may be given it by the Trustee from time to time (as required or permitted by this Indenture); *provided* that in the event of conflict between directions received pursuant to the Security Documents and directions received hereunder, the Collateral Agent will be subject to directions received pursuant to the Security Documents. Except as directed by the Trustee as required or permitted by this Indenture and any other representatives or pursuant to the Security Documents, the Collateral Agent will not be obligated:

(1) to act upon directions purported to be delivered to it by any other Person;

(2) to foreclose upon or otherwise enforce any Second Priority Lien; or

(3) to take any other action whatsoever with regard to any or all of the Second Priority Liens, Security Documents or Collateral.

(d) The Collateral Agent will be accountable only for amounts that it actually receives as a result of the enforcement of the Second Priority Liens or Security Documents.

(e) In acting as Collateral Agent or Co-Collateral Agent, the Collateral Agent and each Co-Collateral Agent may rely upon and enforce each and all of the rights, powers, immunities, indemnities and benefits of the Trustee under Article VII hereof.

(f) The holders of Notes agree that the Collateral Agent shall be entitled to the rights, privileges, protections, immunities, indemnities and benefits provided to the Collateral Agent by the Security Documents. Furthermore, each holder of a Note, by accepting such Note, consents to the terms of and authorizes and directs the Trustee (in each of its capacities) and the Collateral Agent to enter into and perform the Intercreditor Agreement and Security Documents in each of its capacities thereunder.

109

(g) If the Issuer (i) Incurs First Priority Lien Obligations at any time when no intercreditor agreement is in effect or at any time when Indebtedness constituting First Priority Lien Obligations entitled to the benefit of an existing Intercreditor Agreement is concurrently retired, and (ii) delivers to the Collateral Agent an Officers' Certificate so stating and requesting the Collateral Agent to enter into an intercreditor agreement (on substantially the same terms as the Intercreditor Agreement in effect on the Issue Date) in favor of a designated agent or representative for the holders of the First Priority Lien Obligations so Incurred, the Collateral Agent shall (and is hereby authorized and directed to) enter into such intercreditor agreement, bind the holders on the terms set forth therein and perform and observe its obligations thereunder.

SECTION 11.03. <u>Authorization of Actions to Be Taken</u>. (a) Each holder of Notes, by its acceptance thereof, consents and agrees to the terms of each Security Document, the Intercreditor Agreement, and the Guarantor Intercreditor Agreement as originally in effect and as amended, supplemented or replaced from time to time in accordance with its terms or the terms of this Indenture, authorizes and directs the Trustee and the Collateral Agent to enter into the Security Documents to which it is a party, authorizes and empowers the Trustee to direct the Collateral Agent to enter into, and the Collateral Agent to execute and deliver, the Intercreditor Agreement, and the Guarantor Intercreditor Agreement and authorizes

and empowers the Trustee and the Collateral Agent to bind the holders of Notes and other holders of Obligations as set forth in the Security Documents to which it is a party and the Intercreditor Agreement and the Guarantor Intercreditor Agreement and to perform its obligations and exercise its rights and powers thereunder.

(b) The Collateral Agent and the Trustee are authorized and empowered to receive for the benefit of the holders of Notes any funds collected or distributed under the Security Documents to which the Collateral Agent or Trustee is a party and to make further distributions of such funds to the holders of Notes according to the provisions of this Indenture.

(c) Subject to the provisions of Section 7.01 and Section 7.02 hereof, the Intercreditor Agreement, the Guarantor Intercreditor Agreement and the Security Documents, the Trustee may, in its sole discretion and without the consent of the holders, direct, on behalf of the holders, the Collateral Agent to take all actions it deems necessary or appropriate in order to:

(1) foreclose upon or otherwise enforce any or all of the Second Priority Liens;

(2) enforce any of the terms of the Security Documents to which the Collateral Agent or Trustee is a party; or

(3) collect and receive payment of any and all Obligations.

110

Subject to the Intercreditor Agreement, the Trustee is authorized and empowered to institute and maintain, or direct the Collateral Agent to institute and maintain, such suits and proceedings as it may deem expedient to protect or enforce the Second Priority Liens or the Security Documents to which the Collateral Agent or Trustee is a party or to prevent any impairment of Collateral by any acts that may be unlawful or in violation of the Security Documents to which the Collateral Agent or Trustee is a party or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent may deem expedient to preserve or protect its interests and the interests of the holders of Notes in the Collateral, including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of holders, the Trustee or the Collateral Agent.

SECTION 11.04. Release of Liens. (a) Notwithstanding anything to the contrary in the Collateral Agreement and subject to subsections (b) and (c) of this Section 11.04, Collateral may be released from the Lien and security interest created by the Security Documents to secure the Notes and obligations under this Indenture at any time or from time to time in accordance with the provisions of the Intercreditor Agreement or as provided hereby. The applicable assets included in the Collateral shall be automatically released from the Liens securing the Notes, and the applicable Subsidiary Pledgor shall be automatically released from its obligations under this Indenture and the Security Documents, under any one or more of the following circumstances:

(1) upon the Discharge of Senior Lender Claims and concurrent release of all other Liens on such property or assets securing First Priority Lien Obligations (including all commitments and letters of credit thereunder); *provided*, *however*, that if the Issuer or the Parent Guarantor subsequently incurs First Priority Lien Obligations that are secured by Liens on property or assets of the Issuer or the Parent Guarantor of the type constituting the Collateral and the related Liens are incurred in reliance on clause (6)(B) of the definition of Permitted Liens, then the Issuer and its Restricted Subsidiaries will be required to reinstate the security arrangements with respect to the Collateral in favor of the Notes, which, in the case of any such subsequent First Priority Lien Obligations, will be Second Priority Liens on the Collateral securing such First Priority Lien Obligations to the same extent provided by the Security Documents and on the terms and conditions of the security documents relating to such First Priority Lien Obligations, with the Second Priority Lien held either by the administrative agent, collateral agent or other representative for such First Priority Lien Obligations or by a collateral agent or other representative designated by the Issuer to hold the Second Priority Liens for the benefit of the holders of the Notes and subject to an intercreditor agreement that provides the administrative agent or collateral agent substantially the same rights and powers as afforded under the Intercreditor Agreement; *provided, however*, that the Issuer will provide the Trustee and Collateral Agent under the Collateral Agreement with prompt written notification of such reinstitution;

(2) in respect of the property and assets of a Subsidiary Pledgor, upon the consummation of any transaction permitted by this Indenture as a result of which such Subsidiary Pledgor ceases to be a Subsidiary or otherwise ceases to be a Pledgor (as defined in

111

the Collateral Agreement), and such Subsidiary Pledgor shall be automatically released from its obligations hereunder and under the Security Documents, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to such Subsidiary Pledgor;

(3) upon any sale or other transfer by the Issuer or any Subsidiary Pledgor of any Collateral that is permitted under this Indenture to any person that is not the Issuer or a Subsidiary Pledgor (including in connection with an Event of Loss (as defined in the Collateral Agreement)), or upon the effectiveness of any written consent to the release of the security interest granted by the Collateral Agreement in any Collateral pursuant to this Indenture, the security interest in such Collateral shall be automatically released, all without delivery of any instrument or performance of any act by any party;

(4) as to all or any portion of any Collateral (including any Mortgaged Property), following the delivery of a Project Notice (as defined

in the Credit Agreement) to the First Lien Agent that is applicable to all or such portion of the Collateral and Mortgaged Property, in each case upon the release of the security interest securing the Senior Lender Claims in such Collateral or Mortgaged Properties;

(5) to enable the Issuer, the Parent Guarantor or any Subsidiary Pledgor to consummate the disposition (other than any disposition to the Issuer or another Subsidiary Pledgor) of such property or assets to the extent not prohibited under Section 4.06, and to enable any release described in Section 7.15(f) of the Collateral Agreement;

(6) in respect of the property and assets of a Subsidiary Pledgor, upon the designation of such Subsidiary Pledgor to be an Unrestricted Subsidiary in accordance with Section 4.04 and the definition of "Unrestricted Subsidiary", and such Subsidiary Pledgor shall be automatically released from its obligations hereunder and under the Security Documents;

(7) in respect of the property and assets of a Subsidiary Pledgor, upon the release or discharge of the pledge by such Subsidiary Pledgor of the Credit Agreement or other Indebtedness or the guarantee of any other Indebtedness which resulted in the obligation to become a Subsidiary Pledgor; and

(8) as described under Article IX.

Notwithstanding the foregoing, if an Event of Default under this Indenture exists on the date of Discharge of Senior Lender Claims, the Second Priority Liens on the Collateral securing the Notes will not be released, except to the extent the Collateral or any portion thereof was disposed of in order to repay the First Priority Lien Obligations secured by the Collateral, and thereafter the Trustee (or another designated representative acting at the direction of the holders of a majority of outstanding principal amount of the Notes and Other Second-Lien Obligations) will have the right to direct the First Lien Agent to foreclose upon the Collateral (but in such event, the Liens on the Collateral securing the Notes will be released when such Event of Default and all other Events of Default under this Indenture cease to exist).

112

In addition, (i) the security interests granted pursuant to the Security Documents securing the Obligations shall automatically terminate and/or be released all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the applicable Pledgors (as defined in the Collateral Agreement), as of the date when all the Obligations (other than contingent or unliquidated obligations or liabilities not then due) have been paid in full in cash or immediately available funds; and (ii) the security interests granted pursuant to the Security Documents securing the Obligations shall automatically terminate as of the date when the Holders of at least two thirds in aggregate principal amount of all Notes issued under this Indenture consent to the termination of the Security Documents.

In connection with any termination or release pursuant to this Section 11.04(a), the Collateral Agent shall execute and deliver to any Pledgor (as defined in the Collateral Agreement), at such Pledgor's expense, all documents that such Pledgor shall reasonably request to evidence such termination or release (including, without limitation, UCC termination statements), and will duly assign and transfer to such Pledgor, such of the Pledged Collateral (as defined in the Collateral Agreement) that may be in the possession of the Collateral Agent and has not theretofore been sold or otherwise applied or released pursuant to this Indenture or the Security Documents. Any execution and delivery of documents pursuant to this Section 11.04(a) shall be without recourse to or warranty by the Collateral Agent. In connection with any release pursuant to this Section 11.04(a), the Pledgors shall be permitted to take any action in connection therewith consistent with such release including, without limitation, the filing of UCC termination statements.

Upon the receipt of an Officers' Certificate from the Issuer, as described in Section 11.04(b) below, if applicable, and any necessary or proper instruments of termination, satisfaction or release prepared by the Issuer, the Collateral Agent shall execute, deliver or acknowledge such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Security Documents or the Intercreditor Agreement.

(b) Notwithstanding anything herein to the contrary, in connection with (x) any release of Collateral pursuant to Section 11.04(a)(1), (6), (7) or (8) above, such Collateral may not be released from the Lien and security interest created by the Security Documents and (y) any release of Collateral pursuant to Section 11.04(a)(2), (3), (4) and (5), the Collateral Agent shall not be required to execute, deliver or acknowledge any instruments of termination, satisfaction or release unless, in each case, an Officers' Certificate and Opinion of Counsel certifying that all conditions precedent, including, without limitation, this Section 11.04, have been met and stating under which of the circumstances set forth in Section 11.04(a) above the Collateral is being released have been delivered to the Collateral Agent on or prior to the date of such release or, in the case of clause (y) above, the date on which the Collateral Agent executes any such instrument.

(c) Notwithstanding anything herein to the contrary, at any time when a Default or Event of Default has occurred and is continuing and the maturity of the Notes has been accelerated (whether by declaration or otherwise) and the Trustee has delivered a notice of acceleration to the Collateral Agent, no release of Collateral pursuant to the provisions of this Indenture or the Security Documents will be effective as against the holders, except as otherwise provided in the Intercreditor Agreement.

113

SECTION 11.05. Filing, Recording and Opinions. (a) The Issuer will comply with the provisions of TIA Sections 314(b), 314(c) and 314(d), in each case following qualification of this Indenture pursuant to the TIA and except to the extent not required as set forth in any SEC regulation or

interpretation (including any no-action letter issued by the Staff of the SEC, whether issued to the Issuer or any other Person). Following such qualification, to the extent the Issuer is required to furnish to the Trustee an Opinion of Counsel pursuant to TIA Section 314(b)(2), the Issuer will furnish such opinion not more than 60 but not less than 30 days prior to each September 30.

Any release of Collateral permitted by Section 11.04 hereof will be deemed not to impair the Liens under this Indenture and the Security Documents in contravention thereof and any person that is required to deliver an Officers' Certificate or Opinion of Counsel pursuant to Section 314(d) of the TIA, shall be entitled to rely upon the foregoing as a basis for delivery of such certificate or opinion. The Trustee may, to the extent permitted by Section 7.01 and 7.02 hereof, accept as conclusive evidence of compliance with the foregoing provisions the appropriate statements contained in such documents and Opinion of Counsel.

(b) If any Collateral is released in accordance with this Indenture and if the Issuer has delivered the certificates and documents required by the Security Documents and Section 11.04, the Trustee will determine whether it has received all documentation required by TIA Section 314(d) in connection with such release and, based on such determination and the Opinion of Counsel delivered pursuant to Section 11.04, will, upon request, deliver a certificate to the Collateral Agent setting forth such determination.

SECTION 11.06. [Intentionally omitted].

SECTION 11.07. <u>Powers Exercisable by Receiver or Trustee</u>. In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article XI upon the Issuer or the Parent Guarantor with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Issuer or the Parent Guarantor or of any officer or officers thereof required by the provisions of this Article XI; and if the Trustee shall be in the possession of the Collateral under any provision of this Indenture, then such powers may be exercised by the Trustee.

SECTION 11.08. <u>Release Upon Termination of the Issuer's Obligations</u>. In the event (i) that the Issuer delivers to the Trustee, in form and substance acceptable to it, an Officers' Certificate and Opinion of Counsel certifying that all the obligations under this Indenture, the Notes and the Security Documents have been satisfied and discharged by the payment in full of the Issuer's obligations under the Notes, this Indenture and the Security Documents, and all such obligations have been so satisfied, or (ii) a discharge, legal defeasance or covenant defeasance of this Indenture occurs under Article VIII, the Trustee shall deliver to the Issuer and the Collateral Agent a notice stating that the Trustee, on behalf of the holders, disclaims and gives up any and all rights it has in or to the Collateral, and any rights it has under the Security Documents, and upon receipt by the Collateral Agent of such notice, the Collateral Agent shall be deemed not to hold a Lien in the Collateral on behalf of the Trustee and shall do or cause to be done all acts reasonably necessary to release such Lien as soon as is reasonably practicable.

114

SECTION 11.09. <u>Designations</u>. Except as provided in the next sentence, for purposes of the provisions hereof and the Intercreditor Agreement requiring the Issuer to designate Indebtedness for the purposes of the terms First Priority Lien Obligations and Other Second-Lien Obligations or any other such designations hereunder or under the Intercreditor Agreement, any such designation shall be sufficient if the relevant designation provides in writing that such First Priority Lien Obligations or Other Second-Lien Obligations are permitted under this Indenture and is signed on behalf of the Issuer by an Officer and delivered to the Trustee, the Collateral Agent and the First Lien Agent. For all purposes hereof and the Intercreditor Agreement, the Issuer hereby designates the Obligations pursuant to the Credit Agreement as in effect on the Issue Date as First Priority Lien Obligations.

SECTION 11.10. <u>Taking and Destruction</u>. Following the Discharge of Senior Lender Claims, upon any Taking or Destruction of any Collateral, all Net Insurance Proceeds received by the Issuer or any Restricted Subsidiary shall be deemed Net Proceeds and shall be applied in accordance with Section 4.06.

<h2 style="text-align:center">ARTICLE XII</h2>

<h2 style="text-align:center">GUARANTEE</h2>

SECTION 12.01. <u>Guarantee</u>.

(a) Each Guarantor hereby jointly and severally, irrevocably and unconditionally guarantees, (x) in the case of the Parent Guarantor, on an unsecured basis, and (y) in the case of a guarantee by a Subsidiary Pledgor, on a second-priority secured basis, and in the case of each of (x) and (y) as a primary obligor and not merely as a surety, to each holder and to the Trustee and its successors and assigns (i) the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all obligations of the Issuer under this Indenture (including obligations to the Trustee) and the Notes, whether for payment of principal of, premium, if any, or interest on in respect of the Notes and all other monetary obligations of the Issuer under this Indenture and the Notes and (ii) the full and punctual performance within applicable grace periods of all other obligations of the Issuer whether for fees, expenses, indemnification or otherwise under this Indenture and the Notes (all the foregoing being hereinafter collectively called the "<u>Guaranteed Obligations</u>"). Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from any Guarantor, and that each Guarantor shall remain bound under this Article XII notwithstanding any extension or renewal of any Guaranteed Obligation.

(b) Each Guarantor waives presentation to, demand of payment from and protest to the Issuer of any of the Guaranteed Obligations and also waives notice of protest for nonpayment. Each Guarantor waives notice of any default under the Notes or the Guaranteed Obligations. The obligations of each Guarantor hereunder shall not be affected by (i) the failure of any holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Issuer or any other Person under this Indenture, the Notes or any other agreement or

115

otherwise; (ii) any extension or renewal of this Indenture, the Notes or any other agreement; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by any holder or the Trustee for the Guaranteed Obligations or each Guarantor; (v) the failure of any holder or Trustee to exercise any right or remedy against any other guarantor of the Guaranteed Obligations; or (vi) any change in the ownership of each Guarantor, except as provided in Section 12.02(b) or Section 12.02(c). Each Guarantor hereby waives any right to which it may be entitled to have its obligations hereunder divided among the Guarantors, such that such Guarantor's obligations would be less than the full amount claimed.

(c) Each Guarantor hereby waives any right to which it may be entitled to have the assets of the Issuer first be used and depleted as payment of the Issuer's or such Guarantor's obligations hereunder prior to any amounts being claimed from or paid by such Guarantor hereunder. Each Guarantor hereby waives any right to which it may be entitled to require that the Issuer be sued prior to an action being initiated against such Guarantor.

(d) Each Guarantor further agrees that its Note Guarantee herein constitutes a guarantee of payment, performance and compliance when due (and not a guarantee of collection) and waives any right to require that any resort be had by any holder or the Trustee to any security held for payment of the Guaranteed Obligations.

(e) The Note Guarantee of each Guarantor is, to the extent and in the manner set forth in Article XII, equal in right of payment to all existing and future Pari Passu Indebtedness, senior in right of payment to all existing and future Subordinated Indebtedness of the Issuer and subordinated and subject in right of payment to the prior payment in full of the principal of and premium, if any, and interest on all Secured Indebtedness of the relevant Guarantor and is made subject to such provisions of this Indenture.

(f) Except as expressly set forth in Sections 8.01(b), 12.02 and 12.06, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of any holder or the Trustee to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Guarantor or would otherwise operate as a discharge of any Guarantor as a matter of law or equity.

(g) Each Guarantor agrees that its Note Guarantee shall remain in full force and effect until payment in full of all the Guaranteed Obligations. Each Guarantor further agrees that its Note Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest on any Guaranteed Obligation is rescinded or must otherwise be restored by any holder or the Trustee upon the bankruptcy or reorganization of the Issuer or otherwise.

116

(h) In furtherance of the foregoing and not in limitation of any other right which any holder or the Trustee has at law or in equity against any Guarantor by virtue hereof, upon the failure of the Issuer to pay the principal of or interest on any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, by redemption or otherwise, or to perform or comply with any other Guaranteed Obligation, each Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the holders or the Trustee an amount equal to the sum of (i) the unpaid principal amount of such Guaranteed Obligations, (ii) accrued and unpaid interest on such Guaranteed Obligations (but only to the extent not prohibited by applicable law) and (iii) all other monetary obligations of the Issuer to the holders and the Trustee.

(i) Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the holders in respect of any Guaranteed Obligations guaranteed hereby until payment in full of all Guaranteed Obligations. Each Guarantor further agrees that, as between it, on the one hand, and the holders and the Trustee, on the other hand, (i) the maturity of the Guaranteed Obligations guaranteed hereby may be accelerated as provided in Article VI for the purposes of the Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Guaranteed Obligations as provided in Article VI, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by the Parent Guarantor for the purposes of this Section 12.01.

(j) Each Guarantor also agrees to pay any and all costs and expenses (including reasonable attorneys' fees and expenses) Incurred by the Trustee or any holder in enforcing any rights under this Section 12.01.

(k) Upon request of the Trustee, each Guarantor shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

SECTION 12.02. Limitation on Liability.

(a) Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations guaranteed hereunder by each Guarantor shall not exceed the maximum amount that can be hereby guaranteed without rendering this Indenture, as it relates to such Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

(b) A Note Guarantee as to any Subsidiary that executes a supplemental indenture in accordance with Section 4.11 hereof and provides a guarantee shall terminate and be of no further force or effect and such Guarantor shall be deemed to be released from all obligations under this Article XII upon:

(i) the sale, disposition, exchange or other transfer (including through merger, consolidation, amalgamation or otherwise) of the Capital Stock (including any sale, disposition or other transfer following which the applicable Guarantor is no longer a Wholly-Owned Restricted Subsidiary), of the applicable Guarantor if such sale, disposition, exchange or other transfer is made in a manner not in violation of this Indenture;

117

(ii) the Issuer designating such Guarantor to be an Unrestricted Subsidiary in accordance with the provisions of Section 4.04 and the definition of "Unrestricted Subsidiary";

(iii) the release or discharge of the pledge by such Guarantor of the Credit Agreement or other Indebtedness (including the Existing Second Lien Notes) or the guarantee of any other Indebtedness which resulted in the obligation to guarantee the Notes; and

(iv) the Issuer's exercise of its legal defeasance option or covenant defeasance option under Article VIII or if the Issuer's obligations under this Indenture are discharged in accordance with the terms of this Indenture.

A Note Guarantee as to any Subsidiary also will be automatically released upon the applicable Subsidiary ceasing to be a Subsidiary as a result of any foreclosure of any pledge or security interest securing Bank Indebtedness or other exercise of remedies in respect thereof.

(c) The Parent Guarantee shall terminate and be of no further force or effect and the Parent Guarantor shall be deemed to be released from all obligations under this Article XII upon:

(i) the Issuer ceasing to be a Wholly Owned Subsidiary of Harrah's Entertainment;

(ii) the Issuer's transfer of all or substantially all of its assets to, or merger with, an entity that is not a Wholly Owned Subsidiary of Harrah's Entertainment in accordance with Section 5.01 and such transferee entity assumes the Issuer's obligations under this Indenture; and

(iii) the Issuer's exercise of its legal defeasance option or covenant defeasance option under Article VIII or if the Issuer's obligations under this Indenture are discharged in accordance with the terms of this Indenture.

In addition, the Parent Guarantee will be automatically released upon the election of the Issuer and Notice to the Trustee if the guarantee by Harrah's Entertainment of the Credit Agreement, the Retained Notes or any Indebtedness which resulted in the obligation to guarantee the Notes has been released or discharged.

118

SECTION 12.03. Successors and Assigns. This Article XII shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit of the successors and assigns of the Trustee and the holders and, in the event of any transfer or assignment of rights by any holder or the Trustee, the rights and privileges conferred upon that party in this Indenture and in the Notes shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions of this Indenture.

SECTION 12.04. No Waiver. Neither a failure nor a delay on the part of either the Trustee or the holders in exercising any right, power or privilege under this Article XII shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege. The rights, remedies and benefits of the Trustee and the holders herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which either may have under this Article XII at law, in equity, by statute or otherwise.

SECTION 12.05. Modification. No modification, amendment or waiver of any provision of this Article XII, nor the consent to any departure by any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Trustee, and then such waiver or

consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on any Guarantor in any case shall entitle any Guarantor to any other or further notice or demand in the same, similar or other circumstances.

SECTION 12.06. <u>Execution of Supplemental Indenture for Future Note Guarantors</u>. Each Subsidiary and other Person which is required to become a Guarantor of the Notes pursuant to Section 4.11 shall promptly execute and deliver to the Trustee a joinder to the Guarantor Intercreditor Agreement and a supplemental indenture in the form of <u>Exhibit D</u> hereto pursuant to which such Subsidiary or other Person shall become a Guarantor under this Article XII and shall guarantee the Notes. Concurrently with the execution and delivery of such supplemental indenture, the Issuer shall deliver to the Trustee an Opinion of Counsel and an Officer's Certificate to the effect that such supplemental indenture has been duly authorized, executed and delivered by such Subsidiary or other Person and that, subject to the application of bankruptcy, insolvency, moratorium, fraudulent conveyance or transfer and other similar laws relating to creditors' rights generally and to the principles of equity, whether considered in a proceeding at law or in equity, the Guarantee of such Guarantor is a valid and binding obligation of such guarantor, enforceable against such Guarantor in accordance with its terms and/or to such other matters as the Trustee may reasonably request.

SECTION 12.07. <u>Non-Impairment</u>. The failure to endorse a Guarantee on any Note shall not affect or impair the validity thereof.

<center>119</center>

<center>**ARTICLE XIII**</center>

<center>**MISCELLANEOUS**</center>

SECTION 13.01. <u>Trust Indenture Act Controls</u>. If and to the extent that any provision of this Indenture limits, qualifies or conflicts with the duties imposed by, or with another provision (an "<u>incorporated provision</u>") included in this Indenture by operation of, Sections 310 to 318 of the TIA, inclusive, such imposed duties or incorporated provision shall control.

SECTION 13.02. <u>Notices</u>.

(a) Any notice or communication required or permitted hereunder shall be in writing and delivered in person, via facsimile or mailed by first-class mail addressed as follows:

if to the Issuer or a Guarantor:

Harrah's Operating Company, Inc.
One Caesar's Palace Drive
Las Vegas, Nevada 89101-8969
Telephone: (702) 407-6000
Facsimile: (702) 407-6418
Attn: General Counsel

if to the Trustee:

U.S. Bank National Association
60 Livingston Avenue
St. Paul, Minnesota 55107-1419
Telephone: (651) 495-3909
Facsimile: (651) 495-8097
Attn: Corporate Trust Services, Raymond S. Haverstock

The Issuer or the Trustee by notice to the other may designate additional or different addresses for subsequent notices or communications.

(b) Any notice or communication mailed to a holder shall be mailed, first class mail, to the holder at the holder's address as it appears on the registration books of the Registrar and shall be sufficiently given if so mailed within the time prescribed.

(c) Failure to mail a notice or communication to a holder or any defect in it shall not affect its sufficiency with respect to other holders. If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it, except that notices to the Trustee are effective only if received.

SECTION 13.03. <u>Communication by the Holders with Other Holders</u>. The holders may communicate pursuant to Section 312(b) of the TIA with other holders with respect to their rights under this Indenture or the Notes. The Issuer, the Trustee, the Registrar and other Persons shall have the protection of Section 312(c) of the TIA.

<center>120</center>

SECTION 13.04. <u>Certificate and Opinion as to Conditions Precedent</u>. Upon any request or application by the Issuer to the Trustee to take or refrain from taking any action under this Indenture, the Issuer shall furnish to the Trustee at the request of the Trustee:

(a) an Officers' Certificate in form reasonably satisfactory to the Trustee stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(b) an Opinion of Counsel in form reasonably satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

SECTION 13.05. <u>Statements Required in Certificate or Opinion</u>. Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture (other than pursuant to Section 4.09) shall include:

(a) a statement that the individual making such certificate or opinion has read such covenant or condition;

(b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c) a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d) a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with; *provided*, *however*, that with respect to matters of fact an Opinion of Counsel may rely on an Officers' Certificate or certificates of public officials.

SECTION 13.06. <u>When Notes Disregarded</u>. In determining whether the holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Issuer, the Parent Guarantor or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Issuer or the Parent Guarantor shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes which the Trustee knows are so owned shall be so disregarded. Subject to the foregoing, only Notes outstanding at the time shall be considered in any such determination.

SECTION 13.07. <u>Rules by Trustee, Paying Agent and Registrar</u>. The Trustee may make reasonable rules for action by or a meeting of the holders. The Registrar and a Paying Agent may make reasonable rules for their functions.

121

SECTION 13.08. <u>Legal Holidays</u>. If a payment date is not a Business Day, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue on any amount that would have been otherwise payable on such payment date if it were a Business Day for the intervening period. If a regular record date is not a Business Day, the record date shall not be affected.

SECTION 13.09. <u>GOVERNING LAW</u>. **THIS INDENTURE AND THE SECURITIES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

SECTION 13.10. <u>No Recourse Against Others</u>. No director, officer, employee, manager, incorporator or holder of any Equity Interests in the Issuer or of any Guarantor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Issuer or any Guarantor under the Notes or this Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

SECTION 13.11. <u>Successors</u>. All agreements of the Issuer and the Parent Guarantor in this Indenture and the Notes shall bind its successors. All agreements of the Trustee in this Indenture shall bind its successors.

SECTION 13.12. <u>Multiple Originals</u>. The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. One signed copy is enough to prove this Indenture.

SECTION 13.13. <u>Table of Contents; Headings</u>. The table of contents, cross-reference sheet and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 13.14. <u>Indenture Controls</u>. If and to the extent that any provision of the Notes limits, qualifies or conflicts with a provision of this Indenture, such provision of this Indenture shall control.

SECTION 13.15. <u>Severability</u>. In case any provision in this Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

SECTION 13.16. <u>Intercreditor Agreement</u>. The terms of this Indenture are subject to the terms of the Intercreditor Agreement.

**[Remainder of page intentionally left blank]**

122

---

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

**HARRAH'S OPERATING COMPANY, INC.**

By: /s/ Jonathan S. Halkyard
    Name:  Jonathan S. Halkyard
    Title:   Senior Vice President
            CFO & Treasurer

**HARRAH'S ENTERTAINMENT, INC.,**
as Parent Guarantor

By: /s/ Jonathan S. Halkyard
    Name:  Jonathan S. Halkyard
    Title:   Senior Vice President
            CFO & Treasurer

[Indenture]

---

U.S. BANK NATIONAL ASSOCIATION, as Trustee and Collateral Agent

By: /s/ Raymond S. Haverstock
    Name:  Raymond S. Haverstock
    Title:   Vice President

[Signature Page to Indenture]

---

APPENDIX A

PROVISIONS RELATING TO INITIAL SECURITIES, ADDITIONAL SECURITIES
AND EXCHANGE SECURITIES

1. Definitions.

1.1 Definitions.

For the purposes of this Appendix A the following terms shall have the meanings indicated below:

"Additional Interest" has the meaning set forth in the Registration Rights Agreement.

"AI" means an "accredited investor" as described in Rule 501(a).

"Dealer Manager Agreement" means (a) the Dealer Manager Agreement dated March 5, 2009, among the Issuer, the Parent Guarantor, Harrah's BC and the Dealer Managers and (b) any other similar dealer managers agreement or purchase agreement relating to Additional Notes.

"Dealer Mangers" means Citigroup Global Markets Inc. and J.P. Morgan Securities Inc. party to the Dealer Manager Agreement entered into in connection with the HOC Exchange Offers.

"Definitive Note" means a certificated Initial Note or Exchange Note (bearing the Restricted Notes Legend if the transfer of such Note is restricted by applicable law) that does not include the Global Notes Legend.

"Depository" means The Depository Trust Issuer, its nominees and their respective successors.

"Global Notes Legend" means the legend set forth under that caption in the applicable Exhibit to this Indenture.

"Hamlet Tender Offer" means that certain cash tender offer made on the Issue Date to holders of Notes by Hamlet Tender, LLC and Hamlet FW LLC, together with one or more additional investment vehicles formed or to be formed by any of the Sponsors and/or certain other co-

investors, as set forth in the Offer to Purchase dated March 5, 2009, as supplemented from time to time thereafter.

"Harrah's BC" means Harrah's BC, Inc., a Delaware corporation.

"HOC Exchange Offers" means the offer by the Issuer to exchange the Notes on the Issue Date for the Retained Notes, Long-Term Retained Notes and the Issuer's 10.75%/11.5% Senior Toggle Notes due 2018 and 10.75% Senior Notes due 2016, as set forth in the Offering Memorandum.

Appendix A-1

"IAI" means an institutional "accredited investor" as described in Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

"Permanent Global Notes" means all Permanent Regulation S Global Notes and all Permanent Rule 144A Global Notes.

"Permanent Regulation S Global Notes" means all Regulation S Global Notes that do not bear the Temporary Global Notes Legend.

"Permanent Rule 144A Global Notes" means all Rule 144A Global Notes that do not bear the Temporary Global Notes Legend.

"QIB" means a "qualified institutional buyer" as defined in Rule 144A.

"Registered Exchange Offer" means the offer by the Issuer, pursuant to the Registration Agreement, to certain holders of Initial Notes, to issue and deliver to such holders, in exchange for their Initial Notes, a like aggregate principal amount of Exchange Notes registered under the Securities Act.

"Registration Rights Agreement" means (a) the Registration Rights Agreement dated as of April 15, 2009 among the Issuer, the Parent Guarantor and the Dealer Managers relating to the Notes and (b) any other similar registration rights agreement relating to Additional Notes.

"Regulation S" means Regulation S under the Securities Act.

"Regulation S Notes" means all Initial Notes offered and sold outside the United States in reliance on Regulation S.

"Restricted Period," with respect to any Notes, means the period of 40 consecutive days beginning on and including the later of (a) the day on which such Notes are first offered to persons other than distributors (as defined in Regulation S under the Securities Act) in reliance on Regulation S, notice of which day shall be promptly given by the Issuer to the Trustee, and (b) the Issue Date, and with respect to any Additional Notes that are Transfer Restricted Notes, it means the comparable period of 40 consecutive days.

"Restricted Notes Legend" means the legend set forth in Section 2.2(h)(i) herein.

"Rule 501" means Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

"Rule 506" means Rule 506 under the Securities Act.

"Rule 144A" means Rule 144A under the Securities Act.

"Rule 144A Notes" means all Initial Notes offered and sold to QIBs in reliance on Rule 144A and all Initial Notes offered and sold to AIs in reliance on Rule 506.

Appendix A-2

"Notes Custodian" means the custodian with respect to a Global Note (as appointed by the Depository) or any successor person thereto, who shall initially be the Trustee.

"Shelf Registration Statement" means a registration statement filed by the Issuer in connection with the offer and sale of Initial Notes pursuant to the Registration Rights Agreement.

"Temporary Global Notes" means all Temporary Regulation S Global Notes and all Temporary Rule 144A Global Notes.

"Temporary Global Notes Legend" means the legend set forth in Section 2.2(h)(ii) herein.

"Temporary Regulation S Global Notes" means all Regulation S Global Notes bearing the Temporary Global Notes Legend and issued in an aggregate denomination equal to the outstanding principal amount of the Regulation S Notes initially sold to holders that indicated their intention to participate in the Hamlet Tender Offer prior to the expiration of the HOC Exchange Offers in accordance with the terms thereof.

"Temporary Rule 144A Global Notes" means all Rule 144A Global Notes bearing the Temporary Global Notes Legend and issued in an aggregate denomination equal to the outstanding principal amount of the Rule 144A Global Notes initially sold to holders that indicated their intention to participate in the Hamlet Tender Offer prior to the expiration of the HOC Exchange Offers in accordance with the terms thereof.

"<u>Transfer Restricted Definitive Notes</u>" means Definitive Notes that bear or are required to bear or are subject to the Restricted Notes Legend.

"<u>Transfer Restricted Global Notes</u>" means Global Notes that bear or are required to bear or are subject to the Restricted Notes Legend.

"<u>Unrestricted Definitive Notes</u>" means Definitive Notes that are not required to bear, or are not subject to, the Restricted Notes Legend.

"<u>Unrestricted Global Notes</u>" means Global Notes that are not required to bear, or are not subject to, the Restricted Notes Legend.

1.2 <u>Other Definitions</u>.

| Term: | Defined in Section: |
|---|---|
| Agent Members | 2.1(b) |
| Global Notes | 2.1(b) |
| Regulation S Global Notes | 2.1(b) |
| Rule 144A Global Notes | 2.1(b) |

Appendix A-3

2. The Notes.

2.1 Form and Dating; Global Notes.

(a) The Initial Notes issued on the date hereof will be (i) privately placed by the Issuer pursuant to the Offering Memorandum and (ii) sold, initially only to (1) QIBs in reliance on Rule 144A, (2) Persons other than U.S. Persons (as defined in Regulation S) in reliance on Regulation S and (3) AIs in reliance on Rule 506. Such Initial Notes may thereafter be transferred to, among others, QIBs, purchasers in reliance on Regulation S and, except as set forth below, IAIs in accordance with Rule 501. Additional Notes offered after the date hereof may be offered and sold by the Issuer from time to time pursuant to one or more agreements in accordance with applicable law.

(b) <u>Global Notes</u>. (i) Except as provided in clause (d) below, Rule 144A Notes initially shall be represented by one or more Notes in definitive, fully registered, global form without interest coupons (collectively, the "<u>Rule 144A Global Notes</u>").

Regulation S Notes initially shall be represented by one or more Notes in fully registered, global form without interest coupons (collectively, the "<u>Regulation S Global Notes</u>"), which shall be registered in the name of the Depository or the nominee of the Depository for the accounts of designated agents holding on behalf of Euroclear or Clearstream.

The term "<u>Global Notes</u>" means the Rule 144A Global Notes and the Regulation S Global Notes. The Global Notes shall bear the Global Note Legend. The Global Notes initially shall (i) be registered in the name of the Depository or the nominee of such Depository, in each case for credit to an account of an Agent Member, (ii) be delivered to the Trustee as custodian for such Depository and (iii) bear the Restricted Notes Legend.

Members of, or direct or indirect participants in, the Depository (collectively, the "<u>Agent Members</u>") shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Depository, or the Trustee as its custodian, or under the Global Notes. The Depository may be treated by the Issuer, the Trustee and any agent of the Issuer or the Trustee as the absolute owner of the Global Notes for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Trustee or any agent of the Issuer or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depository, or impair, as between the Depository and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any Note.

(ii) Transfers of Global Notes shall be limited to transfer in whole, but not in part, to the Depository, its successors or their respective nominees. Interests of beneficial owners in the Global Notes may be transferred or exchanged for Definitive Notes only in accordance with the applicable rules and procedures of the Depository and the provisions of Section 2.2. In addition, a Global Note shall be exchangeable for Definitive Notes if (x) the Depository (1) notifies the Issuer that it is unwilling or unable to continue as depository for such Global Note and the Issuer thereupon fails to appoint a successor depository or (2) has ceased to be a clearing agency registered under the Exchange Act or (y) there shall have occurred and be continuing an Event of Default with respect to such Global Note; *provided* that in no event shall the Regulation S Global Note be exchanged by the Issuer for Definitive Notes prior to (x) the expiration of the Restricted Period and

Appendix A-4

(y) the receipt by the Registrar of any certificates required pursuant to Rule 903(b)(3)(ii)(B) under the Securities Act. In all cases, Definitive Notes delivered in exchange for any Global Note or beneficial interests therein shall be registered in the names, and issued in any approved denominations, requested by or on behalf of the Depository in accordance with its customary procedures.

(iii) In connection with the transfer of a Global Note as an entirety to beneficial owners pursuant to subsection (i) of this Section 2.1(b), such Global Note shall be deemed to be surrendered to the Trustee for cancellation, and the Issuer shall execute, and the Trustee shall

authenticate and make available for delivery, to each beneficial owner identified by the Depository in writing in exchange for its beneficial interest in such Global Note, an equal aggregate principal amount of Definitive Notes of authorized denominations.

(iv) Any Transfer Restricted Note delivered in exchange for an interest in a Global Note pursuant to Section 2.2 shall, except as otherwise provided in Section 2.2, bear the Restricted Notes Legend.

(v) Notwithstanding the foregoing, through the Restricted Period, a beneficial interest in a Regulation S Global Note may be held only through Euroclear or Clearstream unless delivery is made in accordance with the applicable provisions of Section 2.2.

(vi) The holder of any Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a holder is entitled to take under this Indenture or the Notes.

(c) <u>Temporary Global Notes</u>. In addition to the requirements for Global Notes set forth in Section 2.1(b) above, Notes initially issued in the form of Temporary Global Notes shall bear the Temporary Global Notes Legend and shall be subject to the additional transfer restrictions set forth therein and as set forth below under Section 2.2.

Upon the completion or cancellation of the Hamlet Tender Offer, beneficial interests in the Temporary Global Notes shall be exchanged for beneficial interests in Permanent Global Notes; *provided* that beneficial interests in Temporary Global Notes acquired by affiliates (as defined in Rule 405 of the Securities Act) of the Issuer in the Hamlet Tender Offer shall be exchanged for Definitive Notes in accordance with the requirements set forth below under Section 2.2(g). In order to effect such exchange, the Issuer shall provide written notice to the Trustee instructing the Trustee to (i) direct the Depositary to transfer the specified amount of the outstanding beneficial interests in each Temporary Rule 144A Global Note and Temporary Regulation S Global Note to a corresponding Permanent Rule 144A Global Note or Permanent Regulation S Global Note, as applicable, and provide the Depositary with all such information as is necessary for the Depositary to appropriately credit and debit the relevant holder accounts and (ii) provide prior written notice to all holders of such exchange, which notice must include the date such exchange is proposed to occur, the CUSIP numbers of the relevant Temporary Global Notes and the CUSIP numbers of the relevant Permanent Global Notes into which such holders'

<div align="center">Appendix A-5</div>

beneficial interests shall be exchanged. Upon such exchange of beneficial interests pursuant to this Section 2.1(c), the Registrar shall reflect on its books and records the date of such transfer and a decrease and increase, respectively, in the principal amount of the applicable Temporary Global Notes and Permanent Global Notes, respectively, equal to the principal amount of beneficial interests so transferred. Following any such transfer pursuant to this Section 2.1(c) (and/or Section 2.2(g), if applicable), of all of the beneficial interests in a Temporary Global Note, such Temporary Global Note shall be canceled.

(d) <u>Definitive Notes</u>. To the extent that the purchaser of a Rule 144A Note is an AI and is not an Agent Member or otherwise cannot hold a beneficial interest in a Global Note, then such Rule 144A Note shall be represented by one or more Definitive Notes.

2.2 Transfer and Exchange.

(a) <u>Transfer and Exchange of Global Notes</u>. A Global Note may not be transferred as a whole except as set forth in Section 2.1(b). Global Notes will not be exchanged by the Issuer for Definitive Notes except under the circumstances described in Section 2.1(b)(ii). Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.08 and 2.10 of this Indenture. Beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.2(b) or 2.2(g).

(b) <u>Transfer and Exchange of Beneficial Interests in Global Notes</u>. The transfer and exchange of beneficial interests in the Global Notes shall be effected through the Depository, in accordance with the provisions of this Indenture and the applicable rules and procedures of the Depository. Beneficial interests in Transfer Restricted Global Notes shall be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Beneficial interests in Global Notes shall be transferred or exchanged only for beneficial interests in Global Notes. Transfers and exchanges of beneficial interests in the Global Notes also shall require compliance with either subparagraph (i) or (ii) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(i) <u>Transfer of Beneficial Interests in the Same Global Note</u>. Beneficial interests in any Transfer Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Transfer Restricted Global Note in accordance with the transfer restrictions set forth in the Restricted Notes Legend; *provided, however*, that (A) prior to the expiration of the Restricted Period, transfers of beneficial interests in a Regulation S Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person and (B) transfers of beneficial interests in a Temporary Global Note may not be made to any person other than the offerors in the Hamlet Tender Offer that are not subject to Section 2.2(g). A beneficial interest in an Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.2(b)(i).

<div align="center">Appendix A-6</div>

(ii) <u>All Other Transfers and Exchanges of Beneficial Interests in Global Notes</u>. In connection with all transfers and exchanges of

beneficial interests in any Global Note that is not subject to Section 2.2(b)(i), the transferor of such beneficial interest must deliver to the Registrar (1) a written order from an Agent Member given to the Depository in accordance with the applicable rules and procedures of the Depository directing the Depository to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given in accordance with the applicable rules and procedures of the Depository containing information regarding the Agent Member account to be credited with such increase; *provided* that no transfers or exchanges of beneficial interests in a Global Note may be made for a beneficial interest in a Temporary Global Note. Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note pursuant to Section 2.2(i).

(iii) <u>Transfer of Beneficial Interests to Another Restricted Global Note</u>. A beneficial interest in a Transfer Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Transfer Restricted Global Note if the transfer complies with the requirements of Section 2.2(b)(ii) above and the Registrar receives the following:

(A) if the transferee will take delivery in the form of a beneficial interest in a Rule 144A Global Note, then the transferor must deliver a certificate in the form attached to the applicable Note; and

(B) if the transferee will take delivery in the form of a beneficial interest in a Regulation S Global Note, then the transferor must deliver a certificate in the form attached to the applicable Note.

(iv) <u>Transfer and Exchange of Beneficial Interests in a Transfer Restricted Global Note for Beneficial Interests in an Unrestricted Global Note</u>. A beneficial interest in a Transfer Restricted Global Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.2(b)(ii) above and the Registrar receives the following:

(A) if the holder of such beneficial interest in a Transfer Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form attached to the applicable Note; or

(B) if the holder of such beneficial interest in a Transfer Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form attached to the applicable Note,

Appendix A-7

and, in each such case, if the Issuer or the Registrar so requests or if the applicable rules and procedures of the Depository so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Restricted Notes Legend are no longer required in order to maintain compliance with the Securities Act. If any such transfer or exchange is effected pursuant to this subparagraph (iv) at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an written order of the Issuer in the form of an Officers' Certificate in accordance with Section 2.01, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred or exchanged pursuant to this subparagraph (iv).

(v) <u>Transfer and Exchange of Beneficial Interests in an Unrestricted Global Note for Beneficial Interests in a Transfer Restricted Global Note</u>. Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Transfer Restricted Global Note.

(vi) <u>Exchange of Beneficial Interests in Temporary Global Notes for Beneficial Interests in Permanent Global Notes</u>. In connection with any holder's exchange of its beneficial interest in a Temporary Global Note for a beneficial interest in a Permanent Global Note, the exchanging holder must deliver to the Registrar (1) a written order from an Agent Member given to the Depository in accordance with the applicable rules and procedures of the Depository directing the Depository to credit or cause to be credited a beneficial interest in a Permanent Global Note in an amount equal to the beneficial interest to be exchanged and (2) instructions given in accordance with the applicable rules and procedures of the Depository containing information regarding the Agent Member account to be credited with such increase. Upon satisfaction of all of the requirements for exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Notes pursuant to Section 2.2(i).

(c) <u>Transfer and Exchange of Beneficial Interests in Global Notes for Definitive Notes</u>. A beneficial interest in a Global Note may not be exchanged for a Definitive Note except under the circumstances described in Section 2.1(b)(ii). A beneficial interest in a Global Note may not be transferred to a Person who takes delivery thereof in the form of a Definitive Note except under the circumstances described in Section 2.1(b)(ii). In any case, beneficial interests in Global Notes shall be transferred or exchanged only for Definitive Notes.

(d) <u>Transfer and Exchange of Definitive Notes for Beneficial Interests in Global Notes</u>. Transfers and exchanges of Definitive Notes for beneficial interests in the Global Notes also shall require compliance with either subparagraph (i), (ii) or (iii) below, as applicable:

(i) <u>Transfer Restricted Definitive Notes to Beneficial Interests in Transfer Restricted Global Notes</u>. If any holder of a Transfer Restricted Definitive Note proposes to exchange such Transfer Restricted Definitive Note for a beneficial interest in a Transfer Restricted

Global Note or to transfer such Transfer Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A) if the holder of such Transfer Restricted Definitive Note proposes to exchange such Transfer Restricted Note for a beneficial interest in a Transfer Restricted Global Note, a certificate from such holder in the form attached to the applicable Note;

Appendix A-8

(B) if such Transfer Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A under the Securities Act, a certificate from such holder in the form attached to the applicable Note;

(C) if such Transfer Restricted Definitive Note is being transferred to a Non U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904 under the Securities Act, a certificate from such holder in the form attached to the applicable Note;

(D) if such Transfer Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144 under the Securities Act, a certificate from such holder in the form attached to the applicable Note;

(E) if such Transfer Restricted Definitive Note is being transferred to an IAI in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate from such holder in the form attached to the applicable Note, including the certifications, certificates and Opinion of Counsel, if applicable; or

(F) if such Transfer Restricted Definitive Note is being transferred to the Issuer or a Subsidiary thereof, a certificate from such holder in the form attached to the applicable Note;

the Trustee shall cancel the Transfer Restricted Definitive Note, and increase or cause to be increased the aggregate principal amount of the appropriate Transfer Restricted Global Note.

(ii) Transfer Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes. A holder of a Transfer Restricted Definitive Note may exchange such Transfer Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note or transfer such Transfer Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if the Registrar receives the following:

(A) if the holder of such Transfer Restricted Definitive Note proposes to exchange such Transfer Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form attached to the applicable Note; or

Appendix A-9

(B) if the holder of such Transfer Restricted Definitive Notes proposes to transfer such Transfer Restricted Definitive Note to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form attached to the applicable Note,

and, in each such case, if the Issuer or the Registrar so requests or if the applicable rules and procedures of the Depository so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Restricted Notes Legend are no longer required in order to maintain compliance with the Securities Act. Upon satisfaction of the conditions of this subparagraph (ii), the Trustee shall cancel the Transfer Restricted Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note. If any such transfer or exchange is effected pursuant to this subparagraph (ii) at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an written order of the Issuer in the form of an Officers' Certificate, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of Transfer Restricted Notes transferred or exchanged pursuant to this subparagraph (ii).

(iii) Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes. A holder of an Unrestricted Definitive Note may exchange such Unrestricted Definitive Note for a beneficial interest in an Unrestricted Global Note or transfer such Unrestricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer, the Trustee shall cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes. If any such transfer or exchange is effected pursuant to this subparagraph (iii) at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an written order of the Issuer in the form of an Officers' Certificate, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of Unrestricted Definitive Notes transferred or exchanged pursuant to this subparagraph (iii).

(iv) Unrestricted Definitive Notes to Beneficial Interests in Transfer Restricted Global Notes. An Unrestricted Definitive Note cannot be exchanged for, or transferred to a Person who takes delivery thereof in the form of, a beneficial interest in a Transfer Restricted Global Note.

(v) Definitive Notes to Beneficial Interests in Temporary Global Notes. Notwithstanding anything else contained in this Section 2.2(d),

a Definitive Note cannot be exchanged for, or transferred to a Person who takes delivery thereof in the form of, a beneficial interest in a Temporary Global Note.

Appendix A-10

(e) <u>Transfer and Exchange of Definitive Notes for Definitive Notes</u>. Upon request by a holder of Definitive Notes and such holder's compliance with the provisions of this Section 2.2(e), the Registrar shall register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting holder shall present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such holder or by its attorney, duly authorized in writing. In addition, the requesting holder shall provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.2(e).

(i) <u>Transfer Restricted Definitive Notes to Transfer Restricted Definitive Notes</u>. A Transfer Restricted Note may be transferred to and registered in the name of a Person who takes delivery thereof in the form of a Transfer Restricted Definitive Note if the Registrar receives the following:

(A) if the transfer will be made pursuant to Rule 144A under the Securities Act, then the transferor must deliver a certificate in the form attached to the applicable Note;

(B) if the transfer will be made pursuant to Rule 903 or Rule 904 under the Securities Act, then the transferor must deliver a certificate in the form attached to the applicable Note;

(C) if the transfer will be made pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144 under the Securities Act, a certificate in the form attached to the applicable Note;

(D) if the transfer will be made to an IAI in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (A) through (D) above, a certificate in the form attached to the applicable Note; and

(E) if such transfer will be made to the Issuer or a Subsidiary thereof, a certificate in the form attached to the applicable Note.

(ii) <u>Transfer Restricted Definitive Notes to Unrestricted Definitive Notes</u>. Any Transfer Restricted Definitive Note may be exchanged by the holder thereof for an Unrestricted Definitive Note or transferred to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note if the Registrar receives the following:

(A) if the holder of such Transfer Restricted Definitive Note proposes to exchange such Transfer Restricted Definitive Note for an Unrestricted Definitive Note, a certificate from such holder in the form attached to the applicable Note; or

(B) if the holder of such Transfer Restricted Definitive Note proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder in the form attached to the applicable Note,

Appendix A-11

and, in each such case, if the Registrar so requests, an Opinion of Counsel in form reasonably acceptable to the Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Restricted Notes Legend are no longer required in order to maintain compliance with the Securities Act.

(iii) <u>Unrestricted Definitive Notes to Unrestricted Definitive Notes</u>. A holder of an Unrestricted Definitive Note may transfer such Unrestricted Definitive Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note at any time. Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the holder thereof.

(iv) <u>Unrestricted Definitive Notes to Transfer Restricted Definitive Notes</u>. An Unrestricted Definitive Note cannot be exchanged for, or transferred to a Person who takes delivery thereof in the form of, a Transfer Restricted Definitive Note.

At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.11. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depository at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depository at the direction of the Trustee to reflect such increase.

(f) <u>Automatic Exchange from Transfer Restricted Global Notes to Unrestricted Global Notes</u>. At the option of the Issuer and upon compliance with the following procedures, beneficial interests in a Transfer Restricted Global Note shall be exchanged for beneficial interests in an Unrestricted Global Note. In order to effect such exchange, the Issuer shall, subject to Section 7.07, provide written notice to the Trustee

requesting the Trustee to (i) direct the Depository to transfer the specified amount of the outstanding beneficial interests in a particular Transfer Restricted Global Note to an Unrestricted Global Note and provide the Depository with all such information as is required by the Depository for the Depository to appropriately credit and debit the relevant holder accounts and (ii) provide prior written notice to all holders of such exchange, which notice must include the date such exchange is proposed to occur, the CUSIP number of the relevant Transfer Restricted Global Note and the CUSIP number of the Unrestricted Global Note into which such holders' beneficial interests will be exchanged. As a condition to any such exchange pursuant to this Section 2.2(f), the Trustee shall be entitled to receive from the Issuer, and rely conclusively without any liability, upon an Officer's Certificate and an Opinion of Counsel to the Issuer, in form and in substance reasonably satisfactory to the Trustee, to the effect that such transfer of beneficial interests to the Unrestricted Global Note shall be effected in compliance with the Securities Act. The Issuer

Appendix A-12

may request from holders such information it reasonably determines is required in order to be able to deliver such Officer's Certificate and Opinion of Counsel. Upon such exchange of beneficial interests pursuant to this Section 2.2(f), the Registrar shall reflect on its books and records the date of such transfer and a decrease and increase, respectively, in the principal amount of the applicable Transfer Restricted Global Notes and the Unrestricted Global Notes, respectively, equal to the principal amount of beneficial interests transferred. Following any such transfer pursuant to Section 2.2(f) of all of the beneficial interests in a Transfer Restricted Global Note, such Transfer Restricted Global Note shall be cancelled.

(g) <u>Transfers of Notes Held by Affiliates</u>. Any certificate (i) evidencing a Note that has been transferred to an affiliate (as defined in Rule 405 of the Securities Act) of the Issuer, pursuant to the Hamlet Tender Offer or otherwise as evidenced by a notation on the certificate of transfer and certificate of exchange for such transfer or in the representation letter delivered in respect thereof or (ii) evidencing a Note that has been acquired from an affiliate (other than by an affiliate) in a transaction or a chain of transactions not involving any public offering, shall, until six months after the last date on which either the Issuer or any affiliate of the Issuer was the owner of such Security, in each case, be in the form of a permanent Definitive Note and bear the Restricted Notes Legend subject to the restrictions in this Section 2.2. The Registrar shall retain copies of all letters, notices and other written communications received pursuant to this Section 2.2. The Issuer, at its sole cost and expense, shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable advance written notice to the Registrar and the Trustee.

(h) Legend.

(i) Except as permitted by the following paragraph (iii), (iv) or (v), each Note certificate evidencing the Global Notes and the Definitive Notes (and all Notes issued in exchange therefor or in substitution thereof) shall bear a legend in substantially the following form (each defined term in the legend being defined as such for purposes of the legend only):

"THIS SECURITY (OR ITS PREDECESSOR) HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND, ACCORDINGLY, MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER: (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) (A "QIB"), (B) IT IS NOT A U.S. PERSON, IS NOT ACQUIRING THIS SECURITY FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE

Appendix A-13

TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT OR (C) IT IS AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a) UNDER REGULATION D OF THE SECURITIES ACT (AN "AI"), (2) AGREES THAT IT WILL NOT, WITHIN THE TIME PERIOD REFERRED TO UNDER RULE 144(d)(1) (TAKING INTO ACCOUNT THE PROVISIONS OF RULE 144(d) UNDER THE SECURITIES ACT, IF APPLICABLE) UNDER THE SECURITIES ACT AS IN EFFECT ON THE DATE OF THE TRANSFER OF THIS SECURITY, RESELL OR OTHERWISE TRANSFER THIS SECURITY EXCEPT (A) TO THE ISSUER, HET OR ANY OF ITS SUBSIDIARIES, (B) TO A PERSON WHOM THE HOLDER REASONABLY BELIEVES IS A QIB OR PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QIB IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) IN COMPLIANCE WITH AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED THAT PRIOR TO SUCH TRANSFER, THE TRUSTEE IS FURNISHED WITH AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT), (D) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT, (E) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE AND PROVIDED THAT PRIOR TO SUCH TRANSFER, THE TRUSTEE IS FURNISHED WITH AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT), (F) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a)(1), (2), (3) OR (7) UNDER REGULATION D OF THE SECURITIES ACT (AN "IAI") THAT, PRIOR TO SUCH TRANSFER, FURNISHES THE TRUSTEE A SIGNED LETTER

CONTAINING CERTAIN REPRESENTATIONS AND AGREEMENTS RELATING TO THE TRANSFER OF THIS SECURITY (THE FORM OF WHICH CAN BE OBTAINED FROM THE TRUSTEE) AND, IF SUCH TRANSFER IS IN RESPECT OF AN AGGREGATE PRINCIPAL AMOUNT OF NEW SECOND LIEN NOTES LESS THAN $250,000, AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER AND THE TRUSTEE THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT OR (G) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES

Appendix A-14

ACT AND, IN EACH CASE, IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS, AND (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS SECURITY OR AN INTEREST HEREIN IS TRANSFERRED (OTHER THAN A TRANSFER PURSUANT TO CLAUSE (2)(D) OR 2(E) ABOVE) A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. IN CONNECTION WITH ANY TRANSFER OF THIS SECURITY OR ANY INTEREST HEREIN WITHIN THE TIME PERIOD REFERRED TO ABOVE, THE HOLDER MUST CHECK THE APPROPRIATE BOX SET FORTH ON THE REVERSE HEREOF RELATING TO THE MANNER OF SUCH TRANSFER AND SUBMIT THIS CERTIFICATE TO THE TRUSTEE. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANINGS GIVEN TO THEM BY RULE 902 OF REGULATION S UNDER THE SECURITIES ACT."

"THE TERMS OF THIS SECURITY ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED DECEMBER 24, 2008, BY AND AMONG BANK OF AMERICA, N.A., AS FIRST LIEN AGENT, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE AND THE OTHER PARTIES THERETO FROM TIME TO TIME."

"THIS NOTE IS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE INTERNAL REVENUE CODE. A HOLDER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY FOR SUCH NOTES BY SUBMITTING A REQUEST FOR SUCH INFORMATION TO THE BORROWER AT THE FOLLOWING ADDRESS: HARRAH'S OPERATING COMPANY, INC., ONE CAESAR'S PALACE DRIVE, LAS VEGAS, NEVADA, 89101-8969, ATTENTION: GENERAL COUNSEL."

To be inserted if Notes are guaranteed by the Subsidiaries pursuant to Section 4.11(c):

"THE TERMS OF THIS AGREEMENT ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED AS OF JANUARY 28, 2008, BY AND AMONG BANK OF AMERICA, N.A., U.S. BANK NATIONAL ASSOCIATION, CITIBANK, N.A. AND THE OTHER PARTIES THERETO FROM TIME TO TIME."

Appendix A-15

Each Definitive Note shall bear the following additional legends:

"IN CONNECTION WITH ANY TRANSFER, THE HOLDER WILL DELIVER TO THE REGISTRAR AND TRANSFER AGENT SUCH CERTIFICATES AND OTHER INFORMATION AS SUCH TRANSFER AGENT MAY REASONABLY REQUIRE TO CONFIRM THAT THE TRANSFER COMPLIES WITH THE FOREGOING RESTRICTIONS."

(ii) Temporary Global Notes Legend. Each Temporary Global Note shall bear the following Temporary Global Notes Legend:

"THIS SECURITY (OR ITS PREDECESSOR) IS A TEMPORARY GLOBAL NOTE; AS SUCH, IT IS NOT A TRANSFERABLE INTEREST UNLESS FIRST EXCHANGED FOR A BENEFICIAL INTEREST IN A PERMANENT GLOBAL NOTE IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THE INDENTURE. UPON CONSUMMATION OF THE SECOND LIEN TENDER OFFERS AS DESCRIBED IN THE OFFERING MEMORANDUM OF MARCH 5, 2009 (AS SUPPLEMENTED FROM TIME TO TIME, INCLUDING ON MARCH 17, 2009 AND MARCH 26, 2009), ANY REMAINING INTEREST IN THIS SECURITY WILL BE EXCHANGED FOR A CORRESPONDING BENEFICIAL INTEREST IN A PERMANENT GLOBAL NOTE."

(iii) Upon any sale or transfer of a Transfer Restricted Definitive Note, the Registrar shall permit the holder thereof to exchange such Transfer Restricted Note for a Definitive Note that does not bear the legends set forth above and rescind any restriction on the transfer of such Transfer Restricted Definitive Note if the holder certifies in writing to the Registrar that its request for such exchange was made in reliance on Rule 144 (such certification to be in the form set forth on the reverse of the Initial Note).

(iv) After a transfer of any Initial Notes during the period of the effectiveness of a Shelf Registration Statement with respect to such Initial Notes, all requirements pertaining to the Restricted Notes Legend on such Initial Notes shall cease to apply and the requirements that any such Initial Notes be issued in global form shall continue to apply.

(v) Upon the consummation of a Registered Exchange Offer with respect to the Initial Notes pursuant to which holders of such Initial Notes are offered Exchange Notes in exchange for their Initial Notes, all requirements pertaining to Initial Notes that Initial Notes be issued in global form shall continue to apply, and Exchange Notes in global form without the Restricted Notes Legend shall be available to holders that exchange such Initial Notes in such Registered Exchange Offer.

(vi) Upon a sale or transfer after the expiration of the Restricted Period of any Initial Note acquired pursuant to Regulation S, all

requirements that such Initial Note bear the Restricted Notes Legend shall cease to apply and the requirements requiring any such Initial Note be issued in global form shall continue to apply.

Appendix A-16

(vii) Any Additional Notes sold in a registered offering shall not be required to bear the Restricted Notes Legend.

(i) <u>Cancellation or Adjustment of Global Note</u>. At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.11 of this Indenture. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depository at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depository at the direction of the Trustee to reflect such increase.

(j) <u>Obligations with Respect to Transfers and Exchanges of Notes</u>.

(i) To permit registrations of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate, Definitive Notes and Global Notes at the Registrar's request.

(ii) No service charge shall be made for any registration of transfer or exchange, but the Issuer may require payment of a sum sufficient to cover any transfer tax, assessments, or similar governmental charge payable in connection therewith (other than any such transfer taxes, assessments or similar governmental charge payable upon exchanges pursuant to Sections 3.06, 4.06, 4.08 and 9.05 of this Indenture).

(iii) Prior to the due presentation for registration of transfer of any Note, the Issuer, the Trustee, a Paying Agent or the Registrar may deem and treat the person in whose name a Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Note and for all other purposes whatsoever, whether or not such Note is overdue, and none of the Issuer, the Trustee, the Paying Agent or the Registrar shall be affected by notice to the contrary.

(iv) All Notes issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Notes surrendered upon such transfer or exchange.

(k) No Obligation of the Trustee.

(i) The Trustee shall have no responsibility or obligation to any beneficial owner of a Global Note, a member of, or a participant in the Depository or any other Person with respect to the accuracy of the records of the Depository or its nominee or of any participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any participant, member, beneficial owner or other Person

Appendix A-17

(other than the Depository) of any notice (including any notice of redemption or repurchase) or the payment of any amount, under or with respect to such Notes. All notices and communications to be given to the holders and all payments to be made to the holders under the Notes shall be given or made only to the registered holders (which shall be the Depository or its nominee in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through the Depository subject to the applicable rules and procedures of the Depository. The Trustee may rely and shall be fully protected in relying upon information furnished by the Depository with respect to its members, participants and any beneficial owners.

(ii) The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among Depository participants, members or beneficial owners in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

Appendix A-18

EXHIBIT A

[FORM OF FACE OF INITIAL NOTE]

[Global Notes Legend]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST

COMPANY, A NEW YORK CORPORATION ("DTC"), NEW YORK, NEW YORK, TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO., OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO DTC, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

[Temporary Global Note Legend]

"THIS SECURITY (OR ITS PREDECESSOR) IS A TEMPORARY GLOBAL NOTE; AS SUCH, INTERESTS IN THIS SECURITY MAY NOT BE TRANSFERRED AND MAY ONLY BE EXCHANGED FOR A BENEFICIAL INTEREST IN A PERMANENT GLOBAL NOTE IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF. UPON CONSUMMATION OF THE SECOND LIEN TENDER OFFERS AS DESCRIBED IN THE OFFERING MEMORANDUM OF MARCH 5, 2009 (AS SUPPLEMENTED FROM TIME TO TIME, INCLUDING ON MARCH 17, 2009 AND MARCH 26, 2009), ANY REMAINING INTEREST IN THIS SECURITY WILL BE EXCHANGED FOR A CORRESPONDING BENEFICIAL INTEREST IN A PERMANENT GLOBAL NOTE."

[Restricted Notes Legend]

"THIS SECURITY (OR ITS PREDECESSOR) HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND, ACCORDINGLY, MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER

A-1

(1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) (A "QIB"), (B) IT IS NOT A U.S. PERSON, IS NOT ACQUIRING THIS SECURITY FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT OR (C) IT IS AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a) UNDER REGULATION D OF THE SECURITIES ACT (AN "AI"), (2) AGREES THAT IT WILL NOT, WITHIN THE TIME PERIOD REFERRED TO UNDER RULE 144(d)(1) (TAKING INTO ACCOUNT THE PROVISIONS OF RULE 144(d) UNDER THE SECURITIES ACT, IF APPLICABLE) UNDER THE SECURITIES ACT AS IN EFFECT ON THE DATE OF THE TRANSFER OF THIS SECURITY, RESELL OR OTHERWISE TRANSFER THIS SECURITY EXCEPT (A) TO THE ISSUER, HET OR ANY OF ITS SUBSIDIARIES, (B) TO A PERSON WHOM THE HOLDER REASONABLY BELIEVES IS A QIB OR PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QIB IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) IN COMPLIANCE WITH AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED THAT PRIOR TO SUCH TRANSFER, THE TRUSTEE IS FURNISHED WITH AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT), (D) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT, (E) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE AND PROVIDED THAT PRIOR TO SUCH TRANSFER, THE TRUSTEE IS FURNISHED WITH AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT), (F) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a)(1), (2), (3) OR (7) UNDER REGULATION D OF THE SECURITIES ACT (AN "IAI") THAT, PRIOR TO SUCH TRANSFER, FURNISHES THE TRUSTEE A SIGNED LETTER CONTAINING CERTAIN REPRESENTATIONS AND AGREEMENTS RELATING TO THE TRANSFER OF THIS SECURITY (THE FORM OF WHICH CAN BE OBTAINED FROM THE TRUSTEE) AND, IF SUCH TRANSFER IS IN RESPECT OF AN AGGREGATE PRINCIPAL AMOUNT OF NEW SECOND LIEN NOTES LESS THAN $250,000, AN OPINION OF COUNSEL ACCEPTABLE

A-2

TO THE ISSUER AND THE TRUSTEE THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT OR

(G) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND, IN EACH CASE, IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS, AND (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS SECURITY OR AN INTEREST HEREIN IS TRANSFERRED (OTHER THAN A TRANSFER PURSUANT TO CLAUSE (2)(D) OR 2(E) ABOVE) A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. IN CONNECTION WITH ANY TRANSFER OF THIS SECURITY OR ANY INTEREST HEREIN WITHIN THE TIME PERIOD REFERRED TO ABOVE, THE HOLDER MUST CHECK THE APPROPRIATE BOX SET FORTH ON THE REVERSE HEREOF RELATING TO THE MANNER OF SUCH TRANSFER AND SUBMIT THIS CERTIFICATE TO THE TRUSTEE. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANINGS GIVEN TO THEM BY RULE 902 OF REGULATION S UNDER THE SECURITIES ACT."

"THE TERMS OF THIS SECURITY ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED DECEMBER 24, 2008, BY AND AMONG BANK OF AMERICA, N.A., AS FIRST LIEN AGENT, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE AND THE OTHER PARTIES THERETO FROM TIME TO TIME."

"THIS NOTE IS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE INTERNAL REVENUE CODE. A HOLDER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY FOR SUCH NOTES BY SUBMITTING A REQUEST FOR SUCH INFORMATION TO THE BORROWER AT THE FOLLOWING ADDRESS: HARRAH'S OPERATING COMPANY, INC., ONE CAESAR'S PALACE DRIVE, LAS VEGAS, NEVADA, 89101-8969, ATTENTION: GENERAL COUNSEL."

To be inserted if Notes are guaranteed by the Subsidiaries pursuant to Section 4.11(c):

"THE TERMS OF THIS AGREEMENT ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED AS OF JANUARY 28, 2008, BY AND AMONG BANK OF AMERICA, N.A., U.S. BANK NATIONAL ASSOCIATION, CITIBANK, N.A. AND THE OTHER PARTIES THERETO FROM TIME TO TIME."

A-3

---

Each Definitive Note shall bear the following additional legends:

"IN CONNECTION WITH ANY TRANSFER, THE HOLDER WILL DELIVER TO THE REGISTRAR AND TRANSFER AGENT SUCH CERTIFICATES AND OTHER INFORMATION AS SUCH TRANSFER AGENT MAY REASONABLY REQUIRE TO CONFIRM THAT THE TRANSFER COMPLIES WITH THE FOREGOING RESTRICTIONS."

A-4

---

[FORM OF INITIAL NOTE]

No.

[TEMPORARY (1) 144A] CUSIP No. 413627 BH2
[TEMPORARY (1) 144A] ISIN No. US413627BH24
[TEMPORARY (2) 144A] CUSIP No. 413627 BJ8
[TEMPORARY (2) 144A] ISIN No. US413627BJ89
[PERMANENT 144A] CUSIP No. 413627 BG4
[PERMANENT 144A] ISIN No. US413627BG41

[TEMPORARY (1) REG S] CUSIP No. U24658 AP8
[TEMPORARY (1) REG S] ISIN No. USU24658AP82
[TEMPORARY (2) REG S] CUSIP No. U24658 AQ6
[TEMPORARY (2) REG S] ISIN No. USU24658AQ65
[PERMANENT REG S] CUSIP No. U24658 AN3
[PERMANENT REG S] ISIN No. USU24658AN35

10.00% Second-Priority Senior Secured Note due 2018

HARRAH'S OPERATING COMPANY, INC., a Delaware corporation, promises to pay to Cede & Co., or registered assigns, the principal sum set forth on the Schedule of Increases or Decreases in Global Security attached hereto on December 15, 2018.

Interest Payment Dates: June 15 and December 15

Record Dates: June 1 and December 1

Additional provisions of this Note are set forth on the other side of this Note.

A-5

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed.

<div style="text-align: right">

HARRAH'S OPERATING COMPANY, INC.

By: _____
     Name:
     Title:

</div>

Dated: April 15, 2009

<div style="text-align: center">A-6</div>

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

U. S. BANK NATIONAL ASSOCIATION
    as Trustee, certifies that this is one of the Notes referred
    to in the Indenture.

By: _____
         Authorized Signatory

*/   If the Note is to be issued in global form, add the Global Notes Legend and the attachment from Exhibit A captioned "TO BE ATTACHED TO GLOBAL SECURITIES - SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY."

<div style="text-align: center">A-7</div>

<div style="text-align: center">

[FORM OF REVERSE SIDE INITIAL NOTE]

10.00% Second-Priority Senior Secured Note Due 2018

</div>

1.   Interest

HARRAH'S OPERATING COMPANY, INC., a Delaware corporation (such corporation, and its successors and assigns under the Indenture hereinafter referred to, being herein called the "Issuer"), promises to pay interest on the principal amount of this Note at the rate per annum shown above. The Issuer shall pay interest semiannually on June 15 and December 15 of each year (each an "Interest Payment Date"), commencing June 15, 2009. Interest on the Notes shall accrue from the most recent date to which interest has been paid or duly provided for or, if no interest has been paid or duly provided for, from April 15, 2009, until the principal hereof is due. Interest shall be computed on the basis of a 360-day year of twelve 30-day months. The Issuer shall pay interest on overdue principal at the rate borne by the Notes, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

2.   Method of Payment

The Issuer shall pay interest on the Notes (except defaulted interest) to the Persons who are registered holders at the close of business on June 1 or December 1 (each a "Record Date") next preceding the interest payment date even if Notes are canceled after the record date and on or before the interest payment date (whether or not a Business Day). Holders must surrender Notes to the Paying Agent to collect principal payments. The Issuer shall pay principal, premium, if any, and interest in money of the United States of America that at the time of payment is legal tender for payment of public and private debts. Payments in respect of the Notes represented by a Global Note (including principal, premium, if any, and interest) shall be made by wire transfer of immediately available funds to the accounts specified by The Depository Trust Issuer or any successor depositary. The Issuer shall make all payments in respect of a certificated Note (including principal, premium, if any, and interest) at the office of the Paying Agent, except that, at the option of the Issuer, payment of interest may be made by mailing a check to the registered address of each holder thereof; *provided, however,* that payments on the Notes may also be made, in the case of a holder of at least $1,000,000 aggregate principal amount of Notes, by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such holder elects payment by wire transfer by giving written notice to the Trustee or Paying Agent to such effect designating such account no later than 30 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion).

3.   Paying Agent and Registrar

Initially, U.S. Bank National Association (the "Trustee"), will act as Paying Agent and Registrar. The Issuer may appoint and change any Paying Agent or Registrar without notice. The Issuer or any of its domestically incorporated Wholly Owned Subsidiaries may act as Paying Agent or Registrar.

4.    Indenture

The Issuer issued the Notes under an Indenture dated as of April 15, 2009 (the "Indenture"), among the Issuer, the Parent Guarantor and the Trustee. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa 77bbbb) as in effect on the date of the Indenture (the "TIA"). Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture. The Notes are subject to all terms and provisions of the Indenture, and the holders (as defined in the Indenture) are referred to the Indenture and the TIA for a statement of such terms and provisions.

The Notes are second-priority senior secured obligations of the Issuer. This Note is one of the Initial Notes referred to in the Indenture. The Notes include the Initial Notes, any Additional Notes and any Exchange Notes issued in exchange for the Initial Notes or any Additional Notes pursuant to the Indenture. The Initial Notes, any Additional Notes and any Exchange Notes are treated as a single class of securities under the Indenture. The Indenture imposes certain limitations on the ability of the Issuer and its Restricted Subsidiaries to, among other things, make certain Investments and other Restricted Payments, pay dividends and other distributions, Incur Indebtedness, enter into consensual restrictions upon the payment of certain dividends and distributions by such Restricted Subsidiaries, issue or sell shares of capital stock of the Issuer and such Restricted Subsidiaries, enter into or permit certain transactions with Affiliates, create or Incur Liens and make Asset Sales. The Indenture also imposes limitations on the ability of the Issuer, each Subsidiary Pledgor and the Parent Guarantor to consolidate or merge with or into any other Person or convey, transfer or lease all or substantially all of its property.

To guarantee the due and punctual payment of the principal and interest on the Notes and all other amounts payable by the Issuer under the Indenture and the Notes when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Notes and the Indenture, the Parent Guarantor has unconditionally guaranteed the Guaranteed Obligations pursuant to the terms of the Indenture and any Subsidiary Pledgor that executes a Note Guarantee will unconditionally guarantee the Guaranteed Obligations on a second-priority senior secured basis pursuant to the terms of the Indenture.

5.    Optional Redemption

On or after December 15, 2013, the Issuer may redeem the Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at the following redemption prices (expressed as a percentage of principal amount), *plus* accrued and unpaid interest and additional interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the 12-month period commencing on December 15 of the years set forth below:

| Period | Redemption Price |
|---|---|
| 2013 | 105.000% |
| 2014 | 103.333% |
| 2015 | 101.667% |
| 2016 and thereafter | 100.000% |

A-9

In addition, prior to December 15, 2013 the Issuer may redeem the Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at a redemption price equal to 100% of the principal amount of the Notes redeemed *plus* the Applicable Premium as of, and accrued and unpaid interest and additional interest, if any, to, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

Notwithstanding the foregoing, at any time and from time to time on or prior to December 15, 2011, the Issuer may redeem in the aggregate up to 35% of the original aggregate principal amount of the Notes (calculated after giving effect to any issuance of Additional Notes) with the net cash proceeds of one or more Equity Offerings (1) by the Issuer or (2) by any direct or indirect parent of the Issuer to the extent the net cash proceeds thereof are contributed to the common equity capital of the Issuer or used to purchase Capital Stock (other than Disqualified Stock) of the Issuer from it, at a redemption price (expressed as a percentage of principal amount thereof) of 110.00%, *plus* accrued and unpaid interest and additional interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date); *provided, however,* that at least 50% of the original aggregate principal amount of the Notes (calculated after giving effect to any issuance of Additional Notes) must remain outstanding after each such redemption; *provided, further,* that such redemption shall occur within 90 days after the date on which any such Equity Offering is consummated upon not less than 30 nor more than 60 days' notice mailed to each holder of Notes being redeemed and otherwise in accordance with the procedures set forth in the Indenture.

6.    Mandatory Redemption

The Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

7.    Notice of Redemption

Notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the redemption date to each holder of Notes to be redeemed at his, her or its registered address. Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1,000. If money sufficient to pay the redemption price of and accrued and unpaid interest on all Notes (or portions thereof) to be redeemed on the redemption date is deposited with a Paying Agent on or before the redemption date and certain other conditions are satisfied, on and after such date, interest ceases to accrue on such Notes (or such portions thereof) called for redemption.

A-10

8.    Repurchase of Notes at the Option of the holders upon Change of Control and Asset Sales

Upon the occurrence of a Change of Control, each holder shall have the right, subject to certain conditions specified in the Indenture, to cause the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant record date to receive interest due on the relevant interest payment date), as provided in, and subject to the terms of, the Indenture.

In accordance with Section 4.06 of the Indenture, the Issuer will be required to offer to purchase Notes upon the occurrence of certain events.

9.    Ranking and Collateral

These Notes and any Note Guarantee by a Subsidiary Pledgor are secured by a second-priority security interest in the Collateral pursuant to certain Security Documents. The Second Priority Liens upon any and all Collateral are, to the extent and in the manner provided in the Intercreditor Agreement, subordinate in ranking to all present and future First Priority Liens and will be of equal ranking with all present and future Liens securing Other Second-Lien Obligations as set forth in the Intercreditor Agreement.

10.    Denominations; Transfer; Exchange

The Notes are in registered form, without coupons, in denominations of $2,000 and any integral multiple of $1,000. A holder shall register the transfer of or exchange of Notes in accordance with the Indenture. Upon any registration of transfer or exchange, the Registrar and the Trustee may require a holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes required by law or permitted by the Indenture. The Registrar need not register the transfer of or exchange any Notes selected for redemption (except, in the case of a Note to be redeemed in part, the portion of the Note not to be redeemed) or to transfer or exchange any Notes for a period of 15 days prior to a selection of Notes to be redeemed.

11.    Persons Deemed Owners

The registered holder of this Note shall be treated as the owner of it for all purposes.

12.    Unclaimed Money

If money for the payment of principal or interest remains unclaimed for two years, the Trustee and a Paying Agent shall pay the money back to the Issuer at their written request unless an abandoned property law designates another Person. After any such payment, the holders entitled to the money must look to the Issuer for payment as general creditors and the Trustee and a Paying Agent shall have no further liability with respect to such monies.

13.    Discharge and Defeasance

Subject to certain conditions, the Issuer at any time may terminate some of or all its obligations under the Notes and the Indenture if the Issuer deposits with the Trustee money or U.S. Government Obligations for the payment of principal and interest on the Notes to redemption or maturity, as the case may be.

A-11

14.    Amendment; Waiver

Subject to certain exceptions set forth in the Indenture, (i) the Indenture or the Notes may be amended with the written consent of the holders of at least a majority in aggregate principal amount of the outstanding Notes and (ii) any past default or compliance with any provisions may be waived with the written consent of the holders of at least a majority in principal amount of the outstanding Notes. Subject to certain exceptions set forth in the Indenture, without the consent of any holder, the Issuer and the Trustee may amend the Indenture, the Security Documents, the Intercreditor Agreement or the Notes (i) to cure any ambiguity, omission, defect or inconsistency; (ii) to provide for the assumption by a Successor Issuer of the obligations of the Issuer under the Indenture and the Notes; (iii) to provide for the assumption by a Successor Subsidiary Pledgor of

the obligations of a Subsidiary Pledgor under the Indenture and the Security Documents; (iv) to add a Guarantor with respect to the Notes pursuant to Section 4.11 of the Indenture; (v) to provide for uncertificated Notes in addition to or in place of certificated Notes (*provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code); (vi) to conform the text of the Indenture, the Notes, the Security Documents, the Intercreditor Agreement, or the Guarantor Intercreditor Agreement to any provision of the "Description of New Second Lien Notes" in the Offering Memorandum to the extent that such provision in the "Description of New Second Lien Notes" was intended to be a verbatim recitation of a provision of the Indenture, the Notes, the Security Documents, the Intercreditor Agreement or the Guarantor Intercreditor Agreement; (vii) to add a Subsidiary Pledgor with respect to the Notes or to add Collateral to secure the Notes; (viii) to add additional covenants of the Issuer for the benefit of the holders or to surrender rights and powers conferred on the Issuer; (ix) to comply with the requirements of the SEC in order to effect or maintain the qualification of the Indenture under the TIA; (x) to make any change that does not adversely affect the rights of any holder; (xi) to provide for the issuance of the Exchange Notes or Additional Notes; (xii) to release Collateral as permitted by the Indenture or the Intercreditor Agreement; or (xiii) to add additional secured creditors holding Other Second-Lien Obligations so long as such obligations are not prohibited by the Indenture or the Security Documents.

15.    Defaults and Remedies

    If an Event of Default occurs (other than an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer) and is continuing, the Trustee or the holders of at least 30% in principal amount of the outstanding Notes, in each case, by notice to the Issuer, may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable. If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer occurs, the principal of, premium, if any, and interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any holders. Under certain circumstances, the holders of a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

    If an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders unless such holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense and certain other conditions are complied with. Except to enforce the right to receive payment of principal, premium (if any) or interest when

<div align="center">A-12</div>

due, no holder may pursue any remedy with respect to the Indenture or the Notes unless (i) such holder has previously given the Trustee notice that an Event of Default is continuing, (ii) the holders of at least 30% in principal amount of the outstanding Notes have requested the Trustee in writing to pursue the remedy, (iii) such holders have offered the Trustee reasonable security or indemnity against any loss, liability or expense, (iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity and (v) the holders of a majority in principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period. Subject to certain restrictions, the holders of a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability. Prior to taking any action under the Indenture, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

16.    Trustee Dealings with the Issuer

    Subject to certain limitations imposed by the TIA, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with and collect obligations owed to it by the Issuer or its Affiliates and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee.

17.    No Recourse Against Others

    No director, officer, employee, incorporator or holder of any equity interests in the Issuer or of any Guarantor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Issuer or any Guarantor under the Notes, the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each holder of Notes by accepting a Note waives and releases all such liability.

18.    Authentication

    This Note shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Note.

19.  **Abbreviations**

Customary abbreviations may be used in the name of a holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

A-13

20.  **Governing Law**

THIS SECURITY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

21.  **CUSIP Numbers; ISINs**

The Issuer has caused CUSIP numbers and ISINs to be printed on the Notes and has directed the Trustee to use CUSIP numbers and ISINs in notices of redemption as a convenience to the holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

**The Issuer will furnish to any holder of Notes upon written request and without charge to the holder a copy of the Indenture which has in it the text of this Note.**

A-14

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

I or we assign and transfer this Note to:

(Print or type assignee's name, address and zip code)

(Insert assignee's soc. sec. or tax I.D. No.)

and irrevocably appoint _____ agent to transfer this Note on the books of the Issuer. The agent may substitute another to act for him.

Date: _____          Your Signature: _____

Sign exactly as your name appears on the other side of this Note.

Signature Guarantee:

Date: _____

Signature must be guaranteed by a participant in a recognized signature guaranty medallion program or other signature guarantor program reasonably acceptable to the Trustee

Signature of Signature Guarantee

A-15

## CERTIFICATE TO BE DELIVERED UPON EXCHANGE OR

## REGISTRATION OF TRANSFER RESTRICTED SECURITIES

This certificate relates to $_____ principal amount of Notes held in (check applicable space) _____ book-entry or _____ definitive form by the undersigned.

The undersigned (check one box below):

☐ has requested the Trustee by written order to deliver in exchange for its beneficial interest in the Global Note held by the Depository a Note or Notes in definitive, registered form of authorized denominations and an aggregate principal amount equal to its beneficial interest in such

Global Note (or the portion thereof indicated above);

☐ has requested the Trustee by written order to exchange or register the transfer of a Note or Notes.

In connection with any transfer of any of the Notes evidenced by this certificate occurring while this Note is still a Transfer Restricted Definitive Note or a Transfer Restricted Global Note, the undersigned confirms that such Notes are being transferred in accordance with its terms:

**CHECK ONE BOX BELOW**

(1)  ☐  to the Issuer; or

(2)  ☐  to the Registrar for registration in the name of the holder, without transfer; or

(3)  ☐  pursuant to an effective registration statement under the Securities Act of 1933; or

(4)  ☐  inside the United States to a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act of 1933) that purchases for its own account or for the account of a qualified institutional buyer to whom notice is given that such transfer is being made in reliance on Rule 144A, in each case pursuant to and in compliance with Rule 144A under the Securities Act of 1933; or

(5)  ☐  outside the United States in an offshore transaction within the meaning of Regulation S under the Securities Act in compliance with Rule 904 under the Securities Act of 1933 and such Note shall be held immediately after the transfer through Euroclear or Clearstream until the expiration of the Restricted Period (as defined in the Indenture); or

(6)  ☐  to an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act of 1933) that has furnished to the Trustee a signed letter containing certain representations and agreements; or

(7)  ☐  pursuant to another available exemption from registration provided by Rule 144 under the Securities Act of 1933.

A-16

Unless one of the boxes is checked, the Trustee will refuse to register any of the Notes evidenced by this certificate in the name of any Person other than the registered holder thereof; *provided, however,* that if box (5), (6) or (7) is checked, the Issuer or the Trustee may require, prior to registering any such transfer of the Notes, such legal opinions, certifications and other information as the Issuer or the Trustee have reasonably requested to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act of 1933.

Date: _____          Your Signature: _____

Sign exactly as your name appears on the other side of this Note.

Signature Guarantee:

Date: _____

Signature must be guaranteed by a participant in a recognized signature          Signature of Signature Guarantee
guaranty medallion program or other signature guarantor program
reasonably acceptable to the Trustee

A-17

**TO BE COMPLETED BY PURCHASER IF (4) ABOVE IS CHECKED.**

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Date: _____

NOTICE: To be executed by an executive officer

A-18

[TO BE ATTACHED TO GLOBAL SECURITIES] SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The initial principal amount of this Global Note is $_____. The following increases or decreases in this Global Note have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Notes Custodian |
|---|---|---|---|---|

A-19

OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, check the box:

Asset Sale ☐      Change of Control ☐

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, state the amount ($2,000 or any integral multiple of $1,000):

$

Date: _____        Your Signature: _____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee: _____

Signature must be guaranteed by a participant in a recognized signature guaranty medallion program or other signature guarantor program reasonably acceptable to the Trustee

A-20

EXHIBIT B

[FORM OF FACE OF EXCHANGE NOTE]

[Global Notes Legend]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), NEW YORK, NEW YORK, TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO., OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO DTC, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

"THE TERMS OF THIS SECURITY ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED DECEMBER 24, 2008, BY AND AMONG BANK OF AMERICA, N.A., AS FIRST LIEN AGENT, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE AND THE OTHER PARTIES THERETO FROM TIME TO TIME."

"THIS NOTE IS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE INTERNAL REVENUE CODE. A HOLDER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND

YIELD TO MATURITY FOR SUCH NOTES BY SUBMITTING A REQUEST FOR SUCH INFORMATION TO THE BORROWER AT THE FOLLOWING ADDRESS: HARRAH'S OPERATING COMPANY, INC., ONE CAESAR'S PALACE DRIVE, LAS VEGAS, NEVADA, 89101-8969, ATTENTION: GENERAL COUNSEL."

To be inserted if Notes are guaranteed by the Subsidiaries pursuant to Section 4.11(c):

"THE TERMS OF THIS AGREEMENT ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED AS OF JANUARY 28, 2008, BY AND AMONG BANK OF AMERICA, N.A., U.S. BANK NATIONAL ASSOCIATION, CITIBANK, N.A. AND THE OTHER PARTIES THERETO FROM TIME TO TIME."

<div align="center">B-1</div>

---

<div align="center">[FORM OF EXCHANGE NOTE]</div>

No.                                                                                                                      $_____

<div align="center">10.00% Second-Priority Senior Secured Note due 2018</div>

<div align="right">CUSIP No.   [        ]<br>ISIN No.    [        ]</div>

HARRAH'S OPERATING COMPANY, INC., a Delaware corporation, promises to pay to Cede & Co., or registered assigns, the principal sum of [        ] Dollars on December 15, 2018.

Interest Payment Dates: June 15 and December 15

Record Dates: June 1 and December 1

Additional provisions of this Note are set forth on the other side of this Note.

<div align="center">B-2</div>

---

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed.

<div align="right">HARRAH'S OPERATING COMPANY, INC.

By: _____
Name:
Title:</div>

Dated:

*/    If the Note is to be issued in global form, add the Global Notes Legend and the attachment from Exhibit A captioned "TO BE ATTACHED TO GLOBAL SECURITIES - SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY."

<div align="center">B-3</div>

---

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

U. S. BANK NATIONAL ASSOCIATION
as Trustee, certifies that this is one of the Notes referred
to in the Indenture.

By: _____
Authorized Signatory

<div align="center">B-4</div>

---

<div align="center">[FORM OF REVERSE SIDE OF EXCHANGE NOTE]

10.00% Second-Priority Senior Secured Note Due 2018</div>

1.    <u>Interest</u>

HARRAH'S OPERATING COMPANY, INC., a Delaware corporation (such corporation, and its successors and assigns under the Indenture hereinafter referred to, being herein called the "Issuer"), promises to pay interest on the principal amount of this Note at the rate per annum shown above. The Issuer shall pay interest semiannually on June 15 and December 15 of each year (each an "Interest Payment Date"), commencing June 15, 2009. Interest on the Notes shall accrue from the most recent date to which interest has been paid or duly provided for or, if no interest has been paid or duly provided for, from April 15, 2009, until the principal hereof is due. Interest shall be computed on the basis of a 360-day year of twelve 30-day months. The Issuer shall pay interest on overdue principal at the rate borne by the Notes, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

2.  Method of Payment

The Issuer shall pay interest on the Notes (except defaulted interest) to the Persons who are registered holders at the close of business on June 1 or December 1 (each a "Record Date") next preceding the interest payment date even if Notes are canceled after the record date and on or before the interest payment date (whether or not a Business Day). Holders must surrender Notes to the Paying Agent to collect principal payments. The Issuer shall pay principal, premium, if any, and interest in money of the United States of America that at the time of payment is legal tender for payment of public and private debts. Payments in respect of the Notes represented by a Global Note (including principal, premium, if any, and interest) shall be made by wire transfer of immediately available funds to the accounts specified by The Depository Trust Issuer or any successor depositary. The Issuer shall make all payments in respect of a certificated Note (including principal, premium, if any, and interest) at the office of the Paying Agent, except that, at the option of the Issuer, payment of interest may be made by mailing a check to the registered address of each holder thereof; *provided, however,* that payments on the Notes may also be made, in the case of a holder of at least $1,000,000 aggregate principal amount of Notes, by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such holder elects payment by wire transfer by giving written notice to the Trustee or Paying Agent to such effect designating such account no later than 30 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion).

3.  Paying Agent and Registrar

Initially, U.S. Bank National Association (the "Trustee"), will act as Paying Agent and Registrar. The Issuer may appoint and change any Paying Agent or Registrar without notice. The Issuer or any of its domestically incorporated Wholly Owned Subsidiaries may act as Paying Agent or Registrar.

<div align="center">B-5</div>

4.  Indenture

The Issuer issued the Notes under an Indenture dated as of [_____] 2009 (the "Indenture"), among the Issuer, the Parent Guarantor and the Trustee. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa 77bbbb) as in effect on the date of the Indenture (the "TIA"). Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture. The Notes are subject to all terms and provisions of the Indenture, and the holders (as defined in the Indenture) are referred to the Indenture and the TIA for a statement of such terms and provisions

The Notes are second-priority senior secured obligations of the Issuer. This Note is one of the Exchange Notes referred to in the Indenture. The Notes include the Initial Notes, any Additional Notes and any Exchange Notes issued in exchange for the Initial Notes or any Additional Notes pursuant to the Indenture. The Initial Notes, any Additional Notes and any Exchange Notes are treated as a single class of securities under the Indenture. The Indenture imposes certain limitations on the ability of the Issuer and its Restricted Subsidiaries to, among other things, make certain Investments and other Restricted Payments, pay dividends and other distributions, Incur Indebtedness, enter into consensual restrictions upon the payment of certain dividends and distributions by such Restricted Subsidiaries, issue or sell shares of capital stock of the Issuer and such Restricted Subsidiaries, enter into or permit transactions with Affiliates, create or Incur Liens and make Asset Sales. The Indenture also imposes limitations on the ability of the Issuer, each Subsidiary Pledgor and the Parent Guarantor to consolidate or merge with or into any other Person or convey, transfer or lease all or substantially all of its property.

To guarantee the due and punctual payment of the principal and interest on the Notes and all other amounts payable by the Issuer under the Indenture and the Notes when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Notes and the Indenture, each Parent Guarantor has unconditionally guaranteed the Guaranteed Obligations pursuant to the terms of the Indenture and any Subsidiary Pledgor that executes a Note Guarantee will unconditionally guarantee the Guaranteed Obligations on a second-priority senior secured basis pursuant to the terms of the Indenture.

5.  Optional Redemption

On or after December 15, 2013, the Issuer may redeem the Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at the following redemption prices (expressed as a percentage of principal amount), *plus* accrued and unpaid interest and additional interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the 12-month period commencing on December 15 of the years set forth below:

| Period | Redemption Price |
|---|---|
| 2013 | 105.000% |
| 2014 | 103.333% |
| 2015 | 101.667% |
| 2016 and thereafter | 100.000% |

B-6

In addition, prior to December 15, 2013 the Issuer may redeem the Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at a redemption price equal to 100% of the principal amount of the Notes redeemed *plus* the Applicable Premium as of, and accrued and unpaid interest and additional interest, if any, to, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

Notwithstanding the foregoing, at any time and from time to time on or prior to December 15, 2011, the Issuer may redeem in the aggregate up to 35% of the original aggregate principal amount of the Notes (calculated after giving effect to any issuance of Additional Notes) with the net cash proceeds of one or more Equity Offerings (1) by the Issuer or (2) by any direct or indirect parent of the Issuer to the extent the net cash proceeds thereof are contributed to the common equity capital of the Issuer or used to purchase Capital Stock (other than Disqualified Stock) of the Issuer from it, at a redemption price (expressed as a percentage of principal amount thereof) of 110.00%, *plus* accrued and unpaid interest and additional interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date); *provided, however,* that at least 50% of the original aggregate principal amount of the Notes (calculated after giving effect to any issuance of Additional Notes) must remain outstanding after each such redemption; *provided, further,* that such redemption shall occur within 90 days after the date on which any such Equity Offering is consummated upon not less than 30 nor more than 60 days' notice mailed to each holder of Notes being redeemed and otherwise in accordance with the procedures set forth in the Indenture.

6.   Mandatory Redemption

The Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

7.   Notice of Redemption

Notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the redemption date to each holder of Notes to be redeemed at his, her or its registered address. Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1,000. If money sufficient to pay the redemption price of and accrued and unpaid interest on all Notes (or portions thereof) to be redeemed on the redemption date is deposited with a Paying Agent on or before the redemption date and certain other conditions are satisfied, on and after such date, interest ceases to accrue on such Notes (or such portions thereof) called for redemption.

B-7

8.   Repurchase of Notes at the Option of the holders upon Change of Control and Asset Sales

Upon the occurrence of a Change of Control, each holder shall have the right, subject to certain conditions specified in the Indenture, to cause the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant record date to receive interest due on the relevant interest payment date), as provided in, and subject to the terms of, the Indenture.

In accordance with Section 4.06 of the Indenture, the Issuer will be required to offer to purchase Notes upon the occurrence of certain events.

9.   Ranking and Collateral

These Notes and any Note Guarantee by a Subsidiary Pledgor are secured by a second-priority security interest in the Collateral pursuant to certain Security Documents. The Second Priority Liens upon any and all Collateral are, to the extent and in the manner provided in the Intercreditor Agreement, subordinate in ranking to all present and future First Priority Liens and will be of equal ranking with all present and future Liens securing Other Second-Lien Obligations as set forth in the Intercreditor Agreement.

10.   Denominations; Transfer; Exchange

The Notes are in registered form, without coupons, in denominations of $2,000 and any integral multiple of $1,000. A holder shall register the transfer of or exchange of Notes in accordance with the Indenture. Upon any registration of transfer or exchange, the Registrar and the Trustee may require a holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes required by law or permitted by the Indenture. The Registrar need not register the transfer of or exchange any Notes selected for redemption (except, in the case of a

Note to be redeemed in part, the portion of the Note not to be redeemed) or to transfer or exchange any Notes for a period of 15 days prior to a selection of Notes to be redeemed.

11.  Persons Deemed Owners

    The registered holder of this Note shall be treated as the owner of it for all purposes.

12.  Unclaimed Money

    If money for the payment of principal or interest remains unclaimed for two years, the Trustee and a Paying Agent shall pay the money back to the Issuer at their written request unless an abandoned property law designates another Person. After any such payment, the holders entitled to the money must look to the Issuer for payment as general creditors and the Trustee and a Paying Agent shall have no further liability with respect to such monies.

13.  Discharge and Defeasance

    Subject to certain conditions, the Issuer at any time may terminate some of or all its obligations under the Notes and the Indenture if the Issuer deposits with the Trustee money or U.S. Government Obligations for the payment of principal and interest on the Notes to redemption or maturity, as the case may be.

<div align="center">B-8</div>

14.  Amendment; Waiver

    Subject to certain exceptions set forth in the Indenture, (i) the Indenture or the Notes may be amended with the written consent of the holders of at least a majority in aggregate principal amount of the outstanding Notes and (ii) any past default or compliance with any provisions may be waived with the written consent of the holders of at least a majority in principal amount of the outstanding Notes. Subject to certain exceptions set forth in the Indenture, without the consent of any holder, the Issuer and the Trustee may amend the Indenture, the Security Documents, the Intercreditor Agreement or the Notes (i) to cure any ambiguity, omission, defect or inconsistency; (ii) to provide for the assumption by a Successor Issuer of the obligations of the Issuer under the Indenture and the Notes; (iii) to provide for the assumption by a Successor Subsidiary Pledgor of the obligations of a Subsidiary Pledgor under the Indenture and the Security Documents; (iv) to add a Guarantor with respect to the Notes pursuant to Section 4.11 of the Indenture; (v) to provide for uncertificated Notes in addition to or in place of certificated Notes (*provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code); (vi) to conform the text of the Indenture, the Notes, the Security Documents, the Intercreditor Agreement, or the Guarantor Intercreditor Agreement to any provision of the "Description of New Second Lien Notes" in the Offering Memorandum to the extent that such provision in the "Description of New Second Lien Notes" was intended to be a verbatim recitation of a provision of the Indenture, the Notes, the Security Documents, the Intercreditor Agreement or the Guarantor Intercreditor Agreement; (vii) to add a Subsidiary Pledgor with respect to the Notes or to add Collateral to secure the Notes; (viii) to add additional covenants of the Issuer for the benefit of the holders or to surrender rights and powers conferred on the Issuer; (ix) to comply with the requirements of the SEC in order to effect or maintain the qualification of the Indenture under the TIA; (x) to make any change that does not adversely affect the rights of any holder; (xi) to provide for the issuance of the Exchange Notes or Additional Notes; (xii) to release Collateral as permitted by the Indenture or the Intercreditor Agreement; or (xiii) to add additional secured creditors holding Other Second-Lien Obligations so long as such obligations are not prohibited by the Indenture or the Security Documents.

15.  Defaults and Remedies

    If an Event of Default occurs (other than an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer) and is continuing, the Trustee or the holders of at least 30% in principal amount of the outstanding Notes, in each case, by notice to the Issuer, may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable. If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer occurs, the principal of, premium, if any, and interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any holders. Under certain circumstances, the holders of a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

    If an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders unless such holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense and certain other conditions are complied with. Except to enforce the right to receive payment of principal, premium (if any) or interest when

<div align="center">B-9</div>

due, no holder may pursue any remedy with respect to the Indenture or the Notes unless (i) such holder has previously given the Trustee notice that

an Event of Default is continuing, (ii) the holders of at least 30% in principal amount of the outstanding Notes have requested the Trustee in writing to pursue the remedy, (iii) such holders have offered the Trustee reasonable security or indemnity against any loss, liability or expense, (iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity and (v) the holders of a majority in principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period. Subject to certain restrictions, the holders of a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability. Prior to taking any action under the Indenture, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

16.  <u>Trustee Dealings with the Issuer</u>

Subject to certain limitations imposed by the TIA, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with and collect obligations owed to it by the Issuer or its Affiliates and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee.

17.  <u>No Recourse Against Others</u>

No director, officer, employee, incorporator or holder of any equity interests in the Issuer or of any Guarantor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Issuer or any Guarantor under the Notes, the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each holder of Notes by accepting a Note waives and releases all such liability.

18.  <u>Authentication</u>

This Note shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Note.

19.  <u>Abbreviations</u>

Customary abbreviations may be used in the name of a holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

B-10

20.  <u>Governing Law</u>

THIS SECURITY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

21.  <u>CUSIP Numbers; ISINs</u>

The Issuer has caused CUSIP numbers and ISINs to be printed on the Notes and has directed the Trustee to use CUSIP numbers and ISINs in notices of redemption as a convenience to the holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

**The Issuer will furnish to any holder of Notes upon written request and without charge to the holder a copy of the Indenture which has in it the text of this Note.**

B-11

ASSIGNMENT FORM

To assign this Note, fill in the form below:

I or we assign and transfer this Note to:

(Print or type assignee's name, address and zip code)

(Insert assignee's soc. sec. or tax I.D. No.)

and irrevocably appoint _____ agent to transfer this Note on the books of the Issuer. The agent may substitute another to act for him.

Date: _____    Your Signature: _____

Sign exactly as your name appears on the other side of this Note.

Signature Guarantee:

Date: _____

Signature must be guaranteed by a participant in a recognized signature          _____
guaranty medallion program or other signature guarantor program                   Signature of Signature Guarantee
reasonably acceptable to the Trustee

B-12

---

[TO BE ATTACHED TO GLOBAL SECURITIES] SCHEDULE OF INCREASES OR
DECREASES IN GLOBAL SECURITY

The initial principal amount of this Global Note is $_____. The following increases or decreases in this Global Note have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Notes Custodian |
|---|---|---|---|---|
| | | | | |

B-13

---

OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, check the box:

Asset Sale ☐          Change of Control ☐

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, state the amount ($2,000 or any integral multiple of $1,000):

$

Date: _____    Your Signature: _____
                                                    (Sign exactly as your name appears on the other side of
                                                    this Note)

Signature Guarantee: _____
                     Signature must be guaranteed by
                     a participant in a recognized
                     signature guaranty medallion
                     program or other signature
                     guarantor program reasonably
                     acceptable to the Trustee

B-14

---

EXHIBIT C

[FORM OF]

TRANSFEREE LETTER OF REPRESENTATION

Harrah's Operating Company, Inc.
c/o U.S. Bank National Association
Corporate Trust Services
EP-MN-W53C
60 Livingston Avenue
St. Paul, Minnesota 55107-1419
Attention: Vice President

Ladies and Gentlemen:

This certificate is delivered to request a transfer of $[       ] principal amount of the 10.00% Second-Priority Senior Secured Notes due 2018 (the "Notes") of Harrah's Operating Company, Inc. (the "Issuer").

Upon transfer, the Notes would be registered in the name of the new beneficial owner as follows:

Name: _____

Address: _____

Taxpayer ID Number: _____

The undersigned represents and warrants to you that:

1. We are an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act of 1933, as amended (the "Securities Act")), purchasing for our own account or for the account of such an institutional "accredited investor" at least $100,000 principal amount of the Notes, and we are acquiring the Notes not with a view to, or for offer or sale in connection with, any distribution in violation of the Securities Act. We have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we invest in or purchase securities similar to the Notes in the normal course of our business. We, and any accounts for which we are acting, are each able to bear the economic risk of our or its investment.

2. We understand that the Notes have not been registered under the Securities Act and, unless so registered, may not be sold except as permitted in the following sentence. We agree on our own behalf and on behalf of any investor account for which we are purchasing Notes to offer, sell or otherwise transfer such Notes prior to the date that is two years after the later of the date of original issue and the last date on which either the Issuer or any affiliate of such Issuer was the owner of such Notes (or any predecessor thereto) (the "Resale Restriction Termination Date") only (a) in the United States to a person whom we reasonably

C-1

believe is a qualified institutional buyer (as defined in rule 144A under the Securities Act) in a transaction meeting the requirements of Rule 144A, (b) outside the United States in an offshore transaction in accordance with Rule 904 of Regulation S under the Securities Act, (c) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder (if applicable) or (d) pursuant to an effective registration statement under the Securities Act, in each of cases (a) through (d) in accordance with any applicable securities laws of any state of the United States. In addition, we will, and each subsequent holder is required to, notify any purchaser of the Note evidenced hereby of the resale restrictions set forth above. The foregoing restrictions on resale will not apply subsequent to the Resale Restriction Termination Date. If any resale or other transfer of the Notes is proposed to be made to an institutional "accredited investor" prior to the Resale Restriction Termination Date, the transferor shall deliver a letter from the transferee substantially in the form of this letter to the Issuer and the Trustee, which shall provide, among other things, that the transferee is an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act and that it is acquiring such Notes for investment purposes and not for distribution in violation of the Securities Act. Each purchaser acknowledges that the Issuer and the Trustee reserve the right prior to the offer, sale or other transfer prior to the Resale Restriction Termination Date of the Notes pursuant to clause 1(b), 1(c) or 1(d) above to require the delivery of an opinion of counsel, certifications or other information satisfactory to the Issuer and the Trustee.

Dated: _____

TRANSFEREE: _____,

By: _____

C-2

[FORM OF SUPPLEMENTAL INDENTURE]

SUPPLEMENTAL INDENTURE (this "Supplemental Indenture") dated as of [          ], among [GUARANTOR] (the "New Guarantor"), a subsidiary of HARRAH'S OPERATING COMPANY, INC. (or its successor), a Delaware corporation (the "Issuer"), and U.S. BANK NATIONAL ASSOCIATION, a national banking association, as trustee under the indenture referred to below (the "Trustee").

W I T N E S S E T H :

WHEREAS the Issuer and the Parent Guarantor have heretofore executed and delivered to the Trustee an indenture (as amended, supplemented or otherwise modified, the "Indenture") dated as of April 15, 2009, providing for the issuance of the Issuer's Second-Priority Senior Secured Notes due 2018 ( the "Notes") initially in the aggregate principal amount of $3,705,498,000;

WHEREAS Section 4.11 of the Indenture provides that under certain circumstances the Issuer is required to cause the New Guarantor to execute and deliver to the Trustee a supplemental indenture pursuant to which the New Guarantor shall unconditionally guarantee all the Issuer's Obligations under the Notes and the Indenture pursuant to a Note Guarantee on the terms and conditions set forth herein; and

WHEREAS pursuant to Section 9.01 of the Indenture, the Trustee, the Issuer, the Parent Guarantor and other existing Guarantors, if any, are authorized to execute and deliver this Supplemental Indenture;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the New Guarantor, the Parent Guarantor, the Issuer and the Trustee mutually covenant and agree for the equal and ratable benefit of the holders of the Notes as follows:

1. Defined Terms. As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined, except that the term "holders" in this Supplemental Indenture shall refer to the term "holders" as defined in the Indenture and the Trustee acting on behalf of and for the benefit of such holders. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

2. Agreement to Guarantee. The New Guarantor hereby agrees, jointly and severally with all existing guarantors (if any), to unconditionally guarantee the Issuer's Obligations under the Notes and the Indenture on the terms and subject to the conditions set forth in Article XII of the Indenture and to be bound by all other applicable provisions of the Indenture and the Notes and to perform all of the obligations and agreements of a guarantor under the Indenture.

D-1

3. Notices. All notices or other communications to the New Note Guarantor shall be given as provided in Section 13.02 of the Indenture.

4. Ratification of Indenture; Supplemental Indentures Part of Indenture. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

5. Governing Law. **THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

6. Trustee Makes No Representation. The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture.

7. Counterparts. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

8. Effect of Headings. The Section headings herein are for convenience only and shall not effect the construction thereof.

D-2

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

[NEW GUARANTOR]

By: _____

Name:
Title:

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By: _____
Name:
Title:

D-3

**<u>EXHIBIT 3</u>**

10-K 1 a201310-k.htm 10-K

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549
# FORM 10-K

(Mark One)

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

FOR THE FISCAL YEAR ENDED December 31, 2013

OR

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission File No. 1-10410

# CAESARS ENTERTAINMENT CORPORATION
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **62-1411755** |
| **(State of incorporation)** | **(I.R.S. Employer Identification No.)** |

| | |
|---|---|
| **One Caesars Palace Drive, Las Vegas, Nevada** | **89109** |
| **(Address of principal executive offices)** | **(Zip code)** |

**Registrant's telephone number, including area code:**
**(702) 407-6000**

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common stock, $0.01 par value | NASDAQ Global Select Market |

**SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:**

**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐       Accelerated filer ☒       Non-accelerated filer ☐       Smaller reporting company ☐

(Do not check if a smaller
reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐    No ☒

The aggregate market value of common stock held by non-affiliates of the registrant as of June 30, 2013 was $529.9 million.

As of March 1, 2014, the registrant had 137,161,183 shares of Common Stock outstanding.

# CAESARS ENTERTAINMENT CORPORATION

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|  | Page |
|---|---|
| **Part I** | |
| Item 1 – Business | 3 |
| Item 1A – Risk Factors | 10 |
| Item 1B – Unresolved Staff Comments | 29 |
| Item 2 – Properties | 30 |
| Item 3 – Legal Proceedings | 32 |
| Item 4 – Mine Safety Disclosure | 32 |
| **Part II** | |
| Item 5 – Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 33 |
| Item 6 – Selected Financial Data | 35 |
| Item 7 – Management's Discussion and Analysis of Financial Condition and Results of Operations | 36 |
| Item 7A – Quantitative and Qualitative Disclosures About Market Risk | 59 |
| Item 8 – Financial Statements and Supplementary Data | 60 |
|     Report of Independent Registered Public Accounting Firm | 60 |
|     Consolidated Financial Statements | 61 |
|     Notes to Consolidated Financial Statements | 67 |
| Item 9 – Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 122 |
| Item 9A – Controls and Procedures | 122 |
| Item 9B – Other Information | 124 |
| **Part III** | |
| Item 10 – Directors, Executive Officers and Corporate Governance | 125 |
| Item 11 – Executive Compensation | 125 |
| Item 12 – Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 125 |
| Item 13 – Certain Relationships and Related Transactions, and Director Independence | 125 |
| Item 14 – Principal Accounting Fees and Services | 125 |
| **Part IV** | |
| Item 15 – Exhibits, Financial Statement Schedules | 126 |
| Signatures | 151 |

We have proprietary rights to a number of trademarks used in this Annual Report on Form 10-K for the fiscal year ended December 31, 2013 (this "Form 10-K"), that are important to our business, including, without limitation, Caesars, Caesars Entertainment, Caesars Palace, Harrah's, Total Rewards, Horseshoe, Paris Las Vegas, Flamingo, and Bally's. In addition, Caesars Interactive Entertainment, Inc., which is a majority-owned subsidiary of Caesars Growth Partners, LLC, has proprietary rights to the Slotomania, Playtika, Bingo Blitz and World Series of Poker ("WSOP") trademarks. We have omitted the registered trademark (®) and trademark (™) symbols for such trademarks named in this Form 10-K.

# PART I

## ITEM 1.   Business

### *Overview*

Caesars Entertainment Corporation (referred to in this discussion, together with its consolidated entities where appropriate, as "Caesars," "Caesars Entertainment," the "Company," "we," "our" and "us"), a Delaware corporation, is the world's most diversified casino-entertainment provider and the most geographically diverse U.S. casino-entertainment company. We conduct business through our wholly owned subsidiaries, Caesars Entertainment Operating Company, Inc. ("CEOC") and Caesars Entertainment Resort Properties ("CERP") and their subsidiaries. We also consolidate Caesars Growth Partners, LLC ("CGP LLC"), which is a variable interest entity ("VIE") for which we have determined that we are the primary beneficiary.

As of December 31, 2013, we owned and operated, or managed, through various subsidiaries, 52 casinos in 13 U.S. states and 5 countries. Of the 52 casinos, 39 are in the United States and primarily consist of land-based and riverboat or dockside casinos. Our 13 international casinos are land-based casinos, most of which are located in England. See Item 2, "Properties." In addition, we operate an online gaming business and the World Series of Poker tournament and brand.

As of December 31, 2013, our owned and managed facilities had an aggregate of approximately three million square feet of gaming space and approximately 42,000 hotel rooms. Our industry-leading customer loyalty program, Total Rewards, has approximately 45 million members. We use the Total Rewards system to market promotions and to generate customer play across our network of properties.

On January 28, 2008, Caesars Entertainment was acquired by affiliates of Apollo Global Management, LLC (together with such affiliates, "Apollo") and affiliates of TPG Capital, LP (together with such affiliates, "TPG" and, together with Apollo, the "Sponsors") in an all-cash transaction, hereinafter referred to as the "Acquisition." Subsequent to the Acquisition, our stock was no longer publicly traded. Effective February 8, 2012, as the result of our public offering, our common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the symbol "CZR." In connection with the public offering, we effected a 1.742-for-1 split of our common stock. Unless otherwise stated, all applicable share and per-share data presented herein have been retroactively adjusted to give effect to this stock split.

Note references are to the notes to consolidated financial statements included in Item 8, "Financial Statements and Supplementary Data."

### *Capital Structure*

As described in Note 5, "Caesars Growth Partners, LLC Transactions," and Note 9, "Debt," in the fourth quarter of 2013, Caesars consummated two transactions, (1) creating the new CERP financing structure, formed primarily from our prior CMBS financing structure ("CMBS") and (2) the closing of transactions forming the new CGP LLC, in which we have a majority economic interest and management rights, but no voting control. CGP LLC is considered a variable interest entity and is consolidated into our financial statements. Our business is conducted through our wholly owned subsidiaries, CEOC and CERP, as well as through CGP LLC. See Item 2, "Properties," for properties within each structure. Also see Note 9, "Debt," for greater detail on the debt related to each entity structure.

*Caesars Entertainment Operating Company (CEOC)*

In addition to owning and operating its own properties, CEOC manages properties owned by both CERP and CGP LLC, as described below, as well as for other third parties under management agreements. A substantial portion of the financing for the Acquisition was comprised of bank and bond financing obtained by CEOC.

*Caesars Entertainment Resort Properties (CERP)*

In October 2013, Caesars and its wholly owned subsidiaries, Caesars Entertainment Resort Properties, LLC, and Caesars Entertainment Resort Properties Finance, Inc., which collectively comprise the entities in CERP, completed the *Refinancing of CMBS and Linq/Octavius Transaction* described in *"Summary of 2013 Events."* As a result, CERP is also an issuer of a material amount of our bank and bond financing and holds the sole interest in the holding companies that have title to six Caesars properties, which are managed by CEOC.

3

*Caesars Growth Partners, LLC (CGP LLC)*

In October 2013, Caesars and its subsidiaries, together with Caesars Acquisition Company ("CAC") and CGP LLC, consummated the *Caesars Growth Partners, LLC Transaction* described in *"Summary of 2013 Events"*. Because the equity holders in CGP LLC receive returns disproportionate to their voting interests and substantially all the activities of CGP LLC are related to Caesars, CGP LLC has been determined to be a variable interest entity. CAC is the sole voting member of CGP LLC; neither CAC nor CGP LLC guarantee any of Caesars' debt. The creditors or beneficial holders of CGP LLC have no recourse to the general credit of Caesars Entertainment Corporation. Caesars has certain obligations to CGP LLC through the management and services agreements.

For accounting purposes, the transactions between CGP LLC and Caesars Entertainment and its subsidiaries have been determined to be a reorganization among entities under common control. Because substantially all the activities of CGP LLC are related to Caesars and due to the factors set forth below, we have concluded that we are required to consolidate it under accounting rules.

We have reached this conclusion based upon the weighting of a number of items, including the following: (i) the close association that CGP LLC has with Caesars, including the fact that all of the assets and businesses owned by CGP LLC were acquired from Caesars; (ii) Caesars, through CEOC, has an ongoing management agreement with each of the properties owned by CGP LLC; and (iii) Caesars has the obligation to absorb losses and the right to receive residual returns that could potentially be significant to CGP LLC. See Note 5, "Caesars Growth Partners, LLC Transactions," for greater detail on the transaction and our related accounting.

## Description of Business

We have established a rich history of industry-leading growth and expansion since we commenced casino operations in 1937. We own, operate, or manage casino entertainment facilities in more areas throughout the United States than any other participant in the casino industry. In addition to casinos, our facilities typically include hotel and convention space, restaurants, and non-gaming entertainment facilities.

Caesars Palace, Harrah's Las Vegas, Rio All-Suite Hotel & Casino, Bally's Las Vegas, Flamingo Las Vegas, Paris Las Vegas, Planet Hollywood Resort & Casino ("Planet Hollywood"), and The Quad Resort & Casino ("The Quad") are located in Las Vegas and draw customers from throughout the United States and internationally. The Cromwell (formerly Bill's Gamblin' Hall & Saloon ("Bill's")), also in Las Vegas, was temporarily closed for renovations in February 2013 and is scheduled to reopen in the second quarter 2014. Harrah's Laughlin is located near both the Arizona and California borders and draws customers primarily from southern California and the Phoenix metropolitan areas.

In northern Nevada, Harrah's Lake Tahoe and Harveys Resort & Casino are located near Lake Tahoe and Harrah's Reno is located in downtown Reno. These facilities draw customers primarily from northern California, the Pacific Northwest, and Canada.

Our Atlantic City casinos, Harrah's Resort Atlantic City, Showboat Atlantic City, Caesars Atlantic City, and Bally's Atlantic City, draw customers primarily from the Philadelphia metropolitan area, New York, and New Jersey.

Harrah's Philadelphia, a combination harness racetrack and casino located south of Philadelphia, draws customers primarily from the Philadelphia metropolitan area and Delaware.

Horseshoe Baltimore, which is under development, will serve customers in the Baltimore/Washington metropolitan area and is expected to open in the third quarter of 2014.

Our Chicagoland dockside casinos, Harrah's Joliet in Joliet, Illinois, and Horseshoe Hammond in Hammond, Indiana, draw customers primarily from the Chicago metropolitan area. In southern Indiana, Horseshoe Southern Indiana, a dockside casino complex located in Elizabeth, Indiana, draws customers primarily from northern Kentucky and southern Indiana.

In Louisiana, Harrah's New Orleans, a land-based casino located in downtown New Orleans attracts customers primarily from the New Orleans metropolitan area. In Bossier City, Horseshoe Bossier City, a dockside casino, and Harrah's Louisiana Downs, a thoroughbred racetrack with slot machines, caters to customers in northwestern Louisiana and east Texas, including the Dallas/Fort Worth metropolitan area.

On the Mississippi Gulf Coast, the Grand Casino Biloxi, located in Biloxi, Mississippi, caters to customers in southern Mississippi, southern Alabama, and northern Florida.

Harrah's North Kansas City, a dockside casino, draws customers from the Kansas City metropolitan area. Harrah's Metropolis is a dockside casino located in Metropolis, Illinois, on the Ohio River, and draws customers from southern Illinois, western Kentucky, and central Tennessee.

4

Horseshoe Tunica, Harrah's Tunica, and Tunica Roadhouse Hotel & Casino, dockside casino complexes located in Tunica, Mississippi, are approximately 30 miles from Memphis, Tennessee, and draw customers primarily from the Memphis area.

Horseshoe Casino and Bluffs Run Greyhound Park ("Bluffs Run"), a land-based casino and pari-mutuel facility, and Harrah's Council Bluffs Casino & Hotel, a newly land-based casino facility, are located in Council Bluffs, Iowa, across the Missouri River from Omaha, Nebraska. At Bluffs Run, we own the assets other than gaming equipment and lease these assets to the Iowa West Racing Association ("IWRA"), a nonprofit corporation, and we manage the facility for the IWRA under a management agreement that expires in October 2024. The license to operate Harrah's Council Bluffs Casino & Hotel is held jointly with IWRA. Our Sponsorship and Operations Agreement with IWRA terminates in December 2015, and includes options to extend the term of the agreement for five succeeding three-year terms.

As of December 31, 2013, we owned and operated four casinos in London: the Sportsman, The Playboy Club London, The Casino at the Empire and The Golden Nugget. However, in February 2014, we closed The Golden Nugget casino. Our casinos in London draw customers primarily from the London metropolitan area, as well as international visitors. We also own Alea Nottingham, Alea Glasgow, Manchester 235, Rendezvous Brighton, and Rendezvous Southend-on-Sea in the provinces of the United Kingdom, which primarily draw customers from their local areas. Pursuant to a concession agreement, we also operate two casinos in Egypt, The London Club Cairo (which is located at the Ramses Hilton), and Caesars Cairo (which is located at the Four Seasons Cairo), that draw customers primarily from other countries in the Middle East. Emerald Safari, located in the province of Gauteng in South Africa, draws customers primarily from South Africa.

We also own and operate Bluegrass Downs, a harness racetrack located in Paducah, Kentucky.

We earn fees through our management of three casinos for Indian tribes:

- Harrah's Phoenix Ak-Chin, located near Phoenix, Arizona, which we manage for the Ak-Chin Indian Community. Harrah's Phoenix Ak-Chin draws customers from the Phoenix metropolitan area;

- Harrah's Cherokee Casino and Hotel, which we manage for the Eastern Band of Cherokee Indians on their reservation in Cherokee, North Carolina. Harrah's Cherokee draws customers from eastern Tennessee, western North Carolina, northern Georgia, and South Carolina; and

- Harrah's Rincon Casino and Resort, located near San Diego, California, which we manage for the Rincon San Luiseno Band of Mission Indians. Harrah's Rincon draws customers from the San Diego metropolitan area and Orange County, California.

We also earn fees through our management of the following casinos:

- Caesars Windsor in Windsor, Ontario, which we manage for the Ontario Lottery and Gaming Corporation;

- Horseshoe Cleveland casino and Horseshoe Cincinnati casino in Ohio, which we manage for Rock Ohio Caesars LLC ("ROC"), a venture with Rock Ohio Ventures, LLC ("Rock Gaming") in which we have a 20% equity interest;

- ThistleDown Racino, a thoroughbred racing facility and land-based casino in Cleveland, Ohio, which we manage for ROC.

CIE, which is a majority-owned subsidiary of CGP LLC, owns the World Series of Poker ("WSOP") tournaments, and we license trademarks for a variety of products and businesses related to this brand. CIE also operates an online gaming business providing for certain real money games in Nevada, New Jersey, and the United Kingdom; "play for fun" offerings in other jurisdictions; and social games on Facebook and other social media websites and mobile application platforms, such as Slotomania.

## Sales and Marketing

We believe that our North American distribution system of casino entertainment provides us the ability to capture a disproportionate share of our customers' entertainment spending when they travel among markets, which is core to our cross-market strategy. In addition, where we have multiple properties in markets or regions, we believe that we are able to capture more of our customers' gaming dollars than in those markets where we have single properties competing individually against outside competition. For instance, in Las Vegas we believe our customer stickiness in the center strip generates increased

revenues. We believe our industry-leading customer loyalty program, Total Rewards, in conjunction with this distribution system, allows us to capture a growing share of our customers' entertainment spending and compete more effectively. For example, we believe our collection of distinctly branded properties in Las Vegas, tied together through Total Rewards, helps us capture a greater share of wallet with customers than we would otherwise achieve.

5

---

Our Total Rewards program is structured in tiers, providing customers an incentive to consolidate their entertainment spending at our casinos. Total Rewards customers are able to earn Reward Credits at all of our casino entertainment facilities located in the U.S. and Canada for on-property entertainment expenses, including gaming, hotel, dining, and retail shopping. Total Rewards members can also redeem Reward Credits for on-property amenities or other off-property items such as merchandise, gift cards, and travel. Customers earn status within the Total Rewards program based on their level of engagement with us in a calendar year through both gaming and hospitality expenditures. Total Rewards tiers are designated as Gold, Platinum, Diamond, or Seven Stars, each with increasing sets of customer benefits and privileges.

Separately, customers are provided promotional offers and rewards based on the ways in which they choose to engage with us. These benefits encourage new customers to join Total Rewards and provide existing customers with incentives to consolidate their entertainment spend at our casinos. Additionally, our customers have additional methods to earn and redeem Reward Credits including the Total Rewards Visa credit card and partnerships with Starwood Hotels and Resorts and Excentus, which operates the Fuel Rewards Network.

We have developed a database containing information about our customers, aspects of their casino gaming play, and their preferred spending choices outside of gaming. We use this information for marketing promotions, including through direct mail campaigns, the use of electronic mail, our website, mobile devices, social media, and interactive slot machines.

### Patents and Trademarks

We hold the following trademarks used in this document: Harrah's, Caesars, Grand Biloxi, Bally's, Flamingo, Paris, Caesars Palace, Rio, Harveys, Total Rewards, Bluffs Run, Reward Credits, Horseshoe, Seven Stars, Tunica Roadhouse, The Cromwell (formerly Bill's), Louisiana Downs, The Quad Resort & Casino. Trademark rights are perpetual provided that the mark remains in use by us. CGP LLC holds a trademark license for Planet Hollywood used in connection with Planet Hollywood in Las Vegas, which will expire in 2045. In addition, CIE holds proprietary rights to the Slotomania, Playtika, Bingo Blitz, World Series of Poker and WSOP trademarks. We consider all of the above marks, and the associated name recognition, to be valuable to our business.

The development of intellectual property is part of our overall business strategy, and we regard our intellectual property to be an important element of our success. While our business as a whole is not substantially dependent on any one patent or combination of several of our patents or other intellectual property, we seek to establish and maintain our proprietary rights in our business operations and technology through the use of patents, copyrights, trademarks, and trade secret laws. We file applications for and obtain patents, copyrights, and trademarks in the United States and in foreign countries where we believe filing for such protection is appropriate. We also seek to maintain our trade secrets and confidential information by nondisclosure policies and through the use of appropriate confidentiality agreements. As of December 31, 2013, Caesars had 26 active U.S. cases and 8 active foreign cases. CGP LLC had five active U.S. cases and three active foreign cases. The U.S. cases have patent terms that variously expire between 2015 and 2031.

We have not applied for patents or the registration of all of our technology or trademarks, as the case may be, and may not be successful in obtaining the patents and trademarks for which we have applied. Despite our efforts to protect our proprietary rights, parties may infringe our patents and use information that we regard as proprietary and our rights may be invalidated or unenforceable. The laws of some foreign countries do not protect proprietary rights to as great an extent as do the laws of the United States. In addition, others may be able to independently develop substantially equivalent intellectual property.

### Competition

The casino entertainment business is highly competitive and characterized by competitors that vary considerably by their size, quality of facilities, number of operations, brand identities, marketing and growth strategies, financial strength and capabilities, level of amenities, management talent, and geographic diversity. In most markets, including Las Vegas and Atlantic City, we compete directly with other casino facilities operating in the immediate and surrounding market areas, while in others, including Atlantic City, we face additional competition from nearby markets.

In recent years, many casino operators, including us, have been reinvesting in existing markets to attract new customers or to gain market share, and as a result competition in existing markets has intensified, especially in regional markets. Many casino operators, including us, have invested in expanding existing facilities, developing new facilities, and acquiring established facilities in existing markets. The expansion of existing casino entertainment properties, the increase in the number of

properties, and the aggressive marketing strategies of many of our competitors has increased competition in many markets in which we compete, and we expect this intense competition to continue.

6

**ITEM 2.    Properties**

**Summary of Property Information as of December 31, 2013**

| Region/Property | Location | Entity Structure | Type of Casino | (a) Casino Space– Sq. Ft. | (a) Slot Machines | (a) Table Games | (a) Hotel Rooms & Suites |
|---|---|---|---|---|---|---|---|
| **LAS VEGAS REGION** | | | | | | | |
| Harrah's Las Vegas | Las Vegas, Nev. | CERP | Land-based | 90,600 | 1,280 | 100 | 2,530 |
| Rio All-Suites Hotel & Casino | Las Vegas, Nev. | CERP | Land-based | 117,300 | 1,070 | 90 | 2,520 |
| Caesars Palace | Las Vegas, Nev. | CEOC | Land-based | 139,200 | 1,310 | 190 | 4,250 |
| Paris Las Vegas | Las Vegas, Nev. | CERP | Land-based | 95,300 | 1,020 | 100 | 2,920 |
| Bally's Las Vegas [q] | Las Vegas, Nev. | CEOC | Land-based | 66,200 | 1,000 | 70 | 2,810 |
| Flamingo Las Vegas | Las Vegas, Nev. | CERP | Land-based | 72,300 | 1,220 | 120 | 3,460 |
| The Quad Resort & Casino [b][k][q] | Las Vegas, Nev. | CEOC | Land-based | 44,600 | 760 | 60 | 2,550 |
| The Cromwell [m][q] | Las Vegas, Nev. | CEOC | Land-based | — | — | — | — |
| Hot Spot Oasis | Las Vegas, Nev. | CEOC | Land-based | 1,000 | 15 | — | — |
| Planet Hollywood Resort & Casino | Las Vegas, Nev. | CGP | Land-based | 64,500 | 1,100 | 90 | 2,500 |
| **ATLANTIC COAST REGION** | | | | | | | |
| Harrah's Atlantic City | Atlantic City, N.J. | CERP | Land-based | 154,500 | 2,320 | 180 | 2,590 |
| Showboat Atlantic City | Atlantic City, N.J. | CEOC | Land-based | 108,900 | 2,180 | 110 | 1,330 |
| Bally's Atlantic City [o] | Atlantic City, N.J. | CEOC | Land-based | 105,700 | 2,080 | 140 | 1,750 |
| Caesars Atlantic City | Atlantic City, N.J. | CEOC | Land-based | 111,800 | 2,100 | 150 | 1,140 |
| Harrah's Philadelphia [f] | Chester, Pa. | CEOC | Harness racing and land-based casino | 112,600 | 2,800 | 130 | — |
| Horseshoe Baltimore [l] | Baltimore, Md. | CGP | Land-based | — | — | — | — |
| **OTHER U.S. REGION** | | | | | | | |
| Harrah's Laughlin | Laughlin, Nev. | CERP | Land-based | 56,000 | 940 | 40 | 1,510 |
| Harrah's Reno | Reno, Nev. | CEOC | Land-based | 40,200 | 750 | 40 | 930 |
| Harrah's Lake Tahoe | Lake Tahoe, Nev. | CEOC | Land-based | 45,100 | 830 | 70 | 510 |
| Harveys Lake Tahoe | Lake Tahoe, Nev. | CEOC | Land-based | 44,200 | 740 | 70 | 740 |
| Harrah's Joliet [c] | Joliet, Ill. | CEOC | Dockside | 38,900 | 1,130 | 30 | 200 |
| Horseshoe Hammond | Hammond, Ind. | CEOC | Dockside | 108,200 | 2,970 | 155 | — |
| Harrah's Metropolis | Metropolis, Ill. | CEOC | Dockside | 31,000 | 1,150 | 30 | 260 |
| Horseshoe Southern Indiana | Elizabeth, Ind. | CEOC | Dockside | 86,600 | 1,730 | 110 | 500 |
| Harrah's Council Bluffs | Council Bluffs, Iowa | CEOC | Land-based | 25,000 | 590 | 20 | 250 |
| Horseshoe Council Bluffs [d] | Council Bluffs, Iowa | CEOC | Greyhound racing and land-based casino | 78,800 | 1,610 | 70 | — |
| Horseshoe Tunica | Tunica, Miss. | CEOC | Dockside | 63,000 | 1,280 | 90 | 510 |
| Harrah's Tunica | Tunica, Miss. | CEOC | Dockside | 136,000 | 1,280 | 70 | 1,360 |
| Tunica Roadhouse Hotel & Casino | Tunica, Miss. | CEOC | Dockside | 31,000 | 750 | 30 | 130 |
| Grand Casino Biloxi | Biloxi, Miss. | CEOC | Dockside | 31,300 | 750 | 30 | 490 |
| Harrah's North Kansas City | N. Kansas City, Mo. | CEOC | Dockside | 60,100 | 1,500 | 60 | 390 |
| Harrah's New Orleans [e] | New Orleans, La. | CEOC | Land-based | 125,100 | 1,820 | 140 | 450 |
| Louisiana Downs [e] | Bossier City, La. | CEOC | Thoroughbred racing facility and land-based casino | 12,000 | 1,050 | — | — |

| Horseshoe Bossier City | Bossier City, La. | CEOC | Dockside | 29,300 | 1,370 | 70 | 600 |

30

| Region/Property | Location | Entity Structure | Type of Casino | (a) Casino Space– Sq. Ft. | (a) Slot Machines | (a) Table Games | (a) Hotel Rooms & Suites |
|---|---|---|---|---|---|---|---|
| **MANAGED, INTERNATIONAL & OTHER REGION** | | | | | | | |
| Horseshoe Cincinnati [j] | Cincinnati, Ohio | CEOC | Land-based | 100,000 | 1,990 | 120 | — |
| Harrah's Ak-Chin [g] | Phoenix, Ariz. | CEOC | Indian Reservation | 48,800 | 1,110 | 30 | 300 |
| Horseshoe Cleveland [j] | Cleveland, Ohio | CEOC | Land-based | 96,000 | 1,780 | 120 | — |
| ThistleDown Racino [j] | Cleveland, Ohio | CEOC | Land-based | 71,700 | 1,150 | — | — |
| Harrah's Cherokee [g] | Cherokee, N.C. | CEOC | Indian Reservation | 176,800 | 3,680 | 150 | 1,110 |
| Harrah's Rincon [g] | San Diego, Calif. | CEOC | Indian Reservation | 72,900 | 1,710 | 70 | 660 |
| Conrad Punta del Este Resort and Casino [n] | Uruguay | CEOC | Land-based | — | — | — | — |
| Caesars Windsor [h] | Ontario, Canada | CEOC | Land-based | 100,000 | 2,270 | 90 | 760 |
| Golden Nugget [p] | United Kingdom | CEOC | Land-based | 5,100 | 50 | 20 | — |
| Playboy Club London | United Kingdom | CEOC | Land-based | 6,200 | 30 | 20 | — |
| The Sportsman | United Kingdom | CEOC | Land-based | 5,200 | 40 | 20 | — |
| Rendezvous Brighton | United Kingdom | CEOC | Land-based | 7,800 | 70 | 30 | — |
| Rendezvous Southend-on-Sea | United Kingdom | CEOC | Land-based | 8,700 | 50 | 20 | — |
| Manchester235 | United Kingdom | CEOC | Land-based | 11,500 | 40 | 40 | — |
| The Casino at the Empire | United Kingdom | CEOC | Land-based | 20,900 | 120 | 50 | — |
| Alea Nottingham | United Kingdom | CEOC | Land-based | 10,000 | 50 | 20 | — |
| Alea Glasgow | United Kingdom | CEOC | Land-based | 15,000 | 50 | 30 | — |
| The London Clubs Cairo-Ramses [g] | Egypt | CEOC | Land-based | 2,700 | 40 | 20 | — |
| Caesars Cairo [g] | Egypt | CEOC | Land-based | 5,500 | 30 | 20 | — |
| Emerald Safari [i] | South Africa | CEOC | Land-based | 37,700 | 550 | 40 | 190 |

[a]   Approximate, except for Hot Spot Oasis.

[b]   Includes O'Shea's Casino. O'Shea's Casino reopened in December 2013 as part of The Quad Resort & Casino.

[c]   We have an 80% ownership interest in and manage this property.

[d]   The property is owned by the Company, leased to the operator, and managed by the Company for the operator for a fee pursuant to an agreement that expires in October 2024. This information includes the Bluffs Run greyhound racetrack that operates at the property.

[e]   We own a 49% share of a venture that owns a 150-room hotel located near the property.

[f]   Prior to May 2012, this property operated under the Harrah's Chester name. We have a 99.5% ownership interest in and manage this property.

[g]   Managed.

[h]   We operate this property and the province of Ontario owns the complex through the Ontario Lottery and Gaming Corporation.

[i]   We have a 70% ownership interest in and manage this property.

[j]   We manage this property and have a 20% interest in ROC which owns this property.

[k]   Prior to December 2012, this property operated under the name Imperial Palace Hotel and Casino.

[l]   We have a joint venture interest in this property, which is under development, and will manage the property when it opens, which is expected in the third quarter of 2014.

[m]   This property was formerly Bill's Gamblin' Hall & Saloon. It temporarily closed in early February 2013 to accommodate renovations. The renovated hotel and casino are expected to reopen in the second quarter 2014.

[n]   On May 31, 2013, the Company sold 45% of its equity interest in Conrad Punta del Este and, as a result of this transaction, we no longer consolidate its results, but instead account for it as an equity method investment. The results of Conrad Punta del Este are being included in consolidated results through May 31, 2013 and the equity method income or loss is included in income/(loss) from operations beginning June 1, 2013.

[o]   In October 2013, the Company entered into an agreement to sell its 500-room Claridge Hotel Tower adjacent to Bally's in Atlantic City. The sale was completed in February 2014.

[p]   We closed this casino in February 2014.

[q]   Subsequent to year end, the Company announced the agreement to sell this property to CGP LLC. See Note 24.

31

**CAESARS ENTERTAINMENT CORPORATION**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In millions, except per share data)**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2013 [1] | 2012 [1] | 2011 [1] |
| Revenues | | | |
| Casino | $ 5,808.8 | $ 6,243.0 | $ 6,389.9 |
| Food and beverage | 1,510.0 | 1,507.6 | 1,506.1 |
| Rooms | 1,219.6 | 1,205.5 | 1,193.1 |
| Management fees | 57.0 | 47.3 | 35.8 |
| Other | 874.8 | 762.0 | 647.1 |
| Reimbursed management costs | 268.1 | 67.1 | 26.9 |
| Less: casino promotional allowances | (1,178.6) | (1,252.1) | (1,232.3) |
| Net revenues | 8,559.7 | 8,580.4 | 8,566.6 |
| Operating expenses | | | |
| Direct | | | |
| Casino | 3,280.5 | 3,553.0 | 3,615.2 |
| Food and beverage | 658.4 | 657.6 | 657.0 |
| Rooms | 305.4 | 297.6 | 286.2 |
| Property, general, administrative, and other [1] | 2,168.6 | 2,043.5 | 2,093.5 |
| Reimbursable management costs | 268.1 | 67.1 | 26.9 |
| Depreciation and amortization | 565.2 | 714.4 | 677.0 |
| Write-downs, reserves, and project opening costs, net of recoveries | 104.4 | 99.7 | 73.8 |
| Impairment of intangible and tangible assets | 3,018.9 | 1,074.2 | 32.8 |
| Loss on interests in non-consolidated affiliates | 17.6 | 17.5 | 7.9 |
| Corporate expense | 161.4 | 195.0 | 152.8 |
| Acquisition and integration costs | 81.3 | 6.1 | 4.3 |
| Amortization of intangible assets | 164.5 | 174.6 | 156.7 |
| Total operating expenses | 10,794.3 | 8,900.3 | 7,784.1 |
| Income/(loss) from operations | (2,234.6) | (319.9) | 782.5 |
| Interest expense | (2,253.0) | (2,100.3) | (2,121.7) |
| Gain/(loss) on early extinguishment of debt | (29.8) | 136.0 | 47.9 |
| Gain on partial sale of subsidiary | 44.1 | — | — |
| Other income, including interest income | 13.8 | 25.5 | 25.3 |
| Loss from continuing operations before income taxes | (4,459.5) | (2,258.7) | (1,266.0) |
| Income tax benefit | 1,549.7 | 870.5 | 534.6 |
| Loss from continuing operations, net of income taxes | (2,909.8) | (1,388.2) | (731.4) |
| Discontinued operations | | | |
| Income/(loss) from discontinued operations | (29.8) | (64.5) | 55.1 |
| Income tax provision | (0.2) | (50.1) | (27.8) |
| Income/(loss) from discontinued operations, net of income taxes | (30.0) | (114.6) | 27.3 |
| Net loss | (2,939.8) | (1,502.8) | (704.1) |
| Less: net income attributable to noncontrolling interests | (8.4) | (5.3) | (20.9) |
| Net loss attributable to Caesars | $ (2,948.2) | $ (1,508.1) | $ (725.0) |

| Loss per share - basic and diluted | | | | | | |
|---|---|---|---|---|---|---|
| Loss per share from continuing operations | $ | (22.70) | $ | (11.12) | $ | (6.02) |
| Earnings/(loss) per share from discontinued operations | | (0.23) | | (0.92) | | 0.22 |
| Net loss per share | $ | (22.93) | $ | (12.04) | $ | (5.80) |
| Weighted-average common shares outstanding - basic and diluted | | 128.6 | | 125.3 | | 125.1 |

[1]  As discussed in Note 21, "Employee Benefit Plans," we elected to change our method of accounting for actuarial gains and losses for our pension plan in the United Kingdom to a more preferable method permitted under GAAP. We applied this accounting change retrospectively to all periods presented on the noted line items.

See accompanying Notes to Consolidated Financial Statements.

62

## **EXHIBIT 4**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

_____

**FORM 10-Q**
_____

**(Mark One)**

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the Quarterly Period Ended September 30, 2014

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

**Commission File No. 1-10410**
_____

# CAESARS ENTERTAINMENT CORPORATION

**(Exact name of registrant as specified in its charter)**
_____

| | |
|---|---|
| **Delaware** | **62-1411755** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **One Caesars Palace Drive, Las Vegas, Nevada** | **89109** |
| (Address of principal executive offices) | (Zip Code) |

**(702) 407-6000**
**(Registrant's telephone number, including area code)**

**N/A**
**(Former name, former address and former fiscal year, if changed since last report)**
_____

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒        No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒        No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐   (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| <u>Class</u> | <u>Outstanding at November 1, 2014</u> |
|---|---|
| Common stock, $0.01 par value | 144,362,466 |

## CAESARS ENTERTAINMENT CORPORATION

### INDEX

### PART I. FINANCIAL INFORMATION

| | | Page |
|---|---|---|
| Item 1. | Unaudited Financial Statements | |
| | Consolidated Condensed Balance Sheets | 3 |
| | Consolidated Condensed Statements of Operations | 4 |
| | Consolidated Condensed Statements of Comprehensive Loss | 5 |
| | Consolidated Condensed Statements of Stockholders' Equity/(Deficit) | 6 |
| | Consolidated Condensed Statements of Cash Flows | 7 |
| | Notes to Consolidated Condensed Financial Statements | 8 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 40 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 64 |
| Item 4. | Controls and Procedures | 64 |

### PART II. OTHER INFORMATION

| | | |
|---|---|---|
| Item 1. | Legal Proceedings | 65 |
| Item 1A. | Risk Factors | 66 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 66 |
| Item 3. | Defaults Upon Senior Securities | 66 |
| Item 4. | Mine Safety Disclosures | 67 |
| Item 5. | Other Information | 67 |
| Item 6. | Exhibits | 68 |
| **SIGNATURE** | | 71 |

We have proprietary rights to a number of trademarks used in this Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2014 (this "Form 10-Q") that are important to our business, including, without limitation, Caesars, Caesars Entertainment, Caesars Palace, Harrah's, Total Rewards, Horseshoe, Paris Las Vegas, Flamingo, and Bally's. In addition, Caesars Interactive Entertainment, Inc., which is a majority owned subsidiary of Caesars Growth Partners, LLC, has proprietary rights to World Series of Poker ("WSOP") trademarks. We have omitted the registered trademark (®) and trademark (™) symbols for such trademarks named in this Form 10-Q.

PART I—FINANCIAL INFORMATION

**Item 1.**　　　**Unaudited Financial Statements**

<div align="center">

**CAESARS ENTERTAINMENT CORPORATION**
**CONSOLIDATED CONDENSED BALANCE SHEETS**
**(UNAUDITED)**
**(In millions, except par value)**

</div>

| | September 30, 2014 | December 31, 2013 |
|---|---:|---:|
| *Assets* | | |
| Current assets | | |
| Cash and cash equivalents ($989.2 and $976.9 attributable to our VIE) | $ 3,182.4 | $ 2,771.2 |
| Restricted cash ($17.1 and $28.8 attributable to our VIE) | 61.5 | 87.5 |
| Receivables, net ($99.5 and $54.8 attributable to our VIE) | 622.6 | 619.9 |
| Deferred income taxes ($3.9 and $7.0 attributable to our VIE) | 4.6 | 8.7 |
| Prepayments and other current assets ($23.3 and $15.6 attributable to our VIE) | 246.0 | 237.4 |
| Inventory | 44.7 | 45.6 |
| Total current assets | 4,161.8 | 3,770.3 |
| Property and equipment, net ($2,557.6 and $516.0 attributable to our VIE) | 13,484.8 | 13,237.9 |
| Goodwill ($447.2 and $112.8 attributable to our VIE) | 2,772.7 | 3,063.3 |
| Intangible assets other than goodwill ($299.5 and $180.0 attributable to our VIE) | 3,223.4 | 3,487.7 |
| Investments in and advances to non-consolidated affiliates | 168.8 | 176.2 |
| Restricted cash ($22.5 and $231.6 attributable to our VIE) | 42.5 | 336.8 |
| Deferred income taxes ($23.8 and $0.0 attributable to our VIE) | 23.8 | — |
| Deferred charges and other ($59.9 and $11.0 attributable to our VIE) | 610.8 | 604.2 |
| Assets held for sale | 2.9 | 11.9 |
| Total assets | $ 24,491.5 | $ 24,688.9 |
| *Liabilities and Stockholders' Deficit* | | |
| Current liabilities | | |
| Accounts payable ($126.9 and $54.8 attributable to our VIE) | $ 431.1 | $ 442.7 |
| Accrued expenses and other current liabilities ($205.1 and $126.1 attributable to our VIE) | 1,318.4 | 1,212.3 |
| Interest payable ($49.7 and $5.5 attributable to our VIE) | 594.3 | 389.5 |
| Deferred income taxes ($5.4 and $0.0 attributable to our VIE) | 314.1 | 289.2 |
| Current portion of long-term debt ($18.3 and $47.8 attributable to our VIE) | 140.6 | 197.1 |
| Total current liabilities | 2,798.5 | 2,530.8 |
| Long-term debt ($2,300.5 and $673.9 attributable to our VIE) | 22,888.9 | 20,918.4 |
| Deferred income taxes ($8.5 and $3.8 attributable to our VIE) | 2,077.4 | 2,476.0 |
| Deferred credits and other ($89.5 and $67.3 attributable to our VIE) | 441.1 | 667.5 |
| Total liabilities | 28,205.9 | 26,592.7 |
| Commitments and contingencies (Note 15) | | |
| Stockholders' deficit | | |
| Common stock, voting: par value $0.01; 146.6 and 139.0 shares | 1.5 | 1.4 |
| Treasury stock: 2.3 and 2.2 shares | (18.9) | (16.3) |
| Additional paid-in capital | 8,103.9 | 7,230.5 |
| Accumulated deficit | (12,081.7) | (10,320.7) |
| Accumulated other comprehensive loss | (17.0) | (16.9) |
| Total Caesars stockholders' deficit | (4,012.2) | (3,122.0) |
| Noncontrolling interests | 297.8 | 1,218.2 |
| Total stockholders' deficit | (3,714.4) | (1,903.8) |
| Total liabilities and stockholders' deficit | $ 24,491.5 | $ 24,688.9 |

<div align="center">

See accompanying Notes to Consolidated Condensed Financial Statements.

3

</div>

**CAESARS ENTERTAINMENT CORPORATION**
**CONSOLIDATED CONDENSED STATEMENTS OF OPERATIONS**
**(UNAUDITED)**
**(In millions, except per share data)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2014** | **2013** | **2014** | **2013** |
| *Revenues* | | | | |
| Casino | $ 1,395.6 | $ 1,391.5 | $ 4,046.5 | $ 4,178.7 |
| Food and beverage | 394.3 | 367.3 | 1,143.8 | 1,103.5 |
| Rooms | 301.3 | 302.5 | 915.0 | 887.5 |
| Management fees | 16.0 | 14.5 | 44.4 | 42.3 |
| Other | 337.6 | 220.2 | 892.3 | 628.3 |
| Reimbursed management costs | 62.6 | 72.7 | 196.8 | 203.2 |
| Less: casino promotional allowances | (295.0) | (281.3) | (853.6) | (827.5) |
| Net revenues | 2,212.4 | 2,087.4 | 6,385.2 | 6,216.0 |
| *Operating expenses* | | | | |
| Direct | | | | |
| Casino | 833.9 | 760.0 | 2,412.5 | 2,329.6 |
| Food and beverage | 183.4 | 163.5 | 516.0 | 488.3 |
| Rooms | 81.9 | 74.2 | 241.6 | 225.0 |
| Property, general, administrative, and other | 605.6 | 511.3 | 1,680.5 | 1,490.0 |
| Reimbursable management costs | 62.6 | 72.7 | 196.8 | 203.2 |
| Depreciation and amortization | 131.9 | 124.9 | 371.1 | 410.4 |
| Write-downs, reserves, and project opening costs, net of recoveries | 19.2 | 0.5 | 95.1 | 44.7 |
| Impairment of intangible and tangible assets | 498.6 | 818.6 | 548.8 | 945.9 |
| Loss on interests in non-consolidated affiliates | 6.6 | 4.0 | 9.4 | 20.4 |
| Corporate expense | 73.9 | 37.0 | 192.5 | 114.3 |
| Acquisition and integration costs | 8.8 | 3.2 | 71.0 | 69.6 |
| Amortization of intangible assets | 33.8 | 41.5 | 100.2 | 123.1 |
| Total operating expenses | 2,540.2 | 2,611.4 | 6,435.5 | 6,464.5 |
| Loss from operations | (327.8) | (524.0) | (50.3) | (248.5) |
| Interest expense | (708.3) | (562.9) | (1,954.1) | (1,677.4) |
| Gain/(loss) on early extinguishment of debt | (66.5) | 13.0 | (95.2) | 17.5 |
| Gain/(loss) on partial sale of subsidiary | — | — | (3.1) | 44.1 |
| Other income, including interest income | 1.0 | 0.5 | 5.1 | 8.9 |
| Loss from continuing operations, before income taxes | (1,101.6) | (1,073.4) | (2,097.6) | (1,855.4) |
| Income tax benefit | 169.9 | 374.2 | 479.3 | 777.9 |
| Loss from continuing operations, net of income taxes | (931.7) | (699.2) | (1,618.3) | (1,077.5) |
| Discontinued operations | | | | |
| Loss from discontinued operations | (46.1) | (98.7) | (188.4) | (151.5) |
| Income tax benefit/(provision) | (2.3) | 36.1 | 11.0 | 41.2 |
| Loss from discontinued operations, net of income taxes | (48.4) | (62.6) | (177.4) | (110.3) |
| Net loss | (980.1) | (761.8) | (1,795.7) | (1,187.8) |
| Net (income)/loss attributable to noncontrolling interests | 72.0 | 0.4 | 34.7 | (3.5) |
| Net loss attributable to Caesars | $ (908.1) | $ (761.4) | $ (1,761.0) | $ (1,191.3) |
| Loss per share - basic and diluted | | | | |
| Loss per share from continuing operations | $ (5.96) | $ (5.54) | $ (11.16) | $ (8.60) |
| Loss per share from discontinued operations | (0.33) | (0.49) | (1.25) | (0.87) |
| Net loss per share | $ (6.29) | $ (6.03) | $ (12.41) | $ (9.47) |
| Weighted-average common shares outstanding - basic and diluted | 144.3 | 126.3 | 141.9 | 125.7 |

See accompanying Notes to Consolidated Condensed Financial Statements.

**CAESARS ENTERTAINMENT CORPORATION**
**CONSOLIDATED CONDENSED STATEMENTS OF COMPREHENSIVE LOSS**
**(UNAUDITED)**
**(In millions)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | **2014** | **2013** | **2014** | **2013** |
| Net loss | $ (980.1) | $ (761.8) | $ (1,795.7) | $ (1,187.8) |
| Other comprehensive loss: | | | | |
|     Benefit plan adjustments | 0.4 | 0.2 | 0.9 | 0.6 |
|     Foreign currency translation adjustments | 0.2 | (0.8) | (1.4) | (22.1) |
|     Reclassification of loss on derivative instruments from other comprehensive loss to interest expense | — | — | — | 3.9 |
|     Unrealized loss on available-for-sale investments | (1.3) | (0.4) | (3.5) | (5.1) |
| Total other comprehensive loss, before income taxes | (0.7) | (1.0) | (4.0) | (22.7) |
| Income tax provision related to items of other comprehensive loss | (0.3) | (0.9) | (0.4) | (2.1) |
| Total other comprehensive loss, net of income taxes | (1.0) | (1.9) | (4.4) | (24.8) |
| Total comprehensive loss | (981.1) | (763.7) | (1,800.1) | (1,212.6) |
| Comprehensive (income)/loss attributable to noncontrolling interests: | | | | |
|     Net income | 72.0 | 0.4 | 34.7 | (3.5) |
|     Foreign currency translation adjustments | — | — | — | 0.1 |
| Total comprehensive (income)/loss attributable to noncontrolling interests | 72.0 | 0.4 | 34.7 | (3.4) |
| Comprehensive loss attributable to Caesars | $ (909.1) | $ (763.3) | $ (1,765.4) | $ (1,216.0) |

See accompanying Notes to Consolidated Condensed Financial Statements.

5

# CAESARS ENTERTAINMENT CORPORATION
## CONSOLIDATED CONDENSED STATEMENTS OF STOCKHOLDERS' EQUITY/(DEFICIT)
### (UNAUDITED)
**(In millions)**

| | Caesars Stockholders | | | | | | | |
| | Common Stock | Treasury Stock | Additional Paid-in-Capital | Accumulated Deficit | Accumulated Other Comprehensive Income/(Loss) | Total Caesars Stockholders' Equity/(Deficit) | Noncontrolling Interests | Total Equity/(Deficit) |
|---|---|---|---|---|---|---|---|---|
| Balance as of December 31, 2012 | $ 1.3 | $ (16.3) | $ 6,954.4 | $ (7,372.5) | $ 21.4 | $ (411.7) | $ 80.1 | $ (331.6) |
| Net income/(loss) | — | — | — | (1,191.3) | — | (1,191.3) | 3.5 | (1,187.8) |
| Share-based compensation | — | — | 17.8 | — | — | 17.8 | — | 17.8 |
| Common stock issuances | — | — | 15.4 | — | — | 15.4 | — | 15.4 |
| Issuances of common stock under stock incentive plan | — | — | 1.1 | — | — | 1.1 | — | 1.1 |
| Increase in treasury shares | — | — | (0.1) | — | — | (0.1) | — | (0.1) |
| Contributions from/(distributions to) noncontrolling interest | — | — | 24.7 | — | — | 24.7 | (1.6) | 23.1 |
| Other comprehensive loss, net of tax | — | — | — | — | (24.7) | (24.7) | (0.1) | (24.8) |
| Purchase of interests in subsidiary | — | — | (9.9) | — | — | (9.9) | — | (9.9) |
| Balance as of September 30, 2013 | $ 1.3 | $ (16.3) | $ 7,003.4 | $ (8,563.8) | $ (3.3) | $ (1,578.7) | $ 81.9 | $ (1,496.8) |
| | | | | | | | | |
| Balance as of December 31, 2013 | $ 1.4 | $ (16.3) | $ 7,230.5 | $ (10,320.7) | $ (16.9) | $ (3,122.0) | $ 1,218.2 | $ (1,903.8) |
| Net income/(loss) | — | — | — | (1,761.0) | — | (1,761.0) | (34.7) | (1,795.7) |
| Share-based compensation | — | (2.6) | 31.4 | — | — | 28.8 | — | 28.8 |
| Common stock issuances | 0.1 | — | 135.7 | — | — | 135.8 | — | 135.8 |
| Bond distribution to noncontrolling interest owners | — | — | — | — | — | — | (159.7) | (159.7) |
| Contribution to noncontrolling interest from retirement of debt | — | — | (45.3) | — | — | (45.3) | 45.3 | — |
| Repurchase of subsidiary interest and noncontrolling interest transactions | — | — | (2.2) | — | — | (2.2) | (27.2) | (29.4) |
| Other comprehensive loss, net of tax | — | — | — | — | (4.4) | (4.4) | — | (4.4) |
| Allocation of noncontrolling interest resulting from sales and conveyances of subsidiary stock | — | — | 753.8 | — | 4.3 | 758.1 | (744.1) | 14.0 |
| Balance as of September 30, 2014 | $ 1.5 | $ (18.9) | $ 8,103.9 | $ (12,081.7) | $ (17.0) | $ (4,012.2) | $ 297.8 | $ (3,714.4) |

See accompanying Notes to Consolidated Condensed Financial Statements.

6

**CAESARS ENTERTAINMENT CORPORATION**
**CONSOLIDATED CONDENSED STATEMENTS OF CASH FLOWS**
**(UNAUDITED)**
**(In millions)**

| | Nine Months Ended September 30, | |
| | 2014 | 2013 |
|---|---:|---:|
| Cash flows from operating activities | $ (422.0) | $ (2.4) |
| Cash flows from investing activities | | |
|     Acquisitions of property and equipment, net of change in related payables | (817.2) | (466.7) |
|     Change in restricted cash | 320.3 | 671.2 |
|     Proceeds received from sale of assets | 32.4 | — |
|     Proceeds from partial sale of subsidiary, net of cash deconsolidated | — | 50.4 |
|     Payments to acquire businesses, net of transaction costs and cash acquired | (22.5) | (8.6) |
|     Investments in/advances to non-consolidated affiliates and other | (2.1) | (36.2) |
|     Purchases of investment securities | (13.0) | (26.7) |
|     Proceeds from the sale and maturity of investment securities | 16.5 | 55.8 |
|     Other | 12.9 | (14.1) |
|         Cash flows from investing activities | (472.7) | 225.1 |
| Cash flows from financing activities | | |
|     Proceeds from the issuance of long-term debt | 4,069.9 | 1,808.1 |
|     Debt issuance and extension costs and fees | (224.9) | (81.1) |
|     Borrowings under lending agreements | 105.0 | — |
|     Repayments under lending agreements | (30.0) | — |
|     Cash paid for early extinguishments of debt | (1,847.4) | (2,067.8) |
|     Scheduled debt and capital lease payments | (812.2) | (19.7) |
|     Purchase of additional interests in subsidiaries | — | (9.9) |
|     Contributions from noncontrolling interest owners | — | 35.3 |
|     Issuance of common stock, net of fees | 137.8 | 16.2 |
|     Distributions to noncontrolling interest owners | (35.6) | (11.0) |
|     Other | 4.0 | — |
|         Cash flows from financing activities | 1,366.6 | (329.9) |
| Cash flows from discontinued operations | | |
|     Cash flows from operating activities | (58.5) | (7.9) |
|     Cash flows from investing activities | (2.2) | 65.7 |
|     Cash flows from financing activities | — | — |
|         Net cash from discontinued operations | (60.7) | 57.8 |
| Net increase/(decrease) in cash and cash equivalents | 411.2 | (49.4) |
| Change in cash classified as assets held for sale | — | (0.2) |
| Cash and cash equivalents, beginning of period | 2,771.2 | 1,757.5 |
| Cash and cash equivalents, end of period | $ 3,182.4 | $ 1,707.9 |
| | | |
| **Supplemental Cash Flow Information:** | | |
| Cash paid for interest | $ 1,552.3 | $ 1,357.2 |
| Cash paid for income taxes | 40.3 | 25.2 |
| Non-cash investing and financing activities: | | |
|     Change in accrued capital expenditures | (1.3) | 12.9 |

See accompanying Notes to Consolidated Condensed Financial Statements.

# CAESARS ENTERTAINMENT CORPORATION
## NOTES TO CONSOLIDATED CONDENSED FINANCIAL STATEMENTS
### (UNAUDITED)

*In these notes, the words "Company," "Caesars," "Caesars Entertainment," "CEC," "we," "our," and "us" refer to Caesars Entertainment Corporation, a Delaware corporation, and its consolidated entities, unless otherwise stated or the context requires otherwise.*

## Note 1 - Organization and Basis of Presentation

### *Organization*

We conduct business through our majority owned subsidiary, Caesars Entertainment Operating Company, Inc. ("CEOC"), and our wholly owned subsidiary, Caesars Entertainment Resort Properties, LLC ("CERP"), and their respective subsidiaries. We also consolidate Caesars Growth Partners, LLC ("CGP LLC"), which is a variable interest entity ("VIE") for which we have determined that we are the primary beneficiary (see Note 5 , " Caesars Growth Partners "). As of September 30, 2014 , we owned and operated or managed, through various subsidiaries and CGP LLC, 50 casinos in 14 U.S. states and 5 countries. Of the 50 casinos, 38 are in the United States and primarily consist of land-based and riverboat or dockside casinos. Our 12 international casinos are all land-based casinos, most of which are located in England.

Caesars Interactive Entertainment, Inc. ("CIE"), a majority owned subsidiary of CGP LLC, operates an online gaming business providing for social games on Facebook and other social media websites and mobile application platforms and certain real money games in Nevada and New Jersey; and "play for fun" offerings in other jurisdictions. CIE also owns the WSOP tournaments and brand, and licenses trademarks for a variety of products and businesses related to this brand.

We view each casino property as an operating segment and aggregate such casino properties into one reportable segment.

### *Basis of Presentation*

The accompanying unaudited consolidated condensed financial statements of the Company have been prepared under the rules and regulations of the Securities and Exchange Commission ("SEC") applicable for interim periods and, therefore, do not include all information and footnotes necessary for complete financial statements in conformity with accounting principles generally accepted in the United States ("GAAP"). The results for the interim periods reflect all adjustments (consisting primarily of normal recurring adjustments) that management considers necessary for a fair presentation of financial position, results of operations, and cash flows. The results of operations for our interim periods are not necessarily indicative of the results of operations that may be achieved for the entire 2014 fiscal year.

The financial information for the three and nine months ended September 30, 2013 reflects the results of operations and cash flows of the Golden Nugget, Harrah's Tunica, Showboat Atlantic City casinos as discontinued operations consistent with the current period presentation. See Note 4 , " Dispositions, Divestitures, and Other Property Matters ."

This Form 10-Q should be read in conjunction with our Annual Report on Form 10-K for the year ended December 31, 2013 (" 2013 10-K").

## Note 2 — Liquidity Considerations

We are a highly leveraged company primarily resulting from the leverage of CEOC, which had $18,410.9 million in face value of debt outstanding as of September 30, 2014 , out of the total $25,529.3 million face value of our consolidated outstanding indebtedness. As a result, a significant portion of our liquidity needs are for debt service, including significant interest payments. Our consolidated debt service obligation for the remainder of 2014 is $831.3 million , consisting of $93.4 million in principal maturities and $737.9 million in required interest payments. Our consolidated debt service obligation for 2015 is $2,469.8 million , consisting of $140.6 million in principal maturities and $2,329.2 million in required interest payments.

As a result of our debt service requirements and a general decline in our gaming activity since 2007, with Atlantic City properties and our regional markets being more heavily impacted by this trend, we have experienced substantial operating and net losses in recent years, resulting in a total stockholders' deficit of $3,714.4 million as of September 30, 2014 . Further, we expect to experience operating and net losses for the remainder of 2014 and the foreseeable future.

8

CAESARS ENTERTAINMENT CORPORATION
**NOTES TO CONSOLIDATED CONDENSED FINANCIAL STATEMENTS (CONTINUED)**
**(UNAUDITED)**

| Detail of Debt (continued) (Dollars in millions) | Final Maturity | Rate(s) | Face Value | Book Value | Book Value |
|---|---|---|---|---|---|
| | | | September 30, 2014 | | December 31, 2013 |
| **CGP LLC Debt** [8] | | | | | |
| Secured Debt | | | | | |
| CGP Term Loan [9] | 2021 | 6.25% | 1,172.1 | 1,139.9 | — |
| Second-Priority Senior Secured Notes [9] | 2022 | 9.375% | 675.0 | 660.4 | — |
| PHW Las Vegas Senior Secured Loan | | — | — | — | 456.1 |
| Baltimore Credit Facility | 2020 | 8.25% | 272.5 | 262.9 | 214.5 |
| Cromwell Credit Facility [10] | 2019 | 11.00% | 185.0 | 180.2 | 179.8 |
| Capitalized Lease Obligations | to 2016 | various | 4.6 | 4.6 | 2.1 |
| Other Unsecured Borrowing [11] | | | | | |
| Other | 2014 - 2018 | 0.00% - 6.00% | 57.5 | 56.3 | 57.6 |
| Special Improvement District Bonds | 2037 | 5.30% | 14.5 | 14.5 | 14.8 |
| **Total CGP LLC Debt** | | | 2,381.2 | 2,318.8 | 924.9 |
| | | | | | |
| **Total Debt** | | | 25,529.3 | 23,029.5 | 21,115.5 |
| Current Portion of Long-Term Debt | | | (140.6) | (140.6) | (197.1) |
| Long-Term Debt | | | $ 25,388.7 | $ 22,888.9 | $ 20,918.4 |

[1]  Guaranteed by Caesars Entertainment.
[2]  Repaid in the third quarter 2014.
[3]  The Term B7 Loans have a springing maturity to 90 days prior to March 1, 2017, if more than $500.0 million of CEOC's Term B5 Loan and Term B6 Loan remain outstanding on such date.
[4]  Guaranteed by certain wholly owned subsidiaries of CEOC.
[5]  Increase in discount on long-term debt due to distribution of CEOC notes through a dividend to a non-consolidated affiliate. See Note 5 , " Caesars Growth Partners ."
[6]  $4.3 million face value of debt issued by CEOC is held by other consolidated entities.
[7]  Guaranteed by Caesars Entertainment Resort Properties and its subsidiaries.
[8]  As of September 30, 2014 and December 31, 2013 , under the CGP LLC debt structure, CIE had $39.8 million drawn under an arrangement with Caesars Entertainment. Accordingly, such debt is eliminated in consolidation.
[9]  Guaranteed by an indirect subsidiary of Caesars Growth Partners, LLC and certain wholly owned subsidiaries of it.
[10]  The property that secured this debt was sold to CGP LLC in May 2014. The debt was formerly "Bill's Credit Facility." See Note 6 , " Property Transaction between CEOC and CGP LLC and Related Financing ."
[11]  The December 31, 2013 value of this debt was reclassified. The property that secured this debt was sold to CGP LLC in May 2014. See Note 6 , " Property Transaction between CEOC and CGP LLC and Related Financing ."

As of September 30, 2014 and December 31, 2013 , book values of debt are presented net of unamortized discounts of $2,499.8 million and $2,473.8 million , respectively.

As of September 30, 2014 , our outstanding debt had a fair value of $18,644.8 million and a carrying value of $23,029.5 million . We calculated the fair value of the debt based on borrowing rates available as of September 30, 2014 , for debt with similar terms and maturities, and based on market quotes of our publicly traded debt. We classify the fair value of debt within level 1 and level 2 in the fair value hierarchy.

*Current Portion of Long-Term Debt*

The current portion of long-term debt as of September 30, 2014 is $140.6 million . For CEOC, the current portion of long-term debt primarily includes $35.9 million of payments due on the 10.0% Second-Priority Senior Secured Notes due 2018; current capitalized lease and other obligations of $27.3 million ; quarterly payments totaling $17.5 million on the Term Loan B7; and $1.2 million on the Special Improvement District Bonds. For CERP, the current portion of long-term debt includes required annual principal payments of $25.0 million on its senior secured loan and interim principal payments on other unsecured borrowings and capitalized lease obligations. For CGP LLC, the current portion of long-term debt includes a total of $18.3 million of payments due related to Term Loans, Special Improvement District Bonds, and various capitalized lease obligations.