## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., | Case No. 15-10047 (KG) |
| Alleged Debtor. | **Requested Objection Deadline**: To be determined by the Court |
|  | **Requested Hearing Date**: January 16, 2015 at a time to be determined by the Court |

## MOTION OF PETITIONING CREDITORS, PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 1014(b), FOR AN ORDER (I) ESTABLISHING VENUE FOR THE CHAPTER 11 CASES OF CAESARS ENTERTAINMENT OPERATING COMPANY, INC. AND ITS DEBTOR AFFILIATES IN THE DISTRICT OF DELAWARE AND (II) GRANTING CERTAIN RELATED RELIEF

Appaloosa Investment Limited Partnership I ("Appaloosa"), OCM Opportunities Fund VI, L.P. ("OCM") and Special Value Expansion Fund, LLC ("SVEF" and, collectively with Appaloosa and OCM, the "Petitioning Creditors"), holders of 10% Second-Priority Senior Secured Notes due 2018 issued under indentures dated December 24, 2008 and April 15, 2009 by alleged debtor Caesars Entertainment Operating Company, Inc. ("CEOC" or the "Debtor"), hereby seek the entry of an order, pursuant to section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 1014(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"):  (a) establishing venue for the Caesars Bankruptcy Cases (as such term is defined below) in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"); and (b) granting certain related relief.[1]  In support of this Motion, the Petitioning Creditors respectfully represent as follows:

---

[1]    A proposed form of order is attached hereto as Exhibit A.

**Preliminary Statement**

On January 13, 2015 – *i.e.*, one day after this involuntary chapter 11 case was commenced in the Delaware Bankruptcy Court (the "Delaware Case") – counsel for the Debtor indicated, during a hearing before the Delaware Court of Chancery, that the Debtor intends to commence a parallel, voluntary chapter 11 case (any such case, a "Second CEOC Case") in another jurisdiction (any such bankruptcy court, a "Non-Delaware Court"), on or about January 15, 2015.[2] Upon information and belief, certain of the Debtor's affiliates (collectively, the "CEOC Affiliates" and, together with the Debtor, the "Caesars Entities") also intend to commence parallel, voluntary chapter 11 proceedings (together with the Second CEOC Case, the "CEOC Affiliate Cases" and, collectively with the Second CEOC Case and the Delaware Case, the "Caesars Bankruptcy Cases") in another jurisdiction. Although neither CEOC nor any of the CEOC Affiliates have publicly identified the jurisdiction in which the Parallel Case will be filed, upon information and belief, it appears likely that the Second CEOC Case will be commenced in the United States Bankruptcy Court for the Northern District of Illinois (the "Illinois Bankruptcy Court"). Regardless of the selected venue for the Second CEOC Case, the appropriate venue for the Caesars Bankruptcy Cases is the Delaware Bankruptcy Court.

Pursuant to Bankruptcy Rule 1014(b), this Court, as the court in which the first chapter 11 petition involving the Debtor or its affiliates was filed, has sole authority to determine the venue in which the chapter 11 cases of the Caesars Entities should proceed. Bankruptcy Rule 1014(b) provides that this determination must be made "in the interest of justice or for the

---

[2]    *See* Transcript (Rough) of Jan. 13, 2015, at 10:3-12, *UMB Bank v. Caesars Entertainment Corp.,* et al., Case No. 10393-VCG (Del. Ch.) (statement of Eric Seiler: "But what is going to happen, as we said previously, in the next few days, on or about January 15th, is that CEOC itself is going to file a petition for bankruptcy, not relying on the involuntary petition.").

convenience of the parties." Fed. R. Bankr. P. 1014(b).  Courts in this jurisdiction and elsewhere apply several factors in analyzing whether allowing a case to proceed in a particular forum serves "the interest of justice" and "the convenience of the parties."  In large chapter 11 cases of international scope – such as the Caesars Bankruptcy Cases – the most important of these factors is the economic and efficient administration of the debtor's estate.  Establishing venue of the Caesars Bankruptcy Cases in this Court promotes the economic and efficient administration of the Caesars Entities' chapter 11 estates for several reasons.  CEOC – a Delaware entity – is the primary obligor on the overwhelming majority of the Caesars Entities' approximately $18 billion in debt.  Upon information and belief, most of CEOC's (and, thus, the Caesars Entities') largest financial creditors – including each of the Petitioning Creditors – are Delaware entities and/or located in the northeastern United States.  Many such creditors – including the Petitioning Creditors and Wilmington Savings Fund Society, FSB (the "Trustee"), the indenture trustee for approximately $3.7 billion in Second Lien Notes (as defined below) – intend to vigorously contest not only the Caesars Entities' proposed restructuring, but the legality of various prepetition transactions upon which that restructuring relies.[3]  Delaware's proximity to these creditors and its status as an easily-accessible global financial center renders it an advantageous location for interested parties to participate in court proceedings and conduct negotiations, as well as for the Caesars Entities to access capital markets as necessary to successfully reorganize. In light of these considerations, the Delaware Bankruptcy Court presents a natural and just forum for the administration of the Caesars Bankruptcy Cases.  Accordingly, to promote the efficient

---

[3]    As set forth more fully below, litigation arising from these prepetition transactions – the facts of which precipitated the commencement of the involuntary Delaware Case – currently is pending in the Delaware Court of Chancery, including a case filed by the Trustee against CEOC and certain related parties.

administration thereof and prevent unnecessary confusion and expense, the Court should grant

the relief sought herein.

## Background

CEOC, through the CEOC Affiliates, owns, operates and/or manages 44 gaming and

entertainment properties in 13 states and five countries.[4]  The Caesars Entities' domestic

businesses are national in scope and distribution, with assets and operations located in New

Jersey, Pennsylvania, Ohio, Maryland, Indiana, Illinois, Mississippi, Louisiana, Iowa, Missouri,

Arizona, California and Nevada.[5]  CEOC is incorporated in Delaware.  Of CEOC's subsidiaries,

as of August 14, 2014, (a) 84 were incorporated or registered in Delaware, (b) ten were

incorporated or registered in New Jersey, (c) one was incorporated in Illinois and (d) 164 were

incorporated or registered in 13 other states and 17 foreign jurisdictions.[6]  Although CEOC

indirectly owns two casinos in Illinois, 42 of the 44 properties owned, operated and/or managed

by CEOC are located in other states or abroad.[7]  Moreover, of the 84 CEOC subsidiaries that are

Delaware entities, 74 such entities are limited liability companies registered in Delaware.[8]  At

least one court has held that the location of a debtor's membership interest in a limited liability

company, for purposes of determining location of principal assets as part of venue

determination, was the state in which such limited liability company was registered.

---

[4]    *See* Caesars Entertainment Operating Co. Reaches Agreement with First Lien Noteholder
Steering Committee on Debt Restructuring (Press Release) (Dec. 19, 2014),
available at http://investor.caesars.com/releases.cfm.

[5]    *See* Caesars Entertainment Operating Company, Inc., Form 10-Q (Nov. 14, 2014), at 9;
Leading Assets with Significant Scale, attached hereto as Exhibit B.

[6]    *See* Caesars Entertainment Operating Company, Inc., Form 10-Q (Aug. 14, 2014), at Ex. 21.

[7]    *See* Leading Assets with Significant Scale, attached hereto as Exhibit B; Caesars
Entertainment Operating Co. Reaches Agreement with First Lien Noteholder Steering
Committee on Debt Restructuring (Press Release), *supra* note 4.

[8]    *See* Caesars Entertainment Operating Company, Inc., Form 10-Q (Aug. 14, 2014), at Ex. 21.

*See Montana Dep't of Revenue v. Blixseth (In re Blixseth)*, 484 B.R. 360, 370-71

(B.A.P. 9th Cir. 2012).  Thus, many of CEOC's principal assets (*i.e.*, its membership interests in

its LLC subsidiaries) are located in Delaware for venue purposes.[9]

Because the Caesars Entities' domestic operations are widely distributed geographically,

in all likelihood, so too are their employees and financial and trade creditors.  Upon information

and belief, most of CEOC's (and, thus, the Caesars Entities') largest creditors are Delaware

companies or partnerships, and a large proportion of such creditors are located in the

northeastern United States.

Each of the Petitioning Creditors is the holder of 10.00% second-priority senior secured

notes due 2018 issued pursuant to an Indenture dated as of April 15, 2009 (as supplemented or

amended, the "2009 Indenture"), and certain of the Petitioning Creditors also hold

second-priority senior secured notes (together with the notes issued under the 2009 Indenture,

the "Second Lien Notes") issued pursuant to an indenture dated as of December 24, 2008.

Appaloosa and OCM are Delaware limited partnerships, and SVEF is a Delaware limited

liability company.

Caesars Entertainment Corporation ("Caesars Parent") owns and controls CEOC.

Caesars Parent in turn is owned and controlled by two private equity firms, Apollo Global

Management, LLC ("Apollo"), and TPG Global, LLC ("TPG"), and other co-investors who

participated in the 2008 leveraged buyout of Caesars Parent.  Like CEOC, Caesars Parent,

Apollo and TPG are each Delaware entities.

---

[9]    Because (a) CEOC is not domiciled in Illinois and (b) CEOC's principal place of business
and principal assets are located outside of Illinois, CEOC's sole basis for venue in the Illinois
Bankruptcy Court – if such venue is sought – would be its affiliation with certain CEOC
Affiliates that are incorporated and/or have their principal place of business in Illinois.

On January 12, 2015, the Petitioning Creditors filed an involuntary petition under chapter 11 of the Bankruptcy Code in this Court, commencing the Debtor's involuntary chapter 11 case in the District of Delaware.[10]  On January 13, 2015, in response to CEOC's statement that, notwithstanding the pending bankruptcy case in Delaware, it intends to imminently file a separate petition to commence a second parallel chapter 11 proceeding for CEOC, along with parallel proceedings for affiliates of CEOC, the Petitioning Creditors filed the Motion of Petitioning Creditors, Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1014(b), for an Order Staying Any Parallel Proceedings [Docket No. 17] (the "Stay Motion").

## Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

## Relief Requested

By this Motion, the Petitioning Creditors seek the entry of an order, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1014(b), substantially in the form attached hereto as Exhibit A, (a) determining that venue for the Caesars Bankruptcy Cases should be established in this Court and (b) granting certain related relief, including a direction that the clerk

---

[10]  For a detailed recitation of the facts and circumstances leading to the filing of the involuntary chapter 11 petition, including the numerous transactions by which the Sponsors and Caesars Parent dismantled CEOC's business and transferred its assets to themselves and affiliates out of the reach of CEOC's creditors, *see* the Motion for Appointment of Examiner with Access to and Authority to Disclose Privileged Materials, filed on January 12, 2015 [Docket No. 10] (the "Examiner Motion").

of the court in which the Second CEOC Case and the CEOC Affiliate Cases is filed transfer all files and a certified copy of the docket for such case or cases to this Court.[11]

### Basis for Relief

As the Court in which the first chapter 11 case involving a Caesars Entity was commenced, this Court has the sole authority to determine the district in which the Caesars Bankruptcy Cases should proceed.  *See* Fed. R. Bankr. P. 1014(b).  Where two bankruptcy cases are filed in different courts by or against (a) the same debtor or (b) a debtor and its affiliate, the court in which the first case was filed determines which forum is appropriate, with reference to two factors:  (a) "the interest of justice" and (b) "the convenience of the parties."  *Id.* Bankruptcy Rule 1014(b), titled "Procedure When Petitions Involving the Same Debtor or Related Debtors are Filed in Different Courts," provides as follows:

> If petitions commencing cases under the Code … are filed in different districts by, regarding, or against … the same debtor … or a debtor and an affiliate, *the court in the district in which the first-filed petition is pending* may determine, *in the interest of justice or for the convenience of the parties*, the district or districts in which any of the cases should proceed.  The court may so determine on motion and after a hearing ….

Fed R. Bankr. P. 1014(b) (emphasis added).[12]  In addition, section 105(a) of the Bankruptcy Code gives the Court authority to "issue any order, process, or judgment that is necessary or

---

[11]  *See In re Premier Gen. Holdings, Ltd.*, 427 B.R. 592, 596 n.3 (Bankr. W.D. Tex. 2010) ("If two cases are pending in different districts, the court with the first filed case would properly decide the venue question.  *See* Fed. R. Bankr. P. 1014(b).…  Once venue is decided, the court with the case in the wrong venue would transfer the case to the court with the properly venued case….").

[12]  Bankruptcy Rule 1014(b) further provides that notice must be given to "the United States trustee, entities entitled to notice under Rule 2002(a), and other entities as the court directs." *Id.*

appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).[13] "Venue motions are

entrusted to the discretion of the court and are to be decided upon the particular facts of each

case, in light of the broad purposes of convenience and fairness." *In re Finley, Kumble, Wagner,*

*Heine, Underberg, Manley, Myerson & Casey*, 149 B.R. 365, 368 (Bankr. S.D.N.Y. 1993).[14]

---

[13] Section 105(a) of the Bankruptcy Code gives the Court latitude to implement relief otherwise available under applicable bankruptcy law. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) (Section 105(a) of the Bankruptcy Code "has been construed to give a bankruptcy court 'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings," as long as such relief is "exercised within the parameters of [the Bankruptcy Code].").  Although the new language of Bankruptcy Rule 1014(b) appears to contemplate that a motion for determination of venue will be filed after a second bankruptcy case involving the same debtor (or an affiliate of the debtor) is actually commenced, section 105(a) of the Bankruptcy Code gives this Court authority to determine the issue of venue where, as here, the filing of parallel bankruptcy cases is imminent and the immediate resolution of the venue issue is necessary "to assure the orderly conduct" of the Debtor's "reorganization proceedings."  As set forth herein and in the Stay Motion, the relief requested herein is consistent with, and tailored to implement, applicable bankruptcy law, including (a) Bankruptcy Rule 1014(b) and (b) the United States Supreme Court's ruling in *Freshman v. Atkins*, 269 U.S. 121 (1925), followed by other courts subsequent to enactment of the Bankruptcy Code, in which the Court held that two bankruptcy cases involving the same debtor and the same debts cannot proceed simultaneously.

[14] As a threshold matter, venue for the Caesars Bankruptcy Cases is proper in the District of Delaware.  Section 1408 of Title 28 ("Section 1408") provides, in relevant part, that "a case under title 11 may be commenced in the district court for the district … in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement …." 28 U.S.C. § 1408(1).  Section 1408 "is written in the disjunctive making venue proper in any of the listed locations." *In re Dunmore Homes, Inc.*, 380 B.R. 663, 670 (Bankr. S.D.N.Y. 2008).  Courts within the District of Delaware, and in most other jurisdictions, follow the well-established rule that a corporation's "domicile" for purposes of venue is the state in which such corporation is incorporated. *E.g.*, *In re Innovative Commc'n Co.*, 358 B.R. 120, 125 (Bankr. D. Del. 2006) ("Venue is appropriate in the state of incorporation, 28 U.S.C. § 1408(1), so venue is proper in Delaware with respect to the corporate Debtors.").  Thus, in this case, venue of CEOC's case is proper in Delaware because CEOC is incorporated in Delaware.  Venue is proper for the CEOC Affiliates because each is an affiliate of CEOC. *See* 28 U.S.C. § 1408(2) ("… a case under title 11 may be commenced in the district court for the district … in which there is pending a case under title 11 concerning such person's affiliate….").

In accordance with Bankruptcy Rule 1014(b), "the interest of justice" and "the convenience of the parties" are best served by establishing venue of the Caesars Bankruptcy Cases in this Court, regardless of the Caesars Entities' selected venue for the Second CEOC Case.  In analyzing "the convenience of the parties" for purposes of Bankruptcy Rule 1014, this Court follows the majority of courts nationwide in applying six factors (collectively, the "CORCO" factors) first articulated in *Puerto Rico v. Commonwealth Oil Refining Co.* *(In re Commonwealth Oil Refining Co.)*, 596 F.2d 1239, 1247 (5th Cir. 1979):  "(1) proximity of creditors of every kind to the court; (2) proximity of the debtor; (3) proximity of witnesses who are necessary to the administration of the estate; (4) the location of the debtor's assets; (5) the economic administration of the estate; and (6) the necessity for ancillary administration in the event of liquidation."  *Innovative Communication*, 358 B.R. at 126.  Of these factors, courts overwhelmingly agree upon the primary importance of promoting the economic administration of the estate.  *See In re Qualteq, Inc.*, No. 11-12572, 2012 WL 527669, at *6 (Bankr. D. Del. Feb. 16, 2012) ("It is oft-repeated that the factor accorded the most weight [among the CORCO factors] is promotion of the economic and efficient administration of the estate."); *DHP Holdings II Corp. v. Home Depot, Inc. (In re DHP Holdings II Corp.)*, 435 B.R. 264, 275 (Bankr. D. Del. 2010) (in determining whether a transfer of venue is appropriate, "the most important consideration is whether the requested transfer would promote the economic and efficient administration of the estate"); *In re Enron Corp.*, 274 B.R. 327, 348 (Bankr. S.D.N.Y. 2002) ("It is clear that the most important of these considerations is the economic and efficient administration of the estate.").

In *Innovative Communication*, a case in which (a) affiliated debtors filed voluntary chapter 11 petitions in the Virgin Islands after involuntary chapter 11 petitions regarding them

were filed in Delaware and (b) the debtors filed a motion to transfer venue to the Virgin Islands, this Court held that certain additional factors were relevant to its analysis of "the interest of justice" and "the convenience of the parties."[15]  These additional factors, some of which overlap with the CORCO factors, consist of the following:  (a) the forum preferences of both the "plaintiff" and the "defendant;" (b) "whether the claim arose elsewhere;" (c) "the convenience of the parties as indicated by their relative physical and financial condition;" (d) "the convenience of the witnesses – but only to the extent that the witnesses may actually be unavailable for trial in one of the fora;" (e) "the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum);" (f) "the enforceability of the judgment;" (g) "practical considerations that could make the trial easy, expeditious, or inexpensive;" (h) "the relative administrative difficulty in the two fora resulting from court congestion;" (i) "the local interest in deciding local controversies at home;" (j) "the public policies of the fora;" and (k) "the familiarity of the trial judge with the applicable state law in diversity cases."  *Innovative Communication*, 358 B.R. at 127 (quoting *Jumara*, 55 F.3d at 879-80).

In certain cases, this Court has implicitly collapsed the "interest of justice" and "convenience of the parties" inquiries and applied the above-listed factors to those two standards jointly.  *See id.* at 126-27 (conducting a unified analysis of both the "interest of justice" and "convenience of the parties" under the CORCO and *Jumara* factors); *IPC Int'l Corp. v. Milwaukee Golf Shopping Ctr. LLC (In re IPC Int'l Corp.)*, No. 13-12050, 2014 WL 5544692,

---

[15]    The Third Circuit Court of Appeals articulated these additional factors in *Jumara v. State Farm Insurance Co.*, 55 F.3d 873, 879-80 (3d Cir. 1995), a case involving a motion to transfer a civil action pursuant to section 1404(a) of Title 28 ("Section 1404(a)"). Section 1404(a) contains language similar to that found in Bankruptcy Rule 1014(b). *See* 28 U.S.C. § 1404(a) ("*For the convenience of parties and witnesses, in the interest of justice*, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.") (emphasis added).

at \*\*4-5 (Bankr. D. Del. Nov. 3, 2014) (combining the CORCO and *Jumara* factors into a single

test; holistically applying such test to determine "whether 'justice' and the 'convenience of the

parties' warrant[ed] transfer [of venue pursuant to Section 1404(a)]").  In *Qualteq*, however, the

Court stated that "the interest of justice prong is a broad and flexible standard that is applied

based on the facts and circumstances of each case.  In evaluating the interest of justice, the Court

must consider what will promote the efficient administration of the estate, judicial economy,

timeliness and fairness."  *Qualteq*, 2012 WL 527669, at \*6 (quoting *Enron*, 274 B.R. at 349

(citing *Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest

Prods. Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990))).[16]

In this case, each relevant CORCO and *Jumara* factor that is not neutral or

indeterminable weighs in favor of a determination that the Caesars Bankruptcy Cases should

proceed in this Court, regardless of the venue chosen by the Caesars Entities.  In particular, the

promotion of the economic and efficient administration of the Caesars Entities' chapter 11

estates strongly favors establishing venue in the District of Delaware.  As set forth above, upon

information and belief, most of the Caesars Entities' largest financial creditors are Delaware

entities with principal places of business in the northeastern United States.  Upon information

and belief, such creditors include:  (a) first lien bondholders (i) Elliott Management Corp.

(Delaware corporation headquartered in New York) and (ii) Goldman Sachs Asset Management,

L.P. (Delaware limited partnership headquartered in New York); (b) second lien bondholders

(i) Appaloosa Management, L.P. (Delaware limited partnership headquartered in New Jersey),

---

[16]  Under the *Enron/Qualteq* formulation, the "interest of justice" standard essentially amounts
to a restatement of the CORCO factor pertaining to the economic administration of the estate.
*See Enron*, 274 B.R. at 349 ("The Court finds that the considerations involved with the
interest of justice are intertwined with the economic and efficient administration of the
estate.").

(ii) Avenue Capital Group, LLC and Avenue Capital Management, LLC (Delaware companies headquartered in New York), (iii) BlueMountain Capital Management LLP (Delaware LLP headquartered in New York), (iv) Soros Fund Management LLC (Delaware company headquartered in New York), (v) Third Avenue Management LLC (Delaware company headquartered in New York) and (vi) Contrarian Capital Management, LLC (Delaware company headquartered in Connecticut); and (c) the Trustee (Delaware company headquartered in Wilmington).  Many of the consultants and advisors employed by these creditors also are located in the northeast.  Indeed, as CEOC and Caesars Parent have conceded in their brief in support of a motion to dismiss the state law complaint filed by the Trustee, "[k]ey witnesses reside in or near New York, many of the relevant events occurred there, and many of the Note-Holders, parties, and financial and legal advisors to [CEOC] are located there."  Defendants' Brief in Support of Motion to Dismiss or Stay the Verified Complaint (the "Defendants' MTD Brief"), Case No. 10004-VCG (Del. Ch. Sept. 23, 2014), at 1-2, attached hereto as Exhibit C.[17]  Finally, upon information and belief, CEOC's Chairman and, until recently, also its Chief Executive Officer and President, Gary W. Loveman, resides in Massachusetts.

The concentration of second lien bondholders in the northeastern corridor is of special significance in this matter.  Upon information and belief, the Caesars Entities intend to seek confirmation of a plan of reorganization that (a) implements a restructuring of CEOC's business and debts that was prenegotiated with substantial holders of CEOC's first lien bank and bond

---

[17]   Indeed, the Defendants' MTD Brief is generally instructive with respect to the instant question before the Court.  The Debtors' arguments to the Delaware Court of Chancery in support of dismissal generally sound in the doctrine of *forum non conveniens*, yet at no point do the Debtors suggest that Illinois, or any other potential forum outside of the northeastern corridor, is an appropriate venue to adjudicate any dispute with their creditors.  Rather, the Debtors argued that "New York is by far the more logical forum for this litigation." Defendants' MTD Brief, at 1.

debt and (b) proposes that holders of first lien debt claims will receive recoveries of, or close to, 100%, while holders of second lien debt receive meager recoveries.  The foundation of this restructuring – and the reason that the Debtor characterizes the second lien debt as unsecured – is a series of self-dealing transactions effected in the months preceding the petition date between CEOC and entities controlled by Caesars Parent that (a) enriched Caesars Parent and its affiliates and shareholders at the expense of CEOC and (b) moved billions of dollars of assets beyond the reach of CEOC's creditors.[18]  The Petitioning Creditors and, upon information and belief, numerous other second lien bondholders regard these transactions as manifestly fraudulent and will seek to avoid them under the Bankruptcy Code.[19]  The Petitioning Creditors and, upon information and belief, other second lien bondholders moreover intend to object vigorously to confirmation of the Caesars Entities' intended and patently infirm plan of reorganization (which, among other deficiencies, proposes that Apollo and TPG will retain or reacquire equity in, and control of, the reorganized Caesars Entities after the effective date without subjecting that equity to any valid form of market testing (as required by *Bank of America National Trust & Savings Ass'n v. 203 North LaSalle Street P'ship*, 526 U.S. 434 (1999))).  Where, upon information and belief, the Caesars Entities have effectively reached agreement with the majority (if not all) of their first lien debtholders, it will be the second lien debtholders – *i.e.*, the parties forced to bear the cost of the Caesars Entities' proposed restructuring – that will likely carry the laboring oar in

---

[18]    *See* Examiner Motion, *passim*.

[19]    Indeed, a derivative suit filed by the Trustee against CEOC and certain affiliated parties was pending in the Delaware Court of Chancery as of the petition date.  *See Wilmington Savings Fund Society, FSB v. Caesars Entertainment Corp.,* et al., Case No. 10004-VCG (Del. Ch.) (the "Trustee Delaware Action").  The causes of action alleged in the Trustee's state law complaint – *e.g.*, intentional and constructive fraudulent transfers; breaches of fiduciary duty – are generally within the traditional core competencies of Delaware courts.  Similar causes of action have been brought by certain holders of first lien debt in the Delaware Court of Chancery as well.  *See UMB Bank v. Caesars Entertainment Corp.,* et al., Case No. 10393-VCG (Del. Ch.).

defending creditor rights in connection with the Caesars Bankruptcy Cases.  The concentration of these second lien debtholders in and around Delaware weighs heavily in favor of establishing venue in this Court.

It is particularly noteworthy that multiple versions of a "Restructuring Support Agreement" (the "Lock Up Agreement") negotiated between CEOC and Caesars Parent on the one hand, and certain first lien bondholders on the other hand, expressly required CEOC to commence chapter 11 proceedings in the District of Delaware.[20]  In addition, CEOC's certificate of incorporation expressly provides that the Delaware Court of Chancery "shall be the sole and exclusive forum" for "any derivative action or proceeding brought on behalf of the Corporation" and "any action asserting a claim of breach of fiduciary duty owed by any director, officer, employee or agent of the Corporation to the Corporation or the Corporation's stockholders."[21] This provision demonstrates that CEOC regards Delaware as convenient for any and all disputes regarding the duties of its officers, irrespective of where the complaining parties may be located or where the relevant events took place.  Delaware is thus *never* regarded as an inconvenient location by CEOC for matters such as will be litigated in this chapter 11 case.

---

[20]  *See* Draft Lock Up Agreement of Paul Weiss (Oct. 28, 2014), at p.2, § 8(i) (providing for termination of Lock Up Agreement if CEOC failed to commence its bankruptcy case on or before January 15, 2015 without the written consent of first lien lenders; providing that "'Bankruptcy Court' means the United States Bankruptcy Court for the District of Delaware"); Draft Lock Up Agreement of Kramer Levin (Nov. 14, 2014), at p.2, § 8(b), Ex. C, ¶ 1 (providing for termination of Lock Up Agreement if CEOC failed to commence bankruptcy case on January 15, 2015 or within five business days thereafter; providing that "'Bankruptcy Court' means the United States Bankruptcy Court for the District of Delaware").  The Lock Up Agreement contemplates the restructuring of CEOC as a real estate investment trust, a Property Company ("PropCo") and an Operating Company ("OpCo").  Multiple term sheets associated with proposed versions of the Lock Up Agreement provided that both PropCo and OpCo would be organized in Delaware. *See* Summary Term Sheet for Proposed Restructuring (Oct. 30, 2014), at § VIII; Summary Term Sheet for Proposed Restructuring (Nov. 8, 2014), at § VIII.

[21]  Caesars Entertainment Operating Co., Inc., Amended and Restated Certificate of Incorporation, Article XI

The court in *Enron*, which was also faced with large bankruptcy cases with a broad geographic scope, declined to transfer venue of the debtors' chapter 11 cases from the Southern District of New York to the Southern District of Texas, even though most of the debtors were based in Houston.  *Enron*, 274 B.R. at 350-51.  The *Enron* court placed particular emphasis upon the economic and efficient administration of the estate and explained that, "while the Debtors' management and operations are predominantly in Houston, New York is a more convenient location for those responsible for negotiating and formulating a plan of reorganization." *Id.* at 349.

In this case, where the Caesars Entities' contemplated restructuring is fatally flawed and further negotiation, restructuring and/or market testing of the reorganized Debtor's equity appears inevitable, allowing the Caesars Entities' chapter 11 cases to proceed in Delaware would facilitate negotiations between those entities and many of their major creditors – including the holders of second lien bond debt – most of which are located in Delaware or New York, thus promoting the economic and efficient administration of the chapter 11 estates.

If the Caesars Entities file the Second CEOC Case and the CEOC Affiliate Cases in the Illinois Bankruptcy Court, the determination of whether venue is more appropriate in Delaware or Illinois would present a starker contrast – and thus would be less difficult to resolve – than the venue issue in *Enron* because, under such circumstances, the Caesars Entities would be seeking venue in a jurisdiction in which CEOC – the primary obligor on the Caesars Entities' debt – is neither incorporated nor principally located.  Because CEOC is not domiciled in Illinois and its principal place of business and principal assets are elsewhere, venue for CEOC's chapter 11 case is not proper in the Illinois Bankruptcy Court under section 1408(1) of Title 28.  *See* 28 U.S.C. § 1408(1), *supra* note 14.  Rather, it appears that, in order to manufacture venue in Illinois for

CEOC, one or more purported affiliates thereof will first file for bankruptcy in the Illinois Bankruptcy Court in order to enable CEOC to seek venue in Illinois under section 1408(2) of Title 28, notwithstanding the pendency of the Delaware Case. *See* 28 U.S.C. § 1408(2), *supra* note 14. A contrast of (a) the tenuous relationship of CEOC and the majority of the remaining Caesars Entities to Illinois with (b) the ties to Delaware, CEOC's state of incorporation (as set forth herein), demonstrates the propriety of venue for the Caesars Bankruptcy Cases in this Court.

The dispersed nature of the Caesars Entities' creditor constituency also supports a determination that venue is appropriate in the District of Delaware. Although the Caesars Entities may have some creditors located in and around Illinois – and some creditors undoubtedly are located in and around Las Vegas – the vast creditor body of the Caesars Entities, in all likelihood, is as widely dispersed, geographically, as the properties the Caesars Entities own, operate or manage. The *Enron* court, addressing similar facts, concluded that "while some creditors would be best served by this bankruptcy case being located in Texas, for the remainder of creditors – national and worldwide, Texas provides no better venue, and perhaps may be more inconvenient, than New York." *Id.* at 345. The same is true in this case, where the Caesars Entities' businesses are geographically diffuse and many of their largest creditors are located in the northeast. In *Enron*, the court further noted that wherever the proceedings were adjudicated, some parties in interest would be geographically distant from the courthouse, but explained that such concern was mitigated by the facts that (a) all pleadings in the case were publically available via PACER, and (b) the Bankruptcy Rules require service of all pleadings affecting the rights of any creditor or employee of the debtors upon such creditors and employees. *Id.* at 347.

01:16499660.1

-16-

Creditors and other parties in interest in this matter are entitled to the same protections, and have the same electronic access to court files, as the parties in *Enron*.

The proximity of potential witnesses to the court also does not support establishment of venue in a Non-Delaware Court.  In *Enron*, the court stated that "[w]hile substantially all of the Debtors' officers are located in Houston, most will not be required to attend hearings before this Court.  Rather, the certain participants in the proceedings before this Court will be the professionals retained in these cases." *Enron*, 274 B.R. at 347.  The *Enron* court further noted that "[t]he limited appearances that may be required of the principals will nevertheless allow them to continue with the management of the businesses." *Id.*  As in *Enron*, many of the witnesses likely to testify in this matter are professionals who most likely either are located in the northeastern United States or travel there regularly as business demands.  To the extent that officers of the Caesars Entities will be required to testify in the Caesars Bankruptcy Cases, there is no indication that any such officers would be unable or unwilling to travel to Delaware, or that travel to the East Coast would be burdensome – or at all unusual.  Indeed, upon information and belief, CEOC's Chairman of the Board and its chief spokesman, Gary Loveman, resides in Massachusetts, and certain of the CEOC's other directors reside in New York and Texas.

Finally, in his remarks before the Delaware Chancery Court, counsel to CEOC stated that, following the commencement of the Second CEOC Case, CEOC "is going to seek, I'm advised, an application in the Bankruptcy Court under Section 105 of the Bankruptcy Code and maybe other sections as well seeking to enjoin consideration of the claims against all of the defendants that are before you in the [Trustee Delaware Action]."  To the extent that the Caesars Entities are "forum shopping" by seeking venue in a Non-Delaware Court (*e.g.*, by filing in a venue that might apply more favorable precedent when determining whether to issue an

01:16499660.1

-17-

injunction against claims against insiders pending in Delaware state court), such a motive is

contrary to the "interest of justice" and cannot serve as a basis for transferring venue.

*See In re Portjeff Dev. Corp.*, 118 B.R. 184, 197 (Bankr. E.D.N.Y. 1990) (applying Bankruptcy

Rule 1014(b); stating that "[i]t is not in the 'interest of justice' to tolerate or encourage forum

shopping," such as where a debtor commences a duplicate bankruptcy proceeding in a preferred

forum); *Greater Yellowstone Coal. v. Bosworth*, 180 F. Supp. 2d 124, 129 (D.D.C. 2001) (stating

that "public interest considerations that weigh against a transfer [of venue] include the possibility

that the defendants are forum shopping").[22]

---

[22]    Given that CEOC's Las Vegas headquarters is geographically distant from both Delaware
and Illinois, and that the Caesars Entities' assets are widely distributed throughout the United
States and abroad, if the Second CEOC Case is commenced in Illinois – or any other Non-
Delaware Court  – the CORCO and *Jumara* factors relating to the location of assets, the
proximity of the debtor and the location of the debtor's books and records would be neutral.
*See Enron*, 274 B.R. at 347-48 (holding that "[t]he location of the assets is not as important
where the ultimate goal is rehabilitation rather than liquidation.…  Furthermore, while a
debtor's location and the location of its assets are often important considerations in single
asset real estate cases, these factors take on less importance in a case where a debtor has
assets in various locations;" further stating that the location of a debtor's books and records
"is not a major concern" because "with modern technology that information, which is
ordinarily computerized, can be readily transported via electronic mail").  In addition, the
factors concerning "the local interest in deciding local controversies at home" and "the
familiarity of the trial judge with the applicable state law in diversity cases" have no
application in this case because the Caesars Bankruptcy Cases – which will involve billions
in assets and creditors strewn throughout the United States and in several foreign countries –
hardly constitute a "local controversy," and undoubtedly will involve disputes that
collectively implicate the laws of several states.  The remaining CORCO and *Jumara* factors
– *i.e.*, (a) "the necessity for ancillary administration in the event of liquidation," (b) "whether
the claim arose elsewhere," (c) "the enforceability of the judgment," (d) "the relative
administrative difficulty in the two fora resulting from court congestion," (e) "the public
policies of the fora," (f) the "plaintiff's forum preference as manifested in the original choice"
and (g) "the defendant's preference" – either are neutral or indeterminable, or do not apply
under present facts.  With respect to the parties' respective choice of fora in particular, this
factor is not determinative in cases involving competing voluntary and involuntary petitions.
*See, e.g.*, *Innovative Communication*, 358 B.R. at 128 (noting that "[t]he petitioning creditors
prefer Delaware.  The voluntary Debtors prefer [the Virgin Islands]," but finding neither
preference to be persuasive; ultimately determining that other factors, including convenience
to witnesses, "work together to establish the … proper venue").  If anything, CEOC's view is

Application of the relevant CORCO and *Jumara* factors thus demonstrates that allowing the Caesars Bankruptcy Cases to proceed in this Court promotes the "interest of justice" and the "convenience of the parties."  Accordingly, the Court should enter an order determining that the Caesars Bankruptcy Cases shall proceed in the District of Delaware.

***Remainder of page intentionally left blank***

---

(continued…)

not entitled to any deference, given that the purpose of its restructuring and its apparent desire to seek venue in Illinois is to obtain releases and injunctions and other benefits for non-debtor insiders.  Moreover, even if the Caesars Entities' choice of forum were given deference in this case, such factor would not be determinative given that the "economic administration of the estate" factor is afforded greater weight and, as addressed above, supports a determination that venue is appropriate in Delaware.  *See*, *e.g.*, *In re Three Rivers Cos.*, No. A09-61430, 2009 WL 6499339, at *2 (Bankr. N.D. Ga. Mar. 12, 2009) ("While deference to a debtor's decision [regarding venue] is appropriate under many circumstances, the Court is mindful that a purpose of bankruptcy administration is to achieve as equitable and economic resolution as possible for all parties in interest.  To that end, the Court must consider whether another venue is more suitable given the competing interests of all parties in the case.").

01:16499660.1

WHEREFORE, the Petitioning Creditors respectfully request that the Court enter an

order, substantially in the form attached hereto as Exhibit A, granting the relief requested herein

and such other and further relief to the Petitioning Creditors as the Court may deem proper.

Dated:      January 14, 2015                    Respectfully submitted,
            Wilmington, Delaware


                                                /s/ Robert F. Poppiti, Jr.
                                                Robert S. Brady  (No. 2847)
                                                Edmon L. Morton  (No. 3856)
                                                Robert F. Poppiti, Jr. (No. 5052)
                                                YOUNG CONAWAY STARGATT &
                                                TAYLOR, LLP
                                                Rodney Square
                                                1000 North King Street
                                                Wilmington, Delaware  19801
                                                Telephone:    (302) 571-6600
                                                Facsimile:    (302) 571-1253


                                                -and-


                                                Bruce Bennett
                                                James O. Johnston
                                                Sidney P. Levinson
                                                Joshua M. Mester
                                                Monika S. Wiener
                                                JONES DAY
                                                555 South Flower Street
                                                Fiftieth Floor
                                                Los Angeles, California  90071
                                                Telephone:    (213) 489-3939
                                                Facsimile:    (213) 243-2539

                                                Attorneys for Appaloosa Investment Limited
                                                Partnership I, OCM Opportunities Fund VI,
                                                L.P. and Special Value Expansion Fund, LLC

# **EXHIBIT A**

## **Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., | Case No. 15-10047 (KG) |
| Alleged Debtor. | **Ref. Docket No. _____** |

**ORDER, PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE
AND BANKRUPTCY RULE 1014(b), ESTABLISHING VENUE FOR THE
CHAPTER 11 CASES OF CAESARS ENTERTAINMENT OPERATING COMPANY,
INC. AND ITS DEBTOR AFFILIATES IN THE DISTRICT OF DELAWARE**

This matter coming before the Court on the Motion of Petitioning Creditors,

Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1014(b), for an Order

(I) Establishing Venue for the Chapter 11 Cases of Caesars Entertainment Operating Company,

Inc. and Its Debtor Affiliates in the District of Delaware and (II) Granting Certain Related Relief

(the "Motion"), filed by the Petitioning Creditors;[1] the Court having reviewed the Motion and

having considered the statements of counsel and the evidence adduced with respect to the Motion

at a hearing before the Court (the "Hearing"); the Court finding that:  (a) the Court has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (b) this is a core proceeding

pursuant to 28 U.S.C. § 157(b); (c) notice of the Motion and the Hearing was sufficient under the

circumstances; and (d) a determination that the District of Delaware is the proper venue for the

Caesars Bankruptcy Cases promotes the interest of justice and the convenience of the parties;

and the Court having determined that the legal and factual bases set forth in the Motion and at

the Hearing establish just cause for the relief granted herein;

---

[1]    Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      Venue of the Caesars Bankruptcy Cases shall be in the District of

Delaware.

3.      The clerk of court for the district in which the Second CEOC Case and

CEOC Affiliate Cases is commenced shall transfer all files and certified copies of the docket in

the Second CEOC Case and CEOC Affiliate Cases to this Court.

4.      All proceedings in the Caesars Bankruptcy Cases shall bear the caption

that appears on the first page of this Order.

5.      CEOC shall cause a copy of this Order to be distributed to all counsel of

record, all creditors and all parties in interest.

6.      This Court shall retain jurisdiction over any and all matters arising from or

related to the interpretation or implementation of this Order.

Dated:   January _____, 2015
              Wilmington, Delaware

_____
Kevin Gross
United States Bankruptcy Judge

**EXHIBIT B**

**CEOC Asset Distribution Map**

Case 15-00001-xxx Doc 26 Filed 01/14/15 Page 25 of 69

DRAFT - Privileged & Confidential





Harrah's Council Bluffs

Horseshoe Council Bluffs

Harrah's Metropolis

Harrah's Joliet

Horseshoe Hammond

Harrah's Reno

Harvey's Lake Tahoe

Harrah's Lake Tahoe

Reno / Lake Tahoe

Las Vegas

Council Bluffs

Chicago

Kansas City

Metropolis

Elizabeth

Philadelphia

Atlantic City

Harrah's Chester

Bally's Atlantic City

Caesars Atlantic City

Caesars Palace Las Vegas

Tunica

Shreveport / Bossier City

Harrah's N. Kansas City

Louisiana Downs

Horseshoe Bossier City

Horseshoe Tunica

Tunica Roadhouse Hotel & Casino

Harrah's Gulf Coast

Horseshoe Southern Indiana

## EXHIBIT C

**Defendants' MTD Brief**

EFiled:  Sep 23 2014 11:30PM EDT
Transaction ID 56077924
Case No. 10004-VCG

### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WILMINGTON SAVINGS FUND SOCIETY, FSB, solely in its capacity as successor Indenture Trustee for the 10% Second-Priority Senior Secured Notes due 2018, on behalf of itself and derivatively on behalf of CAESARS ENTERTAINMENT OPERATING COMPANY, INC., | ) ) ) ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 10004-VCG |
| | ) | |
| v. | ) | |
| | ) | |
| CAESARS ENTERTAINMENT CORPORATION, CAESARS GROWTH PARTNERS, LLC, CAESARS ACQUISITION COMPANY, CAESARS ENTERTAINMENT RESORT PROPERTIES, LLC, CAESARS ENTERTAINMENT OPERATING COMPANY, INC., CAESARS ENTERPRISE SERVICES, LLC, ERIC HESSION, GARY LOVEMAN, JEFFREY D. BENJAMIN, DAVID BONDERMAN, KELVIN L. DAVIS, MARC C. ROWAN, DAVID B. SAMBUR, AND ERIC PRESS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., | ) ) | |
| | ) | |
| Nominal Defendant. | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF
MOTION TO DISMISS OR STAY THE VERIFIED COMPLAINT**

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
Kenneth J. Nachbar (#2067)
William M. Lafferty (#2755)
John P. DiTomo (#4850)
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200

*Attorneys for Defendants Caesars
Entertainment Corporation, Caesars
Entertainment Resort Properties, LLC,
Caesars Entertainment Operating
Company, Inc., Caesars Enterprise
Services, LLC, Eric Hession, Gary
Loveman, Jeffrey D. Benjamin, Marc C.
Rowan, David B. Sambur and Eric
Press*

OF COUNSEL

Eric Seiler
Philippe Adler
Emily A. Stubbs
Jason C. Rubinstein
FRIEDMAN KAPLAN SEILER &
ADELMAN LLP
7 Times Square
New York, NY 10036
(212) 833-1100

> *Attorneys for Defendants Caesars*
> *Entertainment Corporation, Caesars*
> *Entertainment Resort Properties, LLC,*
> *Caesars Entertainment Operating*
> *Company, Inc., Caesars Enterprise*
> *Services, LLC, Eric Hession, Gary*
> *Loveman, Jeffrey D. Benjamin, Marc C.*
> *Rowan, David B. Sambur, and Eric Press*

Marc E. Kasowitz
David S. Rosner
Andrew K. Glenn
Joshua M. Greenblatt
KASOWITZ BENSON TORRES &
FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

> *Attorneys for David Bonderman and*
> *Kelvin L. Davis*

September 23, 2014

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

**PRELIMINARY STATEMENT** ...........................................................1

**STATEMENT OF FACTS**...................................................................8

    **A.**    **Defendants**....................................................................8

    **B.**    **The Note-Holders, the Indenture, and the Intercreditor Agreement** ...............................................................12

    **C.**    **Procedural History** .......................................................14

**ARGUMENT** .....................................................................................15

    **I.**    **WSFS AGREED TO LITIGATE ITS CLAIMS EXCLUSIVELY IN NEW YORK**........................................15

        **A.**    **WSFS' Claims Are Subject to an Exclusive and Broad Forum Selection Clause** .............................15

        **B.**    **The Forum Selection Clause Applies to All of WSFS' Claims** ..........................................................17

        **C.**    **The Forum Selection Clause Requires Dismissal of Claims Against All Defendants** ............................19

    **II.**    **THIS COURT SHOULD DISMISS OR, ALTERNATIVELY, STAY THIS ACTION IN FAVOR OF THE NEW YORK ACTION** ................................................................25

**CONCLUSION**...................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Irish Banks, p.l.c. v. Bank of Am., N.A.*,
  875 F. Supp. 2d 352 (S.D.N.Y. 2012) ..............................................................18

*Ameritrust Co. Nat'l Ass'n v. Chanslor*,
  803 F. Supp. 893 (S.D.N.Y. 1992) ..................................................................20

*ASDC Holdings, Inc. v. Richard Malouf 2008 All Smiles Grantor Retained*
  *Annuity Trust*,
  2011 WL 4552508 (Del. Ch. Sept. 14, 2011) ....................................................19

*Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*,
  992 A.2d 1239 (Del. Ch. 2010) ...............................................................*passim*

*Azurix Corp. v. Synagro Techs., Inc.*,
  2000 WL 193117 (Del. Ch. Feb. 3, 2000) ..................................................25, 26

*Baker v. Impact Holding, Inc.*,
  2010 WL 1931032 (Del. Ch. May 13, 2010)........................................................15

*Branson v. Exide Elecs. Corp.*,
  625 A.2d 267 (Del. 1993) .................................................................................8

*Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine Partners 2006, L.P.*,
  93 A.3d 1203 (Del. 2014) ....................................................................6, 31, 32

*Chaitman v. Wolf Haldenstein Adler Freeman & Herz LLP*,
  2004 WL 2471372 (S.D.N.Y. Nov. 3, 2004)........................................................22

*Citizens Bank of Clearwater v. Hunt*,
  927 F.2d 707 (2d Cir. 1991) ...........................................................................26

*Diesel Props S.r.L. v. Greystone Bus. Credit II LLC*,
  2008 WL 4833001 (S.D.N.Y. Nov. 5, 2008)........................................................18

*Direct Mail Prod. Servs. Ltd. v. MBNA Corp.*,
  2000 WL 1277597 (S.D.N.Y. Sept. 7, 2000) .....................................................18

**Page(s)**

*Freeford Ltd. v. Pendleton*,
    53 A.D.3d 32 (1st Dep't 2008) ..........................................................................20

*Gramercy Advisors, LLC v. Coe*,
    2014 WL 4197370 (S.D.N.Y. Aug. 25, 2014)..............................................20, 23

*Harbinger Capital Partners Master Fund I, Ltd. v. Granite Broad. Corp.*,
    906 A.2d 218 (Del. Ch. 2006) ..........................................................................26

*In re Bear Stearns Cos., Inc. S'holder Litig.*,
    2008 WL 959992 (Del. Ch. Apr. 9, 2008)....................................25, 28, 31, 32

*In re Chambers Dev. Co., Inc. S'holders Litig.*,
    1993 WL 179335 (Del. Ch. May 20, 1993)..........................................28, 31, 33

*Int'l Private Satellite Partners, L.P. v. Lucky Cat Ltd.*,
    975 F. Supp. 483 (W.D.N.Y. 1997)....................................................................20

*Kelly v. Fuqi Int'l, Inc.*,
    2013 WL 135666 (Del. Ch. Jan. 2, 2013)............................................................11

*Kidde Indus., Inc. v. Weaver Corp.*,
    1994 WL 89013 (Del. Ch. Feb. 15, 1994) .........................................................26

*Lambert v. Kysar*,
    983 F.2d 1110 (1st Cir. 1993)............................................................................22

*LaRoss Partners, LLC v. Contact 911 Inc.*,
    874 F. Supp. 2d 147 (E.D.N.Y. 2012) ...............................................................23

*Lipcon v. Underwriters at Lloyd's, London*,
    148 F.3d 1285 (11th Cir. 1998) .........................................................................22

*LPR, SRL v. Challenger Overseas, LLC*,
    2000 WL 973748 (S.D.N.Y. July 13, 2000).......................................................17

*Magi XXI, Inc. v. Stato della Citta del Vaticano*,
    714 F.3d 714 (2d Cir. 2013) ..............................................................................23

*Mercury W. A.G., Inc. v. R.J. Reynolds Tobacco Co.*,
    2004 WL 421793 (S.D.N.Y. Mar. 5, 2004).......................................................18

**Page(s)**

*Nemec v. Shrader*,
   991 A.2d 1120 (Del. 2010) ...............................................................27

*Recurrent Capital Bridge Fund I, LLC v. ISR Sys. & Sensors Corp.*,
   875 F. Supp. 2d 297 (S.D.N.Y. 2012) .........................................16, 19

*Royal Indem. Co. v. Gen. Motors Corp.*,
   2005 WL 1952933 (Del. Super. Ct. July 26, 2005).....................29, 31

*RWI Acquisition LLC v. Todd*,
   2012 WL 1955279 (Del. Ch. May 30, 2012).....................................24

*Schnell v. Porta Sys. Corp.*,
   1994 WL 148276 (Del. Ch. Apr. 12, 1994)........................................28

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
   691 F.2d 1039 (2d Cir. 1982) ......................................................6, 32

*Simon v. Navellier Series Fund*,
   2000 WL 1597890 (Del. Ch. Oct. 19, 2000) .......................................9

*Symphony Fabrics Corp. v. Knapel*,
   2008 WL 2332333 (S.D.N.Y. June 2, 2008) .....................................22

*Tate & Lyle Ingredients Am., Inc. v. Whitefox Techs. USA, Inc.*,
   98 A.D.3d 401 (1st Dep't 2012) ........................................................20

*Tex. Instruments Inc. v. Cyrix Corp.*,
   1994 WL 96983 (Del. Ch. Mar. 22, 1994) ..................................29, 30

*This Is Me, Inc. v. Taylor*,
   157 F.3d 139 (2d Cir. 1998) ..............................................................20

*Troy Corp. v. Schoon*,
   2007 WL 949441 (Del. Ch. Mar. 26, 2007) .......................................15

*Weingrad v. Telepathy, Inc.*,
   2005 WL 2990645 (S.D.N.Y. Nov. 7, 2005)...............................*passim*

*Weygandt v. Weco LLC*,
   2009 WL 1351808 (Del. Ch. May 14, 2009).....................................20

**Page(s)**

*Williams Gas Supply Co. v. Apache Corp.*,
    1991 WL 18091 (Del. Super. Ct. Feb. 12, 1991) ...............................................32

**Rules and Statutes**

Ct. Ch. R. 12(b)(2) ........................................................................................8

Ct. Ch. R. 12(b)(3) .............................................................................1, 8, 9, 15

Ct. Ch. R. 12(b)(6) ........................................................................................8

Ct. Ch. R. 12(c) .......................................................................................7, 27

Ct. Ch. R. 23.1............................................................................................7

Defendants Caesars Entertainment Corporation ("CEC"), Caesars Entertainment Resort Properties, LLC ("CERP"), Caesars Entertainment Operating Company, Inc. ("CEOC"), Caesars Enterprise Services, LLC ("Services"), Eric Hession, Gary Loveman, Jeffrey D. Benjamin, David Bonderman, Kelvin L. Davis, Marc C. Rowan, David B. Sambur, and Eric Press (the "Individuals") respectfully submit this brief in support of their motion pursuant to Court of Chancery Rule 12(b)(3) to dismiss, or, alternatively, stay the Verified Complaint (the "Complaint" or "Compl.") of plaintiff Wilmington Savings Fund Society, FSB ("WSFS" or the "Trustee").

## PRELIMINARY STATEMENT

This dispute should have been brought, and should be litigated and decided, exclusively in New York courts. WSFS predicates its claims on a note indenture (the "Indenture") that is governed by New York law, and that incorporates a forum selection clause mandating that disputes relating to the Indenture be brought exclusively in New York courts.[1] And, even apart from the contractual requirement of a New York forum, New York is by far the more logical venue for this litigation. Key witnesses reside in or near New York, many of the

---

[1] As used herein, "Indenture" means the Indenture, dated as of April 15, 2009, by and among Harrah's Operating Company, Inc. (n/k/a CEOC), Harrah's Entertainment, Inc. (n/k/a CEC) and U.S. Bank National Association, as trustee and collateral agent (the predecessor to WSFS), and "Note-Holders" means the holders of the 10.00% second-priority senior secured notes due 2018 (the "Notes") issued pursuant to the Indenture.

relevant events occurred there, and many of the Note-Holders, parties, and financial and legal advisors to the issuer are located there.  By contrast, none of the relevant events occurred in Delaware, and no parties in interest or witnesses are located here.  Moreover, CEC and CEOC are currently pursuing a lawsuit in New York Supreme Court, New York County, arising from the same transactions and raising substantially the same issues as those here (the "New York Action").  In addition, the New York Action names as a defendant a first lien note-holder that is not a party to this action, Elliott Management Corporation ("Elliott").  Permitting this action to proceed in this Court therefore would impose unnecessary costs and inefficiencies and invite inconsistent rulings about the parties' rights and obligations under the Indenture, which must be construed in accordance with New York law.  This Court should, therefore, dismiss or stay this case in favor of the New York Action.

In April 2009, CEOC, then a wholly-owned subsidiary of CEC, issued a series of Notes pursuant to the Indenture.  The Indenture governs every aspect of CEC and CEOC's relationship with the Note-Holders, including when payment is due on the Notes, the circumstances in which CEOC can sell assets securing the Notes, and the conditions for terminating a guarantee by CEC of CEOC's payment obligations to the Note-Holders.  The Indenture provides that New York law shall govern its construction, and it expressly incorporates a forum selection clause that

prescribes New York as the exclusive venue for disputes relating to the Indenture or concerning the assets securing the Notes.

Since the issuance of the Notes, CEOC and CEC have struggled to overcome the disruption to CEOC's business arising from the global financial crisis and an accompanying, unprecedented downturn in the gaming industry. They have done so by embarking on a program of sustained cost-cutting and streamlining at CEOC, extending maturities on CEOC's outstanding debt, removing or amending covenants in CEOC's credit agreements, and consummating a series of restructuring and refinancing transactions to de-lever CEOC. By enabling CEOC to continue making timely interest payments on their Notes, this strategy has redounded directly to the benefit of the Note-Holders that WSFS represents.

Nevertheless, even while pocketing enormous benefits from these restructuring and refinancing transactions, these same Note-Holders have tried to undermine and impede CEC and CEOC's de-levering strategy by falsely, maliciously, and publicly alleging that CEC and CEOC have defaulted under the Indenture governing the Notes, breached their fiduciary duties, and engaged in fraudulent transfers. The Note-Holders' campaign began as early as March of this year, when they sent letters falsely asserting that CEOC was in default of the Indenture, and has taken the form of additional demand letters, media stories,

disruptive appearances before gaming regulators, a baseless default notice, and now this lawsuit. And the Note-Holders have waged this campaign purely in service of their own narrow self interests – not only to improve their leverage in negotiations with CEC and CEOC, but also, in many cases, because they are substantial holders of credit default swaps ("CDS") on CEOC and the Notes, and thus stand to profit handsomely if their threats and baseless claims force CEOC into default or increase the likelihood of a CEOC default.

To put the Note-Holders' meritless claims to rest, CEC and CEOC brought the New York Action against WSFS, the Note-Holders, and Elliott in New York Supreme Court – the agreed to, exclusive forum for such disputes under the Indenture and the State whose law governs WSFS' core claims. The New York Action – filed contemporaneously with this action – addresses precisely the same underlying concerns as the Complaint, and WSFS is already a party to it.

But rather than seek to litigate in the agreed to and appropriate court, WSFS instead seeks to pursue its claims in this Court, although there is no legitimate basis either under the Indenture or as a matter of common sense for WSFS' claims to be litigated here. While WSFS asserts an assortment of contract, fraudulent transfer, and tort claims, not only against CEC and CEOC, but also certain of their corporate affiliates and directors, this is at bottom a dispute about the parties' rights and obligations under the Indenture. This dispute first arose

when the Note-Holders WSFS now represents sent demand letters baselessly alleging that CEOC was in default under the Indenture. And each and every one of WSFS' claims relates to the Indenture or rights or obligations allegedly arising from the Indenture and concerns the assets allegedly securing the Notes. Indeed, the first three claims of the Complaint are either for alleged breach of the Indenture or a declaration of the parties' rights thereunder.

As noted, all of these claims are subject to an exclusive and broad forum selection clause that bars WSFS from asserting such claims "in any court other than New York Courts." That clause, set forth in an intercreditor agreement among the Note-Holders, more senior creditors, and WSFS, is expressly incorporated into the Indenture. The Indenture repeatedly makes clear that its terms are "subject to" those of the intercreditor agreement and states, unequivocally, that WSFS' authority to prosecute this action is "subject to" the terms of the intercreditor agreement.

WSFS disregarded this incorporated exclusive forum selection clause by commencing this action in Delaware, but this Court should enforce it. If WSFS wishes to prosecute its claims, it is free to do so in New York, whose courts can provide WSFS full relief. Accordingly, this Court should dismiss or stay WSFS' claims against all defendants (signatories and non-signatories alike) based upon the

clear terms of the exclusive and broad forum selection clause governing those claims and in the interest of judicial economy, among other reasons.

Separate and apart from the exclusive forum selection clause, judicial comity and concerns for the orderly and efficient administration of justice also compel the dismissal or stay of this action in favor of the contemporaneously filed New York Action. The center of gravity of the dispute between WSFS and defendants is clearly in New York. Among other things, New York law applies to WSFS' core claims for breach of the Indenture, many of the key witnesses reside in or around New York, the New York Action addresses the same issues as WSFS' Complaint and it names as a defendant Elliott (a major holder of CEOC first lien notes that is not a party to this action). New York thus presents the more convenient and logical forum for resolution of the parties' dispute.

Further, staying or dismissing this action would promote the important "public policy" of "endeavor[ing] to give commercial contracts that use standard language" – such as the Indenture – "a consistent meaning." *Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine Partners 2006, L.P.*, 93 A.3d 1203, 1206 (Del. 2014). And conversely, allowing this action to proceed in tandem with the New York Action would increase the likelihood of inconsistent constructions of the Indenture, and thereby "'decrease the value of all debenture issues and greatly impair the efficient working of capital markets.'" *Id.* at 1206 n.9 (quoting *Sharon*

*Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982)).

To banish this risk and ensure uniformity of interpretation, this Court should

dismiss or stay this action and allow the New York courts to construe the Indenture

under New York law.

   If this Court concludes that venue is appropriate here, and declines to

stay or dismiss this action, all of WSFS' claims nevertheless are legally defective

on a number of grounds.  For example, WSFS asserts (i) fiduciary duty claims

against defendants with no fiduciary obligations to the Note-Holders and

(ii) fraudulent conveyance claims against a defendant that never received any of

the alleged collateral for actions permitted under the Indenture – all in a bid to

recover damages for alleged injuries that have not yet been, and might never be,

incurred.  In addition, WSFS asserts the majority of its claims derivatively on

behalf of CEOC, after making only a perfunctory effort to justify its standing to do

so.  Accordingly, in the event this Court rules that WSFS filed this action in the

proper forum, defendants expressly reserve their right to move against the

Complaint on the basis of these and other defenses pursuant to Chancery Rules

12(c) and 23.1 (and stand ready to do so).

   In all events, Delaware Supreme Court authority directs that the Court

must decide the jurisdictional issues raised in this motion before reaching the

substantive issues.[2]   Accordingly, and as set forth more fully below, this Court should enforce the plain terms of the binding, exclusive and broad forum selection clause and dismiss the Complaint pursuant to Chancery Rule 12(b)(3) or, alternatively, dismiss or stay this action while the New York Action proceeds.

## STATEMENT OF FACTS[3]

### A.   Defendants

CEC is the world's most diversified casino-entertainment provider and, through its affiliates, it owns and operates a broad network of casinos throughout the country, including in Las Vegas, Atlantic City, and New Orleans. Compl. ¶ 3.   Until May 6, 2014, CEOC was a wholly owned subsidiary of CEC, and CEC continues to hold a majority equity stake in CEOC.  *Id.* ¶¶ 110, 120.   In 2013, defendants Caesars Growth Partners, LLC ("Growth") and Caesars Acquisition Company ("CAC") were established to participate in a joint venture with CEC.  *Id.* ¶¶ 20-21.   Although all of the corporate defendants are organized under the laws of Delaware, each maintains its principal place of business in

---

[2]   *Branson v. Exide Elecs. Corp.*, 625 A.2d 267, 269 (Del. 1993) (holding that lower court erred by resolving the defendants' Rule 12(b)(6) motion without first ruling on the defendants' Rule 12(b)(2) motion and observing that "a court's finding of personal jurisdiction is not only a condition precedent to a proper exercise of its own judicial authority, but it is determinative of the course of other litigation between the same parties").

[3]   Except where otherwise noted, the facts recited concerning WSFS' claims are derived from the Complaint, and as is required, they are assumed to be true for purposes of this motion only.  Defendants do not concede their truthfulness.

Nevada. *Id.* ¶¶ 18-23. In addition, no individual or corporate defendant maintains a home or office in Delaware. But several of defendants maintain offices in New York (Messrs. Benjamin, Press, Rowan, and Sambur), and that is where their files are found. Also, WSFS has subpoenaed 11 nonparties for documents, none of whom worked on the transactions at issue from Delaware, and many of whom did so from their offices in New York. Hession Aff. ¶¶ 3, 5-6, 8-10.[4]

In January 2008, affiliates of Apollo Global Management, LLC ("Apollo"), which is based in New York, and TPG Capital, LP, which maintains an office in New York, along with co-investors, acquired CEC in a going-private transaction, and they continue to own a majority of CEC's outstanding shares. Compl. ¶ 2; Hession Aff. ¶ 7. The financing documents relating to this going-private transaction and post-acquisition debt issuances (including the tranche of Notes at issue herein) were negotiated and drafted primarily in New York, with the assistance of New York counsel. Hession Aff. ¶ 7.

---

[4] On a motion to dismiss pursuant to Chancery Rule 12(b)(3), this Court can consider evidence outside the pleadings, including the intercreditor agreement containing the forum selection clause at issue, described *infra* at Part I. *Simon v. Navellier Series Fund*, 2000 WL 1597890, at *4-5 (Del. Ch. Oct. 19, 2000).

Citations to "Ex. __" refer to exhibits attached to the accompanying Affidavit of John P. DiTomo in Support of Defendants' Motion to Dismiss or Stay. Citations to "Hession Aff." refer to the accompanying Affidavit of Eric Hession in Support of Defendants' Motion to Dismiss or Stay.

Beginning shortly after their acquisition, CEC and CEOC were faced with revenue and operational challenges, driven by the global economic crisis, that put significant strain on their capital structure. Compl. ¶ 5. Responding to those challenges, CEC and CEOC have pursued a strategy of, among other things, strategic asset sales, extending debt maturities, and removing or amending covenants in CEOC's credit agreements. *Id.* ¶¶ 5-10. Among those transactions were certain sales of assets to Growth, resulting in CEOC's receipt of over $2.5 billion in cash and the assumption of certain liabilities by Growth. Compl. ¶¶ 81, 89. Many of the negotiations leading up to these transactions took place and were documented in New York, with the assistance of legal and financial advisors working from New York. Hession Aff. ¶ 13.

In this action, WSFS, on behalf of holders of a tranche of CEOC second lien Notes (most of whom, upon information and belief, are located in or around New York), alleges that these transactions constituted "self-dealing" and were implemented to move assets "beyond the reach of CEOC's creditors." Compl. ¶ 1; Hession Aff. ¶ 12. As detailed in CEC and CEOC's Amended and Supplemental Complaint in the New York Action, Ex. D ("N.Y. Compl."), this action represents only the latest push in the Note-Holders' campaign

to thwart CEC and CEOC's restructuring and refinancing efforts.[5]  Without regard to the interests of CEOC, its employees, business partners, the communities in which CEOC operates, and other holders of CEOC notes, the Note-Holders represented by WSFS have waged this campaign to increase their negotiating leverage against CEC and CEOC and because, in certain cases, they are substantial holders of CDS covering CEOC, which will pay off if (i) the Note-Holders (or WSFS) can convince the market that CEOC will have a payment default or (ii) CEOC actually has a payment default.

Thus motivated, the Note-Holders have publicly, falsely, and maliciously asserted – through demand letters, statements to the media, disruptive appearances before gaming regulators, the service of a notice of default, and the Complaint – that CEOC and CEC have breached their fiduciary duties, engaged in fraudulent transfers, or defaulted under the Indenture.  *See, e.g.*, N.Y. Compl. ¶¶ 1-17.  Although, as described below, the parties' agreement designates New York as the exclusive forum for their claims, and notwithstanding the pendency in New York of CEC and CEOC's contemporaneously filed lawsuit addressing the same issues as this action, the Note-Holders, through WSFS, improperly seek to pursue their claims in this Court.

---

[5]  On a motion to dismiss, this Court may take judicial notice of pleadings in related litigation.  *See Kelly v. Fuqi Int'l, Inc.*, 2013 WL 135666, at *1 (Del. Ch. Jan. 2, 2013) (Glasscock, V.C.).

B.      **The Note-Holders, the Indenture, and the Intercreditor Agreement**

In April 2009, CEOC issued $3.71 billion in aggregate principal amount of Notes. Compl. ¶ 45. The Indenture, dated as of April 15, 2009, governs the relationship among CEOC, CEC, WSFS, and the Note-Holders. *Id.*; Ex. A. Among other things, the Indenture describes:

- the manner in which CEOC may discharge or redeem the Notes, Ex. A, Arts. III & VIII;

- the Note-Holders' right to receive principal and interest payments, *id.* §§ 4.01, 6.07;

- the circumstances in which CEOC may sell assets securing the Notes, *id.* § 4.06;

- the circumstances giving rise to an "Event of Default," *id.* § 6.01;

- the Trustee's authority to pursue legal actions on behalf of Note-Holders, *id.* § 11.03; and

- the law governing the construction of the Indenture (New York law), *id.* § 13.09.

On April 15, 2009 (the date of the Indenture), the parties to the Indenture also entered into a Joinder and Supplement to Intercreditor Agreement, under which WSFS (as successor Trustee) is bound by the Intercreditor Agreement dated as of December 24, 2008 between Bank of America, N.A. and U.S. Bank National Association (the "Intercreditor Agreement"). Ex. E. The Intercreditor Agreement defines the relative rights of the Note-Holders and holders of more

senior CEOC notes with respect to the assets securing the Notes (referred to as "Common Collateral"). Ex. B at 1; Ex. A § 10.01.

The Indenture, which, along with the Intercreditor Agreement, is governed by New York law, makes clear that it must be read and enforced together with and that its terms "are subject to the terms of the Intercreditor Agreement." Ex. A § 13.16. WSFS' very authority to bring this action is "subject to the Intercreditor Agreement":

> ***Subject to the Intercreditor Agreement***, the Trustee is authorized and empowered to institute and maintain . . . such suits and proceedings as it may deem expedient to protect or enforce the Second Priority Liens or the Security Documents to which the Collateral Agent or Trustee is a party or to prevent any impairment of Collateral by any acts that may be unlawful or in violation of . . . ***this Indenture***, and such suits and proceedings as the Trustee . . . may deem expedient to preserve . . . the interests of the holders of Notes in the Collateral . . . .

*Id.* § 11.03(c) (emphasis added.).[6] The Intercreditor Agreement also confirms that its terms are incorporated by the Indenture: "in the event of any conflict between the provisions of this Agreement, and the provisions of . . . any Second Priority

---

[6] Other provisions of the Indenture confirm that it incorporates the Intercreditor Agreement. *See, e.g.*, Ex. A § 10.01 ("The Intercreditor Agreement defines the relative rights . . . of holders of Second Priority Liens and holders of liens securing First Priority Lien Obligations."); *id.* § 11.03(a) ("Each holder of Notes . . . agrees to the terms of . . . the Intercreditor Agreement . . . ."). The Notes also state, in all capital letters, that "THE TERMS OF THIS SECURITY ARE SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT . . . ." *Id.*, App. A, Exhibit A at A-3 (emphasis in original).

13

Document [including the Indenture], the provisions of this Agreement shall govern." Ex. B § 8.1.

### C.   **Procedural History**

WSFS commenced this action on August 4, 2014 at 9:55 PM.  In its nine claims, WSFS attacks a series of restructuring, refinancing, and other transactions undertaken by CEOC dating back as far as 2010, asserting that such transactions caused defaults under the Indenture and also entailed breaches of fiduciary duty, fraudulent transfers, and corporate waste.  Although WSFS does not − and would have no basis to − allege that any of these transactions caused CEOC to default on any payment to the Note-Holders, the nub of its Complaint is that those transactions were for "inadequate consideration" and allegedly designed by CEC and CAC's controlling shareholders to "strip CEOC of valuable assets[,]" none of which is located in Delaware. *See, e.g.*, Compl. ¶¶ 6, 62, 70, 81, 90.

On August 5, 2014 at 9:16 AM, before a single summons was issued or any defendant was served in this action, CEC and CEOC properly filed the New York Action, captioned *CEOC v. Appaloosa Investment Limited Partnership I*, No. 652392/2014, against certain of the Note-Holders and Elliott (which holds CEOC first lien notes), in the Supreme Court of the State of New York, New York County.  Ex. C.  CEC and CEOC amended and supplemented their complaint in the New York Action on September 15, 2014 to, among other things, add WSFS as

a defendant.  *See* N.Y. Compl.  As is obvious from the face of the pleadings, CEC and CEOC's claims in the contemporaneously filed New York Action arise from the same nucleus of facts as this action.  Accordingly, in the New York Action, CEC and CEOC seek (along with monetary damages) a declaration that no default has occurred under the Indenture, and that CEOC and CEC, or their respective directors, have not breached their fiduciary duties, engaged in any fraudulent transfer or otherwise engaged in any violation of law.  *Id.* ¶¶ 159-60.

## ARGUMENT

### I.   WSFS AGREED TO LITIGATE ITS CLAIMS EXCLUSIVELY IN NEW YORK

#### A.   WSFS' Claims Are Subject to an Exclusive and Broad Forum Selection Clause

"The courts of Delaware defer to forum selection clauses and routinely 'give effect to the terms of private agreements to resolve disputes in a designated judicial forum out of respect for the parties' contractual designation.'" *Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992 A.2d 1239, 1245 (Del. Ch. 2010) (quoting *Troy Corp. v. Schoon*, 2007 WL 949441, at *2 (Del. Ch. Mar. 26, 2007)). Where, as here, a forum selection clause prescribes the court (other than this Court) in which a party can properly and exclusively bring an action, Chancery Rule 12(b)(3) requires dismissal.  *See id.* at 1245; *Baker v. Impact Holding, Inc.*, 2010 WL 1931032, at *2 (Del. Ch. May 13, 2010) ("Courts traditionally will dismiss a matter under Rule 12(b)(3) when the contract underlying the dispute contains an

15

explicit forum selection clause.").   Moreover, where, as here, a forum selection clause applies, dismissal is warranted for both claims alleging breach of the contract incorporating the clause as well as any tort or other claims "arising out of, or depending upon, the contractual relationship in question."  *Ashall Homes Ltd.*, 992 A.2d at 1245, 1252-53 (dismissing claims for, *inter alia*, fraudulent inducement, breach of contract, and tortious interference).[7]

Here, the parties' agreement, as well as WSFS' authority to bring suit, is "subject to the terms of the Intercreditor Agreement," Ex. A §§ 11.03(c), 13.16, which includes an exclusive and broad forum selection clause requiring WSFS to litigate its claims in New York, not Delaware.  That clause, which bears the header "Consent to Jurisdiction; Waivers," states:

> Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding **relating to** this Agreement in the courts of any jurisdiction, **except that each Second Priority Secured Party and each Second Priority Agent agrees that (a) it will not bring any such action or proceeding in any court other than New York Courts**, and (b) in any such action . . . brought against . . . **any Grantor** [*i.e.*,

---

[7]  *See also Weingrad v. Telepathy, Inc.*, 2005 WL 2990645, at *4 (S.D.N.Y. Nov. 7, 2005) (ruling that party could not defeat a forum selection clause by "artful pleading of claims not based on the contract . . . if those claims grow out of the contractual relationship," and dismissing claims against parties and closely related non-parties to the contract for, *inter alia*, trademark infringement and unfair competition) (internal quotation marks omitted); *Recurrent Capital Bridge Fund I, LLC v. ISR Sys. & Sensors Corp.*, 875 F. Supp. 2d 297, 310 (S.D.N.Y. 2012) (ruling that forum selection clause applied to claims for breach of fiduciary duty that arose out of agreement containing the clause).

> CEOC] . . . . in any other court, it will not assert any
> cross-claim, counterclaim . . . **or seek any other**
> **affirmative relief**, except to the extent that the failure to
> assert the same will preclude such Second Priority
> Secured Party from asserting or seeking the same in the
> New York Courts.

Ex. B § 8.7 (emphasis added).  WSFS is a Second Priority Agent.  By filing here,

WSFS intentionally and in bad faith breached and disregarded the plain terms of

this clause.

### B.    The Forum Selection Clause Applies to All of WSFS' Claims

Under New York law, which governs both the Indenture and the

Intercreditor Agreement,[8] the Indenture's incorporated forum selection clause

gives New York courts exclusive jurisdiction over any claims brought by any

Second Priority Secured Party or the Second Priority Agent "relating to" the

Intercreditor Agreement.[9]  As defined in the Intercreditor Agreement, WSFS is a

Second Priority Agent acting on behalf of a Second Priority Secured Party (*i.e.*, the

Note-Holders).    Ex. B § 1.1.    And in the Joinder and Supplement to the

Intercreditor Agreement – executed by WSFS' predecessor, CEC and CEOC on

the same day as the Indenture – WSFS' predecessor confirmed that it is "bound by

the terms of the Intercreditor Agreement as a Second Priority Agent."  Ex. E.

---

[8]  *See* Ex. A § 13.09; Ex. B § 8.10.

[9]  *See LPR, SRL v. Challenger Overseas, LLC*, 2000 WL 973748, at *2 (S.D.N.Y.
July 13, 2000) (ruling that forum selection clause requiring that actions be
"brought" in Chinese court "creates exclusive jurisdiction" in China).

It is also clear that WSFS' claims "relat[e] to" the Intercreditor Agreement.  When used in a forum selection clause, New York courts construe "relating to" expansively to encompass claims that merely share some connection with the agreement at issue,[10] including tort and other claims.[11]  Here, all of WSFS' claims are tightly bound up with the Intercreditor Agreement and the Indenture. WSFS draws its authority from the Indenture, the terms of which are "subject to [the] Intercreditor Agreement."  Ex. A § 13.16.  And in bringing this action, WSFS is acting pursuant to a grant of authority that is itself "subject to" the Intercreditor Agreement.  *Id.* § 11.03(c).

Moreover, the thrust of all of WSFS' claims is that defendants have breached either the Indenture, or fiduciary or other duties created by the

---

[10]   *See, e.g.*, *Allied Irish Banks, p.l.c. v. Bank of Am., N.A.*, 875 F. Supp. 2d 352, 356 (S.D.N.Y. 2012) ("[C]ourts have recognized that the term 'relate to' has a 'broad' meaning, including merely having 'a connection with' the designated item.") (collecting cases); *Diesel Props S.r.L. v. Greystone Bus. Credit II LLC*, 2008 WL 4833001, at *8 (S.D.N.Y. Nov. 5, 2008) ("The meaning of 'related to' is 'extremely broad.'").

[11]   *See, e.g.*, *Direct Mail Prod. Servs. Ltd. v. MBNA Corp.*, 2000 WL 1277597, at *6 (S.D.N.Y. Sept. 7, 2000) (ruling that forum selection clause encompassed tort claims that "ultimately depend[ed] on the existence of a contractual relationship," where the resolution of such claims "relate[d] to interpretation of the contract," or the tort claims "involve[d] the same operative facts as a parallel claim for breach of contract," including claims for misappropriation of trade secrets and intentional interference with business relationships); *Mercury W. A.G., Inc. v. R.J. Reynolds Tobacco Co.*, 2004 WL 421793, at *7 (S.D.N.Y. Mar. 5, 2004) (ruling that forum selection clause applied to claims for deceptive business practices, conversion, unjust enrichment and breach of contract).

18

Indenture,[12] and thereby impaired the Note-Holders' interest in assets securing the Notes.    The assets in question are Common Collateral (as defined by the Intercreditor Agreement),[13] and secure not only the Notes but also notes held by more senior CEOC creditors.  Any lawsuit regarding the Note-Holders' purported rights as to Common Collateral "relat[es] to," and is therefore "subject to," the Intercreditor Agreement – including its exclusive forum selection clause.[14]

### C.    The Forum Selection Clause Requires Dismissal of Claims Against All Defendants

As incorporated by the Indenture, the forum selection clause encompasses all of WSFS' claims, not just its claims against those defendants that signed the Indenture and the accompanying Joinder and Supplement to the

---

[12]    *See Recurrent Capital*, 875 F. Supp. 2d at 310 (recognizing that claims for breach of fiduciary duty arose out of the parties' agreement, which created the fiduciary relationship); *ASDC Holdings, Inc. v. Richard Malouf 2008 All Smiles Grantor Retained Annuity Trust*, 2011 WL 4552508, at *8 (Del. Ch. Sept. 14, 2011) (same).

[13]    The Intercreditor Agreement defines "Common Collateral" as "all of the assets of any Grantor [*i.e.*, CEOC]" as to which both CEOC's first lien note-holders and second lien note-holders have a lien.  Ex. B § 1.1.

[14]    Indeed, WSFS' commencement of this action is in apparent breach of its obligations to the first lien note-holders under the Intercreditor Agreement.  The Intercreditor Agreement bars any "Second Priority Agent" or "Second Priority Secured Party" from "exercis[ing] or seek[ing] to exercise any rights or remedies . . . with respect to any Common Collateral or any other security in respect of any applicable Second Priority Claims, . . . or institut[ing] any action or proceeding with respect to such rights or remedies[,]" so long as the "Discharge of Senior Lender Claims has not occurred."  Ex. B § 3.1.

Intercreditor Agreement (CEC and CEOC).[15]  "It is well established that a 'range of transaction participants, parties and non-parties should benefit from and be subject to forum selection clauses.'" *Weingrad*, 2005 WL 2990645, at *5 (quoting *Int'l Private Satellite Partners, L.P. v. Lucky Cat Ltd.*, 975 F. Supp. 483, 485-86 (W.D.N.Y. 1997)).  A "nonparty may invoke a forum selection clause" when it either was a participant in a "global transaction" (that included the contract that includes the clause) or is "closely related" to one of the signatories, such that "enforcement of the clause is foreseeable by virtue of the relationship between them." *Freeford Ltd. v. Pendleton*, 53 A.D.3d 32, 38-39 (1st Dep't 2008); *see also Tate & Lyle Ingredients Am., Inc. v. Whitefox Techs. USA, Inc.*, 98 A.D.3d 401, 402 (1st Dep't 2012) (deeming parent company "closely related" to wholly-owned subsidiary); *Weygandt v. Weco LLC*, 2009 WL 1351808, at *5 (Del. Ch. May 14, 2009) ("[W]hen a control person agrees to a forum, it is foreseeable that the

---

[15]  Even if the Indenture did not incorporate the Intercreditor Agreement's forum selection clause, CEC and CEOC could still invoke it.  New York law "requires that all writings which form part of a single transaction and are designed to effectuate the same purpose be read together, even though they were executed on different dates and were not all between the same parties." *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998).  Relying on this principle, courts routinely allow a party involved in a dispute over one agreement to invoke a forum selection clause from a related agreement. *See Gramercy Advisors v. Coe*, 2014 WL 4197370, at *2-3 (S.D.N.Y. Aug. 25, 2014) (permitting plaintiff suing under one agreement to invoke a forum selection clause from a related agreement to which it was not a signatory); *see also Ameritrust Co. Nat'l Ass'n v. Chanslor*, 803 F. Supp. 893, 896 (S.D.N.Y. 1992) (ruling that forum selection clause in note applied to a guarantee because the two agreements were intended to be read together).

entities controlled by that person which are involved in the deal will also be bound to that forum."); *Ashall*, 992 A.2d at 1249 (ruling that officers and directors of a corporation could invoke forum selection clause applicable to the corporation, and finding that it was foreseeable that they would invoke the clause because the claims concerned performance under the agreement).

Under this standard, the Individuals can properly invoke the forum selection clause.  WSFS has alleged that the Individuals are either employees and/or directors of CEOC and/or CEC, Compl. ¶¶ 26-33, and, therefore, WSFS must concede that the Individuals are "closely related" to them.  And because WSFS is suing the Individuals for allegedly breaching duties arising out of an agreement signed by CEC and CEOC, the Individuals' invocation of the forum selection clause is not only foreseeable but also appropriate.  See *Ashall*, 992 A.2d at 1249.

Further, non-signatory defendants are able to benefit from the forum selection clause because WSFS' claims against them are interrelated with the claims against the signatory defendants.  A non-signatory may invoke a forum selection clause if the claims against it "involve the same operative facts as a parallel claim for breach of contract."  *Weingrad*, 2005 WL 2990645, at *5 (citing

*Lambert v. Kysar*, 983 F.2d 1110, 1121-22 (1st Cir. 1993)).[16]  It may also receive the benefit of a forum selection clause if its interests are "completely derivative of and directly related to, if not predicated upon, the signatory party's interests or conduct."  *Id.* (quoting *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998)).  That is the case here for non-signatories Growth, CAC, CERP, and Services:  the fraudulent transfer claims against them are identical to those against CEOC and CEC, *see* Compl. ¶¶ 155-166, and are based on the same operative facts as WSFS' breach of contract claims.  *See id.* ¶¶ 128-142.  In addition, the claims against Growth, CAC, CERP, and Services are linked with the claims against CEOC and CEC; Growth, CAC, CERP, and Service's potential liability turns, in large part, on whether the court finds that CEOC or CEC committed a fraudulent transfer.  Even then, Growth, CAC, CERP, and Services have defenses arising from the same operative facts.  As a result, all defendants here should be afforded the benefit of the forum selection clause pursuant to Delaware and New York law, and for reasons of judicial economy and consistency.

---

[16]  *Accord Chaitman v. Wolf Haldenstein Adler Freeman & Herz LLP*, 2004 WL 2471372, at *4 (S.D.N.Y. Nov. 3, 2004) (holding that non-signatories had standing to enforce arbitration clause where the plaintiff's claims against the non-signatory were "closely intertwined" with her claims against signatory defendants); *Symphony Fabrics Corp. v. Knapel*, 2008 WL 2332333, at *5 (S.D.N.Y. June 2, 2008) ("[A] non-signatory to an arbitration provision can still enforce that provision against a signatory if the claims are 'intertwined' with the agreement containing that provision.").

Even beyond the similarity of the claims against all defendants, WSFS' repeated allegation that CEC, CEOC, and their affiliates have at all relevant times been under the "common control" of CEC's majority shareholders and acted in concert in connection with the transactions at issue, *see, e.g.*, Compl. ¶¶ 1-2, 6, 180, compels the same conclusion:  all defendants may invoke the forum selection clause.  *See Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013) (holding that a non-signatory could invoke a forum selection clause where, *inter alia*, it allegedly "acted in concert" with a signatory); *Weingrad*, 2005 WL 2990645, at *5-6 (ruling that non-signatory could enforce forum selection clause where all defendants allegedly "acted in concert" and the non-signatory's interests were "derivative of and predicated on" the signatory's interests or conduct); *Gramercy*, 2014 WL 4197370, at *3 (ruling that it was "certainly 'foreseeable'" that the affiliate of a corporate signatory would seek to enforce a forum selection clause); *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 160-61 (E.D.N.Y. 2012) (noting that "a close business relationship between a signatory and non-signatory is an important factor in determining" whether the two are "closely related").  For this reason, the Indenture's incorporated forum selection clause may be invoked by those defendants as well.

Finally, in the event that this Court finds that a subset of defendants here cannot invoke this clause, this Court should nevertheless exercise its discretion to stay or dismiss this action against those defendants. Delaware courts routinely grant such relief in the interests of judicial economy, effectuating the parties' intent, and common sense, particularly where, as here, there is a parallel proceeding in a court selected by the parties with competent jurisdiction to hear and resolve all of the parties' disputes. *See, e.g.*, *RWI Acquisition LLC v. Todd*, 2012 WL 1955279, at *8-9 (Del. Ch. May 30, 2012) (staying action after determining that certain of plaintiff's claims were subject to a forum selection clause requiring suit in New Mexico); *Ashall*, 992 A.2d at 1251 (dismissing action after ruling that certain of plaintiffs' claims were subject to a clause establishing England as an exclusive venue, and noting that "bifurcating" the dispute "would result in obvious inefficiencies and confusion" and heighten the risk of "conflicting verdicts").

Accordingly, the Court should find that New York courts have exclusive jurisdiction over this dispute and dismiss all of WSFS' claims.

## II.    THIS COURT SHOULD DISMISS OR, ALTERNATIVELY, STAY THIS ACTION IN FAVOR OF THE NEW YORK ACTION

Where, as here, a parallel action involving the same parties and the same issues is pending in another jurisdiction, Delaware courts may dismiss or stay the Delaware action under a standard "akin to a *forum non conveniens* analysis." *In re Bear Stearns Cos., Inc. S'holder Litig.*, 2008 WL 959992, at *5-8 (Del. Ch. Apr. 9, 2008) (staying Delaware action in favor of contemporaneously filed action pending in another jurisdiction); *see also Azurix Corp. v. Synagro Techs., Inc.*, 2000 WL 193117, at *4 (Del. Ch. Feb. 3, 2000) (same).  In deciding motions to stay or dismiss in such circumstances, Delaware courts consider multiple factors, including (1) "the applicability of Delaware law"; (2) "the relative ease of access to proof"; (3) "the pendency or non-pendency of a similar action or actions in another jurisdiction"; and (4) "all other practical considerations that would make the trial easy, expeditious, and inexpensive."  *In re Bear Stearns*, 2008 WL 959992, at *5. Here, all of these factors favor dismissing WSFS' action or staying it during the pendency of the contemporaneously-filed, mirror image New York Action.

*First*, Delaware law is inapplicable to WSFS' core claims.  The dispute between WSFS and defendants focuses on whether CEOC and CEC's restructuring and refinancing initiatives comported with the Indenture, which governs every aspect of the relationship among CEC, CEOC, and the Note-

Holders.  *See* Compl. ¶¶ 128-54.  The parties expressly agreed that New York law governs the construction of the Indenture – along with any dispute relating to whether CEC and CEOC breached the Indenture.[17]  *See* Ex. A § 13.09.  As such, New York courts should at the very least "be afforded the edge in any analysis regarding what court is best suited to resolve this dispute."  *Azurix*, 2000 WL 193117, at *5.

WSFS' assertion of tag-along derivative claims purportedly governed by Delaware law does not enhance Delaware's interest in this lawsuit.  Indeed, Delaware law should not apply to WSFS' fraudulent transfer claims (Claims IV & V) because WSFS does not (and could not) allege that any of the properties at issue in those claims were located in Delaware, or that an entity operating in Delaware was the transferor or transferee.[18]  WSFS concedes that the properties at

---

[17]  The same is true of other agreements that were part of the same transaction.  *See* Ex. E ¶ G (Joinder and Supplement to Intercreditor Agreement); Ex. B § 8.10 (Intercreditor Agreement).

[18]  *See, e.g.*, *Kidde Indus., Inc. v. Weaver Corp.*, 1994 WL 89013, at *3, n.4 (Del. Ch. Feb. 15, 1994) (noting that courts' consideration in fraud cases of the state with "the most significant contacts to the fraud or where the fraud occurred" was "instructive" in the fraudulent conveyance context, and approvingly citing Second Circuit authority that fraudulent conveyance claims "are governed by the law of the state in which the property is located"); *see also Harbinger Capital Partners Master Fund I, Ltd. v. Granite Broad. Corp.*, 906 A.2d 218, 223 (Del. Ch. 2006) (identifying the place where the challenged closing was to occur as a relevant factor); *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 710 (2d Cir. 1991) ("A fraudulent conveyance claim is governed by the law of the state in which the property is located.").

issue are situated in Nevada, Maryland, and Louisiana and that the transferors and transferees are based in Nevada. *See, e.g.*, Compl. ¶¶ 10, 18-21, 81.

And WSFS' claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and corporate waste (Claims VI-IX), while they are governed by Delaware law, do not tilt this dispute's center of gravity away from New York.   All of those claims obviously share the same nucleus of operative facts, and allege the same injury, as WSFS' New York law claims for breach of the Indenture and breach of the implied covenant of good faith and fair dealing, and are therefore foreclosed as superfluous.   *Compare* Compl. ¶¶ 130-32 (alleging breach of the Indenture for entering into certain asset sales) *with id.* ¶¶ 173, 183 (alleging breaches of fiduciary duty for entering into the same asset sales).   *See, e.g.*, *Nemec v. Shrader,* 991 A.2d 1120, 1129 (Del. 2010) ("[W]here a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim.   In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous.").   And even if this Court were ultimately to rule (in connection with a motion brought by defendants pursuant to Chancery Rule 12(c)) that WSFS has alleged viable, independent fiduciary duty and waste claims, those

claims hardly implicate novel issues of Delaware law and a New York court is more than capable of resolving them under Delaware law.[19]

   *Second*, New York is plainly the more convenient forum in terms of proximity and ease of access to proof. None of the thirteen natural persons who is a party or who has been served with a subpoena in the Delaware case lives or works in Delaware, while by contrast several of them live and/or work in New York. Of the 42 corporate entities that are parties or have been served with subpoenas in either case, only one, WSFS, maintains a principal place of business or an office in Delaware. And WSFS, as the new trustee, is acting solely in a representative capacity. The witnesses will be the predominantly New York-based Note-Holders: WSFS is suing on behalf of 28 of the 29 non-WSFS defendants in the New York Action, 18 of which maintain a principal place of business or offices in New York or the New York metropolitan area. New York is also the principal place of business for nonparty Apollo. In addition, most of the subpoenaed nonparty financial advisors that rendered advice in connection with the challenged

---

[19]  *See In re Chambers Dev. Co., Inc. S'holders Litig.*, 1993 WL 179335, at *3 (Del. Ch. May 20, 1993) (noting that not "all actions raising fiduciary duty questions must, or should, be tried by Delaware courts"); *Schnell v. Porta Sys. Corp.*, 1994 WL 148276, at *5 (Del. Ch. Apr. 12, 1994) (staying Delaware action in favor of pending New York action and noting that "[a]t best, Delaware law would govern only one of the counts asserted . . . and the New York federal court is capable of applying the Delaware law of fiduciary duty"). *See also In re Bear Stearns*, 2008 WL 959992, at *6 (recognizing that Delaware's interest in resolving claims touching on Delaware law is reduced when the Delaware law controlling the issue is not novel but rather is based on settled doctrine).

transactions (including Centerview Partners LLC, Duff & Phelps, LLC, Evercore Partners LLC, and Valuation Research Group) are either located in New York or worked on those engagements out of their New York offices, and at least seven of WSFS' eleven non-party subpoenas were served on persons or entities who work, live, maintain offices, or maintain principal places of business in New York.   Hession Aff. ¶¶ 2-12.   All of this suggests that evidence probative of the parties' claims and defenses is likely to be found in New York and unlikely to be found in Delaware.

Moreover, New York was a focal point of the drafting and negotiation of many of the documents that embody the transactions discussed in the Complaint.   Indeed, New York-based lawyers had significant involvement in those transactions.   Many of the face-to-face negotiations for these transactions occurred in New York and Nevada, not Delaware.   *Id.* ¶ 13.   All of these facts weigh heavily in favor of dismissing or staying this action.[20]

---

[20]   *See Royal Indem. Co. v. Gen. Motors Corp.*, 2005 WL 1952933, at *9 (Del. Super. Ct. July 26, 2005) (staying Delaware action in favor of Michigan action where, *inter alia*, Delaware was "not the home of any presently known material witnesses, documents or other items of relevant proof" and where some witnesses and evidence were located in Michigan); *Tex. Instruments Inc. v. Cyrix Corp.*, 1994 WL 96983, at *4-5 (Del. Ch. Mar. 22, 1994) (staying Delaware action in favor of Texas action where, *inter alia*, "most, if not all, of the evidence relevant to [the] dispute is located in Texas[,]" "[a]lmost all of the individuals who negotiated the contract . . . live and work in Texas" and where "[n]o potential witness to [the] dispute lives or works in Delaware").

*Third*, as is apparent from the face of the respective pleadings, the New York Action is in all relevant respects the mirror image of this action, and it arises from the very same nucleus of facts.  *See* N.Y. Compl. ¶¶ 65-92, 122-46, 160 (describing the same challenged transactions and seeking a declaration that, *inter alia*, no default has occurred under the Indenture and that CEOC and CEC have not breached their fiduciary duties or engaged in fraudulent transfers in connection with those transactions).[21]  However, the New York Action also names Elliott, a first-priority senior secured note-holder that is not a party to this action.  Moreover, WSFS (as well as the Note-Holders) is a party to the New York Action and is capable of asserting each of the claims it asserts in this action as counterclaims in New York,[22] *id.* ¶¶ 23-53, and all of the defendants herein who are not yet parties to the New York Action would be amenable to appearing in New York.

This Court has recognized that the pendency of a similar action proceeding in parallel with a Delaware action – and the "risk of harm such

---

[21]   In the New York Action, CEC and CEOC assert an additional claim against a first lien CEOC note-holder (Elliott) that is not a party to WSFS' lawsuit.  *See* N.Y. Compl. ¶¶ 161-164.  This further supports the conclusion that this Court should stay or dismiss this action.  Simply put, all of the questions addressed in this action are also addressed by the New York Action, but not all of the questions addressed by the New York Action are at issue herein.  Nor are all of the parties to the New York Action parties to this action.  *See Tex. Instruments*, 1994 WL 96983, at *5 ("The weight accorded to this factor depends upon whether the two actions are 'similar,' not whether they are identical.").

[22]   That WSFS has "chosen not to seek such relief cannot prevent this factor from weighing in" Defendants' favor.  *Tex. Instruments*, 1994 WL 96983, at *5.

competing litigations would create" – is an "important factor" in considering whether to permit a Delaware action to proceed in parallel with a contemporaneously filed action in a different forum, *In re Bear Stearns*, 2008 WL 959992, at *7, especially in a situation, like here, when a forum selection clause designates a non-Delaware forum.  Indeed, duplicative proceedings are "disfavored because they waste judicial and financial resources, and because the competing proceedings create the appearance of an unseemly race to decide with a potential for inconsistent rulings." *Id.*[23]

This potential for inconsistent rulings is particularly acute, and the disruption caused by such rulings particularly severe, where, as here, the parties' dispute concerns the construction of standard commercial contract language.[24]  As Chief Justice Strine expressly noted in *Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine Partners 2006, L.P.*, 93 A.3d 1203, 1206 (Del. 2014), "[a]s a matter of public policy, . . . courts give commercial contracts that use standard language a

---

[23]  *See also Royal Indem.*, 2005 WL 1952933, at *10 (staying Delaware action in light of, *inter alia*, a similar Michigan action involving the same parties); *In re Chambers*, 1993 WL 179335, at *6-7 ("Because of the great similarities between these claims, it follows that the resolution of one will greatly simplify issues in the other.  When such similarities exist between actions, a stay may be warranted.").

[24]  These concerns are magnified here because duplicative proceedings would carry the potential to undermine CEC and CEOC's ongoing restructuring efforts.  *Cf. In re Bear Stearns*, 2008 WL 959992, at *7 (noting that the risk of inconsistent rulings was heightened by the fact that such rulings could "undermine the market's perception of the Bear Stearns rescue plan").

consistent meaning." Underscoring the importance of this policy for agreements such as note indentures, Chief Justice Strine quoted at length from the Second Circuit's decision in *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982), which states,

> "[U]niformity of interpretation is important to the efficiency of the capital markets . . . . [T]he creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets. Such uncertainties would vastly increase the risks and, therefore, the costs of borrowing with no offsetting benefits either in the capital markets or the administration of justice."

*Caspian Alpha*, 93 A.3d at 1206 n.9. For this reason, in the interest of furthering the uniform construction of indentures governed by New York law, this Court should dismiss or stay this action in favor of the New York Action.

*Finally*, this Court can and should consider "all other practical considerations that would make the trial easy, expeditious, and inexpensive[.]" *In re Bear Stearns*, 2008 WL 959992, at *8. In this context, it bears noting that, although WSFS and the corporate defendants are incorporated in Delaware, "this alone is not a sufficient contact to choose this State as a forum." *Williams Gas Supply Co. v. Apache Corp.*, 1991 WL 18091, at *3 (Del. Super. Ct. Feb. 12, 1991), *aff'd*, 594 A.2d 34 (Del. 1991). And as discussed above, while WSFS, the new Trustee and recent successor to the Minnesota-based U.S. Bank National

Association, is located in Delaware, the Note-Holders, which will be the actual beneficiaries of any recovery realized by WSFS, are not.   Hession Aff. ¶ 12. Because the New York Supreme Court is "capable of doing prompt and complete justice and" because "resolution of the [New York Action] will eliminate the need for this action or greatly simplify it, the resources of this Court will be better served by" deferring to the New York Action.  *In re Chambers*, 1993 WL 179335, at *8.

Accordingly, this Court should dismiss or, alternatively, stay this action until such time as the New York Action is fully adjudicated through appeal.

## CONCLUSION

For the foregoing reasons, defendants Caesars Entertainment Corporation, Caesars Entertainment Resort Properties, LLC, Caesars Entertainment Operating Company, Inc., Caesars Enterprise Services, LLC, Eric Hession, Gary Loveman, Jeffrey D. Benjamin, David Bonderman, Kelvin L. Davis, Marc C. Rowan, David B. Sambur, and Eric Press respectfully submit that their motion to dismiss or stay should be granted, and that they be granted such other, further, or different relief as the Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ John P. DiTomo*
Kenneth J. Nachbar (#2067)
William M. Lafferty (#2755)
John P. DiTomo (#4850)
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200

*Attorneys for Defendants Caesars Entertainment Corporation, Caesars Entertainment Resort Properties, LLC, Caesars Entertainment Operating Company, Inc., Caesars Enterprise Services, LLC, Eric Hession, Gary Loveman, Jeffrey D. Benjamin, Marc C. Rowan, David B. Sambur and Eric Press*

OF COUNSEL

Eric Seiler
Philippe Adler
Emily A. Stubbs
Jason C. Rubinstein
FRIEDMAN KAPLAN
SEILER & ADELMAN LLP
7 Times Square
New York, NY 10036
(212) 833-1100

> *Attorneys for Defendants*
> *Caesars Entertainment*
> *Corporation, Caesars*
> *Entertainment Resort*
> *Properties, LLC, Caesars*
> *Entertainment Operating*
> *Company, Inc., Caesars*
> *Enterprise Services, LLC,*
> *Eric Hession, Gary*
> *Loveman, Jeffrey D.*
> *Benjamin, Marc C. Rowan,*
> *David B. Sambur, and Eric*
> *Press*

Marc E. Kasowitz
David S. Rosner
Andrew K. Glenn
Joshua M. Greenblatt
KASOWITZ BENSON
TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

> *Attorneys for David*
> *Bonderman and Kelvin L.*
> *Davis*

September 23, 2014