**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CAESARS ENTERTAINMENT | ) | Case No. 15-10047 (KG) |
| OPERATING COMPANY, INC., | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | **Re: Dkt. Nos. 26, 35 and 220** |

**OPINION RE DETERMINATION PURSUANT TO FEDERAL RULE
OF BANKRUPTCY PROCEDURE 1014(b) AS TO THE DISTRICT IN
WHICH THE DEBTOR'S BANKRUPTCY CASES SHALL PROCEED[1]**

Wilmington, Delaware
February 2, 2015

---

[1]    The Court is issuing its written opinion based on an oral ruling provided to the parties on January 28, 2015.  The Court has entered an Order giving effect to its ruling. D.I. 220.

Before the Court is the Petitioning Creditors' (defined below) motion seeking a determination pursuant to Federal Rule of Bankruptcy Procedure 1014(b) as to the venue in which the bankruptcy proceedings of Caesars Entertainment Operating Company, Inc. (the "Debtor" or "CEOC") shall proceed. The choices presented to the Court are this District, in which the Debtor is incorporated and where, on January 12, 2015, the Petitioning Creditors initiated an involuntary bankruptcy proceeding pursuant to Section 303 of the Bankruptcy Code,[2] or the United States Bankruptcy Court for the Northern District of Illinois (the "Illinois Court"), where the Debtor and certain of its affiliates three days later initiated a voluntary bankruptcy proceeding. For the reasons set forth below, the Court has determined that the Debtor's bankruptcy proceedings shall proceed in the Illinois Court.

## JURISDICTION

The Court has jurisdiction over this matter and the judicial authority to issue a final order pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

The facts underlying this dispute are both undisputed and relatively straight forward. The Debtor is the main operating subsidiary of Caesars Entertainment Corporation ("CEC"). CEC, together with the Debtor and other of its affiliates

---

[2] 11 U.S.C. § 101 *et seq.*

(collectively, "Caesars") is one of the world's largest casino-entertainment companies. Caesars, founded more than 75 years ago in Reno, Nevada, now owns, operates, or manages 50 casinos in fourteen states and four foreign countries. The Debtor owns, operates, or manages 38 casinos in fourteen states and four foreign countries, primarily under the Caesars, Harrahs, and Horseshoe brand names. The Debtor and its subsidiaries contributed $5.4 billion of the $8.4 billion in total Caesars revenues for the twelve months ending September 30, 2014, and employs 32,000 of the 68,000 Caesars employees.

In early 2008, Apollo Global Management, TPG Capital, and certain of their affiliates and co-investors (collectively, the "Sponsors") acquired Caesars (then known as "Harrah's Entertainment, Inc.") in one of the largest leveraged buyouts in history (the "2008 LBO"). The Sponsors contributed approximately $6.1 billion of Caesars' $30.7 billion purchase price in cash, the rest of which was funded through the issuance of more than $24 billion in debt. Since the consummation of the 2008 LBO, a number of economic factors and industry trends, many a product of the 2008 global recession, have left Caesars unable to service its debt load and limited its ability to address certain capital and operational deficiencies.

In the years preceding the Debtor's bankruptcy filing, Caesars engaged in a series of what the Debtor itself describes as "controversial" transactions, including asset sales, exchange and tender offers, debt repurchases, and re-financings, with the stated

purpose of extending the Debtor's liquidity runway (the "Disputed Transactions").[3] A full listing and description of the Disputed Transactions is not necessary to the resolution of the matter before the Court, but the ultimate result of the transactions is that a significant portion of the Debtor's assets were "sold" to CEC or some other non-debtor affiliate in the years leading up to the Debtor's bankruptcy filing. In June 2014, the Debtors appointed two independent directors to its board and formed a Special Governance Committee (the "Special Committee") which was charged, among other things, with conducting an independent investigation into the Disputed Transactions. The Special Committed ultimately concluded that the Debtor would require a "significant contribution" from CEC and its non-debtor affiliates in order to settle any claims arising from the Disputed Transactions.

Between August and December 2014, noteholders (either individually or through an indenture trustee) initiated four lawsuits, two in the Delaware Court of Chancery and two in the United States District Court for the Southern District of New York, generally accusing CEC, the Sponsors and other of the Debtor's non-debtor affiliates of fraudulently stripping the debtor of valuable assets and cash while leaving the Debtor burdened with an unsustainable debt load of approximately $18 billion (the "Pre-Petition Lawsuits").[4]

---

[3] A list and short description of these transactions is found in the Debtor's Memorandum in Support of Chapter 11 Petitions (D.I. 36-1 at 6-7) and the Petitioning Creditors' Motion for Appointment of Examiner (D.I. 10 at 2-4).

[4] A listing of the lawsuits is found in the Petitioning Creditors' Motion for Appointment of Examiner (D.I. 10 at 4).

Even after the consummation of the Disputed Transactions, the Debtor remained overleveraged, with 2014 EBITDA projected to be approximately $1 billion compared to a debt load of approximately $18 billion. Accordingly, in late 2014 the Debtor, recognizing the need for a more comprehensive restructuring, set on a course of negotiating a consensual or "pre-packaged" bankruptcy filing with certain key creditor constituencies, namely the First Lien Bank Lenders (defined below) and the First Lien Noteholders (defined below). The Debtor made a number of public disclosures regarding the negotiations over the course of the negotiations. After months of negotiations, the Debtors ultimately executed and publicly disclosed the Restructuring Support and Forbearance Agreement (the "RSA"), originally dated December 19, 2014, with the support of 38% of the First Lien Noteholders.

Under the terms of the RSA the Debtor would reorganize into a real estate investment trust, receive what the Debtor describes as a $1.5 billion contribution from CEC in return for releases of CEC and other third parties, provide a 100% recovery for the First Lien Bank Lenders, provide a 92% recovery for the First Lien Noteholders, and provide what the Petitioning Creditors have characterized as a 10-12% recovery for more junior creditors. The RSA also contains various deadlines for, among other things, assumption of the RSA, approval of a disclosure statement, and plan confirmation. The RSA would reduce the Debtor's debt load by approximately $10 billion and annual interest costs by approximately $1.25 billion. The RSA required the Debtor to file a voluntary bankruptcy petition after January 15, 2015 but before January 20, 2015. The RSA did not require the Debtor to file its voluntary bankruptcy in a specific judicial

district and the Debtor did not publicly disclose the district in which it intended to file its voluntary bankruptcy petition prior to the Petition Date (defined below). Prior to the Petition Date, a sufficient percentage of the First Lien Noteholders had signed on to the RSA to make it effective as to that class of creditors.

On January 7, 2015, certain news outlets reported that the Debtor would possibly file its voluntary bankruptcy petition in the Illinois Court. On January 12, 2015 (the "Petition Date"), Appaloosa Investment Limited Partnership I, OCM Opportunities Fund VI, LP, and Special Value Expansion Fund, LLC (collectively, the "Petitioning Creditors") initiated an involuntary bankruptcy proceeding (the "Involuntary Case") in this Court pursuant to Section 303 of the Bankruptcy Code. The Petitioning Creditors are among the Second Lien Noteholders (defined below). On January 14, 2015, the Petitioning Creditors filed a motion with this Court seeking a determination pursuant to Rule 1014(b) that all CEOC bankruptcy proceedings proceed before this Court (the "Initial Venue Motion"), stating their belief that CEOC intended to initiate a voluntary bankruptcy proceeding before the Illinois Court on or after January 15, 2015 (D.I. 26). The Court denied the Venue Motion without prejudice, pending the actual filing of CEOC's voluntary petition in the Illinois Court (D.I. 30).

On January 15, 2015, CEOC and 172 of its direct or indirect subsidiaries (the "Illinois Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Voluntary Case") in the Illinois Court. Also on January 15, 2015, the Petitioning Creditors filed a motion with this Court renewing the Initial Venue Motion (together with the Initial Venue Motion, the "Venue Motion") and seeking a

6

determination that both the Voluntary and Involuntary Cases shall proceed before this Court (D.I. 35). The Debtor filed an objection to the Venue Motion, arguing that the cases should proceed before the Illinois Court (D.I. 40). The Court held a hearing on January 15, 2015, after which, pursuant to Rule 1014(b), it stayed all proceedings in the Voluntary Case, except for motions seeking limited first-day relief, pending a determination of the venue in which the Voluntary and Involuntary Cases should proceed (D.I. 47).[5] The Court further set a briefing schedule with respect to the Venue Motion and the Debtor's objection thereto and scheduled an evidentiary hearing on the Venue Motion for January 26 and 27, 2015.

On January 23, 2015, the Debtor and Petitioning Creditors filed their briefs arguing that the Debtor's case should proceed in their chosen forum. Additionally, the First Lien Bondholders filed a joinder to the Debtor's brief, arguing that the cases should proceed in the Illinois Court while creditors representing portions of the rest of the Debtor's capital structure (outlined below) and a substantial majority of the Debtor's total debt filed joinders to the Venue Motion and Petitioning Creditors' brief, arguing that the cases should proceed before this Court.[6] The Court held a two-day evidentiary hearing on the Venue Motion on January 26 and 27, 2015 (the "Venue Hearing"). The

---

[5] As noted by the Court during the January 15, 2015 hearing, it is beyond peradventure that the two CEOC bankruptcy cases may not proceed in parallel in separate courts. Hr'g Tr. 77, January 15, 2015 ("two cases for one debtor represents inherent harm").

[6] Unless otherwise indicated, all references to the Debtor or Petitioning Creditors below shall include the joiner parties supporting their respective positions as to venue.

following additional facts, introduced at trial or in related filings, are relevant to the Court's decision.

The Debtor's capital structure as of the Petition Date, a legacy of the 2008 LBO, consists of approximately $18 billion in funded debt obligations and is summarized as follows:

- Four tranches of first lien bank debt totaling approximately $5.35 billion (the "First Lien Bank Lenders")

- Three series of outstanding first lien notes totaling approximately $6.35 billion (the "First Lien Noteholders")

- Three series of outstanding second lien notes totaling approximately $5.24 billion (the "Second Lien Noteholders")

- One series of outstanding subsidiary-guaranteed unsecured debt of approximately $479 million

- Two series of senior unsecured notes totaling approximately $530 million

As referenced above, under the terms of the RSA the First Lien Bank Lenders and First Lien Noteholders are scheduled to receive 100% and 92% recoveries, respectively, while the Second Lien Noteholders (including the Petitioning Creditors), as well as the more junior creditors, are scheduled to receive what the Petitioning Creditors have characterized as a 10-12% recovery.

As of the Petition Date, over 80% of the First Lien Noteholders and approximately 15% of the First Lien Bank Lenders had signed on to the RSA. Under the terms of the RSA, it is effective only as to the First Lien Noteholders, as an insufficient

percentage of the First Lien Bank Lenders have signed on to make the RSA effective as to that class of creditors. The First Lien Noteholders received a substantial commitment fee for signing on to the RSA. Under the terms of the RSA the First Lien Noteholders are essentially required to support all decisions made by the Debtor, including its decision as to venue for the Voluntary Case.

The Debtor stated in its briefing prior to the Venue Hearing that it selected the Illinois Court because Chicago is conveniently located at the center of the its operations and because of favorable legal precedents in the Seventh Circuit regarding the assumption of executory contracts and third-party releases (as they relate to a plan of reorganization). John W.R. Payne, the Debtor's chief executive officer, and Randall S. Eisenberg, the Debtor's chief restructuring officer, both testified at the Venue Hearing. Neither Mr. Payne nor Mr. Eisenberg was consulted with respect to venue for the Voluntary Case prior to its filing, but both were made aware of the reasons for selecting the Illinois Court after the fact and confirmed that the main reasons were Chicago's central location and Seventh Circuit law regarding the assumption of executory contracts and third-party releases. Mr. Payne further testified that were the case to proceed before the Court, the executory contract issue could negatively impact the Debtor's yearly EBITDA by as much as $40 million.

Evidence introduced at the Venue Hearing demonstrated that the Debtor's creditors and their professionals are spread throughout the country, with a plurality residing in New York City. The Debtor's management team is likewise spread across the country with a majority residing in Las Vegas, Nevada. The Debtor's books and

records are located in Las Vegas, Nevada as well but electronically accessible from anywhere in the United States.

The Debtor's assets and operations are spread across the country, with concentrations in Nevada, the Midwest, and the mid-Atlantic. The Debtor is headquartered in Las Vegas, Nevada. The Debtor frequently described "Chicagoland" as a "focal point" or "hub" of operations. The Debtor owns one casino in Joliet, Illinois, approximately 45 miles from downtown Chicago, and another casino in Hammond Indiana, approximately 20 miles from downtown Chicago. The Petitioning Creditors vigorously contested the Debtor's characterization of Chicago as a hub of its operations, pointing to more significant concentrations of assets and operations in other locales, particularly in the mid-Atlantic region, noting that the Debtor owns three casinos: in Atlantic City, New Jersey, and near Philadelphia, Pennsylvania. A region-by-region comparison of Debtor's operations is not necessary to the resolution of this matter, and it is sufficient to note that the Debtor has far more significant concentrations of assets and operations in regions other than Chicago, including, for example, Nevada and Atlantic City/Philadelphia, and has not historically regarded Chicago as an operational hub or regional headquarters. Finally, the Debtor's professionals are located predominantly in Chicago and New York City.

At the conclusion of the Venue Hearing, the Court took the matter under advisement. On January 28, 2015, based on the need for a speedy resolution to the Venue Motion so that the cases could proceed in earnest, the Court issued an oral ruling and entered an order determining that the Voluntary and Involuntary Cases shall

proceed in the Illinois Court (D.I. 220, 223). The Court further indicated that it would

issue this written opinion forthwith.

## ANALYSIS

The venue analysis begins with reference to the applicable statutes and rules. The

bankruptcy venue statute, 28 U.S.C. § 1408, provides that:

> [A] case under title 11 may be commenced in the district
> court for the district—
>
> > (1) in which the domicile, residence, principal place of
> > business in the United States, or principal assets in the
> > United States, of the person or entity that is the
> > subject of such case have been located for the one
> > hundred and eighty days immediately preceding
> > such commencement . . . ; or
> >
> > (2) in which there is pending a case under title 11
> > concerning such person's affiliate, general partner, or
> > partnership.

As the Debtor is incorporated under the laws of the State of Delaware, venue for the

Involuntary Case is proper in this Court pursuant to Section 1408(1). Venue for the

Voluntary Case is likewise proper in the Illinois Court pursuant to Section 1408(2) since

at least one of the Illinois Debtors is incorporated under the laws of the State of Illinois

and filed its voluntary bankruptcy petition prior to any of the Illinois Debtors which are

not incorporated in Illinois.

A sister provision to Section 1408, 28 U.S.C. § 1412, provides that the Court "may

transfer a case or proceeding under title 11 to a district court for another district, in the

interest of justice or for the convenience of the parties." While Section 1412 does not

directly address the circumstances before the Court, *i.e.* two bankruptcy petitions

pending against the same debtor in different jurisdictions, Rule 1014(b) provides more precise guidance:

> *Procedure when petitions involving the same debtor or related debtors are filed in different courts.* If petitions commencing cases under the Code or seeking recognition under chapter 15 are filed in different districts by, regarding, or against (1) the same debtor, (2) a partnership and one or more of its general partners, (3) two or more general partners, or (4) a debtor and an affiliate, *the court in the district in which the first-filed petition is pending may determine, in the interest of justice or for the convenience of the parties, the district or districts in which any of the cases should proceed.* . . .

(emphasis added). In short, under Sections 1408 and 1412 and Rule 1014, the Voluntary and Involuntary Cases *may* proceed before either this Court or the Illinois Court. It is up to this Court, as the court in which the first-filed bankruptcy petition is pending, to make the determination pursuant to Rule 1014(b) as to the jurisdiction in which the Voluntary and Involuntary Cases *should* proceed. "The decision of whether to transfer venue is within the court's discretion based on an individualized case-by-case analysis of convenience and fairness." *In re Enron Corp.*, 274 B.R. 327, 342 (Bankr. S.D.N.Y. 2002) (citing cases); *In re Patriot Coal Corp.*, 482 B.R. 718, 739 (Bankr. S.D.N.Y. 2012). The decision to determine venue pursuant to Rule 1014(b) likewise lies within the Court's sound discretion.

Rule 1014(b), tracking the language of Section 1412, sets forth a flexible, dual-track test in which the Court may determine the venue in which the Voluntary and Voluntary Cases should proceed based on (1) the interest of justice *or* (2) the convenience of the parties. "It has been observed that § 1412 is . . . written in the

disjunctive, making transfer of venue appropriate *either* in the interest of justice *or* for the convenience of the parties, and that this statutory provision creates two distinct analytical bases upon which transfer of venue may be grounded." *In re Qualteq, Inc.*, No. 11-12572, 2012 WL 527669, at *6 (Bankr. D. Del. Feb. 16, 2012) (emphasis in original). For the reasons set forth below, the Court finds that the interest of justice narrowly supports a determination that the Voluntary and Involuntary Cases should proceed before the Illinois Court.

### A.   Burden of Proof

As a preliminary matter, the Court observes that it is not entirely clear which party, if any, bears the burden of proof with respect to the present inquiry. Rule 1014(b) is silent on the subject. In a traditional Section 1412 analysis, *i.e.* where a debtor initiates a voluntary bankruptcy proceeding and a party in interest moves to transfer venue, the burden is on the movant to demonstrate that the court should transfer the case in the interest of justice or for the convenience of the parties. Here, the Petitioning Creditors filed the Venue Motion but argue that since the Involuntary Case was filed prior to the Voluntary Case, the burden is on the Debtor to demonstrate that the cases should proceed before the Illinois Court. In support of their argument, the Petitioning Creditors direct the Court's attention to *In re Triton Chem. Corp.*, 46 F. Supp. 326, 328 (D. Del. 1942), a case decided under the Bankruptcy Act in which the court was addressing concurrently pending involuntary bankruptcy petitions. In response the Debtor points out that the Petitioning Creditors are the movants, and would thus generally bear the burden of proof, and suggested that *Triton* is both dated and factually distinguishable.

The Court observes that the Venue Motion seeks a *determination* as to venue as opposed to a *transfer* of venue and that Rule 1014(b) states that "*the court* in the district in which the first-filed petition is pending *may determine* . . . ." (emphasis added). This wording seems to suggest that the burden is, in a manner of speaking, on the Court to determine the venue in which the cases should proceed. Ultimately, this issue is best viewed in terms of deference as opposed to burden of proof. Both the Debtor and Petitioning Creditors argue, as discussed in more detail below, that their respective choices of forum are entitled to deference. If the Court finds that the Debtor's choice of forum is entitled to deference, as a practical matter the Petitioning Creditors bear a burden to overcome that deference, much as they would as the movants in a traditional Section 1412 transfer analysis, and *vice versa*. For the reasons set forth below, the Court finds that the Debtor's choice of forum is entitled to sufficient deference to support a determination that the Voluntary and Involuntary Cases should, in the interest of justice, proceed before the Illinois Court.

### B.    Convenience of the Parties

Although the Court's determination ultimately turns on Rule 1014(b)'s interest of justice prong, a brief discussion of the Rule 1014(b)'s convenience of the parties prong is warranted. When considering the convenience of the parties for purposes of transfer of venue, either under Section 1412 or Rule 1014(b), courts often look to the factors set forth in the United States Court of Appeals for the Fifth Circuit's *CORCO* decision. These factors include:

(1) The proximity of creditors of every kind to the Court;

(2) The proximity of the debtor to the Court;

(3) The proximity of the witnesses necessary to the administration of the estate;

(4) The location of the assets; and

(5) The economic administration of the estate.[7]

*Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co.* (*In re Commonwealth Oil Refining Co.*), 596 F.2d 1239, 1247 (5th Cir. 1979) ("*CORCO*"). *Accord Enron*, 274 B.R. at 343; *In re Innovative Commc'n Co.*, 358 B.R. 120, 126 (Bankr. D. Del. 2006).

Given the sheer magnitude of the Debtor's debts, the geographical diversity of its creditors comes as no surprise to the Court. The Debtor's management team is likewise spread across the United States. In the *CORCO* convenience analysis, courts often focus more closely of the location of the debtors' and creditors' professionals. *See, e.g., Enron*, 274 B.R. at 347-349. In this case, the professionals are located throughout the United States. The Debtor's books and records are electronically accessible from anywhere in the United States. While the parties spent a significant amount of time debating flight times and frequencies, as well as the availability of travel by train, the Court is not convinced that in this modern age of travel and communication, this District is significantly more or less accessible or convenient for the various parties in interest and their professionals than the Illinois Court.

---

[7] The parties agree that the sixth *CORCO* factor, "[t]he necessity for ancillary administration if liquidation should result," is inapplicable here. Further, courts, including the *CORCO* court itself, routinely discount the importance of the sixth *CORCO* factor. *See Enron*, 274 B.R. at 343 n.11, 349; *CORCO*, 596 F.2d at 1248 ("anticipation of the failure of the Chapter XI proceeding is an illogical basis upon which to predicate a transfer.").

The Court recognizes that a substantial majority of the Debtor's creditors have voiced their preference with respect to venue in favor of this Court, a factor some courts take into consideration in the *CORCO* analysis. *See, e.g.*, *Enron*, 274 B.R. at 345 (citing cases). But, the Debtor and First Lien Noteholders[8] have voiced their venue preference in favor of the Illinois Court and, in any event, venue is not determined by popular vote under Rule 1014(b). Ultimately, for the reasons set forth below the Court will, in the interest of justice, defer to the Debtor's venue preference.

The Debtor and Petitioning Creditors also spent a significant portion of the Venue Hearing discussing the distribution of the Debtor's assets and operations as they relate to venue. The Debtors frequently touted the significance of their Chicagoland operations while the Petitioning Creditors pointed to the Debtor's more significant assets in operations located, while not within the borders of the state of Delaware, in close proximity to this Court. The RSA clearly contemplates a "balance sheet restructuring" as opposed to any sort of significant asset sale or operational restructuring. "The location of the assets is not as important where the ultimate goal is rehabilitation rather than liquidation." *Enron*, 274 B.R. at 347 (citing *CORCO*, 596 F.2d at 1248). *Accord Patriot Coal*, 482 B.R. at 753-54.

Even if the location of the Debtor's assets and operations were important to the Court's analysis, the distribution of the Debtor's businesses does not strongly favor this Court over the Illinois Court, or *vice versa*. The information and evidence the parties

---

[8] The Court notes that the First Lien Noteholders are required to support the Debtor's position with respect to venue under the terms of the RSA and were paid a substantial commitment fee to sign the RSA.

amassed comparing gaming square feet, number of gaming tables, number of hotel rooms, number of employees, and earnings at the various casinos does not inform the Court's decision. The Court could readily apply the facts to support a finding on either side of the venue ledger. Were the United States Bankruptcy Court for the District of Nevada under consideration, the Court may very well find the balance tipping in its favor, but the Nevada Court is not under consideration. Thus, the Court concludes that the location of the Debtor's assets and operations is not determinative in this venue dispute.

Ultimately, the most important of the *CORCO* factors is the economic and efficient administration of the Debtor's estate. *Enron*, 274 B.R. at 348; *CORCO*, 596 F.2d at 1247; *Qualteq*, 2012 WL 527669, at *6. The ability of the Court and the Illinois Court to administer the Debtor's bankruptcy cases in a just and efficient manner is equal and no party suggested otherwise.  Further, in this day of law firms with multiple offices across the nation, convenient and accessible airports, electronic access to information and court dockets and every lawyer's fingertips, it is fair to say that both this Court and the Illinois Court are convenient forums for purposes of the *CORCO* analysis. At the very least, this Court and the Illinois Court are on balance equally convenient to the lawyers and professionals who represent the key constituencies in the Debtor's bankruptcy cases and who regularly travel wherever their busy caseloads take them. Simply put, the *CORCO* convenience factors are a "push" and do not factor into the Court's decision.

C.    <u>Interest of Justice</u>

"The 'interest of justice' component of Section 1412 is a broad and flexible standard which must be applied on a case-by-case basis. It contemplates a consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness . . . ." *Patriot Coal*, 482 B.R. at 739 (citing *Gulf States Exploration Co. v. Manville Forest Prods. Corp.* (*In re Manville Forest Prods. Corp.*), 896 F.2d 1384, 1391 (2d Cir. 1990)). This matter ultimately boils down to whether the Court will defer to the Debtor's or Petitioning Creditors' judgment with respect to choice of venue. For the reasons set forth below, in the unique circumstances of this case, the Court finds that the Debtor's judgment with respect to the venue in which it will best be able to reorganize its affairs is entitled to just enough deference to permit it to proceed in its chosen forum.

Courts have consistently commented that the debtor's choice of forum is entitled to a certain level of deference if venue is proper under Section 1408. *See, e.g.*, *Enron*, 274 B.R. at 342 ("A debtor's choice of forum is entitled to great weight if venue is proper."); *Patriot Coal*, 482 B.R. at 739 (same); *In re Rehoboth Hospitality, LP*, No. 11-12798, 2011 WL 5024267, at *3 (Bankr. D. Del. Oct. 19, 2011) ("Generally, there is a presumption in favor of maintaining the debtor's choice of forum."). In *Enron*, though, as well as the other cases cited by the Debtor for this proposition, the courts were addressing a motion to transfer venue of a voluntary bankruptcy proceeding where there was no proceeding, voluntary or involuntary, pending in another district. The level of deference a debtor's

choice of forum is entitled to is less clear in the situation where an involuntary bankruptcy petition was filed against the debtor in a different venue prior to the debtor filing its voluntary petition. The Court is mindful of the fact that it has not yet entered an order for relief with respect to the Involuntary Case, but the fact remains that the Petitioning Creditors filed the Involuntary Case prior to the Debtor filing its voluntary petition in the Illinois Court and a substantial majority of creditors support the Petitioning Creditors' choice of forum. While the Court ultimately concludes that the Debtor's choice of forum is entitled to deference, it has more closely scrutinized that choice than it would in a traditional Section 1412 analysis, as conducted in *Enron*.

The Petitioning Creditors argue that they are entitled to deference with respect to their choice of forum based on the fact that they initiated the Involuntary Case prior to the Voluntary Case. In support of this proposition the Petitioning Creditors direct the Court's attention to the judicially-created "first-filed" rule, commonly applied in situations where there is concurrent civil litigation pending with respect to the same dispute. *See E.E.O.C. v. Univ. of Pennsylvania*, 850 F.2d 969, 971-72 (3d Cir. 1988) ("The first-filed rule encourages sound judicial administration and promotes comity among federal courts of equal rank. It gives a court 'the power' to enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court."). The Debtor counters that the first-filed rule is inapplicable to a collective proceeding such as bankruptcy and even if the rule were to apply in the context of parallel bankruptcy proceedings, the "anticipatory filing" exception to the rule applies as well. The anticipatory filing exception to the first-filed

rule applies "when the first-filing party instituted suit in one forum in anticipation of the opposing party's imminent suit in another, less favorable, forum." *Id.* at 976.

The Court acknowledges that the Petitioning Creditors filed first in this District and that they are strongly supported in their choice of forum by the First Lien Bank Lenders and other junior creditors. But to the extent some form of the first-filed rules applies to parallel bankruptcy proceedings at all, the Involuntary Case was clearly an anticipatory filing. The Court finds that the Petitioning Creditors were aware prior to the Petition Date that the Debtor was planning an imminent voluntary filing in the Illinois Court and with that knowledge made sure to win the race to the courthouse. The Court recognizes that rewarding the Petitioning Creditors' preemptive filing in another forum would set a bad precedent for future bankruptcy cases and limit the ability of future debtors to openly negotiate with creditors prior to filing a voluntary bankruptcy petition. It is contrary to the interest of justice to favor the Petitioning Creditors in such a scenario.

The Debtor also demonstrated that its decision to file in the Illinois Court rather than this Court was premised on their analysis of different applications of the law in the judicial circuits in which this Court and the Illinois Court operate and that those differences could benefit the Debtor's reorganization efforts. Whether the Debtor is correct in its analysis remains to be seen, but the Debtor did provide sufficient justification for its choice of forum. The Court is simply not able, based on the limited record before it, to evaluate the fairness of the Debtor's decision-making process, even though the Debtor's pre-petition behavior would seem to indicate that the decision to

file the Voluntary Case in the Illinois Court was made for the benefit of non-debtor insiders. But, importantly, the Illinois Court and the learned Judge assigned to the case are certainly no less capable and no less available to restrain the Debtor from breaching its duties and preventing fraud.

The Court also readily recognizes that the Debtor's conduct leading up to the filing of the Voluntary Case is, on its face, suspect. There are serious allegations, raised both by the Petitioning Creditors in their involuntary petition and the plaintiffs in the Pre-Petition Lawsuits, that the Sponsors engaged in a series of self-dealing transactions resulting in the fraudulent transfer of very substantial assets out of the reach of the Debtor's creditors. Indeed, the United States District Court for the Southern District of New York held recently that the plaintiffs in one of the Pre-Petition Lawsuits stated a claim sufficient to survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Meehancombs Global Credit Opportunities Funds, LP v. Caesars Entertainment Corp.*, No. 14-cv-7091, 2015 WL 221055, at *8 (S.D.N.Y. Jan. 15, 2015). The plaintiffs in the *Meehancombs* litigation alleged that in a transaction completed in August 2014, the Debtor stripped the plaintiffs, holders of notes issued by the Debtor and guaranteed by CEC, of their guarantees through payment to certain favored noteholders in violation of the Trust Indenture Act of 1939, as amended.  15 U.S.C. §§ 77aaa to 77 bbbb. *Id.* at *4-5.

The *Meehancombs* court also found that the plaintiffs stated a claim sufficient to survive a Rule 12(b)(6) motion to dismiss that CEC was effectuating an out-of-court debt restructuring of exactly the kind the Trust Indenture Act is designed to prevent. *Id.*

21

at *5. The Debtor is now engaged in a restructuring based, in part, on the August 2014 transaction that was the subject of the *Meehancombs* decision. The Court is confident that the Illinois Court will, every bit as much as this Court would, view the allegations of the Debtor's pre-petition conduct with care and concern and afford the Petitioning Creditors every opportunity to bring to light the facts surrounding the Disputed Transactions. The Court is also confident that its decision that the Debtor's bankruptcy cases should proceed before the Illinois Court in no way reduces the opportunity for the Petitioning Creditors and other junior creditors to obtain appropriate relief.[9] The Illinois Court is, of course, fully capable of recognizing, to the extent they exist, breaches of fiduciary duty and fraudulent activity.

In the final analysis, in an unprecedented struggle over the venue in which the Debtor's bankruptcy cases should proceed, the Court finds that the Debtor's choice of forum is entitled to just enough deference to support a finding that, in the interest of justice, the Voluntary and Involuntary Cases should proceed before the Illinois Court. The Court's decision in no way affects the Petitioning Creditors substantive rights with respect to the continued prosecution of the Involuntary Case in the Illinois Court.

---

[9]    It requires minimal conjecture to understand that the Petitioning Creditors filed the Involuntary Case when they did to capture a preference.  Conversely, the Debtor waited to file the Voluntary Case to protect the preference from avoidance.  The Illinois Court will determine the validity of the Involuntary Case and its decision will set the petition date.

**CONCLUSION**

As observed by Judge Chapman in her Patriot Coal decision:

> [A] chapter 11 proceeding is not a two-party dispute. . . . It is not "us v. them." It is a collective proceeding in which the Bankruptcy Court is charged with applying the Bankruptcy Code and other applicable law to achieve the overarching goal of chapter 11—to maximize the value of the Debtors' estates for the benefit of all stakeholders and guide the Debtors, if at all possible, through chapter 11 and beyond to emergence as a stronger company, financially and operationally.

*Patriot Coal*, 482 B.R. at 722. As in *Patriot Coal*, the Court's decision here serves merely to "determine which bankruptcy court will have that privilege and responsibility." *Id*. For the reasons set forth above, the Court has determined that the Voluntary and Involuntary Cases shall proceed before the Illinois Court. With the venue issue resolved, it is incumbent on all stakeholders in these cases to invest themselves in the serious business of rehabilitating the Debtor. Their approach to the cases will determine whether the cases achieve an outcome which benefits all parties, or the cases become mired in years of contentious and costly impasse.

KEVIN GROSS, U.S.B.J.

23